UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

No. 6:09-CR-16-DCR
UNITED STATES OF AMERICA                                                    PLAINTIFF


V.                            STATEMENT OF REASONS AND
                              FINDINGS RELATED TO DETENTION


RUSSELL CLETUS MARICLE                                                      DEFENDANT

* * * * * * *

The Court considers a motion for detention filed by the United States against Defendant

Russell Cletus Maricle.   The Government moved at arraignment to detain Defendant, who faces

four counts under a pending federal indictment.  The Indictment charges Maricle, the Clay Circuit

Judge from the early 1990s to 2007, with leading a RICO conspiracy involving the Clay County

Board of Elections (Count 1–18 U.S.C. § 1962(d)), obstruction of justice (Count 7–18 U.S.C. §§

1503 & 2), conspiracy to injure and oppress qualified voters in the exercise of federal voting rights

(Count 9–18 U.S.C. § 241), and conspiracy to buy votes (Count 10–18 U.S.C. § 371/42 U.S.C. §

1973i).  The election-related counts address, in whole or part, alleged conduct from the 2002-2006

elections, and the obstruction count asserts conduct from May of 2007 involving a witness before

the federal grand jury in this District.

None of the charges fits within 18 U.S.C. § 3142(f)(1), and the Government sought a

detention hearing via 18 U.S.C. § 3142(f)(2)(A) & (B).  At the arraignment, the United States

established, by a preponderance of the evidence, that the case involved a "serious risk" that

Defendant would flee or would obstruct or attempt to obstruct justice as formulated under (f)(2).
*See, e.g., United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988)(detailing "two-step inquiry" and requiring that United States justify basis for a detention hearing "by a preponderance of the evidence"); *United States v. Marbley*, No. IP 05-0314M-01, 2006 WL 559272, at *2 (S.D. Ind. Jan. 30, 2006)(holding that Court must find one of the "six conditions" that "trigger[] the detention hearing . . . by a preponderance").

The United States effectively argued by combining the indicted conduct along with a proffer concerning the bases and substantiation of the charges and further detailing alleged efforts by Maricle to learn the home addresses and other personal identifying information of federal agents involved in the case. The Government also characterized Maricle's asset status and mental health history as increasing risks both that he may flee and that he may be subject to unpredictable conduct, all when facing allegations of this gravity. The Court, after noting the propriety of a detailed proffer under § 3142 and the threshold context of the inquiry, found a hearing warranted under (f)(2)(A) and (B).

As such, the Court granted a hearing in accordance with the dictates of the Bail Reform Act. The United States moved for a continuance.[1] The Court continued the hearing only one business day, at Defendant's request, and conducted the hearing on March 23, 2009.

At the hearing, the Court assured that both parties had received the PSR and were ready to

---

[1]

Generally, the language of the Act permits a continuance on the request of either party. The Court believes that a continuance of some length is automatic, if sought. *See United States v. Williams*, No. 92-8408, 1993 WL 310286, at *1 n.4 (5th Cir. May 6, 1993)(describing initial delay upon motion as "automatic").

proceed.  New counsel[2] appeared for Defendant, and both new and existing counsel declared Defendant ready, as did Maricle himself.  Proof and argument ensued.

The United States offered testimony from FBI SA Briggs and from witness Kenny Day.  The defense cross-examined Briggs but asked Day no questions.  Curiously, the defense offered no evidence on the suitability of release.  Both sides made argument to the Court.  The United States marshaled the § 3142(g) factors and advocated for detention.  The defense opposed, summarily rejected the Government's showing, and expressed a willingness to accept **any** release condition that would avoid detention.

The Court will not rehearse the entirety of the lengthy hearing, but does summarize the important elements presented:

*SA Briggs*

FBI SA Briggs testified in detail about the investigation at issue, including the evidence supporting the indicted charges.  Briggs indicated the following:

–The United States utilized cooperating witnesses (CWs) in the underlying investigation, and the overall case involves over 100 witnesses.  The Government alleges that over 30 audio recordings (half involving Defendant) corroborate the conduct recited in the Indictment.  Briggs has heard those recordings and confirmed the content as inculpatory.  Further, as to election fraud, Briggs pointed to statistical abnormalities in Clay County absentee vote totals during the period of the charged conspiracies.  Briggs further, in corroboration, cited to admissions by conspiracy participants, including plea statements under oath before the District Court at least as to one already-convicted defendant.

---

[2]

New counsel appeared because the United States had raised, at arraignment, a potential issue concerning possible disqualification of defense counsel, Hon. Mark Wohlander.  The Court directed prompt filing of any formal motion, and the United States did file in advance of the hearing.  That matter now is pending.  The defense did not seek a continuance of the detention hearing and determined to forge ahead under the direction of Hon. Henry Hughes, who made an appearance for Defendant on the day of the hearing.

–As to the obstruction count, Count 7, the Government indicates that, per a CW, Maricle specifically knew that the CW would be a federal grand jury witness and knew that an investigation was pending. Maricle allegedly directed the CW on how to testify before the federal grand jury. Briggs corroborated Maricle's involvement through recordings acquired with the CW's consent. Those recordings, heard and described by Briggs, allegedly feature Maricle specifically encouraging the CW to mislead or withhold responsive information from the federal grand jury. Further, per Briggs, Maricle directed Co-Defendant Stivers in giving line-by-line directions to a witness on prospective testimony before a federal grand jury. That direction, again captured on tape and described as occurring at Maricle's direction and approval, including instructions to "plead the 5th," misleadingly to tell "nothing," and falsely to deny vote stealing.

–In 2007, Maricle allegedly attempted to learn the home addresses and vehicle identifications of particular FBI and task force officers involved in the investigation. Maricle purportedly involved a named third-party in this effort, a person with whom Maricle had professional associations via his role as Clay Circuit Judge. On a recording Briggs described, Maricle and a CW discussed Briggs's whereabouts and other matters pertaining to the Agent. Briggs indicated no valid reason for Maricle to seek his or the Agents' personal information. Briggs took the matter seriously enough to have the CW feed false information to Maricle concerning Briggs's personal relocation to a new residence.

–Briggs also described evidence of "paranoia" by Maricle. Defendant allegedly reported to sources, during the course of the federal investigation, that he believed himself under intense scrutiny or surveillance by federal agents. Defendant allegedly moved meeting locations (fearing a listening device in his court chambers), discouraged phone use (referencing investigative techniques in a publicized federal voter fraud case), and surreptitiously "patted down" a CW in hopes of detecting any wire. Maricle also allegedly left the state on occasion to avoid investigators.

–Briggs discussed a 1971 state murder charge against Maricle. The record indicates dismissal on January 1, 1972. Briggs related that an employee of Defendant at the time stated that Maricle disappeared between the charge and the dismissal.

–Briggs described search results under a recent warrant from this Court executed at Maricle's home. The search produced a local precinct list that included the names of many individuals known by Briggs to have been involved in election and voter fraud. The Agent further noted that Maricle's son-in-law remains an elected public official in Clay County. Finally, Maricle allegedly provided to a CW, during the conspiracy, a list of names (seen by Briggs) containing many of the names that Briggs now relates as possible witnesses to/participants in the election fraud scheme.

–Briggs detailed alleged "acts of lawlessness" participated in by Maricle as circuit judge. Defendant was the Circuit Judge in Clay County from approximately 1991 until 2007 (per the Indictment). Briggs depicted two key events as part of his testimony.

First, Briggs described an act of jury tampering that allegedly occurred around 1990, but

after Maricle became a circuit judge.[3] Via use of FBI 302s,[4] which refreshed his recollection, Briggs portrayed an event in which Maricle tampered with a civil jury on a case pending before him as judge. Maricle allegedly accompanied others (including the Plaintiff) to contact the spouse of a sitting juror in order to influence the jury's verdict. The spouse called the sitting juror, in Maricle's and the Plaintiff's presence, and pressured her to return a verdict of a certain size, for Plaintiff. Such a verdict did result.

Briggs also described an event from 2005, again allegedly occurring in a case pending before Maricle as circuit judge. Maricle allegedly learned that a certain defendant in a pending criminal case intended to implicate a daughter of Maricle in wrongdoing. Per Briggs, Maricle allegedly ex parte promised the co-defendant in the case, who already had pleaded guilty, a sentence of no jail time if he testified in a particular way against the co-defendant. Maricle purportedly provided specific and detailed directions on the testimony to be given, which was designed to result in a conviction against the party that mentioned inculpating Maricle's daughter. When the co-defendant failed to follow the script, Maricle allegedly retaliated by sentencing the co-defendant (the sibling of a CW in this case) to the highest possible penalty. Later, Maricle allegedly used potential post-sentencing leniency to induce the same CW (and co-defendant's sibling) to participate in election fraud. Briggs indicated that a taped conversation exists in which Maricle confirms that he agreed to such leniency toward the CW's sibling.

–Regarding cross-examination, Briggs conceded that he has not been harmed by Maricle in the period since 2007. Briggs also admitted that depression is prevalent in society and would be the natural reaction to, *e.g*, the death of a child, which Maricle recently endured.

*Kenny Day*

Day is under an 18-year federal sentence imposed by this District for drug trafficking. He knows Defendant and is from the Clay County area. The Government called him to testify about the jury tampering events SA Briggs referenced.

Day, who identified Maricle in the courtroom, confirmed that he was the representative of his sister-in-law's estate in a matter tried before Maricle in the Clay Circuit Court. Day's relative had died in a car wreck, and Day acted as executor/rep of the estate. Per his testimony, Day accompanied Maricle and others (attorneys in Manchester not involved in the civil case) to see a person whose wife sat on the jury. That person, in Maricle's and Day's presence, called his wife

---

[3]

The record is not clear on when Maricle assumed the judicial role. The Indictment alleges 1991, but the PSR says September of 1990.

[4]

The defense received a redacted version of the 302s during Briggs's direct exam, which is all Briggs himself reviewed. Although the Court instructed the defense that it would review the unredacted version and evaluate the propriety of redaction upon a proper Rule 26.2/Jencks Act motion following direct, the defense did not renew the request. As such, the Court did not order the unredacted version or conduct that review.

and directed her on the desired jury verdict. Specifically, the spouse told the juror not to leave the jury room without at least a $1 million verdict. The ultimate verdict – which was against an insurance company – met the expectations set out as a result of the phone call to the juror in Maricle's presence.

The defense did not question Kenny Day.

\* \* \*

*Analysis*

The Act's default result is release. Indeed, the statute tasks the Court with seeking the least restrictive alternatives to detention, extending custody as the last resort to reasonably assure a defendant's appearance and community safety. *See* 18 U.S.C. § 3142(a)(1)-(4). The mandated beginning point, for the progressive statutory detention analysis, is release on personal recognizance. Release conditions, and then ultimately detention, respectively follow only as proven justified, in the Court's assessment, to assure reasonably against nonappearance or danger. *See id.* At all times, the evaluating court must impose the "least restrictive" alternative. *See id.* at (c). Defendant, of course, enjoys a presumption of innocence as to the Indictment, unaffected by the terms of the Act. *See* 18 U.S.C. § 3142(j).

In this matter, as to danger, the Court could detain only if it determines that "no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community." *See* 18 U.S.C. § 3142(e). A safety-based detention must rest on facts supported by "clear and convincing evidence." *See* 18 U.S.C. § 3142(f). Such evidence is "something more than 'preponderance of the evidence,' and something less than 'beyond a reasonable doubt.'" *United States v. Chimurenga,* 760 F.2d 400, 405 (2d Cir. 1985); *United States v. Vasconcellos*, 519 F. Supp. 2d 311, 316 (N.D.N.Y. 2007)(describing "clear and convincing evidence" in § 3142(e) as requiring "that the evidence support such a conclusion with a high degree of certainty")(quotation omitted).

The Act permits detention only if the court clearly and convincingly finds conditions inadequate. *See* 18 U.S.C. § 3142(e). To detain based on flight risk, relative to potential conditions, (which was the alternative hearing basis under § 3142(f)(2)(A)) the Court applies a preponderance standard to the proof. *See United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Curry*, No. 6:06-82-DCR, 2006 WL 2037406, at *6 (E.D. Ky. July 18, 2006).

Danger has an expansive meaning under the Act,[5] and fairly encompasses much of, though perhaps not all, the (f)(2)(B) grounds. *See, e.g., United States v. Demmler*, 523 F. Supp. 2d 677, 681 (S.D. Ohio 2007)(stating that (f)(2)(B) "plainly requires consideration of the defendant's dangerousness, but focuses that inquiry not on the general risk of harm that he may pose to society, but on whether he will seek to subvert justice, through violent means or not. The Court therefore evaluates [defendant's] dangerousness through the prism of § 3142(f)(2)"); *United States v. LaFontaine*, 210 F.3d 125, 134-35 (2d Cir. 2000)(holding that threat of obstruction, with or without violence, can constitute "the type of danger to the community that would support detention" and noting that "obstruction of justice has been a traditional ground for pretrial detention").

Even in the targeted (f)(2)(B) scenario, the courts evaluating the proof burden have adopted the clear and convincing standard. *See, e.g., United States v. Dodge*, 846 F. Supp. 181, 185 (D. Conn. 1994)("To obtain detention on this ground [*i.e.,* 18 U.S.C. § 3142(f)(2)(B)] the government must sustain its burden of proof by clear and convincing evidence."); *United States v. Brown*, No.

_____

[5]

"In dealing with the danger to the community factor, . . . 'the courts look to more than whether or not defendant *himself* has been guilty of physical violence,' but also to the safety of the community as a whole." *United States v. Ellison*, No. 04-80335-03, 2007 WL 106572, at *3 (E.D. Mich. Jan. 8, 2007)(quoting *United States v. Vance*, 851 F.2d 166, 169 (6th Cir. 1988)); *see also United States v. Patriarca*, 776 F. Supp. 593, 597 (D. Mass. 1991)("Danger in this context . . . means more than a risk of physical violence.").

87-00296-04,1987 WL 28095, at *2 (E.D. Pa. Dec. 14, 1987)(same); *United States v. Dinunzio*, No. 08-10094-WGY, 2008 WL 2148754, at *1 (D. Mass. May 20, 2008)(same); *Cf. Marbley*, 2006 WL 559272, at *2 (applying preponderance standard only to the finding of whether the (f)(2)(B) basis for hearing exists); *Friedman*, 837 F.2d at 49 (imposing preponderance standard only to threshold question of basis for hearing: "Once this determination has been made, the court turns to whether any condition or combinations of conditions of release will protect the safety of the community and reasonably assure the defendant's appearance at trial."). Again, the flight analysis hinges on the lower preponderance standard.

The Court therefore undertakes the multi-factorial analysis required under § 3142(g). The detention/release calculus centers on whether any condition or combination of conditions can adequately mitigate risks of flight or danger. Section 3142(c) arms the Court with great latitude in fashioning conditions. Finally, the Court may not, in the initial bail context, require that conditions absolutely assure or guarantee against flight and danger. Rather, the Court, applying the appropriate evidentiary standard, must determine whether conditions "will *reasonably* assure" against flight and danger. *See* 18 U.S.C. § 3142(e)(emphasis added).

The mandatory § 3142(g) factors guide the Court in assessing suitability of release. The Court acknowledges that this is not a presumption case and that the pre-hearing PSR recommends release on conditions. The statute directs the deciding judicial officer to "take into account the available information" concerning the listed factors. *See* 18 U.S.C. § 3142(g).

1) Nature and circumstances of offenses charged.

The charged offenses are not within those listed as factorially pro-detention in § 3142(g). Still, the Court must account for the nature and circumstances of the alleged conduct, supported by

probable cause and the testimony of SA Briggs. The Indictment alleges concerted, long-term conduct designed to corrupt voting, a basic democratic institution in this republic. The case theories include RICO, which itself depends on multiple acts of related illegality, as well as conspiracy to interfere with voting rights and conspiracy to vote buy. The obstruction count implicates an attack on yet another foundational civic institution, the judicial process. The nature and circumstances of the offenses charged raise significant concern relative to the (f)(2)(B) analysis.

    2) <u>Weight of the evidence.</u>

    Probable cause supports the charges, by definition. SA Briggs additionally described in some detail the range of corroborating information undergirding the Indictment. This included the involvement of CWs, the expectation of over 100 witnesses, and the use of 30 +/- audio tapes, about half of which involve Defendant Maricle. Further, Briggs referenced corroborating documentation provided by Maricle to a CW or seized from Maricle's home. As to the obstruction charge, Maricle purportedly made incriminating remarks on tape regarding directions to a CW regarding grand jury testimony, and Co-Defendant Stivers also made taped remarks inculpatory both to himself and to Maricle.

    Undoubtedly, at this preliminary stage, the evidence is not tested. The Indictment covers a broad period, and Briggs gave only summary information about much of the Government's case. However, it does appear that the United States will present significant witness testimony and objective evidence tying Defendant to the conduct at issue. The Court views the weight of the evidence as pro-detention.

    3) <u>History and characteristics of the person./4)Nature and seriousness of danger.</u>

    Section 3142(g)(3) directs the Court to evaluate a host of indicia related to personal history

and characteristics. Many of these factors, as to Defendant, are decidedly pro-release. Thus, Maricle has stable and enduring family and community ties. He has been married for decades and has lived his life in Clay County. Defendant has no record of drug or alcohol abuse, and his only criminal record is the 1971 dismissed murder charge. Maricle's financial condition is unremarkable, and he does not present assets easily utilized for effective flight. Maricle's role as a long-time circuit judge in the Commonwealth bespeaks, at least nominally, a person of character.

Were this case only about flight risk, the Court would release Defendant on conditions. Based on Maricle's connections to Clay, a combination of strict locational requirements (including GPS monitoring), secured bail, and limits on asset liquidation would reasonably assure Defendant's appearance. Most of the (g)(3) factors cut in favor of release in the context of flight risk. That Maricle occasionally went to Florida is not of consequence; he obviously continued to reside and work in the Clay County area, and police had no evident trouble finding him for arrest. The 1971 events may show some (temporally remote) tendency toward nonappearance, but conditions could guard against Maricle absconding.

The problem with release centers narrowly on the danger that Maricle would, if released, obstruct or attempt to obstruct justice. Defendant, age 65, faces a potential penalty of up to 20 years if convicted (with a preliminary guidelines range, upon conviction, in the 70-87 month area). He has shown some signs of desperation both in his personal life and in his view toward the investigation resulting in these charges. Those signs include a concession of suicidal thoughts, episodic depression, and recent questions regarding his "will to live." Further, Defendant allegedly, with respect to the very federal investigation concluding with Indictment, has attempted to find the home addresses of law enforcement officers, has interfered with the grand jury's investigation by

coaching witness testimony, and has participated in line-by-line orchestration of such testimony. His acts the United States calls paranoia (relocating meetings, patting down associates, avoiding phone use, fearing surveillance) may, in the end, suggest consciousness of guilt. Certainly, the gathered information and resulting inferences raise clear concerns about Maricle's potentialities on release.

The United States solidified these concerns by the "past conduct" evidence provided at the detention hearing. While Defendant's record as a long-tenured circuit judge should virtually ensure release-worthiness, the Government effectively flipped that expectation by clearly establishing egregious judicial misconduct by Maricle. Judicial jury tampering and subornation of perjury – with the direct design of manipulating results for or against particular litigants – surely qualify as the gravest of public trust betrayals. Whether the events happened as described is an open question, but the proof at the hearing was strong, specific, and essentially unchallenged. Kenny Day is, perhaps, self-impeaching to a degree, but he did give a detailed version regarding the jury tampering under oath and faced no cross. The other incident of judicial misconduct allegedly finds corroboration on a tape, which Briggs described, featuring Maricle himself. Finally, the RICO count includes the assertion that Maricle also misused his judicial office as part of the election-related conspiracy.

Release ultimately depends on the Court's assessment of the efficacy of conditions. Such efficacy rests, in large part, on a defendant's good faith intention to comply with and follow stated restrictions. *See United States v. Tortora*, 922 F.2d 880, 887 (1st Cir. 1990)(evaluating predicted good faith in compliance as critical release component); *United States v. Hir*, 517 F.3d 1081, 1092 (9th Cir. 2008)(noting centrality of predicted "good faith compliance"). The Court finds, based on facts supported by clear and convincing evidence, that no set of conditions will reasonably assure

against the danger that Defendant would, if released pending trial, obstruct or attempt to obstruct justice. Could the Court reasonably expect this Defendant, confronting substantial personal jeopardy, to respect and abide by release conditions? The hearing record indicates a defendant: willing (as judge) to corrupt a civil jury, willing (as judge) to suborn perjury to orchestrate the result of a criminal trial, willing to influence corruptly the testimony of a federal grand jury witness in this case, and willing to participate in a multi-year conspiracy designed to adulterate the fundamental democratic institution of voting. Pre-trial detention is prophylactic, not punitive, and a person with the demonstrated capacity for fraudulently manipulating the judicial system is a poor candidate for pretrial release. The Court simply has no confidence that Defendant would follow court restrictions designed to protect the integrity of the judicial process, a process that must unfold on the merits, and *only* on the merits, in this and every case.

The United States proved the need for detention, based on dangerousness, by clear and convincing evidence. Theatrics aside, the defense offered little to counter or weaken the Government's strong showing. The PSR, which contains a recommendation in Defendant's favor, pre-dates the hearing and does not encompass much of the critical hearing content. The Court orders Defendant detained pending the trial of this case.

Defendant is committed to the custody of the Attorney General or his designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. Defendant shall be afforded a reasonable opportunity for private consultation with defense counsel. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility shall deliver Defendant to the United States Marshal for the purpose of an

appearance in connection with a court proceeding herein.

The parties may appeal this Order under the terms of 18 U.S.C. § 3145(a).

This the 26th day of March, 2009.

Signed By:

*Robert E. Wier*

United States Magistrate Judge