United States District Court
Eastern District of Kentucky
Southern Division at London

UNITED STATES OF AMERICA        )  London Criminal
                                )  Action No. 09-16
   vs.                          )
                                )  London, Kentucky
RUSSELL CLETUS MARICLE          )  April 20, 2009
                                )  1:30 p.m.


TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE DANNY C. REEVES


Appearances of Counsel:

On behalf of the United States:    STEPHEN C. SMITH, ESQ.
                                   JASON PARMAN, ESQ.
                                   Assistant U.S. Attorneys
                                   601 Meyers Baker Road
                                   Suite 200
                                   London, Kentucky   40741


On behalf of the Defendant:        DAVID S. HOSKINS, ESQ.
                                   107 East First Street
                                   Corbin, Kentucky   40701


Court Reporter:                    CYNTHIA A. OAKES, CRR
                                   Official Court Reporter
                                   United States District Court
                                   560 Athens Boonesboro Road
                                   Winchester, Kentucky   40391
                                   (859) 983-4346


Proceedings recorded by mechanical stenography,
transcript produced by computer.

```
 1                THE COURT:  Thank you.

 2                Madam Clerk, if you could call the matter scheduled

 3   for 1:30, please.

 4                THE CLERK:  Yes, Your Honor.  London Criminal

 5   No. 09-16, United States of America v. Russell Cletus Maricle.

 6                THE COURT:  Thank you.

 7                If counsel could state their appearances for the

 8   record, please.

 9                Mr. Smith.

10                MR. SMITH:  Good afternoon, Your Honor.  I'm Stephen

11   Smith, and Jason Parman is assisting me here today for the

12   United States.

13                MR. HOSKINS:  Good afternoon, Your Honor, David

14   Hoskins for the defendant, Russell Cletus Maricle, who is

15   seated to my right.

16                THE COURT:  All right.  Thank you.

17                This matter is pending on the defendant's motion for

18   review of the detention order entered by the magistrate judge

19   on March 26th.  The defendant had indicated through motion

20   that he wished to present additional evidence for the Court to

21   consider in connection with the issue of detention.

22                Mr. Hoskins, are you ready to proceed at this time?

23                MR. HOSKINS:  I am, Your Honor.

24                THE COURT:  All right.  Thank you.  You may proceed.

25                MR. HOSKINS:  Your Honor, I would ask if we could
```

1 possibly have the handcuffs removed from Mr. Maricle.  I

2 understand that's a blanket procedure, but it certainly

3 interferes with him being able to write me notes and things of

4 that nature during the hearing.

5      THE COURT:  I will follow whatever procedures the

6 Marshals have established for those matters.  If that's their

7 practice, that's the procedure we'll follow here today.

8      MR. SMITH:  Your Honor, on behalf of the United

9 States, we had earlier invoked the rule on separation of

10 witnesses.  We would like to reinvoke that rule at this time.

11      THE COURT:  All right.  The rule on witnesses having

12 been invoked, any person that's anticipated to be called as a

13 witness in the case will be excluded from the courtroom at

14 this time.

15      MR. HOSKINS:  Your Honor, since they're here, I

16 might call Officer Pace and Officer Blair as witnesses in this

17 case.  So I would ask that they also be excused.

18      THE COURT:  All right.  That would be fine.  They

19 can step outside.

20      MR. SMITH:  Your Honor, I would ask defense counsel

21 to produce a subpoena for the production of these witnesses.

22 I've not been notified that he has an interest in calling any

23 of these individuals, and so — and maybe he has issued a

24 subpoena that I'm not aware of.  Those are sometimes issued

25 under seal.

4

1              THE COURT:  All right.  Any subpoenas having been

2    issued?

3              MR. HOSKINS:  No subpoenas, Your Honor, but they're

4    here, I don't know why they wouldn't want to testify.

5              THE COURT:  Well, I'll exclude those two officers

6    from the courtroom.  The United States may have — let's see,

7    I see Special Agent Briggs is here, he's designated as the

8    case agent; is that correct?

9              MR. SMITH:  That is correct, Your Honor.  And also

10   we have Task Force Officer Blair, who has been assisting in

11   these initial proceedings.  With permission of the magistrate

12   judge, we had asked that, again, based on the complexity of

13   this matter that the United States be given an opportunity to

14   request that a second agent also assist us here as part of the

15   designated team.

16             THE COURT:  All right.  Do you anticipate calling

17   Officer Blair?

18             MR. HOSKINS:  Yes, Your Honor.

19             THE COURT:  All right.  Will you be calling him

20   initially?

21             MR. HOSKINS:  I could call him initially.

22             THE COURT:  All right.  We'll allow you to call him

23   initially and then he can remain in the courtroom as soon as

24   he's been called.

25             Officer Pace, if you could step outside.  Thank you.

1          Any other individuals expected to be called as

2    witnesses that are present in the courtroom, Mr. Hoskins?

3          MR. HOSKINS:  Not that I can tell, Your Honor.

4          THE COURT:  All right.  Thank you.  You may proceed.

5          MR. HOSKINS:  I'll go ahead, then, and start with

6    Officer Blair.

7          THE COURT:  All right.  Thank you.

8                     EDSEL BLAIR,

9    having been first duly placed under oath, was examined and

10   testified as follows:

11         THE COURT:  Thank you.

12         Mr. Hoskins, you may proceed.

13                   DIRECT EXAMINATION

14   BY MR. HOSKINS:

15   Q    Would you state your name, please?

16   A    Edsel Blair, Jr.

17   Q    And, Mr. Blair, how are you employed?

18   A    With the London Police Department, assigned to a task

19   force with FBI.

20   Q    You generally go by the nickname "Buddy," don't you?

21   A    Yes, sir, I do.

22   Q    Officer Blair, in the initial detention hearing in this

23   case, your name came up as somebody who had been involved in

24   the investigation of things that were going on in Clay County,

25   Kentucky; is that correct?

1    A    That's correct.

2    Q    How long have you been involved in that investigation?

3    A    Since the beginning.

4    Q    About when would that be?

5    A    The initial case started approximately in the year 2000.

6    Q    So it's been a number of years that you and members of

7    the task force, including Agent Briggs, have been in Clay

8    County gathering information?

9    A    Yes, sir.

10    Q    Talking to a number of residents of Clay County?

11    A    Yes, sir.

12    Q    And it was no secret during those years that there was an

13    investigation under the auspices of the federal government

14    going on in Clay County, was it?

15    A    That's correct.

16    Q    And one of the names that came up early on and frequently

17    was the defendant, Cletus Maricle?

18    A    Not originally when the case -- the investigation started

19    in 2000.

20    Q    Sometime after that, though, his name came up?

21    A    Yes, sir.

22    Q    And when it came up, lots of people were questioned about

23    him, weren't they?

24    A    Several.

25    Q    Okay.  Now, there was evidence that perhaps

EDSEL BLAIR - DIRECT - MR. HOSKINS                    7

1   Judge Maricle, Mr. Maricle, was trying to find out where

2   people lived, what kind of vehicles they drove.  Had you heard

3   that?

4   A    That's correct.

5   Q    Okay.  Do you, yourself, have any direct information as

6   to that point?

7   A    We obtained that information from a source that we had.

8   Q    Have you listened to the recorded conversations in this

9   case?

10  A    Yes, sir, I have.

11  Q    Is there any point in any of those conversations where

12  Judge Maricle asks where you live or what kind of vehicle you

13  drive?

14  A    There are recordings that mentions agents and task force

15  officers specifically, but not about that topic, no.

16  Q    Okay.  So you've heard them all, and you didn't hear

17  anything from Judge Maricle asking about where you live or

18  what kind of car you drive?

19  A    Not on the recording, no.

20  Q    Okay.  Any other direct statements from Judge Maricle

21  that bear on that that you have or have seen?

22  A    Meaning what exactly, "bear on that"?

23  Q    Well, I don't know, possibly recorded telephone

24  conversations or written statements, letters from

25  Judge Maricle, anything at all where Judge Maricle from his

EDSEL BLAIR - DIRECT - MR. HOSKINS                    8

1 | own hand or his own mouth is asking for that kind of

2 | information?

3 | A    Not to my knowledge, no.

4 | Q    Thank you.  Now, you live in this general area; correct?

5 | A    That's correct.

6 | Q    Laurel County, Clay County, or somewhere in the vicinity?

7 | A    That's correct.

8 | Q    And have lived here and worked here all these years that

9 | this investigation has been going on?

10 | A    That is correct.

11 | Q    Has anybody made any attempt to harm you, threaten you,

12 | or intimidate you in any way in connection with this case?

13 | A    Not — no, not with this case, no.

14 | Q    Okay.  So you don't know of any evidence that

15 | Judge Maricle ever threatened anybody or tried to intimidate

16 | anybody in connection with the investigation of this case?

17 | A    Not personally, no.

18 | Q    Okay.  And, again, none of the — none of the agents or

19 | officers who were involved in the investigation have said

20 | anything to you or reported in your hearing that they were

21 | threatened or they were intimidated in any way?

22 | A    No, not to my knowledge.

23 | Q    And at the same time that this investigation was going

24 | on, you were in Clay County frequently?

25 | A    That's correct.

EDSEL BLAIR - DIRECT - MR. HOSKINS                         9

1   Q    The other investigators were in Clay County frequently?

2   A    Yes, sir.

3   Q    And, again, it was common knowledge that Judge Maricle

4   was at least a person of interest in this investigation,

5   wasn't it?

6   A    Are you asking through us or through the community in

7   Clay County?

8   Q    Through the community in Clay County.

9   A    I'm sure some knew.

10  Q    Mr. Blair, did you work as an election officer in Laurel

11  County in -- since the year 2000?

12  A    Election officer?

13  Q    Or anything in connection with that, some type of

14  position in connection with the actual elections, not as your

15  profession.

16  A    The sheriff in each county is a member of the Election

17  Commission, along with the Clerk and two other

18  representatives.  I was a part of the Election Commission put

19  on there by the sheriff of Laurel County, yes, sir.

20  Q    So you were actually a member of the Laurel County

21  Election Commission?

22  A    Yes, sir.

23  Q    What years did you perform that task?

24  A    I'm not sure.  I think -- I came in in the beginning

25  of -- or in the middle of a term, and I couldn't give you a

1   date, specific date, when I got off that.  I don't know.

2   Q    How long did you serve on that commission?

3   A    I couldn't answer that either.

4   Q    More than a year?

5   A    Yes, sir, I believe so.

6   Q    Okay.  If the records indicated that you were a part of

7   the commission in 2002 and 2004, would that be consistent with

8   your recollection?

9   A    That's possible.

10        MR. HOSKINS:  That's all.  Thank you.

11        THE COURT:  All right.  Mr. Smith, any questions of

12   the witness?

13                        CROSS-EXAMINATION

14   BY MR. SMITH:

15   Q    Officer Blair, you have indicated that you were

16   participating in the investigation and you were also part of

17   communicating with a source; is that correct?

18   A    That's correct.

19   Q    And that there were recordings of certain meetings with

20   the source and with this defendant, Mr. Maricle?

21   A    Several recordings, yes, sir.

22   Q    All right.  Did you record all their meetings?  Did you

23   record all their meetings?

24   A    To my knowledge, yes, sir.

25   Q    Are you aware of conversations that were had that were

1  not recorded?

2  A    Yes, sir.

3  Q    Okay.  Can you explain that?

4  A    There were at times things that the source was told that

5  was after she had left Mr. Maricle's and was given information

6  at the vehicle as she was exiting his residence.

7  Q    And your testimony is, is that your source has provided

8  you information that in an unrecorded conversation Mr. Maricle

9  directly sought out the address of where you and other agents

10  live; is that correct?

11  A    That's correct.

12  Q    And also the vehicles which you were driving?

13  A    That's also correct.

14  Q    Now, that information, you said, was not recorded

15  directly.  Was there some indirect recordings, though, that

16  corroborated what your witness was telling you?

17  A    Yes, sir.

18  Q    And in that, did you hear from those audio recordings

19  mention of a follow-up where you and Agent Briggs had given

20  her false information to give back to Mr. Maricle?

21  A    Yes, sir, there were.

22  Q    Was that on the recording?

23  A    Yes, it was.

24  Q    Now, in the course of your investigation, you indicated

25  in your testimony that while you began investigating the Clay

 1  County case that you didn't specifically target Mr. Maricle

 2  immediately in your investigation over there?

 3  A    No, sir, that's correct.

 4  Q    Did you or other agents put his name out there for the

 5  public to know you were looking at?

 6  A    No, sir, we did not.

 7  Q    And that would have been somewhat disingenuous for an

 8  undercover operation such as you were using cooperating

 9  sources to tape-record —

10        MR. HOSKINS:  Object to the leading.

11  BY MR. SMITH:

12  Q    — secret meetings with Mr. Maricle?

13        MR. HOSKINS:  Object to leading.

14        THE COURT:  Sustained.

15  BY MR. SMITH:

16  Q    Why would you not have given the public knowledge or

17  others out in the community knowledge that you were targeting

18  him while operating an undercover operation with secret

19  recordings?

20  A    For the simple fact that that would have put our source

21  in a dangerous situation.

22  Q    So when was his name brought public?

23  A    His name was brought public during the time that we were

24  conducting the recordings with Mr. Maricle.

25  Q    How did that happen, then, if you were conducting a

1    covert operation and his name got out in the public that you

2    were looking at him?

3    A    Well, that was from our doing that his name had come up,

4    questioning of other subjects.

5    Q    Okay.  Now, do you know approximately when within that

6    investigation would that have been that you used that as a

7    tactic in your investigation?

8    A    That was towards the end of our investigation.

9    Q    And would that have been -- these attempts by Mr. Maricle

10   to find out where you live and what you were driving, did that

11   occur before that precipitous event or after?

12   A    I believe that occurred afterwards.

13   Q    And when you say that it was a part of your tactic to

14   make it known to Mr. Maricle he was being looked at, was that

15   also the time when it was mentioned in the previous hearing

16   that he gave instructions as to how the witness should answer

17   questions to the grand jury?

18   A    That is correct.

19   Q    And during your investigation, were you able to also

20   learn that Mr. Maricle had power and influence over others,

21   including attorneys that were involved in this representing

22   witnesses?

23   A    Yes, sir, that's correct.

24   Q    Can you give me an example of an attorney who Mr. Maricle

25   gave evidence in the investigation he actually had influence

1  and power over?

2  A     We have one of our recordings that was made with

3  Mr. Maricle, Mr. Maricle talking about information that he had

4  obtained from an attorney that was –– had a grand jury session

5  in Lexington.

6  Q     What was that attorney's name?

7  A     The attorney's name was Stephan Charles.

8  Q     And why was he at a grand jury session in the Lexington

9  grand jury to your knowledge?

10 A     Mr. Phillip Mobley, which is the son–in–law of

11 Mr. Maricle, was subpoenaed to the federal grand jury, and

12 Mr. Stephan Charles accompanied him to the grand jury.

13 Q     And what kind of information was Mr. Charles giving back

14 to Mr. Maricle according to Mr. Maricle's own words in the

15 recording?

16 A     Mr. Maricle stated to the source that she talked too

17 much, that he knew everything that was said in Lexington at

18 the grand jury in the waiting room, and told her that she was

19 naive and didn't know when to keep her mouth shut.

20 Q     And in that same conversation, did he exhibit some

21 abnormal paranoia about the government's sinister scheme to

22 reach out and get him?

23 A     Mr. Maricle made reference to Charles Wayne Jones, that

24 he had represented him in the past and that Mr. Maricle had

25 beaten the government on Mr. Jones's case, and since that time

1   that the federal government has been after him ever since.

2   Q    And did he espouse any suspicion as to how the government

3   might be peeping in on the source's conversations there at the

4   courthouse?

5   A    Mr. Maricle insinuated that there were listening devices

6   inside the federal courthouse in Lexington and that everyone

7   knew — everyone from the government knew everything that was

8   said in there.

9   Q    Were you able to isolate in that conversation that he had

10  with the source about who was present and privy to this

11  information he kept relating to her that he knew was going on

12  at that day in that session?

13  A    The source had commented that the only people present

14  during the time of these conversations were Mr. Mobley,

15  Mr. Charles, and herself and another subject, Charles Dobber

16  Weaver.

17  Q    And of those present, did Mr. Maricle mention any of

18  those individuals by name?

19  A    Just Mr. Charles.

20          MR. SMITH:  May I have a moment, Your Honor?

21          THE COURT:  Yes, sir.

22          MR. SMITH:  That's all I have at this time.

23          THE COURT:  Thank you.

24          Mr. Hoskins, any follow-up.

25          MR. HOSKINS:  Yes, sir, Your Honor.  Thank you.

1                    REDIRECT EXAMINATION

2   BY MR. HOSKINS:

3   Q    Mr. Blair, this conversation that you were just telling

4   us about, is that recorded?

5   A    Yes, sir.

6   Q    Okay.  Do you know the date that that –– of that

7   recording?

8   A    I do.

9   Q    What is that date?

10  A    That is May 4th of '07.

11  Q    And you were asked to characterize that as power and

12  influence over this attorney, Stephan Charles.  What leads you

13  to believe that that was power and influence rather than just

14  communication among two people?

15  A    If someone has the ability to reach out to even an

16  attorney that's not representing him, representing somebody

17  else, and be able to gain information from this attorney, I

18  would consider that power that others wouldn't have.

19  Q    Okay.  The person you're talking about, though, was

20  Judge Maricle's son-in-law; right?

21  A    But the information came from Mr. Charles, which is his

22  son-in-law's attorney.

23  Q    His son-in-law's attorney?

24  A    Uh-huh.

25  Q    Do you not think it's common for family members to be

EDSEL BLAIR - REDIRECT - MR. HOSKINS                17

1    involved with discussions with attorneys, especially a family

2    member who has some knowledge about the legal system?

3    A    I don't have an opinion on that.

4    Q    Okay.  Now, you said there were some things that the

5    source was told when she was leaving Mr. Maricle's house.  Are

6    you saying they were words said by Mr. Maricle?

7    A    There were on one occasion things said by Mr. Maricle and

8    on another occasion said by someone else.

9    Q    Who was the other person who said things?

10   A    It would have been a Mr. Richie Asher.

11   Q    Well, now, those things are recorded, aren't they?  All

12   those conversations and comments are recorded, because in each

13   of the recordings I heard the source is talking as she's

14   leaving there, the recorder is still on when she leaves?

15   A    At times it was, yes, sir.

16   Q    So is there anything specific that you can say that

17   Mr. Maricle said to this woman that she turned off the

18   recorder which — she turned off the recorder and he kept

19   talking, is that what you're saying?

20   A    That's what we were told by the source, yes, sir.

21   Q    Okay.  Is that the way sources usually are handled with

22   recording equipment, would they turn it on and off at their

23   discretion?

24   A    At times it is.

25   Q    It's not the most common way, though, is it?

1   A    It can be done the other way, the agents turn the

2   recorder off, yes, sir.

3   Q    Now, you said you had an independent recording that

4   somehow corroborated Mr. Maricle asking for personal

5   information, residence, vehicle.  You're talking about a

6   recording there in which Richie Asher is present; is that

7   right?

8   A    That's correct.

9   Q    And the source is giving information about Agent Briggs

10  having moved out of his house because he has a girlfriend or

11  something of that nature; is that correct?

12  A    That was information provided by agents to the source so

13  they could relay this to Mr. Maricle, yes, sir.

14  Q    Okay.  And so the source goes to Mr. Maricle's home, and

15  in the course of the conversation that topic comes up?

16  A    It does.

17  Q    The source is the one who raises the topic; correct?

18  A    Yes, sir.

19  Q    And Mr. Maricle doesn't say on there, "Well, where does

20  Mr. Briggs live now," does he?

21  A    To my knowledge, no.

22  Q    Nothing even approaching that, does he?

23  A    I don't have the transcripts in front of me, but to my

24  knowledge, no.

25  Q    Thank you.  Again, the government tried to describe

1  something that's abnormal paranoia.  But the fact is that your

2  sources went to Mr. Maricle's home on a number of occasions

3  and told him that the government was asking about him and

4  wanting information about him, didn't they?

5  A    That topic came up on several different occasions.

6  Q    And when it comes up, Mr. Maricle says, "Well, I don't

7  know of anything that I've done wrong to be indicted for,"

8  doesn't he?

9  A    I couldn't tell you exactly what Mr. Maricle responded to

10  that particular question.

11  Q    That's not a verbatim quote, but that's the essence of

12  what he said, isn't it?

13  A    At times he made that statement.

14  Q    And the sources go to Mr. Maricle's house time and time

15  again, don't they?

16  A    That's correct.

17  Q    And they're the ones that bring this stuff up, aren't

18  they?

19  A    Sometimes.  Not all the time, no.

20  Q    Frequently they are?

21  A    Mr. Maricle also brings things up about what's happened,

22  what happened at the grand jury and so on.

23  Q    He's asking questions about what happened at the grand

24  jury and what's being told?

25  A    Yes, sir.

EDSEL BLAIR - REDIRECT - MR. HOSKINS                    20

1   Q    Is there anything abnormal about that if these same

2   people are telling him he's a target?

3   A    Well, what I would consider abnormal is Mr. Maricle

4   making statements that the FBI is hiding in the woods, they're

5   out there now behind the trees, there's been 40 FBI agents in

6   Clay County for years, statements about listening devices and,

7   you know, not using — or not communicating by phone.  That's

8   what I would consider paranoia by Mr. Maricle.

9   Q    Well, agents like yourself use listening devices and used

10  them in this case?

11  A    We have used recording devices, yes, sir.

12  Q    Well, that's a form of listening device, isn't it?

13  A    I would assume, yes, sir.

14  Q    And in some situations you're able to obtain permission,

15  a court order, to tap telephones and listen to telephone

16  conversations?

17  A    That's not occurred in this particular case.

18  Q    But it has occurred in cases?

19  A    Yes, sir.

20  Q    You would agree that it's common knowledge among the

21  general public that the government in some circumstances has

22  the power to get wiretaps?

23  A    Yes, sir.

24  Q    Okay.  And you acknowledge that Judge Maricle was being

25  told by these people that you-all were sending to his home,

1  you're a target, they're asking about you, you're in trouble,

2  over and over again, weren't they?

3  A    They had mentioned that on occasion, yes, sir.

4  Q    Do you have any recordings of Mr. Maricle saying anything

5  like there's a listening device in a doorstop or there's 40

6  agents in Clay County or they're back behind the trees?  Do

7  you have anything like that on tape?

8  A    Yes, sir.

9  Q    Okay.  Now, those things are said in a somewhat humorous

10 tone, aren't they?

11 A    In my opinion, at the time those statements were made, it

12 wasn't in a humorous manner by Mr. Maricle.

13 Q    All this time Mr. Maricle was functioning as circuit

14 court judge in Clay, Leslie, and Jackson Counties, wasn't he?

15 A    That's correct.

16 Q    And then recently he has been a senior status judge going

17 to various counties?

18 A    Yes, sir.

19 Q    If somebody tells a person that they are the subject of

20 investigation, is it not normal for them to want to know what

21 they can about it?

22 A    That's an opinionated question.  I couldn't answer for

23 Mr. Maricle.

24 Q    If you were told you were the subject of an

25 investigation, you would want to know, wouldn't you?

1            MR. SMITH:  Your Honor, I'm going to object to the

2    relevance of that.

3            THE COURT:  I'll sustain.  It's argumentative.

4    BY MR. HOSKINS:

5    Q    Mr. Blair, do you have any knowledge of any evidence that

6    suggests that Mr. Maricle ever went beyond asking questions

7    about who was doing the investigation and what kind of car

8    they might be driving?

9    A    Are you asking other than who was doing the investigation

10   and what kind of vehicle they were driving, any information

11   beyond that?

12   Q    Yes.

13   A    Not to my knowledge, no.

14   Q    Okay.  And so all you have is him expressing an interest?

15   A    Asking questions, yes, sir.

16   Q    And nobody was hurt, no officers were threatened, nobody

17   was intimidated?

18   A    To my knowledge, no.

19   Q    And this dates back to the early part of 2007?

20   A    That's correct.

21   Q    Agent Blair, did you listen to the recording when one of

22   your sources went to Mr. Maricle's home on May 16th, 2007?

23   A    I'm sure I have.  I can't recall what was on that

24   recording on that date.

25   Q    You've listened to all the recordings, though, haven't

EDSEL BLAIR - REDIRECT - MR. HOSKINS                23

1  you?

2  A    I think so, yes, sir.

3  Q    And May 16th is significant because it's two days before

4  Mr. Maricle was told that the source was going to the grand

5  jury; right?

6  A    If — like I said, I don't have the transcript in front

7  of me and can't recall what particularly happened on that

8  date.

9  Q    Do you recall the source saying to Mr. Maricle, "Now,

10  it's really a mistake to send her in there without guidance"?

11  A    With Mr. Maricle making that statement?

12  Q    No, the source making that statement.  Do you recall that

13  source making a statement to Mr. Maricle after begging him for

14  help, that, "It's a mistake, here we are two days before the

15  grand jury and you want me to send her in there without

16  guidance"?  Do you remember hearing that?

17  A    I don't remember that particular quote, no, sir, I don't.

18  Q    Do you remember Judge Maricle responding with a Bible

19  verse about preparation?

20  A    I do remember on one occasion Mr. Maricle quoting a Bible

21  verse to the source.

22  Q    And it was in response to the source saying she needs to

23  know what to say?

24  A    I couldn't give you an honest answer on what it was in

25  reference to.  I just can't remember that.

EDSEL BLAIR - RECROSS - MR. SMITH                    24

1  Q    All right.

2            MR. HOSKINS:  That's all for this witness.

3            THE COURT:  All right.  Thank you.

4            Mr. Smith, anything else?

5                     RECROSS-EXAMINATION

6  BY MR. SMITH:

7  Q    Officer Blair, you were asked about recalling what other

8  things other than him specifically, I guess, questioning the

9  source about the whereabouts of the agents and what they

10 drove; right?

11 A    That's correct.

12 Q    Do you remember that question?  Did you learn that he

13 tasked anyone else to find out that information?

14 A    Yes, sir.

15 Q    And who did he task?

16 A    That would have been a Richie Asher that, to our

17 knowledge, works for Mr. Maricle.

18 Q    And he being a circuit judge, how would he employ a

19 fellow by the name of Richie Asher?

20 A    I think Mr. Asher is employed by a detective is what we

21 have been told.

22 Q    And you-all conducted a search there of his property.

23 Did you find any notes that would indicate that he was paying

24 him to work for him?

25 A    When the search was executed on Mr. Maricle's residence,

EDSEL BLAIR - FURTHER REDIRECT - MR. HOSKINS

 1  there were certain documents that were seized; and on those

 2  documents, there were dates that Mr. Asher, or Richie Asher,

 3  left his worked hours on the desk calendar for Mr. Maricle.

 4          MR. SMITH:  Okay.  That's all I have.  Thank you.

 5          THE COURT:  Thank you.

 6          MR. HOSKINS:  Judge, I'd like to follow up on that

 7  briefly.

 8          THE COURT:  Yes, sir, that's fine.

 9              FURTHER REDIRECT EXAMINATION

10  BY MR. HOSKINS:

11  Q    What's the — what's the basis for saying that

12  Judge Maricle tasked Richie Asher to do something like this?

13  A    Something like —

14  Q    Where does that information come from?

15  A    Like what, asking Mr. Asher to do what?

16  Q    Trying to find out about people investigating him.

17  A    That information come from Mr. Asher to our source.

18  Q    Is that recorded?

19  A    No, sir, it's not.

20  Q    Okay.  Now, what do you know about Richie Asher?

21  A    That Mr. Asher was employed by Mr. Maricle.  Mr. Asher is

22  on some recordings working for Mr. Maricle, making reference

23  to, I think, taking urine samples for the home incarceration

24  and also doing work around the home of Mr. Maricle.

25  Q    There's other people talking on the tapes to Richie Asher

1    about taking urine samples for drug tests; correct?

2    A    I don't recall which particular tape you're asking about.

3    Q    Well, you just said there are people talking about Richie

4    Asher, there's evidence about Richie Asher taking samples for

5    drug tests, urine samples.

6    A    That's correct.

7    Q    Okay.  And is it your understanding that he was an

8    employee of Mr. Maricle, of Judge Maricle, at that point for

9    that purpose?

10   A    It was our understanding -- about the urine samples?

11   Q    Yes.

12   A    Now, that, I don't know.  I know he was an employee of

13   Mr. Maricle's as far as working around the house, doing odd

14   jobs around the house.

15   Q    Odd jobs, handyman-type work; correct?

16   A    That's correct.

17            MR. HOSKINS:  Okay.  That's all.

18            THE COURT:  Thank you.

19            Anything else?

20            MR. HOSKINS:  Judge, if I could --

21   BY MR. HOSKINS:

22   Q    Mr. Blair, on one of those tapes, the source asks Richie

23   Asher about investigating the FBI or the federal government,

24   doesn't she?

25   A    I don't -- I don't recall that.  That may have happened,

1  but I don't recall which tape that would have been.

2  Q    All right.  Well, I'm not asking you which tape it's on,

3  I'm asking if you recall her inquiring him — inquiring of

4  Mr. Asher about investigating the FBI or the federal

5  government?

6  A    I don't recall that.  I'm not saying that that didn't

7  happen, but I don't recall that.

8          MR. HOSKINS:  Okay.  Thank you.

9          THE COURT:  Anything else.

10         MR. SMITH:  No, Your Honor.  Thank you.

11         THE COURT:  You may step down.

12         Mr. Hoskins, you may call your next witness.

13         MR. HOSKINS:  Thank you, Your Honor.  I call Agent

14  Briggs.

15         THE COURT:  Thank you.

16         MR. SMITH:  Your Honor, I know the Court has the

17  benefit of the detention hearing, obviously the transcript,

18  and I understand that Mr. Hoskins has studied that as well.

19  Are we to anticipate that we're going to go back over the same

20  plowed ground or are we going to look at this from a different

21  standpoint?

22         THE COURT:  I'm going to consider all of the

23  testimony that's been previously admitted, as well as any

24  additional testimony to be offered.  And so if there's

25  testimony that was presented in the original hearing, I have

1  reviewed that quite thoroughly, and so we don't need to go

2  into all of that.  But if there are specific areas that you

3  want to inquire about, then you may do so.

4           MR. SMITH:  Thank you, Your Honor.  Your Honor, as

5  we — before we address that, if the Court would allow, I just

6  wanted, for the record, under 3142, I understand that the

7  procedure in which we are is a motion to revoke or review the

8  detention order.  And, obviously, I believe under the Bail

9  Reform Act, it anticipates that if there's additional

10 information that comes to the knowledge of the defendant that

11 wasn't available at the time of the hearing, and at this

12 point, we have been asked again to produce now a second case

13 agent here for what appears to me to be a discovery session

14 rather than an opportunity to show this Court information that

15 wasn't available to this defendant or was not otherwise — and

16 I just want to object if we're going to continue down that

17 road.

18          THE COURT:  All right.  I do understand your

19 position, and this is, of course, not a discovery session, it

20 goes to the issue specifically under Title 18, Section 3142,

21 the factors to be taken into account, Subsection (g)

22 specifically, the four enumerated factors.  Mr. Hoskins has

23 alleged in his pleading that Mr. Maricle was provided

24 ineffective assistance of counsel through Mr. Hughes in the

25 initial hearing.  So I'm going to give him a little more

TIMOTHY BRIGGS - DIRECT - MR. HOSKINS                29

1   leeway than I otherwise would in terms of getting back into

2   some of these issues, but it's not a discovery session,

3   obviously.

4          All right.  Agent Briggs, you can be sworn.

5                       TIMOTHY BRIGGS,

6   having been first duly placed under oath, was examined and

7   testified as follows:

8          THE COURT:  Thank you.

9          Mr. Hoskins, you may proceed.

10         MR. HOSKINS:  Thank you, Your Honor.

11                     DIRECT EXAMINATION

12  BY MR. HOSKINS:

13  Q    Mr. Briggs, you testified at length at the initial

14  detention hearing.  Have you had an opportunity to review a

15  transcript of your testimony?

16  A    No, sir, I have not.

17  Q    Do you have a pretty good recollection of what you

18  testified to?

19  A    Fairly good, yes, sir.

20  Q    Okay.  One of the things that you presented testimony

21  about was a civil case involving Kenneth Day as a plaintiff;

22  correct?

23  A    I don't think he was the plaintiff, no.  His family was

24  involved in the case.

25  Q    Well, that would indicate that you've not looked at the

1   case file from that civil case.  Is that the case?

2   A    Sir, it involved a family member of his.  I do know that.

3   I'm speaking off my 302 when I interviewed him.

4   Q    Okay.  Have you looked at the circuit clerk's file for

5   that case?

6   A    I believe I did at some point, yes, sir.

7   Q    Okay.  When did you do that?

8   A    I don't recall that.

9   Q    Well, you got a statement from Kenny Day in December of

10  2008, didn't you?

11  A    I don't recall the date, sir.

12  Q    Isn't that the date on your 302?

13  A    It may well be, sir, but I don't know the date.  I don't

14  remember the date.

15  Q    Okay.  Your detention hearing was —— the detention

16  hearing you testified in was in March.

17  A    This detention hearing?

18  Q    Yes.

19  A    Yes.

20  Q    That was several months after you got this statement from

21  Kenny Day, wasn't it?

22  A    Again, sir, I don't recall when I got the statement from

23  Mr. Day.

24  Q    Well, you have a general recollection, Mr. Briggs.  Was

25  it a week before?  It wasn't the day before, was it?

1    A    The day before this hearing?

2    Q    No, the day before the first detention hearing.

3    A    Sir, I interviewed him over probably a three-year period.

4    Q    Okay.  Did you talk -- when did you hear about this civil

5    case?  Do you have any idea at all?

6    A    I don't recall that, sir.

7    Q    Okay.  You referred to your 302 during your testimony in

8    the initial detention hearing, didn't you?

9    A    Yes.

10    Q    Okay.  You actually referred to two separate 302s, didn't

11    you?

12    A    Yes, sir.

13    Q    One of them was undated, wasn't it?

14    A    A copy of it, we didn't have a date on it, no.

15    Q    The other one, though, was dated and referred to you in

16    your testimony as being taken in December of 2008.  Is that

17    inconsistent with your recollection of your testimony?

18    A    Sir, I don't recall.

19    Q    Do you have a specific recollection of going to the Clay

20    Circuit Clerk's Office to look at the file in the case that

21    Mr. Day was talking about?

22    A    No, sir.

23            MR. HOSKINS:  Okay.  Your Honor, I would ask that

24    the witness be shown this document.

25            THE COURT:  Very well.

1          MR. HOSKINS:  Judge, I have another copy that I

2     could give to the witness or the government.

3          THE COURT:  Show it to Mr. Smith first.

4          MR. HOSKINS:  I'm sorry, Your Honor.

5          THE COURT:  Thank you.

6     BY MR. HOSKINS:

7     Q    Have you seen that document before?

8     A    Sir, I may have, I don't recall.

9     Q    Do you see the names at the top of that page?

10    A    Yes, sir.

11    Q    It says, "Paul Day, individually, Kenneth Day, as

12    personal representative of the estate of Loretta Day; Kenneth

13    Day as uncle, next friend, and legal guardian of Margaret Ann

14    Day, plaintiffs"; correct?

15    A    Yes, sir.

16    Q    So Kenny Day is the plaintiff?

17    A    Yes, sir, if this is the same case we're talking about,

18    yeah.

19    Q    It's Clay Circuit Court Civil Action No. 89-CI-381.

20    A    Yes, that's what it says.

21    Q    And this document is styled in the middle of it "Trial

22    Jury and Judgment"; correct?

23    A    Yes, sir.

24    Q    The first paragraph says that, "The parties and their

25    respective counsel appeared on the 20th day of September,

1  1990," for a jury that's listed to try this case; correct?

2  A    Yes, sir.

3  Q    On page six of that document, there's a judge's

4  signature, signed this 25th day of September, 1990, Leonard B.

5  Wilson, Special Judge, Clay Circuit Court; correct?

6  A    Yes, sir.

7  Q    Do you see anything in there that indicates that

8  Judge Maricle had anything at all to do with that case?

9  A    Sir, I don't know if this is the same case.  I don't know

10 that -- there may be another case, I'm not sure --

11 Q    Okay.

12 A    -- what the source was referring to.  I don't think I

13 have the case number in my 302.

14 Q    This is the time period that he was talking about, isn't

15 it?

16 A    He estimated the time period.

17 Q    This is a judgment for $3 million, isn't it?

18 A    $3,000,510.

19 Q    Do you think that Mr. Day had more than one 3 million-

20 dollar judgment that year?

21 A    I don't know, sir.

22 Q    Okay.  You do know that Kenny Day, when he testified and

23 when he talked to you, was serving approximately an 18-year

24 federal prison sentence?

25 A    Yes, sir.

TIMOTHY BRIGGS - DIRECT - MR. HOSKINS                    34

1   Q    And you do know that he's hoping from his continued

2   cooperation to get a reduction of that sentence, don't you?

3   A    Yes, sir, I do know that.

4   Q    And you do know that his testimony that day at the

5   detention hearing about jury tampering put him right in the

6   middle of it, didn't it?

7   A    Excuse me?

8   Q    Kenny Day's testimony put Kenny Day in the middle of jury

9   tampering?

10  A    Himself back then?

11  Q    Yes.

12  A    Yes, sir.

13  Q    Okay.  He gave that testimony under oath before Judge

14  Wier?

15  A    Yes, sir.

16  Q    And that tells us that Kenny Day had no qualms about

17  lying or doing something corrupt in the court system to get

18  money?

19  A    I have no doubt about that, sir.

20  Q    Okay.  And how much stronger is his motive today when his

21  freedom is at stake?

22  A    Sir, that answer calls for speculation.  I can't answer

23  that.

24  Q    Agent Briggs, did you do the first thing during the

25  months, from the day you got that statement from Kenny Day to

1   the date of that detention hearing, did you do one single

2   thing to corroborate Kenny Day's story?

3   A    I don't recall doing it specifically myself, sir.  There

4   were several people involved in this investigation, so —

5   Q    Do you know if anybody else did?

6   A    I don't know that, sir.

7   Q    Okay.  Nobody called to Judge Wier's attention that day

8   the fact that Judge Maricle was not even the judge in that

9   case, did they?

10  A    Excuse me?

11  Q    At the first detention hearing, nobody on your side of

12  the courtroom brought it to Judge Wier's attention that

13  Judge Maricle was not the judge in that case?

14  A    No, sir.

15  Q    You've listened to all the recordings, Agent Briggs?

16  A    Not all of them, no, sir.

17  Q    You haven't?

18  A    No.

19  Q    Have you listened to the recording where Judge Maricle

20  tells your sources who are at his home, "The number one thing,

21  don't tell any lies," or words to that effect?

22  A    Yes, sir, I recall that specific statement being made, a

23  number of exculpatory statements, yes, sir.

24  Q    He made a whole lot of exculpatory statements, didn't he?

25  A    Yes, sir.

TIMOTHY BRIGGS - DIRECT - MR. HOSKINS                    36

1    Q    He said many times, "Tell the truth," your source says,

2    "Well, I'm worried about what Dobber is going to say."  And

3    Judge Maricle says, "Well, you tell the truth."

4    A    He also made a lot of other statements to the other end

5    of the spectrum, too, so —

6    Q    Are any of those recorded?

7    A    Yes.

8    Q    What statement from Judge Maricle is recorded where he is

9    telling somebody to testify falsely?

10   A    He says, "Short of being an eyewitness to murder, don't

11   say anything, don't tell the jury any" — "grand jury

12   anything."

13   Q    Where is that?

14   A    It's on one of the audiotapes, sir.  I don't recall the

15   date.

16   Q    Do you know the date for that?

17   A    I don't recall the date.

18   Q    He doesn't — he doesn't say "tell a lie" ever, does he?

19   A    Sir, I don't recall whether he says a lie or never

20   says —

21   Q    Do you recall any single time that he tells somebody

22   something to say affirmatively in this case?

23   A    Other than direction about, "Unless you were an

24   eyewitness to a murder, don't" — or "shooting, don't say

25   anything," and "You should be willing to sit in jail like

TIMOTHY BRIGGS - DIRECT - MR. HOSKINS                    37

1  Susan McDougal and not talk if you're forced to testify,"

2  things of that nature.

3  Q     Well, at some of point, your sources go to Judge Maricle

4  and say, "The government has given the source immunity";

5  right?

6  A     I believe so, yes, sir.

7  Q     And Judge Maricle's response on the recording is, "Well,

8  great, then there's nothing to worry about," isn't it?

9  A     I don't recall the response.  I think — Let me clarify.

10  I think that the source goes to him and says, "What if I'm

11  offered immunity, what would happen then if they force me to

12  testify and I'm offered immunity?"  I don't know that the

13  source ever actually says, "I've got immunity."

14  Q     Are you testifying that there is no recording where the

15  source says, "The government has given us immunity and our

16  lawyer says that means we've got to testify," and

17  Judge Maricle says, "Great, then you've got nothing to worry

18  about"?

19  A     Sir, that could have happened.  We had a lot of meetings,

20  a lot of recordings over quite a bit of time.  I know we

21  discussed "What would happen if I were to receive immunity,"

22  the source said.  We may have ultimately said that.  So that's

23  possible.

24  Q     So you don't recall hearing those recordings.  I'll leave

25  it at that.

1      Your source — You also presented testimony at the

2  original detention hearing to the effect that Judge Maricle

3  scripted testimony in a criminal case for his own personal

4  reasons, didn't you?

5  A    Yes, sir.

6  Q    Now, your source for that is simply the word of this

7  person that's been cooperating for you?

8  A    Others, too.

9  Q    Who else?

10  A    The source's brother —

11          MR. SMITH:  Your Honor, I'm going to object to a

12  witness list being given to the —

13          THE COURT:  Specific identity of individuals?

14          MR. SMITH:  I would object to their being disclosed

15  at this time, yes, Your Honor.

16          THE COURT:  All right.  I'll sustain the objection.

17  If there are others, you may identify the number of others

18  that have given similar information.

19          THE WITNESS:  One or two I can think of.

20  BY MR. HOSKINS:

21  Q    One or two, which is it?

22  A    Sir, one or two is the best of my recollection.

23  Q    Okay.  One of them is the actual person who went to

24  prison; right?

25  A    Yes, sir.

1  Q    Okay.  Who is a brother of your source?

2  A    Yes.

3  Q    Okay.  Other than talking to these two people, what have

4  you done to corroborate that?

5  A    We've interviewed a number of people regarding this

6  that — you know, that seem to corroborate and back up what

7  the sources were saying.

8  Q    In what way?

9  A    About the manner in which the case was held, how things

10  were handled with the individual.

11  Q    Are these court personnel?

12  A    No, sir.

13  Q    Attorneys?

14  A    No, sir.

15  Q    Are they people that you can sit there and say are

16  unbiased witnesses?

17  A    I don't recall them, sir.  I don't recall identity of all

18  these individuals.

19  Q    Okay.  So since you can't recall their identity, you

20  can't recall the substance of what they said, I suppose?

21  A    I just know that we did receive corroborating information

22  regarding what the source was saying, so —

23  Q    Can you be specific about what corroborating information

24  you have?

25  A    Yes.

TIMOTHY BRIGGS - DIRECT - MR. HOSKINS                 40

1   Q    Okay.  And what is it?

2   A    Out of your client's mouth when he agrees during a

3   recording that he did promise leniency on the part of the

4   source's brother for her assistance — the source's assistance

5   in the election fraud.

6   Q    And you're saying that those words are recorded on — are

7   recorded in some way?

8   A    Correct, yes, sir.

9   Q    Do you know what day those words were spoken?

10  A    No, sir, I don't.

11  Q    But you heard them?

12  A    Yes, sir.

13  Q    What does the source say that leads up to that?

14  A    I don't remember, sir.

15  Q    Did you do anything at all to corroborate that in the

16  court records, look at any court files?

17  A    We did look at court files, yes, sir.

18  Q    Which ones did you look at?

19  A    Which ones are you asking me about?

20  Q    Pardon?

21  A    What are you asking about specifically?

22  Q    The case that we're talking about here, *Commonwealth of*

23  *Kentucky v. Eugene Corky Price*.

24  A    Yes.

25  Q    Did you look at that case file?

1    A    Yes, sir.

2    Q    Did you look at the dates of, for example, his

3    arraignment?

4    A    No, sir, I don't recall — I probably looked at it, but I

5    don't recall it.

6    Q    Do you remember the names of the people that he was

7    supposed to testify against?

8    A    I don't recall them, sir.

9    Q    Okay.  So you don't know the date, but there's — you say

10   there's a recording of Judge Maricle saying, "I promised you

11   leniency if you would help me in the election fraud"?

12   A    Someone in that effect, sir, yes, sir.  Not in those

13   exact words, but — that's obviously not an actual quote.

14   Q    Do you have any documents from the court cases that —

15   there are two criminal cases at issue, weren't there, there

16   was the Corky Price case where he's a defendant and then

17   there's the other case where he testifies in the trial of

18   three other defendants?

19   A    Correct.  Well, I know about — I think I've got both.  I

20   looked primarily at the one involving the other three where

21   this individual was a witness.

22   Q    Okay.  Did you have an opportunity to see Corky Price

23   plead guilty in that case?  Did you see a tape of that?

24   A    I didn't personally, no.

25   Q    Okay.  Did you see his testimony?  Did you see a

1  videotape of his testimony?

2  A    I saw portions of it, yes, sir.

3  Q    Okay.  Did you see Judge Maricle indicate any type of

4  displeasure with the testimony?

5  A    I don't recall that, sir.

6  Q    Okay.  He didn't say anything to the witness, did he?

7  A    I don't recall.

8        MR. HOSKINS:  Judge, I would move that that document

9  that I provided to the witness be admitted into evidence in

10  this proceeding.

11        THE COURT:  All right.  I'm not exactly sure what

12  the document is.  Is there a reason to maintain that under

13  seal?

14        MR. HOSKINS:  I don't believe there is, Your Honor.

15        THE COURT:  Mr. Smith?

16        MR. SMITH:  No objection, Your Honor.

17        THE COURT:  All right.  Let it be filed as

18  Defendant's Exhibit 1 to this hearing.

19        MR. HOSKINS:  Thank you, Your Honor.

20  BY MR. HOSKINS:

21  Q    Your source, then, is somebody who feels they were

22  wronged by Judge Maricle, is that fair to say?

23  A    I'm sorry, repeat the question.

24  Q    Your source is someone who believes they were wronged by

25  Judge Maricle, is that fair to say?

TIMOTHY BRIGGS - DIRECT - MR. HOSKINS

1   A    Sir, I can't speculate on what that person feels.

2   Q    Well, she's told you — you've talked to her quite a bit,

3   haven't you?

4   A    I've talked to a number of sources.

5   Q    And you've talked to this one quite a bit?

6   A    Yes, sir.

7   Q    And she's telling you — her words are, "The Judge

8   promised me leniency," and your testimony was that this

9   defendant didn't get leniency; is that right?

10  A    Among other things, yes.

11  Q    Okay.  And you also testified that you're not familiar

12  with the procedure in Kentucky State court, so I won't ask you

13  about that.

14        MR. HOSKINS:  Your Honor, I would also take — ask

15  the Court to take judicial notice of the contents of that

16  transcript where there is testimony to the effect that the 302

17  that Mr. Briggs referred to was dated December of 2008.

18        THE COURT:  All right.  I didn't notice that date,

19  but I'll go back and look at that again.

20        MR. HOSKINS:  It's a Court exhibit to the

21  transcript.  So I guess I would move that it be made an

22  exhibit today and I would —

23        THE COURT:  I'm not sure it was ever made an exhibit

24  to that proceeding.

25        MR. HOSKINS:  Judge, I believe my copy of the

1   transcript indicated that it was — in the table of contents

2   on the last page, it says Court Exhibits No. 1, dated redacted

3   statement, and 2, undated redacted statement.  So I would move

4   that under seal they be put in the record for the purposes of

5   this hearing.

6           THE COURT:  All right.  Any objection?

7           MR. SMITH:  I obviously don't have a problem with

8   the Court viewing those.  They were tendered for purposes of

9   the Rule 26.2 request and so it was not my recollection that

10  it was ever introduced, and so with that in mind, I have no

11  objection to the Court seeing that in-camera.

12          THE COURT:  All right.  Very well.  It will be

13  admitted for that purpose.

14  BY MR. HOSKINS:

15  Q    Do you know what Corky Price was indicted for in the case

16  that we're talking about?

17  A    Assault, I believe.

18  Q    It was assault in the first degree under Kentucky law,

19  wasn't it?

20  A    No, assault in the first degree was scratched out and

21  assault under extreme emotional duress was placed in there.

22  Q    That's what he pled guilty to, but it was an amended

23  charge, wasn't it?

24  A    Sir, I don't know.

25  Q    Do you have a copy of those documents with you?

1   A    No, sir.

2   Q    Okay.  And you don't recall what the -- you don't recall

3   what the original charge was?

4   A    What I remember seeing was assault under emotional

5   distress or something like that, something along those lines.

6   Q    And you know that the facts of that case were that a

7   witness in a Clay County murder case was found with her throat

8   cut ear to ear; correct?

9   A    Yes, sir, I'm very aware of that.

10  Q    Okay.  And that Corky Price pled guilty to being involved

11  with that?

12  A    Pled to an information, I believe.

13  Q    Pled guilty, didn't he, to being involved with that?

14  A    I believe to an information.

15  Q    Does it make a difference in your mind whether it was an

16  indictment or an information?

17  A    I guess not.

18  Q    Okay.  He pled guilty to being involved in that vicious

19  assault trying to silence a witness in a murder case; right?

20  A    He pled guilty.

21  Q    And his sentence was five years in the Kentucky state

22  prison?

23  A    I believe that's correct, yes, sir.

24           MR. HOSKINS:  That's all.

25           THE COURT:  Thank you.

1              Anything else of this witness, Mr. Smith?

2              MR. SMITH:  Thank you, Your Honor.

3                         CROSS-EXAMINATION

4    BY MR. SMITH:

5    Q    Agent Briggs, counsel has produced an exhibit here that

6    you saw earlier referencing it as a judgment that was signed?

7    A    Yes, sir.

8    Q    And this was, I believe, referred to as around '89 or

9    '90, the date?

10   A    Yes, sir, the civil action number is 89-CI, and then the

11   signature page at the end says September of 1990.

12   Q    All right.  In the earlier hearing of detention, I

13   believe it was brought out that Cletus Maricle was running for

14   circuit judge attempting to take the position that he just

15   retired from in about that same time period, is not that

16   correct?

17   A    Yes, sir.

18   Q    And Kenny Day, at that time, was the Republican Election

19   Commissioner in what's been defined by this grand jury as a

20   criminal enterprise being used by these associates called the

21   Clay County Board of Elections?

22   A    Yes.

23   Q    And in your testimony, you indicated that it was Kenny

24   Day's statement to you that Cletus Maricle accompanied him to

25   the home of one of the husbands of the jurors to seek to set

1   or fix a jury?

2   A    Yes, sir.

3   Q    And Kenny Day testified, you were here at that hearing,

4   and he basically was consistent with what he told you?

5   A    Yes, sir.

6   Q    He did not equivocate that Cletus Maricle was with him

7   when he approached the juror's husband?

8   A    That's correct.

9   Q    The only question that was somewhat unanswered after the

10  conclusion of the hearing, and it was argued, was whether or

11  not it was before he took office or after he took office as

12  circuit judge in the '89-'90 time period?

13  A    Correct, yes, sir.

14  Q    Now, you were questioned about your recollection of these

15  recordings.  How many recordings, Agent Briggs, how many hours

16  of recordings do you estimate that there were made in this

17  investigation?

18  A    I would guess, purely guessing, 30 to 40 — or, I'm

19  sorry, 20 to 30 hours.

20  Q    And the government just recently turned that over to

21  counsel for Mr. Maricle, and he's got the benefit of all those

22  at this time, to your knowledge?

23  A    Yes, sir, that's correct.

24  Q    And you've not had an opportunity to review those for

25  today's hearing, you were not subpoenaed to testify here today

TIMOTHY BRIGGS - CROSS - MR. SMITH                    48

1  nor had any reason to believe you would be called to answer

2  questions about those recordings today?

3  A    No, sir.

4  Q    But from your recollection of those recordings, you were

5  asked about whether or not he ever used the term to your

6  witnesses that you should lie, quote-unquote, to the grand

7  jury.

8  A    What's the question, sir?  I'm sorry.

9  Q    Do you recall being asked the question, Agent Briggs,

10 about whether you recall this defendant ever using the word,

11 quote-unquote, lie?

12 A    Yes, sir, I recall that.

13 Q    And you did attempt to — I believe you said, no, he did

14 not use those words?

15 A    Not that I recall, sir.

16 Q    And is that, in your experience and training, when a

17 person is attempting to obstruct justice, uncommon for a

18 defendant not to use the word lie?

19 A    Absolutely, to talk around the issue, say it without

20 saying the key word, I guess you would say.

21 Q    And this is not a usual defendant.  I mean, he's got,

22 what, 35, 40 years' legal experience as a trial attorney and

23 as a judge?

24 A    Yes, sir.

25 Q    And in your experience in dealing with people of that

1  sophistication, it's not uncommon for the wink—wink—nod—nod

2  method?

3  A    Correct.

4  Q    And did you indicate —— in your investigation, did you

5  see him using other means other than overt statements to

6  direct people —— For instance, did he ever direct your source

7  to another person who did give them direct information about

8  this is how you answer the question?

9  A    I mean, he made a number of saying, "Don't use the

10 phones, that's how they caught the group in Bath County,"

11 directing them to go to another co—defendant in the case who

12 would give them —— who they did approach and were given

13 scripted testimony on how to answer the questions.

14 Q    And that was Defendant Stivers?

15 A    Correct.

16 Q    And he did give them direct answers as to how to answer

17 falsely to the grand jury's questions?

18 A    That's correct.

19 Q    Because you gave a ruse —— as part of your investigation,

20 you gave them a list of questions that they were to produce to

21 Mr. Maricle and his co—defendants, didn't you?

22 A    Yes.

23 Q    And they utilized that, then, to script out testimony for

24 your witnesses?

25 A    Correct.

1   Q    Now, as to this most recent involvement that Mr. Maricle

2   was involved in in suborning or attempting to suborn the

3   perjury — perjured testimony of a defendant in Clay County

4   Circuit Court, do you remember those questions?

5   A    Yes.

6   Q    Just so I understand the scheme, and I believe you have

7   explained it before, but he came into Clay County, pled guilty

8   to the charge, and was coached by the judge and others as to

9   how to testify to help convict these defendants?

10  A    That's correct.

11  Q    And why was the judge so concerned about seeing these

12  defendants convicted?  What motivated him according to your

13  sources?

14  A    Some of the defendants charged in this case had

15  information regarding his daughter.

16  Q    And so what kind of information did they have on his

17  daughter?

18  A    You know, I don't recall specifically what it was.  It

19  was, I think, regarding Linsey.  It may have been information

20  about drug activity or another — solving a murder or

21  something like that.

22  Q    So this defendant who made a deal with the judge, did he

23  come through on his part of the bargain, according to the

24  information you obtained from the source?

25  A    Partially.  I mean, he pled guilty and testified,

1  scripted, but slightly went off the script and didn't go as

2  far as he was — you know, the witness was supposed to, so —

3  Q    So what was he promised if he came through 100 percent?

4  A    No jail time.

5  Q    And he got, instead, that you've been offered here, five

6  years in the penitentiary according to the judgment?

7  A    Yes.

8  Q    And that was because he didn't come through with his part

9  of the bargain?

10  A    Correct, to the full extent that the witness was supposed

11  to.

12        MR. SMITH:  Your Honor, that's the questions that we

13  have at this time.  I do anticipate recalling Agent Briggs,

14  with the Court's permission.

15        THE COURT:  All right.  Thank you.

16        Anything else of this witness?

17        MR. HOSKINS:  Just a couple, Judge.

18        THE COURT:  Yes, sir.

19                    REDIRECT EXAMINATION

20  BY MR. HOSKINS:

21  Q    Agent Briggs, you talked about one of your ruses being to

22  prepare a list of questions, and your sources took that list

23  to Judge Maricle's house, didn't they?

24  A    I believe so.  I know they took it to the other

25  co-defendant, and I believe they took it to Mr. Maricle as

1  well.

2  Q    Now, have you listened to the tape where the source tries

3  to give that to Judge Maricle and he doesn't want it?

4  A    I can't answer that, sir.

5  Q    Well that's on tape, isn't it?

6  A    Sir, I wasn't prepared to speak about the tapes today, I

7  have not reviewed them recently.

8  Q    Okay.  You don't remember if it is?

9  A    I don't remember, sir, no.

10 Q    You didn't find that list of questions when you searched

11 Judge Maricle's house, did you?

12 A    No, sir.

13 Q    And the person who you do have on tape sitting down

14 answering those questions is not Judge Maricle, is it?

15 A    I don't think it's fair to say he didn't help them answer

16 the questions, he addressed several of their concerns, but the

17 person I think who more fully answered their questions line by

18 line was Mr. Stivers.

19 Q    Do you have Judge Maricle answering those questions?

20 A    We have Judge Maricle offering them advice on how to

21 handle themselves, yes, sir.

22 Q    I'm asking you if you have Judge Maricle telling them how

23 to answer that list of questions.

24 A    Sir, I don't recall the questions specifically and

25 whether he addressed any one of them directly.

1  Q    All right.  You pointed out a little bit earlier that

2  Corky Price pled guilty to an information.

3  A    The witness in this case pled guilty to an information,

4  yes, sir.

5  Q    Which means that he had entered a guilty plea his first

6  court appearance?

7  A    Sir, I don't — I don't know that.  I don't know how the

8  state court systems work and I don't know what you're asking.

9  Q    That's the way it works in the federal system, isn't it,

10 your experience?

11 A    What is your question, sir?  I don't understand.

12 Q    A person who pleads guilty to an information does that at

13 their first court appearance?

14 A    Typically, yes, sir.

15 Q    Okay.  Corky Price was not given bond by Judge Maricle

16 that day, was he?

17 A    I don't — I don't recall, sir.

18 Q    Okay.  What is your source for saying somebody had

19 information about Judge Maricle's daughter?  Does that come

20 from these same two sources?

21 A    It came from the source, but I also want to say that

22 there may have been a letter sent to Mr. Maricle.  I don't

23 recall the specific details, but the source — I know the

24 sources have verified that, yes, sir.

25 Q    The sources maybe have seen this letter?

TIMOTHY BRIGGS - REDIRECT - MR. HOSKINS                54

1   A    Possibly, sir.

2   Q    Have you seen it?

3   A    This is a very voluminous case, I've got a lot of

4   documents.  I don't recall seeing it, sir, no.

5   Q    Okay.  Now, you're not trying to tell the Judge that you

6   came in here today thinking that you testifying was not a

7   possibility, did you?

8   A    Excuse me?

9   Q    You're not trying to say you had absolutely no thought

10  that you might testify today, are you?

11  A    Oh, no, sir, I was going to testify on new things the

12  government had learned since the last detention hearing.

13  Q    You didn't think any of this other stuff would come back

14  up?

15  A    I guess not with regard to the details of the tapes, no,

16  sir.

17          MR. HOSKINS:  That's all.

18          THE COURT:  Thank you.

19          Anything else of Agent Briggs?

20          MR. SMITH:  No, Your Honor.  Thank you.

21          THE COURT:  All right.  Special Agent Briggs, you

22  can step down.

23          THE WITNESS:  Leave this here?

24          THE COURT:  Yes, sir, that's fine.

25          Mr. Hoskins, let me have the Clerk mark this before

RICHARD COUCH - DIRECT - MR. HOSKINS                55

1   we proceed so I don't --

2           MR. HOSKINS:  Thank you, Your Honor.

3           THE COURT:  -- get it confused with something else,

4   Defendant's Exhibit 1.  While she's doing that, you may call

5   your next witness.

6           MR. HOSKINS:  I will call Richie Couch.

7                   RICHARD COUCH,

8   having been first duly placed under oath, was examined and

9   testified as follows:

10          THE COURT:  Mr. Hoskins, you may proceed.

11                  DIRECT EXAMINATION

12  BY MR. HOSKINS:

13  Q    Would you tell us your name?

14  A    Richard Couch.

15  Q    Mr. Couch, how are you employed?

16  A    I'm the Assistant Commonwealth Attorney in the 41st

17  Judicial Circuit, covers Clay, Leslie, and Jackson Counties.

18  Q    How long have you been doing that work?

19  A    Since 2000.

20  Q    Okay.  Now, have you done it continually since the year

21  2000?

22  A    Yes, other than I served about a year-and-a-half in the

23  National Guard.  I was activated for Operation Iraqi Freedom.

24  Q    So you were overseas --

25  A    Yes, sir.

RICHARD COUCH - DIRECT - MR. HOSKINS                    56

1   Q    -- for about a year-and-a-half.  Other than that, you've
2   been an Assistance Commonwealth's Attorney for the last nine
3   or so years in Clay County?
4   A    Yes, sir, that would be correct.
5   Q    Are you familiar with a fellow named Eugene Corky Price?
6   A    I am.
7   Q    Do you recall ever prosecuting Mr. Price?
8   A    A couple of times.
9   Q    Okay.  Do you recall prosecuting him for any event that
10  took place in April of 2005?
11  A    I am.
12  Q    Can you tell the Court what that case was about?
13  A    And I assume you're talking about the case where Tisha
14  Saylor was the victim?  Mr. Price, along with Brian Curtis
15  Collins, Eddie Joe Cobb, and Grant Hatfield were charged with
16  an assault on Ms. Saylor.  Ms. Saylor was a witness in a case
17  of Commonwealth v. Harold and John Wayne Collins.
18  Q    And that was a murder case, wasn't it?
19  A    That's correct.
20  Q    So Tisha Saylor was a witness in a murder case in Clay
21  Circuit Court?
22  A    That's correct.  She was being interviewed by the State
23  Police.  Now, at the time she had not given a statement, and I
24  remember this well because I was talking to Detective John
25  Yates with the Kentucky State Police and I was telling him we

RICHARD COUCH - DIRECT - MR. HOSKINS                    57

 1  need to re-interview her and see if we can get another
 2  statement, because at the time she wasn't giving any
 3  information.  And so at the time Detective Yates says hold on
 4  a minute, I got a phone call, and that was the call that she
 5  had been assaulted.
 6  Q    Okay.  Well, tell us about the nature of that assault.
 7  A    It was assault with a -- I don't remember if it was a
 8  knife or an instrument, but her throat was cut and there was
 9  severe bleeding, and there was some blunt force trauma to the
10  body.
11  Q    And she was left to die in a church parking lot?
12  A    Left to die at the -- a church at Horse Creek, and I
13  don't remember which.
14  Q    Is that a rural part of Clay County?
15  A    Yes, it is.
16  Q    Now, those four people were charged originally with what
17  crime under Kentucky law?
18  A    I do remember -- I think we charged assault, first
19  degree, possibly attempted murder, intimidating a witness.  It
20  seemed like there was a kidnapping charge as well.
21  Q    Assault in the first degree is the highest level of
22  assault under Kentucky law?
23  A    That's correct.
24  Q    Do you know off the top of your head the penalty range?
25  A    Ten to 20 years, it's a Class B felony.

1  Q    Does it fall under any special sentencing rules when it

2  comes to how long a person has to stay in prison?

3  A    Well, currently it would fall in the 85 percent

4  sentencing guideline.  If a defendant's convicted of assault

5  first, he would not be eligible for parole until he's served

6  85 percent of his sentence.

7  Q    Okay.  And that would be a --

8  A    I think it's the Violate Felony Offender Act.

9  Q    That would be a ten- to 20-year sentence for that

10 offense?

11 A    Yes, sir.

12 Q    And that was also the law in 2005, wasn't it?

13 A    That is correct.

14 Q    Now, do you recall the approximate date that this assault

15 took place?

16 A    I do not.

17 Q    Do you recall the circumstances of how Eugene Corky Price

18 came to enter a guilty plea?

19 A    I recall somewhat vaguely, and I do remember we'd

20 received information that Mr. Price was willing to give us

21 information, and I remember -- I don't remember who brought

22 him, he was actually brought to our office.  He had defense

23 counsel, Carl Anthony Short.  I think Mr. Gregory, myself,

24 Detective Yates, and I want to think we at least talked to

25 Charles Marcum, who was the jailer at the time and also the

RICHARD COUCH - DIRECT — MR. HOSKINS                    59

1   grandfather of the victim.  And I don't remember if we spoke

2   to Ms. Saylor's parents directly or not.  But at that time, we

3   said this person may have information, we would like to offer

4   him a deal, and the deal would have been five years, probated

5   for five, for his truthful testimony.  And at that point in

6   time, the victims were like we all were, none of us wanted

7   really to cut this guy a deal, but we didn't have any forensic

8   evidence other than Ms. Saylor's statement.  There was a lot

9   of blood and other bits of evidence at the scene, none linked

10  to any of the three co-defendants, and so we talked it over

11  with the family, we made the deal.  Detective John Yates

12  interviewed Mr. Price.  And once his statement matched the

13  evidence that we had in hand, we entered into an information,

14  not an indictment, but an information with this defendant,

15  Mr. Price.

16  Q    He entered a guilty plea to that information?

17  A    That's correct.

18  Q    And that was just maybe three weeks after the crime

19  occurred; is that right?

20  A    That's approximate.

21  Q    Now, before you and Mr. Gregory on behalf of the

22  Commonwealth of Kentucky made that deal with Mr. Price, he was

23  interviewed either by you or by law enforcement, is that true?

24  A    He was interviewed by Detective John Yates.  I didn't

25  interview him.

1  Q    Okay.  And when he entered his guilty plea to that

2  assault charge, it was to a reduced charge from the original

3  first degree assault, wasn't it?

4  A    Yes, sir.

5  Q    And before Judge Maricle took a plea from Mr. Price, he

6  got a factual basis from him, didn't he?

7  A    That's correct.

8  Q    Have you recently had an opportunity to review the tape

9  of that hearing?

10  A    I have.

11  Q    And at that hearing, Mr. Price testifies very clearly

12  about his role in that offense, doesn't he?

13  A    He does give a statement.

14  Q    And he tells Judge Maricle when he enters his plea that

15  he dropped this girl off?

16        MR. SMITH:  Your Honor, I'm going to object to the

17  leading.

18        THE COURT:  Okay.  Sustained.

19  BY MR. HOSKINS:

20  Q    Do you remember what he tells Judge Maricle about what he

21  did?

22  A    I do not remember exactly.  I have seen the video.  And

23  Mr. Gregory, in fact, has that video.

24        MR. HOSKINS:  Judge, we also have that video here to

25  show the Court.

1          THE COURT:  All right.

2  BY MR. HOSKINS:

3  Q    Mr. Couch, to your recollection, was his statement, his

4  factual basis when he entered the guilty plea, consistent with

5  the statement he had made to John Yates, the State Police

6  detective?

7  A    I do remember that being consistent at the time.

8  Q    Okay.

9  A    He was -- Mr. Price was reluctant, and Mr. Price is the

10 type of person I deal with in my capacity as -- almost you

11 have to beat the truth out of them, to put it mildly, and I do

12 remember him being reluctant.  But in the end, after the judge

13 went through, he did explain that he had dropped Ms. Saylor

14 off and he knew what was going to happen to her.  And I'm

15 paraphrasing, because I don't remember exactly.

16 Q    That's the essence of what he said; right?

17 A    Correct?

18 Q    Did he say where he dropped her off?

19 A    I don't remember exactly.

20 Q    Now, but you said, again, that was a matter of weeks

21 after this assault?

22 A    I think that to be correct.

23 Q    And was Judge Maricle involved in any discussions with

24 this defendant that you know of?

25 A    No, sir.

1  Q    Okay.

2  A    Not in my office.  This was — like I said, the deal came

3  up rather quickly that Mr. Price was going to give this

4  information.  The only involvement that I can remember the

5  judge possibly having at that time is I probably called him

6  and said I would like to take a plea, and I don't remember

7  exactly how that came about.

8  Q    Okay.  So to your knowledge, the first time Judge Maricle

9  was contacted about this was when you already had an

10 agreement —

11 A    To my knowledge, that would be correct.

12 Q    — with Mr. Price.

13      Mr. Price pled guilty?

14 A    Yes, sir.

15 Q    Did he get a bond that day?

16 A    I'm sure he was set a bond.  He was not released.

17 Q    Okay.  He was remanded to jail, wasn't he?

18 A    I don't remember.  I would assume he was set a bond.

19 Q    It was — what was the Commonwealth's request that day

20 when he entered that plea?

21 A    The Commonwealth requested that Mr. Price remain outside

22 of jail for his security.

23 Q    Did Judge Maricle go along with that?

24 A    He did not.

25 Q    Okay.  And that was in the very — in the timeframe of

1    when this assault first took place?

2    A      It was — that was the same day he took the plea, yeah.

3    Q      Did Corky Price later testify?

4    A      He did.

5    Q      Was his testimony what you, as Commonwealth's Attorney,

6    expected it to be?

7    A      Mr. Gregory did direct examination on Mr. Price, so I

8    don't remember the details.  And, again, I want to be as

9    accurate as possible.  For some reason, it sticks out in my

10   mind that Mr. Price was fudging or being hesitant or wasn't

11   being completely truthful, because I can remember Mr. Gregory

12   and myself being angry in talking amongst ourselves.  I don't

13   remember any details.

14   Q      Okay.  Were those defendants convicted in that trial?

15   A      They were.

16   Q      The other three were convicted of the assault on Tisha —

17   A      Yes.

18   Q      What was her last name?

19   A      Natisha Saylor.

20   Q      Natisha Saylor.

21   A      I think she was commonly addressed as Tish or Tisha.

22   Q      Now, after that trial and the three defendants being

23   convicted, did you learn — ever learn of a letter being

24   written by one of those defendants to Judge Maricle?

25   A      I don't remember.  You've showed me the letter outside,

1    and it looks vaguely familiar, but you got to remember I was

2    Commonwealth Attorney since 2000 and people would frequently

3    send Judge Maricle letters and he would frequently put them on

4    the record or show them to myself and defense counsel and

5    Mr. Gregory.  So it's quite possible, I just don't — I can't

6    specifically remember this letter.  I mean —

7    Q    That was not an unusual thing to happen in —

8    A    No, sir.

9    Q    — Clay Circuit Court, was it?

10    A    No, sir.

11    Q    And Judge Maricle's practice in those situations was to

12    do what?

13    A    His practice was to put those on the record or inform

14    defense counsel and the Commonwealth Attorney.  Usually, I did

15    most of the low level D, C felony-types, and so it would be

16    myself and defense counsel, here's this letter, is there any

17    problem, do I need to recuse, et cetera.

18    Q    Okay.  But you don't have any recollection of specifics?

19    A    I don't have any specific recollection, but it wouldn't

20    surprise me.

21    Q    You signed that plea agreement with Corky Price, didn't

22    you?

23    A    That would be correct.

24    Q    Okay.  Do you have a copy of that with you?

25    A    I do.

1          MR. HOSKINS:  Your Honor, we would move for a copy

2     of that to be entered into the record today as our Exhibit

3     No. 2.

4          THE COURT:  All right.  Any objection, Mr. Smith?

5          MR. SMITH:  No.

6          THE COURT:  All right.  Exhibit 2 will be the plea

7     agreement with Mr. Price; is that a correct description?

8          MR. HOSKINS:  Yes.

9          THE COURT:  It will be admitted.

10    BY MR. HOSKINS:

11    Q    Mr. Couch, that plea agreement reflects that for Eugene

12    Corky Price the original charge was assault first degree;

13    correct?

14    A    That's correct.

15    Q    Okay.  But it was amended to assault under extreme

16    emotional disturbance?

17    A    That's correct.

18    Q    Is the judge in a Kentucky State Court required to accept

19    a plea agreement?

20    A    They are not.

21    Q    Judge Maricle would have had the discretion to reject

22    this plea agreement completely, wouldn't he?

23    A    He could at that time.

24    Q    And what charge would Mr. Price have been facing then?

25    A    It would have been assault first.

RICHARD COUCH - CROSS - MR. SMITH                66

1   Q    With the 85 percent parole eligibility?

2   A    Correct.

3   Q    Mr. Couch, you've known Judge Maricle for many years?

4   A    Yes, sir.

5   Q    Worked with him —

6   A    Yes, sir, I worked —

7   Q    — as an attorney?

8   A    I was a law clerk for him for three years, I think the

9   summer of '97 when I graduated law school, until I took the

10  job as Assistant Commonwealth Attorney.

11  Q    Is Judge Maricle a person that can be counted on to obey

12  court orders if he's instructed not to have contact with

13  witnesses?

14  A    Well, certainly as judge, he expected his court orders to

15  be obeyed.  I —

16  Q    Do have any anything that makes you think he wouldn't be

17  trustworthy in this connection?

18  A    I do not.

19          MR. HOSKINS:  Thank you.  That's all of this

20  witness.

21          THE COURT:  Mr. Smith, any questions of this

22  witness.

23                     CROSS-EXAMINATION

24  BY MR. SMITH:

25  Q    Mr. Couch?

1  A    Yes, sir.

2  Q    You've testified that you were the one that took the plea

3  of Mr. Price?

4  A    That is correct.

5  Q    And at the time that you indicated that this was going

6  down, there was an interview that was conducted of Mr. Price

7  outside your presence?

8  A    That's correct.  It was in my office, but it was outside

9  my presence.

10 Q    And you are not aware of any other meetings that may have

11 been conducted by Mr. Price, by people that work in law

12 enforcement necessarily, by family members or anything, you

13 wouldn't be -- you wouldn't be privy to those visits, would

14 you?

15 A    I would not.

16 Q    Is it possible in the handling of prisoners there in Clay

17 County that maybe the bailiff of the court might have an

18 opportunity to allow one of the defendants to visit someone on

19 their way from jail to court?

20 A    It's possible.

21 Q    And you're not saying that didn't happen in this case?

22 A    I cannot.

23 Q    Your responsibilities began when the defendant got in the

24 courtroom, not getting him there, I understand?

25 A    That would be correct.

1  Q    Now, as far as — you've testified that you were asked to

2  cover a plea, I believe you said, to an information?

3  A    That's correct.

4  Q    All right.  And you speak of that as though that's pretty

5  common.  Is that, in fact, a common occurrence in Clay County?

6  A    Well, if I spoke of it as common, I certainly didn't mean

7  that to be —

8  Q    Well it's common to us in federal court —

9  A    — my express intent.

10  Q    So I just wanted to know —

11  A    It's not —

12  Q    Okay.

13  A    It's not common in state court.  As a matter of fact, I

14  don't remember doing — I may possibly have done one other,

15  and one other may have been done by my predecessor, Sharon

16  Allen.

17  Q    Okay.

18  A    It's not common.  I wished it was, but it's not.

19  Q    In fact, in state court, you generally go to district

20  court to get a warrant for somebody, and then they're brought

21  into district court first or they're brought to the grand jury

22  and indicted?

23  A    That would be correct.

24  Q    But you are familiar enough with the Kentucky Revised

25  Statutes to cite us, I'm sure, to the rules of procedure which

1   allow an information, aren't you?

2   A    Well, I do know an information takes the consent of the

3   defendant himself.

4   Q    Okay.  So it's not something that the Commonwealth has

5   the ability to necessarily go out here and make charges

6   against people, the Kentucky constitution says it must be

7   brought in front of the grand jury unless the defendant

8   consents?

9   A    That's correct.  It would — I guess your typical

10  information-type case would be where a defense attorney has

11  come to you and said, can you give me a good deal and we'll do

12  this by information by waiving the grand jury.

13  Q    In fact —

14  A    It doesn't happen often, but —

15  Q    In fact, this defendant wasn't even in the Commonwealth

16  of Kentucky, he was brought from Texas out here to answer to

17  this information; correct?

18  A    That's possible.  I do know some of his family lives in

19  Texas, and I don't remember specifically, but that's very

20  possible, yes, sir.

21  Q    And he was held with some degree of secrecy by family

22  members, and even the police department, I believe, held him

23  in a hotel room over here?

24  A    I believe the Manchester City Police did hold him.  I

25  have no personal information to that effect, but, yes, sir.

1  Q    And you said that you were prepared for this information

2  and you-all had a court hearing.  Did you-all have that on the

3  docket the day this occurred?

4  A    I assume we put it on the docket.  I don't remember.

5  Q    Did you have a lot of notice, Mr. Couch, that you were

6  going over to do this plea that day?

7  A    No, sir.

8  Q    And how do you remember that?

9  A    I remember that because I reviewed the video, and, in

10 fact, I'm not in a suit, I'm in what appears to be slacks and

11 maybe a Polo-type shirt.

12 Q    And that's not normally the courtroom decorum, it

13 requires you to wear a suit normally; right?

14 A    Yes, sir.

15 Q    Do you recall how it was you came to know that you had

16 this court engagement?

17 A    I do not.  I want to think that I either contacted the

18 judge some way and said, I've got an information, we need to

19 take a plea, but I don't really remember specifically.

20 Q    And in your experience as an Assistant Commonwealth

21 Attorney, did that happen very often, you would be called on

22 without being aware that you're going to have to go to court?

23 A    No, sir, not very often.  It's happened, but --

24 Q    That would be unusual, too?

25 A    Yes, sir, it's unusual.

1   Q    And then you said that you had this detective with the
2   Kentucky State Police by the name of John Yates that was
3   involved.  He was your case detective; is that correct?
4   A    Yes, sir, he was the investigating officer.
5   Q    Okay.  And that's pretty common in the Commonwealth of
6   Kentucky for your cases to be investigated by the Kentucky
7   State Police, I assume?
8   A    Yes, sir.
9   Q    And especially as you've described this, this was a very
10  violent, heinous crime that was involved?
11  A    That's correct.  Again, as I told defense counsel
12  earlier, it was odd that I'm speaking to a detective with the
13  State Police about interviewing a witness and he gets a call
14  in mid-sentence and says this person has been assaulted.  So,
15  yeah, it was —
16  Q    And you're — I believe you indicated that you had an
17  opportunity to review the trial videotape?
18  A    No, sir, I've not reviewed the trial.  I reviewed the
19  plea and the sentencing.
20  Q    Okay.
21  A    And I think Mr. Gregory has a copy of the trial testimony
22  here with him today.
23  Q    Okay.  And in the videotape, would it surprise you to
24  learn that the detective for the Kentucky State Police didn't
25  sit with the Commonwealth during the prosecution of these

 1  defendants?

 2  A    No.  I do remember — I think Mr. Marcum —

 3  Q    It was Charles Marcum, the grandfather?

 4  A    I think that's correct.

 5  Q    And was that normal procedure for you to have a

 6  grandfather of a victim as opposed to your case agent sitting

 7  to help you in trying the case?

 8  A    It's not normal for me.  I always like to have the case

 9  officer present.  Mr. Gregory always liked to have the victim

10  or the victim's family present.

11  Q    And he pretty much ran the show on this trial, didn't he?

12  A    That's correct.

13  Q    You were sitting second, as we would call it?

14  A    I'm second chair, yes.

15  Q    Second chair.  And, again, you said that when the plea

16  was taken that the defendant did give a factual basis, but you

17  don't remember what it was exactly?

18  A    I don't remember specifically.  I think my paraphrase is

19  about as close as I can get.  But I —

20  Q    But what you do know is that you made an agreement with

21  him that he was going to testify in this assault first case,

22  and in exchange for that, you agreed to give him probation?

23  A    Yes, sir.  If I'm correct, I have a copy that made an

24  exchange for his truthful testimony in 04-CR-176-001, which

25  was Commonwealth v. either John Wayne or Harold Collins, and

1  then Grant Hatfield, Brian Curtis Collins, and Eddie Joe Cobb,

2  and any other cases that would arise out of the incidents.

3  Q    And Mr. Gregory was the one who handled the sentencing of

4  this case?

5  A    I was present at the sentencing.

6  Q    But who handled the sentencing, Mr. Couch, to your

7  knowledge, was it Mr. Gregory or you?

8  A    Handled the -- I'm afraid I'm lost.  I saw the

9  sentencing, and I was present.

10 Q    Okay.  Was mr. Gregory present as well?

11 A    Mr. Gregory was not present, no.  He was in the

12 courtroom.

13 Q    Okay.

14 A    It looked like I was alone.

15 Q    But he was present?

16 A    I don't remember if he was --

17 Q    As his assistant, did you consult him before agreeing to

18 stick with this agreement here?

19 A    Now, this -- the offer was -- this was Mr. Gregory's

20 offer.

21 Q    Oh, so it was his offer?

22 A    I wrote it up and I signed it.  Mr. Gregory left that

23 day.  I was the only one who entered the plea in court, but

24 Mr. Gregory talked to the family and detective, and we then

25 got the detective's signature.

RICHARD COLE CROSS - MR. SMITH                    74

1  Q    And as you've testified, you don't know what meetings may
2  have been conducted with your witness by other people outside
3  the courtroom or outside the —

4  A    When he was in jail?  No.  I mean, I don't know who he
5  met with in jail, no.

6  Q    And to your knowledge, there were no other promises or
7  inducements made to this witness other than what's in this
8  document here?

9  A    My office has a standing policy, we only — we don't
10 really even go over testimony with the witness, we tell them
11 to tell the truth, and that's basically it.

12 Q    So you didn't meet with the witness before you called him
13 to testify in that trial?

14 A    I don't remember that.

15 Q    Did Mr. Gregory perhaps meet with the witness outside
16 your presence to discuss his testimony?

17 A    I guess it's possible.  I don't —

18 Q    But you have no recollection of having such a meeting
19 yourself, because that was —

20 A    With Mr. Price?

21 Q    With Mr. Price.

22 A    No, sir.  I certainly do not remember ever going to the
23 jail and speaking to Mr. Price.

24         MR. SMITH:  All right.  May I have a moment, Your
25 Honor?

1             THE COURT:  Yes, sir.

2    BY MR. SMITH:

3    Q    And just so I understand for the record, Mr. Couch, Gary

4    Gregory is the elected official in Clay County as the

5    Commonwealth Attorney; correct?

6    A    That's correct.  I'm and at-will employee.

7    Q    Okay.  And you serve at his discretion and under his —

8    discretion as opposed to — I mean, he can hire and fire

9    whoever he wants as Assistant Commonwealth Attorney, you

10   don't — you're not elected to that position by the people;

11   correct?

12   A    That's correct.  Mr. Gregory could actually fire me, and

13   I'm protected under ERISA for a year because of my deployment

14   to Iraq, but otherwise, after that year, he could fire me

15   because he doesn't like my hair.  And I hope he doesn't do

16   that, but —

17             MR. SMITH:  Okay.  Me as well.  Thank you.

18             THE COURT:  Any redirect?

19             MR. HOSKINS:  Just quickly, Your Honor.

20             THE COURT:  Yes, sir.

21                      REDIRECT EXAMINATION

22   BY MR. HOSKINS:

23   Q    Mr. Couch, you would agree that it was not unusual for

24   Judge Maricle to be available if you-all had a case set for

25   trial or you had a case that you wanted to take a plea on,

 1   Judge Maricle would generally make himself available to take

 2   the plea; correct?

 3   A    That would be correct.

 4   Q    And —

 5   A    I mean, you generally know when the judge is around or if

 6   they're out of town, so, yeah.  I mean, we could always find

 7   him.  I've taken detectives to his house to get arrest

 8   warrants signed.  I mean, he was accessible.

 9   Q    Okay.  Do you have anything at all that you're aware of

10   that makes you think Judge Maricle was involved in talking to

11   Corky Price or was involved in any of this plea negotiation?

12   A    I have no knowledge of that whatsoever.

13   Q    That would be unusual, wouldn't it?

14   A    That would be unusual, yes.

15   Q    If you ever — did you ever know of Judge Maricle doing

16   that?

17   A    Well, when I started working for Judge Maricle, he gave a

18   standing order; people will attempt to ex parte you concerning

19   cases, and he said don't do it, but be nice to people.  You

20   couldn't just kick them out of the office for making ex parte,

21   but he said be nice.

22   Q    But Judge Maricle, when he was would take a plea from

23   somebody, if there was a recommendation of probation, would do

24   what he — normally do what he did in the Corky Price case,

25   wouldn't he?

1  A    That's correct.

2  Q    Tell the Judge what -- how Judge Maricle would handle a

3  recommendation of probation when a person entered a guilty

4  plea.

5  A    He would state to the defendant that the recommendation

6  by the Commonwealth is just that, a recommendation, it was not

7  binding on him and that he would have the sole authority or

8  deciding -- I guess deciding vote on whether or not this

9  person would receive probation.

10  Q    Did he say that to Corky Price that day?

11  A    I do remember him saying that, yes.

12  Q    He didn't promise Corky --

13  A    Now, I'm paraphrasing, but, yes, sir.

14         MR. HOSKINS:  Judge, I'm going to move to introduce

15  a case history printout of the Corky Price case that shows the

16  date of these things.  I think the plea agreement shows the

17  date of the offense, I believe, but I would also -- what I'm

18  showing the government right now is that case history that

19  shows the dates.

20         THE COURT:  All right.  Any objection?

21         MR. SMITH:  No.

22         THE COURT:  That will be Exhibit 3 for the

23  defendants.

24         MR. HOSKINS:  And that's all the questions I have of

25  Mr. Couch.

1              THE COURT:  All right.  Let's see if Mr. Smith has

2   any additional questions.  Mr. Smith?

3              MR. SMITH:  No, thank you, Your Honor.

4              THE COURT:  Mr. Couch, can you confirm that this

5   exhibit is, in fact, a computer printout of the case history

6   of the case that Mr. Hoskins was referring to?

7              THE WITNESS:  Yes, Your Honor, it appears to be.

8              THE COURT:  All right.  Thank you.

9              THE WITNESS:  Or I can at least say the case numbers

10  match up.

11             THE COURT:  Thank you.  You're excused.

12  Mr. Hensley, if you could deliver that exhibit to the Clerk,

13  please.

14             THE WITNESS:  You say I'm finally excused, Your

15  Honor?

16             THE COURT:  Unless you're under subpoena by someone

17  else, yes, sir.

18             MR. HOSKINS:  I call Gary Gregory.

19             THE COURT:  Let me, before the next witness comes

20  in, Exhibit 2, the plea agreement, do you still have that,

21  Mr. Hoskins?

22             MR. HOSKINS:  Yes.

23             THE COURT:  All right.  We don't want it to get

24  away.  You can hang on to it for now, but at the break you can

25  provide that to the Clerk.

1                        GARY HUGH GREGORY,

2   having been first duly placed under oath, was examined and

3   testified as follows:

4             THE COURT:  Counsel, if you could approach the bench

5   just one moment before the witness is examined.

6        (Whereupon, the following discussion was had between the

7   Court and counsel at the bench, out of the hearing of the

8   jury.)

9             THE COURT:  At the hearing before the

10  magistrate-judge, it indicates that this witness may have been

11  involved in criminal activity and may need to be advised of

12  his Fifth Amendment rights at this time.

13            MR. SMITH:  I would ask the Court to do that since

14  obviously he is an attorney, but he has a right to one and

15  might want to consult one before he answers these questions

16  that might be propounded on him today.

17            THE COURT:  Do you agree, Mr. Hoskins?

18            MR. HOSKINS:  Yes.

19            THE COURT:  Thank you.

20       (Whereupon, the following proceedings continued in open

21  court.)

22            THE COURT:  Thank you, Counsel.

23            Mr. Gregory, before you begin your testimony, I do

24  need to advise you that based upon my review of the transcript

25  of the previous detention hearing that there is some

1  indication that you may have been involved in criminal

2  activity in this matter, and, therefore, you need to be

3  advised of your Fifth Amendment right to consult with an

4  attorney and your right to not testify if you choose to do so

5  in the case.  And you do understand that?

6           THE WITNESS:  I do, Your Honor.  Thank you.  And

7  that's why I'm willing to appear here today.

8           THE COURT:  If at any time you believe that it would

9  be in your best interest not to testify, you need to advise me

10 of that.

11          THE WITNESS:  Thank you, Judge.

12          THE COURT:  All right.  Thank you.  You may be

13 seated.

14          MR. HOSKINS:  Thank you, Your Honor.

15                        DIRECT EXAMINATION

16 BY MR. HOSKINS:

17 Q    Thank you, Mr. Gregory.  Would you tell us your full

18 name, please.

19 A    Gary Hugh Gregory.

20 Q    Mr. Gregory, how are you employed?

21 A    I serve as the Commonwealth Attorney for the 41st

22 Judicial Circuit.  I have been employed in that capacity since

23 January of 1994.

24 Q    So you're the chief State prosecutor in Clay County,

25 Leslie County, and Jackson County?

1   A    Yes, sir.

2   Q    Is it your practice in your office that you take primary

3   responsibility in the serious cases?

4   A    Well, yes, it has been.  I mean, I normally try the

5   murder cases or the serious assault cases or serious rape case

6   or a sex abuse case, but I have tried a theft case and things

7   like that many years ago.

8   Q    Do you recall your office prosecuting a Eugene Corky

9   Price?

10  A    I do.

11  Q    Was that on one occasion or many?

12  A    You know, Mr. Hoskins, I actually think -- I don't want

13  to say for certain, but I actually think probably we had

14  prosecuted Corky maybe on something other than the matter

15  of -- regarding Natisha Saylor when she had her throat cut.  I

16  think that Corky had come through my office before, many years

17  before, but I don't want to swear to that.

18  Q    And when he testified in the trial of the other three, he

19  testified that he was already a convicted felon; right?

20  A    As I -- I have his 54-page statement here, and I have the

21  entire transcript of the trial with me, the video trial, and I

22  will not dispute that, but I'm not going to sit here and say I

23  do recall that yes or -- yea or nay.

24  Q    Fair enough.  Do you recall your office prosecuting

25  Harold Wayne Collins?

1   A    Yes, I do.

2   Q    What was Harold Wayne Collins charged with?

3   A    Harold Wayne Collins was charged with the murder of

4   Stevie Collins and — let's see, Harold Wayne Collins and John

5   Wayne Collins were charged with the murder of Stevie Collins,

6   which occurred on October the 10th of 2004.  Crystal Wilson,

7   also known as Crystal Hicks, she was present, we found out she

8   was present as a witness because she was a girlfriend of John

9   Wayne Collins.  She was present during that murder, along with

10  Natisha Saylor, along with April Collins, who was married to

11  Harold Wayne Collins at that time.  Those three witnesses

12  witnessed the murder of Stevie Collins that occurred on Roots

13  Branch.  And so Stevie Collins was killed on October 10th,

14  2004.  And Crystal Wilson, also known as Crystal Hicks, was

15  killed on November the 20th of 2004, roughly five weeks later.

16  So there's one witness gone, this Crystal Wilson.

17       Natisha Saylor was assaulted on April the 6th of 2005 and

18  left for dead in the parking lot of the Horse Creek Baptist

19  Church with her throat cut from ear to ear.  And Corky

20  Price — there was two witnesses gone at that point in time.

21       Obviously, April Collins, being married to Harold

22  Collins, in my honest opinion, they didn't think she would

23  ever testify against him.  But Corky Price came forward saying

24  he had information, because from reading his statement last

25  night, a 54-page statement, he was put in jail.  I want to

1   say, without telling you for certain, that Stevie Collins and

2   John Wayne Collins was indicted, and they were placed in jail

3   in 2004.  But I would refer that to Detective John Yates and

4   some of the other detectives that made the arrest.  But Corky

5   Price was in jail with them for a period of a couple of

6   months.  Then he was out of jail, and then he comes forward

7   saying that he had some information about - well, you'll read

8   in his statement - that Harold Wayne Collins and John Wayne

9   Collins had threatened him while he was in jail about some

10  prior problems.

11      To make a long story short, Natisha was a assaulted on

12  April 6th.  Eugene Corky Price comes in on April 28th, 2005,

13  and says he has information relating to the assault of

14  Natisha, we -- as known as Clay County as Tish Saylor.  And at

15  that particular point in time, we had nothing.

16  Q   Mr. Gregory, Let me step back just a minute.

17  A   Okay.

18  Q   The first -- the first murder victim in this chain of

19  events was who?

20  A   Stevie Collins.

21  Q   Stevie Collins?

22  A   Would be -- is the one, yes.

23  Q   And two people were charged with his murder?

24  A   Yes.

25  Q   And that was Harold Wayne Collins?

1   A    Harold Wayne Collins and John Wayne Collins.

2   Q    Okay.  Were they related, the two Collins, the

3   defendants?

4   A    I'm sorry?

5   Q    Was Harold Wayne Collins and John Wayne Collins, were

6   they kin?

7   A    Related?  Are they — are those two people related?

8   Q    Yes.

9   A    Yes, they are.  I'm not sure if they're brothers or if

10  it's a nephew-uncle-type situation.

11  Q    Okay.  So the first thing you had was the murder of

12  Stevie Collins?

13  A    Right.

14  Q    And you identified witnesses who were present when that

15  murder took place?

16  A    That's correct.

17  Q    The first was Crystal Hicks?

18  A    Yes.  Crystal Hicks — Well, we knew Crystal Hicks was

19  present and we knew Natisha Saylor was present, because I

20  think if you would talk to Detective Yates, and if my memory

21  serves my correctly, he had not been successful in getting any

22  information whatsoever out of Natisha Saylor.  As a matter of

23  fact, I think Detective Yates would probably tell you that

24  he'd been up there to talk to Natisha Saylor just a little bit

25  before she got assaulted and she still wouldn't tell him

1  anything about –– that she knew anything.  However, April had

2  told us some things that put us –– put Detective Yates onto

3  the lead about who all was present.

4  Q    Okay.  Let me focus your testimony just a little bit on

5  the timing here.  The assault on Tisha Saylor was April

6  the 6th of 2005?

7  A    Yes, sir.

8  Q    At that time, her grandfather, Charles Marcum, was the

9  Clay County jailer; is that right?

10  A    Yes, sir.

11  Q    Okay.  Sometime after that assault, but not long after

12  that assault, you became aware of information that Corky Price

13  supposedly had?

14  A    Yes, sir.

15  Q    Can you tell us the source of that information, how you

16  found out Corky had information?

17  A    I can tell you, because I was in my office –– I don't

18  know what day it was, to be honest with you, I don't know if

19  it was this same day that he gave a statement, I'm not sure of

20  that.  But his brother–in–law, I think it was his

21  brother–in–law, a person by the Kennon White, came in there

22  and said that –– because we –– at that particular point in

23  time, I think Detective Yates was asking questions, and he

24  came in there and said that he knew where Corky was and Corky

25  had been in Arizona and Corky had information about this

 1  murder.  I want to say that one of the city police officers

 2  came in with Mr. White, brought him, but I'm not sure about

 3  that day at that time.  They're in and out — they were in and

 4  out, I don't know.

 5  Q    So somebody comes to you with that information.  Was

 6  Judge Maricle involved with that at all that day?

 7  A    Not to my knowledge, David.  Excuse me just a second.

 8       THE WITNESS:  Your Honor, could I please have a

 9  glass of water?

10       THE COURT:  Sure.

11       THE WITNESS:  Okay.

12  BY MR. HOSKINS:

13  Q    And when Corky Price came forward, he gave a statement to

14  law enforcement, didn't he?

15  A    Yes, he did.  I was not present when he gave that

16  statement.  When you look at this statement, Detective John

17  Yates and my assistant, Richie Couch — of course, I don't

18  think Richie — and he can correct me if I'm wrong, but I

19  don't think Richie was even in the room when Detective Yates

20  got the statement, because the statement reflects Detective

21  Yates, and in the room also present is his counsel, Anthony

22  Short.

23  Q    Okay.  It doesn't say anything about Judge Maricle being

24  present, does it?

25  A    No, because the statement was actually taken, to my

1    knowledge — and like I say, I wasn't present, but it was
2    actually taken in my office.
3    Q    Okay.  And that statement from Corky Price was what he
4    had to offer to the Commonwealth in exchange for a reduced
5    charge in the case?
6    A    Yes.  And — yes, it was.
7    Q    Okay.
8    A    And I made the offer, I did make the offer.  However, I
9    was not present when the plea agreement was signed.  I think
10   if you'll look at the records, Richie signed the agreement,
11   but, you know — and it was a good deal for Corky Price.
12   However, there's a whole lot of information in here in this
13   agreement relating to some other crimes in Clay County that
14   Corky Price could also help the Commonwealth on, and when we
15   later tried John Wayne Collins in Bowling Green — if you'll
16   read through this statement, we later tried John Wayne Collins
17   in Bowling Green.  Down there, he had told us about being
18   supposedly shot at by an individual who he had named in this
19   statement.  So the thoughts was also in the back of my mind
20   that I may also have to use him in another case which I was
21   also thinking about.
22   Q    And that was also referenced in the plea agreement, that
23   other case, wasn't it?
24   A    I'm not sure.  I'm just not sure.
25   Q    That's fine.

1  A    Whatever that record says is what —

2  Q    We'll come back to that.  My question — my last question

3  was that Corky Price gave a statement to Detective Yates that

4  was what you understood was his — would be the truthful

5  testimony he would give at trial?

6  A    Yes, sir.

7  Q    Okay.  Now, have you recently had an opportunity to

8  review the hearing where Corky Price comes in and pleads

9  guilty?

10  A    No, I have not.  I was served with a subpoena Saturday

11  afternoon while I was sitting on a tractor.  I did read

12  through this 54-page statement.  I do have that sentencing

13  hearing videotape with me here today, along with the entire

14  transcript if you would like to see it.

15  Q    Thank you, I apologize for the way —

16  A    But I do know that Mr. Couch tells me I wasn't present at

17  the sentencing, and I don't recall being there.

18  Q    Okay.  Well, you don't know what the substance of

19  Mr. Price's statement when he pled guilty would be, then, is

20  that fair to say?

21  A    No.  No.

22  Q    Okay.

23  A    I know I made a deal with Corky Price, and I — because I

24  made the deal with Corky Price, our office — you know, I

25  intended, you know, to honor our word with him.

GARY HUGH GREGORY - DIRECT - MR. HOSKINS          89

1  Q    But you did know, and in trial preparation for the other

2  three people charged with the assault, you knew what Corky

3  Price had told Detective Yates that very first day?

4  A    At what point in time?

5  Q    Well, later on.

6  A    Yeah, we had the trial.  When we tried the — we tried,

7  goodness, the three individuals, Eddie Joe Cobb, Brian

8  Collins, and Grant Hatfield, that was held on 11-28-05, and

9  Corky was a witness in that trial.

10 Q    And you conducted that trial primarily —

11 A    I did.

12 Q    — on behalf of the Commonwealth?

13 A    I did.

14 Q    And those three defendants were convicted of that crime?

15 A    Yes, they were.

16 Q    Now, Corky Price testified at that trial, didn't he?

17 A    Yes, sir.

18 Q    Did he testify consistently with the statement he gave to

19 Detective Yates?

20 A    Well, you know, somewhat and somewhat no.  I think I had

21 to refresh his memory, if my memory serves me correctly,

22 during the course of the trial and remind him that he had, you

23 know, made this statement.  But that's what I remember about

24 it.

25 Q    At any point, did Judge Maricle display any displeasure

1  at Corky's testimony during that trial?

2  A    Goodness, David.

3  Q    Do you remember?  If you don't, that's okay.

4  A    I don't honestly remember.  I mean, you know, there's so

5  many of these trials.

6  Q    Mr. Gregory, start to finish in the Corky Price case, are

7  you aware of anything at all that Judge Maricle did other than

8  act as a judge in the case the way a judge in the case is

9  supposed to act?

10 A    No.  I mean, in my honest opinion, the three defendants

11 received a fair trial and they were guiltier than sin.  And

12 all we had, quite frankly, was I had one dead witness, another

13 witness that had her throat cut from ear to ear, and by the

14 grace of God it got cold enough that night that she didn't

15 die.  I do remember that testimony from the trial.  And we had

16 nothing, there was no -- to my knowledge, no forensic

17 evidence, and Corky Price, we needed his testimony to

18 corroborate Natisha Saylor.  And when you look at his

19 testimony, you'll notice in there Detective Yates -- it's

20 probably about 20-some pages.  At first Corky didn't want to

21 admit that they had offered him a thousand dollars to set her

22 off, but then later on in this statement he did admit to that.

23 Q    Well, I want to focus your attention just on

24 Judge Maricle's role in this whole process.  Are you aware of

25 Judge Maricle ever being involved with any type of

1  conversations with Corky Price other than in the courtroom?

2  A    No, not to my knowledge.  And, you know, let me be clear,

3  please be clear, back here sits my detective been with me for

4  years, and everybody knows me, I've never asked anybody to

5  lie.  And I've only told — I'll tell victims, I'll tell

6  anybody, you tell the truth.  You know, either for me or

7  against me, you tell nothing but the truth.  And considering

8  what I read in the paper the last time we had a hearing over

9  here — and if somebody said that I was in any way present

10  when somebody was told to lie, I'm sorry, that's a mistake.

11  You know, I was not present, I don't know nothing about —

12  anything about that.

13  Q    Do you know of anybody ever suggesting to Corky Price

14  that he tell anything other than the truth?

15  A    I know I haven't, and that's what I know.

16  Q    And you don't have any knowledge of anybody else ever —

17  A    No, I do not.

18  Q    Okay.

19  A    And I know we made — Corky Price got up and made a

20  sweetheart deal and for — in terms of his involvement in this

21  particular case, and I will admit that.  However, he was a

22  witness for us in that trial and may very well —

23         THE WITNESS:  Your Honor, I — Steve, may — may we

24  approach?  May I ask you something, Your Honor, with

25  Mr. Smith?

1              THE COURT:  I believe the witness needs to ask a

2    question with counsel present.

3              THE WITNESS:  Yes.

4              THE COURT:  If you can come up, please.

5         (Whereupon, the following discussion was had between the

6    Court and counsel at the bench.)

7

8

9

10

11

12                        TRANSCRIPT SEALED

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

TRANSCRIPT SEALED

1

2

3

4

5

6

7

8

9

10

11

12

13                          TRANSCRIPT SEALED

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                                    TRANSCRIPT SEALED

4          (Whereupon, the following proceedings continued in open

5    court.)

6                  MR. HOSKINS:  That's all for this witness, Your

7    Honor.

8                  THE COURT:  All right.  Thank you.

9                  Mr. Smith, you may examine the witness.

10                              CROSS-EXAMINATION

11   BY MR. SMITH:

12   Q    Mr. Gregory, you have --

13   A    Mr. Smith.

14   Q    -- given testimony here before the Court regarding your

15   knowledge of the Corky Price prosecution, and I think you

16   related that you had a meeting in your office with Kennon

17   White, is how you became aware that Corky Price was out there.

18   Is that your testimony?

19   A    To the best of my knowledge, I believe that's correct,

20   Mr. Smith.  I believe it was Mr. White who had approached me

21   about Corky Price wanting to tell what he knew about this

22   matter.

23   Q    Did you have a charge against him?  Was he indicted?

24   A    On the -- I would have to look at the record, and Richie

25   could probably tell you.  I want to say that there was an

1   information made that very day that — it was shortly — that

2   day or shortly before that we done it by information.

3   Q    So Kennon White came to you after you prepared an

4   information, is that your testimony?

5   A    No, sir.  No, sir, I don't think that's — No, sir,

6   Mr. Smith.  I want to say — you know, to be honest with you,

7   I don't — I can't sit here and tell you exactly.  I would be

8   glad to look it up for you and get the date of the information

9   and everything and try to tell you that.  I just —

10  Q    So you don't remember?

11  A    No, I don't, sir.

12  Q    Okay.  So you do remember Kennon White coming to your

13  office and saying that his relative, I assume — Did he relate

14  to you he's a relative to him?

15  A    My understanding is he is a relative to him.

16  Q    Did he relate that to you?

17  A    You know, I don't recall.  Mr. Smith, to be honest with

18  you, it was just more or less common knowledge.  I mean —

19  Q    So it was common knowledge they were relatives, is that

20  what you're saying?

21  A    Yes.  Yes, it was.

22  Q    And that's how this case got kicked off?

23  A    I'm sorry?

24  Q    Your meeting with Kennon White kicked off this case?

25  A    No.  No.  Now, Mr. Smith, Kennon talked to me.  Now, we

1  also — we had had information — we had had information that
2  Corky may have some involvement, because there's also in this
3  54-page statement here, there was a girl that was
4  supposedly — well, to be honest with you, I don't know if
5  it's ever been determined where she actually was from, but
6  she's supposedly been from London and had been with Corky and
7  had supposedly gone to Stivers, had asked Corky to take her to
8  Stivers that particular night that he was driving Natisha
9  around, along with Vernon Jarvis and some other guys, and they
10 were doing drugs.  But he had supposedly taken — gotten this
11 girl out of one of these defendant's cars and was supposed to
12 take her to get gas at Stivers's, and she ran out of there and
13 didn't pay for it.  And —
14 Q    In that conversation you had with him, Mr. Gregory, did
15 he indicate that there was a woman by the name of Magdalene
16 Collins that was supposed to have been meeting him there the
17 night that this incident took place?
18 A    You mean Corky Price?
19 Q    Yes, sir.
20 A    In this statement, no, I don't think I saw Magdalene's
21 name.
22 Q    Magdalene wasn't mentioned in that statement, was she?
23 A    Not to my knowledge, in this statement, no, sir.  No,
24 sir, not — after —
25 Q    Do you know who Magdalene Collins is?

1  A    If my memory serves me correctly, Mr. Smith, I want to

2  say that Magdalene Collins at the trial of Brian — Grant

3  Hatfield, Brian — Eddie Joe Cobb and Brian Collins, you know,

4  I want to sit here and say, I'm not a hundred percent certain

5  and let record — the videotape correct me, I want to say

6  she's the mother.  She was the mother of one of these

7  defendants.  And I also want to say that she testified, but I

8  may be wrong.  I know some of the family members testified in

9  their behalf that night, but I'm not sure if it was — I'm

10  just not sure, I would have to look at the videotape for that.

11  Q    Okay.  Do you know Magdalene Collins, know how old she

12  is?

13  A    No, sir, I don't know how old she is, but I do know

14  Magdalene Collins.

15  Q    And you believe her to be the mother of these — one of

16  these defendants?

17  A    Well, I know she's related.  Let me — let me put it to

18  you in those terms.

19  Q    But in his statement, your recollection is he didn't

20  mention Magdalene Collins being present?

21  A    No, sir.

22  Q    And you said that you were only privy to this meeting

23  with Kennon White, that you weren't there when Detective Yates

24  interviewed this subject?

25  A    I wasn't in the room or wasn't — I don't even — you

 1  know, Mr. Smith, I don't actually think I was even in the

 2  office when Detective Yates and them took the statement from

 3  Corky.  I really don't.

 4  Q    Was that before he entered his plea or after he entered

 5  his plea that he gave the statement to them?

 6  A    It would have been before.  It was before, yes.

 7  Q    Before?

 8  A    It was before, yes.  The state —

 9  Q    So after you got that statement, you made a

10  recommendation in your plea agreement that he get probation?

11  A    I did.  And, Mr. Smith, I want to say, too, that I also

12  talked — consulted with the victim's family members, some of

13  the victim's family members before I done any of this thing,

14  telling them about the information that Eugene Corky Price

15  could offer us and could help us out on behalf of the

16  Commonwealth, not only as it related to these three

17  defendants, but he had been in the same cell with Harold

18  Collins and John Wayne Collins and had had to get moved out of

19  that cell because I think the Collins boys jumped on him,

20  and —

21  Q    And isn't it true, Mr. Gregory, that when he was

22  sentenced, again, you weren't handling the sentencing, but you

23  know for a fact that the judge rejected your recommendation

24  and sentenced him to five years in the penitentiary; isn't

25  that true?

1  A     That is true, because Richie Couch watched the videotape

2  of the sentencing, and Richie told me this morning that — I

3  think that the record reflects he twice said that our

4  agreement was to probate him, and he wasn't probated.

5  Q     And you have previously testified that when — you were

6  present there at the trial; correct?

7  A     Yes, sir, I did conduct the trial.

8  Q     And despite what you've heard there at the trial, you've

9  continued to argue for his probation?

10  A     Yes, sir.  Yes, sir, I did, for various reasons.

11  Q     For some reason, Judge Maricle doesn't go along with your

12  recommendation at the sentencing.  Does he tell you why at his

13  sentencing?

14  A     No.  And I don't think —

15  Q     Did you ever ask him?

16  A     No.

17  Q     Okay.

18  A     No.

19  Q     And that's not an everyday occurrence, is it, where your

20  circuit judge rejects your plea agreements, is it,

21  Mr. Gregory?

22  A     You know, Mr. Smith, to be honest with you, you know,

23  Judge Maricle was a judge that we didn't bind him with regard

24  to probation, and the records will tell you that we could only

25  make a recommendation, but we would — we did not bind him.

1  And the records were clear with that matter, that he wasn't

2  bound by the Commonwealth's recommendations.

3  Q    So he was a law-and-order judge that sent everybody to

4  jail, is that what you're saying?

5  A    No.  What I'm saying to you is that if we made a

6  recommendation, it didn't necessarily get followed.

7  Q    Okay.  You're not saying that that rejection of your plea

8  agreement happened every day either, are you?  That would be

9  unusual, wouldn't it, Mr. Gregory?  You would agree with me,

10 wouldn't you?

11 A    Well, you know, I would — you know, I would be more than

12 happy to pull every file and check and see and give you a

13 total statistic, but, you know — see, I'll be honest with

14 you, it got to the point we just — we made our

15 recommendation, he did what he wanted to do.  That's the

16 reality, you know.

17 Q    Sometimes you recommended penitentiary and sometimes he

18 gave them probation, in other words?

19 A    That has happened.

20 Q    Now, but you don't have any statistics here today and

21 can't give us any certainty at all as to whether or not this

22 is normal or not?

23 A    No, I can't, sir.

24 Q    You just can't say?

25 A    I can't.  I can't.

1   Q    Well, let's ask you this:  Now, you said that this case

2   really had three layers.  If we start looking behind it, there

3   was an underlying murder of Stevie Collins?

4   A    Yes, sir.

5   Q    That really kind of was the headliner over there in Clay

6   County, these Collins boys were accused of murdering Stevie

7   Collins?

8   A    Yes, sir.

9   Q    Now, that Stevie Collins, that's — now, that's the

10  businessman Stevie Collins in Clay County; right?

11  A    Yes, sir.  Yes, sir.

12  Q    And I believe, if I understand the family tree over

13  there, he's got a son named Stevie Collins that's a next-door

14  neighbor to Mr. Maricle; is that right?

15  A    I know that he has a son named Stevie Collins, Jr.  I

16  can't tell you where Stevie lives.  Stevie, Jr., I can't tell

17  you where Stevie Collins, Jr., lives.

18  Q    Do you know where Mr. Maricle lives?

19  A    I know where he presently was living at, yes, sir.

20  Q    Circle Drive?

21  A    Is that right — what we recall Radio Hill, he lived just

22  a couple of months ago.

23  Q    If I told you Stevie Collins lived across the street from

24  him, you wouldn't disagree with that?

25  A    Absolutely not.

1   Q    And that was his daddy that was murdered and it was

2   unsolved, and you had a witness you believed in this Natisha

3   Saylor?

4   A    She was an eyewitness to it.

5   Q    Now, Stevie Collins was also prominently known as one of

6   the leading opponents of Jennings White over in Clay County

7   for years, wasn't he?

8   A    You know, Steve, you know, rumor, if you're asking me

9   about a rumor, yeah, I've heard that rumor; but in terms of

10  what I know personally, I can't say that.

11  Q    That rumor is, Mr. Gregory, that it was a known fact that

12  Stevie Collins had a bounty on Jennings White's head and

13  supposedly had a contract out on him.  You've heard that, too?

14  A    I'm sorry to say, sir, I can't actually say that I've

15  heard that rumor.

16  Q    You didn't hear that one?

17  A    No.  I'm sorry.

18  Q    But in any event, Stevie Collins was murdered, and it was

19  this — Natisha Saylor was one of the witnesses?

20  A    Yes, sir.

21  Q    Did you also learn that Linsey Maricle might have been a

22  witness in this murder as well of the Collins fellow?

23  A    No, I did not.

24  Q    You did not know that?

25  A    I was given this letter by David Hoskins today.

1  Q    Have you read that letter?

2  A    I did read this letter while I was sitting out there.

3  Q    And after reading that letter, could you tell the Court

4  whether it's been suggested that Linsey Maricle may have been

5  a witness to that murder?

6  A    To the Stevie Collins murder?

7  Q    Yes, sir.  While you're looking at that, do you have any

8  other documents you brought up there to testify from,

9  Mr. Gregory?

10  A    No, I have the statement of Eugene Corky Price, the

11  letter that Mr. Hoskins gave me, I think he gave Mr. Couch a

12  copy of the plea agreement.  These are the videotapes of the

13  trial.  These are the two tapes of the sentencing.

14  Q    Would you be willing to let me take a look at some of

15  that material?

16  A    Absolutely, you can have it all.

17          MR. SMITH:  Would the Court allow the United States

18  an opportunity to look at this letter and other documentation

19  that the witness is referring to in his testimony?

20          THE COURT:  Yes, sir.

21          MR. HOSKINS:  Judge, I have a copy of that letter.

22  We're going to introduce it, so I'll be happy to give Mr.

23  Smith a copy of it right now.

24          THE COURT:  You want to look at it before you

25  continue with the examination?

1          MR. SMITH:  Well, I would also like the benefit of

2    seeing what else he's looked at, Your Honor.  I appreciate Mr.

3    Hoskins' offer, I'll take him up on that, but I would like to

4    see what else he's referring to.

5          THE COURT:  We'll take about a 15-minute recess at

6    this time.  We'll be in recess for 15 minutes.

7      (Whereupon, a short recess was had, after which the

8    following proceedings were had in open court.)

9          THE COURT:  Mr. Smith, are you ready to proceed?

10         MR. SMITH:  Yes, Your Honor.

11   BY MR. SMITH:

12   Q    Mr. Gregory, I think at the break you were taking a look

13   at a letter that you said had been provided to you before

14   Court today.

15   A    Yes.

16   Q    How did you get the letter?

17   A    Mr. Hoskins gave a copy to me and my assistant, Richie

18   Couch, when we came to court here today.

19   Q    Do you know how many letters were sent to the Judge in

20   regard to this matter?

21   A    No, sir.

22   Q    This was the only one that was brought to your attention

23   today?

24   A    Yes, sir.

25   Q    But you can't say whether there was another letter sent

1  to him or ten other letters sent to him ――

2  A    No, sir.

3  Q    ―― outside your presence?  You don't know what he got?

4  A    I do not, no.

5  Q    But as to this letter, which apparently is attributed to

6  being authored by Brian Collins ―― That would have been one of

7  the co-defendants in the case you prosecuted; right?

8  A    Yes, sir.

9  Q    ―― (continuing) it was dated January the 6th of 2006?

10  A    It says written by Brian C. Collins on 1-6-06.

11  Q    And really, it ends with the letter of a plea on the

12  mercy of the Court saying, "My life is in your hands, please

13  sentence me to my concurrent time, it would cut my time in

14  half," was essentially the final plea made by the letter?

15  A    That's correct, sir.

16  Q    And, again, you've never seen that letter before it was

17  presented to you by Mr. Hoskins?

18  A    No, sir.

19  Q    And as far as, again, this letter, while it does appear

20  to be something related to the sentencing and not necessarily

21  the trial, it does mention the name of a woman named Linsey.

22  Does Judge Maricle have a daughter named Linsey?

23  A    Yes, he does.

24  Q    Do you know if they're referring to Linsey, his daughter,

25  in this letter?

1  A    By reading the entire contents of the letter, I take it

2  that they are referring to his daughter.

3  Q    And a couple of passages out of the letter says something

4  to the effect, me, John Wayne, Grant Hatfield, Laura Garrison,

5  Crystal Hicks, and Linsey was all caught at Crystal's house on

6  Roots Branch drinking.  And then another passage reads,

7  "Linsey was passed out at the time, and Laura had went home.

8  I was in the trailer with Crystal and Linsey, and I wrapped

9  Linsey with a bullet-proof vest that was given to Harold Wayne

10 for protection from Bill Roland Phillips by someone we both

11 know."

12      You still -- based on those passages, you take it that

13 that's referring to Judge Maricle's daughter, Linsey Maricle?

14 A    I do, only because back on the preceding page, Mr. Smith,

15 it refers to a person by the name of Blake is her son, and she

16 has a son named Blake.

17 Q    And then the third passage I want to highlight to you

18 says, "I threw her" - and I'm going to assume that's referring

19 to Linsey - "over my shoulder and took her to the car and

20 left, and she woke up during all the shooting."  Would that

21 have been the shooting of Stevie Collins by chance that

22 they're referring to in the letter?

23 A    Mr. Smith, you know, I honestly do not know that.  And

24 the reason I don't is because the next sentence says, "I took

25 her to Harold Wayne's and let her sleep off the drunk," which

1  tells me, you know, because all the witnesses that we

2  interviewed, April Collins, Natisha Saylor, Crystal Hicks,

3  also known as Crystal Wilson, were the only ones that were

4  there at the time Stevie Collins was murdered.

5  Q    But you charged Harold Collins and John Wayne Collins

6  with that murder?

7  A    Yes, sir.

8  Q    And as reported in this letter to the Judge, that this

9  person, whether rightfully or wrongfully, asserts these facts?

10 A    That's correct.

11 Q    Asserts as a fact that she was present during the

12 shooting, whether that's right or wrong?

13 A    This absolutely says she was present during a shooting,

14 absolutely, and had a bullet-proof vest wrapped around her for

15 protection, I believe.

16 Q    Mr. Gregory, you have to admit that you don't know what

17 conversation Judge Maricle might have had with family members

18 of any of your witnesses or anybody in a court proceeding

19 outside your presence at the courthouse, do you?

20 A    Absolutely, I don't know who he may have had

21 conversations with.

22 Q    And your testimony is you don't know what expectations he

23 had of your witness, Eugene Price?

24 A    Absolutely, no.

25 Q    But all you do know is he expressed he was not going to

1  go along with your plea agreement, by giving a five-year

2  penitentiary as opposed to probation which your office was

3  urging?

4  A    I know that I recommended probation and probation was

5  denied.

6  Q    And, Mr. Gregory, let me ask you this:  This woman,

7  Linsey Maricle, she is someone close to your family now, I

8  understand?

9  A    Well, as of now, from ten months ago, after my son got

10  back from the war, from Afghanistan and Iraq and ten months

11  ago, maybe 11 months ago, he was taken to the VA Hospital for

12  all the problems he had been having.  Well, I find out that

13  Linsey picks him up one day from the VA Hospital down there,

14  and now here a month ago there's a baby been born, and the

15  fact of the matter is my son is with Linsey.  And I have seen

16  them a few times, but I'm not going to sit here and tell you

17  that I know for a fact that that is my grandson, because I

18  think they're planning DNA testing, but if it is -- I mean my

19  granddaughter.  But if it is, I'll do my part and be

20  responsible in that regard.  That's the facts, and I'll tell

21  you that, yes, my son has had problems.

22  Q    And at this point, at least from what you're saying, your

23  son is treating it as though it is his child?

24  A    That's correct, sir.

25  Q    And that's the way it stands today?

1   A     That is correct.

2                MR. SMITH:  Thank you.

3                THE COURT:  Any redirect, Mr. Hoskins?

4                MR. HOSKINS:  Yes, Your Honor.

5                       REDIRECT EXAMINATION

6   BY MR. HOSKINS:

7   Q     Mr. Gregory, Corky Price was originally charged with

8   first degree assault in this case, wasn't he?

9   A     Mr. Hoskins, you know, I would refer to the information.

10  I think that's what he was charged with, but I would allow the

11  information to reflect that accurately.

12  Q     Okay.  And Judge Maricle did go along with the charge

13  being reduced from first-degree assault to a Class D felony?

14  A     Yes, he did under extreme emotional distress.  I think

15  that's what it was amended down to, if I remember reading it

16  correctly.

17  Q     So what you're saying is that he refused to grant

18  probation to a man who came into his court and said, "I

19  dropped this girl off knowing she was going to get her throat

20  cut"?

21  A     All I know is during the first part of the statement that

22  Corky Price gave by Detective Yates, he continued to say he

23  had picked up Natisha, had been up to Natisha's house and they

24  had gone around and gotten high.  Later on in the statement,

25  around the back part, "Did they tell you to drop her off at

1   Crawfish?"  "No, they never say to drop her off at Crawfish,

2   just drop her off, and that's what I did."  "Was there any

3   kind of agreement made about where she was going to be

4   dropped?"  And he says, "No, Crawfish."  And then he goes one,

5   he never wanted to admit anything, but in the very end he did

6   say to Detective Yates, he told Detective Yates, "Yes, I knew

7   what they was going — what they were up to."

8       Here's his statement.  I'll be glad to file it in the

9   record.

10  Q   That's the man that didn't get probation for his part in

11  that crime?

12  A   He was not probated.

13  Q   Okay.  All right.  Now, you well know that the circuit

14  judge doesn't have to accept any plea agreement in Kentucky,

15  does he?

16  A   Absolutely.  And that's Judge Maricle's policy, always

17  was, we could make the recommendation, but he will not be

18  bound by our recommendations.  And he also had another policy

19  for many, many months — not months, I think it existed

20  probably for years, that if they came in on the day of trial

21  and they wanted to plead on that day, that day was pleading to

22  the charge as charged.  I mean, we respected that, he's the

23  judge.

24  Q   You're familiar with Kentucky Supreme Court case of

25  *Hoskins v. Maricle*?

1   A    Somewhat.

2   Q    And that's a case out of Clay County that involved

3   murders and went to the Supreme Court, and Judge Maricle was

4   upheld in being allowed not to accept a plea agreement he

5   thought was too lenient in that case?

6   A    Yes.  I think that is correct.  That was the second time

7   I think it went up.  If I'm not mistaken, the first time I

8   tried that case, and it was a hung jury, 11-to-one, to convict

9   for murder, where a man was — two people were killed and put

10  in the trunk of a car and pushed over into a — Is that the

11  same case you're referring to?  And then I had to get out of

12  that case, I had to withdraw from that case, and then another

13  Commonwealth Attorney came in to handle that.  And I think

14  that's the one that the plea agreement went up on.

15  Q    And the lawyer that took that to the Supreme Court to try

16  to make Judge Maricle do that plea agreement was Stephan

17  Charles, wasn't it?

18  A    The defense lawyer?

19  Q    Yeah.

20  A    David — excuse me, Mr. Hoskins, I think Steve did

21  represent — did he represent both of them?  I think

22  Mr. Charles — yes, I think Mr. Charles represented one of

23  them.  At least he did during the trial I had.

24          MR. HOSKINS:  That's all.

25          THE COURT:  Anything else, Mr. Smith?

1          MR. SMITH:  No, Your Honor.

2          THE COURT:  All right.  Thank you.  You may step

3  down, and you're finally excused from this hearing.

4          MR. HOSKINS:  Your Honor, during the break, one of

5  the government's agents, Detective Pace, asked me if he could

6  be excused, and I told him at this point I did not intend to

7  call him.  He asked me to ask the Court to allow him to be

8  excused.

9          THE COURT:  Yes, sir.

10          MR. HOSKINS:  And we would call Barbara Carnes.

11          MR. SMITH:  Mr. Hoskins, you referenced that you

12  were going to introduce these exhibits he's got.  Is that your

13  intention?  He's carrying them off now.

14          MR. HOSKINS:  I've got copies.

15                          BARBARA CARNES,

16  having been first duly placed under oath, was examined and

17  testified as follows:

18          THE COURT:  Mr. Hoskins, you may proceed.

19                       DIRECT EXAMINATION

20  BY MR. HOSKINS:

21  Q    Would you tell us your name, please?

22  A    Barbara Carnes.

23  Q    Ms. Carnes, how are you employed?

24  A    I'm with the Office of Public Advocacy, Capital Trial

25  Branch.

BARBARA CARNES - DIRECT - MR. HOSKINS                114

1   Q    So you are an attorney?

2   A    Yes, I am.

3   Q    How long have you been a practicing attorney in Kentucky?

4   A    Twenty-four years.

5   Q    Twenty-five in November?

6   A    Close.

7   Q    Have you ever practiced in Clay Circuit Court in front of

8   Cletus Maricle?

9   A    Yes, I have.

10  Q    In particular, were you involved in a case, *Commonwealth*

11  *of Kentucky v. John Wayne Collins and Harold Wayne Collins*?

12  A    Yes, I was.  I was co-counsel with Wendy Craig on that

13  case.

14  Q    What were those cases about?

15  A    John Wayne Collins was charged with the death of Stevie

16  Collins, and he had a second indictment, he was charged with

17  the death of Crystal Wilson.

18  Q    And he was charged with murder in both of those cases?

19  A    He was.

20  Q    And the Commonwealth sought the death penalty?

21  A    They did.

22  Q    During the course of your representation of Mr. Collins,

23  did you ever — did you ever find out about a letter being

24  sent to Judge Maricle that might have some bearing on the

25  case?

1    A    Yes, I did.

2    Q    How did you find out about that letter?

3    A    The letter was provided to me when I entered the case.  I

4    got a copy of Wendy Craig's file, and it included the letter.

5    I did not get into the case until Wendy had had the case by

6    herself, I'm guessing, maybe about a year.

7    Q    Okay.  So you were not in the case on the date that the

8    letter actually was received, then?

9    A    I don't believe I was, no.

10   Q    Did Judge Maricle ultimately conduct a trial of that

11   case?

12   A    No, he did not.

13   Q    It was tried in another city?

14   A    We tried it in Bowling Green in the fall of 2007, and it

15   was Judge Lewis, a special judge, from that area who tried it.

16   Q    Was Corky Price, Eugene Corky Price, a witness in that

17   trial in Bowling Green?  Do you recall?

18   A    I don't believe so, no.

19           MR. HOSKINS:  Okay.  That's all.  Thank you.

20           THE COURT:  Thank you.

21           Mr. Smith, any questions?

22           MR. SMITH:  No, Your Honor.

23           THE COURT:  All right.

24           MR. HOSKINS:  I call Wendy Craig.

25                          WENDY CRAIG,

 1  having been first duly placed under oath, was examined and

 2  testified as follows:

 3            THE COURT:  Thank you.

 4            Mr. Hoskins, you may proceed.

 5            MR. HOSKINS:  Thank you, Your Honor.

 6                       DIRECT EXAMINATION

 7  BY MR. HOSKINS:

 8  Q    Would you tell us your name, please?

 9  A    Wendy Alana Craig.

10  Q    Ms. Craig, how are you employed?

11  A    I'm currently a trial lawyer with the London Public

12  Defender's Office.

13  Q    How long have you been a practicing lawyer in the

14  Commonwealth of Kentucky?

15  A    Seventeen years.

16  Q    Have you ever practiced a case in front of Judge Maricle?

17  A    Yes, several.

18  Q    Do you recall a case of *Commonwealth v. John Wayne*

19  *Collins*?

20  A    Yes, sir.

21  Q    Were you Mr. Collins' attorney in that case?

22  A    Yes, sir.

23  Q    Initially, who was the judge?

24  A    Judge Maricle.

25  Q    During the course of your representation of Mr. Collins,

WENDY CRAIG - DIRECT - MR. HOSKINS                117

1  did you come to learn that a person had written a letter to

2  the judge that might have some bearing?

3  A    Yes, sir.

4  Q    How did you learn about that letter?

5  A    My recollection is that I was at the courthouse and

6  Judge Maricle indicated that I needed to come to his office,

7  and when I did, he handed me the letter he had received, I

8  believe, the day prior.  I walked outside of his office and

9  made a copy for my file.

10 Q    Okay.  And you recently provided that to me, didn't you?

11 A    Correct.

12 Q    That was maybe Friday of last week?

13 A    Friday afternoon, yes, sir.

14 Q    What action did you take as far as representing your

15 client when you saw that letter?

16 A    As a result of the letter and after some discussion with

17 my supervisor, it was determined to protect the record I

18 should file a motion to recuse Judge Maricle based on that

19 letter.

20 Q    And you did that?

21 A    Yes, sir, we did.

22 Q    Okay.  And you wouldn't have known about that letter if

23 Judge Maricle hadn't provided you a copy of it?

24 A    No, sir.

25 Q    The letter mentions Judge Maricle's daughter.

1   A    Correct.

2   Q    Have you read the letter recently?

3   A    Yes, sir.  In preparation for this hearing.

4   Q    And do you have a copy of it with you?

5   A    Yes, sir, I do.

6   Q    Do you also have a copy of the motion that you filed --

7   A    Yes, sir, I do.

8   Q    -- when you received that letter?

9        MR. HOSKINS:  Your Honor, we would move that those

10  two documents be introduced as our next two exhibits.

11       THE COURT:  Any objection?

12       MR. SMITH:  No, Your Honor.

13       THE COURT:  What numbers would those be?

14       THE CLERK:  It's four and five.

15       THE COURT:  Four and five.  All right.  Thank you.

16       The letter will be marked as Exhibit 4 and the

17  motion will be No. 5.

18  BY MR. HOSKINS:

19  Q    Ms. Craig, your motion sets out the date that you were

20  contacted about this letter.

21  A    Yes, sir.

22  Q    What was that date?

23  A    According to my notes, I'm in a habit of marking on

24  documents when I receive them, where and when, and it looks

25  like this letter was no different.  I put on here that I

1  received it from Judge Maricle himself on January 11th of '06,

2  which would have been the date after he received it.

3  Q    And the letter itself has a date in which it was

4  reportedly written.

5  A    Yes, that would — it was the 6th, I believe.

6  Q    Now, did you recognize the name of the man who wrote that

7  letter?

8  A    Yes, sir.

9  Q    And his name was Brian Collins?

10  A    Yes, sir, Brian Curtis.

11  Q    And you were aware that he had recently been tried in

12  Judge Maricle's court?

13  A    Yes.

14  Q    So this letter was written in between the trial and the

15  sentencing?

16  A    Correct.

17  Q    The thrust of the letter is — to Judge Maricle is to

18  please show me some mercy because I was good to your daughter

19  when she was in a bad situation?

20  A    Yes, sir.

21  Q    Did Judge Maricle say anything to you about keeping this

22  letter secret?

23  A    Absolutely not.

24  Q    Did you know Linsey before that day?

25  A    Yes, sir.

1    Q    How did you happen to know her before then?

2    A    I had met her professionally.

3    Q    You had represented her?

4    A    Yes, sir.

5    Q    Because she had been in trouble, in criminal trouble, in

6    Clay County?

7    A    Correct, more than — more than once.

8    Q    More than once.  And as public defender, you represented

9    her?

10   A    Yes, sir.

11   Q    You were not hired —

12   A    No, sir.

13   Q    — by Judge Maricle or his wife?

14   A    No.

15   Q    And the notes in the upper right-hand corner of the

16   motion are your handwriting?

17   A    Yes, sir.

18   Q    And the note in the upper right-hand corner of the first

19   page of the letter is your handwriting?

20   A    Correct.

21           MR. HOSKINS:  That's all.

22           THE COURT:  Thank you.

23           Any questions of this witness?

24           MR. SMITH:  No, Your Honor.

25           THE COURT:  All right.  Thank you, ma'am.  You may

1   step down.  We'll need to make copies of those two documents

2   for the record.

3         MR. HOSKINS:  Judge, I have copies here.

4         THE COURT:  Let Mr. Smith look at those and make

5   sure that they're the same.

6         THE WITNESS:  I can take these with me then?

7         THE COURT:  Let's make sure that we have a copy.

8         MR. HOSKINS:  We can introduce those, Judge, that's

9   fine.

10        THE COURT:  If we have copies, we can substitute

11  copies.  I just want to make sure everyone is in agreement

12  before she leaves.

13        All right.  You can keep your originals and we'll

14  substitute those copies as Exhibits 4 and 5.  Thank you, you

15  may step down.

16        MR. HOSKINS:  I call Bobby Morris.

17                      BOBBY GENE MORRIS,

18  having been first duly placed under oath, was examined and

19  testified as follows:

20        THE COURT:  Thank you.

21        And you may proceed.

22                    DIRECT EXAMINATION

23  BY MR. HOSKINS:

24  Q    Would you tell us your full name, please?

25  A    Bobby Gene Morris.

1  Q    Mr. Morris, you live in Jackson County?

2  A    Yes, I do.

3  Q    What kind of work do you do over there?

4  A    I'm the Circuit Court Clerk.

5  Q    How long have you been the Circuit Court Clerk of Jackson

6  County?

7  A    Since November the 7th, 1986.

8  Q    When you first became clerk, who was the circuit judge,

9  do you recall?

10 A    Clay M. Bishop.

11 Q    And when Mr. Bishop left the bench, who was the next

12 circuit judge?

13 A    Mr. Maricle.

14 Q    And you continued to act as clerk during the whole time

15 he was circuit judge?

16 A    Yes, I did.

17 Q    Have you had an opportunity to work with him much?

18 A    I've sat in his court numerous times.

19 Q    That's your -- part of your job as the clerk?

20 A    Yes, it is.

21 Q    Do you have a good working relationship with

22 Judge Maricle?

23 A    Yes, I did.

24 Q    Is he a person that can be counted on to obey court

25 orders?

1    A    All the times that I've been in court he has.  He's a law

2    to — right by the book.

3    Q    You've never seen him act improperly as a judge in any

4    way, have you?

5    A    No, I haven't.

6    Q    And you believe he would follow the conditions if the

7    Judge were to release him on bond?

8    A    My belief, I think he would.

9            MR. HOSKINS:  Thank you.

10           THE COURT:  Thank you.

11           Mr. Smith, any questions of Mr. Morris?

12           MR. SMITH:  No, Your Honor.

13           THE COURT:  All right.  Thank you, sir.  You may

14   step down.

15           MR. HOSKINS:  I call Marilyn Roberts.

16           THE COURT:  What's the last name?

17           MR. HOSKINS:  Roberts.

18           THE COURT:  Roberts.  Thank you.

19                   MARILYN ROBERTS,

20   having been first duly placed under oath, was examined and

21   testified as follows:

22                   DIRECT EXAMINATION

23   BY MR. HOSKINS:

24   Q    Would you tell us your name, please?

25   A    Marilyn M. Roberts.

1    Q    Ms. Roberts, what kind of work do you do?

2    A    I'm a court reporter.

3    Q    You're a court reporter for the actual court?

4    A    The 41st Judicial Circuit.

5    Q    You're the official court reporter?

6    A    Uh-huh.

7    Q    How long have you held that position?

8    A    Since October 1967.

9    Q    So you were already the court reporter when Judge Maricle

10   took the bench?

11   A    Yes, sir.

12   Q    And you continued to work as court reporter during his

13   entire term on the bench?

14   A    Yes, sir.

15   Q    During those years that you were Judge Maricle's court

16   reporter, did you work closely with him?

17   A    Yes, sir, I reported court for him in all three counties.

18   Q    Okay.  Did you-all travel together or eat together when

19   you were —

20   A    Sometimes we would eat together.  We didn't travel

21   together.  We worked on instructions and in the courtroom

22   during trials.

23   Q    And you knew him outside of the courthouse as well,

24   didn't you?

25   A    I did.

1  Q    Now, in all those years that you ever were associated
2  with Judge Maricle, did he ever ask you to do anything
3  improper?
4  A    No, sir, he never asked me to do anything improper.
5  Q    Did you ever see anything out of Judge Maricle that was
6  improper?
7  A    No, sir.
8  Q    Do you believe he's the kind of person who would follow
9  his conditions if he were released on a bond?
10 A    Yes, sir.
11        MR. HOSKINS:  That's all.  Thank you.
12        THE COURT:  Mr. Smith.
13                    CROSS-EXAMINATION
14 BY MR. SMITH:
15 Q    Ms. Roberts, you serve under other judges, I assume,
16 being the court reporter for the 41st?
17 A    Yes, sir, I serve under whichever judge has been elected
18 to serve, and as well as whatever special judges might come
19 into the courts.
20 Q    Okay.  Clay County has been known to have some
21 interesting trials, I'm sure, over the years that you've been
22 reporting, haven't they, ma'am?
23 A    Yes, they have.
24 Q    Lots of murder cases?
25 A    Yes.

MARILYN ROBERTS CROSS - MR. SMITH                126

1    Q    Lots of civil cases?

2    A    Yes.

3    Q    And Clay County has been known to render some pretty

4    large jury verdicts over the years?

5    A    A few.

6    Q    Do you recall any of those specifically?

7    A    The biggest one I guess I can remember would have been

8    the Ford Motor case, Tommy Smith and Ford Motors, but —

9    Q    That was a state record, as I read.  It was about

10   $30 million; is that right?

11   A    Twenty-something or 30, I'm not for sure of the exact

12   amount.

13   Q    And Judge Maricle was the judge over that case?

14   A    He was.

15   Q    Yeah.  And there was another big verdict in about '89 or

16   '90 there that's been mentioned here in this hearing, in fact,

17   a fellow by the name of *Paul Day and The Estate of Loretta Day*

18   *v. Gary Runion*.  Do you remember that case?

19   A    I remember the case, I don't remember the verdict.

20   That's been several, several years ago.  I do have a

21   transcript of that trial, though.

22   Q    Yeah.  And I assume that basically, ma'am, what you've

23   testified to is while in court, on the record, Judge Maricle

24   has not done anything wrong?

25   A    Not that I have seen, no, he has not.

1  Q    But what he does outside the court, you generally don't

2  accompany him and necessarily in his company, do you?

3  A    No, I don't.

4          MR. SMITH:  That's all I have.  Thank you.

5          THE COURT:  Anything else, Mr. Hoskins?

6          MR. HOSKINS:  Just a couple.

7          THE COURT:  Yes, sir.

8                    REDIRECT EXAMINATION

9  BY MR. HOSKINS:

10 Q    Ms. Roberts, you said you did have a recollection of a

11 trial involving the Days and the Runions?

12 A    Yes, I have a vague recollection of it.  The daughter in

13 that case was named Margaret Day, I think, but I don't recall

14 the specifics.

15 Q    Do you remember that there was a special judge -- between

16 the time Judge Bishop left the bench and before Judge Maricle

17 was appointed, there was a special judge that came regularly

18 to Clay County, wasn't there?

19 A    Yes, there was.

20 Q    And who was that judge?

21 A    I believe that was Judge Leonard Wilson.

22 Q    Do you remember whether or not Leonard Wilson was the

23 judge in that case?

24 A    He was.

25 Q    Okay.  Now, you don't give out 3 million-dollar judgments

1   every day in Clay County, do they?

2   A    No, they don't.

3   Q    When one that big comes down, it's news, isn't it?

4   A    It is.

5   Q    Okay.  Was there any other case that Kenny Day was

6   involved with in any way where there was a great big judgment

7   in a civil case?

8   A    I don't remember.  I know Kenny Day and I saw him at

9   times at the courthouse, but just you asking me right now, off

10  of the top of my head, I can't remember.  I mean, I might be

11  able to think and recall one, but right off the top of my

12  head, I can't.

13  Q    Well, you remembered him being involved in that one case?

14  A    Yeah, that was his brother.  Paul Day was Kenny Day's

15  brother.

16  Q    Okay.  And you remember that Judge Wilson was the judge

17  here?

18  A    Yes, I do.

19  Q    Did that case start to finish, didn't he?

20  A    Yes.

21           MR. HOSKINS:  That's all.  Thank you.

22           THE COURT:  Anything else of this witness?

23           MR. SMITH:  No, Your Honor.

24           THE COURT:  All right.  Thank you, ma'am.  You may

25  step down.

```
 1           THE WITNESS:  Can I be excused, sir?

 2           THE COURT:  Yes, ma'am, you may be excused.

 3           MR. HOSKINS:  I call Lisa Hubbard.

 4                       LISA HUBBARD,

 5   having been first duly placed under oath, was examined and

 6   testified as follows:

 7           THE COURT:  Mr. Hoskins, you may proceed.

 8                     DIRECT EXAMINATION

 9   BY MR. HOSKINS:

10   Q     Would you tell us your name, please?

11   A     My name is Lisa Hubbard.

12   Q     Ms. Hubbard, you're having some trouble with your voice

13   today, aren't you?

14   A     Yes.

15   Q     You are a schoolteacher in Manchester?

16   A     Yes.

17   Q     You teach first grade?

18   A     Yes.

19   Q     Last year, did you have Judge Maricle's grandson as a

20   student?

21   A     I did.

22   Q     His name is Blake?

23   A     Yes.

24   Q     Did you see Judge Maricle around the school very often?

25   A     I saw Mr. Maricle around almost every day.
```

```
 1   Q    Would he be the one to bring Blake to school?

 2   A    I'm not sure about bringing him, but picking him up, he

 3   was there at least 95 percent of the time.

 4             MR. HOSKINS:  That's all.  Thank you.

 5             THE COURT:  Mr. Smith, any questions?

 6                       CROSS-EXAMINATION

 7   BY MR. SMITH:

 8   Q    Ms. Hubbard, was that school year of 2008?

 9   A    2007-2008.

10   Q    So you're going from August, basically the school

11   calendar, to May of '08?

12   A    Right.

13             MR. SMITH:  Thank you.

14             THE COURT:  Mr. Hoskins, anything else?

15             MR. HOSKINS:  Nothing further.

16             THE COURT:  You may step down, you're excused.

17             MR. HOSKINS:  I call Lisa Frazier.

18                        LISA FRAZIER,

19   having been first duly placed under oath, was examined and

20   testified as follows:

21                       DIRECT EXAMINATION

22   BY MR. HOSKINS:

23   Q    Would you state your name, please?

24   A    Lisa Frazier.

25   Q    Ms. Frazier, how are you employed?
```

| | | |
|---|---|---|
| 1 | A | I am employed by the Clay County Board of Education. |
| 2 | Q | You're a schoolteacher? |
| 3 | A | Yes. |
| 4 | Q | What grade do you teach? |
| 5 | A | Second grade. |

6  Q    Is Judge Maricle's grandson, Blake, in your class this
7  year?

8  A    Yes, he is.

9  Q    You have some records that you brought with you today,
10 don't you?

11 A    Yes.

12 Q    Those are the records of who picks children up at the end
13 of the schoolday?

14 A    That is correct.

15 Q    Do you have the records on Blake?

16 A    Yes, I do.

17 Q    Have you looked at them?

18 A    Yes.

19 Q    Could you tell us roughly how often Cletus Maricle was
20 the person that picked Blake up from school?

21 A    Approximately 95 percent of the time.

22        MR. HOSKINS:  That's all.  Thank you.

23        THE COURT:  Mr. Smith, any questions?

24        MR. SMITH:  No questions.

25        THE COURT:  Thank you, ma'am.  You may step down,

1   and you're excused.

2            MR. HOSKINS:  I call Becky Welch.

3                    BECKY WELCH,

4   having been first duly placed under oath, was examined and

5   testified as follows:

6                  DIRECT EXAMINATION

7            THE COURT:  Thank you.

8            Mr. Hoskins, you may proceed.

9            MR. HOSKINS:  Thank you, Your Honor.

10                 DIRECT EXAMINATION

11  BY MR. HOSKINS:

12  Q    Would you tell us your name, please?

13  A    Rebecca Shepard Welch.

14  Q    Ms. Welch, you live in Lexington, Kentucky?

15  A    Yes, sir.

16  Q    Do you know Cletus Maricle?

17  A    Yes, sir.

18  Q    Do you know his family?

19  A    Yes, sir.

20  Q    Tell us generally how you came to know them, how long

21  you've known them?

22  A    I've known them probably since I was about six or seven

23  years old.  My older sister and Cletus's older daughter was

24  best friends in high school, and I was best friends, still am

25  best friends, with his daughter and his son, Rusty.

BECKY WELCH - DIRECT - MR. HOSKINS                 133

1  Q    And which daughter is it that you're best friends with?

2  A    Meredith.

3  Q    You have a very close relationship with the Maricle

4  family?

5  A    Yes, sir.

6  Q    So close that you were at their home when their son,

7  Rusty, died unexpectantly?

8  A    Yes.

9  Q    You were there out of love and concern?

10 A    (Witness nodding head affirmatively.)

11 Q    Did you actually stay there in their home?

12 A    Yes, sir.

13 Q    Were you there the night of the visitation for Rusty at

14 the funeral home?

15 A    Yes, sir.

16 Q    And were you there at the Maricle's home?

17 A    Uh-huh.  I was there — I stayed the night that night and

18 got up and helped get the children ready for the funeral.

19 Q    You were with the family as they prepared to go leave the

20 home to go to the funeral home that night?

21 A    Yes.

22 Q    And you saw other people in and out of the house that

23 night?

24 A    Yes, sir.

25 Q    Was one of those people Wanda White?

1    A    Yes, sir.

2    Q    Did you see Wanda White come into the Maricle's home that

3    night?

4    A    Yes, I did.

5    Q    Now, as far as anybody else knew, she was there for the

6    same purpose you were; right?

7    A    Oh, yes, sir.

8    Q    She behaved in that way?

9    A    Uh-huh.  Yes, she did.

10   Q    What did you see her do when she came into the Maricle's

11   home?

12   A    She came in and hugged numerous people, just like

13   everyone else was doing, a time of grieving, talked to people,

14   just kinda, you know, socialized.

15   Q    Did you see her when she met up with Cletus Maricle that

16   night?

17   A    Yes, sir.

18   Q    And did you see how he behaved towards her at that point?

19   A    Yes, sir.  He gave her a hug, from what I remember, and

20   talked to her.

21   Q    Did you see anything at all unusual in the way he greeted

22   Wanda White that night?

23   A    No, sir.

24   Q    Did you see anything that made you think he was trying to

25   frisk her or pat her down?

1    A    No, sir.

2    Q    You had been around the family during that time?

3    A    Yes, sir.

4    Q    What kind of state of mind were Rusty's parents and

5    sisters in?

6    A    They were devastated.  They were — it was hard to

7    function, which is one of the reasons I was there.

8    Q    Do you remember the date that that actually happened?

9    A    That would have been — I was there.  Rusty passed away

10   on Friday the 29th or the 30th, I'm not sure of the exact

11   date.  I came down on a Saturday, stayed the night, left

12   Sunday evening late, and returned on Monday afternoon and did

13   not leave until Wednesday morning.

14                MR. HOSKINS:  I think that's all.  Thank you.

15                THE COURT:  Thank you.

16                Mr. Smith, any questions?

17                           CROSS-EXAMINATION

18   BY MR. SMITH:

19   Q    Ms. Welch, you indicated that you were one — I assume

20   one of the first to greet the family at their home after the

21   news?

22   A    I'm not — I probably was not one of the first.  As I

23   said, I actually got there on Saturday afternoon around 2:30

24   or 3:00.

25   Q    Do know where the Defendant Maricle and his wife were

1  when it happened?

2  A    When it happened?  No, sir.

3  Q    You don't know?

4  A    No, sir.

5  Q    Did you speak to them during the time that you say you

6  were there, did you learn during your conversations with them

7  or others that they were not at home when the death occurred?

8  A    When the death occurred, I talked to Meredith Friday

9  evening -- no, I'm sorry, our friend Kim Robinson called on

10 Friday afternoon around 3:30 or 4:00 and told me that Rusty

11 had passed away, that Judy and Cletus were in Florida and on

12 their way back.

13 Q    Do you know why they were in Florida?

14 A    No, sir, I didn't ask.

15 Q    You didn't learn over the course of your visits that --

16 the reason they were there?

17 A    No, there were other things going on.

18 Q    But you did learn they were in Florida at the time?

19 A    Yes, sir.

20 Q    To your knowledge, have they been in Florida -- you've

21 known them for years, you're a close family friend, do they

22 make frequent visits to Florida?

23 A    To my knowledge, no.  But I do live in Lexington.

24          MR. SMITH:  Sure.  Okay.  Thank you, ma'am.

25          THE COURT:  Anything else of this witness?

1          MR. HOSKINS:  Not from this witness, no, Your Honor.

2          THE COURT:  You may step down, and you're excused.

3          MR. HOSKINS:  Your Honor, I would ask the Court if

4   we could take a short break to determine whether we need to

5   call any additional witnesses.

6          THE COURT:  How much time would you need?

7          MR. HOSKINS:  Five minutes.

8          THE COURT:  That will be fine.  We'll take a recess

9   of five minutes.

10       (Whereupon, a short recess was had, after which the

11  following proceedings were had in open court.)

12         THE COURT:  Thank you.

13         Mr. Hoskins, do you have additional witnesses?

14         MR. HOSKINS:  Yes, one additional witnesses, Your

15  Honor.  Anthony Lovett.

16                      ANTHONY LOVETT,

17  having been first duly placed under oath, was examined and

18  testified as follows:

19         THE COURT:  Thank you.

20         Mr. Hoskins, you may proceed.

21         MR. HOSKINS:  Thank you, Your Honor.

22                     DIRECT EXAMINATION

23  BY MR. HOSKINS:

24  Q    Would you tell us your name, please?

25  A    Anthony Lovett.

1   Q    How do you spell your last name, Mr. Lovett?

2   A    L-o-v-e-t-t.

3   Q    And how are you employed?

4   A    I'm the pastor of Horse Creek Baptist Church.

5   Q    Is that in Clay County?

6   A    Yes.

7   Q    How long have you been the pastor of that church?

8   A    A little over four years.

9   Q    In your capacity of pastor of that church, are you

10  familiar with Cletus Maricle?

11  A    Yes, sir.

12  Q    Would you tell us a little bit about that?

13  A    Cletus attends worship service, he's an assistant Sunday

14  school teacher to one of the adult Sunday school classes.  I

15  would say he's been more regular in the last couple of years,

16  you know, and — you know, just that way, pretty much just the

17  pastor-parishioner type thing.

18  Q    Do you have a good relationship in that context with

19  Mr. Maricle?

20  A    Yes, sir, I believe so.

21  Q    Now, you have some other weekly or regular things at your

22  church besides Sunday morning worship, don't you?

23  A    Yeah, we have, you know, morning service, Sunday school,

24  evening service, and then throughout the week we have prayer

25  time on Tuesday and Thursday morning, which Brother Cletus is

1  pretty regular in attending that.  And then we have Wednesday

2  night Bible study, and he's there, attends that pretty

3  regular, too.

4  Q    In your opinion, is he somebody that can be trusted to

5  obey the Court's order?

6  A    As far as I can tell, yes, sir.

7           MR. HOSKINS:  That's all.  Thank you.

8           THE WITNESS:  Okay.

9           THE COURT:  Mr. Smith, any questions?

10          MR. SMITH:  None, Your Honor.

11          THE COURT:  Thank you.  Mr. Lovett, you may step

12  down.

13          Mr. Hoskins?

14          MR. HOSKINS:  Your Honor, we do not have any other

15  witnesses that we want to call, but we have some other

16  evidence that we want the Court to consider.

17          THE COURT:  All right.

18          MR. HOSKINS:  And I'll ask the Court how you would

19  like to proceed with that.  One of the things that we have is

20  a very short video of Corky Price entering his guilty plea in

21  Clay Circuit Court before Judge Maricle.  Then we have another

22  video of Corky Price's testimony at the trial of the other

23  three defendants.  It's not lengthy, but it's probably at

24  least 30 minutes.  We have that on videotape, and we have the

25  equipment here to play that, and we'll do whatever the

1   Court —

2           THE COURT:  All right.  Well, let me ask you this

3   question:  Do you anticipate that you would like to file any

4   briefs on these issues?  If you do, I can — we'll have those

5   admitted by agreement of the parties unless there's some

6   question about their authenticity, and I can review those.  I

7   assume you're not going to use a witness to ask questions as

8   they're played.

9           MR. HOSKINS:  No.

10          THE COURT:  I can certainly review those before

11  making a final determination, but I think Mr. Smith indicated

12  earlier he may have a witness that he wants to call.  So we

13  can get all the testimony in now, and if you have those

14  additional exhibits, those can be introduced into the record

15  and I can review those.  Is that agreeable with everyone?

16          Mr. Smith?

17          MR. SMITH:  Yes, Your Honor.

18          THE COURT:  So it will be those two matters.  Then

19  there's also the 302s that were referenced.  I'm going to need

20  to review the redacted version, the original version will be

21  filed under seal.

22          MR. HOSKINS:  Yes, Your Honor.  We also have some

23  other court records from Clay Circuit and District Court cases

24  that we think will be necessary to get all the time frames

25  down on different things that are material here.

1          THE COURT:  All right.  So you may want to file

2    those as exhibits to the brief that you plan to file?

3          MR. HOSKINS:  I could do that, Your Honor, or I

4    could go ahead and file them now so that they're in the

5    record.

6          THE COURT:  All right.

7          MR. HOSKINS:  But I can do that as an attachment to

8    my brief and send a copy of them to Mr. Smith that way.

9          THE COURT:  Any objection to that procedure?

10         MR. SMITH:  No, Your Honor.  Obviously, we've not

11   had an opportunity to review them.  Thank you.

12         THE COURT:  I understand.  You may have objections

13   to the document or think that they're not relevant, but you

14   can raise those in any response that you file.  All right.

15   Thank you.

16         Mr. Smith, you have additional testimony or evidence

17   to present?

18         MR. SMITH:  Yes, we do, Your Honor.

19         THE COURT:  All right.  You may proceed.

20         MR. SMITH:  I call Special Agent Timothy Briggs.

21                  TIMOTHY BRIGGS,

22   being previously duly sworn, was examined and testified

23   further as follows:

24         THE COURT:  Mr. Smith, you may proceed.

25                  DIRECT EXAMINATION

TIMOTHY BRIGGS - REDIRECT DIRECT - MR. SMITH      142

1   BY MR. SMITH:

2   Q      State your name, please.

3   A      Timothy S. Briggs.

4   Q      Agent Briggs, you were present here at the last hearing

5   where you were called to testify, as well as Kenneth Day, in

6   the matter of the government's — supporting the government's

7   motion to detain him pending trial; correct?

8   A      Yes, sir.

9   Q      And since that time, have you learned of potential

10  threats against witnesses that were mentioned or mentioned

11  maybe in — not by name, but mentioned in substance, during

12  your testimony of the detention hearing?

13  A      Yes, we had a witness that received a threat on the

14  computer via MySpace page.

15  Q      And were you able to determine whether or not this

16  witness had contact with the alleged criminal enterprise that

17  was often used for criminal purposes and known as the Clay

18  County Board of Elections?

19  A      Yes, he did have contact.

20  Q      What was his relationship?  Was he an associate, was he a

21  member?

22  A      He was a member.

23  Q      And what position did he hold within that organization?

24  A      He was an election officer during the 2008 election.

25  Q      And as you have previously had opportunities in the

1   earlier detention hearing, you referred to Cletus Maricle as

2   one of the leaders or directors of this alleged racketeering

3   enterprise that's alleged in this indictment.

4   A    Yes, that's correct.

5   Q    And you've indicated that this subject was charged with

6   an attempt to intimidate or threaten a witness that you had in

7   the case?

8   A    Yes.

9   Q    Can you relate in summary fashion to the Court the nature

10  of this threat that occurred over MySpace?

11  A    One of the witnesses received a message on their MySpace

12  page with a picture of a person pointing a gun at the camera

13  and in the text it said, "Look what your lies have caused," or

14  something to that effect.  I'm not actually quoting it, but --

15  Q    And when was that reported to you, do you recall?

16  A    It was March 24th, I believe, somewhere in there.

17  Q    And the hearing that was conducted in this courtroom

18  downstairs in front of Magistrate Wier was March 23rd?

19  A    Yes, that's correct.

20  Q    So the day following the hearing, you have to investigate

21  an alleged threat against your witnesses?

22  A    Yes.

23  Q    Were you able to relate that this subject that was

24  accused of sending this threat was in any way related to any

25  of the co-defendants that are named in this indictment?

1   A    Yes.

2   Q    And who would that have been?

3   A    The individual that sent the threat had just had a

4   meeting with one of the co-defendants in the case, Wayne —

5   Charles Wayne Jones.

6   Q    And has — it's been alleged in the indictment that he

7   was acting during times for this criminal enterprise as the

8   Democrat election commissioner?

9   A    Correct.

10  Q    And would he, in your estimation, be a person above

11  Cletus Maricle's direction or below his direction?

12  A    Below.

13  Q    And in your investigation, how long has he had a

14  relationship with Cletus Maricle?  How long have they known

15  each other?

16  A    I think Mr. Maricle represented him on a bank robbery

17  charge back in the '70s.  I mean, years and years, decades,

18  they've had a relationship.

19  Q    And during your investigation, did you — you say that

20  you developed information that this person that sent the

21  threat had contact with this defendant, Charles Wayne Jones,

22  before the threat was sent?

23  A    Yes.

24  Q    How recent to the threat was it that he had contact with

25  Mr. Jones?

1  A    The individual made a statement saying that they had

2  talked to Mr. Jones, I want to say, around noon or 1:00, and

3  then later that night, actually it was 12:30 -- later that

4  night, hours later, the threat was sent.

5  Q    Now, in this -- in this particular investigation, did you

6  relate that Cletus Maricle had anything to do with sending

7  that threat?

8  A    Excuse me?

9  Q    Have you been able to tie Cletus Maricle to the threat

10 that was sent to your witnesses?

11 A    No, sir.

12 Q    And how is it a concern of yours that Cletus Maricle

13 might be a threat or otherwise support your argument that he's

14 a threat, if he's released, to your witnesses by the fact that

15 you've had this threat that's tied to Mr. Jones?

16 A    Well, the activity leading up to this indictment shows

17 that Mr. Maricle was the leader of the group, held meetings,

18 chaired meetings, directed others to do various things, such

19 as pass out money, recruit corrupt election officers, so forth

20 and so on.  So he was the leader directing others as to what

21 to do, and I believe that that easily is continuing here or

22 could continue.

23 Q    And based on your training and experience, do you see

24 that there is a risk that if Cletus Maricle is released and

25 not detained by this Court that you would have other acts of

 1  intimidation or attempts to influence or corrupt the

 2  administration of justice in this case?

 3  A     Yes.

 4  Q     Now, during the course of your testimony earlier, I

 5  believe that it was mentioned that you detected that there

 6  were acts by this defendant that you have identified as

 7  countersurveillance?

 8  A     Yes.

 9  Q     And you've conducted a search of his home and you've

10  looked through several documents during that search; correct?

11  A     That's correct.

12  Q     Did you find any documents that would support that

13  Mr. Maricle was seeking to find out where you were?

14  A     Yes.

15        MR. SMITH:  And I'm going to hand to the witness

16  Government's Exhibit No. 1.

17        THE COURT:  Yes, sir.

18        MR. SMITH:  I should say Exhibit 1 for this hearing.

19  I'm not sure —

20        THE COURT:  Yes, sir.

21        MR. SMITH:  Thank you.

22  BY MR. SMITH:

23  Q     Can you identify Government's Exhibit 1?

24  A     Yes, sir.

25  Q     And tell the Court what that is.

TIMOTHY BRIGGS - REBUTTAL DIRECT - MR. SMITH      147

1  A    This is a day planner, a page from a day planner, that

2  was taken out of Mr. Maricle's residence, and the day of this

3  calendar that was pulled out was May 4th, 2006.

4  Q    And what's the message in the planner?

5  A    There's a quote — a notation at the top, which I don't

6  think relates to this investigation.  There's a notation below

7  that that says, "Call" — on one line it says, "Call Charles,"

8  and below that it says, "Briggs in London."

9  Q    And what significance do you place on the name Charles?

10  A    I know he — Mr. Maricle was very close with Stephan

11  Charles, who is an attorney, and Mr. Charles was attending the

12  grand jury throughout this investigation representing

13  Mr. Maricle's son-in-law and then would report information

14  back to Mr. Maricle.

15  Q    And was the grand jury investigation ongoing during this

16  time period of May 4th, 2006?

17  A    Yes, I believe it was.

18  Q    Now, it references "Briggs."  So what was the statement

19  again for Briggs?

20  A    "Briggs in London."

21  Q    And what significance do you place on that?

22  A    Well, that's where my — it's where my office is at,

23  so —

24  Q    Okay.  That's your name?

25  A    Some may assume — correct, that's my name.

1  Q    And it says "Briggs in London."  Is it possible, Agent

2  Briggs, that you could be mistaken and there could be a

3  Charles Briggs in London and Mr. Maricle has fairly noted that

4  in his planner?

5  A    I have checked all the lists of telephone numbers for

6  London and Manchester and I cannot find a Charles Briggs or

7  Charles Biggs or anything close to that.

8  Q    Have you checked your calendar to determine whether or

9  not you had attended any court matters on that day regarding

10 this case?

11 A    Yes, I believe I was in Lexington that day at a hearing

12 on a case that preceded this, a Clay County case preceding

13 this case.

14 Q    Are you saying it was unrelated or related?

15 A    Related.  Related.  Corruption case.  I was in Lexington,

16 Kentucky at U.S. District Court testifying or attending a

17 hearing on a corruption case regarding — that's out of Clay

18 County.

19 Q    So the note on the daily planner is to "Call Charles,"

20 "Briggs in London"?

21 A    Yes.  Yes, sir.

22 Q    Now, during your time period since the — since the last

23 hearing, have you sought to determine whether Mr. Maricle may

24 be in possession of any liquid assets?

25 A    Yes, sir.

1  Q    And have you found anything in your investigation that

2  would support that there are liquid assets that he has in his

3  possession?

4  A    Yes, sir.

5       MR. SMITH:  I would like to hand to the witness,

6  Your Honor, a series of exhibits here.  Your Honor, I would

7  now like to hand the witness Government's Exhibits 2 through

8  6.

9       THE COURT:  Yes.

10 BY MR. SMITH:

11 Q    I refer your attention to Government's Exhibit No. 2 and

12 3.

13 A    Yes, sir.

14 Q    Can you identify for the Court what those are?

15 A    That's a houseboat called The Judge's Chambers, Port of

16 Manchester, Kentucky.  It's at Lee's Ford Marina owned by

17 Mr. Maricle and his wife.

18 Q    And do those photographs fairly and accurately depict its

19 condition at or about the time of this hearing today?

20 A    Yes, sir.

21       MR. SMITH:  I move for the introduction of

22 Government's Exhibit 2 and 3.

23       THE COURT:  Any objection?

24       MR. HOSKINS:  No objection to any of those

25 documents, Your Honor, they can go in.

1              THE COURT:  Exhibits 2 through 6 will be admitted,

2  but you'll need to identify them.

3  BY MR. SMITH:

4  Q     Would you identify Government's Exhibits 4 through 6,

5  please?

6  A     Yes, sir.  Government's Exhibit 4 is United States of

7  America, it's a certificate of document issued by the

8  Department of Homeland Security, United States Coast Guard.

9  It's a national vessel documentation.

10  Q     Who's the documented owner of that vessel?

11  A     Judy C. Maricle and R. Cletus Maricle.

12  Q     Now, in the course of your investigation, Agent Briggs,

13  are you aware, would this particular item of property show up

14  in a general search of the Kentucky records?

15  A     No, it would not.  It does know show up.

16  Q     The vessel doesn't show up as having a Kentucky

17  certificate of title?

18  A     No, sir.

19  Q     And so this particular document establishes that it is,

20  though, in the name of Judy Maricle and Cletus Maricle?

21  A     At 393 Circle, Manchester, Kentucky, yes, sir.

22  Q     Would you describe the vessel?  Does it state in there

23  with particularity about what this vessel is?

24  A     It's approximately 16 feet wide, 73 feet long, what I

25  call a houseboat, but it's actually named a yacht.  And

1   Exhibit No. 5, to answer your question you asked earlier, is a

2   Insurance Underwriters Agreement where the boat is insured for

3   140,000.

4   Q    Does that appear to be a current contract?

5   A    Yes, the date on here is June 20th, 2008.

6   Q    Who is the insurance company?

7   A    United Marine Underwriters.

8   Q    Who do they have the contract to insure this property

9   with?

10  A    Cletus and Judy Maricle.

11  Q    How much have they insured this vessel?

12  A    $140,000.

13  Q    Do you have another document there?

14  A    Yes, sir.

15  Q    In reference to Exhibit 5?

16  A    Yes, that was No. 5, the insurance document.  Exhibit

17  No. 6 is a lease for, I guess, a slip rental agreement between

18  the Maricles and Lee's Ford Marina.

19  Q    And how much are the Maricles paying to dock this vessel?

20  A    It appears to be — the annual rental amount is $4,672.

21  Q    And does that agreement with Lee's Ford Marina require an

22  owner to sign acknowledging and binding themselves to the

23  agreement?

24  A    Yes, sir, it does.

25  Q    And who signed as owner?

1   A    R. Cletus Maricle on December 9th, 2008.

2   Q    Is that a current contract still pending?

3   A    Yes.

4   Q    Through 2009?

5   A    Yes.

6   Q    And in your opinion, Agent Briggs, is this a significant

7   asset?

8   A    Absolutely, yes.

9   Q    And in your opinion, is this one which a person could

10  liquidate?

11  A    Yes.

12  Q    And in your opinion, is that --

13       MR. HOSKINS:  Your Honor, I'm going to ask that we

14  have an opportunity to voir dire Mr. Briggs on his knowledge

15  and ability to give an opinion on liquidation of houseboats in

16  the current market.

17       THE COURT:  You'll be able to ask him about that.

18       You may proceed, Mr. Smith.

19  BY MR. SMITH:

20  Q    Let's make an assumption, Agent Briggs, that this

21  defendant did not disclose this to the Court.  Would that, in

22  your opinion, raise your concern that he might have plans to

23  flee?

24  A    Yes, not disclosing sizeable assets would be a very big

25  concern.

TIMOTHY BRIGGS - REBUTTAL DIRECT - MR. SMITH     153

1  Q     In your estimation, let me ask you this:  Have you had
2  boats that you've owned yourself?
3  A     Yes, sir.
4  Q     And do you find that people who own boats generally try
5  to insure them for at or about their fair market value?
6  A     Yes.
7  Q     So let's assume that this boat is worth 140-, $150,000.
8  Is six figures is a significant amount of money in your
9  estimation for a person who made have made statements that
10 rather than being a practicing judge he would like to live
11 with the Indians in Mexico?
12 A     That's a sizeable dollar amount.  A lot of people don't
13 pay that for their home, their primary residence.
14 Q     And to your knowledge, would six figures of American
15 dollars be a significant amount of money in Mexico?
16 A     Absolutely.
17 Q     And could one see themselves living on that for a number
18 of years?
19 A     Yes.
20         MR. SMITH:  I pass the witness.
21         MR. HOSKINS:  Your Honor, I would move, pursuant to
22 Rule 26, that we be provided with witness statements.
23         THE COURT:  All right.  Any statements pertaining to
24 his testimony?
25         MR. SMITH:  Well, Your Honor, this motion was made

1    earlier in the prior hearing, and I believe that the Court

2    handled that hearing appropriately.  I don't know that there's

3    any objection to the way it was handled at that time.  Just so

4    I understand the motion, the Rule 26.2, it regards the direct

5    testimony of a witness that has transpired up to this point.

6              THE COURT:  To these issues.

7              MR. SMITH:  May I have a moment?

8              THE COURT:  Yes, sir.

9              MR. SMITH:  Your Honor, after consulting, I believe

10   we will need a recess to access potentially one document that

11   may be applicable under Rule 26.2, and I would like to have an

12   opportunity to get that and review that.

13             THE COURT:  Yes, sir.  How much time would you like?

14             MR. SMITH:  We should be able to accomplish that in

15   15 minutes.

16             THE COURT:  All right.  That will be fine.  We'll

17   take a 15-minute recess.

18        (Whereupon, a short recess was had, after which the

19   following proceedings were had in open court.)

20             THE COURT:  Thank you.

21             Mr. Hoskins, did you receive the materials you had

22   asked for?

23             MR. HOSKINS:  Yes, at least one statement, Your

24   Honor.  I understand there's a possibility of another one that

25   they've not given me yet.

1          THE COURT:  All right.

2          MR. SMITH:  Your Honor, just for the record, we've

3   produced to him a signed affidavit that was signed by Agent

4   Briggs.  I did put counsel on notice that there was a 302 by

5   another agent that I have not reviewed.  I believe that it is

6   basically consumed by the substance of this affidavit as has

7   been described to me, but we should have that in the next five

8   minutes or ten at the most, and I can hopefully without any

9   undue delay get that to counsel so he'll have that as well.

10          THE COURT:  All right.  Thank you.

11                      CROSS-EXAMINATION

12  BY MR. HOSKINS:

13  Q    Agent Briggs, the threat that you talked about that was

14  sent over MySpace was sent by a guy named Hubbard?

15  A    Yes, sir.

16  Q    And he was arrested?

17  A    Yes.

18  Q    But he's not in custody anymore, is he?

19  A    No.

20  Q    Okay.  So that's a pretty good indication of how serious

21  a threat that is, isn't it?

22  A    Excuse me?

23  Q    That's a pretty good indication of how serious a threat

24  that is, the fact that that young man is not in custody?

25  A    I don't understand your question, sir.

1   Q    Well, you've talked about this being a threat, but it's

2   not such a threat that the government has taken measures to

3   keep him in jail?

4   A    We originally requested a detention hearing, and then

5   after meeting with his attorney, we came to terms that we

6   agreed to, you know, conditionally let him out at that point

7   in time and not pursue the detention, so —

8   Q    So he's out with the government's blessing?

9   A    He is currently not incarcerated.

10  Q    Because you agreed that he could be released?

11  A    The government did not — did not follow through with the

12  detention hearing, we waived that in the final moment.

13  Q    Okay.  All right.  What you found when you investigated

14  that was that he had talked to Charles Wayne Jones?

15  A    Yes.

16  Q    Who is a co-defendant of Mr. Maricle's?

17  A    Yes.

18  Q    And Mr. Jones is also not in custody?

19  A    Correct.

20  Q    And you're not suggesting that Mr. Maricle was in any way

21  involved in communicating with the young man that sent this

22  MySpace message, are you?

23  A    I don't know that.

24  Q    Are you suggesting that he somehow was involved in that?

25  Do you have anything beyond bare speculation to support that?

1   A    I can't answer one way or the other, sir.

2   Q    Do you have anything beyond speculation?

3   A    No.  No, sir.

4   Q    Mr. Maricle was in jail that night in Somerset?

5   A    Correct.  Well, he was in jail, I don't know where he was

6   at.

7   Q    Okay.  He didn't have an opportunity to speak to Brian

8   Hubbard, did he?

9   A    I don't know that.

10  Q    But you know that Wayne Jones did, Charles Wayne Jones

11  did.

12  A    Spoke with?

13  Q    Hubbard.

14  A    Yes.

15  Q    And you know that when you took a statement from

16  Mr. Hubbard that the person he seemed to be upset about going

17  to jail was Charles Wayne Jones?

18  A    He was generally upset about the whole investigation.

19  Q    Well, you just gave me an affidavit that you swore to,

20  and the only defendant's name that comes out of the mouth of

21  Mr. Hubbard is that Jones, Charles Wayne Jones; right?

22  A    No, he mentions Mr. Maricle, he mentions Doug Adams.

23  Q    He says he knows those people.  But the only person he

24  says he's upset about is Charles Wayne Jones?

25  A    He made the general statement, "You sons of bitches have

1  just ruined this county with this investigation," so, I mean,

2  I took that to mean he was discussing the whole group.

3  Q    Okay.  But when he talks about somebody who's not capable

4  of sitting in jail, he's talking about Charles Wayne Jones?

5  A    That statement specifically he was talking about

6  Mr. Jones; you're correct.

7  Q    And his statement that he knew Judge Maricle was in

8  response to your questions, "Do you know these people?"

9  A    Yes.

10  Q    Okay.

11  A    Yes.

12  Q    He didn't come in here, he didn't say anything to you

13  that says I did this because of Cletus Maricle?

14  A    He didn't say that.

15  Q    Now, this exhibit that we've just had admitted that has

16  the name Charles and has "in London" and that sort of thing,

17  you've had an awful lot of opportunity to look at Judge

18  Maricle's handwriting, haven't you?

19  A    I wouldn't say that, sir.

20  Q    Oh, you haven't?  Okay?  Would you concede that that

21  appears to be a woman's handwriting on that paper?

22  A    No, I would not.

23  Q    Okay.  Do you know exactly where that came from?

24  A    From his -- from Mr. Maricle's residence.

25  Q    Okay.  There's a lot of rooms in that residence and a lot

1   of people living there; right?

2   A      Yes.  At least three adults that I'm aware of, yes.

3   Q      One of those people is Judge Maricle's wife, Judy?

4   A      Correct.

5   Q      Who has a real estate business?

6   A      Yes, or works in real estate.  I think she had a

7   business.  I don't know if she still has it or not.

8   Q      Okay.  Do you have any idea from where in the house,

9   whose desk, whose office that piece of paper came from?

10  A      It was on the discovery material, but I don't recall

11  specifically where it came from, sir.

12  Q      Well, that's another issue.  It's not in the discovery

13  material that I've been provided with.  But my question is do

14  you know where ––

15  A      I don't recall sir, no.

16  Q      –– in the home that came from?

17         Okay.  Is it unusual, in your experience, for real estate

18  agents to talk to people that don't live in their county or

19  the county next to it?

20  A      I'm sorry, what was the question again?

21  Q      Is it unusual for a real estate agent to have a client

22  from out of town, out of state?

23  A      No.  No.

24  Q      Okay.  Well, let's talk about how liquid this houseboat

25  is.  Do you have a houseboat like that?

TIMOTHY BRIGGS CROSS - MR. HOSKINS                    160

1  A    No, I do not, sir.

2  Q    Are you in the business of -- in side business of dealing

3  with boats in any way?

4  A    I have friends that are, but I do not, sir.

5  Q    And what basis do you have, what's your personal

6  knowledge and experience, to offer a value -- opinion as to

7  the value of this boat?

8  A    Well, it's a six-figure-dollar-amount item that's on a

9  popular lake that could be sold even for half the price and

10 bring a great deal of money.  So, I mean, just by virtue of

11 the fact it's a big ticket item, one could sell it for money.

12 Q    Okay.  What's the market like right now for luxury boats?

13 A    The market has gone down -- the market's down on boats

14 and real estate and most big-ticket items these days.

15 Q    And Lake Cumberland has had -- where this boat is has had

16 problems with water levels the last summer or so?

17 A    It has, yeah.  I have -- I have no statistics on how much

18 it's affected the business.  I have not noticed it decreasing

19 the business, but --

20 Q    In what business?

21 A    In the tourism business in Somerset and Lake Cumberland

22 area.

23 Q    Well, what type of investigation have you done into that?

24 A    Well, I frequent the lake.

25 Q    Okay.  So your records indicate that you were not in

1   London on that date that's referenced on that calendar page?

2   A    I may have been in London.  I had a court appearance in

3   Lexington that day, but my office is in London.

4   Q    Well, your office is in London every single day, isn't

5   it?

6   A    Yes.

7   Q    I mean, that's where —

8   A    Well, I mean, I work out of other offices, but my primary

9   office is London, yes.

10  Q    Okay.  So that wouldn't be a special day for you to be in

11  London or anything, would it?

12  A    No, sir.

13          MR. HOSKINS:  Your Honor, we would like an

14  opportunity to see that witness — that exhibit, the calendar

15  page that was admitted.

16          THE COURT:  I'm sorry?

17          MR. HOSKINS:  We'd like to have a chance to look at

18  that exhibit again, the calendar page that he was asking

19  about.

20          THE COURT:  All right.  Do you have one?

21          THE WITNESS:  I've got it right here.

22          THE COURT:  Pass that to Mr. Grigsby, please.

23          MR. SMITH:  Your Honor, while we're taking a break,

24  I do have now a copy of the 302 that's been requested.  I can

25  hand that to defense counsel, it's dated 4-8-09.

1          THE COURT:  All right.

2          MR. HOSKINS:  Your Honor, a couple of points I would

3   like to address with the Court right now.

4          THE COURT:  Yes, sir.

5          MR. HOSKINS:  Shortly after I entered my appearance

6   in this case, I contacted the United States Attorney to

7   request discovery, and one thing that I was particularly

8   interested in were the items that were taken from my client's

9   home.  I spoke with Mr. Smith about those, and I have yet to

10  receive those.  This exhibit here today, Government's Exhibit

11  No. 1, evidently came from that.  Had we had access to that,

12  as we did a number of recordings, we would have reviewed that

13  before today.

14          One handicap that we're stuck with right now is that

15  had we had that, I would have shown this to Judge Maricle's

16  wife and asked her if that was her writing and what she knew

17  about it, which I believe to be the case, if she could explain

18  that.  Not knowing that we would get this type of evidence,

19  we've had her in the courtroom all day.  So I would ask the

20  Court to make an exception to the rule on exclusion of the

21  evidence for that limited purpose so that we can question her

22  about this document.

23          THE COURT:  All right.  Any objection, Mr. Smith?

24          MR. SMITH:  Well, Your Honor, it seems that I have

25  been portrayed here as holding back and hiding the ball from

1    the defendant, and I want to respond to that if the Court
2    would allow.

3             THE COURT:  Yes, sir.

4             MR. SMITH:  Mr. Hoskins, while he has entered his
5    appearance here just recently, his predecessor who represented
6    Mr. Maricle made several motions at the beginning of his
7    appearance here, one of which sought off sealing and unsealing
8    and requested everything be sealed.  And there's been some
9    confusion, just to be honest with the Court, about the timing
10   of which the unsealing of the search warrant should happen.

11            I made that motion and the magistrate judge took
12   that under advisement and entered an order just a few days ago
13   saying that because of the flurry of motions to seal by the
14   defendant, he wasn't comfortable in releasing those, and it
15   wasn't until Friday that there was some clarity brought to the
16   matter in which I feel now confident that we can go forward
17   with that.

18            Mr. Hoskins now seems to argue that we're trying to
19   play different with him or difficult, that's been the case
20   with all the defendants, and it's been the case because I was
21   uncertain as to whether or not the matter was unsealed, giving
22   me permission to go forward in giving that over.  It's not to
23   try to gain an advantage over him in this hearing.  I
24   personally, again, am not here to try to stand in the way of
25   Mr. Hoskins presenting whatever arguments he wants to bring.

1  If he wants Mrs. Maricle to take an oath here today and swear

2  to what he's proffered to the Court, I'm not going to stand in

3  the way of that.  I certainly do not, though, take that we've

4  tried to hide things from him.  That's not been the case, Your

5  Honor.

6          THE COURT:  All right.

7          MR. HOSKINS:  And, Your Honor, that's certainly not

8  what I said.  I just laid out the facts, and I don't

9  believe —

10         THE COURT:  You sure you-all want to get into this

11 at this point in this hearing with me?

12         MR. HOSKINS:  Probably not, Your Honor.

13         THE COURT:  Probably not.  All right.  I'll let you

14 call Mrs. Maricle here in just a moment.  Do you have any

15 other questions of Special Agent Briggs?

16 BY MR. HOSKINS:

17 Q   Mr. Briggs, the — there's nothing improper about the way

18 this houseboat was registered, is there?

19 A   You know, it's difficult to find, because it wasn't

20 registered through the State of Kentucky.  We had to go

21 through the U.S. Coast Guard to actually find the ownership of

22 this boat.  So it wasn't easy.  I don't know how common it is

23 to do this.  Honestly, I don't know how common that is.

24 Q   It's not a question of how common it is, I didn't ask

25 you was it difficult for you to do this.

1   A    There's nothing wrong.

2   Q    I asked you was there anything improper?

3   A    There's nothing wrong with it.

4   Q    And there is not?

5   A    No.

6   Q    And the comment that was alluded to earlier about being

7   with the Indians, are you aware of the timing when that

8   comment was made and the context it was made in?

9   A    I've only heard it discussed in court here.  That's

10  something I believe that Mr. Maricle had said to someone from

11  the probation office.  I don't know — presumably since he had

12  been arrested.

13  Q    Okay.  You don't — you don't have any information that

14  would date that back to a time before he even became judge, do

15  you?

16  A    No.

17  Q    You don't know when that statement was made?

18  A    I know it was made to government officials after his

19  arrest.

20            MR. HOSKINS:  All right.  That's all.

21            THE COURT:  Mr. Smith, anything else of Agent

22  Briggs?

23            MR. SMITH:  No, Your Honor.  Thank you.

24            THE COURT:  Do you have the exhibits with you there?

25            THE WITNESS:  Yes, sir, 2 through 6.  Mr. Hoskins

1   has 1.

2          THE COURT:  Thank you.

3          MR. HOSKINS:  Your Honor, I would ask if we would be

4   allowed to call —

5          THE COURT:  All right.  Let's see if Mr. Smith has

6   any additional witnesses he plans to call.

7          Mr. Smith, anyone else?

8          MR. SMITH:  In the interest of time, I do think that

9   it is important to once again point out to the Court the

10  pretrial services report.  I do not feel that it's necessary,

11  as the magistrate has made us aware that this is part of

12  consideration.  I would ask this Court to make it part of its

13  consideration, particularly highlighting his failure to

14  disclose the significant asset that we've just identified as

15  this houseboat insured at $140,000.

16         THE COURT:  All right.  Very well.  I'll take a look

17  at that.

18         Ms. Jeffreys or Mr. Little, if you could prepare a

19  copy of that for me, please.

20         All right.  Thank you.  You may call — any other

21  witnesses or evidence, Mr. Smith?

22         MR. SMITH:  No, Your Honor.

23         THE COURT:  All right.  Mr. Hoskins, if you would

24  like to call the one additional witness, you may do so.

25         MR. HOSKINS:  I call Judy Maricle.

1                            JUDY MARICLE,

2      having been first duly placed under oath, was examined and

3      testified as follows:

4                  THE COURT:  Thank you.

5                  Mr. Hoskins, you may proceed.

6                  MR. HOSKINS:  Thank you, Your Honor.

7                         DIRECT EXAMINATION

8      BY MR. HOSKINS:

9      Q    Would you tell us your name, please?

10     A    Judy Maricle.

11     Q    Mrs. Maricle, you're Cletus Maricle's wife?

12     A    Yes, sir, I am.

13     Q    You-all have been married for a very long time?

14     A    Thirty-eight, going on 39 years.

15                 MR. HOSKINS:  I would ask that the witness be shown

16     Government's Exhibit No. 1.

17     BY MR. HOSKINS:

18     Q    Would you read that, please, Mrs. Maricle?

19     A    You want me to read all of it or just the one?

20     Q    Read the whole thing.

21     A    It just says, "No motion hour today, call Charles Biggs,"

22     and "Cletus is in London."

23     Q    Does it say Biggs or Briggs?

24     A    Charles Biggs.

25     Q    Does that name mean anything to you?

1   A    Yes, sir, it does.

2   Q    Who is that?

3   A    He's a client in real estate several years ago that I

4   showed farms to.  He lives in Michigan.

5   Q    Do you have an address and phone number for him?

6   A    Yes, sir, I do.

7   Q    Do you have that with you?

8   A    I don't have it in front of me, but I have it.  He lives

9   in Michigan, and he was dating a lady from Tennessee, her name

10  is Vivian and they have since married.  I showed him farms in

11  the London area.

12          MR. HOSKINS:  Your Honor, I would ask that the

13  witness be shown this book to see if it refreshes her

14  recollection as to an address and phone number.

15          THE COURT:  Very well.

16          THE WITNESS:  He lives at 1923 Clinton Avenue, Saint

17  Clair, Michigan, is where he lives.

18  BY MR. HOSKINS:

19  Q    Are there phone numbers there for him as well?

20  A    Yes, sir, his home phone is 1-810-329-6678, and his cell

21  phone, at least it was at the time, 1-810-434-5791.

22  Q    Now, is this Mr. Biggs somebody that you had professional

23  dealings with back around that time?

24  A    I can't testify to the date, but since this is my writing

25  and it was May 2006, I'm assuming that's when it was, sometime

1   around that time that I was showing him farms.

2   Q    You were showing him farms?

3   A    Yes, sir.  I showed him farms in Jackson County and

4   Laurel County.  And his girlfriend with him — was with him

5   from Tennessee named Vivian.

6   Q    And that exhibit that you're looking at, Government's

7   Exhibit No. 1, is that in your handwriting?

8   A    Yes, it is.

9           MR. HOSKINS:  That's all.  Thank you.

10          THE COURT:  Mr. Smith, any questions?

11                  CROSS-EXAMINATION

12  BY MR. SMITH:

13  Q    Mrs. Maricle, that's your diary or address book?

14  A    Well, we just wrote on these things, but this particular

15  one is mine, because Mr. Biggs, that's who that is, it's

16  not — it's not him, it was Charles Biggs from Michigan.

17  Q    I understand your testimony, but —

18  A    Yeah.

19  Q    But the document, are you claiming that that's your

20  planner?

21  A    Well, I don't know if it's my planner.  I may have just

22  wrote on it.  It lays on the desk and I could have just

23  written on it.

24  Q    That other book that you've got there in your hand, is

25  that yours?

1    A    This is mine, yes.

2    Q    And you brought it with you here today?

3    A    Yes, I did.

4    Q    You keep it with you?

5    A    Most of the time.

6    Q    Most the time?  Did you give it to your attorney before

7    you took the witness stand?

8    A    I let him see the Charles Biggs name, yes.

9    Q    Okay.  Had he shown you that exhibit I guess so you could

10   identify that before you produced the book?

11   A    I don't know if I saw this first, no.  I just knew when

12   he said that that I had a client named Charles Biggs, and that

13   if it was Biggs, then it was probably my client.

14   Q    Yeah.  Okay.  Now, you and your husband maintain a close

15   relationship, I assume, husband and wife?

16   A    Yes.

17   Q    You-all have lived — stay in the same residence;

18   correct?

19   A    Yes.

20   Q    And I assume that during times that you were visited by

21   these cooperating witnesses that you were there on occasion,

22   were you not?

23   A    Tell me who you're talking about.

24   Q    Well, ma'am, you've sat through this entire hearing,

25   you've heard references to cooperating sources that have been

1    used by the investigators to tape conversations of your

2    husband, have you not?

3    A    Yes.  But I'm still not sure who you're asking about.

4    Q    My question is, ma'am, were you present when they made

5    visits to your husband's home?

6    A    If you'll tell me who made visits, I can tell you.

7    Q    I'm not going to tell you their names, because at this

8    point that's not something that I'm free to give you.  But I

9    do assume that since you've been here throughout both the

10   earlier proceeding and today's proceeding that you would know

11   that there had been visits made to your home by people who had

12   equipment that contained recorders?

13   A    If you're talking about the day of the wake, I'm aware

14   that somebody supposedly patted him down.  If they had a

15   recorder, then, yes, I'm aware she was there.

16   Q    I'm talking about your home, ma'am.

17   A    I was in my home.

18   Q    Okay.  And during the time of this investigation, isn't

19   it true, ma'am, that you were also privy to conversations with

20   these witnesses and talking to them about grand jury

21   testimony?

22   A    I may have been.  I was at home when people came to visit

23   a lot.  I don't know specifically what you're talking about.

24   Q    Okay.  Do you recall when they were asking questions

25   about what should we say when we go to the grand jury, and a

 1  female voice raises from the background and says, "You don't
 2  tell them nothing."  Do you remember making that statement,
 3  Mrs. Maricle?
 4  A    No, sir, I don't.  I'm not saying I did or didn't, but I
 5  don't remember it.
 6  Q    And your husband chimes in and says, "That's right,
 7  nothing."  You don't recall that conversation?
 8  A    No, sir, I don't.  But then I don't — you know, I don't
 9  remember two or three years ago.
10  Q    Okay.  You just don't remember?
11  A    I don't remember, no.
12  Q    But you remember Charles Biggs who you had as a client
13  almost four years ago that came from Michigan with a
14  girlfriend in Tennessee and —
15  A    Yes, I remember it well.
16  Q    —— on May 4 of 2006, that you recall specifically he was
17  in London and you were going to show him a farm because his
18  girlfriend was coming up from Tennessee and he was driving
19  down from Saint Clair, Michigan?
20  A    That's not quite right.  I remember Charles Biggs.  All I
21  asked is if this says Biggs it could have been my client
22  Charles Biggs from Michigan.  The date I did not remember.
23  I'm just hoping that it was Charles Biggs and not Mr. Briggs.
24  Q    Okay.  Your memory is pretty good on that?
25  A    On that, it is.

1  Q    You just don't have any memories of discussing grand jury

2  testimony with witnesses and telling them not to talk to the

3  grand jury?

4  A    No, sir, I don't.

5  Q    Okay.

6  A    I'm not saying I did or didn't, but, no, I don't recall

7  it.

8           MR. SMITH:  Okay.

9           THE COURT:  Anything else of this witness?

10          MR. HOSKINS:  Nothing further, Your Honor.

11          THE COURT:  All right.  Thank you, ma'am.  You may

12 step down.

13          All right.  Mr. Hoskins, any additional witnesses or

14 exhibits to present.

15          MR. HOSKINS:  No additional witnesses, Your Honor.

16 We would like to submit these videos of the Corky Price guilty

17 plea and his testimony in the case that was described.

18          THE COURT:  Yes, those will be admitted as the next

19 numbered exhibits, and you can provide those to the Clerk's

20 office at the conclusion of the hearing.

21          And I also want to talk with counsel about briefing.

22 I assume that you're going to order the transcript of this

23 hearing; is that correct?

24          MR. HOSKINS:  Yes, Your Honor.

25          THE COURT:  How much time would you like to file a

1   short memorandum after the transcript has been prepared?

2          MR. HOSKINS:  Judge, I guess it kind of depends on

3   the timing of getting the transcript.

4          THE COURT:  All right.

5          MR. HOSKINS:  And I know that that's not always

6   predictable, but as — when I left my office this morning, I

7   had a case set for trial before Judge Thapar on April 27th.  I

8   don't know if an order has been entered letting me out of that

9   case or not.  It appears that it has.

10          THE COURT:  Is there a prediction on that?  Is there

11   a prediction as to whether the — It looks like you're out.

12          MR. HOSKINS:  Okay.  Well, that's good news.  Then,

13   Your Honor, I essentially would have that week if the

14   transcript is ready.  I would probably like to have it in my

15   hands for seven days before I had to file anything.

16          THE COURT:  All right.  I'm going to ask the parties

17   to file simultaneous memos in the case.  If you need a short

18   period of time afterwards to file any response, that will be

19   three business days after the initial brief.  So you'll have

20   seven days after the transcript has been filed, and then three

21   business days to file any responses that might be necessary.

22   And I would certainly take this up — I'll be reading the

23   transcript as soon as it's filed.  So I'll have the

24   opportunity to refresh myself with that and also review the

25   other exhibits that have been tendered.

1          I believe there is one 302, the redacted version,

2   but I'll need to get the original version just for a Court

3   exhibit.  It will not be made available to defense counsel in

4   the case, but if you could make that available to me,

5   Mr. Smith.

6          MR. SMITH:  I'll do my best before I leave tonight,

7   and, if not, first thing tomorrow.

8          THE COURT:  That will be fine.  And I'll be in

9   Frankfort tomorrow, so I have a hearing up there in the

10  morning.

11         MR. HOSKINS:  The only other thing, Your Honor, is

12  these court records that I would like to file.  I would

13  suggest that I just go ahead and file those as a document.

14  That would give the Court and Mr. Smith access to that.  It's

15  essentially just case histories.

16         THE COURT:  Why don't you submit that as a notice of

17  filing of additional materials, and then if Mr. Smith believes

18  that maybe there's an authenticity problem or something, he

19  can take that up with the Court, but otherwise the Court will

20  be able to look at those documents.

21         MR. HOSKINS:  Thank you, Your Honor.

22         THE COURT:  Anything else to take up on this issue,

23  Mr. Hoskins?

24         MR. HOSKINS:  No, Your Honor.  I don't believe so.

25         THE COURT:  All right.  Mr. Smith, anything else?

1          MR. SMITH:  No, Your Honor.

2          THE COURT:  Thank you, Counsel.

3          MR. HOSKINS:  There is one other thing that we would

4     like to submit.  I almost forgot.  It's just a newspaper

5     article that reflects the date that Judge Maricle was sworn in

6     as judge.  So we'd like —— I think I ——

7          THE COURT:  All right.  Do you have a copy?  You can

8     go ahead and tender that as the next numbered exhibit at this

9     point, exhibit to the hearing.

10          MR. SMITH:  I would like to get a copy of it, but we

11     can take that up afterwards.

12          THE COURT:  Jackie, could you make copies of those

13     for Mr. Smith after they've been marked as exhibits?

14          Mr. Smith, we'll have copies of those made for you

15     if there's not enough for everyone.

16          Thank you.  Mr. Smith, anything else on behalf of

17     the government?

18          MR. SMITH:  Not at this time.

19          THE COURT:  All right.  Thank you, Counsel.  The

20     motion, of course, will be taken under advisement pending

21     submission of the materials that we've discussed.  We'll be in

22     recess.

23                    Proceedings concluded at 6:10 p.m.)

24

25

1                  C E R T I F I C A T E

2        I, Cynthia A. Oakes, certify that the foregoing is a

3    correct transcript from the record of proceedings in the

4    above-entitled matter.

5

6    4/25/2009                    s/CYNTHIA A. OAKES
        DATE                      CYNTHIA A. OAKES, RPR, RMR, CRR
7

8

9                        I N D E X

10                                              PAGE

11   Testimony of EDSEL BLAIR:
          Direct Examination by Mr. Hoskins:            5
12        Cross-Examination by Mr. Smith:              10
          Redirect Examination by Mr. Hoskins:         16
13        Recross-Examination by Mr. Smith:            24
          Further Redirect Examination by Mr. Hoskins: 25
14
     Testimony of TIMOTHY BRIGGS:
15        Direct Examination by Mr. Hoskins:           29
          Cross-Examination by Mr. Smith:              45
16        Redirect Examination by Mr. Hoskins:         51

17   Testimony of RICHARD COUCH:
          Direct Examination by Mr. Hoskins:           55
18        Cross-Examination by Mr. Smith:              66
          Redirect Examination by Mr. Hoskins:         75
19
     Testimony of GARY HUGH GREGORY:
20        Direct Examination by Mr. Hoskins:           80
          Cross-Examination by Mr. Smith:              95
21        Redirect Examination by Mr. Hoskins:        110

22   Testimony of BARBARA CARNES:
          Direct Examination by Mr. Hoskins:          113
23
     Testimony of WENDY ALANA CRAIG:
24        Direct Examination by Mr. Hoskins:          116

25

1  Index (Continued)

2  Testimony of BOBBY GENE:
        Direct Examination by Mr. Hoskins:              121
3
   Testimony of MARILYN ROBERTS:
4        Direct Examination by Mr. Hoskins:              123
         Cross-Examination by Mr. Smith:                125
5        Redirect Examination by Mr. Hoskins:           127

6  Testimony of LISA HUBBARD:
         Direct Examination by Mr. Hoskins:              129
7        Cross-Examination by Mr. Smith:                130

8  Testimony of LISA FRAZIER:
         Direct Examination by Mr. Hoskins:              130
9
   Testimony of BECKY WELCH:
10       Direct Examination by Mr. Hoskins:              132
         Cross-Examination by Mr. Smith:                135
11
   Testimony of ANTHONY LOVETT:
12       Direct Examination by Mr. Hoskins:              137

13 Testimony of TIMOTHY BRIGGS:
         Rebuttal Direct Examination by Mr. Smith:       141
14       Cross-Examination by Mr. Hoskins:              155

15 Testimony of JUDY MARICLE:
         Direct Examination by Mr. Hoskins:              167
16       Cross-Examination by Mr. Smith:                169

17

18

19

20

21

22

23

24

25

E X H I B I T S

| Government's Exhibit No. | Identified | Page Admitted |
|---|---|---|
| 1 | 147 | 150 |
| 2 | 149 | 150 |
| 3 | 149 | 150 |
| 4 | 150 | 150 |
| 5 | 151 | 150 |
| 6 | 151 | 150 |

| Defendant's Exhibit No. | Identified | Page Admitted |
|---|---|---|
| 1 | 32 | 42 |
| 2 | 65 | 65 |
| 3 | 77 | 77 |
| 4 | 118 | 118 |
| 5 | 118 | 118 |
| 6 | 173 | 173 |
| 7 | 173 | 173 |
| 8 | 176 | 176 |