United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09-16-S |
| vs. | ) |
| | ) London, Kentucky |
| RUSSELL CLETUS MARICLE | ) February 4, 2010 |
| DOUGLAS C. ADAMS | ) 11:42 a.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM R. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) VOLUME 3-A |
| STANLEY BOWLING | ) |

TRANSCRIPT OF CROSS-EXAMINATION OF KENNETH DAY BY MR. BAYER
BEFORE THE HONORABLE DANNY C. REEVES

Appearances of Counsel:
On behalf of the United States:     STEPHEN C. SMITH, ESQ.
                                    JASON D. PARMAN, ESQ.

On behalf of the Defendant          DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:             MARTIN S. PINALES, ESQ.
                                    CANDACE C. CROUSE, ESQ.

On behalf of the Defendant          R. KENT WESTBERRY, ESQ.
Douglas C. Adams:                   BENNETT E. BAYER, ESQ.
                                    KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant          T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant          ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant          RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:                 R. TUCKER RICHARDSON III, ESQ.

On behalf of the Defendant          JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant          ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant          DANIEL A. SIMONS, ESQ.
Stanley Bowling:

```
 1   Appearances of Counsel:

 2   On behalf of the United States:   STEPHEN C. SMITH, ESQ.
                                       JASON D. PARMAN, ESQ.
 3                                     Assistant U.S. Attorneys
                                       601 Meyers Baker Road
 4                                     Suite 200
                                       London, Kentucky  40741
 5
     On behalf of the Defendant       DAVID S. HOSKINS, ESQ.
 6   Russell Cletus Miracle:          107 East First Street
                                       Corbin, Kentucky  40701
 7
                                       MARTIN S. PINALES, ESQ.
 8                                     CANDACE C. CROUSE, ESQ.
                                       150 East Fourth Street
 9                                     Federal Reserve Building
                                       Cincinnati, Ohio  45202
10
     On behalf of the Defendant       R. KENT WESTBERRY, ESQ.
11   Douglas C. Adams:                KRISTEN N. LOGAN, ESQ.
                                       220 West Main Street
12                                     Suite 1900
                                       Louisville, Kentucky  40202
13
                                       BENNETT E. BAYER, ESQ.
14                                     106 West Vine Street
                                       Suite 800
15                                     Lexington, Kentucky  40507

16   On behalf of the Defendant       T. SCOTT WHITE, ESQ.
     Charles Wayne Jones:             133 West Short Street
17                                     Lexington, Kentucky  40507

18   On behalf of the Defendant       ROBERT L. ABELL, ESQ.
     William R. Stivers:              120 North Upper Street
19                                     Lexington, Kentucky  40507

20   On behalf of the Defendant       RUSSELL JAMES BALDANI, ESQ.
     Freddy W. Thompson:              R. TUCKER RICHARDSON III, ESQ.
21                                     300 West Short Street
                                       Lexington, Kentucky  40507
22
     On behalf of the Defendant       JERRY W. GILBERT, ESQ.
23   William B. Morris:               212 North Second Street
                                       Richmond, Kentucky  40475
24
     On behalf of the Defendant       ELIZABETH SNOW HUGHES, ESQ.
25   Debra L. Morris:                 201 West Short Street
                                       Lexington, Kentucky  40507
```

1  On behalf of the Defendant          DANIEL A. SIMONS, ESQ.
   Stanley Bowling:                    116 West Main Street
2                                      Suite 2A
                                       Richmond, Kentucky  40476
3

   Court Reporter:                     CYNTHIA A. OAKES, CRR
4                                      Official Court Reporter
                                       United States District Court
5                                      560 Athens Boonesboro Road
                                       Winchester, Kentucky  40391
6                                      (859) 983-4346

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Proceedings recorded by mechanical stenography,
    transcript produced by computer.

KENNETH DAY — CROSS — MR. BAYER

1                          CROSS—EXAMINATION

2    BY MR. BAYER:

3    Q    Mr. Day, if you remember, I'm Bennett Bayer, I'm Doug

4    Adams' attorney.  We spent some time together about a week or

5    so ago?

6    A    Yeah.

7    Q    Do you know what an FBI—302 is?

8    A    No, I do not.

9    Q    It's where the FBI makes a summary of all the statements

10   that you've made to them and they put it in summary form and

11   then they keep it in their records.  Have they provided you

12   copies of any of your statements?

13   A    No, they have not.

14   Q    Do you have any written material that you've used to

15   refresh your memory to get ready for trial?

16   A    The only thing that I had is what we done here Tuesday,

17   last Tuesday.

18   Q    What were you given?  What have you've gotten from them?

19   A    This is my plea agreement here.

20   Q    Did they give you a copy of the transcript from the

21   hearing last week?

22   A    Yes, sir.

23   Q    And were you able to look at that and figure out whether

24   or not you had made any errors during the course of that

25   hearing?

5

KENNETH DAY – CROSS – MR. BAYER

1  A    Not really.

2  Q    Well, when you say "not really," what does that mean?

3  A    I can't recall none.

4  Q    Who was it that gave you that transcript?

5  A    One of the agents.  I don't know what his name was.

6  Q    Was it Agent Briggs who's here?

7  A    No.

8  Q    It was a different FBI agent?

9  A    Yes.

10 Q    How many different FBI agents do you think you've met with

11 over the past four or five years in preparing to work for many

12 different trials?

13 A    Two.

14 Q    Who?

15 A    Tim Briggs and Buddy there.

16 Q    You also said another agent brought you the transcripts?

17 A    I don't know if he was an agent or what he was, but he

18 brought me the transcript.

19 Q    Your plea agreement is dated what?

20 A    February the 12th, '06.

21 Q    And since that point in time, how many different trials

22 have you testified in for the United States?

23 A    One is all I've testified in.

24 Q    Which one was that?

25 A    Wayne Reed.

KENNETH DAY — CROSS — MR. BAYER

1  Q    Did you not also testify in the Jennifer Garrison trial?

2  A    Now, wait a minute.  That was before that — that was in

3  my case, Jennifer Garrison was, yes.

4  Q    And you testified in that case, didn't you?

5  A    I did.

6  Q    You testified against Jennifer Garrison, didn't you?

7  A    I did.

8  Q    And she was found not guilty by the jury, wasn't she?

9         MR. SMITH:  Your Honor, I'm going to object.

10        THE COURT:  Sustained.

11  BY MR. BAYER:

12  Q    You testified in the Jennifer Garrison case, you testified

13  in the Wayne Reed case, and every time you testified you did it

14  under the impression that it was going to help you in getting

15  your sentence reduced at some point in time; correct?

16  A    That is right.

17  Q    And, in fact, just by coincidence, Judge Reeves has been

18  the judge in all these cases?

19  A    He has.

20  Q    Do you think by testifying for the prosecution that it's

21  going to impress Judge Reeves and help you?

22  A    I have no idea.

23  Q    Is that what your hope is?

24  A    I would like to.

25  Q    So every time you come into court you think it's helping

KENNETH DAY — CROSS — MR. BAYER

1  you, don't you?

2  A    Maybe.

3  Q    Mr. Maricle's counsel asked you some questions about when

4  you were in the drug rehab program.  You went into the drug

5  rehab program knowing that it would reduce your prison

6  sentence; correct?

7  A    That's right, seven months.

8  Q    How did you learn about that?

9  A    When I got to prison.

10  Q    You learn about a lot of things when you're in prison,

11  don't you?

12  A    Such as?

13  Q    Such as what a plea agreement will do for you in which you

14  agree to testify?

15  A    That's right.

16  Q    So in other words, when you were answering questions and

17  you really didn't — you said you really didn't understand what

18  your plea agreement might mean, and, in fact, when you were in

19  prison you talked with other people in the prison about what

20  that plea agreement would mean?

21  A    I did not.

22  Q    You did not?

23  A    I did not.

24  Q    Did you talk with other inmates there about what it might

25  do for you if you testified?

KENNETH DAY - CROSS - MR. BAYER

1  A    No, I did not.

2  Q    Then how did you find out in prison that it would benefit

3  you?

4  A    I was talking about the drug programs, is what I was

5  talking about.  And all the programs that they have in prison

6  is what I was talking about.  I discussed my case with nobody

7  whatsoever.

8  Q    Well, I think you shared a jail cell with Eugene Lewis at

9  one point in time, didn't you?

10 A    I did.

11 Q    You talked to Mr. Lewis about the case?

12 A    About my case, I did.

13 Q    You talked with Mr. Lewis and you indicated to him that

14 you were going to help the government out and you had all sorts

15 of information on all sorts of people where you thought it was

16 going to help you, didn't you?

17 A    No, I did not.

18 Q    You didn't tell Mr. Lewis about all these cases?

19 A    No, I did not.

20 Q    You didn't tell Mr. Lewis that you had all sorts of

21 information that you were going to provide to the government?

22 A    I did do that.

23 Q    And why did you tell that to Mr. Lewis?

24 A    We was just sitting in the jail cell at Somerset over

25 there and we talked about it.

KENNETH DAY — CROSS — MR. BAYER

1  Q    What was it you told Mr. Lewis?

2  A    I talked about my case to him is all I talked about.

3  Q    And you said that you were hopeful you were going to get

4  your sentence reduced; correct?

5  A    I did not say that to him.

6  Q    You didn't?

7  A    I talked to him very little about anything.

8  Q    Let's talk about your sentence for a moment.  What is your

9  understanding is your sentence?

10  A    Eighteen years.

11  Q    How old are you?

12  A    Fifty-eight.

13  Q    Are you afraid of dying in prison?

14  A    If I die, I die.

15  Q    But you want to get out as soon as you can?

16  A    Well, everybody does that.

17  Q    And you went to prison for a drug conviction in what year?

18  A    '97.  The first one?

19  Q    Yes, sir.  And you came back — what year did you get out

20  of prison?

21  A    '01.

22  Q    And you were on supervised release at that time?

23  A    Five years.

24  Q    And during the time that you were on supervised release is

25  when you got arrested again, didn't you?

KENNETH DAY — CROSS — MR. BAYER

1  A    That is right.

2  Q    And if I understood your testimony this morning correctly,

3  you testified that when you went to prison you immediately

4  started rounding up new customers for your drug operations?

5  A    I didn't say immediately.  I said when I was in the drug

6  program, that's when I met all my people that I sold drugs to

7  when I got out.

8  Q    So you went into the drug program to cut your sentence;

9  and while you were in the drug program, you lined up new

10  customers so that you could cut your sentence, get out of

11  prison sooner, and then start dealing drugs again; correct?

12  A    That is correct.

13  Q    I want to talk a little bit about your involvement in

14  politics.  And if I understand you correctly, you stated that

15  you've been in politics all your adult life?

16  A    Most of my adult life.

17  Q    And the two circumstances that you testified to this

18  morning, the two races, was the race regarding Oscar Gayle

19  House and Clay M. Bishop — not Clay M. Bishop, it was — it

20  was Clay Bishop and Oscar Gayle House race?

21  A    That's right.

22  Q    You don't have a recollection when that year was?

23  A    No, I do not.

24  Q    But all the records indicate when we were at the hearing

25  last week it was 1983.  Do you disagree with that?

KENNETH DAY — CROSS — MR. BAYER

1  A    I don't remember the year.

2  Q    Does 1983 sound correct?

3  A    I don't remember the year.

4        MR. SMITH:  Your Honor, I'm going to object to

5  arguing.

6        THE COURT:  It has been asked and answered a couple

7  of times.  The witness has indicated he doesn't recall the

8  year.

9  BY MR. BAYER:

10  Q    When did you start dealing drugs?

11  A    The first time?

12  Q    Yes, sir.

13  A    Around '95; '94, '95.

14  Q    So if the evidence shows that the Clay Bishop—Oscar Gayle

15  House race was in 1983, that was over a decade before you

16  started being a drug dealer?

17  A    If that's what it shows.

18  Q    If the records show that the Mike Hooker race was 1985,

19  that was over a decade before you became a drug dealer?

20  A    Probably was.

21  Q    So what you're doing during the early '80s, the people

22  that you're associating with in the early '80s and the

23  political races that you're dealing with in the early '80s, had

24  nothing to do with drugs, did it?

25  A    Not in the early '80s, no, it did not.

KENNETH DAY – CROSS – MR. BAYER

1  Q    The members of the jury really don't understand the whole

2  concept, I think, of Clay County, as far as some aspects of the

3  political environment.  Describe for me the White family.

4  A    I don't know what you're looking for.

5  Q    Well, what — who are the Whites in Clay County?

6  A    Doug White, Jack White, I worked for them for 20 some

7  years, Jennings White.

8  Q    Who are these people?

9  A    I don't understand what you're asking.

10 Q    Okay.  You said you worked for one of the Whites?

11 A    I worked for two of them.

12 Q    Who?

13 A    Jack and Doug.

14 Q    Are they related to Jennings White?

15 A    I don't know — they are related, but I don't know what

16 the relationship is.

17 Q    Who is Charles White?

18 A    Charles White is — I think he's Jennings' cousin maybe.

19 I don't know.

20 Q    Who's Daugh white?

21 A    That's Doug White.  That's a brother to Jack.

22 Q    What office did Doug White hold?

23 A    Mayor.

24 Q    What office did Charles White hold?

25 A    He was the superintendent at one time.

KENNETH DAY – CROSS – MR. BAYER

1  Q    Superintendent of Education?

2  A    Clay County Schools.

3  Q    Who is James Phillips Clay?

4  A    I don't know no James Phillips Clay.

5  Q    County Circuit Court Clerk, I think you told the FBI that

6  his wife's nephew is a White.

7  A    Do what now?

8  Q    Well, let me move on.  Who's Glenn Harris?

9  A    Glenn Harris is a cousin to Jennings White.

10  Q    Yancey White?

11  A    I don't know if Yancey is any kin to them or not.

12  Q    Jennings' cousin perhaps?

13  A    No.

14  Q    Charles Marcum?

15  A    Ex-jailer.

16  Q    Is he close to Jennings White?

17  A    I don't really know.

18  Q    And who is Jennings White?

19  A    Ex-clerk of Clay County.

20  Q    What is your relationship with Jennings White?

21  A    Just a good friend.

22  Q    Jennings White laundered some of your drug money, didn't

23  he?

24  A    Yes, he did.

25  Q    The two of you were in the drug business together?

KENNETH DAY – CROSS – MR. BAYER

1    A    Do what now?

2    Q    The two of you were in the drug business together?

3    A    That's not right.

4    Q    He laundered your drug money?

5    A    He did that.

6    Q    How did that happen?  Explain that to me, I don't

7    understand.

8    A    I took $20,000 to him, or 22,000, I don't remember the

9    exact number it was, and he wrote me a check for 18,000.

10    Q    Why?

11    A    To launder the money.

12    Q    How many times did you do that?

13    A    One time.

14    Q    And he charged you ten percent just to launder the money?

15    A    Yes.

16    Q    Why is it you would have gone to Jennings White to have

17    him launder that money for you?

18    A    I knew I could ask him to do it.

19    Q    Why?

20    A    We was close friends.

21    Q    Very close friends?

22    A    Yes, we was.

23    Q    Lifelong buddies?

24    A    No, not lifelong buddies, but we was close friends.

25    Q    How many times did you work in his political campaigns?

15

KENNETH DAY – CROSS – MR. BAYER

1    A    Once.

2    Q    When?

3    A    The first time he won.

4    Q    When was that?

5    A    I don't know the year.

6    Q    How many other White's campaigns did you work in?

7    A    None.

8    Q    How many other Whites are you close friends with?

9    A    None.

10   Q    You tried to align yourself with the White family

11   connections, though, didn't you?

12   A    Say that again.

13   Q    You tried always to align yourself with the White family

14   connections, didn't you?

15   A    I don't know what you're trying to say.

16   Q    In other words, you always wanted to stay in good graces

17   with the White family?

18   A    I did Jennings, yeah.

19   Q    You never came out against the White family, did you?

20   A    No, I did not.

21   Q    Why?

22   A    I was friends to Jennings.

23   Q    In 2002, what happened to Jennings White?

24   A    I didn't work that election, but he got beat.

25   Q    Who beat him?

KENNETH DAY – CROSS – MR. BAYER

1   A    Freddy Thompson.

2   Q    Freddy Thompson and Jennings White are not friends, then,

3   are they?

4   A    I don't know that.

5   Q    Who helped Freddy Thompson?

6   A    I do not know that.

7   Q    If somebody helped Freddy Thompson in 2002, they would not

8   be Jennings White's friend, would they?

9   A    I cannot speculate on that.  I do not know.  I had nothing

10  to do with that.

11  Q    Well, let me ask you this:  Jennings White at one time

12  told you that he was going to plant drugs in Doug Adams' car,

13  didn't he?

14  A    No, he did not.

15  Q    Who told you about that then?

16  A    Jennings tried to get me to do it.

17  Q    My mistake, I'm sorry.  Explain to me what Jennings told

18  you to do.

19  A    He didn't tell me to do nothing.  He asked me if I knew

20  anybody that would plant drugs in Doug Adams's automobile to

21  get him busted.

22  Q    Why would Jennings want Doug Adams busted?

23  A    I can't answer that.

24  Q    Jennings hates Doug Adams, doesn't he?

25  A    I don't know that.

KENNETH DAY - CROSS - MR. BAYER

1  Q    Why would he tell you to get Doug Adams set up?

2  A    I do not know that.

3  Q    Are you aware of whether or not Jennings White ever bought

4  votes?

5  A    Did I ever — yeah, I am.

6  Q    Tell us about that.

7  A    I seen him give Clinton Johnson $10,000.  And I also seed

8  him give Darrell McQueen $10,000.  He give Darrell McQueen

9  $10,000 in my presence, and he left my pawnshop agoing to

10 Clinton Johnson's with $10,000 for him in the '02 election.

11 Q    You also gave Jailer Charles Marcum a thousand dollars,

12 didn't you?

13 A    I did not.

14 Q    Who did?

15 A    I do not know.

16 Q    Tell me about Edd Jordan.  Who's Edd Jordan?

17 A    He used to be the sheriff of Clay County.

18 Q    And Jennings White sat up a meeting with Edd Jordan for

19 you, didn't he?

20 A    That is right.

21 Q    And you went over to meet with Edd Jordan and Jennings

22 White, didn't you?

23 A    I went right to the office.

24 Q    What was the purpose of the meeting?

25 A    Edd told me that he didn't — that I wasn't under no

KENNETH DAY — CROSS — MR. BAYER

1  investigation and would not be as long as he was sheriff, I had

2  nothing to worry about.

3  Q    What's that mean?  I don't understand.

4  A    Do what now?

5  Q    I don't understand what you're trying to accomplish with

6  meeting with the sheriff.

7  A    What I was trying to accomplish is I was wanting

8  protection in Clay County to make sure that I wasn't going

9  to — the Clay County Sheriff's Department was not going to

10  come into my pawnshop and try to raid or find drugs or illegal

11  activities going on.

12  Q    And Edd Jordan says as long as he's sheriff, you've got

13  that protection?

14  A    He said that.

15  Q    And Jennings White was there with you?

16  A    He was.

17  Q    And you asked Jennings White to set the meeting up for

18  you?

19  A    I did.

20  Q    Because Jennings White had a lot of power with Edd Jordan?

21  A    Jennings was closer to Edd than I was.

22  Q    And you're very close with Jennings?

23  A    Yes, I am.

24  Q    So Edd Jordan promises you that as long as he's going to

25  be sheriff he's going to take care of that?

KENNETH DAY — CROSS — MR. BAYER

1   A    That is right.

2   Q    And Jennings White is standing right there doing it?

3   A    Do what now?

4   Q    Jennings White is standing right there listening to that?

5   A    Yes, he is.

6   Q    Jennings White is in prison, isn't he?

7   A    Yes.

8   Q    What for?

9   A    Laundering drug money for me.

10  Q    And other people?

11  A    I don't know about other people.

12  Q    But he's in prison right now?

13  A    Who?

14  Q    Jennings.

15  A    To my knowledge, he is.

16  Q    Do you know who Vernon Hacker is?

17  A    I do.

18  Q    Tell me, who is Vernon Hacker?

19  A    He used to be councilman and head of the 9-1-1 building.

20  Q    What do you know about his drug dealings with Jennings

21  White?

22  A    I don't know nothing about his drug dealings with Jennings

23  White.

24  Q    What about with you?

25  A    None with me whatsoever.  The only thing I done with him

KENNETH DAY — CROSS — MR. BAYER

1  was I had a guy leave my place with 32-pound of marijuana, and

2  I called him — I didn't call him, I called Jennings to go see

3  him, him or Todd one, and I was going to give them $50,000 for

4  the drugs back.

5  Q    You know, you mentioned something about a Eugene Stewart.

6  Didn't you try to help Eugene Stewart get some charges dropped

7  against him?

8  A    I did not.

9  Q    Well, do you remember going — I'm sorry.  Do you remember

10  setting up a meeting between the Assistant Chief Roberts,

11  yourself, Kentucky State Representative Barbara White Colter

12  and Daugh White?

13  A    I did not.

14  Q    Well, did you tell the FBI that you did?

15  A    I did not.  And I wasn't at the meeting neither.

16  Q    So then you don't know anything about that?

17  A    I do not know nothing about that meeting.

18  Q    So if that's in your FBI-302, you don't know anything

19  about it?

20        MR. SMITH:  Your Honor, I'm going to object.  He's

21  already —

22        THE COURT:  Sustain the objection.

23  BY MR. BAYER:

24  Q    Do you know anything about State Representative Barbara

25  White Colter?

KENNETH DAY — CROSS — MR. BAYER

1  A    She's Doug and Jack's sister, is the only thing I know

2  about her.

3  Q    So when Mr. Smith was describing Barbara Colter to the

4  jury, it's actually Barbara White Colter, isn't it?

5  A    Do what now?

6  Q    Barbara is one of the Whites, isn't she?

7  A    I don't understand where you're coming from.  I didn't

8  hear Mr. Smith ask me nothing about Barbara White Colter.

9  Q    I'm sorry, that was a little bit confusing for you.  If

10  Barbara Colter has been described in this courtroom, it's

11  actually Barbara White Colter, isn't it?

12  A    She was a White before she married John Colter.

13  Q    Which White is she related to?

14  A    She's Jack and Doug's brother —— I mean sister.

15  Q    Did you ever talk to Edd Jordan about trying to get some

16  charges dropped against Eugene Stewart?

17  A    I did not.

18  Q    Well, did you ever talk with Vernon Hacker trying to get

19  some marijuana out of the evidence room over at the police

20  department?

21  A    I sure did.

22  Q    Tell us about that.

23  A    Well, I just told you, but I'll tell you again.  There was

24  a guy left my place with 32-pound of marijuana from North

25  Carolina, Old Fort, North Carolina, and he got stopped going

22

KENNETH DAY - CROSS - MR. BAYER

1  through Fogertown.  State Police took the marijuana off of him,

2  took him to the Clay County jail, and that's when I

3  approached Jennings to see Todd or Vernon, whichever one he

4  could see, to get the marijuana back.  I had a 50,000-dollar

5  reward on it, but Jennings goes up and sees them and, guess

6  what?  They didn't trust him to leave it in Clay County, they

7  took it to London.  I didn't get it back.

8  Q    You know, that's interesting because nobody ever trusted

9  you to handle money either, did they?

10  A    Yeah.  Yeah, they did.

11  Q    Well, I thought you testified this morning that you didn't

12  handle the money in the McKeehan race because they didn't trust

13  you with the money.

14  A    That ain't what I testified to.  I testified that I had

15  the money in the McKeehan race, but in the Oscar Gayle and the

16  Clay M. race Neville Smith was sitting at the mouth of Bray

17  Creek with the money and he would dole it out to us, 5-,

18  $10,000 at a time.  Doug would go get the money, bring to it

19  me, and I would pay the people, because it was against Doug's

20  religion to pay them.

21  Q    Because he wouldn't handle the money?

22  A    Do what now?

23  Q    Doug wouldn't handle the money?

24  A    No, he had got religion and wouldn't handle the money, but

25  he would buy the votes.

KENNETH DAY — CROSS — MR. BAYER

1  Q    Well, he was talking to the people about the votes?

2  A    He approached the people and made the deals, and I paid

3  them.

4  Q    That's right, he would talk to the people about he votes.

5  What do you know —— Another one of the Whites we haven't talked

6  about yet.  Who's Kennon White?

7  A    That's Doug White's son.

8  Q    And did you help Kennon White get some cocaine charges

9  taken care of?

10 A    No, sir.

11 Q    What do you know about that?

12 A    Nothing.

13 Q    Well, didn't you testify that you knew about cocaine

14 charges being taken care of by Barbara Colter White?

15 A    Not to my knowledge, I did not.

16 Q    After Edd Jordan promised you as sheriff that he was going

17 to protect you, did you go out and buy votes for Edd Jordan?

18 A    No, I did not.

19 Q    You never told the FBI that you were —— that you always

20 bought votes for Edd Jordan?

21 A    I did.  But not after he told me that.  I didn't fool with

22 no elections after he told me that.

23 Q    When were you buying votes for Edd Jordan?

24 A    Back in the early, I don't know, '80s, late '80s, early

25 '90, whenever I brung —— when I was buying votes at Burning

KENNETH DAY – CROSS – MR. BAYER

1  Springs, Edd would always be on my list.

2  Q    So even before the time that you met with the sheriff to

3  make sure that the sheriff would give you protection, you were

4  doing work for the sheriff, you were buying votes for him?

5  A    Say that again now.

6  Q    Before the time that you went to the sheriff to get

7  protection, you were helping to buy votes for the sheriff?

8  A    Well, what happened was, if you want to get into that, was

9  I bought votes for Edd at Burning Springs.  There was an

10 election going on and Cletus was inside and Doug is inside and

11 we had a slate.

12 Q    When you say "we," who is "we"?

13 A    Me, I had a slate.

14 Q    Yes, sir.

15 A    And I had Edd Jordan on the slate, and Cletus stopped the

16 election, he was making them fill out the forms that they was

17 supposed to fill out, we was voting one about every 15 minutes.

18 And Doug comes to me and he says, "Cletus, he shut us down."  I

19 said, "What's he want?"  He said, "He wants Harold Sizemore."

20 Harold was running against Edd at that time.  I said, "Give

21 that to him, let's get back in business," and that's what

22 happened.  I bought votes for Edd Jordan, but I sold him out

23 that day.  He wasn't my most person on the list.

24 Q    When you went to ask him for protection, did you tell him

25 you had previously sold him out?

KENNETH DAY — CROSS — MR. BAYER

1    A    What do you think?

2    Q    I don't know, I wasn't there.

3    A    No, I did not.

4    Q    Did he ever find out that you sold him out?

5    A    I didn't tell him.

6    Q    If he had found out that you sold him out when you were

7    asking for protection, what do you think he would have done at

8    that point in time?

9            MR. SMITH:  Your Honor, I'm going to object.

10           THE COURT:  I'm going to sustain the objection as to

11   speculation.

12   BY MR. BAYER:

13   Q    You've got a son, don't you?

14   A    Yes, I do.

15   Q    What is his name?

16   A    Kenneth Rodney.

17   Q    What does Kenneth Rodney do?

18   A    Nothing.

19   Q    Why?

20   A    He's a drug addict.

21   Q    Is he also a dealer?

22   A    No, he's not.

23   Q    How did he get hooked on drugs, Kenny?

24   A    I have no idea.

25   Q    Did you ever provide any drugs to your son?

26

KENNETH DAY - CROSS - MR. BAYER

1  A    No, I did not.

2  Q    What did you do to keep your son from becoming a drug

3  addict?

4  A    I tried everything.

5  Q    Like what?

6  A    Give him a job, tried to get him off of them, just

7  couldn't get him off of them.

8  Q    Does it bother you that your son is a drug addict?

9  A    What do you think?

10  Q    I don't know.

11  A    Yes, it bothers me.

12  Q    If you've got problems that your son is a drug addict, why

13  would you sell thousands of pounds of drugs so other children

14  could get hooked on it?

15  A    I did.

16  Q    That doesn't bother you?

17  A    Yes, it does, too.

18  Q    Rodney used to work at the Clay County schools, didn't he?

19  A    Yes, he did.

20  Q    What happened to him?

21  A    They fired him.

22  Q    Who fired him?

23  A    Doug Adams.

24  Q    Why did Doug Adams fire him?

25  A    He was on drugs.

KENNETH DAY — CROSS — MR. BAYER

1  Q    He came to work stoned, didn't he?

2  A    He was on drugs.  I was locked up at the time.

3  Q    And Doug Adams fired him?

4  A    He did.

5  Q    He's the same Doug Adams that you talked to somebody

6  setting up with drugs in his vehicle.  Jennings wanted you to

7  do that, didn't he?

8  A    Yes, he did.

9  Q    Your good buddy, Jennings?

10  A    Yes, he did.

11  Q    Edd Jordan hates Doug Adams, doesn't he?

12  A    I don't know that.

13  Q    He's not told you that?

14  A    No, he has not.

15  Q    Edd Jordan is part of the Jennings White faction, isn't

16  he?

17  A    I do not know that.

18  Q    Well, Jennings was able to set up the meeting for you?

19  A    He did that.

20  Q    I would say that's pretty close contact.  I mean, let me

21  ask it this way:  If the sheriff of Clay County is going to

22  have a meeting with Jennings White and you were — he's going

23  to talk about giving you protection for all your drug business

24  and he does it in front of Jennings White, I suspect he's

25  pretty close to Jennings White, wouldn't you?

1          MR. SMITH:  Your Honor, I'm going to object again to

2    speculation.

3          THE COURT:  Sustained.

4    BY MR. BAYER:

5    Q    Let me ask it this way:  Edd Jordan didn't do anything to

6    hide that information from Jennings White, did he?

7    A    Do what now?

8    Q    Edd Jordan made those statements in front of Jennings

9    White, didn't he?

10   A    Yes, he did.

11   Q    Didn't do anything to hide that information from Jennings

12   White?

13   A    He made them in front of him.

14   Q    At the time you were standing there, did it look like Edd

15   Jordan trusted Jennings White?

16         MR. SMITH:  Your Honor, again objection, speculation.

17         MR. BAYER:  I'm asking what he observed, Your Honor.

18         THE COURT:  I'll sustain the objection.

19   BY MR. BAYER:

20   Q    How many times now do you think you've testified to try to

21   help cut your sentence?

22   A    This is the third.

23         MR. SMITH:  Your Honor, I'm going to object again.

24   Mischaracterizing the testimony.

25         THE COURT:  I'll overrule.

KENNETH DAY — CROSS — MR. BAYER

1          You may answer the question.

2          THE WITNESS:  Ask it again now.

3   BY MR. BAYER:

4   Q     How many times have you now testified to try to reduce

5   your sentence?

6          THE COURT:  I'll sustain the objection to the last

7   part.  You can ask him how many times he's testified.

8   BY MR. BAYER:

9   Q     How many times now have you testified?

10  A     Well, you talking about the times in this case?

11  Q     Every time you have now come in as a government witness.

12  A     This is the third time on this case here, and two more

13  makes five, the best of my recollection.

14  Q     And all done with the idea that it's going to cut your

15  sentence?

16  A     That is right.

17         MR. BAYER:  Judge, if I could have a moment, please,

18  to check something?

19         THE COURT:  Yes, you may.

20  BY MR. BAYER:

21  Q     I just want to follow up briefly on the election that you

22  heard that the results were announced reversed.  Okay.  If I

23  understood your testimony correctly, it was because they were

24  afraid to announce the correct results there because they

25  thought the crowd was going to kill them?

KENNETH DAY – CROSS – MR. BAYER

1  A    No, they thought Corky McKeehan's brother was going to

2  kill them.

3  Q    So they were in fear of their life?

4  A    That is right.

5  Q    As far as — but you have no knowledge whatsoever as to

6  whether or not the results were accurately and properly

7  recorded at the courthouse?

8  A    Do what now?

9  Q    You have no knowledge whatsoever as to whether or not the

10  results were accurately recorded at the courthouse?

11  A    No, I do not.

12  Q    But you just know that Corky McKeehan's brother was there

13  threatening to kill them if Corky — if the results were not

14  announced that Corky won?

15  A    That is not right.

16  Q    What is it then?  I don't understand.

17  A    Corky was there, Cork — I mean, Corky's brother was all

18  there helping buy votes, and along up in the afternoon, he

19  said, "We're going to have a party at Corky's tonight, Corky

20  has won this election."  And he said, "You're invited to come."

21  And I said, "Well, I don't know about that."  And along up in

22  the afternoon, Doug and Cletus called me to the door.  They

23  said that they was going to announce the votes opposite of what

24  they was because it was so lopsided that they feared that

25  Corky's brother that was there would kill them.

KENNETH DAY − CROSS − MR. BAYER

1   Q    And they told you to leave so you would be safe, didn't
2   they?

3   A    They told me to leave and they was going to announce the
4   votes, they was going to switch them.

5   Q    Switch the announcement?

6   A    That's right.

7   Q    Because of Corky McKeehan's brother?

8   A    That is right.

9           MR. BAYER:  No further questions.

10          THE COURT:  We're going to take our lunch break at
11   this time.

12          Ladies and gentlemen, we will take a break for lunch
13   before we continue with examination.  Please keep in mind the
14   admonitions that you've been given several times not to discuss
15   the case among yourselves while we are in recess.  I'm going to
16   ask you to be back if you can at 1:15.  If you're a little bit
17   longer than that, then we'll certainly give you a few moments,
18   but we'll shoot for 1:15 and see how that works.

19          (Whereupon, the jury retired from the courtroom, after
20   which the following proceedings were had in open court.)

21          THE COURT:  Thank you, and please be seated.

22          Counsel, before I excuse you for our lunch break, I
23   just wanted to confirm just a couple of points.  I had gone
24   over an instruction that I will give if requested to do so.
25   When we had our last bench conference, I believe the

32

1  instruction had been or would be instructed on behalf of

2  Mr. Maricle, the testimony relates to three witnesses in the

3  case –– I'm sorry three defendants in the case.  I believe that

4  counsel to Mr. Maricle wanted me to give the instruction,

5  counsel for Mr. Adams did not want me to give the instruction,

6  had objected to it, and counsel for Mr. Jones wanted me to give

7  the instruction.

8        MR. WHITE:  That's right, Your Honor.

9        MR. PINALES:  That's correct.

10       MR. BAYER:  I think Mr. Westberry will address the

11  issues of whether we object to the instruction in its entirety.

12       THE COURT:  Well, it's your client, you can confer

13  with him, but if you object to me giving the instruction, I'm

14  only going to give it with respect to the other two defendants

15  in the case.  If you want to give it, I'll note your objection

16  to the language, but if you want me to give the instruction ––

17       MR. BAYER:  I would rather you give it to all three

18  rather than to isolate us out.

19       THE COURT:  Just so we're clear, the time to give the

20  instruction would be at the conclusion of the witness's

21  testimony, and if anyone asks me, at that time then I'll

22  certainly give the instruction.  But if you change your mind,

23  for whatever reason, just –– the three of you need to let me

24  know.  Again, this relates to testimony with respect to three

25  of the defendants in the case.  If anyone else feels the need

1  to join in, then you need to let me know that as well.

2          Are there any other issues that need to be taken up

3  outside the presence of the jury?  If so, I'm going to exclude

4  Mr. Day.

5          MS. HUGHES:  I know the government doesn't want to

6  tell us the order of proof, I anticipate there will be one more

7  attorney cross-examining today.

8          THE COURT:  I'm going to excuse Mr. Day and then

9  we'll talk about that.

10          Mr. Day, I'll let you step down.

11      (Whereupon, the witness exited the courtroom.)

12          THE COURT:  All right.  Thank you.

13          Mr. Day is not present at this time.

14          MS. HUGHES:  I was just thinking we could expedite

15  this if there was additional Jencks Act material for the next

16  witness, they could go on and turn that over and know what it

17  was and we wouldn't have to take the break in between.

18          THE COURT:  That may depend on how much cross-

19  examination is remaining with Mr. Day.  If I could get a

20  general sense of that.

21          Mr. White, how long do you anticipate spending?  I

22  will remind everyone you don't have to cover every question

23  that co-counsel has already gone over.

24          MR. WHITE:  I factored that in, because you had

25  actually told me to do that in our pretrial.  Taking out what

1   Mr. Bayer and Mr. Pinales did, I would say — and that's the

2   reason I was kind of getting up there, I think I got about

3   15 minutes, if that.  Of course, a lot depends upon —— he's

4   done a pretty good job in terms of responding to questions, so

5   I would say about 15 minutes.

6           THE COURT:  Fifteen.

7           Mr. Abell.

8           MR. ABELL:  Judge, I'm not going to question Mr. Day

9   today.

10          MR. BALDANI:  I've got two minutes or less.

11          MR. GILBERT:  I don't intend to cross—examine any.

12          MS. HUGHES:  I'm not going to ask any questions.

13          MR. SIMONS:  I'm not going to ask any questions.

14          THE COURT:  It appears that we may be finished with

15  cross—examination, say, 15 to 20 minutes at most.  Will you be

16  in position to provide any *Jencks* material with respect to the

17  next witness you anticipate calling?

18          MR. SMITH:  We will take care of that, Your Honor.  I

19  don't expect that we're going to have any, but I'm going to

20  double—check.  It's Eugene Lewis, for their benefit, if they

21  want to check their notes and we'll take an opportunity to

22  revisit that before resuming on the lunch break.

23          THE COURT:  If the issue is still open when we come

24  back, let me know that, and if we need to take a little bit

25  longer lunch break on this issue, then we can certainly take

1   that up.

2           MS. HUGHES:  These witnesses don't affect my client

3   at all.  I thought it would be easier to move us along.

4           THE COURT:  I appreciate that.  Well, I want to get

5   all — we'll go ahead and let you have your lunch break as

6   well.  So if the jury takes a little longer and when we stop

7   after 12:00, then they run into the lunch crowd here in town.

8   Hopefully, if they can get back by 1:15, we'll be ready to

9   resume at that time.  If one or more is not back, then, of

10  course, I'll let you know and we'll bring the jury back in if

11  there's nothing else to take up.  So we'll be in recess

12  hopefully until 1:15.

13      (Whereupon, a recess was had for the noon hour, after

14  which the proceedings continue uninterrupted to Volume 3—B)

15                  (Proceedings concluded at 12:20 p.m.)

16               C E R T I F I C A T E

17      I, Cynthia A. Oakes, certify that the foregoing is a

18  correct transcript from the record of proceedings in the

19  above—entitled matter.

20

21  2/7/2010                    s/CYNTHIA A. OAKES
        DATE                    CYNTHIA A. OAKES, RPR, RMR, CRR
22

23

24

25

1                                 I N D E X

2                                                                    PAGE

3    Testimony of KENNETH DAY:
4           Cross-Examination by Mr. Bayer:                    4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25