United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09-16-S |
| vs. | ) |
| | ) Frankfort, Kentucky |
| RUSSELL CLETUS MARICLE | ) February 11, 2010 |
| DOUGLAS C. ADAMS | ) 9:00 a.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM E. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) VOLUME 6-A |
| STANLEY BOWLING | ) |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States:    STEPHEN C. SMITH, ESQ.
                                   JASON D. PARMAN, ESQ.

On behalf of the Defendant         DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:            MARTIN S. PINALES, ESQ.

On behalf of the Defendant         BENNETT E. BAYER, ESQ.
Douglas C. Adams:                  R. KENT WESTBERRY, ESQ.
                                   KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant         T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant         ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant         RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:                R. TUCKER RICHARDSON, III, ESQ.

On behalf of the Defendant         JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant         ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant         DANIEL A. SIMONS, ESQ.
Stanley Bowling:

```
 1   Appearances of Counsel:

 2   On behalf of the United States: STEPHEN C. SMITH, ESQ.
                                     JASON D. PARMAN, ESQ.
 3                                   Assistant U.S. Attorneys
                                     601 Meyers Baker Road
 4                                   Suite 200
                                     London, Kentucky  40741
 5

 6   On behalf of the Defendant      DAVID S. HOSKINS, ESQ.
     Russell Cletus Miracle:         107 East First Street
 7                                   Corbin, Kentucky  40701

 8                                   MARTIN S. PINALES, ESQ.
                                     150 East Fourth Street
 9                                   Federal Reserve Building
                                     Cincinnati, Ohio  45202
10

11   On Behalf of the Defendant      BENNETT E. BAYER, ESQ.
     Douglas C. Adams:               106 West Vine Street
12                                   Suite 800
                                     Lexington, Kentucky  40507
13
                                     R. KENT WESTBERRY, ESQ.
14                                   KRISTEN N. LOGAN, ESQ.
                                     220 West Main Street
15                                   Suite 1900
                                     Louisville, Kentucky  40202
16

17   On behalf of the Defendant      T. SCOTT WHITE, ESQ.
     Charles Wayne Jones:            133 West Short Street
18                                   Lexington, Kentucky  40507

19
     On behalf of the Defendant      ROBERT L. ABELL, ESQ.
20   William E. Stivers:             120 North Upper Street
                                     Lexington, Kentucky  40507
21

22   On behalf of the Defendant      RUSSELL JAMES BALDANI, ESQ.
     Freddy W. Thompson:             R. TUCKER RICHARDSON III, ESQ.
23                                   300 West Short Street
                                     Lexington, Kentucky  40507
24

25
```

```
1   On behalf of the Defendant      JERRY W. GILBERT, ESQ.
    William B. Morris:               212 North Second Street
2                                    Richmond, Kentucky  40475

3
    On behalf of the Defendant      ELIZABETH SNOW HUGHES, ESQ.
4   Debra L. Morris:                201 West Short Street
                                    Lexington, Kentucky  40507
5

6   On behalf of the Defendant      DANIEL A. SIMONS, ESQ.
    Stanley Bowling:                116 West Main Street
7                                    Suite 2A
                                    Richmond, Kentucky  40475
8

9   Court Reporter:                 CYNTHIA A. OAKES, CRR
                                    Official Court Reporter
10                                   United States District Court
                                    560 Athens Boonesboro Road
11                                   Winchester, Kentucky  40391
                                    (859) 983-4346
12

13

14

15

16

17

18

19

20

21

22

23

24
    Proceedings recorded by mechanical stenography,
25  transcript produced by computer.
```

4

1      (Whereupon, the following proceedings were had outside the
2  presence of the jury.)
3          THE COURT:  Thank you, and good morning, everyone.
4          The record will reflect that the jury is not present
5  at this time.  Let's see, all parties and counsel are accounted
6  for, it appears.
7          Mr. Smith, have you had an opportunity to review the
8  supplemental notices that were filed by several of the
9  defendants with respect to proposed expert witnesses?
10         MR. SMITH:  Yes, we have, Your Honor.
11         THE COURT:  All right.  What is the position of the
12 United States with respect to whether *Daubert* hearings would be
13 necessary as to those witnesses?
14         MR. SMITH:  Your Honor, I do —— I do believe that we
15 have isolated the issues that the government seeks to raise on
16 this matter.  And, obviously, they're a little bit of overlap.
17 My understanding of the analysis that the Court has to engage
18 in is whether the person has the qualifications, experience,
19 training or otherwise, that would enable them to make such an
20 opinion; the second is whether or not that opinion would assist
21 the tryer of fact.
22         And as I see it, that kind of overlaps with the
23 relevancy argument, and that's where I believe that we have ——
24 our objections would be centered upon, is that these are
25 opinions that are either irrelevant or would not assist the

5

1  tryer of fact in the issues framed before this Court.

2          THE COURT:  With respect to the experts, there are

3  several individuals that are listed that would appear to the

4  Court who would be testifying as to forfeiture issues.  At

5  least that's what it appears to me.

6          MR. SMITH:  If there is relevance in the Government's

7  mind, there could be an issue.  Of course, we understand and

8  appreciate that obviously those are bifurcated proceedings and

9  would not be before the trier of fact at this point.  But I

10 do — I do see that there's a different possible utility with

11 that information in the forfeiture aspect.  Our argument is, is

12 that in this portion of the trial proceedings, Your Honor, that

13 it is not helpful and is not relevant.

14         THE COURT:  Specifically which of the experts that

15 have been identified would you — do you believe that *Daubert*

16 hearings would be needed?  Let me just got through these.

17         MR. SMITH:  Your Honor, if the Court would allow me

18 to send my assistant to our office, I believe I came out here

19 without those pleadings to refer to.

20         THE COURT:  All right.  That will be fine.  While

21 she's retrieving those materials, let's talk about scheduling

22 just a moment.  At this point, I'm not going to use tomorrow

23 for any *Daubert* hearings.  We need to proceed with testimony in

24 the case.  And, if necessary, my plan is to schedule hearings

25 obviously before we would get to their testimony, to do that in

1    the evenings based on their availability.  I know that -- I
2    believe several of the attorneys have indicated that there may
3    be some scheduling issues with some of these folks, so we want
4    to try to do it at a time that meets their schedules if we can,
5    if at all -- if it's all possible.
6          This morning I understand that one of our jurors was
7    snowed in and has just now gotten out of a snow bank and is on
8    his way here, and it probably will be another 45 to 50 minutes
9    before he gets here, he's traveling some distance.  And so we
10   will have a little bit of a delay this morning.  But we do need
11   to proceed with all of our jurors present in light of the
12   length of this trial.
13         I believe also yesterday there was a motion for
14   reconsideration filed on behalf of Defendant Thompson with
15   respect to my earlier ruling dealing with exculpatory
16   statements, and I have gone back and I have looked at the
17   statements that Defendant Thompson wishes the Court to
18   reconsider, and it, again, appears to the Court that this would
19   not fit within the statements that the Court allowed to be
20   included.  Instead, they're denials of criminal activity that
21   are offered -- in my opinion, that are offered for the truth of
22   the matter asserted, not -- as opposed to a state-of-mind issue
23   and they're not necessary under Rule 106.  So the Court's
24   ruling would stand with respect to previous order dated
25   January 26th of this year.  So the motion for reconsideration

1    will be denied.  But I did go back and look at those statements

2    once again.

3                Let me take these supplemental experts in the order

4    in which supplements were filed, supplemental notification.

5                I believe Mr. Bowling filed the first supplement

6    listing three individuals, Charles Stivers, CPA — I guess my

7    first question is whether this is the same Charles Stivers

8    that's the brother of the defendant in the case, William

9    Stivers.

10                MR. SIMONS:  It is not.

11                THE COURT:  Different Charles Stivers.

12                Second is Larry Cann, and the third is Benton Hanson,

13    Quest Engineering.

14                MR. SIMONS:  Your Honor, I filed those disclosures

15    out of an abundance of caution.  Candidly, I believe that both

16    of those witnesses are fact witnesses.  They do have expertise,

17    they did prepare engineering estimates and, to some degree,

18    they may be expressing opinions.  They're not going to express

19    any opinions on the ultimate issue, but I felt like it was

20    proper to notify the government that I would be calling them.

21    I intend to subpoena them.  And they're not retained by me,

22    and, frankly, they were hired by the City, and I haven't even

23    been able to deal with them.  So I have to subpoena them to get

24    them here.

25                THE COURT:  I suppose one of the issues that comes up

1    with these witnesses will be this –– again, getting back to the

2    question I asked Mr. Smith earlier, is whether these witnesses

3    would go to the forfeiture counts.  In looking at RICO

4    forfeiture provisions, I believe that statute talks in terms of

5    proceeds as opposed to profits, and there's some changes in the

6    law, I think, last year that relates to that issue.  So it may

7    be that the Court would have to instruct the jury as to the

8    definition of proceeds and it may involve profits, but I

9    believe proceeds falls somewhere between net profits and gross

10   profits.  So it may be that there's some legal issues that

11   we'll need to take up.  But I suppose your position on these

12   witnesses would be that if they do express opinions, I guess

13   you would need to subpoena those witnesses in to testify, if we

14   have a *Daubert* hearing, then you would need to ––

15           MR. SIMONS:  That's correct.

16           THE COURT:  –– hold them over for the case in chief?

17           Again, though, it would appear to me that these

18   witnesses would relate to forfeiture issues.  Do you agree or

19   disagree?

20           MR. SIMONS:  I think that they go to the substantive

21   issues as well, but if government has indicated, at least

22   indicated to me, that there's going to be proof that my client

23   got these contracts and then took shortcuts in the performance

24   of them, and that's part of their case, these gentlemen would

25   be prepared to testify that that didn't happen, and that's a

1  factual issue in the underlying substantive count.

2          THE COURT:  All right.  So that would be — that

3  would be factual testimony from individuals who were involved

4  in the oversight or the bidding process.

5          MR. SIMONS:  That's correct, that's my position.

6          THE COURT:  All right.

7          All right.  Mr. Smith, what is the government's

8  position with respect to whether a *Daubert* hearing would be

9  needed on these three witnesses?

10         MR. SMITH:  Your Honor, I fail to see the relevance.

11 I would argue that a *Daubert* hearing is not needed, that if

12 these issues do bring about the relevance of Mr. Bowling's

13 performance of a particular job, these individuals have factual

14 information regarding that, that's a different issue.  But at

15 this point, this juncture of the case, again, we would just

16 argue that it's not necessary for a *Daubert* hearing and that

17 our position is is that it's — at this point, they're not

18 relevant.

19         THE COURT:  All right.  Well, I'll have to make a

20 determination as to relevancy and I'm not going to be able to

21 do that until I see how the case develops.  I think it would be

22 premature for me to make a determination as to relevancy

23 without hearing any proof at this point as to these issues.  So

24 it may be necessary to revisit this at a later time, and, of

25 course, if I believe it's necessary to have a further hearing

1    to take testimony before these issues are presented to the

2    jury, I'll certainly do that in sufficient time so these

3    witnesses can be subpoenaed.

4              MR. SIMONS:  I can subpoena them.

5              THE COURT:  All right.  Thank you.

6              Let's see.  And I believe that Mr. White has listed,

7    I believe, the same two individuals that were identified

8    earlier, but he's provided quite a bit of information at this

9    point through the supplemental notice, Mr. James Lewis, and

10   Kathryn Gabhart, I believe is her name.

11             MR. WHITE:  Good morning, Your Honor.

12             THE COURT:  Yes, sir.

13             MR. WHITE:  Oh, I'm sorry, did you —

14             THE COURT:  I was going to ask Mr. Smith what his

15   position was on these two witnesses.

16             MR. SMITH:  Your Honor, I believe that Mr. White has,

17   not only through his supplemental notice but through his

18   representations to the Court, narrowed, I believe, the scope of

19   these two witnesses to what he believes to be issues not

20   necessarily calling upon their expertise to make opinions.  If

21   that's the case, again, I think that this is a circumstance

22   where if relevant we can address those witnesses when they come

23   in and a *Daubert* hearing would not be necessary.

24             THE COURT:  All right.

25             Mr. White, any further comment?

1          MR. WHITE:  No further comment, Your Honor.  The only

2    thing I would alert everyone to is there are a couple of

3    factual issues that I identified with Katy Gabhart in terms of

4    the voting machine purchase stuff.  But, again, I think that's

5    something we can deal with when we call her, and I will alert

6    the United States to that before we put that evidence in so

7    that Your Honor will have an opportunity to deal with that.

8          THE COURT:  All right.  Let me also alert the

9    parties, with respect to some of the testimony of some of these

10   witnesses, the parties should prepared to tender to the Court

11   proposed jury instructions.  If witnesses start talking about

12   what certain provisions of Kentucky law would require, then the

13   Court ultimately would have to make an instruction or give an

14   instruction to the jury as to those issues, and if there's some

15   difference of opinion, then you should be prepared to do that

16   in advance.

17         MR. WHITE:  Your Honor, is that something that would

18   be helpful to you before I call or is that something you would

19   want for the instructions conference?

20         THE COURT:  Well, what — the way it may come up is

21   if there's an objection that's made during the course of

22   testimony that a witness is expressing a legal opinion, it

23   could come up at that point, it could delay the proceedings.

24   And so if the parties would like to be looking at that issue

25   now and be prepared to address it, it may speed things along.

 1          MR. WHITE:  We will, Your Honor, and if I think it's

 2   appropriate, I'll just file something in the record for you to

 3   take a look at, that way Mr. Smith will have it as well.

 4          THE COURT:  I think as I had indicated earlier to

 5   Ms. Hughes with respect to one of her proposed witnesses,

 6   typically if there's a legal issue that's presented, it's the

 7   proper subject of an instruction, a jury instruction.  Now,

 8   there may need to be some foundation laid to get to that point,

 9   but typically the Court would instruct as a matter of law.

10          MR. WHITE:  Thank you, Your Honor.

11          THE COURT:  All right.  Thank you.

12          And, Mr. Smith, I believe a supplement was also filed

13   for Mr. Gravitt, a witness that Mr. Adams anticipates calling

14   in the case as to several issues.  Have you had an opportunity

15   to review that supplement?

16          MR. SMITH:  Yes, Your Honor, and our position, again,

17   remains the same as to this disclosure.

18          THE COURT:  All right.  Thank you.

19          And then, finally, I believe Mr. and Mrs. Morris

20   supplemented their earlier notification with respect to

21   testimony of Mr. Craft.

22          Is the United States' position the same with respect

23   to his proposed testimony?

24          MR. SMITH:  It is, Your Honor.

25          THE COURT:  All right.  Again, if the parties'

1  positions were to change with respect to the need for a *Daubert*

2  hearing as to any of these witnesses, the Court would

3  appreciate being advised just as quickly as possible.

4        I guess the remaining issue with respect to expert

5  witnesses would be the IRS agent, Mr. Sagrecy.  I believe

6  earlier when we were discussing this matter, I believe one of

7  the defendants indicated they would be asking for a *Daubert*

8  hearing with respect to Mr. Sagrecy but reserved on that until

9  some earlier testimony had been reviewed.  That's my memory.

10 At this point, do any of the defendants wish —— or would like

11 the Court to schedule a *Daubert* hearing with respect to that

12 testimony?

13     (No audible response.)

14        THE COURT:  No?  All right.  All right.  Thank you.

15        In terms of our schedule for today, Mr. Smith, I

16 believe when we finished on Monday, I think it was, Mr. White

17 was on the witness stand, and are we at the point now where

18 we're about to get into audiotapes and transcripts?

19        MR. SMITH:  We are, Your Honor.  I think that I have

20 probably got another hour of direct testimony leading up to the

21 playing of those recordings.

22        THE COURT:  All right.  I know some of these are

23 rather lengthy.  So what I'm going to ask that you do is after

24 we've been in session for an hour and a half, we'll need to

25 take a break.  If the jury doesn't get here until 10:00, we'll

14

1  probably just got for two hours and take our lunch break about
2  12:00.  I don't want to stop someone in the middle of a
3  transcript, but if you know that there's a good place to break,
4  then I'm going to rely upon you to do that with a witness.  And
5  I may signal you that it's time to take a break, so if you
6  would be observant of that.
7          Are there any other issues -- while the jury isn't
8  present, any other issues that we need to take up at this time?
9      (No audible response.)
10         THE COURT:  No?  Mr. Westberry, I think -- no?  Yes,
11 sir.
12         MR. WESTBERRY:  Judge, thank you.  Just a scheduling
13 issue.  Judge Reeves, on February 22nd, I have a hearing in
14 front of Judge Van Tatenhove that we set in London, it's a
15 *Brady Giglio* hearing.  We set that knowing I was scheduled in
16 your court.  I think he wanted to get something on the book.
17 I'm operating under the assumption that we're going to be in
18 trial here on the 22nd.  I wanted to be able to represent that
19 to Judge Van Tatenhove when he calls.
20         THE COURT:  We're planning to be, but if you would
21 like for me to talk with him about that, I'll certainly do
22 that.
23         MR. WESTBERRY:  It's your call.  I and Ms. Logan
24 could be witnesses in a *Brady Giglio* hearing, and that's why we
25 have someone else that's helping me with it.  If you don't

 1   mind, Judge, when you get a chance, perhaps it would be a good

 2   idea as to that.

 3         THE COURT:  All right.  I'll contact him about that

 4   issue and try to give as much latitude as I can.  I know that

 5   there may be — I know there's one day this month that hasn't

 6   been set yet, but I believe there's going to be one day when

 7   I'm going to need to be in Lexington for a meeting.  We have a

 8   judges' meeting that I can't miss, and I don't know when that's

 9   going to be yet, and if it turns out to be the 22nd, that may

10   work out.

11         The other thing I want to talk about just for a

12   moment in terms of scheduling, originally, you know, we were

13   going to use tomorrow for a *Daubert* hearing, but that's not

14   necessary, so we'll proceed with the jury tomorrow.  Monday is

15   scheduled to be a federal holiday and I think I've made all the

16   arrangements that are necessary for us to be in session on

17   Monday, and I was going to tell the jury that at the end of the

18   day today, that although it's a federal holiday, we'll plan to

19   proceed with the trial on Monday.  Of course, there's bad

20   weather that's scheduled to move in again this weekend as well.

21   So I would like to proceed on Monday if we can.  Of course, one

22   issue we have is with jurors and we have a couple of jurors in

23   the case that live pretty far out in a couple of counties.  And

24   I've — we've got to call into the Marshal's Service to find

25   out about alternate transportation if the jurors can't get

 1   here, and I don't know the answer to that yet.  But as I have

 2   further information, I'll share it with counsel.  But we need

 3   to proceed with all jurors at this point, we don't need be

 4   excusing anyone at this stage of the proceeding.  We're less

 5   than a week in in terms of testimony, and so we need to keep

 6   all of our jurors that we possibly can.  But we will have

 7   delays throughout the course of this trial, either due to

 8   sickness or weather conditions or other matters that come up,

 9   so we'll just have to be as flexible as possible.  And I do

10   appreciate the attorneys and their flexibility to this point in

11   the case.  I know that you-all have been very cooperative the

12   last couple of days in trying to work out the schedule, and I

13   do appreciate that.

14           Let's see, Mr. Westberry, did you have anything else?

15           MR. WESTBERRY:  That was it.  Thank you, Your Honor.

16           THE COURT:  All right.

17           MARSHAL SHELTON:  Your Honor, may I approach?

18           THE COURT:  Yes, sir, Mr. Shelton.

19       (Whereupon, an off-the-record discussion was had between

20   the Court and Marshal Shelton at the bench, out of the hearing

21   of the jury, after which the following proceedings were had in

22   open court.)

23           THE COURT:  Mr. Smith, did you have an issue to take

24   up as well?

25           MR. SMITH:  Your Honor, there is one issue.  We have,

17

1   of course, been assisted with two case agents, and Special

2   Agent Timothy Briggs has had a death in the family and is

3   expected to travel tonight to the services tomorrow.  If the

4   Court and the parties don't have an objection to him being

5   absent tomorrow?

6               THE COURT:  All right.

7               MR. WESTBERRY:  No, of course not.

8               THE COURT:  I wouldn't anticipate there would be —

9   all right.  I'll express my condolences to the family.

10              All right.  Anything else?

11              All right.  Ladies and gentlemen, if you would be on

12  standby, hopefully the — we have two jurors that weren't here

13  when I came into court.  One I know is 45 minutes away, I'm not

14  sure about the other, but —

15              THE CLERK:  He misunderstood and he thought it was on

16  the Franklin County schedule.

17              THE COURT:  He thought we were on the Franklin County

18  schedule?  Okay.  Well, hopefully, we'll be able to get started

19  by 10:00.  And, Mr. Smith, if you can check and make sure your

20  equipment is functioning, we'll be ready to go as soon as our

21  jurors arrive.  We'll be in recess to await the jurors to

22  arrive.

23          (Whereupon, a recess was had, after which the jury entered

24  the courtroom and the following proceedings were had in open

25  court.)

KENNON WHITE - CONTINUED DIRECT - MR. SMITH        18

1              THE COURT:  Good morning, everyone.

2              The record will reflect that all members of the jury

3    are present.  The parties and counsel are also present.

4    Mr. White has returned to the witness stand.

5              You're still under oath of course.

6              THE WITNESS:  Yes, Your Honor.

7              THE COURT:  Mr. Smith, you may continue.

8              MR. SMITH:  Thank you, Your Honor.

9                        KENNON WHITE,

10   being previously duly sworn, was examined and testified further

11   as follows:

12                  CONTINUED DIRECT EXAMINATION

13   BY MR. SMITH:

14   Q    Mr. White, I believe when we broke last we were discussing

15   your testimony, your first involvement, I believe, in the

16   election that you've identified as an election involving your

17   aunt?

18   A    That's correct.

19   Q    And that would have been, as you refer to also, your first

20   trip around the county with Jennings White?

21   A    That's correct.

22   Q    And you had discussed that there were other political

23   people that you also were introduced to during that time period

24   and I believe you introduced us to Cletus Maricle and Doug

25   Adams?

KENNON WHITE – CONTINUED DIRECT – MR. SMITH          19

1    A    That's correct.

2    Q    And if you could, just tell us how it was that they came

3    to you or you came to them during that time period.

4    A    Okay.  In the timeframe when my —— the first election that

5    we're talking about, when my aunt had run and I had went around

6    the county with Jennings White, I ran —— Cletus Maricle, we had

7    talked to him, he would come to the campaign headquarters quite

8    a bit down —— it was beside of Colter's Diamond Center in town,

9    he'd come to the campaign center.  Doug Adams, we went to the

10   high school and talked with him.  They had —— someone had sent

11   word for us to come out there and talk with him.

12   Q    In speaking with Cletus Maricle, did he talk to you at all

13   about how Jennings White could help you with your effort to

14   help your aunt?

15   A    Yes, he said —— he told me that he was the best he had

16   ever seen at being able to organize the vote buying and to be

17   able to do what needs to be done in the election.

18   Q    Now, you indicated, I think, that there was also another

19   early race that you recall, I believe you mentioned that your

20   father was involved in an actual mayoral race sometime during

21   this same time period.  Do you recall that?

22   A    Yes, it was, I think, somewhere in the late '80s.

23   Q    Now, in discussing —— in your first introduction into the

24   Clay County politics, was the money that you saw involved at

25   this early stage primarily just for vote buying, or was money

KENNON WHITE — CONTINUED DIRECT — MR. SMITH          20

1  also introduced in other ways in these elections?

2  A    Okay.  From the early stage, it was used for vote buying,

3  all the money that I had seen.

4  Q    All right.  Now, were there any of these meetings that you

5  attended when your father was running?

6  A    The meetings that I attended was, yeah, at the car

7  dealership.

8  Q    Okay.  And who do you recall attending those meetings

9  besides you and your father?

10  A    Okay.  I had went over some names, I remember that — I

11  know that Cletus Maricle was there, Laura House was there —

12  Q    Tell us who Laura House is.

13  A    She's a — she was a city council member at the time.

14  Q    Okay.

15  A    And then also there was Ralph and Penny Robinson.

16  Q    And who are they?

17  A    Ralph is deceased now and Penny is an elected council

18  member.

19  Q    Okay.  And what kind of discussions were in your presence

20  in those early meetings?

21  A    Would you like me to continue with the names of the people

22  that —

23  Q    Oh, if there are other names, certainly.

24  A    Yes.  Harvey Hensley was there, he's an elected council

25  member as of now.  George Saylor was there, there was —

KENNON WHITE – CONTINUED DIRECT – MR. SMITH          21

1   Q    Who is George Saylor?

2   A    He's a candidate for mayor now.

3   Q    All right.

4   A    They was probably others that are –– I know they was more,

5   there was several meetings.  Stanley Bowling was there.

6   Q    Okay.  And at that time, what was his position?

7   A    He was City –– the general supervisor at the City.

8   Q    And what was generally discussed in that meeting?

9   A    What was discussed in that meeting was basically the

10  different people that each and every one that was there knew

11  and their families and what they would take to support my

12  father and –– money-wise usually.

13  Q    Did you get involved in any other campaigns leading up to

14  the 2002 campaign when you yourself entered as a candidate?

15  A    I had –– I had actually been involved in one other race

16  with Jennings White when he ran for clerk.

17  Q    And what race was that?

18  A    When he ran for clerk.

19  Q    And how did he –– or you get involved in that case?

20  A    I was –– he –– I had went along with a gentleman that was

21  distributing money in the Pin Hook precinct.

22  Q    At the Pin Hook precinct?

23  A    Uh-huh.

24  Q    And who was that that you accompanied in the Pin Hook

25  precinct?

1   A    Lonnie Day.

2   Q    Okay.  And does he hold any office?

3   A    No, he does not.

4   Q    What does he do?

5   A    The last time I knew he had a car lot.

6   Q    Okay.  And who put you two together to distribute out

7   money in the Jennings race?

8   A     Jennings.  Jennings did. Jennings and Les Carnahan, which

9   was magistrate.

10  Q    Okay.  Les Carnahan?

11  A    Yes.

12  Q    Did you contribute any money to any of these races leading

13  up to 2002 yourself?

14  A    I had contributed some different times.  I think that I

15  had written a check to Vernon Hacker for $500 once for him to

16  cash and buy votes with.

17  Q    You say you wrote him a check.  Do you know what race that

18  would have been in?

19  A    It seems like that that would have probably been around

20  the 2000.

21  Q    And was that race involving himself or others?

22  A    It was involving —— there was a council race going on and

23  it was —— he had came and approached me at a council meeting

24  and I was there and he asked me to put up money for him.

25  Q    Any other occasions that you recall?

1   A    Okay.  Are you talking about for vote buying or just

2   donating to campaigns or --

3   Q    Well, I asked the question generally as far as giving

4   money to people before the 2000 election.  Do you recall any

5   other monies that you might have given?

6   A    Yes, I'm sorry, I didn't understand the question.  Robert

7   Stivers, I give Robert Stivers some money for his campaign.

8   Q    Okay.  Was that a donation for -- by check?

9   A    It was by check.

10  Q    Okay.  Any others?

11  A    I think that's it.

12  Q    And how much did you give Mr. Stivers?

13  A    If my memory serves me correctly, around a thousand

14  dollars.

15  Q    So when was it, Mr. White, that you got interested in

16  running for jailer in 2002?

17  A    Okay.  I had started to close down my manufacturing

18  housing lot where we sold mobile homes, the business had taken

19  a downturn, and I had heard that the jailer was not going to be

20  running again and I decided at that time to pursue that office

21  as jailer.

22  Q    Had you ever put your name out as a candidate for public

23  office before then?

24  A    No.

25  Q    And in making those decisions, did you go to certain

1   people to discuss this prospect?

2   A    Yes, I did.

3   Q    And who's the first person you recall going to?

4   A    I went to Cletus Maricle.

5   Q    And tell us about that, Mr. White.

6   A    Okay.  I went and asked him if he thought that he would

7   give me his support and that if I had a chance to win, and he

8   told me that I should run.  And I asked him how much money that

9   it would take to run, and he said, "If you want a sure thing,"

10  he said, "you're looking at probably $120,000.  If you want

11  to — if it's going to be close," he said, "you're probably

12  looking at 60 to 80,000.

13  Q    Where did you go from there?

14  A    I went to Jennings White's.

15  Q    And in talking with Cletus Maricle, did Jennings' name

16  come up?

17  A    Yes.

18  Q    And what did he suggest about Jennings?

19  A    That I needed to talk with Jennings because I would need

20  his help.

21  Q    Okay.  So tell us about your visit to Jennings.

22  A    Well, when I went to see Jennings, he became irate, he

23  didn't want me to run.

24  Q    He became what?

25  A    Irate, he became upset, he did not want me to run against

1    the current jailer, and —

2    Q    And who was the current jailer?

3    A    Charles Marcum.

4    Q    What did he tell you?

5    A    He told me that it was going to be different this time,

6    that he wasn't going to take — he was taking a different

7    approach, that he was going to encourage the magistrates to do

8    the distribution of funds and money and vote buying and let

9    them do what they wanted to do and that if I tried — if I ran

10   for jailer, that Charles had been a strong ally for him and

11   that it would cause Charles to swing his votes and the ones

12   that he knew to buy to the school board and that the Doug Adams

13   and the school board would defeat him for clerk if I ran.

14   Q    Now, he said he was going to do it differently this time

15   and let the magistrates —

16   A    (Witness nodding head affirmatively.)

17   Q    How many magistrates were there in Clay County at that

18   time?

19   A    I don't know the exact amount.  I think they was six or

20   seven.

21   Q    Did he explain to you why he had to change his method of

22   operation in 2002?

23   A    He didn't really go really in depth.  He just said that

24   the magistrates was — from this point out was going to have to

25   be the ones that handled — that had handled the money and that

1  he was going to go through them, that he was going to give them

2  the election officers as far as his votes, that he could -- you

3  know, his votes on election officers and he was going to allow

4  him to pick who they wanted and allow them to handle the whole

5  matter.

6  Q    Did you know where Jennings White had the grip on election

7  officers in the county?

8  A    Yes.

9  Q    And where was that at that time?

10 A    He had the grip on most of the elections officers because

11 of where he was clerk.  But his strongest precinct was the

12 Horse Creek precinct.

13 Q    Okay.  Who else did you seek advice from after talking

14 to Jennings?

15 A    I went to Doug Adams.

16 Q    Okay.  And tell us about that, Mr. White.

17 A    Well, I went and talked with Doug about running for

18 jailer.  He wanted me to run for clerk, and he told me that if

19 I would run for clerk that he would -- that he would get Freddy

20 Thompson not to file for clerk and that he would support me and

21 that I would need, you know, to put up quite a bit of money.  I

22 told him that I didn't want to run against Jennings because of

23 where Jennings was a cousin to me, and he told me that if I did

24 decide to -- not to run for clerk, to run for jailer, that he

25 would need $60,000 and that he would throw the support of the

KENNON WHITE — CONTINUED DIRECT — MR. SMITH          27

1   school board and that he would distribute that and for me to

2   bring it to him and that he would take care of it and I would

3   have complete support of the school board in a way that hadn't

4   been seen in Clay County in a long time.

5   Q    Now, you said interestingly that he opened up the

6   possibility that he would actually support you against Jennings

7   White as clerk?

8   A    Yes.

9   Q    Did he talk to you in depth about how that was going to

10  work and what kind of support he could offer you in that race?

11  A    Yeah, he was — he was wanting rid of Jennings White,

12  and Jennings was — he wanted — he wanted — he knew that the

13  clerk's position was a powerful position and that it held, you

14  know, control over election officers and that he wanted — that

15  he wanted that office, you know, that he didn't want Jennings

16  White to have that office.

17  Q    Now, in talking with Doug Adams and Jennings White, did

18  you ever come to figure out what the source of this animosity

19  or this rivalry was?

20  A    Well, I've heard two or three different things.

21          MR. WESTBERRY:  Objection, hearsay.

22          THE COURT:  Sustained.

23  BY MR. SMITH:

24  Q    Well, let's center about what they told you.

25  A    Okay.

1  Q    What did Doug Adams tell you was the reason that he was

2  wanting Jennings White out at that time?

3  A    Well, he told me that he wanted Jennings White -- Jennings

4  out because that he just did not -- that he didn't -- he just

5  didn't want him there.  He said Jennings has been against him,

6  that Jennings had tried to control, you know, him, and that he

7  wouldn't be controlled and that he wanted -- you know, that he

8  wanted Jennings out of there.

9  Q    Did you have discussions with Jennings White about why

10 Doug Adams was against him?

11 A    Jennings seemed to think it was because of someone that

12 had came from out of state to rob Doug Adams for a large amount

13 of money and had accidentally went to a different house and

14 that they had helped those people get out of trouble, him and a

15 few more politicians in Clay County had helped those people,

16 and that Doug Adams had held it against him ever since that had

17 happened.

18 Q    Where did you go from your meeting with Doug Adams?

19 A    Well, I went and talked with Stanley Bowling and Bart

20 Morris.

21 Q    And do you recall under what circumstances you met Stanley

22 Bowling and Bart Morris?

23 A    There was a couple of circumstances that I met with them.

24 The first I just went to them individually and talked with them

25 about what they thought about my chances of running.

1  Basically, they told me that — what they did tell me was that

2  the school board and that — you know, I would need the support

3  of the school board; also, that I would need the support

4  of Jennings if I was going to run and that it would be nice if

5  I could get the support of both but that they were going to

6  be a — you know, that that was going to be a big issue to try

7  to do.  They told me how much money that they thought I would

8  need.

9  Q    What did they tell you?

10  A    For the city precinct, Bart told me that I would probably

11  need 8- to $10,000.

12  Q    And what did Stanley tell you?

13  A    Stanley said about 4- to 5,000 for his help around Harts

14  Branch.

15  Q    What else did you-all discuss?

16  A    We discussed how that I — we were going to be able to

17  get — to get Jennings to help me, because at that time he was

18  really not wanting me to be involved in this race.  And not

19  long after that I got a call from Bart that they were down in

20  the Clerk's Office and for me to come down there.  And I came

21  down there, and they was several officeholders and other people

22  in the backroom at the Clerk's Office and they agreed to help

23  me at that time.

24  Q    Now, who do you recall was at this meeting at the County

25  Clerk's Office?

KENNON WHITE - CONTINUED DIRECT - MR. SMITH          30

1    A    I know that Roger Smith, the one called "Uncle Bud," was

2    there.  I know that there was -- Randall Wagers was there, he

3    was a magistrate.  Tommy Harmon was there.

4    Q    And what was his position?

5    A    Tommy was magistrate.  Tommy was magistrate.  And then you

6    had -- let's see, Jennings was there.  And Clinton Johnson,

7    which was a candidate for magistrate, was there.  And --

8    Q    Okay.  Now, you mentioned this guy Roger Smith.  Was he

9    seeking office?

10   A    No.

11   Q    Did you learn what his role was going to be?

12   A    Yes, at a later time, he was -- he orchestrated the vote

13   buying on -- for four precincts.  And I later took him

14   and Jennings around 17, $18,000 to a garage that he owned to

15   purchase votes with.

16   Q    So what was discussed at this meeting, Mr. White?

17   A    Well, that they would -- that they did not want me to give

18   any money to the school board, that if I was going to run that

19   they wanted me to be solely on their side, that they didn't

20   want me to give any money to the opposite side.  And Jennings

21   felt that he could help me, that I would get all his votes that

22   he could give me except in the Horse Creek precincts, that he

23   was going to have to try to work something out there different

24   because the Horse Creek and Pigeon Roost precincts him and

25   Charles worked together in and that was going to be a problem,

KENNON WHITE - CONTINUED DIRECT - MR. SMITH        31

1   that he would have to see what he could do there.

2   Q    Now, was -- up to this point, was it your experience in

3   Clay County that sometimes when these slates were put together

4   that sometimes people would have to drop off and drop in and

5   drop out of this thing in order to make the -- make the scheme

6   work?

7   A    In -- yes, it was common in Clay County --

8        MR. WESTBERRY:  Excuse me, I apologize.  Objection.

9   Leading in the form of the question and there's several

10  multiple questions in there.

11       THE COURT:  All right.

12       I'll sustain the objection.  You may rephrase it.

13       MR. SMITH:  Okay.

14  BY MR. SMITH:

15  Q    Leading up to this point, Mr. White, had you learned in

16  Clay County that there was -- that you had to be open to

17  dropping in and dropping out when you came to meet with these

18  candidates on a slate?

19  A    Yes.

20  Q    Okay.  Explain that.

21  A    Well, what would happen is that when we -- when you would

22  go and meet with them, they would be certain precincts that

23  they would be able to help you in and certain precincts that

24  they wouldn't.  They would tie with whatever would be the best

25  to benefit the candidate.  In other words, someone you -- might

1  be for you in one precinct may be against you in another, it

2  was just according to what they needed to do to get the votes

3  that they wanted, you know.

4  Q      Now, Charles Marcum, had he been in politics in Clay

5  County for a long time leading up to 2002?

6  A      Been there for, yeah, many years.

7  Q      And did he hold an office other than jailer?

8  A      Yes, he was magistrate before he became jailer.

9  Q      And where was his home precinct?

10  A      His home precinct, even though he moved from there, but

11  his home precinct was still considered Horse Creek.

12  Q      So in that meeting did you-all discuss how much money you

13  were going to have to contribute to the pool?

14  A      Yeah, and they told me that Jennings would be getting with

15  me, but it would — you know, that I would need — they asked

16  me how much that I had, and I told them that I had 50- to

17  $60,000 at that time, even though I did end up spending more

18  than that.

19  Q      Now, Mr. White, did you actually have 50- or $60,000 on

20  you at that time?

21  A      Not on me at that time, but I had —

22  Q      Where were you going to get the money?

23  A      I would go to the bank and I — I borrowed money off my

24  father, and then I had some myself, and I would go to the bank

25  and cash checks at a bank, at National City Bank, and I had a

1  lockbox there, and I would keep a certain amount of funds in
2  that lockbox so that when they notified me of when I needed to
3  deliver this money that I would have access to it.

4  Q    And did you have an understanding that it had to be cash
5  money?

6  A    Yeah, it had to be cash.  Better to be 20s than 10s.

7  Q    Who told you that?

8  A    Well, Jennings has told me that; Bart, Stanley, different
9  people that's, you know, involved in vote buying.

10 Q    Did they explain to you why they wanted 20-dollar bills?

11 A    Because the 20-dollar bills is usually what people takes
12 for their votes, or 30, and then usually the haulers are paid
13 so much cash for the people they can get to sell their vote, so
14 it's the denominations that's -- you know, that's useful in
15 that way.

16 Q    Did you make a commitment to this group before you left
17 that meeting?

18 A    Yes, I did.

19 Q    Okay.  What commitment did you take?

20 A    I made a commitment that I would -- that I would stick
21 with them except in the Oneida and South Fork precincts where
22 that they could not help me in the Horse Creek's, that they --
23 I had some people that was affiliated with the school board
24 usually in their races that worked there that would help me in
25 those precincts that would not help them.  So we swapped off on

1    what precincts that I wouldn't get as much help in the Horse

2    Creek's, but they released me to go ahead and be able to get

3    help in Oneida and South Fork.

4    Q    And did you have a person in mind when you were discussing

5    that with them, about who you were going to rely upon that was

6    allied with the school board in those precincts?

7    A    Yes, that was Mike Bishop and his father and John Russell

8    Brown.

9    Q    Now, Mike Bishop, at that time, what was he doing for

10   employment?

11   A    At that time he was working — I don't know his exact date

12   of hire, but I think he was working for the city police

13   department.

14   Q    And his father, do you know his name?

15   A    Paul Bishop.

16   Q    And then there was a third person that you named.  What

17   was his name?

18   A    John Russell Brown.

19   Q    And what position did he hold?

20   A    He was a principal at — I think at that time he was

21   either principal or around that time he got moved to the actual

22   Board of Education office to work.

23   Q    Now, you indicated that the Bishops were aligned with the

24   school board, but they're working for you at the City.  Could

25   you explain that?

1  A     Okay.  He had just started working at the City, you know,

2  around that time from what —— the best of my recollection.  His

3  father was a long —— lifelong friend of Doug Adams and, you

4  know, everyone knew, you know, there —— his mother worked ——

5  whether she worked at that time I do not know, but his mother

6  ended up working at the Board of Education.

7  Q     What position did she work?

8  A     Well, she worked at the front desk when you walked in to

9  the Board of Education.  I don't exactly know her job title.

10 Q     Okay.  So there was a swap-out and then you allowed them

11 to align with who in the Horse Creek?

12 A     From my understanding, they were aligning with Charles

13 where they could and ——

14 Q     Charles who?

15 A     Marcum, my competition.

16 Q     Now, you indicated that you didn't put any money on the

17 table at this meeting?

18 A     No.

19 Q     When were you called to bring money?

20 A     I was called to bring money at —— probably about maybe

21 four to five days before the election they called me and I

22 started delivering money to the people that were —— I was

23 supposed to.

24 Q     Who did you first take money to that you recall,

25 Mr. White?

1  A    I think the first amount of money I took was to Jennings

2  White and Roger Smith.

3  Q    And how much money did you take them?

4  A    It was around or about 17- to $18,000.

5  Q    Okay.  Who else did you take money to that you recall in

6  the 2002 primary election?

7  A    I took money to Johnny "Poss" Gregory.

8  Q    Who is he?

9  A    He was a magistrate and he did -- he was at Pigeon Roots,

10 which was one of the original precincts that we was supposed to

11 have swapped off on, but later they had something come that he

12 had a problem with Charles and he had told me to bring my money

13 and that he would help me.

14 Q    And did he have a relative on the slate of candidates

15 running as well, was he related to any other person?

16 A    He was a candidate hisself.

17 Q    Did he have any other relatives running in that race that

18 you recall.

19 A    I don't remember whether he did or not at that time.

20 Q    Okay.  But his own name was on that for magistrate in that

21 precinct?

22 A    Yes, sir.

23 Q    Who else did you take money to?

24 A    I took money to Tommy Harmon.

25 Q    I believe -- did you tell us what he was running for?

1   A    He was —— he was magistrate.  He was sitting magistrate.

2   Q    And how much money did you take him?

3   A    The best of my recollection, I think it was 8,000, around

4   or about $8,000.

5   Q    Who else did you take money to?

6   A    I took money to Clinton Johnson.

7   Q    And how much money did you take him?

8   A    Around $10,000.

9   Q    Who else did you take money to?

10  A    Let's see.  I give money to Doug Bowling.

11  Q    And who's Doug Bowling?

12  A    His mother was an election officer, and Stanley and I had

13  met with him, Stanley had hooked me up with him.

14  Q    Stanley who?

15  A    Bowling.

16  Q    And you met with Doug Bowling?

17  A    Actually, Stanley and I met with Doug Bowling prior to the

18  election, maybe two weeks, and then they were in the process of

19  tearing down the old courthouse and they had stripped most of

20  the insides, and I got a call to come there one night.  And I

21  went and I took —— and Stanley had asked me to give $4500 to

22  Doug Bowling there, and I give him 4500.

23  Q    Was there a meeting at that place at that time?

24  A    About every candidate that was running was there.

25  Q    You said the courthouse was being renovated?

KENNON WHITE - CONTINUED DIRECT - MR. SMITH          38

1  A     Actually, it was in the process of -- yeah, I guess

2  renovated you would say.

3  Q     And is it nighttime?

4  A     Yes.

5  Q     And where within the courthouse did you-all have this

6  meeting?

7  A     We had it in the old Clerk's Office.

8  Q     And who was at that meeting that you recall?

9  A     Jennings White, Edd Jordan, Stanley, Bart --

10 Q     Stanley who?

11 A     Stanley Bowling.

12 Q     Okay.

13 A     Bart Morris, Todd Roberts.  Let's see, let me think of

14 some more.  Tommy Harmon was there.  Randall Wagers.  That's

15 the ones that I can think of now.

16 Q     And what happened at this meeting?

17 A     It was just a reaffirmation of how everybody was going to

18 be when the race took place.

19 Q     And you delivered some money to who?

20 A     To Doug Bowling.

21 Q     And who was present there when you made that delivery of

22 money?

23 A     Stanley Bowling and Bart Morris.

24 Q     And did you do that in front of the whole group or was it

25 outside the presence of the others?

1   A    My wife was present also at that, and also she was present

2   when I delivered most of the money to the other candidates.

3   But, yeah, we did it outside the presence of the rest of them.

4   Q    So where did you-all go?

5   A    We walked outside and just walked over to the side.  I

6   mean, they — it's possible that someone had seen me give it to

7   him, we didn't have a private room or anything like that, you

8   know, we walked into, but we kind of walked off from the

9   general crowd.

10  Q    Now, Edd Jordan, you mentioned his name being present at

11  this meeting.  What was he running for?

12  A    He was running for sheriff.

13  Q    Okay.  Now, did you have other money that you delivered?

14  A    Yes, sir.

15  Q    Okay.  Tell us what other monies you delivered.

16  A    Edd Jordan and myself, we delivered money to Johnny

17  Brumley and his son Jonathan Brumley.

18  Q    And what role did Johnny Brumley and Jonathan Brumley play

19  in the election?

20  A    They bought votes and controlled the vote buying in the

21  Goose Rock precinct.

22  Q    And who was the election officers at the Goose Rock

23  precinct?

24  A    I don't know.

25  Q    Okay.  How much money did you give the Brumleys?

1   A    Around or about $5,000.

2   Q    Who else did you give money to?

3   A    Let's see.  Give me just one moment.

4   Q    Let me ask you this:  You indicated that you were going to

5   also go outside the group and speak with some folks over in the

6   Oneida area?

7   A    Yeah, I give — I give money to John Russell Brown in

8   Oneida, and I give money to Mike Bishop.

9   Q    Okay.  Now, let's talk about John Russell Brown.  What

10  precinct was he going to use the money in?

11  A    In the Oneida precinct.

12  Q    Okay.  And this is the principal at the school?

13  A    Yes, he was either principal at that time or had been

14  moved around that time to the Board of Education.

15  Q    Okay.  How much money did you give him?

16  A    Around or about $5500.

17  Q    Now, when you're giving this money, did you have to rely

18  upon others to tell you how much money to give them, or did

19  they negotiate that amount of money with you on an individual

20  basis?

21  A    They would tell you how much they needed and how many

22  votes that they thought they could get for that amount of

23  money.

24  Q    And for $5500, what were you told that would buy you?

25  A    Down there they told me that I would end up with about 150

 1  votes, 125 to 150 votes.

 2  Q     And who told you that?

 3  A     John Russell Brown.

 4  Q     Okay.  So you gave him the $5500 expecting him to bribe or

 5  buy you about 125 or so votes?

 6  A     That's correct.

 7  Q     And then you indicated there was another person you took

 8  money to?

 9  A     Yes, it was Mike Bishop.

10  Q     Okay.  And what was the amount you took to him?

11  A     I took him around 2,000.

12  Q     And how was he going to operate for you in the election at

13  that time?

14  A     He was election officer.

15  Q     Okay.  Where was he an election officer?

16  A     At the South Fork precinct.

17  Q     And how did he become election officer over there in South

18  Fork?

19  A     Actually, that was — there's a story behind that.  He was

20  going be election officer but they did not have the votes to

21  get him in as election officer.  So he needed the sheriff's

22  vote and the clerk's vote at that time to help to get in as

23  election officer.

24  Q     Now, would the sheriff and the clerk at that time been a

25  part of the Board of Elections?

1    A    Yes.

2    Q    So what happened?

3    A    I talked with Edd Jordan, and Edd — he had already talked

4    with Edd Jordan, and me and Edd talked to Jennings

5    because Jennings was concerned about his support in his race

6    and he did not want Mike Bishop there, but he agreed to go

7    along with Mike Bishop and support him as being the election

8    officer so that he could be the election officer there alone,

9    and — but he wanted what they call "a fair shake," in other

10   words, what votes he sent in to be voted, even though they

11   wasn't the ones that was necessarily the ones that Mike may

12   have been for, that he did not lose his bought vote, that he

13   would seek his bought vote outside of Mike, but that he wanted

14   them to be voted straight, whenever that he sent his bought

15   vote in that they would not steal them inside the precinct.

16   Q    Okay.  Well, let's break that down a little bit,

17   Mr. White.  You said that there was some concern that Mike

18   Bishop wouldn't support Jennings White?

19   A    Uh-huh.

20   Q    And did Jennings White explain to you why he had this

21   concern?

22   A    Because of Mike's family's relationship with the Board of

23   Education and Doug Adams.

24   Q    So you said there was a middle ground that you-all reached

25   on Mike Bishop.  You called it, I think, "a fair shake"?

1  A    Yeah, it was — the agreement was — is that the votes

2  that Jennings sent in or whoever that he had that was helping

3  him in that precinct sent in, that they would not steal the

4  votes back inside — you know, when they came in.

5  Q    So when you say Jennings sending in votes, are you talking

6  about people who had been bribed?

7  A    The people that had been bribed for their vote.

8  Q    So did Mike agree to this?

9  A    Yes.

10 Q    So what was Mike supposed to do when Jennings' voters came

11 in?

12 A    I don't know where the deal went from there, I just know

13 that that was the original terms.  I don't know who Jennings

14 had buying his votes.

15 Q    So he ended up being an election officer in South Fork?

16 A    Uh-huh.

17 Q    And you got the vote of the sheriff and the clerk.  Was

18 that all you needed on the Board of Elections to get the

19 sufficient votes for Mike Bishop?

20 A    That's — from what I understand, that's correct.

21 Q    Does the clerk have more than one vote?

22 A    I think in the case of a tie that he has two votes, his

23 votes counts as two.  So him and one more, him and the sheriff

24 could actually dictate who was election officers.

25 Q    Now, you mentioned earlier that you had also discussed

1  giving money to Stanley Bowling and Bart Morris?

2  A    Uh-huh.

3  Q    Did you give them money?

4  A    Yes.

5  Q    How much money did you give them?

6  A    Between the two, I'm going to say around or about $12,000.

7  Q    And how were they representing to you they were going to

8  use this money?

9  A    They were using it to buy absentee votes and they were

10  using it to buy votes on election day.

11  Q    Now, do you buy absentee votes different than you do

12  voters on election day?

13  A    Yes, they's two different ways that they buy the absentee

14  votes.  One is they get what's call a "mail-in ballot."  They

15  send a ballot out.  People can call in and request a ballot.

16  They send them the ballot, and then they fill the ballot in and

17  vote on that ballot and sign a statement that they're not going

18  to be able to be there on election day.  And then they send

19  that ballot back to the Clerk's Office with the votes that they

20  want to cast on it.

21      And the other way is they set up an election —— a machine

22  at the Clerk's Office, and before the election, actual day of

23  the election, then some people walks in and votes on the

24  machine that way.

25  Q    Now, when you met with Stanley Bowling, you said that

1  ordinarily you would ask them how much money they would need.

2  Who suggested to you or did you make the suggestion or did

3  Stanley about the amount of money you were going to give him?

4  A    I asked Stanley and he told me just what — around or

5  about what I needed.

6  Q    And what did he tell you that would produce for you?

7  A    Every one that he got, I know that the amount of votes I

8  got, it seemed like it was around 175 or something to that

9  effect.

10  Q    And with Bart Morris, what discussion did you have with

11  him about that?

12  A    He said it would probably produce around 250 votes, 275.

13  Q    Did your dad participate with you in delivering any of

14  these monies?

15  A    He was with me a time or two.  He also went — he told me

16  he had seen them privately.

17  Q    And do you recall when he went with you?

18  A    He's made the trip to Bart or Stanley's with me a couple

19  of times.

20  Q    Now, with the absentee process, you said there was the

21  early voting?

22  A    Yes, they set up the machine, and you had also the ballots

23  that was mailed.

24  Q    And as a candidate, were you interested in knowing what

25  was going on during that early voting in the May primary of

KENNON WHITE — CONTINUED DIRECT — MR. SMITH          46

1   2002?

2   A      Yes, I was.

3   Q      And did you actually get yourself involved in

4   participating or observing that early voting?

5   A      Yes, I did.

6   Q      Tell us what you saw.

7   A      Okay.  What took place on the machine was we would — we

8   set up at Bart's garage, Bart Morris's garage, and they would

9   be — they would have a list of election voters and a highlight

10  pencil to mark off the voters.

11  Q      When you say "they would," who are you talking about?

12  A      I'm talking about Bart Morris and his wife, Debbie Morris,

13  and Vernon Hacker, and I was there, as well as some other

14  people.

15  Q      Okay.  So you had a list and it was highlighted.  Why was

16  it highlighted?

17  A      The highlighted votes would be the — when people would

18  come in, they would mark them off the list so that they

19  wouldn't be paid twice, because some people that would sell

20  their votes, they would try to go to different places and be

21  paid twice for their vote.  So how they would — how they would

22  keep track of that is when the people would sell their vote,

23  they would come in with a list of people they had taken to vote

24  on the absentee machine.  Okay.  The person that took them down

25  there would see that they went in and voted.  Then they would

1   take and mark off — when they would come back to pay them,

2   they would mark them off that list as paid so that they

3   wouldn't be paid twice.

4   Q     Now, who managed the list and the payment to these voters?

5   A     Debbie and Bart mainly.

6   Q     And how much were they paying your absentee early voters

7   there in the May primary of 2002 on average?

8   A     It was varying anywhere from 30 to $40, sometimes up to

9   50.

10  Q     How many voters were you-all averaging there that you saw

11  coming to the Morris residence?

12  A     I think the day that we were open, we had to shut down

13  early because we had got a call or we could have got more, but

14  about 175 or 180 or somewhere around that range.  It was — you

15  know, it ran a little bit under the 200 range.

16  Q     And this occurred within the first few days?

17  A     Yes.

18  Q     And you say you got stopped.  What stopped you?

19  A     They was two different times we got stopped. Jennings

20  would keep us notified of when the Attorney General would show

21  up in town or anything to do with elections, because that's

22  where they would go a lot of times first, is to his office.

23  And so then he would give us — Bart a call, or Bart would tell

24  me that's where the call come from, and we would have to shut

25  down.

1        And another time, we shut down because that the other side

2   had started purchasing votes and were running a whole lot of

3   votes through, and Jennings and Edd Jordan decided to shut down

4   the polls to stop the other side's votes from getting run

5   through because they had actually organized up and had -- just

6   had a bunch of people in line and were getting ready to run a

7   whole bunch of votes through, which would have -- you know,

8   which was -- would have went and counted toward the other side.

9   Q    And who was operating inside as election officers for the

10  other side?

11  A    Okay.  Back at that time, I do not know.

12  Q    Okay.  And you had word from Jennings, though, was that he

13  was shutting it down to stop the other side?

14  A    Uh-huh.  Jennings was assisting voters also there.

15  Q    When you say "assisting voters," what do you mean?

16  A    I mean he was -- he was making sure that some of the ones

17  that came in was voting the way they were paid to vote.

18  Q    When you assist a voter in this scheme, what do you do?

19  A    You make sure that they vote for the candidate that they

20  were paid to vote for.

21  Q    Now, with your faction, you said that they were being

22  taken to the polls and then returned back to the Morris's to be

23  paid?

24  A    Uh-huh.

25  Q    And you indicated that there was a way in which -- there

1  were also vote haulers involved.  How were they involved?

2  A    They were the people that would know —— that would know

3  the different —— the different people that would sell their

4  votes or would know where they lived.  They would be sent to

5  pick those people up and to bring them in and take them down

6  there to vote.  And then usually the hauler was paid so much a

7  head for every bought vote that they could produce.

8  Q    And who kept up with the vote hauler's tally as far as how

9  many votes they were hauling in?

10 A    That was Bart and Debbie and Vernon.

11 Q    Okay.  And how much were they paying them per head, you

12 call it?

13 A    I've seen them pay them sometimes five, sometimes $10 a

14 head.

15 Q    Do you recall in the 2002 primary who was being used by

16 Bart, Debbie, and Vernon to haul these voters?

17 A    They was several different ones.  James Goins had hauled

18 some.

19 Q    And James Goins, where did he work?

20 A    He worked for Bart Morris.

21 Q    Okay.  Who else do you recall?

22 A    I know Pepper Gilbert had hauled some.

23 Q    And where did he work?

24 A    He worked —— he worked for the City of Manchester.

25 Q    Okay.  Who else do you recall?

1   A    Okay.  I know that Gail Roberts, I think is her name, if

2   I'm not mistaken --

3   Q    Where does she work?

4   A    I don't know where she worked at.  And then I think the

5   lady's name, the other one, was Billie Jean Berry.  I know at

6   one time she helped around Bart's down there.  And then I know

7   that -- which Deshae Henson could not drive, he didn't have a

8   license, but he would help to get voters in to haul.  And

9   Antoine Henson.

10  Q    And where do these gentlemen work?

11  A    Antoine worked at the -- worked at the City.  I don't know

12  if he worked at the City at that time or not, but after that

13  time he worked at the City.

14  Q    Now, you indicated that early that you had met with Doug

15  Adams before you announced your candidacy?

16  A    Uh-huh.

17  Q    Did you meet with him anytime after you announced your

18  candidacy in that May primary 2002 election?

19  A    I had -- I had briefly spoken with him a couple of times

20  and he basically just reaffirmed of, you know, are you bringing

21  the -- are you going to bring the money, you know.

22  Q    So after you announced you were going to run for jailer,

23  he wanted to know about money?

24  A    He wanted to know if I was -- you know, if my aunt or me

25  myself were going to participate in their ticket.

1  Q     Now, was your aunt also running for an office?

2  A     Yeah, she was running for state representative.

3  Q     And what did you tell him when he asked you if you were

4  bringing him money?

5  A     Well, the first time or two I just put him off because I

6  did not want him to take an active step and maybe getting out

7  and going against me out in the open.  And then at the last,

8  probably maybe the last ten days before the election, I told

9  him that I was just going to stick with Jennings' side.

10  Q     Okay.  Now, you indicated earlier that the first — one of

11  the first people that you went to was Cletus Maricle before you

12  decided whether to announce.  Did you talk to him at any time

13  after you announced?

14  A     I talked to him several times after I announced and — you

15  know, about what was going on in the election and things.

16  Q     Okay.  Now, when you say you talked to him about what was

17  going on in the election, what kind of things did you two talk

18  about?

19  A     Well, we talked about the absentees and, you know, just

20  talked about the vote buying in general and, you know, what

21  was — who was supporting who and that sort of thing.

22  Q     Why were you talking to Cletus Maricle about those aspects

23  of your involvement?

24  A     I was hoping to get his support and get him to help me

25  with his people.

1  Q    And did you get any commitments out of him?

2  A    When I started to run, yes, and he did tell me that he

3  would talk with some people.

4  Q    Did he contribute any money?

5  A    He give me 700 in cash.

6  Q    And did he make any statements to you when he gave you

7  that money?

8  A    He told me not to turn it in on my campaign report.

9  Q    And what form was this money in that Cletus Maricle gave

10 you?

11 A    It was in hundred-dollar bills.

12 Q    And where were you when he gave you that money?

13 A    I was standing in his kitchen.

14 Q    What did do you with that money, that $700?

15 A    I used it to buy votes with.

16 Q    In talking with Cletus Maricle, did he tell you if he was

17 giving money to anybody else in that election?

18 A    No.

19 Q    Now, we've heard some testimony previously about things

20 happening to people after they chose sides in this election.

21 Did you observe or learn of anything happening adverse to

22 people after they took up sides with one side or the other?

23 A    Well, I — not — you know, they was a shooting incident

24 up on —

25 Q    Well, let's —

1              MR. WESTBERRY:  Judge ——

2    BY MR. SMITH:

3    Q    —— talk about the shooting incident, and that was an

4    incident involving whom?

5    A    Jennings White.

6              THE COURT:  Overruled.

7              MR. WESTBERRY:  Okay.  Thank you.  That helps.

8    BY MR. SMITH:

9    Q    And if you could, explain to us what was going on, was

10   this before the primary election day?

11   A    Yes, it was before.

12   Q    And how was Jennings White involved in a shooting?

13   A    Well, we were —— a bunch of us was at Diary Queen, which

14   was kind a political place that everyone met that was running.

15   You know, all the candidates and stuff would go up there every

16   night between 6:00 and 8:00 or something, and what would happen

17   is, you know, we would talk politics.  Well, we were up there

18   and we heard that —— Todd Roberts was there, and he pulled in

19   and he said, "There's a shot in Jennings White's van up on" ——

20   they was some holler, I forget the name of it, the name of the

21   holler, but we all —— there was a bunch of us got in the

22   vehicles and rode up there.  And the van that he was driving

23   had maybe —— had numerous gun holes in the front of it.  And I

24   had talked with him, he said he'd rolled over a hill and

25   crawled on his belly until he got cell phone service and then

1  made a call.  I don't know who he called.

2       That same night, they was also shots fired into — there

3  was a report came that there was shots fired at Freddy

4  Thompson's house, who was running for clerk.  And sometime

5  during that timeframe, there was a man that was shot in the

6  back named — that was going down Horse Creek.  His name was

7  Bill Roland Phillips.

8  Q    And who is Bill Roland Phillips?

9            MR. WESTBERRY:  Objection as to relevancy, please.

10  He may be able to lay a foundation, but I don't see the

11  relevance.

12            THE COURT:  All right.  I believe that's the intent

13  of the question, to establish some relevance.  You may — the

14  objection is overruled, you may answer.

15            THE WITNESS:  Bill Roland Phillips is a local Clay

16  County person that is — I've been told he was a private

17  detective.  I don't know that personally, whether he —

18            MR. PINALES:  Objection, Your Honor, what he's been

19  told.

20            THE COURT:  All right.  The objection is sustained as

21  to hearsay.

22  BY MR. SMITH:

23  Q    Do you know his associates, who he associates with in

24  town?

25  A    He associates with Peanut Abner and —

1    Q     Who's Peanut Abner?

2    A     He's a gentleman that lives on Town Branch.  I mean, I —

3    you know, he's been in trouble before.

4    Q     And what kind of trouble is he known for?

5    A     I read in the paper what —

6             MR. PINALES:  Objection, Your Honor.

7             THE COURT:  Sustained.

8    BY MR. SMITH:

9    Q     Who else does Mr. Phillips associate with to your

10   knowledge?

11   A     He associated with Cletus Maricle, he associated with Doug

12   Adams, he's associated with William "Al Man" Stivers, with, you

13   know, just most of the politicians there that —

14   Q     And you say he got shot?

15   A     Yes.

16   Q     How many times did he got shot?

17   A     I don't know exactly.

18   Q     Okay.  So all these shootings occurred within days or

19   weeks of the primary?

20   A     To my recollection, it was days.

21   Q     Was anybody arrested, to your knowledge, for these

22   shootings?

23   A     No.

24   Q     Now, on election day in the 2002 primary, what did you do?

25   A     On that day, I went back and forth to precincts, mainly

KENNON WHITE — CONTINUED DIRECT — MR. SMITH          56

1  earlier in the day, my wife and I, to check and see if —— to
2  talk to people to make sure that they wasn't trying to steal
3  the votes on the inside of the —— and everything was going like
4  it was supposed to.
5  Q    And how would you go about learning whether or not your
6  voters were voting the way you bribed them to?
7  A    You would try to find people that you trusted to tell you
8  the truth that were coming out from the voting precinct and
9  find out what they have heard, and you would also —— if it ——
10 if you were able to, talk to the officers.
11 Q    Now, this money that you put in place, do you know when it
12 was distributed to pay or bribe these voters?
13 A    It would have had to been within days, because they —— it
14 was given to the people within three to four days prior to the
15 election.
16 Q    What was the plan?
17 A    The plan was to —— at that time, some people they would
18 pay the night before, the ones that they thought they could
19 trust and —— to sell their vote and not go in there and switch
20 over, especially the ones that basically they didn't have —— or
21 the ones they had election officers to be able to see that they
22 voted the way they were supposed to.  But some ——
23 Q    Did you not have election officers in every precinct that
24 you could —— have double-check to make sure they weren't
25 double-crossing you?

KENNON WHITE - CONTINUED DIRECT - MR. SMITH          57

1    A    Yes.

2    Q    Did you have them in every precinct?

3    A    You had — you had election officers in — I wouldn't say

4    every precinct, but most of them.

5    Q    And who told you that they had these cooperating corrupt

6    election officers in most of the precincts?

7    A    Jennings and — you know, Jennings mainly.

8    Q    Were there points of distribution where money was being

9    given out to voters that you visited that day?

10   A    The points — the points of distribution that I had — of

11   that was Stanley's — Stanley's garage.

12   Q    Stanley who?

13   A    Bowling.

14   Q    And where was Stanley Bowling's garage?

15   A    It was on — well, I say it's on Beech Creek.

16   Q    And is there a voting precinct or polling place near his

17   garage?

18   A    They are now.  Used to it was down in town, but as of now

19   it's there probably within a couple hundred yards of his home.

20   Q    And you say at the time of your '02 primary election it

21   was at some place other than where it is now?

22   A    Yes, it was — to my recollection, it was at the middle

23   school.

24   Q    Okay.  What other points of distribution of money did you

25   visit?

1  A    Okay.  On the day — on the day of the primary, now I'm

2  speaking on the day of the primary —

3  Q    Sure.

4  A    — it was at Bart's and at Stanley's.

5  Q    Bart who?

6  A    Morris's.

7  Q    And where was his place?

8  A    It was located on Green Street.

9  Q    And is that in the City of Manchester?

10  A    Yes, it is.

11  Q    How did your election go, Mr. White?

12  A    I got — I was defeated.

13  Q    And who defeated you?

14  A    Charles Marcum.

15  Q    And do you recall how — whether the race was close or

16  whether it was a landslide?

17  A    It was a landslide victory for Mr. Marcum.

18  Q    Did you have an opportunity to see what maybe had

19  happened?  Did you talk to anyone after the election?

20  A    Yes.

21  Q    And who do you recall talking to?

22  A    I talked with Jennings.

23  Q    Okay.  And what was — what was that conversation?

24  A    He told me that he had basically lost his officers and

25  that the school board — I say the school board, it was — he

1  said that Doug Adams had been able to get to most of the

2  officers and that they were — had turned on him and had been

3  able to turn most of the magistrates and that they had

4  double-crossed him and that that is what had happened to me

5  also, that the officers had — on account of having — he told

6  me that on account of their relationships to being employed at

7  the Board of Education that they had some of the — a lot of

8  the officers had turned and did what Doug Adams wanted them to

9  do.

10 Q    Now, you've indicated there were two members that you knew

11 were on the board, that was Edd Jordan and Jennings White.  Do

12 you know who else was on the Board of Elections that year?

13 A    I know that Edd Jordan and Jennings White — I don't —

14 the best of my recollection, I think it was Don Nolan, but I

15 don't know that for a fact, for the Democrat, and maybe Clay

16 Massey Bishop as a Republican, I do not know.

17 Q    Now, Clay Massey Bishop, does he hold an office in town?

18 A    Yes, he does.

19 Q    What position does he hold?

20 A    County attorney.

21 Q    Who else did you talk to about the results of the

22 election?

23 A    I talked with Cletus.

24 Q    And what did you and Cletus talk about?

25 A    He — just basically how that I ended up getting defeated,

1   and he basically just —

2   Q     Did he offer you any suggestions as to why?

3   A     Well, he offered me the suggestion that Charles had been

4   around a long time and knew how to — a lot of people would not

5   go against what Charles wanted because that basically, to be

6   frank with you, that he had been in on about any kind of

7   election — well, he didn't use the word fraud, but any kind of

8   election activities that had went on in Clay County for years

9   and that it was hard for me to be able to compete against

10  Charles for that reason, and that's what he told me.

11  Q     Did you-all discuss the choices that you made in aligning

12  yourself with Jennings White?

13  A     Yeah, he said that — he said that I would have needed —

14  needed to have been with Doug Adams, that that hurt me, not

15  being able to get with both of them, because that I needed to

16  be on both tickets to have been able to win — to have won, to

17  had a chance.  We also discussed the precincts that I had

18  carried and why I carried them, and that — he told me that I

19  would probably be better to follow my — to further my

20  political career in the City of Manchester because that was

21  where that I had did the best as far as my precincts.

22  Q     And did you later take his advice and move to Manchester?

23  A     Yes, I listed my house with his wife and sold my house and

24  moved to Manchester.

25  Q     Were you living out in the county at the time you ran for

1    jailer?

2    A    Yes, I was living on Greenbriar.

3    Q    Did you talk with Doug Adams after the election?

4    A    Yes.

5    Q    And tell us what you talked with Doug Adams about.

6    A    I told him that I made a mistake, that I should have went

7    with him and that I should have took the money to him and that

8    if I had of that I — I would probably have been the new

9    jailer.  And he agreed with me, that that's what I should have

10   done, and that he had give me the opportunity but that I had

11   turned down the opportunity that he had give me; that he give

12   me two opportunities, one on being able to run against Jennings

13   instead of Freddy Thompson, and the other, you know, to bring

14   the money down for him to support me against Charles because he

15   wasn't really crazy about having to do business with Charles in

16   elections and that — but I had left him no choice.

17   Q    Did you offer him any explanation about what it ultimately

18   came down to as to why you picked one side over the other?

19   A    I told him that I — that I just did not want to split the

20   White family's vote up by — you know, that I wasn't aware of

21   how many votes that — you know, I was afraid it would just

22   hurt my whole family's political career had I went against

23   Jennings.

24   Q    And what was his response to that?

25   A    He understood.

1  Q    Now, you indicated that there were areas in which -- in

2  the county in which you did show some favorable results and I

3  think earlier you testified about taking, I believe, $17,000 to

4  Roger Smith?

5  A    Yes.

6  Q    What kind of results did you get in those precincts he

7  claimed?

8  A    I got the precinct that -- I guess the best -- one of

9  the -- the one I won the most by by the amount of voters that

10 voted was his precinct, and I'm trying to think of the name of

11 the actual precinct, Flat Creek or -- precinct, and I won it,

12 and then I had won the Manchester Precinct, and if I'm not

13 mistaken, I think I won the Harts Branch precinct, that those

14 was the --

15 Q    Now, during that primary election, did you ever run in to

16 Charles Wayne Jones or Al Man Stivers?

17 A    Yes.

18 Q    Tell us the circumstances of that.

19 A    When I run into Wayne, it was very, very general

20 conversation, but Al Man and his brother came to -- came to my

21 house about a week before the election and had asked that -- me

22 to reconsider about going with Doug Adams and Freddy Thompson

23 and putting money up, that if I would do that that they would

24 still allow me to go on that ticket, that it wasn't too late,

25 that they hadn't put all the votes in place yet to do what

KENNON WHITE - CONTINUED DIRECT - MR. SMITH          63

1  needed to be done and that they were there — or Al Man was

2  there representing that — you know, that if I would put that

3  money up that they — I would get help from the Democratic side

4  and the school board.

5  Q    And how much money did they ask that you bring to the

6  table?

7  A    $60,000.

8  Q    And what was your response to this offer?

9  A    I told them that I just was going to stay with Jennings

10 because I didn't want to split up everything and that I just

11 didn't have the extra money to be able to put that money up

12 with the — with the Democratic side and with Doug and that I

13 just couldn't do that.

14 Q    So how soon after the election did you and your wife move

15 to the City of Manchester?

16 A    It wasn't very long.  I think we were there in — 2003.

17 Q    Okay.  And where did you-all choose to locate for a

18 residence in Manchester?

19 A    We ended up buying my grandmother's house, that belonged

20 to my grandmother.  I purchased it off of my aunt and my uncle

21 and my dad.

22 Q    And did you and your wife continue to have an association

23 with Cletus Maricle when you moved to town?

24 A    Yeah, that's — where we were living so close to him, it

25 become — we seen him a lot more.

1  Q    So how close were you and your wife living to Cletus
2  Maricle?
3  A    A mile —— within a mile, I would presume.
4  Q    And how did you handle yourself politically when you moved
5  to town?  What decisions or changes did you make yourself?
6  A    I ended up registering as a —— changing my registration,
7  my wife and I, from Democrat —— I mean, from Republican to
8  Democrat.
9  Q    And what motivated you to make that change?
10 A    Because Cletus had suggested that he was going to be
11 needing some Democratic election officers in the city precinct
12 and that they would like for me and Wanda to consider - Wanda
13 being my wife - those positions.
14 Q    So you-all changed to the Democrat party, and then what
15 happened?
16 A    I ended up —— around or about that time, I ended up taking
17 a job as a City supervisor or working —— taking a job at the
18 City, and we just started —— my aunt run again during this
19 timeframe also, and we ended up —— my wife getting appointed to
20 election officer.
21 Q    Okay.  Now, we touched on the 2002 primary.  Did you and
22 your wife get involved in the fall 2002 race?
23 A    Uh-huh.
24 Q    How did you get involved in that?
25 A    We went down, and it was the council race, and we just

KENNON WHITE - CONTINUED DIRECT - MR. SMITH          65

1   kindly kept an eye to see what was going on and who was buying

2   what.  We didn't have — we were there, I mean, and present

3   when things was going on.  Also, Stanley Bowling's, we was at

4   his — he had competition that year.

5   Q    And what was he running for?

6   A    Magistrate.

7   Q    Okay.  And how was the city council in the fall 2002

8   organized?

9   A    It was organized a little bit different at that time.

10  They were starting to become concerned more about an

11  investigation — a pending investigation and they would change

12  locations and, you know, do vote buying from different

13  locations than Bart's and try to take care of who they could;

14  the night before, buy their vote, and were trying to keep it

15  hid a little bit more because it become so obvious because of

16  all the cars and the traffic on election day and during when

17  the machines opened up that they became worried about —

18  worried about that.

19  Q    Now, you said they were moving locations.  Did the

20  Morrises move their location?

21  A    They moved — Bart Morris had a motor home and they moved

22  it over to a place that was owned by Jennings White and took

23  care of some vote.

24  Q    What was that place called?

25  A    I think the name of it is Coal Hollow.  I'm not real sure

1   the name of it.

2   Q    And he had a motor home?

3   A    Yes.

4   Q    And what did they do with the motor home?

5   A    They basically run the same organization out of it as what

6   they did at Bart's, they would go over there and pay the voters

7   out of it.

8   Q    Now, was there money, to your knowledge, pooled for the

9   city council race and Stanley Bowling's race that fall?

10  A    Yes.

11  Q    And do you recall how that was pooled?

12  A    Bart went to meet with them at the City Hall.  And also I

13  give -- I give Stanley, my father and I, give him a few

14  thousand dollars.

15  Q    And what was -- you say that there was a meeting at City

16  Hall.  Who was there at that meeting?

17  A    I stayed at Bart's.  They had called him over there and he

18  asked for me to stay at his house, and so I'd stayed at his

19  home while he went and met with them.

20  Q    And what was going on at his home while he was away?

21  A    He had -- there wasn't actually, at that time, anything

22  going on.  He just wanted to meet with him hisself and didn't

23  want me to be with him when he went to pick the money up.

24  Q    Now, did you discuss with Bart Morris when he returned

25  what the meeting was about?

1   A    Yes.

2   Q    And what did he tell you?

3   A    He said that they were getting together to pool their

4   money to be able to buy — you know, to take care of the city

5   precincts.

6   Q    And how much was it that he said that the members of the

7   group were going to have to contribute to this election?

8   A    On that one, I think it was a thousand dollars apiece.

9   Q    And how many city council seats were available in that

10  race?

11  A    I don't recall.  They was, I think, eight available.

12  Q    All right.  And what was going to be — how was the money

13  going to be used once it was pooled?

14  A    They were going to be used to buy votes, they were just

15  going to do it like they always did.

16  Q    All right.  So they were going to keep doing the same —

17  A    Uh-huh.

18  Q    — method of operation?

19  A    Yes, sir.

20  Q    When did they decide that they needed to move the place

21  where they were distributing the money to the motor home?

22  A    During that time, they were starting to become alarmed.  I

23  don't know the exact timeframe that they done that, I just know

24  that it was done.

25  Q    Okay.  Now, did you know of city council members who would

1   have others put money up for them in that fall 2002 race?

2   A    The year that Jeff Deaton was running for council, Bart

3   came to my father and me and said that Doug Adams was wanting

4   to put Jeff Deaton on the ticket and had given him a thousand

5   dollars and whether did we have a problem with that.

6   Q    And what was your-all's response?

7   A    No, we did not have a problem with that.

8   Q    Was there any others that told you they were putting up

9   money for city council people and giving it to Bart Morris?

10  A    Cletus told me that he put up -- Cletus Maricle told me he

11  put up $500 for Penny every time she had run and had continued

12  to with Bart.

13  Q    And did you ever talk to Bart and did he ever confirm

14  that Cletus Maricle was giving him money during each of these

15  city council races?

16  A    He confirmed that he -- that Cletus had given money for

17  Penny Robinson.

18  Q    Now, was Cletus and Penny Robinson related in any way?

19  A    I think that -- this is -- through their wife.  I think

20  Cletus's wife was related to Penny.

21  Q    Now, you mentioned Vernon Hacker being involved.  Which

22  side did he finally end up sticking with in the May primary

23  election?

24  A    Of which year?

25  Q    The May primary of 2002, I'm sorry.

KENNON WHITE - CONTINUED DIRECT - MR. SMITH          69

1  A    Okay.  He ended up sticking with Jennings White.

2  Q    And did you discuss with him after the election anything

3  that had happened to him adversely for him taking a stand

4  for Jennings?

5  A    During the election, before the -- before it was actually

6  over, before it was run, we were at Bart's, and he came in and

7  said that he had been sent home or let go or had had an

8  altercation at the bus garage, that they had taken his route

9  and were leaning on him to be for Freddy Thompson and that they

10 had done that to him.

11 Q    Did you ever have any discussions with Cletus Maricle

12 about that?

13 A    Cletus pulled up to Bart's and hollered at Vernon, and

14 Vernon walked over to the vehicle, and I walked over to the

15 vehicle behind him.  And he was going on asking Vernon about

16 what had happened.  And I made the statement, I said, "Well,

17 that's a shame if a man loses his job because of who he's for."

18 He said, "Well," he says --

19 Q    Who said this?

20 A    I did, I said that.  And --

21 Q    And you said "he said."  Who are you referring to?

22 Identify their names, please.

23 A    Okay.  When -- first let me start.  What happened, Vernon

24 went over to the vehicle.  I walked up behind the vehicle.

25 Cletus affirmed that it was a shame when a man lost his job

1  because of who he was for politically.  I agreed with that, and

2  he said, "But I want to tell you one thing, things is getting

3  ready to change because I'm pissed off."  And I —

4  Q     Who said that?

5  A     Cletus Maricle.

6  Q     Okay.

7  A     And I said, "You're pissed off?"  He said, "Yeah, I'm

8  pissed off," and he says, "I'm going to do something about it."

9  And he said, "'I can do something about."  And that's what he

10 said.

11 Q     And after he made those statements, did Vernon report to

12 you any change in his job status with the school board?

13 A     I think he went back to work for them.

14 Q     Now, in 2004, you were now living in Manchester?

15 A     Yes.

16 Q     And I believe you were about to lead us up to another

17 election actually in that year of the primary election.  Who

18 was involved in the primary election?

19 A     Of 2000?

20 Q     Four.

21 A     Okay, in the primary of 2004, my aunt was running.

22 Q     Okay.  So the same aunt that had lost her seat in 2002 now

23 trying to regain it in 2004?

24 A     Yes.

25 Q     And who was her competition?

1  A    Tim Couch.  There may have been someone else running, I

2  don't know who it was, though.

3  Q    Were you, at that time, entertaining any position to run

4  for?

5  A    At that time, I had filed for city council and I had ended

6  up coming off of the council and they had given me a job.

7  That's the time that I got my job.  As a matter of fact, I came

8  off like a week after I got my job, I came — what I did, I

9  went and signed that I wouldn't run.

10  Q    Did someone come to you and ask you to come off or why did

11  you come off?

12  A    Well, Yancey White had came and talked with me.

13  Q    Now, Yancey White, is he a public officeholder there?

14  A    No, he's an attorney.

15  Q    Is he related to any public officeholders there in Clay

16  County?

17  A    I don't know the exact connection, but it's — he's a

18  distant cousin, I think, to Jennings and to myself and —

19  Q    Now, he's married to whom?

20  A    Annette Morgan.

21  Q    Does she hold a job there in town?

22  A    She's an attorney also.

23  Q    Do they have a law office there in Manchester?

24  A    Yes, they do.

25  Q    And who is her father?

KENNON WHITE - CONTINUED DIRECT - MR. SMITH          72

1  A     Roy Morgan.

2  Q     And is he a person of political influences?

3  A     Yeah, he's ran -- he used to be magistrate and he's ran a

4  close race for county judge a couple of times.

5  Q     Did he run in 2002, to your recollection?

6  A     I think he did run in 2002.

7  Q     All right.  And do you recall which faction he was

8  supporting in that election in 2002?

9  A     Yes, he was with Doug Adams.

10 Q     So Yancey White comes to you, and what does he tell you?

11 A     He tells me that I'm making a bad decision about running,

12 that --

13        MR. RICHARDSON:  Your Honor, I'll object at this

14 point, hearsay.

15        THE COURT:  All right.  Counsel, approach, please.

16    (Whereupon, the following discussion was had between the

17 Court and counsel at the bench, out of the hearing of the

18 jury.)

19        THE COURT:  Mr. Smith, I'm not sure of the connection

20 of Yancey White in the alleged conspiracy.

21        MR. SMITH:  Well, it was mentioned, I believe, in

22 opening statement and it has been mentioned previously that

23 there was a meeting at Paul Bishop's where about 150- to

24 $200,000 was brought to the table, and Yancey White was at that

25 meeting, and then they'll be other testimony about his

 1   delivering monies that were pooled together, escorting them to

 2   different locations throughout this conspiracy.  I fully

 3   believe I can establish, Your Honor, if allowed, that he is an

 4   unindicted co-conspirator, it's involving multiple acts of

 5   voter bribery and potential solicitations or extortion attempts

 6   himself.  Our position is that under the co-conspiracy

 7   exception to the hearsay rule that this should qualify.

 8               THE COURT:  All right.

 9               MR. RICHARDSON:  Your Honor, I think the motions that

10   were filed previously specifically requested the names of the

11   co-conspirators, and we wanted to have a hearing about what

12   they were going to say.  So, you know, I don't know when to

13   object and when not to object because I don't know who these

14   alleged co-conspirators are, so I have to object when I hear

15   him getting ready to say stuff.  Now, we were talking about the

16   '04 election, is what he's testified here now.  There was no

17   meeting that I'm aware of at Paul Bishop's house in '04.  There

18   was a supposedly a meeting in '02, but now we're in '04, and

19   Paul Bishop never named — he was the one who told him about

20   this meeting, Paul Bishop never said that Yancey White was at

21   the meeting.

22               THE COURT:  All right.  With respect to the issue of

23   pretrial discovery, the United States is not required to

24   identify all unindicted co-conspirators.  This particular

25   statement was made during the time it's alleged to be in the

1  course of the conspiracy and it does appear that it was made in

2  furtherance of the conspiracy to advance its goals by an

3  individual who does appear to be a member of the conspiracy.

4  So I believe all the elements have been satisfied for the Court

5  to admit the statement under *United States v. Enright*.  The

6  objection will be overruled.

7       (Whereupon, the following proceedings continued in open

8  court.)

9            THE COURT:  All right.  Thank you, Counsel.  The

10  objection is overruled.

11            Mr. Smith, you may continue.

12  BY MR. SMITH:

13  Q    You were telling us about the discussion that you had with

14  Yancey White.  What did he tell you?

15  A    He told me that they was some people that were upset about

16  me running for council.  He told me that he had spoken with a

17  couple of the council members that felt that I was going to be

18  going after — maybe wanting to run for mayor later on and that

19  they felt like that I needed to have — serve my time doing —

20  you know, basically in politics and stuff before that I made a

21  step like that and that they really felt threatened by me

22  running as council and that it would affect my aunt's race and

23  that he could get some help from some other people if I

24  would — if I would come off, that it would help my aunt.

25  Q    5now, had he been actively involved in helping your aunt's

1  prior efforts to obtain the office of state representative?

2  A    Not in a prior election.  At this time, he had been

3  helping her some.

4  Q    So in 2004 he was helping her?

5  A    Uh-huh.

6  Q    And what did you do, Mr. White?

7  A    I came off later.

8  Q    And what made the final decision for you?

9  A    Well, actually, I got a job working at the City when my

10  dad hired me there.  He had said he had talked with some of the

11  council and that they offered me a -- you know, I got a good

12  job, so I didn't -- so I went ahead and came off.

13  Q    And you talked previously I think when we introduced your

14  testimony about that job.  That's a job your dad created for

15  you?

16  A    Yes.

17  Q    And how much did he start paying you in that job?

18  A    It was around or about 48,000 a year.

19  Q    And before accepting that job offer, did you consult

20  with Cletus Maricle about that?

21  A    Yes, I did.

22  Q    And what did you-all talk about?

23  A    Well, I talked with him about my concerns after all the

24  mess that it would cause a lot of animosity and trouble if I

25  took that job, and he told me that I needed to go ahead and

KENNON WHITE - CONTINUED DIRECT - MR. SMITH        76

1   take that job.

2   Q    And did he offer you any reasons that encouraged you or --

3   A    He said that it was a good job and it held clout and a job

4   like that would be a good job for me to have in active

5   politics.

6   Q    Okay.  What other discussions did you and Cletus have

7   about the future and you being in that position in the City?

8   A    We talked about what I could do in that position and how I

9   could move forward and benefit us politically in other ways.

10  One, we talked about the Zoning Board, talked about being able

11  to -- if we could get the votes and redistrict or reorganize

12  the Zoning Board and put on it who we need that we could

13  control, the people that had -- that had, you know, money and

14  that sort of thing, because basically, with the Zoning Board he

15  told me that you can make people's property worth a lot or

16  worth nothing.  He says, you know, the Zoning Board is a real

17  powerful board.

18  Q    Now, how do he propose that he himself could be benefiting

19  from you being in that position?

20  A    He talked about purchasing property at the end of -- on

21  Town Branch and that we could, you know, buy property and I

22  could sell it back to the City and that we could make, you

23  know, money on it that way.  He told me that also -- that is

24  basically what he had said.

25  Q    Now, you had, at that time, discussions with him.  Did you

1   act upon that in any way, Mr. White, later in that position?

2   A    What I did do is we also had talked about the Ethics

3   Board, which is the board that takes care of basically policing

4   the ethics of the City.

5   Q    All right.

6   A    And we had — I had started on that board and we had got

7   people in place that we thought was friendly to my father's

8   administration and —

9   Q    Okay.  Did you talk with Cletus about who you should put

10  on those positions?

11  A    Yes, I did.

12  Q    And who did he suggest?

13  A    Okay.  He suggested — he made some suggestions.  Bart

14  Morris's wife, Debbie, went on the board.  I asked him if he

15  wanted his wife on the board.  He said that that would be fine

16  with him, so she went on the board.  So she was on the board,

17  my wife — not my wife, his wife, my aunt, she went on the

18  board, Barbara Colter, and there was a Hoskins man that went on

19  the board also.

20  Q    And you say that this was the board that oversaw the

21  operations of the City's ethics?

22  A    Uh-huh, that's correct.

23  Q    And policed the entire administration?

24  A    Yeah, the Ethics Board.

25           MR. SMITH:  If I can have just a moment, Your Honor.

1          THE COURT:  Yes, sir.

2   BY MR. SMITH:

3   Q    At some point after becoming City Manager, Mr. White, did

4   you and your father get involved in paving private driveways?

5   A    Yes.

6   Q    And how is it that private driveways can be paved there in

7   the City of Manchester?

8   A    Okay.  Where they was putting down -- if they were

9   supporting my father and the council, they were getting their

10  driveways paved.

11  Q    Okay.  And during the time period that this was going on,

12  did you speak with Cletus Maricle about that practice?

13  A    Yes.

14  Q    And tell us about that discussion.

15  A    He told me to -- that I needed to be out there and be the

16  one that was getting the credit for doing that and --

17  Q    Was there any suggestions about how you could get credit

18  for paving people's driveways?

19  A    I needed to walk right with the blacktop truck and point

20  them to where to -- point them to where they wanted it done so

21  the people could see that I was the one doing it and --

22  Q    Was there anybody else that was attempting to do the same

23  thing?

24  A    Well, I attempted for one day, but then Darnell Hipsher

25  ended up doing the rest of them.

1  Q    What interest did he have?  Was he an officeholder?

2  A    He was a council member.

3  Q    Okay.  And so when you were riding the truck, you were

4  actually riding along with the paving crew?

5  A    Actually, I was driving up behind them, and I would walk

6  behind there and —— for the first day there.  And I found that

7  they was a lot of people getting upset because ——

8  Q    At some point after you-all paved these driveways, did the

9  State of Kentucky come in and do an audit of the City?

10 A    Yes, they did.

11 Q    And did they uncover this practice of paving private

12 driveways in Manchester?

13 A    Yes.

14 Q    And from that, was there a discussion about how maybe

15 you-all could cover it up by mailing out false or made-up

16 invoices to certain people?

17 A    Yes, they suggested at — Darnell had called me to come

18 over there to a meeting.  I went in and they did suggest to

19 mail those bills and to adjust those bills from what the

20 original amounts was.

21 Q    And is that part of the conduct which you pled guilty to

22 in federal court?

23 A    Yes, it is.

24 Q    Okay.  Now, you have continued to serve as the city

25 position holder for your father until his defeat in 2006?

1  A     Uh-huh.

2  Q     And leading up to 2006, when did you and your wife get

3  involved in that upcoming election?

4  A     Okay.  We got involved whenever Wayne Jones had come and

5  brought a list to my wife to further up on the conversation

6  with Cletus about being appointed to election officer.  He

7  brought a list to my wife at City Hall and told us to put the

8  names down of the people we wanted to serve to help us there.

9  Q     All right.  So let's back up.  You said that there was a

10 discussion with Cletus about becoming — serving, I guess?

11 A     Uh-huh.

12 Q     Tell us about that.

13 A     Okay.  We had talked with Cletus and he had talked about

14 putting us in as election officers, one of us, and when it

15 ended up coming time, he had wanted help for his son-in-law who

16 was running for the tax commissioner or whatever that office is

17 and that we could help my father and help him, you know, by my

18 wife being in there as election officer.

19 Q     So what did you do after he made that offer?

20 A     We took him up on it, my wife did.

21 Q     Okay.  And then there was meetings with other people.  Who

22 were the first people that you-all met with after making an

23 agreement with Mr. Maricle?

24 A     Met with — met with Al Man Stivers and Cletus and Wayne.

25 Q     And what were the circumstances of that meeting, if you

1   recall?

2   A    They were interested to make sure that Wanda would be able

3   to do what she needed to do, which is my wife's name, whenever

4   that she was at the polls and --

5   Q    Okay.  And you said that there was -- at some point you

6   were told or Wanda was told to meet with Wayne Jones.

7   A    Uh-huh.

8   Q    Was that after this meeting?

9   A    That was after this meeting.

10  Q    Okay.  So the first meeting you met with Stivers, Jones,

11  and Maricle?

12  A    Yes.  I was there first and my wife came in later.

13  Q    Okay.  And do you recall specifically how they proposed

14  that she could do this?

15  A    They talked about that there was going to be some

16  confusion at the polls with the new machines that were getting

17  used.  There is a -- there is a two-step process to finishing

18  that voting process.  Do you want me to continue with that

19  or --

20  Q    If you could tell us what was discussed, yes, sir, at that

21  meeting.

22  A    Okay.  What was discussed was how that she would be able

23  to get votes -- change people's votes at the election polls.

24  What it amounted to is there was a cast ballot and a vote

25  button, and a lot of people would get confused on the last step

1   and they would leave the voting machine without finishing the

2   final casting process.  At that time, my wife would change the

3   vote -- the person's vote like she had been told to do to who

4   was on the slate if they wasn't -- you know, because you could

5   change it before you made the actual cast ballot.  So she could

6   change that vote between those steps.

7   Q    So when this was laid out to you and Wanda, what did

8   you-all say?

9   A    We told him that we -- you know, that we wanted help, you

10  know, with my dad's election and that we -- you know, we agreed

11  to do it.

12  Q    Okay.  Now, was your dad going to be running the same time

13  that Cletus's son-in-law was going to be running?

14  A    Actually, he was going to be running in the general

15  election, and Cletus -- which his son-in-law was running

16  unopposed in the general election, but the primary when he had

17  competition was before my dad's election.

18  Q    Okay.  So what did you do after that meeting?

19  A    After that meeting, we took a list of -- that we was given

20  by Wayne Jones.  The only person that he had requested to be on

21  that list was Anthony Short, which is an attorney from town,

22  and then we took and got people to put people on that list and

23  turned it back in to Wayne so that he could get it confirmed by

24  the Election Commission.

25  Q    So when you say he made only one request and allowed

1   you—all to fill in the rest, you're saying that Anthony Short

2   was that request?

3   A    Yes.

4   Q    So there were other positions to be filled out besides

5   Wanda's?

6   A    Uh—huh.

7   Q    And what were they, do you remember?

8   A    Wanda was a Democrat election judge.  There was — there's

9   a sheriff and there's a clerk, I think, and then there's a

10  Republican judge.

11  Q    Okay.  And you—all were asked to look at the Democrat

12  side?

13  A    That's correct.

14  Q    And did you—all make suggested names for Charles Wayne

15  Jones to put on — for the Democrat list?

16  A    Yes, we did.

17  Q    Do you recall who it was you—all put on the list?

18  A    We put Earl Pennington, I think was one, and Dobber,

19  Charles Weaver's wife, Minnie Weaver.

20  Q    Okay.  And was she a Democrat?

21  A    Yes.

22  Q    So these were all Democrats that you—all put together?

23  A    Yes.

24  Q    Did you come up with those names yourself or did you seek

25  input from others to suggest those names to Wayne Jones?

KENNON WHITE – CONTINUED DIRECT – MR. SMITH          84

1   A    I came up with them after talking with Cletus and talking

2   with Darnell and Bart and other people involved.

3   Q    Okay.  So you didn't make these suggestions without

4   talking to them first?

5   A    Right.

6   Q    Okay.  And were these people that they approved of?

7   A    Well, they were — they were skeptical of my wife a little

8   bit, but they ended up approving.

9   Q    Were all of them skeptical of your wife?

10  A    I think Darnell was the most skeptical of my wife.  He

11  wanted Earl Pennington to be there.

12  Q    What about Cletus Maricle, was he skeptical of my wife?

13  A    Oh, no, he was adamant in wanting her there.

14  Q    What about Bart Morris?

15  A    Bart could live with it either way.

16  Q    Had your wife ever served as an election officer before?

17  A    No.

18  Q    Was she very actively involved in politics before you

19  started running in 2002?

20  A    No.

21  Q    Did you ever — did you have any meetings with Doug Adams

22  about this proposal?

23  A    Yes.

24  Q    And if you could, tell us about your meeting with Doug

25  Adams.

KENNON WHITE – CONTINUED DIRECT – MR. SMITH          85

1  A    I had went and told him, because Wayne had — Jones had

2  told me that Don Nolan had had some problems with putting my

3  wife there, and that was coming from the school board and Doug

4  Adams.  So I went and talked with him, and he had basically

5  said that Darnell was wanting Earl in there but he didn't have

6  no problem, if I wanted to put Wanda there that he would not,

7  you know, go against it.

8  Q    Now, did Darnell also work for Doug Adams?

9  A    Yes.

10 Q    How was he employed by Doug Adams?

11 A    I don't know his exact job title.

12 Q    Okay.  Did he make any specific requests of Wanda through

13 you?

14 A    He wanted Wanda to be for Kevin Johnson.

15 Q    And what office was he seeking?

16 A    Sheriff.

17 Q    What did you tell him?

18 A    I told him that Wanda had usually supported Edd but that I

19 would try my best to get her to be for Kevin.

20 Q    All right.  Was Edd Jordan the sheriff at that time?

21 A    Yes.

22 Q    Did you go talk to Edd Jordan about this prospect of your

23 wife serving as election officer?

24 A    Yes, I did.

25 Q    And what did he say?

1   A    He said that he would be for her, that he was not allowed

2   to vote hisself, he was having to appoint his wife to vote, but

3   that Edith would be for Wanda.

4   Q    Now, when the final elections of officers were made by the

5   Board of Elections, who got selected?

6   A    For the precinct in —

7   Q    For the one in which your wife served.

8   A    Okay.  For the primary, it was Lucy Marcum, Anthony

9   Short —

10  Q    Her name is Marcum.  Is she related to Charles Marcum?

11  A    That's his sister-in-law.

12  Q    All right.  Who else?

13  A    And Charles "Dobber" Weaver and Anthony Short and my wife.

14  Q    All right.  Now, in the course of that election, did

15  you-all get involved in any way with the absentee or early

16  voting in 2006?

17  A    Yes, I did.

18  Q    And tell us what you did.

19  A    Okay.  Now, I'm not talking about the primary, I'm talking

20  about the general.

21  Q    Okay.  What about the primary?

22  A    I had very limited — I seen things, but I did not take an

23  active role in it.  I did see Darnell and Bart fill out mail-in

24  ballots.

25  Q    Who do you mean when you saw them fill out mail-in

1  ballots?

2  A    They would get ballots that people would request for their

3  vote, you know, be able to vote, and when they would get them,

4  Darnell or Bart would go and retrieve them and then they would

5  have like a stack of them, and then they would take and fill

6  them out -- they would have the person sign those forms, and

7  then they would take and fill out the slate of who they wanted

8  to vote for and then mail them theirselves.

9  Q    Did you discuss with them how they were obtaining these

10 mail-in ballots?

11 A    Yes.

12 Q    And what did they tell you?

13 A    They would go to the people and ask them to mail them in

14 and call -- sometimes they would call them in for them and they

15 would wait for them to come back to their house and then they

16 would go pick them up, and the ones that were selling their

17 vote, which was most of the them, they would pay for their --

18 for them to sign the open ballot and give to them and then they

19 would mark the ballot for the list of candidates that they

20 wanted them to vote for.

21 Q    And where did you see this taking place, where they were

22 filling out these ballots, where were they?

23 A    In Bart's garage.

24        MR. SMITH:  Your Honor, I think this may be a point

25 where we can stop.

1            THE COURT:  All right.  Thank you, Mr. Smith.

2            Ladies and gentlemen, we will take our lunch break at

3    this time.  We'll take an hour recess for lunch.  Please keep

4    in mind the admonitions that you have been given previously not

5    to discuss the case among yourselves while we are in recess,

6    and the jury will be excused for one hour at this time.

7            (Whereupon, the jury retired from the courtroom, after

8    which the following proceedings were had in open court.)

9            THE COURT:  Counsel, any matters to take up outside

10    the presence of the jury?

11            MR. PINALES:  Judge, just because of convenience at

12    this time, I would like to offer a continuing objection so I

13    don't have to keep popping up and down to any transcripts that

14    are shown and suggestion that our transcripts that we submitted

15    the 22nd or 23rd of December were the corrected copies —— more

16    correct copies, Your Honor.  But this way, I have it in the

17    record.

18            THE COURT:  All right.  The Court has addressed this

19    matter on numerous occasions — And have a seat just a moment.

20    Let me go ahead and make findings.

21            The Court has addressed this issue on a number of

22    occasions previously, and that is the issue of transcripts that

23    correspond with audio recordings.  The Court has listened to

24    the audiotapes that the United States proposes to play in the

25    case and has made a number of rulings concerning the

1   admissibility of the information contained in the transcripts

2   and the tapes as well.  With respect to the corresponding

3   transcripts that the United States plans to use, the Court has

4   reviewed each and every one of those transcripts in connection

5   with the audio recordings and finds that they are accurate as

6   they have been recently amended and as the United States

7   intends to use those.  The Court finds that it would be unduly

8   burdensome for the jury to review both the United States'

9   transcripts, which the Court finds accurate, as well as other

10  transcripts that are — have been tendered by the defendants,

11  and, therefore, the objection is noted for the record,

12  continuing objection, to the use of the transcripts but, once

13  again, will be overruled for the reasons stated by the Court at

14  this time as well as in previous rulings that have been made

15  with respect to that issue.

16          MR. PINALES:  Thank you, Your Honor.

17          THE COURT:  Any other issues before we take our lunch

18  break?

19          MR. WHITE:  Your Honor, I apologize —

20          THE COURT:  Yes, sir.

21          MR. WHITE:  — for jumping up.

22          THE COURT:  That's fine.

23          MR. WHITE:  I was going to make the same objection

24  and I assume that you could just consider that for all of us.

25          THE COURT:  Yes, sir.

1          MR. WHITE:  That way I don't have to jump up.  The

2     only thing I would add that just for the record, and you have

3     already ruled on it, is our request that the entire tape be

4     played if any tapes are going to be played.

5          THE COURT:  All right.  And the Court, as you're

6     aware, has previously determined that all portions of the

7     transcript need not be played for a variety of reasons,

8     including under Rule 106 of the Federal Rules of Evidence.  The

9     portions that the United States plans to play are, in my

10    opinion, complete.  Other portions that would be included and

11    that have been tendered by the defendants would constitute in

12    many cases inadmissible hearsay or evidence that would

13    otherwise be inadmissible for the rulings that the Court has

14    previously made.  So, therefore, that request will be denied as

15    well.

16         MR. WHITE:  Thank you, Your Honor.

17         THE COURT:  It is noted as to all defendants.  Yes,

18    sir, Mr. Abell.  It will be noted for everyone, so you don't

19    have to join in that objection.

20         MR. RICHARDSON:  Thank you.

21         MS. HUGHES:  You had already ruled that, hadn't you?

22    Someone had —

23         THE COURT:  At least four times.

24         MS. HUGHES:  Exactly.

25         THE COURT:  But five's a good number, so —

1           MS. HUGHES:  Because I'm not joining in anybody's

2    objection, because I just assumed that right from the beginning

3    we were already joining in everybody's —

4           THE COURT:  Yes, ma'am.  The Court has also made a

5    number of rulings with respect to the admissibility of

6    co-conspirator statements.  The Court ruled that a number of

7    elements had been met previously, but the Court, at this point,

8    having heard testimony that has been offered, finds that the

9    United States has established a conspiracy involving many of

10   the defendants here, most of the defendants that are present,

11   and so the Court believes that the United States has

12   established all the other elements that would be necessary to

13   admit those statements that were made from the time that the

14   conspiracy allegedly began, and that would include statements

15   and testimony of this witness, as well as Mr. Hacker and I

16   believe one other witness that's testified with respect to

17   those events.

18          Unless there's something else to take up at this

19   time, we'll be in recess until 1:05 this afternoon.

20       (Whereupon, a recess was had for the noon hour, after

21   which the proceedings continue uninterrupted to Volume 6-B.)

22                  (Proceedings concluded at 12:10)

23

24

25

1              C E R T I F I C A T E

2        I, Cynthia A. Oakes, certify that the foregoing is a

3    correct transcript from the record of proceedings in the

4    above-entitled matter.

5

6    2/11/2010                    s/CYNTHIA A. OAKES
         DATE                     CYNTHIA A. OAKES, RPR, RMR, CRR
7

8

9

10                    I N D E X

11                                                    PAGE

12   Testimony of KENNON WHITE:
         Continued Direct Examination by Mr. Smith:       18
13

14

15

16

17

18

19

20

21

22

23

24

25