United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09-16-S |
| vs. | ) |
| | ) Frankfort, Kentucky |
| RUSSELL CLETUS MARICLE | ) February 17, 2010 |
| DOUGLAS C. ADAMS | ) 9:00 a.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM E. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) VOLUME 8-A |
| STANLEY BOWLING | ) |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States: STEPHEN C. SMITH, ESQ.
                                JASON D. PARMAN, ESQ.

On behalf of the Defendant      DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:         MARTIN S. PINALES, ESQ.

On behalf of the Defendant      BENNETT E. BAYER, ESQ.
Douglas C. Adams:               R. KENT WESTBERRY, ESQ.
                                KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant      T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant      ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant      RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:             R. TUCKER RICHARDSON III, ESQ.

On behalf of the Defendant      JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant      ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant      DANIEL A. SIMONS, ESQ.
Stanley Bowling:

```
 1   Appearances of Counsel:

 2
     On behalf of the United States:  STEPHEN C. SMITH, ESQ.
 3                                     JASON D. PARMAN, ESQ.
                                       Assistant U.S. Attorneys
 4                                     601 Meyers Baker Road
                                       Suite 200
 5                                     London, Kentucky  40741

 6
     On behalf of the Defendant        DAVID S. HOSKINS, ESQ.
 7   Russell Cletus Miracle:           107 East First Street
                                       Corbin, Kentucky  40701
 8
                                       MARTIN S. PINALES, ESQ.
 9                                     150 East Fourth Street
                                       Federal Reserve Building
10                                     Cincinnati, Ohio  45202

11
     On Behalf of the Defendant        BENNETT E. BAYER, ESQ.
12   Douglas C. Adams:                 106 West Vine Street
                                       Suite 800
13                                     Lexington, Kentucky  40507

14                                     R. KENT WESTBERRY, ESQ.
                                       KRISTEN N. LOGAN, ESQ.
15                                     220 West Main Street
                                       Suite 1900
16                                     Louisville, Kentucky  40202

17
     On behalf of the Defendant        T. SCOTT WHITE, ESQ.
18   Charles Wayne Jones:              133 West Short Street
                                       Lexington, Kentucky  40507
19
20   On behalf of the Defendant        ROBERT L. ABELL, ESQ.
     William E. Stivers:               120 North Upper Street
21                                     Lexington, Kentucky  40507

22
     On behalf of the Defendant        RUSSELL JAMES BALDANI, ESQ.
23   Freddy W. Thompson:               R. TUCKER RICHARDSON III, ESQ.
                                       300 West Short Street
24                                     Lexington, Kentucky  40507

25
```

```
 1   On behalf of the Defendant        JERRY W. GILBERT, ESQ.
     William B. Morris:                212 North Second Street
 2                                     Richmond, Kentucky  40475

 3
     On behalf of the Defendant        ELIZABETH SNOW HUGHES, ESQ.
 4   Debra L. Morris:                  201 West Short Street
                                       Lexington, Kentucky  40507
 5

 6   On behalf of the Defendant        DANIEL A. SIMONS, ESQ.
     Stanley Bowling:                  116 West Main Street
 7                                     Suite 2A
                                       Richmond, Kentucky  40475
 8

 9   Court Reporter:                   CYNTHIA A. OAKES, CRR
                                       Official Court Reporter
10                                     United States District Court
                                       560 Athens Boonesboro Road
11                                     Winchester, Kentucky  40391
                                       (859) 983-4346
12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by mechanical stenography,
25   transcript produced by computer.
```

1          (Whereupon, the jury entered the courtroom, after which

2     the following proceedings were had in open court.)

3          THE COURT:  Thank you.  And good morning, everyone.

4     Welcome back.

5          The record will reflect that all members of the jury

6     are present.  All parties and counsel are also present.

7     Mr. White has returned to the witness stand.  He's still under

8     oath.

9          Mr. Smith, I believe when we stopped on Friday, you

10    were on direct examination of the witness.

11         MR. SMITH:  Yes, Your Honor.

12         THE COURT:  You may continue.

13         MR. SMITH:  Thank you.

14                     KENNON WHITE,

15    being previously duly sworn, was examined and testified further

16    as follows:

17              CONTINUED DIRECT EXAMINATION

18    BY MR. SMITH:

19    Q    Mr. White, I believe as we broke Friday, we were again

20    discussing the recordings which you were participating in;

21    correct?

22    A    That's correct.

23    Q    And in each of these recordings, you were doing this

24    pursuant to the direction of the FBI?

25    A    That's correct.

1   Q    And in most of these recordings, both you and your wife

2   were present, but in not all of them; is that correct?

3   A    That's correct.

4   Q    I would like to hand to you now what's marked as

5   Government's Exhibit A12 and A12A.  You have before you now a

6   disk marked A12?

7   A    Yes.

8   Q    Okay.  Do you recognize that disk?

9   A    Yes, that's a disk of a recording that I made with some of

10  the defendants.

11  Q    Okay.  And what date was this recording made?

12  A    It was made on May the 1st, 2007.

13  Q    Okay.  And at the time that you made that, again, were you

14  a participant in that conversation?

15  A    Yes, I was.

16  Q    And have you had an opportunity to review that recording

17  before testifying here today?

18  A    I have.

19  Q    And is that a fair and accurate copy or depiction of the

20  conversation in which you participated?

21  A    Yes, it is.

22  Q    You also have in front of you A12A, which is a transcript.

23  Do you see that in front of you?

24  A    I do.

25  Q    Have you also had an opportunity to review that and

1    compare that with the recording of the conversation in which

2    you were a participant?

3    A    I have several times.

4    Q    And, Mr. White, can you say that that's a fair and

5    accurate transcription of the words that were spoken in the

6    conversation?

7    A    I can.

8         MR. SMITH:  At this time, I would move for the

9    introduction of Government's Exhibits A12 and A12A, Your Honor.

10         THE COURT:  Any objection other than those previously

11    stated?

12         Exhibits A12 and A12A will be admitted.

13    BY MR. SMITH:

14    Q    Mr. White, again, listening to this recording, who are we

15    going to hear?

16    A    You'll hear myself and Bart Morris.

17    Q    And do you recall where this recording took place?

18    A    At Bart Morris's home.

19    Q    And do you know approximately — or do you know roughly

20    where his house was located at the time you made the recording?

21    A    Yes, it was on Green Street in Manchester.

22    Q    Okay.  And just to put in context, May the 1st of 2007,

23    you had been telling in previous conversations some of the

24    defendants of an upcoming grand jury appearance of your wife;

25    is that correct?

1    A    That is correct.

2    Q    And is this, again, a recording prior to that anticipated

3    grand jury appearance?

4    A    It is.

5         MR. SMITH:  All right.

6         I would like to ask the Court permission to publish

7    at this time, Your Honor.

8         THE COURT:  Yes, you may.

9        (Whereupon, a portion of Government's Exhibit No. A12,

10   00:12:48 to 00:44:46, was played to the Court and jury, after

11   which the following proceedings were had in open court.)

12   BY MR. SMITH:

13   Q    Mr. White, we have –– in the latter part of that clip?

14   There was a reference to a woman by the name of Stacey.  And

15   you said, "The only thing that ever worries me would be

16   Stacey."  Who were you referring to, Mr. White?

17   A    I was referring to Stacey Perkins.

18   Q    And what was the significance of Stacey Perkins?

19   A    Cause Bart Morris and I had taken her money to buy votes

20   for my father, as well as Al Man had sent her to the house to

21   get money to buy votes for my father, more money.

22   Q    Now, when did Al Man send her to you?

23   A    It was a few days or a couple days after Bart and myself

24   had went and taken her some money.

25   Q    And what election was this, Mr. White?

1  A     It was the general election of 2006.

2  Q     So November of 2006, Al Man Stivers sends money?

3  A     He sent Stacey to get money off of myself and my father.

4  Q     How much money did she get from you?

5  A     Altogether, it was around or about $2500.

6  Q     And what did she tell you when she came to get the money?

7  A     When she came — when Al Man sent her, she said that Al

8  Man had sent her to get the money.

9  Q     And had you and Al Man talked about who you were going to

10 use to distribute money in the November '06 election?

11 A     Yes.

12 Q     And tell us about that conversation.

13 A     He had told me that Stacey had always been a good one down

14 in that area to help to get votes and to — or to buy votes and

15 that she would haul them in there and see that they voted the

16 way they need to and that I would pay her and she would take

17 care of paying the voters.

18 Q     Now, in your conversation you said, "I heard that she's

19 been working for UNITE."  What were you concerned about?

20 A     It was — it was on the Internet that she had worked —

21 was working for UNITE undercover, that she had been busted for

22 selling pills and that — you know, that's what it said, and I

23 was concerned that she might be working with them.

24 Q     And then as that conversation completed on that, you said,

25 "You think she's solid, Bart?"  And he says, "I would think so,

1  you know, but I don't know."  Who were you referring to?

2  A    Stacey Perkins.

3  Q    And what did you mean by saying, "Is she solid, Bart?"

4  A    Do you think she will tell on us for election fraud and

5  buying votes and us taking the money up there to her.

6  Q    Now, he goes on to say, "She killed, what, two men?"  Who

7  was he referring to?

8  A    Stacey Perkins.

9  Q    Just prior to that conversation about Stacey, you said,

10 "Wanda said something about I figure it's Jennings and Vernon

11 told," and Morris said, "It might be over something like

12 Superman."  And you said, "Doug?"  Who are you referring to?

13 A    Doug Adams.  He's commonly known as "Superman," that's his

14 nickname.

15 Q    And in that conversation with Morris you speak of Darnell.

16 Who were you referring to as Darnell?

17 A    Darnell Hipsher, a council member at that time.

18 Q    And you made a comment something that "He dilly-dallied

19 around on both sides."  What were you referring to?

20 A    I was referring that he had bought votes for both sides,

21 that he had taken money from both sides, which was the people

22 that were running — the woman that was running against my

23 father, that he had taken money from both sides and bought

24 votes for both sides.

25 Q    And you made a further statement, "When you go from number

1  one to number five, and then, you know, there's not that many

2  votes in between the bottom three."  What were you referring to

3  there?

4  A    I was referring to the order of how many votes the council

5  members got in that race.  He had dropped from number one to

6  number five, Darnell had.

7  Q    And to your knowledge, Mr. White, was being number one on

8  the ticket, top vote-getter for city council, significant in

9  any way in the City of Manchester?

10  A    Yes, because it would give you an opportunity to be pro

11  temp mayor, and if anything happened to the mayor you would

12  have a shot at that.

13  Q    And had Darnell been the top vote-getter in the past?

14  A    Yes.

15  Q    You and Mr. Morris were talking about — you made the

16  statement, "Yeah, they can bring down big people."  And he

17  says, "That's who they want, officers, power players, they use

18  somebody like me and you to Mickey Mouse up there."  To your

19  understanding, what was he referring to?

20  A    He was referring that we weren't — we wasn't significant

21  when it came to being an officeholder and that the — that the

22  federal investigation liked to target people that were of

23  officeholders, like judges and superintendents and that sort of

24  thing that held offices.

25  Q    You also made a comment to Mr. Morris, you said, "Yeah, he

1    seen Wanda come out of the FBI headquarters over there."  He

2    said, "Did he?"  Who were you referring to, Mr. White?

3    A    Stanley Bowling.

4    Q    How did you know that Stanley Bowling had seen your wife

5    leaving the FBI headquarters?

6    A    My wife had told me that she —

7    Q    You also had made conversation further that "Probably, you

8    know, you know more than he wants to know."  He says, "Yeah,

9    Phillip, he and Doug, he knows what to get over this.  He's

10   nice and stuff, you know, Jennings has squealed shit on Doug

11   Adams.  The two hate each other."  To your understanding, what

12   was he referring to?

13   A    He was referring to a rivalry that went on between Doug

14   Adams and Jennings White and that other people were getting

15   caught in between and getting stuff told that they had done in

16   these elections because of them two being into it.

17   Q    When you began that conversation with Mr. Morris, he says,

18   "I figure when they got him, Oscar, they got Doug."  Who is he

19   referring to?

20   A    He's referring to Oscar Hubbard, which is Doug Adams's

21   brother-in-law that was arrested when they arrested Kenny Day

22   in that drug sting, you know, it was connected to the drug

23   string operation.

24        MR. WESTBERRY:  Judge Reeves, objection, same as

25   previously stated.

1          THE COURT:  All right.  I'm going to sustain the

2   objection.  The jury will be instructed that the witness may

3   state his understanding of what's being said to him but may not

4   interpret what another person says.  So I will sustain the

5   objection.

6   BY MR. SMITH:

7   Q    Morris said further that, "Well, they ain't got nothing.

8   They don't have nothing.  If they wanted to get after the

9   election, they should have gone way back."  To your

10  understanding, what was he referring to, "they should go way

11  back"?

12  A    He's referring that everything was done more in the wide

13  open when I talked about vote buying and that sort of thing,

14  that after 2002 they started trying to conceal it a little bit

15  better and trying to be more careful when election fraud was

16  committed and vote buying and that sort of thing, and that in

17  2002 it went wide open, right out in the open and that if they

18  wanted to investigate, that would have been where to start.

19  Q    Who were you referring to when you told Mr. Morris that,

20  "He might as well — it makes no difference, he has to be

21  within a hundred foot of that machine."  Who were you referring

22  to?

23  A    My father, Doug White.

24  Q    And what was the significance of a hundred foot of a

25  machine?

1  A    He was on a bracelet, what they call a bracelet, under his

2  bond conditions to where that he couldn't get so far away from

3  this box that was connected to the telephone.

4  Q    Was he under charges at that time?

5  A    Yes, he was.

6  Q    And what court had him charged?

7  A    Federal court.

8  Q    You-all further were discussing the elections and you made

9  a statement, "I didn't realize it, but they put Sammy Gregory

10 and that whole Horse Creek bunch up there, that precinct up

11 there, after the May election."  What were you referring to,

12 Mr. White?

13 A    I was referring to an earlier investigation by the federal

14 government into election fraud of people that had been called

15 to testify in front of the grand jury.

16 Q    Okay.  What time period were you referring to?

17 A    That was after the May election in 2006.

18 Q    Mr. White, Mr. Morris made a statement along toward the

19 end that — he referred to Doug Adams and said, "That's too

20 much power for one man to have."  To your understanding, what

21 was he referring to?

22 A    He was talking about Doug's power over the elections, to

23 do with election officers and to do with his power over being

24 the superintendent and the school board employees and having

25 power to be able to persuade them to vote the way that they

1  wanted to vote and just prevent always having that much power

2  in the elections and being able to corrupt elections.

3  Q    Now, had you — after 2002, when you spoke of earlier

4  about your defeat as jailer, did you try to get back in with

5  Doug Adams?

6  A    Yes, I did.

7  Q    And in the course of that, did Mike Bishop's name come up

8  to you at some point?

9  A    Yes, Mike Bishop wanted to be — he worked at the city

10 police department and he wanted to be promoted to police chief.

11 Q    And how did that come to you?

12 A    Through Mike Bishop.

13 Q    And so how did Doug Adams play a part in that?

14 A    Well, Doug — I talked with Doug and — after speaking

15 with Mike, and Mike had said that Doug was willing to help not

16 to go against my father and to run somebody against him for

17 mayor and that I would have the support of the school board and

18 support of Doug Adams if I would move — if I could persuade my

19 father to move him to assistant police chief.

20 Q    And you learned this through Mike Bishop?

21 A    Yes.

22 Q    And so what did you do?

23 A    I went and talked with Doug Adams about it.

24 Q    Okay.  Tell us about that conversation.

25 A    I told him what Mike had told me, and he told me that that

1   was agreeable.  Actually, my father and I went and met with him

2   and Mike and Mike's father, Paul, and agreed on the terms of

3   the promotion of Mike Bishop to assistant police chief; the

4   terms being that the school board and Doug Adams would support

5   my father and — for mayor and to try to keep him from having

6   competition.

7   Q     What time period did this promotion occur in, Mr. White?

8   A     It occurred — I don't know the exact timeframe, but it

9   was in between when I started my job in '04 and around the '05

10  mark, '06.

11  Q     So you were employed in the management position at the

12  City?

13  A     Yeah, I was working under the City Supervisor, reporting

14  back to my father and getting instructions from him.

15  Q     Now, did you and your father ever do anything to try to

16  further favor with Mr. Adams by doing any personal favors for

17  him through the City?

18  A     Okay.  We sent a dozer that belonged to my father, and it

19  was hauled — we hauled it down there on a City trailer that

20  you pull a dozer with to his farm and let him keep it there.

21  We also installed lights at the Board of Education and paid for

22  them through the City, you know, had the electric company come

23  and put them in, and —

24  Q     What was the reason that you and your dad sent a bulldozer

25  out to his farm?

KENNON WHITE - CONTINUED DIRECT - MR. SMITH          16

1   A    To gain political favor with him.

2   Q    And what was he intentions, what need did he have for a

3   bulldozer on his farm?

4   A    He was making roads so that they would have roads to ride

5   four-wheelers to deer hunt on.

6   Q    And what timeframe did you send the bulldozer out?  Was

7   that with a City employee, did the City —

8   A    Yes, it was City employees delivered it.

9   Q    Okay.  What time period did that occur in?

10  A    That occurred after the May primary but before the general

11  election in November.

12  Q    Finally, in that last clip, Mr. Morris made a statement,

13  "If Doug Adams wasn't in power, Doug would stay be mayor."  To

14  your understanding, who was he referring to?

15  A    He's referring to Doug Adams being in the position of

16  superintendent and in the powerful position that he held with

17  elections, that if he hadn't been in that position that my

18  father would have won for mayor because Doug Adams did not do

19  what he was supposed to do and support my father.  Matter of

20  fact, he went against him.

21  Q    But you just told us that you had this agreement worked

22  out where if he promoted Mike Bishop that he was going to

23  support your dad?

24  A    That is correct.

25  Q    And what happened to that agreement, Mr. White?

1    A    When it came time, he was concerned — my understanding is

2    that he was concerned about getting Kevin Johnson elected to

3    the sheriff's position and that he basically just — we use the

4    term sold us out, and said, you know, that was his primary

5    concern, and he put all this effort and made whatever political

6    deal that needed to be made to ensure that Kevin Johnson won

7    for sheriff.

8          MR. SMITH:  Your Honor, with the Court's permission,

9    I would like to continue to play the latter part of the clip.

10         THE COURT:  Yes, sir.

11       (Whereupon, a portion of Government's Exhibit No. A12,

12   00:45:27 to 00:47:20, was played to the Court and jury, after

13   which the following proceedings were had in open court.)

14   BY MR. SMITH:

15   Q    Mr. White, following the recording there made at Morris's,

16   did you and your wife further the investigation by approaching

17   another person for a recording?

18   A    Yes.

19   Q    And where did you go from there?

20   A    To Cletus Maricle's home.

21   Q    Was that on the same date?

22   A    Yes, sir.

23   Q    And, again, was that pursuant to the cooperation with the

24   FBI?

25   A    It was under the direction of the FBI.

KENNON WHITE – CONTINUED DIRECT – MR. SMITH          18

1   Q    Did you continue to use the same recording device when you

2   went to the next location?

3   A    Yes, I did.

4          MR. SMITH:  And at this time, Your Honor, I would

5   like to continue to play that portion of the clip.  I think

6   beginning on page 20.

7          THE COURT:  All right.  Mr. White?

8          MR. WHITE:  I'm sorry, Your Honor, I was just trying

9   to get the page number to get caught up.  Thank you.

10          THE COURT:  Also, Mr. Smith, before you proceed with

11   that clip, with these longer sections like we've just gone

12   through —

13          MR. SMITH:  Yes, Your Honor.

14          THE COURT:  — if you have follow-up questions, it

15   would be helpful to the Court and also for counsel if you could

16   make reference to the specific pages, because we've had that

17   issue come up with some of the shorter ones, but with these

18   longer ones it would be helpful if you could do that.

19          MR. SMITH:  Certainly, Your Honor.

20          THE COURT:  All right.  Thank you.  You may proceed.

21      (Whereupon, a portion of Government's Exhibit No. A12,

22   00:55:25 to 01:01:23, was played to the Court and jury, after

23   which the following proceedings were had in open court.)

24   BY MR. SMITH:

25   Q    Mr. White, in this clip, I believe on page 21,

1  Mr. Maricle made the statement to you, "You don't need to go up

2  there."  To your understanding, what was he referring to?

3  A    He was referring to me going around the grand jury or the

4  FBI building.

5  Q    Now, at this point in time, were you still anticipating

6  the grand jury appearance to be in the future?

7  A    Yes.

8  Q    You say, "They asked her if there were any voting

9  irregularities.  They asked her how she became election

10 officer."  Who were you referring to when you say, "They asked

11 her"?

12 A    I was referring to the FBI.

13 Q    And how is it that you had explained to him that the FBI

14 had talked to your wife?

15 A    Okay.  Can you repeat that question?  I'm sorry.

16 Q    If you could, explain yourself.  You say that you're

17 referring to the FBI —

18 A    Uh-huh.

19 Q    — when you say "they asked her."  Could you put that in

20 context?  The FBI asked her when?

21 A    Asked her when she went to meet with the FBI at their

22 headquarters.

23 Q    And in context with this recording, when had that

24 occurred?

25 A    That had occurred, to my understanding, this day or the

KENNON WHITE – CONTINUED DIRECT – MR. SMITH          20

1   day before.

2   Q    All right.  And when you made the statement, "Wanda went

3   to her appointment there," what were you referring to?

4   A    Her appointment with the FBI at the FBI headquarters in

5   London, Kentucky.

6          MR. SMITH:  And for the record, that's on page 20.

7   I'm sorry.  If we could proceed, Your Honor, with the next

8   clip?

9          THE COURT:  Yes, sir.

10         MR. SMITH:  Thank you.

11     (Whereupon, a portion of Government's Exhibit No. A5,

12  01:02:28 to 01:05:00, was played to the Court and jury, after

13  which the following proceedings were had in open court.)

14  BY MR. SMITH:

15  Q    Mr. White, on page 23, Maricle made the statement to you,

16  "Money was probably spent somewhere and I figure –– well, I

17  figured Crawdad's spent."  To your understanding, who is he

18  referring to as "Crawdad"?

19  A    Crawdad Sizemore, the person that won for county judge.

20  Q    And then you made the statement, "I figured Johnny Dean

21  put some up for Kevin."  Who were you referring to?

22  A    Johnny Dean Wolf and Kevin Johnson, Kevin Johnson being

23  the person that won for sheriff and Johnny Dean being his

24  father-in-law.

25         MR. SMITH:  If we could proceed to the next clip.

1          THE COURT:  Yes, sir.

2          MR. SMITH:  Thank you.

3      (Whereupon, a portion of Government's Exhibit No. A12,

4   01:13:55 to 01:15:44, was played to the Court and jury, after

5   which the following proceedings were had in open court.)

6   BY MR. SMITH:

7   Q    Mr. White, in that clip on page 24 you made the statement,

8   I figured I would have got subpoenaed before Wanda would, and

9   then Maricle said, "They done subpoenaed you once."  To your

10  understanding, what was he referring to?

11  A    He was referring when I was subpoenaed in front of the

12  grand jury on a previous investigation into matters at the City

13  of Manchester, blacktopping and that sort of thing.

14  Q    And in context as far as time, how far prior to this

15  recording had you made that grand jury appearance, Mr. White?

16  A    It had probably been almost a year.

17          MR. SMITH:  If we could now play the next clip, Your

18  Honor?

19          THE COURT:  Yes, sir.

20      (Whereupon, a portion of Government's Exhibit No. A12,

21  01:22:00 to 01:24:30, was played to the Court and jury, after

22  which the following proceedings were had in open court.)

23  BY MR. SMITH:

24  Q    Mr. White, in this clip, I believe on page 24 at the

25  bottom, you made the statement, "She probably would have been

1  just as well.  Phillip never went, did he?"  Who were you

2  referring to as Phillip?

3  A    Phillip Mobley, Cletus Maricle's son-in-law.

4  Q    And when you say he never went, where were you referring

5  to, never went where?

6  A    To the FBI headquarters to meet with the FBI.

7  Q    And Maricle responds with a question, "You know anybody

8  else that got subpoenaed?"  To your understanding, what was he

9  referring to?

10  A    Anyone else that had been subpoenaed to appear in front of

11  the grand jury under the —

12        MR. SMITH:  If we could, Your Honor, proceed to the

13  next clip.

14        THE COURT:  Yes, sir.

15        MR. SMITH:  I would like to hand the witness now

16  what's marked as Exhibits A14 and A14A.

17        THE COURT:  All right.

18  BY MR. SMITH:

19  Q    You should have in front of you now, Mr. White, a disk

20  marked A14.

21  A    Uh-huh, I do.

22  Q    Do you recognize that as a disk which you previously

23  reviewed before your testimony here today?

24  A    Yes, I do.

25  Q    And when was that recording made?

1   A     May the 2nd, 2007.

2   Q     And where was the recording made?

3   A     Cletus Maricle's home.

4   Q     And when this conversation begins or this recording

5   begins, whose voices are we going to hear?

6   A     Myself and Cletus Maricle's.

7   Q     Have you, again, had an opportunity to review that

8   recording and can you state it's a fair and accurate copy of

9   the conversation in which you participated?

10  A     Yeah, I've reviewed it several times, and it is.

11  Q     And also, do you have in front of you A14A, which is a

12  transcript?

13  A     Yes.

14  Q     Have you had an opportunity to compare that with the

15  recording?

16  A     Several times.

17  Q     And can you state that that's a fair and accurate

18  transcription of the words that were spoken in the conversation

19  in which you participated?

20  A     It is.

21        MR. SMITH:  I would move, at this time, for the

22  introduction of Government's Exhibit A14 and A14A, Your Honor.

23        THE COURT:  Any objection other than those previously

24  stated?

25        Exhibits A14 and A14A will be admitted.

1          MR. SMITH:  At this time, Your Honor, I would like

2     permission to publish.

3          THE COURT:  Yes, sir.

4        (Whereupon, a portion of Government's Exhibit No. A14,

5     02:17:38 to 02:43:44, was played to the Court and jury, after

6     which the following proceedings were had in open court.)

7          THE COURT:  Mr. Smith, will you be having follow-up

8     questions on this segment of the tape?

9          MR. SMITH:  I do have some, Your Honor.

10         THE COURT:  I think we'll take a break before we get

11    to that.

12         Ladies and gentlemen, we will take our morning break

13    at this time.  We'll take a 20-minute recess until 11:00.

14    Please keep in mind the admonition that you were given

15    previously not to discuss the case among yourselves while we

16    are in recess.  But you'll be excused for 20 minutes.

17        (Whereupon, the jury retired from the courtroom, after

18    which the following proceedings were had in open court.)

19         THE COURT:  Thank you, and please be seated.

20         Counsel, as we go forward, just so there's no

21    misunderstanding, I previously allowed witnesses to be asked

22    about their understanding of certain statements, but the

23    answers that are extending into the witness's — what the

24    witness understands — his understanding of someone else's

25    statement, not his own, but he's interpreting what other

1   witnesses —— I wasn't going to release him, but before we start

2   back, I want to make sure that we are clear that you can ask

3   him what his understanding is to put his statements in context

4   to further explain communications that take place, because, of

5   course, not all communications are verbal.  But once we get

6   beyond that and once he starts interpreting and saying what he

7   thinks someone else meant to say, then that's when I'm

8   sustaining the defendants' objections to that line of

9   questioning.  I don't know if that's clear, Mr. Smith, but

10  that's the Court's intention.

11          MR. SMITH:  Your Honor, I'll be glad to speak with

12  the witness at the break and shore up that with him and make

13  sure he's understanding what the Court's ruling is.  I don't

14  think that my question necessarily has been asking for anything

15  more, but ——

16          THE COURT:  Sometimes his answers are, I believe,

17  going a little beyond that, and sometimes it is necessary

18  because we're dealing with a series of communications and he's

19  referring back to earlier communications and it may be

20  necessary for him to explain why he understands certain

21  statements to mean certain things.  But, again, it's his

22  understanding and it's not the understanding of a third party

23  that he's expressing.

24          MR. SMITH:  So I understand, the Court does not

25  intend to restrict the government from asking him about his ——

1    for instance, Doug Adams comes up, talking about he's powerful,

2    he's the most powerful man in the county, what did you and your

3    father try to do to get influence or obtain influence of Doug

4    Adams, and he goes in to explain, well, this is what we did, A,

5    B, and C.

6                THE COURT:  That's —

7                MR. SMITH:  My understanding of the Court's ruling,

8    you're not restricting us from going into those, but it's the

9    conversation interpretation only.

10               THE COURT:  That's correct.  Because, again, we're

11   dealing with audiotapes and we're dealing with transcripts

12   here, and you're asking him to put his statements in certain

13   context, and, of course, his statements are admissible for

14   context only because he was not a co-conspirator at the time

15   that these statements occurred or he allegedly was not a

16   co-conspirator.  So the evidence in the case are the statements

17   made by the defendants on these tapes, and in order to put

18   those statements in context, of course, his questions and

19   answers are important, but it's also important at points, if

20   it's not clear, for him to be able to explain what he meant by

21   a certain statement.  But then once he starts to say I meant A

22   and so-and-so meant B, that's improper once he starts talking

23   about what someone else meant by a particular statement.  But

24   there may be some situations where —

25               MR. SMITH:  Let me ask the Court this:  If he's

1    talking to Mr. Maricle and Mr. Maricle mentions Doug, and I

2    say, to your understanding, who was he referring to —

3            THE COURT:  I think the defendants —

4            MR. SMITH:  I think the defense wants us to explain

5    it's Doug White as opposed to Doug Adams.

6            THE COURT:  Yes, sir.  But, again, it's his

7    understanding of who is being referenced.

8            MR. SMITH:  And that's okay?

9            THE COURT:  Yes, sir.

10            MR. SMITH:  Okay.

11            THE COURT:  Yes, sir.

12            Mr. Pinales?

13            MR. PINALES:  May it please the Court, regarding the

14    transcript that was just played, and I don't have paper here so

15    it was hard following along in my computer and on the screen.

16            THE COURT:  All right.

17            MR. PINALES:  At the bottom of page seven, I don't

18    believe it was in the part that was shown to the jury and I

19    don't believe it was included in a limine that the government

20    had filed where it says, "Maricle:  One of the main ones was

21    my — my thinking was," and ending at the bottom of that clip.

22    I did not catch that in the part on the screen, and I do

23    believe it is not only proper but important that that be in

24    there.

25            THE COURT:  All right.  We'll have to go back and

1  check that to see if that was part of the section that was

2  displayed on the screen.

3          MR. PINALES:  My co-counsel says he is absolutely

4  sure it was not, but —

5          THE COURT:  All right.

6          MR. PINALES:  And I believe it should have been.

7          THE COURT:  Well, we'll need to take a break and

8  we'll need to go back to see if it was.  I want to make sure I

9  get through all these issues and then we'll take a break and we

10  won't have to come back and make that determination.

11          MR. PINALES:  I need to take a break, too, Your

12  Honor.

13          THE COURT:  All right.

14          MR. PINALES:  A serious break.

15          THE COURT:  Well, then you need to exert some

16  influence on counsel for the other defendants here.

17          Mr. Westberry?

18          MR. WESTBERRY:  I understand, I'm just standing for

19  personal comfort.

20          THE COURT:  All right.  Any other issues before we

21  take a recess?  Otherwise, what we'll do is we'll take about a

22  ten-minute recess.  I do want to resolve this issue before the

23  jury and the witness come back in.

24          And, Mr. Smith, I am going to allow you to talk with

25  the witness and make sure he understands the Court's ruling,

1  that when you're asking him to explain his understanding, it is

2  his understanding as opposed to a third party's understanding

3  about a statement.

4          All right.  We'll take approximately ten minutes.

5          (Whereupon, a short recess was had, after which the

6  following proceedings were had outside the presence of the

7  jury.)

8          THE COURT:  Thank you.

9          The record will reflect the jury is not present at

10  this time.  Let's see, I believe all parties and counsel are

11  present.

12          Before we took the break, Mr. Pinales had raised an

13  issue about one section of the audio and the accompanying

14  transcript, Exhibit A14 and A14A, specifically to a reference

15  or statement contained on the tape made by Mr. Maricle and also

16  reflected at the bottom of page seven of the transcript.

17          Mr. Smith, have you been able to locate that section?

18          MR. SMITH:  Yes, I asked that we put that in front of

19  the Court so we can see what is in issue.  The Government's

20  Exhibit 14A, which I believe you have the hard copy, on the

21  bottom of page seven has a sentence — actually, it looks like

22  two full sentences of Maricle that has been pointed out is not

23  reflected in the sanction's version, and it appears that

24  Kennon's conversation picks back up with, "Well, did you know

25  he was mad at you over it?"  And the proceeding statement of

1  Maricle has been deleted.  I've asked about the technical

2  reason for this, and apparently my motion in limine asked that

3  part of that statement be stricken and the Court granted our

4  motion, and in effecting the Court's order of striking I guess

5  a portion of that statement, technically we're having — she

6  explains to me that to basically accomplish the statement, she

7  can't dissect it into that small a portion.  And I'm not real

8  sure I understand it, Your Honor, I'm just repeating what I've

9  been told.

10        So I guess the remedy, if the Court seeks to — you

11  know, unless I can find some technical answer that I don't have

12  here in front of me, I'm told that's impossible dissected in

13  that small a portion and that it will be all or nothing, and

14  that is the Court's ruling that that part of that statement

15  will have to be included in the whole.

16        THE COURT:  All right.  What — I don't have the

17  original version in front of me.  What portion was removed by

18  the motion in limine?

19        MR. SMITH:  I believe that my attachment is a chart

20  of exculpatory statements filed at 575 document, 575, it's 15

21  pages, Your Honor.  On page five of my chart, I believe —

22        THE COURT:  Just one second, please.  I don't think I

23  have that with me.  Go ahead, please.

24        MR. SMITH:  It's docket entry 575, and there's 15

25  pages to that attachment, and on page five of that, the third

1    line down, we referenced an exculpatory statement of Maricle's

2    which says, "Kennon, I really didn't —— I did not get very

3    involved in Phillips' election, uh, for a lot of reasons."

4    That appears to be a complete sentence.  But it happens to be

5    within the comment that Maricle has made after —— in between

6    these two statements that appear —— that appear here on the

7    screen.

8            She apparently has attempted it and says that if we

9    keep the redacted portion out, it will pick up after the first

10   comment, Your Honor, which is, "One of the main reasons was my

11   thinking I got involved in Phillips' election," comma, the

12   recording would start there, "It would hurt him."

13           THE COURT:  What's the position of the defendant?

14           MR. PINALES:  My position is that portion that was

15   not redacted should be part of this transcript, it puts the

16   matter in a correct context, it is part of our defense, it is

17   part of the government's theory in the prosecution against

18   that, and I think it's very important.  One of the solutions,

19   Your Honor, is that the government withdraw its motion to

20   redact that first part and put the whole paragraph up.

21           THE COURT:  All right.  Mr. Smith, are you able to ——

22   two questions.  I assume you're able to go back and play the

23   portion that includes the entire statement; is that correct?

24           MR. SMITH:  Yes, Your Honor.  What I would propose is

25   that we take a variation —— I think we can set up here with the

1   projector, I think I can put on the screen this transcript

2   that's been introduced into evidence that has the objectionable

3   portion included, we replay that section and portion enough

4   that it keeps it in context and put it up on the screen.

5   Therefore, we bypass this issue with the sanctions issue, we

6   get the record completed by putting in what's actually

7   introduced into evidence but, for whatever reason, didn't

8   appear upon our projection.  So that would be my suggestion.

9          THE COURT:  So we would go back and we would begin

10  from Mr. White's statement, replay that section, and you would

11  have the transcript, the hard copy of the transcript, to place

12  on the overhead projector?

13         MR. SMITH:  Yes, Your Honor.

14         THE COURT:  All right.  Well, I think that

15  accomplishes the -- what needs to be done here, but I assume

16  it's going to take awhile to make sure the equipment is

17  operating and that we don't have any glitches with that.  Let's

18  take another short recess to allow you to set that equipment up

19  and we can come back and we will start at that point.  Take

20  approximately another five minutes.

21      (Whereupon, a short recess was had, after which the jury

22  returned to the courtroom and the following proceedings were

23  had in open court.)

24         THE COURT:  Thank you.

25         The record will reflect all members of the jury are

1   present.  The parties and counsel are also present at this

2   time.

3           Ladies and gentlemen, during the break, we discovered

4   that there was one section of the last audiotape, Exhibit A14,

5   that was omitted from the portion that was played to you.  So

6   we're going to go back and the United States is going to play

7   that portion again.  It won't show up on the screen, so we're

8   going to have use some other equipment because that's not part

9   of the transcript that was shown on the screen.

10          Mr. Smith, you may proceed.

11          MR. SMITH:  Thank you, Your Honor.  We're ready to

12  publish the page seven, I believe.

13      (Whereupon, a portion of Government's Exhibit No. A14 was

14  played to the Court and jury, after which the following

15  proceedings were had in open court.)

16  BY MR. SMITH:

17  Q    Mr. White, in the — now, before we broke, we had heard

18  mention in the prior clips a conversation where you and

19  Mr. Maricle began in that conversation and he made reference

20  to, "She doesn't listen very well.  She keeps wanting to go

21  down there and talk to Dobber.  That ain't going to serve no

22  useful purpose to her."  To your understanding, who was

23  Mr. Maricle referring to?

24  A    Referring to my wife, Wanda White, and Dobber Weaver,

25  Charles "Dobber" Weaver.

1  Q    Page three, Mr. Maricle and yourself were talking about a

2  job, and he made the statement, "We might get something out of

3  Doug."  To your understanding, which Doug was he referring to?

4  A    Doug Adams.

5  Q    Page eight, again, you're referencing a job and

6  Mr. Maricle said, "Edd made me a good sheriff."  Who was he

7  referring to, to your knowledge?

8  A    Edd Jordan, the former sheriff.

9  Q    Page nine, there's a reference to getting approval in

10  Washington, D.C., Mr. Maricle says.  And then you respond,

11  "I'll tell you what Brent says."  "I'm going to tell you

12  something, it's a big deal, I think Stephan Charles is right, I

13  think the '02 election."  Who were you referring to as Stephan

14  Charles?

15  A    A local attorney from Manchester.

16  Q    And did he have a relationship, to your knowledge, with

17  Phillip Mobley at that time?

18  A    That was Phillip's attorney, to my knowledge.

19  Q    Page 11, you again reference the 2002 and Jennings White,

20  Maricle said, "He was good."  Who was he referring to, to your

21  knowledge?

22  A    Jennings White.

23  Q    And he says, "I" –– further, "I don't think it

24  was Jennings.  I really don't, that was Sue."  To your

25  understanding, who was he referring to when he referred to Sue?

KENNON WHITE - CONTINUED DIRECT - MR. SMITH          35

1  A    He was referring to Sue, she was a candidate for
2  magistrate.
3  Q    And at that time that you-all had this conversation, had
4  you been advised by Maricle what role Sue had played in the
5  investigation?
6  A    Yes.
7  Q    And what did Maricle report to you?
8  A    That she had went over and had given testimony in front of
9  the grand jury in London.
10 Q    Which grand jury investigation would that have been?
11 A    The one after the May primary.
12 Q    There was also a conversation with you and Mr. Maricle
13 about again the job, and he referred to checking with Ralph in
14 Jackson County.  To your understanding, who was he referring
15 to?
16 A    Ralph Hoskins, the superintendent in Jackson County.
17       MR. SMITH:  At this time, Your Honor, if the Court
18 please, I would like to hand the witness Government's Exhibit
19 A17 and A17A.
20       THE COURT:  Yes, sir.
21       MR. WHITE:  Excuse me, Your Honor, could we possibly
22 turn this off, the lights —
23       THE COURT:  We'll have Ms. Ratliff do it.  That will
24 be fine.
25 BY MR. SMITH:

1   Q    You should have in front of you now what's marked as

2   Government's Exhibit A17.

3   A    Yes.

4   Q    A disk?

5   A    Yes.

6   Q    Have you reviewed that disk prior to this time?

7   A    I have.

8   Q    Could you tell us what that is a recording of, Mr. White?

9   A    That's a recording of a conversation between me and

10  Mr. Maricle and my wife.

11  Q    What date was this recording made?

12  A    May the 14th, 2007.

13  Q    Now, at the time that this recording was made, would this

14  have been after the reported appearance of Ms. White before the

15  grand jury?

16  A    I think it was before.

17  Q    Okay.  And so in the context of these recordings, you made

18  a visit to where when you made this recording?

19  A    To Cletus Maricle's home.

20  Q    Okay.  And you've reviewed that prior to testifying.  Can

21  you state that's a fair and accurate copy of the recording of

22  the conversation which you participated?

23  A    Yes, I can.

24  Q    And, Mr. White, have you also looked at Government's

25  Exhibit A17A?

1  A    Yes, I have.

2  Q    That's a transcript.  Have you compared the words on there

3  to the audio recording of your conversation?

4  A    Yes, I have.

5  Q    And can you state that's a fair representation of the

6  words spoken in that conversation?

7  A    Yes, that's an accurate representation.

8        MR. SMITH:  I would move, at this time, for

9  Government's — introduction of Government's Exhibit A17 and

10 A17A, Your Honor.

11       THE COURT:  Any objection other than those previously

12 stated?

13       Government's Exhibit A17 and A17A will be admitted.

14       MR. SMITH:  If the Court please, I would like to

15 publish those through the witness at this time.

16       THE COURT:  Yes, sir, you may.

17     (Whereupon, a portion of Government's Exhibit No. A5

18 beginning at 00:13:00 to page ten of the transcript was played

19 to the Court and jury, after which the following proceedings

20 were had in open court.)

21       MR. SMITH:  Your Honor, I apologize, we apparently

22 have lost the video.

23       THE COURT:  Can we stop the audio portion?  You can't

24 stop it?  This may be a good time for our lunch break,

25 Mr. Smith.

1          MR. SMITH:  I think so.

2          THE COURT:  I believe the transcript, it was at the

3    top third of page ten.  So we'll try to get that working during

4    the noon hour.

5          Ladies and gentlemen, we will take our lunch break at

6    this time.  Again, keep in mind the admonition that you have

7    been given several times not the discuss the case while we are

8    in recess.  And the jury will excused until 1:00 p.m. this

9    afternoon.

10         (Whereupon, the jury retired from the courtroom, after

11   which the following proceedings were had in open court.)

12         THE COURT:  Thank you, and please be seated.

13         Before we recess for lunch, I wanted to check on our

14   schedule a bit.

15         Mr. Smith, when would you anticipate completing

16   direct examination of Mr. White?

17         And, Mr. White, you can step down, sir.

18         THE WITNESS:  Okay.

19         THE COURT:  Thank you.

20         MR. SMITH:  Hopefully by the afternoon break, Your

21   Honor, we'll have him turned over to cross-examination.

22         THE COURT:  All right.  Let me see if there are other

23   matters that we need to take up outside the presence of the

24   jury.

25         Mr. Westberry?

1          MR. WESTBERRY:  Very briefly, Judge.

2          THE COURT:  Yes, sir.

3          MR. WESTBERRY:  With regard to your ruling earlier

4    today involving a witness trying in offer interpretation of

5    what someone else or what he may have heard on the tape, would

6    the Court consider some sort of instruction or an admonition to

7    the jury at the appropriate time instructing them that they

8    would disregard any previously mentioned interpretation by a

9    witness?  And I have, of course, in mind Mr. Kennon White where

10   he attempts to offer his own interpretation of what someone

11   else may have been saying.  And I don't have a very well

12   crafted admonition, but I think this was a recurring problem

13   last week as well.  Now I have a better understanding of the

14   parameters that the Court has set.

15         THE COURT:  What I am planning to do is give the same

16   admonition or the same instruction that I had given previously,

17   and that is that — this is with respect to both Mr. White and

18   his wife if she — I assume she'll testify, that their

19   statements, the statements made during the course of these

20   tapes, are admitted only to provide context and that while they

21   have given testimony with respect to their understanding of

22   statements that are made, the jury is reminded that their

23   statements in that regard are only their understanding of what

24   was being said.  Something along those lines is what I would be

25   giving.  But if you would like to craft something for me to

1    consider, I'll certainly do that.

2              MR. WESTBERRY:  I'll do that.

3              THE COURT:  But I think you run into a problem if it

4    gets to be too lengthy with the jury understanding, and so I

5    would be more inclined to give a shorter version than a more

6    lengthy version, but I'll certain consider that at the

7    appropriate time.

8              MR. BALDANI:  Judge, I have a real quick question.

9              THE COURT:  Yes, sir.

10             MR. BALDANI:  The snow days, the days we missed, is

11   that going to change the plans to be out of session on the 22nd

12   and March the 5th?

13             THE COURT:  No, it doesn't.  I wish that we could

14   readjust that, but the problem we have is we have I think two

15   attorneys that have to be in other courts on the 22nd.  I know

16   that Mr. White had to reschedule a sentencing hearing before

17   Judge Caldwell, so she has set that up for next Monday, and —

18             MR. BALDANI:  I did the same with Judge Caldwell.

19             THE COURT:  And I believe Mr. Westberry has to be

20   down in London in front of Judge Van Tatenhove on that same

21   day.  And then on the 5th, I think Mr. Pinales has to be in the

22   Sixth Circuit arguing on an unrelated matter.  So I wish that

23   we could readjust those two dates, but at this point — I do

24   periodically during a lengthy trial I will check with the

25   parties and see how we're going in terms of the schedule, and

 1  if it looks like we're going a little too slow, then sometimes
 2  I'll either shorten the breaks or maybe start earlier or end
 3  later in the day when we can, when we have the chance to do
 4  that.  So I'll continue to do the best I can in that regard,
 5  Counsel, but there's not a lot we can do about the weather
 6  unfortunately.  And as you know, some of these jurors are
 7  coming quite a distance to court.  So, you know, it's easy for
 8  us to get here sometimes if we're coming from Lexington or
 9  Richmond or wherever, but some of these jurors are coming a
10  pretty good distance and not on the main roads, and so —
11              MR. BALDANI:  I understand.
12              THE COURT:  All right.  Anything else before we take
13  our break?
14              MR. WESTBERRY:  1:00, Judge?
15              THE COURT:  1:00.  We'll be in recess until that
16  time.
17          (Whereupon, a recess was had for the noon hour, after
18  which the proceedings continue uninterrupted to Volume 8-B.)
19                      (Proceedings concluded at 11:50 a.m.)
20
21
22
23
24
25

1                        C E R T I F I C A T E

2        I, Cynthia A. Oakes, certify that the foregoing is a

3  correct transcript from the record of proceedings in the

4  above-entitled matter.

5

6  2/17/2009                    s/CYNTHIA A. OAKES
       DATE                     CYNTHIA A. OAKES, RPR, RMR, CRR

7

8

9

10                         I N D E X

11                                                    PAGE

12  Testimony of KENNON WHITE:
         Continued Direct Examination by Mr. Smith:      4

13

14

15                        E X H I B I T S

16

17  Government's                                       Page
    Exhibit No.            Identified                Admitted

18
       A12                     5                        6
19     A12A                    5                        6
       A14                    22                       23
20     A14A                   22                       23
       A17                    36                       37
21     A17A                   36                       37

22

23

24

25