United States District Court
Eastern District of Kentucky
Southern Division at London

UNITED STATES OF AMERICA          )  London Criminal
                                  )  Action No. 09-16-S
  vs.                             )
                                  )  Frankfort, Kentucky
RUSSELL CLETUS MARICLE            )  February 18, 2010
DOUGLAS C. ADAMS                  )  8:45 a.m.
CHARLES WAYNE JONES               )
WILLIAM E. STIVERS                )
FREDDY W. THOMPSON                )
WILLIAM B. MORRIS                 )
DEBRA L. MORRIS                   )  VOLUME 9-A
STANLEY BOWLING                   )

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States: STEPHEN C. SMITH, ESQ.
                                JASON D. PARMAN, ESQ.

On behalf of the Defendant      DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:         MARTIN S. PINALES, ESQ.

On behalf of the Defendant      BENNETT E. BAYER, ESQ.
Douglas C. Adams:               R. KENT WESTBERRY, ESQ.
                                KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant      T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant      ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant      RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:             R. TUCKER RICHARDSON, III, ESQ.

On behalf of the Defendant      JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant      ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant      DANIEL A. SIMONS, ESQ.
Stanley Bowling:

```
 1   Appearances of Counsel:

 2   On behalf of the United States: STEPHEN C. SMITH, ESQ.
                                     JASON D. PARMAN, ESQ.
 3                                   Assistant U.S. Attorneys
                                     601 Meyers Baker Road
 4                                   Suite 200
                                     London, Kentucky  40741
 5

 6   On behalf of the Defendant     DAVID S. HOSKINS, ESQ.
     Russell Cletus Miracle:        107 East First Street
 7                                   Corbin, Kentucky  40701

 8                                   MARTIN S. PINALES, ESQ.
                                     150 East Fourth Street
 9                                   Federal Reserve Building
                                     Cincinnati, Ohio  45202
10

11   On Behalf of the Defendant     BENNETT E. BAYER, ESQ.
     Douglas C. Adams:              106 West Vine Street
12                                   Suite 800
                                     Lexington, Kentucky  40507
13
                                     R. KENT WESTBERRY, ESQ.
14                                   KRISTEN N. LOGAN, ESQ.
                                     220 West Main Street
15                                   Suite 1900
                                     Louisville, Kentucky  40202
16

17   On behalf of the Defendant     T. SCOTT WHITE, ESQ.
     Charles Wayne Jones:           133 West Short Street
18                                   Lexington, Kentucky  40507

19
20   On behalf of the Defendant     ROBERT L. ABELL, ESQ.
     William E. Stivers:            120 North Upper Street
                                     Lexington, Kentucky  40507
21

22   On behalf of the Defendant     RUSSELL JAMES BALDANI, ESQ.
     Freddy W. Thompson:            R. TUCKER RICHARDSON III, ESQ.
23                                   300 West Short Street
                                     Lexington, Kentucky  40507
24

25
```

```
 1   On behalf of the Defendant      JERRY W. GILBERT, ESQ.
     William B. Morris:              212 North Second Street
 2                                   Richmond, Kentucky   40475

 3
     On behalf of the Defendant      ELIZABETH SNOW HUGHES, ESQ.
 4   Debra L. Morris:                201 West Short Street
                                     Lexington, Kentucky   40507
 5

 6   On behalf of the Defendant      DANIEL A. SIMONS, ESQ.
     Stanley Bowling:                116 West Main Street
 7                                   Suite 2A
                                     Richmond, Kentucky   40475
 8

 9   Court Reporter:                 CYNTHIA A. OAKES, CRR
                                     Official Court Reporter
10                                   United States District Court
                                     560 Athens Boonesboro Road
11                                   Winchester, Kentucky   40391
                                     (859) 983-4346
12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by mechanical stenography,
25   transcript produced by computer.
```

1          (Whereupon, the following proceedings were had outside the

2    presence of the jury.)

3          THE COURT:  Let's see.  Before the jury is brought

4    in, I think one of the attorneys had an issue to take up, but

5    I'm not sure everyone is here yet.  Let's see, Mr. Pinales is

6    here on behalf of Mr. Maricle, he's here.  We don't have

7    counsel for Mr. Adams, and Mr. Adams isn't here.  Mr. White is

8    here.  Mr. Jones is present.  Mr. Abell and Mr. Stivers are

9    both present.  Mr. Gilbert is present.  But neither Mr. Baldani

10   nor Mr. Richardson are present.  Ms. Hughes and Mr. Simons are

11   present.  Mr. Bowling and the Morrises are both present.

12         All right.  Counsel, we will need to wait until all

13   the missing attorneys and parties arrive before we can take

14   this matter up.  So we'll be in recess until the tardy

15   attorneys and the parties arrive.

16         (Whereupon, a short recess was had, after which the

17   following proceedings were had outside the presence of the

18   jury.)

19         THE COURT:  All right.  The record will reflect the

20   parties and counsel are present at this time.  The jury is not

21   present.  I understand that one of the attorneys had an issue

22   to take up.

23         Mr. Smith.

24         MR. SMITH:  Yes, Your Honor.  I have reviewed our

25   exhibits that were introduced over the past couple of days,

5

1    which as the Court is aware, we tendered a hard copy to the

2    witness and introduced as our exhibits and then, of course,

3    used the Sanction's program to display the transcripts with the

4    redactions.  It was brought to my attention late yesterday that

5    these exhibits that were introduced were the actual unredacted

6    version.  So in doing an evaluation of those, I went back and

7    have identified portions which were redacted by this Court's

8    rulings and have a proposal for the Court.  Obviously, for the

9    record, none of the — it's my understanding that if there

10   were, there were a couple of bumps in the road and it was

11   identified by defense counsel and we rectified those during the

12   course of the testimony.

13          As we go forward with cross-examination, I would

14   propose that a redaction of the Court — or the actual exhibits

15   that have been introduced be performed before cross-

16   examination, which I am prepared to do that this morning.  I

17   think that can be accomplished quickly.

18          For counsel's benefit, I went and tagged — I made

19   copies of all the Court exhibits and I have identified the

20   redactions that we would obviously execute this morning, which

21   would mirror what was on the screen and what the jury — has

22   been published to the jury.  I don't know how counsel seeks or

23   proposes to cross-examine the witness, but if they want to use

24   the actual exhibit within that, it's unredacted at this moment.

25   I do feel confident that I can execute these redactions rather

6

1  quickly and it could be done a couple of ways.  One is we

2  could — we could do a supplemental exhibit for purposes of

3  examination, we could treat the previous exhibits as Court

4  exhibits and mark these as the actual exhibits if the Court

5  would allow.  But I'm obviously concerned and I know — I

6  wanted to bring that to everyone's attention that an unredacted

7  copy not get put in front of the jury.

8          THE COURT:  All right.

9          Mr. Hoskins?

10          MR. HOSKINS:  Your Honor, I know from all the time

11  that I put in working on these transcripts, it's very easy to

12  make mistakes and I'm not suggesting anybody has done anything

13  intentional, but I am concerned that it's so easy to make

14  mistakes.  We have looked at the transcripts that we want to

15  use in cross, and it won't be anything that will be a problem

16  with that.  So rather than trying to do that now, I would ask

17  that we have an opportunity to look at the proposed substitute

18  exhibits very closely before we put them in.

19          THE COURT:  All right.  If you're not planning to use

20  those — and, quite frankly, with respect to the exhibits that

21  have been marked as 14A — whatever is the transcript edition,

22  those have been admitted, but I don't know that I'm going to

23  allow those to go back to the jury, I haven't made a decision

24  on that yet.  The parties have been using these — the overhead

25  that does have the redactions with the couple of exceptions,

7

1  and we've corrected those in the course of the testimony.  But

2  if you're ready to go forward with the witness, then we can

3  take care of substituting or providing supplemental exhibits

4  and then when the time comes, I can make a determination as to

5  whether those should go back to the jury.  I think you know

6  what my practice is in terms of audiotapes, that if the jury

7  ultimately asks to hear something again, I would bring them

8  back out into the courtroom and play it.

9          So I haven't made any final decision on the

10  transcripts, but if you're not planning to use the hard copies

11  of the transcripts, then that will give the United States the

12  time that it needs to make any changes, substitutions,

13  corrections, and we can take that up at the appropriate time.

14          MR. HOSKINS:  Your Honor, I know Mr. Pinales intends

15  to use A14A and A17A if it's needed to refresh the recollection

16  of the witness.

17          THE COURT:  All right.

18          MR. HOSKINS:  But those two would be the only ones

19  that would come up in our cross of this witness.

20          THE COURT:  Do you know if that would include the

21  parts of those transcripts or the audios that have been

22  redacted pursuant to the Court's order on a motion in limine,

23  for example?

24          MR. HOSKINS:  Your Honor, I'm certain that the parts

25  that we would be emphasizing have been approved by the Court.

1      THE COURT:  All right.

2      Ms. Hughes?

3      MS. HUGHES:  Mr. Smith, the ones that you gave us

4  electronically that we got from Ms. Poynter, those are the

5  correct redacted versions; right?

6      MR. SMITH:  Yes.

7      MS. HUGHES:  So if Mr. Hoskins and Mr. Pinales are

8  planning on using our versions that we have rather than —

9  because we didn't get copies of what was tendered to the Court.

10 I think that everybody should be safe, because our versions are

11 redacted, and I'm certain you didn't ask the Clerk to make a

12 copy in order to do your cross-examination.

13     MR. SMITH:  I fail to understand why you didn't get a

14 copy of these, because we gave you a disk of all our exhibits

15 before trial.

16     MS. HUGHES:  Yes, you did.  And my point is that the

17 transcripts that we received are the redacted versions.  For

18 example, what we played at the end of the day had that one

19 sentence spoken by Mr. Maricle redacted in our transcript.

20     MR. ABELL:  Judge, what the —

21     THE COURT:  Yes, sir, Mr. Abell.

22     MR. ABELL:  The Court required the United States to

23 provide to me hard copies of the exhibits —

24     THE COURT:  Yes, sir.

25     MR. ABELL:  — and the transcripts I have in this

1   notebook appear to be, as Elizabeth says, the correct redacted
2   versions —

3          THE COURT:  All right.

4          MR. ABELL:  —— if that's helpful.

5          MR. WHITE:  Mr. Smith gave us a CD/R, and I think
6   that's what you were talking about.  Everything I've got on the
7   CD/R was what was up on the screen.

8          THE COURT:  All right.  Well ——

9          MR. WHITE:  And the transcript that I was going to
10  use, Your Honor, during my cross was the last one, it was A21,
11  the one with Wayne Jones, and it's clearly the redacted one.
12  I'm not using anything that wasn't.

13         THE COURT:  All right.  Well, it may be that it's
14  just the copy that was provided to the Clerk and perhaps my
15  copy that's the unredacted version, but Mr. Smith, I suppose,
16  can check and make sure that that's the case.  But if you're
17  not planning to use that unredacted version, then it won't be a
18  problem in terms of cross-examination.

19         MR. PINALES:  I will try to do it by questions and
20  not with the transcript and that may solve the problem for
21  today.

22         THE COURT:  All right.  If we do run into that
23  problem, if we need to stop, Mr. Smith, you could alert me and
24  then we'll take it up at that time, but ——

25         MR. PINALES:  Thank you.

1          MR. SMITH:  Yes, Your Honor.

2          THE COURT:  Any other issues we need to take up

3    before --

4          Mr. White?

5          MR. WHITE:  Your Honor, since we're all here and the

6    jury is out, I was curious if we could get an update on the

7    text messages.  Have you heard anything yet?

8          THE COURT:  Mr. Smith, any --

9          MR. SMITH:  We're expecting those today.

10         MR. WHITE:  Thank you, Your Honor.

11         THE COURT:  I'll check again at the end of the day

12   and see where we stand on that.

13         All right.  Are we ready to have the jury brought in

14   or do we have any other issues?

15         All right.  Please bring the jury in.

16      (Whereupon, the jury entered the courtroom, after which

17   the following proceedings were had in open court.)

18         THE COURT:  Thank you, and please be seated.  Good

19   morning, everyone.

20         The record will reflect that all members of the jury

21   are present.  All parties and counsel are also present.

22   Mr. White has returned to the witness stand, and he is still

23   under oath, of course.

24         Mr. Pinales, you were examining the witness, and you

25   may continue.

1          MR. PINALES:  Thank you, Your Honor.

2                       KENNON WHITE,

3    being previously duly sworn, was examined and testified further

4    as follows:

5                    CONTINUED CROSS-EXAMINATION

6    BY MR. PINALES:

7    Q    Good morning.

8    A    Good morning.

9    Q    Yesterday at the beginning of my examination of you, we

10   had an exhibit, which was D14.  It was the pink paper.

11   A    Uh-huh.

12   Q    And I asked you some questions about that, and you gave me

13   some answers?

14   A    Yes.

15   Q    Yesterday you said that you prepared that in 2002 when you

16   ran for jailer.

17   A    That's correct.

18   Q    You testified a few days earlier on your direct

19   examination of Mr. Smith; do you recall that?

20   A    I --

21   Q    You testified earlier before the snowstorms and all that?

22   A    Yes, sir.

23   Q    And on Monday, I believe, February the 8th, you testified

24   about Exhibit D14, the pink piece of paper; do you recall that?

25   A    Yes.

1  Q    And do you recall that you said that –– your Aunt Barbara

2  entered her first race sometime in the mid '90s?

3  A    Yes, sometime in the '90s.

4  Q    And that race was against Barbara House?

5  A    No, that race was against Stella House.

6  Q    Stella House, I'm sorry.  Barbara Colter and Stella House;

7  right?

8  A    Yes.

9  Q    Mid '90s.  And both of those candidates ran and there was

10 no incumbent, that was the first time each of them ran?

11 A    I think that's correct.

12 Q    And that was your entrance into politics, you testified to

13 that?

14 A    Uh–huh.

15 Q    And that you were involved in that race and sought advice

16 from people, including Cletus Maricle?

17 A    Yes, sir.

18 Q    And in seeking the advice in the mid '90s from Cletus

19 Maricle, you said that he, along with others, gave you names of

20 people to contact.  Do you recall that?

21 A    Back at –– I would like to see a transcript of that

22 testimony, if that would be okay.

23        MR. PINALES:  Your Honor, may I ask that this ––

24        THE COURT:  Yes, sir, you may.

25 BY MR. PINALES:

1  Q    I just happen to have one.

2  A    Yes, that's fine.

3  Q    And if you would look —— if I can direct your attention so

4  we don't waste a lot of time to page 23.  I don't want you to

5  read it out loud, but just look at it and familiarize yourself.

6  Tell me when you're ready.

7  A    Okay, I'm on page 23.

8  Q    And that is where you were saying that Aunt Barbara Colter

9  and Stella House were running and there was no incumbents in

10  the race.  Do you see that?

11  A    The page 23 and the page 23 you have may be two different

12  page 23s.  Let me look and see if I can find it.

13  Q    Well, you do remember that race?

14  A    Well, it's not the one that you're telling me that's on

15  this page.  I mean, it's ——

16  Q    But do you remember the race?

17  A    I remember the race my Aunt Barb and Stella House ran.

18  Q    And on page 34 of that transcript, you are talking about

19  your Aunt Barbara running for the first time.  Go through 34 to

20  yourself and then 35 to yourself.

21  A    Okay.

22  Q    You're familiar with what you've said?

23  A    I'm familiar with —— it's not the pages that you're

24  telling me that I'm to look at.  What you're telling, the

25  pages, it's not on there what you're telling me.  And, no, I've

1   not got to look at the exact testimony that I asked to see,

2   so — so it's 34, you could go down —

3   Q    Are they numbered?

4   A    Yes, sir, there's a page —

5   Q    You see a number in the left-hand corner?

6   A    It's not in the left-hand, it's in the right-hand corner.

7   Q    No, the lines, are they numbered?

8   A    Yes.

9   Q    Okay.  And you were talking about at the very top —

10  A    What page are we on now?

11  Q    On 34.

12  A    Okay.

13  Q    So we're all on the same page.

14  A    Yeah, I'm on that page.

15  Q    Let's make sure we're on the same page.

16  A    I'm on that page.

17  Q    You were asked this question — you were asked a question

18  and you gave — on 33, you were asked the question, "When was

19  this race that you are referring to that you were involved with

20  Jennings White on with your aunt's race?"  And then on page 34,

21  at the top of the page, you gave an answer.

22  A    Okay.  What line are you referring to, sir?

23  Q    Line one, answer, "It was the first time she ran for state

24  representative."  Do you see that line?  Are we on the same

25  page?

KENNON WHITE – CONTINUED CROSS – MR. PINALES          15

```
 1  A    Okay.  I'm on page 34.  Line one says, "Me, there's where
 2  the call come from and we had to shut down."  That's what I've
 3  got on page 34 that you're —
 4        MR. PINALES:  May we have this transcript handed,
 5  Your Honor?
 6        THE COURT:  Yes, provide him with the transcript.
 7  BY MR. PINALES:
 8  Q    Mr. White, I apologize —
 9  A    I apologize to you for —
10  Q    — I don't want to confuse you.  And, again, if I ask you
11  any question at all that you don't understand, just give me a
12  holler.
13  A    Okay, I see what you were looking at now.
14  Q    Okay.  I'm looking at what you were looking at, and,
15  again, I'm looking at page 34 at the very top of the page, line
16  one.
17  A    Okay.  They must have been two page 34s in there, because
18  I was looking at page 34 and if they are at the main top, I
19  don't —
20  Q    Okay.  I'm only looking at one.  But regardless, let's
21  make sure we're looking at the same page.
22  A    Okay.  It says, "It was the first time she ran for
23  state representative."
24  Q    And when was that, mid '90s, I believe you testified; is
25  that correct?
```

1  A    Somewhere during the '90s.

2  Q    And then during the course of your examination a couple,

3  you know, days ago, you were asked questions by Mr. Smith.

4  A    Uh-huh.

5  Q    And handed Exhibit D14.  Do you recall that?

6  A    Uh-huh.

7  Q    And you said — you were asked about D14 and asked what it

8  was.

9  A    Uh-huh.

10 Q    Do you recall saying that, "this is a list that I made

11 when my aunt ran for the first time to help her out."  Do you

12 recall that?

13 A    No, I do not.  What line is that?

14 Q    Well, would you turn to page 35?

15 A    Uh-huh.

16 Q    Read over 35.

17 A    Okay.  What line are you at?

18 Q    Well —

19 A    I would say No. 20, but that's a compiled list.

20 Q    Yeah, that's line 20, and that's what D14 was, a compiled

21 list of people that helped out in those precincts; right?

22 A    It's not a compiled list of people that — it's people

23 that would help out in those precincts to help purchase votes

24 and help you in those precincts, that's correct, that's what

25 that list is.

1  Q    Like it says, all fire departments, do you remember -- do

2  you see that on line 24?

3  A    Yes, sir.

4        MR. PINALES:  Could the witness be handed D14, the

5  pink paper?

6  BY MR. PINALES:

7  Q    That's the list; right?

8  A    Yes.

9  Q    And what does it say at the very top?

10  A    All fire departments.  Well, actually, it's all fire

11  departments abbreviated, departments is.

12  Q    And you were talking about your aunt's first race, were

13  you not?  This whole line of questions and the whole line of

14  answers were about your aunt's first race; isn't that true?

15  A    It appears that that's correct.

16  Q    And you're talking about Exhibit D14, the pink paper?

17  A    Just one moment.

18  Q    Take your time.

19  A    Okay.

20  Q    And on 36, you're talking about where you got the names

21  from, and you said on line five, "I got them from Cletus

22  Maricle, got them from Kenny Day, got them from numerous

23  different people, Stanley Bowling."  Do you see that?

24  A    Uh-huh, yes.

25  Q    And you're talking about D14, the pink paper?

1  A    They — okay.  They were more than one list that that —

2  and I could have got confused on which list, but he helped me

3  compile every list that was made that I did.

4  Q    But you had D14 in front of you?

5  A    Okay.  That's — I acknowledge that.  If I made a mistake,

6  I'm sorry.

7  Q    Okay.  Let's go on.  You started your working career

8  working at White Chevrolet?

9  A    That's correct.

10 Q    And you worked in various positions in White Chevrolet;

11 right?

12 A    Yes, I worked in different positions.

13 Q    Parts?

14 A    Yes, and washing cars.

15 Q    Washing cars?

16 A    Sales.

17 Q    And sales.

18 A    Uh-huh.

19 Q    And, again, White Chevrolet was owned at that time by your

20 Uncle Jack —

21 A    Yes.

22 Q    Then you started your own business and went to White

23 Mobile Homes?

24 A    Yes, I started a — started a, yeah, mobile home business.

25 Q    White Mobile Homes; is that correct?

1  A    Yes.  Uh-huh.

2  Q    And you did that in London, Kentucky?

3  A    Uh-huh.

4  Q    And you did that starting in about, what, the mid '90s?

5  A    Yes, that would have been close to that.

6  Q    Did it for about ten years?

7  A    That's — that's close.

8  Q    And I believe you testified on direct examination that

9  that did not work out?

10 A    In the end, it ended up closing.

11 Q    And it not only ended up closing, your daddy had to come

12 in and pay off the floor plan and get you out of there?

13 A    The business lost money, and, yes, they was — they was

14 money — he actually took over partial ownership, and he did

15 end up having to put money in that business, as well as White

16 Chevrolet.

17 Q    So then it lasted about ten years?

18 A    Uh-huh.

19 Q    All right.  And then you moved back home, working again in

20 Manchester?

21 A    Yes.

22 Q    And this time your daddy, after you were bailed out of

23 White Motors, gave you a job?

24 A    After I was bailed out of White Motors?

25 Q    Yes, gave you a job in the City of Manchester?

1   A    No, that's not correct.  The bailed out part, he was part

2   owner in that business; okay?  And what had happened was, is

3   the business was in trouble, it did lose money, as well as a

4   lot of other businesses, and — to do with manufactured

5   housing, it was like a 30- or 40-year low, but, no, it wasn't

6   White Motors that he bailed me out of, sir.  You said White

7   Motors.

8   Q    White Mobile Homes?

9   A    Yes, White Mobile Homes, he was a partner with me in White

10  Mobile Homes.

11  Q    Okay.  My point is, you came back to the City of

12  Manchester?

13  A    Yes.  Now, that's correct.

14  Q    And my point is he gave you a job?

15  A    Yes.

16  Q    He created a job that didn't exist before?

17  A    Uh-huh.

18  Q    And didn't exist afterward?

19  A    That's correct.

20  Q    And that job was with the City of Manchester?

21  A    Yes.

22  Q    And you were — what was the title?

23  A    The title was City Supervisor, City Manager.  Actually,

24  there was — I acted in that capacity, they was never an

25  official title created.

1  Q    What was your official title?

2  A    There was never an official title created.  I worked under

3  the responsibilities of reporting back to him and the

4  management.

5  Q    So you worked as a City supervisor, even though you

6  weren't — that name wasn't on the door?

7  A    That's right.

8  Q    Okay.

9  A    Or the name was not — it was not official.

10 Q    Okay.  But you officially got paid?

11 A    That's right.

12 Q    And you officially got paid, you were the highest paid

13 employee in the City of Manchester?

14 A    That's not correct.

15 Q    Well, let's put it this way.  You made $48,000 a year?

16 A    Thereabouts.

17 Q    Thereabouts.  And your daddy was mayor?

18 A    That's correct.

19 Q    And the mayor didn't get a salary even?

20 A    No, he did not.

21 Q    And city council was there?

22 A    Uh-huh.

23 Q    And they didn't get a salary either?

24 A    No.

25 Q    And you testified yesterday or — I believe it was

1  yesterday, it might have been sometime back, that you were

2  going to run for city council?

3  A     At one time, yes, sir.

4  Q     And this was right at the time you started your job?

5  A     It was -- actually, I had filed before I got my job.

6  Q     And your aunt was running?

7  A     That's correct.

8  Q     And you withdrew your name because you didn't want to

9  interfere with your aunt's race, that's what you testified to?

10 A     Yes, and also because of where I was employed at the City,

11 I could not hold that and --

12 Q     So you decided that you would take the job at

13 approximately $48,000 a year?

14 A     I took the job.

15 Q     And your wife was working, Wanda was working?

16 A     She went to work sometime after that.

17 Q     For the City of Manchester?

18 A     Yes, she did.

19 Q     As assistant to your daddy, assistant to the mayor?

20 A     She was not assistant to the mayor.

21 Q     What was she?

22 A     She worked in the police department for a while and then

23 she worked in the water department for a while.

24 Q     Okay.  Appointed by the mayor?

25 A     She was hired by the mayor.

1  Q    Okay.  And you kept that job until Carmen Lewis was

2  elected?

3  A    Yes, that's correct.

4  Q    And when Carmen Lewis was elected, she went back to the

5  way things were before you were ever hired and there was no

6  position?

7  A    They changed quite a few things after she went in that

8  were —

9  Q    I'm talking about your job.

10  A    That's right.  I wasn't — I wasn't there anymore.

11  Q    And your wife wasn't there anymore?

12  A    She worked for a few months after Carmen took office.

13  Q    And she was replaced?

14  A    And she was laid off.

15  Q    And there was a clean — there was a cleaning of the house

16  when Carmen Lewis came in?

17  A    I — I don't know.

18  Q    A lot of people lost their jobs?

19  A    I really don't know.

20  Q    Well, you lost yours?

21  A    I lost mine.

22  Q    Your wife lost hers?

23  A    She was laid off, that's correct.

24  Q    Judge Maricle's grandson, who was a co-op student, he lost

25  his?

1  A    According to what was said on that tape, he was the one

2  that told me that.

3  Q    And a lot of people were laid off?

4  A    Yeah.

5  Q    And you collected unemployment?

6  A    Yes.

7  Q    And your wife collected unemployment?

8  A    Yes.

9  Q    And according to the tapes we heard, the problem was that

10  you had unemployment but you didn't have health insurance;

11  correct?

12  A    I didn't have health insurance, that's correct.

13  Q    And so that's why your wife was looking for a job; right?

14  We talked about the jobs.  Do you remember that?

15  A    Yes, I remember that, sir.

16  Q    Okay.  Your wife is a beautician?

17  A    Yes.

18  Q    And you talked with Cletus Maricle about the possibility

19  of her coming back as a beautician; right?

20  A    I don't remember that.

21  Q    You don't remember that?

22  A    I don't remember that particular conversation.

23  Q    Okay.

24  A    I will say this:  Cletus Maricle promised her a job for

25  the help that she provided down there for his son-in-law.

1  Q    You talked with Cletus Maricle and his wife about a job

2  perhaps with the state and going to Frankfort and taking a

3  test; did you not?

4  A    I don't — I don't recall.

5  Q    You don't recall that either?

6  A    I don't — well, I don't understand what you're — I mean,

7  what are you saying?  I mean, I don't know what you're talking

8  about, what you're referring to at the time.  You're going from

9  one place to another trying to —

10 Q    I'm talking about jobs for your wife.

11 A    Okay.

12 Q    Are we on the same subject?

13 A    Well, I guess so.

14 Q    Okay.  I had asked you whether or not there was ever any

15 conversation with Cletus Maricle and his family about being a

16 beautician, and you said you don't recall that?

17 A    They knew she was a beautician, she did all their hair

18 free.

19 Q    I understand that.  That's not my question.  My question

20 is:  Did you talk about her possibly going back and getting a

21 job with the Maricles as a beautician?

22 A    When you say with the Maricles as a beautician, what — I

23 mean —

24 Q    Your wife is a beautician?

25 A    Yes, she is.  Are you saying Cletus Maricle was wanting to

1  open a beauty shop; is that what you're saying?

2  Q    No, I'm saying there were conversations, were there not,

3  about jobs, pleural?

4  A    Yes, there was conversations about jobs, they were on that

5  tape.

6  Q    And there were conversations not on that tape, I'm saying.

7  And my question is:  Did you talk about jobs and different

8  jobs?  Yes or no?  Simple question.

9  A    Talked about — talked about different jobs, I'm sure,

10  over the period of time that we talked.

11  Q    Sure.

12  A    But he was talking about the drug court job, was the one

13  that he talked about.

14  Q    And one of the jobs that was talked about was being a

15  beautician again, because she wanted to get back to work; isn't

16  that right?

17  A    That could have been mentioned, yes.

18  Q    And one of the jobs that was discussed with Cletus Maricle

19  was going to Frankfort and taking a test for a state job; isn't

20  that correct?

21  A    I don't recall that part, I'm sorry.

22  Q    And one of the jobs that was talked about with Cletus

23  Maricle and his family, his wife, was going back to school and

24  getting a real estate license.  Do you recall that?  There was

25  a lot of talk about that, wasn't there?

1  A     She had actually –– had went to real estate school many

2  years back and was going to go to work for Judy, and then she

3  ended up not doing it.

4  Q     My question, though, is:  Was there talk when she was

5  unemployed about going back to real estate?

6  A     That's a possibility.

7  Q     And there was talk about drug court?

8  A     There were ––

9  Q     Yes or no?  It's a simple question.

10  A     Okay.  The situation is, is you're wanting to talk about

11  other jobs when the facts is, is that he did promise her a job

12  in drug court for the help provided down there in the election.

13  Q     I understand that.

14  A     Okay.

15  Q     And your comment is appreciated, but that's not my

16  question.

17  A     Okay.

18  Q     And if you don't understand my question, just tell me and

19  I'll rephrase it.

20        In one of the tapes –– And you said you have gone over

21  them several times and were very familiar with them?

22  A     I went over them several times.

23  Q     You talked about Cletus Maricle being over drug court;

24  right?  He was in charge of drug court?

25  A     Yeah, he was the Judge.

1  Q    He was the Judge.  And the Judge sentences people to drug

2  court; right?

3  A    I think that's the way it works, yes, sir.

4  Q    And the Judge talked in the tapes about that there has to

5  be certain numbers of people in drug court for a job to be

6  created?

7  A    That's right, that was what we were waiting on.

8  Q    And you were waiting on the number to hit an additional, I

9  believe you said, 30?

10  A    I don't remember the amount.  It's whatever he said it

11  was.

12  Q    Okay.  He sentences people to drug court; right?

13  A    That's right.

14  Q    And he could have sentenced people at any time, any

15  number, to drug court?

16  A    If I recall in the tape, what he said is they wasn't

17  arresting or they wasn't getting enough at the time.

18  Q    Well, in one of the tapes you even discussed that there

19  was a raid where 51 people were arrested on a sealed indictment

20  by this Drug Task Force.

21  A    But they had not had a chance to plead guilty or to be

22  sentenced to drug court at that time.

23  Q    And I think in that tape you talked about that

24  Judge Maricle was kind of concerned about those 51 people.  You

25  said he was a little agitated; do you recall that?

1  A    I don't remember me saying that.  It could have been said.

2  Q    Okay.  But you went over the tapes and —

3  A    I went over the tapes, that's correct.  They's a whole lot

4  of those tapes there, there's some things that I may have to

5  have — to look at to see exactly what was said.  It's hard,

6  you know, to know every single exact word.

7  Q    Okay.  You ran for jailer?

8  A    Yes, sir.

9  Q    And you know that there is a Clay County jail?

10  A    Yes.

11  Q    And you know that Clay County jail holds about, what, 180

12  people?

13  A    If I recall, it's somewhere over 150, I think.

14  Q    And you know that there were even more than what it holds

15  in the jail, like about over 200?

16  A    I didn't know that.

17  Q    You didn't know that?

18  A    No.

19  Q    Okay.  Well, would it be fair that Judge Maricle, when you

20  said he was concerned about that, that he was concerned that

21  there was no place to house them?  Would that be your

22  impression?

23  A    I don't know that that would be a concern.  I wouldn't

24  think that would be an impression that I would have had with

25  it.

1            MR. SMITH:  Your Honor, I'm going to object to the

2    relevance and also hearsay.

3            THE COURT:  I'll sustain.

4            MR. PINALES:  I'll withdraw.

5    BY MR. PINALES:

6    Q    You mentioned just a few minutes ago Cletus Maricle's

7    son-in-law.

8    A    Yes, sir.

9    Q    Mr. Mobley?

10   A    Uh-huh.

11   Q    He ran for PVA?

12   A    Yes.

13   Q    There was a primary?

14   A    Yes.

15   Q    It was a primary -- a Republican primary?

16   A    Yes.

17   Q    Cletus Maricle can't even vote in that, can he?  He's a

18   Democrat; right?

19   A    He's a Democrat, I presume that's correct.

20   Q    And then there was the general election?

21   A    That's correct.

22   Q    And Mr. Mobley had no competition, there was no candidate

23   on the other side; is that correct?

24   A    To my knowledge.

25   Q    He ran unopposed?

1   A    That's correct.

2   Q    In your testimony with Mr. Smith, we talked about the

3   Downey case.  Do you recall that?

4   A    That's correct.

5   Q    And the Downey boy you said you asked — you were asked by

6   John Downey?

7   A    I was asked by Raleigh Downey, which is John's brother.

8   Q    Okay, John's brother.

9   A    Uh-huh.

10  Q    Raleigh then asked you to talk to Cletus Maricle?

11  A    Yes.

12  Q    And Cletus Maricle –– The position that you were in at

13  that point was John was in jail?

14  A    That's correct.

15  Q    And John didn't want to be in jail?

16  A    That's right.

17  Q    And Raleigh wanted him out?

18  A    That's right.

19  Q    And you said you talked to Cletus and you got him out?

20  A    That is correct.

21  Q    And Cletus actually let him out?

22  A    They actually let him out and set his sentencing until

23  after the election date to make sure that he did what he did to

24  hang it over his head.

25  Q    Okay.  And Cletus Maricle did that?

1   A    Yes, sir.

2   Q    Okay.  In tape A3A —— A3 and then the transcript A3A, and

3   I just want to ask you some questions about that and to set the

4   right context.  That was where you talked about Anthony Short

5   was your brother-in-law's lawyer.  Do you recall that?

6   A    Yes.

7   Q    Anthony Short is a lawyer; right?

8   A    Yes.

9   Q    Anthony Short was a lawyer representing your brother-in-

10  law?

11  A    That is correct.

12  Q    Anthony Short was a lawyer selected by the Price family?

13  A    Yes.

14  Q    Actually Anthony Short was a friend of yours?

15  A    Yes.

16  Q    And Gary Gregory was the —— was who?

17  A    He was the prosecutor on the case.

18  Q    And the prosecutor on the case —— just so we're talking

19  about the right person, the prosecutor on your brother-in-law,

20  Kenny Price's, case?

21  A    Not Kenny Price.

22  Q    I'm sorry.

23  A    Eugene Price.

24  Q    Eugene Price.  And Eugene, nicknamed Corky?

25  A    That's correct.

1  Q    And Corky Price had made a deal with Gary Gregory?

2  A    To my knowledge.

3  Q    And that deal was for a very light sentence?

4  A    That deal was to testify for a lighter sentence in his

5  participation in a criminal act.

6  Q    And, in fact, it was to be probated, to be given

7  probation?

8  A    That was talked about.  However, I was not in on all the

9  negotiations of what went on.  I do not know all the specifics.

10 Q    And there was an information?

11 A    That's correct.

12 Q    And that information was the formal charge against Corky?

13 A    That's correct.

14 Q    And it came before Judge Cletus Maricle?

15 A    Yes, it did.

16 Q    And the prosecutor, Gary, asked for a very low bond?

17 A    I don't remember exactly what he asked for, but it was

18 a — it was some type of leniency.

19 Q    And he went into court, he, Corky, and pled guilty to the

20 information?

21 A    That's correct.

22 Q    And Judge Maricle gave him no bond?

23 A    The thing about it is, Judge Maricle wanted him to testify

24 falsely to the fact that there was a lady give him a thousand

25 dollars or a thousand dollars worth of OCs, and he did not do

1  that when it came time, and that was the reason that that

2  happened like that.

3  Q    So you're saying that Judge Maricle put him in jail?

4  A    Yes, Judge Maricle put him in jail because he wouldn't

5  testify to the exact thing that he wanted him to testify to.

6  Q    And when Judge Maricle had that court session, they

7  said — Were you in court that day?

8  A    Yes, I was in court part — yeah, I think so.

9  Q    And the state's attorney, the prosecutor, gave a statement

10 of facts in open court, he read a statement of facts?

11 A    He made some kind of statement.  I don't know what you're

12 referring to, "statement of facts" there, you know.

13 Q    And when Judge Maricle heard it, he put no bond on your

14 brother?

15       MR. SMITH:  Your Honor, I'm going to object as to

16 hearsay.

17       THE COURT:  Sustained.  That's outside the scope of

18 this witness's knowledge.

19 BY MR. PINALES:

20 Q    On tape A8 and A8A, that was the tape where Judge Maricle

21 was very concerned about his daughter.  Do you recall that?

22 A    I would have to look at it, but I remember talking about

23 that on those tapes.

24 Q    And I believe you said Judge Maricle was sort of

25 whispering because that's the way he was.  Do you recall that?

1   A    He does that in certain situations, yes.

2   Q    Well, he did it on A8.  Do you recall that?

3   A    Yeah, he wasn't wanting his wife to hear what he was

4   saying.

5   Q    And he was distraught, he was upset, he was really hurting

6   over his daughter's problems, was he not?

7   A    I think he was changing the subject at that time so that

8   he would not continue to talk because he was feeling

9   uncomfortable about what we was talking about.

10  Q    He was distraught, and it's apparent in that tape, about

11  his daughter, wasn't he?

12          MR. SMITH:  Your Honor, I'm going to object.  He's

13  asked and answered the question already.

14          THE COURT:  Sustained.

15  BY MR. PINALES:

16  Q    Your wife had a lawyer when she went to the grand jury?

17  A    Yes.

18  Q    You told that to Cletus Maricle?

19  A    Yes.

20  Q    You went to his house wired with a recording device?

21  A    Yes.

22  Q    You were trying, because you met with the FBI, you said,

23  to get him to make certain statements?

24  A    I was engaged in a conversation about the grand jury.

25  Q    And you were engaged in topics that were given to you by

1    the FBI?

2    A    Yes.

3    Q    The lawyer she had was Brent Caldwell?

4    A    That's correct.

5    Q    And you keep asking what should she do.  Do you recall

6    that?  About the grand jury.

7    A    Yes, that's correct.

8    Q    And you recall Judge Maricle — And we listened to it.  Do

9    you recall him saying, "You listen to what your lawyer tells

10   you on that, because I'm not the man to answer that question."

11   Do you recall that?

12   A    Yeah, but he made other statements that conflicts with

13   that.

14   Q    I'm just asking if you recall that statement.

15   A    Okay.  I —

16   Q    I know you want to answer —

17           MR. SMITH:  Your Honor, I'm going to object to

18   counsel arguing with the witness.  I think he's attempting to

19   answer.

20           THE COURT:  All right.  Counsel, let me —

21           MR. PINALES:  I'm sorry, I apologize.

22           THE COURT:  Let me instruct the witness; okay?

23           MR. PINALES:  Okay.

24           THE COURT:  Mr. White, if you can answer his question

25   yes or no, then you should do that.  If you need to explain

 1  your answer, then you're entitled to do that as well.

 2          THE WITNESS:  All right.  Thank you, Your Honor.

 3          MR. PINALES:  Thank you, Judge.  I appreciate that.

 4          THE COURT:  Yes, sir.

 5  BY MR. PINALES:

 6  Q    My question was, to put it in the right context, you were

 7  there to get Judge Maricle to make statements about your wife

 8  testifying before the grand jury; is that correct?

 9  A    Yes.

10  Q    And you were wired to record those statements?

11  A    That is correct.

12  Q    And you are asking and talking to Judge Maricle and you

13  say, "Can they compel her to testify?"  Do you recall that?

14  A    I don't know the exact context, but something like that,

15  yes, sir.

16          MR. PINALES:  Okay.  Your Honor, may I use the

17  overhead?

18          THE COURT:  Yes, you may.

19          MR. PINALES:  Thank you.

20          MR. SMITH:  Can we have a reference to the page?

21          MR. PINALES:  Yes, A14A, page nine.

22  BY MR. PINALES:

23  Q    Just look at the top of the page.  And for the purposes of

24  the record, I'm showing you A14A, page nine; okay?  Do you see

25  "Can they compel her to testify?"  Do you see that part that I

1   just made yellow?

2   A     Uh-huh.

3   Q     Okay.  And then underneath it, do you see, "You listen" —

4   A     I can't see because the yellow line is covering it up,

5   sir.

6   Q     Yellow line is gone.  Do you see where it says, "Maricle"

7   right under that?

8   A     Uh-huh.

9   Q     And he says, "You listen to what your lawyer tells you on

10  that, because I'm not the man to answer that question."  Do you

11  see that?

12  A     Uh-huh.

13  Q     And we heard that in court the other day.  Do you recall

14  that?

15  A     Yeah.

16  Q     And the prosecutor, Mr. Smith, played the tape when we

17  heard that, we all heard it together.

18  A     (Witness nodding head affirmatively.)

19  Q     And it was on the screen highlighted in yellow, and then

20  afterwards he was asking you certain questions, and I think one

21  of the questions that he was asking, "Do you have an impression

22  of what that meant to you?"  What was the meaning to you of

23  that line?

24  A     I don't think that that question was asked.  I could be —

25  Q     No, not of that, but that was the question throughout the

1   direct examination.

2   A    Yes, I —

3   Q    I'm asking that same question where Cletus Maricle says,

4   "You listen to what your lawyer tells you."  What did that mean

5   to you?

6   A    I'll tell you what that means — what I think that meant

7   to me.  I think that he was torn up because he knew she was

8   going to the grand jury and he was worried about getting an

9   obstruction of justice charge.

10  Q    And she had a lawyer, Brent Caldwell; right?

11  A    Uh-huh.

12  Q    That was a lawyer she picked; right?

13  A    Yes.

14  Q    And that's a lawyer she hired?

15  A    Yes.

16  Q    And she hired that lawyer to give her advice?

17  A    Of course.

18  Q    And to represent her in the grand jury?

19  A    Yeah, I mean, she hired — she hired Brent Caldwell as an

20  attorney.

21  Q    And he says, "You listen to what your lawyer tells you";

22  right?

23  A    That's what — yeah, I mean, I'm not disputing that he

24  said that there.  I mean —

25  Q    Okay.  In transcript A17A, that was a conversation

1  recorded May 14, 2007.  And it's with you, your wife, Wanda,

2  and Cletus Maricle.  And they're talking, again, about going

3  down to the grand jury; right?

4  A    Uh-huh.

5  Q    And you were complaining about the FBI agent; right?

6  A    I don't know the exact context of what he's talking about

7  now.  I'd have to —

8  Q    Page ten.  And before we get to that, would you look

9  around the courtroom, is Mr. Caldwell in the courtroom?

10            MR. SMITH:  Your Honor, I'm going to object.

11            THE COURT:  Sustained.

12 BY MR. PINALES:

13 Q    To put it in the right context, in this portion, you're

14 talking about your wife's testimony and you're talking about

15 the agents; right?

16 A    Yeah, I'm talking about that.

17 Q    And you see the first part on the left where it says —

18            MR. SMITH:  Your Honor, I'm going to object and I'm

19 going to ask that we approach at this time.

20            THE COURT:  All right.  Come on up.

21     (Whereupon, the following discussion was had between the

22 Court and counsel at the bench, out of the hearing of the

23 jury.)

24            MR. SMITH:  Your Honor, counsel, first of all, is

25 trying to impeach a witness in front of the jury before he's

1  given him a chance to answer the question.  He's not examined

2  him and requested an answer, he's simply placing these

3  transcripts in front of him, and I believe that that's an

4  inappropriate way to attempt to impeach a witness, is to throw

5  the witness statement out there in front of him, and I think

6  you first have to ask the question, and if the question that he

7  seeks — the answer he seeks is inconsistent with the

8  statement, then he can impeach him with the statement.  It

9  seems we have that reversed here.

10        MR. PINALES:  Your Honor, I agree with Mr. Smith if I

11 was trying to impeach the witness.  I'm not.  I'm asking the

12 witness what his impression was when that statement was made,

13 the same question that Mr. Smith asked.

14        THE COURT:  Okay.  Well, I guess there are two

15 issues.  One is this would be akin to refreshing his

16 recollection, do you remember when this was discussed either on

17 the tape or in direct examination, and to do that, you have to

18 show him a statement or refer to the statement, and if he says

19 he doesn't remember the statement, then you can show it to him,

20 let him review it, and then you can ask him if he remembers

21 that being said, and then what his impression was of that.

22        MR. PINALES:  Okay.

23        THE COURT:  In terms of impeachment, of course, and I

24 think you have followed this, but the way you impeach a witness

25 with a prior inconsistent statement is to ask the question.  If

1  he gives an inconsistent answer, show him the document, refer

2  to it, let him read it, and then ask him the question.  The

3  proper way I think to do it is as you did, ask him if he

4  remembers the conversation about the FBI.  If you were

5  refreshing his recollection, refer him it, let him see it, and

6  then ask him a question about it, and if you need to ask him

7  what his impression was of that, that's fine.

8         MR. PINALES:  And then I leave it.

9         THE COURT:  It's also opening up and it's making some

10 of the statements that were admitted for limited purposes

11 admitted for other reasons, and that's why I was hesitant

12 yesterday to give Ms. Hughes an answer on her request to

13 further limiting language to the instruction, because at this

14 point, his testimony and his statements are relevant for other

15 reasons, and so let's try to follow that procedure if we can.

16        MR. PINALES:  I will.  And then I'm going to get off

17 of this —

18        MR. RICHARDSON:  If I can, because I'm planning on

19 doing this with my cross-examination.  We are at a disadvantage

20 here, because when the prosecutor played these statements to

21 the jury, they got to read them and highlight them and then

22 went back and questioned.  Now, I don't have the ability to do

23 that and I think that puts me at a disadvantage, because they

24 don't know what context we're coming at it from.  So I think I

25 need to be able to pull these out there.  They're the

1    transcripts, and say, who was there, is this what you're

2    talking about, and this is where we're leading to and point out

3    that answer.  I didn't have the ability to do that as Mr. Smith

4    had, and I got to put it in context.  So I want to use these,

5    exactly what Mr. Pinales is doing, and I think I should be able

6    to.

7            THE COURT:  Well, number one, you do have the audio

8    recordings and you can go back and play these over again if you

9    want to.  Number two, you can use these transcripts, the ones

10   that don't have the redacted —— that are proper.

11           MR. RICHARDSON:  Yes, sir.

12           THE COURT:  But I will warn you when you do that,

13   you're giving a lot of emphasis to transcripts that are used as

14   an aid to understand what the audios are, and I'm going to be

15   more inclined to admit these transcripts at the end of the

16   case.  And just so everyone knows, the more that you use these

17   transcripts, then that's likely what's going to happen.  So you

18   can use the transcripts, you can refresh his memory with

19   transcripts, you can play the same audio portions that

20   Mr. Smith did and you ask him the same questions because he has

21   made those available to you.

22           MR. RICHARDSON:  See, I don't really have the

23   ability —— I mean, I'm not technically advanced enough to go

24   back ——

25           THE COURT:  Well, that's a different issue.

1            MR. RICHARDSON:  Yeah, it is, Judge.  And I'm going

2     to take all day with my cross if that's the way the Court wants

3     us to do it.

4            THE COURT:  I'm not telling you how to do it, but I

5     am disagreeing with you that you don't have the same ability

6     that Mr. Smith does to do that.  You may have your own personal

7     limitations, but you can engage in the same type of examination

8     that Mr. Smith engages in if you choose to do so.  Any other

9     issues?

10           MS. HUGHES:  Just with respect to that, is this going

11    to be treated on a transcript by a transcript basis?

12           THE COURT:  Probably not.

13           MS. HUGHES:  Okay.  So how other people deal with

14    their transcripts would affect what happens to transcripts

15    in —

16           THE COURT:  It could very well do that.

17           MR. PINALES:  I'm planning on taking that down right

18    now, Your Honor.

19           MR. WHITE:  Thank you, Mr. Pinales.

20           THE COURT:  But you do understand what I was saying

21    earlier about the more references that are made and statements

22    that are — when this witness is asked about particular

23    statements, it's more than just putting it into context.

24           MS. HUGHES:  Judge, I do understand, I've been trying

25    to do a little research on that, so before the Court ultimately

1  decides, I would like to have a discussion about that outside

2  the presence of the jury, but I don't have the answer yet.

3         THE COURT:  Well, I just want to alert everyone of

4  the consequences of actions.

5         Mr. White, did you have an issue?

6         MR. WHITE:  I had an issue, Your Honor, but to be

7  honest with you, I think you've answered it.  I want to think

8  about it, I may need to come up before my cross.

9         THE COURT:  We may have another break before we get

10 to your cross.

11        MR. PINALES:  I will be finished probably before the

12 break and pass the witness.

13        THE COURT:  Thank you.  That will be fine.

14     (Whereupon, the following proceedings continued in open

15 court.)

16        MR. PINALES:  Could I ask A17A be given to the

17 witness and have it before him?

18 BY MR. PINALES:

19 Q    Mr. White —

20 A    Uh-huh.

21 Q    — when A17A was first shown to you, it was shown to you

22 with A17, which was the audio disk.  Do you recall that?

23 A    Uh-huh.

24 Q    And when A17A was shown to you, you were asked whether or

25 not it — you studied it and had an opportunity to go over it.

1  Do you recall that?

2  A    Yes.

3  Q    And do you recall in A17A you said you had and it was

4  identical to the disk?

5  A    I said it was an accurate —

6  Q    Accurate portrayal; correct?

7  A    Uh-huh.

8  Q    And do you recall that being played to the jury?

9  A    Yes.

10 Q    And I asked whether you recalled during the course of that

11 conversation whether or not Cletus Maricle, who was a party to

12 that conversation, said you have to tell the truth.  Do you

13 recall that being said?

14 A    It's possible that that was said.  I don't recall exactly.

15 I can go through it and look and verify it.

16 Q    Well, can I send you to page ten?

17 A    Okay.  Uh-huh.

18 Q    Just refresh your memory.  Right at the top.

19 A    Yes.

20 Q    Okay.  Is your memory refreshed now?

21 A    Yeah.  I mean, I'm to where that you're at and what you're

22 talking about.

23 Q    Okay.  And isn't it a fact that Judge Maricle said, "You

24 have to tell the truth"?

25 A    Yes, he says that there.

1  Q    What's your impression of what he meant by that?

2  A    What my impression by what he meant by that is that he

3  says things to cover hisself — Can I explain my answer?  May I

4  explain my answer?

5  Q    Sure.

6  A    He says things, he's a lawyer, he's a judge, he knows

7  words that will get him in trouble.  He sometimes becomes

8  paranoid, and sometimes he says things that are like that.

9  But, I mean, if — I mean, it doesn't change the fact that he

10 said that this time and says something different later.

11 Q    So are you saying to this jury that when Mr. Smith was

12 asking you your impression, sometimes he meant what he said and

13 sometimes he meant something else that he wasn't saying; is

14 that what you're saying to this jury?

15 A    No, what I'm saying to this jury is that he is very

16 careful about the way he words things because he's worried

17 about getting into trouble, he's worried — numerous times he's

18 told me, you know, he has to be careful how he says things,

19 that he's worried about being recorded, he's worried about bugs

20 in his home.  I mean, he has patted me down a time or two, my

21 wife down, other people.  I mean, every time you walk in, I

22 mean, he will rub his hand up and down your back.  I mean, he's

23 very cautious about that kind of thing.  And sometimes he will

24 talk and he will say things in a certain situation that you're

25 in to where he feels that it's the minimal that you would be —

1  you know, you might be at a ballgame and hen walks up when

2  you're not expecting him to be there and he may say something

3  at that time, because he knows that you're not, you know, going

4  to be having a wire on or something.  But, now, he's very

5  cautious when it comes to that sort of thing.

6  Q    Where did this conversation take place?

7  A    It took place at his home.

8  Q    And you went to his home?

9  A    That's correct.

10  Q    At the direction of the FBI?

11  A    Yes, I did.

12  Q    Wearing a wire; right?

13  A    Yes.

14  Q    Wearing a tape, recording the conversation?

15  A    Yes, I did.

16  Q    You didn't tell him you were recording the conversation?

17  A    I did not —— I did not go in there and tell him I was

18  recording the conversation.

19  Q    And in this conversation and in all of the others when

20  Mr. Smith said what was your impression of what that meant,

21  they all are the same, you were giving an impression of the

22  words that he was saying and what it meant to you; right?  Yes

23  or no?

24  A    He asked me particular breaks of what was said in these

25  tapes of what they meant; okay?  Not as a whole, he was going

1  and asking — he asked me particular words that was said and

2  what I —

3  Q    Let's do it the same way.  Let's break it right now, and

4  in response to "You have to tell the truth," let's break it

5  right there, what was the impression of those words at that

6  break to you?

7  A    The reason I think he said that and the impression of them

8  words is that he becomes paranoid and I think that he was

9  saying that — Can I give an example?

10 Q    No, I — you're allowed to answer the question, you're

11 allowed to give a response.

12          MR. SMITH:  Your Honor —

13          THE COURT:  I'm going to let him complete his answer

14 on this point.

15          THE WITNESS:  Okay.  I mean, if I buy a radio off

16 someone and I take that radio home and, I mean, I bought the

17 radio.  Just because that person says I didn't buy the radio

18 doesn't mean that I didn't buy it if I bought it.  Now, what

19 I'm trying to say is, he says things that he does not mean.  I

20 mean, he says stuff to cover hisself, and what he was doing at

21 this point was saying something to cover hisself.  Now, that's

22 what I think he was doing.  I mean, I can't, you know, say it

23 any other way than that.  Sometimes he will come off and say

24 exactly as if he were being recorded, but you can see him right

25 there when it clicks on him when you're talking to him, he

1  becomes concerned.  And you watch him and you can tell when he

2  starts talking like that that that's what he's doing, he's

3  covering hisself at that time to make sure that — he's become

4  paranoid and not sure that he's not being recorded.  And, yes,

5  sometimes he does think that people's recording him and he is

6  very cautious about what he says, and sometimes almost what he

7  says to you is scripted in his mind to make sure that he

8  doesn't say anything that would cause him any trouble.

9  BY MR. PINALES:

10 Q    Are you done now?

11 A    Yes, I am.

12 Q    I didn't want to interrupt you.

13      So you're saying to this jury that sometimes he means what

14 he says and sometimes he doesn't?

15 A    Yes.

16 Q    And you have the ability to tell which is which?

17 A    Well, I can tell by his reactions with his eyes, I can

18 tell sometimes by the way that he — I mean, he's made

19 statements — well, I mean, he's done things — he's told me

20 that he was mad at people.  He said, you know, I wouldn't care

21 if that right there happens, just like that right there

22 (indicating).  What does that mean?  I mean, you know, it

23 doesn't take a rocket scientist to know what that means.  But

24 if you were sitting there and didn't see him do that, you

25 wouldn't know what it means, would you, if you just heard a

1   tape.

2   Q    But he uses those words, and I don't want to argue with

3   you.  Let me ask you a question.  You said that you made these

4   recordings, sometimes by yourself?

5   A    Uh-huh.

6   Q    Sometimes with your wife.

7   A    (Witness nodding head affirmatively.)

8   Q    Sometimes she made recordings without you?

9   A    That's correct.

10  Q    You knew when she made recordings?

11  A    I think most of the time I did.  I may not have knowed

12  every time, sir.

13  Q    And she knew when you made recordings, to your knowledge?

14  A    Most of the time she probably did.  I'm not saying she did

15  every time.

16  Q    And this was done at the direction of the FBI?

17  A    That's correct.

18  Q    Who is Rusty?

19  A    Rusty is Cletus Maricle's son.

20  Q    And it is Rusty that passed away; is that correct?

21  A    That's correct.

22  Q    Rusty passed away rather suddenly?

23       MR. SMITH:  Your Honor, I'm going to object to the

24  relevance.

25       MR. PINALES:  I'll tie it in.

1          THE COURT:  You need to come up and explain to me how
2   you're going to tie this in.
3        (Whereupon, the following discussion was had between the
4   Court and counsel at the bench, out of the hearing of the
5   jury.)
6          THE COURT:  What is the relevance?
7          MR. PINALES:  The relevance is that that tape was
8   made right before the wake at his house, the FBI sent her in.
9          THE COURT:  I still don't see the relevance.
10          MR. PINALES:  It's just that's the entire mood of how
11   they were trying to catch Cletus Maricle off guard, in sending
12   someone in as they're getting ready to go to the funeral home,
13   Your Honor.
14          THE COURT:  I'll sustain the objection.
15          MR. PINALES:  I would proffer that for the record.
16          THE COURT:  Well, I understand, but it's excluded
17   under Rule 403.  The objection will be sustained.
18          MR. PINALES:  Thank you.
19        (Whereupon, the following proceedings continued in open
20   court.)
21          THE COURT:  Thank you, Counsel.  The objection is
22   sustained.
23          MR. PINALES:  Thank you, Your Honor.
24   BY MR. PINALES:
25   Q    You had a plea agreement —— you have a plea agreement in

1   this case?

2   A    That's correct.

3   Q    I believe it's PA1?

4   A    I don't know exactly what it is.

5          MR. PINALES:  Can I have that handed to the witness,

6   Your Honor?

7          THE COURT:  Yes, sir.

8   BY MR. PINALES:

9   Q    A document has been handed to you, which is PA1 that's

10  been admitted in this case.  Do you recognize that document?

11  A    Yes.

12  Q    That is your plea agreement in this case?

13  A    Yes.

14  Q    You entered a plea when; do you recall?

15  A    It was in April, around the end of April.

16  Q    And of what year?

17  A    Of 2007.

18  Q    And you have yet to be sentenced; is that correct?

19  A    That is correct.

20  Q    And you are here today testifying because you've been

21  called as a witness by the government?

22  A    That's correct.

23  Q    And you understand that the government can file a motion

24  on your behalf?

25  A    To my understanding.

1  Q    And that the ultimate decision of what you receive as a

2  sentence is up only to Judge Reeves?

3  A    That is correct.

4  Q    You've met with the prosecuting attorney for your

5  testimony today pursuant to that, have you not?

6  A    I've met with the prosecuting attorney.

7  Q    You've gone over your testimony about today?

8  A    I've not gone over my testimony about today.  No, I went

9  over my statements during — you know, and during this

10 investigation, you know.

11 Q    When was the last time you talked to the prosecuting

12 attorney or the agents?

13 A    Okay.  I spoke to them in the hall, I speak to them

14 regularly, you know, when I come in.  I mean —

15 Q    I'm not talking about good morning, how are you, we had a

16 lot of snow, I'm talking about talking to them about this case.

17 A    I met with them before this trial started.

18 Q    And you met with them for the purpose of getting ready to

19 testify —

20 A    Yes.

21 Q    — is that correct?

22         MR. PINALES:  Nothing further, Your Honor.

23         THE COURT:  All right.  Thank you.

24         Mr. Westberry.

25         MR. WESTBERRY:  Yes, sir.

1          THE COURT:  On behalf of Mr. Adams.

2          MR. WESTBERRY:  Yes, thank you, Judge Reeves.

3                    CROSS-EXAMINATION

4   BY MR. WESTBERRY:

5   Q     Good morning, Mr. White.

6   A     Good morning.

7   Q     Let me know if you can't hear me from time to time.

8   A     Okay.

9   Q     I'm Kent Westberry, I and a couple of others represent

10  Doug Adams.

11  A     All right.

12  Q     I don't think that -- You and I have never talked before;

13  is that correct?

14  A     Not to my knowledge.

15  Q     I want to ask you about some of the testimony that you

16  have given over the last several days including some testimony

17  that you gave, some things you said before our snow breaks.

18  A     Okay.  I didn't hear the last part of that.

19  Q     Before the snow breaks --

20  A     Okay.

21  Q     Some of the testimony, so I'm going back a few days.

22  A     Okay.

23  Q     And ask me to rephrase if you don't understand the

24  question, please, sir.

25  A     That'll be fine.

1  Q    I think you testified maybe last week that you first got

2  involved in politics back sometime in the early part of the

3  1990s involving a race with your Aunt Barbara Jo White Colter

4  who ran against Stella House among other people?

5  A    That's correct.

6  Q    As a matter of fact, I think our understanding of the

7  case, that was a primary for state representative back in about

8  1994; does that sound about right to you?

9  A    That sounds about right.

10 Q    Now, the person that helped you get started back during

11 that timeframe, if we understand it correctly, Mr. White, was

12 Jennings White; is that correct?

13 A    Yes.

14 Q    Jennings White served as clerk of the county court there

15 in Clay County for about nine years; is that correct?

16 A    I don't know exactly how long, but that sounds --

17 Q    Now, you do agree now that Jennings White is currently

18 serving a seven-year sentence in federal prison for drug

19 offenses; correct?

20 A    I know he's in prison, but I don't know how long -- how

21 much time he has or anything like that.

22 Q    But you do understand it's for drug offenses; correct?

23         MR. SMITH:  I'm going to object to the relevance of

24 that.

25         MR. WESTBERRY:  That's been a basic theme

1  throughout —

2          THE COURT:  Well I think it may —

3          MR. SMITH:  He said he didn't know.

4          THE COURT:  — not correctly characterize the nature

5  of the offense to which he entered the plea, but —

6          MR. WESTBERRY:  I'm move right along, sir.

7          THE COURT:  All right.  All right.  I'll overrule the

8  objection.

9          MR. WESTBERRY:  Thank you.

10 BY MR. WESTBERRY:

11 Q    Now, your Aunt Barbara, Barbara Jo White Colter, served as

12 state representative there in that county a few years — for a

13 number of years after she won that election in 1994; is that

14 your recollection?

15 A    She served — yeah, she served state representative for a

16 while.

17 Q    From about 1994 to about 2002, would you agree with that,

18 sir?

19 A    I think that's correct on the dates.

20 Q    Now, going back to that first race back in '94 that you

21 were involved with her on her behalf, you bought votes for her

22 after that first election that you became involved in; correct?

23 A    Yes, I bought votes.

24 Q    And I think that continued up to 2004 in another race that

25 she made trying to get re-elected, you bought votes for her

1  with money that she provided for that purpose; correct?

2  A    Let me state this —

3  Q    Can you please answer yes or no before —

4  A    But I can't without explaining my answer.  On that, I

5  can't answer yes or no without telling you.

6  Q    Go right ahead.

7  A    All right.  Once that I helped her and bought votes for

8  her in her first race, I did not — was not involved in her

9  races or bought any votes again until —

10  Q    2004?

11  A    Well, maybe 2002, partially in 2004.

12  Q    But you did buy votes for her again in that timeframe that

13  you just mentioned; is that correct?

14  A    Yes, I did.

15  Q    And that was money that she had given to you for that

16  purpose; is that correct?

17  A    That's correct.

18  Q    Talking a little bit about your early involvement in

19  politics there in Clay County, and, again, I'm trying to go

20  back before we had the snow break, Mr. White, you testified

21  that from time to time there were organizational meetings at

22  White's Chevrolet there in Manchester; correct?

23  A    There was some meetings when my dad had run for mayor

24  against Homer Weaver there earlier, and there possibly was some

25  scattered meetings after that timeframe for other races.

1  Q    And in addition, you know, to the typical political talk
2  that might occur at that kind of organization meeting, vote
3  buying was discussed at those meetings at White Chevrolet as
4  well; correct?
5  A    At times.
6  Q    Now, some of the people from my notes that may have been
7  present back in that time were a Ralph Robinson, a Penny
8  Robinson, a George Saylor, and Harvey Hensley?
9  A    They were some of the ones that were there.
10 Q    Yeah.  Doug Adams was never present that you saw at any of
11 those organizational meetings at the Chevrolet dealership; is
12 that correct?
13 A    That's correct.
14 Q    There were also some of these organizational meetings at a
15 business there in Manchester called Colter's Diamond Center; is
16 that correct?
17 A    Now, not that — I don't remember any at Colter's Diamond
18 Center.  There was a place that they owned a building beside
19 Colter's Diamond Center.
20 Q    When you say "they," who is they?
21 A    I'm talking about Barb.
22 Q    That's your Aunt Barb; is that correct?
23 A    Yes, sir.
24 Q    And Colter's Diamond Center was a jewelry shop, a jewelry
25 store that had been owned by your Aunt Barb back in those days;

1   is that correct?

2   A    That's correct.

3   Q    And in additional to the organizational things that are

4   typically discussed in a political meeting, vote buying would

5   also be discussed in those meetings in that building located

6   adjacent to the Diamond Center; correct?

7   A    Sometimes.

8   Q    Doug Adams was never present that you saw at any of those

9   meetings; is that correct, sir?

10  A    He wasn't present at those meetings.

11  Q    Now, as part of your involvement, Mr. White, in that

12  race — in those races many years ago, Jennings White, you

13  testified, sort of took you around and introduced you to a

14  variety of different people with the idea that he would sort of

15  give you an education on how politics worked in Clay County; is

16  that correct?

17  A    Yeah, he took me around and introduced me to some people.

18  Q    One of the people that he first took you to see is Kenny

19  Day; correct?

20  A    Kenny Day had actually worked for us at the Chevrolet

21  dealership, so I had knowledge of Kenny Day prior to.

22  Q    That is correct.  But Jennings White took you to see Kenny

23  Day?

24  A    Yeah, we went and seen Kenny Day.

25  Q    And you just said, but again I'll ask you just to make the

1  record clear, for many years Kenny Day had worked as the

2  service manager at White Chevrolet; is that correct?

3  A    He did.

4  Q    And White's Chevrolet, of course, was owned by your

5  father, Daugh, and your Uncle Jack for many years; is that

6  correct?

7  A    Yes, and then there was another partial owner, Johnny Bill

8  Watkins.

9  Q    All right.  And I believe your grandfather had actually

10 started that business many years before that?

11 A    My great-grandfather had started it, Langdon, Albert

12 Langdon.

13 Q    You now know that Kenny Day is a convicted drug dealer;

14 correct?

15 A    Yes.

16 Q    And you also knew that Kenny Day was a supporter of

17 Jennings White; correct?

18 A    Yes.

19 Q    During -- Mr. White, during the 1990s and up until the

20 2000s when Kenny Day was supporting Jennings White, you knew he

21 was a drug dealer; correct?

22 A    No.

23 Q    You did not?

24 A    I didn't find that out till later.

25 Q    Fairly common knowledge, though, in Clay County about what

1  Kenny Day did in terms of drugs?

2  A     When he left White Chevrolet or right before that time, it

3  become pretty common knowledge, yes.

4  Q     One of the other people, Mr. White, that Jennings White,

5  your relative, took you to see was somebody named Uncle Bud

6  Smith, do I have that right?

7  A     That's right.

8  Q     Now, Uncle Bud Smith was a supporter of Jennings White;

9  correct?

10  A     Yes, he was.

11  Q     And the idea is that you would be introduced to Uncle Bud

12  Smith so that he could tell you how to deliver money to

13  purchase votes; is that correct?

14  A     Actually, I delivered money to Uncle Bud Smith to buy

15  votes on Flat Creek.  He also had affiliations with Doug Adams

16  and the school boards later on.

17  Q     Okay.  Uncle Bud Smith is a convicted drug dealer, is he

18  not, sir?

19  A     I don't know what he's charged with.  I know that he's

20  serving time, but I do not know what he's charged with.

21  Q     And he was another one of the supporters of Jennings

22  White; correct?

23  A     Yes, he supported Jennings White.

24  Q     Doug Adams did not support Jennings White for any of those

25  races for county court clerk to the best of your knowledge; is

1  that correct, sir.

2  A    Not to the best of my knowledge.  To the best of my

3  knowledge, he did not.

4  Q    You don't have any knowledge, as a matter of fact, do you,

5  Mr. White, that Doug Adams ever offered any support to Jennings

6  White; correct?

7  A    Not that I know of.

8  Q    You testified, Mr. White, several days ago about some hard

9  feelings between Jennings White and Doug Adams.  In particular,

10 something that stemmed from an incident where some people came

11 from out of state to rob Doug Adams and accidentally went to a

12 different house.  Do you recall your testimony from a few days

13 ago?

14 A    Yes.

15 Q    I think you described them, according to the notes I

16 wrote, as fool robbers or something like that?

17 A    From what I -- from what I were told, that they was --

18 that they had heard that he had $250,000 of money from selling

19 marijuana stored in his house and that they come to rob him

20 from Indianapolis, Indiana.  Some people came to rob him.

21 Q    Just a rumor?

22 A    Well, that's what the rumor was -- that's what was told.

23 Q    Thank you.  But more importantly, Jennings White, you

24 testified, then got together with a few other politicians in

25 Clay County and helped get these robbers out of trouble;

1  correct?

2  A    I know they were trying assist him.  I don't know whether

3  they actually ultimately -- I think one of them passed away

4  while awaiting trial.  I don't know what happened in the end of

5  that case.  I know that they had attempted to help them, yes,

6  him and Charles Marcum and few more.

7  Q    Jennings White, Charles Marcum, and a few more attempted

8  to help these, for lack of a better, fool robbers get out of

9  trouble; is that correct?

10  A    Yeah.  Evidently they knew someone that was -- yeah.

11  Q    Now, despite what you've described, Mr. White, as these

12  hard feelings, you said that yourself and Jennings White went

13  to the high school sometime back in the early 1990s when

14  Mr. Adams was principal of the high school and give him a sum

15  of money?

16  A    $6,000.

17  Q    Now, do you know an individual in Clay County named Mike

18  Hooker?

19  A    Yes.

20  Q    Do you know if he's related to Doug Adams?

21  A    I think he is a relative.

22  Q    Would a first cousin sound about right to you, sir?

23  A    Something like that.

24  Q    Do you know that Mike Hooker actually ran against Jennings

25  White back in 1993 in that first race that Mr. White had for

1  county court clerk?

2  A    That might be the case, but we did take Doug Adams $6,000

3  and he did sit right there when Jennings White and me were

4  sitting all the way at the other end of that office, it was a

5  really long office, about from me here and he was sitting at a

6  desk about where you're at, and he said to me, he said, "I will

7  help Barb Jo" — he used the "F" word, and said but "F" Charles

8  White and Jennings, he says, "I will help Barb, but it's got

9  nothing to do with you."  That's what he said.

10 Q    Did you walk by his secretary when you walked in his

11 office?

12 A    I don't know whether I walked by his secretary or not.

13 Q    Who was his secretary at that time?

14 A    I do not know.

15 Q    Anybody else present in that room other than you,

16 Mr. Adams, and Jennings White?

17 A    No.

18 Q    As a relative of Jennings White, you supported Jennings

19 White throughout his campaigns; correct?

20 A    I supported him when he ran — I was for him when he ran

21 the first time.  I never had anything else to do with his

22 elections or anything until 2002.

23 Q    2002; is that correct?

24 A    That's correct.

25 Q    You supported him in 2002; correct?

1  A    I ended up pooling my money with him instead of with the

2  school board and Doug Adams; that's correct.

3  Q    Now, Doug Adams actually supported Freddy Thompson for

4  county court clerk in 2002; correct?

5  A    Yes.

6  Q    And you ultimately decided to run for jailer in 2002;

7  correct?

8  A    That's correct.

9  Q    And Doug Adams did not support you in that race; correct?

10 A    He offered his support, if I would bring him $60,000 that

11 he would buy votes on my behalf and I would have the backing of

12 the school board.  However, I did not do that, and, no, he did

13 not.

14 Q    He ultimately did not support you in that race for jailer,

15 he supported Mr. Marcum; correct?

16 A    That is correct.

17 Q    Now, Daugh White is your father; correct?

18 A    Yes, that's his name.

19 Q    And your father served as mayor for the City of

20 Manchester, I think by your testimony, for well over 25 years.

21 Do I have that number about right?

22 A    He served for — I don't know the exact number of years,

23 but, yes, it was something like that.

24 Q    Doug Adams never supported your father, Daugh White, in

25 any of your father's races for mayor; is that correct?

1   A    Well, I can say this:  He never had any competition but

2   twice that I know of, and once was many years ago, and in the

3   race against Carmen Lewis, he was supposed to have supported

4   us, but he ended up making deals with the other side to help

5   Kevin Johnson become elected because he was interested in

6   Freddy and Kevin being able to control the election officers

7   with the votes that they had for election officers.

8   Q    Let's talk about 2006.  I believe that's the year that

9   your father lost his race for mayor of the City of Manchester;

10  correct?

11  A    That's correct.  Uh-huh.

12  Q    Now, you would agree that right before that 2006 election,

13  in October of that year, the FBI actually raided the City of

14  Manchester; correct?

15  A    Yes.

16  Q    Would you also agree, and you've established a good

17  portion of this from questions that you gave to Mr. Pinales,

18  that you and your wife, Wanda, had been given jobs by your

19  father at the City of Manchester; correct?

20  A    That's correct.

21  Q    Quite a bit of talk around town about those two jobs;

22  correct?

23  A    Yes, they used it as a political sword.

24  Q    People didn't appreciate -- you would agree that people in

25  the City of Manchester did not appreciate having those jobs

1  created at those kind of salaries where they had not been

2  created before; correct?

3  A    Okay.  I can tell you this:  They were some people that

4  did not care for it and they was some that thought that I did a

5  good job, other than — you know, from what they knew.

6  Q    But your father ultimately lost the race; correct?

7  A    Yes, he did.

8  Q    By a fairly comfortable margin; correct?

9  A    It was — it was pretty close.

10 Q    It was close, excuse me.  Did your father have a drinking

11 problem during this time?

12 A    Yes, he did.

13        MR. SMITH:  Your Honor, I'm going to object to the

14 relevance.

15        MR. WESTBERRY:  Would you like me to come up?

16        THE COURT:  Yes, if you could, please.

17        MR. WESTBERRY:  Yes, sir.

18        THE COURT:  Just for a moment.

19    (Whereupon, the following discussion was had between the

20 Court and counsel at the bench, out of the hearing of the

21 jury.)

22        THE COURT:  An attempt to impeach a person that's not

23 on the stand with conduct, that may not be used to impeach in

24 any event.

25        MR. WESTBERRY:  May I at least make my record?  I

1   think I —

2              THE COURT:  Yes, sir.

3              MR. WESTBERRY:  The government has diligently —

4   Well, let me rephrase.  Through the testimony of Kennon White

5   several days ago, there was a portion in a tape that was read,

6   I cannot recall if it was a statement either made — I think it

7   was made by Mr. Maricle, perhaps by Mr. White, that Daugh White

8   would still be mayor of the City of Manchester had Doug Adams

9   not been in power or continued to operate the — have the

10  position of superintendent of schools.  Implied in that, of

11  course, is that that is the reason why Daugh White got beat.

12             We believe the reason Daugh White got beat was for

13  some of the areas of cross-examination that we've been able to

14  establish.  I don't plan on going real far with this.  I view

15  this witness as somebody who's - I'm saying this at sidebar -

16  is fighting us tooth and nail in an effort to cooperate, but I

17  have practiced law long enough to know I'm not going to give

18  him enough leash whenever I can avoid doing it, but I think you

19  know the relevancy of where we're trying to go with this,

20  Judge.

21             THE COURT:  Well, I think what you're saying is that

22  there are reasons other than political affiliations that would

23  cause a person to lose an election, including if a person is an

24  alcoholic or has a drinking problem.  A family member may know

25  that another family member has a drinking problem, but that

1  does not mean necessarily that it's common knowledge in the

2  community that he has a drinking problem.  So what I'll allow

3  you to do is you can ask the question, if he had a drinking

4  problem at the time, and then I think we need to leave it at

5  that because I don't think you can establish anything beyond

6  that.

7       MR. WESTBERRY:  I understand.  May I ask one other

8  question?  I think it's best to do it before the Court right

9  now.  The next line of questioning is, consistent with the

10  drinking, has Daugh White consorted with young women.  That was

11  actually alluded to by Cletus Maricle in a statement that he

12  made on tape when he said to Kennon, and I'm paraphrasing, your

13  dad would still be mayor if it were not for the sex.  And

14  that's consistent with the same relevancy argument that I'm

15  advancing on the alcohol, but I think it best that I bring it

16  to the Court's attention up here.  I think it was fairly common

17  knowledge, and Hacker has testified to some of it.

18       THE COURT:  I don't know that it's been established

19  that it is common knowledge.  The Court has some familiarity

20  with that issue based on hearings on bond --

21       MR. WESTBERRY:  Uh-huh.

22       THE COURT:  -- and release considerations, but as I

23  can recall from that episode, I don't recall that it was

24  matters of common knowledge.  So I'm not aware that there is

25  information that it's common knowledge.

1          MR. WESTBERRY:  I understand.

2          THE COURT:  And I don't think you're planning to

3    represent -- that you're going to establish this as a matter of

4    community knowledge.  Under 403, it would tend to be more

5    prejudicial than probative, number one; and, number two, it

6    also opens up an entirely different area.  So it would be a

7    collateral matter, and so I would not allow you to go into that

8    at this point in the case --

9          MR. WESTBERRY:  Okay.

10          THE COURT:  -- but you can ask if he knew -- was

11    aware that his father had a drinking problem.  I think there's

12    a good-faith basis for that question.

13          MR. SMITH:  Your Honor, I have a request.

14          THE COURT:  Let Mr. White --

15          MR. WHITE:  Your Honor, you said we could not go into

16    his father's extramarital affairs?  I just didn't hear the --

17          THE COURT:  Yes, I did.  I'm going to allow

18    Mr. Westberry to ask about alcohol abuse, his knowledge of

19    alcohol abuse.

20          Mr. Smith.

21          MR. SMITH:  I beg the Court for a break.  I have -- I

22    got here at 8:30 and I've been sitting in here since then and

23    I'm really in trouble.

24          MR. WESTBERRY:  That's fine.  That's fine with me.

25    That's fine with me.

1          THE COURT:  All right, sir.  Are you at a good place

2    to break?

3          MR. WESTBERRY:  That's fine.

4          THE COURT:  We're close to that point.  All right,

5    we'll do that.

6          MR. WHITE:  I want to make him suffer just a little

7    bit, if that's okay.

8          THE COURT:  Just remember, what goes around comes

9    around.

10          MR. WHITE:  There are a couple of things that I want

11   to talk to you about before my cross starts.  So if

12   Mr. Westberry finishes before lunch, if we could take just a

13   short break and come up, and it shouldn't take -- it will take

14   a couple of minutes.

15          THE COURT:  We can do that, or we can start a little

16   bit early before the jury comes back in.  So I'll give the jury

17   20 minutes and give you all 15.

18          MR. WHITE:  Thank you, Your Honor.

19       (Whereupon, the following proceedings continued in open

20   court.)

21          THE COURT:  All right.  Thank you, Counsel.

22          Ladies and gentlemen, is anyone ready for a break at

23   this time?  I know I am.  So we'll take -- we'll give the jury

24   about a 20-minute recess.  Please, as we are in recess, keep in

25   mind the admonitions that were given to you previously.  The

1  jury will be excused for 20 minutes.

2          (Whereupon, the jury retired from the courtroom, after

3  which the following proceedings were had in open court.)

4          THE COURT:  The jury is in recess for 20 minutes, but

5  we'll be in recess for 15.

6          (Whereupon, a short recess was had, after which the

7  following proceedings were had outside the presence of the

8  jury.)

9          THE COURT:  Thank you.

10         The record will reflect the jury is not present at

11 this time, and the witness is not present in the courtroom

12 either.

13         Let's see, Mr. White, I believe we need to take up a

14 matter prior to your cross-examination of the witness.

15         MR. WHITE:  Yes, Your Honor.  There were two things I

16 wanted to alert the Court to.  One is — and I may not have to

17 go into this, it depends on what the answers are I'm able to

18 get.  In the recording of my client, which was the June 7th of

19 '07 —

20         THE COURT:  I'm sorry.  Wait a minute.  I didn't

21 realize Mr. Stivers wasn't in the courtroom.  I apologize.

22         THE MARSHAL:  I'm sorry, Your Honor.

23         THE COURT:  That's fine.  For the record, he hasn't

24 missed anything.  Mr. White.  Mr. Stivers was just coming in.

25         Yes, sir.

1          MR. WHITE:  On that recording, there are some

2    derogatory statements made about general federal officials, as

3    the Court may recall.  I had planned -- I'm going to have to

4    allude to that.  I would like to avoid using the "MF" word if I

5    could, if you Court would permit me to do that.  I'm just going

6    to say the "F" word.  If I'm allowed to do that?

7          THE COURT:  Yes, sir, that will be fine.

8          MR. WHITE:  The other thing I wanted to raise is we

9    received a letter from the United States at the end of December

10   in which they disclosed a few discovery matters, one of which

11   dealt with the employment of Kennon White, which he's already

12   testified to.  It deals -- it mentions that Mr. Blair --

13   Agent Blair's wife works at the same place, and the statement

14   was there's no indication that either Kennon or Wanda were

15   given preferential treatment obtaining a job or while serving

16   as an employee.  I just wanted to alert the Court I'm going to

17   go into that.  I do not intend to explore that very deeply, but

18   I may very well mention Mr. Blair's name.

19         THE COURT:  All right.

20         MR. WHITE:  That's obviously relevant on the issue of

21   motive and bias on the part of the defendant, and I think that

22   the probative value of that, given what an important witness he

23   has been for the United States, certainly outweighs any

24   prejudicial effect.

25         THE COURT:  All right.

1           Any objection, Mr. Smith?

2           MR. SMITH:  Well, Your Honor, I failed to see how

3   it's relevant.  Senture is a company that employs thousands of

4   people in the United States, it happens to be a coincidence

5   more than -- and I think -- I investigated that and explored

6   it, and I shared it with counsel because I felt out of an

7   abundance of caution that, you know, if they wanted to

8   investigate this and come up with something.  But my

9   investigation shows it was a coincidence, that there was no

10  preferential treatment, and, therefore, to raise it, I believe,

11  again would violate 403, because it creates, again, a

12  collateral issue, one on which I believe there's potential

13  prejudice here where the relevance of this, you know, if there

14  were preferential treatment where they got jobs because they

15  knew Buddy Blair, that's one thing, but in this situation, it's

16  a large company, and I don't see there's a connection there,

17  and if Mr. White has evidence that there is a connection, then

18  obviously that changes things, but --

19          MR. WHITE:  I would like to respond if I may, Your

20  Honor.

21          THE COURT:  Yes, sir.

22          MR. WHITE:  Thank you.  I think, responding directly

23  to Mr. Smith, I do have a little more information.  It's not a

24  national company.  I believe if you go to the website, it is

25  headquartered in London and employs 130 people, and my wife

1   just anecdotally happens to be in the HR business, and I would

2   find it unusual that Mr. Blair's wife is not aware of at least

3   these people work there.  And what I would point out is that

4   based on the plea agreement, he entered a plea agreement in

5   April of '07.  If he applied for a job at Senture after April

6   of '07, he would have had to disclose on his application that

7   he was a felon.

8          Now, I believe that it would be very unusual for a

9   person, an HR professional, to not be aware of and perhaps even

10  approve that hire.  Again, I think it's entirely relevant

11  because he has obviously a close relationship with Mr. Blair.

12  Now, I've got all the information about Senture and how many

13  people they employ right off of www.senture.com.  So that's the

14  source of that information.

15         THE COURT:  Well, in terms of relevance, it may have

16  some very nominal relevance in the case.  I don't believe that

17  it would be unduly prejudicial, so in terms of the 403

18  analysis, I'm going to allow you to go into it, but I'm not --

19  if you start to dwell on it, then it becomes a different issue

20  under 403.  And I'm not telling anyone how to try their case,

21  but it may end up, of course, blowing up in your face if you

22  try to make an issue of something that's not and then the

23  United States is able to come back and respond to it.  But

24  that's for you-all to decide.  In terms of relevancy, I will

25  allow you to ask the question since it may somehow affect his

1  credibility in the case. But if we get into it too much, then

2  it does become a collateral issue and then it would be a waste

3  of time under 403 and then I would cut off the examination at

4  that point, so --

5          MR. WHITE: I understand, Your Honor.

6          The other thing I wanted -- there's two other quick

7  things. One of the last things I wanted to alert the Court to,

8  and that is I didn't know that this was going to happen, but

9  Mr. Pinales --

10         I seem to be the only one that can't get your name

11 right.

12         MR. PINALES: I answer to anything.

13         MR. WHITE: As do I.

14         But he asked Mr. -- was speaking to Mr. Caldwell,

15 that elicited an objection, and Your Honor sustained it. Of

16 course, Mr. Caldwell is in the courtroom. I do want to point

17 that out, and let me tell you why I think it's relevant.

18         A, it's relevant because it gives a sense of comfort

19 perhaps that he is represented by an independent counsel who is

20 present. I also think it's relevant because to get the 5K he

21 wants, he's going to have to obviously satisfy the United

22 States that he has earned the 5K by giving substantial

23 assistance. And so his attorney being present, I think, helps

24 show that he is focused on this 5K.

25         THE COURT: No. No, I do not agree with that

1   argument at all.  I believe it would be improper.  And,

2   obviously, counsel is present from time to time in order to be

3   able to make arguments subsequently about issues that are not

4   collateral to this proceeding, and so I would — the Court's

5   position would be the same —

6           MR. WHITE:  Thank you, Your Honor.

7           THE COURT:  — if you raise that.

8           MR. WHITE:  I think those are the only things I have

9   that I thought I would need to get —

10          THE COURT:  All right.  Well, that does speed things

11  along.  I appreciate you bringing it up at this point.

12          Anyone else have an issue before we bring the jury

13  back in?

14          Let's bring the witness in first.

15      (Whereupon, the witness returned to the witness stand.)

16          THE COURT:  And you can bring the jury in.

17      (Whereupon, the jury returned to the courtroom, after

18  which the following proceedings were had in open court.)

19          THE COURT:  Thank you, and please be seated.

20          The record will reflect that all members of the jury

21  are present.  The parties and counsel are also present.

22  Mr. White has returned to the witness stand.

23          And, Mr. White, you're still under oath, of course.

24          THE WITNESS:  Thank you, Your Honor.

25          THE COURT:  And, Mr. Westberry, you were examining

1    the witness, and you may continue.

2              MR. WESTBERRY:  Thank you, Judge.

3    BY MR. WESTBERRY:

4    Q    Hello again, Mr. White.  Right before we broke, I asked

5    you some questions about your father's, Daugh White, drinking

6    and whether or not that was an issue in the 2006 mayoral race.

7    Do you recall those questions?

8    A    Yes.

9    Q    Was that an issue in that mayoral race in 2006?

10   A    I think so.

11   Q    Thank you.  Now, before your dad was mayor of the City of

12   Manchester, your Uncle Jack White had been mayor before him;

13   correct?

14   A    That's correct.

15   Q    I think he was mayor — Jack White was mayor for about

16   eight years thereabouts; correct?

17   A    I think that's correct.

18   Q    And long before either your father or your Uncle Jack

19   served as mayor of the City of Manchester, your grandfather,

20   Joe B. White, served as the mayor of the City as well; correct?

21   A    Yeah, I think there was someone — someone in between

22   them, but, yes, that's correct.

23   Q    And Mr. Pinales asked you this question, I'll try again.

24   If you were to add up all the years that a White had served at

25   the City of Manchester before 2006 when your father lost that

1    reelection, it would add up to many, many years; correct?

2    A    Yes, that's correct.

3    Q    Now, James Phillips, do you know a James Phillips of Clay

4    County?

5    A    Yes, I do.

6    Q    Now, is he the circuit court clerk of Clay County?

7    A    He is.

8    Q    And he's been circuit court clerk for many years; correct?

9    A    I don't know exactly how many, but he's been there for a

10   while.

11   Q    He is a White; correct?

12   A    He's a Phillips.  He may be related to the Whites, he's a

13   distant cousin.

14   Q    Yes.  Is he a White by marriage, his mother was a White,

15   do you know that?

16   A    I think his mother was a White.

17   Q    Thank you.  Do you know a Clint Harris, a lawyer there in

18   the City of Manchester?

19   A    Yes, I do.

20   Q    Has Clint Harris been assistant county attorney for a good

21   long period of time, 20 years or thereabouts?

22   A    He's been there a long time.

23   Q    And he is a White?  Was his mother a White as well, if you

24   know?

25   A    I don't know for sure.  I —

1  Q    Do you have any knowledge about his relation at all?

2  A    I think he's related to the Whites.

3  Q    Thank you.

4  A    Distant.

5  Q    Now, Charles White was superintendent of schools from

6  about 1990 through 1999; correct?

7  A    I don't know when the years he was, but he was

8  superintendent.

9  Q    During the period of time when you said that you went to

10 see Doug Adams and his — in Mr. Adams' office at the high

11 school, Charles White would have been the superintendent of

12 schools during that time; correct?

13 A    Yeah, he was.

14 Q    And he would have been Doug Adams' boss; correct?

15 A    Yes, I would say that's right.

16 Q    Now, during the 2002 election, Mr. White, did you ever

17 hear the term "White Out" used?

18 A    Yes, sir.

19 Q    And what did that refer to?

20 A    That was referring to removing the Whites from office,

21 that was what the political opposition was using.

22 Q    At any period of time, have you ever heard the City of

23 Manchester referred to as Whitesville?

24 A    As what?

25 Q    Whitesville?

1  A     No, I've not.

2  Q     To your knowledge, does Mr. Doug Adams have any relatives

3  or family members who are elected officials in Clay County?  If

4  I represented to you the answer is no —

5  A     I was thinking.  No, I don't think so.

6  Q     You talked — we asked you about Mike Hooker, a first

7  cousin of his that ran for clerk back in '93 against Jennings

8  White.  Do you recall that line of questioning before the

9  break?

10  A     Yes.

11  Q     And Mr. Hooker didn't win that race, did he?

12  A     No, he did not.

13  Q     Do you know a Danny Reid of Clay County?

14  A     Yes, I do.

15  Q     Do you know if Danny Reid is a relative or relation of

16  Doug Adams?

17  A     Yes, he is.

18  Q     Is he a first cousin?

19  A     I don't know the exact relationship, but he told me he was

20  related to him.

21  Q     And Danny Reid ran for sheriff in 2002; is that your

22  recollection?

23  A     That is correct.

24  Q     And he didn't win that race either, did he?

25  A     No, he did not.

1  Q    Now, I would like to ask you, Mr. White, about some of the

2  people that worked under and supported your father during the

3  years that your father served as mayor of the City of

4  Manchester.  The first one I would like to ask you about is a

5  fellow named Todd Roberts.  Go ahead and take a drink of water.

6  A    Excuse me, I'm sorry.

7  Q    You're fine.  Do you know Todd Roberts?

8  A    Yes, I do.

9  Q    Todd Roberts had been as high as assistant police chief in

10  the City of Manchester at one time; correct?

11  A    Yes, he was assistant chief at one time.

12  Q    Now, he was convicted of burning down a building in the

13  City of Manchester with the help of a fellow named Vernon

14  Hacker and Bobby Joe Curry; correct?

15  A    I don't know — I don't know exactly what he was convicted

16  of.

17  Q    But you know that he was convicted; is that correct?

18  A    Yes, he was convicted of something.

19  Q    Do you know Bobby Joe Curry?

20  A    Yes.

21  Q    Do you know Bobby Joe Curry to be a drug dealer?

22  A    From rumor, yes.

23  Q    Pretty substantial rumor in the City of Manchester in Clay

24  County?

25  A    Yeah, that's a known.

1  Q    You wouldn't quibble about that, would you, sir?

2  A    No, I wouldn't say that he wasn't.

3  Q    Now, Todd Roberts was actually serving as assistant chief

4  of police when an arson was committed; is that your

5  understanding?

6  A    I don't know what his capacity was at that time.

7  Q    But he was definitely on the police department; is that

8  your understanding?

9  A    He was on the police department, but I don't know what

10  dates that that happened.

11  Q    Todd Roberts was actually hired on in the police

12  department during the period of time when your father served as

13  mayor; correct?

14  A    That's correct.

15  Q    Now, do you understand that there was a building that the

16  City of Manchester wanted to buy for the construction of a

17  9-1-1 facility, the building was owned by a man named Smith who

18  refused the City's offer?  Do I have that about right?

19  A    I'm not completely familiar with it, but, yeah, that's

20  about right.

21  Q    And your father — after the offer was refused by

22  Mr. Smith, Daugh White, your father, directed Todd Roberts and

23  Vernon Hacker and Bobby Joe Curry to go out and burn the

24  building; correct?

25  A    No, not to my knowledge.

1  Q    You do not have any knowledge about that at all?

2  A    I don't have any knowledge that he told them to do that.

3  Q    Okay.  Do you know Vernon Hacker?

4  A    Yes, I do.

5  Q    How long have you known Vernon Hacker?

6  A    Probably 15 years or 20, something.

7  Q    A good long period of time?

8  A    Yeah, I've knowed him.

9  Q    Vernon Hacker had actually been hired on as the 9-1-1

10 director for the City of Manchester; is that your recollection?

11 A    That's city and county position, I think.

12 Q    He was hired by the 9-1-1 board; correct?

13 A    I think that's correct.

14 Q    And your father served on that board; correct?

15 A    Yes, him, as well as several others.

16 Q    But your father did serve on the 9-1-1 board; correct?

17 A    Yes.

18 Q    Now, you know that Vernon Hacker was convicted of a

19 conspiracy to distribute kilograms of cocaine and is now

20 serving a federal sentence.  You know that, sir?

21 A    I know he's serving a federal sentence.  Once again, I

22 don't know what he was convicted of.

23 Q    Again, that's just beyond your realm of knowledge?

24 A    I just -- well, I just don't know exactly what he was

25 convicted of.

1   Q    You know it involved drugs?

2   A    I think it — yeah, from what the papers and what I

3   understand; that's correct.

4   Q    We're not going to quibble about it, at least involving

5   drugs; is that fair —

6   A    I think that's —

7            MR. SMITH:  Your Honor, I'm going to object to

8   counsel continuing to try to get the witness to agree with him.

9   I think he's said basically what he knows.

10           MR. WESTBERRY:  I'll move on, Judge.

11           THE COURT:  All right.  I'll sustain — I'll sustain

12   the objection.

13  BY MR. WESTBERRY:

14  Q    Vernon Hacker committed this offense or he conspired to

15  commit this offense with Todd Roberts and Bobby Joe Curry;

16  correct?

17  A    I don't — I don't really know, sir.

18  Q    Now, your father, Daugh White, offered protection for

19  Bobby Joe Curry if he participated in the burning of that

20  building; correct?

21  A    I do not know that, sir.

22  Q    There was some talk a few days ago about a person named

23  Mike Bishop.  Do you recall some conversation on the tapes

24  about Mike Bishop of Clay County?

25  A    Yes, I do.

1   Q    You know who Mike Bishop is, of course?

2   A    Yes, I do.

3   Q    He, at one time, had served as a police officer, among

4   other things, in the City of Manchester Police Department?

5   A    Police officer, assistant chief, yes.

6   Q    Now, he once competed for the chief's position, if I

7   recall correctly, with Todd Roberts among others; is that your

8   recollection?

9   A    Yes.

10  Q    Now, you would agree that Mike Bishop is not a convicted

11  felon, correct, to the best of your knowledge?

12  A    To the best of my knowledge.

13  Q    But you know that Todd Roberts is a convicted felon;

14  correct?

15  A    I know that he is now.  I don't think at the time they

16  were competing that he was.

17  Q    Of course, you didn't know everything that Todd Roberts

18  was doing at that particular time; correct?

19  A    I knew when I was told by the officers down there that

20  they had heard.

21  Q    Rumors?

22  A    Yeah.

23  Q    Involving Todd Roberts?

24  A    Yes.

25  Q    Your father, Daugh White, created a job for you, we've

1  kind of generally described it as City Manager, paid

2  approximately $48,000 a year; is that correct?

3  A    Around that.

4         MR. SMITH:  Your Honor, that's been asked and

5  answered.  I'm going to object to continue going over that.

6         MR. WESTBERRY:  Not by me.  I have a point that I'm

7  getting to in just a moment.

8         THE COURT:  All right.  Overruled.

9  BY MR. WESTBERRY:

10 Q    Also created job for your wife as well, correct, your dad

11 did?

12 A    She worked — yeah, she worked at the police department.

13 Q    Now, Mr. White, that job that was created by your father

14 that paid the salary that you mentioned a minute ago for your

15 benefit.  You used that job, that position as City Manager, to

16 help accept or take bribes from businesses there in town that

17 did business with the City; is that correct?

18 A    I accepted bribes, and I'm ashamed of that and wished I

19 hadn't done that now, sir.

20 Q    You and your father, Daugh White, as part of this scheme

21 or practice of accepting bribes, made phony change orders on

22 water and sewer projects in order to help make the bribes a

23 little more easy to collect; correct?

24 A    They — we — that's pretty technical, what you're getting

25 into, but we did do some things to help get bribes and to help

1  to raise the amount of money that they was a local contractor
2  getting.
3  Q    Submitted phony bogus change orders, correct, on sewer and
4  water projects; is that fair?
5  A    I think the work was done.  I think it was inflating the
6  amount of money that was done.
7  Q    So that person would have more money to operate with from
8  the City in order to pay the bribes back to you and your
9  father; correct?
10 A    Back to me; that's correct.
11 Q    You took cash payments for those bribes; correct?
12 A    Yes, I did, sir.
13 Q    And those cash payments totaled approximately $67,000;
14 correct?
15 A    It was somewhere about that range.
16 Q    And those payments were made in cash over about a three-
17 year period; correct?
18 A    That's correct.
19 Q    You and Darnell Hipsher — Darnell Hipsher was a city
20 councilman at one time; correct?
21 A    Yes, he was.
22 Q    And he was a supporter of your father, Daugh White;
23 correct?
24 A    In some instances.
25 Q    Wasn't he a supporter of Jennings White as well?

1   A    In some instances.  He worked for Doug Adams, though.

2   Q    Yeah.  But he supported Jennings White; is that correct?

3   A    In some instances.

4   Q    You and Darnell Hipsher also paved private drives in 2005

5   with City or government funds; correct?

6   A    That's correct.

7   Q    And you, your father, and Darnell Hipsher tried to hide

8   that particular fact from the state auditors; correct?

9   A    Yes, it's in the plea agreement.

10  Q    But I want you just to reaffirm it.  Have I said anything

11  about it that's inaccurate?

12  A    Not that I see yet.

13  Q    You pled guilty about three years ago in federal court in

14  London, Kentucky; correct?

15  A    Actually, I pled guilty in Lexington.

16  Q    Was it in Lexington?

17  A    Uh-huh.

18  Q    But it was about three years ago, do I have that correct,

19  sir?

20  A    Somewhere around that range.

21  Q    Yet you've not been sentenced since — I think it was

22  April of 2007 when you entered that plea; correct?  You've not

23  been sentenced?

24  A    No, I've not.

25  Q    In your own mind, why have you not been sentenced?

1          MR. SMITH:  Your Honor, I'm going to object.

2          THE COURT:  I'll sustain the objection.

3          MR. WESTBERRY:  Yes, sir.

4   BY MR. WESTBERRY:

5   Q    Mr. White, over the last two, three, almost four days,

6   we've listened to tapes, many hours' worth of tape recordings

7   that were made by either you or your wife, Wanda; correct?

8   A    That's correct.

9   Q    And although it seemed like it was many, many hours that

10  we listened to, I think in questioning by Mr. Pinales

11  yesterday, there were many hours of tapes that were not

12  actually played in this trial; correct?

13  A    There's a portion of those tapes that wasn't played,

14  that's correct.

15  Q    A substantial portion, would you agree?

16  A    I don't know exactly how much.

17  Q    Hours?

18  A    I don't know.  I don't know exactly.

19  Q    And you made these recordings when working with the

20  government in connection with this case; correct?

21  A    That's correct.

22  Q    You would agree that Doug Adams was never heard in person

23  on any of these secret tape recordings that were made by either

24  yourself or your wife, Wanda; correct?

25  A    I'll agree with that.

1    Q    Now, I made some notes on some of the excerpts from some

2    of the statements you made on the tapes, and I want to just ask

3    you if you recall having made these.  "Jennings White is a

4    meticulous record keeper."  Do you remember having made that

5    statement on the tapes yesterday?

6    A    I think so, yes.

7    Q    "He's a meticulous record keeper as he is —— would not

8    have —— probably did everything he could to get everything he

9    could on everybody that he knew was against him for sure."  Is

10   that substantially what you recall yesterday?

11   A    It seems something to that nature.  I would have to look

12   at it to make sure exactly what was said.

13   Q    But is that close?

14   A    I would say that's probably close.

15   Q    Another statement:  "I think Jennings White has give them

16   every trick that he —— and he's the master of them —— he did ——

17   he was a —— he's probably did more in elections than anybody

18   else in history."  Do you recall that statement from the tapes

19   yesterday?

20   A    I don't recall that particular statement.

21   Q    Do you disagree with that statement?

22   A    I'm not saying I —— I'm not saying it's impossible that I

23   made it, but I would to look to —— look at it to verify that I

24   did say that.

25   Q    It was asked of you a few minutes ago, Mr. White, but I

1  would like to explore this with you again.  You would agree

2  that only Judge Reeves can make a determination as to whether

3  you get a break at sentencing or not; correct?

4  A    Yes.

5  Q    But before the Court can decide whether or not to give you

6  a break, you would agree that the government has got to file a

7  motion or the papers asking the Court to do so; correct?

8  A    I think that's correct, yes, sir.

9  Q    In determining whether the government will file the papers

10 or the motion, that would depend on the level of help that you

11 give the government in this case; correct?

12 A    I suppose.  It requires truthful testimony.

13 Q    Let me ask you this, Mr. White:  In order to get a break

14 at sentencing, would you lie —

15 A    No, I would not.

16 Q    Please let me finish.  Would you lie about having anything

17 to do with politics in Clay County in order to get a break?

18 Would you lie in order to get a break?

19 A    No, I would not.

20 Q    If you wouldn't outright lie, would you shade the truth in

21 any way?

22 A    No, I would not.

23 Q    Of course, you have lied or misled before in very serious

24 matters, many of which involve the same subject that brings us

25 to Court here today; correct?

1  A    I think good people makes mistakes sometimes, and I

2  consider myself a good person and I think that I have made some

3  mistakes and I regret the mistakes I made, sir.

4  Q    In order to accept the bribes or the kickbacks from the

5  local businesses, you and your father made change orders on

6  City contracts, declared false emergencies, all in order to

7  keep the money flowing for the bribes to continue to be taken

8  and received by you; correct?

9  A    I will say that, once again, yes, I did accept bribes, and

10 I apologize and I — you know, I wish I hadn't done it and I'm

11 ashamed that I did.

12 Q    But you lied, that was a false statement in a very serious

13 matter?

14 A    I did then.  I did then, and I —

15 Q    You would agree this is a serious matter that brings us to

16 court here today; correct?

17 A    Yes.

18 Q    You also lied and schemed with your father and Darnell

19 Hipsher to disguise the free paving from the state auditors

20 when you sent out those bogus or those phony invoices to about

21 11 individuals there in Manchester.  That was a

22 misrepresentation or a lie, too, wasn't it, sir?

23 A    Sir, I am telling the truth and doing what that I think is

24 right, and that's all I can say now.  To tell you that I did

25 not lie then, yes, I did.  But I apologize and I'm sorry for

1  what I've done.  Okay.

2  Q    And you're trying to get a break on your sentence, that's

3  your hope here today; correct?

4  A    I'm trying to do the right thing, sir.  Of course, yes, I

5  would like to have a break on my sentence, but I'm trying to do

6  the right thing.  It's not been easy.

7  Q    Do you know a Melanda Adams of Clay County?

8  A    Yes, I do, that's Doug Adams's daughter.

9  Q    She's the daughter of Doug and Sissy Adams; is that your

10  understanding?

11  A    To my understanding; that's correct.

12  Q    How long have you known Melanda Adams?

13  A    I don't really know.

14  Q    A good number of years?

15  A    I've known her for a few years.  I've not -- you know,

16  I've not known her really closely or anything, but I have known

17  of her.

18  Q    Do you know if in a time period before 2002 if Melanda

19  Adams had a problem with drugs?

20  A    That's been rumored; that's correct.

21  Q    Do you know that?

22  A    I don't from firsthand knowledge know, but it was rumored

23  and pretty well general information in Clay County that she did

24  have a drug problem.

25        MR. SMITH:  Your Honor, I'm going to object.

1              THE COURT:  Sustained.

2              MR. WESTBERRY:  Let me have just a second, please,

3    Judge.  I'm trying to get to the bottom of this.

4              THE COURT:  Yes, sir.

5    BY MR. WESTBERRY:

6    Q    You're represented by counsel; correct?  You have a

7    lawyer?

8    A    Yes, I do.

9    Q    He's explained to you these things called the Sentencing

10   Guidelines; correct?

11   A    I'm not for sure I'm familiar with everything to do with

12   them, but I generally know.

13   Q    Have you heard the term "Guidelines" used in connection

14   with other court appearances you've made by your counsel?

15   A    I'm not really familiar with all the legal aspects of

16   everything.  I'm not a lawyer.

17   Q    Yeah, you're just relying on your lawyer?

18   A    I speak with him, yes.

19   Q    But before — but before Judge Reeves can make a

20   determination whether or not you have a reduction in sentence,

21   the government would have to decide first; correct?

22   A    I don't know the exact terminology of that and that sort

23   of thing, I really don't.

24   Q    Has the government made you any promises as to what

25   they'll do?

1   A    No, they have not.

2   Q    It depends on what you say in court; is that correct?

3   A    No, it doesn't.  It depends on my testimony being

4   truthful, and I can generally read that, but I can't tell you

5   the legal terminology of what all that means.  I mean, I can't.

6   Q    So you're saying you're being truthful here today;

7   correct?

8   A    That's correct.

9   Q    But you weren't truthful a number of years ago when you

10  accepted approximately $67,000 in bribes; correct?

11         MR. SMITH:  Your Honor, I'm going to object, that's

12  been asked and answered.

13         THE COURT:  All right.  I'll sustain, it has been

14  covered previously.

15         MR. WESTBERRY:  Thank you.

16         THE COURT:  Thank you, Mr. Westberry.

17         Mr. White on behalf of Mr. Jones.

18         MR. WHITE:  Can you give me just a moment, Your

19  Honor, to get organized?

20         THE COURT:  Yes, sir.

21         MR. WHITE:  Thank you, Your Honor.

22         THE COURT:  Thank you.  You may proceed.

23                    CROSS-EXAMINATION

24  BY MR. WHITE:

25  Q    Good morning.

1  A    Good morning.

2  Q    My name is Scott White, I represent Charles Wayne Jones

3  right over there.  I think you know Mr. Jones.  In fact, you've

4  already identified him for us.

5       What I would like to begin with —— And let me start by

6  saying the same thing everybody, I think, else has.  Mr. White,

7  if at any time you do not understand my question or anything

8  like that, just tell me and I will do my best to make myself

9  understood.

10      The first thing I want to talk to you about, though, is

11 the last recording —— what you thought was the last recording

12 you made on June 7th, 2007, when you went over to Wayne's

13 house.

14 A    Yes.

15 Q    Do you remember that recording?

16 A    Yes.

17 Q    And that recording is —— was identified by the United

18 States, the transcript, as Exhibit A21A.  Do you have that?

19 A    No, I don't.

20      MR. WHITE:  I would ask that the Clerk, if she could,

21 give you A21A.  We may not need it, but just in case.

22      THE WITNESS:  Thank you.

23 BY MR. WHITE:

24 Q    Now, who turned on the hidden recording device that day

25 when you went over there?  You or an FBI agent?

1  A    I did.

2  Q    And what did you understand your instructions to be

3  from -- Well, let me back up.

4       As you testified to Mr. Pinales yesterday, did you meet

5  with the FBI and get instructions before you went over to

6  Mr. Jones's?

7  A    I didn't meet that exact day, no.

8  Q    Had you met the day before?

9  A    I don't know.  It would have been in that --

10 Q    Is this just something you free agented on, did you decide

11 to go over there?

12 A    No, I did not.

13 Q    Did you call them before?

14 A    Yes, I did.

15 Q    Okay.  And what was your -- did they direct you to do

16 anything in particular, any subject areas to cover?

17 A    Just said to go in there and just the same thing that it

18 had been.

19 Q    I'm sorry?

20 A    The same -- you know, I went in to talk with them about

21 what was going on with the investigation.

22 Q    Okay.  And this would have been in May -- I'm sorry, early

23 June of 2007?

24 A    Uh-huh.

25 Q    Now, when you arrived at Wayne's, he was working in his

1 garden, wasn't he, and you-all were talking about the weather

2 and how a big storm had come up?

3 A    I don't remember exactly.  I don't know.

4 Q    You remember -- I mean, we heard the tape.  I mean, it was

5 clear he was moving around and working while you-all were

6 talking.

7 A    Yeah, I think he was in his garden when I pulled up.

8 Q    And you-all -- and so you testified on -- I keep wanting

9 to say today is Tuesday.  When you testified Wednesday,

10 yesterday, and you said that the recording was made at an

11 outbuilding, that's not right, it was made out in his garden

12 while he was working in the garden?

13 A    No, it was made at an outbuilding.  It was -- when I

14 arrived, he was walking out of the garden into his outbuilding.

15 Q    Really?

16 A    Yes.

17 Q    How big is that outbuilding?

18 A    It's not a real big outbuilding.  It's kind of like a --

19 it had -- it's like a smaller garage-type thing, you couldn't

20 pull a car in it, it was more of a thing that you could store

21 tools.

22 Q    It was a garden shed?

23 A    Well, I'm sorry, the definition of that.  I may should

24 have said a garden shed, sir, if that's what it would have --

25 you know, that may have been what it was.  He had chairs set up

1    in there to where you could sit down.

2    Q    Okay.  There weren't any women around, were there, it was

3    you and him, and I think some other fella had kind of come up

4    while you-all were talking?

5    A    Yes.

6    Q    J.D. Napier, was that the fellow?  Do you remember?

7    A    I think so, yes.

8    Q    Now, one of the topics, and I believe you brought it up —

9    A    I don't know.

10   Q    — was these — the voting machines that were used in the

11   2002 — in the 2006 election; is that correct?

12   A    Yes, we talked about the voting machines.

13   Q    Okay.  Now, I want you to read to yourself, it may take

14   you a minute or so, I want you to read pages six through nine

15   of that document.  This is the transcription.

16              MR. SMITH:  Your Honor, may we approach?

17              THE COURT:  Yes, sir.

18        (Whereupon, the following discussion was had between the

19   Court and counsel at the bench, out of the hearing of the

20   jury.)

21              THE COURT:  What is the exhibit number again?

22              MR. SMITH:  A21A.

23              MR. WHITE:  A21A.

24              THE COURT:  Okay.

25              MR. SMITH:  Your Honor, I announced to the Court

1    before we began the session today it's my recollection that

2    counsel had been given copies of these redacted versions, and I

3    see from Mr. Scott White's screen that he does have an initial

4    version, which leads me to believe that my representation to

5    the Court that I had given copies of this is correct.  I wasn't

6    able to refute the claim that I had not given them these, but

7    it appears on his screen that he's got the initial version, and

8    the concern I have is on page six there are —

9              MR. WHITE:  Can I go get mine so I can strike it out?

10             THE COURT:  You can.  Everybody else stay up here.

11             MR. SMITH:  Page six, where he directed the witness

12   —

13             THE COURT:  Just a second until he comes back.

14             MR. WHITE:  Okay.  What page are we on?  Six?

15             THE COURT:  Page six.

16             MR. SMITH:  The concern I have, Your Honor, is the

17   witness has an unredacted version he's been directed to read,

18   which is not the same copy that you're reading from.

19             MR. WHITE:  You want to switch out?

20             THE COURT:  Let me give him my three pages — four

21   pages, six through nine.  Will that remedy the problem?

22             MR. SMITH:  I think it would.  I'm just concerned

23   that, again, without having — the witness having any knowledge

24   that this is an unredacted version in front of him, I'm

25   concerned that we'll bring up unnecessarily an issue.

1          THE COURT:  Well, you may want to advise the witness

2     that, of course, the Court has ruled on the relevancy of some

3     of this information and there may have been some redactions.

4          MR. WHITE:  How about if I say the Court made

5     pretrial rulings, or do you want me to just say ruled on

6     relevancy?

7          THE COURT:  The Court has made determinations as to

8     what's been admitted, so there may be — there's some

9     references that are not included.  I think that will take care

10    of the issue.

11         MR. WHITE:  Okay.

12         MR. RICHARDSON:  To make sure I'm understanding you,

13    the copies that we got are the correct copies?

14         MR. SMITH:  Yes.

15         MR. RICHARDSON:  And the ones that the witness has

16    are —

17         MR. SMITH:  The unredacted versions.

18         MR. PINALES:  Your Honor, I just assume from the

19    questions there is something like corrected copies and that

20    covers a lot.

21         THE COURT:  Well, I'm afraid where we're going to get

22    to — and I'm trying to think a little bit ahead.  I think

23    where we're going to get to is I'm going to end up advising the

24    jury that they're not to consider matters that are not included

25    in the tape recordings.  See, if there's a reference made to

 1  something that's not included, it's just like if the Court

 2  instructs the jury to disregard an question and answer, the

 3  jury is not to consider that.  So if we're getting into that,

 4  that's where we're headed.  Now, I don't know if your questions

 5  are going to center on anything that's been —

 6          MR. WHITE:  I don't know.  Can I see the unredacted,

 7  Steve?  The one I've got is redacted.

 8          No, all I'm going to ask about are the machines.  Is

 9  there anything on the other page?

10          MR. SMITH:  That's the only redacted portion.

11          THE COURT:  You're going to show him this and you're

12  going to direct the questions about the voting machines.

13          MR. WHITE:  Yes.

14          THE COURT:  That should be okay.

15          MR. WHITE:  Yeah.  I think we should be okay.

16          THE COURT:  I'll give him my copy to make sure that

17  he has the same thing that you do.

18          MR. WHITE:  Okay.  Thanks, Judge.

19          MR. HOSKINS:  To make sure that I'm clear on what

20  we're referring to as the redacted copies, we were given copies

21  with a disk with all the government's exhibits, and my

22  understanding is that the transcripts that appear on that disk

23  labeled government's exhibits are the redacted copies; is

24  that — am I correct?

25          MR. SMITH:  I believe that is correct.  It's just

1   what was revealed to me here, that he has that copy that I've

2   given him and it shows those redactions.

3              THE COURT:  With respect to this one.

4              MR. WHITE:  And I believe it is for all, because I've

5   actually reviewed those, Judge.  So the only thing we don't

6   have are the unredacted.  Well, we do, because we got them

7   earlier.

8              MR. PINALES:  As the Court can see, it's so easy to

9   confuse this.

10             THE COURT:  We are dealing with different versions of

11  these documents, and I think Mr. Hoskins is trying to make sure

12  we're all on the same page.  And with respect to this exhibit,

13  we are.

14             All right.  Thank you.

15         (Whereupon, the following proceedings continued in open

16  court.)

17             THE COURT:  Thank you.

18             Mr. White, just so we're clear what pages we're on,

19  I'm going to give you the pages that he asked you to review,

20  and you can just look at that.  It should be the same as what

21  you've got, but that's the version he wants you — those are

22  the pages he wants you to look at.

23             Give him just a moment to look at those.

24             MR. WHITE:  Sure.

25  BY MR. WHITE:

1  Q    Mr. White, after you get past page six, it's all the same

2  as you've already read.

3  A    Okay.

4  Q    I just wanted to advise you before –– and we may not read

5  from that at all, but that's the area I'm going to cover, so I

6  just wanted you to kind of be more generally familiar.  But I

7  want to advise you that the Court made determinations as to

8  that transcript and what we heard as to what's been admitted,

9  and there may be references in that –– what you were given by

10 the Clerk that's not included in what was read to the jury.  So

11 I didn't want you to get into anything that is not properly

12 before the jury.  Are you with me?

13 A    Yes.

14 Q    Okay, great.  So in other words, don't read anything off

15 that document unless I've asked you; okay?  And then I think we

16 can avoid any problems.

17      So let me go back.  You've had a chance to look at six

18 through nine?

19 A    Yes.

20 Q    Would it be a fair –– You would agree with me, then, that

21 you were the one who brought up the subject of these voting

22 machines?

23 A    Yes, sir.

24 Q    And these voting machines –– Now, in 2006, you were still

25 the City Manager or City Supervisor; correct?

1  A    Yeah.

2  Q    And you were aware that in 2006 the county or whoever had

3  gotten new voting machines; correct?

4  A    Uh-huh.

5  Q    Do you know -- If you don't mind, would you mind, as best

6  you can, just say yes or no instead of uh-huh and huh-uh?

7  A    I'm sorry.

8  Q    I'm thinking of our court reporter.

9  A    Oh, I'm sorry.  I'm sorry.

10  Q    Listen, everybody does it, don't worry about it.

11       But my question is:  Do you know why new voting machines

12  were purchased; if you know?

13  A    I don't know.

14  Q    That's fine.  Now, isn't it true -- would it be also an

15  accurate statement to say that in that whole discussion about

16  the voting machines that Wayne Jones never agreed that the

17  machines could be manipulated to steal a vote?

18  A    I don't see where he agreed to that.  He said they was

19  some people walked off.

20  Q    Right.  And he said -- you would agree that he also said

21  that if folks walked off, meaning that they had gotten through

22  the voting process and they thought that they had cast a

23  ballot, correct, but they hadn't done the last stage?

24  A    Okay, that's what he was referring to.

25  Q    Right.  So if a voter that had been used to voting on the

1  old machines, they do what they do, and they walk away.  On the

2  new machine, they did what they did, they thought they cast a

3  vote, but they had not yet officially done it because they

4  didn't press that last button, but they didn't think they had

5  to and they walked off; correct?

6  A    Yes, that was the way that the system was set up to steal

7  the votes.

8  Q    Okay.  Well, I'm going to come back to that, but I wanted

9  to just stick with you on this.  You said that was the way the

10  system was set up to steal the votes.

11  A    That's the way that they stole them, is when people

12  walked --

13  Q    Yeah, I'm with you.  So let me ask you this:  But you

14  would agree with me, having refreshed your memory about that

15  transcript, that Mr. Jones, Wayne, said that the way to deal

16  with that, if somebody walked away, was that the two election

17  judges would go to the machine and either cast the ballot if

18  they could determine the -- the two of them could determine

19  that's what the voter intended to do or they would cancel the

20  vote.  That's what he told you, isn't it?

21  A    That's what he said on this transcript, but what he said

22  at other times was different; a lot.

23  Q    And then after you-all talked about the voting machines,

24  you changed the subject to talk about how worried you were and

25  you couldn't eat and had -- I think you said you had diarrhea?

1   A    Yeah.

2   Q    That wasn't the truth, was it?  That was a lie?

3   A    Yes.

4   Q    You weren't worried about anything?

5   A    Oh, I was worried, but I —

6   Q    But, I mean, you weren't — you weren't worried sick that

7   people were going to come and get you, because you had already

8   turned yourself in and pled guilty.

9   A    Yeah, I had done that.

10  Q    That's what you had already done before you went and saw

11  Wayne, so you just lied about that, didn't you?

12  A    But I had worry, and I was instructed on what to say.

13  Q    Oh, did the FBI tell you to tell Mr. Jones that you were

14  worried and you had diarrhea?

15  A    Okay, here's what you're getting into.  It was not word

16  for word, but I was instructed by the FBI to induce

17  conversation.  So I wasn't acting without doing that.

18  Q    Now, you testified, did you not, on direct examination

19  that Wayne taught your wife, Wanda, how to manipulate these

20  machines at the County Clerk's Office; correct?

21  A    That's right.

22  Q    And were you in the Clerk's Office when this happened?

23  A    No, I wasn't.

24  Q    So that's just what she told you?

25  A    That's what she told me, that's what Charles "Dobber"

1    Weaver told me, they was several election officers told me

2    that -- how that they'd put them through the process of what to

3    do there.

4    Q    When did this happen?

5    A    That happened --

6    Q    Let me -- let me back up.

7         MR. WHITE:  Your Honor, may I withdraw that question

8    just briefly?  Because I want to make sure that we're clear.

9    BY MR. WHITE:

10   Q    The election occurred that I'm talking about -- Well,

11   strike that.

12        You claim -- or your wife claims that Wayne taught her how

13   to manipulate the machine, that was before the primary election

14   in 2006; correct?

15   A    That's right.

16   Q    And that occurred in May?

17   A    I think that's correct.

18   Q    I mean --

19   A    Yeah, that's when the May --

20   Q    We always have our elections in Kentucky in May.

21   A    Yeah, I think that's correct.  That's what I said.

22   Q    Okay.  Well, I just wanted to -- you seemed a little -- At

23   any rate, how long was it before that election that your wife

24   was taught how to manipulate the machine?

25   A    I don't know exactly.  You would have to ask her.  It was

1  a few days prior.

2  Q    Just a few days prior?

3  A    I don't think it was weeks.

4  Q    Was it within a week?

5  A    You would have to ask her.

6  Q    Well, I mean, she told you, didn't you?

7  A    Well, do you think I can remember that date?  I don't

8  know —

9  Q    I don't know.  That's why I'm asking you.

10  A    Well, I'm just asking — well, I'm asking you to tell —

11  to ask her.

12  Q    I don't know if you may remember the exact date, but what

13  I'm curious about is can you remember whether it was within a

14  week before the election?

15  A    I don't know whether it was in a week or not, sir.

16  Q    Well, was it more than a month?

17  A    No.

18          MR. SMITH:  Your Honor, it's been asked and answered.

19  I think we're now arguing with the witness.

20          THE COURT:  Yes.  Let me remind counsel when we talk

21  over each other the reporter has the option of reporting one or

22  the other, she can't get both for the record, so just a

23  friendly reminder.

24          MR. WHITE:  I appreciate that, Your Honor.

25          THE COURT:  Yes, sir.

1  BY MR. WHITE:

2  Q    Do you know the times that -- I don't want to ask you when

3  she did it, but the times that -- the time that she went in and

4  got taught by Wayne on how to do this machine, did -- was that

5  during the day, during regular business hours?

6  A    With all due respect, I think it was after hours, but you

7  will have to ask her.

8  Q    Okay.  You're just not sure.  Now, your wife has her own

9  deal with the feds; right?

10          MR. SMITH:  Your Honor, I'm going to have to object.

11          MR. WHITE:  If he knows.

12          THE COURT:  I'll overrule.

13          If you can answer the question based on your

14  knowledge.

15          THE WITNESS:  Yes.

16  BY MR. WHITE:

17  Q    What's your understanding of the deal she has with the

18  federal government in this case?

19  A    That she has to provide truthful testimony and truthful

20  information about the -- what went on and that she wouldn't be

21  charged.

22  Q    Wouldn't be charged at all; correct?

23  A    To my understanding, but you would have to talk to her

24  further.

25  Q    Now, I got to ask you a question or two that Mr. Pinales

1  made a point of yesterday, but I want to give it some context,

2  so just bear with me for a second.

3     When you got to Wayne's, the machine was already running,

4  and you knew it was running, you were there to record a

5  conversation; correct?

6  A    Uh-huh.

7  Q    So you knew anything you said would be recorded; is that

8  right?

9  A    Yes.

10 Q    And you knew, based on just your experience in life, that

11 there was a possibility that recording may end up getting

12 played to a jury someday; correct?

13 A    Yes.

14 Q    Okay.  One thing I'm curious about, you would agree with

15 me that at least on this day and in this recording Wayne Jones

16 didn't say anything about doing anything illegal or wrong with

17 that voting machine; is that correct?

18 A    He knew that Wanda had been to the grand jury, he --

19 Q    Hold on.

20 A    Okay.

21     MR. WHITE:  Your Honor, I would ask if you could

22 instruct the witness to answer my question, and then he can

23 explain, but at least if I can get an answer to my question.

24     THE COURT:  If you can answer his question, then you

25 can explain.

1        THE WITNESS:  Okay.  No.

2        THE COURT:  Now you may explain.

3        THE WITNESS:  Okay.  He knew that my wife had been to

4  the grand jury.  They were starting to become very concerned

5  about what she had said at the grand jury, so they were

6  actually, at this time, worried about what she was telling.

7  BY MR. WHITE:

8  Q    Are you implying that Wayne Jones was being cautious, too?

9  A    I'm implying that he was careful about what he said

10  because he knew my wife had been to the grand jury and he

11  probably wasn't trusting me enough to have a conversation with

12  me at this time.

13  Q    Really.  You think he was being cautious that day you were

14  recording him?

15  A    Oh, I think he cussed and I think he said things on there

16  that was -- that was -- I think he was being rebellious, I

17  think he was being the way Wayne is.  I mean, but I think that

18  he was not exposing hisself to any trouble or willing to talk

19  about -- he's no stranger to the criminal elements of what goes

20  on, I can tell you that.

21  Q    Well, thank you.  Is it your testimony today that Wayne

22  Jones was worried that he was being recorded by you?

23  A    I think that at that point that it's a --

24        MR. WHITE:  Your Honor, if you could instruct the

25  witness to answer the question.

1              THE COURT:  No, you're asking him — you're asking
2   him for his understanding or belief, and so I think that's what
3   he's expressing.  You can withdraw the question or he'll be
4   allowed to answer it.
5   BY MR. WHITE:
6   Q    Go ahead.
7   A    Yes, I think at this point that it's very possible that he
8   thought that he may be being recorded.
9   Q    So given that possibility and knowing that that could be
10  played in court, he said all those things he said about federal
11  prosecutors and federal judges, that's your testimony; right?
12  A    Yeah, I think — I think that's correct, and I don't think
13  that he really cares if it was said in the courtroom at that
14  time.
15  Q    Now, Mr. Lewis — I'm sorry, Mr. White, when Carmen Lewis
16  fired you from your job, when was the next time you held a job?
17  A    It was probably a little bit over a year.
18  Q    So you were let go in January of '07?
19  A    Uh-huh.
20  Q    I'm sorry, could you say yes?
21  A    Yes.
22  Q    Okay.  And then you basically went into becoming a
23  cooperating witness or a confidential informant for the federal
24  government sometime in, what, was it February or March of 2007?
25  A    I don't remember the exact date.

1  Q    Was it early spring, do you remember, about this time of

2  the year?

3  A    Yeah, it was right about the time that I entered into the

4  plea agreement or somewhere a little bit before.

5  Q    And so from February — or, I'm sorry, from about the time

6  that you did the plea agreement, which would have been in

7  April, until about a year later, which would have been January

8  of 2008, is when you got your first job?

9  A    No, it was probably a little bit longer than that, sir.

10 It was — it was probably around July of —

11 Q    Of '09?

12 A    No, of '08.

13 Q    Oh, okay, a year and a half ago?

14 A    Yeah, something like that.  It may have been June, I don't

15 remember exactly.

16 Q    Thank you.  And one thing I was curious about, we know

17 that your starting salary was $48,000.  How much were you

18 making when you were let go in January of '07?

19 A    Making the same.

20 Q    You never got a raise?

21 A    What do you mean?

22 Q    I mean, you started — when you first got the job in '04,

23 you were paid $48,000 a year; correct?

24 A    They did some cost of living raises at that time.  I think

25 a year or two — a year prior to that, I don't know exactly how

 1  much it was or nothing.

 2  Q    It was about the same?

 3  A    Yeah, it may have been 500 or a thousand dollars more or

 4  something, I don't know for sure.

 5  Q    Now, you eventually -- did you testify at the very

 6  beginning of your testimony, I think last week or the week

 7  before, that you worked at a company in London?

 8  A    Uh-huh.

 9  Q    I'm sorry?

10  A    Yes.

11  Q    I know that's annoying, I apologize.  At that place -- And

12  the name of that place is what?

13  A    Senture.

14  Q    And you said you were a customer service representative?

15  A    Yes, it's a call center.

16  Q    Okay.  So people would call about -- that had bought a

17  product and something happened -- or you tell me what the job

18  was.

19  A    There was different contracts, most of them was temporary,

20  some of them was political contracts that they called and you

21  read a script, a political script.  Some of it was to do with

22  the digital cable boxes that were issued.  Some of it was to do

23  with Cash for Clunkers.  Some of it was to do with several

24  different things there, Medicare.

25  Q    And is this -- is this call center in one location?

1  A    I think it's got more than one location.

2  Q    The location that you worked at was in London; correct?

3  A    Yes, it was London.

4  Q    Was it in one building?

5  A    Yes.

6  Q    Was it on one floor or was it multi floors?

7  A    It's one floor, but it's like a factory.  It's a really

8  tremendously big building.

9  Q    Okay.  About how many people work there –– Let me strike

10  that.  Do they have shifts?

11  A    They have shifts.

12  Q    What shift did you work?

13  A    I worked different shifts.

14  Q    Some days you would work during the day, sometimes in the

15  evening, sometimes at night?

16  A    They was different shifts.  Yeah, I worked different

17  shifts.  Sometimes I was there in the morning, sometimes I was

18  there in the evening, it just according to what contract and

19  when I was needed.

20  Q    And I'm just going to ask you this because I don't –– it

21  didn't come up, so I don't know what the answer is, but what

22  are the –– between the time you left the City in January of '07

23  and went to work at Senture in the summer of '08 ––

24  A    Uh–huh.

25  Q    –– I mean, that's a long time to go without a job; you

1  would agree?

2  A    Uh-huh.

3  Q    And were things tight at your house?

4  A    It was pretty tight.  You know, I was drawing unemployment

5  and I had some -- you know, some things that, you know -- yeah,

6  it was tight.

7  Q    In the summer of '08, had your unemployment run out?

8  A    I don't remember the exact date it run out, but by the

9  summer of '08 I'm sure that it had.

10  Q    I'm not sure how long that lasts.  At any rate, would you

11  agree -- Now, to collect unemployment in Kentucky, don't you

12  have to show evidence you've been looking for a job?

13  A    I did show that evidence.

14  Q    And you have to make so many contacts a week or every

15  couple of weeks?

16  A    Uh-huh.

17  Q    Is that right?

18  A    Yeah, that's right.

19  Q    Did you -- so it would be fair to say you were having a

20  hard time finding a job, you were looking for a job, but you

21  were having a hard time finding a job?

22  A    With everything that was going on in Clay County at that

23  time and the publicity that it was getting and people knowing

24  who my father was, yes, it was -- it was hard.

25  Q    When did you move from Clay County to London?

1  A    I moved from Clay County to London around April, I think,

2  May, something like that, of '07, maybe March.

3  Q    Okay.  Shortly after you became a cooperating witness with

4  the FBI?

5  A    Something -- yes.

6  Q    So living in Laurel County, it took you well over a year

7  to find a job?

8  A    I went and applied for jobs, and, yes, it was a tough job

9  market there, especially with what was going on.

10 Q    Well, were you a well-known person in Laurel County?

11 A    I had had a mobile home dealership there for a long time

12 and I knew quite a few people, but I was trying to get a job

13 in -- you know, I had went to car agencies and I went to

14 manufactured home lots and I did find it hard trying to find a

15 job in the fields that I wanted to go into.

16 Q    Now, you testified on direct that you have a high school

17 diploma?

18 A    I have a GED.

19 Q    You don't have any college, do you?

20 A    No, I have took several courses as far as training for

21 corporations and people when I was in the manufactured housing

22 business, and I took Chrysler courses and General Motor courses

23 and that sort of thing.

24 Q    Now, when you went to work at Senture, I reckon it's like

25 most places, did you have to fill out a job application?

 1   A     Yeah, I filled out a job application.

 2   Q     And did they ask for your criminal history?

 3   A     Yes, I signed a thing that they could —

 4   Q     Did they check your criminal background?  Did you — did

 5   you disclose to them that you were a convicted felon?

 6   A     I asked my attorney at that time and he said till this

 7   sentencing took place that anything could happen and

 8   technically I was not.  They didn't ask me if I had pled

 9   guilty, they asked me if I was convicted, and actually till I'm

10   sentenced I wasn't convicted from what I was —

11   Q     Oh, really.

12   A     Well —

13   Q     That's what your lawyer told you?

14         MR. SMITH:  Your Honor, I'm going to object to

15   counsel testifying.

16         THE COURT:  Sustained.

17         MR. WHITE:  Thank you, Your Honor.

18   BY MR. WHITE:

19   Q     Did you have any references?

20   A     I had a few references, yes.

21   Q     Was there anybody — were you aware that one of the FBI

22   agents —

23         Let me ask you this:  Was one of the FBI agents that you

24   were working with as a cooperating witness, was that Agent

25   Blair?

1    A    Yes, it was.

2    Q    Did you express to Agent Blair or did you ever ask Agent

3    Blair — Let me back up.

4         Were you aware that Agent Blair's wife is employed in the

5    HR department at Senture?

6    A    Not till several months after working there.

7    Q    Let me switch topics on you now, if I could, Mr. White.

8    A    Okay.

9    Q    You said that Wayne — I want to talk to you about the

10   absentee voting in 2006; okay?  Did you testify that Wayne

11   Jones was working the absentee voting in the primary election

12   in 2006?

13   A    He was working — he told me he was working the absentee

14   voting in that, and I know he worked it in the general election

15   from my own eyes, but he did tell me he was working it — that

16   he had worked it and that he was working it in the primary.

17   Q    Okay.  And absentee voting occurs for a period of time

18   before the polls open to allow folks who for whatever reason

19   aren't in the county on that day to be able to cast their

20   ballots, is that your understanding of what absentee voting is?

21   A    Yes, that's correct, my understanding.

22   Q    And that takes place in the County Clerk's Office?

23   A    Yes, sir.

24   Q    Now, are you familiar — have you ever been in the Clay

25   County Clerk's Office?

A Yes.
Q It's a new building, isn't it?
A Yes.
Q But it was the building -- the building that sits there today is the same building that was there in '06; correct?
A I think that's correct. Yes, that's correct.
Q And what I'm going to do is I want to draw, if I could get you to help me from there, the layout of the Clerk's Office; okay? Do you know it well enough if you went in there that we could just draw a diagram? If not, that's okay.
A I don't know it well enough, but I can tell you this: They were positioned, the best of my recollection, to the left. When you walked in that door, Freddy's office was on the right, there was a -- now they positioned that election machine at different places at different times.
Q Let me -- so we all are kind of together, let me give a stab at a drawing --
A Okay. I can't --
Q -- and you just tell me if I get it wrong. Is that all right?
A Well, you can -- I'm --
Q All right. I'm going to just draw the courthouse. Okay. Is the entrance -- would it be fair so say -- I'm going to make this the front; okay? I'll put an "F" there.
A Uh-huh.

1   Q    That's the front door where you go in?

2   A    Uh-huh.

3   Q    Now, the Clerk's Office – let me do it over here – is over

4   here; correct?  When you walk in and you turn to the right?

5   A    It's on the right as you walk in.  That's not really

6   establishing –– the drawing don't look ––

7   Q    Well, you walk in the front door, and the Clerk's

8   Office ––

9   A    Yeah.

10  Q    –– is this block right here; correct?

11  A    It's on the right when you walk in.

12  Q    Correct.  And there's a –– when you walk in –– you walk in

13  a door, correct, there's an actual door there?

14  A    Yes.

15  Q    And then there's kind of a long counter ––

16  A    Uh-huh.

17  Q    –– in the front; correct?

18  A    Yeah, and it goes down the other side also.

19  Q    Down this side or this side?

20  A    The other side.  Yeah, where your ––

21  Q    Where my finger is at now?

22  A    Yeah, right there.

23  Q    Does it go all the way to the end?

24  A    It doesn't, I don't think, go all the way to the end.

25  Q    Okay.  And is Freddy's office right here?

1   A    Yes.

2   Q    So in other words, you walk in the front door and Freddy

3   is right over there where Mr. Simons is sitting pretty much?

4   A    If you walk ——

5   Q    This is Mr. Simons here.

6   A    If I'm walking in the door, that's the door, it would be

7   close to where they're sitting.  It's right on the right as you

8   go in and then it's to the right.

9   Q    And there's a door —— I mean, it's a private office,

10  there's a door there; right?

11  A    Yes.

12  Q    And the wall, though —— the wall, the thing right here at

13  his office, those are glass windows; right?

14  A    Uh-huh.

15  Q    I'm sorry?

16  A    Yes, they are.

17  Q    I'm sorry, I'm giving you that annoying reminder again.

18  A    No, you're okay.

19  Q    And there's also a window in the door?

20  A    Yes.

21  Q    And is it —— did you say it was over here where the

22  absentee voting machine was?

23  A    When I seen the absentee voting machine set up, it was to

24  the end of the office down —— if you walked in and went down

25  the top of the counter, and I'm talking about the top counter,

1   all the way down —

2   Q    Down here?

3   A    This is — yeah.  And then you take a right and go to the

4   back of that office, and there was — the best of my

5   recollection, back there in the back there was a room set up in

6   the back corner adjacent — well, I wouldn't say adjacent.  I'm

7   having trouble diagramming what you're doing there, I can't —

8               MR. WHITE:  I'm sorry.

9               Your Honor, would it be all right if he came down

10  here with me?

11              THE COURT:  Well, we're not making a very good record

12  of this line of questioning because we're not going to be able

13  to copy that.  So perhaps the best thing to do would be to

14  have — if you want him to sketch something out, of course not

15  to scale — we're getting close to the lunch hour as well.

16              MR. WHITE:  Okay.

17              THE COURT:  So you may want to do that during the

18  lunch hour perhaps and we can start back on that point when we

19  resume at 1:00.

20              MR. WHITE:  You want me to break now?

21              THE COURT:  Yes, we'll do that.

22              MR. WHITE:  Thank you, Your Honor.

23              THE COURT:  Ladies and gentlemen, we'll take our

24  lunch break at this time until 1:00.  Please keep in mind the

25  admonition that you've been given several times not to discuss

1    the case among yourselves while we are in recess.  The jury

2    will be excused until 1:00.

3         (Whereupon, the jury retired from the courtroom, after

4    which the following proceedings were had in open court.)

5              THE COURT:  Thank you, and please be seated.

6              Mr. White, are you going to ask the witness to make a

7    drawing of the Clerk's Office?

8              MR. WHITE:  Yes.

9              THE COURT:  If so, what I'm going to do is I'm going

10   to give him a pad with a few pieces of paper in it with a pen

11   and he can do that over the lunch hour.

12             MR. WHITE:  That would be great, if you don't mind.

13             THE WITNESS:  I must warn you, I'm a terrible drawer.

14             THE COURT:  I'll trade you those four pages from my

15   notebook.  Thank you.  That's fine.

16             MR. PINALES:  Your Honor, before the witness is

17   excused —

18             THE COURT:  Yes, sir.

19             MR. PINALES:  — I would request the Court to

20   admonish this juror that he is not to discuss his testimony

21   with any other potential witnesses that may be in the witness

22   room.

23             THE COURT:  Yes, sir.

24             Mr. White, the Court previously invoked the rule on

25   exclusion of witnesses, and essentially what that means, that's

1  a rule of evidence, Rule 615, and it provides that once a

2  person testifies that they're not to discuss their testimony

3  with any other potential witness in the case, either directly

4  or indirectly.  So you understand that you would not be able to

5  talk about your testimony with anyone.  Of course, you can

6  speak with your attorney, but you can't use your attorney to

7  communicate with someone else that might be a witness in the

8  case.  You understand that?

9           THE WITNESS:  Yes.

10          THE COURT:  All right.  Thank you.

11          Counsel, I'm going to excuse Mr. White.

12          You can step down at this time.

13          Let me see if there's any other issues that need to

14  be taken up before we take our lunch break.  Anything else?

15  Mr. Richardson has one.

16          MR. RICHARDSON:  One for me, Judge.  If I may

17  approach or have the court officer approach you.  I want to

18  present to you –– I didn't make a copy for everybody, but maybe

19  we can put it on the Elmo.  Judge, if we can turn on the Elmo I

20  can show everybody else here real quick.

21          THE COURT:  That'll be fine, yes, sir.

22          MR. RICHARDSON:  Judge, in my –– in my cross-

23  examination of Mr. White –– Did I turn it on?

24          Your Honor, I have made what I have termed a

25  timeline, and basically this timeline is designed to assist the

1  jury in my cross-examination of detailing when the Whites met

2  with the FBI, when they went to the grand jury and turned over

3  evidence.  I don't think there's any dispute about the accuracy

4  of this timeline.  I gave it to Mr. Smith in regard to, you

5  know, telling him I was going to use it in my cross-

6  examination.  He objected saying it's not an exhibit.  I don't

7  intend to -- it's like I had a blackboard here, Judge, and

8  could write on the blackboard.  This is simply to help assist

9  the jury in setting the time where everybody talked to the FBI

10 and gave over certain materials.  So I would like to use this

11 in my cross-examination.

12         THE COURT:  Well, what you'll need to do, of course,

13 you'll need to -- before it can be admitted, you'll need to

14 have the witness testify to the matters, the accuracy of the

15 matters that are listed.

16         MR. RICHARDSON:  Sure.

17         THE COURT:  You can't publish it if there's an

18 objection to it until it has been admitted as an exhibit in

19 evidence.  So that's the way we would need to proceed on that.

20 I don't -- he may agree or may disagree with one or more items,

21 we'll just have to wait and see.  But you have to lay a

22 foundation first before the document could be admitted.

23         MR. RICHARDSON:  I understand the laying the

24 foundation.  If, say, Mr. White says, well, I don't know one of

25 these things, then I intend to come over here and use the Elmo

1    and write down another timeline based upon this.  So even

2    though it won't be — like I said, it's like using a

3    chalkboard.

4              THE COURT:  Right.

5              MR. RICHARDSON:  It's not going to be admitted as an

6    exhibit —

7              THE COURT:  Right.

8              MR. RICHARDSON:  — it will just be an aid for the

9    jury to kind of follow along.  Is that permissible?

10             THE COURT:  Well, let me go back to matters that were

11   discussed at the pretrial conference, which you did not attend.

12   At the pretrial conference, which you did not attend, we

13   discussed the use of items such as this and I instructed the

14   parties that if everyone was in agreement with the use of

15   matters such as this, demonstrative aids, that if there was no

16   objection then they could be displayed to the jury.

17             MR. RICHARDSON:  I understand that.

18             THE COURT:  But if there was an objection, then there

19   would need to be a foundation laid before a document could be

20   used as an exhibit, which is essentially what this would be.

21   And I'm going to follow that procedure.  So if there is an

22   objection, and there has been, then it could not be shown to

23   the jury unless it's been admitted into evidence.  If you want

24   to bring out a dry board and put notes on the dry board as the

25   witness acknowledges certain dates, then you can certainly do

1    that.

2              MR. RICHARDSON:  Okay.  And use the Elmo rather than

3    a dry board, use the Elmo, it's the same thing.

4              THE COURT:  If you want to create a document with a

5    witness based on the witness's testimony, such as Mr. White is

6    attempting to do, a drawing of the courthouse or the Clerk's

7    Office, then you can have those — you can write those dates

8    down as the witness testifies, and subsequently, if you move to

9    admit that into evidence, then the Court would rule on that.

10             MR. RICHARDSON:  Yes, sir.

11             THE COURT:  All right.  Thank you.

12             Any other issues, Counsel?

13             MS. HUGHES:  I'll just tell the Court that I am ready

14   to discuss with the Court the issue of the admonition whenever

15   it pleases the Court.  I think when we're at the bench I said I

16   was doing a little research.

17             THE COURT:  Yes, ma'am.

18             MS. HUGHES:  My research is now on Post-it notes,

19   very effective, so whenever the Court is inclined, I am

20   prepared to discuss that.

21             THE COURT:  Okay.  Let's take it up now.

22             MS.  HUGHES:  All right.

23             THE COURT:  Everyone else can be seated.

24             Ms. Hughes.

25             MS. HUGHES:  Sorry for everybody that's hungry, but I

1  think it's important.

2         What we're talking about is what is the purpose of
3  Mr. White's recorded statements and what admonition the Court
4  is going to give to the jury about what he says on the tape.
5  And I think I would like to make it pretty clear that, you
6  know, whatever –– if he is going to testify to out-of-court
7  statements of one of these defendants, we know that that is the
8  admission of a party opponent, and so that's going to come in.
9  But I think the situation when the Court makes reference to
10 admissions on those tapes, we're not talking about admissions
11 of party defendants that are on the tapes, those are
12 admissions, those come in.  But when Mr. White is talking on
13 the tapes and then relating the issue –– relating a statement
14 of a defendant or a co-conspirator that would be considered an
15 admission, I think that's a double hearsay issue.  Double
16 hearsay is a mischaracterization, because it's not hearsay,
17 it's an admission, but it's still an out-of-court statement.
18 The witness, I think, Mr. White, can say Debbie Morris told me
19 X, Y, Z, but when he's on the tape saying Debbie Morris told me
20 X, Y, Z, that's what creates a problem.

21         So in my research of this issue, I think that the
22 courts are pretty clear that they've let this –– the
23 confidential informant's recorded statements come in only for
24 two reasons.  One would be it's not hearsay because it's not
25 offered for the truth of the matter asserted, and we've talked

1  about that, and the other one would be if it's an adopted

2  admission, and I don't think that we — we might have some

3  specific issues of that, but I don't think there's another

4  exception.  So our position would be that.

5       THE COURT:  Well, that's true.  There are admissions

6  that could come in, admissions of the defendant — the

7  defendants that could come in.  There could be adoptive

8  admissions or there could be admissions by silence when there's

9  a statement made and the witness should be expected to respond

10 a certain way and does not — does not respond.  But really

11 what we're talking about here, we're talking about

12 801(d)(2)(E), statements of co-conspirators made during and in

13 the course of a conspiracy, and that can include individuals

14 that are named as defendants, as well as others that are

15 involved in the conspiracy or members of the conspiracy that

16 are not parties to the proceeding, unindicted co-conspirators,

17 for example.

18       MS.  HUGHES:  I agree with that.

19       THE COURT:  Well, thank you.

20       MS.  HUGHES:  So far.

21       THE COURT:  But what we've been dealing with to this

22 point is we've been dealing with — I want to narrow the issue

23 just for a moment, if we could.  On direct examination,

24 Mr. Smith was asking the witness about his understanding of

25 certain statements that were made by the defendant, because in

1   cases such as this, sometimes there is double speak, for lack

2   of a better term.  A person says something, really means

3   something else, and the person has to explain the context of

4   what's being discussed.  So it's important to understand the

5   overall conversation that's taking place, and the party that's

6   testifying has to put that in some context.  Sometimes the

7   party also has to put into context a particular statement.  He

8   said this but he winked at me, which I meant -- which I

9   understood him to mean just the opposite.

10          So we have verbal conversations that are taking

11  place, and then we have non-verbal statements that are being

12  conveyed by the witness, and he can testify to all of those

13  matters under 801(d)(2)(E) or under 801(d) that deals with just

14  admissions made by the party.  So we have had some of that.

15          But then we've also had in cross-examination a couple

16  of the attorneys that have specifically asked about a statement

17  that was made and not to put it in context, but they've asked

18  about the statement as to whether it's true or not true.  So to

19  some extent, what the Court allowed in as context, to put the

20  entire conversation in context, has been expanded through the

21  cross-examination.

22          MS.  HUGHES:  Right.  Could we point fingers?

23          THE COURT:  Mr. Pinales did some of that, I think

24  Mr. Westberry perhaps did a little more of it.  But what I

25  would intend to do is I'm going to go back to the point that I

1   made earlier, and that is the Court's original admission of

2   those statements, they were admitted, and this is what I would

3   plan to instruct the jury.  We talked about this earlier, but

4   I've changed it just a bit, and let me go through this

5   instruction.  And that is the last part.

6          You've heard the testimony given by a witness which

7   includes his interpretation of what other people meant by what

8   they said.  You are reminded that this testimony represents the

9   witness's understanding of what was meant by the statements and

10  has been admitted to put these statements and the parties'

11  conversations in context.

12         So as long as I instruct the jury that that's the

13  reason that I admitted the statements, then I don't need to

14  instruct the jury that, but other defendants have expanded the

15  scope of the statements that were being admitted to prove — or

16  to — they go to other matters, and it may be — well, a

17  variety of different issues, and I'm not sure why all these

18  matters were questioned by the other attorneys, but they were.

19  It can be to challenge a person's credibility, for example.

20         MS.  HUGHES:  Which would be nonhearsay issue.

21         THE COURT:  Which could be nonhearsay, but it would

22  be admitted for another purpose.

23         MS.  HUGHES:  Right.  I understand that.

24         THE COURT:  Being offered by another purpose by one

25  of the defendants.  But the Court originally admitted these

1  statements when they were offered by the government for the

2  purposes that I've just outlined, and so that's why I would

3  limit the instruction just to the points that I've just made.

4       MS. HUGHES: Okay. And I just previously asked for

5  the word "only" be, because I thought they are only to provide

6  context, not for the truth of the matter asserted, and you're

7  telling me because -- that while that may have been true

8  before, because of cross-examination, that is no longer true?

9       THE COURT: That's not necessarily correct. I think

10  as long as I give the jury this instruction that that's the

11  reason that I've admitted these statements, it's correct. But

12  if I include the word "only" --

13       MS. HUGHES: Right, it would be better.

14       THE COURT: -- then I'm going to have to explain to

15  the jury. But other defendants have raised a number of these

16  statements, and then do I need to identify the specific

17  statements that they've attempted to introduce or attempted to

18  use, challenge credibility, for example? And I think it

19  becomes unwieldy to do that with a jury, it's confusing to the

20  jury, and, quite frankly, I'm not sure it really helps the

21  defendants if I start doing that, because it focuses then upon

22  issues that may not be in their best interest for the Court to

23  focus on. So I think less may be better in this particular

24  case.

25       MS. HUGHES: I understand.

1          THE COURT:  And I think it's the correct instruction
2     to give to the jury.  So that would be my inclination unless
3     you have some specific authority that would indicate the Court
4     can't do that.

5          MS. HUGHES:  I have so looked for specific authority,
6     and I cannot find it.  But thank you.

7          THE COURT:  Well, that's the — that's my inclination
8     at this point, and that's what I would intend to instruct at
9     the appropriate time if requested to do so.

10          Mr. Hoskins.

11          MR. HOSKINS:  Thank you, Your Honor.  I would like to
12     take this moment to ask the Court to reconsider some of the
13     redactions in light of something that you pointed out to us
14     just a minute ago.

15          THE COURT:  All right.

16          MR. HOSKINS:  And that is when Kennon White on these
17     recordings makes these broad long speeches about all these
18     things and you pointed out that those things can be taken as
19     adoptive admissions if the person doesn't say something, and
20     two specific things that come to mind right away, the Court has
21     redacted Mr. Maricle's response to those false accusations, and
22     the two things I'm thinking about, number one, when he's
23     talking about that Downey guy, the Downey defendant who
24     supposedly got favorable treatment in court.  Mr. Maricle says,
25     "I don't remember any Downey person."  And then another time he

1  says something about handling money or doing something with

2  money, and Mr. Maricle says, "I didn't do anything like that."

3        Now, the problem with those long speeches from Kennon

4  coming in is the jury could very well take those as adoptive

5  admissions.

6        THE COURT:  Well, I have not given the jury any

7  instructions on adoptive admissions to this point.  I haven't

8  told the jury they can consider that as an adoptive admission

9  by the defendant, but I have excluded the statements as being

10 exculpatory statements under the rules of evidence.  And so I

11 know that's -- I understand your point, but I'm not going to

12 change my ruling based on the conversation I've just had with

13 counsel in open court about how some of these statements could

14 conceivably come in as matters other than just context.  So,

15 no, I'm not going to change my ruling for that reason.

16        MR. ABELL:  Judge, in a nonsubstantive matter, I

17 believe there's a trial transcript up on the witness stand from

18 February 8th.  I would ask that it be returned to me.

19        THE COURT:  What we'll do is there's some -- there's

20 a number of exhibits over there, and what we'll do is when we

21 take our break, hopefully very, very soon, I'm going to ask the

22 Clerk to keep the exhibits that have been admitted, but if --

23 and I assume yours is over here, she'll return that to you at

24 that time.  So we'll make sure -- I've gotten my four pages

25 back from my exhibit book, but we'll make sure that you get

1    yours back as well.

2          All right.  Unless there's anything else that needs

3    to be taken up, we'll be in recess until 1:00 p.m.

4       (Whereupon, a recess was had for the noon hour, after

5    which the proceedings continue uninterrupted to Volume 9-B.)

6             (Proceedings concluded at 12:15 p.m.)

7                    C E R T I F I C A T E

8       I, Cynthia A. Oakes, certify that the foregoing is a

9    correct transcript from the record of proceedings in the

10   above-entitled matter.

11

12   2/21/2010                    s/CYNTHIA A. OAKES
         DATE                     CYNTHIA A. OAKES, RPR, RMR, CRR
13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

PAGE

Testimony of KENNON WHITE:
    Continued Cross-Examination by Mr. Pinales:    11
    Cross-Examination by Mr. Westberry:    55
    Cross-Examination by Mr. White:    97

E X H I B I T S

| Government's Exhibit No. | Identified | Page Admitted |
|---|---|---|
| A8 | 34 | |
| A8A | 34 | |

| Defendant's Exhibit No. | Identified | Page Admitted |
|---|---|---|
| D14 | 11 | |