United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09-16-S |
| vs. | ) |
| | ) Frankfort, Kentucky |
| RUSSELL CLETUS MARICLE | ) February 23, 2010 |
| DOUGLAS C. ADAMS | ) 9:00 a.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM E. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) VOLUME 11-A |
| STANLEY BOWLING | ) |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States: STEPHEN C. SMITH, ESQ.

On behalf of the Defendant          DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:             MARTIN S. PINALES, ESQ.

On behalf of the Defendant          R. KENT WESTBERRY, ESQ.
Douglas C. Adams:                   KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant          T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant          ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant          RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:                 R. TUCKER RICHARDSON, III, ESQ.

On behalf of the Defendant          JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant          ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant          DANIEL A. SIMONS, ESQ.
Stanley Bowling:

1  Appearances of Counsel:

2  On behalf of the United States: STEPHEN C. SMITH, ESQ.
                                   Assistant U.S. Attorneys
3                                  601 Meyers Baker Road
                                   Suite 200
4                                  London, Kentucky  40741

5

6  On behalf of the Defendant        DAVID S. HOSKINS, ESQ.
   Russell Cletus Miracle:           107 East First Street
                                     Corbin, Kentucky  40701
7

8                                    MARTIN S. PINALES, ESQ.
                                     150 East Fourth Street
                                     Federal Reserve Building
9                                    Cincinnati, Ohio  45202

10

11 On Behalf of the Defendant        R. KENT WESTBERRY, ESQ.
   Douglas C. Adams:                 KRISTEN N. LOGAN, ESQ.
                                     220 West Main Street
12                                   Suite 1900
                                     Louisville, Kentucky  40202
13

14 On behalf of the Defendant        T. SCOTT WHITE, ESQ.
   Charles Wayne Jones:              133 West Short Street
15                                   Lexington, Kentucky  40507

16

17 On behalf of the Defendant        ROBERT L. ABELL, ESQ.
   William E. Stivers:               120 North Upper Street
                                     Lexington, Kentucky  40507
18

19 On behalf of the Defendant        RUSSELL JAMES BALDANI, ESQ.
   Freddy W. Thompson:               R. TUCKER RICHARDSON III, ESQ.
20                                   300 West Short Street
                                     Lexington, Kentucky  40507
21

22 On behalf of the Defendant        JERRY W. GILBERT, ESQ.
   William B. Morris:                212 North Second Street
23                                   Richmond, Kentucky  40475

24

25 On behalf of the Defendant        ELIZABETH SNOW HUGHES, ESQ.
   Debra L. Morris:                  201 West Short Street
                                     Lexington, Kentucky  40507

```
 1   On behalf of the Defendant        DANIEL A. SIMONS, ESQ.
     Stanley Bowling:                  116 West Main Street
 2                                     Suite 2A
                                       Richmond, Kentucky   40475
 3

 4   Court Reporter:                   CYNTHIA A. OAKES, CRR
                                       Official Court Reporter
 5                                     United States District Court
                                       560 Athens Boonesboro Road
 6                                     Winchester, Kentucky   40391
                                       (859) 983-4346
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Proceedings recorded by mechanical stenography,
     transcript produced by computer.
25
```

1          (Whereupon, the jury returned to the courtroom, after

2    which the following proceedings were had in open court.)

3               THE COURT:  Thank you.  Good morning, everyone.

4               The record will reflect that all members of the jury

5    are present.  The parties and counsel are also present.

6    Ms. White has returned to the witness stand.

7               Ma'am, you're still under the same oath that you were

8    placed under last week.

9               Let's see, Mr. Smith, I believe you were questioning

10   the witness and you may continue.

11              MR. SMITH:  Your Honor, for the record, and I

12   apologize, Mr. Parman advised that he is ill this morning and

13   will not be here today.  So we'll move forward.

14              THE COURT:  All right.  That's fine.  You can

15   proceed.

16                          WANDA WHITE,

17   being previously duly sworn, was examined and testified further

18   as follows:

19                       DIRECT EXAMINATION

20   BY MR. SMITH:

21   Q    Ms. White, I believe on Friday we had completed a review

22   of our Exhibit A12, and now I would like to hand to you a new

23   exhibit, which is going to be labeled A13 and A13A.

24        You should have a disk labeled A13.  Do you see that in

25   front of you?

1   A    It does.

2   Q    Okay.  Ms. White, have you a recollection of being a

3   participant in a conversation that was recorded on that disk?

4   A    Yes.

5   Q    Have you reviewed that prior to your testimony here today?

6   A    I have.

7   Q    What date was this recording made, ma'am?

8   A    May 2nd, 2007.

9   Q    And do you recall generally who the main participants in

10  the conversation were?

11  A    Myself, my husband, Cletus Maricle, and Judy Maricle.

12  Q    Okay.  And do you recall where this recording was made?

13  A    At Mr. Maricle's home.

14  Q    Okay.  And having reviewed that audio recording, can you

15  state as a participant of that conversation whether that's a

16  fair copy or depiction of the conversation in which you

17  participated?

18  A    Yes.

19  Q    And likewise, A13A should be a transcript.  Do you have

20  that in front of you?

21  A    I do.

22  Q    Have you also had an opportunity to compare that with the

23  recording of that conversation which you were a participant?

24  A    I have.

25  Q    And can you state that that's a fair transcript recording

1   accurately the words that were spoken in that conversation?

2   A    Yes.

3           MR. SMITH:  I would move, at this time, Your Honor,

4   to introduce Exhibit A13 and A13A.

5           THE COURT:  Any objection other than those previously

6   stated?

7       (No audible response.)

8           THE COURT:  No?  Exhibits A13 and A13A will be

9   admitted.

10           MR. SMITH:  With the Court's permission, I would like

11   to publish.

12           THE COURT:  Yes, sir, you may proceed.

13       (Whereupon, a portion of Government's Exhibit No. A13,

14   00:06:10 to 00:38:21, was played to the Court and jury, after

15   which the following proceedings were had in open court.)

16   BY MR. SMITH:

17   Q    Ms. White, you say that this conversation occurred where?

18   A    At Cletus Maricle's home.

19   Q    And we just heard some person I believe identified as

20   Maricle say, "There's Judy."  Who was he referring to?

21   A    His wife, Judy Maricle.

22   Q    Had she not been present during the first part of this?

23   A    Not up to this point, no.

24   Q    Okay.  Now, you and your husband, at this time, were

25   cooperating with the FBI?

1  A    Yes.

2  Q    And at the time that this conversation took place, had you

3  made the predicted appearance at the grand jury at this point?

4  A    I'm sorry, ask that again.

5  Q    Had you made an appearance to the grand jury at this

6  point, the conversation that we're listening to?

7  A    I had, yes.

8  Q    Okay.  You represented to him that you had not been to the

9  grand jury yet.

10  A    I did.

11  Q    But you had already been to the grand jury?

12  A    Yes.  Yes.

13  Q    Okay.  So why is it that you told him that you had not

14  been to the grand jury?

15  A    Because I had been advised not to.

16  Q    Okay.  So this was part of what you had been instructed to

17  by the FBI?

18  A    Yes.

19  Q    And when did you first appear to the grand jury?  Do you

20  remember the date?

21  A    I don't remember.

22  Q    Okay.  But you think you had talked to the grand jury

23  before you made this recording?

24  A    I think I had.  I know I had talked to the agents before.

25  Q    Okay.  Now, at this conversation, there were numerous

WANDA WHITE — CONTINUED DIRECT — MR. SMITH          8

1  discussions, I think, that we've referenced there more recently

2  on page 16.  On page 16 of the transcript, Maricle asked the

3  question, "How did" —— "How long did Dobber stay?"  To your

4  understanding, who was he referring to?

5  A    Charles Weaver.

6  Q    And what was he referring to, to your understanding, about

7  staying where?

8  A    In a meeting with the agents.

9  Q    Okay.  So in context, again, when had this meeting with

10  the agents occurred as you had discussed with Mr. Maricle in

11  this conversation?

12  A    Days before.

13  Q    And when he refers to "How long did Dobber stay," he was

14  referring to his visit with the FBI as well?

15  A    He was, yes.

16  Q    And he further asked —— I believe he says —— Kennon says,

17  "Don't know for sure, but I think he stayed awhile."  Maricle

18  says, "What time did you leave?"  To your understanding, who

19  was he referring to as "you"?

20  A    Me.

21  Q    And then you said, "I got there about ten after 9:00."

22  And Maricle makes a statement, "He was out before 12:00."  To

23  your understanding, who was he referring to?

24  A    Charles Weaver.

25  Q    And did Mr. Maricle explain to you how he knew how long

1    Dobber Weaver had been at the FBI office the day he made the
2    visit?
3    A    He didn't explain that to me, no.  I'm assuming Phillip
4    told him, because Phillip was there on the same day.
5            MR. HOSKINS:  Your Honor, we'll object to that.
6            THE COURT:  Yes, I'll sustain the objection and
7    instruct the jury to disregard the speculation, but if you need
8    to come up, you may.
9        (Whereupon, the following discussion was had between the
10   Court and counsel at the bench, out of the hearing of the
11   jury.)
12           MR. HOSKINS:  David Hoskins for the defendant, Cletus
13   Maricle.  Your Honor, my concern here is that there may be some
14   grand jury testimony that we have not received.  The first
15   grand jury testimony I have from this witness is May the 3rd of
16   2007.  This recording was made May 2nd, 2007, and the witness
17   has testified that she had been to the grand jury prior to this
18   date.
19           THE COURT:  I believe she testified she thought she
20   had been but she wasn't sure, and I suppose that's what
21   Mr. Smith was getting to on his questions.
22           Is that correct?
23           MR. SMITH:  She's not just sure what day it was.
24           THE COURT:  That's what I understood it to mean,
25   Mr. Hoskins.

1          MR. SMITH:  It's not an issue that I think he ought

2    to be worried about until after she testifies.  It's *Jencks*

3    material.  If he wants to bring up a *Jencks* issue, he can do it

4    then.

5          MR. HOSKINS:  That's fine.  I just understood that we

6    had been given all that.

7          THE COURT:  Well, Mr. Smith, are you aware of any

8    grand jury testimony by this witness prior to the date that

9    she's testifying about here?

10          MR. SMITH:  No, sir.

11          THE COURT:  Mr. Hoskins, are you aware of any such

12    grand jury testimony?

13          MR. HOSKINS:  I'm not, Your Honor, until she

14    testified to it.

15          THE COURT:  All right.  Thank you.

16      (Whereupon, the following proceedings continued in open

17    court.)

18          THE COURT:  Thank you, Counsel.

19          Mr. Smith, you may continue.

20    BY MR. SMITH:

21    Q    Further on page 16, Ms. White, Mr. Maricle says, "Was he

22    there when you left?"  To your understanding, who was he

23    referring to?

24    A    Charles Weaver.

25    Q    Now, you got confronted by Mr. Maricle after you—all had

1  talked for a while in this conversation on page 12.  And he

2  confronted you straight up, I believe, there in the middle —

3  on the top of that page.  He says, and I've not talked to him

4  and I don't intend to talk to him.  He says they had told him

5  that Wanda had told them that she changed a bunch of votes.

6  And they asked him if she did and he told them.  To your

7  understanding, Ms. White, who was Mr. Maricle referring to

8  here?

9  A    He was referring to Charles Weaver.

10 Q    You made a statement, "They never asked me nothing like

11 that."  What were you referring to?

12 A    He was — he was inquiring — he had received some type of

13 information that I had told that Dobber and I had changed

14 votes, and I was instructed to tell him that I did not say

15 that.

16 Q    Had Maricle ever confronted you before this time that he

17 thought you had cooperated with the government and told them

18 about you changing votes?

19 A    I can't remember.

20 Q    He says, "That's what bothers me."  What was he referring

21 to?

22 A    If I had indeed told that.

23       MR. HOSKINS:  Objection, Your Honor, unless it's

24 characterized as her understanding.

25       THE COURT:  Ms. White, was that your understanding of

1    the conversation?

2              THE WITNESS:  That's what he meant by that.

3              THE COURT:  All right.  Objection overruled.

4    BY MR. SMITH:

5    Q    A couple of points I wanted to clarify about who you were

6    referring to.  It says — on page six, Maricle says, "I could

7    see if they were trying to get something on Todd."  To your

8    understanding, who was he referring to when he refers to Todd?

9    A    Todd Roberts.

10   Q    "Or Doug."

11   A    Doug White.

12   Q    Okay.  Now, you told Mr. Maricle there on page six, you

13   said, "I never had nothing to do with Doug Adams."  Do you

14   remember telling him that on page six?

15   A    I did.

16   Q    And why is it that you were telling Mr. Maricle you didn't

17   have nothing to do with Doug Adams at that point?

18   A    This was — I had went over this with the agents and this

19   was my instructions, not to alarm him in that manner.

20   Q    Page eight, he referenced a fellow by the name of Steve.

21   He says, "Well, neither does Stephan Charles and he's the

22   greatest conspiracy man in the world, and he usually can come

23   up with something."  Who was he referring to Stephan Charles?

24   A    Stephan Charles is a local attorney which is Mr. Maricle's

25   friend and Phillip Mobley's attorney.

1    Q    Has he been friends with Stephan Charles for a while?

2    A    Many, many years.

3    Q    And over the years that you've had conversations with him,

4    does — did he relate to you in the past that he confided in

5    Stephan Charles over the years?

6    A    I know that he confides in Stephan Charles.

7    Q    Did he tell you that?

8    A    He did.

9    Q    Page 11, you made a statement — Maricle says, sure,

10   you've got the right to take the Fifth Amendment if it's

11   something that might incriminate you.  And then it was further

12   stated — you ask the question, "Doug took the Fifth Amendment,

13   didn't he, Kennon?"  Who were you referring to as Doug?

14   A    Doug White.

15   Q    Page 14, again, Maricle says, I think Steve thinks they're

16   just trying to — just fishing basically, Steve thinks they'll

17   indict a bunch of people over the 2002 election.  To your

18   understanding, who was he referring to as Steve?

19   A    Stephan Charles.

20   Q    And, again, you make a statement, "I didn't have nothing

21   to do with that."  Ms. White, what were you referring to?

22   A    The '02 election.

23   Q    And why did you tell him that you didn't have anything to

24   do with the '02 election at that point?

25   A    Well, again, I was told not to alarm him.

WANDA WHITE — CONTINUED DIRECT — MR. SMITH          14

1  Q    Now, when you and Mr. Maricle were talking about the time

2  that you had spent over at the FBI office, had you, in fact,

3  been over there and had you, in fact, spent a block of time at

4  the FBI office that day?

5  A    I had.

6  Q    And had you, in fact, been aware that Charles "Dobber"

7  Weaver was being visited by the FBI or had visited the FBI at

8  that same location?

9  A    I was.

10 Q    You further made a statement that you've seen Stanley

11 Bowling there, too.  What were you referring to, ma'am?

12 A    I saw him at the stock sale when I was leaving and that he

13 might have seen me there.

14 Q    And, again, Kennon says, "Who does Steve think they'll

15 indict for the 2002 election?"  And Maricle says he couldn't

16 say.  To your understanding, who were they referring to?

17 A    Stephan Charles.

18 Q    At the top of page 19, Maricle makes a statement to me —

19 makes a statement to you, "Let me be honest with you.  I don't

20 think you need to talk to Dobber."  To your understanding, what

21 was he referring to?

22 A    Dobber Weaver.

23        MR. SMITH:  If we could continue to publish the next

24 clip.

25        THE COURT:  Yes, sir, you may.

1          (Whereupon, a portion of Government's Exhibit No. A13,

2     00:40:22 to 00:57:24, was played to the Court and jury, after

3     which the following proceedings were had in open court.)

4     BY MR. SMITH:

5     Q    Ms. White, this clip started out with your statement

6     saying, "They put Doug in jail, Cletus."  Who were you

7     referring to, Ms. White?

8     A    Doug White.

9     Q    And then you made a further statement — or question, you

10    said, "Do you think I can handle myself down there?"  We're on

11    page 21.  What were you referring to, ma'am?

12    A    Answering the questions.

13    Q    When you asked the question, "Do you think I can handle

14    myself down there," where were you referring to as "down

15    there"?

16    A    I was asking Cletus if I could handle the questions in

17    front of the grand jury.

18    Q    And he says, "Yeah."  And you said, "I'll fall to pieces."

19    And he says, "Just don't go off and volunteer statements like

20    you did on Jennings and Vernon."  To your understanding what

21    was he referring to?

22    A    He was referring — basically telling me not to say

23    anything because I had told him that I had told things prior

24    about Jennings White and Vernon Hacker.

25    Q    Told things regarding what subject?

1  A    Election.

2  Q    And he further says, "Don't make no statements like that."

3  To your understanding, what was he referring to?

4  A    He was unhappy that I had made statements about Jennings

5  White and Vernon Hacker.

6  Q    Had he been associated in the past in the elections with

7  Jennings White and Vernon Hacker?

8  A    Yes.

9  Q    And at the time that Jennings White and Vernon Hacker were

10  brought up in this discussion, were they being prosecuted by

11  the federal government?

12  A    They were, yes.

13  Q    Page —— top of page 22, he again says, "...but don't go

14  volunteering stuff."  To your understanding, what did he mean

15  by the statement "don't go volunteering stuff"?

16  A    He didn't want me to tell anything.

17  Q    You say, "The only reason I done that is I thought that

18  that's where everything was coming from."  What were you

19  referring to, Ms. White?

20  A    I was referring to telling about Jennings White and Vernon

21  Hacker and that the FBI already knew what they had been

22  involved in.

23  Q    Maricle says, "That's because you thought you — take a

24  swipe at them and you ain't in no position to take a swipe at

25  them because they already got theirs done."  To your

WANDA WHITE — CONTINUED DIRECT — MR. SMITH          17

1  understanding, what was referring to?

2  A    Well, he was referring to that they had already been

3  indicted or were being prosecuted and I was in no position

4  because the same thing could happen to me.

5  Q    Judy enters the conversation on page 23 –– page 22 and

6  over in to page 23, and you make a statement, "But I got to

7  meet with Brent at 1:00, and he told me that simple yes and

8  no," Judy says, "That's what Clet says.  Simple yes and no

9  answers."  To your understanding, who was she referring to as

10  Clet?

11  A    Her husband, Cletus Maricle.

12  Q    She then goes on to say, "yes, no, and nothing."  To your

13  understanding, what was Judy referring to?

14  A    To my answers to the grand jury.

15  Q    At the bottom of page 26, you make a statement, "I'll bet

16  you a million dollars I will fall to pieces.  I know what I'll

17  do."  "Do you know that I've never been on the stand before for

18  nothing?"  What were you referring to, Ms. White?

19  A    My appearance at the grand jury and being nervous and

20  overwhelmed.

21  Q    Maricle says, "You won't fall apart, you're a strong

22  person, Wanda."  To your understanding, what was he referring

23  to?

24  A    That I could –– he was confident that I could handle

25  myself.

1  Q    Page 27, you asked the question, "Are you even going with

2  me?"  And Maricle says, "Kennon don't need to be down there."

3  To your understanding, what was he referring to?

4  A    He was referring to the fact that Kennon may be called

5  before the grand jury as well.  He had warned us before about

6  the same thing happening.

7  Q    Kennon, on page 29, says, I never thought I'd be sitting

8  here worrying about Wanda going to jail.  And Maricle says at

9  the bottom of the page, "That's exactly what they want you to

10 do.  You're doing exactly what they want you to do."  To your

11 understanding, what was he referring to?

12 A    He was referring to how nervous and how overly concerned I

13 was and I was giving in to the FBI by feeling that way.

14 Q    Finally, Ms. White, on page 31, you—all were referring to

15 a job that was closing on the 5th.  What job were you referring

16 to, Ms. White?

17 A    Drug court position.

18 Q    And on page 32, you say, "Cletus, am I not going to get

19 that job?"  He makes a statement, "There'll have to be a job

20 first."  To your understanding, what was he referring to?

21 A    He was referring to a position coming open in the Laurel

22 and Clay County systems for drug court.

23 Q    Had you been promised the job?

24 A    I had been promised a job, yes.

25 Q    And when did you get promised a job, Ms. White?

WANDA WHITE — CONTINUED DIRECT — MR. SMITH          19

1  A    Before the election.

2  Q    And that would have been the 2006 election?

3  A    Yes.  I had not been concerned about a job because he had

4  given me a job before in the court system.

5  Q    What job was that, Ms. White?

6  A    He appointed myself and Kenny Day and Granville Sizemore

7  to — they sold properties and we'd give the appraisals on them

8  for the state.

9  Q    And that was a job that Mr. Maricle had made sure that you

10  had gotten before?

11  A    Yes.  That would have been in the mid '90s.

12  Q    Was that a part-time or full-time position?

13  A    It was, I'm assuming, part time.

14          MR. SMITH:  Judge, I don't know if the Court is

15  inclined to take a break.  We do have other clips to play this

16  morning and I —

17          THE COURT:  What is the length of this next one?

18          MR. SMITH:  Let me see if I can inquire.

19          Okay.  Fortunately this is a short one, so we can

20  probably get through it.

21          THE COURT:  All right.  Why don't you proceed with

22  that?

23      (Whereupon, a portion of Government's Exhibit No. A13,

24  01:04:45 to 01:09:12, was played to the Court and jury, after

25  which the following proceedings were had in open court.)

1    BY MR. SMITH:

2    Q    Ms. White, during that clip, it appeared that Mr. Maricle

3    was not involved in the conversation till the very end.  Where

4    was he?

5    A    He was on the phone.

6    Q    Okay.  And you were in conversation with whom?

7    A    Judy Maricle.

8    Q    Okay.  Before he got the phone call, he made a statement,

9    I really do believe you-all are overly worried about — think

10   you're overly worried, not telling you not to be unconcerned,

11   but, of course, it's easy for somebody like me who for 40 years

12   has dealt with subpoenas and warrants.  To your understanding,

13   what was he referring to?

14   A    He was saying that we were overly concerned about going to

15   the grand jury.

16   Q    Judy, following that, on the bottom of page 36, says, "I

17   would be too.  I would be so scared, I would be trembling.  I

18   work up there, but I'm back in that little room."  To your

19   understanding, what was she referring to?  She worked up where?

20   A    She works for the Circuit Court — she works for Cletus

21   and she was referring to being in the backroom of the circuit

22   courthouse.

23   Q    What kind of job did she do for the judge?

24   A    I'm not sure.  I guess she was his secretary.

25   Q    Do you know how long she worked for him?

1    A     I mean, always, as far as I know.

2    Q     Page 38, it refers to, again, the grand jury, and you

3    said, "What they did to Doug.  I ain't going to do what he did,

4    though."  Who are you referring to as Doug?

5    A     Doug White.

6    Q     And you said, "I'm not going to do what he did, though."

7    What were you referring to?

8    A     We had joked about it earlier, that he had basically made

9    a fool of hisself in front of the grand jury and they — the

10   grand jurors had applauded and he thought it was a good thing,

11   and I was making a statement that I wasn't going to get up

12   there and make a fool of myself.

13        MR. SMITH:  Your Honor, the next clip is about seven

14   minutes.

15        THE COURT:  Why don't you proceed with that.  Thank

16   you.

17        (Whereupon, a portion of Government's Exhibit No. A13,

18   01:10:08 to 01:17:39, was played to the Court and jury, after

19   which the following proceedings were had in open court.)

20   BY MR. SMITH:

21   Q     Ms. White, in the beginning of that clip on page 39,

22   following on page 40, you and Mr. Maricle were in a

23   conversation about workers, and he says, "We've got

24   two-and-a-half workers, Vicki, Dana, and the Turner girl."  To

25   your understanding, who is he referring to?

1   A    Girls that worked in the drug court office.

2   Q    And then you-all discussed, "Sue's in trouble," you say.

3   And Maricle says, "It hurts the public image."  And you say,

4   I'm not surprised at Robyn.  I am surprised at Sue."  Who were

5   you referring to, Ms. White?

6   A    Sue Fox and Robyn Pennington.

7   Q    And when Mr. Maricle made the statement "It hurts the

8   public image," to your understanding, what was he referring to?

9   A    Well, he had given them chances in —— through drug court

10   and they kept getting in trouble.  And he was stating that he

11   was surprised at Robyn, and I said I was surprised at Sue.

12   Q    Now, Robyn Pennington, is she somebody that you knew

13   outside of this conversation?

14   A    Yes.

15   Q    And how did you know her?

16   A    I knew her through the City, within the city limits.  She

17   was a vote hauler.

18   Q    A vote hauler.  And had you taken advantage of her vote

19   hauling in the prior scheme to effect the elections in 2006?

20   A    We had earlier, yes.

21   Q    And Sue Fox, did you know this person outside of this

22   conversation?

23   A    She was a vote hauler.

24   Q    And had she been involved in the 2006 scheme?

25   A    She had been in the previous elections, involved in the

1  previous elections.

2  Q    Which elections?

3  A    '02.

4  Q    Okay.  Page 41, you ask Mr. Maricle, you said, "Well,

5  Cletus, can you answer questions, some questions, and not

6  answer other questions?"  What were you referring to,

7  Ms. White?

8  A    The grand jury questions.

9  Q    And he makes a response, "No, if you don't want to answer

10 the question, you plead the Fifth."  To your understanding,

11 what was he referring to?

12 A    Well, he had told me anything that would incriminate me.

13 Q    In what circumstance?  Grand jury?

14 A    Grand jury testimony, yes.

15 Q    Top of page 42, again, he says, "I'm stumped as to why you

16 three."  To your understanding, who was he referring to?

17 A    Myself, Phillip Mobley, and Dobber Weaver.

18 Q    And did you understand that he was really confused at this

19 point?

20 A    No, he wasn't confused.

21 Q    But he said he was confused.  Why, to your understanding,

22 was he saying that to you?

23 A    I can't answer that.

24 Q    Had he done that in other instances where you were

25 attempting to record him in this cooperation effort?

1  A    He had.

2  Q    Page 43, you make the statement at the top of the page,

3  "He can't hurt me none.  How can it hurt me?"

4  A    I was referring to Dobber Weaver.

5  Q    Dobber Weaver?  And how were you expecting that he could

6  not hurt you?

7  A    Well, I felt — I was telling him that Dobber did exactly

8  the same thing I did and if he told on me, he would have to

9  tell on himself.

10  Q    At the bottom of page 43, Maricle says, "What purpose

11  would it serve for you to go talk to Dobber?  Give me one good

12  reason it would serve."  To your understanding, what was he

13  referring to there?

14  A    Well, he didn't want me going and talking to Dobber

15  because he had received information that Dobber had made a

16  statement that I had changed votes and he didn't think it was

17  necessary for me to — he did not want me talking to Dobber.

18  Q    In the 2006 scheme, you indicated that Dobber Weaver was

19  aware of the plan and joined the plan and helped in the plan —

20  A    Yes.

21  Q    — in your earlier testimony.

22      How much involvement did Cletus Maricle directly have in

23  directing Dobber Weaver in executing the plan?

24  A    He was — he did reach out to Dobber; he and Al Man.

25  Q    Who was the primary contact person with Dobber Weaver?

1   A    William Stivers and Wayne Jones.

2   Q    And did you also operate at points in times to communicate

3   directions to Dobber Weaver?

4   A    I did.

5        MR. SMITH:  I think this is a point, Your Honor,

6   where we're picking up the next clip.

7        THE COURT:  All right.  Ladies and gentlemen, we'll

8   take our morning break at this time.  We'll take a 15-minute

9   recess until 10:50 this morning.  Please keep in mind the

10  admonitions that you've been given previously not to discuss

11  the case among ourselves while we are in recess.  The jury will

12  be excused for 15 minutes.

13   (Whereupon, the jury retired from the courtroom, after

14  which the following proceedings were had in open court.)

15       THE COURT:  Ms. White, you can step down for

16  15 minutes.

17       Let's see if there are any matters to take up outside

18  the presence of the jury.

19   (No audible response.)

20       THE COURT:  No?

21       Mr. Smith, where do we stand on the text messaging

22  issue?

23       MR. SMITH:  Your Honor, we did not receive those

24  until late yesterday.  We are beginning the process of

25  reviewing those now.

1          THE COURT:  All right.

2          MR. SMITH:  I'm a little bit hampered by the fact

3   that Mr. Parman is ill today, but I will, at the end of our day

4   today, begin the process of reviewing them.

5          THE COURT:  All right.  Thank you.

6          We'll be in recess for 15 minutes.

7      (Whereupon, a short recess was had, after which the jury

8   returned to the courtroom and the following proceedings were

9   had in open court.)

10          THE COURT:  Thank you.

11          The record will reflect that all members of the jury

12   are present.  The parties and counsel are also present.

13          Ms. White, of course, you're still under oath.

14          Mr. Smith, you may continue.

15          MR. SMITH:  If the Court would allow, we would like

16   to publish our next clip.

17          THE COURT:  Yes, sir.

18      (Whereupon, a portion of Government's Exhibit No. A13,

19   01:20:40 to 01:22:00, was played to the Court and jury, after

20   which the following proceedings were had in open court.)

21          MR. SMITH:  We'll go on to the next clip, if Your

22   Honor please.

23      (Whereupon, a portion of Government's Exhibit No. A13,

24   01:27:25 to 01:34:00, was played to the Court and jury, after

25   which the following proceedings were had in open court.)

1  BY MR. SMITH:

2  Q    Ms. White, in this second clip that we just reviewed with

3  you, there was conversations that involve some additional

4  female voices.  Do you recall who those were?

5  A    Linsey Maricle and Judy Maricle.

6  Q    And there was initially a question there, you said, "I'm

7  going to give Dobber a piece of my mind, I'm going to be honest

8  with you."  Maricle again asks, "What purpose is that going to

9  serve?"  Who were you referring to, ma'am?

10  A    Charles Weaver.

11  Q    And you were going to give him a piece of your mind in

12  regard to what?

13  A    The grand jury testimony.

14  Q    And then you said, "Probably about the same purpose it

15  served going and jumping on the Blue Johns."  Now, who were you

16  referring to as the Blue Johns?

17  A    They are local drug dealers.

18  Q    And you did this without further explanation in the

19  conversation, but how did you equate the circumstance with

20  Weaver and the Blue Johns to Mr. Maricle?

21  A    Well, the circumstance of that is if I went and jumped on

22  Charles Weaver it wouldn't do any good, he would still give the

23  same testimony.  And if I went and jumped on the local drug

24  dealers, it wouldn't do any good, because they would still sell

25  drugs.  So I was referring it would do about as much good as

WANDA WHITE — CONTINUED DIRECT — MR. SMITH        28

1  to — I was making a comparison.

2  Q    At the top of page 47, he says, "I know you would feel

3  better if Kennon was there, but do you want them to ask him

4  questions, to bring you out and immediately get Kennon, to take

5  him in there and ask him questions?"  To your understanding,

6  what was Mr. Maricle referring to?

7  A    Well, he had made a previous statement that Donna, which

8  is his daughter, would not be there that following day, and he

9  was making it — he said, use common sense, Kennon shouldn't be

10 there either, do you want him questioned.

11 Q    Now, who is Donna?

12 A    Donna is Mr. Maricle's daughter and the wife of Phillip

13 Mobley.

14 Q    Now, on page 48 and 49, while you're engaged in

15 conversation with Linsey, Mr. Maricle says, "She spent an hour

16 with them."  And Linsey makes a response, and he says, "She

17 spent over an hour with them" on page 48.  And on page 49, it

18 says, "You was down there on hour with them, wasn't you?"  What

19 was Mr. Maricle referring to, Ms. White?  To your

20 understanding.

21 A    To my understanding of this conversation — well, I know

22 this conversation, I know what he was referring to.  Linsey had

23 been subpoenaed prior to this, a whole separate incident to

24 this, and the FBI agents had wanted to question her and she had

25 met them at the 9-1-1 center and he was stating that she had

1   spent an hour with the agents.

2   Q     Now, she was working where at that time?

3   A     Manchester City Hall.

4   Q     And how did she get that job?

5   A     Doug White gave it to her.

6   Q     And what job was she doing at City Hall?

7   A     Clerical position.

8   Q     Page 47, there's a reference to -- you make the statement,

9   "Is that why you didn't want me to go when you and Doug went?"

10  Ms. White, who were you referring to when you said "Doug"?

11  A     I was referring to Kennon's dad, Doug White, when he

12  had -- when he had gone to the grand jury.

13  Q     Page 49, one of the last comments you made, you said,

14  "Well, we ain't going nowhere" -- "we don't have" -- "we ain't

15  got nowhere to go, Judy.  We've not got Doug in five or six

16  months."  Who were you referring to when you refer to "Doug"?

17  A     I was referring to Doug White, and I actually stated we

18  had not talked to him in five or six months because he was

19  under home incarceration and we weren't allowed to see him.

20  Q     Now, during this recording -- earlier, in that first clip,

21  you were in conversation with Judy, and were you-all alone at

22  points in time?

23  A     What page are you referring to?

24  Q     It would be page 44.  Okay.  I'm sorry, strike that.  Let

25  me follow up with you shortly after we end this clip.  I would

1  like to start the next clip at this time.

2  A    Okay.

3           THE COURT:  Yes, sir.

4           MR. SMITH:  Thank you.

5      (Whereupon, a portion of Government's Exhibit No. A13,

6  01:40:00 to 01:42:00, was played to the Court and jury, after

7  which the following proceedings were had in open court.)

8  BY MR. SMITH:

9  Q    Ms. White, in this clip, who are the voices that we've

10 just heard?

11 A    Myself and Judy Maricle.

12 Q    And were you-all alone at this point?

13 A    We were.

14 Q    And do you recall where your husband and Mr. Maricle had

15 gone?

16 A    They had gone inside.

17 Q    Okay.  And when you say they had gone inside, where were

18 you, outside the house?

19 A    They had — No, there's an adjacent sunroom and then

20 there's a living room to the front of it.

21          MR. SMITH:  Okay.

22          If we could continue playing the next clip, please?

23          THE COURT:  Yes, sir.

24     (Whereupon, a portion of Government's Exhibit No. A13,

25 02:01:30 to 02:30:40, was played to the Court and jury, after

1  which the following proceedings were had in open court.)

2  BY MR. SMITH:

3  Q    Ms. White, I know this is a lengthy clip, so I'm going to

4  try to help you get back to page — the break at, I believe,

5  page 45.

6       Is that right?  It's the beginning of that clip.  I

7  apologize, 49.  And over to page 50, I think is where we began.

8  At the bottom of the page, Maricle says, "The questions that

9  you were asked, they asked you about Doug."  To your

10  understanding, who was he referring to when he referred to

11  "Doug"?

12  A    Doug Adams.

13  Q    "If you're right on 2002" —

14       MR. HOSKINS:  Your Honor, I want to object.  That

15  transcript reflects that was Kennon talking, not Mr. Maricle.

16       THE COURT:  The transcript reflects that, but I

17  believe the transcript was incorrect in that regard.  It did

18  appear to the Court that this was Mr. Maricle speaking, so I'll

19  note that for the record and overrule the objection.

20  BY MR. SMITH:

21  Q    It says, "If you're right on 2002, if you're right, then

22  that's where they are probably going."  To your understanding,

23  what was he referring to?

24  A    I had told him that they had asked me questions about the

25  2002 election and he was saying if I was right, then they were

1   going back to Doug's slate.

2   Q    When he said, "Everybody knows Doug had him a slate in

3   2002, or I won't say everybody knows," to your understanding,

4   who was he referring to?

5   A    Doug Adams.

6   Q    On page 51, ma'am, Maricle says, "Yeah, and they may

7   figure you did last year, I don't know whether they figured

8   that or not."  And you said, "Well, I'm going to tell them

9   whatever I know about Doug Adams then."  And Maricle says,

10  "Well, you don't know" — "What do you know about Doug?  You

11  don't have no dealings with Doug, did you?"  And you said, "No,

12  but I'll tell them whatever they want to know if they'll leave

13  me alone."  What were you referring to, ma'am?

14  A    Well, what he says is, is he's saying, well, you don't —

15  what do you know about Doug?  You don't have dealings with

16  Doug, do you?  So he was saying a question, but he was actually

17  telling me something in the question.  And then I go on to

18  say —

19              MR. WESTBERRY:  Objection, Your Honor.

20              THE COURT:  Objection overruled.

21              You're explaining what your understanding was of that

22  statement?

23              THE WITNESS:  Yes.

24              THE COURT:  All right.  Objection overruled, you may

25  answer.

1          THE WITNESS:  And then I say, no, but I'll tell them

2    whatever they want to know about Doug Adams if they'll leave me

3    alone.  And what I meant was, at that point — before I had

4    told him and I was instructed to tell him that I hadn't told

5    anything about Doug Adams.  But at that point where he had

6    already said in an earlier statement, everybody knows Doug

7    Adams had a slate, I then felt comfortable, at that point,

8    telling him, well, I'll tell them whatever they want to know

9    about Doug Adams.

10   BY MR. SMITH:

11   Q    Then further in that statement, Ms. White, you say, "I

12   don't know nothing about no 2002 election."  And Maricle says,

13   "That's exactly right."  What were you referring to there,

14   ma'am?

15   A    Well, after I had made the statement earlier, I could see

16   in his expressions that his expressions was displeased with my

17   answer, so then I went back and said, well, I didn't know

18   anything about the 2002 election, and he said, "That's exactly

19   right."

20   Q    On the bottom of page 53, you make the comment, "I

21   shouldn't say nothing about Jennings" — "I shouldn't said

22   nothing about Jennings and Vernon.  I don't know why I did

23   that."  Who were you referring to, Ms. White?

24   A    I was referring back to Jennings White and Vernon Hacker,

25   and I had made an earlier statement that I had told things

1  about Jennings and Vernon, and he, again, had showed that he

2  was displeased with that answer.  So I went back and was going

3  over with him I guess I shouldn't have said anything about

4  them.

5  Q    Page 54, he says, "Here's what — here's what they do, and

6  I've done it, so I know" — "I, you know, here's what they do,

7  you get two people and split them up and you say, 'Oh,

8  so-and-so said so-and-so.'" To your understanding, what was he

9  referring to, Ms. White?

10 A    He was referring to me and Dobber and about us being split

11 up and he was referring to that the agents would play us

12 against each other and get us to say things.

13 Q    Did you know that Mr. Maricle was also a practicing

14 attorney?

15 A    I did, yes.

16 Q    And did you also know he was a prosecutor before?

17 A    I did, yes.

18 Q    All right.  Further down on page 54 you said, "All right.

19 Well, that's another thing, too, you don't — you don't know if

20 they really even said that to Dobber because Dobber lies."  Who

21 were you referring to, ma'am?

22 A    I was referring to Dobber Weaver and I was instructed by

23 the agents to tell Mr. Maricle my — that I was aggravated with

24 Dobber and that was my reason for being so upset and to be more

25 forward with him and more aggressive with him about Dobber.

1  Actually, Dobber and I were friends.

2  Q    Now, earlier in this conversation, you recall in your

3  testimony that Mr. Maricle had confronted you that Dobber had

4  actually told someone who had told him that you had told, you

5  had been down there stealing votes.

6          MR. WHITE:  Your Honor I'm going to object.  That's a

7  mischaracterization of testimony.  That's the question that he

8  asked.  She never testified to —

9          THE COURT:  All right.  The jury will have to recall

10 what the testimony was.

11         MR. WHITE:  Thank you, Your Honor.

12         THE COURT:  Do you need the question repeated?

13         THE WITNESS:  Yes, please.

14         THE COURT:  Mr. Smith.

15 BY MR. SMITH:

16 Q    You said that you had been given instructions about

17 Dobber.  Earlier in this conversation, which we had played

18 previously, there was a conversation, again, where it was

19 mentioned that he was told — Maricle was told that you had

20 been down there telling people you had stolen votes, and the

21 question was about Dobber Weaver, at that time, being the one

22 who had said this.  Do you recall that?

23 A    I do recall it.

24 Q    Now, were you, at this point, continuing to refer to that

25 circumstance with Dobber Weaver telling the FBI about you

1  stealing votes?

2  A    Yes, he had — Mr. Maricle had told me that he had

3  received information — I don't know, he couldn't disclose, he

4  said Bob Rawlings, but I don't — that he had gathered

5  information of what I had given in testimony.

6  Q    Page 55, you said, "I guess that's true.  I don't tell

7  lies, though.  That's the difference between me and him.  I'm

8  not sure they said that to him."  Who were you referring to

9  there, Ms. White?

10  A    Charles "Dobber" Weaver.

11  Q    And when you say, I'm not sure "they" said that to Charles

12  "Dobber" Weaver, who were you referring to?

13  A    The agents.

14  Q    And Maricle says, "I'm not sure they are either.  He says

15  they made reference to Crawdad and James Phillips.  I doubt

16  that."  Who's he's referring to when he says, "He says they

17  made reference to Crawdad and James Phillips," according to

18  your understanding?

19  A    To my understanding, he's making a statement that Dobber

20  had expressed to him that he had referred to Crawdad and James

21  Phillips.

22  Q    Page 56, you further in your conversation, the top — or,

23  first, toward the middle of the page, you said, "I know stuff,

24  though, Cletus.  I don't want to get — I don't want to get

25  Wayne in trouble."  Who were you referring to, Ms. White?

1    A    I was referring to Wayne Jones.

2    Q    And when you say, "I know stuff, though, Cletus," what

3    were you referring to, Ms. White?

4    A    I was referring to election business.

5    Q    Election business?

6    A    Uh-huh, election — illegal election activity.

7    Q    And then you said, "I didn't see no money."  What were you

8    referring to, Ms. White?

9    A    What page are you on?

10   Q    Fifty-six, middle of the page.

11   A    Election money on the day of the election.

12   Q    Page 57, you say, "I guess we'll know tomorrow."  And

13   Maricle says, "Steve may be right, they are just fishing" —

14   "that they're just fishing hoping to come up with something."

15   Who is he referring to when he says "Steve"?

16   A    Stephan Charles.

17   Q    And then Maricle says, "Wanda, I'm going to ask you

18   something you need to talk to your lawyer about."  And you

19   said, "What?"  And he said, "Have him ask you" — "ask if

20   you're a target."  To your understanding, what was he referring

21   to?

22   A    He wanted my — wanted me to ask my attorney to find out

23   whether or not I was a target of the investigation, which

24   changed everything.

25   Q    Page 58, five lines into that first page, on page 58,

1  Kennon says, "I wonder if they got a bunch of people from

2  2002."  And Maricle says, "Well, if they did, they's some

3  people that's in trouble, in my opinion, because they was a lot

4  of money sent out on" — "spent out on that clerk's race."  To

5  your understanding, what was Mr. Maricle referring to?

6  A    He was referring to the race of Freddy Thompson and

7  Jennings White, and he was stating that they was a lot of money

8  spent in the clerk's race.

9  Q    In response to that you said, "Shoot, we spent —" and

10  Maricle interrupts you and says, "Ahh, you didn't spend

11  nothing."  And you said, "Okay.  All right."  What were you

12  referring to, ma'am?

13  A    Well, when I made that statement, he cut me off and he

14  said you didn't spend nothing, and I said, oh, and I — he

15  makes a lot of facial expressions, and I said, "Oh, okay.  All

16  right."

17  Q    When you say he makes a lot of facial expressions, what

18  are you referring to, ma'am?

19  A    Well, I've known him for a long time and I can — I can

20  read his facial expressions, and I'll know when he's

21  displeased, I know when he's happy, I know — I know quite a

22  bit about him.

23  Q    And to your understanding, ma'am, when he says to you,

24  "You didn't spend nothing," and makes that facial expression,

25  to your understanding, what was he telling you?

1   A    He was telling me if I was asked that I didn't spend

2   anything.

3   Q    Page 61, it says —— Kennon says, "Clet, we hate to keep

4   you."  He says, "Oh, no problem, that's what I'm here for."

5   Who was your husband, to your understanding, referring to as

6   "Clet"?

7   A    Cletus Maricle.

8   Q    And then you interjected, "Speaking of 'put in jail,' what

9   about Cork?  I know about —— I know that Anthony didn't get his

10  paperwork in."  What were you referring to, Ms. White?

11  A    My brother, Eugene Corky Price.

12  Q    And Maricle says, "He needs to get it in there, so we'll

13  see what I can" —— "so what" —— "we'll see what we can do for

14  him.  We'll try to help him.  How much time has he been in

15  now?"  To your understanding, what was he referring to?

16  A    He was referring to he had promised me he would probate

17  him, and then he put the probation sentencing off till after

18  the election, and this had been after the election and he had

19  promised me that he was going to shock probate him.

20  Q    What's shock probation, to your understanding?

21  A    Well, to my understanding was that it was up to him, and

22  after he had spent some time he could then file the paperwork

23  and he would be released.

24  Q    And when you said earlier that, "I know Anthony didn't get

25  his paperwork in," what were you referring to?

WANDA WHITE — CONTINUED DIRECT — MR. SMITH          40

1   A    Well, he had told me earlier — Cletus had told me earlier

2   that Anthony needed to get paperwork in and file it before he

3   could proceed with releasing him.

4   Q    Then Maricle says — after you say, "Well, he's been in a

5   long time," Maricle says, "Because I know what the agreement

6   was."  To your understanding, what was Mr. Maricle referring to

7   about this agreement?

8   A    Well, he and I had had an agreement.

9   Q    What was your agreement?

10  A    That I did what I was supposed to do in the election and

11  he would help me with Cork.

12  Q    You said that Cork's sentence was put off after the

13  election?

14  A    Yes.

15  Q    Which election was that that he put it off after?

16  A    The May.

17  Q    Of what year?

18  A    '06.

19  Q    Did you ask him why he put his — your brother's sentence

20  off till after the election?

21  A    I did.

22  Q    And what was his response?

23  A    He said that we didn't need the attention of the Collinses

24  and we needed to put it off to make sure everything just played

25  out and let it rest awhile and die down.

1  Q    And the Collinses, what interest politically did he have

2  or concern for the Collinses?

3  A    They're a big political family, that they've got lots of

4  votes within the family.

5  Q    And who are they connected with politically?

6  A    Who are they connected with?  Well, they're connected to

7  Doug Adams's son-in-law, he's married in — he's a Collins.

8  They're Harvey Dean Collins.

9  Q    Whose son?

10  A    Doug Adams.

11  Q    All right.  Doug Adams has a son-in-law?

12  A    Yes.

13  Q    Who?

14  A    Stevie Collins.

15  Q    So they had an interest in this case that you said your

16  brother was charged in?

17  A    They did, as well as Charles Marcum.

18  Q    And Charles Marcum, is he a political officeholder, or

19  was?

20  A    He was, yeah.

21  Q    And so what reason did Maricle give you for putting it off

22  until after the election?

23  A    He just wanted things to die down.  It was not a good time

24  during the election with Phillip running.

25  Q    On page 62, Maricle says, "I mean, Phillip has absolutely

WANDA WHITE — CONTINUED DIRECT — MR. SMITH          42

1   no connection with Todd, you know, not really, other than all

2   of us being friends."  Who is he referring to as — to your

3   understanding, ma'am, when he referred to "Phillip having no

4   connection with Todd other than just us all being friends"?

5   A     He was referring to Todd Roberts.

6   Q     And Phillip being a reference to whom, ma'am?

7   A     Phillip Mobley, his son-in-law.

8   Q     Now, in the closing comments in this clip, you reference

9   to a person named "Al Man."  Who were you-all referring to,

10  ma'am, as "Al Man"?

11  A     William Stivers.

12  Q     Okay.  And there was some statement that he's got a bad

13  reputation, and your husband says, "I'm not going to lie to

14  you."  And Maricle says, "He made it for himself, though.  He

15  says these things.  Do you believe half of what he says?"  Who,

16  to your understanding, was Maricle referring to?

17  A     He was referring to William "Al Man" Stivers.  What page

18  are you on, sir?

19  Q     I'm sorry, page 63.

20  A     Okay.  He was referring to William "Al Man" Stivers.

21  Q     Now, in that conversation, Maricle gives you an example of

22  what he was talking about and he says, "He's always going

23  up" — on page 64, he says, "I'll take care of him for you.

24  I'll take care of him for you if you need something from

25  somebody, you know."  He says, "Well, I called his bluff the

1  other night.  I called his bluff.  I said, 'Buddy, will you do

2  that for me now?' 'Yeah. Yeah.' He says, 'Well, I'll tell you

3  where I'm going to be and what time you need to be there.'" To

4  your understanding, what was Mr. Maricle referring to?

5  A     Well, what he was referring to is that he had had

6  conversations that Al Man had always stated "I'll take care of

7  him for you, I'll take care of him if you need anything —

8  anything from somebody," you know, and he said that he called

9  his bluff and basically said that he was setting him up and he

10 called his bluff and told him to meet him at a certain place.

11 Q     Now, further in that conversation, there was mention about

12 you getting a subpoena, and you said, "I catch him in lies all

13 the time," on the bottom of page 65.  "Was it yesterday?

14 Kennon said, "Al Man, did" — "did you know about Wanda getting

15 a subpoena?"  And he said, "I ain't heard a thing." What were

16 you referring to, Ms. White?

17 A     Well, we had gone to Al Man's home and Kennon said, "Did

18 you hear Wanda got a subpoena?"  And he said, "No."  And a few

19 minutes afterwards, Wayne came — Wayne Jones came in, and he

20 said, "Did you hear that Wanda got a subpoena?"  And he said,

21 "Oh, yeah, Al Man told me."

22 Q     Finally, ma'am, on page 67, there's a reference to an

23 incident in Christian County, and then it was followed by a

24 comment that Kennon made, "He whipped the dog piss out of

25 Ouchie out there in the election, too."  To your understanding,

1  who was Kennon referring to as "Ouchie"?

2  A    Gary "Ouchie" Jackson.

3  Q    And did you have conversations with Al Man Stivers about

4  that incident with Ouchie?

5  A    We had.

6  Q    And what did he tell you about that incident?

7  A    He said that him — that Ouchie, Gary "Ouchie" Jackson,

8  and Darnell had come to his driveway and that he regretted ever

9  doing it, but they come to confront him on absentee voting, he

10  was in control of the absentee voting, and that whenever Ouchie

11  stepped out of the vehicle they got in a confrontation.  And we

12  also — myself and my husband also had talked to Ouchie about

13  it, and he said that Al Man Stivers had beat him.  So we had

14  talked to both sides.

15  Q    Did you see Gary Jackson after this reported incident?

16  A    I did.

17  Q    Did you see any evidence of an assault?

18  A    He was black and blue, his face was disfigured.

19  Q    Could you explain to me what the — as Al Man described to

20  you, what the source of the conflict was with Ouchie and

21  Darnell?

22  A    That Ouchie believed that he had — that Al Man had

23  cheated him on the absentee machine.

24  Q    And was Ouchie and Darnell part of a slate that was

25  involved in the scheme to steal votes and buy votes in the 2006

WANDA WHITE — CONTINUED DIRECT — MR. SMITH          45

1  election?

2  A    For the council race.

3  Q    Do you know -- I'm sorry, what year was that that Al Man

4  reported to you that the election occurred where the beating of

5  Gary Jackson occurred?

6  A    I don't recall.  I don't recall him telling me.

7  Q    But he was a candidate for office?

8  A    Both of them, Darnell also, yes.

9  Q    And what office were they seeking at that time?

10 A    Councilman.

11      MR. SMITH:  Your Honor, that's a point of break.  I'm

12 not sure if the Court wants to take a recess.  We do have

13 another clip to play.

14      THE COURT:  Yes, sir.  We'll take our lunch recess at

15 this time.

16      Ladies and gentlemen, please keep in mind the

17 admonition that you have been given several times.  We will be

18 in recess until 1:00 this afternoon.

19      (Whereupon, the jury retired from the courtroom, after

20 which the following proceedings were had in open court.)

21      THE COURT:  You can step down, Ms. White.  Thank you.

22      Any matters to take up outside the presence of the

23 jury?

24      (No response.)

25      THE COURT:  We'll be in recess until 1:00.

1    (Whereupon, a recess was had for the noon hour, after

2 which the proceedings continue uninterrupted to Volume 11-B.)

3                    (Proceedings concluded at 12:00 p.m.)

4              C E R T I F I C A T E

5    I, Cynthia A. Oakes, certify that the foregoing is a

6 correct transcript from the record of proceedings in the

7 above-entitled matter.

8

9 2/28/2010                    s/CYNTHIA A. OAKES
     DATE                     CYNTHIA A. OAKES, RPR, RMR, CRR

10

11

12

13              I N D E X

14                                        PAGE

15 Testimony of WANDA WHITE:
        Continued Direct Examination by Mr. Smith:        4

16

17

18

19              E X H I B I T S

20 Government's                              Page
   Exhibit No.           Identified          Admitted
21
     A13                     4                   6
22   A13A                    4                   6

23

24

25