United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09-16-S |
| vs. | ) |
| | ) Frankfort, Kentucky |
| RUSSELL CLETUS MARICLE | ) March 16, 2010 |
| DOUGLAS C. ADAMS | ) 9:50 a.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM E. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) VOLUME 25-A |
| STANLEY BOWLING | ) |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States: STEPHEN C. SMITH, ESQ.
                                JASON D. PARMAN, ESQ.

On behalf of the Defendant      DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:         MARTIN S. PINALES, ESQ.

On behalf of the Defendant      R. KENT WESTBERRY, ESQ.
Douglas C. Adams:               KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant      T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant      ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant      RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:             R. TUCKER RICHARDSON, III, ESQ.

On behalf of the Defendant      JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant      ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant      DANIEL A. SIMONS, ESQ.
Stanley Bowling:

```
 1   Appearances of Counsel:

 2   On behalf of the United States: STEPHEN C. SMITH, ESQ.
                                     JASON D. PARMAN, ESQ.
 3                                   Assistant U.S. Attorneys
                                     601 Meyers Baker Road
 4                                   Suite 200
                                     London, Kentucky  40741
 5

 6   On behalf of the Defendant      DAVID S. HOSKINS, ESQ.
     Russell Cletus Miracle:         107 East First Street
 7                                   Corbin, Kentucky  40701

 8                                   MARTIN S. PINALES, ESQ.
                                     150 East Fourth Street
 9                                   Federal Reserve Building
                                     Cincinnati, Ohio  45202
10

11   On Behalf of the Defendant      R. KENT WESTBERRY, ESQ.
     Douglas C. Adams:               KRISTEN N. LOGAN, ESQ.
12                                   220 West Main Street
                                     Suite 1900
13                                   Louisville, Kentucky  40202

14
     On behalf of the Defendant      T. SCOTT WHITE, ESQ.
15   Charles Wayne Jones:            133 West Short Street
                                     Lexington, Kentucky  40507
16

17   On behalf of the Defendant      ROBERT L. ABELL, ESQ.
     William E. Stivers:             120 North Upper Street
18                                   Lexington, Kentucky  40507

19
     On behalf of the Defendant      RUSSELL JAMES BALDANI, ESQ.
20   Freddy W. Thompson:             R. TUCKER RICHARDSON III, ESQ.
                                     300 West Short Street
21                                   Lexington, Kentucky  40507

22
     On behalf of the Defendant      JERRY W. GILBERT, ESQ.
23   William B. Morris:              212 North Second Street
                                     Richmond, Kentucky  40475
24

25
```

```
 1   On behalf of the Defendant        ELIZABETH SNOW HUGHES, ESQ.
     Debra L. Morris:                  201 West Short Street
 2                                     Lexington, Kentucky   40507

 3
     On behalf of the Defendant        DANIEL A. SIMONS, ESQ.
 4   Stanley Bowling:                  116 West Main Street
                                       Suite 2A
 5                                     Richmond, Kentucky   40475

 6
     Court Reporter:                   CYNTHIA A. OAKES, CRR
 7                                     Official Court Reporter
                                       United States District Court
 8                                     560 Athens Boonesboro Road
                                       Winchester, Kentucky   40391
 9                                     (859) 983-4346

10

11

12

13

14

15

16

17

18

19

20

21

22
     Proceedings recorded by mechanical stenography,
23   transcript produced by computer.

24

25
```

1          (Whereupon, the following proceedings were had outside the

2    presence of the jury.)

3               THE COURT:  Thank you.

4               The record will reflect the jury is not present at

5    this time.  Parties and counsel, with the exception of

6    Mr. Abell, are here.

7               Anyone seen Mr. Abell?

8               MR. WHITE:  He's definitely here, Your Honor.

9               THE COURT:  All right.

10              MR. WESTBERRY:  He's probably checking his witnesses,

11   I think.

12              THE COURT:  All right.  We'll wait just a moment.

13         (Whereupon, Mr. Abell returned to the courtroom, after

14   which the following proceedings were had in open court.)

15              THE COURT:  All right.  Thank you.

16              The record will reflect that all attorneys are

17   present at this time.  A couple of matters to take up before

18   the jury is brought in this morning.

19              The jurors have asked me to remind the attorneys to

20   please speak into the microphone at all times, they're having a

21   hard time hearing some of the attorneys.  So if you—all could

22   remember to use those microphones, I'm sure the jury would

23   appreciate that.

24              Madam Clerk, I'll let you put this in the file.

25              The other issue I wanted to take up this morning is

1    the issue of admissibility of a document that Mr. White had

2    marked earlier as Jones Exhibit No. 5.  I had asked the

3    attorneys to look at this last night to confer to see if there

4    was going to be a problem in terms of foundation before the

5    introduction of the exhibit.

6                Mr. White, have you and Mr. Smith had a chance to

7    talk about that?

8                MR. WHITE:  We have, Your Honor, and we have agreed

9    that the only exhibit I'm going to use from that stack when I

10   get it back from you is the memorandum, it's actually signed

11   memorandum of agreement between Clay County Fiscal Court and

12   the — I believe it's the State Board of Elections.  And that

13   would show that they bought the right machine or an approved

14   machine.  Everything else we agreed was extraneous.

15               THE COURT:  All right.  Let me hand these back to

16   you, then.  Thank you.

17               If that's not the first page, and I don't think it

18   is, then you'll need to put another sticker on that before

19   it's —

20               MR. WHITE:  Thank you.

21               THE COURT:  All right.

22               MR. WHITE:  Did you want me to — because I'm not

23   going to offer anything else as to this, and Ms. Johnson didn't

24   refer to this in her testimony, is it okay if I retain the rest

25   of the document?

1          THE COURT:  Yes, sir, you can retain the rest of it

2     unless there's some issue with it.  But it doesn't sound like

3     there is, so you can staple and mark with an exhibit sticker

4     the pages of that that you want to introduce.

5          Any other issues that we need to take up this

6     morning?

7          Mr. Smith?

8          MR. SMITH:  Your Honor, I do have an issue regarding

9     a witness that was recognized yesterday afternoon.  I believe

10    his name is Ronnie Owens.

11         THE COURT:  Uh-huh.

12         MR. SMITH:  I've been advised that he was seen at

13    dinner with Doug Adams last night following his recognition as

14    a witness in the case.  I'm sure the Court is aware that the

15    order on conditions of release of Mr. Adams specifically

16    prohibits him having contact with co-defendants or witnesses in

17    the matter except through an attorney.  And this issue has been

18    well-visited many times by the Court prior to the trial and

19    it's a surprise to learn that this defendant chose to have

20    contact with a witness recognized in court here yesterday.  We

21    would ask that there be a show cause hearing for the defendant

22    to show cause why his bond should not be revoked based on this.

23    And also we intend to raise this as an issue on the rule of

24    separation of witnesses, and since this is not his witness, I

25    believe it's a witness of one of his co-defendants, that may be

7

1    an issue that we need to take up this morning, I'm not sure.

2                    THE COURT:  All right.

3                    Mr. Westberry, would you like to respond?

4                    MR. WESTBERRY:  Thank you, Judge.  I don't know much

5    about it personally.  I did find out about it sometime last

6    night, I'm estimating 7:00 to 8:00 at night, as I understand

7    it, it was after court.  Apparently it happened at the Long

8    Horn Steakhouse here in town.  I don't personally know who

9    Mr. Owens is, and, again, I wasn't — so I think I understand

10   is that the representatives of the United States were at the

11   steakhouse too, I think possibly Mr. Smith and one of the

12   agents, and they may have just seen them there.

13                   What limited information I have been able to learn so

14   far, I'll just make this representation to the Court, I have

15   been told that there was no trial testimony discussed.

16   Apparently this witness is a longtime acquaintance of Mr. Adams

17   in Clay County.  I don't know the circumstances under which —

18   whether they met by chance at the Long Horn Steakhouse or

19   otherwise.

20                   You know, I wish I had been consulted before.  I

21   think this wouldn't be an issue if I had.  I don't know,

22   Mr. White may have — I have spoken briefly with him this

23   morning about it.  If the government wants a show cause

24   hearing, there's no — I don't necessarily oppose that at this

25   point.  Perhaps we could do that sometime later during the

1  process of the trial, in particular after we finish our proof

2  in this matter.  I'm sorry, I don't know any more —

3           THE COURT:  All right.

4           MR. WESTBERRY:  — but that's the limit of my

5  knowledge.

6           THE COURT:  All right.  Mr. Owens is one of

7  Mr. Jones' witnesses?

8           MR. WHITE:  He is, Your Honor.  Do you want me to

9  forecast what he's going to testify about?

10          THE COURT:  Well, I think probably what I'll need to

11  do is we'll need to have Mr. Owens — He's here today?

12          MR. WHITE:  He is, he's in the witness room, Your

13  Honor.

14          THE COURT:  We'll need to have him brought in.  I'm

15  going to give the United States a chance to voir dire him

16  outside of the presence of the jury to determine what, if

17  anything, he discussed with Mr. Adams that could affect his

18  ability to testify or the United States' ability to raise those

19  issues in front of the jury, the fact that he's violated a

20  ruling of the Court by discussing — perhaps discussing matters

21  with a party.  So I'm going to give the United States a chance

22  to do that this morning briefly before we start.

23          During the lunch hour today, I will proceed with a

24  show cause hearing as to why the bond conditions should not be

25  altered or revoked for Defendant Adams in the case.  Hopefully,

1  his presentation of his proof will be completed by the lunch

2  hour.  So we'll be able to take that up at noon today.  I would

3  not anticipate that would be a lengthy hearing, but I do want

4  to proceed with that matter at that time.

5          As the parties understand, I have become more weary

6  as this case has gone on about contact with witnesses and

7  potential witnesses in the case, activities of the defendants,

8  and so I do take this matter very seriously and we will be

9  proceeding with a hearing at noontime today on that matter.

10          MR. WHITE:  Your Honor, just to let you know, at the

11  end of the evidence yesterday, Mr. Adams asked me, he said, "Is

12  Mr. Owens going to be spending the night?"  I said, "I'm not

13  sure."  He said, "Well, I wouldn't mind taking him out to

14  dinner."  I instructed him to check with Mr. Westberry.  I

15  couldn't recall what his limitations were.  And so that's —

16          THE COURT:  All right.  Well.

17          MR. WHITE:  — what my knowledge of it was.  And then

18  I got a call last night by my client's wife, I think around the

19  same time, 7:00 or 8:00, and she told me that they had dinner

20  at the Long Horn.

21          THE COURT:  All right.  Well, we'll need to take this

22  up first with respect to the witness who's anticipated to be

23  called this morning.

24          If you would see if Mr. Owens is in the —

25          THE MARSHAL:  He is.

1          THE COURT:  -- witness room?  He can be brought in at
2     this time.
3          Any objection to proceeding in the manner that I've
4     outlined, Counsel?  Anyone have a problem with the order that
5     we'll going to do this?
6       (No Response.)
7          THE COURT:  Thank you.
8          Madam Clerk, if you could please administer the oath.
9                         RON OWENS,
10    having been first duly placed under oath, was examined and
11    testified as follows:
12         THE COURT:  Thank you.  Please be seated.
13         Mr. Smith, you may proceed to voir dire the witness
14    outside the presence of the jury at this time.
15                   VOIR DIRE EXAMINATION
16    BY MR. SMITH:
17    Q    Good morning.
18    A    Good morning.
19    Q    State your name, please.
20    A    Ron Owens.
21    Q    And tell us where you reside, sir.
22    A    I reside in Manchester, Kentucky.  You need an address?
23    61 Lavadia Drive, Manchester, Kentucky.
24    Q    And how long have you lived in Manchester, sir?
25    A    Approximately 15 year.

1   Q    Do you work down there somewhere?

2   A    I'm self-employed at the moment.

3   Q    How do you occupy yourself?

4   A    I'm a carpenter.

5   Q    All right.  And you work there in the local area of

6   Manchester?

7   A    Yes, sir.

8   Q    And are you a remodeler or --

9   A    I do renovations, mostly renovations.

10  Q    Okay.  Do you know Doug Adams?

11  A    Yes, I do.

12  Q    How long have you known him?

13  A    Probably a year.

14  Q    Probably a year?

15  A    Yes.

16  Q    How did you-all meet?

17  A    His daughter owns a store there below my neighborhood and

18  I've seen him in that area.

19  Q    Okay.

20  A    Met with him and talked with him.

21       THE COURT:  I'm sorry, you're going to need to speak

22  up so I can hear you.

23       THE WITNESS:  Okay.

24  BY MR. SMITH:

25  Q    You've met with him and talked with him there at the

1  store?

2  A    Yes.

3  Q    Do you shop there —

4  A    Yes, sir.

5  Q    — or eat lunch there —

6  A    I shop there and eat lunch there, too.

7  Q    Okay.  And is that a place where he frequents, you see him

8  there frequently?

9  A    Occasionally.

10 Q    And is there any other aspect of that relationship other

11 than just meeting there at the grocery store, do you-all have

12 any social gatherings that you attend together?

13 A    Not that I can say, no.

14 Q    You've been subpoenaed to testify here for Mr. Jones; is

15 that right?

16 A    Yes.

17 Q    And when did you receive your subpoena, sir?

18 A    I think it was approximately Thursday.

19 Q    Okay.  And Thursday being a week ago last Thursday?

20 A    Last week, last Thursday, yes.

21 Q    And when you got that subpoena, did you share any

22 information with Mr. Adams about getting the subpoena at that

23 time?

24 A    No, sir.

25 Q    When was the first time that he knew you were going to be

1   a witness up here in court?

2   A     I think yesterday.

3   Q     Okay.  And I recognize you as being the one that came in

4   and I think the Court recognized you to be back here today.  Is

5   that -- is that when you would have believed that Mr. Adams

6   would have first known that you were going to be a witness

7   here?

8   A     I would say so.

9   Q     You-all didn't have any phone contact with each other

10  before yesterday?

11  A     No.

12  Q     You don't have any family in common?

13  A     No.

14  Q     Okay.  Not related to him or his wife?

15  A     No.

16  Q     Okay.  And the only activities that would put you guys

17  together would be what contact you've had at the store?

18  A     Basically, yes.

19  Q     Okay.  Now, did you talk to him after your court

20  appearance here yesterday?

21  A     Yes.

22  Q     And how did you-all meet to talk?

23  A     We just went to dinner.

24  Q     And how was that arranged?

25  A     We just met out in front, my attorney and -- you know,

 1  said that we was going to meet — you know, just meet up and

 2  have dinner.

 3  Q    Your attorney is who?

 4  A    Scott White.

 5  Q    And how long has he been representing you?

 6  A    Well, he's not actually representing me.  I'm just a

 7  witness for —

 8  Q    Okay.  So he's someone that you've been talking with about

 9  this case?

10  A    Yes.

11  Q    Have you talked to anybody else about this case other than

12  Mr. White?

13  A    No, not really, no.

14  Q    "Not really."  That makes me want to ask another question.

15  A    Well, you know —

16  Q    Did you discuss —

17  A    — my fiancee or something like that, you know, we might

18  have discussed it or —

19  Q    You might have discussed it with whom, sir?

20  A    My fiancee.

21  Q    Okay.  Anyone else?

22  A    I wouldn't think so.

23  Q    Did you talk with Mr. Adams at dinner last night?

24  A    Yes.

25  Q    Did you-all talk about the case?

1   A      No.

2   Q      What did you-all talk about?

3   A      High school and high school education, our, you know,

4   kids, what we gathered in high school, you know, people that we

5   knew in common in high school, and like one of the counselors,

6   we was talking about, you know, that my fiancee said that she

7   didn't need to go to college or something or something to that

8   effect.  It was —

9   Q      How long did you-all spend together last night?

10  A      Approximately maybe 30 minutes, 45 minutes.

11  Q      And that was at the Long Star?

12  A      Long something, Long Branch, Long Star, or something like

13  that.

14  Q      And who paid for dinner?

15  A      Doug.

16  Q      And did you know that when you went out to eat with him

17  last night, he was going to buy?

18  A      Not actually, no.

19  Q      Did you-all leave together or separate?

20  A      Separate.

21  Q      Who left first?

22  A      I did.

23  Q      Was there some reason you-all didn't leave together?

24  A      No, not really.

25  Q      That was your — was your fiancee with you?

1   A    Yes.

2   Q    Did she leave as you left?

3   A    Yes.

4   Q    You-all left together?

5   A    Yes.

6   Q    And you-all stayed there 30 to 45 minutes?

7   A    Approximately, yes.

8   Q    Did you-all ride together there?

9   A    Me and my fiance did.

10  Q    So you met Mr. Adams at the restaurant?

11  A    Well, actually, we met at Captain D's, I guess is the name

12  of it, and it was closed, and then we proceeded on to the Long

13  Star or Long Ranch.

14  Q    Okay.  But you-all were driving separate vehicles?

15  A    Yes.

16  Q    Okay.  Did you-all meet up after dinner?

17  A    No.

18  Q    Did you talk to him on the phone?

19  A    No, I don't think so.

20  Q    If we pull the phone records, it wouldn't show him

21  contacting you at all yesterday?

22  A    It's a possibility.  You know, I could have said something

23  or, you know, he could have called me or something like that.

24  I'm not —

25  Q    You don't recall having a phone conversation with him

1    yesterday at all?

2    A    Yeah, I believe he did call me.

3    Q    Okay.

4    A    But he was asking me where I was staying —

5    Q    Was that before dinner or after?

6    A    Pardon?  After dinner.

7    Q    After dinner?

8    A    Yeah.

9    Q    And what was that conversation about?

10   A    It was asking where I was staying, did I get a room or,

11   you know — and I said, "Yeah, I'm renting a motel room."

12   Q    Did he at any time indicate to you that he was concerned

13   about agents being there in the restaurant?

14   A    No, not really.

15   Q    He didn't mention that he saw an FBI agent there in the

16   restaurant?

17   A    No.

18   Q    And that isn't the reason that he had you-all leave in

19   single file, one and another, rather than leaving together —

20   A    No.

21   Q    — in order to try to keep down the attention?

22   A    I wouldn't think so.

23   Q    He didn't indicate to you that he had seen an agent there?

24   A    No.

25             MR. SMITH:  Let me have just a moment.

```
 1              THE COURT:  Yes, sir.

 2              MR. SMITH:  That's all.

 3              THE COURT:  Mr. Westberry, do you have any questions

 4   for this witness?

 5              MR. WESTBERRY:  May I have just one moment, please?

 6              THE COURT:  Yes, sir.

 7              MR. WESTBERRY:  Judge Reeves, no additional

 8   questions.  Thank you.

 9              THE COURT:  All right.

10              Mr. White?

11                      VOIR DIRE EXAMINATION

12   BY MR. WHITE:

13   Q    The only question I would ask is, was there any

14   conversation at dinner or on the phone about what your

15   testimony was going to be?

16   A    No.

17   Q    That didn't come up at all?

18   A    No.

19              MR. WHITE:  That's all I have, Your Honor.

20              THE COURT:  All right.

21                      VOIR DIRE EXAMINATION

22   BY THE COURT:

23   Q    Mr. Owens, I have one follow-up question for you.  When

24   Mr. Smith, the United States Attorney, was asking you questions

25   about whether you had a phone call with Mr. Adams yesterday,
```

1    you initially said you didn't recall having one.

2    A    Well, I didn't recall, you know.

3    Q    My question for you is, were you lying when you said that?

4    Because you later admitted that you had a conversation.

5    A    I did have a conversation.

6    Q    And that was just yesterday?

7    A    Right.

8    Q    Are you saying initially you didn't recall having a

9    conversation with Mr. Adams when you were first asked?

10   A    No, I never remembered having no call with him.  I thought

11   he was talking about the previous — before we left the

12   restaurant.

13   Q    Now, you had a telephone conversation with Mr. Adams

14   within 12 to 14 hours ago, 8:00 to 10:00 last night; correct?

15   A    Yes.

16   Q    And you said to Mr. Smith you didn't recall that

17   conversation?

18   A    No, he was saying did I have a call —

19   Q    Yes, sir.

20   A    I took it that he was saying I had a call earlier and I

21   had talked to him earlier before we met up for dinner and went

22   out to dinner.

23   Q    All right.

24   A    And afterwards, yes, I did have a call from him.

25            THE COURT:  All right.  You can step down.

1          Mr. Smith, I'm going to allow the witness to be

2    called by Mr. Jones in the case, but I am going to allow you to

3    question him about his conversations, his meetings, both with

4    parties, as well as counsel in the case.  Clearly, it is

5    relevant to his credibility.  He has violated the Court's order

6    under Rule 615 and that is a relevant inquiry that the United

7    States may conduct under the circumstances of this particular

8    matter.  As I indicated earlier, we'll proceed further on the

9    show cause issue with respect to Mr. Adams' improper contact

10   with this witness at the noon hour.

11          Any other issues that need be taken up before the

12   jury is brought in?

13          MR. WESTBERRY:  May I check on my next witness, Your

14   Honor —

15          THE COURT:  Yes, sir, you may.

16          MR. WESTBERRY:  — before you call the jury?

17          THE COURT:  Yes, sir.

18          THE MARSHAL:  He's here.

19          MR. WESTBERRY:  He wasn't here when we came into

20   court.

21          THE COURT:  Is it Mr. Bishop, is that the next

22   gentleman, Mr. Bishop?

23          MR. WESTBERRY:  (Witness nodding head affirmatively.)

24          THE COURT:  All right.  Please bring the jury in.

25          (Whereupon, the jury entered the courtroom, after which

 1   the following proceedings were had in open court.)

 2              THE COURT:  Thank you, and please be seated.

 3              The record will reflect that all members of the jury

 4   are present.  The parties and counsel are also present.

 5              Mr. Westberry, just one moment before you call your

 6   next witness.

 7              All right.  Thank you.  Let's see, Mr. Westberry, you

 8   may call your next witness.

 9              MR. HOSKINS:  Yes, Judge.  Clay Bishop.

10                    CLAY MASSEY BISHOP, JR.

11   having been first duly placed under oath, was examined and

12   testified as follows:

13                    DIRECT EXAMINATION

14   BY MR. WESTBERRY:

15   Q    Good morning.

16   A    Good morning.

17   Q    I'm Kent Westberry, Mr. Bishop, I'm one of Doug Adams'

18   attorneys.

19        Could you tell us your full name for the record, please,

20   sir?

21   A    Clay Massey Bishop, Jr.

22   Q    And where do you reside, Mr. Bishop?

23   A    Manchester, Kentucky.

24   Q    How long have you lived in Manchester, Kentucky, and/or

25   Clay County?

1  A      Except for about 11 years when I was away at school, all

2  my life.

3  Q      Do you have family, immediate family, Mr. Bishop?

4  A      Yes.

5  Q      And could you tell us just who your immediate family is?

6  A      My wife, Shirley Bishop, and we have four children.  I

7  have a daughter, Jenny Lynn; a daughter, Sonya; a son, Clay

8  Bishop III; and a daughter, Aleena Paige.

9  Q      How long have you been married?

10  A      I've been married to Shirley for ten years.

11  Q      How old are your kids, are they grown?

12  A      Yeah, Shirley had two children by her former marriage and

13  I had two by my former marriage.  So our oldest daughter,

14  Sonya, is a physical therapist in Lexington, and she's married

15  to Michael Sullivan, and my oldest daughter, Jenny Lynn, is a

16  dietitian for Saint Joseph Hospital in Lexington.  My oldest —

17  my only son, Clay Bishop III, is a senior finishing his degree

18  in criminal justice at EKU, and he presently resides with me in

19  Manchester.  And our youngest daughter, Paige, is a sophomore

20  at Eastern Kentucky University majoring in broadcasting at the

21  current time.

22  Q      Okay.  Do you have any grandchildren?

23  A      No.

24  Q      What do you do for an occupation, Mr. Bishop?

25  A      Well, primarily, I'm an attorney.  I'm also the Clay

1  County Attorney, and I also am an instructor for paralegal

2  studies at Eastern Kentucky University.

3  Q    Okay.  What is your educational background, where you did

4  get your schooling?

5  A    I received a Bachelor's of Political Science degree in

6  1975 at Eastern Kentucky University, and a degree in history in

7  1976, and a Master's Degree in history, along with a teacher's

8  certificate in 1978.  I went to law school in 1979 and received

9  a Juris Doctor degree in 1982.

10 Q    How long have you served as County Attorney in Clay

11 County?

12 A    I'm currently in my 25th year.

13 Q    The position of county attorney, is that a prosecutor?

14 A    Yes, sir, it is.  Part time, yes.

15 Q    Do you have a private law practice in addition to your

16 Clay County prosecutorial duties?

17 A    Yes, sir, I do.

18 Q    What court does the county attorney prosecute in,

19 Mr. Bishop?

20 A    District Court.

21 Q    And is that a different court than, say, Circuit Court?

22 A    Yes, sir, it is.

23 Q    Are you related to William Hugh Bishop?

24 A    He is my brother.

25 Q    That's your older brother?

1  A    He's my older and my only brother, yes, sir.

2  Q    And had your father been a practicing attorney and

3  officeholder in Clay County in years past?

4  A    Yes, sir, he was a practicing attorney.  He also held —

5  well, he was a public servant for 38-and-a-half years.  Four

6  years as a teacher, and the rest Railroad Commissioner, County

7  Attorney, Circuit Court Clerk, and Circuit Judge for 20-and-

8  a-half years.

9  Q    Now, Mr. Bishop, do you know Doug Adams?

10  A    Yes, sir, I do.

11  Q    Are you able to look in the courtroom today, just look

12  around a little bit, and see if you can identify where Doug is

13  and just point him out for the record, please.

14  A    He's sitting right there, had sort of a green tinted shirt

15  on.  That's him standing up.

16        MR. WESTBERRY:  May the record reflect he's

17  identified —

18        THE COURT:  The record will reflect the witness has

19  identified the defendant, Douglas Adams.

20  BY MR. WESTBERRY:

21  Q    How long have you known Doug Adams?

22  A    Twenty-eight, 29 years, in that range.

23  Q    Do you consider Doug Adams to be a friend?

24  A    Yes, sir, I do.

25  Q    How close a friend would you characterize him?

1  A    Close.  It's not that we see each other a lot, but we're
2  close friends and have been over the years.
3  Q    Do you attend any gatherings or functions or organizations
4  together?
5  A    We're both Masons, but I don't think we've ever been to a
6  meeting together.  As time goes by, there's less and less time
7  for that sort of thing.  But we were on the board of directors
8  at Manchester Memorial Hospital together, I did see him at a
9  few of those meetings in years past.  And I guess that's about
10 it really.
11 Q    Do you attend church services together?
12 A    Oh, yes, we do, we attend Laurel Creek Church of God
13 together.  I started going down there in May of 2006.  And I've
14 been in church all my life, it just that the church I was going
15 to I couldn't get any of my family to go with me and it was
16 sort of a dried-up church, and so we went looking for a new
17 church and we found one and been there ever since.
18 Q    Thank you.  Now, shifting just a little bit, Mr. Bishop,
19 have you ever served as a member of the Clay County Board of
20 Elections?
21 A    Yes, sir, I have.
22 Q    Now, can you just briefly tell us, what is the Board of
23 Elections, from your understanding?
24 A    The Board of Elections is made up of -- it's a statutory
25 creature, made by statute, and it's made up of the County Court

CLAY MASSEY BISHOP - DIRECT - MR. WESTBERRY        26

1  Clerk, who acts as the chairman and has the tiebreaking vote,

2  and the sheriff of the county, and then there is a Republican

3  commissioner from the Republican party, and that is chosen

4  every four years, the Republican party, along with the

5  Democratic party, because the fourth person is a Democrat

6  commissioner, or the third person, and each of the two parties

7  every four years, after their conventions and when these

8  vacancies occur every four years, they have to send in a list

9  of five persons who are willing to serve on the Board of

10 Elections.  They send that list in to the State Board of

11 Elections, I believe it is, and then they choose who is to

12 serve from each political party from that list of five that is

13 sent in.

14 Q    And does the local Board of Elections, if you know,

15 have -- and you may have said this, have responsibility for

16 appointment of elections officers?

17 A    They do.  It does, yes.

18 Q    Now, what position have you held in the past, Mr. Bishop,

19 on the Clay County Board of Elections?

20 A    I was the commissioner for the Republican party of Clay

21 County.

22 Q    How many times have you served as commissioner for the

23 Clay County Republican party?

24 A    I can't really remember specifically, but I believe that I

25 began, I think, in 1998.  I just can't really be sure.  But I

CLAY MASSEY BISHOP, JR. - DIRECT - MR. WESTBERRY     27

1  think that's correct.  And it may have been — it may have been

2  1994.  I just can't remember for sure.  But I served for a

3  while during the '90s, and then I had opposition in 2002 and —

4  Q    When you say "opposition," what opposition are you talking

5  about?

6  A    Another attorney in Clay County decided to run against me

7  for the county attorney's position on the Republican ticket, so

8  I had a May primary opponent.

9  Q    And did that — what's the policy in terms of whether you

10 stay on as a Board of Election member if you have someone

11 running against you in an election?

12 A    And the policy has changed.  But, at that time, because I

13 did have opposition and because I was a candidate on the

14 ballot, then I was disqualified from serving on the Board of

15 Elections.

16 Q    Did someone take your place for that primary election in

17 '02?

18 A    Yes, sir.

19 Q    And who was that, Mr. Bishop?

20 A    As far as I know, it was my brother, William Hugh Bishop.

21 Q    Do you recall the circumstances under which you were first

22 chosen as a Board of Election member many years ago?

23 A    Yes, sir, I do.  I was given a list of the five to send in

24 to Frankfort and I took that list to my Republican Executive

25 Committee, which is made up of captains of each and every

CLAY MASSEY BISHOP, JR. - DIRECT - MR. WESTBERRY     28

1  precinct in the county, which would be 20 people, and then the

2  chairman, of which I was a chairman of the party at that time

3  as well and still am, and the vise chairman, secretary,

4  treasurer, and youth chairman all have a right to say who makes

5  up that list that we send in.  And I took the list to them,

6  which was provided to me by Jennings White, and it was not

7  acceptable.  And then I called another meeting because I had

8  been given another list by Mr. White, and it was not

9  acceptable.  And there was a motion made that since I was the

10 chairman that I be allowed to do whatever I deemed best and

11 most appropriate for the party as far as sending in the list.

12 So I just put my name at the top and I sent it in.  I was tired

13 of the bickering.

14 Q    Now, from your personal knowledge, has Doug Adams ever

15 been a member of the Board of Elections in Clay County?

16 A    No, sir.

17 Q    Do you know who the members of the Board of Elections were

18 in 2002?

19 A    I think that would have been Jennings White as the County

20 Clerk, Edd Jordan as the Sheriff, I think Wayne Jones as the

21 Democrat, and my brother, William Hugh Bishop, as the

22 Republican.  I think that's accurate.

23 Q    Okay.  And William Hugh Bishop, did he take your place in

24 '02 —

25 A    Yes.

1  Q    — because you were running for election; is that correct?

2  A    That is correct.

3  Q    Do you have any recollection of who served on the Board of

4  Elections in Clay County in 2004?

5  A    I think I did; I think.  I think I did and Wayne Jones and

6  Freddy Thompson, the Clerk, and Kevin Johnson, I guess.

7  Q    Okay.  What position did Kevin Johnson —

8  A    No.  No, I'm sorry, that's wrong.  That would have been

9  Edd Jordan again.  I'm sorry.

10  Q    Is that the year that Edd Jordan ran for reelection of

11  sheriff?

12  A    Let's see, he ran in 2002.  No, 2004, he did not run.  He

13  did not run.

14  Q    Freddy Thompson would have been the clerk; correct?

15  A    Yes.

16  Q    And Edd Jordan would have still been sheriff at the time?

17  A    That's correct.

18  Q    What about 2006, Mr. Bishop, do you know who made up the

19  Clay County Board of Elections in 2006; if you know?

20  A    No, I don't.

21  Q    Were you on the Board of Elections in 2006?

22  A    I don't think so.

23  Q    Now, you indicated a moment ago that Doug Adams, from your

24  personal knowledge, has not served on the Board of Elections

25  before.  I believe that was your answer?

1   A    Not to my knowledge ever.

2   Q    From your personal knowledge, Mr. Bishop, has Doug Adams

3   ever sought to influence you in your role as a commissioner on

4   the Board of Elections in Clay County during those times that

5   you've served in years past?

6   A    No, sir.

7   Q    From your personal experience, would that even be

8   possible?

9             MR. SMITH:  Your Honor, I'm going to object as to

10  speculation.

11            THE COURT:  Sustained.

12  BY MR. WESTBERRY:

13  Q    Mr. Bishop, are you aware if he ever sought to influence,

14  from your personal knowledge, any other member of the Clay

15  County Board of Elections?

16            MR. SMITH:  Objection, Your Honor, that would be

17  outside the witness's knowledge.

18            THE COURT:  I'll overrule.  You can ask that.

19            THE WITNESS:  No, sir.  Not to my knowledge, no, sir.

20  BY MR. WESTBERRY:

21  Q    No information has ever been brought to your attention in

22  your capacity as a member of the Board of Elections —

23            MR. SMITH:  It calls for hearsay, I object.

24            THE COURT:  I think he's answered the question, it is

25  repetitive, so I'll sustain for that reason.

1          MR. WESTBERRY:  Yes, sir.

2  BY MR. WESTBERRY:

3  Q     Starting with — you identified who the members of the

4  Board of Elections were in 2002, and I believe you said in

5  addition to William Hugh Bishop, your brother, who stepped in

6  for you while you were running for reelection and in addition

7  to Wayne Jones, you also testified that Edd Jordan and Jennings

8  White were also members of the Board during that period of

9  time; correct?

10  A     Correct.

11  Q     From your personal knowledge, were Jennings White and Edd

12  Jordan political allies of one another, and in particular

13  during that 2002 election, from your personal knowledge?

14  A     Yes.

15  Q     Why do you say that?

16  A     Because they always voted together.

17  Q     Now, from your personal knowledge, did Doug Adams support

18  a candidate other than Jennings White in that 2002 race for

19  county court clerk?

20  A     Yes, sir, he did.

21  Q     And who did he support?

22  A     He supported Freddy Thompson.

23  Q     So from your personal knowledge, has any information been

24  brought to your attention that Doug Adams ever tried to

25  influence either Jennings White or Edd Jordan during the time

1  that they served as members of the Board of Elections?

2  A    No, sir.

3  Q    From your personal knowledge, has Doug Adams ever tried to

4  influence you with regard to the appointment of election

5  officers in Clay County during any of the elections we've been

6  talking about?

7  A    No, sir, he did not.

8  Q    Has any information been brought to your attention, again

9  in your capacity as having served on the Board of Elections,

10 that Doug Adams has ever tried to influence the Board —

11        MR. SMITH:  Calls for hearsay, I object.

12        THE COURT:  Overruled.

13 BY MR. WESTBERRY:

14 Q    Tried to influence the Board with regard to the

15 appointment of election officers?

16 A    No, sir.

17 Q    From your personal knowledge, Mr. Bishop, could you say

18 whether or not Doug Adams has been interested in politics in

19 Clay County over the years that you've known him?

20 A    Yes, sir.

21 Q    Okay.  Why do you say yes?

22 A    Well, because when I decided to seek the position of

23 county attorney in 1985, I asked Doug if he would help me, and

24 he said yes, that he would.  And he did.  Now, he took me to

25 people that I did not know to introduce me to them, to allow me

1  to tell them why I wanted to be county attorney and why I
2  thought I would make a good county attorney, and he took me to
3  people that I had known in years past but had lost track of
4  because I did spend about 11 years away at school, and he was
5  very helpful to me as far as introducing me -- re-introducing
6  me, I guess, to my home county, so to say.  But he was very
7  helpful to me, and we became close friends during that period
8  of time.  And that would have been 1985.

9  Q    From your personal experience, have you ever seen Doug
10 Adams or made aware of anything Doug Adams did politically that
11 you would consider to be improper or illegal?

12         MR. SMITH:  Objection, Your Honor.  Outside the
13 scope.

14         THE COURT:  I'll overrule.

15 BY MR. WESTBERRY:

16 Q    You may answer, Mr. Bishop.

17 A    No, I have never, no.  No, sir, I have not.

18 Q    Mr. Bishop, in the years that you've lived in Clay County
19 and served as prosecutor as the county attorney, have you
20 been -- ever become familiar with the term "political slate"?

21 A    Yes.

22 Q    You would agree that in 2002, of course, Doug Adams
23 supported Mr. Thompson, Freddy Thompson, in the County Court
24 Clerk's race against Jennings White; correct?

25 A    Yes, just as he supported me in 1985, yes.

1  Q    Do you have any personal knowledge regarding whether Doug

2  Adams supported any additional candidates in the 2002 race

3  other than the county court clerk?

4  A    No.

5  Q    Do you know an individual in Clay County named Roy Morgan?

6  A    Yes, I do.

7  Q    Do you know if Roy Morgan was a candidate in 2002 for any

8  office in Clay County?

9  A    Yes, sir, he was -- yes, sir, he was a candidate for

10  county judge executive in 2002.

11  Q    From your personal knowledge, do you know if Doug Adams

12  supported Roy Morgan in that race for county judge executive in

13  2002 and, if so, what level of support would you know about

14  from your personal knowledge?

15  A    I do not know that he -- whether or not he supported Roy

16  Morgan.  I know that he supported Freddy Thompson and I know

17  that he promised he would vote for me.

18  Q    And did you see Doug Adams periodically during the 2002

19  election season, in particular the days and the weeks leading

20  up to the primary in 2002?

21  A    No, not really.  I probably saw him maybe a total of three

22  times face to face.

23  Q    You indicated that you prosecute in district court in your

24  capacity as Clay County Attorney; correct?

25  A    That's correct, yes, sir.

1  Q    Now, would Cletus Maricle have ever been a presiding judge

2  in the court in which you prosecute, Mr. Bishop?

3  A    No, sir.

4  Q    Would Mr. Maricle have been the presiding or the sitting

5  judge in another court?

6  A    Yes, sir, he was the circuit court judge.  He succeeded my

7  father.

8  Q    Was there ever an occasion -- Well, let me rephrase the

9  question.  Do you know Melanda Adams?

10 A    Yes, sir, I do.

11 Q    And who do you know her to be?

12 A    She is the daughter of Douglas Adams.

13 Q    Was there ever an occasion that Melanda Adams appeared in

14 the court in which you prosecute?

15 A    Yes, sir.

16 Q    Prior to Melanda Adams appearing in the court in which you

17 prosecute, from your personal knowledge, did Doug Adams ever

18 ask for any special treatment or leniency for Melanda Adams to

19 you?

20 A    No, sir, he did not.

21 Q    From your personal knowledge, did anybody, on Melanda

22 Adams' behalf or Doug Adams' behalf, try to influence you with

23 regard to the court appearance that she would have made in the

24 court in which you prosecuted?

25 A    No, sir.

1  Q    From your personal knowledge, was she treated any

2  differently regarding that court appearance than what you would

3  ordinarily do in a similar circumstance?

4  A    No, sir.  In fact, I would characterize her treatment as

5  sort of standard practice as far as we could do it, and that

6  would be that we would have them stay in jail and be

7  incarcerated until we could find them a suitable place for

8  rehabilitation.

9              MR. WESTBERRY:  Okay.  Thank you.

10             May I have one moment, please, Judge Reeves?

11             THE COURT:  Yes, sir, you may.

12             MR. WESTBERRY:  Judge Reeves, we pass the witness,

13  thank you.

14             THE COURT:  All right.  Thank you.

15             Mr. Smith.

16             MR. SMITH:  Your Honor, may we approach?

17             THE COURT:  Yes, sir, you may.

18      (Whereupon, the following discussion was had between the

19  Court and counsel at the bench, out of the hearing of the

20  jury.)

21             MR. SMITH:  Your Honor, I want to ask the Court's

22  guidance.  At pretrial hearings, we discussed the arrest and

23  prosecution of Doug Adams for voter fraud conduct in the Clay

24  Circuit Court.  He was represented by Mr. Maricle.  This

25  witness has just gone very broad.  He has made basically a

1   wholesale declaration here that Doug Adams has never done

2   anything improper, I believe is the words he used.  And I

3   believe he's also acknowledged that he was the prosecutor who

4   would have been in that court system in 1989 when it was

5   brought by the Commonwealth.  My understanding of the system is

6   that he would have been involved in some way, some fashion, and

7   should have known, and I believe that — again, I believe under

8   608 that there are limited circumstances in which a charge

9   would bring — be brought in and be relevant, and I believe

10  that the circumstances include situations where a defendant

11  through his witness makes some kind of a wholesale he's never

12  done anything wrong, he's never done anything improper.  I

13  would argue it means the same thing, he's never been arrested,

14  he's never been brought before the Court for anything wrong.

15          And I believe that having gone so far with his

16  testimony that I have now an opening under 608 which would

17  allow me to question this witness specifically about his

18  knowledge of him being arrested for vote fraud in Clay County,

19  Kentucky, in 1989.

20          THE COURT:  Mr. Westberry?

21          MR. WESTBERRY:  Judge Reeves, Kent Westberry on

22  behalf of Doug Adams.  I did not know this was coming, and I

23  didn't bring my rule book with me and I have not had an

24  opportunity to look at 608.  I have better memory of 609, quite

25  frankly.  This does not — this incident regarding the Court's

1    earlier ruling, of course, does not involve a conviction.  From

2    what little we know from I believe the one pleading, the matter

3    was dismissed.

4         I asked the questions of Mr. Bishop from his personal

5    knowledge.  We tried to be as careful as we could to phrase

6    that in that way.  I don't think it is quite as broad as the

7    government would represent here at the bench conference with

8    regard to that matter.  Again, I haven't looked at 608 in

9    years, and I'm not nimble enough to cite the provisions of 608

10   chapter and verse, but it simply seems to us that given the way

11   the questions were phrased, and in particular given that we all

12   agree, I believe, that this older matter did not involve a

13   conviction, that I think it would be prejudicial unfairly and

14   unduly prejudicial to allow him to explore it, and I would just

15   request that the Court's previous ruling stay intact.  Thank

16   you.

17        THE COURT:  All right.

18        Mr. Smith did object several times during the direct

19   examination to the scope essentially of the questions that were

20   being asked.  I overruled those objections and allowed you to

21   ask him some pretty broad questions about his knowledge.  So I

22   do believe that you have opened the issue and the Court can

23   under Rule 608 allow specific instances of conduct.

24        And, Mr. Smith, your position is that he was in the

25   court system at the time, but the indictment would have been

1  brought in circuit court, I believe, as opposed to district

2  court.

3          MR. WESTBERRY:  I believe that is correct.

4          THE COURT:  So what I'm going to allow you to do

5  first before you get into the specific instances of conduct is

6  to show the witness the exhibit that shows that he was, in

7  fact, represented by Maricle and ask him if he was aware of

8  that charge that was brought at the time he was county attorney

9  and then if he says he was aware of it, I am going to allow you

10 to go into it and see if that would change the opinions that

11 he's rendered here.

12         MR. WESTBERRY:  May we do this outside the presence

13 of the jury, Judge Reeves, have a voir dire to set this

14 foundation or this predicate first?

15         THE COURT:  No, I'm giving you the guidelines for

16 setting predicate first.  If he doesn't know anything about it,

17 that may end the inquiry.  If he does, then I'm going to allow

18 you to go further as to whether that would change the opinions

19 that he's reached here.  I do understand that he's also —

20 Well, with respect to this issue, that will be my ruling, but

21 you can inquire as to that document first.  I don't have the

22 exhibit number, but I believe you know the one I'm referring

23 to.

24         MR. SMITH:  I recall it, and I feel that it would —

25 I'll start there, but I believe that there's no indication of

1  any description of what the substance of the charge is, that it

2  was a — I mean, he said that this man has done nothing wrong

3  in the election.  He said — there was no year, this was has he

4  ever done anything improper, and he says no.  And I believe

5  that, have you heard that Cletus Maricle was charged with

6  election fraud, would impeach this witness in his broad

7  statement saying that he has never known.

8         THE COURT:  You said Cletus Maricle, you meant

9  Douglas Adams.

10         MR. SMITH:  I apologize.

11         THE COURT:  You're correct on that, Mr. Smith.

12         MR. SMITH:  And I believe that I need to say, have

13  you heard that Douglas Adams was charged with election fraud

14  crimes in the Commonwealth of Kentucky v. Adams in the Clay

15  Circuit Court.  He's in the court system, he's a prosecutor,

16  he's even — I believe in his interview to us, he's even

17  indicated he's prosecuted cases in circuit court, assisted the

18  Commonwealth Attorney, so —

19         THE COURT:  All right.  I'm going to allow you to

20  inquire into it.

21         MR. PINALES:  Your Honor, Martin Pinales on behalf of

22  Mr. Maricle.  We would object to that coming in; and while I

23  disagree with the Court's ruling, I respect the ruling and

24  would just raise 403 as it applies to Judge Maricle.

25         MR. WESTBERRY:  One more point, Judge.  I seem to

41

1  recall –– even though I haven't looked at the rule book, 609

2  has some time limitations, if I recall correctly.  Isn't it ten

3  years?  Are there any such limitations in 608?  And I ask that

4  in terms of time.  This is a 20-plus-year ––

5        THE COURT:  Well, the issue, though, is whether the

6  questions would be responsive to what you asked on direct, and

7  you didn't place any time limits on your questions, and so it

8  would be fair for Mr. Smith to inquire.

9        With respect to the issue that Mr. Pinales raises

10 under 403, the only reference to Mr. Adams –– to Mr. Maricle is

11 the fact that he represented Mr. Adams as counsel, and that's

12 already an issue in the case, that he represented him.

13 Otherwise his name hasn't been mentioned and I don't believe

14 that's the intent of Mr. Smith to cross-examine this witness

15 about Mr. Maricle, it focuses on Mr. Adams.  And so with

16 respect to your objection under 403, that would be overruled.

17 The Court finds no prejudicial effect whatsoever to Mr. Maricle

18 from this line of questioning.  And likewise, the Court

19 believes, in light of the fact that Mr. Adams raised this in

20 direct, that it would not be improper under 403 to allow the

21 United States to put in and cross-examine the witness.  Not to

22 do so would unfairly tie the United States' hands in the case.

23       And, Mr. Smith, you will be allowed to inquire as to

24 those matters.

25       MR. SMITH:  Yes, Your Honor.

1          MR. WESTBERRY:  One last question.  In the event

2    there is some redirect and assuming that the government can

3    establish enough of a foundation to pursue this line of

4    questioning, would I be fair to assume that I would be allowed

5    to ask appropriate questions on this subject matter in

6    redirect?

7          THE COURT:  Yes, sir.

8          MR. WESTBERRY:  Thank you.

9          MR. BALDANI:  Judge, could I mention one thing?

10          THE COURT:  Yes, sir, Mr. Baldani.

11          MR. BALDANI:  We subpoenaed Mr. Bishop, too.  I don't

12    know if that has any bearing on the order you want us to go --

13    I don't really have any preference, I just did want to let you

14    know that we had subpoenaed this witness.

15          THE COURT:  We'll proceed in the same manner with the

16    United States cross-examining first.  And then, again, if you

17    have someone under subpoena and you want to ask them questions

18    as if on direct, and so if there's the problem with leading

19    that we had yesterday, but we'll just proceed then in the same

20    order.  You can go outside the scope, but it is on direct.

21          MR. BALDANI:  I understand, Your Honor.

22       (Whereupon, the following proceedings continued in open

23    court.)

24          All right.  Thank you, Counsel.

25          Again, ladies and gentlemen, I do apologize for the

1  delay, but bench conferences do intend to speed things along,

2  so I appreciate your indulgence.

3          Mr. Smith, you may cross-examine the witness.

4                    CROSS-EXAMINATION

5  BY MR. SMITH:

6  Q    Good morning.

7  A    Good morning.

8  Q    My name is Stephen Smith, and I represent the United

9  States.  I have a few questions for you.

10  A    Yes, sir.

11  Q    Mr. Bishop, as I understand it, your testimony, you are a

12  private practice attorney as well as the County Attorney for

13  Clay County; is that right?

14  A    Correct.

15  Q    And I believe that -- I was looking in the paper in

16  Manchester, and I found out that you've got another name you go

17  by according to the advertisement, "The Shark"; is that true?

18  A    That was true for a very short period of time.

19  Q    And I believe your advertisement said, "If you've been

20  hurt in a car wreck, call The Shark, he bites back so you don't

21  have to."

22  A    Sounds about right.

23          MR. WESTBERRY:  Objection.

24          THE COURT:  Overruled.

25  BY MR. SMITH:

1  Q    You don't use that advertisement now?

2  A    No, that was a short-lived ill-fated advertisement policy

3  that I wish I had never used at all, but these things happen.

4  I don't do that kind of work anymore either, by the way, but

5  that was a short-time thing.

6  Q    You have given testimony here, I believe, that you and

7  Doug Adams go back about 30 years as friends; is that — is

8  that fair?

9  A    Yes, sir, that's fair.  Almost 30 years, yes, sir.

10 Q    And you also know Russell Cletus Maricle, I believe, it

11 would be fair to say; is that right?

12 A    Yes, sir.

13 Q    He's been your circuit judge until he retired for many

14 years back till about September 24th of 1990; would that be

15 fair?

16 A    Yes, sir.

17 Q    And before then, I believe that you indicated your father

18 was a circuit judge in Clay County; is that fair?

19 A    That's correct.

20 Q    And your father did not enjoy the support of Cletus

21 Maricle in his race against Oscar Gayle House, I understand;

22 isn't that fair?

23 A    In 1983?

24 Q    Yes, sir.

25 A    Yeah, I think that's fair, yeah.

1  Q     Cletus Maricle was opposing your father, but Doug Adams
2  was there supporting your father?
3  A     To the best of my knowledge, he was, yes.
4  Q     And he also had Kenneth Day down there helping support
5  your father; isn't that fair?
6  A     I don't know about that.
7  Q     You know Kenneth Day, don't you?
8  A     Yeah.  Yes.
9  Q     But you don't know him to be supporting your father in
10 that election for circuit judge; is that your testimony?
11 A     That's my testimony.  I don't know who he supported.
12 Q     Were you there around that time period in Clay County,
13 sir?
14 A     I came back -- I passed the Bar in February of 2000 -- or
15 I'm sorry, 1982, and I moved back shortly after that.  So I
16 moved back probably about this time, you know, in 1982, in
17 March, I guess.  And my father ran for reelection in 1983, and
18 I married my first wife on May the 28th, 1983.  So the first
19 part of that election in 1983 I don't remember too much about,
20 I was involved in other things.  So, you know, that's what I
21 was doing at that period of time.
22       During that period of time, I was essentially dispatched
23 by my father to go to Jackson County and practice -- politic
24 for him the best I could in Jackson County.  That was my
25 primary responsibility.

CLAY MASSEY BISHOP, JR. - CROSS - MR. SMITH          46

1  Q     You recall, I assume, FBI agents visiting you and

2  interviewing you on January the 21st of this year?

3  A     Yeah, they stopped me as I was on my way home and —

4  Q     And you recall telling them specifically remembering

5  Cletus Maricle and Kenneth Day working at the Burning Springs

6  precinct during your father's election?

7  A     No, sir, I don't recall that.  I told them I remembered

8  one person.

9  Q     Well, I'm going to ask you some questions about what I've

10 highlighted here, if that's okay.

11 A     Okay.

12 Q     You indicated that you did not tell the FBI agent that you

13 saw Kenneth Day with Cletus Maricle at the Burning Springs

14 precinct; is your testimony, sir?

15 A     I told them I couldn't remember seeing them on the

16 grounds.  They asked me if I saw them on the grounds and I said

17 I can't remember.  They asked me if I saw Doug Adams on the

18 grounds, I told them I could not remember.  They asked me if I

19 saw Cletus Maricle on the grounds, I told them I could not

20 remember.  They asked me if I saw Kenny Day on the grounds, I

21 told them I could not remember.

22 Q     You do recall telling them, don't you, sir, that Cletus

23 Maricle, in your opinion, was the architect of the Democratic

24 party in Clay County?  You do remember telling them that, don't

25 you.

1          MR. HOSKINS:  Objection, Your Honor.

2          THE COURT:  Overruled.

3          THE WITNESS:  The architect of the Democratic party?

4    BY MR. SMITH:

5    Q    You do recall telling them that, do you not, sir?

6    A    I recall telling them he was the chairman of the

7    Democratic party.

8    Q    So, again, you deny telling an FBI agent, quote-unquote,

9    Cletus Maricle was the architect of the Clay County Democratic

10   party on January the 21st, 2010?  You deny that; is your

11   testimony, sir?

12   A    I don't remember calling him the architect.  I remember

13   saying he was the chairman.

14   Q    Do you recall telling them that Wayne Jones asked favors

15   of you in the court system for his family members?

16   A    He asked me for a favor for one of his family members,

17   yes, sir.

18   Q    And isn't it a fact you did a favor for him in your court

19   system on a drug charge for one of his family members; isn't

20   that a fact?

21   A    Yes, sir.  I helped many people.

22   Q    And Wayne Jones was a Democrat Election Commissioner;

23   isn't that fair?

24   A    Yes, sir.

25   Q    And you helped Democrats just as well as you helped

1   Republicans, then, I assume; is that the way it works?

2   A    I don't have anything against Democrats.

3   Q    So the fact that -- You indicated I think further in your

4   testimony that you served on this Clay County Board of

5   Elections, and I believe your testimony was that Doug Adams was

6   never a part of the Clay County Board of Elections.  Do you

7   recall that testimony?

8   A    To my knowledge, he never was.

9   Q    Do you not consider election officers a part of the Board

10  of Elections, sir?

11  A    No.

12  Q    What do you consider them a part of?

13  A    Election officers are appointed to serve by the Election

14  Board or the Board of Elections.

15  Q    You would agree with me, sir, that Doug Adams served for

16  many years as an election officer down in Burning Springs;

17  isn't that true?

18  A    I believe he did, yes.

19  Q    And he served alongside of Cletus Maricle down there, him

20  serving as a Republican judge and Maricle serving as a

21  Democratic judge for many years down there; isn't that a fact?

22  A    Well, I'd have to check the records, but that's possible,

23  if they served together.

24  Q    You indicated that you had an opponent, I believe, in

25  2002?

1  A    Yes, it is.

2  Q    Is that the last time you've had an opponent in Clay

3  County?

4  A    That's the last time I had an opponent, yeah.

5  Q    And that appointment was Richie Couch, the young assistant

6  Commonwealth Attorney to Gary Gregory there in the county; is

7  that fair?

8  A    Yes, sir.

9  Q    And at that time he was serving as Assistant Commonwealth

10 Attorney; would that be fair?

11 A    Yes, sir.

12 Q    And I believe that also it would be fair to say, would it

13 not, sir, that that was a concern of yours about being

14 reelected in 2002?

15 A    Yes.

16 Q    And you attended some meetings; isn't that true?

17 A    Meetings?

18 Q    Yes, sir.

19 A    No.

20 Q    You never attended any meetings?

21 A    Well, what — you're going to have to get more specific,

22 sir, I'm sorry.

23 Q    Well, isn't it a fact, Mr. Bishop, that you went to Paul

24 Bishop's house and met with a group of men and discussed

25 pooling of money in the 2002 election?  Isn't that true?

 1  A    No, sir.

 2  Q    You deny being at Paul Bishop's house, sir?

 3  A    I have been in Paul Bishop's house one time.  I have never

 4  been to Paul Bishop's house with a group of men having a

 5  meeting pooling money together.

 6  Q    What about Paul Bishop's garage or Mike Bishop's garage,

 7  it's situated behind Mike Bishop's house, have you ever been

 8  there for a meeting, sir?

 9  A    I have met Doug Adams there.

10  Q    And who else was there, sir?

11  A    No one else.

12  Q    Just you and Doug Adams?

13  A    That's correct.

14  Q    And what would cause you to go all the way out eight or

15  ten miles out in the county to meet Doug Adams at the Bishop's

16  garage, sir, if you recall?

17  A    I was out politicking.  I guess he was, too.  It was just

18  a convenient place to meet, it's not far from where we go to

19  church.  It's just one of those things.

20  Q    And that's the only meeting you've ever attended?

21  A    Well, I went to a fish fry there once before my brother

22  was married, and then we attended a meeting in 2000 and — I

23  can't remember the date, but it was when Carl Jackson was

24  elected as the new magistrate in that district, whatever

25  district that is down there.  I was invited to a potluck fish

1  fry.  So I've been in that building three times in my life.

2  I've been in Paul Bishop's house one time in my life.

3  Q    So you would admit that you've been there but just not for

4  a meeting with Doug Adams, Roy Morgan, Charles Marcum, Freddy

5  Thompson, Dick Woods, Paul Bishop, you never were there at that

6  meeting; is that what you're saying, sir?

7  A    Absolutely that's what I'm saying.  That never happened.

8  Q    Well, you don't know whether the meeting happened or not,

9  sir —

10 A    No, I wasn't there.

11 Q    — is that correct?  Isn't that fair?

12        MR. WESTBERRY:  Objection, Your Honor.

13        THE WITNESS:  I was not there.

14        THE COURT:  Overruled.

15 BY MR. SMITH:

16 Q    Well, let me ask it this way:  You've only been to Paul

17 Bishop's three times according to your testimony; isn't that

18 fair?

19 A    To his garage or whatever they call it, barn.  It depends

20 on who you're talking to.

21 Q    And you've made a statement to this jury that that meeting

22 that Paul Bishop described with you being present there never

23 happened.  You don't know if another meeting could have

24 happened with these individuals or not, do you?

25        MR. WESTBERRY:  Objection, speculation.

1          THE COURT:  Overruled.

2          THE WITNESS:  No.

3    BY MR. SMITH:

4    Q    You're denying being there because you know for a fact

5    that if you're a candidate bringing 8 to $10,000 and laying it

6    down on the table, that would be against the law, wouldn't it,

7    Mr. Bishop?

8    A    Probably, yeah.  It depends on what you were going to do

9    with it.

10   Q    Well, if you gathered it for the purpose of bribing

11   voters, that would be illegal according to state law, wouldn't

12   it?

13   A    Sure.

14   Q    You-all have problems with vote buying down in Clay

15   County; isn't that fair?

16   A    I've heard that.

17   Q    You just don't know anything about it?

18   A    That's correct.

19   Q    You've never brought any cases against anyone down there

20   for it?

21   A    Never had a complaint.

22   Q    You said, I believe, earlier in your testimony you've

23   never known Doug Adams to ever do anything improper in an

24   election.  You said that to this jury, didn't you?

25   A    I surely did.

1    Q    Have you not heard that he was charged with election crime

2    fraud in 1989 and represented by Cletus Maricle down there in

3    circuit court?

4    A    I have heard that.  It doesn't mean he did it.

5    Q    And yet you testified here to this jury that you've never

6    heard of him ever doing anything improper, but now you want to

7    admit to us you have heard he's been charged by a grand jury

8    who indicted him for election fraud, haven't you?

9    A    Well, they indicted a bunch of people for election fraud

10   back in 1989, yeah.  But that's — again, that's — I don't

11   know of him doing anything improper, and hearing stuff in Clay

12   County is a waste of time.

13   Q    But I believe your testimony — the record will prove what

14   you've testified to, but I believe you testified you've never

15   heard of him doing anything improper in Clay County in an

16   election?  You didn't testify to that, sir?

17   A    I guess I did, but I've never known of him doing anything.

18   I hear everything in the world.

19   Q    Well, you've testified I believe that during the course of

20   these election cycles over there that you served on the Board,

21   I believe, in '04?

22   A    As far — to the best of my memory.

23   Q    And you took over in the '90s.  You took over from Kenneth

24   Day; isn't that a fact?

25   A    I think that's correct.

1   Q    And that was after he got convicted with seven kilos of

2   cocaine down in south Florida that he resigned and you took

3   over as the Republican Commissioner; isn't that a fact?

4   A    Probably.

5   Q    Now, you testified that you never saw Doug Adams do

6   anything improper in that 2002 election; do you recall that?

7   A    Yeah.

8   Q    But isn't it a fact, sir, that you also testified you

9   never saw him more than three times face to face that whole

10  election cycle?

11  A    I think that's about right.

12  Q    So you can't testify where all Doug Adams went and maybe

13  what voters he visited in 2002, could you, sir?

14  A    Oh, no.

15  Q    And you can't testify whether or not he aligned himself

16  with Charles Wayne Jones and Al Man Stivers to accomplish the

17  task, I believe you said, of defeating Jennings White?  You

18  don't know whether he did that or not?

19  A    I didn't say anything about the task of defeating anybody.

20  Q    Okay.  You said he supported Freddy Thompson; isn't that

21  your testimony?

22  A    Yeah, I said that.

23  Q    You said that you didn't know that he aligned himself with

24  any other candidates?

25  A    I don't know that he supported anybody but Freddy

1  Thompson, and he promised me he would vote for me.  That's what

2  I said, and that's the truth.

3  Q    Is it a fact, sir, that you do not know that he had

4  aligned himself with Charles Wayne Jones and Al Man Stivers in

5  that 2002 election?

6  A    I have no knowledge of that.

7  Q    Well, you do know that Charles Wayne Jones was a member of

8  the Board of Elections in that year, do you not?

9  A    In 2002?

10 Q    Yes, sir.

11 A    As far as I know, he was, yes.

12 Q    And he's a Democrat, isn't he, sir?

13 A    Yes.

14 Q    And Al Man Stivers was a Democrat in 2002; isn't that a

15 fact?

16 A    Far as I know.

17 Q    Now, you told the FBI that this meeting that occurred up

18 there at the Bishops was to — I believe your words to them was

19 is to pick challengers.  Do you remember telling that?

20 A    Yes.

21 Q    And that wouldn't be a place where you would want two

22 strong Democrats in the room with you, would you, sir, you

23 wouldn't want Charles Wayne Jones and Al Man Stivers sitting

24 there helping you pick the Republican challengers, would you,

25 sir?

1    A    It didn't really matter to me who was there, quite

2    frankly, because challengers are worthless in my political

3    opinion.

4    Q    Well, you went to that worthless meeting, according to

5    your interview with the FBI, didn't you?

6    A    Yeah, I did.

7    Q    And you went to that worthless meeting there knowing there

8    was going to be two strong Democrats, Charles Wayne Jones and

9    Al Man Stivers, sitting right there hearing the tactics and

10   strategy of your Republican party?

11   A    No, sir, that's not true.

12              MR. WESTBERRY:  Asked and answered.

13              THE COURT:  Overruled.

14              THE WITNESS:  I told you at that meeting it was Doug

15   Adams and myself, and I asked for the meeting.

16   BY MR. SMITH:

17   Q    So you deny telling the FBI you went there for the purpose

18   of picking challengers, you deny that as well?  On

19   January 21st, 2010, isn't it a fact, sir, you told an FBI agent

20   that there was a meeting there to pick challengers?

21              MR. WESTBERRY:  Same objection.

22              THE COURT:  Overruled.

23              THE WITNESS:  Yes, sir, that's what I told them.

24   There was a meeting between Mr. Adams and myself, period.

25   Nobody else was there.

1  BY MR. SMITH:

2  Q    Now, you testified that you had operated as County

3  Attorney on a case of your good friend, Doug Adams', daughter,

4  Melanda Adams; that's your testimony, isn't it?

5  A    That is correct.

6  Q    Do you–all operate under the rules of the Kentucky Bar

7  Association as County Attorney?

8  A    Yes.

9  Q    And you're aware that there's a conflict of interest

10 provision for prosecutors in cases in Kentucky, are you not?

11 A    Yeah.

12 Q    And you did not see that as a conflict of interest, for

13 your good friend of 30 years for you to be standing and

14 prosecuting his daughter?

15       MR. WESTBERRY:  Objection, and may we approach?

16       THE COURT:  No, I'll let him answer the question.  If

17 there's a follow–up, then we may need to confer, but he can

18 answer the question.

19       THE WITNESS:  I'm sorry, you're going have to repeat

20 it.  I'm sorry.

21       THE COURT:  The question was whether you believe

22 there was a conflict of interest for you to be involved in a

23 prosecution involving Melanda Adams.

24       THE WITNESS:  No, sir, there's no conflict of

25 interest there.  I have sent some of my best friends to jail

1   for DUI.  You know, there's no conflict of interest.  A

2   conflict of interest if it had been my daughter or my brother's

3   daughter or something like that.  But I —— you know, I like to

4   think that most of the people I know in my county are my

5   friends.  At least that's the way I like to think about it, and

6   I hope that's true.  And I have to sometimes prosecute many

7   friends of mine, especially friends of their family.  You know,

8   "they" being the defendants and their family members being dear

9   friends of mine.  But my job as a prosecutor, I can't say, oh,

10  that's just too touchy for me.

11  Q    That's just the way you do business down there; is that

12  what you're saying?

13  A    I do it the way it should be done.

14  Q    Well, that's your testimony.  But that's the way you do

15  business down there, isn't that true?

16          MR. WESTBERRY:  Asked and answered.

17          THE COURT:  Overruled.

18          THE WITNESS:  I don't know what you're talking about

19  now.

20  BY MR. SMITH:

21  Q    Well, I'm talking about you standing as a prosecutor.

22  You're representing the Commonwealth, you're representing the

23  people.

24  A    Yep.

25  Q    You're not a private lawyer, you're representing the

1  government —

2  A    That's correct.

3  Q    — isn't that a fact?

4  A    That's correct.

5  Q    And you have a duty of honor as a prosecutor to appear to

6  be above the appearance of impropriety.  Are you telling us,

7  this ladies and gentlemen of this jury and this Court, that you

8  as prosecutor stand up in front of a court and not have the

9  appearance of impropriety by dismissing a case against Doug

10 Adams' daughter?

11 A    The case was not dismissed.

12 Q    Oh, it was not dismissed?

13 A    No, it was not.

14 Q    Have you checked the records?

15 A    No, not lately.  If it was dismissed, that was because she

16 spent her time in jail and she completed a rehabilitation

17 program that we prescribed for her, "we" being the Court and

18 myself.  She did spend time in jail.

19 Q    Is it your testimony, Mr. Bishop, that a reasonable person

20 would have no reason to question your independence as a

21 prosecutor if you're standing in court dismissing a case

22 against Doug Adams' daughter, is it your testimony it would not

23 be reasonable to question your impropriety — that you're

24 possibly giving the appearance of impropriety?

25          MR. WESTBERRY:  Objection, may we approach briefly?

1          THE COURT:  You may approach.

2          (Whereupon, the following discussion was had between the

3    Court and counsel at the bench, out of the hearing of the

4    jury.)

5          MR. WESTBERRY:  Thank you, Judge.  Kent Westberry for

6    the defendant, Doug Adams.  As the Court knows, I have had a

7    couple of objections to this line of questions leading up to

8    our sidebar.  Perhaps as the Court knows, I am reasonably

9    familiar with the ethical provisions of the KBA, having worked

10   in that system, as best I can, for a number of years.  I am not

11   aware of any ethical prohibition that would keep the County

12   Attorney, a Commonwealth Attorney, from prosecuting a

13   non-family member.  Having initially in my practice practiced

14   in a very small county not to dissimilar from Clay, as a

15   practical matter I think county attorneys prosecute people that

16   they are aware of on a fairly frequent basis.  Again, I have

17   tried, as best I can, to stay out of this, but if there is an

18   ethical provision that I am not aware of that would establish a

19   good-faith basis for this line of questioning, I would

20   certainly stand corrected, but for the life of me I just -- I'm

21   not aware of it, and that's the basis for my objection.

22          THE COURT:  I understand -- I don't want to speak for

23   Mr. Smith, but I understand he's referring to the appearance of

24   impropriety provision that would apply to county attorneys, as

25   well as judges that would be involved in prosecution of

1    matters, the same as it would be for an attorney, quite

2    frankly, impropriety that may require an attorney to step out

3    of the case.  We've gotten to the point, though, that I think

4    we're just about finished with this line of inquiry.

5              Mr. Smith, how much further do you plan —

6              MR. SMITH:  I would like for him to answer this

7    question and then I'm ready to move on.

8              THE COURT:  All right.  Well, I think he's made it

9    clear at this point that he doesn't consider it to be improper.

10   I think that's his answer.  So we'll move on.

11             MR. WESTBERRY:  Yes, sir.  Thank you.

12             THE COURT:  All right.

13        (Whereupon, the following proceedings continued in open

14   court.)

15             THE COURT:  Thank you, Counsel.

16             And you may proceed.

17   BY MR. SMITH:

18   Q    Mr. Bishop, let's move on to another matter here.  I

19   understand that you were also the prosecutor on the matter of

20   prosecuting William "Al Man" Stivers.  Do you recall that back

21   in 2002?

22   A    Yes.

23   Q    And I believe that was a case in which it was defended by

24   Yancey White, the son-in-law of Roy Morgan.  Do you recall

25   him —

1  A    Yes.

2  Q    –– being the defense attorney?

3  A    Yes.

4  Q    And I believe the judge in that case, if you recall, was

5  Renee Muncy, the district judge below circuit judge, been down

6  in the district court?

7  A    Correct.

8  Q    And you recall a conflict of interest coming up in that

9  case, do you not, sir?

10 A    No.

11 Q    Because you had a complaining witness, Jennings White, do

12 you recall him?

13 A    Yeah.

14 Q    And you recall Todd Roberts being there as the assistant

15 chief of police?

16 A    Oh, yeah.

17 Q    And you do not recall a conflict of interest coming up in

18 that case, sir?

19 A    No.

20 Q    Well, I do have a copy of that proceeding that's been

21 transcribed.  Would that refresh your memory if I showed you a

22 copy of that, you think?

23 A    Probably.

24        MR. SMITH:  I would like to hand what's marked D86,

25 Your Honor.

1          THE COURT:  Yes, sir.

2          THE WITNESS:  Your Honor, before I read this, may I

3   explain my answer?

4          THE COURT:  No, there's not a question pending that

5   would require you to explain your answer.

6             Mr. Smith, you need to refer him to a specific page?

7          MR. SMITH:  Page three.

8          THE WITNESS:  You want me to go to page three?

9   BY MR. SMITH:

10  Q    I believe that it starts on page three, sir, the very

11  first page, and I believe the very first statement of Officer

12  Todd Roberts refers to his request that there be an appointment

13  of a special prosecutor and a special judge.  He was very —

14  Look there on page three.

15  A    Okay.  I can't see it.  Officer Todd Roberts says that

16  he's a party to the action, which is not true.  He would ask

17  for a special judge and prosecutor be appointed to this case.

18         THE COURT:  Let me remind the witness that when

19  something is given to refresh memory, you're not to read it to

20  the jury.

21         THE WITNESS:  I'm sorry.

22         THE COURT:  You're to read it to yourself and then

23  respond as to whether it refreshes your memory.

24         THE WITNESS:  Oh, okay, I'm sorry.

25  BY MR. SMITH:

1  Q    Sir, does that refresh your memory about this conflict

2  coming up in your case?

3  A    Yeah.

4  Q    Isn't it a fact, sir, that the conflict of interest was

5  the first thing came up in that hearing?  Isn't that a fact?

6  A    It was alleged by Police Officer Todd Roberts.

7  Q    Yes, sir.  And isn't it a fact, sir, that you refused to

8  recuse yourself as a special prosecutor, even though a

9  representative of the Commonwealth, at that time being the

10 police department, asked that you step aside and you refused to

11 step aside; isn't that a fact?

12 A    That's a fact.

13 Q    And you have commentated a little bit while you were

14 getting ready to read this, I believe you said something about

15 Todd Roberts didn't have -- he wasn't the arresting officer or

16 something to that effect.  Did you recall that low speech that

17 you were commenting about something about Mr. Roberts?

18 A    Yeah.  Yeah, I do.

19 Q    Your testimony is that Todd Roberts shouldn't have been

20 able to ask for a recusal of you in this matter; is that your

21 testimony, sir?

22 A    No, he said he was a party to the action, and that's not

23 true at all.

24 Q    Well, you would agree with me, sir, that he was a party to

25 the action after you agreed to dismiss this charge against

1  Mr. Stivers, wasn't he?

2  A     I'm sorry?

3  Q     After you agreed to dismiss these criminal charges of

4  terroristic threatening and alcohol intoxication, Mr. Roberts

5  was a party to a civil action in front of Cletus Maricle; isn't

6  that a fact?

7  A     I don't know anything about that.

8  Q     You've not heard that the City of Manchester and Todd

9  Roberts got sued personally and had to settle the case against

10  Al Man Stivers in Cletus Maricle's court?

11  A     Mr. Smith, I've — I hear many things.  What I know, I

12  know.  What I hear is simply what I hear.  And I do not know or

13  have any personal knowledge of what you are speaking about.

14  Q     Have you heard?

15  A     Yes.

16  Q     Okay.  So you have heard that the result of you dismissing

17  this case ended up in a civil settlement in favor of

18  Mr. Stivers; isn't that a fact?

19  A     It was mediated, I think.

20  Q     And the City had to pay $70,000 to Al Man Stivers for this

21  circumstance in which you were a party in the criminal case;

22  isn't that a fact?

23  A     If you're going on hearsay, what I was told was 75,000.  I

24  don't know.

25  Q     All right.  75,000 is what you heard?

 1   A     I don't know.

 2              MR. SMITH:  If I could have just one moment.

 3              THE COURT:  Yes, sir, you may.

 4   BY MR. SMITH:

 5   Q     Mr. Bishop, do you know a fella by the name of Darnell

 6   Hipsher?

 7   A     Yes.

 8   Q     And Vernon Hacker?

 9   A     Yes, sir.

10   Q     And Terry Davidson?

11   A     Yes, sir.

12   Q     And Clinton Johnson?

13   A     Yes, sir.

14   Q     And Joe Swafford?

15   A     Yes, sir.

16   Q     Todd Roberts?

17   A     Yes, sir.

18   Q     Daugh White?

19   A     Yes, sir.

20   Q     Kennon White?

21   A     Yes, sir.

22   Q     Isn't it a fact, sir, that you traveled with this group on

23   occasion?

24   A     Well, I went to Washington, D.C., one time.

25   Q     Okay.  And there were about 28 Clay Countians including

1  yourself that went on that trip; isn't that a fact?

2  A    Well, actually, they came separately.  I was there at a

3  domestic violence conference.

4  Q    So you're saying to this Court and this jury you weren't

5  with them?

6  A    No, I'm saying I did not travel with them, I traveled

7  alone, I was attending a domestic violence conference.  And I

8  did go to the meeting with them and introduce them to Senator

9  Jim Bunning.

10  Q    Let me hand you what's marked as Government's Exhibit P42.

11         MR. SMITH:  If the Court would allow?

12         THE COURT:  Yes, sir.

13  BY MR. SMITH:

14  Q    You would agree with me, sir, that that list of names I

15  just gave you are convicted of federal or state violations of

16  corruption; isn't that a fact?

17  A    Well, let's see here.  Yeah, some of them are.

18  Q    Do you recognize that photograph, sir?

19  A    Yes.

20  Q    Do you see yourself in there somewhere?

21  A    Yes.  Standing right beside Darnell, as a matter of fact.

22         MR. SMITH:  I would move for the introduction of

23  Government's Exhibit P42, Your Honor.

24         THE COURT:  All right.  Any objection?

25         MR. BALDANI:  No objection.

1          THE COURT:  Exhibit P42 will be admitted.

2          MR. SMITH:  If I could have that back from the

3   witness I would like to ask him some more questions about that,

4   please.

5          THE COURT:  Yes, sir.

6   BY MR. SMITH:

7   Q    Would that be accurate, sir, to describe this as being a

8   photograph of you in this group?

9   A    Yes, sir.

10  Q    And this would be Darnell Hipsher standing to your left?

11  A    Yes, sir.

12  Q    And Tim Couch, a state representative, to your right; is

13  that fair?

14  A    Yeah, that's fair, yes, sir.

15  Q    And you would agree with me, sir, that in that photograph

16  you've also got Joe Swafford and he's on the far left here, and

17  you would agree with me, sir, that he's been convicted of

18  corruption charges; isn't that a fact?

19  A    I don't know about that.

20  Q    You're not aware that Joe Swafford, who served in your

21  county as a public official, was prosecuted by Gary Gregory ––

22  A    I didn't know that.

23  Q    –– for misuse of confidential information?

24  A    (Witness shakes head negatively.)

25  Q    You're not aware of that?

CLAY MASSEY BISHOP, JR. - CROSS - MR. SMITH          69

1  A    I'm not aware of that.

2  Q    Are you aware whether he served in a public position in

3  your county, sir?

4  A    He served under some — I don't know what he was really,

5  to tell you the truth.  He was a — he was the Executive

6  Director of the Chamber of Commerce, I believe, and he was — I

7  don't know what his capacity with County Judge Executive James

8  Garrison was exactly.  But he was sort of a — I don't know

9  what he was, a consultant maybe, a driver, a chauffeur, I don't

10 know what it was.

11 Q    You're not aware of his criminal charges?

12 A    I am not aware of them, no, sir.  I didn't know he had

13 done anything.

14 Q    Darnell Hipsher, are you aware of Darnell Hipsher being

15 convicted of federal corruption charges and a racketeering

16 scheme with Mayor White and his administration?

17 A    Yes, sir.

18 Q    I believe next to him, that would be — who is that, sir?

19 A    I can't really tell.

20 Q    Isn't that Terry Davidson, sir?

21 A    It sure don't look like him.  I'm not saying it's not,

22 but — Yeah, it's — it could be.  I think that's his smile.

23 Yeah, I think that's him.  I'm not positive, but I think it is.

24 Q    He's a magistrate over there who's also been convicted of

25 federal charges?

1   A    Yes, sir, he was convicted of something, I don't know what

2   it was.  But, yes, sir, he was.

3   Q    Did you make calls on his behalf over to Tom Handy's

4   office?

5   A    No, sir.

6   Q    You never called Tom Handy's office and asked for help?

7   A    No, sir.

8   Q    Okay.  You know Terry Davidson, though, don't you?

9   A    Yes, sir.  He was a magistrate from 1994 until he was

10  convicted of whatever they convicted him of.

11  Q    You know Tom Handy being a prosecutor in Laurel County at

12  one time, do you not?

13  A    Yeah, I know Tom very well.

14  Q    This would be Doug Adams; is that fair?

15  A    Yes, sir.

16  Q    And Robert Stivers, senator over there?

17  A    Yes, sir.

18  Q    And behind him Vernon Hacker.

19  A    Yes, sir.

20  Q    And you know him to be convicted of federal drug crimes,

21  do you not, sir?

22  A    Yes, sir.

23  Q    And this would be Clinton Johnson, another one of your

24  magistrates in Clay County; isn't that a fact, sir?

25  A    Yes, sir.  Former magister, yes, sir.

1  Q    And he's been convicted of election fraud in the federal

2  court system over there, hasn't he?

3  A    Yes, sir.

4  Q    For his 2002 involvement?

5  A    Yes, sir.

6  Q    And isn't it a fact, sir, that he actually was given money

7  by Jennings White but turned at the last minute and took Doug

8  Adams' money to support him and yourself on a slate of

9  candidates in that 2002 election?

10 A    I have no knowledge of that.

11 Q    This is Stanley Bowling, defendant on charges in this

12 case; isn't that true?

13 A    Yes, sir.

14 Q    That would be Kennon White, also convicted of corruption

15 charges in Manchester; isn't that a fact?

16 A    Has he been convicted?  I don't know that, but —

17 Q    That would be his father, Daugh White, also convicted of

18 drug charges in Manchester; isn't that a fact?

19 A    Yes, sir.

20 Q    This would be Judy Maricle, wife of Cletus Maricle; isn't

21 that a fact?

22 A    Yes, sir.

23 Q    Cletus being a defendant on charges in this case?

24 A    Yes, sir.

25 Q    And that would be Todd Roberts.

1    A    Yes, sir.

2    Q    Assistant Chief of Police at that time?

3    A    Assistant Chief of Police, yes.

4    Q    I would like to hand to you now what's marked as P44.

5         THE COURT:  Let's see if the — we'll wait until

6    counsel looks at it.

7    BY MR. SMITH:

8    Q    Do you know a fellow by the name of Randy Craft?

9         MR. WESTBERRY:  Judge?

10         THE COURT:  Yes, sir.

11         MR. WESTBERRY:  May we approach before he goes much

12    further?

13         THE COURT:  Yes, sir, you may.

14     (Whereupon, the following discussion was had between the

15    Court and counsel at the bench, out of the hearing of the

16    jury.)

17         THE COURT:  Mr. Westberry.

18         MR. WESTBERRY:  Kent Westberry for the defendant,

19    Douglas Adams.  I'm looking at — I believe you identified it

20    as P44, I think is the number.  I'm looking at it quickly and

21    for the first time.  You know, it appears to be a photograph

22    with Clay Bishop, Senator Bunning, Douglas Adams.  I think

23    that's Darnell Hipsher and I can't tell the rest, and it's a

24    newspaper article and the bottom right portion of it has been

25    cut off, but it looks to be the word prevalence, and, you know,

there's some commentary in there about methamphetamine drug use
in — as quickly as I'm able to read this.  I don't know that
that isn't the kind of statement in a newspaper article that
should be admitted.  I would ask if that would be taken out of
this exhibit, because I, again — you know, I think it's far
side.  If you said that you have not posted it yet, that's
correct, you have not posted or published this to the jury yet.
And we're looking at this as quickly as we can.  I don't think
I see any additional references to drug activity in here, but I
think that I've made my point as clear as I can, Judge, at the
bottom right.

        THE CLERK:  Right, there's an article that — the
witness hasn't been shown the photograph yet, and I'm assuming
that this is being shown to him because of the photo.  I don't
know about the language, but let me ask Mr. Smith.

        MR. SMITH:  It is.  If there's an objection as to
what's in the article, we can put Post-it notes over it when
it's displayed to the jury, if it's displayed, and later redact
it, but I would like to move forward with the photo.

        MR. WESTBERRY:  I did this not knowing how quickly he
would move.

        THE COURT:  I understand.  He can be shown the
original photograph and you can ask him questions about the
photograph.  You can put it up on the screen, just put it where
you can see the photograph and not the language, and that will

1  prevent any problem until the document can be redacted.

2          MR. WHITE:  Can I ask a quick question?  Katy Gabhart

3  has got a State Board of Election meeting at 1:00.

4          THE COURT:  It sounds like she's going to miss it.

5          MR. WHITE:  Okay.  Well, is there any way I can

6  release her?

7          THE COURT:  No, we need to keep moving.  Thank you.

8       (Whereupon, the following proceedings continued in open

9  court.)

10          THE COURT:  If that can be shown to the witness

11  please.

12  BY MR. SMITH:

13  Q    Mr. Bishop, before you identify that for us, I have a

14  couple of follow-ups on the photos in front of you.

15  A    Okay.

16  Q    And the question is, do you know Randy Craft?

17  A    Yes, sir.

18  Q    He served as Deputy Sheriff down in your county; is that

19  fair?

20  A    He does at this time, yes, sir.

21  Q    And he's also in this photograph, I believe, there on the

22  fourth person?

23  A    I think that's him, yes, sir.

24  Q    That would be Randy Craft?

25  A    I believe so.

1  Q    And the second from the right, that's Cletus Maricle

2  there?

3  A    Yes, sir.

4  Q    Up there?

5  A    Yes, sir.

6  Q    Okay.  You should have in front of you now P44.  Do you

7  recognize that being your photograph, sir?

8  A    Yes, sir, I do.

9  Q    And that would be in the presence of Doug Adams, Darnell

10 Hipsher, and others?

11 A    Yes, sir.

12        MR. SMITH:  Okay.  I would move for its introduction

13 at this time, P44.

14        THE COURT:  The photograph shown, P44, will be

15 admitted at this time and it may be displayed without any

16 commentary.

17        MR. SMITH:  Yes, if we could retrieve that from the

18 witness, I would like to ask a few more questions.

19        THE WITNESS:  Okay.

20 BY MR. SMITH:

21 Q    You should have there on your monitor P44.

22 A    Yes.

23 Q    Is that you standing there in the presence of Doug Adams

24 and Jim Bunning?

25 A    Yes, I was introducing the delegation.

1  Q    And to the right of Doug Adams was –– immediately to his

2  right, that's Darnell Hipsher; is that not true?

3  A    I believe that's correct.

4  Q    And Vernon Hacker next to Darnell Hipsher?

5  A    I think so.

6  Q    You're not sure?

7  A    Well, I'm pretty sure, but it's hard to see, he's sort of

8  hidden.

9  Q    And to the right of him would be Mr. Joe Swafford?

10 A    I believe that's correct, yeah.

11 Q    And this was on that same trip that you–all made to

12 Washington, D.C., from Clay County; is that true?

13 A    Well, that's on the trip that all of those people came to

14 Washington, D.C.  I was already there at a domestic violence

15 conference.  I met them there.  I was the first one to arrive,

16 I talked with Senator Bunning for a short time, and then the

17 rest of them came, that would be accurate.

18 Q    You indicated that you were church friends with Doug Adams

19 as well, you–all go to the same church together?

20 A    We do now, yes.

21 Q    And Paul Bishop also goes to church with you and Doug

22 Adams; is that not true?

23 A    He does.

24 Q    Sir, are you aware that your brother was appointed kind of

25 last minute, I believe, if the records show correctly, if my

1  recollection is correct, in the 2002 election.  You were slated

2  to be the Commissioner for the Board of Elections; isn't that

3  true?

4  A    I was on the Board of Elections prior to that, yeah.

5  Q    And shortly before the election you got replaced by your

6  brother, William Hugh; isn't that fair?

7  A    I think that's accurate, yeah.

8  Q    And then I believe it would also be fair to say, sir, he

9  was a part-time bus monitor with the School Board, Doug Adams

10 being his boss, before the election?

11 A    He worked for the School Board.

12 Q    Do you know he had a part-time job as a bus monitor before

13 the election in 2002, sir?

14 A    I knew he had some kind of a job with them.  I guess it

15 was bus monitor for a while, yeah.  I think he does

16 something else now.

17 Q    And by August of 2002 I believe the record will show,

18 after the election, he got a promotion, he got a full-time job

19 as staff support for the School Board; isn't that true?

20 A    I don't know.  Is that a full-time job?  I don't know.  I

21 don't know.  He goes in early in the morning, and if somebody

22 needs a substitute, he finds one and asks them if they would

23 substitute.  He's in there — I think he opens up, because he

24 was there when I passed by this morning, and he's usually home

25 by 10:00 or so.

1  Q   He got a promotion, in other words, after the election;

2  isn't that true?

3  A   I don't know.  He didn't tell me about it.

4          MR. SMITH:  Pass the witness.

5          THE COURT:  All right.  Thank you.  We're going to go

6  in the same order, except for Mr. Westberry, who would be on

7  redirect.  So we'll go in the same order.

8          Mr. Hoskins, do you have any questions first?

9          MR. HOSKINS:  Just a minute, please.

10          THE COURT:  Yes, sir.  That will be fine.

11          MR. HOSKINS:  No questions, Your Honor.

12          THE COURT:  Mr. White, we'll go with you.

13          MR. WHITE:  No questions, Your Honor.

14          THE COURT:  Mr. Abell?

15          MR. ABELL:  Judge, I do have a few questions.

16          THE COURT:  Yes, sir.

17                      DIRECT EXAMINATION

18  BY MR. ABELL:

19  Q   Mr. Bishop, my name is Robert Abell, I represent William

20  Stivers in this case, and I want to ask you a few questions

21  about the case that involved him; okay?

22  A   Yes, sir.

23  Q   Do you recall that there was a hearing in Clay District

24  Court, it looks like, December 2 of 2002?

25  A   Yes, sir.

1  Q    And I think we already know and understand that you

2  represented the Commonwealth at that hearing?

3  A    That's correct.

4  Q    Do you recall there being testimony at that hearing from a

5  Mitzy Collett from Manchester Hospital?

6  A    Oh, yes.  I don't recall the name, but I do recall the —

7  what I will call expert testimony.

8  Q    What do you recall about that expert testimony?

9            MR. SMITH:  Your Honor, I'm going to object.

10           THE COURT:  Hearsay?

11           MR. SMITH:  Hearsay.

12           THE COURT:  Sustained.

13  BY MR. ABELL:

14  Q    Do you recall that Police Officer Jeff Culver testified at

15  that hearing?

16  A    He did.

17  Q    Do you recall that Police Officer Kelly Johnson testified

18  at that hearing?

19  A    He did.

20  Q    Did the evidence presented at that hearing, to your

21  perception, substantiate the charges against Mr. Stivers?

22  A    No.

23  Q    Is that the reason why the charges were dismissed?

24  A    Absolutely.

25           MR. ABELL:  Thank you.

1              THE COURT:  All right.  Thank you.

2              Mr. Baldani.

3              MR. BALDANI:  Thank you, Your Honor.

4                        DIRECT EXAMINATION

5    BY MR. BALDANI:

6    Q    Good morning, Mr. Bishop.

7    A    Good morning.

8    Q    My name is Russ Baldani, I'm one of Freddy's attorneys.

9    A    Yes, sir.

10   Q    The prosecutor asked you about your brother replacing you

11   on the Board of Elections in '02.  Do you remember those

12   questions?

13   A    Yes, sir.

14   Q    All right.  What happens when a member of the Board of

15   Elections is actually a candidate in an election?  Can you

16   serve?

17   A    No.  No.  You have to -- you're disqualified, so you have

18   to essentially step aside.

19   Q    All right.  As far as you understand, is there anything

20   improper about your brother assuming your position?

21   A    Apparently not.  He did, as far as I know.

22   Q    Now, in 2002, Edd Jordan was the sheriff and he was on the

23   Board of Elections; does that sound right?

24   A    Yes.

25   Q    And did he run for office in '02?

1    A    Yes.

2    Q    Did someone stand in in his place like your brother stood

3    in for you?

4    A    If they did, it would have been his wife, Edith, I think.

5    Q    That's what I was wondering.

6    A    Yes.

7    Q    Now, I want to ask you a little bit about how election

8    officers are selected; okay?

9    A    Yes, sir.

10   Q    How many precincts are there in Manchester?

11   A    In Clay County?  There are 20 —

12   Q    In Clay County?

13   A    Yeah, that's okay.  In Clay County, there are 20

14   precincts, including Manchester.

15   Q    All right.  And is it the Board of Elections that selects

16   the election officers?

17   A    Ultimately, yes.

18   Q    And how are they given a list of people from which to

19   select?

20   A    Well, I'm not sure about the Democrat party, because I can

21   only speak from the Republican point of view.  But I've been

22   chairman of the Republican party since 1992, and since 1994 we

23   had a rule that was voted upon by all the members of the

24   Republican Party Executive Committee that indicated we would

25   allow the precinct captains who get up those Saturdays in March

1   early to go to their respective polling places and run and, you

2   know, submit themselves as candidates for the -- there's a

3   captain in each precinct, there's a co-captain, which must be

4   of the opposite sex, and then there's a youth captain, which

5   can be anyone who votes in that precinct, but they have to be

6   under the age of 35.  So we came up with a rule that said

7   whoever those folks or the captain of the precincts sent in,

8   there's a list the chairman has to send out to all the

9   precincts, and I've done that this year as well because it

10  happens every four years, and, you know, like this year, for

11  example, the letter said it's that time again, please find

12  enclosed the form that is required to be submitted to me and

13  then to the Board of Elections and please get, if you can,

14  someone to serve.  And the people who are willing to serve in

15  the precincts have to put their name, their address, their

16  phone number, and they have to sign, because by signing they

17  promise that they will serve if picked.

18  Q    Let me ask you about 2003.  You had run for office in '02.

19  Were you back on the Board of Elections in '03?

20  A    I can't really remember, but I think so.

21  Q    All right.  I want to show you what's been introduced as

22  Government's PR16L.

23       MR. BALDANI:  Judge, if I could get that from the

24  Clerk, please.

25       THE COURT:  Show it to Mr. Baldani first, please, and

1  make sure it's what he's looking for.

2  BY MR. BALDANI:

3  Q    And I was going to refer the witness to I believe the

4  fourth page.  Page four.

5  A    Where are we now?

6  Q    I'm going to show it on here, so you'll see it.

7  A    Oh, okay.  I'm sorry.

8  Q    Now, when you were on the Board of Elections, did you-all

9  have regularly scheduled meetings and keep minutes of those

10  meetings, Mr. Bishop?

11  A    Fairly regularly, yes.

12  Q    All right.  Do you see — at the top of the page, do you

13  see a motion made by Edd Jordan with respect to election

14  officers?

15  A    Yes, sir.

16  Q    And what was that motion?

17  A    That No. 1, the name No. 1 on the list and No. 2 on the

18  list be used as No. 1, the judge, and all the list to serve as

19  officers and to pick No. 3 as an alternates — or as

20  alternates.

21  Q    All right.  And would that be the list that was submitted

22  to the Board of Elections by the precinct captain?

23  A    Yes, it was submitted from the precinct captains to me as

24  the chairman of the party and then to the Board of Elections.

25  Like, for example, yesterday was the final day for me to submit

1  all those to the Board of Elections and I forgot, and so one of

2  my child support workers had to go into my office and find them

3  and take them down there yesterday because it was the final

4  day.

5  Q    Okay.  So in '03, do you recall that the motion to take

6  No. 1 and No. 2 off the list was agreed upon or not agreed

7  upon?

8  A    As far as I know, it was agreed upon.

9  Q    And was that a change from the way things used to be

10 handled under Jennings White?

11 A    No, that's generally the way it was, except for

12 when Jennings didn't want it to happen that way, then he just

13 did whatever he wanted to do.

14 Q    When you were on the Board of Elections under — you were

15 on the Board of Elections under Jennings White and along with

16 Freddy Thompson; is that right?

17 A    Yes.  Yes.

18 Q    All right.  How did Jennings White select election

19 officers, to your knowledge?

20 A    In certain precincts, he picked and that was it.

21 Q    Okay.

22 A    And, I mean, we voted and he outvoted us.  The County

23 Clerk has the tiebreaking vote.  So if it's like two to two,

24 then he breaks the tie.

25 Q    Did that change under Freddy Thompson as County Clerk?

1   A    Yes.

2   Q    Did you ever personally observe Freddy Thompson

3   handpicking election officers?

4   A    I did not.

5        MR. BALDANI:  If I could see PR16M, please.  I'm done

6   with this one.

7   BY MR. BALDANI:

8   Q    Mr. Bishop, I'm going to display a couple of things from

9   PR16N, which are the Board of Election minutes from '04.  You

10  were on the Board of Elections in '04, I believe you testified;

11  right?

12  A    I think so, yeah.  It's hard to remember all those things,

13  but I think so.  Yeah, I'm pretty sure I was in '04.  In '06, I

14  think I was back off again because I was a candidate.  The

15  rules change from time to time from the State.

16  Q    All right.  Do you see up at the top March 19th of '04?

17  A    Yes, sir.

18  Q    Does that appear to be the Board of Election minutes?

19  A    Yes, sir, it does.

20  Q    And if you look down at the bottom, I want to ask you, do

21  you see the Manchester precinct?

22  A    Yes, sir.

23  Q    Who was the judge in the Manchester precinct?

24  A    Stanley B. Roberts.

25  Q    Okay.  And who was the other judge?

1   A    Larry Henson.

2   Q    Okay.  And I'm going to go to the next page of Exhibit

3   PR16M and refer you to the list of alternates.  Do you see

4   where I am?

5   A    I do.

6   Q    Who's the first in the list of — on the column on the

7   right, who's the first alternate?  What's the name of the first

8   alternate?

9   A    On the right being Glen Rowland.

10  Q    Do you know Glen Rowland?

11  A    Yes, sir, I do.

12  Q    And is William "Al Man" Stivers also listed as an

13  alternate down a few?

14  A    William Elmer Stivers.  I never did know his name was

15  Elmer, but if that's him, that's him.

16  Q    As far as you know, would that be the person that goes by

17  "Al Man Stivers" or do you know?

18  A    I guess.  I know his name is William, but I never knew

19  about Elmer, but I would say that's him.

20  Q    And I'm going to go over to page eight.  Does that appear

21  to be the Board of Election minutes from May 19th of '04?

22  A    Yes, sir.

23  Q    All right.  And when you see the signatures there, is that

24  your signature signing off on this Board of Election minutes?

25  A    Yes, sir, it is.

1  Q    And do you see a motion made by Wayne Jones at that

2  meeting regarding Larry Henson?

3  A    Yes, sir.

4  Q    Read that motion.

5           MR. SMITH:  Your Honor, I'm going to object.

6           THE COURT:  I'm sorry, I can't see.  So you-all will

7  have to come up here.

8           MR. BALDANI:  You want us to —

9           THE COURT:  I want you to come up.  What I'm going to

10 do is I'm going to go ahead and excuse the jury for lunch at

11 this time before we discuss this matter.

12          We'll give you until 1:00, ladies and gentlemen.

13 Please keep in mind the admonition that you've been given

14 previously not to discuss the case among yourselves while we

15 are in recess, and the jury will be excused until 1:00 p.m.

16 this afternoon.

17      (Whereupon, the jury retired from the courtroom, after

18 which the following proceedings were had in open court.)

19          THE COURT:  The witness will be excused until

20 1:00 p.m.

21          Counsel, please be seated.  You can go back to the

22 table if you like.  Mr. Smith had an objection about this

23 particular document.  Rather than have the jury sit for ten

24 minutes, I just thought I would give them a little bit longer

25 for their lunch break.

1          Mr. Smith.

2          MR. SMITH:  Well, Your Honor, I believe that

3   Mr. Thompson is seeking basically to have read to this jury

4   minutes that were not prepared by this witness in order to —

5   I'm not real sure how in procedure and process.  I make my

6   objection to the form that it appears that the witness has no

7   recollection of the meeting, didn't even recall being a Board

8   member until he was reminded by counsel that he was a Board

9   member at the time, and now we seek to go into intricate

10  details that are put in the minutes of the Board meetings and

11  have him — not question him about them but just read this, and

12  would you read this, would you read that, would you read this,

13  would you read that.  And the document, of course, is

14  introduced into evidence, it speaks for itself, and to — at

15  this point, it would be cumulative, it would be a waste of this

16  jury's time to have him read — because there's a lot of things

17  I'd like to have him read and maybe we'll just go read for the

18  last, you know, 20 years the Board of Election minutes.

19          If that's — it just appears to me that we're going

20  down a road here that's cumulative.  This record has already

21  been in evidence, they've already had an opportunity — they'll

22  have an opportunity to argue their case, and if this is

23  argument it's improper, it's cumulative, it's argument, and

24  there's no basis for this witness to introduce, that has been

25  established by foundation.

1              MR. BALDANI:  May I respond, Judge?

2              THE COURT:  Yes, sir.

3              MR. BALDANI:  For starters, the witness clearly

4    stated on direct that he was a member of the Board of Elections

5    in '04.  So that's not something that I led him to state, he

6    acknowledged he was on the Board of Elections.  The government

7    in their opening statement said that they were going to prove

8    to the jury that Freddy Thompson manipulated election officers

9    and they cited, I think it was on page 40 of the transcript in

10   particular this issue about Glen Rowland showing up as an

11   election officer, Freddy Thompson telling him to go home.  And

12   that was their graphic example of this man selecting election

13   officers.  The truth of the matter is, Your Honor -- and then

14   they called Glen Rowland to relay this.  The truth of the

15   matter is that Glen Rowland was an alternate, which I

16   established when I showed him the previous page, that Larry

17   Henson was the election officer that was supposed to serve,

18   that Larry Henson, as it turns out, doesn't show up, and

19   actually a motion was made regarding Larry Henson's failure to

20   show up.

21              So all I'm trying to do, Judge, is respond with the

22   Government's Exhibit to something that the government has

23   squarely placed into issue.  I mean, if Mr. Smith says it's a

24   waste of time, I was going to ask him to read one paragraph

25   that would have taken 15 seconds.  I can simply say -- I was

1   trying not to lead him, but I could simply say, was there a

2   motion made regarding Larry Henson about not showing up, and my

3   point would be made.  But to imply, Judge, that it's opening

4   the door to introduce and for him to read all these Board of

5   Election minutes, I've selected a portion out of a government's

6   exhibit that directly refutes something that the government has

7   stated in opening and that the government has tried to prove

8   and I feel I've done it fairly and squarely.

9           THE COURT:  All right.  Well, the proper manner of

10  asking about activities that happened during Board members is

11  to ask the witness if he recalls.  You haven't done that,

12  you're having him read from a document to introduce the

13  document that's already in evidence.  So he doesn't have any

14  independent recollection of it.  It essentially does amount to

15  argument and it does become cumulative.  So I'll sustain the

16  objection.

17          MR. BALDANI:  Am I allowed to ask him does he recall

18  this motion?

19          THE COURT:  Well, you haven't done that yet.

20  Mr. Smith was objecting because you didn't do that.  You didn't

21  ask him about his memory of those particular events that

22  occurred, instead you were having him read from a document.  So

23  I've sustained the objection to that question that's been

24  raised at this time.  Now, if there are other objections that

25  are raised properly with the witness, I'll address those at the

1    appropriate time, but I'm not going to give you any more

2    advance rulings as to what you may or may not ask for you then

3    to turn around and change the question that's posed to the

4    witness and act like you're surprised when you don't get the

5    ruling that I told you that you would likely get.  So I'm not

6    going to give you an advance ruling; okay?

7                MR. BALDANI:  Fine.

8                THE COURT:  Now, we're going to proceed here in the

9    next five minutes.  We're going to take a five-minute recess

10   and then we're going to proceed with the show cause hearing for

11   Mr. Adams' violation of his conditions of bond.  If the parties

12   wish to present any testimony or evidence, we'll do that in

13   five minutes.  We'll take a recess until that time.

14               MR. PINALES:  Your Honor?

15               THE COURT:  Mr. Pinales?

16               MR. PINALES:  Those of us not involved are excused?

17               THE COURT:  Yes, sir, unless you wish to be here,

18   you're certainly excused.

19               MR. PINALES:  Thank you.

20        (Whereupon, a short recess was had, after which the

21   following show cause hearing was had outside the presence of

22   the jury with Mr. Smith, Mr. Parman, Mr. Hoskins, Mr.

23   Westberry, Mr. White, Mr. Gilbert, Ms. Hughes, and Mr. Simons

24   being present, said hearing beginning at 12:04 p.m.)

25               THE COURT:  The record will reflect, of course, the

1   jury is not present at this time.  This matter is called at

2   this time for a hearing, show cause hearing, on the issue of

3   bond violation by the defendant, Douglas Adams.  The issue

4   presented to the Court involves whether the defendant has

5   violated the conditions of release by having contact, either

6   directly or indirectly, with any person who is a potential

7   witness in the case.

8          The Court heard earlier this morning from a witness

9   to be called on behalf of Defendant Jones.  I'll certainly take

10  that information into consideration.

11         Does the United States wish to present any additional

12  testimony or evidence with respect to the alleged violation?

13         MR. PARMAN:  Yes, Your Honor.

14         THE COURT:  All right.  You may proceed.

15         MR. PARMAN:  Thank you, Your Honor.  The United

16  States would call Edsel Blair.

17         THE COURT:  Thank you.

18                    EDSEL VINCENT BLAIR,

19  having been first duly placed under oath, was examined and

20  testified as follows:

21                    DIRECT EXAMINATION

22  BY MR. PARMAN:

23  Q    Good afternoon, sir.

24  A    Good afternoon.

25  Q    State your name, please.

1  A     Edsel Vincent Blair.

2  Q     How are you employed?

3  A     I'm a Task Force agent with the Federal Bureau of

4  Investigation.

5  Q     Where did you have dinner last night?

6  A     We had dinner last night at the Long Horn Steakhouse here

7  in Frankfort.

8  Q     Did you see Douglas Adams there?

9  A     Yes, I did.

10  Q     Who did you see with Mr. Adams?

11  A     When we went in the restaurant, we saw Mr. Adams seated in

12  the corner of the dining room with a witness introduced

13  yesterday in court to us known as Ronnie Owens.  And also as

14  Mr. Owens stated earlier, his fiancee, I'm assuming.

15  Q     What did you do then?

16  A     After we were seated, we were in the same room with

17  Mr. Adams and Mr. Owens.  We all — Agent Briggs and myself and

18  also Mr. Smith and Mr. Parman were eating dinner, and all four

19  visibly saw Mr. Adams.

20  Q     Sir, to your knowledge, did Mr. Adams see you?

21  A     Mr. Adams did see us.  We, at one point, had taken a

22  picture of Mr. Adams and Mr. Owens, who was seated at their

23  table, and at that point, they visually saw us and began — I

24  believe Mr. Owens exited first, and three or four minutes

25  later, the female exited the booth, then exited the restaurant.

1   And at that point — which that restaurant, the waiters come

2   back to the table, take your bill and your money, so you pay

3   for your table.  But at that point, Mr. Adams got up and exited

4   the dining room and went to the front desk where you check in

5   with his bill, assuming he paid there.

6   Q    Did you see Mr. Adams stay at the front desk area for a

7   period of time?

8   A    For a period of time.  I'm assuming that he was waiting on

9   someone to come take his bill.

10  Q    So did Mr. Owens and the lady that was with him, did you

11  say they didn't leave together?

12  A    They individually got up and exited the dining room at

13  different intervals, yes.

14  Q    Did it appear to you to be a deliberate attempt to — for

15  everybody at the table to leave in a discreet manner?

16  A    Very much so.  It was shortly after we had taken a

17  photograph of the subjects at the table they begin exiting the

18  dining room individually.

19  Q    And spaced out over time?

20  A    Approximately three, four minutes apart, yes, sir.

21         MR. PARMAN:  Thank you, Officer.

22         THE COURT:  Mr. Westberry.

23         MR. WESTBERRY:  Just briefly if I may from here,

24  Judge Reeves?

25         THE COURT:  Yes, sir, that's fine.

1                    CROSS-EXAMINATION

2  BY MR. WESTBERRY:

3  Q    Agent Blair, I guess good afternoon now.

4  A    Good afternoon, sir.

5  Q    I think you were present in the courtroom earlier this

6  morning when Mr. Owens, I believe, testified?

7  A    Yes, I was.

8  Q    All right.  I think I know, but I would ask you, were you

9  ever in a position to overhear any of the conversation between

10  the Owens and Adams table?

11  A    No, sir.

12           MR. WESTBERRY:  Thank you, Judge.  Thank you.

13           THE COURT:  All right.

14           Mr. White, do you have questions of this witness?

15           MR. WHITE:  None, Your Honor.  Thank you.

16           THE COURT:  All right.  You're just observing.

17           MS. HUGHES:  Yes, Your Honor.

18           THE COURT:  All right.  Thank you.

19           Mr. Blair, you may step down.

20           THE WITNESS:  Thank you.

21           THE COURT:  Mr. Parman, any additional witnesses on

22  this point?

23           MR. PARMAN:  No, Your Honor.

24           THE COURT:  Thank you.  Mr. Westberry.

25           MR. WESTBERRY:  Yes, Judge Reeves, I have talked with

1   Mr. White.  He is willing to provide either testimony or he can

2   speak to the Court from the bench, I guess in the form of a

3   proffer to the Court as to some incidents that happened late in

4   the day yesterday that are relevant to how all of this

5   developed.  I would think it would be appropriate under these

6   circumstances.

7              Scott, have I said that correctly?

8              THE COURT:  All right.  Well, I would allow him to

9   make a statement as an officer of the court unless the United

10  States intends to ask him questions, in which case he would

11  need be placed under oath to do so.

12             Mr. Parman, what is your preference?

13             MR. PARMAN:  I believe he can make a statement as an

14  officer of the court.

15             THE COURT:  All right.

16             MR. WESTBERRY:  Could I — just one question, I

17  haven't done this in a long time, so forgive me, I'm a little

18  rusty.

19             THE COURT:  Yes, sir.

20             MR. WESTBERRY:  If I had something that I wanted to

21  elicit from Mr. White, would it be necessary for him to be —

22             THE COURT:  No, he can make — unless the United

23  States wishes to examine him on anything, any questions that

24  you ask, you may inquire of him without him being placed under

25  oath.  I may have some questions for him.  But, again, of

1  course, he is here, he's present as an officer of the court and
2  has an obligation as an officer to completely respond
3  truthfully in all matters and all respects.  But if you want to
4  ask him questions, you may do so.

5      MR. WESTBERRY:  Thank you.  I'm going to let
6  Mr. White begin —

7      THE COURT:  That'll be fine.

8      MR. WESTBERRY:  — by telling the Court just how
9  it — what happened late in the day yesterday that is relevant
10 to what we've discussed here today.

11      MR. WHITE:  Your Honor, Scott White, I represent
12 Charles Wayne Jones.

13      At the conclusion of the day, as I recall, right
14 after you were leaving, I was the only one with an exhibit,
15 plus I had witnesses I was trying to figure out what to do
16 with.  I turned around and Mr. Adams sits directly behind me
17 and he grabbed me by the arm and he said, "Is Ronnie going to
18 be staying the night, I would like to take him to dinner."  And
19 I said, "I'm not sure, check with your attorney."  At that
20 point, I went back, grabbed all of the people, all of my
21 witnesses — I can't recall, I think Mr. Owens — he
22 actually — I actually exited the courtroom.  All my witnesses
23 were right there along with Sarah, I explained to them, I
24 apologized, I couldn't get them on, I told them that's the
25 nature of our business and that they would have to come back

1    tomorrow.  But I had arranged for Ms. Gross, one of my

2    witnesses, actually to drive up, and I made the same offer to

3    Mr. Owen.  He said, "No, I'm just going stay the night."  I

4    said, "Well, check with Doug or his attorney, they're talking

5    about doing something on dinner."  And then that was it.  The

6    next thing I remember about this — in fact, I'm certain the

7    next thing that happened is I received a phone call last night

8    about — I could check my cell phone.  I want to say it was

9    sometime between 9:00, 9:30, I got a call from Janet Jones, my

10   client's, wife, who disclosed this to me.  I presume she must

11   have found that out — I don't know how she found it out.  But

12   then I spoke with Mr. Westberry this morning.  He informed me

13   of the situation.  I went over and talked to Mr. Smith and

14   informed him.  That's what I remember.

15            THE COURT:  All right.

16            Mr. Westberry, do you want Mr. White to expand in any

17   way?

18            MR. WESTBERRY:  Yes, if I could ask Mr. White this

19   question:

20            At the time that you were contacted by Mr. Adams last

21   night, what was your understanding regarding contact, if any,

22   or not, that defendants in this case would have with witnesses,

23   not only for the government, but defense witnesses as well, if

24   you know?

25            MR. WHITE:  What my understanding is, Your Honor, is

1  this:  And to be honest with you, I paid more attention to my

2  client obviously than anyone else.  My client can have no

3  contact with any witnesses.  That's a condition of his bond.

4          THE COURT:  Well, that's a standard condition that

5  was set at the time of arraignment for all parties in the case,

6  all defendants in the case.

7          MR. WHITE:  I understand that, Your Honor.

8          THE COURT:  And throughout the course of this

9  proceeding, there have been problems with some defendants that

10 have overstepped their bounds with respect to contacting

11 witnesses.  Of course, I've already found that your client

12 improperly had contact with two potential witnesses, and that's

13 why he's subject to home detention.  And you realize that even

14 after that occurred, Mr. Abell's client, Mr. Stivers, had his

15 bond revoked for having contact with two witnesses in the case.

16 So I don't look at this in a vacuum, I look at this from the

17 standpoint of what's happened in this case to this point.

18         So you're not trying to tell me, are you, that you

19 did not realize that defendants could not have contact with

20 witnesses in the case?  I don't think that's what you're trying

21 to tell me.

22         MR. WHITE:  No, it's not.  But, in fact, I guess my

23 point is I just didn't even think about it, because Mr. Adams

24 is not my client, I'm not comfortable with giving him advice.

25 That's why I told him he needed to talk to Mr. Westberry.  And

1   I made the mistake of not following back up with Kent,

2   Mr. Westberry.  It just got lost in the moment.  I just

3   presumed that Mr. Adams would, in fact, talk with his lawyer

4   before doing something like that.  That's why I instructed him

5   to do what I told him to do.

6              THE COURT:  All right.  Thank you.

7              Anything else, Mr. Westberry?

8              MR. WESTBERRY:  No, Your Honor.  Thank you.

9              MR. WHITE:  Is there anything else for me, Your

10  Honor.

11             THE COURT:  Not at this time.

12             Mr. Westberry, do you want to present any proof or

13  testimony?

14             MR. WESTBERRY:  May I have one second, please?

15             THE COURT:  Yes, sir.

16             MR. WESTBERRY:  Thank you, Judge.  That's all we

17  have.  Thank you.

18             THE COURT:  All right.  Thank you.

19             What is the position of the United States with

20  respect to conditions of bond of Defendant Douglas Adams?

21             MR. PARMAN:  Your Honor, it would be the position of

22  the United States that Mr. Adams has clearly violated his

23  release condition, I think that has been established for 3148

24  by clear and convincing evidence.  The problem at this point

25  is, as the Court notes, we've had multiple instances of witness

1    tampering, potential witness tampering, and at this point in

2    the trial, it continues to progress and progress and progress.

3            From looking at this situation with Mr. Owens,

4    Mr. Owens testified that the contact with Mr. Adams was

5    essentially limited to very, if you will, random contact at

6    his —— at Mr. Adams daughter's store.  This isn't like this is

7    a —— not that it even matters per the Court's conditions, but

8    this isn't like this is a lifelong friend of Mr. Adams that he

9    hasn't seen in some period of time, this is an individual who

10   he very sporadically knows at best.  And then after he's

11   recognized as a witness, then he takes them out contrary to the

12   Court's orders, contrary to separation of witnesses, and buys

13   his lunch.  I think it's clear from Mr. Owens's testimony

14   that he was —— excuse me, it was his dinner, not his lunch.  I

15   think it's clear from Mr. Owens's testimony that he was hedging

16   for Mr. Adams as well.  He was at best not forthcoming about

17   the telephone contact that happened less than 12 hours ago,

18   even after Mr. Adams saw the agents at the restaurant.  And

19   then when he was confronted about it, confronted and actually

20   to the point of saying if we pull your call records will we

21   find that there was phone contact, then he eventually admitted

22   it.  So what actually was discussed at the meeting is certainly

23   suspicious as best.

24           Taking all that into consideration, Your Honor, the

25   United States, at this time, would move for revocation of

1    Mr. Adams' release conditions.

2            THE COURT:  All right.

3            Mr. Westberry.

4            MR. WESTBERRY:  Thank you, Judge.  May it please the

5    Court, referencing only Mr. Owens' testimony at the beginning

6    of this Court proceeding today, and I am not minimizing what,

7    quite frankly, appears to be based on the proof that has been

8    offered to date, there appears to be a bond violation.  I wish,

9    I wish someone had called me last night, but they didn't, and

10   that is water under the dam.

11           THE COURT:  And I understand that, but here's the

12   problem.  It clearly appears to the Court that Mr. Adams knew

13   he needed to check before he talked with the witness, otherwise

14   why even tug on Mr. White's arm and ask the question?  But even

15   after that happened, the next thing we know that happens is not

16   that you're contacted but that there's this dinner meeting with

17   the witness in the case.

18           MR. WESTBERRY:  I won't waste your or counsels' time.

19   I would — excuse me, I don't mean to interrupt you if you have

20   something.  I had some thoughts.

21           THE COURT:  That's fine.  Please proceed.

22           MR. WESTBERRY:  We're nearing the end of the trial, I

23   think.  As you might expect, Judge Reeves, I work extensively

24   with Mr. Adams in the evenings.  We have the week planned to

25   prepare, quite frankly, for our closing argument.  My greatest

1    fear as an attorney trying to prepare for the remainder of this
2    case is that if he is incarcerated in the evening — you may or
3    may not notice, I commute from Louisville every day.

4                THE COURT:  I'm sorry?

5                MR. WESTBERRY:  I commute from Louisville —

6                THE COURT:  Yes, sir.

7                MR. WESTBERRY:  — every day.  You may have known
8    that.  If he were incarcerated, as I think the government is
9    suggesting, for the remainder of this trial, in particular the
10   preparation of the closing, we would have a very, very
11   difficult time.

12               It seems to me that if the Court is inclined to — I
13   would hope — I ask the Court to consider maybe amending the
14   terms of his release.  Perhaps this situation is a bit closer
15   to that of Mr. Jones.  I think — I was not present at the
16   Stivers revocation hearing, so I can only speak —

17               THE COURT:  Well, let me just tell you what I said to
18   Mr. Abell when he was making the same argument at Mr. Stivers'
19   hearing.  I told him that I thought I made a mistake with
20   respect to Mr. Jones and had I known then what I knew at the
21   time of Mr. Stivers' hearing, the decision would have been
22   different and Mr. Jones would have been incarcerated because of
23   this continuing pattern that's shown throughout the course of
24   this case of parties not respecting this Court's orders and not
25   playing by the rules, quite frankly.  And so it's a continuing

1   problem that we have in this case.  It seems like we have rules

2   for one side but no rules whatsoever for the other side in the

3   case, and this Court just can't tolerate that type of activity

4   or that type of behavior in a case.

5           MR. WESTBERRY:  I understand.  Well, you know my

6   dilemma in terms of trying to effectively represent him,

7   particularly as we close the proof in this case and prepare for

8   closing.  I do work a lot with him in evenings, if not by

9   phone, in person in many instances.  They're renting an

10  apartment, perhaps the Court knew that, here.

11          THE COURT:  I don't know the details of that.  I do

12  understand that he's complied with what the Probation Office

13  has required.

14          MR. WESTBERRY:  That's correct.  Otherwise I don't

15  believe there has been a previous violation of any condition of

16  his release that I am aware of.  I'm happy to answer — I think

17  you know, I got a call, my best recollection, about 7:00 or

18  8:00 last night was the first time that I was made aware of

19  this matter.

20          THE COURT:  All right.  All right.  Thank you,

21  Mr. Westberry.

22          Mr. Parman.

23          MR. PARMAN:  Yes, if I could respond briefly, Your

24  Honor?

25          THE COURT:  Yes, sir.

1            MR. PARMAN:  What Mr. Westberry said, I do think

2    highlights an important aspect of this situation, and the Court

3    previously noted it to an extent.  Mr. White tells him to talk

4    to his attorney, that being Mr. Adams.  Then Mr. Adams does not

5    talk to his attorney about going and having dinner with this

6    witness.  Instead he goes ahead and has dinner with the

7    witness, then only contacts his attorney after he sees that the

8    agents have caught him in the act.  I think that goes further

9    to show what the true intent here was regarding this encounter.

10           On the second point, regarding the attorney

11   contact — or rather the attorney representation of Mr. Adams

12   and Mr. Westberry, I mean, the United States is sympathetic to

13   that; however, that's not a factor to be considered under 3148.

14   But the issue here is, now that there is certainly a violation,

15   is whether or not this defendant is likely to abide by release

16   conditions, A; or whether or not the Court can find by

17   essentially a surety that he will not be a danger to the

18   community, and per prior Court ruling, witness tampering and

19   witness intimidation are the type of danger that is

20   incorporated within community danger within the Bail Reform

21   Act, and when you look at those two factors, Your Honor, I

22   believe revocation is the only option that's available.

23           THE COURT:  All right.  Thank you, Counsel.

24           Well, first, let me go back and reset this a little

25   bit.  But before I do that, I want to make a couple of comments

1  about the attorneys in the case, and I don't find that

2  Mr. White or Mr. Westberry have done anything wrong with

3  respect to this particular issue in this case.  I want that to

4  be clear from the record.  Further, with respect to

5  Mr. Westberry, he has certainly performed admirably throughout

6  the course of this proceeding.  I've had issues with some of

7  the actions of some of the attorneys, but they haven't been

8  Mr. Westberry.  I want to make sure that that's clear for the

9  record.  I do understand the predicament that this places him.

10 This is a very tough situation as we get close to the end of

11 the case, but it's a position that Mr. Adams has placed himself

12 in.

13          Throughout the course of this proceeding, there has

14 been attempts to tamper with and intimidate witnesses.  That's

15 clear to me.  There also has been efforts, not by the

16 defendants, but there have been efforts to broadcast these

17 proceedings, the testimony that's been offered throughout the

18 course of this proceeding, through the Manchester Enterprise.

19 We know that they've published transcripts in violation of

20 Rule 53 of the Federal Rules of Criminal Procedure until such

21 time as the Court directed the court reporter not to provide

22 daily copy to a newspaper that would provide the daily

23 transcripts so these witnesses could go out and read the

24 testimony in violation of the rule on separation of witnesses.

25          But then in this case, we've had instances in which

1  Mr. Stivers, who's not present, but the Court has made a

2  finding that Mr. Stivers has attempted to intimidate witnesses.

3  Of course, that testimony has been presented in the course of

4  this proceeding.  He had his bond revoked as a result of that

5  action.  That came after we had a hearing regarding Mr. Jones

6  and his violation of the rule that would prohibit him from

7  attempting to influence witnesses, either directly or

8  indirectly.  So now we have the third instance here since this

9  case has been filed, and it's not even to mention the other

10  activities that have taken place before the case was filed.

11  And now we have this activity in which the defendant,

12  Mr. Adams, checks not with his own attorney but with an

13  attorney in the case about meeting with a witness who's been

14  recognized as a witness in the case.  His bond conditions are

15  clear that he can't have contact, direct or indirect.  So

16  that's clear.  There's been no information that he didn't

17  understand that to be the case.

18          So he knows the person is going to testify because he

19  was recognized as a witness yesterday, he then proceeds to have

20  dinner with the witness.  He's observed having dinner with the

21  witness by members of the United States Attorney's Office and

22  the agents that are working on the case, and then, based upon

23  the testimony presented, after being spotted, then the

24  witness's fiancee and then, finally, Mr. Adams would leave the

25  witness in a manner which could indicate that they were

1  attempting to avoid further detection of being together with
2  the witness.
3          So I do find that a violation has occurred by clear
4  and convincing evidence, a violation under Title 18,
5  Section 3148.
6          The question then becomes are there conditions that
7  would be less restrictive than revoking the conditions of bond
8  and requiring incarceration through the remainder of this
9  proceeding.  I wish I could conclude that there would be, but I
10  believe that under the circumstances there will be no guarantee
11  that this defendant would not continue to violate orders of
12  this Court and conditions of his release.
13          So, therefore, I am finding that he violated the
14  conditions of release and I am ordering that at the end of the
15  day today that he be detained pending the conclusion of this
16  matter based on the violation of conditions of release and what
17  this Court believes would constitute improper tampering with a
18  witness that's expected to testify in this matter.
19          Previously in the case, I had indicated that the
20  United States would be allowed to cross-examine this witness,
21  Mr. Owens, with respect to his violation of the rule, the fact
22  that he had contact in violation of Rule 615, persons that he
23  spoke with, the times that that occurred, and that ruling still
24  stands, but that will also -- the Court will also make a ruling
25  that the defendant has violated the conditions of release.

1          The Marshal will be requested to maintain the

2     defendant at a location that will allow the maximum

3     communication with his attorneys throughout the course of this

4     proceeding, and I would assume that would be in the Franklin

5     County Detention Center.

6          THE MARSHAL:  Yes, Your Honor.

7          THE COURT:  In the event the Franklin County

8     Detention Center does not allow contact with the attorneys, I

9     want to be advised of that immediately, and if I need to make

10    other arrangements to allow Mr. Westberry and his co-counsel to

11    continue to work with Mr. Adams through the course of this

12    proceeding, then I'll make modifications to that determination.

13         That will be the ruling of the Court, and we will be

14    in recess until 1:00 this afternoon.

15         MR. WHITE:  Your Honor, can I raise one quick matter?

16         THE COURT:  Yes, sir, you may.

17         MR. WHITE:  I've decided not — because the only

18    thing I was going to do with Ms. Gabhart was going to be just

19    this exhibit, I've decided, given what Ms. Johnson has already

20    testified to, I am not going to call her at all as a witness.

21    So I would ask if I could release her.

22         THE COURT:  If she's not subject to any other

23    subpoena, she can — if you want to release her, she can be

24    released.

25         MR. WHITE:  The only other thing I wanted to ask you,

110

1  Your Honor, I'm going to consult with my client, Mr. Jones, as

2  to whether we are still going to call Mr. Owens given the

3  Court's what I think is an appropriate ruling.  If I choose not

4  to call him, I'm the only one that has him under subpoena.

5  What do you want me to do with that?

6          THE COURT:  Well, I'm going to give the United States

7  an opportunity, if it wishes, to subpoena that witness to do so

8  before he would be released.  I don't know that he has any — I

9  don't know what he would be testifying to because we didn't get

10 into the substance of his testimony here today.  But confer

11 with Mr. Smith before he's released, and if you're the only

12 person that has him under subpoena, if the United States

13 doesn't intend to call him based on what we've heard here

14 today, then he can be released as far as I'm concerned.  But

15 you would need to check with the United States first in light

16 of the events of today.

17         MR. WHITE:  So as not to bother you, if the United

18 States does want to subpoena him, is it — I would presume that

19 it would be for rebuttal, and then just so he can leave and

20 then come back for rebuttal?

21         THE COURT:  Yes, sir.

22         MR. WHITE:  Thank you, Your Honor.

23         THE COURT:  Yes, sir.

24         MR. WHITE:  That's all I have.  And, again, my own

25 apologies.  I do feel I should have followed up with

1  Mr. Westberry.  I don't know why I didn't, it was just the end

2  of the day and I just didn't think, that was lost on me, it was

3  poor judgment on my part, I apologize.

4        THE COURT:  Well, Mr. White, quite frankly, it wasn't

5  your duty, and Mr. Westberry wasn't here, but the defendant

6  certainly was aware of his obligations.  And so, again —

7        MR. WHITE:  You're being too kind, Your Honor, I

8  should have done it.

9        THE COURT:  We'll be in recess until 1:00.

10     (Whereupon, a recess was had for the noon hour, after

11 which the proceedings continue uninterrupted to Volume 25-B.)

12                    (Proceedings concluded at 12:35 p.m.)

13                 C E R T I F I C A T E

14    I, Cynthia A. Oakes, certify that the foregoing is a

15 correct transcript from the record of proceedings in the

16 above-entitled matter.

17

18 3/16/2010                    s/CYNTHIA A. OAKES
      DATE                      CYNTHIA A. OAKES, RPR, RMR, CRR
19

20

21

22

23

24

25

1

2                          I N D E X

3                                                         PAGE

4  Testimony of RON OWENS:
        Voir Dire Examination by Mr. Smith:          10
5       Voir Dire Examination by Mr. White:          18
        Voir Dire Examination by The Court:          18
6
   Testimony of CLAY MASSEY BISHOP, JR.:
7       Direct Examination by Mr. Westberry:         21
        Cross-Examination by Mr. Smith:              43
8       Direct Examination by Mr. Abell:             78
        Direct Examination by Mr. Baldani:           80
9

10 Show Cause Hearing regarding Mr. Adams:           92

11 Testimony of EDSEL VINCENT BLAIR:
        Direct Examination by Mr. Parman:            92
12      Cross-Examination by Mr. Westberry:          94

13

14

15                       E X H I B I T S

16
   Government's                                      Page
17 Exhibit No.              Identified            Admitted

18     P42                      67                   68
       P44                      75                   75
19

20

21

22

23

24

25