United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09-16-S |
| vs. | ) |
| | ) Frankfort, Kentucky |
| RUSSELL CLETUS MARICLE | ) March 22, 2010 |
| DOUGLAS C. ADAMS | ) 1:27 p.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM E. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) VOLUME 29-A |
| STANLEY BOWLING | ) |

TRANSCRIPT OF CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States:  STEPHEN C. SMITH, ESQ.
                                 JASON D. PARMAN, ESQ.

On behalf of the Defendant       DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:          MARTIN S. PINALES, ESQ.
                                 CANDACE C. CROUSE, ESQ.

On behalf of the Defendant       R. KENT WESTBERRY, ESQ.
Douglas C. Adams:                KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant       T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant       ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant       RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:              R. TUCKER RICHARDSON, III, ESQ.

On behalf of the Defendant       JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant       ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant       DANIEL A. SIMONS, ESQ.
Stanley Bowling:

2

```
 1   Appearances of Counsel:

 2   On behalf of the United States:  STEPHEN C. SMITH, ESQ.
                                      JASON D. PARMAN, ESQ.
 3                                    Assistant U.S. Attorneys
                                      601 Meyers Baker Road
 4                                    Suite 200
                                      London, Kentucky  40741
 5

 6   On behalf of the Defendant       DAVID S. HOSKINS, ESQ.
     Russell Cletus Miracle:          107 East First Street
 7                                    Corbin, Kentucky  40701

 8                                    MARTIN S. PINALES, ESQ.
                                      CANDACE C. CROUSE, ESQ.
 9                                    150 East Fourth Street
                                      Federal Reserve Building
10                                    Cincinnati, Ohio  45202

11
     On Behalf of the Defendant       R. KENT WESTBERRY, ESQ.
12   Douglas C. Adams:                KRISTEN N. LOGAN, ESQ.
                                      220 West Main Street
13                                    Suite 1900
                                      Louisville, Kentucky  40202
14

15   On behalf of the Defendant       T. SCOTT WHITE, ESQ.
     Charles Wayne Jones:             133 West Short Street
16                                    Lexington, Kentucky  40507

17
     On behalf of the Defendant       ROBERT L. ABELL, ESQ.
18   William E. Stivers:              120 North Upper Street
                                      Lexington, Kentucky  40507
19

20   On behalf of the Defendant       RUSSELL JAMES BALDANI, ESQ.
     Freddy W. Thompson:              R. TUCKER RICHARDSON III, ESQ.
21                                    300 West Short Street
                                      Lexington, Kentucky  40507
22

23
     On behalf of the Defendant       JERRY W. GILBERT, ESQ.
24   William B. Morris:               212 North Second Street
                                      Richmond, Kentucky  40475
25
```

```
 1   On behalf of the Defendant      ELIZABETH SNOW HUGHES, ESQ.
     Debra L. Morris:                201 West Short Street
 2                                   Lexington, Kentucky   40507

 3
     On behalf of the Defendant      DANIEL A. SIMONS, ESQ.
 4   Stanley Bowling:                116 West Main Street
                                     Suite 2A
 5                                   Richmond, Kentucky   40475

 6
     Court Reporter:                 CYNTHIA A. OAKES, CRR
 7                                   Official Court Reporter
                                     United States District Court
 8                                   560 Athens Boonesboro Road
                                     Winchester, Kentucky   40391
 9                                   (859) 983-4346

10

11

12

13

14

15

16

17

18

19

20

21

22
     Proceedings recorded by mechanical stenography,
23   transcript produced by computer.

24

25
```

1    (Whereupon, the jury returned to the courtroom, after which

2  the following proceedings were had.)

3            THE COURT:  Thank you.

4            The record will reflect that all members or the jury

5  are present.  The counsel and parties are also present.  I hope

6  everyone had a good weekend.

7            Ladies and gentlemen, the way we'll proceed at this

8  point is first we're going to proceed with closing arguments, to

9  be followed, of course, by the jury instructions.  Due to the

10  number of parties in the case, the arguments of counsel will

11  extend into tomorrow.  After arguments, of course, I'll give you

12  the instructions, and, at that point, we will pick the

13  alternates in the case and those jurors will be excused while

14  the remaining 12 jurors deliberate on the case.

15            All right.  Are the parties prepared to proceed at

16  this time?

17            MR. SMITH:  Yes, sir.

18            THE COURT:  Thank you.  Mr. Smith, if I could just ask

19  you one question at sidebar, please.

20    (Whereupon, the following discussion was had between the

21  Court and counsel at the bench, out of the hearing of the jury.)

22            THE COURT:  How long do you want for your initial

23  argument?  I forgot to ask you that earlier.

24            MR. SMITH:  Two-and-a-half or maybe less.

25            THE COURT:  We'll take a break at an hour and a half.

CLOSING ARGUMENT - MR. SMITH                5

1    So you can tell me at that point how much further you have.

2        (Whereupon, the following proceedings continued in open

3    court.)

4            THE COURT:  And, ladies and gentlemen, I will tell you

5    now that I will interrupt counsel after about an hour and a half

6    so we can change our reporters and give everyone just a short

7    break.

8            Mr. Smith, are you prepared to proceed with your

9    initial closing?

10           MR. SMITH:  Yes, Your Honor.

11           THE COURT:  Thank you.  You may proceed.

12           MR. SMITH:  May it please the Court.

13           THE COURT:  Mr. Smith.

14           MR. SMITH:  Ladies and gentlemen and counsel.

15           MR. WHITE:  Mr. Smith.

16           MR. WESTBERRY:  Mr. Smith.

17           MR. SMITH:  Ladies and gentlemen of the jury, I have

18   at times shared everyone's eagerness to see this day come,

19   because this is a day in which you all get to function as a true

20   jury deliberating on this case.  And I will say on behalf of the

21   United States that you-all have been extremely attentive

22   throughout this entire trial, and I know that all parties

23   appreciate that, as well as the United States.  Anytime we have

24   a case of this length, this many interruptions, and yet you-all

25   have been so diligent in your duties and I want to thank you on

CLOSING ARGUMENT - MR. SMITH                        6

1  behalf of the United States.

2          Sometimes when doing a closing, I sometimes feel like

3  one of the evening newscasters.  I used to have a couple of them

4  that I watched, and that was when evening news was popular.  I

5  understand evening news is not popular anymore as much, but they

6  would generally get up and they would tell you what they're

7  going to tell you and then they'd tell you what they were going

8  to tell you and then at the end they would tell you what they

9  told you, and I sometimes feel like that's where I am on a

10 closing argument.  But I do think on a case of this length, an

11 indictment that has multiple charges and instructions — a set

12 of instructions that's very lengthy, that it's important that we

13 spend some time talking a little bit about those instructions,

14 spend some time talking about what the evidence was, because

15 it's been, my calculation, almost seven weeks since we started

16 our case.  And so I want to take — if you-all will indulge me,

17 I want to take some time to talk about some of the witness

18 testimony.

19          And before I do, I would like to get into some of the

20 instructions, some of the law.  And that is, of course, your

21 oath as jurors that you took is that you would take the law of

22 the evidence from the witness stand and you would apply it to

23 the law.  And I'm certain that counsel for defense, we have

24 talked with the Court, and if I misstate any aspects of the law,

25 I'm sure it will be pointed out to you.  But we have gone over

CLOSING ARGUMENT — MR. SMITH                7

 1   those, and I anticipate that these instructions that I'll be

 2   talking to you with and about will be similar, if not exactly

 3   the same, as the judge will give you when it's time to instruct

 4   you on the law.

 5        And in order to do this, I'm going to take the

 6   projector and begin, again, talking with you about some of those

 7   instructions that I think we need to look at at the beginning of

 8   our closing.

 9        As you-all recall, we had an indictment in this case

10   which alleges 11 counts, which you-all are going to consider in

11   this case.  And these instructions that we're going to go over

12   are going to instruct you on the law as to each of these counts.

13        There are some preliminary instructions and,

14   obviously, preliminary instructions are instructions that tell

15   you basically some things that I would like to point out to you,

16   and number one is, use your common sense.  I believe that it

17   will instruct you that you should use your common sense in

18   weighing the evidence and let your everyday experience guide you

19   in what weight you believe the evidence deserves.  So this is

20   one of the basic premises of law, and that is common sense

21   should dictate you and guide you as you go through your

22   deliberations.

23        Some people may say, well, is there some evidence

24   that's direct evidence, some evidence that's circumstantial?  I

25   expect that the jury will be instructed something to the effect

1   that it's your weight to decide how much to give to direct and

2   circumstantial evidence.  However, make this notation:  That the

3   law makes no distinction between the weight you should give

4   either one or say the other is better than the other.  Direct

5   and circumstantial evidence under the law should be given the

6   same consideration.

7           Count 1 obviously is the racketeering conspiracy

8   charge, and as you have already been made aware, in the

9   racketeering case, the indictment alleges that this conspiracy

10  began on or about March 2002, the exact date is unknown, through

11  July 17th, 2007.

12          The first thing that you're going to have to determine

13  in a racketeering enterprise conspiracy, the first element is

14  that an enterprise existed; second, that the enterprise was

15  engaged or had some effect on interstate commerce; third, that

16  the defendant was associated with or employed by the enterprise;

17  fourth, that, again, between these dates alleged in the

18  indictment two or more persons reached an agreement or came to

19  an understanding to participate in the affairs of the

20  enterprise, either directly or indirectly, through a pattern of

21  racketeering activity; and, fifth, that the defendant

22  voluntarily and intentionally joined in that agreement or

23  understanding.

24          Now, that is the five elements.  The instructions, I

25  expect, will break down those five elements for you.  And

1  there's going to be things in this indictment and in these

2  instructions that are not contested, and we can talk about some

3  of those.  Some things that we know are not contested.  For

4  instance, is this an enterprise?  It's alleged that the Clay

5  County Board of Elections was an enterprise.  Okay?  There is in

6  the definition an enterprise includes any individual

7  partnership, corporation, association, or other legal entity.

8  As you will recall, in the opening statement, the United States

9  addressed this issue.  The Board of Elections was not illegal as

10 a whole.  It is a legal entity.  The Clay County Board of

11 Elections has a structure.  It is defined by statute.  And the

12 instructions say an enterprise can be a legal entity such as the

13 Clay County Board of Elections.  That is not in dispute.

14        It's also interesting that you don't have to be

15 employed.  You know, the question is, well, now, Doug Adams and

16 Cletus Maricle, you haven't shown that they served as election

17 officers in 2002 or 2004 or 2006.  Shouldn't that make a

18 difference according to the law?  Well, no.  I would submit to

19 you that an association, okay — you don't have to be an

20 employee, but if you're associated with.  It says such an

21 association of individuals may retain its status even though the

22 association changes by adding or losing individuals during the

23 course of the indictment.

24        Right up front, the United States, there are people

25 that are coming in and out of this thing and they're not

CLOSING ARGUMENT - MR. SMITH                    10

1    continuous.  Does that matter?  The instructions say no.  This

2    enterprise maintained its identity throughout 2002, 2004, and

3    2006.  It was the key to controlling the politics in Clay

4    County.  It was the key for these members to utilize improperly

5    and corruptly.  Was every election officer in Clay County

6    corrupt?  No, that was never the allegation, it's never been our

7    position, and it was not the case in Clay County.  But what we

8    did show is that this legal entity, the Clay County Board of

9    Elections, was, in fact, utilized for the corrupt purposes of

10   these individuals who came together in agreement and at times

11   came in and came out of this, depending on their needs and their

12   desires, as to whether or not they were going to utilize the

13   Clay County Board of Elections to control the outcomes of these

14   elections.

15            Now, that's a big long legal term, a racketeering

16   enterprise.  What's the racketeering enterprise?  The

17   racketeering enterprise is as simple as it was explained to you

18   by the witnesses in this case.  We don't have lawyers explaining

19   to you how it worked, we have witnesses explaining to you how it

20   worked.  It was simple.  People in Clay County would put

21   together hundreds and thousands of dollars to control this

22   election.  They weren't going to just throw it out in the

23   streets of Clay County and hope that somebody might take the

24   money and promise them a vote and go down to the poll and turn a

25   lever as they were supposed to.  No, the enterprise had to be

1   utilized for a corrupt purpose.  That is, you've got to have
2   Charles Wayne Jones being the commissioner.  You got to have Al
3   Man Stivers and other corrupt election officers within who would
4   operate this legal entity in a corrupt manner.  That is, we're
5   going to teach these people how to steal votes in 2006.  In
6   2006, we're going to buy votes.  In 2004, we're going to buy
7   votes.  In 2002, we're going to by votes.  And we're going to
8   use the early voting, the absentee voting, the mail—in ballots,
9   and all of this can be used corruptly if we have the election
10  officers.  Now, you say how do you need the election officers?
11  You got to have the election officers in order to control and
12  ensure that your money is being spent properly.

13         I mean, if you're Freddy Thompson and you put up
14  $140,000 in 2002, are you just doing it by chance?  Or Charles
15  Marcum, you bring in 10,000, are you just doing it by chance?
16  Doug Adams brought those people together because he had Charles
17  Wayne Jones and Al Man Stivers sitting there and they were going
18  to control the Board of Elections in 2002.  And they were going
19  to continue to do that, as we showed through witness after
20  witness and election after election.  This was a continuing
21  process.  We're going to do this election cycle after election
22  cycle to fit our needs.  And so this legal entity, the Clay
23  County Board of Elections, is one which is a legal entity but it
24  was used for corrupt purposes, and its membership and
25  association did, in fact, change by adding or losing members

1   during the course of its existence, and that's never been

2   disputed.

3          One of the things that a racketeering enterprise has

4   got to show is it's got to show that it affected interstate

5   commerce.  Okay?  Did the actions of the enterprise affect in

6   any degree, any degree, any degree, 1 degree, 2 degrees,

7   3 degrees, any degree, the law says.  It doesn't have to be

8   complete, saturated with interstate movement of goods.  No.  The

9   law says if the actions of the enterprise affect in any degree

10  the movement of money, goods, or services across state lines,

11  then interstate commerce was engaged in or affected.

12         It's further, I suggest to you the instructions are

13  going to say, the United States need not prove that the

14  defendant engaged in interstate commerce or that the acts of the

15  defendant affected interstate commerce.

16         Interstate commerce by affecting the outcome of

17  federal and state elections, awarding contracts by the city

18  government for sanitation services and construction of sewer and

19  water projects, that is what the indictment alleges and what the

20  government has alleged in this case.  In fact, as you will

21  recall the testimony, Carmen Webb Lewis, the Mayor, she

22  explained how these contracts worked.

23         You see, for people like Stanley Bowling and Bart

24  Morris, there was more in this election than just getting a

25  salary and getting a job.  You know, Stanley Bowling, he wasn't

CLOSING ARGUMENT — MR. SMITH                    13

1   just out to get a magistrate's salary of 20-something thousand
2   dollars a year.  Bart Morris and Debi Morris never ran for
3   office one time.  What was it in for them?  They were in it
4   from — from the aspect is they're going to get these contracts.
5   Okay?  They're going to get these contracts.  And you recall the
6   contracts, the B&B Excavating contracts were PRIDE and U.S.
7   Department of Agriculture, Rural Development grants.  And I
8   would submit to you that the law requires if it is show that
9   this enterprise affected "in any degree."  And you say, well,
10  how could that be affected?  Well, I think Carmen Webb Lewis
11  summed it up very well.  You see, when you're on city council,
12  you're asked to vote on these, you're asked to approve these
13  contracts.  In 2004, when Bart Morris decided he wanted to
14  change the terms, he got to go in front and get Vernon Hacker
15  and Darnell Hipsher.  You remember the Board meeting minutes,
16  that's who made the motion, it was seconded, it was Darnell
17  Hipsher and Vernon Hacker.  Because that relationship, see,
18  they're in the enterprise.  These folks are together, they're
19  members, you see, and you scratch my back, I scratch yours.  And
20  that's the way this works.  And we affect interstate commerce
21  when we pass and we agree that Bart Morris is going to get that
22  sanitation, the PRIDE cleanup money.  Federal monies are going
23  to be dispersed through the city government.  So, again, we're
24  affecting interstate commerce.

25          We're also affecting federal and state elections.

1   Federal and state elections.  Every two years, the United States

2   House of Representatives in the Fifth District will have a

3   candidate.  And you can look at the records for Congress.  And

4   if you recall, Wayne Jones made comment to one of the vote

5   buyers, turn it every time you can against Hal Rogers.  See,

6   he's affecting a federal office when he makes that statement in

7   the course of his position.  He's commissioner.  The

8   commissioner tells one of his officers, you turn one against Hal

9   Rogers every time you can, you steal a vote, you steal it, make

10  sure you don't vote it for Hal Rogers?  See, that's affecting a

11  federal election.  It's affecting it whether or not that happens

12  or not.  It's affecting it because they're on the ballot.

13          Other ways it's affected:  You know, we had these

14  engineers come in here to talk about, you know, how good the

15  contract was and how they followed the plans.  We've never

16  alleged that Bart Morris didn't haul garbage, we've never

17  alleged that Stanley Bowling didn't dig ditches and put lines

18  in.  That's never been the allegation in this case.  But the

19  engineer said, you know, one of the things is that we have these

20  contracts and they're supposed to be bid and they're supposed to

21  be advertised.  And Carmen Webb Lewis, you know, what happens is

22  the taxpayers, the people who are paying the taxes down there in

23  Manchester, they care about this.  You know, because if this

24  contract is put in the Lexington Herald-Leader or on Dodge, this

25  Internet website, other companies from out of state can bid on

CLOSING ARGUMENT — MR. SMITH                    15

1    these.  Other companies in the state and out of the state can
2    compete and we'll get a better bang for our buck.  And what did
3    we do in this enterprise?  We took that away.  Kennon White and
4    Doug White made sure that Stanley Bowling got the contracts,
5    eight of them.  Well, now, he did advertise one of them.  Only
6    bidder, only one bidder.  Nobody else could compete down there
7    in Clay County.  Advertised it seven days before it closes and
8    then have an inside scheme with the mayor and his son, sure it's
9    affecting interstate commerce.
10             Again, going back to this element defined by the
11   instructions I believe will say, again, we've got to show that
12   there was a defendant associated with — and what does that
13   mean?  You know, you got employees.  You know, Wayne Jones is
14   commissioner, 2002 through 2004, 2006.  Freddy Thompson is the
15   chairman of the board.  I mean, there's no — this is not a
16   disputed issue.  These men are on the board, they're in the
17   enterprise, they're employed by it, they get paid.  Al Man
18   Stivers, he's employed by — he is an election officer.  So
19   these are members of by employment.  But there's also members by
20   association:  Cletus Maricle, Doug Adams, Bart and Debi Morris,
21   Stanley Bowling.  How can they be a part of an enterprise if
22   they're not employed?  Well, they can be associated with.  What
23   does that mean?  To be associated with, must be involved with
24   the enterprise in a way that is related to its affairs.
25   Although the person need not have a stake in the goals of the

CLOSING ARGUMENT — MR. SMITH                    16

1    enterprise and may even act in a way that subverts those goals,

2    a person may be associated with an enterprise without being so

3    throughout its existence.

4            You see, Cletus Maricle, other than his occasional

5    appearances to enforce things, such as the meeting with Vernon

6    Hacker — you remember Vernon Hacker, he was on the fence.  And

7    Doug Adams was saying, you're going to get off the fence.  He

8    sends Ronnie Hacker to him and says, you're going to lose your

9    bus if you don't move.

10           And then there's another important meeting with Vernon

11   Hacker.  Just before he loses his bus, he gets called to a

12   meeting and Cletus Maricle is there, and he says, the tide has

13   changed.  You know, when you're circuit judge, what higher

14   office is there in the county?  And when you're there trying to

15   influence a man who's in a position of Vernon Hacker as to

16   whether or not, okay, am I going to stay with my loyalties to

17   Jennings White or am I going to go with Doug Adams who is

18   putting pressure on me through my job with the school board, and

19   you got a man like Cletus Maricle, who says — all he has to say

20   is, the tide has changed, and he lets everybody know where he

21   stands on the issue.

22           See, these are acts which would show that these men

23   were involved in a way that related to its affairs.  These men

24   were not employed.  You know, that recording, we'll touch on

25   some of those recordings because I think they're important,

1  they're very important, extremely important.  But one of those

2  was one of the very first ones, you know, and it just kind of

3  incapsulates the membership of this enterprise.  You know, Wanda

4  White and Kennon White that come into this meeting where Stivers

5  and Jones were there, and Wanda is upset because she didn't get

6  picked as election officer for 2007.  You recall that.  And when

7  she comes in, she's like, I can't believe you-all did this.  And

8  Stivers immediately fires out, well, you know who the daddy of

9  that is, don't you?  Said, who, Bart?  He said no.  He said,

10  Cletus is the daddy of that.  See, there's evidence for you,

11  ladies and gentlemen, that this man was, just as it is alleged,

12  he was a puppet master.  He pulled the strings, you see.  He

13  could stand up from the top and look down.  When you're circuit

14  judge you can look down and pull the strings, and he pulled the

15  strings.  See, he doesn't have to be employed by, he's

16  associated with it in a way that relates to its affairs.

17          Doug Adams, how many witnesses do you-all recall

18  saying that Doug Adams was the most powerful man in Clay County?

19  How many?  Three, four, more?  How many do you recall?  Was he a

20  member of the Clay County Board of Elections?  No.  But if you

21  remember further in that conversation, Stivers and Jones, again,

22  they said, why did they not pick you, Wanda, they wanted to pick

23  Darnell?  She said, well, we did it to please Doug Adams.  We

24  wanted to put Darnell in there for Doug Adams.  See, these are

25  words out of their mouths; okay?  They're their members.

1   They're not our witnesses.  This is confessions, admissions out

2   of their own mouths that are telling you these men were involved

3   in this in a way that related to its affairs.

4          Witness after witness will tell you that Bart and Debi

5   Morris were there in 2002, 2004, 2006, operating the machine.

6   Vernon Hacker called it the headquarters.  Headquarters.

7   Stanley Bowling, Bobby "Red" Sams, he explained, yeah, they were

8   kind of on the outs with us initially.  You know, in 2002, we

9   weren't altogether on the same page.  See the racketeering

10  conspiracy, the conspiracy wasn't to elect Freddy Thompson, the

11  conspiracy wasn't to elect Kennon White, the conspiracy was to

12  control the political process of Clay County.  And just like any

13  other criminal organization, criminals just can't get along, you

14  see.  They don't always get along.  Does that make it no longer

15  a racketeering conspiracy if we don't get along all the time?  I

16  submit to you the law says no.

17         They were associated and according to Bobby "Red"

18  Sams, it all came together in 2006.  Wayne Jones and Stanley

19  Bowling made up.  We were all right there together.

20         Doug Adams was down there working with Bart Morris.

21  And you-all remember Jeff Deaton, he got extorted basically of

22  money by his boss, told him, look, man, you're going to run for

23  city council in Manchester, you're going to have pay 1,000

24  bucks.  Put it right here on the desk.  Put it right there.  Put

25  it right there on the desk.  See, the enterprise continues to

CLOSING ARGUMENT – MR. SMITH                          19

1    work, and it works by these associates, directed by these

2    associates, puppet masters, pulling the strings, the highest,

3    biggest employer in the county, Superintendent of Schools;

4    circuit judge, highest authority in the land in Clay County.

5              The United States must prove beyond a reasonable doubt

6    that the defendants knowingly reached an agreement.  Now, does

7    that have to be in writing?  Did they have to actually get down

8    and put on pen and paper, I, Doug Adams, I, Cletus Maricle, I,

9    Wayne Jones, I, William "Al Man" Stivers, I, Freddy Thompson, I,

10   Bart Morris, and, I, Debi Morris, and I, Stanley Bowling, we all

11   on this 1st day of March, 2002, hereby declare and present to

12   all men and women that we are in agreement?  No.  The

13   instructions say that there has to be an understanding at least

14   with one other person to participate, directly or indirectly, in

15   the affairs of the enterprise.

16             You see, there was not a mountain of difference here

17   between Jennings White and Freddy Thompson.  You know, there

18   wasn't –– the fact is we're all going to use every bit of the

19   power and energy that we can muster to control the Clay County

20   Board of Elections.  That's the overall goal.  The overall goal

21   is to control Clay County.  Jennings White was in the way.  You

22   see, we had Clay M. Bishop, you remember Clay M. Bishop, the

23   county attorney, we had him.  You know, he was there, Dick Woods

24   puts him right there at the meeting.  He's there.  So he's going

25   to switch his brother out, William Hugh.  You heard from him,

CLOSING ARGUMENT - MR. SMITH                    20

1  you judge his credibility.  We had him and we had Charles Wayne

2  Jones.  Okay?  The commissioner.  Okay?

3         Now, you ask yourself this question:  How did they do

4  it?  If Jennings White and Edd Jordan were so powerful, how did

5  they put Al Man Stivers and Paul Bishop, one of Doug Adams'

6  closest friends, to operate as elections officer in the absentee

7  of 2002?  How did they do it?  Because, again, we're all going

8  for the same goal, is to control the politics in Clay County

9  through the Board of Elections.

10         They had everything but the county clerk, and Wayne

11  Jones' son-in-law was going to be — was going to fit the bill.

12  Because once we had Freddy Thompson and his money, we're going

13  to take this thing.  And, again, reaching an understanding.

14  Reaching an understanding.  I submit to you that the

15  instructions will say a person may join without knowing all the

16  details and without knowing all the other members.  Further,

17  it's not necessary that a person agree to play any particular

18  part in carrying out that agreement.  A person may become a

19  member of that conspiracy even if that person agrees to play

20  only a minor part.

21         They say, well, Debi Morris didn't do that much in

22  this case, folks.  The law says playing a minor role, you're as

23  guilty as the rest of them.  She was ultimately important.  I

24  mean, you-all remember her role.  Her role was to make sure that

25  that money, this hundreds and thousands of dollars that we're

1  going to put out there and buy these votes and get this election
2  wrapped up for our people, we got to have insurance.  And what
3  does she do?  She kept the list.  Why did she keep a list?  She
4  kept the list to make sure they didn't pay people twice.  Vote
5  haulers or vote sellers, people we want to bribe for their vote,
6  we don't want to pay them twice, we're wasting our money.  So a
7  slight role, a minor role, you're still part of the agreement if
8  you have an understanding with at least one other person.

9          Did Debi Morris have to sit down with Doug Adams and
10  reach that agreement?  Absolutely not.  She and her husband
11  worked out those details.  The fact that she and her husband
12  worked out those details and never met with Doug Adams in 2002,
13  2004, or 2006, if that's what the evidence shows, makes no more
14  of a consequence under the law.  They're still as guilty of the
15  conspiracy as if they had sat with, as Dick Woods described, the
16  table with the Paul Bishops, because the evidence has shown that
17  they knew the overall purpose was to steal and to buy votes and
18  they voluntarily joined it.  See, I submit to you that those are
19  the requisite elements for a conspiracy.

20          It's further stated in the law and I submit to you the
21  instructions will tell you that a person used their position or
22  association with the enterprise to perform acts in some way
23  during the operation or management.  It goes right back to
24  Al Man Stivers saying, who's the daddy of this?  It's Cletus
25  Maricle and Doug Adams, we're doing this for them.  You know, I

1   know the law says that, you know, that the — you know, the

2   county Republicans and the county Democrats, they're supposed to

3   nominate and they're supposed to do this, but they've confessed

4   to you on tape, that's not the way it worked.  Who decides who

5   plays and who doesn't?  It's basically, again, an association of

6   the enterprise involved in the operation and management,

7   directly or indirectly.  And, again, it's reiterated again, an

8   enterprise may be operated not just by the upper management, not

9   just by Doug Adams and Cletus Maricle, no, it's also by the

10  lower-rung participants.

11          Again, if we go back to the definition of a RICO

12  conspiracy, the fourth element says that during the dates

13  alleged in the indictment that the persons, two or more of them,

14  came together for an agreement or understanding to conduct the

15  affairs of the enterprise, directly or indirectly, through a

16  pattern of racketeering activity.  Through a pattern of

17  racketeering activity.

18          In other words, I submit to you, what does that mean?

19  You must find that there were members of the conspiracy willing

20  to commit at least two acts of racketeering.  If you believe

21  from the evidence that these members came together with an

22  understanding that two people would be bribed for their vote in

23  Clay County in 2002, that's enough evidence under the law, I

24  submit to you.  Two acts, the defendants are in agreement, and

25  one of them, just one of them, just Bart Morris, assuming he was

CLOSING ARGUMENT - MR. SMITH                    23

1  the only one, said, I'll go two votes.  That's two racketeering

2  acts, that's enough to find you guilty under the law.  But we

3  know the case is much bigger.  We know the evidence is

4  overwhelming of the hundreds of people that were bribed for

5  their votes in 2002 and 2004 and 2006; hundreds.  So there's

6  hundreds of racketeering acts on the bribery alone.

7          There are other racketeering acts and we're going to

8  talk about those.  Again, acts that are related and not

9  isolated.  If they had similar purpose, participants, victims,

10 or committed in a similar way.  If there's anything in this case

11 that's uncontested, it's that we used the same people, we go to

12 the same hollers, we visit the same houses, we know who's going

13 to sell their vote, we go up in the hollers and we drag them out

14 election day or the early voting preferably when the FBI and

15 attorney general is not in town and where Debi and Bart and

16 Stanley can go on their trip to Gatlinburg, we'll get them in

17 for the early voting that 12 days before.  And what we'll do is,

18 we'll bring them all in and we're going to pay them and we're

19 going to bribe them to vote the way we want them to vote.

20 Again, a pattern of racketeering activity.  Year in, year out,

21 it's not going to stop.  It's not going to stop.  Why?  Because

22 the money keeps coming in and the votes keep getting bought and

23 we got to continue to control this county, and so we do it

24 through the enterprise, and this continuity goes over a

25 substantial period of time.

CLOSING ARGUMENT — MR. SMITH                    24

1          Cletus Maricle got up here and admitted to you-all
2     that he was vote buying in the '80s when he didn't have anything
3     on the line.  Kenny Day told you it's been going on since he was
4     17 or 18 years old.  Eugene Lewis said as long as he's ever
5     remembered they've been buying votes in Clay County.  They don't
6     know it's any different, folks.  They don't think there's
7     anything wrong, it's just the way things are in Clay County.
8     It's a continuity of acts over a substantial period of time.
9     And, again, a conspiracy, there would be a conspiracy violation
10    if there are only two.

11         One of the things that you're going to be asked to
12    consider based on the evidence is whether or not there were
13    multiple conspiracies.  Something that I suspect that you're
14    going to have to look at is, again, the instructions.  What we
15    have to show to convict any one of these defendants of
16    conspiracy in Count One is that they —— must convince you beyond
17    a reasonable doubt that the defendant was a member of the
18    conspiracy charged in the indictment.

19         See, if there was — if there was a conspiracy out
20    there that —— you know, to commit arson, to burn down the 9-1-1
21    Center, and you-all have heard some talk about that and
22    admissions of people who did get convicted of that, see, that
23    would be another conspiracy.  That's a separate conspiracy; all
24    right?  And what we have to convince you beyond a reasonable
25    doubt that the member was a member of the conspiracy in the

1    indictment; all right?

2          Now, let's assume this:  Let's assume that there were

3    some members of this enterprise and this conspiracy that were

4    involved in another conspiracy; okay?  Say, they were involved

5    in burning down a house in order to make way for the new 9-1-1

6    building.  There's not evidence of that, but let's assume that

7    there is, that one of these defendants were involved in that.

8    Would that preclude them from being guilty of this offense?  No.

9    I would submit to you that the law is going to say if a

10   defendant was a member of some other conspiracy, that it would

11   not prevent you from returning a guilty verdict if the

12   defendant -- the United States also proved that she or he was a

13   member of this conspiracy.

14         What are some factors that you look for?  Well, to

15   prove a single conspiracy, the United States, I submit to you,

16   must convince you that members agreed to participate in what he

17   or she knew was a group activity directed toward a common goal.

18         You see, as Kennon White and Bobby "Red" Sams and some

19   of the other witnesses who were intimately involved in the

20   scheme described to you, the ultimate goal was -- obviously was

21   to, again, control Clay County politics through this Board of

22   Elections, through this Clay County Board of Elections, the

23   enterprise.  And, of course, during this time period, their

24   membership had changed.  Bobby "Red" Sams said it wasn't

25   uncommon that on the night before the election that if one of

CLOSING ARGUMENT — MR. SMITH                    26

1   the candidates came up with more money than the other we would

2   drop him and put this one on.  You see it wasn't about —— the

3   conspiracy wasn't necessarily about who you got on the slate,

4   see.  They're going to argue to you that, well, now, let's see

5   now, 2002, there was a difference here.  And now let me show

6   you.  Jennings White was on a slate with Edd Jordan.  And now

7   Freddy Thompson, he was on a slate, and he had Roy Morgan.  And

8   Jennings White had James Garrison.  So, you know, these are

9   different conspiracies; right?

10          I submit to you the law says the fact that there are

11  subgroups operating in different places or many different

12  criminal acts committed over a long period of time does not

13  necessarily mean there were more than one conspiracy.  The

14  conspiracy was to control the elections through an enterprise

15  called the Clay County Board of Elections.  We had a

16  falling—out, but Bobby "Red" Sams helped you put it back

17  together.  He told you about Stanley Bowling and Wayne Jones and

18  them all coming together.  And then, of course, they all came

19  together when it came to the city council races.

20          You know, when Doug Adams wanted Jeff Deaton in as

21  city council member, it didn't matter that the Morrises had

22  maybe bought some votes on the other side.  You see, they had

23  these other agreements, you know, these side agreements.  You

24  know, when Stanley Bowling is down there, and Bobby "Red" Sams

25  says, down at Harts Branch we all reached an agreement.  You—all

CLOSING ARGUMENT - MR. SMITH                    27

1  remember that agreement.  You know, he's got his daughter-in-law
2  Crystal, and he's got Jackie Jones, the relative of Charles
3  Wayne Jones, down there operating Harts Branch, and so what are
4  we going to do with these voter assistance forms?  Well, we're
5  going to reach an agreement.  We're going to reach an agreement
6  that these voter assistance forms are just going to be thrown
7  away; okay?  You buy your votes, we buy ours, and we'll still
8  use this mechanism, Clay County Board of Elections will still
9  use the elections officers within it, we're going to control
10 what happens here, but we're going to fight it on our terms with
11 the enterprise; okay?

12         And, again, criminal groups have always had spats and
13 always had switching.  That doesn't mean there was more than one
14 conspiracy, I would submit to you.  What it means is there were
15 subgroups that were acting within this general premise of we're
16 going to control the elections through the Clay County Board of
17 Elections, we going to continue again to come back together in
18 and out.  You see it doesn't matter as long as we get what we
19 want.  As long as we can control Clay County through this Clay
20 County Board of Elections and our elections officers, that's
21 what matters.

22         The second count that you're going to recall from our
23 chart is this money laundering conspiracy.  And, again, these
24 are very important counts to the case of the United States and
25 to this indictment because they are conspiracy counts that

CLOSING ARGUMENT — MR. SMITH                    28

1    include all the defendants.  They include all the defendants.

2          Now, in a little bit, we're going to talk about those

3    racketeering acts that are also named, the bribery, the acts of

4    extortion, and the honest services mail fraud.  The conspiracy

5    that is alleged in Count 1 alleges that there were going to be

6    other, again, racketeering acts, the predicate acts, those

7    things that are actually in furtherance of this conspiracy,

8    included acts of extortion, acts of mail — honest services mail

9    fraud, and acts of bribery.  And I'm going to talk to you about

10   that in just a little bit about what those elements are.  But,

11   again, the Count 2 is the money laundering.

12         May I have just a moment to switch charts?

13         In order to find the defendant guilty of the money

14   laundering conspiracy under Count 2, you must find that he or

15   she agreed with at least one other person to violate the money

16   laundering statute.  First, you got to understand what does the

17   money laundering statute violation consist of?  See, the money

18   laundering conspiracy is similar to the racketeering conspiracy

19   and the conspiracy to commit vote buying and vote stealing that

20   you're going to hear about in Counts 10 and 11, that is,

21   generally the conspiracy, as defined by 1956(h), I would submit

22   to you, it requires that two or more persons agreed to try to

23   accomplish a common and unlawful plan, that the defendant knew

24   the unlawful purpose and joined it willfully, and that there was

25   at least an agreement that one or more would commit an overt

CLOSING ARGUMENT – MR. SMITH                          29

1    act, which is, I submit to you, not required by these

2    instructions.  It will be the evidence, however, that there were

3    multiple overt acts in this case, and you-all recall, again, the

4    testimony was essentially replete through each election cycle in

5    2002, 2004, and 2006, with this idea that we're going to put

6    together money and we're going to use it to buy votes.  And

7    we're going to look at the elements to see how is this a money

8    laundering violation?  How can an agreement to pool money to

9    bribe votes, to buy votes, be a money laundering conspiracy?

10           Again, there has to be this agreement.  Again, a

11   violation of the statute would consist of these elements, that

12   he conducted or attempted to conduct a financial transaction;

13   that the financial transaction involved the property that

14   represented the proceeds of bribery or extortion; and, third,

15   that the defendant knew the property involved represented the

16   proceeds of some form of unlawful activity; fourth, they had the

17   intent to promote or had to promote to conceal the nature and

18   location of the proceeds.  Now, again, that's a lengthy

19   definition.  We're going to take it piece by piece.  Again, we

20   got to look at these as individual elements.

21           When they had the meeting at Paul Bishop's, you know,

22   Mike Bishop told you about the meeting, Dick Woods told you

23   about the meeting, they all came together.  And when they came

24   together, they put together on the table over 140, $150,000,

25   depending on which estimate you use.  But Freddy Thompson told

CLOSING ARGUMENT - MR. SMITH                    30

1   Mike Bishop he put in 140,000.  Dick Woods said that he recalled
2   that Charles Marcum said all he could come up with was $10,000.
3   So there's 150,000.  And votes, as Jeff Farmer would tell you
4   and some of the others that bought those votes in 2002, ranged
5   from 50 on up per vote.  So there were a range of money that was
6   being exchanged and used during the course of this conspiracy.
7           So basically, according to the law, once those
8   proceeds are gathered together and put on that table with the
9   intent of committing voter briberies, that's state felonies to
10  bribe a person for their vote.  When that money is put on the
11  table, at that point it's unlawful proceeds.  Now, what that
12  means is those proceeds are derived from -- indirectly from a
13  form of unlawful activity.  You know, not to mention, you know,
14  Ray "Chipman" Adams, who just before 2002 gets approached by
15  William Stivers and Jeff Farmer, hey, buddy, you need to pony
16  up, you're going to pay to play here in this 2002 election, if
17  you're going to be magistrate, we need $6,000.  Or when Doug
18  Adams tells Kennon White, look, you want to be jailer in Clay
19  County in 2002, give us 60,000; okay?  Or later in 2004, Carmen
20  Webb Lewis is approached by Wayne Young and Al Man Stivers, you
21  pay to play, ma'am, you want to be a city council woman, you got
22  to pay to play in Manchester a thousand dollars each.  Where's
23  your money?
24          You see, this money is being brought together from
25  unlawful activity.  Once it's brought together, it's proceeds,

CLOSING ARGUMENT - MR. SMITH                    31

1   it represents proceeds, again, of unlawful activity, the phrase

2   "knew that the property involved in the financial transaction

3   represented the proceeds of some form of unlawful activity."

4   Okay?  It didn't necessarily, okay -- it's not required that all

5   this money be bad money.  You know, Freddy Thompson's dad could

6   have -- let's assume theoretically, his dad, owner of the

7   hardware store or business down in town, he could have

8   theoretically put some money of his into that campaign, and

9   say -- let's say Dad put in 50,000; okay?  Once that money is

10  put on the table and put there with the intent to bribe these

11  voters, it's unlawful.  I submit to you under the law it's

12  unlawful.  I expect the instructions will tell you such that

13  defines what those proceeds are, and I submit to it will read

14  something similar to this:  That the money the person intends to

15  use to bribe another becomes proceeds of a specified unlawful

16  activity when he gives it to a third party and the third party's

17  subsequent transfer of the money is a money laundering offense.

18          You see, when we accumulate that money there in 2002

19  and we put that in the hands of operatives, you see, they had to

20  deliver that money.  You know, Paul Bishop and his son, Mike,

21  had some.  They took it out to other parts of the county.  You

22  remember Dick Woods said that Yancey White, who was at the

23  meeting later the night before the election, met several of the

24  operatives in Clay County in the Bright Shade district, and he

25  paid Eugene Mills and some of those other people right there at

CLOSING ARGUMENT - MR. SMITH                              32

1  his place, he paid them out the money.  See, those are
2  subsequent transfers, those are financial transactions going
3  from one hand to another.  So there's a money laundering
4  offense.
5          The question is, when you go back to deliberate will
6  be, was there an understanding to accomplish this unlawful
7  purpose?  Did the defendant have knowledge and did the defendant
8  voluntarily join it?  Now, does a defendant have to put up money
9  and be shown to put up money to be part of the conspiracy?  I
10 submit to you no.  No.  What they have to do is they have to
11 have an understanding that this is what the money is going to be
12 used for and to voluntarily join it.  You see, they knew during
13 the course of 2002 and later in 2004 and 2006 that the means in
14 which we're going to distribute this money is going to change.
15 The fact that we do not show you that they had a meeting in 2004
16 at a table at Paul Bishop's in 2004 and Doug Adams presiding
17 over the meeting and Clay Bishop co-presiding over the meeting
18 that we haven't shown a money laundering offense, look, the
19 money laundering offense, the conspiracy, the agreement is just
20 like the conspiracy on the RICO, and I submit to you the law
21 would say that you can come in and come out of that conspiracy.
22 It can add members.  And during the course of this conspiracy,
23 was there an agreement between that time period, between 2002
24 and 2007, when they did reach an understanding?  And, again,
25 what their roles were and how they participated in that varied

CLOSING ARGUMENT – MR. SMITH                          33

1   from election to election.

2          In the council races, Bart and Debi Morris, they had

3   the safe, they took the money down there.  The candidates met at

4   their house, they would open up the safe, and they would start

5   doling it out, Deshae Henson, some of the Mary Gail Roberts,

6   some of those vote haulers, they would get them involved, Carl

7   Curry's, they would elicit them up at Beech Creek, Stanley

8   Bowling they would get him out at Harts Branch, we'll all come

9   together and we'll work together and do this.  And, again, this

10  was a common plan, a common scheme.  And, again, the money is

11  unlawful once it's put on the table.  The subsequent

12  transactions that occur later are financial transactions that we

13  have to show in order to prove that there was a conspiracy and

14  money laundering.

15         The three elements I submit to you that the Court will

16  instruct you on are as follows:  That we prove each of these

17  following elements:  First, that two or more persons conspired

18  or agreed to commit the crime of money laundering; second, that

19  the defendant knowingly and voluntarily joined it; and, third,

20  that the conspiracy took place, in whole or in part, in the

21  Eastern District between these dates of March '02 through

22  July 17th, '07.

23         Just like the previous conspiracy, it does not require

24  the proof of any formal agreement.  The United States must prove

25  there was a mutual understanding, either spoken or unspoken, and

CLOSING ARGUMENT - MR. SMITH                34

1    the agreement can be proven indirectly by facts and

2    circumstances which lead to the conclusion that an agreement

3    existed.  Again, just like the other conspiracy instructions,

4    this does not require proof the defendant knew everything about

5    the conspiracy or everyone else involved or was a member of it

6    from the very beginning.

7            See, the fact is some of these members were not at the

8    2002 meeting.  And one of your number may try and bring that up

9    and you need -- again, to reflect on the jury instructions, I

10   submit to you the law would say that's not required.  Simply

11   put, what the United States must prove is the defendant knew the

12   conspiracy's main purpose and voluntarily joined it intending to

13   help advance or achieve its goals.

14           You see, Stanley Bowling and Bart and Debi Morris,

15   there's no evidence they put money on that table.  So you're

16   going to say, how could they be involved in this money

17   laundering conspiracy if they didn't put money in there?  Well,

18   the instruction says that you must prove they knew the

19   conspiracy and voluntarily joined it intending to help advance

20   or achieve its goals.

21           Now, ask yourself, how did Bart and Debi and Stanley,

22   during this course of this conspiracy involving money

23   laundering, how was it they were able to advance or achieve its

24   goals?  They were ultimately involved.  They were very crucial

25   to the success of this, because what they were doing is they

CLOSING ARGUMENT — MR. SMITH                    35

1  were setting up the headquarters.  You know, Wanda White, Bobby

2  "Red" Sams, these witnesses that came in, they told you about

3  specific places in which they would operate from.  Wanda White

4  would haul voters.  See, she didn't know anything about the

5  political structure until about 2002 and then she got her

6  education.  She started out down on the low, you know.  Like

7  Cletus and Doug Adams, they didn't start out being puppet

8  masters, they started out down there buying votes like everybody

9  else as election officers.  Wanda started out even lower than

10 that, she started out hauling voters.  Bobby "Red" Sams, that's

11 his job.  Where they were going was they were going to the

12 Bowlings' garage and Morris's garage and there was the center of

13 activity where they were picking up voters, hauling them to the

14 polls, returning them and getting them paid.  Again, they're a

15 part of the conspiracy.  I would submit to you whether or not

16 they put one penny on the table, they were as ultimately

17 involved and responsible under the law as the man and woman or

18 women who might have put up tens of thousands of dollars.

19          See, each election it's been shown, it's

20 uncontroverted, that city council, there's eight members, and

21 they put 1,000, 2,000 every time.  You remember Judge Oscar

22 Gayle House, his wife, Sherri House, he would end up coming up

23 with a couple thousand every time.  He would pay it for his

24 wife.  Cletus Maricle would put up $500 every time, Penny

25 Robinson, with regard to his wife.  Carmen Webb Lewis was told

CLOSING ARGUMENT — MR. SMITH                    36

1   she better pay to play, and she didn't.  Others were approached.

2   How many, we don't know.

3        Again, whether or not those proceeds involved $1 or

4   $1 million in unlawful proceeds from extortion or attempts to

5   extort, again, when it was put on that table with the attempt to

6   bribe voters, it became unlawful.  And so the whole money

7   laundering conspiracy, again, continues to evolve and continues

8   to evolve into further financial transactions.

9        You know, I told you originally in our opening

10  statement that the money laundering conspiracy, it's not

11  required, I'll submit to you under the law, that we trace the

12  proceeds from these — you know, ultimately, how can you trace

13  the proceeds, how can you trace those dollars?  You know, those

14  50-dollar payments out to these voters, how can you trace that

15  back to the table at the Bishop's house?  It's not required, I

16  submit to you.  The law doesn't require us to trace those

17  proceeds, because the general understanding that this is the

18  goal, the conspiracy is accomplished.  Whether or not we trace

19  the proceeds or not — I submit to you that it would be easy.

20  It was possible in this case to trace the proceeds, and Agent

21  Sagrecy helped us to understand how that could be done in this

22  case.

23        And, again, ask yourself why would these people put

24  this money on the table?  Why would you, being a hardworking man

25  or woman down in Clay County, trying to be a potato chip driver,

CLOSING ARGUMENT – MR. SMITH                         37

1   selling potato chips, why would you be even enticed to put that
2   money up there?  Why would you do that?  Because, ladies and
3   gentlemen, these individuals convinced others that that was the
4   only way you could get in office.  And that's the way you're
5   going to get it back.  You see, you put your money in, as Al Man
6   Stivers and Wayne Jones came to Carmen Webb Lewis, you're going
7   to get it back, you see.  How are you going to get it back?
8   Well, the Bowlings and the Morrises, Mr. Bowling and Mr. Morris,
9   they were going to get it back through the contracts, you see?
10  If the city council is controlled, then we have our contracts,
11  we don't have to worry about getting approval, our people are
12  going be in, you scratch my back, I'll scratch yours and I'll
13  get a contract.
14          If you're in public office, like a circuit judge, you
15  may not have any competition.  Your salary will not be touched.
16  You know, it's not required that we show that the first salary
17  he drew in 1990 through every year thereafter was the proceeds
18  of this unlawful activity.  No, it was sustained by it.  Just
19  like Doug Adams, he sustained — you know, he got that job in
20  1999, and we didn't allege this conspiracy began in '99, we've
21  alleged it began in 2002.  But, see, when he went out to battle
22  Dobber Weaver for that board member seat for Charles Keith, the
23  chairman of the board, the reason he did that, I submit to you,
24  ladies and gentlemen, was to maintain, continue to draw that
25  salary.  Again, we can trace these proceeds back, and it's

CLOSING ARGUMENT – MR. SMITH                                      38

1    again, ask yourself the question, why are you going to put that
2    kind of money up if you don't expect it to be returned?  You see
3    it can change forms, that money can change forms, but ultimately
4    it comes back in my pocket, you see.  When I put $100,000 in,
5    I'm going to get a salary out.  And, you know, again, those
6    numbers were brought to you in evidence.

7           What kind of return on the investment did they make?
8    What kind of return on the investment did they make?  Well, you
9    can look around the board here.  Stanley Bowling, over
10   $1 million through B&B Excavating; William and Debra Morris,
11   over $1 million in sanitation contracts.  Total of $2 million
12   there.  Is it worth the risk to open my house up, bring Darnell
13   Hipsher and Vernon Hacker in, open it up as headquarters and let
14   everybody come into the operation and me handle the money, put
15   my wife into it and her checking off the list and keeping a safe
16   back there and taking the risk somebody is going to come in to
17   rob me?  Is it worth the risk?  Stanley Bowling, is it worth the
18   risk?  What about Freddy Thompson, $140,000 he put in there.
19   What did he get return on his investment?  Almost half a million
20   dollars.  Again, this is just the monetary part.  This is just
21   the monetary part.

22          What was their intention?  Their intention was, again,
23   to place this money on the table to bribe voters.  It became
24   unlawful proceeds.  It was understood that that money would have
25   future financial transactions.  I submit to you that under the

CLOSING ARGUMENT — MR. SMITH                    39

1   law it doesn't matter whether the evidence showed that it

2   ultimately traced back to a salary or contract, it became a

3   money laundering offense when they reached an agreement with the

4   purpose and plan in mind to bribe these voters in the upcoming

5   elections.  And this was something that was going to continue

6   election after election.

7            You know, you think, well, is there another money

8   laundering analogy that you can give?  Let's just talk about

9   Kenny — you remember Kenny Day?  Kenny Day talked about his big

10  drug operation, you know, up to two tons of marijuana he sold

11  out of Clay County there.  And sometimes he said, at its

12  optimum, highest level, he was selling that almost every two or

13  three weeks.  You see, a drug dealer and his money laundering,

14  their money laundering is to promote their operation.  You see,

15  how do they do that?  Well, when Kenny Day went to pick up that

16  load of marijuana from John Sherry or Rishdi Asam in El Paso,

17  Texas, and they brought it into Clay County and he took that and

18  said he paid a hundred thousand dollars for that shipment of a

19  hundred pounds of marijuana, I think he was paying a thousand

20  dollars a pound, selling it for 1400.  So then when he sells

21  that marijuana, then he takes back the profit and he goes back

22  and buys more dope.  That's a money laundering.  And it's a

23  continuing enterprise, it's a continuing operation, because what

24  he's doing is he's making a financial transaction, it's unlawful

25  proceeds when he sells it, he puts it back in the hands of John

CLOSING ARGUMENT — MR. SMITH                    40

1    Sherry or Rishdi Asam and buys more.  And that's what they did

2    in Clay County in these elections.  You go in and you —

3    basically you're going to collect money every election cycle.

4    You're going to fleece the flock, you're going to take their

5    money, and then you're going to pool it and you're going to make

6    bribes with it, and then you're going to have those voters vote

7    for your slate, and you're going to legitimize your illegal

8    enterprise, because you're going to prove that we can produce.

9    We can make you city councilwoman, Carmen Webb Lewis.  We can

10   make you or break you.

11          So what they do is they take that money in, and it's a

12   continuous cycle, over and over going again.  That money is

13   unlawful once it's pooled, financial transactions then result in

14   voters bribery —— voters bribed, and once they vote the way

15   they're supposed to and ensured by the election officer, then

16   what happens?  The city council, Vernon Hacker and Darnell

17   Hipsher, and guess what happens?  When Bart Morris's contract

18   comes up, guess what happens?  Vernon Hacker and Darnell Hipsher

19   are first and second motion to approve, the contract comes

20   through, and what happens?  The money changes form and it

21   becomes a contract and ultimately the Morrises end up over time

22   with over $1 million.  By controlling the political process,

23   they ultimately controlled who's paying the bills, who's paying

24   our salary, who's paying our contracts.

25          If we go back to the racketeering, in a racketeering

CLOSING ARGUMENT — MR. SMITH                    41

1    enterprise, we are required under the law to show that there was

2    a conspiracy or agreement to violate the racketeering law, and

3    in that there were enumerated in Count 1 the object of that

4    was — or one of the predicate acts of that was the honest

5    service mail fraud.  That's also Counts 3, 5, 6, and 7 on our

6    chart.  Counts 3, 1341, 1356, Count 5, 6, 7, those are the

7    counts we're concerned with the honest services mail fraud.

8    And, again, we have — anticipate that the Judge will give you

9    the instructions that will follow along these lines, saying that

10   you must be convinced of the following elements:  First, the

11   defendant knowingly advised or participated in a scheme to

12   fraudulently deprive the citizens of Clay County the right to

13   honest services as a member of the Board of Elections and the

14   County Clerk, using the following manner or means; participating

15   with others in pooling funds for the purpose of buying votes,

16   instructing election officers to buy votes, and marked voters or

17   present tickets to voters for purposes of identifying voters who

18   had sold their votes; three, instructing election officers to

19   assist voters who sold their votes and to destroy voter

20   assistance forms which may have resulted, and assisting in the

21   preparation of an election report which falsely reported as

22   fraudulent — as valid fraudulent vote totals in the county to

23   the Kentucky Secretary of State and the Kentucky Board of

24   Elections; Second, that the defendant so willfully with the

25   intent to defraud; and, third, the defendant used the United

1   States Postal Service by mailing or by causing to be mailed for

2   the purpose of executing the scheme.

3          First of all, I point out to you that under the law

4   it's not necessary that the United States prove all of the

5   details alleged in the indictment concerning the precise nature

6   and the purpose of the scheme or that the material itself was

7   false.  What must be proven is that the defendant, with the

8   specific intent to defraud, knowingly devised, intended to

9   device, or participated in a scheme to defraud substantially the

10  same as the one alleged in the indictment, and the use of the

11  mail was closely related to the scheme.  Each separate use of

12  the mails in furtherance of the scheme constitutes a separate

13  offense.

14         Also, you can find the defendant guilty of this

15  offense if they were an aider or abettor, and that is that the

16  crime occurred, that the defendant helped to commit the crime,

17  and, third, that the defendant helped or intended to help.  And,

18  again, proof the defendant may have known about it, even if he

19  was there when it was committed, is not enough.  You can

20  consider this in deciding whether the United States has proved

21  he was an aider and abettor, but without more, it is not enough.

22         Let's talk about that offense as it pertains to our

23  case.  Obviously, during the course of the testimony in this

24  case, there were forms such as this that had been introduced,

25  this is Exhibit PK87 — PR - Thank you.  — which involved the

1    November 2004 election.  And we look at this form, they're going

2    to follow closely along.  So we'll look at this one, there's one

3    in May of '04, November of '04, May of '06, and November of '06,

4    and that tracks the indictment as alleged.  And, again, what was

5    it about these forms that were fraudulent?  What is that makes

6    this an attempt to defraud?  Well, obviously, the absentee

7    voting totals, the machine votes, absentee votes.  The absentee

8    votes are going to cover all candidates; okay?  So in the course

9    of the closing out the absentee votes, those votes would have

10   been important because they were a product of the corruption and

11   of the fraudulent scheme.  You see, when we're going in 2004 —

12   After 2002, members of the organization were very suspect about

13   law enforcement.  There had been multiple incidents.  You-all

14   recall shootings at Jennings White, shooting at Freddy

15   Thompson's beside his house, there had been occasions where the

16   Attorney General's Office had been called, Todd Roberts brought

17   some of them down and escorted them around.  The photographs had

18   been taken by Todd Roberts and sent to the FBI office in 2002.

19   Word had gotten around town that we're going to have to do

20   something about these absentees.  And so what the membership of

21   the enterprise decided is, Mr. Al Man Stivers and Charles Wayne

22   Jones leadership in the Board of Elections, they basically will

23   tell their corrupt officers you need to destroy your voter

24   assistance forms.  You see, these men who helped Freddy Thompson

25   get in office, father-in-law Charles Wayne Jones had after

CLOSING ARGUMENT — MR. SMITH                    44

1   Freddy gets elected total and complete control.  When you
2   consider now they have the chairman of the board, Freddy
3   Thompson; Charles Wayne Jones, Democratic commissioner, they
4   control because he had the tiebreaking vote.  So ultimately, the
5   success of this operation continued, because when Freddy gets
6   put on it's basically you scratch my back, I scratch yours.  You
7   know, Freddy Thompson, if you believe the evidence is going to
8   show that he reasonably knew that this scheme that he got in
9   office or was going to continue to perpetuate and get these
10  choice members of this group elected in 2004 and 2006, then it's
11  reasonably foreseeable that when I sign off on this form it's
12  going to be corrupted by false voter totals.  And that's what we
13  have here, absentee voter totals were corrupted in each of these
14  elections, the evidence supported that, and, therefore, when he
15  signs and certifies this along with Charles Wayne Jones, I would
16  submit to you, ladies and gentlemen, that they have committed
17  the crime of honest services mail fraud.  Now, that is, again,
18  an element of the offense that you're going to have to look at
19  for each of these offenses.  There's May of '04.  And during —
20  again, the certification of these results would also certify
21  state and federal offices.  And then, of course, the absentee
22  ballot paper ballots.
23          You see, that was part of the scheme too, and it's
24  important that you—all — and I know you recall Kennon White's
25  testimony about how they would use the paper ballots.  You see,

CLOSING ARGUMENT – MR. SMITH                    45

1  Bart Morris and Darnell Hipsher would go up to Freddy's office
2  and they would find out who was getting their mail-in ballot
3  requests, they would go and they would bribe the voter to give
4  me an open ballot.  You say, what's an open ballot?  Well, we
5  take those mail-in ballots and you have the voter, you would pay
6  them and they would sign at the bottom saying that's my vote,
7  and then they would take them over to Bart's house and stack
8  them up on the table, and you remember Kennon said at one point
9  they had a stack of them, said, here vote some for your daddy,
10 you want to?  They had them all stacked up.  How many he
11 couldn't number.  But the fact is your mail-in ballots were
12 corrupted in these elections, and that was part of the MO.  The
13 method of operation of this group was to, again, corrupt the
14 process through not only the only machine, and that was vital to
15 the success of this enterprise, it was important that we focus
16 this election and control, because what was so important about
17 the absentee?

18        You-all recall that one of the things that was pointed
19 out in the testimony was that you had 20 precincts in Clay
20 County.  If we have in 2004 William "Al Man" Stivers and Charles
21 "Dobber" Weaver, the Democrat and the Republican judge, and
22 they're seated down at the County Clerk's Office, we can work
23 all 20 precincts, we only have to control two officers.  You
24 talk about bang for your buck.  We can control the whole county
25 with two officers operating the early voting, because it's the

CLOSING ARGUMENT - MR. SMITH                    46

1    check and balance.  See, Democrat and Republican doesn't mean a

2    whole lot when it's corrupted.  Because when you got Wanda White

3    as the Democrat and Charles "Dobber" Weaver as the Republican

4    and you control both of them, who's watching the henhouse?  The

5    fox is.  The fox is watching the henhouse.  Because when we

6    bring them in to vote them, when Charles Wayne Jones and Al Man

7    Stivers works their organization and gets the people coming in,

8    you're going to vote them, vote them the way the organization

9    tells you to.  When you're going to send out these ballots,

10   again, when you're going to certify these results, who's

11   certifying them?  Freddy Thompson and Charles Wayne Jones.  May

12   '04, Freddy Thompson, Charles Wayne Jones.  November, '04,

13   Charles Wayne Jones, Fred Freddy Thompson.

14          You're going to say, well, you-all didn't charge

15   everybody in this case.  What about these people like -- you

16   know, there's Clay M. Bishop there and you-all made some pretty

17   -- your witnesses made some pretty strong statements about he

18   hauls them in there.  And there's been other witnesses that are

19   unindicted in this case.  I submit to you the law and the

20   instructions will tell you within the Judge's instructions that

21   everybody that's involved in this conspiracy doesn't have to be

22   on trial in this case.  The fact that they had a part to play in

23   this, I submit to you, the law will tell you it is not a factor

24   for you to consider.  You're to consider the evidence and these

25   defendants and not these uncharged ones.

1          This is '02, it's not one of concern, because '02 is

2    not charged.  There's May of '02, it's not a concern, it's not

3    charged.  May of '06, PR92, again, what do we have here?  We

4    have certification on May of '06.

5          Now, this is an interesting one, too, because Charles

6    "Dobber" Weaver and Wanda White, I recall in their testimony and

7    you'll recall what the testimony is, but Gary Gregory, the

8    Commonwealth Attorney, you know, the one who was charged with

9    prosecuting the serious crimes up there in Cletus Maricle's

10   court, he was included on that slate.  And his race would be

11   certified, just like Judge Maricle's was in 2006, and that's

12   unopposed.  But the fact of the matter is, this vote total in

13   May of '06 would have been a product of this fraudulent voter

14   fraud scheme, as well as paper ballots, absentee voter machine.

15   November '06, again, using those same figures, Charles Wayne

16   Jones, Freddy Thompson, certifying those results.

17          There's an alternate theory of liability that's

18   also — I expect you will have an instruction, and that is

19   callid the *"Pinkerton* liability,"* and simply put what that is,

20   if one or more of these — two or more of these individuals are

21   involved in the conspiracy and it's reasonably foreseeable that

22   this is going to be part of that conspiracy, they can be

23   responsible for it.  It says here that in addition to convincing

24   you that a defendant personally committed or participated in the

25   crime or that he aided and abetted the crime, the United States

1  may also prove the defendant guilty based on a legal rule that

2  all members of the conspiracy are responsible for acts committed

3  by other members as long as those acts are committed to help

4  advance the conspiracy and are within the reasonable foreseeable

5  scope of the agreement.

6          You see Freddy Thompson did not have to be down there

7  actually buying the votes to be guilty of this offense.  What

8  has to be shown is, is that he was a member of the conspiracy,

9  that he had foreseeability.  Is it reasonable for him to foresee

10 that as part of his duties on the Clay County Board of Elections

11 and as County Clerk that he's going to be certifying results his

12 father-in-law had corrupted through the means of buying these

13 votes?  So, again, that's all that's required.  Freddy Thompson

14 did, in fact, I believe the evidence will support and did

15 support, mail these to the Secretary of State.  Beverly Gray,

16 his deputy clerk, recalled that the person who took them to the

17 mailbox was Freddy Thompson.

18         And those elements under, again, first, that the

19 defendant was a member of the conspiracy; second, that after he

20 joined the conspiracy and while he was still a member of it, one

21 or more of the other members committed the crime of mail fraud;

22 and, third, the crime was committed to help advance the

23 conspiracy; and, fourth, it was within reasonably foreseeable

24 scope of the unlawful project.  The crime must have been one the

25 defendant could have reasonably anticipated as a necessary and

1  natural consequence of the agreement.

2          Again, there's evidence in the record to support, I

3  submit to you, ladies and gentlemen, that when Freddy Thompson

4  agreed to join on this illegal enterprise he bought it for what

5  it was worth.  He's County Clerk, it's the most important

6  pivotal position on the Board of Elections, and when he did it,

7  the question you got to ask yourself, was it reasonably

8  foreseeable to him that the operation which got him in office

9  was going to continue until '04.

10         Now, in '06, he was intrinsically involved, because he

11 and Charles Wayne Jones coached the election officers on how to

12 steal the votes on the machine.  So he's participating

13 intimately in accumulating fraudulent results.  He's in it

14 participating personally in 2006 according to the evidence, I

15 would submit to you, and, therefore, his involvement in that

16 2006 election would be hands-on.  The reasonable foreseeability

17 is actual foreseeability.  He was involved in coaching the

18 election officer in how to steal the votes.  So we have, again,

19 a circumstance there where, again, the evidence will support as

20 the instructions require.

21         Count 4.  Count 4 has a similar provision under the

22 *Pinkerton* theory.  I'll not go over that again.  But, again, the

23 same elements of *Pinkerton*, that is, was Charles Wayne Jones and

24 Al Man Stivers, they either could be guilty by personally

25 committing it themselves or by being part of the conspiracy and

1  reasonably foreseeable to them when they joined it that this act

2  was going to be performed by one of them.

3       You recall the evidence in the case, of course, and

4  the elements that are required are that the person knowingly

5  attempted to obtain property or money, in this case from Carmen

6  Webb Lewis;

7       Second; the defendant did so by means of extortion, by

8  use of fear, okay, that's one theory; or under color of official

9  right, that's a second theory as those terms are defined.  We'll

10  look at those;

11       Third, that the defendant believed that Carmen Webb

12  Lewis would have parted with the money because of the extortion;

13       And, fourth, that the conduct of the defendant

14  affected or would have affected or had the potential to affect

15  interstate commerce.

16       Now, the first element, uncontested.  The defendants

17  knowingly attempted to obtain Carmen Webb Lewis's money.  She

18  testified that when she was running in September of 2004 for the

19  first time for office for city council that she was approached

20  approximately two or three times and her husband was approached

21  as well, and each of those occasions she was told by Mr. Stivers

22  and Mr. Jones being present and at points she believed

23  reiterating and reemphasizing, the point was you pay to play.

24  She's like, what are you talking about?  And it was further

25  explained, it's a thousand dollars.  If you want to be on the

1  city council, you're going to have to pay to play.

2          Let's look at what extortion means, by the use of fear
3  or under control of official right.  The first theory defined by
4  the instructions will follow something like this, I expect:
5  Attempted extortion under color of official right occurs when a
6  public official attempts to obtain money to which he or she is
7  not entitled.  The question you got to ask is, was Charles Wayne
8  Jones a public official?  Sure he was.  It's uncontested.  He
9  was the Democrat commissioner for the Clay County Board of
10 Elections.  Was William "Al Man" Stivers a commissioner?  Yes,
11 he was, he was an election officer working within the Board of
12 Elections.

13         Now, the question is, is that money which they're not
14 entitled?  Absolutely.  It's uncontroverted.  They were not
15 entitled to candidates paying them money to get in office.  It's
16 nowhere defined in the statute and no one can argue that, it's
17 against common sense.

18         And was it in return for them taking, withholding, or
19 influencing official action?  Well, if you're on the Board of
20 Elections and the setting in which these people portrayed it to
21 her, it was you pay to play.  You do not get elected unless you
22 pay us to play.  Okay.  So, again, they're acting in the
23 official capacity of the Board of Elections, they're telling
24 her, you don't -- you don't participate, you're not going to be
25 a city councilwoman unless you pay us.

CLOSING ARGUMENT - MR. SMITH                    52

1          What's the other theory?  Attempted extortion by fear
2   means, okay, you can either find these two defendants guilty
3   under the theory that they were acting under color of official
4   right or that they attempted by extortion, by fear, which means
5   the wrongful use of fear to attempt to obtain money or property.
6   Wrongful means the defendant had no lawful right to the money or
7   property.  Fear includes the fear of economic loss, a direct
8   loss of money or harm to future business, or fear of some
9   ability to compete in the marketplace.

10          So when Carmen Webb Lewis explained to you-all that
11  she was under an -- extorted by fear, I would submit to you she
12  didn't use those terms, but she explained to you that this was
13  going to be a circumstance where she had the fear of economic
14  loss.  You say, well, how was economic loss?  Well, I think the
15  evidence will establish that these candidates were campaigning,
16  were spending money, were trying to get elected.  Was there
17  future harm to her in the future to compete in the marketplace
18  as another candidate or a candidate of city council or later
19  mayor?  Absolutely.  These individuals were using this.  And was
20  it reasonable?  You decide.  The United States must prove the
21  victims here would have been reasonable under the circumstances.
22  Was it reasonable for Carmen Webb Lewis to fear these men, if
23  she didn't pay, she couldn't play?  I submit to you that's what
24  the instructions will require.

25          And, again, that interstate commerce, does it have the

CLOSING ARGUMENT — MR. SMITH                    53

1  potential, not did it affect interstate commerce, but did it

2  have the potential to affect interstate commerce?  And I would

3  submit to you that the law as instructed will say, this means

4  the natural consequences of a defendant's actions would have had

5  some effect on interstate commerce, however minimal.  However

6  minimal.  That is what's the instruction.  And, again, what does

7  city council — she explained how they have to approve these

8  contracts funded by federal agencies such as PRIDE, such as the

9  Rural Development Fund we've heard about, such as the other

10  projects that were funded during the course of this city

11  government.  There were continuously contracts that were coming

12  up of a federal nature.  Did it have the potential?  I would

13  submit to you absolutely.  Even so minimal, however minimal that

14  is.  The instructions don't further define that, it says

15  "minimal."  And, again, the *Pinkerton* theory of liability can be

16  used by you on this instruction as well.

17          And understand that this is an attempt; okay?  It's

18  alleged that it's an attempt.  All right.  An attempt is not a

19  complete act.  The fact that they never got the money from her,

20  that's not required by the law, I submit to you.  The fact that

21  they had the intent to get the money and made a substantial step

22  towards getting that money, that does matter.  And I submit to

23  you it is an attempt, it was never alleged that she gave the

24  money, she never testified she gave the money, and she never

25  testified that she lost the race, she won the race by four

CLOSING ARGUMENT — MR. SMITH                    54

 1  votes.  Does that mean there was not an attempt to extort money

 2  out of her?  I submit to you, no.  The instructions don't

 3  require that that has to be successful.  The success of that

 4  attempt at extortion is not something you need be concerned

 5  about.  It's the fact that they did make that attempt.

 6          Were there evidence of other candidates being

 7  approached by these?  Absolutely.  You heard Ray "Chipman"

 8  Adams, the man who had worked 30 years for Frito Lay and wanted

 9  to be a magistrate over there in Clay County, he got approached

10  by William Stivers in 2002, and what was he told?  You got to

11  pay to play.  Said, if you want on the ticket, you got to pay me

12  $6,000.  And Chipman Adams said, I didn't agree.  I didn't

13  agree.  But, again, continuously repeating of itself over and

14  again throughout the cycle of this conspiracy were these acts

15  that we have defined.  Under Count 4, it is the attempt to

16  extort.

17          Count —

18          THE COURT:  Mr. Smith, we're going to take a break

19  whenever you get to a good stopping point.

20          MR. SMITH:  Okay.  I'm starting on new counts, so this

21  may be a good point.

22          THE COURT:  All right.

23          Ladies and gentlemen, we will take approximately a

24  ten-minute recess.  Please keep in mind the admonitions that you

25  have been given previously.  The jury will be excused for ten

CLOSING ARGUMENT - MR. SMITH                    55

1  minutes.

2      (Whereupon, the jury retired from the courtroom, after which

3  the following proceedings were had in open court.)

4          THE COURT:  We'll be in recess until 3:10.

5      (Whereupon, a short recess was had for the noon hour, after

6  which the proceedings continue uninterrupted to Volume 29-B.)

7              (Proceedings concluded at 3:00 p.m.)

8

9              C E R T I F I C A T E

10     I, Cynthia A. Oakes, certify that the foregoing is a

11  correct transcript from the record of proceedings in the

12  above-entitled matter.

13

14  3/22/2010                    s/CYNTHIA A. OAKES
       DATE                      CYNTHIA A. OAKES, RPR, RMR, CRR
15

16

17

18              I N D E X

19                                           PAGE

20  Closing argument on behalf of the Government
       By Mr. Smith:                            5
21

22

23

24

25