United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09-16-S |
|   vs. | ) |
| | ) Frankfort, Kentucky |
| RUSSELL CLETUS MARICLE | ) March 23, 2010 |
| DOUGLAS C. ADAMS | ) 12:36 p.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM E. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) VOLUME 30-C |
| STANLEY BOWLING | ) |

TRANSCRIPT OF CLOSING ARGUMENTS
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States:  STEPHEN C. SMITH, ESQ.
                                 JASON D. PARMAN, ESQ.

On behalf of the Defendant       DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:          MARTIN S. PINALES, ESQ.
                                 CANDACE C. CROUSE, ESQ.

On behalf of the Defendant       R. KENT WESTBERRY, ESQ.
Douglas C. Adams:                KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant       T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant       ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant       RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:              R. TUCKER RICHARDSON, III, ESQ.

On behalf of the Defendant       JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant       ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant       DANIEL A. SIMONS, ESQ.
Stanley Bowling:

```
 1  Appearances of Counsel:

 2  On behalf of the United States:  STEPHEN C. SMITH, ESQ.
                                     JASON D. PARMAN, ESQ.
 3                                   Assistant U.S. Attorneys
                                     601 Meyers Baker Road
 4                                   Suite 200
                                     London, Kentucky  40741
 5

 6  On behalf of the Defendant       DAVID S. HOSKINS, ESQ.
    Russell Cletus Miracle:          107 East First Street
 7                                   Corbin, Kentucky  40701

 8                                   MARTIN S. PINALES, ESQ.
                                     CANDACE C. CROUSE, ESQ.
 9                                   150 East Fourth Street
                                     Federal Reserve Building
10                                   Cincinnati, Ohio  45202

11

12  On Behalf of the Defendant       R. KENT WESTBERRY, ESQ.
    Douglas C. Adams:                KRISTEN N. LOGAN, ESQ.
13                                   220 West Main Street
                                     Suite 1900
14                                   Louisville, Kentucky  40202

15  On behalf of the Defendant       T. SCOTT WHITE, ESQ.
    Charles Wayne Jones:             133 West Short Street
16                                   Lexington, Kentucky  40507

17

18  On behalf of the Defendant       ROBERT L. ABELL, ESQ.
    William E. Stivers:              120 North Upper Street
19                                   Lexington, Kentucky  40507

20  On behalf of the Defendant       RUSSELL JAMES BALDANI, ESQ.
    Freddy W. Thompson:              R. TUCKER RICHARDSON III, ESQ.
21                                   300 West Short Street
                                     Lexington, Kentucky  40507
22

23  On behalf of the Defendant       JERRY W. GILBERT, ESQ.
    William B. Morris:               212 North Second Street
24                                   Richmond, Kentucky  40475

25
```

```
 1
 2   On behalf of the Defendant        ELIZABETH SNOW HUGHES, ESQ.
     Debra L. Morris:                  201 West Short Street
 3                                     Lexington, Kentucky   40507

 4   On behalf of the Defendant        DANIEL A. SIMONS, ESQ.
     Stanley Bowling:                  116 West Main Street
 5                                     Suite 2A
                                       Richmond, Kentucky   40475
 6

 7   Court Reporter:                   CYNTHIA A. OAKES, CRR
                                       Official Court Reporter
 8                                     United States District Court
                                       560 Athens Boonesboro Road
 9                                     Winchester, Kentucky   40391
                                       (859) 983-4346
10

11

12

13

14

15

16

17

18

19

20

21

22
     Proceedings recorded by mechanical stenography,
23   transcript produced by computer.

24

25
```

1          (Whereupon, the jury returned to the courtroom, after which

2    the following proceedings were had.)

3               THE COURT:  Thank you.

4               All members of the jury are present.  The parties and

5    counsel are also present.

6               Mr. Richardson, you may continue with your argument.

7               MR. RICHARDSON:  Thank you, Judge.

8               I want to talk to you about smokescreens now first.

9    Smokescreens in 2002.  Freddy Thompson put $140,000 in the pot.

10   $140,000.  Him and his dad owned a little hardware store in one

11   of the poorest counties in the state.  Yet on 2002, he's got

12   $140,000 to throw into a pot on an election that pays for a

13   60,000-dollar-a-year job.  You know, the FBI has a lot of

14   powers, subpoena powers, grand jury powers, bring those bank

15   records to me.  We got a Jeff Sagrecy, the financial crimes

16   expert to go through there and go, all right, here's where it

17   is.  There, withdrawal, yeah.  Where is Freddy Thompson going to

18   get $140,000?  Mike Bishop told you that's what Freddy told him

19   he put into the pot.  Mike Bishop has a motive to lie.  He got

20   immunity.  Uncorroborated testimony.  That is smokescreen.

21              2004 smokescreen.  Glen Rowland.  We talked about Glen

22   Rowland in the fact that on 2004 the election officers were

23   picked.  The election officers were picked from the precinct

24   captains who sent their selection in, they took one and two, and

25   on the Manchester precinct, a Democratic judge, a guy named

1  Larry Henson.  Larry Henson did not show, and so Don Nolan, who

2  is the Democratic chair person for the County, not on the Board

3  of Elections, gets Glenn Rowland to become the — become the

4  Democratic person.

5        I was afraid of this.  In my office it didn't look too

6  good, and it don't look good there.  PR16M, this is the Board of

7  Election minutes from 2004.  And basically, you look up there at

8  the top left at the first precincts that are done, you'll see

9  Larry Henson is the judge if you look at it.  And that's marked,

10 I think, March 19th, 2004.  And flip to the next page and you'll

11 see on the alternates on the right there toward the bottom,

12 you'll see Glen Rowland is an alternate and Al Man Stivers is an

13 alternate.  Glen Rowland — or Larry Henson doesn't show up.  So

14 Don Nolan gets Glenn Rowland to come, and Wayne Jones, who's on

15 the Board of the Elections, gets Al Man to come, and they both

16 show up at Manchester at that point, and there's some confusion

17 about who's supposed to serve.  And Glen Rowland says, well, I

18 think I'm going to call Freddy first just to make sure.  And

19 Freddy's response is, quote, what a mess.  Glen Rowland

20 volunteers to go home, so — and then Freddy says I'll pay you

21 because you showed up at 5:30 in the morning, so that's not a

22 problem, being the good guy he is.  And they are saying this is

23 their example of manipulating election officers.

24        It's not manipulation, we've heard from — it's hard

25 to get election officers, you know, it's just a mess.  You got

1   to coordinate about 80 people to get someplace at 5:30 in the

2   morning on election day.  I don't want that job.

3          But Glen volunteers to go home, Freddy says, what a

4   mess.  If the Board of Elections truly controlled where they

5   wanted their election officers, if they wanted Al Man as an

6   election officer, why not put him there in the first place?

7   Simple as that.  I note that they didn't have Don Nolan come and

8   testify and tell you that there was a sinister motive.  They

9   want you to think there's a sinister motive.  It's just a

10  mix-up, folks.  Freddy didn't have anything to do with it,

11  they've never proven that, it's a smokescreen.

12         2006, the next one, you'll see that last thing is

13  where they took Larry Henson and said, hey, he's a no-show, they

14  put him on the absentee report.  I think that came out too.

15  That's also in PR16E.

16         2006, the ESS letter.  This is a letter that came from

17  that fellow and they talk about all the precincts and it was

18  Colleen Haack was the person who came and said that they had

19  this training.  And the ESS system stands for Electronic Records

20  and Management Program or something.  It's a software program

21  that ESS has designed to go along with these machines.  This

22  supposedly makes it so much easier to tabulate the totals.

23  Sometimes those things don't work.  They got it there in May, a

24  couple weeks before the election, and they had this training and

25  then they're going, this is a mess, they couldn't get it to --

1  they had a different machine for the absentee voter machines and

2  they were trying to bring them altogether and it didn't work.

3  But the bottom line is — And this is PR30A and PR91.  The

4  bottom line is, is at the end of the voting, the election

5  officers total the machine in their precinct.  There's 20

6  precincts.  All four election officers sign the election returns

7  and deliver them back to the County Clerk.  Every one of them

8  puts in there the vote totals for their precinct.

9          This is an official return mailed to Frankfort that is

10  an honest services mail fraud.  This is the thing that's mailed

11  to Frankfort.  Certificate, official count of records of

12  election totals for November '06.  So they get the vote totals,

13  put it in there, send it to the County Clerk's, and the County

14  Clerk has to count each precinct, add up the absentee votes, and

15  add up in the absentee machine, so there's actually 21 tapes,

16  and then the paper ballots.  And then they put that result right

17  there.  And it says that Renee Muncy got a total votes of 3957

18  in November of '06.  They have — the United States has all the

19  election records, all these public documents.  If they took

20  those 21 tapes, the absentee machine included, and the absentee

21  paper ballots and added them up and they didn't come out to that

22  correct total, 3957, you would have heard about that.  You would

23  have heard about that.  And all that ERM system is supposed to

24  do is make it easier to get the 3957.  They did it by hand.  And

25  Sarah Ball Johnson says as long as you get the total votes

CONTINUED CLOSING ARGUMENT - MR. RICHARDSON          8

1  counted, it doesn't matter how it happened.  This is a

2  smokescreen, folks.  They brought this lady in here from ESS

3  just to say they are trying to manipulate something.  Did they

4  show you they manipulated anything?  No, they did not.  It's a

5  smokescreen.

6        Come back to '06.  Absentee ballots, they want you to

7  think they brought all the absentee ballots, they want you to

8  think that it's something sinister and dirty on Freddy because

9  there's a bunch of absentee ballots.  If a voter walks into

10 Freddy's office and signs a verification or calls on the phone

11 and asks — requests an application and mails that application

12 back and says, I'm going to be out of town, Freddy is obligated

13 to give them a vote — an absentee ballot.  He has no choice in

14 the matter.  They are verifying that they are going to be out of

15 town, Freddy is not supposed to go, where's your plane ticket,

16 where are you going to be?  If a voter wants an absentee ballot,

17 he's obligated to give them one.  So they want to make it sound

18 like Freddy's sinister because there's a lot of absentee

19 ballots.  That's not Freddy's fault, there's nothing he can do

20 about that.

21       Now, they also — they said that some people were

22 sending in absentee — calling and requesting an application for

23 a ballot, he would mail them the application, they would mail

24 the application in signed and certified, and then they would

25 mail them the ballot.  And when they got the ballots, supposedly

1 | some other people were filling them out and mailing them in.
2 | Well, if Freddy's involved with this grand scheme, then why
3 | doesn't Freddy just give them a stack of absentee ballots and
4 | say, just fill them in when you want, just fill them in when
5 | you're voting. They got all those forms. If those applications
6 | weren't there, we would have heard about it. Once again, this
7 | is a smokescreen, folks. They're wanting a sinister cloak to
8 | throw over Freddy Thompson, and it's not there.

9 |        Hiring, hired Melanda Adams. When Freddy took his
10 | office, Beverly Gray said he kept everyone of us, didn't fire
11 | anybody. They were Jennings White people, Freddy kept them all.
12 | Two years later Samantha Smith quits to go back to school.
13 | Melanda is coming out of drug rehab, Freddy, the nice guy he is,
14 | gives her a hand up. Not a handout, a hand up. She's one of
15 | the lowest paid, she starts at the bottom, she doesn't have a
16 | cushy job given to her. She does a good job in the Clerk's
17 | Office, she's coming clean, she's thankful for the break. And
18 | now, 2010, there's a sinister motive for that. Sometimes people
19 | need a hand up, and Freddy's gave that hand up and now he's
20 | getting punished for it. You know, I would like to point out it
21 | didn't happen immediately. It was two years later, somebody
22 | quit, he filled that position with her.

23 |        Complaints. That is another smokescreen. Here in
24 | 2002, we've got 63, leads the state. Freddy is not in office,
25 | Freddy has no control over that, yet that's part of his — that

1  cloak of sinisterness.

2          Come to 2004, seven complaints.  Do we get credit?

3  No.  No.  That's not good.  Come to 2006, 104 complaints.  I

4  agree that's a lot of complaints, big jump.  Got to remember,

5  we're one of five counties, one of five counties, that got all

6  new machines all across the county.

7          Sarah Ball Johnson told you that there's no comparison

8  with the other counties.  I wonder what the other -- across the

9  state.  We don't know.  There was no comparison on how the other

10  counties did.  We brought that out on cross.  Well, they don't

11  have those, we just don't have them.  I wonder how the other

12  four counties did on their complaints that had all new machines.

13          When he got these complaints, Freddy did his job.

14  There was testimony that Freddy sent out William Hugh Bishop and

15  Wayne Jones three times that day in May of '06 as they got these

16  complaints in and the -- it's like that investigator with the

17  State board, and I can't think of his name, he said -- I said,

18  is it like when you turn on the light and the cockroaches

19  scurry?  Well, as soon as they see them coming, they know we

20  can't be doing it -- you know, they clean up.  And then when you

21  leave, right back in and turn that light off, there they go

22  again.  It's hard to catch them in the act.  Don't blame Freddy

23  because they didn't catch them in the act.  That's a

24  smokescreen.

25          I want to go to the charges that Freddy faces, the

CONTINUED CLOSING ARGUMENT — MR. RICHARDSON          11

1   RICO charge.  They say he organized a criminal conspiracy to

2   control the Clay County Board of Elections.  The government's

3   theory is the Clay County Board of Elections was controlled by

4   two men, the puppet masters, remember?  Doug Adams and

5   Judge Maricle.  But the evidence the government submitted wasn't

6   that Doug Adams and Judge Maricle were partners in crime.  The

7   evidence that you heard is they didn't even talk to each other.

8   And I'm talking about the government tapes, these secret

9   recordings between Wanda and Kennon.  And you got to think about

10  this.  You know, they say the Judge was kind of sneaky and stuff

11  like that.  But he has no reason during these tapes to distance

12  himself from Doug Adams unless he was able to clairvoyantly say,

13  oh, yeah, they're going to say I'm the kingpin of Doug Adams.

14  But in the tapes, A12, 5-1-07, Judge, Kennon White, and Wanda,

15  the Judge says, did Doug Adams support Phillip?  Did Doug Adams

16  support Phillip?  He said it the next day, A13, did Doug support

17  him?  Does he sound like the two puppet masters are working

18  together to get somebody elected?

19          The same day, May 2nd, '07, in tape A13, and Wanda is

20  talking about, well, if they want to know something on Doug

21  Adams, I'll tell them, I'll tell them whatever they want to

22  know, just get me out of trouble.  And the Judge replies, what

23  they'll want to know on Doug Adams, you and me neither one

24  knows.  What they'll want to know on Doug Adams, you and me

25  neither one knows.  He's telling you in his own words I don't

CONTINUED CLOSING ARGUMENT - MR. RICHARDSON      12

1   know about Doug Adams.  No reason to distance themselves.

2   That's their own tapes.  So these two kingpins don't even know

3   what's going on, and that just doesn't jibe with the

4   government's theory of this case.

5         On A18, the Judge and Kennon White talking on

6   May 16th, and the Judge says, Wayne and I don't always support

7   the same candidates, the same people.  You know, that, again,

8   Wayne Jones, his friends, we don't always see eye to eye.

9   There's no conspiracy here.

10        And then I go back to April 10th, '07, in tape A5.

11  And Judge and Kennon and Wanda are talking about the election

12  officers down in Manchester, and the Judge asks the question and

13  indicates that he doesn't know, he's asking, is Anthony Short a

14  Democrat?  Now, think about that.  Anthony Short is a longtime

15  Democratic election officer, and the Judge doesn't know that?

16  He served with Wanda White as the two Democratic election

17  officers in May of '06.  And the Judge doesn't even know he's a

18  Democrat?  It doesn't make sense.  If he's the puppet master, he

19  knows where everyone is, where they are, where they're

20  positioned.

21        So what's the connection between Doug Adams, Judge

22  Maricle, and Freddy Thompson?  What's their connection?  The

23  Rolodex.

24        Could I see that, please?

25        This Rolodex, look at all those cards.  The Whites,

CONTINUED CLOSING ARGUMENT — MR. RICHARDSON          13

1   Doug Adams, and everybody else —

2              Thank you.

3              That's Exhibit D61.  Everybody else except Freddy

4   Thompson.  He's not in there.  Well, what's that number?  He

5   said, well, County Clerk, what's the fax number to the Circuit

6   Court Clerk's?  She got up and said, oh, yeah, that's our fax

7   number.  So Freddy's number isn't even in there.

8              No evidence submitted to you that he was ever at the

9   Judge's home, his office, social events, political meetings with

10  the Judge, wasn't even at Phillip Mobley's post-election party.

11  Wanda and Kennon told you that.  There's no connection between

12  Freddy and the Judge.

13             Doug Adams, what's the connection between them?  He

14  got Melanda the job, gave Melanda the hand up, so there is a

15  connection between them.  Rode around with the Judge — or Doug

16  on election day '02.  But after that, there's no connection.

17  Never at his house, never at Doug's office, never at a social

18  gathering, never at a political meeting.  No connection between

19  Doug Adams and Freddy Thompson.  And they got to prove this,

20  that there's a tight-knit conspiracy here.

21             Now, the government theory that the Clay County Board

22  of Election controlled the election officers and a quote from

23  the government's opening statement, when you control the Board

24  of Elections, you control who serves, you control where they

25  serve, and you control when they serve.  That's what they told

1    you in their opening statement.  The truth about appointing

2    election officers, evidence is directly to the contrary.  Once

3    Freddy took office in 2003, they gave — they decided, and here

4    they are, '03, '04, and '06; PR16L, M, and O, the Board of

5    Election meetings, and we pointed out to you in the cross-

6    examination '03, top two, '04, top two election officers that

7    come from the precinct captains, '06, top two election officers

8    from the precinct captains.  And we have in PR16 a list of the

9    precinct officers that were nominated in 2006 by the precinct

10   captains; all right?  It's PR16.  And the only thing in '06,

11   they said we're not going to take the ones, I think, from

12   Burning Springs because it's the McQueens.  And William Wayne

13   Bishop says, I make that motion because they said they weren't

14   going to serve, they had to do something else or whatever, we

15   put them as alternates, but they weren't going to serve, so we

16   took them out.

17          Business not as usual.  Jennings White appointed

18   people wherever he wanted to.  As soon as they came into the

19   Board of Elections, the precinct captains basically said who was

20   going to run their precincts.  So where were the precinct

21   captains to tell you that somebody in this group manipulated

22   them, pressured them, made them put them on that list?  You

23   didn't hear from a one of them; not a one.  And especially you

24   didn't hear from Don Nolan.  Don Nolan, if you look at the

25   Democratic precinct captain list, they don't have a lot of

CONTINUED CLOSING ARGUMENT – MR. RICHARDSON          15

1   Democrats.  So, obviously, Don Nolan does double duty.  And he's

2   a precinct captain for every precinct.  And we didn't hear Don

3   Nolan up here telling you that the Judge made me put Wanda White

4   on that list, at the top of the list.  And Anthony Short, no.

5   But you got to think, not a lot of Democrats, it's 95 to

6   5 percent.  So there's just not that many Democrats.  If you

7   wanted to be a Democratic election officer, thank you.  Thank

8   you, we'll let you be one.  And, remember, Wanda and Dobber both

9   had their own reasons for being election officers in '06.  Wanda

10   so Daddy could –– father-in-law could win in November, Dobber

11   for the new job, and Wanda had that whole financial paycheck.

12          So the evidence does not support the government's

13   theory, this crime organization, like organized crime, like

14   Sagrecy said, top down, organized crime family, it ain't there.

15   So when we come to the RICO charge, you're going to get an

16   instruction that I feel is going to look like this and you're

17   going to find Freddy Thompson not guilty.

18          We're going to go to the money laundering charge.

19   There is no evidence that Freddy did anything illegal or wrong

20   in 2002.  There just isn't.  Some people –– I admit to you that

21   people bought votes for Freddy in 2002, but there wasn't any

22   evidence that Freddy was involved, and I told you that in my

23   opening.  Not a single dollar came from Freddy's hands to buy a

24   vote.  And there isn't anything.  So he didn't get that office

25   illegally, and he certainly didn't do anything illegally to

1   obtain that office, because he was unelected, he didn't have to

2   run in '04, and he was unopposed in '06, so he didn't do

3   anything to keep his job illegally.  And Jeff Sagrecy said that

4   salary itself is not illegal.  So they got to prove that he did

5   something illegal to get it, they haven't proven that.  So as to

6   Count Two, the money laundering, not guilty.

7          Honest services mail fraud.  Mailing the returns back

8   to the State Board of Elections in May of '04, November of '04,

9   May of '06, and November of '06.  Four counts, 3, 5, 6, and 7.

10  They got the results from each precinct, the totals of all the

11  numbers match.  I went over that just a few minutes ago on the

12  smokescreen about the ESS people.  All the totals match.  If

13  they weren't, you would have heard about that and we are

14  manipulating results and that would have been something else.

15  But you didn't hear about that, so you got to consider all

16  results match.  So the totals were there, mailed to the

17  Secretary of State.  So the results are valid, except for the

18  government says that votes were bought or stolen, and they want

19  you to say that Freddy Thompson is responsible for that, even

20  though they can't prove him guilty beyond a reasonable doubt.

21          Now, we don't dispute that Freddy Thompson signed

22  those results.  Freddy Thompson's signature right there.  And I

23  submit to you that's November of '06, it's on May '04,

24  November '04, May '06, and there it is on November '06.  We

25  signed it along with the other three Board of Election members,

CONTINUED CLOSING ARGUMENT — MR. RICHARDSON        17

1    and we don't dispute that Freddy mailed them or one of his staff

2    did.  Our position is if those results contained bought or

3    stolen votes, Freddy didn't know about it.  And I anticipate

4    that the instruction on this willful —— on this mail fraud,

5    honest service mail fraud, will be that he willfully intended to

6    defraud.  Willfully intended.  And I think back on that

7    instruction about inferring the mental state, and I think back

8    to what he said on that tape when Kennon got him and says, why

9    does Phillip Mobley need a lawyer?  You could infer a mental

10   state on that.  Why does he need a lawyer?

11          Now, the prosecutor, when he mentioned this honest

12   services mail fraud, he's talking about *Pinkerton* liability.  If

13   you don't find him guilty on this, you can find him guilty under

14   *Pinkerton* liability, and that means that the defendant can be

15   responsible for reasonably foreseeable.  Do you remember that,

16   reasonably foreseeable acts of a co-conspirator?  That is a

17   smokescreen, folks.  That's another red herring.  He certified

18   the results, he mailed them, and we're not talking about acts

19   committed by another.  The reason you're going to find him not

20   guilty on Count 3, 5, 6, and 7 is because he had no knowledge

21   what was going on out there.  He had no willful intent to

22   defraud.  Therefore, as to Counts 3, 5, 6, and 7, I'm going to

23   ask you to find him not guilty.

24          Now I want to talk about obstruction of justice.  The

25   U.S. opening, they said that he destroyed voter assistance

 1  forms.  That's what they said in their opening.  Said he was

 2  ordered by subpoena to bring those to the federal grand jury,

 3  bring those records.  And those records, the FBI will tell you,

 4  when they showed up, many of those voter assistance forms that

 5  were filled out by some of the election officers were not there.

 6  The only evidence you've heard that some were gone is Wanda

 7  White, and that's the corrupt to obstruct a federal ongoing

 8  investigation.

 9          Then we get to Agent Briggs.  When he got on the

10  stand, he says, no, he didn't mention the voter assistance

11  forms, he said he lied about the '06 complaints.  That's what

12  Agent Briggs told you, he lied about the '06 complaints.  And

13  then he took some pieces of Freddy Thompson's grand jury

14  testimony.

15          And that's D84, please, if I could.

16          And he went to page ten, line five:  Mr. Thompson, did

17  you have any complaints on election day or anytime regarding the

18  process of the voting or the machine or allegations that poll

19  workers might have been manipulating things?

20          I don't know if you can see that or not.  Agent

21  Briggs, this is what he went to.

22          "Mr. Thompson, did you have any complaints during the

23  May '06 primary?"  "Election day or after election?"  "Anytime,

24  regarding the process of the voting or the machine or

25  allegations that poll workers might have been manipulating

CONTINUED CLOSING ARGUMENT – MR. RICHARDSON          19

1  things?"

2          "Well, I had one guy come in from the Garrard

3  precinct, demanded I shut the precinct down, and I tell him I

4  can't shut it down.  Then he demands I throw all four election

5  officers out and put four more in, you know.  I said we can't do

6  that, there's no more to do it.  Then he wants the results

7  throwed out that evening from the Garrard precinct.  He said all

8  of these votes are getting stolen.  But yet, that evening he

9  carries the precinct."

10          "Who was this?"

11          "Blaine Smith for jailer."

12          "Did he — when did he bring that complaint to you?"

13          "Right around dinnertime."  That's the next page,

14  "Right around dinnertime.  But yet he carried the —

15          "Before the results were" —

16          "Yes.  Yes.  Really the only complaints we had was

17  losing candidates and their families.  Really and truly."

18          Remember in their close, really and truly.  All right?

19  That's just Freddy's way of talking.

20          Go to page 13, line 18 and now I'll back this up.

21  Line 11, "What role did they play as the election board with

22  poll workers in educating them on how to use the machine?"

23          THE COURT:  I'm sorry, but there's no way the reporter

24  can take this down when you're speaking that quickly.

25          MR. RICHARDSON:  Yes, sir, I'm sorry, I'll slow it

1  down.  Thank you, sir.

2           "None that I know of."

3           "They had no role whatsoever in training the workers?"

4           "Not that I know of, no.  Like I said, me and my two

5  girls done all the training."

6           "Now, during the course of the election, I assumed

7  that they'll be voters who will come to the polls who will

8  request assistance to vote; is that true?"

9           "Yes."

10          "And by law, you're required to have a form filled out

11 by those individuals?"

12          "Yes, it should be right there."

13          "And you have produced in these records here and on

14 this -- this is Box No. 4, this will be a representation of all

15 of the voter assistance forms that were executed back in May of

16 '06?"

17          "Well, this is the precinct sheriff's, so they're

18 mixed up."

19          "Okay."

20          "That's the voter assistance forms, yeah."

21          "And you're required as earlier stated by law to keep

22 those, correct, for 22 months?"

23          "Yes, 22 months."

24          "And in the course of keeping these records -- where

25 are these kept, by the way, in your office?"

CONTINUED CLOSING ARGUMENT — MR. RICHARDSON          21

1          "In the file room — excuse me, in the deed room."

2          "In the deed room?"

3          "Yeah."

4          "And the deed room in most counties are actually

5    secured locked spaces.  Is that the same for your place?"

6          "Yes."

7          "And who had access to these records other than

8    yourself in the office?"

9          "Well, just the girls who worked there, yeah."

10         "So you gave every person on your staff access to

11   these records?"

12         "Well, I mean, they're not in the file locked up by

13   theirself, they're back in the deed room in filing cabinets."

14         "Are those filing cabinets locked?"

15         "No, there's no way to lock them, no."

16         "So they're not locked?"

17         "No."

18         So that was their second shot saying he lied to the

19   grand jury.  And then they went to line 15 — or page 15, right

20   down the page here, line 16, and said.

21         Question:  "Well, let me ask you this:  Are you aware

22   of anybody coming to look at those records that was not a person

23   in your staff?"

24         "No, nobody has ever asked.  No, we've never seen

25   nobody look at them."

1              "Has anybody asked you to remove those?"

2              "No, sir."

3              "These voter assistance forms from your office?"

4              "No, huh-uh."

5              "Have you seen anybody attempt to destroy a voter

6    assistance form?"

7              "No, I've not."

8              So that's what Agent Briggs said in his theory, that

9    he lied to the grand jury, basically lied about the voter

10   assistance forms, we've talked about that.  So I'm not going to

11   go into that again.  But just lying to the grand jury about the

12   number of complaints.

13             Well, I want you-all to go back there and look at this

14   whole testimony, and I'm going to tell you that the United

15   States cherrypicked their little portions so they could make

16   this allegation.  As to the allegation about the lying about the

17   complaints, that he didn't tell them that the votes were being

18   stolen, you go to page 23, line seven.  "What about the May '06

19   election?"  What was the talk in town about the election during

20   the particular primary?"

21             "Well, like I said, we'll go to the losing candidates

22   and say they're getting robbed, you know, saying that the

23   precinct officers were stealing their votes."

24             So he tells the grand jury, yeah, the losing

25   candidates complained that the precinct officer were losing

1   their votes.

2          Then we jump down to line 16.  "Mr. Thompson, what

3   were the allegations regarding how the votes were being stolen?"

4          "Well, that's like the Blaine Smith I was telling you

5   a minute ago; said that like when the voter would –– they

6   thought they had voted and walked away from the screen.  Said

7   that the election officer were going and like changing their

8   votes.  But I asked several voters from that precinct and

9   they –– nobody –– nobody –– nobody never seen nothing that I

10  talked to."

11         He didn't lie about that.  It's in there.  But they

12  didn't want to tell you that.  They wanted to make their

13  allegation.  They created the whole thing.  Read this exhibit,

14  D84.  Freddy didn't lie to them on that.

15         And you got to remember, you got to remember, back in

16  July 12th, '07, when Freddy gave that testimony, nobody knew

17  that Wanda White and Dobber Weaver were actually changing votes.

18  That didn't come out until much later.  Freddy just thought, you

19  know, we get these complaints all the time.  Losing candidates

20  come in and complain their –– you know, their votes are being

21  stolen, you know, I didn't take it seriously.  But he told them

22  about it, he said, yeah, that was a complaint that they were

23  getting.  And you got to remember, when he got the complaints

24  during the day, he was sending out trying to stop it.  I don't

25  know what more the government wants us to do.  So as to Count 9,

CONTINUED CLOSING ARGUMENT – MR. RICHARDSON          24

1  that's the obstruction of justice as to Freddy Thompson,

2  Count 9, I'm going to ask you to find him not guilty.

3          Now we go to the conspiracy to deprive persons of the

4  right to vote, that's Count 10, said he conspired with Al Man

5  and Judge and Wayne Jones to deprive the people of the right to

6  vote.  Absolutely no evidence that he conspired with these

7  people the right to vote.  They haven't even proven he knows the

8  Judge.  No evidence.  Once again, I'm going to ask you to find

9  him not guilty.

10          Count 11, conspiracy to commit vote buying for 2006.

11  He said they funneled money to buy votes, pooled money in '06,

12  they couldn't show that he pooled money in '04 and '02, so now

13  they're saying he pooled money in '06.  No witness said he ever

14  bought a single vote in '02 or '04 or '06; no evidence, credible

15  evidence, that Freddy was involved.  So as to this Count 11,

16  vote buying, conspiracy to commit vote buying, I'm going to,

17  once again, ask you to find him not guilty.

18          I'm getting ready to close up here, folks, I got a

19  couple of final thoughts.  I agree with some of my colleagues,

20  Instruction No. 5, common sense.  Common sense.  I want you to

21  use that when you make your deliberations about Freddy.

22          The immunity of a witness, I anticipate that will be

23  Instruction No. 23 — 28.  These guys who got up here, Wanda and

24  Kennon, said these things about Freddy, and you got to take that

25  with a grain of salt.  Use caution when evaluating their

CONTINUED CLOSING ARGUMENT – MR. RICHARDSON                25

1    testimony, and uncorroborated testimony.  Unless you believe

2    that testimony beyond a reasonable doubt is not sufficient to

3    sustain a verdict of guilty.

4            And there's one other thing I got to bring up.  The

5    United States said in their closing, well, there's not a

6    mountain of difference between Freddy Thompson and Jennings

7    White.  I got to beg to differ.

8            Jennings White is a longtime political powerhouse, not

9    Freddy Thompson; Jennings White conspired with drug dealers and

10   laundered money, not Freddy Thompson; Jennings White, video game

11   business, remember he said, when you haul around millions of

12   dollars, you got to arm yourself.  Not Freddy Thompson.  Only

13   armed with a big lighter, I think is what –– Jennings White

14   hired Denver Sizemore to kill a man that publicized the fact

15   that he raped somebody, not Freddy Thompson; Jennings White rode

16   from precinct to precinct in '02 with an automatic weapon.  Like

17   I said, Freddy had his lighter and he was using it according to

18   Jeff Deaton; Jennings White wanted Denver Sizemore to shoot

19   Charles Stevens out there at the polling place in 2002, not

20   Freddy Thompson; Jennings White handpicked his election officers

21   whenever he could, and not Freddy Thompson.  They changed it as

22   soon as Freddy came in.

23           So I submit to you, is there a difference, a mountain

24   of difference, between Jennings White and Freddy Thompson?

25   You–all know that answer.

CONTINUED CLOSING ARGUMENT – MR. RICHARDSON          26

1      I want to –– Russ and Freddy and myself want to thank
2  you.  I know it's been a long time, and it's time for you guys
3  to go your way and we'll go ours and we'll probably never see
4  each other again.  And I hope that this has been a meaningful
5  experience for you guys.  But today you have bestowed upon you
6  one of the most greatest powers you'll ever have, and that is
7  deciding the guilt or innocence of Freddy Thompson.

8      Now, back in the olden days the King of England would
9  come in and say, off with his head, and they would take that
10 poor guy out and they would cut off his head.  And when our
11 forefathers came to this country, they said, we're not going to
12 do it like that.  Before the power of the government can come
13 down and punish one of our citizens, 12 fellow citizens have to
14 sit in judgment and verify that the government has proven their
15 case beyond a reasonable doubt before the government can punish
16 somebody.

17     So you 12 – 16 at this point, but soon to be 12 – have
18 the power to decide the fate of Freddy Thompson, and I know
19 you're going to exercise that power with wisdom, compassion, and
20 understanding.  And Russ and I have tried to show you, to the
21 limits of our ability, there is only one verdict here today on
22 behalf of Freddy Thompson, and that is not guilty.  So when you
23 go back and deliberate and you reach that verdict of not guilty
24 as to Freddy Thompson, you can walk out of this courtroom with
25 your head held high.  Thank you very much.

CLOSING ARGUMENT - MR. GILBERT                    27

1          THE COURT:  Thank you.

2          Mr. Gilbert, you may proceed on behalf of Mr. Morris.

3          MR. GILBERT:  May it please the Court.

4          THE COURT:  Mr. Gilbert.

5          MR. GILBERT:  Fellow colleagues.

6          Ladies and gentlemen of the jury.  It's been a while

7     since I've been able to talk to you.  I too want to express my

8     gratitude for the attention and the time that you-all have

9     served here over this very lengthy trial.  Most times I don't

10    say that to a jury, because jury service is a responsibility

11    that we all have as citizens of this great country that we have,

12    and it's something that puts you the closest that you'll ever

13    get to the administration of justice and participation in the

14    democracy that we have in the United States.  But this has been

15    a particularly long trial, one that's had a lot of evidence, one

16    that's had sub-trials and different trials, and it's almost like

17    it's two trials in one.  And I have watched you and you-all have

18    watched us work hard, watched the government work hard, and

19    you-all have been attentive throughout, and I thank you and

20    Mr. Bart Morris thanks you.

21         I want to start out by talking about the first thing

22    that the Judge says about -- in his instructions about

23    substantive law, and that is presumption of innocence and

24    reasonable doubt.  And you've heard that in other closing

25    arguments.  And I have highlighted some of the areas, and you

CLOSING ARGUMENT — MR. GILBERT                    28

1  will see on the instructions how important that is.  This

2  presumption of innocence stays with them until the United States

3  presents evidence here in court that overcomes that presumption

4  and convinces you beyond a reasonable doubt that they are

5  guilty.  And you must find the defendants not guilty unless the

6  United States convinces you beyond a reasonable doubt that they

7  are guilty.  And the United States has the burden of proving

8  every element of the crimes charged beyond a reasonable doubt.

9  And that's very important in this case, because you've heard a

10 lot of evidence.  And you will be instructed over a hundred

11 pages of instructions in terms of what the law is in this case.

12         Bart Morris is charged in three counts of the

13 indictment.  The first count is the RICO charge, and that's a

14 conspiracy charge.  The second charge is a money laundering

15 charge, and that too is a conspiracy charge.  The last charge is

16 Count 11, and it is the vote buying — conspiracy to buy votes

17 in the 2006 election.

18         Now, let's talk about the RICO charge.  And you'll see

19 in the instructions that the Court — and Mr. Abell touched on

20 this, is that the government must prove as a part of this

21 enterprise that they — that these defendants engaged — joined

22 together for the purpose of engaging in a common course of

23 conduct.  And I have highlighted those words there.  And that's

24 the burden that the United States has in this case, and that is

25 an element in the charge that they must prove to you beyond a

1   reasonable doubt.

2          And this concept is further explained by another

3   instruction that we expect the Judge to give in terms of

4   multiple conspiracies, because the United States must convince

5   you beyond a reasonable doubt that the defendant was a member of

6   the conspiracy charged in the indictment.  "If the United States

7   fails to prove this, then you must find the defendant not guilty

8   of the conspiracy charge even if you find that he or she was a

9   member of some other conspiracy.  Proof that a defendant was a

10  member of some other conspiracy is not enough to convict."

11         And this is further explained by the Court.  "To prove

12  a single conspiracy, the United States must convince you that

13  each of the members agreed to participate in what he or she knew

14  was a group activity directed toward a common goal.  There must

15  be proof of an agreement of an overall objective."

16         And finally, "What is controlling is whether the

17  United States has proved that there was an overall agreement on

18  a common goal.  That is the key."  And that applies to the RICO

19  conspiracy in Count One.

20         The government has alleged and they've told you in

21  their closing argument that the common goal and the overall

22  objective was to control the Board of Elections and to control

23  the political aspects of the county.  If you look at the three

24  election cycles that are engaged in this case, starting with

25  2002, you will see that there was not a common goal, that this

CLOSING ARGUMENT — MR. GILBERT                    30

1  common goal was not true with respect to Bart Morris, with

2  respect to these other defendants.  In 2002, there was not a

3  common goal, because Bart Morris supported Jennings White, he

4  supported Edd Jordan, he supported Kennon White, and he

5  supported Barbara Joe Colter.  Doug Adams, Wayne Jones, William

6  Stivers, and Freddy Thompson did not have that common goal.  And

7  that was true in 2004 also, because Bart Morris supported

8  Barbara Jo Colter and these other defendants supported Tim

9  Couch, and that was the election.

10        Now, the government alleges and they submit the proof

11  and they submit the testimony of Kennon White that in the fall

12  of 2004, that Bart Morris came back to the fold because he

13  accepted money from Doug Adams to support Jeff Deaton, who was a

14  school Board employee.  Well, we'll talk about that in a minute.

15        In 2006, there was not a common goal, because Bart

16  Morris supported James Garrison for county judge executive,

17  William Stivers supported Johnny "Poss" Gregory, and Wayne Jones

18  supported Crawdad Sizemore.  There weren't common goals, there

19  were not common objectives, and Bart Morris did not participate

20  in any common endeavor with respect to these other defendants.

21        In fact, he didn't participate after 2002.  In the

22  2004 spring election, you've heard testimony from his son that

23  he was in Lexington the day before with his wife and the day of

24  the election.  In the fall of 2004, you heard testimony from

25  Barry Spivey, who was the PRIDE representative of Jackson

CLOSING ARGUMENT — MR. GILBERT                    31

1    County, that he was at work on a job out on Halcomb Hill, and

2    we've introduced proof with respect to that.  And that's the

3    interim site visit form.  And it's dated November the 2nd, 2004.

4    And it is an interim site visit form from PRIDE, Jackson County

5    Fiscal Court, signed by Barry Spivey, who you heard testimony

6    to — from, and it says, "Contractor working today, handpicking

7    a lot of small items, some appliances still buried in bank,

8    removing them today, most small dumps up and down the edge of

9    the road have been cleaned up, probably 75 complete so far."

10   And he was there.  And Barry Spivey came in and testified, and

11   he said although that's six years ago, I can't be 100 percent

12   sure, but I'm 99 percent sure that Bart Morris was there,

13   because Bart Morris was always there on the jobs working when he

14   had a crew up there.

15         Now, in the spring of '06, you've heard various

16   testimony about the Morrises going to Gatlinburg for Mother's

17   Day, and they left on Sunday and didn't come back on Wednesday.

18   And that was during the election circle, that was during the

19   spring election.

20         Now, in the fall of '06, Bart Morris was on another

21   site in Jackson.  And how do we know that, on the election day

22   of November the 7th?  Because there's a newspaper article with

23   respect to that, ladies and gentlemen, and it is dated Thursday,

24   November the 9th, 2006, and it has two pictures on there, one of

25   which identifies James Goins, Anthony Hayer, and David Hacker

1  and Buck Bowling.  Now, you've heard considerable testimony with

2  respect to Wanda White and Kennon White about James Goins and

3  David Hacker being vote haulers for Bart Morris.  This is on

4  election day.  This is on election day in 2006.  And the reason

5  we know it's on election day in 2006, because of this caption

6  here, it's two days after the election and this caption here

7  says Ray "Buck" Bowling and Steven Bowling discussed where to

8  start work on Travis dump Tuesday morning.  So this is election

9  day.

10        Now, I know you can't see it very well here, but

11  you'll be able to look at this picture when you get back into

12  the jury room, and you have Steven Bowling here and you have

13  Buck Bowling here, and you have Mr. Bart Morris right here

14  underneath the boom of that excavator.  And that's on election

15  day.

16        Simply put, ladies and gentlemen, Bart Morris'

17  involvement in these elections have been greatly exaggerated by

18  Kennon White and Wanda White.  And we've heard a lot of

19  discussion from the lawyers with respect to their credibility.

20  But I submit to you if Bart Morris is the chairman of the prom,

21  then he's going to go to the dance, he's going to be there on

22  election day.  And if he is the king of city politics, then

23  Jennings White, when he comes in here and takes the stand, is

24  going to recognize that fact, and he didn't mention Bart Morris

25  one iota in his testimony; not one iota.

CLOSING ARGUMENT — MR. GILBERT                    33

1          You know, Jennings White was the one convict that they

2    put on the stand that the government didn't ask, are you

3    expecting a reduction in your sentence by testifying truthfully.

4    That exchange didn't take place.  Because he got up there and he

5    said, "I have" —— "I have 25 months left and I'm going to get up

6    here and tell the truth and I'm going to serve it out."  And he

7    contradicts Kennon White on virtually every point with respect

8    to the 2002 election.  He says Kennon didn't put up any money.

9    Kennon says he says he gave Jennings White 17 to $18,000.

10   That's not what Jennings White says.  He says the only ones who

11   put up money were me, Barbara Jo, and Edd Jordan.  He doesn't

12   say that there's a meeting at his Clerk's Office, he doesn't say

13   that there's a meeting at the old courthouse.  On virtually

14   every point that Kennon testified to about that 2002 election,

15   Jennings White contradicts him.

16          And what about Kennon White?  You judge his

17   credibility.  He's in drug rehab and fails to graduate high

18   school.  He can't get a job other than what his dad has given

19   him.  He has testified as to two significant drug relapses and,

20   of course, his failed mobile home business.  With that being the

21   background, he decides to run for public office.  And he goes

22   in —— or says he go and consults people with respect to the

23   jailer's race in 2002, and the first person he talks to is

24   Cletus Maricle, or he says he talks to Cletus Maricle.  And

25   he —— and he's not really encouraging in terms of him running

CLOSING ARGUMENT — MR. GILBERT                    34

1    this case.

2          He talks to Jennings White, his relative, and Jennings

3    is irate.  He says, if you run for —— if you run for jailer, I

4    won't get the support of my ally, Charles Marcum, and I'll lose

5    my race, which is exactly what happened.  Barbara Jo Colter

6    didn't want him to run.  Yancey White didn't want him to run.

7    Bart Morris and Stanley Bowling, when he goes to them, they

8    said, "You can't win, Kennon, unless you get both the school

9    Board and Jennings White to support you," and we know that that

10   was an impossibility.  In '04, he gets a job created for him in

11   City Hall, which is absolutely a total disaster.  And I don't

12   need to go into all the things that he did, but it cost his

13   father his job.

14         And that's the backdrop to the only testimony that

15   puts Bart Morris with the candidate supported by the school

16   board or Doug Adams.  And that's important to the Government's

17   case.  Mr. Smith mentioned that three times in his closing

18   yesterday, and he said — uses the word "Bart Morris has come

19   back to the fold because he's supported Jeff Deaton."  And it's

20   important to their case, because, otherwise, you don't have a

21   common goal with respect to Bart Morris at any point in time in

22   any of these elections.  And only the best that the government

23   could prove would be a separate conspiracy, and that's not the

24   conspiracy that's charged in the indictment.

25         What really happened with respect to Jeff Deaton when

1    he ran?  Well, it's not what Kennon White says, that Doug Adams

2    gave money to Bart Morris, it's what Vernon Hacker said.  He

3    said, "I got $500 for Jeff Deaton," not Bart Morris.  And he

4    testified very plainly, ladies and gentlemen, on my question to

5    him, "Are you aware of Bart Morris supporting any candidate

6    backed by the school Board or Doug Adams?"  And Vernon Hacker

7    said, "No."  Bart Morris didn't come back to the fold, because

8    he never ever was in the fold; he never ever was in that

9    conspiracy.

10          You know, when I first started practicing law in

11   Richmond, I came into the law practice and my mentor was a

12   lawyer named Charles Coy.  And Charles was a great trial lawyer

13   and we did a lot of trials together.  And bless his heart, he

14   was somewhat harassable and he would have difficulty with some

15   people at times.  And I would say to him, "Charles, why did you

16   fall out with so-and-so?"  And he would say, "Jerry, I didn't

17   fall out with them because I never fell in with them."  And

18   that's what it is with respect to Bart Morris.  He never came

19   back to the fold, as alleged by the United States, because he

20   never was in that fold.

21          There never was a common goal with any of the other

22   defendants proven by any credible evidence other than what

23   Kennon White says with Jeff Deaton.  There's no connection to

24   Cletus Maricle, Doug Adams, Wayne Jones, William Stivers, or

25   Freddy Thompson.  And on that basis, ladies and gentlemen,

1  without that common goal, without that common purpose connected

2  to Bart Morris, you must find him not guilty under the RICO

3  Count 1.

4        Now, let's talk about money laundering, and that's

5  Count 2.  And you will see the Judge will instruct you with

6  respect to that charge.  It requires that a financial

7  transaction involved property that represents the proceeds of

8  bribery and extortion.  The words proceeds mean any property

9  derived from, obtained, retained, directly or indirectly,

10  through some form of unlawful activity, including the gross

11  receipts of that activity.

12        Now, what is important in that instruction is that it

13  has to be derived or obtained or retained.

14        Now, you've heard the testimony of the IRS agent, Jeff

15  Sagrecy.  He testified that but for the bribery or extortion,

16  Bart Morris wouldn't have his contracts, and, therefore, the

17  proceeds of those contracts are the fruits of money laundering.

18        Ladies and gentlemen, that's not the proof.  That's

19  not the proof.  This is a conspiracy that the government alleges

20  occurred in 2002 to 2007.  And the proof is in the record that

21  B & J Transfer was incorporated, was formed in 1994.  And you'll

22  see in the government's exhibit the initial proposed bid to the

23  City.  And at that time, the City was contracting with Popp

24  Brothers to transfer the trash from Clay County to the landfill,

25  and they were charging $12.50 without a contract.  And Bart

1  Morris formed this company and made a proposal that was less

2  than that amount, and the City awarded him that contract.  And

3  that is a competitive bid.  That is a competitive bid.

4           Then in 1996 they renewed that contract.  And as the

5  agent testified to, he said, "I could find no evidence of a

6  bidding process."  Well, that's just not the case, ladies and

7  gentlemen.  The minutes of those minutes clearly reflect that

8  that bid was to be advertised, and you'll see, when we produced

9  the copy of the Manchester Enterprise back in 1996, it was

10  advertised and Bart Morris bid on that job and he was awarded

11  that, and the bids were opened the next month and his was the

12  only bid.  That's not his fault that it was the only bid, but it

13  was —— there was a bidding process.

14           Now, in 2002, his contract was renewed again, and,

15  again, there's evidence in the minutes of advertisements and

16  there's an ad in the paper that we've introduced into evidence

17  with respect to that process in 2002.  But even that was before

18  the primary election in 2002.

19           Now, in 2004, the contract was amended from compressed

20  cubic yards to tonnage.  And you heard the testimony of

21  Mr. Craft with respect to that, that there are regulations

22  within the Commonwealth of Kentucky that convert compressed

23  cubic yards three to one from —— into tonnage.  So one

24  compressed cubic yard is three tons.  And at that particular

25  time, Bart Morris, the contract rate was $18 per compressed

1  yard. If you extrapolated that under what the state regulations

2  are, that would be $54 a ton.  But that's not what the contract

3  was amended to, ladies and gentlemen, it was amended to $46,

4  which was less than that.  And the proof is in the pudding with

5  respect to that.

6          In the next year, there was a 4,000-dollar increase,

7  and the two subsequent years from that, as testified by Agent

8  Sagrecy, as testified by Mr. Craft, resulted in a decrease in

9  the charges to the City of Manchester.  And this amendment took

10  place at an open meeting that benefited —— ultimately benefited

11  the City of Manchester by reducing the amount that they paid for

12  the transfer of garbage.

13          Now, Mr. Craft also testified that from the inception

14  of this contract to the date that the City — that it ran out

15  and the City stopped taking their trash to the transfer station,

16  there was less than a 3 percent annual increase in what was

17  charged with the City, and that's less than the Consumer Price

18  Index for inflation.

19          Now, they must prove that the proceeds were derived

20  from or obtained or retained, directly or indirectly, from some

21  form of unlawful activity.  What is the proof of that?  What is

22  the proof of that?  Is that corroborated by anything other than

23  the circumstantial evidence that the government wants you to

24  believe, that because they allege that he supported the City

25  Council members that they were beholding to him.  Is that

CLOSING ARGUMENT — MR. GILBERT                    39

1    corroborated in any way?  And the United States says

2    corroboration is key in this case.

3           Well, during that period of time, we've had two

4    council members that have testified with respect —— in this

5    case, and that's Vernon Hacker and Jeff Deaton.  Carmen Lewis

6    also testified, but she wasn't a council member when any of the

7    contracts were approved or when it was amended.  But those two

8    council members were Vernon Hacker and Jeff Deaton.  And was any

9    inquiry made to them with respect to these contracts or why they

10   voted on them or whether it was because of unlawful activity

11   that they voted on them?  No.  Did they put on any other council

12   members to corroborate them, Sherrie House, Laura House, Penny

13   Robinson?  Darnell Hipsher, did he testify?  Or the mayor, Doug

14   White?  No corroboration with respect to how these contracts

15   were obtained, derived, or maintained.

16          And the proof is just the opposite, ladies and

17   gentlemen.  B & J Transfer, Incorporated, was doing a good job

18   at a reasonable rate, and they're not getting rich either.  It's

19   hard work.

20          You heard testimony about the salary that Bart Morris

21   received and the distributions that he received from the

22   sub—chapter S corporation from 2002 were from a range of $26,000

23   a year up to $77,000 a year.  That's not enrichment, that's

24   compensation for hard work.  That's why they maintained those

25   contracts, because it was a reasonable rate with good service.

CLOSING ARGUMENT - MR. GILBERT                    40

1          Now, we heard some testimony from the City employees

2    about cost savings by the City after the termination of the

3    contract, 60,000 to $80,000 a year.  Of course there would be

4    initial savings, not paying a transfer company to take it to the

5    landfill.  But they have to use City workers, they have to use

6    City trucks, and they have to use the compactor trucks, and

7    there's no consideration of the wear and tear.  I submit one

8    breakdown and those savings are either — are totally gone or

9    result in a deficit.

10         You heard Carmen Lewis testify that they bought one

11   truck, a rollback truck, that they were taking back to the

12   landfill, and at the end of the year they have to decide whether

13   to pay $20,000 for the use of that truck, which is cost-free at

14   this moment in time, or they have to buy the truck for a hundred

15   thousand dollars.  That's all your savings.  There's no savings.

16   And there's no savings in there.  It just makes common sense,

17   ladies and gentlemen, that taking a compactor truck three miles

18   in the long run will be more cost effective than taking it

19   40 miles round trip to the landfill in London.  And there's a

20   reason for all the surrounding counties around Clay County to

21   use a transfer station, it's cost effective in the long run.

22         This money, the proceeds from those contracts, there's

23   insufficient proof with respect to they were obtained or

24   retained by an illegal activity, and you cannot find that beyond

25   a reasonable doubt.  That's because it's not money laundering,

1   these were legitimate businesses, business providing a needed

2   service, and no one testified otherwise.  And so we would ask

3   you to find Bart Morris not guilty on the money laundering

4   count.

5           Now, the last count is Count 11, and that's 2006

6   conspiracy to buy votes.  There is no credible proof that Bart

7   Morris was involved in vote buying in either the primary or fall

8   election; no proof, no credible proof.  The only proof otherwise

9   comes from Kennon White, Wanda White, and Dobber Weaver.

10          Wanda White's testimony is so incredible that she puts

11  Vernon Hacker in the fall election, working the fall election,

12  and we know that in 2006 Vernon Hacker had been arrested in

13  August and was in jail.

14          Now, all three of those individuals had stakes in

15  those elections.  They're the ones that testified in 2006 that

16  they were vote stealing.  And you heard Agent Briggs testify

17  that in 2006 the scheme had changed from vote buying to vote

18  stealing.  And these are the people that had a big stake in

19  terms of maintaining their jobs with the City:  Kennon White was

20  the city manager, Wanda White was working as her father-in-law's

21  assistant, and Dobber Weaver was the fire chief who got a free

22  truck, got free rent from the City, free gas, utilities from the

23  City, and was wanting to get the 9-1-1 job.

24          Now, his testimony with respect to what happened in

25  the spring is correct.  And what he said was, "We were going to

CLOSING ARGUMENT — MR. GILBERT                    42

1    steal the votes.  It's just like Agent Briggs said, it's
2    changed.  We can't buy votes anymore, they're watching us."
3    Bart Morris didn't participate in that.  They left in '06 and
4    went to Gatlinburg.

5            But Dobber Weaver says, "We're going to run it clean
6    except for stealing the votes."  And then on election eve Kennon
7    comes to him and says, "We need to make the Manchester precinct
8    look good, so I'm going to run 50 to 75 people through there."
9    And that's what happened.  That's not Bart Morris, that's not
10   Debi Morris, that's Kennon White.

11           Now, and the same holds true for the fall election;
12   where Bart Morris and his workers are up there in Jackson County
13   working on this dump where they spend all day long and with the
14   alleged vote haulers up there on election day.  It doesn't make
15   sense.

16           But I want to show you something in terms of — in
17   terms of Bart Morris's alleged involvement in absentee voting.
18   In 2004, you can look at — Well, let's look at 2006.  2006, you
19   can look at the tabulation of votes.  And this is May the 16th,
20   in the primary election in 2006, and the allegation is that Bart
21   Morris is working the absentees, because he's in Gatlinburg,
22   he's not working election day, he's in Gatlinburg, and this is
23   the absentees for his good friend, Stanley Bowling.  This is the
24   tabulation sheet.  You'll see Stanley Bowling's name right here.
25   And down at the bottom, these two columns right here represent

1    the absentee ballots that were cast for Stanley Bowling; 18

2    mail-in ballots and 46 ballots on the machine, for a total of

3    64.   Is that working the absentee ballots, 64 ballots out of

4    765, 765 that were cast for Stanley Bowling in that spring

5    election?

6              Let's look at the fall election.  This is the election

7    where Stanley Bowling is unopposed.  Unopposed.  He had a

8    contested race in the spring in 2006, and he's unopposed.  And

9    he has 20 mail-in ballots, 39 machine, for a total of 59, which

10   is almost -- it's only five less than in a contested race out of

11   a total of 900 votes cast for Mr. Bowling in the fall election.

12   And we know he wasn't working election day because the newspaper

13   article has him in Jackson County all day and Barry Spivey has

14   him working all day in Jackson County.  So if he's not working

15   the absentee ballots in either the primary of 2006 or the fall

16   of 2006, then he's not participating, ladies and gentlemen.

17   He's not buying votes.  And the allegation with respect to

18   Count 11, 2006, vote buying is buying the votes.  It's not

19   stealing the votes as Dobber Weaver and Wanda White were, it is

20   buying votes.  And he was in Gatlinburg on election day in the

21   primary and there's no evidence that he did anything with

22   respect to Stanley Bowling.  And in the fall, he's up on

23   Jackson -- on the hill in Jackson County working, and there's no

24   evidence that he did anything with the absentee ballots that

25   election.

CLOSING ARGUMENT — MR. GILBERT                    44

1          Corroboration is so important, ladies and gentlemen.
2    There's no evidence of election fraud at the house when they
3    executed the search warrant.  They weren't moving out, as you
4    saw on those pictures.  There were still personal effects there
5    at their house.  If they had been involved in the 2004 and 2006
6    election, there would have been lists and evidence of their
7    involvement.  I submit to you with respect to Count 11 that
8    there's insufficient evidence and that the government has not
9    met their burden of proving allegations of vote buying for those
10   years beyond a reasonable doubt, and I would ask that you find
11   Bart Morris not guilty on that count as well.  Thank you.

12          THE COURT:  All right.  Thank you, Mr. Gilbert.

13          Ladies and gentlemen, we will take a recess at this
14   time until 2:10 this afternoon.  Again, please keep in mind the
15   admonitions that you've been given.  The jury will be excused
16   until 2:10.

17       (Whereupon, the jury retired from the courtroom, after which
18   the following proceedings were had in open court.)

19          THE COURT:  Thank you.  I will advise counsel and
20   Mr. Smith we'll probably go until about 4:45 this afternoon, so
21   it may be necessary to split up your rebuttal argument in case
22   you want to plan for that accordingly.  We'll be in recess until
23   2:10.

24       (Whereupon, a recess was had, after which the proceedings
25   continue uninterrupted to Volume 30-D.)

1        (Proceedings concluded at 2:00 p.m.)

2            C E R T I F I C A T E

3     I, Cynthia A. Oakes, certify that the foregoing is a

4  correct transcript from the record of proceedings in the

5  above-entitled matter.

6

7  3/30/2010                    s/CYNTHIA A. OAKES
     DATE                       CYNTHIA A. OAKES, RPR, RMR, CRR
8

9

10

11              I N D E X

12                                          PAGE

13 Continued closing argument on behalf of
      Defendant Thompson by Mr. Richardson:        2
14
   Closing argument on behalf of the Defendant
15    William Morris by Mr. Gilbert:              27

16

17

18

19

20

21

22

23

24

25