1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF KENTUCKY
 2                    SOUTHERN DIVISION at LONDON
                               - - -
 3
       UNITED STATES OF AMERICA,      :  Docket No. CR 09-16-S
 4                                     :
                      Plaintiff,       :  Frankfort, Kentucky
 5                                     :  Friday, February 5, 2010
           versus                      :  9:00 a.m.
 6                                     :
       RUSSELL CLETUS MARICLE,         :
 7     DOUGLAS C. ADAMS                :
       CHARLES WAYNE JONES             :
 8     WILLIAM R. STIVERS              :
       FREDDY W. THOMPSON              :       Trial Day 4A
 9     WILLIAM B. MORRIS               :
       DEBRA L. MORRIS                 :
10     STANLEY BOWLING,                :
                                       :
11                    Defendants.      :
12
13                             - - -
                      TRANSCRIPT OF TRIAL
14               BEFORE DANNY C. REEVES
          UNITED STATES DISTRICT COURT JUDGE and a jury
15                             - - -
16     APPEARANCES:
17     For the United States:     STEPHEN C. SMITH
                                  JASON D. PARMAN, ESQ.
18                                Assistant U.S. Attorney
                                  601 Meyers Baker Road
19                                Suite 200
                                  London, KY 40741
20
       For the Defendant          MARTIN S. PINALES, ESQ.
21     Russell Cletus Maricle:    Strauss & Troy
                                  150 E. Fourth Street
22                                Fourth Floor
                                  Cincinnati,OH  45202
23
                                  DAVID S. HOSKINS, ESQ.
24                                107 E. First Street
                                  Corbin, KY  40701
25
```

2

```
 1    For the Defendant           R. KENT WESTBERRY, ESQ.
      Douglas C. Adams:           KRISTIN N. LOGAN, ESQ.
 2                                Landrum & Shouse, LLP
                                  220 West Main Street
 3                                Suite 1900
                                  Louisville, KY 40202
 4
                                  BENNETT E. BAYER, ESQ.
 5                                Landrum & Shouse, LLP
                                  106 West Vine Street
 6                                Suite 800
                                  Lexington, KY  40507
 7

 8    For the Defendant           T. SCOTT WHITE, ESQ.
      Charles Wayne Jones:        Morgan & Pottinger, P.S.C.
 9                                133 West Short Street
                                  Lexington, KY  40507
10

11    For the Defendant           ROBERT L. ABELL, ESQ.
      William R. Stivers:         120 North Upper Street
12                                Lexington, KY  40507

13
      For the Defendant           RUSSELL JAMES BALDANI, ESQ.
14    Freddy W. Thompson:         R. TUCKER RICHARDSON, ESQ.
                                  Baldani, Rowland & Richardson
15                                300 West Short Street
                                  Lexington, KY  40507
16

17    For the Defendant           JERRY W. GILBERT, ESQ.
      William B. Morris:          Coy, Gilbert & Gilbert
18                                212 North Second Street
                                  Richmond, KY 40475
19

20    For the Defendant           ELIZABETH SNOW HUGHES, ESQ.
      Debra L. Morris:            Gess, Mattingly & Atchison, PSC
21                                201 West Short Street
                                  Lexington,KY40507
22

23    For the Defendant           DANIEL A. SIMONS, ESQ.
      Stanley Bowling:            Thompson, Simons, Dunlop & Fore
24                                116 West Main Street
                                  Suite 2A
25                                Richmond, KY 40476
```

3

Court Reporter:                LISA REED WIESMAN, RDR-CRR
                               Official Court Reporter
                               35 W. Fifth Street
                               P.O. Box 1073
                               Covington, KY  41012
                               (859) 291-4410


     Proceedings recorded by mechanical stenography,
transcript produced with computer.

4

1          (The jury entered the courtroom at 9:02 a.m.)

2          THE COURT:  Thank you, and good morning, everyone.

3     The record will reflect all parties are present, all counsel

4     are also present.  I believe when we had broken for the

5     evening last night, Mr. Bayer was examining Mr. Lewis.

6          Mr. Bayer, you may continue.

7          Let me remind Mr. Lewis, of course, he's still under

8     oath.

9          MR. BAYER:  Yes, sir, and before I begin the

10    examination, I'd like to approach the Bench and ask the Court

11    a question before we get started?

12         THE COURT:  That will be fine, counsel.  Come on up.

13               (A sidebar conference was held out of the

14                hearing of the gallery):

15         MR. BAYER:  Yesterday, when I was closing this series

16    of questions, I was going to ask him about was the

17    communications that he and Kenny Day had with each other while

18    they were in jail.  Mr. Smith objected on the relevance, and I

19    want to ask you if your ruling is that I cannot go into those

20    discussions.

21         THE COURT:  My ruling yesterday dealt with attempting

22    to refresh a witness's memory.  When a witness does not have a

23    memory of an event and expresses that he cannot recall an

24    event, it is sometimes proper to show a witness a document or

25    some other item to refresh memory.  When you do that, that

5

1   does not make the document itself admissible, unless it comes

2   in under 801(d), a prior statement of a witness, sworn

3   statement acknowledged by the witness.  That's not a 302.

4          If the witness states that he doesn't have a memory

5   of an event, you can show him a document.  You can ask him

6   questions about his conversations with Mr. Day.

7          MR. BAYER:  Okay.

8          THE COURT:  The Court's admonition to you was

9   attempting to read a 302, a document into evidence that was

10  not otherwise admissible.  Okay?  The proper method of

11  refreshing memory, if a witness clearly states that he or she

12  does not have a memory of an event, is to show the witness

13  whatever it is you want to use to refresh memory, allow him or

14  her to read it silently.  The document then either does or

15  does not refresh memory.  At that point, the testimony is the

16  testimony of the witness and not the document unless the Court

17  rules otherwise.  Okay?  So that's the Court's ruling on that

18  issue.

19         MR. BAYER:  And I have no intention of asking him

20  what the 302 says.  I merely wanted to go into discussions he

21  had with Mr. Day.  That's where I'm heading.

22         THE COURT:  And again, you can ask him that, and I

23  believe he's testified about what his memory was of his

24  conversations with Mr. Day.  I don't believe this witness has

25  indicated that he didn't have a memory of his conversations

6

1    with Mr. Day so I'm not sure that really it's even proper to

2    show him the document if he says that he recalls a

3    conversation.

4         So that's where we are.  If you want to go back to

5    that and ask him if he has a memory of conversations with Mr.

6    Day while he was incarcerated, either at Pulaski Detention

7    Center or at the Grayson County Detention Center, that's fine.

8    He either has a memory or he doesn't have a memory of that

9    conversation.  If he does, you can ask him about it if it's

10   relevant.  If the United States raises an issue of relevancy,

11   then I'll have to take that up.  I can't rule on that in

12   advance, because I don't know what this area is that we're

13   concerned about.  Mr. Smith?

14        MR. SMITH:  Well, Your Honor, again, this 302 that he

15   has referenced is about a conversation apparently when Lewis

16   at one point, 2005, five years ago, recalled to an agent that

17   Kenny Day had mentioned some names of some people that he

18   thought were involved in criminal activity in Clay County.

19        THE COURT:  Well, so here we have another issue at

20   this point of attempting to impeach with -- not with

21   convictions, but with allegations of improper conduct.  So

22   we're attempting to get in second party hearsay about other

23   individuals that, as far as I know, are not parties in the

24   case.

25        MR. BAYER:  Candidly, I wasn't going that route at

1    all.  I merely wanted to address whether or not he had

2    discussions with Kenny Day where they were talking about

3    things in Clay County, talking about things that are at issue

4    in this case.  That's the only area I'm going.  I'd, in fact,

5    intended not to even go into the names.  When I asked the

6    question yesterday, I didn't give him any names.  I said did

7    you talk to him about individuals in Clay County.  So I had no

8    intention of actually eliciting names.

9         THE COURT:  Well, the proper way to impeach with

10   prior convictions is clearly set forth in the rule, and, of

11   course, it depends upon whether a particular person has a

12   conviction that's a felony or has been charged with conduct

13   that would be conduct involving dishonesty fraud or deceit.

14        For example, allegations that a person engaged in

15   cock fighting would not fall within that type of use for

16   impeachment purposes.  So depending on where you're going and

17   what you're attempting to elicit, it may depend upon what the

18   Court's ruling would be.  The Court's ruling would depend upon

19   why you're attempting to elicit the information.

20        MR. BAYER:  I will not be talking about individual

21   criminal acts or addressing background behavior.  That's not

22   my intent.

23        THE COURT:  The issue is if you're attempting to

24   elicit relevant information, relevant testimony from a

25   witness, something that's relevant to this proceeding, and

8

1    it's not otherwise inadmissible hearsay or otherwise

2    inadmissible, you can ask him about his conversation with Mr.

3    Day.  But I think I've outlined pretty well where I think

4    you've made some errors in the case, and I've given you

5    instructions on what you can and what you can't do with

6    respect to these 302s.

7          I'm going to have to wait and see if there's an

8    objection to your questions.  And if there is, then I'll rule

9    on the objections.

10         MR. RICHARDSON:  Before we leave here, I want to make

11    sure I understand your ruling.  If, say, somebody gets up and

12    is testifying and we want to impeach him with a grand jury

13    transcript, that's their sworn statement, then I can read that

14    to them, correct?

15         THE COURT:  That is different than a 302.

16         MR. RICHARDSON:  Okay.

17         THE COURT:  Because grand jury testimony is sworn

18    testimony.

19         MR. RICHARDSON:  Yes, sir.

20         THE COURT:  And if a proper question is asked, if you

21    do it the correct way, you can impeach with a prior

22    inconsistent statement.

23         MR. RICHARDSON:  Yes, sir.

24         THE COURT:  But a 302 is not the witness' statement.

25    That's a recording made by someone else that may or may not be

1    correct.  It's not been reviewed by the witness.  It's not

2    been acknowledged to be a truthful statement by the witness.

3            MR. RICHARDSON:  Also, if I am impeaching someone

4    with a 302 and I give him the document and they say I do not

5    recall, am I prohibited from saying "so you don't recall

6    telling Agent Blair A"?

7            THE COURT:  That's right.

8            MR. RICHARDSON:  I can't even ask him that?

9            THE COURT:  No, because it's not -- you cannot

10   attempt to use a 302 for impeachment, unless it's otherwise

11   admissible under Rule 801(a)(2) --

12           MR. RICHARDSON:  I just wanted to make sure I was

13   correct on the Court's ruling before I get up there so we

14   don't have a problem.  I understand what you're saying, Judge.

15           THE COURT:  Let me tell you about this use, improper

16   use of these 302s.  If it happens again, whoever does it needs

17   to bring your toothbrush next week, and your best pair of

18   pajamas.  Okay?  Get my drift?  Okay.

19           MR. PINALES:  Judge, because of weather situation, if

20   the Court permits, I would duck out at the afternoon recess.

21   Apparently, there's going to be a narrow window of good

22   driving.

23           THE COURT:  That will be fine.  You didn't do the

24   cross of this witness.  If you're involved with a witness

25   that's on the witness stand, of course, you'll need to stay.

*LEWIS - Cross (Mr. Bayer)*                                          10

1          MR. PINALES:  Of course.

2          THE COURT:  But otherwise, if you'll just advise me,

3     that will be fine.

4          MR. PINALES:  Appreciate that.

5          THE COURT:  Thank you.

6               (Sidebar conference concluded.)

7          THE COURT:  Thank you.  Counsel, let me remind you

8     that if there are matters to take up out side the presence of

9     the jury that you're aware of, you need to do so at 8:30 in

10    the morning before we start.

11         At this time, Mr. Bayer, you may continue.

12         MR. BAYER:  Thank you, Judge.

13              CROSS-EXAMINATION (cont'd)

14    BY MR. BAYER:

15    Q.  Mr. Lewis, you remember you are still under oath?

16    A.  Yes, sir.

17    Q.  Yesterday, when we last were talking, I was asking you

18    about when you were in a jail cell with Kenny Day.  Do you

19    remember discussing with Mr. Day and Mr. Day telling you about

20    that he had all sorts of information regarding cases and

21    material that would be pending in Clay County and that he was

22    going to assist the FBI?

23    A.  Yes, sir.  He mentioned some items, yes, sir.

24    Q.  So as far back as 2005, the two of you were talking about

25    what it would take, possibly, to work with the FBI and talk

*LEWIS - Cross (Mr. Bayer)*                                               11

1    about cases?

2    A.   We didn't -- that was nothing said about that.  He just

3    give me some information.  I didn't have no idea what it

4    really was, you know.  And if it would help me in the long

5    run, I just didn't know, but I gave him some information.

6    Q.   You gave him some information?

7    A.   No, I gave the FBI information.

8    Q.   With the idea that if it was going to help you in the

9    long run, then that would be a good thing?

10   A.   Well, that would possibly be true.

11   Q.   Okay.  When you were buying votes in Clay County, explain

12   for the jury, explain for me, is there a breakdown in -- of

13   political factions in Clay County?  How does it work?  What

14   have you got as far as politics going in Clay County back when

15   you were buying votes?

16   A.   Well, on the Republican side, and like me, I was a

17   Democrat election officer, but I always go with the

18   Republicans.

19   Q.   Why?

20   A.   Because they controlled the county.

21   Q.   Now, that doesn't -- there are Democrats in Clay County

22   that vote for Republicans?

23   A.   Yes, sir.

24   Q.   Doesn't mean there's anything wrong with that, does it?

25   A.   Probably not.

*LEWIS - Cross (Mr. Bayer)*                                          12

1    Q.   Okay.  So anyway, continue explaining what you were

2    talking about, then.

3    A.   Well, if you're with the Republican ticket side, you can

4    take any person's name with the backing of the Clay County

5    School Board and other prominent officials in Clay County,

6    which they go together, and you can, like I said before, you

7    can take a guy by the name Joe Donkey or Betty Pig and put

8    their name on the ticket and they'll win.

9    Q.   All right.  Let's look at the 2002 election.

10   A.   Yes, sir.

11   Q.   I have been told that the primary is the big contest in

12   Clay County.  Why is that?

13   A.   Because the primary, the guy that's on the primary

14   ticket, he's almost all made the winner because there's no

15   Democrat challengers.

16   Q.   So in 2002, who was the big Republican person in Clay

17   County in 2002?  Was it Jennings White?

18   A.   No, sir.

19   Q.   Jennings White was the county clerk at that time,

20   correct?

21   A.   Yes, sir.

22   Q.   Was he a powerful man?

23   A.   Yes, he's powerful.  Yes, he is.

24   Q.   And he was the incumbent office holder, wasn't he?

25   A.   Yes, he was.

*LEWIS - Cross (Mr. Bayer)*                                        13

1   Q.   And Jennings White had, I think you described it as a

2   slate of candidates, perhaps, that Jennings White was working

3   with?

4   A.   Yes.

5   Q.   Who was Jennings White's slate in 2002?

6   A.   The ones he came to my precinct to vote was a ticket of

7   Roy Morgan and Edd Jordan.

8   Q.   Was Barbara Colter White, Barbara White Colter also part

9   of that slate?

10  A.   I don't think she was running that time, sir, in 2002.

11  She might have been, against Tim Couch.

12  Q.   Yes, sir.

13  A.   She could have been.  I don't remember.

14  Q.   So what all was Jennings White doing at that time to make

15  sure that his slate was going to get elected?

16  A.   I have no idea what he was doing.  Just the people came

17  to vote with a ticket to vote for them, and I made sure that

18  he got his vote.  But other people would come in to vote for

19  Harold Crawdad Sizemore, and you talking about -- no, that's

20  the 2002 election.  In 2002 election, I wasn't even there,

21  sir.  You're confusing me.  That's '94.  You're getting

22  back -- confusing me.

23  Q.   Did you ever buy votes for Barbara Colter White?

24  A.   Yes, I have.

25  Q.   What elections?

*LEWIS - Cross (Mr. Bayer)*                                          14

1   A.   The ones she run against the House girl, attorney, what's

2   the House girl's name?  I bought probably a hundred votes for

3   her in that precinct.  She got a hundred and like 50 votes in

4   the precinct.  Not many people come out.  The other girl, she

5   got 30.  I probably bought 100 votes for her.

6   Q.   There seems to be a common theme here.  Perhaps you can

7   explain it for us.  Was the White family very powerful at this

8   time in Clay County?

9   A.   Yes.  Have been for years.

10  Q.   They held what offices; do you remember?

11  A.   Jennings held the clerk's office from '94 to what -- I

12  mean, from '94 to 2002.

13  Q.   Yes, sir.

14  A.   Then Doug, the mayor, had been mayor for, what, 30 some

15  years.

16  Q.   That's Doug White?

17  A.   Doug White, the ex-mayor.  And then Doug's father was the

18  mayor for many years.

19  Q.   And I think Charles White was the superintendent of

20  education?

21  A.   Charles White was a county judge, because my uncle beat

22  him for county judge in either -- 1970, I believe.  My uncle

23  beat him for county judge.

24  Q.   A Democrat?  Was your uncle a Democrat?

25  A.   No, sir, but he got the backing of the Democrats that

*LEWIS - Cross (Mr. Bayer)*                                                    15

1    time.

2    Q.   I think yesterday you made the comment at heart you're a

3    Republican, but you're a registered Democrat?

4    A.   I'm a registered Democrat, yes.

5    Q.   So the Whites were very much in power and control in Clay

6    County?

7    A.   Yes, sir.

8    Q.   Did you know Jennings White?

9    A.   More or less just -- I never been to his house, and he's

10   never been to mine.  Just speak to him, more or less, as a

11   human being.

12   Q.   Did you ever do any drug dealings with Jennings White?

13   A.   Definitely not.

14   Q.   Why?

15   A.   I didn't think he done nothing.

16   Q.   We heard testimony he was laundering money for Kenny Day.

17   Were you aware of that?

18   A.   No, sir.

19   Q.   Do you remember having the hearing last week where we

20   were talking about different things?  You remember being at

21   the hearing last week?

22   A.   Yes, sir.

23   Q.   I want to ask you a question.  During the entire time

24   that you were in Clay County, did you ever do anything

25   politically at all with Doug Adams?

*LEWIS - Cross (Mr. White)*                                    16

1   A.   No, sir.

2          MR. BAYER:  I don't have any other questions.  Thank

3   you, Judge.

4          THE COURT:  Mr. White.

5          MR. WHITE:  Thank you, Your Honor.

6          THE COURT:  You may proceed.

7                        CROSS-EXAMINATION

8   BY MR. WHITE:

9   Q.   Good morning.

10  A.   How you doing?

11  Q.   We met last week as well.  I wanted to ask you a few

12  questions.  I'm going to do my very best not to be repetitive.

13  Let me start by asking you when we quit last night, you were

14  on the witness stand, and you left, and you've come back this

15  morning.  Have you spoken about this case or your testimony

16  with anyone since then?

17  A.   No, sir.

18  Q.   Okay.  Now, going back to your testimony yesterday on

19  direct examination, you had mentioned that you had gotten

20  involved with some guys to go deer hunting up in Henry County,

21  correct?

22  A.   Yes.

23  Q.   There's, what, about 30 of you?

24  A.   Thirty.

25  Q.   About 30 of you.  And the lady that owned that property,

*LEWIS - Cross (Mr. White)*                                               17

1    she died during the time y'all were using it to deer hunt, and

2    then some of that property became available; is that correct?

3    A.   Yes, sir.

4    Q.   And then you arranged -- you heard about it and then you

5    arranged to buy the property; is that correct?

6    A.   Yes, sir.

7    Q.   And you did that with Mansell Baker, Wayne Jones, and

8    yourself?

9    A.   Yes, sir.

10   Q.   And the three of you put the money together and bought

11   the property, correct?

12   A.   Yes.

13   Q.   And it was, what, $55,000?

14   A.   I think that's what the payoff was.

15   Q.   Okay.

16   A.   She owed against.  Her heirs did.

17   Q.   It was the heirs in the estate that you bought the

18   property from?

19   A.   Yes.

20   Q.   And when you bought that property, you don't have -- you

21   may have had it, but you decided to finance part of it and you

22   borrowed some money from the State Bank there in Manchester?

23   A.   Yes.

24   Q.   And did you all do a mortgage and a deed and a promissory

25   note?

*LEWIS - Cross (Mr. White)*                                          18

1    A.   I reckon so, yes, sir.

2    Q.   And who was the attorney you hired to draw up all the

3    documents?

4    A.   Gary Gregory, the commonwealth attorney was the one

5    that -- present commonwealth attorney from Clay County right

6    now is the one that had the -- that got the papers.

7    Q.   Okay.

8    A.   To my knowledge.

9    Q.   And you signed --

10   A.   I worked him with a girl in Henry County.  I think she

11   might have been an attorney down there too.  Some girl in

12   Henry County.  I don't know.

13   Q.   Okay.  But you got the documents ready, you and the other

14   gentlemen signed the documents, and those documents would have

15   been then recorded in the clerk's office up in Henry County?

16   A.   I suppose so, sir.

17   Q.   Now, it's your recollection that sometime later, after a

18   year or two, Mr. Jones wanted to get out of the ownership of

19   this property, and you all let him out and paid him some

20   amount of money; is that correct?

21   A.   Yes, sir.

22   Q.   And when you did that, you let someone else in, Denver

23   Sizemore?

24   A.   Yes, sir.

25   Q.   And is Mr. Sizemore, is he kin to you?

*LEWIS - Cross (Mr. White)*                                           19

1    A.   He was my brother-in-law for several years, till him and

2    my sister got divorced.

3    Q.   Okay.  When did they get divorced?  Do you remember?

4    A.   Sir, that's been 20 years, I guess.

5    Q.   Oh, okay.  Was he your -- I'm sorry.  Was he your

6    brother-in-law during the time you all were doing the Henry

7    County transaction?

8    A.   No, sir.

9    Q.   They were already divorced?

10   A.   Yes, sir.

11   Q.   Now, the reason you testified on direct was that when you

12   decided to buy the property, you weren't going to use it for

13   deer hunting anymore; is that correct?

14   A.   Repeat that?

15   Q.   I apologize.  That was a bad question.  I get lost in my

16   words sometimes so just stop me if I do.

17        When you decided to purchase the property in Henry County

18   from the estate, from those heirs, the reason you did that was

19   you wanted to use some of that property for growing marijuana?

20   A.   That's true.

21   Q.   Did you all do any deer hunting up there after that, or

22   was it strictly used for growing marijuana?

23   A.   Yes, they was several people from Clay County come hunted

24   on the farm.

25   Q.   Okay.  So still a good place to hunt?

*LEWIS - Cross (Mr. White)*                                         20

1   A.   Yes, it was.

2   Q.   Okay.  Was that up by -- what part of Henry County was

3   that?  Was that up by Port Royal or up by the river?

4   A.   It's close to the Kentucky River, right next to Owen

5   County line.  Near Pleasureville, Kentucky.

6   Q.   I'm trying to get it fixed in my mind.  Now, you

7   testified yesterday that when Mr. Jones left the deal, you all

8   did -- you had one more transaction with him, maybe you

9   testified to this last week, in which y'all traded some

10  marijuana or something, about 1992?

11  A.   It was before that, sir, I believe.

12  Q.   Okay.  Before 1992?

13  A.   Yes, sir.

14  Q.   But from that time to the time you went back into jail on

15  these current charges, the reason you're in jail today, you

16  didn't do any other marijuana transactions with him

17  whatsoever, did you?

18  A.   Yes.  I think I told you that.

19  Q.   Since 1992?

20  A.   That was --

21  Q.   That's the one where he --

22  A.   1992.

23  Q.   Right.  Where he owed you a little bit of money?

24  A.   That's right.

25  Q.   That's right, okay.  I thought we were talking about the

*LEWIS - Cross (Mr. White)*                                            21

1    same thing.  We just got our wires crossed.  Okay.  Now, I'm

2    going to hand you, if I could ask the --

3            MR. WHITE:  Your Honor, just for being able to keep

4    track of the paper, I thought I would mark this as CWJ-1.

5    Q.   Sir, if you would flip back to the third page of that

6    document, what's the date down there on the bottom in terms of

7    where it was recorded?  You see where it has at the very

8    bottom, it looks like notary language on the document, notary

9    republic or notary public?

10   A.   Is that '88?

11   Q.   Yes, witnessed by hand this 11th day of February, 1988,

12   at 1:45 p.m.?

13   A.   Um-hmm.

14   Q.   And it looks like the document was prepared by a lady,

15   Katherine Adams, who is an attorney with Jackson & Kelly in

16   Lexington.

17   A.   Yes, sir.

18   Q.   Okay.  And then look on the front page and the first

19   paragraph, I'm just going to try to speed this up, it looks

20   like that it's a deed dated 11 February, 1988, by and between

21   Valerie Shuck Moffett and Katherine A. Adams, being the same

22   person as that referred to in the Will of Laurel W. Adams as

23   Katherine Ann Walton, co-executrixes under the Will of Laurel

24   Adams, deceased.  Was that the lady, Ms. Adams, the lady that

25   you all were leasing the property from that died?

*LEWIS - Cross (Mr. White)*                                                    22

1    A.   Yes, Miss Adams was, yes, sir.

2    Q.   And then Miss Moffett and Miss Adams were the heirs?

3    A.   Yes.

4    Q.   And then it says -- I'm going to pick back up with

5    Laurel W. Adams, the first paragraph.  It's five lines down.

6    Are you with me?  And then it says, "Hereinafter referred to

7    as the grantors," which is lawyer talk for they're the ones

8    selling, and could you read the three names after that?

9    A.   Eugene Lewis, Denver Sizemore and Mansell Baker.

10   Q.   Yes, sir.

11   A.   Okay.

12   Q.   So the three names on the deed are Eugene Lewis, Denver

13   Sizemore and Mansell Baker?

14   A.   Yes, sir.

15   Q.   Okay.  Now I'm going to hand you another document.  And

16   sir, if you would just set that in front of you, because I may

17   come back to it.

18          MR. WHITE:  And Your Honor, for identification

19   purposes, I can just mark this as CWJ-2.  Let me show it to

20   Mr. Smith.

21   Q.   And sir, if you would like to look at the one, two,

22   three, fourth page of that document -- first, let me ask you,

23   is that a mortgage?

24   A.   That's way it looks to me.

25   Q.   Okay.  Now, it's your testimony, is it not -- strike

*LEWIS - Cross (Mr. White)*                                                23

1   that.  Is it your recollection that when the property was

2   purchased originally from the heirs, that you, Wayne Jones,

3   and Mansell Baker went to the State Bank and borrowed the

4   money and the three of you signed the note?

5   A.   That was my impression, sir.

6   Q.   Okay.  Now, the mortgage, I want you to take a look at

7   page 4.  And do you see those signatures?

8   A.   Yes, sir.

9   Q.   Is that your signature on the top right where it shows

10  borrowed?

11  A.   Yes, it is.

12  Q.   And the other signatories or other people who signed the

13  document -- I'm starting to sound like a real estate lawyer.

14  I'm sorry.  The other folks that signed it are Diane Baker,

15  Denver Sizemore, Burdette Lewis, Mansell Baker and, of course,

16  yourself.  Those are the five folks who signed the mortgage

17  dated February 11, 1988.  Is that correct, sir?

18  A.   Yes.

19  Q.   Okay.  And is Burdette Lewis, is she your wife?

20  A.   Yes.

21  Q.   So she knew you were buying this property up there?

22  A.   Yes.

23  Q.   Did she think you were just buying it for deer hunting?

24  A.   Knowing my wife, that's what she would think.

25  Q.   You didn't tell her what else you were using it for, did

1    you?

2    A.   No.

3    Q.   You were following the happy wife, happy life rule.  And

4    then Mr. Sizemore has signed it, Denver Sizemore.  And then

5    I'm assuming, but that always gets me in trouble so let me ask

6    you.  Is Diane Baker, or is that Diana Baker, is that Mansell

7    Baker's wife?

8    A.   Diane, yes.

9    Q.   Okay, sir.  And does this mortgage -- and feel free to

10   look at it.  You signed it.  It looks like -- and this

11   mortgage, it shows that you were borrowing -- that the folks

12   who signed this mortgage were borrowing $40,000 from the First

13   State Bank of Manchester?

14   A.   Yes.

15   Q.   Which is the bank y'all went and borrowed the money from

16   to buy this property up in Henry County?

17   A.   Yes.

18   Q.   Is Charles Wayne Jones' name anywhere on this document?

19   And I want you to take as much time as you need to look at it.

20   A.   I don't see it nowhere, sir.

21   Q.   No, sir.  And, of course, this was recorded -- and you

22   can look at the very last page, but it appears to be recorded

23   in Henry County on February 11 -- ooh, you okay?

24   A.   Yes, sir.

25   Q.   February 11, 1988?

1   A.   Yes.

2   Q.   Yes, thank you.  I'm going to hand you one more document,

3   and then I'm going to be through.  I told you I was going to

4   try and be quick.

5          MR. WHITE:  Your Honor, I'm going to mark for

6   identification purposes document CWJ-3.

7   Q.   Sir, does that appear to be a document called a general

8   warranty deed?

9   A.   Yes.

10  Q.   Okay.  And is that dated -- I'm going to lead you through

11  here a little bit so we can go quick.  If you want to look at

12  the last page, and I believe on this one, there's front and

13  back, so it's the very last page.  Take your time.  That's a

14  pesky mic, I know.  Is the date of that document December 19,

15  1990?

16  A.   Yes, it is.

17  Q.   And it shows it was recorded in Henry County?

18  A.   Yes.

19  Q.   Okay.  Now, I want you just to go to the -- go back to

20  the first page, and then I want you to flip it over, and

21  page 2 is on the back of the first page.  Got it?  And does

22  that show -- is that your signature on the line where it says

23  grantee, Eugene Lewis, is that your signature?

24  A.   Yes, it is.

25  Q.   On the left, that's Denver Sizemore?

LEWIS - Cross (Mr. White)                                          26

1    A.   Yes, sir.

2    Q.   And then turn -- all you got to do is just do this, flip

3    it so you're looking at page 3.

4    A.   Okay, I gotcha.

5    Q.   All right, sir.  And is that Mansell Baker and Diane

6    Baker, also their signature?

7    A.   I would say it is.

8    Q.   Okay.  Now, I want you to go back to page 1.  And on

9    page 1, is it accurate to state that this deed is the evidence

10   of Denver Sizemore, Mansell Baker, and Diane Baker selling you

11   their interest in the Henry County property?

12   A.   Yes.

13   Q.   Okay.  And you paid, the next paragraph is, it appears to

14   say that you gave a total of $4,000 for it, 2,000 -- they each

15   got 2,000.  Meaning Mr. Sizemore got two and the Bakers

16   together got two.  Is that accurate?

17   A.   True.

18   Q.   Okay.  You can set that down now.  Thank you, sir.

19        MR. WHITE:  May I be given just one moment, Your

20   Honor?

21        THE COURT:  Yes.

22        MR. WHITE:  I think I'm done.  Mr. Lewis, thank you,

23   sir, for your time and best of you luck to you.  I'm all

24   finished, Your Honor.  Thank you.

25        THE COURT:  All right.  Thank you.

1              MR. ABELL:  Judge, I don't have any questions for Mr.

2    Lewis.

3              THE COURT:  Thank you, Mr. Abell.  Mr. Baldani?

4    Let's give Mr. White just a moment.

5              MR. WHITE:  I'm sorry, had too many papers.

6              THE COURT:  So we don't run into each other.  Thank

7    you.

8                        CROSS-EXAMINATION

9    BY MR. BALDANI:

10   Q.  Good morning, Mr. Lewis.

11   A.  How you doing?

12   Q.  I'm fine.  My name is Russ Baldani.  I'm one of Freddy

13   Thompson's attorneys.  Can you hear me okay from here?

14   A.  Yes, sir.

15   Q.  Mr. Lewis, like yourself, Freddy Thompson was born and

16   raised in Clay County, wasn't he?

17   A.  I suppose so.

18   Q.  You knew him as a pretty young boy, didn't you?

19   A.  Yes.

20   Q.  And that's because he played on the Little League team

21   that you coached?

22   A.  Yes.

23   Q.  That when he was 10, 11, 12, 13, around that time?

24   A.  Yeah.

25   Q.  All right.  And Freddy wasn't from a political family in

1    Clay County, was he?

2    A.   No, sir.

3    Q.   His dad had like a mining supply or coal supply store?

4    A.   Yes.

5    Q.   Right?  And then kind of branched into the hardware

6    business?

7    A.   Yes.

8    Q.   So very much unlike the White family, the Thompson family

9    was not in politics at all, right?

10   A.   No, sir.

11   Q.   And you testified about some of your vote buying

12   activities quite a few years ago, right?

13   A.   Yes.

14   Q.   And you said you weren't involved in any of that in '02.

15   So really, the stuff you talked about was way before '02,

16   right?

17   A.   Yes, sir.

18   Q.   And to be perfectly fair and clear, Freddy Thompson

19   wasn't involved with you in that business at all?

20   A.   None whatsoever.

21   Q.   All right.  And you also testified about a good bit of

22   drug business, whether it be growing, selling, that kind of

23   thing, right?

24   A.   Yes.

25   Q.   And to be perfectly honest and fair, Freddy Thompson

*LEWIS - Cross (Mr. Baldani)*                                    29

1    wasn't involved in any selling, growing, or even using drugs,
2    to your knowledge, was he?
3    A.    Not with me, sir.
4    Q.    You testified about your friendship with Freddy's
5    father-in-law, Wayne Jones, correct?
6    A.    Yes.
7    Q.    Now, the fact of the matter is you didn't have any
8    relationship with Freddy Thompson other than when you coached
9    him in Little League, right?
10   A.    That's true.
11   Q.    Let me ask you about this.  You talked about buying votes
12   for Barbara White Colter, correct?
13   A.    Yes.
14   Q.    I want to ask you, did Miss Colter, Miss White Colter,
15   did she actually give you money to do that, or did somebody
16   else?
17   A.    Somebody else, sir.
18   Q.    So you don't even really know whether she knew that
19   person gave you money to buy votes; is that true?
20   A.    That's true.
21   Q.    So sometimes somebody that wants a particular candidate
22   could give a person like you money to buy votes to get their
23   candidate in, and that candidate not even be behind it or
24   aware of it, right?
25   A.    That's true.

*LEWIS - Cross (Mr. Baldani)*                                      30

1    Q.   Okay.  Now, you talked about Wayne Jones coming to you in

2    '02 and asking you to help his son-in-law, Freddy Thompson,

3    who was running against Jennings White for county clerk,

4    right?

5    A.   Yes.

6    Q.   And I want to make it perfectly clear.  Freddy Thompson

7    wasn't with his father-in-law when he approached you, was he?

8    A.   No, sir.

9    Q.   Freddy Thompson never personally approached you, did he?

10   A.   No, sir.

11   Q.   And you don't have any reason to tell this jury that

12   Freddy Thompson even knew his father-in-law approached you, do

13   you?

14   A.   That's true.

15   Q.   So it could have been like the Barbara Colter thing,

16   where somebody wanted somebody in, and they approached you

17   without any knowledge whatsoever from the candidate, right,

18   Mr. Lewis?

19   A.   Yes, sir.

20   Q.   And the truth of the matter is, back in '02, there was

21   lots of people that wanted Jennings White out of there for

22   lots of different reasons, wasn't there?

23   A.   Evidently, they did, because he lost the election.

24   Q.   Evidently so.  Thanks.

25              MR. BALDANI:  That's all the questions I have.

*LEWIS - Redirect (Mr. Smith)*                                          31

1          THE COURT:  Thank you, Mr. Baldani.

2          MR. GILBERT:  I have no questions, Your Honor.

3          THE COURT:  Thank you.  Miss Hughes?

4          MS. HUGHES:  I have no questions, Your Honor.

5          THE COURT:  And Mr. Simons?

6          MR. SIMONS:  Nor do I.

7          THE COURT:  All right.  Thank you.  See if there's

8    any redirect by the United States.  Mr. Smith, any redirect?

9          MR. SMITH:  I would like an opportunity, Your Honor,

10   if the Court please.

11         THE COURT:  You may proceed.

12         MR. SMITH:  Thank you.

13                    REDIRECT EXAMINATION

14   BY MR. SMITH:

15   Q.  Mr. Lewis, you were shown some deeds there when you took

16   ownership of the property in Henry County?

17   A.  Yes.

18   Q.  And I think you said earlier that you had a discussion

19   with Wayne Jones, and he said he didn't want his name on the

20   deed?

21   A.  Yes.

22   Q.  Did he ever explain to you why he didn't want his name on

23   the deed?

24   A.  See, I thought -- personally, sir, I thought he'd signed

25   the deed, but he didn't.  Come to find out later that I found

LEWIS - Redirect (Mr. Smith)                                    32

1    out that he was afraid that something may come up or something
2    and he would be charged out of counties.
3    Q.   Now, you were asked about, I believe it was by Mr.
4    Maricle's attorneys about your relationship with Mr. Maricle.
5    Did you know that Charles Wayne Jones and Cletus Maricle were
6    real close over the years?
7    A.   Yes.  For several years.
8    Q.   How long have they been close, Mr. Lewis?
9    A.   I'd say from at least 1980 up till now.
10   Q.   And when we say close, could you give me some examples of
11   what you mean?
12   A.   Well, from the last, until I got locked up in 2005, if
13   you seen one, you seen two and three.
14   Q.   Who was the third?
15   A.   Mr. Stivers back there, the bald-headed gentleman.
16   Q.   So you saw them together a lot?
17   A.   Many, many times.
18   Q.   And I assume when you and Mr. Jones were in partners in
19   that drug business, you told him pretty frankly about your
20   drug business?
21        MR. HOSKINS:  Objection.  Leading.
22        THE COURT:  Sustained.  You may rephrase.
23   Q.   Did you talk to Mr. Jones a lot about your drug business
24   when you and he were in business together?
25   A.   Yes, I talked to him.

LEWIS - Redirect (Mr. Smith)                                    33

1    Q.   Now, Mr. Jones has been in politics for a while, hasn't
2    he?
3    A.   Many years.
4    Q.   And where did he get involved in politics, in what
5    county?
6    A.   Clay.
7    Q.   Do you know what positions that he held over there in
8    Clay County?
9    A.   He was the Democrat election commissioner for several
10   years, and from Wayne -- Wayne had a job with, what, human
11   resources I call them.  The Welfare people.  I guess that's
12   what you call it.  And Wayne had numerous influence with
13   people in the county, because he's told me many, many times
14   how he could sign people up on that to get to control their
15   votes when election time comes.
16   Q.   So he'd actually use his office at the Welfare office?
17   A.   That's true.
18   Q.   And do you know when Freddy Thompson married into the
19   Wayne Jones family?
20   A.   Did I know when?
21   Q.   Yeah.  How long has he been in that family?
22   A.   I'd say probably 25 years.  I don't know how old their
23   son -- I know they have a son.  I'd say he's probably 25 years
24   old.  I don't know for sure, sir.
25   Q.   Let's see.  You said you coached him in Little League,

*LEWIS - Redirect (Mr. Smith)*                                              34

1    you were a coach at that time?

2    A.   Yes, I coached him in Little League.  He was on my team.

3    Q.   How many years ago was that?

4    A.   He's about the same age as my son, Jeffrey.  I'd say they

5    should be about 45, I'd say, so that's been, what, 20 some

6    years ago, 20, 25 years ago.  Been longer than that.  Thirty

7    some.

8    Q.   Okay.  I think we get a better understanding.  So he was

9    a Little Leaguer?

10   A.   Yes, sir.

11   Q.   Mr. Lewis, you're a drug dealer, growing marijuana,

12   selling these drugs right there in Clay County?

13   A.   Yes.

14   Q.   Weren't you afraid of getting caught by the police, sir,

15   in Clay County?

16   A.   Yes, you're always afraid, sir.

17   Q.   What did you do to help yourself?

18   A.   What did I do to help myself?

19   Q.   Yes, sir.

20   A.   When I got caught, I pled guilty in a timely manner and

21   went on to prison, because I knew --

22   Q.   What did you do to try to keep from getting caught?

23   A.   What did I do?

24   Q.   Yeah, what kind of things did you do to protect yourself

25   as a drug dealer?

LEWIS - Redirect (Mr. Smith)                                    35

1    A.   I didn't pay nobody no protection.  I tried to be very

2    secrete [sic] about it.  But evidently, I wasn't secrete [sic]

3    enough.  Only a small dealer to start with.

4    Q.   You had these candidates in public office giving you

5    money to spend, buy votes during an election; is that right?

6    A.   Yes, sir.

7    Q.   Did you keep any of that money?

8    A.   No, sir.

9    Q.   They pay you anything?

10   A.   No, sir.  They give me the money to buy the votes with,

11   and I'd always spend it.

12   Q.   So you just out of the goodness of your heart went out

13   here, putting yourself in criminal liability, buying votes in

14   Clay County every year?

15   A.   I always wanted to be good no matter what I done.  If it

16   was running a bulldozer or cutting timber, I always wanted to

17   be the best.  And I know as an election officer, the guys

18   would come to me, and they'd always know that I'd do them a

19   good job in there.

20   Q.   So you're just going out here buying these votes and

21   doing it out of the goodness of your heart; is that what

22   you're saying?

23   A.   Yes, sir.

24        MR. SMITH:  Okay.  That's all I have.

25        THE COURT:  Mr. Hoskins?

*LEWIS - Recross (Mr. Hoskins)*                                          36

1           MR. HOSKINS:  Your Honor, could I have just a moment?

2           THE COURT:  Yes, sir.

3                         RECROSS-EXAMINATION

4    BY MR. HOSKINS:

5    Q.   Mr. Lewis?

6    A.   Yes, sir.

7    Q.   One of the people from Clay County that went up there to

8    Henry County to hunt on your property was Sheriff Edd Jordan,

9    wasn't it?

10   A.   Yes, he hunted once, possibly twice.

11   Q.   And Cletus Maricle never hunted up there?

12   A.   No, sir.

13   Q.   Now, you've told the jury that you saw Cletus Maricle and

14   Mr. Jones and Mr. Stivers together a lot?

15   A.   Many, many times.

16   Q.   Where did you see them?

17   A.   Mostly all the times at the Stivers Chevron and Arby's

18   there many, many times.  Eating breakfast, eating lunch.

19   Q.   There in Manchester, right?

20   A.   Yes, sir.

21   Q.   Manchester is a town of about 1,500 people?

22   A.   I think the sign said 1,900 at one time.

23   Q.   Okay.  Not many people there.  Not many places to go eat

24   breakfast, are there?

25   A.   No.

1   Q.   Not many places to eat lunch?  Most people gather around

2   the same kind of places, don't they?

3   A.   Sometimes, yes, sir.

4           MR. HOSKINS:  Thanks.

5           THE COURT:  Thank you, Mr. Hoskins.  Mr. Bayer?

6           MR. BAYER:  Nothing further.

7           THE COURT:  Mr. White?

8           MR. WHITE:  Nothing further, Your Honor.  Thank you.

9           THE COURT:  Anyone else have any questions?  All

10  right.  Thank you.  Anything else of the witness before he

11  steps down?  If not, the witness may step down at this time.

12          Let me ask the attorneys wish the Court to give the

13  instruction on background evidence.

14          MR. WHITE:  Yes, Your Honor.

15          MR. PINALES:  Yes, Your Honor.

16          THE COURT:  Ladies and gentlemen, let me again remind

17  you that the United States has introduced certain testimony

18  and evidence which the Court has admitted as background

19  evidence.  Background evidence includes an act or acts other

20  than the specified acts charged in the indictment, which is

21  intertwined with the offense or offenses charged.

22          The introduction of background evidence is offered to

23  complete the story of the charged offense or offenses.  Here,

24  the United States is offering this evidence as it relates to

25  events prior to 2002 to show the origins of the enterprise;

*LAWSON - Direct (Mr. Smith)*                                      38

1   that is, the inception of the conspiracy that has been alleged

2   and the roles of the respective members of the alleged

3   enterprise.

4          Also, I do want to advise you again that you are

5   advised that Mr. Jones is not charged in this matter with drug

6   crimes.  However, Mr. Lewis's testimony has been admitted as

7   evidence of Mr. Jones' alleged marijuana activities.

8          Thank you.  Mr. Smith, are you ready to call your

9   next witness?

10          MR. SMITH:  Yes, Your Honor.  J.C. Lawson.

11          J.C. LAWSON, GOVERNMENT'S WITNESS, SWORN

12          THE COURT:  Thank you.  Mr. Smith.  You may proceed.

13                        DIRECT EXAMINATION

14   BY MR. SMITH:

15   Q.   Mr. Lawson, could you state your name, please?

16   A.   J.C. Lawson.

17   Q.   And where were you born and raised?

18   A.   Clay County.

19   Q.   In what part of Clay County were you last living?

20   A.   Big Creek.

21   Q.   Okay.  And Big Creek, is that pretty big area of Clay

22   County or --

23   A.   Yeah.

24   Q.   -- small area?

25   A.   Yeah, it's pretty good size.

*LAWSON - Direct (Mr. Smith)*                                      39

1    Q.   And how long have you lived in Big Creek?

2    A.   All my life, 55 year.

3    Q.   Okay.  And you're currently serving a sentence of

4    imprisonment?

5    A.   Yes, sir.

6    Q.   And do you recall what you were convicted of?

7    A.   Yeah, growing marijuana.

8    Q.   And was that here in the Eastern District of Kentucky in

9    federal court?

10   A.   Yes, sir.

11   Q.   And did you enter a plea of guilty in that case?

12   A.   Yes, I did.

13            MR. SMITH:  I'd like to hand the witness Government's

14   Exhibit PA3, Your Honor.

15            THE COURT:  Yes.

16            MR. SMITH:  I believe I'm going to ask my assistant,

17   I see that we've got two -- actually got two agreements here

18   attached.  One second, Your Honor.

19            THE COURT:  Yes, sir.

20            MR. WHITE:  Mr. Smith, was that PA3?

21            THE COURT:  Yes.

22   Q.   Mr. Lawson, you have your reading glasses with you?

23   A.   No.

24   Q.   Do you usually use reading glasses?

25   A.   Yes.

*LAWSON - Direct (Mr. Smith)*                                      40

1   Q.   Are you able to see that without your reading glasses?

2   A.   Yeah, I can see it.

3   Q.   Do you recognize that?

4   A.   Yes, I do.

5   Q.   What is that?

6   A.   That's the plea agreement on the marijuana plants.

7   Q.   Would you look at the last page of that document?  I

8   believe it's page 5.  Is that your signature?

9   A.   Yes, it is.

10  Q.   Okay.

11          MR. SMITH:  I move to introduce Government's

12  Exhibit PA3.

13          THE COURT:  Any objection?

14                          (No verbal response.)

15          THE COURT:  Exhibit PA3 will be admitted.

16                  (Government Exhibit No. PA3

17                  was admitted into evidence.)

18  Q.   Mr. Lawson, how much time did you get sentenced for that

19  conviction?

20  A.   Ten year.

21  Q.   And when was that that you began that sentence?

22  A.   When I was first picked up?

23  Q.   Were you arrested immediately and kept in jail during the

24  pending of your trial?

25  A.   Yeah.

LAWSON - Direct (Mr. Smith)                                    41

1  Q.   This plea agreement's dated March the 3rd, 2008.  Is that
2  the date you were sentenced?
3  A.   No, I was picked up -- yeah.  No, I was sentenced
4  December the 4th.
5  Q.   So would this have been the day you entered your plea?
6  A.   Yeah, that's the day I entered the plea.
7  Q.   Okay.  And do you remember which judge it was you entered
8  the plea in front of?
9  A.   Karen Caldwell.
10 Q.   And she's the judge that sentenced you?
11 A.   Yes.
12 Q.   And was that down in London?
13 A.   Yes, sir.
14 Q.   And at the time that you entered this plea agreement, did
15 you agree to cooperate and testify truthfully if called as a
16 witness by the United States?
17 A.   Yes, sir.
18 Q.   And has the government promised you anything, Mr. Lawson?
19 A.   No, sir.
20 Q.   If your sentence is to be reduced in this case, who would
21 decide whether it gets reduced?
22 A.   The judge.
23 Q.   Do you understand under your plea agreement that you have
24 promised to be truthful if called as a witness?
25 A.   Yes, sir.

*LAWSON - Direct (Mr. Smith)*                                          42

1    Q.   What do you understand, Mr. Lawson, would happen here

2    today if you were not truthful under oath?

3    A.   Another one to five.

4    Q.   Another what?

5    A.   One to five for perjury.

6    Q.   One to five what?

7    A.   Years.

8    Q.   Okay.  And what would happen to your chances of getting

9    your sentence revisited by the district judge if you were not

10   truthful?

11   A.   None.

12   Q.   Mr. Lawson, you say you grew up in Big Creek?

13   A.   Yes, sir.

14   Q.   What kind of jobs have you held?

15   A.   Growing pot, farming.

16   Q.   Have you ever been employed?

17   A.   Very little.

18   Q.   You have children?

19   A.   Yeah, two.

20   Q.   What are their ages?

21   A.   My daughter, she's 34; and my son, I think, is 29.

22   Q.   How far did you go in school?

23   A.   I completed the 6th.

24   Q.   And what school was that that you finished 6th grade in?

25   A.   Big Creek.

LAWSON - Direct (Mr. Smith)                                    43

1    Q.   And Mr. Lawson, have you been convicted of drug crimes

2    before?

3    A.   Yes, sir.

4    Q.   How many times have you been convicted?

5    A.   Twice before this one.

6    Q.   Is that over in Manchester in Judge Maricle's court?

7    A.   One time -- no, no, this is federal.

8    Q.   Okay.  You got two prior convictions before this one?

9    A.   Yes.

10   Q.   So you now have three?

11   A.   Yeah.

12   Q.   And all three of those were in federal court?

13   A.   Yes, sir.

14   Q.   When were you first convicted?

15   A.   I think it was '88, something like that.

16   Q.   '88?

17   A.   Um-hmm.

18   Q.   And what were you convicted of in '88?

19   A.   Cocaine and -- marijuana and cocaine.

20   Q.   And Mr. Lawson, do you recall, before getting that

21   conviction, having your picture put in newspapers?

22   A.   Yes, sir.

23   Q.   I'd like to hand to you what's marked as Government's

24   Exhibit D68.  Do you recognize that?

25   A.   Yes.

*LAWSON - Direct (Mr. Smith)*                                          44

1    Q.   Is that a newspaper article?

2    A.   Yes, sir.

3    Q.   Of a story concerning yourself?

4    A.   Yes, sir.

5    Q.   Whose picture is that on the newspaper?

6    A.   That's me.

7             MR. SMITH:  I'd move for the introduction of

8    Government's Exhibit D68, Your Honor.

9             THE COURT:  Any objection?

10                              (No verbal response.)

11            THE COURT:  Exhibit D68 will be admitted.

12                        (Government Exhibit No. D68

13                        was admitted into evidence.)

14            MR. SMITH:  If the Court would permit publishing that

15   at this time.

16            THE COURT:  May be displayed to the jury.  We'll give

17   the clerk just a moment to make sure --

18            MR. SMITH:  Apologize, Your Honor.

19            THE COURT:  Mr. Smith, why don't we take an early

20   break.  We'll take a short break.  We may take another break

21   again this morning.  We'll be in recess approximately ten

22   minutes.  Please keep in mind the admonition you were given

23   earlier.  We'll be in recess for ten minutes.

24                        (The jury left the courtroom at 10:03 a.m.)

25            THE COURT:  Thank you.  We'll be in recess for ten

*LAWSON - Direct (Mr. Smith)*                                        45

1    minutes.

2                    (Recess from 10:04 a.m. until 10:16 a.m.)

3                    (The jury entered the courtroom at 10:16 a.m.)

4            THE COURT:  Thank you.  The record will reflect all

5    members of the jury are present.  Parties and counsel are also

6    present.

7            Mr. Lawson, of course, you're still under oath.

8            Mr. Smith, you may continue.

9    BY MR. SMITH:

10   Q.  Mr. Lawson, I believe we're now publishing the copy of

11   the article.  There's a picture there on the center of the

12   screen.  Could you describe for us who that person is in

13   there?

14   A.  Yes, sir, that's me.

15   Q.  And what's your background?  What have you got in your

16   background?

17   A.  Marijuana.

18   Q.  And do you remember being interviewed for that article?

19   A.  Yes, I do.

20   Q.  Who did you give an interview to?

21   A.  Lexington Herald and Bill Estep.

22   Q.  And where did you all conduct that interview?

23   A.  Sugar Creek and Red Bird.

24   Q.  And did the reporters actually go out in the mountains

25   with you?

*LAWSON - Direct (Mr. Smith)*                                         46

1    A.   Yes.

2    Q.   And Bill Estep take that picture of you there?

3    A.   Yeah.

4    Q.   Now, at that time, Mr. Lawson, you hadn't had any

5    convictions for marijuana growing, had you?

6    A.   No.

7    Q.   And what kind of a drug business did you have?  About how

8    much marijuana were you growing at the height of your

9    business?

10   A.   The most, the highest was -- I think I made about 350,000

11   one year.

12   Q.   $350,000?

13   A.   Yeah.

14   Q.   You made that in one year?

15   A.   Um-hmm.

16   Q.   Growing marijuana, selling it?

17   A.   Yes, sir.  Yeah.

18   Q.   And did you grow all that marijuana in Clay County?

19   A.   Yes.

20   Q.   And did you sell that marijuana there in Clay County?

21   A.   No.  I sold it to up north.

22   Q.   Did they come from up north to Clay County to get it?

23   A.   Yes, they did.

24   Q.   And that's one of your marijuana patches there that you

25   took the reporters to?

LAWSON - Direct (Mr. Smith)                                         47

1    A.   Yeah.

2    Q.   Now, in the course of your life, did you end up getting a

3    conviction shortly after this article came out?

4    A.   Yes, I did.

5    Q.   And do you remember who arrested you?

6    A.   FBI agent Phil Sheets.

7    Q.   And do you remember how long it was after this article

8    made the newspapers in the Lexington Herald Leader that you

9    got arrested by the FBI?

10   A.   Very few days.

11   Q.   I'd like to hand to you now what's been marked as

12   Government's Exhibit D69.  Did you also give an interview or

13   was your interview also published in the USA Today?

14   A.   I can't say for sure about that now.  I think so.

15   Q.   Okay.  Let me ask you this.  Is that D69 in front of you,

16   do you recognize your picture in that article?

17   A.   Yes.

18   Q.   All right.  And that's a picture of you and who else?

19   A.   My ex-wife, Blenda, and the top one is Gatewood

20   Galbraith.

21   Q.   And that appeared in USA Today?

22   A.   Yep.

23            MR. SMITH:  I'd move the introduction of Government's

24   Exhibit D69.

25            THE COURT:  Any objection?

LAWSON - Direct (Mr. Smith)                                      48

1                                        (No verbal response.)

2              THE COURT:  Exhibit D69 will be admitted.

3                      (Government Exhibit No. D69

4                      was admitted into evidence.)

5              MR. SMITH:  Ask that that be published for the jury,

6     please.

7              THE COURT:  It may be published.

8     Q.   Now, this picture came out in the USA Today, Mr. Lawson,

9     and that's you, you said, and your ex-wife?

10    A.   Yes, sir.

11    Q.   Y'all are no longer married?

12    A.   No, sir.

13    Q.   And do you recall who took those pictures of you for the

14    newspapers?

15    A.   No.  Can't remember.

16    Q.   Was there a lot of talk in Clay County about you and your

17    marijuana growing business after these articles came out in

18    the Herald Leader and USA Today?

19    A.   Yes, sir, there was.

20    Q.   And you recall when this article came out, was it after

21    the Herald Leader article or before?

22    A.   I think that one was after the -- well, can't say for

23    sure if it was after or just before.

24    Q.   Okay.  Now, when you went to the prison for the first

25    time, that happened shortly, you say, after these articles

*LAWSON - Direct (Mr. Smith)*                                      49

1    came out in the newspapers?

2    A.    Yes.

3    Q.    And how long did you stay in prison, Mr. Lawson?

4    A.    I got 36 months, and I think I stayed 24 or something

5    like that.

6    Q.    Okay.  And then when you got released from prison, where

7    did you go, Mr. Lawson?

8    A.    Back to Clay County.

9    Q.    Okay.  And did you take up residence back in Big Creek?

10   A.    Yes, sir.

11   Q.    And while there back in Big Creek, did you get back

12   involved in -- or let me ask you this.  Have you ever gotten

13   involved in politics down there --

14   A.    Yeah, a little bit, yeah.

15   Q.    -- in Big Creek?  Let's see.  During the time period you

16   say you got back out from prison, how did you get involved in

17   politics?

18   A.    One of my friends, he was sheriff, and I just kind of got

19   back in the drug business again.

20   Q.    So you had a friend who was sheriff.  Who was that?

21   A.    Harold Sizemore.

22   Q.    And did Harold need you to help him some way in the

23   election over there?

24   A.    Yeah.

25   Q.    And how was it that you could help him, Mr. Lawson?

LAWSON - Direct (Mr. Smith)                                    50

1    A.   With voters and people and money.

2    Q.   Okay.  Did you know a lot of people over there in Big

3    Creek?

4    A.   Yes, sir.

5    Q.   And when you say there was money, what was the need for

6    money over there in Big Creek?

7    A.   For the election votes.

8    Q.   And how was it needed to help in the elections and

9    voting?

10   A.   Buy votes.

11   Q.   And did you buy votes?

12   A.   Yes, sir.

13   Q.   And tell us generally how you go about buying votes over

14   there in Big Creek for these candidates.

15   A.   Well, you just, you would know everybody around and you

16   know who would sell, and everybody -- that's what everybody's

17   looking for.

18   Q.   So when would you start going around trying to get these

19   voters to sell their votes?

20   A.   Usually just a little bit before election.

21   Q.   And did you kind of go generally to the same hollers;

22   same families, basically, every election?

23   A.   Yeah, you always know who you're gonna go to.

24   Q.   So how many voters did you count on about every election

25   that you could go out and bribe to vote with money?

LAWSON - Direct (Mr. Smith)                                        51

1    A.   Most of the time, probably about 50 some.  Between 50,

2    60, something like that.

3    Q.   Between 50 and 60 voters?

4    A.   Um-hmm.

5    Q.   And who would bring you this money that you would take to

6    bribe these voters with?

7    A.   Well, the one time, Stanley Bowling, he come by and I

8    didn't want to keep the money, and another fella kept it.  But

9    the third come by the house and set there, and I took the

10   voters and paid the voters.

11   Q.   Okay.  So you remember one time Stanley Bowling brought

12   you some money?

13   A.   Yeah.

14   Q.   Why didn't you want to handle the money?

15   A.   I just didn't want to keep the money.

16   Q.   Were you on supervised release?

17   A.   Huh?

18   Q.   Were you on some kind of supervision by the probation

19   office?

20   A.   Yeah, I was on probation.

21   Q.   So what election was that that Stanley Bowling came to

22   you?

23   A.   2002.

24   Q.   And what was he running for; do you remember?

25   A.   Magistrate.

*LAWSON - Direct (Mr. Smith)*                                                   52

1   Q.   And did you all have some conversations about what he

2   wanted you to do with the money?

3   A.   Yes.

4   Q.   What did he say?

5   A.   Buy votes for him, you know, help him.

6   Q.   Okay.  How long has it been since you've last seen

7   Stanley Bowling?

8   A.   I've seen him just a little bit after the election, and

9   that was the last time.

10  Q.   Okay.  Do you see him here in the courtroom this morning?

11  Understand you're going to have to look all the way around the

12  room here.

13  A.   Can't say for sure, because everybody changes over seven

14  or eight years, nine.

15  Q.   Okay.  Are you a person that needs glasses, Mr. Lawson?

16  A.   Yes, sir.

17  Q.   Are you able to see me okay?

18  A.   Yeah.

19  Q.   All right.  Why don't you have your glasses this morning,

20  Mr. Lawson?

21  A.   I left them at the prison.

22  Q.   Okay.  Now, in the course of that conversation that you

23  had with Mr. Bowling, you said he gave you some money.  How

24  much money did he give you?

25  A.   There was somewhere a little over, I think it's about --

LAWSON - Direct (Mr. Smith)                                          53

1    I never really counted.  Spent a little over 5,000 or

2    something or other.  Bought 50 some votes, I think, 54 votes.

3    Q.   You bought 54 votes?

4    A.   Yeah, $50 a vote.

5    Q.   And you were paying 50 a vote?

6    A.   Yeah.

7    Q.   And where were you taking your voters that you were

8    paying this money?

9    A.   Down to Big Creek School.

10   Q.   And what was the plan to do with the voters once you got

11   them down to the Big Creek School?

12   A.   They'd vote and then come back up to the house, and I

13   paid them.

14   Q.   And did you have any idea whether or not they voted the

15   way they were supposed to?

16   A.   No, not really.  Just I took them down there, and they

17   went in, took care.

18   Q.   Did you know who the election officers were inside?

19   A.   Yeah, I think it was Alan Roberts.

20   Q.   And had Alan Roberts ever been involved in buying votes

21   or bringing money in to buy votes before?

22   A.   Yes, sir.

23   Q.   When had Alan Roberts been involved in buying votes?

24   A.   In '86 or '87, something like that, I give him eight or

25   nine thousand dollars for election, to help.

LAWSON - Direct (Mr. Smith)                                          54

1   Q.   Okay.  And did he tell you who he was going to help with

2   that money?

3   A.   It was supposed to went to Gayle House and Cletus

4   Maricle.

5   Q.   Okay.  And Gayle House and Cletus Maricle, what were they

6   running for?

7   A.   Gayle was running for judge.  I'm not really -- it was

8   just to help.

9   Q.   So you believe it was to help Mr. House?

10  A.   The election.

11  Q.   And his race for judge?

12  A.   Yeah.

13  Q.   Okay.  And Alan Roberts took how much money from you?

14  A.   Eight to nine thousand.

15  Q.   And where did that money come from?

16  A.   From drug dealing I made.

17  Q.   Now, you said when Stanley Bowling brought you that money

18  that you didn't want to handle it.  So who handled the money?

19  A.   Yeah.

20  Q.   Who handled the money?

21  A.   Garrett Gilbert.

22  Q.   Is he a fella you'd known very well?

23  A.   I'd known him all my life.

24  Q.   Had he been involved in buying votes before?

25  A.   Yes.

LAWSON - Direct (Mr. Smith)                                        55

1   Q.   What was his role, what did he do that day?

2   A.   He set in the vehicle.  He's too big a guy to do anything

3   else.

4   Q.   So he sat in the vehicle and did what?

5   A.   He just sat there and held the money.  I'd go get the

6   money when the people come back and pay them.

7   Q.   Okay.  Now, when you take them in there, you take them to

8   Alan Roberts?

9   A.   I took them to there; and yeah, they'd go in, tell him

10  who sent them in.

11  Q.   And when Alan Roberts took them in, did he actually go

12  behind the curtain with them?

13  A.   I don't know.  I wasn't in there.

14  Q.   Okay.  So you didn't go close enough where you could

15  watch?

16  A.   No, I wasn't allowed in there.

17  Q.   You weren't allowed?

18  A.   No.

19  Q.   Did they restrict how close you could get to the polls?

20  A.   Not really.  Never did really say.  Just that I wasn't

21  allowed down there.

22  Q.   Okay.  When did Stanley bring you the money?  Do you

23  remember how many days before the election it was he brought

24  you the money?

25  A.   It was the night before.

LAWSON - Direct (Mr. Smith)                                         56

1    Q.   Okay.  And where did he take the money to to give to you?

2    A.   He --

3    Q.   Where did y'all meet?

4    A.   Stanley didn't give me the money.  He give it to Garrett

5    Gilbert.

6    Q.   And where did this take place, though?

7    A.   I don't know.  He gave it to him, and Garrett came back

8    to me and told me he brought it to him.

9    Q.   And you spent all that money that day?

10   A.   I wouldn't say all of it, but I spent 54 votes.

11   Q.   What did you do with the rest of it?

12   A.   He took it back with him when he left, Garrett Gilbert.

13   Q.   Oh, he did?

14   A.   Um-hmm.

15   Q.   And you said Stanley Bowling came back and talked to you

16   after election day?

17   A.   About 10:00 that night, 11:00, he came back.  I was

18   asleep at my daddy's.  He knocked on the door.  He was there,

19   shook my hand and thanked me and gave me $500 for helping him.

20   Q.   Had the votes already been counted, and did they know who

21   won the race when he brought you the money?

22   A.   Yes.

23   Q.   And who won race?

24   A.   Stanley Bowling.

25   Q.   Now, are you aware of anybody else handling money for

*LAWSON - Direct (Mr. Smith)*                                                    57

1    that election that day?

2    A.   There was a few around, but I never went around them.   I

3    just mostly stayed around my house there.

4    Q.   Was there anybody else handling money for other

5    candidates that you know at Big Creek?

6    A.   Yeah, David -- Dave Hoskins was supposed to been handling

7    some for Jennings White.

8    Q.   What was Jennings White running for?

9    A.   He was running for clerk.

10   Q.   Okay.  Do you know a fella by the name of Charles Wayne

11   Jones?

12   A.   Yeah, I know him and know of him, yeah.

13   Q.   And what's his name?  What does he go by, do you know?

14   A.   All I ever knowed him was just his real name, Charles.

15   Q.   Charles?

16   A.   Yeah.

17   Q.   Okay.  And how long have you known Charles?

18   A.   I really don't know him that good.  I just knowed him

19   when he worked at the food stamp office a little bit, and I'd

20   seen him out in the mountains a time or so.

21   Q.   And when you saw him out in the mountains, what was he

22   doing?

23   A.   Growing dope.

24   Q.   Where was his marijuana growing?

25   A.   Down in the southern branch.

*LAWSON - Direct (Mr. Smith)*                                              58

1    Q.   Do you remember when that was that you saw him?

2    A.   Back in -- it was back in the early '80s.

3    Q.   Okay.  And what were you doing out in the woods that day?

4    A.   I was growing dope.

5    Q.   And did you fellas talk when you met out there in the

6    woods?

7    A.   No.  I happened to be already in the mountains when he

8    come in, and he didn't see me.

9    Q.   When you're growing marijuana, do you kind of have to

10   keep a watch on things growing?

11   A.   Yeah.

12   Q.   Is that what you were doing that day?

13   A.   Yeah, I was out working it.

14   Q.   What do you mean working it?

15   A.   Hauling it, fertilizing.

16   Q.   Does it take quite a bit of work to work a marijuana

17   patch?

18   A.   Yeah, it does.

19   Q.   Do you consider yourself pretty good at it?

20   A.   Yeah.

21   Q.   How much marijuana do you think you've grown in your

22   lifetime, J.C.?

23   A.   A lot.

24   Q.   Got any idea?

25   A.   Not really.

LAWSON - Direct (Mr. Smith)                                    59

1  Q.   What would you average in a year?  Would you try to put

2  out so many plants each year?

3  A.   Well, the one year I was talking about, I think I got

4  about 300 pound.

5  Q.   How many plants do you have to grow to harvest 300

6  pounds?

7  A.   Probably about 2 or 3 thousand.

8  Q.   And you grew all these thousands of plants there in Clay

9  County?

10 A.   Yes, sir.

11 Q.   Weren't you afraid of the law?

12 A.   Not really.

13 Q.   What did you do to protect yourself?

14 A.   Just I knowed kind of everybody, and kind of helped the

15 sheriff and all them out.

16 Q.   How did you help the sheriff out?

17 A.   With money and his family.

18 Q.   And what occasions did you have to give him money?  For

19 elections or other times?

20 A.   Elections or if they need money for the family, family

21 got sick or something or other.

22 Q.   How much money did you give the sheriff; do you think?

23 A.   I probably give, I'm going to say 15, 20 thousand.  I'm

24 not for sure.  Maybe a little more, could have been a little

25 less.  I don't know.

*LAWSON - Direct (Mr. Smith)*                                          60

1   Q.   Did he ever do anything to help you?

2   A.   Yeah.

3   Q.   What would he do to help you?

4   A.   Well, his wife, she would always call me if something was

5   going on, tell me what was going on, and I'd know not to go

6   where I didn't need to be.

7   Q.   Do you have any recollection of an example you can share

8   with us where she gave you a call?

9   A.   Yeah.  They was couple times that there was a pot patch

10  somebody reported, and they was having to get it, and they was

11  laying in wait.  I was called not to go there.  My friend was

12  gone.

13  Q.   Said his friend was gone?

14  A.   Yeah.

15  Q.   Was that a code word?

16  A.   Yeah, Harold was my friend.

17  Q.   That was all the information you'd get?

18  A.   Yeah.

19  Q.   What did that mean to you when she told you that?

20  A.   That he was there watching it.

21  Q.   What would you do when you got that call?

22  A.   I wouldn't go back around it.

23  Q.   Did they ever cut your marijuana?

24  A.   Yeah.

25  Q.   Did he notify you, let you know they were going to cut it

LAWSON - Direct (Mr. Smith)                                          61

1   before they did?

2   A.   Yeah, she would do it.  One time, I had a patch that he

3   found and was going to cut near the road.  He was going to

4   bring the governor up to cut it.  It was probably 30, 40 foot

5   out of the road.  He told me not to cut it, he was going to

6   bring him out there.  So I went there, cut two or three plants

7   out of it and left the rest of it.

8   Q.   And did the governor show up and cut those plants with

9   the governor's visit?

10  A.   I never seen him, but they come and cut it.

11  Q.   So when you went back, the plants were gone?

12  A.   Well, when I drove back, I seen they were gone.

13  Q.   Oh, you drove by and saw they were gone?

14  A.   Um-hmm.

15       MR. SMITH:  Have just a second, Your Honor?

16       THE COURT:  Yes.

17  Q.   Do you know Cletus Maricle?

18  A.   Yes, sir.

19  Q.   How long have you known Cletus Maricle?

20  A.   A long time.

21  Q.   And you had any dealings with him over the years?

22  A.   No, sir.

23  Q.   Did you ever hire him to work for you as a lawyer or --

24  A.   I think one time, I had him as a lawyer.  But that's been

25  a long time ago.

LAWSON - Direct (Mr. Smith)                                          62

1    Q.   And what was the reason that you needed him for a lawyer?

2    A.   I think it was in a divorce case.   My first wife.

3    Q.   And during the time period that you know him, did you

4    know him to be close to Wayne Jones, Charles Jones?

5    A.   I've just seen Wayne in his office time or two when I'd

6    go by.

7    Q.   And you'd see him in his office?

8    A.   Um-hmm.

9    Q.   What was he doing in his office?   Was that where he was a

10   lawyer or when he was a judge?

11   A.   That was when he was a judge.

12   Q.   And you'd see Wayne Jones in his office?

13   A.   Yeah, couple times.

14   Q.   Were you there doing court business when you were going

15   to the courthouse?

16   A.   Yeah, I was there to see him about trying to get my son

17   out of jail.

18   Q.   And how did you go about trying to talk to Judge Maricle

19   about it?

20   A.   Well, I finally met him in the hall and talked to him in

21   the courthouse.   I never went into his office.

22   Q.   Did he agree to talk to you about this pending court

23   case?

24   A.   No.

25   Q.   He didn't talk to you?

*LAWSON - Cross (Mr. Pinales)*                                             63

1    A.    Uh-uh.

2    Q.    Are you mad at him over that?

3    A.    Not really.

4    Q.    Now, you said earlier that while you were in business and

5    making money, you tried to stay in good with some of the

6    people in power over there in Clay County?

7    A.    Yes, sir.

8    Q.    Who do you consider to be the power, people who hold the

9    power in Clay County?

10   A.    Well, the judges and the sheriff.

11   Q.    Okay.  And did you ever run for office yourself?

12   A.    No.

13   Q.    You just supported other candidates?

14   A.    Yes, sir.

15            MR. SMITH:  Just one more second.

16            THE COURT:  Yes, sir.

17            MR. SMITH:  That's all I have.

18            THE COURT:  All right.  Thank you.  Mr. Pinales?

19            MR. PINALES:  Thank you, Your Honor.

20                           CROSS-EXAMINATION

21   BY MR. PINALES:

22   Q.    Good morning.  I'm Marty Pinales, and along with David

23   Hoskins and Candace Crouse, we represent Cletus Maricle.  I

24   have just a few questions to ask of you.

25       Mr. Smith started his questioning asking you about the

*LAWSON - Cross (Mr. Pinales)*                                    64

1    plea agreement that you have.

2    A.   Yes, sir.

3    Q.   And you're familiar with that plea agreement?

4    A.   Yeah.

5    Q.   And you certainly read it, even though you may have

6    troubles today without your glasses?

7    A.   I've read it before.

8    Q.   Sure.  And he asked you questions about hoping, by

9    testifying today and in other cases, you hope to get your

10   sentence reduced?

11   A.   Yes.

12   Q.   And you understand that the only person, the only person

13   that can reduce your sentence is the judge?

14   A.   (Nodding affirmatively).

15   Q.   Correct?

16   A.   Yes.

17   Q.   And you understand, though, that the only person that can

18   ask the judge for a reduction is the prosecuting attorney?

19   A.   Yes.

20   Q.   So before the judge ever has the chance to reduce your

21   sentence, the prosecutor has to file the -- the assistant

22   United States attorney has to file a motion on your behalf?

23   A.   Yeah.

24   Q.   And if the prosecutor doesn't file that motion, the judge

25   can't consider it?

*LAWSON - Cross (Mr. Pinales)*                                          65

1    A.   Right.

2    Q.   Thank you.  I'm a little confused on timing.  So if you

3    could help me out, you said you got your first conviction in

4    what year?

5    A.   It was '86, '87, somewhere in there.  I can't say for

6    sure now.  It's been a while back.

7    Q.   And you said you got a three-year sentence; but with good

8    time, you got out after two?

9    A.   Yeah.

10   Q.   And then I don't know if you testified, but I'm asking,

11   when did you get your second conviction?

12   A.   I think in '88.

13   Q.   And in '88, you received a sentence of?

14   A.   Thirty-six months.

15   Q.   And you went in and served two years?

16   A.   Yeah.

17   Q.   Again.  And then the last one was 2008?

18   A.   The last one --

19   Q.   The one you're serving now?

20   A.   Yeah, they picked me up in 2007.

21   Q.   2007, and you got a ten-year sentence?

22   A.   Yeah.

23   Q.   So you should be getting out, with good time, about 2015

24   and 2016, somewhere in that area?

25   A.   The max date is 2016.

LAWSON - Cross (Mr. Pinales)                                    66

1    Q.   Okay.  Prosecutor was showing some articles, and we saw

2    it on the screen, and the first article was in the Lexington

3    paper?

4    A.   Yeah.

5    Q.   And then the second article was in the USA Today?

6    A.   USA Today.

7    Q.   And I think the caption that I remember said that you

8    were the Robin Hood of Clay County.

9    A.   Yes.

10   Q.   Is that what you considered yourself?

11   A.   Yeah.

12   Q.   Okay.  And you considered yourself the Robin Hood because

13   you were a great believer that marijuana should be made legal,

14   right?

15   A.   Yeah.

16   Q.   And you disagreed with the marijuana laws of both the

17   Commonwealth of Kentucky and the United States of America?

18   A.   Not all the laws.

19   Q.   No, I mean with regard to marijuana.

20   A.   Yeah.

21   Q.   And so you were not ashamed or were proud of going public

22   and saying what you believed there should be a change in the

23   law?

24   A.   No, sir.  No, I wasn't ashamed.

25   Q.   Right.  In addition to those articles, you also wrote a

LAWSON - Cross (Mr. Pinales)                                    67

1   letter to the editor one time, didn't you, back in Manchester?

2   A.   Yeah.

3   Q.   And that letter to the editor in the <u>Manchester</u>

4   <u>Enterprise</u> was basically published and a complaint about the

5   then-judge Cletus Maricle being too hard on drug dealers?

6   A.   No, sir.  It was on my son.

7   Q.   Yes.  And your son was in jail?

8   A.   Yes, sir.

9   Q.   And this is what you were just talking to Mr. Smith

10  about, trying to approach the judge about letting your son

11  out, right?

12  A.   Yeah.

13  Q.   And he didn't let your son out?

14  A.   No, but everybody else got out.

15  Q.   But he didn't let your son out?

16  A.   No, sir.

17  Q.   And you wrote a letter to the editor complaining --

18  A.   Um-hmm.

19  Q.   -- about Judge Maricle not letting your son out?

20  A.   Yeah.

21         MR. PINALES:  Could I have a moment, Your Honor?

22         THE COURT:  Yes, sir.

23         MR. PINALES:  I have nothing further.  Thank you,

24  Your Honor.

25         THE COURT:  All right.  Thank you.  Mr. Bayer?

LAWSON - Cross (Mr. Bayer)                                           68

1                              CROSS-EXAMINATION

2       BY MR. BAYER:

3       Q.   Mr. Lawson, do you remember from last week, I'm Bennett

4       Bayer.  I'm Doug Adams' attorney.

5       A.   Yeah.

6       Q.   You never had any dealings with Doug Adams at all?

7       A.   No, sir.

8       Q.   Do you even know him?

9       A.   No.

10      Q.   When you were buying votes, I heard you say you helped

11      Edd Jordan?

12      A.   And Freddy Thompson and Gayle House and Stanley Bowling.

13      Q.   Okay.  Now, you never did anything with Doug Adams?

14      A.   No.

15      Q.   Have you ever talked with him?

16      A.   No.

17              MR. BAYER:  I don't have anything else.  Thank you.

18              THE COURT:  Thank you.

19              MR. WHITE:  No questions, Your Honor.  Thank you.

20              THE COURT:  Mr. Abell?

21              MR. ABELL:  Judge, I don't have any questions for Mr.

22      Lawson.

23              THE COURT:  Thank you.

24              Mr. Baldani?

25      ///

1                            CROSS-EXAMINATION

2      BY MR. BALDANI:

3      Q.   Mr. Lawson, I represent Freddy Thompson, and I was

4      sitting here while the prosecutor asked you a whole slew of

5      questions, and you never said Freddy Thompson's name one time,

6      did you?

7      A.   No.

8      Q.   All right.  Well, I want to ask you how, in response to

9      Mr. Bayer's question, Mr. Thompson's name comes up for the

10     first time.

11     A.   Well, Mr. Thompson, he was -- he was just throwing him on

12     the voting ballot when I was paying for votes, you know.  It

13     was for him and Edd Jordan, Gayle House and Stanley Bowling.

14     Q.   Now, Freddy Thompson, you're not telling this jury that

15     Freddy Thompson ever asked you to buy votes for him, did he?

16     A.   No.

17     Q.   Never?

18     A.   No.

19     Q.   Let's make this clear.

20     A.   Yeah.

21     Q.   Because I don't understand how his name comes up just on

22     cross-examination when -- so Freddy Thompson never asked you

23     to do any illegal act for him, did he?

24     A.   No, sir.  He just asked me to vote for him, help him,

25     that's all.

*LAWSON - Cross (Mr. Baldani)*                              70

1    Q.   Okay.  The only thing he ever asked you to do for him was

2    the legitimate act of casting a vote?

3    A.   Yes.

4    Q.   And the prosecutor asked you about who has the power in

5    Clay County.  Right?

6    A.   Yeah.

7    Q.   And you said the sheriff, the judge.  Well, there's other

8    people have power in Clay County, at least back when you were

9    a free man, right?

10   A.   Yeah.

11   Q.   Jennings White had a lot of power, didn't he?

12   A.   Yeah.

13   Q.   Doug White had a lot of power?

14   A.   Yeah.

15   Q.   The whole White family had a lot of power?

16   A.   Yeah.

17   Q.   They pretty much ruled the county, didn't they?

18   A.   Pretty well.

19   Q.   Freddy Thompson never had any power back when you were a

20   free man, did he?

21   A.   No.

22   Q.   He was just known as a guy whose dad had a hardware

23   store?

24   A.   Right.

25   Q.   Never asked you for a thing except do the legitimate act

*LAWSON - Cross (Mr. Simons)*                                      71

1   of casting a vote?

2   A.   Yes.

3              MR. BALDANI:  That's all.

4              THE COURT:  Thank you.  Mr. Gilbert?

5              MR. GILBERT:  I have no questions, Your Honor.

6              THE COURT:  Miss Hughes.

7              MS. HUGHES:  Nor do I.

8              THE COURT:  All right.

9              MR. SIMONS:  I do, Your Honor.

10             THE COURT:  Yes, sir.

11                      CROSS-EXAMINATION

12  BY MR. SIMONS:

13  Q.   Mr. Lawson, I've seen these articles in the Lexington

14  paper, the USA Today.  You were a prominent and good marijuana

15  farmer; were you not?

16  A.   Yes, sir.

17  Q.   Grew a good product, expensive product?

18  A.   Yes, sir.

19  Q.   And you would be one of the more notorious marijuana

20  growers in Clay County or in southeastern Kentucky; would you

21  not be?

22  A.   Notorious, what do you mean?

23  Q.   Famous?

24  A.   Yeah.

25  Q.   And were you kind of proud of that?

*LAWSON - Cross (Mr. Simons)*                                72

1    A.   Yes.

2    Q.   That's what I thought.  You kind of liked it.  You liked

3    being called the Robin Hood of Clay County.  Fair enough?

4    A.   Not really.

5    Q.   Okay.  But you were kind of proud of the fact that you

6    grew a lot of marijuana and it was good?

7    A.   Yeah.  I done it.  I wasn't ashamed of it.

8    Q.   Would you say that in doing that, you would need to know

9    most of the people who would be involved in marijuana

10   production and sales in Clay County?

11   A.   Yeah.

12   Q.   Okay.  And you've talked a little bit about my client,

13   Stanley Bowling, the gentleman that you could not recognize.

14   A.   Yeah.

15   Q.   I want to ask you this.  He never had anything to do with

16   marijuana or drugs or anything like that, did he?

17   A.   No, sir.

18   Q.   And you didn't even know him, you'd never met him in your

19   life until May of 2002; is that correct?

20   A.   Right.

21   Q.   And how many Lawsons are there that live up on Lawson

22   Mountain near Big Creek?

23   A.   Quite a few.

24   Q.   Right.  There's a lot of voters in your extended family,

25   aren't there?

*LAWSON - Cross (Mr. Simons)*                                              73

1    A.   Um-hmm.

2    Q.   Okay.  And Stanley Bowling came to you the first time he

3    ever ran for magistrate in May of '02, and he wanted your

4    support and help; is that fair enough?

5    A.   Yeah.

6    Q.   And he wanted your family to vote for him, those who

7    could vote that were not convicted of crimes and whatnot.  Is

8    that true?

9    A.   Yeah.

10   Q.   Now, Stanley won the election ultimately in May of '02;

11   did he not?

12   A.   Yeah.

13   Q.   After he won that election, did you ask him for some

14   favors?

15   A.   I asked him, yeah, a couple times about some gravel.

16   Q.   Three or four times you called up, you asked him to put

17   gravel on some of your roads, didn't you?

18   A.   Yeah.

19   Q.   The mountains.  And he refused you every time; did he

20   not?

21   A.   No, he done it two or three times.

22   Q.   One time, he put gravel on a road because a family member

23   died, and it was necessary for the cemetery?

24   A.   Cemetery.

25   Q.   And every other time you called, he refused; is that not

*LAWSON - Cross (Mr. Simons)*                                      74

1   correct?

2   A.   No, sir.  He gravelled my land and house.

3   Q.   Do you remember me talking to you a couple weeks ago on a

4   Tuesday?

5   A.   Yeah.

6        MR. SIMONS:  If Your Honor please, I have the

7   transcript of that testimony.

8        THE COURT:  Yes, sir.  You can show him the document.

9   Mr. Simons, what I'm going to do, I have an extra pair of

10  reading glasses.  I'm going to give them to the witness.  I

11  don't know if they'll work or not, but you can give them a

12  shot.  Do those help you at all?

13       THE WITNESS:  Yeah, a little bit.

14  Q.   Mr. Lawson, do you have that transcript in front of you?

15  A.   Yes, sir.

16  Q.   And that was right here in this very courtroom that you

17  and I met on Tuesday, January 19.  Would you please turn to

18  page 36?

19                 (A sidebar conference was held out of the

20                  hearing of the gallery):

21       THE COURT:  The reporter tells me that there are two

22  versions of the transcript and so your page numbers aren't

23  going to match up with Mr. Smith's.

24       MR. SIMONS:  That's correct.  He's got 100 or

25  something.  I only ordered the Lawson testimony.  What I've

LAWSON - Cross (Mr. Simons)                              75

1   given him is correct.  Do you want me to work through it with

2   Steve?

3           THE COURT:  As long as he knows where his version of

4   the transcript it is.  But the reporter says that's the

5   problem, there's two different versions there.

6           MR. SIMONS:  If you'll give me a minute, I'll

7   straighten it out.

8           THE COURT:  Take your time.  I didn't know if you all

9   realized that.

10              (Sidebar conference concluded.)

11  BY MR. SIMONS:

12  Q.  Mr. Lawson, did you find page 36 in the document that's

13  before you?

14  A.  Yeah.

15  Q.  And I want to ask you -- you were under oath that day;

16  were you not?

17  A.  Yes, sir.

18  Q.  I want to start at line number 3, and this is my

19  question.  Did you call him multiple times and ask him to put

20  gravel on personal roads for your family?  And what was your

21  answer?

22  A.  Yes, sir.

23  Q.  And then did I ask you, in fact, did he gravel a cemetery

24  road when you had a relative die?  And what was your answer?

25  A.   My mother and my sister and -- family, whatever I had.

LAWSON - Cross (Mr. Simons)                                        76

1   Q.  Yes.  And then I asked you, and he put some gravel on
2   that?
3   A.  Yeah.
4   Q.  You said yes, sir.  Right?
5   A.  Yeah.
6   Q.  And then the next line, 11, I said, you asked him three
7   or four other times shortly after he was elected to put gravel
8   on your roads.  And you said?
9   A.  Yeah.
10  Q.  And then I said, and he refused every time, didn't he?
11  And you said?  What did you say?
12  A.  I said yes, sir.
13  Q.  Okay.  And that was just two weeks ago right here in this
14  courtroom when you were under oath?
15  A.  Yes, sir, but there was two or three times that I didn't
16  think about that he put gravel, and there was three or four
17  times that he denied.
18  Q.  Okay.  Now, I want to talk to you about this May, 2002
19  election.  The money you got came from Garrett Gilbert, right?
20  A.  That's who had it.
21  Q.  That's what I'm saying.  You didn't see Stanley Bowling
22  give Garrett Gilbert the money.  You got it from him, correct?
23  A.  No, he come by the house and that's where he went, come
24  back from.
25  Q.  Now, you never met Stanley Bowling, had you?

*LAWSON - Cross (Mr. Simons)*                                        77

1    A.   No, not until then.

2    Q.   Okay.  And he didn't have any way to check on anything

3    you did with this alleged money?

4    A.   No.

5    Q.   He just gave it to you, you gave it to somebody you

6    didn't know, and you were supposed to use it to buy votes for

7    him?

8    A.   Yes, sir.

9    Q.   Did you know Stanley Bowling when he came to talk to you

10   about voting for him?

11   A.   No.  We got talking and he told me, and my daddy knowed

12   his daddy and all them went around and stuff.

13   Q.   And he wanted your family and all to vote for him, right?

14   A.   Right.

15   Q.   Okay.  Now, did you tell him that your very best friend

16   in the world was running against him in that very election?

17   A.   No.  He already knowed it.

18   Q.   Junior Sparks?

19   A.   Um-hmm.

20   Q.   Who grew up right beside you?

21   A.   Right.

22   Q.   Was your very best friend that you had in Big Creek,

23   right?

24   A.   Right.

25   Q.   And he was running in the very election against Stanley

*LAWSON - Cross (Mr. Simons)*                                      78

1    Bowling?

2    A.   Yeah.

3    Q.   Is that a fact?

4    A.   Yeah.

5    Q.   All right.  Now, today is the first time that I ever

6    heard you say that Stanley Bowling gave anybody any money

7    before the election.

8            MR. SMITH:  Your Honor, I'm going to object to

9    counsel testifying.

10           MR. SIMONS:  I'll --

11           THE COURT:  You can rephrase.  I'll sustain the

12   objection.  You can rephrase the question.

13           MR. SIMONS:  Thank you, Your Honor.

14   Q.   Did you not tell me on January 19 that the money was

15   given to you by Stanley Bowling, $500, after the election and

16   the polls were closed?

17   A.   That was the night.  He had the election, he come by the

18   house.

19   Q.   Well, I want you to open that document that I've given

20   you there to page 34, please.  I'm sorry, Mr. Smith, give me

21   one second.  I'm sorry, Mr. Lawson, 33 is the page I would

22   like for you to turn to.  Can you find that?  I'm at line 7 on

23   that page.  Do you see that, sir?  Can you see line 7, Mr.

24   Lawson?

25   A.   Yeah.

1    Q.   Did I ask you this question:  Stanley would ask for your

2    help if he was seeking office.  The government says there was

3    no money that changed hands until after the election.  That's

4    true, isn't it, between you and Mr. Bowling if it happened?

5    And what was your answer?

6    A.   It was that night.

7    Q.   It was that night.  Is that not what you said?

8    A.   Yeah.

9    Q.   And I said after the election?  And you responded?

10   A.   Yep, that night.

11   Q.   About 10:00 is what you said?

12   A.   Yeah.

13   Q.   And then I said so the election was over, polls were

14   closed, right?

15   A.   Right.

16   Q.   Okay.  Thank you.  Now, you were under oath that day too?

17   A.   Yeah.

18   Q.   Now, whatever Stanley Bowling did in May of 2002, he came

19   to you and he wanted your support.  He wanted your family's

20   support, right?

21   A.   Yeah.

22   Q.   What he wanted for him, he wanted to be elected as

23   magistrate?

24   A.   Um-hmm.

25   Q.   And that's all he wanted was a vote for him, correct?

*LAWSON - Redirect (Mr. Smith)*                                      80

1    A.   Yeah.

2    Q.   Okay.

3             MR. SIMONS:  Your Honor, I think that's all I have.

4             THE COURT:  All right.  Thank you.  If we could

5    collect that.  Does anyone else need the transcript?

6             MR. SMITH:  Yes, I do, Your Honor.

7             THE COURT:  You do need it open.  Okay, we'll leave

8    it there for just a minute.  Mr. Smith, if you have any

9    redirect, you may proceed.

10            MR. SMITH:  Thank you.

11                         REDIRECT EXAMINATION

12   BY MR. SMITH:

13   Q.   Mr. Lawson, you still got your place on the page you were

14   asked to read a few lines of?

15   A.   Which one, 33?

16   Q.   Yeah.

17   A.   Yeah.

18   Q.   You see there where you were asked about middle of

19   that -- I guess line 3, I'm not following since our copy's not

20   the same as yours, but let me give you the words he was

21   reading to you.  You answered, it was that night.  He said,

22   after the election?  You said yeah, at night, about 10.  Do

23   you see that part?

24   A.   Yeah.

25   Q.   And then he goes, so the election was over, the polls

*LAWSON - Redirect (Mr. Smith)*                                     81

1   were closed, right?

2   A.   Yeah.

3   Q.   And then what was your answer?

4   A.   Before that, I bought votes, you know.

5   Q.   So you told Mr. Bowling's attorney at that time that you

6   had bought votes before that?

7   A.   Yeah.

8   Q.   Okay.  So this money that came at 10:00 at night was the

9   $500 that Mr. Bowling, you talked about, brought to basically

10  pay you for your work that day?

11  A.   Yes, sir.

12  Q.   Now, he said he was only there to get your vote.  Did you

13  have a right to vote?  You're a convicted felon at that time?

14  A.   Yeah.

15  Q.   Did you have your rights restored?

16  A.   No, sir.

17  Q.   So you couldn't vote for Mr. Bowling?

18  A.   No, sir.

19  Q.   Did he know that?

20  A.   Yes, sir.

21  Q.   So when he came to you, did anybody come with him?

22  A.   There was somebody in the vehicle.  I don't know who it

23  was.

24  Q.   There was somebody in the vehicle?

25  A.   Um-hmm.

LAWSON - Redirect (Mr. Smith)                                   82

1   Q.   What kind of vehicle was he driving?

2   A.   A truck.

3   Q.   Now, you said in answer to counsel's questions that you

4   not only, when you took the money, you didn't only have to

5   vote people for Stanley Bowling, but you had to vote them for

6   some other people, including Freddy Thompson?

7   A.   Yeah, that was about the money come back up, Garrett

8   Gilbert, and that was the other three that was thrown in the

9   pool with Stanley.

10  Q.   Who actually took the money from Mr. Bowling's hands

11  before you started buying votes?

12  A.   Garrett Gilbert.

13  Q.   Okay.  And then he delivered the money to you?

14  A.   He bought the money in the van with the money, and I'd

15  take the voter and go back over to the van to get the money.

16  Q.   Now, had you had this sit-down conversation with Mr.

17  Bowling when you said he came and wanted to get your family

18  and everybody involved in the campaign?

19  A.   Do what now?

20  Q.   Had you already talked to Mr. Bowling when you say he

21  came into your home, talked to you about helping him?

22  A.   Yeah.

23  Q.   So Gilbert comes after the visit by Bowling?

24  A.   Um-hmm.

25  Q.   And then Bowling comes after election night and brings

*LAWSON - Recross (Mr. Pinales)*                                   83

1    you $500 more money?

2    A.   Yes.

3    Q.   I see.  Mr. Thompson's attorney wanted to ask you about

4    the White family, and he asked you to agree with him that they

5    ran the county.  Do they run the county now?

6    A.   No.

7    Q.   Who runs the county now?

8            MR. BAYER:  Objection, Your Honor.

9            THE COURT:  It's responsive to matters brought in by

10   cross.  You may answer.

11   Q.   You were asked your opinion, who runs the county back

12   when the Whites were in power.  Who in your opinion now runs

13   the county?

14   A.   It was Doug Adams and Cletus Maricle.

15           MR. SMITH:  Thank you.

16           THE COURT:  Mr. Pinales.

17                     RECROSS-EXAMINATION

18   BY MR. PINALES:

19   Q.   But you've been in jail a long time?  You haven't been

20   back in Clay County, have you?

21   A.   Been about three year.

22   Q.   And you've been away from Clay County for three years?

23   You're in jail, you're a prisoner?

24   A.   Yeah.

25           MR. PINALES:  I have nothing further, thank you, Your

LAWSON - Recross (Mr. Simons)                                    84

1    Honor.

2              THE COURT:  All right.  Thank you.  Mr. Bayer?

3              MR. BAYER:  Nothing further, Your Honor.

4              MR. WHITE:  Nothing, Your Honor.

5              THE COURT:  Anyone?  Let's see, Mr. Baldani?  Let me

6    see if he has any questions?

7              MR. BALDANI:  I don't have anything else of this

8    witness, Judge.

9              THE COURT:  Mr. Simons, anything else?

10             MR. SIMONS:  I have one I can ask him here, Your

11   Honor.

12             THE COURT:  That's fine.

13                            RECROSS-EXAMINATION

14   BY MR. SIMONS:

15   Q.  Mr. Lawson, can you see me?

16   A.  Yes, sir.

17   Q.  The only person Stanley Bowling asked you to vote for was

18   him, right?

19   A.  Yeah.

20             MR. SIMONS:  Okay, thank you.

21             THE COURT:  All right.  Thank you.  Anything else of

22   the witness?

23             MR. SMITH:  No, Your Honor.

24             THE COURT:  If not, the witness may step down.  Let

25   me make sure I get those glasses back.  Thank you.

85

1          Ladies and gentlemen, I gave you a short break

2     earlier.  I want to give you another break at this time.  I'm

3     going to give you about another ten-minute break.  If you need

4     a little longer, you can advise the security officer.  We'll

5     take a longer break.  Otherwise, please keep in mind the

6     admonition given to you previously.  The jury will be in

7     recess for at least ten minutes.

8                    (The jury left the courtroom at 11:06 a.m.)

9          THE COURT:  Thank you.  Please be seated.  Before we

10    take our break, I wanted to make sure that we're ready to call

11    the next witness and that all 3500 material had been provided.

12    Mr. Smith, who will your next witness be?

13         MR. SMITH:  Yes, Your Honor.  We're going to call

14    Gilbert Acciardo.

15         THE COURT:  And everything has been provided with

16    respect to that witness?

17         MR. SMITH:  Yes, sir.

18         THE COURT:  Very well.  Yes, sir, Mr. Westberry?

19         MR. WESTBERRY:  There is one matter very briefly,

20    Your Honor.  I thought actually they may call someone other

21    than Mr. Acciardo.  It has to do with some of the contents in

22    plea agreements that have been introduced into evidence.  I

23    don't know if you want to hear about that now.  It would not

24    involve Mr. Acciardo.

25         THE COURT:  If no one needs to take a restroom

1    break --

2         MR. WESTBERRY:  Well, I'll have an uprising by my

3    co-counsel.  I don't want to do that.  I want to let you know,

4    it's probably before Mr. Roberts is called, Todd Roberts will

5    be the appropriate time.

6         THE COURT:  About how long do you think it will take

7    to address that issue?

8         MR. WESTBERRY:  Less than five minutes.

9         THE COURT:  Well, Mr. -- is it Acciardo?

10         MR. SMITH:  That's my pronunciation, Your Honor.

11         THE COURT:  That's the one we'll go by.  About how

12    long do you think that he will testify on direct?

13         MR. SMITH:  Ten minutes.

14         THE COURT:  Ten minutes, all right.

15         MR. SMITH:  It's Mr. Parman's witness.  I'm speaking

16    for him.

17         MR. PARMAN:  Probably 15 minutes, Your Honor.

18         THE COURT:  We can take this up before Mr. Roberts

19    testifies.  If he happens to be the next witness, what we'll

20    do is we'll take an early lunch break and we can take that up

21    after the jury's been excused.

22         MR. WESTBERRY:  I don't anticipate it will be very

23    long.

24         THE COURT:  All right.

25         MR. WESTBERRY:  Thank you, Judge.

*ACCIARDO - Direct (Mr. Parman)*                                    87

1          THE COURT:  Thank you.  We'll be in recess for ten

2    minutes.

3               (Recess from 11:08 a.m. until 11:19 a.m.)

4               (The jury entered the courtroom at 11:19 a.m.)

5          THE COURT:  Thank you.  The record will reflect all

6    members of the jury are present.  Parties and counsel are all

7    present.  Mr. Smith or Mr. Parman, you may call your next

8    witness.

9          MR. PARMAN:  Thank you, Your Honor.  The United

10   States would call Gilbert Acciardo.

11         THE COURT:  Thank you.

12         GILBERT ACCIARDO, GOVERNMENT'S WITNESS, SWORN

13         THE COURT:  Thank you.  Mr. Parman, you may proceed.

14         MR. PARMAN:  Thank you, Your Honor.

15                      DIRECT EXAMINATION

16   BY MR. PARMAN:

17   Q.  Good morning, sir.

18   A.  Good morning.

19   Q.  State your name for the record.

20   A.  Gilbert Acciardo.

21   Q.  Where are you from, sir?

22   A.  London, Kentucky.

23   Q.  Are you currently employed?

24   A.  No, I'm not.  I'm retired.

25   Q.  Where are you retired from?

1    A.   From Kentucky State Police.

2    Q.   How long did you work for Kentucky State Police?

3    A.   Twenty-seven years, five months.

4    Q.   As part of your duties as a Kentucky State Police

5    officer, were you also the public affairs officer?

6    A.   Yes, sir, I was.

7    Q.   How many years were you public affairs officer?

8    A.   Fourteen years in the London post.

9    Q.   Do you recall the time frame?

10   A.   Please?

11   Q.   Do you recall the time frame that you were public affairs

12   officer?

13   A.   From 1984 to 1998.

14   Q.   During the course of being public affairs officer, were

15   you contacted by news outlets and media to go undercover or go

16   in on operations that the Kentucky State Police performed?

17   A.   Yes, sir, quite frequently.

18   Q.   Do you recall an incident in 1989 when you were

19   approached about such an activity?

20   A.   Yes, sir, I do.

21   Q.   Share with the jury how that occurred.

22   A.   Yes, sir.  Scott Rapoport contacted the Kentucky State

23   Police post at London and asked if he could accompany us on an

24   eradication effort of marijuana in Clay County.

25   Q.   Did you know who Scott Rapoport was and who he was

*ACCIARDO - Direct (Mr. Parman)*                                    89

1    associated with?

2    A.   Yes, a TV magazine, "Inside Edition."

3    Q.   Share with the jury what "Inside Edition" does.  Where do

4    they publicize their work?

5    A.   They're a national TV magazine, and they travel all over,

6    and they wanted to come to Clay County and see what marijuana

7    eradication efforts that Kentucky State Police did in Clay

8    County.

9    Q.   Did you then take Mr. Rapoport in 1989 over to Clay

10   County?

11   A.   Yes, I did.

12   Q.   Share with the jury what you did once you were in Clay

13   County.

14   A.   We went to Clay County, and it was the fall of the year.

15   It was a big time of cutting marijuana for the Kentucky State

16   Police.  Our eradication efforts are quite intense at that

17   time of the year, because it's getting near the end of the

18   growing season, and if we don't get it, you know, pretty

19   quick, then the marijuana growers get it.

20        So we took him along with us on an eradication effort in

21   Clay County, just to show him what we did in Clay County.

22   Q.   In the course of public affairs officer, did you ask him

23   when this article would be published?

24   A.   Yes.  I did that with all media people that I dealt with,

25   because I wanted to get feedback, make sure that the article

ACCIARDO - Direct (Mr. Parman)                                    90

1    or the interview was accurate.  And it was about two or three

2    weeks afterwards that this aired on television, and I taped it

3    off at home because I wanted to review it and make sure that

4    everything was accurate.

5    Q.  I want to show you what's been marked as Government's

6    Exhibit V3.  Sir, did you review a DVD this morning?

7    A.  Yes, I did.

8    Q.  And is that DVD a true and accurate copy of the article

9    or the news article that was published on television in 1989,

10   pursuant to the investigation?

11   A.  Yes, sir, it is.

12   Q.  And then the video that you reviewed this morning, did

13   you mark it with anything?

14   A.  Yes, sir.  I put my initials and today's date.

15   Q.  Okay.  I want you to look at Government's Exhibit V3.

16   A.  Yes, this is it.

17            MR. PARMAN:  Your Honor, I'd move to enter that into

18   evidence.

19            THE COURT:  Any objection?  Is it D or B?

20            MR. PARMAN:  V3, Your Honor.

21            THE COURT:  V.  Exhibit V3 will be admitted into

22   evidence.

23                    (Government Exhibit No. V3

24                     was admitted into evidence.)

25            MR. PARMAN:  Your Honor, I'd ask to publish that to

*ACCIARDO - Direct (Mr. Parman)*                                     91

1    the jury, if I could have it back.

2              THE COURT:  It may be published.

3         (Government's Exhibit V3 was played in open court.)

4              MR. PARMAN:  Thank you.  That's all I have.

5              THE COURT:  Thank you.  Mr. Hoskins?

6              MR. HOSKINS:  No questions.

7              THE COURT:  All right.  Mr. Bayer?

8              MR. BAYER:  No questions, Your Honor.

9              MR. WHITE:  No questions.

10             THE COURT:  Anyone have any questions of this

11   witness?  All right.  Thank you.  You may step down.  Thank

12   you.  Let's see.  Counsel, any matters to bring up before the

13   next witness is called?

14             MR. WESTBERRY:  Do you want to discuss the one matter

15   that we broached?

16             THE COURT:  Why don't you all approach, and I need to

17   know who the next witness is first.

18                       (A sidebar conference was held out of the

19                       hearing of the gallery):

20             THE COURT:  Before we do that, Mr. Hoskins, do you

21   want me to give a limiting instruction on the 404(b) evidence,

22   that's the tape?  Essentially, the instruction would be that

23   it is admitted as evidence because although it was prior to

24   the time that alleged in the indictment, it's proof of intent,

25   preparation and plan as to how to control the political

92

1    process within the county.  Now, it may be that you don't want

2    me to give it.

3            MR. HOSKINS:  We may ask for it in the final

4    instructions.

5            THE COURT:  I wanted to check now before the next

6    witness was called.

7            MR. HOSKINS:  Thank you.

8            THE COURT:  All right.  Will Mr. Roberts be the next

9    witness?

10           MR. SMITH:  Yes, Your Honor.

11           THE COURT:  There was an issue about his plea

12   agreement.

13           MR. WESTBERRY:  Yes, Judge.  Briefly, in each one of

14   the plea agreements that have been introduced to date, and

15   there have been three, including Roberts, there is a provision

16   about polygraph examinations contained.  We know in Roberts'

17   case, and I believe I was reminded in Vernon Hacker, another

18   witness we anticipate will be called, they not only took

19   polygraphs, they failed the polygraphs.  We know that the

20   United States provided us that information in the discovery

21   materials.

22           I did not plan on cross-examining anybody about any

23   polygraph exam results, but it struck me that under the

24   circumstances that probably those paragraphs should be

25   redacted from the plea agreements, particularly as to Roberts

93

1    and Hacker, and I would think it would be appropriate as to

2    the other three as well.  I fear that the jury could draw, if

3    they start to parse through those plea agreements, they could

4    draw an unfair impression.

5              THE COURT:  Inference that because you haven't asked

6    about it, they must have passed the polygraphs?

7              MR. WESTBERRY:  Right.

8              THE COURT:  Just by virtue of that paragraph being in

9    the document.  Let's see.  That's a fair issue.  I assume that

10   these plea agreements aren't going to be shown to the jury.  I

11   know several of those have been admitted previously, but they

12   haven't been shown to the jury, at least not those particular

13   paragraphs.

14             MR. SMITH:  I have no intention, Your Honor, of

15   showing these to the jury.  Frankly, I don't have any

16   objection to redactions.  I just don't have the ability to do

17   that at this moment.

18             MR. WESTBERRY:  And I don't think we would have to do

19   it at this moment, just sometime before the exhibits are

20   submitted to the jury.

21             THE COURT:  Just making sure that everyone

22   understands they shouldn't be putting it up on the monitor to

23   show that paragraph until we've had a chance for those

24   paragraphs to redacted.

25             MR. WESTBERRY:  Yes, sir.

94

1          THE COURT:  All right.  We'll proceed in that manner.

2          MR. BAYER:  Judge, one quick thing for the record.

3     We had filed an objection to the admission of the inextricably

4     intertwined background evidence.  I just wanted to renew that

5     objection and also just renew the motion for mistrial based

6     upon that information.  That's all.  Just want to put it in

7     the record.

8          THE COURT:  As to the background evidence, I didn't

9     give an instruction Mr. Lawson because, number one, it wasn't

10    requested.  And number two, really, it went to the substance

11    of the charges starting in 2002.  And he referenced

12    specifically Mr. Bowling, contact with Mr. Bowling with

13    respect to that election.  So with respect to Mr. Lawson, it

14    wasn't necessarily background evidence.

15         Of course, this tape is -- that was just played was

16    404(b) evidence.  The Court's ruling, of course, would be the

17    same, and the Court would overrule motion for a mistrial based

18    on the admission of the evidence to this point.

19         MR. BAYER:  Thank you.

20         THE COURT:  All right.  Thank you.

21              (Sidebar conference concluded.)

22         THE COURT:  All right.  Thank you, counsel.  Mr.

23    Smith, we're about 20 minutes before noon.  I'm going to give

24    you the option.  Would you like to continue now with your

25    witnesses, or would you like to take an earlier lunch break?

ROBERTS - Direct (Mr. Smith)                                      95

1          MR. SMITH:  The United States expects this to be a

2     lengthy testimony.  So if you want to get started at this

3     point, we're ready to go.

4          THE COURT:  Let's do that.  You can call your next

5     witness, please.

6          MR. SMITH:  The United States would call Richard Todd

7     Roberts.

8          RICHARD TODD ROBERTS, GOVERNMENT'S WITNESS, SWORN

9          THE COURT:  Thank you.  Mr. Smith, you may proceed.

10                          DIRECT EXAMINATION

11    BY MR. SMITH:

12    Q.   State your name, please.

13    A.   Richard Todd Roberts.

14    Q.   And Mr. Roberts, where were you born and raised?

15    A.   I was born and raised in Clay -- well, I was born in

16    London, but I was raised in Clay County.

17    Q.   And tell us a little bit about yourself.  How far did you

18    go in school?

19    A.   Went to high school and completed some college courses.

20    Q.   And what did you do for employment after education?

21    A.   I went through a series of things.  I started out as a

22    dispatcher at the Clay County Manchester dispatch.  And then I

23    went on to work at the ambulance service there in Clay County

24    and the sheriff's office, and then I ended up at the

25    Manchester Police Department.

ROBERTS - Direct (Mr. Smith)                                    96

1    Q.   And do you know approximately when it was that you

2    started to work with the Manchester Police Department?

3    A.   The best I remember is 1996.

4    Q.   And what position did you first begin working at the

5    Manchester Police Department?

6    A.   As a patrolman.

7    Q.   And did you progress up into the ranks of the police

8    department?

9    A.   Yes, sir.  I did.

10   Q.   And could you tell us how it was you progressed?

11   A.   I was several year later, I was promoted to sergeant

12   within the police department.  And then several year after

13   that, I was promoted to the assistant chief of police.

14   Q.   And do you recall when it was that you became assistant

15   chief of police of Manchester?

16   A.   I'm wanting to think somewhere around 2000, 2001.  I

17   don't know that to be for sure, but I think that to be

18   correct.

19   Q.   And how long did you serve in that position, Mr. Roberts?

20   A.   Up until 2006.

21   Q.   And why did you leave the police department?

22   A.   I left because I'd been charged in a criminal case in

23   federal court.

24   Q.   And was that case prosecuted by the United States?

25   A.   Yes, sir, it was.

ROBERTS - Direct (Mr. Smith)                                     97

1   Q.   And did you subsequently enter a plea of guilty in that

2   case?

3   A.   Yes, sir, I did.

4   Q.   And could you tell the Court and the jury what it is that

5   you pled guilty to, Mr. Roberts?

6   A.   I pled guilty to conspiracy to commit arson and

7   obstruction of justice under the RICO act.

8   Q.   And do you recall the judge which you went before to

9   enter your plea of guilty?

10  A.   Judge Reeves.

11  Q.   And did you have a plea agreement with the United States

12  when you entered your plea of guilty?

13  A.   Yes, sir, I did.

14       MR. SMITH:  I'd like to hand the witness now what's

15  marked as Government's Exhibit PA8.

16  A.   Yes, sir, that's a copy.

17  Q.   And the last page of that document, does that have your

18  signature on it?

19  A.   Yes, sir, it does.

20  Q.   And do you recall when it was that your plea was accepted

21  by Judge Reeves in federal court?

22  A.   November the 20th, 2007.

23  Q.   And do you know when you were sentenced?

24  A.   November 21st, I think.

25  Q.   And that was of what year?

*ROBERTS - Direct (Mr. Smith)*                                          98

1    A.   2007.

2    Q.   And what sentence did you get, Mr. Roberts?

3    A.   Eighty-seven months.

4    Q.   And how far have you served in that sentence at this

5    point?

6    A.   I think 31 months; 30, 31 months.

7    Q.   Mr. Roberts, in this plea agreement with the United

8    States, did you agree to cooperate and testify truthfully, if

9    called to testify in any proceedings?

10   A.   I did.

11   Q.   And did the government make you any promises?

12   A.   As far as?

13   Q.   Reducing your sentence to a certain amount for your

14   testimony.

15   A.   There's no mention of any time that would be taken off my

16   sentence.  Just the fact that if I did cooperate, that there

17   could be a reduction.

18   Q.   And who will decide, based on your understanding of the

19   plea agreement, whether or not your sentence gets reduced any,

20   if at all?

21   A.   The judge.

22   Q.   Mr. Roberts, what's your understanding under the

23   agreement if you were to fail to testify truthfully here in

24   front of the ladies and gentlemen of the jury here today?

25   A.   I could receive an additional charge or receive more time

*ROBERTS - Direct (Mr. Smith)* 99

1   on my sentence.

2   Q.   And what would be the result of your hopes of getting a

3   reduced sentence under the terms of the plea agreement, if you

4   were to testify falsely?

5   A.   Oh, it would be invalid.  It wouldn't be enforceable.

6            MR. SMITH:  Your Honor, I'd move at this time to

7   introduce Government's Exhibit PA8.

8            THE COURT:  Any objection?

9                                     (No verbal response.)

10           THE COURT:  That document will be admitted.

11                     (Government Exhibit No. PA8

12                     was admitted into evidence.)

13   Q.   Now, Mr. Roberts, you have spent most of your life in

14   Clay County as a police officer?

15   A.   Yes, sir.

16   Q.   At least your adult life?

17   A.   Yes, sir.

18   Q.   And during the time period there, were you also active

19   and involved in the politics in Clay County, Manchester,

20   Kentucky?

21   A.   Yeah, I supported, you know, various different people.  I

22   voted for people or showed my support or having signs in my

23   yard or something, yes.

24   Q.   And when do you first recall actually getting actively

25   involved in politics down in Clay County in Manchester?

ROBERTS - Direct (Mr. Smith)                                        100

1   A.   Back when I was in high school.

2   Q.   And how was it that you first got involved, Mr. Roberts?

3   A.   Well, actually had a club there, the key club that we

4   done some things at school.  And a friend of mine and myself,

5   we just basically took a liking to politics in general.

6   Q.   Now, as you got yourself involved in politics, did you

7   take on any positions in any parties or offer yourself up as

8   any election officer or anything with the Board of Elections?

9   A.   I served as election officer in one of the elections.

10  I'm wanting to think it was back in '94.  It was in the early

11  '90s, I'm thinking.  Yeah, I know for sure it was.

12  Q.   And was that while you were with the sheriff's

13  department?

14  A.   I wanting to think I was with the ambulance service.  I'm

15  not real sure on that, but I'm thinking I was with the

16  ambulance service.  I could very well been part-time on the

17  sheriff's office.

18  Q.   As a police officer, did you have occasions to observe

19  and sometimes receive complaints about what's going on in the

20  elections in Clay County?

21  A.   Yes, sir, I did.

22  Q.   Do you recall any elections stand out in your mind as

23  being one in which there were more complaints, more calls that

24  you received?

25  A.   The 1998 election, the 2002 election.

1    Q.   Now, the 2002 election, what was the heated contest, to

2    your knowledge, in the 2002 election?

3    A.   Actually, probably the most talked about and the hottest

4    one in the thing would have been the county court clerk's

5    race.

6    Q.   And who were the candidates vying for that position?

7    A.   Jennings White and Freddy Thompson.

8    Q.   And as you recall, what involvement did you have in that

9    particular election?

10   A.   I supported Jennings White.

11   Q.   And had you known Jennings White?

12   A.   Yes, sir, I had.

13   Q.   And how long had you known Jennings White?

14   A.   Probably 15, 20 year, I guess, since I was a little boy.

15   He was raised in the same community as I was.  He actually

16   lived across the street from my grandparents there for a while

17   and then moved on down the block.  So he actually lived in the

18   community I lived in, Littleton.

19   Q.   Now, you say you received complaints in that election?

20   A.   Yes, sir.

21   Q.   Did you act on any of those complaints?

22   A.   Yes, sir, I did.

23   Q.   And what did you do?

24   A.   I contacted Special Agent Carl Johnson with the FBI and

25   consulted with him on the information that I had been given

*ROBERTS - Direct (Mr. Smith)*                                        102

1   and asked him --

2   Q.   What did you tell him?

3   A.   I told him that they were over there, there was a

4   temporary county court clerk's office set up in the old First

5   State Bank building because of construction of a new

6   courthouse in Manchester.  And I told Special Agent Johnson

7   that they were voting a large number of absentee voters and

8   that I had received complaints that there was vote buying

9   going on.

10  Q.   And after you gave him this information, what happened?

11  A.   He asked me if I could to try to observe and maybe obtain

12  photographs of actually what was going on and what I seen to

13  be taking place there at that voting precinct.

14  Q.   And what did you do?

15  A.   I took photographs of various individuals coming and

16  going and activities in front of the voting precinct there at

17  the county court clerk's office.

18          MR. SMITH:  If I could have a moment, Your Honor.

19          THE COURT:  Yes, sir.

20  Q.   Where was it that you set up to do this, Mr. Roberts?

21  A.   In my office at the police department, which was directly

22  across the street from the county clerk's office.

23  Q.   Now, you said this was a temporary setup for the county

24  clerk's office.  Why did they need a temporary office for the

25  2002 election?

ROBERTS - Direct (Mr. Smith)                                   103

1    A.   They were constructing a new courthouse and a county

2    administration building.  They were constructing it on the

3    side of the old courthouse so everything had to be moved to

4    temporary spaces so they could start construction of the new

5    place, tear down the other one.

6    Q.   Now, we're going to come back to the photographs that you

7    took, but as you had had that contact with the FBI and made

8    these photographs, what other steps did you take in the 2002

9    election?  The photographs you took, was this on election day

10   itself, or what day was it, do you recall, taking these

11   photos?

12   A.   No, this was a precinct that was set up for absentee

13   voters that wasn't going to be there on election day to come

14   and vote because they were going to be out of town on the

15   actual election day.  It went on, I think it was open for

16   several weeks before the actual election day.

17   Q.   And how long did you have yourself to observe this

18   voting, early voting you're calling it?

19   A.   It happened every day there, Monday through Saturday, for

20   the time period that it was open up until the day -- or the

21   day before election.  Ever what day they stop it, I think it's

22   the day before.

23   Q.   And could you describe for ladies and gentlemen of the

24   jury what observations that you recall?

25   A.   There was a large numbers of people coming and going at

ROBERTS - Direct (Mr. Smith)                                        104

 1    that precinct.  They were actually bringing them in in

 2    15-passenger vans, like church buses.  And there was activity,

 3    people -- pretty much the same familiar faces that was there

 4    all the time that would come out and greet people or bend over

 5    and lean in the cars, or the same people would be operating

 6    the vehicles or the buses.  And basically, you know, a lot of

 7    activity going on, hand shaking or people reaching in the cars

 8    or walking people -- a lot of people would walk them into the

 9    precinct.

10    Q.   Now, do you recall who was working inside as election

11    officers during these days that you're calling the early

12    voting absentee vote?

13    A.   Yes, sir, I do.

14    Q.   And who was that?

15    A.   Paul Bishop, Lester Harmon, Vernon Hacker, and William

16    Stivers.

17    Q.   Now, William Stivers, did you know him to go by any other

18    names?

19    A.   Yes, sir.  He has a nickname, Al Man.

20    Q.   And do you see him here in the courtroom this morning?

21    You may have to take a look all the way around.

22    A.   Yes, sir, I do.

23    Q.   Could you point out for the record where he's seated and

24    what he's wearing?

25    A.   He's seated in the corner over there of all the attorneys

ROBERTS - Direct (Mr. Smith)                                    105

1    in a green, teal green shirt.

2          THE COURT:  The record will reflect the witness has

3    identified the defendant, William Stivers.

4    Q.   Now, Mr. Roberts, were you knowledgeable of how the

5    County Board of Elections there in Clay County was organized

6    for this election and how these four individuals ended up

7    being serving there as the officers that day or those days?

8    A.   Yeah.  The County Board of Elections selects people to

9    represent their parties, or the parties actually turn in a

10   list submitted to the County Board of Elections and then the

11   County Board of Elections vote as to who will serve or

12   determine who will serve.

13   Q.   And you recall these four people being the ones that were

14   chosen for this early voting?

15   A.   To my knowledge, yes.

16         MR. SMITH:  First group of photos, Your Honor.  If

17   the Court please, I'd like to hand the witness Government

18   Exhibits P1 through P18.

19   Q.   Had an opportunity to review those, Mr. Roberts?

20   A.   Yes, sir, I have.

21   Q.   And can you identify those?

22   A.   Yes, sir.  These are the photographs that I actually

23   taken myself.

24   Q.   And do they fairly and accurately depict scenes that you

25   saw on that day in May of 2002?

*ROBERTS - Direct (Mr. Smith)* 106

1    A.  Yes, sir.

2          MR. SMITH:  I'd move for the introduction, Your

3    Honor, of Government Exhibits P1 through P18.

4          THE COURT:  Any objection?

5                              (No verbal response.)

6          THE COURT:  Exhibits P1 through P18 will be admitted.

7                    (Government Exhibit Nos. P1 through P18

8                    were admitted into evidence.)

9          MR. SMITH:  At this time, with the Court's

10   permission, I'd like to publish P1.

11         THE COURT:  You may publish those to the jury.

12   Q.  Mr. Roberts, we have P1 in front of you.  And at this

13   time, could you identify for the court and the jury what this

14   is a photograph of?

15   A.   This is a photograph of the individuals, Charles Marcum,

16   who is the jailer, with the glasses on, with the blue and

17   white shirt.  The lady in the blue shirt was his daughter,

18   Libby.  And the gentleman with his back to the photograph with

19   the hat on was his son, Charles Wayne.  And the gentleman down

20   in the lower corner, his head with a cap on, was William

21   Stivers.

22   Q.  Now, do you recall what was going on at this time when

23   you began taking your photographs?

24   A.   There was a large number of people coming and voting at

25   the absentee precinct there, people coming, like I said, in

*ROBERTS - Direct (Mr. Smith)*                                          107

1    vans and cars and so forth.

2    Q.   Now, these two individuals, Mr. Stivers and Mr. Marcum,

3    they belong to the same political party?

4    A.   That I'm not sure of.

5    Q.   You know Mr. Marcum as jailer.  Do you know what party he

6    ran under, what party, Republican or Democrat?

7    A.   Republican.

8    Q.   And Mr. Stivers, Al Man Stivers, do you know him to serve

9    as an election officer for the Democrat party or the

10   Republican party?

11             MR. RICHARDSON:  Objection, leading.

12             THE COURT:  Overruled.

13   A.   I'm wanting to think he's a Democrat.  I'm not positively

14   sure, but --

15   Q.   And you associated family members of Mr. Marcum here.

16   What part of the county do the Marcums live in, to your

17   knowledge?

18   A.   Horse Creek.  The majority of his family does.  But he

19   built a new house out on Greenbriar, so two different

20   locations.

21   Q.   Okay.  At the time of the 2002 election, where would his

22   family be residing at that time, Mr. Roberts?

23   A.   The two different places, I think.  I think his house was

24   complete out there by then.

25   Q.   And where do they generally vote at Horse Creek?

*ROBERTS - Direct (Mr. Smith)*                                          108

1    A.   Yes.

2    Q.   Is there a precinct called Horse Creek?

3    A.   Yes, it's the Horse Creek precinct.   I'm sorry.

4    Q.   Okay.   Now, this particular location is where?

5    A.   That's in town square, Manchester, right in main

6    downtown.   The actual precinct there would be comprise the

7    Manchester area, people lived in the city of Manchester would

8    actually have been there.

9    Q.   And then early voting, could people from all parts of the

10   county come into town to vote?

11   A.   That is correct.   Up until election day, it was open to

12   anybody in the county that wouldn't be there on election day

13   to vote.

14   Q.   Move now to Government's Exhibit P2.   Can you identify

15   these two individuals?

16   A.   The gentleman in the front, with the no cap on, is

17   Charles Marcum, the jailer.   And the gentleman behind him with

18   the cap on and smoking a cigarette is William Stivers.

19   Q.   Okay.   Move on to P3.

20   A.   The gentleman with his back to the photograph with the

21   hat on is Charles Wayne Marcum, and the gentleman in the

22   middle seated is Charles Marcum, and the gentleman to the far

23   right of the picture with the cap on is William Stivers.

24   Q.   How long were you able to observe Mr. Stivers and Mr.

25   Marcum at that particular time, Mr. Roberts?

*ROBERTS - Direct (Mr. Smith)*                                       109

1    A.   All day, basically, that day.

2    Q.   And what did you see?

3    A.   Well, as the picture in number two depicts, or P2, I'm

4    sorry, they would walk around to the sides of the building or

5    huddle up and meet with people or go out to people's vehicles

6    or, you know, a lot of hand signalling.  A lot of hand

7    gestures going on.  Things of that nature.

8    Q.   And after they, you say they would leave the building, go

9    out to a place outside the voting precinct?

10   A.   Yes, sir.

11   Q.   And then they would return?

12   A.   Yes, sir.

13   Q.   Let's go on and move to P4.

14   A.   The lady with the purse that is reaching in the truck is

15   the daughter of Charles Marcum.  I'm not real sure on her

16   name.  They call her Lele.  I'm not sure of her actual name.

17   The individual in the back of the truck, I'm not sure of his

18   identity.  He was somebody that come in there and voted.

19   Q.   Let's move on to P5.

20   A.   The gentleman in the picture, in the P5 to the right with

21   a cap on is Danny Reed.  He was a candidate for, I'm wanting

22   to think he was a candidate for sheriff in that election.

23   Q.   P6.

24   A.   The individual walking from the car there was Charles

25   Marcum's son.  I'm not real sure of his name.  Can't think of

ROBERTS - Direct (Mr. Smith)                                           110

1    it at the time.  And the lady in the car is his girlfriend or

2    wife.  I'm not sure whether they were married or not, but I

3    know they were in companionship.

4    Q.  P7.

5    A.  That is a picture of a license plate on a vehicle that

6    was bringing people in to vote that had been there on more

7    than one occasion.

8    Q.  P8.

9    A.  P8 is a various group of individuals from Horse Creek.

10   Their last names are Frost.  These people are registered to

11   vote, but they have -- all of the children have mental

12   disabilities and they're in a special program in school.  I've

13   had interactions with them and their family so I personally

14   knowed them on a regular basis.

15   Q.  What did you observe going on with these family of

16   handicapped people?

17   A.  They hauled them in and voted them.

18   Q.  And who is "they"?

19   A.  The Marcums.  Charles Marcum and his family took them in

20   to the precinct.

21   Q.  Go on to P9.

22   A.  Let me correct that.  I said Frost.  I think they're

23   Rosses.  Ross is their last name.  I misspoken.

24   Q.  They live out in the county or in the city?

25   A.  They live in Horse Creek, on Crawfish.  They actually

ROBERTS - Direct (Mr. Smith)                                    111

1    live -- they live to the back of Charles Marcum's family

2    there.  He has a cluster of houses there, and they live back

3    across the branch behind him.

4    Q.   P9.

5    A.   P9, the fella in the ball cap with the red shirt on is

6    Steve Price.  The individual with his back to us with the

7    black ball cap on is Peewee Sester is what I know him by.  I

8    don't know his actual first name, but they call him Peewee.

9    And then I'm not sure of the gentleman behind Mr. Price.

10   Q.   P10.

11   A.   The individual to the far left in the blue shirt is Toby

12   Harmon.  He's a magistrate there, or was in county.  The next

13   individual is Charles Marcum, the jailer.  And the individual

14   in the yellow shirt, he's a Gray.  I can't think of his first

15   name right now, but his last name's a Gray.  And the gentleman

16   next to him is Charles Wayne Jones -- or Charles Wayne Marcum,

17   I'm sorry, which is Charles Marcum's son.

18   Q.   Lester Harmon you testified earlier was appointed by the

19   Board of Elections to work as election officer inside; is that

20   right?

21   A.   Yes, sir.

22   Q.   Is he related to this candidate here, Harmon, that you

23   just identified?

24   A.   That's his brother.

25   Q.   Let's move on to P11.

ROBERTS - Direct (Mr. Smith)                                    112

1    A.   P11, the gentleman with the cap, his back to the

2    photograph is Charles Wayne Marcum.  And unable to identify

3    the two individuals that were seated there.  But they had

4    actually tooken them in and voted them.

5    Q.   P12.

6    A.   That's another picture of Charles Marcum, the jailer,

7    with his back to the photograph.

8    Q.   P13.

9    A.   The picture there is the guy with the shirt on that has

10   the insignia on it or the diagram on the back is -- he is

11   Bobby Red Sams, and the guy that he's talking to is Bobby

12   Banks.  That's in the green shirt that's facing him.  In the

13   back of the picture is Charles Wayne Marcum with the glasses

14   on with his arm around the lady.  And the lady, I know her

15   name, but I can't think of it right now.  She was a -- I can't

16   think of her name right now.

17   Q.   Bobby Red Sams, what observations did you make of him

18   that day?

19   A.   He was a regular coming and going to the precinct,

20   bringing people there to vote.

21   Q.   And do you remember what he was driving or what he was

22   using to haul them with?

23   A.   No, sir, I can't.

24   Q.   Let's go on to P14.

25   A.   14 --

*ROBERTS - Direct (Mr. Smith)*                                              113

1    Q.   It is P14.

2         MR. SMITH:   I'm sorry, Your Honor.

3    Q.   P14, please.

4    A.   The individual leaning up on the hood of the black Ford

5    truck with the cap on, I know him by Buzzy Marcum.   He's

6    related to Charles Marcum in some capacity.   And the lady that

7    is in front of the gentleman with the white cap on is his

8    wife.   She actually served as a regular election officer at

9    the Manchester precinct in the elections.   And then these

10   various individuals were people that they brought in there to

11   vote.   I know the faces, but I don't know the names of those

12   individuals.

13   Q.   P15.

14   A.   Leaning on the hood of the black Ford truck in this

15   photograph was Charles Marcum, who was the jailer.   And

16   standing beside him with the cap on was Charles Wayne Jones,

17   his -- or Charles Wayne Marcum, I'm sorry, his son with

18   various different individuals that they brought to vote.

19   Q.   P16.

20   A.   That is a picture of Charles Marcum's daughter, Lib's,

21   truck.   The license plate number, Kentucky 5240CE.   The

22   individuals there in front of the truck was Goldie Smith was

23   the lady with the white shirt on.   The individual next to her

24   is her boyfriend, her husband, he's a Bowling.   And the lady

25   that's going into the precinct, I can't identify her.   I can

ROBERTS - Direct (Mr. Smith)                                    114

1    only see the back of it.  But those two individuals were

2    hauling people to vote that day also.

3    Q.   P17.

4    A.   That is the Bowling individual that was in the previous

5    photograph.  Wanting to think his -- Jackie Bowling or Johnny

6    Bowling, one.  But I do know he's a Bowling.

7    Q.   P18.

8    A.   P18, the first individual standing there leaned up

9    against the building is Ricky Whitehead.  At the time of that

10   election, he was the county detective working in the county

11   attorney's office.

12   Q.   County detective, is that a person who is a law

13   enforcement officer?

14   A.   I assume by his description of his job that he was.

15   That's the first one I knowed of that we had in county.

16   Q.   And who was the county attorney at that time?

17   A.   Clay Bishop.

18   Q.   And this Mr. Whitehead, had you observed him in other

19   places and suspected of wrongdoing or voter involvement?

20   A.   Yes, sir.

21   Q.   Where else did you see Mr. Whitehead in that May, 2002

22   election?

23   A.   On election day, he was at the Garrard precinct.

24   Q.   And what was he doing up there?

25   A.   He was working the election for various individuals.

*ROBERTS - Direct (Mr. Smith)*                                          115

1    Q.   And what do you mean when you say working the election?

2    A.   He was buying votes.

3    Q.   And did you see him at any other places where there was

4    this kind of activity going on?

5    A.   He was a frequent at various different precincts.  He was

6    traveling around.  Mr. Bishop was a candidate for reelection

7    in the county attorney's race.  He was being opposed by Richie

8    Couch, who was the assistant commonwealth attorney at the

9    time.  So that was Mr. Whitehead's main interest in the

10   election.

11   Q.   So Clay Bishop, the county attorney, had a pretty good

12   opponent being assistant commonwealth attorney Richie Couch,

13   in that election?

14        MR. WHITE:   Objection, leading and speculative, Your

15   Honor.

16        THE COURT:   Sustain the objection.  You can rephrase.

17   Q.   Okay.  This Richie Couch, was he an opponent of Mr.

18   Bishop's in the county attorney race?

19   A.   Yes, sir, he was.

20   Q.   And was that race getting any attention?

21   A.   Yes, it was.  Not as much as the other races, but to some

22   degree, yes, it was.

23   Q.   Now, you've identified here places in the early voting

24   where you suspected that they were hauling voters in.  Did you

25   have other places in the county or in the area that you

*ROBERTS - Direct (Mr. Smith)*                                            116

1    identified where you believe they were paying voters?

2    A.   Yes.  On election day, I had the opportunity to visit

3    some of the precincts along with members of the attorney

4    general's office and follow up on some complaints that we had

5    received about vote buying and voter irregularity in the

6    election that day.

7            THE COURT:  Mr. Smith, is this a good place to take

8    our lunch break?

9            MR. SMITH:  Yes, Your Honor.

10           THE COURT:  All right.  Thank you.  Ladies and

11   gentlemen, we will take our break at this time.  We'll take an

12   hour, until about 1:15 this afternoon.  Please keep in mind

13   the admonition you've been given previously not to discuss the

14   case among yourselves while we are in recess.  The jury will

15   be excused for one hour.

16                   (The jury left the courtroom at 12:13 p.m.)

17           THE COURT:  Counsel, any matters to take up outside

18   the presence of the jury?  Mr. Hoskins?

19           MR. HOSKINS:  Your Honor, I'm not sure this exists,

20   but I know that Mr. Roberts pled guilty to something that

21   involved obstruction with the grand jury.  I know he testified

22   before the grand jury.  We don't have any grand jury

23   testimony, we don't have any 302s or anything like that.

24           MR. SMITH:  Well, Your Honor, I believe that the plea

25   agreement reads, as I recall it, it doesn't indicate that he

1    testified in front of the grand jury.  It's that he gave

2    statements to an FBI agent, which he knew or should have known

3    was taking information to the grand jury at the time.  So if

4    that's cleared up any of that issue, I don't believe there is

5    any grand jury testimony that involves this witness.

6    Certainly, it's not been brought to my attention if there is.

7    As to 302s --

8              THE COURT:  One second.  Yes, sir.

9              MR. SMITH:  It appears he's asking whether there's a

10   302 on the issue of his grand jury testimony.  Is that what

11   you're asking?

12             MR. HOSKINS:  Or the stuff where he made the false

13   statements.

14             MR. SMITH:  Okay.  I will certainly inquire if the

15   Government's got anything that hasn't been given over, but

16   I've been assured that we've given everything.

17             THE COURT:  We'll let you all look for that during

18   the lunch break.  Mr. Abell, were you stretching earlier?

19             MR. ABELL:  I have nothing at this time, Judge.

20             MR. WHITE:  Your Honor, it was me that was standing

21   up.  I was stretching but I did have something I needed to

22   inform the court about by way of disclosure.  I think it's

23   okay to do it in open court, but I can go to the sidebar if

24   you prefer.

25             THE COURT:  Well, why don't you come on up, out of an

1    abundance of caution.  Mr. Smith, you can come up as well.

2                    (A sidebar conference was held out of the

3                    hearing of the gallery):

4         THE COURT:  Yes, sir.

5         MR. WHITE:  I'm sorry, Your Honor.  This is the first

6    time that I've heard any testimony involving the attorney

7    general's office in 2002.  At that time, I was the assistant

8    deputy attorney general.  My main duties dealt with policy

9    issues, civil, and the investigation of the governor's race.

10   What we did was we drew people -- drew certain counties, we

11   sent people out.  Occasionally, a complaint would come in

12   during the day on an election and I would just get involved

13   very, very peripherally, because I had a lot of experience in

14   election law.

15        I have no recollection of Clay County at all being

16   involved.  And what he was talking about, as I understood it,

17   was limited to the absentee voting.  My guess is I would know

18   nothing about that, because we just sent the teams we drew, we

19   just sent those out on election day.  So I wanted to let you

20   know that and let the United States know it.  I don't see a

21   problem, but by the same token, as soon as I heard OAG, I felt

22   like I had an obligation to inform you.

23        THE COURT:  Mr. Smith?

24        MR. SMITH:  Well, I appreciate you bringing that

25   forward.  Any newspaper article you read at that time talked

119

1    about the attorney general's office investigating Clay County.

2    For that to be news, it was in the Herald and many of the

3    articles around that time.

4         THE COURT:  He's saying he didn't have any direct

5    involvement in those type of investigations that were ongoing.

6         MR. SMITH:  I don't see that there's an issue with

7    the United States at this time.

8         THE COURT:  I appreciate you calling it to the

9    Court's attention.

10        MR. WHITE:  Thank you, Your Honor.

11             (Sidebar conference concluded.)

12        THE COURT:  Thank you, counsel.  One last issue

13   before we take our lunch break.  I'm going to be checking the

14   weather this afternoon.  And if I feel like we need to take a

15   break a little bit earlier than we ordinarily do for our

16   jurors, primarily, then we may be doing that.  I do

17   understand, Mr. Pinales, that you will not be cross-examining

18   witnesses this afternoon.

19        MR. PINALES:  That's correct.

20        THE COURT:  And so if you need to leave a little bit

21   earlier, you can certainly do so.

22        MR. PINALES:  I appreciate that.

23        THE COURT:  I have a 4:30 rearraignment with an

24   attorney from Covington who has asked that I continue that,

25   and I agreed to that do.  So we won't have a hearing at 4:30,

120

1    but if the weather's bad, then we may break even earlier than

2    that.

3            MR. WESTBERRY:  Thank you, Judge.

4            THE COURT:  We'll be in recess until 1:15 this

5    afternoon.

6                    (Proceedings recessed at 12:19 p.m.)

7                              - - -

8                    C E R T I F I C A T E

9            I, LISA REED WIESMAN RDR-CRR, certify that the
     foregoing is a correct transcript from the record of
10   proceedings in the above-entitled case.

11

12    \s\ Lisa Reed Wiesman              February 9, 2010
     LISA REED WIESMAN, RDR-CRR          Date of Certification
13   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2    <u>GOVERNMENT WITNESS</u>

3    EUGENE LEWIS
     Cross-examination by Mr. Bayer (cont'd).......... Page 10
4    Cross-examination by Mr. White.................. Page 16
     Cross-examination by Mr. Baldani................ Page 27
5    Redirect examination by Mr. Smith.............. Page 31
     Recross-examination by Mr. Hoskins............. Page 36
6
     J.C. LAWSON
7    Direct Examination by Mr. Smith................ Page 38
     Cross-examination by Mr. Pinales............... Page 63
8    Cross-examination by Mr. Bayer................. Page 68
     Cross-examination by Mr. Baldani............... Page 69
9    Cross-examination by Mr. Simons............... Page 71
     Redirect Examination by Mr. Smith.............. Page 80
10   Recross-examination by Mr. Pinales............. Page 83
     Recross-examination by Mr. Simons............. Page 84
11
     GILBERT ACCIARDO
12   Direct Examination by Mr. Parman............... Page 87

13   TODD ROBERTS
     Direct Examination by Mr. Smith................ Page 95
14
                           - - -
15
16   <u>GOVERNMENT EXHIBITS</u>                      <u>ADMITTED</u>

17   Exhibit No. PA3, J.C. Lawson plea agreement
     Admitted....................................... Page 40
18
     Exhibit No. D68, <u>Lexington Herald</u> article
19   Admitted....................................... Page 44

     Exhibit No. D69, <u>USA Today</u> article
20   Admitted....................................... Page 48

21   Exhibit No. V3, "Inside Edition" DVD
     Admitted....................................... Page 90
22
     Exhibit No. PA8, Richard Todd Roberts plea agreement
23   Admitted....................................... Page 99

24   Exhibit No. P1 through P18, photos
     Admitted....................................... Page 106
25                            - - -