1

1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF KENTUCKY
2                  SOUTHERN DIVISION at LONDON
                            - - -
3
     UNITED STATES OF AMERICA,       :  Docket No. CR 09-16-S
4                                    :
                        Plaintiff,   :  **Frankfort, Kentucky**
5                                    :  Tuesday, February 23, 2010
          versus                     :  1:00 p.m.
6                                    :
     RUSSELL CLETUS MARICLE,         :
7    DOUGLAS C. ADAMS                :
     CHARLES WAYNE JONES             :
8    WILLIAM R. STIVERS              :
     FREDDY W. THOMPSON              :       **Trial Day 11B**
9    WILLIAM B. MORRIS               :
     DEBRA L. MORRIS                 :
10   STANLEY BOWLING,                :
                                     :
11                      Defendants.  :

12

13                          - - -
                   TRANSCRIPT OF TRIAL
14              BEFORE DANNY C. REEVES
         UNITED STATES DISTRICT COURT JUDGE and a jury
15                          - - -

16   APPEARANCES:

17   For the United States:     STEPHEN C. SMITH
                                Assistant U.S. Attorney
18                              601 Meyers Baker Road
                                Suite 200
19                              London, KY 40741

20   For the Defendant          MARTIN S. PINALES, ESQ.
     Russell Cletus Maricle:    Strauss & Troy
21                              150 E. Fourth Street
                                Fourth Floor
22                              Cincinnati,OH  45202

23                              DAVID S. HOSKINS, ESQ.
                                107 E. First Street
24                              Corbin, KY  40701

25

```
 1    For the Defendant              R. KENT WESTBERRY, ESQ.
      Douglas C. Adams:              KRISTIN N. LOGAN, ESQ.
 2                                   Landrum & Shouse, LLP
                                     220 West Main Street
 3                                   Suite 1900
                                     Louisville, KY 40202
 4

 5    For the Defendant              T. SCOTT WHITE, ESQ.
      Charles Wayne Jones:           Morgan & Pottinger, P.S.C.
 6                                   133 West Short Street
                                     Lexington, KY  40507
 7

 8    For the Defendant              ROBERT L. ABELL, ESQ.
      William R. Stivers:            120 North Upper Street
 9                                   Lexington, KY  40507

10
      For the Defendant              RUSSELL JAMES BALDANI, ESQ.
11    Freddy W. Thompson:            R. TUCKER RICHARDSON, ESQ.
                                     Baldani, Rowland & Richardson
12                                   300 West Short Street
                                     Lexington, KY  40507
13

14    For the Defendant              JERRY W. GILBERT, ESQ.
      William B. Morris:             Coy, Gilbert & Gilbert
15                                   212 North Second Street
                                     Richmond, KY 40475
16

17    For the Defendant              ELIZABETH SNOW HUGHES, ESQ.
      Debra L. Morris:               Gess, Mattingly & Atchison, PSC
18                                   201 West Short Street
                                     Lexington,KY40507
19

20    For the Defendant              DANIEL A. SIMONS, ESQ.
      Stanley Bowling:               Thompson, Simons, Dunlop & Fore
21                                   116 West Main Street
                                     Suite 2A
22                                   Richmond, KY 40476

23

24

25
```

3

1    Court Reporter:                LISA REED WIESMAN, RDR-CRR
                                    Official Court Reporter
2                                   35 W. Fifth Street
                                    P.O. Box 1073
3                                   Covington, KY  41012
                                    (859) 291-4410
4

5         Proceedings recorded by mechanical stenography,
    transcript produced with computer.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*W. WHITE - Direct (Mr. Smith)*                                              4

1          (The jury entered the courtroom at 1:01 p.m.)

2          THE COURT:  Thank you.  The record will reflect that

3     all members of the jury are present.  Parties and counsel are

4     present as previously noted.

5          Miss White, of course, you're still under oath.

6          Mr. Smith, you may continue.  We were on A-13.

7                          DIRECT EXAMINATION

8     BY MR. SMITH:

9          MR. SMITH:  Yes, Your Honor.  I believe it was

10    page 68 of the transcript.  If we could at this time publish

11    our next clip.

12         THE COURT:  Yes, sir.

13                     (Exhibit A13A was played from

14                      2:35:46 until the end of the exhibit.)

15    Q.   Miss White, we began on page 68, I believe, of this clip.

16    Page 69, Maricle made the statement, "you all come up here and

17    decided to change your registration to Democrat."  You said,

18    "I'm not telling 'em that, I'm not."  What were you referring

19    to, Miss White?

20    A.   What page are you on?

21    Q.   Page 69, six lines from the top.

22    A.   I see it.  Now, what was your question?

23    Q.   Maricle makes a statement you "decided to change your

24    registration to Democrat."  You made the statement, "I'm not

25    telling 'em that."  What were you referring to, ma'am?

*W. WHITE - Direct (Mr. Smith)*                                      5

1   A.   I was referring to Kennon had asked him a question, what

2   if they get down there and asked her if she changed her

3   registration, and I was letting him know that I wouldn't go

4   into that, talking about it with them.

5   Q.   Now, several times, Mr. Maricle encouraged you to pray.

6   Did he know that you were in church at this time?

7   A.   He did, yes.

8   Q.   And when did you start going to church during your

9   association with Maricle?

10  A.   January 3rd, 2007.

11  Q.   So when he makes the statement, "Lord be with you and

12  give you strength," were those statements commonly made to you

13  by him in the past?

14  A.   That's the first time I'd ever heard that statement.

15  Q.   Page 70, you said, "he's got me covered on a job."  Who

16  were you referring to, Miss White?

17  A.   Cletus Maricle.

18  Q.   He says, "you'll get a job."  What job was he referring

19  to, to your understanding?

20  A.   Drug court position.

21  Q.   And you followed up, "Right.  And you got Cork took care

22  of."  Who were you referring to, Miss White?

23  A.   My brother.

24  Q.   What did you mean by the statement Cork got took care of?

25  A.   Well, he'd told me previously in the recording he was

1    going to take care of Cork being released.

2    Q.   Top of page 71, you said, "I ain't going to worry about

3    it tonight.  I can tell you this, I'm not going to do nothing

4    to get nobody in trouble."  What were you referring to, Miss

5    White?

6    A.   I was reassuring him that I wouldn't say anything to the

7    grand jury about anything we had all been involved in.

8    Q.   On top of page 72, sounded as though Mr. Maricle lowered

9    his voice, and he said, "folks, folks, they're trying to put

10   pressure on Dobber."  To your understanding, what was he

11   referring to?

12          MR. WHITE:  Objection to the characterization of Mr.

13   Maricle.

14          THE COURT:  Overruled.

15          THE WITNESS:  Can I answer that question?

16          THE COURT:  Yes, ma'am, you may.

17   A.   Well, he did that many times.  I mean, you can see

18   throughout the recording he did that.  Anytime he wanted to

19   make a significant statement, he would lower his voice.

20   Q.   What did you understand him to mean when he said they're

21   trying to put pressure on Dobber, Miss White?

22   A.   They're trying to put pressure on Dobber.  He believed it

23   to be on Todd and Doug White, Todd Roberts and Doug White, and

24   they were putting pressure on him to tell things on himself.

25   Q.   Who did you understand him to mean when he said they are

*W. WHITE - Direct (Mr. Smith)*          7

1    putting pressure?

2    A.   FBI agents.

3    Q.  Kennon asked the question, "you don't think he's cut a

4    deal with Todd?"  Maricle says, "I don't think Todd's cut a

5    deal."  Who to your understanding are they referring to when

6    they refer to Todd?

7    A.   Todd Roberts.

8    Q.  Maricle says, "I think they'll spend whatever it takes.

9    Bill Johnson doesn't come for tens of thousands of dollars.

10   He comes for hundreds of thousands of dollars."  To your

11   understanding, who is Mr. Maricle referring to, Miss White?

12   A.   Todd Roberts's attorney.

13   Q.  Middle of page 74, ma'am, you all again are talking about

14   Dobber.  You say, "he better not have told that."  Kennon

15   says, "that's exactly what he's done; and they've said,

16   alright, we'll subpoena Phillip."  Maricle says, "Dobber made

17   a statement to somebody.  Dobber's made a statement, now, I'm

18   not saying that they've said this to Dobber, but they told him

19   they had enough to indict him, but they wasn't after him,

20   they's after the big boys."  To your understanding, Miss

21   White, who is Mr. Maricle referring to?

22   A.   He was -- to me, my understanding of this, the big boys

23   would be people in office, that held offices.

24   Q.  And again, did Maricle, in this -- to your understanding,

25   was Maricle referring to Dobber making a statement to whom?

1    A.   To the agents.  Although I don't know how he was getting

2    that information.

3    Q.   Middle of page 75, Maricle says, "you all to get, to get

4    Todd and Doug."  To whom is he referencing there, Miss White?

5    A.   Where are you at?

6    Q.   Middle of page 75.

7    A.   He was referring to myself.

8    Q.   Okay.  When he refers to Todd or Doug, who is he

9    referring to, to your understanding?

10   A.   Todd Roberts and Doug White.

11   Q.   Bottom of page 76, ma'am.  Maricle makes the statement,

12   "just keep your calm and don't get all out, out to gut nobody.

13   Just keep your calm."  To your understanding, what was he

14   referring to, ma'am?

15   A.   Well, he was referring to me to keep calm, and he had

16   thought I'd got a -- made a statement about Jennings and

17   Vernon earlier.  And he said I was just getting a punch at

18   them and to be calm and just don't tell any more than what I'd

19   already told.

20   Q.   Middle of page 77, he says, "Wanda, you really don't

21   know, the least you say and try to do gut to this, that, and

22   the other, the better off you are."  To your understanding,

23   what was he meaning by that statement?

24   A.   My understanding, well, he was telling me to just be

25   quiet.

*W. WHITE - Direct (Mr. Smith)*                                            9

1    Q.   Three lines below that, he says, "but he's one of the
2    first people that come and talked to me."  To your
3    understanding, who was Maricle referring to there, according
4    to your understanding?
5    A.   According to my understanding, Dobber Weaver.
6    Q.   Maricle makes the statement, "Dobber worked, when I ran
7    in 1990, Dobber worked hard for me."  To your understanding,
8    what was Maricle referring to?
9    A.   When he ran for circuit judge.
10   Q.   And then you make a statement, "He did?  Why was he
11   against Phillip?"  What were you referring to, Miss White?
12   A.   Early on, several of them had made comments that Dobber
13   would not be for Phillip.  And he was making a statement that
14   he had to be for Phillip, that he had gotten him his job.
15   Q.   Page 79, Maricle asks the question, "now, what relation
16   is his wife to J.C. Lawson?"  To your understanding, who was
17   Mr. Maricle referring to?
18   A.   Minnie Weaver, Dobber's wife.
19   Q.   And in what capacity did she associate with you?
20   A.   She replaced Anthony Short in the November election.
21   Q.   Of what year?
22   A.   Of '06.
23   Q.   Bottom of the page, 79, you said, "and I was tore up, you
24   know, he wouldn't even talk to me.  I was trying to get my
25   story straight, you know."  What were you referring to, Miss

1    White?

2    A.   I was giving him an explanation of why I went to talk to

3    Dobber.

4    Q.   Top of page 81, Maricle makes the statement, "you know I

5    don't care a lot about her."  You said, "I don't either, but

6    now she don't let nobody push her around."  Miss White, who

7    were you referring to?

8    A.   Carmen Webb Lewis.

9    Q.   Finally, on page 83, Miss White -- I'm sorry.  That's not

10   the last question, but page 83, you were referring to Crawdad

11   and about how he got his name.  And then you made the

12   statement, "well, I'm gonna be a crawdad tomorrow."  What were

13   you referring to, Miss White?

14   A.   I was referring -- a crawdad goes backwards, and I was

15   going to go back on my previous statements and not tell

16   anything.

17   Q.   And when you say your statements, to whom, ma'am?

18   A.   To the agents.  I was reassuring him.

19   Q.   And page 85, ma'am, Maricle says, "you're gonna be all

20   right.  Don't go down there with any vindication that you're

21   going to get --" "I'm gonna lay it to this one, I'm lay it to

22   that one."  To your understanding, what was he referring to?

23   A.   He was referring back to my statements about Jennings

24   White and Vernon Hacker.

25   Q.   And just following that, Maricle makes the statement,

1   "well, I mean, I'm not saying not to tell the truth or

2   anything."  To your understanding, what was he referring to?

3   A.   What page are you on again?

4   Q.   Page 85.

5   A.   Yeah, and he went on to say "but there's no need," and

6   then it cut off.  He was just -- "tell the truth or anything,"

7   he was just covering his self again.

8          MR. HOSKINS:  Object.

9          THE COURT:  Ma'am, is this your understanding?

10         THE WITNESS:  That's my understanding, yes.

11         THE COURT:  All right.  Objection overruled.

12  Q.   Finally, on page 86, ma'am, you make the statement, "I

13  can handle myself, can't I?"  And Maricle says, "you can."  He

14  says, "I've got confidence in you."  What were you referring

15  to, Miss White?

16  A.   Well, what I was referring to is he's always made me

17  aware that he's always had total confidence, trust in me.

18  That's why I was put there.  I couldn't have walked in and

19  said I want to be an election officer.  I mean, I was put

20  there, and he was reassuring me that he had confidence that I

21  could handle myself and not tell anything I wasn't supposed to

22  tell.

23  Q.   Page 87, ma'am.  Toward the middle of the page, Kennon

24  says, "if she don't live in it, she don't live in it."  And

25  you say, "but I mean it ain't right; if she don't live in it,

1    she shouldn't; I mean it ain't right."  Maricle asked, "how

2    did you let that get by us?"  To your understanding, what was

3    Maricle referring to?

4    A.   He was referring to the fact a question had been raised

5    whether Carmen Webb Lewis indeed lived in the City when she

6    ran for mayor.  His statement was how did you let that get by

7    us.  He was saying that to Kennon, if I had known earlier, we

8    could have done something about it.

9    Q.   Finally, there on page 88, one of the last comments you

10   made, you said, "that done it, that done it.  We got him,

11   didn't we?"

12   A.   Yeah.

13   Q.   What were you referring to, Miss White?

14          MR. HOSKINS:  Objection.

15          THE COURT:  Sustained, sustained.

16   Q.   Was that comment made outside the presence of Mr.

17   Maricle?

18   A.   It was.

19          MR. HOSKINS:  Your Honor, object and move to strike

20   that.  If this statement was made --

21          THE COURT:  No, that's the reason I sustained the

22   objection was because it was outside the presence of the

23   defendant.

24          MR. HOSKINS:  Could we approach, Your Honor?

25          THE COURT:  You may.

*W. WHITE - Direct (Mr. Smith)*                                    13

1              (A sidebar conference was held out of the

2              hearing of the jury):

3         MR. HOSKINS:  Your Honor, the Court, I believe, has

4    ruled that the statements made by Wanda White and Kennon White

5    on these tapes are admissible only for context on what other

6    people said.  So the statement that was made only between

7    those two does not put anything anybody else does or says in

8    context.

9         THE COURT:  Agreed.  It wasn't a contemporaneous

10   objection to the statement at the time it was played or before

11   the time it was played.

12        MR. HOSKINS:  My objection to Mr. Smith's question --

13        THE COURT:  I sustained it.

14        MR. HOSKINS:  I made a second objection when he asked

15   the question and I moved to strike.

16        THE COURT:  He asked if it was outside the presence

17   of Mr. Maricle, which it wasn't clear on the tape whether it

18   was or not.  That's the reason I sustained the objection.

19        MR. HOSKINS:  I apologize.  I didn't recognize that

20   the Court had sustained that second objection.  Sorry.

21        THE COURT:  I allowed Mr. Smith to ask the question

22   to establish that it was made outside the presence of Mr.

23   Maricle.  And once that was established, then again, I

24   referred to the fact that I sustained your objection.  That

25   was the reason for it.

W. WHITE - Direct (Mr. Smith)                                    14

1          MR. HOSKINS:  Thank you.

2          THE COURT:  All right, thank you.

3                    (Sidebar conference concluded.)

4          THE COURT:  Thank you.  Mr. Smith, I believe that was

5     the end of that exhibit; is that correct?

6          MR. SMITH:  Yes, Your Honor.  If the Court would

7     allow, I'd like to present the witness A15.

8          THE COURT:  Yes, sir, you may.

9     Q.  Miss White, you should have a disk in front of you

10    labeled A15.

11    A.  Yes.

12    Q.  And is that an audio conversation that you reviewed prior

13    to the testimony here today?

14    A.  Yes.

15    Q.  What date was this recording made, ma'am?

16    A.  May 4, 2007.

17    Q.  And do you recall generally who the participants were in

18    the conversation?

19    A.  Myself, my husband, and Cletus Maricle.

20    Q.  And where was this recording made, ma'am?

21    A.  In his home.

22    Q.  And have you had an opportunity to again review that

23    audio recording?

24    A.  Yes.

25    Q.  Is that a fair and accurate copy of the conversation in

*W. WHITE - Direct (Mr. Smith)*                                    15

1    which you participated?

2    A.   Yes.

3    Q.   Likewise, A15A should be before you now.

4    A.   Yes.

5    Q.   Do you recognize that as a transcript?

6    A.   Yes.

7    Q.   Is that one which you reviewed prior to your testimony?

8    A.   It is.

9    Q.   Have you compared that with the conversation in which you

10   participated on May the 4th, 2007?

11   A.   Yes.

12   Q.   Is it accurate?

13   A.   Yes.

14        MR. SMITH:  I'd move to introduce Government's

15   Exhibit A15 and A15A.

16        THE COURT:  Any objection other than those previously

17   stated?  Exhibit A15 and A15A will be admitted.

18             (Government Exhibit Nos. A15 and A15A

19             were admitted into evidence.)

20        MR. SMITH:  I would ask permission to publish at this

21   time, Your Honor.

22        THE COURT:  You may.

23             (Government's Exhibit A15 was played

24             from 00:10:41 until 00:42:08.)

25   Q.   Miss White, we began there, I believe, refer you to

1    page 2.  In the middle section there, you make the statement

2    "I went in there at 5:55 and didn't get out till seven, ten

3    after seven."  What were you referring to, Miss White?

4    A.   When I went into the grand jury.

5    Q.   And as you further explained, "every question he asked me

6    was about you, every single question."  Who were you referring

7    to, Miss White?

8    A.   Cletus Maricle.

9    Q.   And then you further make the statement, you made the

10   statement on page 3, "and I pled the Fifth Amendment on five

11   of 'em, and I got ready to plead the Fifth when he slammed the

12   thing down and said I'll be right back."  What were you

13   referring to, Miss White?

14   A.   Referring to my grand jury testimony.

15   Q.   When you testified in front of the grand jury, did

16   someone slam something down in front of you?

17   A.   No.

18   Q.   Did they, someone actually pursue a court order to compel

19   you to testify?

20   A.   No, sir.

21   Q.   Why were you reporting that to Mr. Maricle at this time,

22   Miss White?

23   A.   The agents told me.

24   Q.   Mr. Maricle asked the question then, "what was he

25   asking?"  And you said, "I wrote a few of 'em down."  What

*W. WHITE - Direct (Mr. Smith)*                                            17

1   were you referring to, Miss White?

2   A.   I was referring back to a list of questions that the

3   agents had given me.

4   Q.   Did you actually have a written list of questions with

5   you?

6   A.   I did.

7   Q.   And did you show them to Mr. Maricle at that time?

8   A.   Yes.  He was going over them.

9   Q.   Hand to you now what's marked as Government's Exhibit

10  D15.  Do you recognize Government's Exhibit D15?

11  A.   I do.

12  Q.   Can you identify what that is, please?

13  A.   This is a list of the questions that I was to go over

14  with Mr. Maricle in my handwriting.

15  Q.   And did you have someone assist you in making up these

16  questions?

17  A.   The agents.

18  Q.   And did you use that during this conversation with Mr.

19  Maricle?

20  A.   Yes, I referred back to them, and he was going over them

21  as well.

22  Q.   Did you actually hand him that list at some point?

23  A.   I did.

24  Q.   Did you get it back from him?

25  A.   I did.

*W. WHITE - Direct (Mr. Smith)*                                          18

1    Q.   And did he make a copy of it while you were there?

2    A.   No, I don't think he did.

3    Q.   Did you use it at any later meetings with anyone?

4    A.   I did.

5    Q.   And who did you use it with later?

6    A.   William Stivers.

7         MR. SMITH:  I'd move at this time for introduction of

8    Government's Exhibit D15.

9         THE COURT:  Any objection?  Exhibit D15 will be

10   admitted.

11              (Government Exhibit No. D15

12              was admitted into evidence.)

13   Q.   On page 4 again you said, "he slammed the binder down on

14   the desk and it popped like a gun."  And Mr. Maricle says,

15   "what, what, do you remember specifically what he asked?"

16   What were you referring to, ma'am, as he slammed the binder

17   down?

18   A.   The agents told me to tell Mr. Maricle that they were a

19   bit more aggressive in my grand jury questions, and I was

20   going over my testimony again.

21   Q.   You then said, "he asked how, how the relationship

22   between you and Wayne."  Who were you referring to, Miss

23   White?

24   A.   You, Mr. Smith.

25   Q.   Middle of page 4, are you with me on the transcript?

1    A.   Yes.

2    Q.   He asked "how the relationship between you and Wayne --"

3    A.   Yes.

4    Q.   -- "asked if I had been given any favors."  Who were you

5    referring to?

6    A.   Cletus Maricle and Wayne Jones.

7    Q.   Okay.  When you said, "asked if I had been given any

8    favors," who were you referring to, ma'am?

9    A.   Cletus Maricle and myself.

10   Q.   Mr. Maricle asked, "how many times did he mention my

11   name?"  And you said, "about ten times.  About every question

12   was directed towards you."  Who were you referring to, Miss

13   White?

14   A.   Mr. Maricle.

15   Q.   And he says, "what questions were they?"  To your

16   understanding, what was he referring to?

17   A.   The questions that I was asked at the grand jury.

18   Q.   He then asked, "did you take the Fifth on all those?"  To

19   your understanding, what was he referring to?

20   A.   The questions I was asked at the grand jury.

21   Q.   Top of page 8, you ask, "did they not ask Phillip nothing

22   about you?"  Who were you referring to, Miss White?

23   A.   The grand jurors.

24   Q.   And when you refer to Phillip, who were you referring to?

25   A.   Phillip Mobley.

*W. WHITE - Direct (Mr. Smith)*                                          20

1    Q.   Top of page 10, Kennon said, "would you think we'll get a

2    letter?"  Maricle says yeah.  "So you think they'll do."  And

3    you say, "you do?"  What were you referring to, and what was

4    your understanding Mr. Maricle was referring to in this

5    exchange?

6    A.   An order to compel me to testify.

7    Q.   Bottom of page 10, you say, "when you appeal it, what do

8    you do?  You just appeal it, how does that prolong it?"  What

9    were you referring to, Miss White?

10   A.   Well, at the end of that, at the end of that statement

11   that he had made before I said that, he said, "particularly

12   now", he said, "ah."  You can appeal it "anyway."  I said,

13   "when you appeal it, what do you do?  You just appeal it, how

14   does that prolong it?"

15   Q.   And he makes a response, "I don't know that, you know,

16   you better listen to your lawyer.  I can't give you advice.

17   You know, at this point in time."  To your understanding, what

18   was he referring to?

19   A.   Well, that we had made him aware that he was -- the

20   questions were being asked about him.

21   Q.   Top of page 11, Maricle says, "if I do, it's obstruction

22   of justice, which would mean a criminal offense on my part."

23   You said, "but you're talking to me now."  He says, "I'm

24   talking to you, but I'm telling you it would be obstruction of

25   justice and there ain't no need to going that route."  To your

1   understanding, what was he referring to?

2   A.   Well, he was referring to that again, we'd made him aware

3   that he was the -- the questions were being asked about him,

4   and I made a statement, "you're talking to me now" and that we

5   were close enough we could discuss it, and he was scared to

6   talk any further.

7   Q.   Page 13, top of the page, you say, "I'm going to jail."

8   Maricle says, "Connie, ah, Sonny Hunt spent 18 months in jail

9   because she wouldn't answer the questions once."  You said,

10  "do they put you in jail right then on the spot?"  He says,

11  "they can.  They can."  To your understanding, what was Mr.

12  Maricle referring to about spending 18 months in jail?

13  A.   I don't know who Sonny Hunt is, but my understanding what

14  he was telling me is that just don't answer them and go to

15  jail.

16  Q.   And he makes the question, "asked her if I was involved

17  in '02, '04 and '06."  To your understanding, what was he

18  referring to?

19  A.   He was reading a question off this paper.

20  Q.   Is there a question on there relating to '02, '04 and

21  '06?

22  A.   There is.

23  Q.   And to your recollection, what was that question?

24  A.   He was saying to himself, asked her, which was me, they

25  asked me if he was involved in the '02, '04 and '06 elections.

*W. WHITE - Direct (Mr. Smith)*                                          22

1    Q.   Referring to whom?

2    A.   He was saying that the question was directed to me about

3    him being involved.

4    Q.   That being Cletus Maricle?

5    A.   That being Cletus Maricle.

6    Q.   Then he said, "I've never seen like that thing up in Bath

7    County, they counted the phone calls from various ones."  To

8    your understanding, what was Mr. Maricle referring to when he

9    refers to the Bath County, counting phone calls?

10   A.   He was referring, when Kennon said he'd called him, and

11   if you notice, he didn't call Kennon back, and he was telling

12   that he was concerned that they counted the phone calls from

13   phone to phone, and he was letting Kennon know not to call

14   him.

15   Q.   And did he talk to you about Bath County before?

16   A.   We'd talked to it in conversation before.

17   Q.   And how did Bath County play a relevance into this, to

18   your understanding?

19   A.   It was the same type of investigation.

20   Q.   And did Mr. Maricle tell you where he learned about the

21   Bath County investigation?

22   A.   No.

23   Q.   Page 15, Kennon says, "they're coming after us, ain't

24   they?"  Maricle says, "yeah, I've expected it for some time, I

25   mean."  To your understanding, what was he referring to?

1    A.   Well, he's referring to the FBI agents and being

2    indicted.

3    Q.   On page 18, in the middle of that page, Miss White, Mr.

4    Maricle says, "I sort of thought that might be what they's

5    doing."  You said, "you did?  Why didn't you tell me that?"

6    He says, "because I just, I wasn't really sure.  I mean, I

7    could just never reply, because really, I've been in elections

8    pretty vocal for the past 30 years.  I have."  Do you

9    understand what was Mr. Maricle referring to there?

10   A.   I understand it well.  He was referring that he'd been

11   active in the elections, and he couldn't reply to them because

12   he couldn't afford not to.

13   Q.   I'm sorry, ma'am.  I had trouble understanding your last

14   question.  I don't know --

15            MR. SMITH:   It might be objectionable, but I couldn't

16   hear for the cough.  I didn't hear her answer, Judge.

17            THE COURT:   That's fine.

18   A.   He says that he'd been vocal.  To me, vocal would be

19   active, you know.  He didn't hide it.  And for the past 30

20   years, he could just never reply to it, because if you're

21   vocal, you can't reply to it.  I mean, it is what it is.

22   Q.   On page 20, bottom of page, Miss White, you said, "Friday

23   night, I mean you're talking about this past."  Maricle says,

24   "that Friday night before the election.  They'll ask you when

25   you talked to me, the last time you talked to me."  To your

1    understanding, what was Mr. Maricle referring to?

2    A.   Because we'd met with him the night before the election.

3    Q.   And when he asks -- who was he referring to, ma'am, when

4    he says they'll ask you when you last met with me?

5    A.   The grand jurors.

6            MR. SMITH:  Your Honor, I have intentions of going on

7    to the next clip.  I do understand there may be need to change

8    out some of our head sets so we'll need to take a break.

9            THE COURT:  This may be a good time to take our

10   afternoon break.  We'll take a break until 2:50 this

11   afternoon.  Please keep in mind the admonition you were given

12   previously not to discuss the case among yourselves while we

13   are in recess.  The jury will be excused until 2:50.

14            (The jury left the courtroom at 2:31 p.m.)

15            THE COURT:  We'll be in recess for 15 minutes.

16            (Recess from 2:32 p.m. until 2:46 p.m.)

17            THE COURT:  Thank you.  The record will reflect that

18   the jury's not present at this time.  Mr. Abell, you have an

19   issue?

20            MR. ABELL:  Judge, the issue I wanted to take up with

21   the Court at this time is regarding the testimony Miss White

22   has given regarding her interpretation of the clip that has

23   just been played.

24            It might be helpful for me to give a couple of

25   examples.  For instance, I think there's three different types

1    of explanations or interpretations that are going on, that

2    she's giving testimony regarding.  The first, for instance, on

3    page 4 of this exhibit we're playing down at the middle of the

4    page, it says "Wanda:  How, how the relationship between you

5    and Wayne.  Uh, asked if I had been given any favors.  Had I

6    been offered any money, he said monetary or something, but it

7    meant money, right?"  I'm not objecting to her explaining what

8    that's talking about and who it's referring to.  That I agree

9    does kind of explain, put it into context.  I've, of course,

10   listened to these tapes, as has the Court.  I think it's

11   helpful to the jury.

12          Another example is on page 11, the same clip.  At the

13   top of the page, Judge Maricle says, "I'm talking to you, but

14   I'm telling you what it would be obstruction of justice, and

15   there ain't no need to going that route."  And she's

16   testified, well, that's what he said, and he was scared about

17   talking about it any further.  I'm not objecting about that

18   type of testimony either.

19          What I am objecting to is her testifying that

20   unambiguous statements actually mean the opposite of what is

21   said.  And the example of that is on page 85 of the previous

22   exhibit, A13A.  At the bottom, it says, Judge Maricle says,

23   "well, I'm, I mean, I'm not saying not to tell the truth or

24   anything."  And her testimony was, in fact, notwithstanding

25   what he had said, notwithstanding the clear, unambiguous

*W. WHITE - Direct (Mr. Smith)*                                              26

1    statement, what he actually meant was the opposite.  She

2    understood she was to shut up and that he was just covering

3    himself.

4          My objection to the Court is that clear, unambiguous

5    statement like that, without an explanation as to why she had

6    that perception, if I say something like that, don't make --

7    I'm not telling you not to tell the truth, and I'm winking at

8    you, there's a rational perception for your understanding

9    that, in fact, I mean something else.  But in the absence of a

10   foundation like that or some indication that she had a

11   rational basis for believing something other than the

12   unambiguous statement was intended, it's improper for her to

13   give that testimony.

14         THE COURT:  I agree with you.  In this example, for

15   example, if you'll read on to the next section, there's some

16   interruption of the conversation.  "There's no need --" and I

17   think the implication is there's no need to say any more than

18   what you have to say.  Now, I don't know, but perhaps that's

19   the explanation that she wants to give.  But I agree, to go

20   beyond that question to offer some other, further explanation

21   would be objectionable for the reasons that you've stated.

22   And if there is that contemporaneous objection to those type

23   of answers that are given to a question, then I'll certainly

24   take that up at the appropriate time.

25         MR. ABELL:  Okay.  Thank you.

1          THE COURT:  Again, I can't always tell why the

2     defendants object or don't object to certain things.  As far

3     as I'm concerned, you may be wanting to ask questions about

4     this later.  But I do agree with what you've said to this

5     point about that type of an explanation.

6          Anything else that we need to take up on these

7     matters before the jury's brought in?

8                              (No verbal response.)

9          THE COURT:  Let's see.  Mr. Smith, what page are we

10    on at the current exhibit?

11          MR. SMITH:  Page 22, I believe.

12          THE COURT:  All right.  You can bring Miss White in,

13    please.

14                    (Ms. White returned to the witness stand.)

15          THE COURT:  Before the jury's brought in, I just

16    wanted to explain to you that if you would, please listen very

17    carefully to counsel's questions.  There may be times in which

18    you need to explain a particular answer.  But otherwise,

19    you'll just need to focus your answers on the questions that

20    are being asked of you.

21          THE WITNESS:  Okay.

22          THE COURT:  Thank you.  You can bring the jury in.

23             (The jury entered the courtroom at 2:52 p.m.)

24          THE COURT:  The record will again reflect that all

25    members of the jury are present.  All parties and counsel are

*W. WHITE - Direct (Mr. Smith)*                                      28

1   present.  Miss White has returned to the witness stand and, of

2   course, you're still under oath, ma'am.  Mr. Smith, I believe

3   we were discussing A15 exhibit, and you may continue.

4            MR. SMITH:  If the witness would refer to page 22, I

5   believe is where we stopped off.  I'd ask the Court permission

6   to publish the next clip, Your Honor.

7            THE COURT:  Yes, sir.

8                      (Government's Exhibit A15 was played

9                       from 00:43:50 to 1:32:34.)

10  Q.  Miss White, at the beginning, I believe we started on

11  page 22, and Mr. Maricle said, "they didn't need to ask you

12  any questions about Jennings and Vernon."  To your

13  understanding, who was he referring to?

14  A.  My grand jury testimony.

15  Q.  And Jennings being?

16  A.  Jennings White.

17  Q.  And Vernon being?

18  A.  Vernon Hacker.

19  Q.  And then top of page 25, Kennon says, "well, now, let me

20  tell you him and Vernon got close.  He said he was letting

21  Vernon clean."  You said, "he was and Chad worked there."  Who

22  were you referring to, Miss White, on the top of page 25?

23  A.  He was referring -- we were referring to Vernon Hacker

24  and Freddy Thompson.

25  Q.  And when you say "he was and Chad worked there," who were

1    you referring to?

2    A.   Vernon Hacker and Chad Thompson.

3    Q.   And who is Chad Thompson?

4    A.   The son of Freddy Thompson.

5    Q.   And had he gotten a job somewhere in the City?

6    A.   Yeah, he worked with me at the 911 center.

7    Q.   And do you know how he got that job?

8    A.   As a favor to Freddy, through Vernon.

9    Q.   Page 40.  You made the statement, "would you sit in jail

10   that long for somebody?"  And Maricle said yes.  What were you

11   referring to, Miss White?

12   A.   They had made reference that someone had set in jail for

13   Bill Clinton.  I asked him if he would sit in jail for

14   somebody, and he said yes.  He being Cletus.

15   Q.   You further make a question, "would you sit that long for

16   me?"  And he says, "that's right, absolutely.  I'll be very

17   honest with you.  I would not, if I've ever seen somebody

18   shoot somebody.  But as far as other things, no.  If that's

19   what you have to do, that's what you have to do."  To your

20   understanding, Miss White, what was Mr. Maricle meaning by

21   that statement?

22   A.   He was meaning he would sit -- he was indicating that he

23   would sit in jail short of seeing someone shoot somebody.  But

24   for anything else, such as what I had seen, he was insinuating

25   that I should sit in jail for the same.

*W. WHITE - Direct (Mr. Smith)*                                    30

1    Q.   You followed up and said, "I tell you, Cork, his ass put

2    in jail for not telling.  He sat there."  Who were you

3    referring to, Miss White?

4    A.   My brother, Eugene Price.

5    Q.   And what did you mean by saying him in jail for not

6    telling?

7    A.   That's why he was in jail at the time was for not

8    telling.  His testimony.

9    Q.   Can you explain what you mean by that?

10   A.   He was to give testimony during a trial, and he got on

11   the stand and wouldn't go through with his testimony.

12   Q.   And how did that result in him being put in jail, if you

13   know?

14   A.   Well, he was -- he and I were promised probation.  And at

15   the end of the trial, he was given a five-year sentence

16   because he wouldn't follow through with his testimony.

17   Q.   On page 45, ma'am, you began a conversation about getting

18   your clothes and moving over to where you were, and Kennon

19   says, "well, if we're not going to be able to talk up here,

20   where do we need to talk.  We ever need to."  Maricle says,

21   "we'll have to figure that out."  You said, "youn's really

22   think they know we're here?"  Your understanding, what was

23   being referred to here about you'll have to figure out what?

24   Your understanding.

25   A.   Well, he felt like the agents might have possibly

*W. WHITE - Direct (Mr. Smith)*                                        31

1    followed us up there, and he made the statement he thought

2    they'd had 40 agents in the area for some time and that they

3    had listening devices and other things, and we were going to

4    have to figure out a different meeting place to discuss things

5    further.

6    Q.   Page 55, Miss White.

7    A.   55?

8    Q.   Yes, ma'am.  You make the statement there, top of the

9    page, "election fraud is what they're looking at."  Maricle

10   says, "I guess."  You said, "election fraud.  I wonder if

11   they'll ask me questions about what I did at the polls."

12   Maricle later says, "they're getting around, they're getting

13   around to it."  Your understanding -- well, what did you mean

14   when you made the statement "what I did at the polls"?

15   A.   Stealing votes at the polls.  There's no other way to put

16   it.

17   Q.   Page 57, ma'am.  Maricle says, at the top of the page,

18   "you talked too much down there yesterday in that room."

19   "What room?  It was a cafeteria," you said.  "You were down

20   there talking.  You talked too much, telling this stuff,"

21   Maricle says.  To your understanding, what was he referring

22   to?

23   A.   There was a cafeteria or it was more a break room, and I

24   was in that break room with Stephen Charles, which is

25   Phillip's attorney, and Phillip Mobley, and Stephen Charles

*W. WHITE - Direct (Mr. Smith)*                                          32

1    had told him that I had talked too much while I was in that

2    room, and he was telling me that they had listening devices in

3    there as well.

4    Q.   Page 58, you say, "did Steve tell you I talk too much?"

5    And Maricle says, "I heard what you said, and I know it was

6    too much."  Who were you referring to, ma'am, when you said

7    did Steve say or tell you I talked too much?

8    A.   Stephen Charles.

9    Q.   And on the bottom of page 59, ma'am, Maricle says, "you

10   didn't hear Stephen Charles say anything, did you?"  You said

11   no.  He said, "that's right.  You can't keep --" and he says,

12   "you're naive.  You know all about it."  To your

13   understanding, what was Mr. Maricle referring to when he says,

14   "you're naive" and "you know all about it"?

15   A.   He was stating the fact that he thought I talked too much

16   while I was in the cafeteria, and that I was naive into

17   thinking that the federal government didn't have listening

18   devices.

19           MR. SMITH:  Proceed, Your Honor, with the next clip,

20   please.

21           THE COURT:  Yes, sir.

22                   (Government's Exhibit A15 was played

23                   from 1:33:58 to 1:38:28.)

24           MR. SMITH:  Court please, proceed to the next clip?

25           THE COURT:  Yes, sir.

*W. WHITE - Direct (Mr. Smith)*                                          33

1              MR. SMITH:  Thank you.

2                    (Government's Exhibit A15 was played

3                    from 1:40:27 to 1:41:52.)

4              MR. SMITH:  Court please, can we proceed to the next

5    clip?

6              THE COURT:  Yes, sir.

7                    (Government's Exhibit A15 was played

8                    from 1:45:10 to 1:48:43.)

9    Q.  Miss White, if I could refer you back as far as page 60,

10   please.  We played, I believe, about three clips so I want to

11   go back and touch on a couple of those short clips.

12       Page 60, there was a reference to you're "using city time

13   and property for your own benefit," Maricle says.  "I didn't

14   know, I mean, I didn't know," you said.  And he said, "damn

15   near fired Chris Jones, Wayne's boy."  You said, "what did he

16   do?  For getting a computer."  To your understanding, who was

17   he referring to as Chris Jones?

18   A.  Wayne Jones's son.

19   Q.  And where did he work?

20   A.  At the state department.

21   Q.  And further, he says, "well, you was talking about Doug."

22   To your understanding, who was he referring to when he

23   mentioned the name Doug?

24   A.  Doug White.

25   Q.  Page 64, ma'am, Kennon asked the question, "do you think

*W. WHITE - Direct (Mr. Smith)*                                            34

1    they'll get any of these magistrates?  According to what

2    Jennings had said."  Maricle says, "I wouldn't be surprised."

3    He said, "I think Terry, Tommy are the two, maybe Clinton."

4    Miss White, do you know who he's referring to as Terry, Tommy

5    and maybe Clinton?

6    A.   I do.

7    Q.   Would you tell us, to your understanding, who is he

8    referring to?

9    A.   Terry Davidson, Tommy Harmon and Clinton Johnson.

10   Q.   Page 67, ma'am.  Middle of the page, Mr. Maricle said,

11   "don't you worry about what you said.  That's the least of

12   things right now."  You said, "don't say it again."  He says,

13   "just watch what you say."  To your understanding, ma'am, what

14   was Mr. Maricle referring to?

15   A.   The things, referring back to the things I'd said at the

16   grand jury.

17   Q.   Page 68, you asked the question or make a statement, "I

18   wonder if they asked Doug anything about election stuff."  Who

19   were you referring to as Doug, Miss White?

20   A.   Doug White.

21   Q.   Finally, on page 69, Miss White, the conclusion of your

22   conversation, it appeared that you gave out a number, you and

23   your husband did together to Mr. Maricle.  Whose number was

24   that you were giving him?

25   A.   Our cell phone numbers.

*W. WHITE - Direct (Mr. Smith)* 35

1   Q.   And Kennon makes a statement, "she probably won't call,

2   but, I mean --" he said, "no, but she might get a call."  To

3   your understanding, what was Mr. Maricle referring to when he

4   said, "no, but she might get a call"?

5   A.   Kennon was referring to me calling him.  And in return he

6   said no, but she may get a call, referring back to me.

7   Q.   And one of the final statements in that conversation,

8   ma'am, Maricle says, "listen, we'll communicate."  To your

9   understanding, what was he referring to?

10  A.   He was referring not -- he was basically saying don't

11  worry about it, I'll communicate with you somehow.

12  Q.   And at the conclusion of this conversation, was your

13  understanding that you were still welcome to come up there and

14  talk to him anymore about his case?

15  A.   No.  He wasn't comfortable with us coming up there,

16  because he thought agents were following us.

17  Q.   And following this, did you get some direction to go to

18  someone else to talk to?

19  A.   William Stivers.

20  Q.   And who gave you directions to go speak to William

21  Stivers?

22  A.   Cletus Maricle.

23       MR. SMITH:  Like to hand the witness now what's been

24  marked as Government Exhibit A19.

25  Q.   Do you recognize Government Exhibit A19?

*W. WHITE - Direct (Mr. Smith)*                                                36

1    A.   Yes.

2    Q.   Is that a conversation which you participated in?

3    A.   Yes.

4    Q.   And did you review it prior to your testimony here today?

5    A.   I did.

6    Q.   And is it an accurate recording or depiction of the

7    conversation which you participated?

8    A.   Yes.

9    Q.   Who was in that conversation with you, ma'am?

10   A.   Myself, my husband Kennon White, and William "Al Man"

11   Stivers.

12   Q.   And what date did this conversation occur on, ma'am?

13   A.   May 17, 2007.

14   Q.   There's also an exhibit marked A19A.  Do you have that in

15   front of you?

16   A.   Yes, I do.

17   Q.   Have you had an opportunity to review that transcript

18   prior to your testimony today?

19   A.   I have.

20   Q.   Is that a fair actual statement or recollection of the

21   words that were spoken in the conversation to which you were a

22   participant?

23   A.   Yes.

24        MR. SMITH:  I'd like to move at this time to

25   introduce Government Exhibit A19, A19A.

*W. WHITE - Direct (Mr. Smith)*                                    37

1          THE COURT:  Any objections other than those

2    previously stated?  Exhibit A19 and A19A will be admitted.

3                        (Government Exhibit Nos. A19 and A19A

4                        were admitted into evidence.)

5          MR. SMITH:  Court please, I'd like to publish it at

6    this time.

7          THE COURT:  You may.

8          MR. SMITH:  Your Honor, if the Court please, this

9    clip's going to take us into about 4:30, but that should get

10   us through this exhibit, if the Court would allow.

11         THE COURT:  Yes, sir.

12         MR. SMITH:  Thank you.

13                        (Government's Exhibit A19 was

14                        played in its entirety.)

15         MR. SMITH:  Your Honor, this might be a good point to

16   break for the day.

17         THE COURT:  Yes, sir.  We will take our break for the

18   evening.  Before I give the jury its admonition, Miss White,

19   you may step down.  We'll start again at 9:00 tomorrow

20   morning.

21         THE WITNESS:  Thank you.

22         THE COURT:  Ladies and gentlemen of the jury, let me

23   remind you of a couple of instructions that you were given

24   previously.  First, with respect to the transcriptions of the

25   tape recordings, again, you've heard some tape recordings that

1    were received in evidence, and you were shown some of the

2    written transcripts of the tapes.  Please keep in mind that

3    the transcripts are not evidence.  They are offered to you

4    only as a guide to help you follow what was being said.

5           The tapes themselves are the evidence.  If you

6    noticed any difference between what you heard on the tapes and

7    what you read in the transcripts, you must rely upon what you

8    heard and not on what you read.  If you could not hear or

9    understand some parts of the tapes, then you must ignore the

10   transcripts as far as those parts are concerned.

11          You've also heard the testimony given by a witness

12   which includes her interpretation of what other people meant

13   by what they said.  You are reminded that this testimony

14   represents the witness's understanding of what was meant by

15   the statements and has been admitted to put these statements

16   and the parties' conversations in context.

17          Also, let me remind you of the general admonition

18   that I do give you as we break for the evening.  First, of

19   course, as we take our evening break, you should not talk with

20   each other about the case and, likewise, you should not talk

21   with any friends or family members about this matter.  You

22   should not allow anyone to approach you in an attempt to

23   discuss the case.  Of course, if that should ever happen, you

24   should report that to the Court promptly.  Do not speak to any

25   of the parties, witnesses, lawyers or anyone else involved in

*W. WHITE - Direct (Mr. Smith)*                                        39

1    the case.

2              Don't read, watch or listen to any news accounts, if

3    there should be any, about this matter.  Don't attempt to

4    perform any type of research or do any investigation on your

5    own while we are in recess, and, of course, don't engage in

6    any type of electronic communications such as blogging or

7    other type of communication about the case.

8              Finally, of course, don't make up your mind about

9    this matter until it is finally submitted to you.  We will

10   plan to start promptly at 9:00 a.m. tomorrow morning.  The

11   jury will be excused until that time.

12                    (The jury left the courtroom at 4:40 p.m.)

13             THE COURT:  Before we recess, let me see if any of

14   the attorneys have any issues to take up.  Please be seated.

15   Mr. White?

16             MR. WHITE:  Yes, Your Honor.  Just two quick

17   housekeeping ones.

18             THE COURT:  Yes, sir.

19             MR. WHITE:  The first is I wanted to find out from

20   the United States if the transcripts that they have introduced

21   with this witness, if those are redacted or if we need to deal

22   with the same issue we did with Mr. Kennon White for

23   preparation for cross-examination so if I need to arrange for

24   the witness to have a transcript --

25             MR. SMITH:  They have been redacted.

*W. WHITE - Direct (Mr. Smith)*                                    40

1          MR. WHITE:  Thank you.  And then the other question I

2     have, Your Honor, again, I'm mindful of what we discussed on

3     day one as to who the witnesses were going to be.

4          THE COURT:  Yes, sir.

5          MR. WHITE:  But my question was if the United States

6     could at least give us a clue as to when they expected to

7     rest.  We've got a number of subpoenas out.  I've got people,

8     some of my witnesses staggered to come in.  I'm going to go

9     ahead and call them and tell them they're on standby.  Don't

10    drive up unless you get a call from me.  I'm trying to -- I'm

11    starting to run into issues with people being out of town,

12    that kind of thing.  Just hoping if we can get a feel for when

13    the U.S. may be resting.

14         THE COURT:  Mr. Smith, I'm assuming we're at least

15    two weeks away from the Government closing its case.  Is that

16    fair?

17         MR. SMITH:  Your Honor, I expect that that's probably

18    the best estimate I can give.  I know that we have learned

19    over the weekend of an illness of a couple witnesses and a

20    couple other instances that are going to have major change in

21    our lineup for witnesses, probably tomorrow.  So trying to get

22    a best estimate right now, we'll probably be about two more

23    weeks.

24         MR. WHITE:  Thank you very much, Your Honor.

25         THE COURT:  Mr. White, if you would like to have your

*W. WHITE - Direct (Mr. Smith)*                                        41

1    witnesses brought in in two weeks or if it looks like it may

2    be sooner than that, to be recognized as witnesses in the

3    case, we can do that either one afternoon, after we recess for

4    the evening, or I could even do that at lunch time, if you

5    feel more comfortable making sure that your witnesses do

6    understand they're under subpoena and need to be brought

7    before the Court.

8            MR. WHITE:  I think for the most part, I'm okay.

9    There may be a couple I may want to do that with.  Just

10   letting you know a day or two ahead work okay with your

11   schedule?

12           THE COURT:  That will be fine.

13           MR. WHITE:  Thank you, Your Honor.

14           THE COURT:  I'm going to try to continue to advise

15   the attorneys if I do have matters in the afternoon that need

16   to be scheduled.  Really never know about supervised release

17   violations, but with respect to other matters, such as

18   sentencings and rearraignments that I'm attempting to do at

19   4:30, I'll try to make sure that I advise you of those matters

20   at least a day or two in advance so you can at least move

21   materials off the table.

22           Anything else we need to take up?  We'll be in recess

23   until 9:00 a.m. tomorrow morning.

24               (Proceedings adjourned at 4:44 p.m.)

25                          - - -

*W. WHITE - Direct (Mr. Smith)*                                    42

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2              I, LISA REED WIESMAN RDR-CRR, certify that the
    foregoing is a correct transcript from the record of
3   proceedings in the above-entitled case.

4

5    \s\ Lisa Reed Wiesman                    February 28, 2010
    LISA REED WIESMAN, RDR-CRR               Date of Certification
6   Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                INDEX

2    GOVERNMENT'S WITNESS

3    WANDA WHITE
     Direct Examination by Mr. Smith.................. Page 4
4


5    GOVERNMENT'S                                      ADMITTED

6
     Exhibit No. A15, 5/4/07 audio recording
7    Admitted....................................... Page 15

8    Exhibit No. A15A, transcript of 5/4/07 recording
     Admitted....................................... Page 15
9
     Exhibit No. D15, handwritten list of questions
10   Admitted....................................... Page 18

11   Exhibit No. A19, 5/17/07 audio recording
     Admitted....................................... Page 36
12
     Exhibit No. A19A, transcript of 5/17/07 recording
13   Admitted....................................... Page 36

14                               - - -

15

16

17

18

19

20

21

22

23

24

25