1

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
 2                   SOUTHERN DIVISION at LONDON
                              - - -
 3
     UNITED STATES OF AMERICA,        :   Docket No. CR 09-16-S
 4                                     :
                      Plaintiff,       :   Frankfort, Kentucky
 5                                     :   Monday, March 1, 2010
          versus                       :   12:50 p.m.
 6                                     :
     RUSSELL CLETUS MARICLE,           :
 7   DOUGLAS C. ADAMS                  :
     CHARLES WAYNE JONES               :
 8   WILLIAM R. STIVERS                :
     FREDDY W. THOMPSON                :      Trial Day 15B
 9   WILLIAM B. MORRIS                 :
     DEBRA L. MORRIS                   :
10   STANLEY BOWLING,                  :
                                       :
11                    Defendants.      :

12

13                            - - -
                     TRANSCRIPT OF TRIAL
14                BEFORE DANNY C. REEVES
           UNITED STATES DISTRICT COURT JUDGE and a jury
15                            - - -

16   APPEARANCES:

17   For the United States:       STEPHEN C. SMITH, ESQ.
                                   JASON D. PARMAN, ESQ.
18                                 Assistant U.S. Attorney
                                   601 Meyers Baker Road
19                                 Suite 200
                                   London, KY 40741
20
     For the Defendant            MARTIN S. PINALES, ESQ.
21   Russell Cletus Maricle:      Strauss & Troy
                                   150 E. Fourth Street
22                                 Fourth Floor
                                   Cincinnati,OH  45202
23
                                   DAVID S. HOSKINS, ESQ.
24                                 107 E. First Street
                                   Corbin, KY  40701
25
```

2

```
 1    For the Defendant          R. KENT WESTBERRY, ESQ.
      Douglas C. Adams:          KRISTIN N. LOGAN, ESQ.
 2                               Landrum & Shouse, LLP
                                 220 West Main Street
 3                               Suite 1900
                                 Louisville, KY 40202
 4
                                 BENNETT E. BAYER, ESQ.
 5                               Landrum & Shouse, LLP
                                 106 West Vine Street
 6                               Suite 800
                                 Lexington, KY  40507
 7

 8    For the Defendant          T. SCOTT WHITE, ESQ.
      Charles Wayne Jones:       Morgan & Pottinger, P.S.C.
 9                               133 West Short Street
                                 Lexington, KY  40507
10

11    For the Defendant          ROBERT L. ABELL, ESQ.
      William R. Stivers:        120 North Upper Street
12                               Lexington, KY  40507

13

14    For the Defendant          RUSSELL JAMES BALDANI, ESQ.
      Freddy W. Thompson:        R. TUCKER RICHARDSON, ESQ.
                                 Baldani, Rowland & Richardson
15                               300 West Short Street
                                 Lexington, KY  40507
16

17    For the Defendant          JERRY W. GILBERT, ESQ.
      William B. Morris:         Coy, Gilbert & Gilbert
18                               212 North Second Street
                                 Richmond, KY 40475
19

20    For the Defendant          ELIZABETH SNOW HUGHES, ESQ.
      Debra L. Morris:           Gess, Mattingly & Atchison, PSC
21                               201 West Short Street
                                 Lexington,KY40507
22

23    For the Defendant          DANIEL A. SIMONS, ESQ.
      Stanley Bowling:           Thompson, Simons, Dunlop & Fore
24                               116 West Main Street
                                 Suite 2A
25                               Richmond, KY 40476
```

3

Court Reporter:                    LISA REED WIESMAN, RDR-CRR
                                   Official Court Reporter
                                   35 W. Fifth Street
                                   P.O. Box 1073
                                   Covington, KY  41012
                                   (859) 291-4410


     Proceedings recorded by mechanical stenography,
transcript produced with computer.

*CRAFT - Direct (Mr. Parman)* 4

1           (The jury entered the courtroom at 12:49 p.m.)

2           THE COURT:  Thank you.  The record will reflect that

3   all members of the jury are present.  Parties and counsel are

4   all present.

5           Mr. Smith you, may call your next witness.  I'm

6   sorry.  Mr. Parman.

7           MR. PARMAN:  My apologies, Your Honor.  United States

8   calls Randy Craft.

9           THE COURT:  Thank you.

10           RANDY CRAFT, GOVERNMENT'S WITNESS, SWORN

11           THE COURT:  Thank you.  Mr. Parman, you may proceed.

12           MR. PARMAN:  Thank you, Your Honor.

13                          DIRECT EXAMINATION

14   BY MR. PARMAN:

15   Q.   Good afternoon, sir.

16   A.   Good afternoon.

17   Q.   Could you state your name for the record?

18   A.   Randy Craft.

19   Q.   Sir, where do you live?

20   A.   Manchester, Kentucky.

21   Q.   How long have you lived there?

22   A.   Pretty much all my life.  Thirty-eight years.

23   Q.   Are you married?

24   A.   Yes.

25   Q.   How long have you been married?

*CRAFT - Direct (Mr. Parman)* 5

1    A.   Thirteen years.

2    Q.   Do you have kids?

3    A.   One on the way.

4    Q.   When is your child due?

5    A.   August.

6    Q.   Congratulations.  Sir, are you currently employed?

7    A.   Yes, sir.

8    Q.   How are you employed?

9    A.   Clay County Sheriff's Department.

10   Q.   What position do you hold with the Clay County Sheriff's

11   Department?

12   A.   Supervisor of the courthouse.

13   Q.   How long have you been employed in that capacity?

14   A.   January, be four years.

15   Q.   What other jobs have you held?

16   A.   Several.  Worked for the Clay County school board before

17   I went to work for the sheriff's department.  Was in the car

18   business, been in the car business for about ten years.

19   Q.   The work you did for the Clay County school board,

20   explain to the jury what that was.

21   A.   I was in public relations.  I done, took care of all the

22   news, activities that went on in the school system and put it

23   into the newspaper.

24   Q.   How long have you worked in that capacity?

25   A.   Two or three years.

*CRAFT - Direct (Mr. Parman)*                                                    6

1    Q.   Now, is that a job that carried benefits with it?  Did

2    you have benefits?

3    A.   Insurance, yes, sir.

4    Q.   Who gave you that job?

5    A.   Doug Adams would have been the one who hired me, I

6    assume.

7    Q.   Had you asked Mr. Adams for jobs before you actually got

8    that job?

9    A.   Yes, sir.

10   Q.   Sir, have you been involved in elections in Clay County?

11   A.   Yes, sir.

12   Q.   Were you involved in the 2002 election?

13   A.   Yes, sir.

14   Q.   Did you participate in a scheme to buy votes during the

15   2002 election?

16   A.   Yes, sir.

17   Q.   Who did you participate in that scheme with?

18   A.   With my father.

19   Q.   What's your father's name?

20   A.   James Craft.

21   Q.   Now, is Mr. Craft still alive?

22   A.   No, sir.

23   Q.   When did he pass away, sir?

24   A.   Buried him last Tuesday.

25   Q.   I know this may be difficult.  If you need to take a

*CRAFT - Direct (Mr. Parman)*                                           7

1    moment, please do.

2    A.   Okay.

3    Q.   Are you okay?

4    A.   Yeah.

5    Q.   First want to talk to you about the absentee voting.  Did

6    you and your father buy votes during the absentee voting?

7    A.   Yes, sir.

8    Q.   Where did you buy votes at?

9    A.   We were located at a store called -- it was Mike Hooker's

10   grocery store.

11   Q.   Share with the jury how the vote buying worked.

12   A.   Pretty much they would just come there and then we would

13   go with my -- follow them or go with them or take them to

14   where they would vote absentee.  And then they'd either be

15   paid before they went over; or once they voted, they'd go back

16   and be paid.

17   Q.   Can you recall how much the voters were being paid?

18   A.   I'm not for sure, somewhere between 25 -- 20 to 50

19   dollars, somewhere in that.

20   Q.   Who was paying the voters?

21   A.   My father.

22   Q.   And what role did you perform?

23   A.   Pretty much my role was to make sure they went.

24   Q.   And to make sure they voted the way they were supposed

25   to?

*CRAFT - Direct (Mr. Parman)*                                              8

1    A.   Yeah, I would take -- either go with them or follow them
2    there, one.
3    Q.   Do you know or have an estimate as to how many voters you
4    voted during absentee?
5    A.   No, sir.
6    Q.   Now, after the absentee voting, did you also then buy
7    votes in the regular election?
8    A.   Yes, sir.
9    Q.   Where did you buy votes from then?
10   A.   It is what they call the KD Pawn Shop building, located
11   behind that building.
12   Q.   Share with the jury how the scheme worked then.
13   A.   Voter would just come there, and I would get them to
14   vote, pay them.  Some we would send on their own, some I would
15   go follow and make sure they'd go voted.
16   Q.   Do you recall whether or not there was a slate of
17   candidates that you were voting the voters with?
18   A.   Yes, sir.
19   Q.   Who was on the slate of candidates?
20   A.   Freddy Thompson, Charles Marcum, Mike Hooker, Tim Couch,
21   Roy Morgan and Danny Reed.
22   Q.   Do you recall what office Freddy Thompson was running
23   for?
24   A.   Circuit clerk.  County clerk, I mean.
25   Q.   What office was Charles Marcum running for?

*CRAFT - Direct (Mr. Parman)*                                               9

1    A.    Jailer.

2    Q.    Mike Hooker?

3    A.    Magistrate.

4    Q.    Did you say Tim Couch?

5    A.    Yeah, state representative.

6    Q.    Roy Morgan?

7    A.    County judge.

8    Q.    And Danny Reed?

9    A.    Sheriff.

10   Q.    And when they were taken to the polls, you made sure they

11   voted for those candidates?

12   A.    Yeah.

13   Q.    And in the regular election, who then paid them?

14   A.    My dad.

15   Q.    Where did you dad get the money?

16   A.    He said Doug Adams gave it to him.

17   Q.    How much money did Doug Adams give him?

18             MR. BAYER:  Judge, can we approach for a moment?

19             THE COURT:  Yes, you may.

20                  (A sidebar conference was held out of the

21                   hearing of the jury):

22             MR. BAYER:  He's asking him questions specifically

23   about what James Craft would have said and what James Craft

24   would have done.  Unfortunately, Mr. Craft has died, and I

25   understand this.  These are questions I'm sure they were

*CRAFT - Direct (Mr. Parman)*                                    10

1    prepared to ask Mr. James Craft upon his testimony as he would

2    have testified.

3         I would object to Randy Craft testifying regarding

4    anything his father might have said.  It's hearsay, testifying

5    to anything as to his father because he really doesn't have

6    firsthand knowledge to these things.

7         THE COURT:  It's not hearsay if it's a

8    co-conspirator's statement made in the course of the

9    conspiracy and in furtherance of the scheme under

10   801(d)(2)(E).

11        MR. PARMAN:  That's correct, Your Honor.  That's what

12   these statements were made during, while the scheme was going

13   on.  During the process, they discussed where the money was

14   coming from that they then were turning around and using to

15   buy votes with.

16        THE COURT:  Objection overruled.

17        MR. BAYER:  Thank you, Judge.

18        THE COURT:  Yes, Mr. Baldani?

19        MR. BALDANI:  I wanted to join in that, and I have a

20   question, Judge.  There's been other co-conspirator statements

21   that I understand your ruling, but -- and I hate to object

22   just to be overruled in front of the jury, but can I have a

23   continuing objection to co-conspirator statements, or do you

24   want me to object whenever it comes up?

25        I mean, I'm sorry, I understand what your ruling is,

*CRAFT - Direct (Mr. Parman)*                                          11

1    and it's pretty apparent certain people, you know, in the

2    government's theory are co-conspirators, and I don't really

3    want to waive anything, but I don't want to object and

4    interrupt, you know --

5             THE COURT:  I will, at the conclusion of the

6    government's proof, make findings with respect to

7    co-conspirator statements which have been introduced and been

8    offered during the course of the conspiracy.  At this point,

9    there have been several co-conspirator statements that have

10   been introduced.  This would seem to fall within the same area

11   that the United States is offering with respect to other

12   witnesses; specifically, co-conspirators during the 2002, 2004

13   and 2006 elections.  So this would fall within that same area.

14            Again, at the end of the proof of the government, I

15   will make a final determination, but at this point I'm

16   admitting these statements conditionally subject to that final

17   determination.  If you want to make a continuing objection to

18   co-conspirator statements, again, these statements are being

19   offered in the course conditionally under 801(d)(2)(E) of the

20   Federal Rules of Evidence.

21            MR. WHITE:  Your Honor, excuse me.  Scott White on

22   behalf of -- counsel for defendant Charles Wayne Jones.  I was

23   reading the realtime.  Was it my understanding that you want

24   us to, if we have an objection to co-conspirator statements,

25   to do that when you make your conditional finding at the end

*CRAFT - Direct (Mr. Parman)*                                    12

1    of the proof, or did you want us to make those now?

2              THE COURT:  I thought we'd taken this up pretrial.

3    Apparently, I wasn't very clear during the pretrial conference

4    on this.  A number of statements were objected to that were

5    contained specifically on the tape recordings.  I made certain

6    findings as to those statements with the understanding that

7    the Court would make further findings during the course of

8    this proceeding.

9              If you wish to object, if you wish to make additional

10   objections, you may do so, but this particular statement is

11   being admitted under 801(d)(2)(E) at this time.

12             MR. WHITE:  Thank you, Your Honor.

13             THE COURT:  Objection is noted and overruled.

14                  (Sidebar conference concluded.)

15             THE COURT:  Mr. Parman, you may continue.

16   BY MR. PARMAN:

17   Q.   The question I'd asked you before we broke, how much

18   money did Doug Adams provide to your father to buy votes with?

19   A.   He said somewhere around $15,000.

20   Q.   Sir, were you also present at a meeting before the 2002

21   election at Paul Bishop's house?

22   A.   Yes, sir.

23   Q.   How long were you present at this meeting?

24   A.   Not that long.  Maybe, I don't know, maybe 30, 45

25   minutes.  About that.

*CRAFT - Direct (Mr. Parman)*                                    13

1    Q.   And was the subject of the conversation at that meeting

2    an election?

3    A.   Yes, sir.

4    Q.   Who was present at that meeting?

5    A.   The ones I remember was Paul Bishop, Doug Adams, Freddy

6    Thompson, Wayne Jones, William Stivers, myself, my father,

7    Charles Marcum, Mike Hooker.  That's the only ones I can

8    remember.

9    Q.   Now, you mentioned Mr. Jones.  Do you see Mr. Charles

10   Wayne Jones here in the courtroom today?

11   A.   Yeah, he's located beside Doug Adams on the left, my

12   left.

13   Q.   Could you indicate what he's wearing?

14   A.   I can't see what he's wearing.

15   Q.   You can stand up if you need to.

16   A.   Looks like a gray suit coat.

17          THE COURT:  This is Mr. Jones?

18          MR. PARMAN:  Yes, Your Honor.

19          THE COURT:  Record will reflect that the witness has

20   identified the defendant, Charles Wayne Jones.

21   Q.   You also mentioned William Stivers.  Does he also go by a

22   nickname?

23   A.   Yes, sir.

24   Q.   What do you know that to be?

25   A.   Al Man.

CRAFT - Direct (Mr. Parman)                                  14

1   Q.   Do you see Mr. William "Al Man" Stivers here in the
2   courtroom?
3   A.   Yeah, he's located on the left of Wayne Jones.
4           THE COURT:  Record will reflect the witness has
5   identified the defendant, William Stivers.
6   Q.   You mentioned Mr. Adams, Doug Adams.  Do you see him in
7   the courtroom?
8   A.   Yes, sir.
9   Q.   Could you identify him?
10   A.   Yeah, he's standing up.
11           THE COURT:  Record will reflect the witness has
12   identified the defendant, Douglas Adams.
13   Q.   Finally, you mentioned Freddy Thompson being present at
14   the meeting.  Can you identify him?
15   A.   He's standing.
16           THE COURT:  The record will reflect the witness has
17   also identified the defendant, Freddy Thompson.
18   Q.   Are you okay to proceed, sir?
19   A.   (Nodding affirmatively).
20   Q.   Sir, then following the 2002 election, is that when you
21   received your job for the Board of Education?
22   A.   It was after that.
23   Q.   Did you then work in the 2004 election?
24   A.   I was election officer.
25   Q.   Which officer, which position did you hold?

*CRAFT - Direct (Mr. Parman)*                                          15

1    A.   Sheriff.

2    Q.   What precinct?

3    A.   Garrard.

4    Q.   Then again in 2006, did you work in the election?

5    A.   Yes, sir.

6    Q.   What did you do in the 2006 election?

7    A.   I was a clerk.

8    Q.   What precinct did you work?

9    A.   Garrard.

10   Q.   Sir, before your father passed, did he work for the Board

11   of Education as well?

12   A.   Yes, sir.

13   Q.   What did he do for the Board of Education?

14   A.   He drove a school bus and worked at the bus garage.

15   Q.   How many years did he work for the Board of Education?

16   A.   Probably somewhere around 17, 18 years.

17   Q.   Is your wife employed by the Board of Education?

18   A.   Yes, sir.

19   Q.   What does she do for the Board of Education?

20   A.   Teaches.

21   Q.   When did she receive that position?

22   A.   This is her second year teaching.

23            MR. PARMAN:  Your Honor, may I have a moment?

24            THE COURT:  Yes.

25            MR. PARMAN:  That's all I have, Your Honor.  Thank

*CRAFT - Cross (Mr. Bayer)*                                          16

1    you.

2              THE COURT:  Thank you.  Mr. Pinales.

3                         CROSS-EXAMINATION

4    BY MR. PINALES:

5    Q.  Good afternoon.  I'm Marty Pinales, and I represent

6    Cletus Maricle.  I believe you said, at the beginning of your

7    testimony, in response to one of the questions that you are

8    courthouse supervisor for the sheriff's office?

9    A.  Yes, sir.

10   Q.  And as a courthouse supervisor of the sheriff's office,

11   you're employed by the sheriff's office and placed in the

12   courthouse; is that correct?

13   A.  Yes, sir.

14             MR. PINALES:  I have nothing further.  Thank you.

15             THE COURT:  All right.  Thank you.  Mr. Bayer?

16             MR. BAYER:  Thank you, Judge.

17                         CROSS-EXAMINATION

18   BY MR. BAYER:

19   Q.  Hi, Mr. Craft, I'm Bennett Bayer.  I'm one of Doug Adams'

20   attorneys.  My condolences to you on the loss of your father

21   last week.

22       I'd like to take you back to that meeting at Paul

23   Bishop's in 2002.  You were there for maybe, what, 45 minutes?

24   A.  Yes.

25   Q.  You've already told us all the different people that were

*CRAFT - Cross (Mr. Bayer)*                                         17

1    there.  As I understand, you got to hear some people maybe

2    talk about maybe candidates that they were supporting?

3    A.   Yes.

4    Q.   What else was being talked about there?

5    A.   Pretty much just, you know, look good in, you know, this

6    precinct or that precinct.  That was pretty much it.

7    Q.   And each of the individuals were kind of talking about

8    what candidate they were supporting for that election, weren't

9    they?

10   A.   I don't understand what you're asking me.

11   Q.   Well, as I understand, I think that you overheard Doug

12   Adams, and he was principally talking about Freddy Thompson in

13   '02, wasn't he?

14   A.   I'm not understanding what you're -- yeah, Freddy

15   Thompson was one of the people, yes.

16   Q.   But as I understand, that's basically all Doug Adams at

17   that meeting at Paul Bishop's was talking about was just --

18           MR. PARMAN:  Objection, Your Honor.  It's outside the

19   scope of what this witness testified to.  He didn't testify to

20   what he's saying he understood.

21           THE COURT:  All right.  Objection overruled.

22           MR. PARMAN:  Thank you, Judge.

23   A.   What was your question?

24   Q.   Principally, Doug Adams was there talking about Freddy

25   Thompson.  That's what you heard Doug talking about?

*CRAFT - Cross (Mr. Bayer)* 18

1    A.   Yes, sir.

2    Q.   You never heard Doug Adams talking about a slate of

3    candidates, did you?

4    A.   There was a group of people that -- people I told you

5    that was the ones that was being talked about.

6    Q.   Correct, by a lot of people.  But Doug Adams was talking

7    about Freddy Thompson?

8    A.   I don't know who was talking about who, but that was the

9    conversation.

10   Q.   Correct.  Among the candidates that you talked about,

11   Mike Hooker and Danny Reed, they both lost, didn't they?

12   A.   Yes, sir.

13   Q.   So each of these candidates that were talked about at

14   that meeting, they didn't all win, did they?

15   A.   No, sir.

16   Q.   The big race that year that they were really talking

17   about was that Jennings White/Freddy Thompson race, correct?

18   A.   Yes, sir.

19   Q.   You were working, I think, in the sheriff's office at the

20   time?

21   A.   No, sir.

22   Q.   Where were you working at the time in 2002?

23   A.   I was unemployed at the time.

24   Q.   You were unemployed?

25   A.   Yeah.

*CRAFT - Cross (Mr. Bayer)*                                        19

1    Q.   Did someone come and ask you to support Jennings White at

2    that time?

3    A.   No, sir, not that I can remember.

4    Q.   Did you support Jennings White?

5    A.   No, sir.

6    Q.   Why not?

7    A.   I was for Freddy Thompson.

8    Q.   I'm sorry?

9    A.   I was for Freddy Thompson.

10   Q.   How long had you known Freddy?

11   A.   A couple years, maybe.

12   Q.   What did you think about Jennings?

13            MR. PARMAN:  Objection, Your Honor.

14            THE COURT:  Sustained.

15   Q.   Now, you talked about some money being given to your

16   father?

17   A.   Yes, sir.

18   Q.   Are you sure that wasn't Mike Hooker that gave the money

19   to your father?  Do you remember for sure?

20   A.   My dad told me Doug Adams gave it to him.

21   Q.   But you weren't there at the time?

22   A.   No, sir.

23   Q.   It might -- you don't know whether or not it was Doug or

24   Mike Adams?  You're just recounting what your father told you

25   at the time?

1    A.   Yes, sir.

2    Q.   When you worked for the school system, what did you do?

3    A.   I was public relations.

4    Q.   How did you get that job?

5    A.   There was an opening, and I asked Doug for a job, and he

6    had an opening and a job.

7    Q.   You knew that there was an opening?

8    A.   No, I didn't know for sure there was an opening then.

9    I'd been asking for several years.

10   Q.   Correct.  And you put in an application?

11   A.   I guess so.  I don't remember exactly when I put the

12   application in.

13   Q.   What I'm getting at is you went through the normal

14   process to get a job with the Board of Education, correct?

15   A.   From my understanding, yeah.

16   Q.   And you got hired?

17   A.   Yes, sir.

18   Q.   When your wife got hired, she's a teacher?

19   A.   Yes, sir.

20   Q.   Did she go through the normal process to get hired?

21   A.   As far as I know, yes, sir.

22   Q.   They didn't -- no one did any favors to either you or

23   your wife other than allow you to be interviewed and get a

24   job?  In other words, it wasn't done in consideration for

25   anything else, was it?

*CRAFT - Cross (Mr. Baldani)*                                    21

1    A.  No, sir.

2            MR. BAYER:  I don't have any other questions.  Thank

3    you.

4            THE COURT:  Mr. White?

5            MR. WHITE:  No questions, Your Honor, thank you.

6            THE COURT:  Go around and see if anyone has any

7    questions.  Mr. Baldani?

8            MR. BALDANI:  I do, Judge.

9            THE COURT:  All right.  Thank you.

10                        CROSS-EXAMINATION

11   BY MR. BALDANI:

12   Q.  Good afternoon, Mr. Craft.  My name is Russ Baldani.  I'm

13   one of Freddy's attorneys.  I want to start with '02.  I

14   didn't hear what you said as far as absentee voting, where --

15   I thought you said a grocery store, but I didn't hear you say

16   whose or what grocery store that was.

17   A.  The voters were left from Mike Hooker's grocery store and

18   went to the absentee --

19   Q.  Voting place, which is the county courthouse, clerk's

20   office, right?

21   A.  Yeah, during then it was in the center of town.  They

22   were renting a building while they were building, I think.

23   Q.  Okay.  But it would be the temporary clerk's office,

24   right?

25   A.  Yes, sir.

*CRAFT - Cross (Mr. Baldani)*                                           22

1   Q.   Because there's only one place where absentee votes are

2   cast?

3   A.   Yes, sir.

4   Q.   But the people originated at Mike Hooker's grocery store,

5   which is how many miles from the county clerk's office?

6   Several?

7   A.   Five to eight.  Somewhere in that neighborhood.

8   Q.   And then your role was taking people from the grocery to

9   the county clerk's office, right?

10  A.   Pretty much, yes.

11  Q.   All right.  And, of course, Freddy won that election.  In

12  '04, to your knowledge, Freddy was unopposed, correct?

13  A.   Right.

14  Q.   You didn't see him active in '04, did you?

15  A.   No, sir.

16  Q.   And the same in '06, he was unopposed, right?

17  A.   Yeah, I don't think anybody run against him in '06

18  either.

19  Q.   You didn't see him active in any vote stuff in '06?

20  A.   No, sir.

21  Q.   You said you were election officer in '06?

22  A.   Yes, sir.

23  Q.   And election officers have to go through some mandatory

24  training, right?

25  A.   Yes, sir.

*CRAFT - Cross (Mr. Baldani)*                                             23

1    Q.   And that, was that put on by the commonwealth attorney,

2    Gary Gregory?

3    A.   He put on one.  That may have been it.

4    Q.   You recall going to election officer training in '06,

5    don't you?

6    A.   Yes, sir.

7    Q.   And you saw Wanda White and Dobber Weaver there, didn't

8    you?

9    A.   I probably did.

10   Q.   You remember them being election officers in '06?

11   A.   I don't recall whether they was there when I was there or

12   not.

13   Q.   All right.  Now, in '06, when you were at the election

14   officer training, Freddy Thompson didn't teach you to

15   manipulate a machine, did he?

16   A.   No, sir.

17   Q.   Or give you any training on how to dupe people out of

18   their votes?

19   A.   No, sir.

20   Q.   That didn't happen?

21   A.   No, sir.

22   Q.   Did you see him giving Wanda White or Dobber Weaver any

23   one-on-one training?

24   A.   No, sir.

25   Q.   Didn't see him training the two of them together either,

1    did you?

2    A.   No, sir.

3    Q.   And in '02, you supported Freddy Thompson?

4    A.   Yes, sir.

5    Q.   Right?

6    A.   Yes, sir.

7    Q.   And you kind of -- would it be fair to say that you

8    abandoned your better judgment and your morals in engaging in

9    vote buying?

10   A.   Yes, sir.

11   Q.   Would you agree with that?

12   A.   Yes, sir.

13   Q.   Is it true, sir, the reason you did that was because you

14   felt it was necessary to get Jennings White out of power?

15            MR. PARMAN:  Objection, Your Honor.

16            THE COURT:  Sustain the objection.

17            MR. BALDANI:  I don't have any other questions,

18   Judge.

19            THE COURT:  Jury may disregard the last question.

20   Let's see where we are here.  Mr. Gilbert?

21            MR. GILBERT:  No questions.

22            THE COURT:  Miss Hughes, Mr. Simons?

23            MR. SIMONS:  None for me, Your Honor.

24            THE COURT:  Mr. Parman, any redirect?

25            MR. PARMAN:  Just one moment, Your Honor.  Just one

*CRAFT - Redirect (Mr. Parman)*                                    25

1    follow-up, Your Honor.

2              THE COURT:  Yes, sir.

3                        REDIRECT EXAMINATION

4    BY MR. PARMAN:

5    Q.  Sir, you were asked about the 2002 meeting at Paul

6    Bishop's house.  Just so everybody's clear, the slate of

7    candidates was being discussed at that meeting; is that

8    accurate?

9    A.  Yes, sir.

10             MR. PARMAN:  Thank you.

11             THE COURT:  Any other question of the witness?

12             MR. BAYER:  Judge, can I approach the Bench just a

13   moment?

14             THE COURT:  If necessary, you may.

15             MR. BAYER:  Please.

16                       (A sidebar conference was held out of the

17                        hearing of the jury):

18             MR. BAYER:  The United States is using the term

19   "slate."  During the course of his grand jury testimony, the

20   witness specifically stated that he was not aware of a slate.

21   He was asked the question, "Mr. Craft, are you aware of a

22   slate of candidates that had been promoted by Doug Adams?"  He

23   said no.  They went on and on.  He would never acknowledge a

24   slate.  He said no.  I would like to ask him just a follow-up

25   question as to whether or not at the grand jury, he did or did

*CRAFT - Recross (Mr. Bayer)*                                     26

1    not answer no to this specific question.  If you like, I can

2    show it to him on a computer.  It's whatever the Court directs

3    me to do.

4              THE COURT:  I'm not directing you how to ask a

5    question about impeachment of a prior inconsistent statement.

6    We've covered this several times.  If you wish to attempt to

7    impeach him with a prior inconsistent statement, consult with

8    your co-counsel.  He'll consult with you how to do it and you

9    can proceed.

10             MR. BAYER:  Thank you, Judge.  May I show him the

11   statement using my computer rather than a written document?

12             THE COURT:  You may ask him if he recalls being

13   present at the grand jury; if, during the grand jury, he was

14   asked the following statement and whether he gave the

15   following answer.  That's how you do it.  Okay?

16             MR. BAYER:  Thank you, Judge.

17                  (Sidebar conference concluded.)

18                      RECROSS-EXAMINATION

19   BY MR. BAYER:

20   Q.   Mr. Craft, do you remember testifying before the grand

21   jury?

22   A.   Yes, sir.

23   Q.   Do you remember questions that were being asked by the

24   United States regarding the meeting that was at the Bishops'

25   property?

*CRAFT - Recross (Mr. Bayer)*                                    27

1    A.   I don't think there's a question asked like that, as far

2    as at the Bishops' property, in front of the grand jury.

3    Q.   Do you remember being asked questions about the

4    discussions that had been going on there?

5    A.   If you've got the documents there, I'd be glad to look at

6    them.  I don't --

7    Q.   Let me ask you if you remember a specific question being

8    asked of you.  This would have been asked --

9             MR. SMITH:  What page are we on?

10            MR. BAYER:  It was on page 11 of the grand jury

11   testimony.

12            MR. SMITH:  Thank you.

13   Q.   And the question was posed to you, Mr. Craft, you aware

14   of a slate of candidates that had been promoted by Doug Adams

15   and the school board?  Do you remember being asked that

16   question?

17   A.   That question was asked, and when I -- they asked that

18   question, I assumed they were talking about 2006.

19   Q.   And your response was?

20   A.   No, there was no slate in 2006.

21   Q.   So in 2002, when I was asking you questions earlier about

22   Mr. Adams speaking about Freddy Thompson, you're saying that

23   there was a slate that other people were supporting in 2002?

24   A.   I don't understand what you're asking me.

25   Q.   You're saying that there was no slate in 2006, 2004?

CRAFT - Recross (Mr. Bayer)                                        28

1   A.   Not that I'm aware of.

2   Q.   At the 2002 meeting, you're saying that there were people

3   talking about a slate, but you remember Mr. Adams speaking

4   only about Freddy Thompson?

5   A.   I remember the discussion of a group of people.  I don't

6   remember who Doug all spoke about, whether it was just Freddy

7   or all of them.  I don't know.  All I know is there were a

8   group of people.

9   Q.   And they were talking about all sorts of different

10  things?

11  A.   I don't know what all was discussed, but I do know they

12  were discussing the group of people.

13          MR. BAYER:  That's fine.  Thank you, sir.

14          THE COURT:  Anything else?  Mr. Parman, any other

15  questions of this witness?

16          MR. PARMAN:  No, Your Honor.  Thank you.

17          THE COURT:  Thank you, Mr. Craft.  You may step down,

18  sir.  Witness will be finally excused.  Mr. Smith or Mr.

19  Parman, call your next witness.  Mr. Smith?

20          MR. SMITH:  Thank you, Your Honor.  United States

21  would like to call Frank Roberts.

22          THE COURT:  Thank you.

23          MR. SMITH:  Is the Court security aware of the name

24  that I spoke?  This is not Mr. Frank Roberts.

25          COURT SECURITY OFFICER:  I'm sorry.

*ROBERTS - Direct (Mr. Smith)*                                          29

1          THE COURT:  Sir, you can step down, and I assume
2     we'll be calling you a little bit later.
3          MR. SMITH:  I apologize, Your Honor.
4          THE COURT:  That's fine, Mr. Smith.  Technical
5     difficulties you talked about from time to time.
6          MR. SMITH:  Good to know we've got another one
7     waiting.
8          THE COURT:  Yes, sir.
9          FRANK ROBERTS, JR., GOVERNMENT'S WITNESS, SWORN
10          THE COURT:  Thank you.  Mr. Smith, you may proceed.
11                    DIRECT EXAMINATION
12    BY MR. SMITH:
13    Q.   Good afternoon.
14    A.   Afternoon.
15    Q.   State your name, please.
16    A.   Frank Roberts, Jr.
17    Q.   Okay.  Mr. Roberts, there's a microphone there in front
18    of you.  If you need to adjust it a little bit, we will ask
19    you to speak into that.
20    A.   Okay.
21    Q.   And tell us, what's your age?
22    A.   Fifty-four.
23    Q.   And if you could, tell us where you've been living.
24    A.   Manchester, Kentucky.
25    Q.   And are you a life-long resident of Manchester?

ROBERTS - Direct (Mr. Smith)                                      30

1    A.   Yes, sir.

2    Q.   Are you married, Mr. Roberts?

3    A.   Yes, sir.

4    Q.   And how long have you been married?

5    A.   Thirty year.

6    Q.   And do you all have any children?

7    A.   Got one.

8    Q.   And how old is your child?

9    A.   He's 24.

10   Q.   What part of Clay County do you live in, Mr. Roberts?

11   A.   Horse Creek.

12   Q.   And how long have you lived in the Horse Creek area?

13   A.   All my life.

14   Q.   What have you done for jobs, Mr. Roberts?

15   A.   I worked for the Department of Transportation.

16   Q.   And what kind of job did you do for them?

17   A.   I was special equipment operator.

18   Q.   How long did you work for the Department of

19   Transportation, sir?

20   A.   Twenty-seven years.

21   Q.   And was that a job that caused you to work in other

22   counties other than Clay County?

23   A.   Yes, sir.

24   Q.   How many counties did you cover?

25   A.   Eight.

ROBERTS - Direct (Mr. Smith)                                    31

1    Q.   And are those counties all in the southeastern Kentucky

2    area?

3    A.   Yeah.

4    Q.   Have you also been asked to serve as election officer by

5    the Clay County Board of Elections in Clay County?

6    A.   Yes, sir.

7    Q.   And do you know when you first began serving as an

8    election officer down in Clay County?

9    A.   Probably back in the '80s.

10   Q.   Okay.  And did you have a specific precinct where you

11   would normally serve as election officer?

12   A.   Yeah, Horse Creek or Pigeon Roost.

13   Q.   And when is the last time you served as election officer,

14   sir?

15   A.   '08.

16   Q.   Okay.  And you still serving in that same precinct?

17   A.   Yeah.

18   Q.   There's actually two, Pigeon Roost, Horse Creek?

19   A.   Yeah.  When I first started, it was just Horse Creek.

20   Q.   And does that polling place, does it exist together where

21   both of those come together to vote at the same place?

22   A.   Yeah.

23   Q.   What's the name of that place?

24   A.   Horse Creek Grade School.

25   Q.   Okay.  And you've been doing this for basically more than

ROBERTS - Direct (Mr. Smith)                                    32

1    25 years?

2    A.   Yes, sir.

3    Q.   And did you serve in all the positions as election

4    officer, including sheriff and clerk, or just judge?

5    A.   All of them.

6    Q.   And when you served as judge, which party did you

7    represent?

8    A.   Democrat.

9    Q.   And Mr. Roberts, during the time you've been serving over

10   there, did you participate in a scheme to buy votes?

11   A.   Yes, sir.

12   Q.   And how long have you been participating in the scheme

13   over there to buy votes, Mr. Roberts?

14   A.   '02 and '04 elections.

15   Q.   And had you been involved prior to '02 in buying votes?

16   A.   No, sir.

17   Q.   You do recall that 2002 election?

18   A.   Yes, sir.

19   Q.   And do you recall the primary?

20   A.   Yes, sir.

21   Q.   And do you recall what you did to assist in that scheme

22   to buy votes in 2002, Mr. Roberts?

23   A.   I bought 'em.

24   Q.   All right.  How did you get -- how did you get involved

25   in doing that, Mr. Roberts?

*ROBERTS - Direct (Mr. Smith)*                                          33

1    A.   They just brought me some money to the house, and I

2    bought the votes myself.

3    Q.   Okay.  So when you say they brought the money to the

4    house, is that your house in Horse Creek?

5    A.   Yes, sir.

6    Q.   And do you know when it was?  Was it days before the

7    election or a night before, or do you recall when it was they

8    came?

9    A.   Probably a couple of days before.

10   Q.   Couple of days before?

11   A.   Yeah.

12   Q.   And who came to make that visit?

13   A.   Doug Adams, Yancey White and Al Man Stivers.

14   Q.   When they came, was there anybody else at home other than

15   yourself?

16   A.   Just my wife.

17   Q.   And did she sit in on the conversation?

18   A.   No.

19   Q.   Where did you all have your conversation?

20   A.   In the back.

21   Q.   And back being inside the house or outside the house?

22   A.   No, in the house, back room of the house.

23   Q.   And do you recall about what time of day it was?

24   A.   It was at night, probably -- I don't really know, 7:00 or

25   8:00 or something like that.

ROBERTS - Direct (Mr. Smith)                                    34

1    Q.   And do you remember what they were driving when they came

2    up?

3    A.   No.

4    Q.   What was discussed when they came?

5    A.   Just to buy votes.

6    Q.   And did you understand who was going to be the

7    beneficiary or who was going to get the benefit of these

8    bought votes?  Did they tell you who they wanted you to vote

9    for?

10   A.   Yes, sir.

11   Q.   And who did they say they wanted you to buy these votes

12   for?

13   A.   Freddy Thompson and Roy Morgan.

14   Q.   Okay.  And did you know what Roy Morgan was running for,

15   what position?

16   A.   County judge.

17   Q.   And in Horse Creek, did you have a magistrate out there

18   by the name of Mike Hooker running?

19   A.   No, not -- he didn't run in our end.

20   Q.   So he wasn't in your district?

21   A.   No.

22   Q.   Okay.  Now, how much money did they bring you that night,

23   Mr. Roberts?

24   A.   $4,000.

25   Q.   And do you remember how they presented it to you?  Was it

ROBERTS - Direct (Mr. Smith)                                    35

1    in something, or do you remember how it was given to you?

2    A.   No, they counted it out on the coffee table.  I just

3    picked it up then.

4    Q.   Okay.  And you say that you did the vote buying with it?

5    A.   Yeah.

6    Q.   And did you use it on election day?

7    A.   Yes, sir.

8    Q.   And how is it that you got money to the voters on

9    election day?

10   A.   I went in the machine with them.  When I voted them, I

11   paid them.

12   Q.   Okay.  When you say when you voted them, did you go in to

13   assist them in their voting?

14   A.   Yeah.

15   Q.   And how is it you made sure they voted for the people

16   that Doug Adams told you to vote for?

17   A.   Because I watched them vote.

18   Q.   Okay.  And if -- did you have, on occasions have to pull

19   the lever for them?

20   A.   Yeah.

21   Q.   Was that, in fact, the 2002, before they got the

22   computers?

23   A.   Yes.

24   Q.   How many people did you recall on election day there in

25   2002 that you bought the votes, Mr. Roberts?

ROBERTS - Direct (Mr. Smith)                                    36

1    A.   Probably about 75.

2    Q.   Did you use all the $4,000 that Doug Adams and those

3    other fellas brought you?

4    A.   Yeah.

5    Q.   Did you run out of money at any point?

6    A.   Yeah.

7    Q.   And what happened when you ran out of money?

8    A.   That was it.

9    Q.   Okay.  Did you make any call for more money?

10   A.   No.

11   Q.   Do you know how far in the day you got before you ran out

12   of money?

13   A.   Say it was around 5:00 or so.

14   Q.   Okay.  Now, was there a faction on the other side that

15   was trying to do the same thing, buying votes in that 2002

16   election?

17   A.   Yes, sir.

18   Q.   Could you tell us who was on the other side trying to do

19   the same thing in buying these voters?

20   A.   Sammy Gregory.

21   Q.   And was he an election officer?

22   A.   Yeah, he was Republican judge.

23   Q.   And who was he trying to buy votes for, which side?

24   A.   Jennings White.

25   Q.   Did he have a slate just like you did of candidates in

*ROBERTS - Direct (Mr. Smith)*                                          37

1    addition to Jennings White?

2    A.   I don't know.

3    Q.   Do you know who was bringing his voters in?

4    A.   No.

5    Q.   Did you have anybody bringing voters to you that day?

6    A.   Yes, sir.

7    Q.   And who did you have bringing voters to you?

8    A.   Edie Hicks.

9    Q.   Okay.  And how do you spell that first name?  Is it Adie

10   or Eddie?

11   A.   Edie.

12   Q.   Edie.  Is that a female?

13   A.   Yeah, she's a woman.

14   Q.   Anybody else you remember?

15   A.   No.

16   Q.   And when she brought them, were these people that you

17   knew would sell their votes to you?

18   A.   Yes, sir.

19   Q.   Now, Yancey White, was he a candidate for office in 2002?

20   A.   No, sir.

21   Q.   Do you know who he was related to that was running for

22   office?

23   A.   Roy Morgan.

24   Q.   And how are they related, to your knowledge?

25   A.   Yancey's father-in-law.

ROBERTS - Direct (Mr. Smith)                                    38

1    Q.   Now, how much were you paying these voters or bribing --
2    using to bribe these voters?  How much would it take?
3    A.   Fifty.
4    Q.   Fifty dollars?
5    A.   Yeah.
6    Q.   And on the other side, did you know how much they were
7    paying?
8    A.   Same.
9    Q.   Same amount of money?
10   A.   Yeah.
11   Q.   Did you appear to be holding your own with Jennings White
12   at your precinct that day?
13   A.   Mostly, yeah.
14   Q.   Now, in 2004, were you also serving as election officer?
15   A.   Yes, sir.
16   Q.   And did you also serve as a Democrat judge there, the
17   same precinct?
18   A.   Yes, sir.
19   Q.   And was there vote buying going on in that election?
20   A.   Yes, sir.
21   Q.   And did you participate in it?
22   A.   Yes, sir.
23   Q.   How did you get involved in 2004?
24   A.   I bought votes for Barbara Jo Colter.
25   Q.   And can you explain to us how that started?

ROBERTS - Direct (Mr. Smith)                                    39

1    A.   Yancey called me and asked me, and he brought me $3,000
2    to buy votes with.
3    Q.   And Yancey being Yancey White?
4    A.   Yes, sir.
5    Q.   And you say he brought you 3,000.  Where did he bring the
6    money to?
7    A.   To the house.
8    Q.   And how far in advance of the election day was it that he
9    came this time?
10   A.   Probably a week.
11   Q.   In the 2006 election, were you also election officer in
12   2006?
13   A.   Yes, sir.
14   Q.   Did you have a meeting with Al Man Stivers about a fella
15   named Shoupe?
16   A.   Yes, sir.
17   Q.   And tell us about that meeting that you had with Mr.
18   Stivers.
19   A.   I just went and talked to Al Man to see if he could get
20   Boone out of -- Boone Shoupe out of jail.
21   Q.   Do you know where he was in jail at?
22   A.   Yeah, Manchester.
23   Q.   And who was his judge?
24   A.   He was circuit, in the circuit court.  That's Cletus
25   Maricle.

ROBERTS - Direct (Mr. Smith)                                        40

1    Q.   And so you went to Al Man Stivers before the election?

2    A.   Yeah.

3    Q.   And what did you tell Al Man Stivers about?

4    A.   I just asked him if he could help get Boone out of jail.

5    His wife was real sick.

6    Q.   All right.  And what did he tell you?

7    A.   He said he'd see what he could do.

8    Q.   And did you bring up the election as a possibility of a

9    way you could help him?

10   A.   I told him if he could, that I would get Boone's family

11   to vote for Phillip Mobley.

12   Q.   And did you understand Phillip Mobley was somebody Cletus

13   Maricle was interested in seeing elected?

14   A.   Yes, sir.

15   Q.   And what was his interest in seeing Phillip elected?

16   A.   It's his son-in-law.

17   Q.   And did Shoupe get let out of jail before the election,

18   to your knowledge?

19   A.   Yes, sir.

20   Q.   And did you do what you promised?

21   A.   Yep.

22   Q.   Okay.  Now, Mr. Roberts, has the United States promised

23   you anything to get you to testify here today?

24   A.   No, sir.

25   Q.   Are you here pursuant to a subpoena?  You've been

*ROBERTS – Cross (Mr. Pinales)*                                    41

1    subpoenaed?

2    A.  Yes, sir.

3    Q.  All right.

4            MR. SMITH:  Just a moment, Your Honor.

5            THE COURT:  Yes, sir.

6            MR. SMITH:  Pass the witness.

7            THE COURT:  Thank you.

8            MR. PINALES:  Your Honor, is there any additional

9    material?

10           THE COURT:  Mr. Smith?

11           MR. SMITH:  No.

12           MR. PINALES:  Thank you.

13           THE COURT:  Mr. Pinales, you may proceed.

14           MR. PINALES:  Thank you, Your Honor.

15                        CROSS-EXAMINATION

16   BY MR. PINALES:

17   Q.  Mr. Roberts, I'm Marty Pinales, and I represent Cletus

18   Maricle.

19   A.  Yes, sir.

20   Q.  Good afternoon.

21   A.  Afternoon.

22   Q.  I have a few questions to ask you.  I'll try to keep it

23   very, very brief.  You stated that you were the election

24   judge.

25   A.  Yes, sir.

*ROBERTS - Cross (Mr. Pinales)*                                    42

1    Q.   And the party that you were involved with was the

2    Democratic party?

3    A.   Yes, sir.

4    Q.   And you didn't know Cletus Maricle, Judge Maricle well,

5    did you?

6    A.   I've knowed him all my life, but not that well.

7    Q.   And you knew that he was a Democrat?

8    A.   Yes, sir.

9    Q.   And you said in the 2006 election, you had a friend whose

10   wife was ill?

11   A.   Yes, sir.

12   Q.   And he was in jail for what crime?

13   A.   Buying drugs.

14   Q.   And actually, he hadn't come to trial yet, had he?

15   A.   No.

16   Q.   And you went to Mr. Stivers, not to Judge Maricle,

17   correct?

18   A.   Correct.

19   Q.   And you don't know if Mr. Stivers went to Judge Maricle,

20   do you?

21   A.   No.

22   Q.   You were not present at any meetings, were you?

23   A.   No, sir.

24   Q.   And your friend who was in jail had not gone to trial

25   yet, had he?

*ROBERTS - Cross (Mr. Pinales)*                                            43

1   A.   No.

2   Q.   He was actually being detained pretrial?

3   A.   Yes, sir.

4   Q.   And he was able to post bond and get out?

5   A.   Yes, sir.

6   Q.   And he got out before the trial by posting a regular

7   bond?

8   A.   Yes, sir.  A surety bond.

9   Q.   A surety bond?

10  A.   Yes.

11  Q.   And by a surety bond, that a bondsman promised that he

12  would be there?

13  A.   Yes, sir.

14       MR. SMITH:  Your Honor, I'm going to object to his

15  characterization.  I don't believe that's accurate.

16       THE COURT:  Sustained.

17  Q.   Let me ask it this way.  He did go to trial?

18  A.   Yes, sir.

19       MR. SMITH:  Objection, Your Honor.  I believe that

20  the issue of the trial now is irrelevant because that's after

21  the election, as Mr. Pinales has already pointed out.

22       THE COURT:  Sustained.

23       MR. PINALES:  Your Honor, may I approach?

24       THE COURT:  Yes, you may.

25       MR. PINALES:  Thank you.

1              (A sidebar conference was held out of the

2              hearing of the jury):

3         MR. PINALES:  Your Honor, in response -- Martin

4    Pinales.  In response to the questions asked by the government

5    about getting a favor done for his friend and getting out of

6    jail, there is the inference that he got out of jail and out

7    of trouble, and that is absolutely not the case.  He did get

8    out of jail after posting a regular surety bond.  He then went

9    to trial.  He was found guilty and sent to the penitentiary.

10   The inference that the prosecutor raised with this jury, I

11   think, is one that does call for proper cross-examination.

12        THE COURT:  I didn't draw that inference.  Mr. Smith,

13   what's your response?

14        MR. SMITH:  Well, I think that he's free in asking

15   his understanding, and this man's understanding was that if he

16   went to Al Man, that his friend was going to get out of jail

17   before the election, and he was going to do his part in

18   helping Phillip Mobley, basically getting the support of his

19   family for him.

20             Counsel now seeks to again go into a collateral

21   matter, which is, you know, what was it, 10 months, 15 months,

22   18 months later, he has a trial and then there's evidence

23   presented and then a jury convicts him.  What was that

24   evidence?  Was there jury tampering in that?  Do we need to go

25   in and prove how that was resolved?  I mean, if he has an

ROBERTS - Cross (Mr. Pinales)                                    45

1    understanding that the agreement was held up as far as Maricle

2    was concerned when he let him out before the election and

3    that's as far as it went, then I think that's as far as it

4    should go.  Otherwise, end up trying another case.

5           THE COURT:  I'm going to let him ask the question if,

6    to his knowledge, if he knows whether he proceeded to trial

7    and what the outcome of the trial was.

8           MR. PINALES:  That was where I was --

9           THE COURT:  And that's as far as we're going to go.

10          MR. PINALES:  That was where I was going to sit down

11   anyway, Your Honor.  Thank you.

12          THE COURT:  That will be fine.

13                  (Sidebar conference concluded.)

14          THE COURT:  Thank you.  You may proceed.

15          MR. PINALES:  Thank you, Judge.

16   BY MR. PINALES:

17   Q.  Mr. Roberts, with regard to your friend, Mr. Shoupe --

18   A.  Yes, sir.

19   Q.  -- did he ultimately go to trial?

20   A.  Yes, sir.

21   Q.  And that trial was in front of Judge Maricle?

22   A.  Yes, sir.

23   Q.  And what is your understanding of the outcome of that

24   trial?

25   A.  He went to the pen.

*ROBERTS - Cross (Mr. Pinales)*                                    46

1          MR. PINALES:  Nothing further.

2          THE COURT:  Thank you.  Mr. Bayer?

3          MR. BAYER:  If you don't mind, Judge, I'll do it from

4    here.  I've only got a couple quick ones, if that would be all

5    right.

6          THE COURT:  That will be fine.

7                          CROSS-EXAMINATION

8    BY MR. BAYER:

9    Q.   Mr. Roberts, I'm Bennett Bayer.  I'm one of Doug Adams'

10   attorneys.  I think you indicated that in 2002, those three

11   gentlemen came over to your house the night before the

12   election?

13   A.   Yes.

14   Q.   Was that the general election or the primary, sir?

15   A.   Primary.

16   Q.   And they asked you to help them in the race for Freddy

17   Thompson?

18   A.   Yes, sir.

19   Q.   If I understand you correctly, you were holding a

20   Democrat position?

21   A.   Yes, sir.

22   Q.   And that position was?

23   A.   Judge.

24   Q.   Judge.  Was there a Republican judge at the same

25   precinct?

*ROBERTS - Cross (Mr. Abell)*                                                47

1    A.   Yes, sir.

2    Q.   And who was that judge?

3    A.   Sammy Gregory.

4    Q.   And who was Sammy Gregory supporting in that race?

5    A.   Jennings White.

6    Q.   Was Sammy Gregory buying votes for Jennings White?

7    A.   Yes, sir.

8    Q.   And you were there helping to get Freddy Thompson

9    elected?

10   A.   Yes, sir.

11            MR. BAYER:  No further questions.

12            MR. WHITE:  No questions, Your Honor.

13            THE COURT:  Mr. Abell.

14            MR. ABELL:  Judge, I do have a few.

15                        CROSS-EXAMINATION

16   BY MR. ABELL:

17   Q.   Mr. Roberts, my name is Robert Abell, and I represent

18   William Stivers in this case.

19   A.   Yes.

20   Q.   To your understanding, in 2002, was Mr. Stivers a

21   supporter of Freddy Thompson?

22   A.   Yes, sir.

23   Q.   To your understanding, in 2002, was Mr. Stivers a

24   supporter of Roy Morgan?

25   A.   I can't answer that.

*ROBERTS - Cross (Mr. Baldani)*                                          48

1    Q.   When you spoke with Mr. Stivers regarding Boone Shoupe,

2    where was that?

3    A.   At his house.

4    Q.   Where was his house?

5    A.   On Charlie Sizemore Road.

6              MR. ABELL:  That's all.

7              THE COURT:  All right.  Thank you.  Mr. Baldani?

8              MR. BALDANI:  Thank you, Your Honor.

9                        CROSS-EXAMINATION

10   BY MR. BALDANI:

11   Q.   Good afternoon, Mr. Roberts.

12   A.   Afternoon.

13   Q.   My name is Russ Baldani.  I'm one of Freddy Thompson's

14   lawyers.

15   A.   Yes, sir.

16   Q.   You were election officer in '02, '04 and '06, right?

17   A.   Yes, sir.

18   Q.   Now, you've told the jury about participating in some

19   voter fraud, right?

20   A.   Yes, sir.

21   Q.   And, in fact, actually going to the booth and assisting

22   and voting people, right?

23   A.   Yes, sir.

24   Q.   And when you did that, you didn't fill out voter

25   assistance forms, did you?

*ROBERTS - Cross (Mr. Baldani)*                                    49

1  A.  No.

2  Q.  Because to do so would just create a paper trail of the

3  fraud that you were participating in, right?

4  A.  That's right.

5  Q.  So it didn't make any sense to you to fill out a piece of

6  paper with your name on it for a bought voter, did it?

7  A.  No.

8  Q.  All right.  Now, in '02, Freddy Thompson wasn't among the

9  people that came to you with money the night before, was he?

10  A.  No, sir.

11  Q.  You don't even know whether he knew they were coming, do

12  you?

13  A.  No, sir.

14  Q.  Now, in '04, Freddy Thompson was unopposed, right?

15  A.  Yes, sir.

16  Q.  And you didn't observe him participate --

17       MR. SMITH:  I'm going to object.  I believe that

18  there is no evidence in the record that there was a county

19  clerk race in 2004.  Counsel keeps representing to witnesses

20  that he was having a potential race.  I believe that's

21  inaccurate.

22       THE COURT:  I'll sustain the objection.

23  Q.  Did you observe Freddy Thompson participating in

24  elections at all in '04, Mr. Roberts?

25  A.  No, sir.

ROBERTS - Cross (Mr. Baldani)                                  50

1    Q.   All right.  Same question with '06.  Did you observe

2    Freddy Thompson participating at all in '06?

3    A.   No, sir.

4    Q.   Now, back to '04, is it your testimony that the same

5    people that had gotten you involved in '02 were supporting

6    Barbara Colter in '04?

7         MR. SMITH:  Your Honor, that's not been testified.  I

8    object to the misstatement of the evidence.

9         THE COURT:  Sustained.

10   Q.   Who were you asked to support in '04?

11   A.   Barbara Jo Colter.

12   Q.   Who asked you to do that?

13   A.   Yancey White.

14   Q.   And Yancey White is one of the ones that came to you in

15   '02; is that right?

16   A.   Yes.

17   Q.   Now, back to '06.  '06 was the first year that the

18   electronic computerized machine was used, correct?

19   A.   Yes, sir.

20   Q.   And as part of election officer training or to be an

21   election officer, you had to go to election officer training

22   in the days leading up to the election, right?

23   A.   Yes, sir.

24   Q.   In '06, that training was particularly important because

25   y'all were using a new machine, right?

*ROBERTS - Cross (Mr. Baldani)*                                              51

1    A.   Yes, sir.

2    Q.   All right.  And was it Gary Gregory, the commonwealth

3    attorney, that did that training?

4    A.   Yes, sir.

5    Q.   Where did that take place?

6    A.   At fiscal court office in downtown building.

7    Q.   Same building that the county clerk, Freddy Thompson, has

8    his office in, right?

9    A.   Yes.

10   Q.   And you participated in that regular election officer

11   training, right?

12   A.   Yes.

13   Q.   Freddy Thompson didn't give you any special training

14   teaching you how to --

15        MR. SMITH:  Your Honor, I'm going to object.  That's

16   outside the scope --

17        THE COURT:  Outside the scope of direct.  Sustained.

18   Q.   Were you given any training other than the regular

19   training?

20   A.   No, sir.

21   Q.   In '06, in your precinct, you didn't notice people vote,

22   walking away from the machine without finally casting their

23   vote, did you?

24        MR. SMITH:  Same objection.

25        THE COURT:  Sustained.

*ROBERTS - Redirect (Mr. Smith)*                                        52

1              MR. BALDANI:  That's all the questions I have, Judge.

2              THE COURT:  All right.  Thank you.

3              MR. GILBERT:  No questions.

4              MS. HUGHES:  No, sir.

5              THE COURT:  Anyone else?

6              MR. SIMONS:  No, thank you.

7              THE COURT:  Any redirect?

8              MR. SMITH:  If I could.

9              THE COURT:  Yes, sir.

10             MR. SMITH:  Thank you.

11                        REDIRECT EXAMINATION

12    BY MR. SMITH:

13    Q.  Mr. Roberts, you were asked about that Shoupe fella that

14    you went to talk to Mr. Stivers about.

15    A.  Yes, sir.

16    Q.  And it was suggested to you that he had an opportunity to

17    fill a bond?

18    A.  Yes.

19    Q.  What was his bond set at before you went to Al Man

20    Stivers?

21    A.  I don't know.

22    Q.  Was it one he could meet?

23             MR. PINALES:  Objection.

24             THE COURT:  It's his understanding.  Objection

25    overruled.

*ROBERTS - Redirect (Mr. Smith)*                                        53

1    A.   I don't know what it was.  I have no idea.

2    Q.   Let me ask you this.  The reason you went to Al Man

3    Stivers in the first place was to see if you couldn't get Mr.

4    Shoupe out of jail, right?

5    A.   Yes, sir.

6    Q.   So for whatever reason, he was in jail and couldn't get

7    out.  Is that your understanding?

8    A.   Yes, sir.

9    Q.   And after you went to Al Man Stivers, he got out of jail?

10   A.   Yes, sir.

11   Q.   And it was suggested to you that there was a surety bond

12   that he was able to fill?

13   A.   Yes, sir.

14   Q.   Do you know what a surety bond is?

15   A.   No.

16   Q.   Do you know if he had to put up any money?

17   A.   I don't think so.

18   Q.   Okay.  Now, you said he eventually went to the pen.  Did

19   he get tried by a jury or by a judge, to your understanding?

20   A.   I don't know about that either.

21   Q.   You didn't go to the trial?

22   A.   No.

23   Q.   And you were also asked about these voter assistance

24   forms out there.  Now, you didn't work in Manchester precinct

25   in any of these elections, as I understand.  Is that correct?

ROBERTS - Redirect (Mr. Smith)                                54

1    A.  Yes, sir.

2    Q.  Your Horse Creek precinct was a place where you said you

3    didn't fill out these voter assistance forms?

4    A.  No.

5    Q.  As an election officer, would it make you nervous if

6    there's people, say lawyers or some kind of people, preachers

7    in line there and watching you fill out voter assistance

8    forms?

9            MR. BALDANI:  Objection, Your Honor.

10           THE COURT:  Objection overruled.  You can answer.

11   Q.  Would that make you uncomfortable?

12   A.  Yes, sir.

13   Q.  As an election officer, if you saw lawyers and preachers

14   in line, would that be something that might cause you to

15   change your mind and fill out a voter assistance form?

16   A.  No.

17   Q.  You still do it anyway?  All right.  Has it been pretty

18   much wide open there in your precinct for as long as you can

19   remember, Mr. Roberts?

20   A.  Pretty much so.

21           MR. SMITH:  That's all I have.  Thank you.

22           THE COURT:  All right.  Thank you.  Any further

23   recross of the witness?

24           MR. PINALES:  No additional, thank you.

25           THE COURT:  See if anyone has any.  No.  Thank you,

*T. BAKER - Direct (Mr. Smith)*                                    55

1    sir.  You may step down.  Witness will be finally excused.

2              Mr. Smith, Mr. Parman?

3              MR. SMITH:  Your Honor, the United States would call

4    Mr. Terry Baker.

5              THE COURT:  Thank you.

6              TERRY BAKER, GOVERNMENT'S WITNESS, SWORN

7              THE COURT:  Thank you.  Mr. Smith, you may proceed.

8              MR. SMITH:  Thank you, Your Honor.

9                        DIRECT EXAMINATION

10   BY MR. SMITH:

11   Q.  Good afternoon, Mr. Baker.  Would you state your full

12   name for the record?

13   A.  Terry Wayne Baker.

14   Q.  And Mr. Baker, where were you born and raised?

15   A.  I was born in London, was raised in Manchester.

16   Q.  Okay.  And let's ask a little bit of background about

17   you.  Are you married?

18   A.  Divorced.

19   Q.  Do y'all have any children?

20   A.  I have one daughter.

21   Q.  And how old is your daughter?

22   A.  She turned 12 in October.

23   Q.  Okay.  And while living in Manchester, have you held

24   jobs?

25   A.  Yes.

*T. BAKER - Direct (Mr. Smith)*                                    56

1    Q.   And what kind of jobs have you held, Mr. Baker?

2    A.   Mostly like construction type work and maintenance work.

3    Q.   Okay.  Most recently, where did you work?

4    A.   I'm employed right now at Southeast Kentucky Doors

5    installing garage doors.

6    Q.   Is Southeastern Kentucky Doors a business that's located

7    in Manchester?

8    A.   It's in London.

9    Q.   Okay.  And generally, just describe for us what they're

10   in the business of doing.

11   A.   We mostly do, like, residential and commercial garage

12   doors, but we do some, like, commercial walk doors and service

13   and stuff also.

14   Q.   Okay.  And what is the position that you hold with the

15   company right now?

16   A.   I just do installations and troubleshooting and service

17   calls.

18   Q.   Okay.  And how long have you been working there for

19   Southeastern Kentucky Doors?

20   A.   Around 27 months.

21   Q.   Okay.  And is that a full-time position?

22   A.   Yes.

23   Q.   And you're currently residing in Manchester?

24   A.   No, I live in Corbin.

25   Q.   Corbin, thank you.  Now, Mr. Baker, I want to ask you,

*T. BAKER - Direct (Mr. Smith)*                                      57

1    were you living over in the Manchester area in 2002, around

2    election time?

3    A.   Yes.

4    Q.   And if you could, tell us where you were residing back in

5    the 2002 election, if you recall.

6    A.   I was renting an apartment at the time.

7    Q.   Okay.

8    A.   In Garrard.

9    Q.   In Garrard?

10   A.   Yeah.

11   Q.   And were you to vote in the Garrard precinct that year?

12   A.   No, I actually voted in the Harts Branch precinct.

13   Q.   Harts Branch, okay.  And during that 2002 election, did

14   anyone approach you to try to bribe you to vote for a certain

15   candidate or a slate of candidates, to your knowledge?

16   A.   Yes.

17   Q.   Could you tell us what happened?

18   A.   It was Jeff Farmer.  And at the time I was, I was kind of

19   hanging around -- he run a little pool hall in town, and I was

20   kind of hanging around there some anyway.  And he had told me,

21   you know, that -- he told me he could get me some money for

22   voting.

23   Q.   Okay.  And did he specify to you when he was going to get

24   the money to you?

25   A.   Well, I actually voted -- I voted the absentee.  I voted

*T. BAKER - Direct (Mr. Smith)*                                    58

1    an absentee ballot.

2    Q.   Okay.  And when you went to vote the absentee, do you

3    remember what office you went to do this?

4    A.   It was in the temporary office they had set up in town

5    there, right next to the clerk's office.  They had a voting

6    booth set up in there.  That's where I -- everybody was voting

7    absentees.

8    Q.   And how is it that you managed to get paid for your vote

9    that time?

10   A.   Well, I got up with him, and he went and picked up the

11   money, and he paid me.

12   Q.   Okay.  And did anyone else go with you to sell their vote

13   as well?

14   A.   Not that particular day.  But a couple days later, the

15   girl I was living with, she also got up with him and sold her

16   vote too.

17   Q.   And what was her name?

18   A.   Tammy Burns.

19   Q.   And when you say she got up with him, who was that she

20   got up with?

21   A.   Jeff.

22   Q.   Okay.  And do you know where she had to go to find him

23   when she got up with him at that time?

24   A.   That particular day, he was, he was parked in a parking

25   lot, a little gravel parking lot there in Manchester, right

1    next to White's Chevrolet.

2    Q.   Okay.  And was there any other businesses that was

3    located close to this area that you saw him in?

4    A.   Yes, Freddy Thompson owned the hardware store right next

5    to it.

6    Q.   Okay.  And what was the name of that business?

7    A.   It was Thompson Hardware.

8    Q.   Okay.  And what was he driving?  Do you remember what he

9    had as a vehicle at that time?

10   A.   The best of my knowledge, I think he was in a Ford

11   pickup.  I'm not talking for sure.

12   Q.   Ford?

13   A.   Yeah.

14   Q.   Now, when you went in to vote, do you remember seeing an

15   election officer or somebody that was in the position of

16   election officer there at the polls?

17   A.   Yeah.  They were -- the three that I remember was, it was

18   Vernon Hacker and Al Man and one of the Harmons.  David, I

19   guess, is his name.

20   Q.   Does Al Man, do you know his full name?

21   A.   It's William, I think.

22   Q.   What's his last name?

23   A.   Stivers.

24   Q.   Okay.  And when you discussed this with Jeff Farmer

25   about, you know, taking money for your vote, did he talk to

*T. BAKER - Direct (Mr. Smith)*                                    60

1    you about who he wanted you to vote for?

2    A.   Yes.

3    Q.   And do you recall who it was he asked you to pull the

4    lever for?

5    A.   The main one was Freddy.  Like I'm sure they was more

6    mentioned, but, you know, I can't really -- but the main one

7    of his interest was Freddy.

8    Q.   Okay.  Do you recall him specifying others and you just

9    don't recall their names?

10   A.   Yeah, I'm sure there was.  But like I said, I don't

11   really remember all those.

12   Q.   Okay.  Do you ever remember a camper set up at the

13   Y Hollow over there in Manchester?

14   A.   Yes.

15   Q.   And when you saw the camper at the Y Hollow, what was

16   going on up there?

17   A.   Well, at the time it was --

18           MR. GILBERT:  Objection.

19           THE COURT:  Sorry?

20           MR. GILBERT:  Objection.

21           THE COURT:  His observations.  Overruled.

22   A.   At the time, it was actually a different election.

23   Q.   Than '02?

24   A.   It was a different one than '02.

25   Q.   Okay.  Do you recall which election it was?

*T. BAKER - Direct (Mr. Smith)*                                61

1   A.   It was -- I was still married at the time so it was like

2   around latter part of '99, early part of 2000, because I was

3   still married.  So I've been divorced since 2000.

4   Q.   Okay.  Mr. Baker, at the time that these events occurred

5   that you've testified to in 2002, were you involved in using

6   drugs yourself?

7   A.   Yes.  Yes, I was.

8   Q.   And what kind of drugs were you using at that time?

9   A.   OxyContin.

10  Q.   And are you still under the -- did you have an addiction

11  to OxyContin?

12  A.   Yes, I did.

13  Q.   And have you been able to overcome that addiction at some

14  point?

15  A.   Yes.

16  Q.   And how long has it been since you've used OxyContin, Mr.

17  Baker?

18  A.   November was two years.

19  Q.   Okay.  And did you have help in getting over OxyContin?

20  A.   Yes.

21  Q.   And what kind of help did you take advantage of?

22  A.   Well, I had been in and out of a couple treatments.  But

23  when I actually got clean, I got into a Saboxin program.

24  Q.   All right.

25  A.   Going to a doctor every month and seeing her is what

*T. BAKER - Direct (Mr. Smith)*                                     62

1    finally got me off of it.

2    Q.   Okay.  And let me ask you this.  Have you been in the

3    court system under Cletus Maricle as a defendant?

4    A.   Yes.

5    Q.   And did he sentence you at some points in time for past

6    criminal offenses?

7    A.   He was my judge, but the day I actually went for my final

8    sentencing, it was a different judge.  He didn't actually

9    final sentence me.

10   Q.   Do you hold any grudges against him at this point --

11   A.   No.

12   Q.   -- for what happened in that case or any other cases?

13   A.   No.

14   Q.   Now, are you related to Todd Roberts?

15   A.   Yes.

16   Q.   And how are you related to Todd Roberts?

17   A.   His mother and my mother are sisters.

18   Q.   Were you on a home incarceration program over there in

19   Clay County?

20   A.   Yes.

21   Q.   Who ordered you to home incarceration, Mr. Baker?

22   A.   The courts.

23   Q.   And which judge was it, Cletus Maricle or the later

24   Judge?

25   A.   Cletus.

*T. BAKER - Cross (Mr. Hoskins)*                                            63

1   Q.   Okay.  And did you have to pay money to be on home

2   incarceration?

3   A.   Yes.

4   Q.   How much money did you have to pay?

5   A.   It was $11 a day.

6   Q.   And do you know who you paid those payments to?

7   A.   It was, it was at the office.  Sandy Davidson, I think,

8   was her name.

9   Q.   Do you know how long you were on home incarceration back

10  then?

11  A.   From right around July till November, sometime in

12  November.

13  Q.   About four months?

14  A.   Yeah.

15          MR. SMITH:  If I could have a second, Your Honor.

16          THE COURT:  Yes, sir.

17          MR. SMITH:  Pass the witness.

18          THE COURT:  Thank you.  Mr. Hoskins, you may proceed.

19          MR. HOSKINS:  Thank you, Your Honor.

20                        CROSS-EXAMINATION

21  BY MR. HOSKINS:

22  Q.   Hi, Mr. Baker.  My name's David Hoskins, and I represent

23  Cletus Maricle.  Just so we're real clear, when you went to

24  make or whoever made those payments to that Sandy Davidson,

25  the office that they went to was out on the highway, wasn't

*T. BAKER - Cross (Mr. Hoskins)*                                    64

1   it?

2   A.   Yeah, it was right next to the state highway department.

3   Q.   Okay.  So it wasn't at the courthouse?

4   A.   Uh-uh.

5   Q.   It wasn't at Cletus Maricle's office or anything like

6   that?

7   A.   No.

8   Q.   Okay.  Before you were put on home incarceration, you had

9   to sit in jail for a while and dry out, right?

10  A.   Well, actually, I had been in a treatment facility, and I

11  had got discharged from there.

12  Q.   Okay.

13  A.   So I went on -- when I come home from there, I went on

14  home incarceration until my court proceedings were finished.

15  Q.   So you went through a treatment program and got weaned

16  off of drugs while you were there, right?

17  A.   Yeah, which I had been in jail before, when I went to

18  treatment, and then I went on to home incarceration when I

19  come home from there.

20          MR. HOSKINS:  Thank you.  That's all.

21          THE COURT:  See if anyone else has any questions of

22  the witness?  No?

23          MR. ABELL:  Judge, I do have.

24          THE COURT:  Yes, sir, you can proceed.

25  ///

*T. BAKER - Cross (Mr. Abell)*                                        65

                          CROSS-EXAMINATION

2    BY MR. ABELL:

3    Q.   Mr. Baker, my name is Robert Abell, and I represent

4    William Stivers in this case.  In 2002, you voted absentee?

5    A.   Yes.

6    Q.   The election officers working the polls when you showed

7    up to vote absentee that you recall were Vernon Hacker, my

8    client Mr. Stivers, and David Harmon?

9    A.   Yes.

10   Q.   Is it correct that during this period of time, May, 2002,

11   you were suffering then from the OxyContin addiction that

12   you've described today?

13   A.   Yes.

14           MR. ABELL:  That's all, Judge.

15           THE COURT:  Thank you.

16           MR. BALDANI:  Judge, I don't have any questions.

17           MR. GILBERT:  No questions.

18           THE COURT:  All right.  Thank you.  Any redirect of

19   the witness?

20           MR. SMITH:  No.

21           THE COURT:  All right.  Thank you.  You may step

22   down.  Thank you.

23           Mr. Smith, you may call your next witness.

24           MR. SMITH:  I'm going to need a person from my desk

25   to run to pick up a couple more files.

1             THE COURT:  That will be fine.

2             MR. SMITH:  While they're doing that, I'll call the

3      witness, Mansell Baker.

4             MR. SIMONS:  Your Honor, while they're gone, could we

5      approach for a second?

6             THE COURT:  Yes.  Come on up.  That will be fine.

7                    (A sidebar conference was held out of the

8                    hearing of the jury):

9             THE COURT:  Mr. Simons?

10            MR. SIMONS:  There's two matters I want to bring up

11     with respect to this witness before he testifies.  The first

12     is that there was an order entered before the trial being had

13     prohibiting cross-examination about crimes which were not --

14     did not result in convictions.  And the language is fairly

15     clear, but this witness is in an unusual posture.  He is now

16     facing four state felonies and a PFO charge, and he is in

17     jail.  I do intend to cross-examine him about that.  I think

18     that's fair.  I wanted to make sure that wasn't on the wrong

19     side of the Court.

20            THE COURT:  You would be on the wrong side of the

21     Court for a charge that hasn't resulted in a conviction.

22            MR. SIMONS:  Even though it's pending and he's yet to

23     be tried on it?

24            THE COURT:  Right.  It's not a conviction.

25            MR. SIMONS:  I understand that.

67

1        THE COURT:  Well, let's see what the rule is that

2   would support that.

3        MR. SIMONS:  Specifically, the source of the

4   interrogation would be that his efforts here, he has been

5   interviewed by the FBI on multiple occasions.  Each time he

6   gets in a different bit of trouble, he gives additional

7   information which is damaging.

8        He is the only government witness -- which leads into

9   my second thing -- that has any potential evidence of my

10   client, Stanley Bowling, being involved in any way, shape or

11   form with drug activity.

12        That was first disclosed in a 302 which surfaced in

13   late January of 2010.  It also surfaced when he was in the

14   Clark County -- excuse me, the Clay County Detention Center.

15   He was arrested late last year, is awaiting trial on that

16   matter, and it seems to me it's quite not only relevant but

17   compelling reason to add on to his previous testimony.

18        THE COURT:  Okay.  Not admissible under 609.  The

19   request to interrogate on that issue would be denied.  The

20   Court's pretrial ruling would be in effect.

21        MR. SIMONS:  The second topic that I would like to

22   bring up is that I would like to move in limine that he not be

23   permitted to talk about the marijuana involvement that he had

24   with my client or that he alleges that he had with my client,

25   which is vehemently denied.  The 302 that I have doesn't state

68

1    the relevant time frame.  I would view it -- I was not

2    notified, and I do not believe it would be admissible as

3    background evidence in this instance.

4              THE COURT:  Okay.  Mr. Smith, do you plan to go into

5    any marijuana use involving Mr. Bowling through this witness,

6    Mr. Baker?

7              MR. SMITH:  I've asked for that file, Your Honor.  I

8    apologize.  My memory's a little bit in need of refreshing in

9    the context of that.  As the Court's aware, this Mansell Baker

10   has been talked about by many witnesses, including Eugene

11   Lewis and Denver Sizemore, as being in partnership in the

12   marijuana growing business that started with Wayne Jones back

13   in, I guess, the '89, '90 period.

14             I apologize for being slow to get my notes.  I'm not

15   complaining.  I'm glad we're moving along.  Again, just give

16   me another minute so I know the 302 that Mr. Simons is

17   referring to here, and I want to make sure I get that in front

18   of me.

19             That is correct, that he recalled raising marijuana

20   in Henry County in the late, mid '80s.  He said the farm was

21   leased from an old woman by individuals in Clay County to deer

22   hunt on.  He said he was in partnership with Charles Wayne

23   Jones and Denver Sizemore and Eugene Lewis.  Those are matters

24   I do intend to go into, because I do believe those were

25   noticed sufficiently for the parties to know that this

partnership is going to be discussed as background evidence.

He further goes on to state that Stanley Bowling approached him about moving his brother's marijuana, Ronny "Buzzard" Hacker, and that Hacker -- Baker would make trips to deliver marijuana.  He said that Bowling was actually making trips to deliver marijuana and that it was three to five pounds.  He says that Ronny Hacker got arrested in Northern Kentucky and his drugs taken.  Baker said that him and Bowling was actually fronting Hacker with the marijuana that he got caught with, and he was paying them afterward, after he made the sale.

He said on one occasion Hacker unknowingly paid him and Stanley $1,800 too much for the marijuana, and he and Bowling split the money without telling Denver Sizemore or Eugene Lewis.  That time frame seems to tie back into the partnership with the Henry County farm.  And again, that was evidence that's already, at least I believe been noticed and brought into play.

I will state that my recollection is this was given to Mr. Bowling before we had the 404(b) hearing, and I think this is something that could have been raised at the hearing, had he had an objection to going into this area for reasons that he thought.  But I don't have the date in which that was delivered to you, Mr. Simons.  If you've got a different date --

70

1           MR. SIMONS:  What date was the 404(b) hearing?

2           MR. SMITH:  What was the date?

3           THE COURT:  January 18 was the date.

4           MR. SIMONS:  The date of the transcription here is

5      January 26, Your Honor, so it was not in my possession.  I

6      knew nothing about it.  In fact, I made a motion in limine to

7      the Court to exclude.  And in it, I put -- in the motion to

8      the Court I put that nobody would testify that my client was

9      involved with drugs.  Within five days, probably, I got this

10     302 which was taken from Mansell Baker by an undercover agent

11     for Unite, a drug task force in Clay County, who was arrested

12     at that point and was in the Clay County Detention Center

13     facing what I would say is five felonies right now.

14           I think it's brutally unfair to my client not to be

15     able to address the current charges over his head and the

16     position that he's in with respect to Mr. Baker when he comes

17     up with this statement that is undocumented from anybody else

18     in the case to this point.

19           MR. SMITH:  Your Honor, I have to go on his

20     representation.  I thought we had that issue come up again

21     before the trial on the 2nd or the 1st, but maybe he's right.

22     Maybe it was all dealt with on the 18th.  This does go into a

23     lot of detail that Bowling was actually a silent partner with

24     Baker on that Sizemore/Lewis partnership.  And if that

25     wasn't -- again, if it wasn't background evidence, which

71

1    that's what I recall it being, as opposed to being 404(b),

2    then I'm -- Mr. Simons has found me here without an answer.

3    But I thought it was background evidence, and I believe the

4    rules do not require a pretrial notice and hearing on that.

5    And if I was wrong on that, I apologize to the Court.

6            THE COURT:  I ruled at the hearing that this would

7    come in.  The only thing that I held was 404(b) evidence was

8    the videotape.  Everything else I held to be background

9    evidence that did not require prior notice being given.  This

10   302, of course, would be -- this is Jencks material.  It would

11   not be required to be provided until the witness has

12   testified.  This is not a statement that this witness read and

13   affirmed as his statement.  This is a 302.  It is just a

14   recording made by an agent after an interview, essentially.

15           MR. SMITH:  That's my complete understanding of it,

16   Your Honor.

17           THE COURT:  All right.  I'll overrule the objection,

18   but if counsel needs a few moments to review any materials

19   prior to cross-examination, I'll give those to him.

20           MR. SIMONS:  Are there additional matters that have

21   not been produced with respect to Mr. Baker?

22           MR. SMITH:  I'll have to ask at the table there.  I

23   don't see anything that's not been produced.

24           THE COURT:  Grand jury testimony?

25           MR. SIMONS:  I have the grand jury testimony, unless

1  he's testified more than once.

2          MR. SMITH:  No, sir.

3          THE COURT:  All right.

4          MR. ABELL:  Judge, while we're here, in this 302 that

5  I believe was produced January 30th, there's indication that

6  this witness said that he was told by Mary Gail Roberts or

7  Mary Lou Roberts that she paid my client, William Stivers, 10,

8  15 thousand dollars.  And as a result of that, the upshot of

9  it was an OxyContin charge or drug charge pending against her

10 went away.

11         THE COURT:  Who is Miss Roberts again?  Refresh my

12 memory.

13         MR. ABELL:  I think Mary Lou Roberts has previously

14 been identified as a vote hauler.

15         MR. SMITH:  There's a Mary Gail and there's a Mary

16 Lou.  I believe they're two different people.  But it has been

17 mentioned that -- Mary Roberts has been mentioned.

18         MR. ABELL:  Well, in any event, I'm concerned about

19 the admission of this testimony.

20         THE COURT:  Again, I don't have the -- go over this

21 with me once again.  This witness that's about to testify,

22 Mansell Baker --

23         MR. ABELL:  Baker reports in his 302 that he was told

24 by Mary Lou Roberts that she paid William Stivers 10 to 15

25 thousand dollars and as a result of that payment, a pending

1   OxyContin trafficking charge against her was dismissed or

2   otherwise disposed of in a favorable manner.  And that was the

3   first disclosure to me of that.  It's not clear to me when

4   Roberts claims this happened or when she told it to Baker, but

5   obviously it's before January 22, 2010, when he disclosed it.

6          It was not disclosed as part of 404(b).  If this is

7   not the Roberts that was a vote hauler -- I would assume the

8   Roberts that would be a vote hauler would be considered a

9   co-conspirator.

10          THE COURT:  Right.

11          MR. ABELL:  But I'm led to believe now that that's

12   not correct.  If it is -- if she is the co-conspirator, it

13   seems to me to be a boasting statement in terms of looking at

14   what I got accomplished and not a statement in furtherance of

15   the purposes of the conspiracy.  And I have a case to discuss

16   with Your Honor on whether or not boasting is a statement in

17   furtherance of the conspiracy.  But I bring this up now, since

18   we were here, and this testimony may or may not be

19   forthcoming.  It is obviously of concern for me on behalf of

20   my client.

21          THE COURT:  All right.  Well, I think what we need to

22   do is before we go into these areas, I need to excuse the jury

23   for their break, and I'm going to keep you all in here and

24   we'll talk about this further.

25                    (Sidebar conference concluded.)

74

1           THE COURT:  Thank you.  Ladies and gentlemen, I'm

2    going to go ahead and send you on to your break while I

3    discuss these matters with counsel.  We'll give you about a

4    20-minute recess.  Please keep in mind the admonition you were

5    given previously not to discuss the case among yourselves

6    while we are in recess.  You'll be excused for 20 minutes.

7              (The jury left the courtroom at 2:19 p.m.)

8           THE COURT:  Mr. Abell, you wanted to be heard further

9    on the issue of an out of court statement that is maybe the

10   subject of the upcoming witness's testimony?

11          MR. ABELL:  Yes, Judge.  I'm concerned about

12   testimony from Mansell Baker to the effect that a Mary Lou

13   Roberts at an indeterminate point in the past, prior to, I

14   think, January 22, 2010, but I don't know when -- and I say

15   January 22, 2010, because that's the date of the interview,

16   although it was transcribed January 26, 2010.  It was

17   disclosed to me, I believe, January 30, 2010.

18          The testimony regards Mary Lou Roberts relating to

19   Mansell Baker that my client, William Stivers, that she had

20   paid William Stivers 10 or 15 thousand dollars for help with

21   regard to a pending OxyContin charge that then had a favorable

22   disposition.

23          The implication, obviously, being that Mr. Stivers

24   used his influence in some manner.  And I would think in the

25   context of this case, the inference would be to discuss with

1    prosecuting authorities and/or, more likely, to be blunt,

2    Cletus Maricle, the judge in Clay Circuit Court, to have

3    something done favorable to Ms. Roberts.

4         And it is, as I indicated at the Bench, unclear to me

5    whether this Miss Roberts has previously been identified as a

6    vote hauler.  If she had been identified as a vote hauler,

7    arguably she would be a co-conspirator, and 801(d)(2)(E) could

8    be applicable.  However, a statement of this nature which is

9    boasting to somebody about something you've done in the past

10   is not a statement in furtherance of the conspiracy.

11        And I would, in that regard, refer the Court to

12   United States v. Conrad, 507 F.3d 424.

13             THE COURT:  That's a Sixth Circuit case?

14             MR. ABELL:  Yes, sir, it is.  November 2007 is the

15   date of the decision.

16             THE COURT:  All right.

17             MR. ABELL:  And it discusses the issue of what are

18   statements in furtherance of the conspiracy.  And aside from

19   all other ambiguities about whether or not this person is

20   involved and any discussion that took place, in assuming that

21   she is a co-conspirator, it is a boast about something I did

22   in the future that does not advance --

23             THE COURT:  In the past.  Something that was done in

24   the past, right?

25             MR. ABELL:  Yes.  So I bring that issue to the

76

1   Court's attention, because I don't believe that Mr. Baker

2   should be permitted to testify regarding it.

3        THE COURT:  All right.  Let's see.  Mr. Smith, would

4   you like to respond?

5        MR. SMITH:  Well, Your Honor, it's hard for me to

6   respond because, number one, this is a 302.  This is not a

7   statement of the witness.  It is a report by an agent.  And

8   obviously, there are several questions here.  If it is, as

9   represented by Mr. Abell, that it was not in furtherance of

10  the conspiracy, not a statement that was made in context of

11  what we define relevant to the conspiracy, then I see issues.

12        The problem is, the 302 doesn't say who said that.

13  It could have been -- the 302, it could just as well have been

14  Stivers tells Mansell Baker that he took 10 to 15 thousand

15  dollars to Cletus Maricle to get the charges dismissed.  And

16  if that's the scenario, then I think the analysis somewhat

17  turns differently than if it is Mary Lou Roberts that made the

18  statement to Mr. Baker.

19        I do think that we've heard a lot of talking on these

20  tapes about making money on cases in front of Judge Maricle by

21  William Stivers, and I think it is highly probative.  But the

22  question I don't have -- or answer I don't have for the Court

23  is based on this 302, whether or not this is a statement that

24  could qualify.  And I apologize for lack of information.  This

25  is something that certainly, if the Court would like, I will

*M. BAKER - Voir Dire by Mr. Smith*                                    77

 1    be glad to question the witness outside the presence of the

 2    jury and we can get a ruling on that now.  Or if the Court

 3    wants to have me question the witness outside here and find

 4    out, then I can represent to you what he's going to say.

 5          But at this point, I can't really do that.

 6          THE COURT:  Well, I am going to ask the witness to be

 7    brought in.  I'm going to allow limited *voir dire* on that

 8    particular issue.  We're not going to get into all other

 9    issues in the case, but just on that one limited issue.  Bring

10    in the witness, Eric.  The witness, Mr. Baker.  Mansell Baker.

11              MANSELL BAKER, GOVERNMENT'S WITNESS, SWORN

12          THE COURT:  You are Mansell Baker; is that correct?

13          THE WITNESS:  Yes, it is.

14          THE COURT:  Mr. Baker, two of the attorneys are going

15    to be asking you just a few questions while the jury is not

16    present.  If you would, please respond to their questions.

17    Mr. Smith?

18                        DIRECT EXAMINATION

19    BY MR. SMITH:

20    Q.   Good afternoon.  Mr. Baker, did you have a relationship

21    with Al Man Stivers back at a time when you were also selling

22    OxyContin or involved in that aspect of drugs over in Clay

23    County?

24    A.   No, I did not.

25    Q.   Did you have a relationship with Mr. Stivers at some

1   point in the past?

2   A.   No, I have not.

3   Q.   Did you ever have a conversation with him about drugs

4   that Mary Lou Roberts was selling?

5   A.   No, I have not.

6   Q.   Did you ever have a conversation with him about her

7   paying him money to get to Cletus Maricle to dismiss charges

8   against her?

9   A.   There -- I've not had the conversation.  You know, there

10  was a conversation with a woman.

11  Q.   With who?

12  A.   With Mary Lou.

13  Q.   Okay.  That you had?

14  A.   That I overheared.

15  Q.   Oh, that you overheard?

16  A.   Yeah.

17  Q.   And who was she talking with, if you don't mind telling

18  us?

19  A.   Her sister.

20  Q.   What is her name?

21  A.   Bertha.

22  Q.   Okay.  And is that where this information came about,

23  money going to Cletus Maricle to dismiss drug charges?

24  A.   Yeah.  She had ended up going to jail.  She caught

25  another trafficking charge and ended up going to jail, and she

*M. BAKER - Voir Dire by Mr. Smith*                                          79

1    was mad over doing the time.

2    Q.   Okay.  Now, this selling of OxyContin, did she also tell

3    you she was selling OxyContin for William Stivers?

4    A.   No, she didn't.

5    Q.   Okay.

6    A.   He was delivering stuff, and I think she was buying from

7    him.

8    Q.   Okay.  How do you know that?

9    A.   Just word of mouth.  Her statement.

10   Q.   From whose mouth?

11   A.   Mary Lou, you know, talking to somebody else.  Same

12   person.

13   Q.   So basically, you never had any conversations with

14   William Stivers about either one of these topics?

15   A.   No.

16   Q.   All right.

17              MR. SMITH:  Your Honor, I think based on that, we

18   have no reason to pursue that with this witness.

19              THE COURT:  All right.

20              MR. ABELL:  And my arguments, therefore, are rendered

21   moot.

22              THE COURT:  Your objection to that line of

23   questioning will be sustained.

24              MR. ABELL:  Thank you, Judge.

25              THE COURT:  Thank you.  Now, Mr. Baker, we're going

*M. BAKER - Direct (Mr. Smith)*                                    80

1    to take a break here in just a couple of moments.  I'm going

2    to give the attorneys a chance to take a restroom break.

3    We'll start back in about ten minutes, and the clerk will need

4    to administer the oath to you again when the jury's brought

5    in.  So we'll begin in approximately ten minutes.  We'll be in

6    recess until that time.

7                 (Recess from 2:30 p.m. until 2:43 p.m.)

8                 (The jury entered the courtroom at 2:43 p.m.)

9         THE COURT:  Thank you.  The record will reflect that

10   all members of the jury are present.  Parties and counsel are

11   present as well.  Mr. Smith, you may proceed, but the witness

12   will need to be sworn to answer questions.

13             MANSELL BAKER, GOVERNMENT'S WITNESS, SWORN

14        THE COURT:  Mr. Smith, you may proceed.

15                        DIRECT EXAMINATION

16   BY MR. SMITH:

17   Q.  State your name, please.

18   A.  Mansell Baker.

19   Q.  And Mr. Baker, tell me your age.

20   A.  Forty-seven.

21   Q.  And where were you born and raised?

22   A.  Clay County, Kentucky.

23   Q.  Are you married?

24   A.  No.

25   Q.  Do you have any children?

*M. BAKER - Direct (Mr. Smith)*                                        81

1    A.   Yeah, I got one girl.

2    Q.   And how old is she?

3    A.   Nineteen.

4    Q.   How far did you go in school?

5    A.   Graduated high school.

6    Q.   And where did you graduate from?

7    A.   Clay County High School.

8    Q.   Did you pursue any further education?

9    A.   I've got a diploma from the vocational tech.

10   Q.   Okay.  And what was the vocational degree that you got?

11   A.   Mechanics.

12   Q.   Have you worked in the past?

13   A.   Yes, I have.

14   Q.   What kind of jobs have you held, Mr. Baker?

15   A.   Construction work.

16   Q.   Okay.  And did you have a particular line of construction

17   work that you were good at?

18   A.   Worked on coal companies and pipelines and stuff.

19   Q.   Were you an equipment operator as well?

20   A.   Yes.

21   Q.   And what was your most recent job that you had, Mr.

22   Baker?

23   A.   B&B Excavation.

24   Q.   Okay.  And is that a local company?

25   A.   Yes, it is.

*M. BAKER - Direct (Mr. Smith)*                                    82

1   Q.   Who owns the company?

2   A.   Stanley Bowling.

3   Q.   Okay.  And is there a time period there that you worked

4   for him?

5   A.   Yeah, I worked around four years.

6   Q.   Four years.  And when did you leave that employment, if

7   you know?

8   A.   Probably four years ago.

9   Q.   Okay.  So about 2006, you believe, would be an estimate?

10  A.   Somewhere in there.

11  Q.   And where were you living at the time that you worked for

12  Mr. Bowling?

13  A.   In Mr. Bowling's garage.

14  Q.   Okay.  Does he have living quarters there in his garage?

15  A.   We made a little section there in the garage.

16  Q.   And when you say you made a little section, was that like

17  an efficiency apartment or something?

18  A.   I put a bed and stuff in.  We already had the sink, stove

19  and everything where we cooked and stuff.

20  Q.   Okay.  And how long were you living there on the

21  property?

22  A.   Repeat that, please?

23  Q.   How long were you living there on the property?

24  A.   The whole time, four years.

25  Q.   The four years you worked there?  Now, did he have other

*M. BAKER - Direct (Mr. Smith)*                                          83

1    employees that you worked alongside with?

2    A.   On and off, just temporary help.

3    Q.   Who did most of the labor for him?

4    A.   Me.

5    Q.   Now, did you have -- you said other construction

6    employment.  Did you ever work in the City of Manchester?

7    A.   It's been a long time ago, yeah.

8    Q.   And what did you do for the City of Manchester?

9    A.   Labor.

10   Q.   And how long did you work for them?

11   A.   One year.

12   Q.   Okay.  Now, over the course of years, Mr. Baker, have you

13   also been involved with growing marijuana?

14   A.   Yes, I have.

15   Q.   And when did you first get involved in growing marijuana,

16   Mr. Baker?

17   A.   In the eighth grade.

18   Q.   In the eighth grade?

19   A.   Yeah.

20   Q.   And was that a venture that you took upon yourself, or

21   did you have others?

22   A.   Stayed by myself till I graduated high school.  '83.

23   Q.   And were you growing the marijuana in Clay County?

24   A.   At that time, I was.

25   Q.   Did you ever have interest in a property over in Henry

*M. BAKER - Direct (Mr. Smith)*                                            84

1    County?

2    A.   Yes, we did.

3    Q.   Tell us about that.

4    A.   We'd been hunting, a large group of us been hunting,

5    about 30 from Clay County.  And me and Denver Sizemore, Wayne

6    Jones, Eugene Lewis proceeded to grow marijuana there.  And

7    eventually, the woman died and we bought the land and kept

8    growing.

9    Q.   Now, how did that land ownership -- to your recollection,

10   did you all go in partnerships on that?

11   A.   Yes, we did.

12   Q.   And do you know who was on the deeds at that time?

13   A.   At that time, me, Denver and Eugene was on the deed and

14   our women.

15   Q.   Okay.  And your women, you mean your wives?

16   A.   Our wives.

17   Q.   Okay.  And you mentioned Wayne Jones as being a partner.

18   Was he not on the deeds?

19   A.   He wasn't on the deed.  He said he didn't want no part of

20   the deed or nothing like that.

21   Q.   Okay.  How long did you fellas grow marijuana in Henry

22   County on that property?

23   A.   Wayne was a partner for two years.  And then the rest of

24   us kept growing, probably, for five years.

25   Q.   Okay.  And you said the rest of you.  Who was that?  Who

*M. BAKER - Direct (Mr. Smith)*                                    85

1   would that be?

2   A.   That was me, Denver, Eugene Lewis, and we took Denver's

3   son on as a partner, Todd.

4   Q.   Okay.  And when you say you were growing marijuana, was

5   there a large quantity or small quantities that you all were

6   growing?

7   A.   Large quantity.

8   Q.   And when the marijuana was harvested, what did you all do

9   with the marijuana?

10  A.   Dried some there, brought some to the houses, to our

11  houses.  And once we got it dried and cleaned, you know, we

12  started selling stuff.  And we had to go to other people to

13  distribute.

14  Q.   Okay.  Now, was it split four ways initially?

15  A.   Yes.

16  Q.   And that marijuana that you got, did you sell it

17  yourself?

18  A.   Yes.

19  Q.   And who did you sell your marijuana to?

20  A.   I went through Mr. Bowling a few times, to his brother.

21  He had a half brother that dealt in marijuana.

22  Q.   Mr. Bowling being which Mr. Bowling?

23  A.   Stanley Bowling.

24  Q.   And you say you went through him to his brother.  What

25  was his brother's name?

1    A.   We called him Buzzard.  Can't, I can't tell you his real

2    name at this time.  Ronny Hacker.

3    Q.   Ronny Hacker?

4    A.   Ronny Hacker.

5    Q.   And he had a nickname, Buzzard?

6    A.   Yeah.

7    Q.   And you say that you went -- explain that to us, how you

8    went through Stanley Bowling to get to him.

9    A.   At the time, I didn't know Mr. Hacker.  And Stanley, you

10   know, we had cookouts and stuff with people.  And Stanley said

11   he could move some through his brother.  And me and him, well,

12   we bagged it at Eugene's house, and me and Stanley went up to

13   his brother's and sold it up there.  He helped me get rid of

14   it.

15   Q.   Now, did you pay Stanley any money for doing this for

16   you?

17   A.   Seemed like he got two, two or three hundred dollars a

18   pound.

19   Q.   And how much were you getting a pound for your marijuana

20   at that time?

21   A.   At the time, 13.

22   Q.   Okay.  And did you get cash on delivery or was there

23   credit involved when you dealt with Stanley and his brother,

24   Buzzard?

25   A.   The first little while it was cash.  Then after that, he

1    started -- we had to start delivering, and he'd pay us later.

2    Q.   Okay.  How long did you have this relationship with

3    Stanley and his brother when it pertained to this marijuana?

4    A.   Me and Stanley, one season.  Me and Buzzard, like three.

5    Q.   Okay.  What happened to the Henry County farm?

6    A.   It was eventually -- the U.S. marshal seized one farm,

7    and we eventually split the other one up.

8    Q.   Okay.  Did you have more than one farm?

9    A.   At the time, Todd and Denver had bought a farm.

10   Q.   And do you know where it was?

11   A.   On the back side, it adjoins.  There was about a thousand

12   yards between the two farms, on the rough range.

13   Q.   Okay.  Now, you said that you were working for Stanley

14   Bowling in his construction company.

15   A.   Yes, sir.

16   Q.   And where was Stanley living at the time?

17   A.   There within the house side of the garage where I lived.

18   Q.   And this property that he owns, is it nearby the City

19   property?

20   A.   Yeah, City owns all the way around.

21   Q.   And how is it that the City managed to obtain all the

22   property around Stanley's place?

23            MR. SIMONS:  I'm going to object, Your Honor.  Lack

24   of personal knowledge.

25            THE COURT:  Sustained unless you can establish he has

*M. BAKER - Direct (Mr. Smith)*                                      88

1  knowledge of that.

2  Q.  Were you able, while working with Stanley, to talk with

3  him about how the City came to own the property around him?

4  A.  No, I wasn't.

5  Q.  Okay.  Did you come to knowledge about how he -- how the

6  City got the property around him?

7  A.  I don't know on the front part.  But on the back, in the

8  holler up through there, there was some people that owned the

9  land, like the mayor at that time and a coal company that

10  bought the land and stripped part of the coal sold it back to

11  the City.

12  Q.  Okay.  And the mayor being who?

13  A.  Doug White.

14  Q.  And you don't know about the front part?

15  A.  No, don't know about the front part.

16  Q.  Okay.  During the time that you were working for Stanley,

17  did he get any property from the City?

18  A.  Yes, he did.

19  Q.  And what property did he get from the City?

20  A.  It adjoin his property in the back, back of it.

21  Q.  And was there some reason why he had an interest in

22  buying the property?

23       MR. SIMONS:  Objection, Your Honor.  Again, lack of

24  personal knowledge.

25       THE COURT:  Objection sustained unless you can lay a

*M. BAKER - Direct (Mr. Smith)*                                          89

1    foundation as to how he would know.

2    Q.   Did you speak with Stanley about his interest in buying

3    the property from the City?

4    A.   No, no, I did not.

5    Q.   Okay.  This property that you say, did you know the

6    location of the property --

7    A.   Yes.

8    Q.   -- he was able to get from the City?

9    A.   Yes.

10   Q.   And tell us where it was in relation to his garage and

11   his home.

12   A.   You would go right in behind the garage, you know, beside

13   his land or through his part of his land at that time and go

14   back into a big barn.

15   Q.   Do you know when he got the property?

16   A.   Six year ago.

17          MR. SIMONS:  Objection, Your Honor.  Move to strike.

18          THE COURT:  Overruled.

19   Q.   Do you know what was paid for the property?

20   A.   No, I do not.

21   Q.   Is the City now land locked by the fact that Stanley

22   Bowling owns this piece of property?

23   A.   To a sense.

24   Q.   I'm sorry?

25   A.   To a sense, they are.

*M. BAKER - Direct (Mr. Smith)*                                    90

Q.   Okay.  Do you have -- were you working with Stanley
Bowling when he did the Laurel Branch project for the City of
Manchester?

A.   Yes, I was.

Q.   And did you know he had standing contracts with the City
of Manchester?

A.   Yes.

Q.   And this being one of them, during the time period that
you worked for him, was there occasion when you all cut
corners on the projects to save money?

A.   A few times.

Q.   And could you describe for us what you mean by that few
times?

A.   Some of the contracts got, you know, going up creeks,
beside of cliffs and stuff like that.  We come back through
blacktop roads and lay water line through it.

Q.   Okay.  These blacktop roads, were they county or state
maintained properties?

A.   County maintained.

Q.   Okay.  And could you describe for us how that would save
money if you ran it through the road as opposed to through the
creek as contracted?

A.   Well, you'd have to cross a creek, a holler, come up
another side over there, make a road with a dozer and then
still come out at the top.  Where if you'd have went with the

*M. BAKER - Direct (Mr. Smith)*                                      91

1    blacktop, you'd have been there anyway and been quicker.

2    Q.   And how did you go back -- how did he go about repairing

3    the road once he tore it up to lay a line in the road, if you

4    know?

5    A.   At one point, the county's trucks brought gravel.   And

6    eventually, I think the county come back -- they had it

7    advised for blacktop.   And when we got through, they did

8    blacktop it back.

9    Q.   Okay.   Did you also work on the Rocky Branch project?

10   A.   Yes, I did.

11   Q.   And were there occasions during that project -- again,

12   was that a project that was contracted with the City?

13   A.   Yes, it was.

14   Q.   And B&B Excavating, you were working for them at the

15   time?

16   A.   Yes.

17   Q.   During that time, did they cut corners on that project,

18   to your knowledge?

19   A.   Yes.

20   Q.   And could you explain?

21   A.   On the paper, on the drawings, they should have went up

22   beside the main highway.   There was rock even with the

23   blacktop so we come back down and went through a creek instead

24   of going up and over the little hill and laid pipe and stuff

25   in it and casing.

*M. BAKER - Direct (Mr. Smith)*                                          92

1    Q.   And could you explain how that would save money for the

2    company?

3    A.   We'd have had to chip about 30 inches of rock all the way

4    up the hill right there.  Pretty good ways.

5    Q.   And when you say chipping, how did you chip rock?

6    A.   You'd have to bring in an excavator with a hammer.

7    Q.   And in time, would that save time as well?

8    A.   Yeah, save a lot of time.

9    Q.   How much time, to your knowledge, Mr. Baker, did it save

10   the company on this project?

11   A.   I would say four weeks.

12   Q.   Were you living and working in Clay County during the

13   2002 election?

14   A.   Yes, I was.

15   Q.   Do you know a fella by the name of Bobby "Red" Sams?

16   A.   Yes, I do.

17   Q.   Did you witness him being involved in a scheme to haul

18   and buy votes during 2002 election?

19   A.   I seen him pick voters up, but I never seen him pay

20   nobody.

21   Q.   When you say you saw him picking voters up, could you

22   explain what you saw?

23   A.   He pulled into, you know, the projects and places and

24   asked people about going and voting and stuff and talked to

25   them.  I wasn't -- I was out from him.  I didn't hear what he

*M. BAKER - Direct (Mr. Smith)*                                    93

1    was saying at the time.  He would take them down to election

2    polls and then bring them back.

3    Q.   Do you know who he met at the voting polls with the

4    voters?

5    A.   No, I don't, because I was at the projects.

6    Q.   Did he at any point tell you who he was hauling voters

7    for?

8    A.   No, he did not.

9    Q.   You say it was from the projects.  Is there a project

10   area in Manchester you're familiar with?

11   A.   Yeah.  We've got a Beech Creek Apartments on the way to

12   Stanley's house.

13   Q.   Do you know a fella by the name of Gary "Ouchie" Jackson?

14   A.   Yes, I do.

15   Q.   Do you recall seeing him active in the 2002 or 2004

16   election involved in a similar type of scheme?

17   A.   Yes, I have.

18   Q.   Could you tell us what you saw Mr. Jackson involved in?

19   A.   He worked at Pennington Hill area.  It was part of the

20   city council which he was running for, and they brought voters

21   down.  He took them inside, and they would make a deal.  I

22   don't know what kind of deal.  And would go back, another guy

23   would take them and vote 'em and stuff, and they would come

24   back.  And at one point, he had to go to the bank and get

25   money on a credit card.

*M. BAKER - Direct (Mr. Smith)*                                    94

1    Q.   When you say he went to the bank, are you talking about

2    Gary Jackson?

3    A.   Yes.

4    Q.   And do you know where he was hauling voters to and from?

5    A.   At that time, he was going to the Horse Creek precinct or

6    Whites Branch, it was called.

7    Q.   Were there other times during the day that you saw him

8    hauling from or to other places?

9    A.   No, just that one there.

10         THE COURT:  Mr. Smith, if you could, I believe you

11   haven't narrowed this to 2002 or 2004 election.

12   Q.   Do you recall which one of those elections it was?

13   A.   2002.

14   Q.   Okay.  Did he approach you during that time period at

15   all?

16   A.   No, he did not.  I worked for him at that time.

17   Q.   What did you do for Mr. Jackson at that time?

18   A.   I run a couple jobs and worked on them.

19   Q.   Did he ask you to help him in his effort to buy these

20   votes?

21   A.   He didn't ask me to help him buy votes, but I was sent to

22   Pennington Hill, people I know to take to vote.

23   Q.   Okay.  But you weren't involved in the vote buying

24   scheme?

25   A.   I wasn't, no.

*M. BAKER - Cross (Mr. White)*                                    95

1    Q.   Where did you vote in the '02, '04 elections, to your

2    knowledge?

3    A.   One time, I voted at Whites Branch precinct.  The next

4    time, at the middle school.

5    Q.   Okay.  And that middle school being what precinct?

6    A.   I guess the Manchester precinct.

7                MR. SMITH:  Pass the witness.  Thank you.

8                THE COURT:  Thank you.

9                MR. PINALES:  No questions.

10                THE COURT:  All right.  Mr. Bayer?

11                MR. BAYER:  No questions, Your Honor.

12                THE COURT:  Thank you.

13                MR. WHITE:  Just a couple, Your Honor, if I may.

14                THE COURT:  Yes, sir, Mr. White.

15                          CROSS-EXAMINATION

16    BY MR. WHITE:

17    Q.   Good afternoon, Mr. Baker.  My name is Scott White.  I

18    represent Mr. Jones in this matter.  I wanted to ask you a few

19    questions about the Henry County property that you testified

20    about.

21    A.   Yes, sir.

22    Q.   Did you testify on direct that it was four of you and

23    your wives that purchased the property?  It was Mr. Sizemore,

24    Mr. Eugene Lewis -- or Denver Sizemore, Mr. Eugene Lewis, Mr.

25    Jones and yourself?

*M. BAKER - Cross (Mr. White)*                                    96

1    A.   Yes.

2    Q.   Do you recall that you all -- you testified on direct

3    about a deed.  Did you see that deed?

4    A.   Yes, I had a copy of the deed.

5    Q.   And on that deed, it had everyone's name except Mr.

6    Jones; is that correct?

7    A.   That's correct.

8    Q.   Was there a mortgage?  There was a mortgage also attached

9    to that deed; is that not right?

10   A.   That's right.

11   Q.   And that was a mortgage that you all took out at the

12   First State Bank of Manchester?

13   A.   That's right.

14        MR. WHITE:  Your Honor, if I could ask the CSO to

15   show him what I've marked as Defendant's Exhibit CWJ2.

16        THE COURT:  Yes.

17   Q.   Let me reference you to page 4, if I could, Mr. Baker, of

18   that document.  First, let me -- I apologize.  Let me go back.

19   Do you recognize that document?

20   A.   Yeah, somewhat.

21   Q.   Is that -- what is that document?

22   A.   This is a mortgage on a deed.  This is actually a deed

23   mortgage that we had borrowed money from this First State Bank

24   of Manchester, Kentucky.

25   Q.   Could you turn to page 4, please?

*M. BAKER - Cross (Mr. White)*                                        97

1   A.   Yes, sir.

2   Q.   Does your signature appear on that page?

3   A.   Yes, it does.

4   Q.   Does your wife's signature appear on that page?

5   A.   Yes, she does.

6   Q.   Is that the mortgage that you -- strike that.  If you'll

7   go to page 1, does that say who the other folks are that

8   borrowed the money from the First State Bank?

9   A.   Yes, it does.

10  Q.   And who are those?

11  A.   It will be Eugene Lewis and wife Burdette Lewis; Mansell

12  Baker and wife Diane Baker; and Denver Sizemore, a single man.

13  Q.   Mr. Jones' name, nor that of his wife, are on there; is

14  that correct?

15  A.   No, sir.  They're not.

16         MR. WHITE:  Those are all the questions I have, Your

17  Honor.  Thank you.  I would move admission of defense

18  exhibit --

19         THE COURT:  Jones Number 2?

20         MR. WHITE:  Yes, Your Honor.  I didn't move its

21  admission earlier.

22         THE COURT:  All right.  We'll see if there's an

23  objection to the admission of that document.

24         MR. SMITH:  No, Your Honor.

25         THE COURT:  That exhibit will be admitted at this

*M. BAKER - Cross (Mr. Simons)*                                    98

1    time.  Thank you.

2                    (Defense Exhibit Jones Number 2

3                     was admitted into evidence.)

4         MR. WHITE:  Thank you, Your Honor.  That's all I

5    have.  Pass the witness.

6         MR. ABELL:  No questions, Judge.

7         MR. BALDANI:  Nor from us.

8         MR. GILBERT:  No, sir.

9         MS. HUGHES:  None.

10        MR. SIMONS:  I have some.

11        THE COURT:  Yes, sir.

12                         CROSS-EXAMINATION

13   BY MR. SIMONS:

14   Q.  Afternoon, Mr. Baker.

15   A.  Afternoon.

16   Q.  My name is Dan Simons.  I represent Stanley Bowling.  You

17   know Mr. Bowling?

18   A.  Yes, sir, I do.

19   Q.  In fact, you lived in his garage for, you said, four

20   years?

21   A.  Yes, I did.

22   Q.  All right.  I want to talk about your relationship with

23   Stanley just a little bit.  Would you say he's been good to

24   you?

25   A.  Very good to me.

*M. BAKER - Cross (Mr. Simons)*                                          99

1   Q.   As a matter of fact, when you moved in his garage in

2   about 2002, you were essentially homeless, weren't you?

3   A.   Yes, I was.

4   Q.   And were you a drug addict at that time?

5   A.   Yes, I was.

6   Q.   And what drug was your addiction?

7   A.   Cocaine.

8   Q.   And how long had you been a cocaine addict at that time?

9   A.   Since '90.

10  Q.   Okay.  And did you have intermittent problems with

11  cocaine, repeated problems over many years?

12  A.   Yes, I have.

13  Q.   Okay.  Have you been charged with any cocaine crime?

14          MR. SMITH:  Objection, Your Honor.

15          THE COURT:  Sustained.

16  Q.   Have you been convicted of any crime involving cocaine?

17  A.   One possession.

18  Q.   Okay.  And that was a felony possession; was it not?

19  A.   It was amended down.

20  Q.   It was not a felony?

21  A.   No.

22  Q.   And when was that?

23  A.   That was back in the early '90s.

24  Q.   And you're telling this jury that it was not a felony

25  conviction when it finally was resolved?

*M. BAKER - Cross (Mr. Simons)*                                          100

1    A.   I stayed in Laurel --

2    Q.   That's what I asked you.  Are you telling the jury you

3    did not plead to a felony conviction?

4    A.   The only thing I pled to was a possession of cocaine, a

5    misdemeanor, as far as my knowledge.

6    Q.   I wasn't aware that there was a misdemeanor cocaine

7    charge.

8         MR. SMITH:  Your Honor, I'm going to object.  Counsel

9    has asked, and he's I believe given him an answer.

10        THE COURT:  Sustained.

11   Q.   I'll move on.  Have you ever been convicted of any

12   felony?

13   A.   Yes, I have.

14   Q.   Okay.  What was that?  Tell the jury what that was.

15   A.   Theft over 300.

16   Q.   And what did you steal?

17   A.   A trailer from a church.

18   Q.   Seventh Day Adventist church trailer?

19   A.   Yes, I did.

20   Q.   And did that trailer have belongings in it?

21   A.   Yes.

22        MR. SMITH:  Your Honor, I'm going to object.

23        THE COURT:  Sustained.

24   Q.   When was that theft of the trailer from the church, Mr.

25   Baker?

*M. BAKER - Cross (Mr. Simons)*                                    101

1    A.   During the last six months I lived with Mr. Bowling.

2    Q.   Okay.  Let me back up.  Let's talk about your

3    relationship with Stanley Bowling and how you came to be at

4    his home, all right?  You had met Stanley some years back and

5    actually worked for the City while he was supervisor for a

6    year or so?

7    A.   Yeah.

8    Q.   Do you remember when that was?

9    A.   About '84.

10   Q.   Okay.

11   A.   '85.

12   Q.   Okay.  And that was where you met him?

13   A.   Yes.

14   Q.   All right.  And then you went in to a lot of drug

15   troubles?

16   A.   Yeah.

17   Q.   Became addicted to cocaine?

18   A.   Yeah.

19   Q.   And battled that for a lot of years?

20   A.   Yes.

21   Q.   All right.  And then did you move in with some people

22   named Smith?

23   A.   Yes, I did.

24   Q.   Okay.  Would you tell me, tell the jury, please, who

25   those people are?

*M. BAKER - Cross (Mr. Simons)*                                              102

1   A.   A Greg Smith, Greg and Melissa Smith.

2   Q.   Okay.  Did they also have cocaine troubles?

3   A.   Greg did.

4   Q.   Okay.  He was bad on cocaine?

5   A.   Yes.

6   Q.   And, in fact, they had numerous fights and --

7             MR. SMITH:  Your Honor, I object to the relevance.

8             THE COURT:  Sustained.  You'll need to come up and

9   explain the relevance to me.  I don't see it.  Thank you.

10                  (A sidebar conference was held out of the

11                   hearing of the jury):

12            MR. SIMONS:  I'm trying to explain -- have him

13   explain to the jury how he got to Stanley Bowling's residence.

14   The reason is because he got kicked out of this Smith place

15   and was homeless.  I was one question away from being there.

16            THE COURT:  How is that relevant to his testimony as

17   to why he got kicked out of someone else's house?

18            MR. SIMONS:  It will be relevant, Your Honor, when I

19   show why he left Stanley Bowling's, which was cocaine use.

20   Stanley kicked him out.  That's what the proof is going to be.

21            THE COURT:  Sustain the objection to the questions

22   about people he lived with previously.  Stanley may have

23   kicked him out for drug use.  I don't think he's denied that.

24   I don't see the relevance of this, where he lived previously.

25   So I've sustained the objection.

*M. BAKER - Cross (Mr. Simons)*                                      103

1          MR. SIMONS:  All right.

2          MR. PINALES:  Your Honor, Martin Pinales on behalf of

3   Mr. Maricle.  While we're here, just to save a little time,

4   I'm just renewing my objection and request for a separate

5   trial.  I think all this drug testimony is very relevant --

6          THE COURT:  I'll let you brief that issue and you can

7   file your brief by Friday morning at 9:00.

8          MR. PINALES:  Thank you, Your Honor.

9               (Sidebar conference concluded.)

10         THE COURT:  All right.  The objection is sustained.

11  The motion at sidebar is overruled.  You may proceed.

12         MR. SIMONS:  Thank you, Your Honor.

13  BY MR. SIMONS:

14  Q.  I think you said you moved into Stanley's garage in about

15  2002?

16  A.  Yes.

17  Q.  And he accommodated you with a place to live?

18  A.  Yes, he did.

19  Q.  Put a little refrigerator in there?

20  A.  Yes.

21  Q.  Did he give you a little stove to cook on?

22  A.  Yeah, we had a stove, full works.

23  Q.  Did he put groceries in there some of the time?

24  A.  Yes.

25  Q.  Did he give you a job?

*M. BAKER - Cross (Mr. Simons)*                                          104

1   A.   Yes.

2   Q.   Okay.  Did his wife, Sarah, cook meals for you from time

3   to time?

4   A.   Yes, she did.

5   Q.   Did she do your laundry for you?

6   A.   Yes, she did.

7   Q.   And did they try to accommodate your every need while you

8   were there?

9   A.   Anything I needed.

10  Q.   Was it a rule of Stanley's for you that you not use drugs

11  and stay off drugs while you were in his garage?

12          MR. SMITH:  Your Honor, I'm going to object to the

13  hearsay.

14          THE COURT:  Sustained.

15  Q.   You were there for four years?

16  A.   Yes.

17  Q.   Did you redevelop your drug habit at the end of that

18  time?

19  A.   Yes, I have.  I did.

20  Q.   You did?

21  A.   Yeah.

22  Q.   And you did that just before Stanley made you depart his

23  premises; is that true?

24  A.   Pretty much, yes.

25  Q.   Okay.  And isn't it true that Stanley and his son,

*M. BAKER - Cross (Mr. Simons)*                                             105

1    Stephen -- you know Stephen?

2    A.   Yes.

3    Q.   Stephen works for his dad's company?

4    A.   Yes.

5    Q.   And at that time -- they're both hard working people; are

6    they not?

7    A.   Yes.

8              MR. SMITH:  Your Honor, I'm going to object.

9              THE COURT:  Sustained.

10   Q.   Did Stanley Bowling, my client, and/or his son Stephen

11   find evidence of cocaine use in the garage where you were

12   living?

13   A.   Yes, they did.

14   Q.   And did they confront you with that, about your use?

15   A.   Yes.

16   Q.   And did they, in fact, try to intervene and get you into

17   a rehab program?

18   A.   Yes.

19             MR. SMITH:  Your Honor, I'm going to object.

20             THE COURT:  Sustained.

21   Q.   Did you enter a rehab program?

22   A.   Not at that time.

23   Q.   In fact, you left the garage and no longer lived or

24   worked for Stanley Bowling or B&B; is that true?

25   A.   Yes.

*M. BAKER - Cross (Mr. Simons)*                                          106

1    Q.  I'm going to move on a little bit further now.  I'm going

2    to talk about -- I'm going to go backwards.  I want to talk to

3    you about a couple of jobs you mentioned in response to Mr.

4    Smith, okay?

5    A.  Yes.

6    Q.  The Laurel Branch job, you said Stanley took some sort of

7    short cut?

8    A.  Yes.

9    Q.  Could you tell me what that was?

10   A.  The original contract was to go around side of a hill,

11   and, you know, up ditch lines and stuff.  And we went through,

12   he got it revised from the people that drawed the plans up and

13   we went through the blacktop.

14   Q.  Hang on just a second.  The people that drew the plans

15   up, that was an engineering firm; was it not?

16   A.  Yes, it was.

17   Q.  And they had to approve and the City had to approve any

18   deviations --

19           MR. SMITH:  Your Honor, I'm going to object.  It's

20   outside of this man's knowledge.  It's all speculation.

21           MR. SIMONS:  Your Honor, he testified to cutting

22   corners.

23           THE COURT:  I'll sustain the objection.

24   Q.  Was there, in fact, not a high pressure gas line right

25   where he was supposed to lay the pipe that he had to avoid?

*M. BAKER - Cross (Mr. Simons)*                                    107

1    A.   Yes, through the ditch line was.

2    Q.   So the place he was supposed to lay the pipe, it couldn't

3    be done because it might blow the place up.  Isn't that fair?

4    A.   Yes.

5    Q.   All right.  So in an effort to get around that, they cut

6    through the road and then refilled the road?  Is that fair?

7    A.   That's some of it, yes.

8    Q.   Okay.  Now, after you left Stanley's, did you take your

9    things with you that night when you left?

10   A.   No, I did not.

11   Q.   All right.  Did Stanley ever contact you again in any

12   way?

13   A.   Yes, he did.

14   Q.   Okay.  Did he bring your stuff to you later?

15   A.   He come and seen me a couple times, seen how I was doing.

16   And then, you know, eventually, he sent a guy down there with

17   them.

18   Q.   Okay.

19   A.   You know.

20   Q.   He continued to try to help you; did he not?

21   A.   Yes, he did.

22   Q.   And you never did work for him anymore after that?

23   A.   No, sir, I haven't.

24   Q.   Okay.  Now, there was some mention about the 2002

25   election, and you seeing Bobby "Red" Sams?

*M. BAKER - Cross (Mr. Simons)*                                        108

1   A.   Yes.

2   Q.   Is he a friend of yours?

3   A.   Actually, kin by marriage.

4   Q.   Okay.  And the jury's seen his picture earlier in this

5   trial, I think.  Was he -- did you say you knew who he was

6   hauling for?

7   A.   No, I did not say.

8   Q.   You know he wasn't hauling for Stanley Bowling --

9         MR. SMITH:  Your Honor, I'm going to object.  He said

10  he didn't know who he was hauling for.

11        MR. SIMONS:  I'll withdraw.

12        THE COURT:  I'm going to sustain the objection.  I'll

13  instruct the jury to disregard the question.

14  Q.   You say you voted in what precinct?

15  A.   I voted in the Harts Branch precinct.  See, in the 2002,

16  I voted in the Whites Branch precinct.  In the 2004, I should

17  have voted in the Manchester precinct.

18  Q.   How were you able to vote with a felony conviction on

19  your record?

20  A.   I still don't, you know, I don't think I was convicted of

21  a felony.

22  Q.   Well, you acknowledged to me that you were convicted of a

23  felony theft.

24        MR. SMITH:  Your Honor, I believe the witness has

25  stated that that was outside the time period of the elections

*M. BAKER - Redirect (Mr. Smith)*                                    109

1    he said he voted in.  I think it's mischaracterizing the

2    evidence.

3              THE COURT:  Sustained.

4              MR. SIMONS:  That's all I have for you, Mr. Baker.

5    Thank you.

6              THE WITNESS:  Thank you.

7              THE COURT:  Any redirect of the witness, Mr. Smith?

8              MR. SMITH:  If I could have just one second.

9              THE COURT:  Yes, sir.

10                        REDIRECT EXAMINATION

11   BY MR. SMITH:

12   Q.  Mr. Baker, you were given some bank mortgage documents

13   there to look at.  Do you remember that?

14   A.  Yes.

15   Q.  And you acknowledge that that had everybody's name on it

16   but Wayne Jones and his wife?

17   A.  Yes.

18   Q.  What was your understanding of the reason Wayne Jones'

19   name's not on there?

20   A.  He said at the time he didn't want his name on no kind of

21   documents and stuff.

22   Q.  Now, how long has it been since you talked to Eugene

23   Lewis, Mr. Baker?

24   A.  He's actually in the cell beside of me, but it's been 10,

25   15 years since I talked to Mr. Lewis.

M. BAKER - Redirect (Mr. Smith)                                    110

1    Q.  So how is it he's in the cell beside of you and you

2    fellas not get to talk?

3    A.  We left this place here with very bad feelings.

4    Q.  You and Mr. Lewis did?

5    A.  Yes.

6    Q.  Y'all have hard feelings?

7    A.  Yes.

8    Q.  And you haven't spoken to him in how long?

9    A.  Probably 10 or 15 years.

10   Q.  Okay.  And how long has it been since you spoke to Denver

11   Sizemore?

12   A.  The same amount.

13   Q.  You all not on speaking terms either?

14   A.  No.

15   Q.  Now, during the time period you were working for Stanley

16   Bowling, did you see him associating with Kennon White on the

17   job?

18   A.  Yes.

19   Q.  How often did you see Kennon White visiting Stanley

20   Bowling on the job?

21   A.  Every other day, sometimes, you know, day after day.

22   Q.  And to your knowledge, did Kennon White have something to

23   do with approving these contracts that Mr. Bowling was getting

24   modified?

25            MR. SIMONS:  Your Honor, may I object?  This is

*M. BAKER - Recross (Mr. Simons)*                                    111

1    outside the scope of cross-examination.

2            THE COURT:  No, I disagree.  I will overrule the

3    objection.

4    A.   Question again, Your Honor -- or sir?

5    Q.   To your knowledge, did Kennon White have something to do

6    with getting these contract modifications approved that you've

7    been questioned about?

8    A.   That is -- I'm not a hundred percent sure on that.

9            MR. SMITH:  That's all I have.

10           THE COURT:  All right.

11           MR. PINALES:  Nothing further, thank you, Judge.

12           THE COURT:  Mr. Simons, I think we're back -- Mr.

13   White, did you have any?

14           MR. WHITE:  None, Your Honor, I'm sorry.

15           THE COURT:  Mr. Simons, we're back around to you.

16                        RECROSS-EXAMINATION

17   BY MR. SIMONS:

18   Q.   Can you see me right here, Mr. Baker?

19   A.   Yes, I can.

20   Q.   Did you talk to Kennon White during the time you were

21   working for Mr. Bowling?

22   A.   Just say hello and stuff.

23   Q.   Well, did he ask you to do a job in town and tell you

24   that he needed money from you if you were to bid for it and

25   get it?

*FARMER - Direct (Mr. Smith)*                                      112

1    A.   Yes, he did.

2    Q.   Okay.  Did he also tell you that he was extorting money

3    from Jackie Jones and Scott Robinson?

4    A.   Jackie Jones and Scott had a disagreement with Kennon

5    over that.

6    Q.   Over him extorting money from them, correct?

7    A.   Yes.

8             MR. SIMONS:  That's all.  Thank you.

9             THE COURT:  Anything else of the witness?

10            MR. SMITH:  No, thank you, Your Honor.

11            THE COURT:  All right.  Thank you, Mr. Baker.  You

12   may step down, sir.  Thank you.

13            Mr. Smith or Mr. Parman, you may call your next

14   witness.

15            MR. SMITH:  Yes, Your Honor.  United States would

16   like to call Jeff Farmer.

17            JEFF FARMER, GOVERNMENT'S WITNESS, SWORN

18            THE COURT:  Thank you.  Mr. Smith, you may proceed.

19            MR. SMITH:  Thank you.

20                          DIRECT EXAMINATION

21   BY MR. SMITH:

22   Q.   State your name, please.

23   A.   Jeffrey William Farmer.

24   Q.   And Mr. Farmer, tell us, how old are you?

25   A.   I'm 37.

*FARMER - Direct (Mr. Smith)* 113

1    Q.  And where are you currently residing?

2    A.  In Clay County.

3    Q.  And where were you born and raised?

4    A.  Clay County.

5    Q.  Are you married?

6    A.  Yes.

7    Q.  Do you have any children?

8    A.  No.

9    Q.  Are you currently employed?

10   A.  Yes.

11   Q.  And how are you employed, Mr. Farmer?

12   A.  Where am I employed?

13   Q.  Yes, sir, how are you employed?

14   A.  I'm employed at TMK, Toyota Manufacturing of Kentucky.

15   Q.  And where is that plant located?

16   A.  Located in Georgetown, Kentucky.

17   Q.  And how long have you been employed with Toyota?

18   A.  March will be six years altogether.  Two was temporary

19   service and four full-time.

20   Q.  Do you have children?

21   A.  No, sir.

22   Q.  Sorry.

23   A.  I have stepchildren, three stepchildren.

24   Q.  Okay.  Well, how old are your stepchildren?

25   A.  Okay.  Noah's 18, Jacob's 14, Hannah's 9.

FARMER - Direct (Mr. Smith)                                        114

1    Q.   They live with you and your wife?

2    A.   No, they live with their father.

3    Q.   As you've indicated, you live in Manchester.  You make

4    that drive to Georgetown every day, or do you live up in the

5    Georgetown area during the week?

6    A.   I make the drive.

7    Q.   How long have you been making that drive, Mr. Farmer?

8    A.   Since I've been employed there.

9    Q.   What position do you actually hold there at Toyota?

10   A.   Production team member.

11   Q.   All right.  And Mr. Farmer, let me ask you this.  When

12   living there in Clay County, do you recall a time when you

13   were involved in the 2002 election?

14   A.   Yes, sir.

15   Q.   And if you could, tell the ladies and gentlemen of the

16   jury how it is that you got involved, to your recollection, in

17   that election in 2002.

18   A.   Well, when I first got involved, I was running a game

19   room up in Garrard.  And William Stivers and Randy Craft

20   approached me first time to get involved.  Me and Randy had

21   some differences at the time so I declined.

22   Q.   You have to help us out a little bit.  I'm a little hard

23   of hearing.  If you could, come up close --

24   A.   Okay.  I was running a game room up at Garrard precinct,

25   where the Garrard precinct is.  Randy Craft and William

FARMER - Direct (Mr. Smith)                                    115

1   Stivers approached me to help in an upcoming election.  Me and

2   Randy at that time had a difference on some property disputes

3   so I declined to help them.  Well, later on, Wayne Jones came

4   to me, wanted me to help him and I finally did.  I finally

5   agreed to.

6   Q.  Now, you said that the first approach was with William

7   Stivers.  Does he go by another name?

8   A.  Al Man.

9   Q.  Okay.  And he was with Randy Craft, and then you said

10  Wayne Jones came back.  How soon after that first visit of

11  Stivers and Craft did Jones come see you?

12  A.  It was probably within a week or so.

13  Q.  And did Stivers explain to you what he wanted you to do

14  in the election?

15  A.  Not at that moment.  I mean, I assumed what needed to be

16  done.

17  Q.  Did you at some point get involved in a vote buying

18  scheme in 2002?

19  A.  Yes, sir.

20  Q.  And when was it that you got involved into that scheme?

21  A.  When was it?

22  Q.  Yeah.  When was it you agreed to actually get involved in

23  the vote buying scheme?

24  A.  Actually before they started taking the absentee ballots.

25  Q.  Okay.  And when you say absentee ballots, are you talking

FARMER - Direct (Mr. Smith)                                    116

1   about that 12 days of early voting prior to the actual

2   election day?

3   A.   Yes, sir.

4   Q.   And if you could, explain to us how you got involved in

5   that early voting.

6   A.   Well, I was the one that paid the voters.

7   Q.   Okay.

8   A.   After they voted.

9   Q.   And when you say you paid them, how did you go about

10  paying voters?

11  A.   Cash.

12  Q.   And where were you situated at that time?

13  A.   I was situated behind the hardware store which Freddy

14  Thompson owned.

15  Q.   Could you tell us, is it located next to another business

16  there?

17  A.   There was a Chevrolet dealership across the road from it,

18  and his father owns a mining supply company back there too.

19  Q.   Okay.  And the name of that dealership was White's

20  Chevrolet?

21  A.   I think it's White's at the time.  I know it changed to

22  Cornett's later on.

23  Q.   It's now another name?

24  A.   Yeah.

25  Q.   And this actual place that you were set up, was there an

*FARMER - Direct (Mr. Smith)*                                              117

1    area there on the Thompson Hardware property that you sat and

2    parked your vehicle?

3    A.   There was a gravel parking lot in the back back there.

4    Right off the road.

5    Q.   And what were you driving?

6    A.   An F150 Ford pickup.

7    Q.   And whose vehicle was that?

8    A.   That would have been William Stivers, Al Man.

9    Q.   And how did you come to have possession of the Stivers

10   F150 that early voting period?

11   A.   Well, pretty much I pretty much stayed with Charles

12   Stivers at the time.

13   Q.   Who is Charles Stivers in relation to William Stivers?

14   A.   That would be William's brother.

15   Q.   Okay.  And when you say you stayed with him, could you

16   explain what you mean?

17   A.   I resided at his residence, lived there.

18   Q.   Okay.  And how long had you been living with Charles

19   Stivers before you got involved in helping in the voter bribe

20   scheme in the early voting?

21   A.   I guess first time I moved in with Charles would been

22   around the time that Jennings White's vehicle got shot up that

23   time.

24   Q.   Okay.

25   A.   It was after that night, I started staying there.

*FARMER - Direct (Mr. Smith)*                                        118

1   Q.   You started staying with Charles after the vehicle got

2   shot up?

3   A.   Yeah, um-hmm.

4   Q.   And was that something that Charles Stivers spoke to you

5   about --

6   A.   Yeah, we was afraid something else might happen.

7   Q.   Okay.  And who else was residing there other than you and

8   Mr. Charles Stivers?

9   A.   Charles was staying there, his two daughters, his wife

10  and William Stivers there, Al Man.

11  Q.   And so Al Man resided there as well during that time?

12  A.   Yes, that time, yes.

13  Q.   So explain to us how you got first made aware of what was

14  going to take place in the early voting in 2002.

15  A.   How was I made aware?

16  Q.   Yes, sir.

17  A.   Me and Al Man and Wayne Jones, we set down and figured

18  things out, how we was going to do it, who we was going to

19  see, who was going to haul votes.  You know, there was

20  preparations made.

21  Q.   Okay.  And these preparations that you talk about, did

22  they occur over a period of hours or days?

23  A.   It took time.  It took, you know, a month or so.  It

24  wasn't overnight.

25  Q.   And when you say there was preparations, why was it

FARMER - Direct (Mr. Smith)                                          119

1    important that you have these lists of names to work with?

2    A.   Well, my father was into politics, and he working out in

3    Clay County, and he had dealt with a few elections hisself.

4    And I grew up around it and knew some people back in there.

5    Q.   Had you been involved in vote buying in past years?

6    A.   I'd seen my father.  Been around it.

7    Q.   Did you father succeed in getting an office in Clay

8    County?

9    A.   No, he never ran for office.

10   Q.   Okay.  He just worked the elections?

11   A.   He just worked, yeah.

12   Q.   Did he ever serve as an election officer?

13   A.   I think he may have in the past.

14   Q.   Okay.  Now, as you say, these preparations were made.

15   Who was present during the time period y'all were doing the

16   planning?

17   A.   We were doing the planning procedures, I guess mostly me

18   and Al Man and Wayne would do all the ground, leg work.  As

19   far as Freddy goes, he was never around much with all the

20   little leg work detail.

21       Now, Doug Adams went with us one time to up Lockards

22   Creek, but it was more or less a confidence builder with some

23   families.  Nothing transpired illegally.  He kind of was the

24   big guy in town, kind of assured everybody they was on the

25   right side.

*FARMER - Direct (Mr. Smith)*                                    120

Q.   Now, explain a little bit, why is it necessary that you have somebody of the significance of the superintendent of schools to go along with you on a trip like that?

          MR. BAYER:  Objection, Your Honor.  Can we approach just for a moment, please?

          THE COURT:  Yes, you may.

                    (A sidebar conference was held out of the
                     hearing of the jury):

          THE COURT:  Basis of the objection?

          MR. BAYER:  Judge, he's asking him to give an opinion on the role that Mr. Adams plays in all these elections, and he's asking him to speculate that why is it important that you had somebody like the superintendent to go with you.  So first off, he's going to ask for him to interpolate whatever anybody that they were talking to might be considering.  That's number one.

          Secondly, he's asking him to give some sort of lay opinion on setting the political landscape for Clay County and the role that Mr. Doug Adams would play in it, which is way beyond the scope of what he's capable of doing.  He can testify to the fact that Mr. Adams went with him.  He can testify to the fact that specifically what was said by Mr. Adams; but beyond that, he really shouldn't be giving any opinion as to why he was there.

          I mean, this is the same objection that the United

*FARMER - Direct (Mr. Smith)*                                         121

1    States has been making against us as we ask a witness why was

2    this going on.

3                THE COURT:  All right.  Finished?

4                MR. BAYER:  Yes, sir.

5                THE COURT:  Objection to the form of the question is

6    sustained.  Mr. Smith, you may rephrase the question.  You may

7    ask him if there was a reason that he had Mr. Adams accompany

8    him.

9                MR. SMITH:  Okay.

10               MR. BAYER:  Thank you, Judge.

11                    (Sidebar conference concluded.)

12               THE COURT:  Objection to the form of the question

13   will be sustained.  Mr. Smith, you may rephrase your question.

14   BY MR. SMITH:

15   Q.  Mr. Farmer, you said that you'd taken Mr. Doug Adams to

16   Lockards Creek?

17   A.  Yes, sir.

18   Q.  What was the reason that you took Mr. Doug Adams with you

19   to Lockards Creek?

20   A.  Took him over to meet a family member of this family that

21   pretty much has a large family that's quite an impact on that

22   holler right there, especially.

23   Q.  What were you anticipating the family to be involved --

24   how were they to be involved in that scheme of 2002 to buy

25   votes?

*FARMER - Direct (Mr. Smith)*                                          122

1    A.   Well, there was two routes about it, you know.  One side

2    of it, they had a lot of legitimate votes in the family, and

3    then also some to be bought.

4    Q.   And you indicated that the time you all were making these

5    preparations, this is before the early voting occurred, the

6    absentee voting?

7    A.   Give me the question again?

8    Q.   You were -- I'm trying to keep track with where we are in

9    the testimony.  As I understand it, you were in preparations

10   before the absentee early voting?

11   A.   Yeah.

12   Q.   Could you put us in to context as when you took the trip

13   with Doug Adams to Lockards Creek?

14   A.   Okay.  That would have been the before the absentee.

15   Q.   So this was during the preparations period that you say

16   y'all were making preparations for your list?

17   A.   Yeah.

18   Q.   And did this family in Lockards Creek make the list?

19   A.   No, they never really, no, no, never really made a list.

20   But the family was -- we worked with them before, my father

21   had.

22   Q.   Did you buy their votes in 2002?

23   A.   Bought some of them, yes.

24   Q.   Okay.  You said it was a large family.  How large was the

25   family?

*FARMER - Direct (Mr. Smith)*                                          123

1   A.   I'd say the family has probably 200 people.

2   Q.   And during the time period that you made this trip, how

3   long did you all stay up in Lockards Creek working this

4   particular family?

5   A.   Well, me and Al Man, we was up there frequently, all the

6   time, just double checking, make sure because we had -- you

7   know, the other side that was also doing the same thing we

8   were doing, going behind us.

9   Q.   Okay.  And who was on the other side?

10  A.   You had Jennings White running, and you had Kennon White

11  running, and you had Barbara Jo Colter running.  And Charles

12  Marcum had an opponent that was -- he was a Smith, can't think

13  of his first name.

14  Q.   Did you all formulate other candidates as well as Freddy

15  Thompson that you were helping in the election?

16  A.   Well, we had a ticket together.

17  Q.   Okay.  And explain to us what a ticket is.

18  A.   That's when people come together on one ticket and pretty

19  much pool their money.

20  Q.   Okay.  And who was on the ticket?

21  A.   Freddy was on the ticket.  Charles Marcum was on the

22  ticket.  Tim Couch was on the ticket.  And we carried Danny

23  Reed on there too.

24  Q.   Did y'all have a judge candidate on the ticket?

25  A.   No, not that I remember.

*FARMER - Direct (Mr. Smith)*                                    124

1    Q.   Okay.  So as you and Stivers and Jones were planning this

2    out, was that settled at some point who was going to be on the

3    ticket with you all?

4    A.   I'm just, I'm down the totem pole so I was told who was

5    on the ticket.  You know, I wasn't in discussions on where it

6    was worked out.

7    Q.   Who directed you, specifically, that these are going to

8    be the people we're going to buy votes for?

9    A.   Well, I worked under Al Man and Wayne so they'd be the

10   two that directed me what to do.

11   Q.   Now, during the time period that you all were doing

12   preparations, did you involve -- were you personally involved

13   in setting up what's called vote haulers?

14   A.   I referred a few people and introduced a few people that

15   have done it in the past.  Yes.

16   Q.   Okay.  And when you say refer, who did you refer to these

17   vote haulers?

18   A.   There was one fella by the name of Henry Hall that they'd

19   used before.  My dad had.

20   Q.   And who did you suggest Henry to?

21   A.   Al Man.

22   Q.   Do you know who was serving as the election officer for

23   your faction during that early voting?

24   A.   I think Al Man was inside the voting poll.

25   Q.   And to your understanding of the scheme --

*FARMER - Direct (Mr. Smith)*                                      125

1          THE COURT:  Let's take a break.  Let's take a break

2    just for a moment.  Let me make sure -- do we need to take a

3    break?  You okay?  Mr. Smith, I apologize.

4    Q.   Who was going to serve for your faction as the election

5    officer at the early voting poll?

6    A.   It would have been Al Man.

7    Q.   And do you know what his role was going to be as election

8    officer on the -- those days of early voting?

9    A.   He made sure that our people voted for who we wanted.

10   Q.   And were you participating -- you said from Thompson

11   Hardware parking lot?

12   A.   Yes.

13   Q.   And where would you send the voters once you had talked

14   with them there?

15   A.   Well, when they came to me, they'd already voted.

16   Q.   Okay.  And how did you know they'd already voted?

17   A.   Well, there wasn't any kind of system other than Wayne

18   would come up there every now and then with a list or tell me

19   a bunch were coming.  That's about the only notification I

20   would have.

21   Q.   Okay.  And that was set up at the Thompson's Hardware?

22   A.   Yes.

23   Q.   How much money did you handle during those early voting

24   days?

25   A.   I'd imagine three, four thousand, somewhere in that

*FARMER - Direct (Mr. Smith)*                                      126

1    ballpark.

2    Q.   And what were you all paying these voters and bribing

3    them to vote for these slate of candidates?

4    A.   Well, it was various different times, because our

5    opponents were also doing the same thing we were doing.  So it

6    would range anywhere from 30 to 40 to 50 dollars sometimes.

7    Q.   Now, did you have opportunity to observe an individual by

8    the name of Bobby "Red" Sams during that early voting period?

9    A.   Yes, Bobby had brought a few to me, few voters to me too.

10   Q.   When you say he brought voters to you, are these people

11   who had been bribed to vote?

12   A.   They'd been paid to vote, yes.

13   Q.   And when he brought them to you, where were you located?

14   A.   We'd been located at the location I just mentioned, at

15   the graveled area behind the hardware store.

16   Q.   Okay.  Now, were you also involved in the scheme on

17   election day?

18   A.   Yes, I was.

19   Q.   And were there any meetings that you participated in

20   prior to election day?

21   A.   Other than our own little meetings we would have, nothing

22   higher up or anything.

23   Q.   And who were at the meeting the night before the

24   election?

25   A.   Night before the election, it would be me and Al Man,

FARMER - Direct (Mr. Smith)                                      127

1    Wayne, Charles Stivers was with us at the time.  And that

2    would be about it.

3    Q.   Did you see Freddy Thompson before the election?

4    A.   Freddy would stop by off and on, but Freddy was friends

5    with Charles Stivers too so I -- you know, they would stop in

6    and out.

7    Q.   And when Freddy Thompson stopped by, were you all still

8    discussing your plan for the next day on election day?

9    A.   We would discuss things all the time, but as far as

10   talking about the money stuff, never did talk about that.

11   Q.   What about in front of Wayne Jones and William "Al Man"

12   Stivers?

13   A.   Wayne and William, we would, yeah.

14   Q.   What about Charles Stivers, did you talk with him about

15   the money?

16   A.   Yes.

17   Q.   You just wouldn't talk about it to Freddy?

18   A.   Well, Freddy never would touch on the subject.

19   Q.   Did he touch on the subject the day you were situated out

20   in his parking lot at the Thompson Hardware?

21   A.   Actually, I never saw him that day.

22   Q.   You worked there many days at his hardware store?

23   A.   Yeah, there was a few days I worked there.

24   Q.   Did he ever show up at his hardware store while you were

25   sitting there in the F150?

*FARMER - Direct (Mr. Smith)*                                      128

1    A.   Well, the position I was in, I couldn't see the front of

2    the hardware store.  It was back behind there.

3    Q.   You couldn't see Freddy's store from where you were

4    parked?

5    A.   I could see part of side of the building, but as far as

6    the entrance --

7    Q.   You never saw Freddy Thompson enter his store for the 12

8    days of early voting?

9    A.   No, not that I recall.

10   Q.   He just wasn't seen?

11   A.   I never saw him.

12   Q.   But you do recall paying those voters at that location --

13   A.   Yes, I do.

14   Q.   -- during those 12 days of early voting?

15   A.   Yes.

16   Q.   Now, on election day, did you all have a system for

17   determining how the voters were, once they'd voted, did you

18   have some signal that was operating on election day?

19   A.   Yes.  I had a deck of cards.  They were, I think,

20   Caesar's Palace cards.  They had like one of that

21   manufacturers that had a hole, and it was hard to duplicate.

22   So we used them.

23   Q.   Caesar Palace cards?

24   A.   Like to vote --

25   Q.   Talking about a deck of playing cards?

*FARMER - Direct (Mr. Smith)*                                           129

1    A.   Yeah, deck of playing cards, yes.

2    Q.   And where did you come up with the deck of playing cards?

3    A.   Charles Stivers give 'em to me.

4    Q.   And what did he say he wanted you to do with them?

5    A.   I would take them with me when I went into the voting

6    precinct in Horse Creek is where I stationed as a challenger.

7    And people needed assistance, I would assist them.  They would

8    come there, ask for me.  I would help people vote and make

9    sure they voted our way and hand them the card.  They would

10   take the card out with them to go get paid.

11   Q.   Now, did you have to get approved by the Board of

12   Elections to serve as a challenger there?

13   A.   Yes, I had set through a training and stuff.

14   Q.   And when you say that you worked on the inside of the

15   polls, did you actually assist voters to vote them at the

16   precinct?

17   A.   Yes, sir.

18   Q.   Was that part of the plan?

19   A.   Yes, sir.

20   Q.   And did you all discuss that with Wayne Jones and Al Man

21   Stivers before you went to do that?

22   A.   Yes.

23   Q.   What was your success there that day?

24   A.   Well, the success rate at Horse Creek, it was a lost

25   precinct anyways.

*FARMER - Direct (Mr. Smith)* 130

1    Q.   And why was that, Mr. Farmer?

2    A.   Well, our opposition had it covered on the inside with

3    all the election officers.  Mostly, it was family members and

4    close friends.

5    Q.   And you're talking about Jennings White?

6    A.   Jennings White.

7    Q.   Is that his home precinct, Horse Creek?

8    A.   Yes, sir.

9    Q.   Did you know that going into that day?

10   A.   Yes, I knew that.

11   Q.   Did you and Al Man and Wayne Jones talk about that fact

12   before you went up there?

13   A.   Yes.

14   Q.   So you got put in as a challenger, not as an election

15   officer?

16   A.   Yes, sir.

17   Q.   But that had to be approved by the Board of Elections?

18   A.   Yes, sir.

19   Q.   Was Wayne Jones on the Board of Elections?

20   A.   I think so.

21   Q.   Were you responsible for filling out assistance forms

22   when you voted those voters in 2002?

23   A.   Yes, that was part of the procedure.

24   Q.   Were you required to fill them out that day?

25   A.   Well, I was pushed to fill them out and sign there, but

*FARMER - Direct (Mr. Smith)*                                           131

1    nobody else was.  You know, it was one of them type of deals.

2    Q.   So how long did you stay there serving in that capacity,

3    Mr. Farmer?

4    A.   I probably stayed there till around 11:00 or 12:00

5    before -- actually, about 10:00, everything started getting

6    out of hand.

7    Q.   And tell us what you mean by that.

8    A.   Well, the people inside that was representing the other

9    party or the opposing party was -- one of the guys threatened

10   me, threatened to hit me.  And then after that, we had

11   Jennings White showed up raising all kinds of stink.  And then

12   after that, the sheriff, Edd Jordan showed up.  Told me to sit

13   my butt down, threatened to take me to jail.

14       And then shortly after that, his deputies finally showed

15   up to try to arrest me, try to run me off and arrest me.  I

16   had a paper on me showing I had the right to be there.  There

17   was state troopers outside.  I went and talked to them, KSP

18   officers, and they told me I could stay.

19       And then Charles Stivers finally came over and he said,

20   "Jeff, might as well go ahead and go.  They're going to take

21   you to jail if you stay here."

22   Q.   Did you leave after that?

23   A.   Yes, I left the voting precinct after that.

24            MR. SMITH:  Hand the witness what's marked as D76.

25   Q.   Were you also the subject of the Lexington Herald Leader

FARMER - Direct (Mr. Smith)                                    132

1   during that election?

2   A.   Yes, sir.

3   Q.   Like to hand to you now what's marked as D76.  Do you

4   recognize that?

5   A.   Yes.

6   Q.   And what is that?

7   A.   This is the newspaper article that came out the next day

8   after the election.

9   Q.   And did that touch on the fact that you got thrown out of

10  the polling place on election day?

11  A.   Yes, it has a little bit about it.

12        MR. SMITH:  I'd move for the introduction of

13  Government's Exhibit D76.

14        MR. ABELL:  Judge, I object to this exhibit.  If we

15  could approach.

16        THE COURT:  You'll need to approach.  And if you have

17  an extra copy, I don't think I have that in the notebook.

18               (A sidebar conference was held out of the

19               hearing of the jury):

20        THE COURT:  All right.  Mr. Smith, the purpose of

21  offering this exhibit?

22        MR. SMITH:  Well, I have a person here who has

23  testified that there was an incident in which he was placed by

24  the organization, put in the polling place and removed.  I

25  have an article that came out in the paper following that in

*FARMER - Direct (Mr. Smith)* 133

1   the Lexington Herald Leader.

2          THE COURT:  All right.  He hasn't been cross-examined

3   yet.  This hasn't been challenged yet.  This is by a newspaper

4   reporter so it's a hearsay statement.  A hearsay statement

5   offered as a consistent statement or statement that would

6   support his version of the events, where he said an incident

7   occurred.  There's an objection based on hearsay, I'm

8   assuming.

9          MR. ABELL:  Not just with -- Your Honor, Robert Abell

10  on behalf of Defendant Stivers.  My objection is also based in

11  part on the fact that this newspaper article includes

12  quotations from two other persons.  One is an attorney general

13  investigator, John Hall, who says, "yes, sir, I think it's

14  unusual."  Near the end of this story, there's a quotation

15  that apparently comes from a sheriff candidate Blaine Smith,

16  who said he knew for a fact that votes were being bought.  "I

17  could prove it if I wanted to get killed."  There's also

18  quotes from Edd Jordan in here as well.  We've got four people

19  whose statements are being reported in this article.

20          THE COURT:  All right.

21          MR. SMITH:  I'll withdraw it.  I'm certainly ready to

22  move on with this witness.

23          THE COURT:  All right.

24               (Sidebar conference concluded.)

25          THE COURT:  Thank you, counsel.  You may continue.

*FARMER - Direct (Mr. Smith)*                                      134

1    Q.   Do you recall how soon after the election day this

2    article came out, Mr. Farmer?

3    A.   Excuse me.  Again?

4    Q.   Do you recall how soon after election day this article

5    came out?

6    A.   I think it was the next day.

7    Q.   Okay.  During that 2002 election, did you have occasion

8    to go alongside a fella by the name of Ricky Whitehead and Al

9    Man Stivers and others to visit a fella by the name of Ronald

10   Jackson?

11   A.   Yes.

12   Q.   And tell us the circumstances of that.  Who was along on

13   that trip, if you recall?

14   A.   It was me, Al Man Stivers, Doug Adams went with us, and I

15   think Ricky Whitehead went with us.

16   Q.   Now, Ricky Whitehead, did he have a position in the

17   county at that time?

18   A.   I think he was -- he did something for Clay Massey Bishop

19   at the time.

20   Q.   That's the county attorney?

21   A.   Yes.

22   Q.   And he was employed by the county attorney's office at

23   that time?

24   A.   I think he was, yes.

25   Q.   And what was -- did this trip occur before the election

*FARMER - Direct (Mr. Smith)* 135

1  day?

2  A.  Yes.

3  Q.  And what happened on the trip?

4  A.  We just rode to the Jackson's house, and he came out and

5  spoke to him and, you know, he was told that if he would

6  cooperate, help us with the election that, you know, something

7  would be done about his charges coming up.

8  Q.  Charges, what kind of charges did he have pending?

9  A.  I think they were marijuana charges.

10  Q.  And what kind of help was asked of him in the election,

11  to your knowledge?

12  A.  I'm not really sure what his position was and what he

13  did, but it had something to do with at the polls, I think.

14  Q.  Okay.  Now, after the election, did you get another job?

15  A.  After the election?

16  Q.  Yes, sir.

17  A.  I had -- I received a job from the school board,

18  custodian.

19  Q.  And who hired you for that job?

20  A.  Well, Doug Adams is the one that got me the job.

21  Q.  And did you have to fill out an application and go

22  through the hiring process that way?

23  A.  I filled an application out, went through that.

24  Q.  How many days before you had the interview did you fill

25  out the application?

FARMER - Direct (Mr. Smith)                                    136

1    A.   Actually never was really no interview.

2    Q.   You didn't have an interview?  Was there a job advertised

3    that you were applying for?

4    A.   I was just told to go put my application in and I'd get a

5    job.

6    Q.   Did you have any drug testing or anything like that that

7    they required of you at that time?

8    A.   I don't recall me having a drug test when I was hired.

9    Q.   Did you have a drug problem at some point in time, Mr.

10   Farmer?

11   A.   Yes, I have in the past.

12   Q.   And what kind of drug problem did you have?

13   A.   It was a pain pill.

14   Q.   And how long were you suffering from an addiction to pain

15   pills?

16   A.   Probably four, five years.

17   Q.   Could you give us a time frame?

18   A.   Probably started up around '95 or '96, lasted all the way

19   through 2002, 2003, somewhere around there.

20   Q.   And how long have you been clean?

21   A.   I've been clean since 2003, completely clean.

22   Q.   After the election in 2002, did you stay there in Clay

23   County, continuing to live there, work there at the school

24   board position?

25   A.   Yes.

*FARMER - Direct (Mr. Smith)*                                    137

1    Q.   And did you get involved in the 2004 election?

2    A.   No, sir.

3    Q.   And did you get involved in the 2006 election?

4    A.   No, sir.

5    Q.   Were you ever approached in 2006 and asked if you would

6    help?

7    A.   Phillip Mobley and Aaron had stopped by my house one

8    evening and asked me if I would help them.  I just told him

9    before it got any further, told them I wouldn't do nothing.  I

10   was done with it.

11   Q.   Did they indicate to you --

12            MR. PINALES:  Your Honor, can you instruct the

13   witness to keep his voice up?  At the end, it seems to taper

14   off.  I'm having trouble hearing him.

15            THE COURT:  If you could, please.  Did you say

16   Phillip Mobley and someone else?

17   A.   Phillip Mobley and Aaron Mobley.

18   Q.   Are they related, sir?

19   A.   Yes, they're brothers.

20   Q.   Did they say who sent them to you?

21   A.   They said Al Man sent them to me to see if I could help

22   them.

23   Q.   Now, if you could, Mr. Farmer, do you see William "Al

24   Man" Stivers here in the courtroom this afternoon?

25   A.   Yes.

*FARMER - Direct (Mr. Smith)*                                                138

1   Q.   Could you point out for the record what he's wearing and

2   where he's seated, please?

3   A.   Blue shirt, standing up back there.

4            THE COURT:   The record will reflect that the witness

5   has identified the defendant, William Stivers.

6   Q.   Now, you indicated that you also were meeting with Wayne

7   Jones?

8   A.   Yes.

9   Q.   Do you know him to be here in the courtroom here as well

10  this afternoon?  Could you identify what he's wearing and

11  where he's seated for the record if you see him?

12  A.   He's back there next to Al Man.

13  Q.   Okay.  What's he wearing?

14  A.   I can't tell you.

15  Q.   Okay.  What side of Mr. Stivers is he seated?

16  A.   He'd be the left side, my right looking.

17           THE COURT:   All right.  The record will reflect the

18  witness has identified the defendant, Charles Wayne Jones.

19  Q.   You also indicated that you met at various times with

20  Doug Adams during the '02 election.  Do you see him here this

21  afternoon?

22  A.   Yes.

23  Q.   Could you point out where he's seated and what he's

24  wearing?

25  A.   He's wearing a blue coat -- I don't know what color it

FARMER - Direct (Mr. Smith)                                    139

1    is.

2           THE COURT:  Is that the gentleman that just stood up?

3           THE WITNESS:  Gentleman that just stood up, yes.

4           THE COURT:  The record will reflect the defendant has

5    identified the defendant, Doug Adams.

6    Q.  You testified at times you saw Bobby "Red" Sams operating

7    in the scheme and bringing voters in?

8    A.  Yes.

9    Q.  Did you have an opportunity to see what he was driving

10   that day?

11   A.  I seen him driving a red Xterra Nissan.

12   Q.  Do you know whose vehicle he was operating?

13   A.  Yes.

14   Q.  Whose vehicle was it?

15   A.  It was Freddy Thompson's son's vehicle.

16   Q.  Now, after you got expelled from the Horse Creek polling

17   place, did you have anything else to do with delivering money

18   or buying votes on that election day?

19   A.  Yes.

20   Q.  Could you tell us what that was?

21   A.  I was told to go with Yancey White to the Big Creek

22   precinct to drop some money off.

23   Q.  And Yancey White, was he involved in the election

24   himself?

25   A.  Well, I guess at that moment he was.

*FARMER - Direct (Mr. Smith)*                                        140

1    Q.   And what was his interest in the election?

2    A.   I guess his father-in-law would have been his interest.

3    Q.   Where did he pick you up at?

4    A.   He was at Stivers parking lot.

5    Q.   And where was the parking lot at?

6    A.   It was right outside of the Horse Creek Elementary

7    School.

8    Q.   And is there a business that Stivers owned at that time?

9    A.   Yes, it was a gas station and food mart.

10   Q.   And so it was at the parking lot of the food mart?

11   A.   Yes.

12   Q.   And you say you all traveled to Big Creek?

13   A.   Yes.

14   Q.   Is that another polling precinct in Clay County?

15   A.   Yes.

16   Q.   And what did you all do when you got at Big Creek?

17   A.   Well, we drove these gentlemen, I think they're Bowlings,

18   Bowling brothers.  Can't remember their first names.

19   Q.   Bowling brothers?

20   A.   Yeah.

21   Q.   And what happened with the Bowling brothers?

22   A.   Yancey left the vehicle, went and talked to them.  I

23   assumed he give them some money, some of that money.

24   Q.   How much money did you all leave with?

25   A.   I was told it was around 4,000.

FARMER - Direct (Mr. Smith)                                            141

1    Q.   And what was it contained in when you were told that's

2    what it was?

3    A.   An envelope.

4    Q.   And was the envelope delivered to them?

5    A.   Well, he got out of the vehicle.  I mean, personally,

6    myself visually seeing him handing the money, I don't know.

7    Q.   Sure.

8    A.   But I knew what transpired.  I was in the vehicle, I

9    guess, you know.

10   Q.   Okay.  And was this at a polling place that he delivered

11   that money?

12   A.   Yes.

13   Q.   Do you know a fella by the name of Jackie Bowling out

14   there in that Big Creek area?

15   A.   Jackie Bowling.  I know Jackie Bowling in Lockards Creek.

16   Q.   Did you have an opportunity to visit him when you were

17   doing your preparational meetings and visiting people in

18   Lockards Creek?

19   A.   Yes.

20   Q.   When did you last see Jackie Bowling before the election,

21   if you know?

22   A.   Probably a day or two before the election.

23   Q.   Do you know what time of day or night it was?

24   A.   I probably been there various times.  Probably night and

25   day.

*FARMER - Direct (Mr. Smith)*                                        142

1   Q.   You were at his place various times, night and day?

2   A.   Yeah.

3   Q.   Did you all operate under different hours of the day

4   leading up to the 2002 election?

5   A.   Yes.

6   Q.   What kind of hours did you all work?

7   A.   Just, you know, just going when we was needed, you know,

8   needed to go check on things.  Wasn't a time schedule like an

9   eight-hour day.  Subject to change any time, you know, we

10  needed to do something.

11  Q.   Did you all operate after midnight sometimes?

12  A.   We have.

13  Q.   Did you in 2002?

14  A.   Yes.

15  Q.   And when you say operate, was that visiting people,

16  lining them up so that you could have them ready to go on

17  election day?

18  A.   Visiting them and making sure that they hadn't turned

19  against us, you know, and took more money and went the other

20  way or got influenced some way.

21  Q.   Okay.  And you say you went to Jackie Bowling's.  Who

22  went with you to Jackie Bowling's?

23  A.   Most of the time, me and Al Man was together.

24  Q.   And did you ever have to help deliver or see that vans

25  were available if needed?

*FARMER - Direct (Mr. Smith)*                                              143

1    A.   There was one van involved.

2    Q.   And tell us what you recall about that van.

3    A.   It was a blue, a little minivan, a little blue minivan.

4    Q.   And who was involved in receiving the van?

5    A.   Al Man came up with it.

6    Q.   And where did he take the van?

7    A.   I think Jackie Bowling used it.

8    Q.   And did you understand what Jackie Bowling's role would

9    be in the vote buying scheme on election day?

10   A.   Yes.

11   Q.   And what was that?

12   A.   He would haul voters.

13   Q.   And did you all negotiate a price with him as to how much

14   he would get paid?

15   A.   Well, the price was ten dollars a head.

16   Q.   Okay.  And how did you keep up with the voters that were

17   being hauled by the vote haulers?

18   A.   How did we keep up with them?

19   Q.   Yeah.

20   A.   Actually, I wasn't there at the time that all that was

21   transpiring so I really don't know how they tallied everything

22   up and took care of that part.  I just know I helped set it up

23   and who to go to.

24   Q.   You weren't there when they actually paid him for the

25   vote hauling?

*FARMER - Direct (Mr. Smith)*                                          144

1    A.   Not that day I wasn't.

2    Q.   Okay.  And to your knowledge, did Freddy Thompson and the

3    slate of candidates have any victory parties after the

4    election?

5    A.   There was one at Charles Stivers' house.

6    Q.   Okay.  And do you recall anyone present there that you

7    see here in the courtroom today?

8    A.   Well, yeah, Freddy was there, Doug was there.

9    Q.   Doug who?

10   A.   Adams.

11   Q.   Okay.

12   A.   And Al Man.

13   Q.   Anyone else you see here?

14   A.   I think Wayne stopped by for a while.

15   Q.   Did you get any personal thanks while you were

16   celebrating the victory that night?

17   A.   Freddy came up and thanked me for helping him.

18   Q.   Anybody else you remember thanking you personally?

19   A.   No.

20   Q.   Mr. Farmer, you indicated earlier that you were aware of

21   a shooting incident when Jennings White's van got shot up.

22   A.   Yeah, I remember that happening.

23   Q.   Were there any other shooting incidents that occurred

24   that you were aware of close in time to that?

25   A.   There was a little accident at Freddy's house that -- I

*FARMER - Direct (Mr. Smith)*                                    145

1    think it was that same night.

2    Q.   Same night that Jennings reported a shooting incident?

3    A.   Um-hmm, yeah.

4    Q.   And where was that?

5    A.   Where was it at?

6    Q.   Yes.

7    A.   It was at Freddy's house.

8    Q.   And were you present at Freddy's house?

9    A.   Yes, I was there.

10   Q.   Were you present when the shot occurred?

11   A.   Yes, I was in the room.

12   Q.   And where did the shot come from?

13   A.   My personal opinion, came from the ceiling.

14   Q.   Okay.  There was a shot came down through the ceiling?

15   A.   Yes.

16   Q.   And it came from outside the house into the house?

17   A.   I think it was an accidental discharge.

18   Q.   Okay.  What did you see, Mr. Farmer, or hear?

19   A.   When it happened?

20   Q.   In the house, did you hear a gun fire?

21   A.   We heard the gun fire, and I saw like a powder in there.

22   Q.   You saw a powder?

23   A.   Yeah.

24   Q.   Did you see a gun?

25   A.   No.

*FARMER - Cross (Mr. Bayer)*                                      146

1    Q.   Nobody in the house had a gun, to what you saw?

2    A.   Yeah, we had -- there were guns in the house.

3    Q.   How many guns were in the house at that time?

4    A.   I really don't know.

5    Q.   What were you doing at Thompson's house that night?

6    A.   That was the night that I actually first moved in with

7    Charles.  That's the night that Jennings White's van got shot

8    up, and we was afraid something was going to happen to one of

9    us.

10   Q.   So who sent you to Freddy Thompson's house?

11   A.   Charles.

12   Q.   Did you have a gun?

13   A.   Yes, I think I did, yeah.

14           MR. SMITH:  I'll pass the witness.

15           THE COURT:  Thank you.

16           MR. HOSKINS:  No questions.

17           THE COURT:  Mr. Bayer.

18                        CROSS-EXAMINATION

19   BY MR. BAYER:

20   Q.   Mr. Farmer, my name is Bennett Bayer.  I'm one of Mr.

21   Adams' attorneys.

22   A.   Okay.

23   Q.   If I understand you correctly, you were talking about, I

24   think your only real involvement with Doug Adams in the 2002

25   primary was where you took him up to, what, Lockhart's --

*FARMER - Cross (Mr. Bayer)*                                          147

1    A.   Lockards Creek.

2    Q.   Locks?

3    A.   Lockards Creek.

4    Q.   And my understanding is that you went up there to see a

5    particularly large family?

6    A.   Yes.

7    Q.   What was the name of that family, sir?

8    A.   They were the Collinses.

9    Q.   Went up there to see the Collinses.  And on direct

10   examination, I think you used the term that Doug was there to

11   be a confidence builder?

12   A.   Yes.

13   Q.   Principally there to talk about why these people should

14   vote against Jennings White?

15          MR. SMITH:  Your Honor, I'm going to object to the

16   mischaracterization.

17          MR. BAYER:  I'm asking him a question, Judge.

18          THE COURT:  All right.  I will overrule the

19   objection; but Mr. Smith, you may follow up on matters that

20   were discussed at the Bench on your redirect.

21          MR. SMITH:  Yes, Your Honor.

22   Q.   Was this reference to confidence building.  In other

23   words, why these people should vote against Jennings White?

24   A.   No, it was pretty much to let those people know that Doug

25   Adams was on our side.

*FARMER - Cross (Mr. Bayer)*                                          148

1  Q.  Okay.  But you said he didn't do anything illegal?

2  A.  No.  No money transpired, nothing like that, no.

3  Q.  And then if I understand you correctly, sometime after

4  the election, you got a job in the school system?

5  A.  Yes, sir.

6  Q.  About what month was that?

7  A.  Around August.

8  Q.  Okay.  And we're talking so from the May primary and

9  perhaps for that fall school year?

10 A.  Yes.

11 Q.  You were going to start as, I believe, a custodian?

12 A.  Custodian, yes.

13 Q.  And you made an application for the job?

14 A.  Yes.

15 Q.  And you went to work as a custodian?

16 A.  Yes.

17 Q.  And Mr. Smith asked you a question, and you responded

18 about the fact that you had not -- you didn't take a drug test

19 for that job?

20 A.  No, I didn't.

21 Q.  Do you know whether or not a drug test to be a custodian

22 was required?

23 A.  Not that I know of.

24 Q.  In fact, I think if I understand you correctly, it was

25 late 2002 when you started to really kick your drug habit,

*FARMER - Cross (Mr. Bayer)*                                          149

1    wasn't it?

2    A.   I was still dabbling in 2002.

3    Q.   So --

4    A.   I was still dabbling in 2002.

5    Q.   If I understand you correctly on direct examination, it

6    was late 2002 when you really started to --

7              MR. SMITH:  Your Honor, I'm going to object.  Counsel

8    is arguing with the witness.

9              MR. BAYER:  I'm not arguing with him, Judge.

10             THE COURT:  I'll sustain the objection to the form of

11   the question.  You may reask it one other time.

12             MR. BAYER:  Thank you, Judge.

13   Q.   About when did you start kicking your drug habit?

14   A.   I started kicking about the time I hooked up with Al Man

15   and them.  Tried to quit then.

16   Q.   Which would have been before fall of 2002?

17   A.   Actually would have been before the election.

18   Q.   So at the time you were acting as custodian, did you ever

19   have a problem there as a custodian?

20   A.   No.

21   Q.   You were able to do your job well, weren't you?

22   A.   I could do my job, yes.

23   Q.   You left your job working for the school system, correct?

24   A.   Yes, sir.

25   Q.   And you got a job with Toyota, right?

*FARMER - Cross (Mr. White)*                                    150

1    A.   Yeah, a little bit down the road, yes.

2    Q.   Much better job, much better paying job?

3    A.   Yes, sir.

4    Q.   The entire time that you were working as a custodian or

5    working within the school system, did Doug Adams ever talk

6    politics with you?

7    A.   No.

8    Q.   Did you ever feel like your job was threatened because of

9    politics?

10   A.   No.

11            MR. BAYER:  If I could have just a moment, Judge.

12            THE COURT:  Yes.

13            MR. BAYER:  Thank you, Mr. Farmer.

14            THE COURT:  Mr. White.

15            MR. WHITE:  Your Honor, I don't have many.  Would it

16   be okay if I just asked from here?

17            THE COURT:  That will be fine.

18                          CROSS-EXAMINATION

19   BY MR. WHITE:

20   Q.   Okay.  Good afternoon, Mr. Farmer.  My name is Scott

21   White.  I represent Wayne Jones.  He's sitting right here.  I

22   want to ask you a few questions.  In the 2002 election, this

23   was the primary election I wanted to ask you about, you were a

24   challenger in the -- at a precinct, correct?

25   A.   Yes.

FARMER - Cross (Mr. White)                                         151

1    Q.   Did you testify that was the Horse Creek precinct?
2    A.   Yes.
3    Q.   Was it your understanding of the duties of the challenger
4    that that person was able to, quote, challenge particular
5    voters' credentials as to whether they were allowed to vote?
6    A.   Yes.
7    Q.   Did you testify that other than the time that you were a
8    challenger, did you serve as an election officer, an actually
9    appointed election officer in any other elections?
10   A.   No, never have.
11   Q.   Do you have an understanding -- strike that.  When you
12   received the training before the 2002 election, did you
13   testify that was at the county clerk's office?
14   A.   No.  That took place in the courthouse, I think.
15   Q.   Was that the temporary county clerk's office at that time
16   while they were building that new building?
17   A.   The temporary county clerk's office was across from the
18   First National Bank on the corner there so it wasn't in the
19   courthouse.
20   Q.   Who gave the training at the courthouse?
21   A.   I actually can't remember, to be honest.
22   Q.   Were those election, Clay County election officials, and
23   they were training everybody that was going to be serving?
24   A.   Yeah, there was a group being trained, yes.
25   Q.   As part of that training, did you learn and come to an

FARMER - Cross (Mr. White)                                     152

1    understanding as to who was allowed to provide assistance to

2    voters?

3    A.   I believe so.

4    Q.   Would you agree that that was either the Democrat or the

5    Republican judge assigned to that precinct?

6    A.   I don't know about that.

7    Q.   Did you believe you could provide assistance?

8    A.   Yes.

9    Q.   The day that you were working as a challenger in the 2002

10   primary, did you testify that at some point, there was an

11   event where either Mr. Jordan or someone was challenging you

12   as to whether you could even be there?

13   A.   Yes.

14   Q.   Who was that?

15   A.   Actually, Edd Jordan and Jennings White.

16   Q.   Mr. Jordan was the sheriff?

17   A.   Yes.

18   Q.   Mr. White was the --

19   A.   The clerk.

20   Q.   -- county clerk?

21   A.   Yeah.

22   Q.   They were both on the ballot in 2002; is that correct?

23   A.   Yes.

24   Q.   But they came down and challenged you.  Were the Kentucky

25   State Police there at that time?

FARMER - Cross (Mr. White)                                      153

1    A.   They weren't inside.  I think they were outside

2    somewhere.  They might have been.

3    Q.   Tell us about when you went out to talk to the Kentucky

4    State Police.  Were you inside the precinct and went out to

5    talk to them?

6    A.   Yes.

7    Q.   How many state troopers were there?

8    A.   There were two present.

9    Q.   Tell us about that conversation, if you could.

10   A.   I just opened my paperwork and, you know, told them what

11   was taking place, you know.  They was trying to run me out,

12   and I had just as much right to be there as anybody else in

13   there.  And they look at my paperwork and said fine, you got

14   all the right to stay.

15   Q.   So they backed you up?

16   A.   Yes.

17   Q.   I want to ask you now about the absentee voting period

18   that occurred in the primary of 2002, if I could.  Did you

19   testify on direct that your role during that period was to

20   actually pay the voters who had sold their vote?

21   A.   Yes, I had.

22   Q.   And did you testify that you were paying somewhere

23   between 30 and 50 dollars a vote?  Is that the going rate?

24   A.   Well, you try to start out as low as you can.  If your

25   competition bids higher, you got to bid higher with them.

*FARMER - Cross (Mr. Abell)*                                          154

1   Q.   But was 30 to 50 dollars the range?

2   A.   That's pretty much average range.

3   Q.   If I'm a voter and I sell my vote to you, you give me 50

4   dollars, is that for my entire vote, or is that just for a

5   particular candidate?  Do you understand my question?

6   A.   Yes.  That is usually for a ticket.

7   Q.   I see.  And when you were paying these voters, you were

8   located down at Freddy Thompson's hardware store; is that

9   correct?

10  A.   Back in behind it.  Not right at it.

11  Q.   You were behind the building?

12  A.   Yeah.  Actually, be to the left-hand side of it, if you

13  was facing it.

14  Q.   And you were parked in the truck?

15  A.   I was in a truck in a gravel parking lot.

16        MR. WHITE:  Give me one moment, Your Honor, please.

17        THE COURT:  Yes, sir.

18        MR. WHITE:  Your Honor, that's all I have.  Thank you

19  very much for your time, Mr. Farmer.

20        THE COURT:  Thank you, Mr. White.  Mr. Abell?

21        MR. ABELL:  Thank you, Judge.

22                         CROSS-EXAMINATION

23  BY MR. ABELL:

24  Q.   Mr. Farmer, my name is Robert Abell, and I represent

25  William Stivers in this case.  In the May primary, 2002, I

FARMER - Cross (Mr. Abell)                                          155

1    want to get straight the candidates that you were supporting,

2    okay?

3    A.   Okay.

4    Q.   Freddy Thompson for clerk, Charles Marcum for jailer, Tim

5    Couch for state representative and Danny Reed for sheriff?

6    A.   Yes.

7    Q.   And it was your understanding that my client, William

8    Stivers, was supporting those same candidates in the May, 2002

9    election?

10   A.   Yes.

11   Q.   On the other side and opposing the candidates that you

12   and Mr. Stivers supported were Jennings White for clerk,

13   Kennon White for jailer, and Barbara White Colter for state

14   representative?  Is that correct?

15   A.   Yes, sir.

16   Q.   Was Edd Jordan the incumbent sheriff in May, 2002?

17   A.   Yes, he was the sheriff against Danny Reed running.

18   Q.   And was it your understanding that Mr. Jordan, the

19   sheriff, was also on the other side from the candidates you

20   were supporting?

21   A.   He was on the Jennings White ticket, yes.

22   Q.   The Jennings White shooting that you referred to, do you

23   know what the actual circumstances were?

24   A.   Never did know.

25   Q.   Okay.

*FARMER - Cross (Mr. Baldani)*                                      156

1          MR. ABELL:  Nothing further, Judge.  Thank you.

2          THE COURT:  All right.  Thank you, Mr. Abell.  Mr.

3    Baldani?

4          MR. BALDANI:  Thanks.

5                     CROSS-EXAMINATION

6    BY MR. BALDANI:

7    Q.  Mr. Farmer, I'm Russ Baldani.  I'm one of Freddy's

8    attorneys.  You didn't know the circumstances of Jennings

9    White shooting, but it caused you concern for your personal

10   safety, right?

11   A.  Yeah, it caused all of us concern at the moment.

12   Q.  I'm sorry?

13   A.  At the time that it happened, it caused everyone concern.

14   Q.  And that's why you moved into Charles Stivers'?

15   A.  Yes.

16   Q.  And specifically, you were concerned about violence from

17   the other side that you were working against, right?

18   A.  Yes.

19   Q.  Okay.  Now, this lot that you're talking about, do you

20   even know whether that's part or owned by the -- whoever owns

21   the Thompson Hardware store, or is it just next to it or

22   nearby it?

23   A.  It's next to it.  I don't really know who is on the deed,

24   who owns the property, no.

25   Q.  But is it also close to the White Chevrolet there?

*FARMER - Cross (Mr. Baldani)*                                      157

1    A.   It's close to it too.

2    Q.   Okay.  Now, in the lead-up to '02 primary, you talked

3    about the absentee voting and you also talked about some

4    meetings, correct?

5    A.   Yes.

6    Q.   All right.  And Freddy Thompson wasn't at those meetings

7    leading up to the primary, was he?

8    A.   Freddy was never there when we discussed the day-to-day

9    business.

10   Q.   Right.

11   A.   Taking care of things.

12   Q.   Okay.  And to be perfectly clear, Freddy Thompson never

13   gave you any money, did he?

14   A.   I never received any money from Freddy, no.

15   Q.   All right.  And when you were sitting in the truck, were

16   you trying to be discreet about it, or was it just totally out

17   in the open, wide open?

18   A.   It was kind of in the wide open, I guess, you know.  It

19   was in a parking lot, an empty one.

20   Q.   But when you were out there in the truck, Freddy Thompson

21   never came to you?

22   A.   No, Freddy wasn't there, no.

23   Q.   You never saw him and to your knowledge, he never saw

24   you --

25   A.   No.

*FARMER - Cross (Mr. Baldani)*                                    158

1    Q.   -- right?  All right.  And then you mentioned that

2    right -- that was kind of the absentee part.  You mentioned

3    that right close to the actual election, Freddy actually came

4    in to a meeting or two that you were having, right?

5    A.   He came by Charles' house off and on.  It wasn't actually

6    a meeting.  He just stopped by is what I'm saying.

7    Q.   But when he came by, you made a conscious decision not to

8    discuss money in front of Freddy Thompson, didn't you?

9    A.   It was never discussed.  We never did discuss it in front

10   of Freddy.  Never was -- I don't know, just never was brought

11   up, actually.

12   Q.   But I'm asking you, did you make it a point not to

13   discuss it in front of him?

14   A.   No, not really.

15   Q.   Just didn't happen?

16   A.   Just didn't happen.

17          MR. BALDANI:  That's all, Your Honor.

18          THE COURT:  Thank you.

19          MR. GILBERT:  No questions.

20          THE COURT:  Anybody else?

21          MS. HUGHES:  No.

22          MR. SIMONS:  I have two if I can do it from here,

23   please.

24          THE COURT:  Yes, sir, that's fine.

25

*FARMER - Redirect (Mr. Smith)* 159

                           CROSS-EXAMINATION

1     BY MR. SIMONS:

2     Q.   Mr. Farmer, you mentioned Bowling brothers and a Jackie

3     Bowling in your testimony.  Do you recall that?

4     A.   There were two separate people.

5     Q.   Right.  I understand.  Three people all total?

6     A.   Three people all total, yes.

7     Q.   And my client's name is Stanley Bowling.  Do you know

8     Stanley Bowling?

9     A.   Yes, I know Stanley.

10    Q.   He's not one of the Bowling brothers?

11    A.   No, he's not one of them.

12    Q.   And he's not related to them either, is he?

13    A.   Not that I know of.

14    Q.   Would Doug and Mike Bowling make sense to you?

15    A.   Yes, that's the two, yes.

16    Q.   And the other one, Jackie Bowling, he's also not related

17    to Stanley?

18    A.   Not that I know of, no.

19             MR. SIMONS:  Thank you.

20             THE COURT:  Any redirect of Mr. Farmer?

21             MR. SMITH:  Yes, Your Honor.

22                        REDIRECT EXAMINATION

23    BY MR. SMITH:

24    Q.   Mr. Farmer, you were asked about this trip to Lockards

*FARMER - Redirect (Mr. Smith)*                                    160

1    Creek on cross-examination, and I think you indicated in

2    testimony that that's the big family you're referring to is

3    the Collins family?

4    A.   Yes, sir.

5    Q.   Did you know a Stevie Collins?

6    A.   I know two Stevie Collinses.  Big Stevie, Little Stevie.

7    Q.   Is that father and son?

8    A.   Yes.

9    Q.   And are they part of the Collins family?

10   A.   I think they're from the same set.

11   Q.   And did Stevie Collins get involved in helping in the

12   election?

13   A.   I think Big Stevie might have.

14   Q.   And was that in coordination with you and the candidates

15   that you supported?

16   A.   I think we was on the same team.

17   Q.   Okay.  And is Stevie Collins still with us?

18   A.   No, he's not.

19   Q.   What happened to Stevie Collins?

20   A.   He was murdered.

21   Q.   And was that a trial that occurred down in -- well, did

22   it occur in Clay County, the murder?

23   A.   The murder occurred in Clay County.

24   Q.   Okay.  And you were also indicating that when you took

25   Doug Adams up there, I believe you said you wanted people to

*FARMER - Redirect (Mr. Smith)*                                     161

1    know Doug Adams was on your side.

2    A.   Yeah, yes.

3    Q.   And why was that important?

4    A.   Because he's a man of authority in Clay County.

5    Q.   Now, this job that you were talking about and talked

6    about again in cross-examination, was it brought up to you

7    before the election?

8    A.   No, it was after the election when I got the job.

9    Q.   But did you know that there was a job possibility before

10   the election?

11   A.   I was told about it may be a possibility of getting a

12   job, but the bus garage was supposed to be a good paying job.

13   That never took place.

14   Q.   And did you get paid any money for doing all these things

15   that you did for Wayne Jones and Al Man Stivers?

16   A.   I never got paid personally, no.  I got room and board.

17   Q.   Okay.

18   A.   That was about it at the time because I was down on my

19   luck.

20   Q.   And you got told there was a possible job with the school

21   board?

22   A.   Yes.

23   Q.   Now, you were talking about these planning and strategy

24   meetings.  You said Freddy Thompson wasn't present when you

25   all talked about money?

*FARMER - Redirect (Mr. Smith)*                                        162

1    A.   No.

2    Q.   None of the other candidates were present when you talked

3    about money either, were they?

4    A.   No, but see I wasn't at all the meetings either.

5    Q.   And that wasn't really your concern, was it?

6    A.   No, I never really had no say so in what took place in

7    that part.

8    Q.   You don't know who funded all that money you spent on

9    election day, do you?

10   A.   Not actually, other than what I was told when I was

11   giving money.

12   Q.   And what were you told?  Who put up the money?

13   A.   I was given the money -- the money was given to me by Al

14   Man, Wayne Jones, when I received the money.

15   Q.   And did they explain to you where they got it?

16            MR. WHITE:  Objection, Your Honor.

17            THE COURT:  Overruled.

18   A.   They never really come out explained, said.  But I

19   assumed, you know, I knew pretty much.  I mean, why would you

20   spend money on somebody --

21            MR. BALDANI:  Object to an assumption, Your Honor.

22            THE COURT:  Sustained.

23            MR. SMITH:  That's all.  Thank you.

24            THE COURT:  See if there's any recross of the

25   witness.

163

1          MR. BAYER:  Just have one quick question for him,

2     Your Honor.

3          THE COURT:  Mr. Bayer.

4                    RECROSS-EXAMINATION

5     BY MR. BAYER:

6     Q.   You indicated that you did a very good job as custodian?

7     A.   I thought I did, yes.

8     Q.   Is there any reason why you should not have been hired as

9     the custodian?

10          MR. SMITH:  Your Honor, I believe that's outside the

11     scope of our recross, redirect.

12          THE COURT:  Sustained.

13          MR. BAYER:  That's all, thank you.

14          MR. WHITE:  No questions, Your Honor.

15          THE COURT:  Anyone else?  No?

16          MR. BALDANI:  We're done, Judge.

17          THE COURT:  All right.  Thank you, sir.  You may step

18     down.  Witness is finally excused.

19          Ladies and gentlemen, we will break at this time for

20     the evening.  I do want to, again, remind you of the

21     admonition that I've given to you several times.  First, of

22     course, as we do take our break, please remember that you

23     should not discuss the case with anyone and, likewise, you

24     should not allow anyone to discuss the case with you.

25          If anyone should approach you in an effort to discuss

164

1    the case, you should report that to the Court promptly.

2             As we are in recess, of course, please don't read,

3    watch or listen to any accounts of the case if there should be

4    any.  Don't attempt to perform any type of research or other

5    type of investigation.  Don't communicate with anyone about

6    the case electronically.  Don't visit any of the locations

7    that you've heard about and, of course, don't make up your

8    mind about the case until it is finally submitted to you.

9             Provided we don't have any weather delays, of course,

10   we'll start tomorrow morning at 9:00.  I do want to remind

11   you, I think I told you two weeks ago there were a couple days

12   that we would be out of session in this matter.  One of those

13   days is this Friday, the 5th of March.  So you will not be

14   reporting on the 5th, but hopefully we will be in session

15   Monday through Thursday of this week.  Again, if we don't have

16   any weather delays, we'll see you tomorrow morning at 9:00.

17                     (The jury left the courtroom at 4:28 p.m.)

18             THE COURT:  Thank you.  Counsel, please be seated.

19   Let me see if there are any matters to take up outside the

20   presence of the jury.

21             MR. BALDANI:  I do, Judge.

22             MR. ABELL:  I'd like to ask the Court if it

23   anticipates any other off days between now and the 26th.

24             THE COURT:  No, not at this point.

25             MR. BALDANI:  Judge, I can announce to the Court and

1    the United States that we will withdraw our subpoena for

2    Charles Marcum, so I don't -- and we'll let his counsel know.

3            THE COURT:  I'll prepare an order.  I've got a

4    rearraignment at 4:30, but I'll prepare an order this

5    afternoon setting that aside for Wednesday.  You can advise

6    his counsel.

7            MR. BALDANI:  We'll do that when we leave today,

8    Judge.

9            THE COURT:  Mr. Westberry?

10            MR. WESTBERRY:  Very quickly, Your Honor.  We're in

11    the process of preparing and having served our trial subpoenas

12    for witnesses.  I wanted to ask you about the possibility of

13    next Monday as a return date for those, if that's acceptable

14    under the same sort of format you discussed with other

15    counsel.

16            THE COURT:  You propose at noon time or at 4:30 in

17    the afternoon?

18            MR. WESTBERRY:  If we're having any trouble getting

19    people served, can I advise the Court?

20            THE COURT:  That will be fine.

21            MR. WESTBERRY:  We're doing the best we can.

22            THE COURT:  Monday, either at noon time or 4:30.

23    Thank you.  Mr. White?

24            MR. WHITE:  There's only one witness I might need to

25    have here.  Do you want me to do that one time on Monday,

166

1    rather than Wednesday?

2              THE COURT:  That would be fine.  Mr. Simons?

3              MR. SIMONS:  Segueing from those, Your Honor, I

4    issued a subpoena for a gentleman at 8:50 Wednesday to do like

5    we did this morning.

6              THE COURT:  That will be fine.  We'll do that prior

7    to trial.  One pending matter.  Mr. Smith, do you have

8    anything else?

9              MR. SMITH:  Your Honor, I want to make sure the

10   Court's calendar.  We have a 4:30 rearraignment today?  Is

11   that scheduled?

12             THE COURT:  I do have a rearraignment today at 4:30.

13             MR. SMITH:  I just want to make sure that the Court

14   has a United States attorney here.  I'm not aware of the

15   matter.

16             THE COURT:  It's a Covington matter.

17             MR. SMITH:  Okay.

18             THE COURT:  It's a Covington matter and when we take

19   our recess, I'll have my clerk advise you of the case number.

20             MR. SMITH:  Okay.

21             THE COURT:  I don't have it handy here.  Let's see.

22   One other matter.  Mr. Pinales, you've made a motion for

23   severance based upon testimony concerning Mr. Bowling and his

24   involvement in certain drug activities.

25             MR. PINALES:  Yes, Your Honor.

167

1          THE COURT:  I'm going to ask you to file your brief

2     on that tomorrow morning by 9:00.  So feel free to have that

3     ready for me first thing in the morning, and it would be

4     matters that the Court hasn't already addressed, and it would

5     be just based upon that testimony.

6          MR. PINALES:  Just that narrow portion.

7          THE COURT:  That particular evidence and how it would

8     give rise to a motion for severance in light of all the

9     testimony that has been presented in the case.

10          MR. PINALES:  Thank you, Your Honor.

11          THE COURT:  All right.  If there's nothing else to

12     take up, this case will be in recess until 9:00 tomorrow

13     morning.  The Court will be in recess until 4:30.

14          (Proceedings adjourned at 4:32 p.m.)

15                         - - -

16              C E R T I F I C A T E

17          I, LISA REED WIESMAN RDR-CRR, certify that the
       foregoing is a correct transcript from the record of
18     proceedings in the above-entitled case.

19

20     \s\ Lisa Reed Wiesman               March 3, 2010
       LISA REED WIESMAN, RDR-CRR          Date of Certification
21     Official Court Reporter

22

23

24

25

1                              INDEX

2     <u>GOVERNMENT WITNESS</u>

3     RANDY CRAFT
      Direct Examination by Mr. Parman.................. Page  4
4     Cross-examination by Mr. Pinales................. Page 16
      Cross-examination by Mr. Bayer.................... Page 16
5     Cross-examination by Mr. Baldani................. Page 21
      Redirect examination by Mr. Parman............... Page 25
6     Recross-examination by Mr. Bayer................. Page 26

7     FRANK ROBERTS
      Direct Examination by Mr. Smith.................. Page 29
8     Cross-examination by Mr. Pinales................. Page 41
      Cross-examination by Mr. Bayer................... Page 46
9     Cross-examination by Mr. Abell................... Page 47
      Cross-examination by Mr. Baldani................. Page 48
10    Redirect examination by Mr. Smith............... Page 52

11    TERRY BAKER
      Direct Examination by Mr. Smith.................. Page 55
12    Cross-examination by Mr. Hoskins................ Page 63
      Cross-examination by Mr. Abell.................. Page 65
13

14    MANSELL BAKER
      Voir Dire Examination by Mr. Smith.............. Page  77
      Direct Examination by Mr. Smith.................. Page  80
15    Cross-examination by Mr. White.................. Page  95
      Cross-examination by Mr. Simons................. Page  98
16    Redirect Examination by Mr. Smith............... Page 109
      Recross-examination by Mr. Simons............... Page 111
17

18    JEFFREY FARMER
      Direct Examination by Mr. Smith.................. Page 112
      Cross-examination by Mr. Bayer.................. Page 146
19    Cross-examination by Mr. White.................. Page 150
      Cross-examination by Mr. Abell.................. Page 154
20    Cross-examination by Mr. Baldani................ Page 156
      Cross-examination by Mr. Simons................. Page 159
21    Redirect Examination by Mr. Smith............... Page 159
      Recross-examination by Mr. Bayer............... Page 163

22

23    <u>DEFENSE EXHIBITS</u>                              <u>ADMITTED</u>

24    Exhibit No. Jones 2, Deed
      Admitted........................................ Page 97
25
                              - - -