UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON
- - -

UNITED STATES OF AMERICA,           :    Docket No. CR 09-16-S
                                    :
                    Plaintiff,      :    **Frankfort, Kentucky**
                                    :    Monday, March 8, 2010
        versus                      :    12:50 p.m.
                                    :
RUSSELL CLETUS MARICLE,             :
DOUGLAS C. ADAMS                    :
CHARLES WAYNE JONES                 :
WILLIAM R. STIVERS                  :
FREDDY W. THOMPSON                  :    **Trial Day 19B**
WILLIAM B. MORRIS                   :
DEBRA L. MORRIS                     :
STANLEY BOWLING,                    :
                                    :
                    Defendants.     :

- - -
TRANSCRIPT OF TRIAL
BEFORE DANNY C. REEVES
UNITED STATES DISTRICT COURT JUDGE and a jury
- - -

APPEARANCES:

For the United States:      STEPHEN C. SMITH, ESQ.
                            JASON D. PARMAN, ESQ.
                            Assistant U.S. Attorney
                            601 Meyers Baker Road
                            Suite 200
                            London, KY 40741

For the Defendant           MARTIN S. PINALES, ESQ.
Russell Cletus Maricle:     Strauss & Troy
                            150 E. Fourth Street
                            Fourth Floor
                            Cincinnati,OH  45202

                            DAVID S. HOSKINS, ESQ.
                            107 E. First Street
                            Corbin, KY  40701

2

```
 1    For the Defendant          R. KENT WESTBERRY, ESQ.
      Douglas C. Adams:          KRISTIN N. LOGAN, ESQ.
 2                               Landrum & Shouse, LLP
                                 220 West Main Street
 3                               Suite 1900
                                 Louisville, KY 40202
 4

 5    For the Defendant          T. SCOTT WHITE, ESQ.
      Charles Wayne Jones:       Morgan & Pottinger, P.S.C.
 6                               133 West Short Street
                                 Lexington, KY  40507
 7

 8    For the Defendant          ROBERT L. ABELL, ESQ.
      William R. Stivers:        120 North Upper Street
 9                               Lexington, KY  40507

10

      For the Defendant          RUSSELL JAMES BALDANI, ESQ.
11    Freddy W. Thompson:        R. TUCKER RICHARDSON, ESQ.
                                 Baldani, Rowland & Richardson
12                               300 West Short Street
                                 Lexington, KY  40507
13

14    For the Defendant          JERRY W. GILBERT, ESQ.
      William B. Morris:         Coy, Gilbert & Gilbert
15                               212 North Second Street
                                 Richmond, KY 40475
16

17    For the Defendant          ELIZABETH SNOW HUGHES, ESQ.
      Debra L. Morris:           Gess, Mattingly & Atchison, PSC
18                               201 West Short Street
                                 Lexington, KY 40507
19

20    For the Defendant          DANIEL A. SIMONS, ESQ.
      Stanley Bowling:           Thompson, Simons, Dunlop & Fore
21                               116 West Main Street
                                 Suite 2A
22                               Richmond, KY 40476

23

24

25
```

3

Court Reporter:                    LISA REED WIESMAN, RDR-CRR
                                   Official Court Reporter
                                   35 W. Fifth Street
                                   P.O. Box 1073
                                   Covington, KY  41012
                                   (859) 291-4410


      Proceedings recorded by mechanical stenography,
transcript produced with computer.

4

1           (Proceedings commenced at 12:50 p.m.)

2           THE COURT:  Thank you.  Before the jury comes in, I

3   understand there's one more witness to be recognized.

4           MR. WESTBERRY:  Yes, Miss Simms.

5           THE COURT:  Ma'am, if you could state your name,

6   please.

7           MS. SIMMS:  My name is Rhonda Lynn Simms.

8           THE COURT:  Miss Simms, I understand you've been

9   subpoenaed to appear in the course of this trial on behalf of

10  Douglas Adams?

11          MS. SIMMS:  I have.

12          THE COURT:  The United States is still presenting its

13  case, and it's not expected the defense will begin presenting

14  witnesses until later in this week.  What we'll do at this

15  time is recognize you as a witness to testify in the case.

16  You will be requested to return.  Counsel for Mr. Adams will

17  advise you as to when he expects that you'll be called as a

18  witness.

19          MS. SIMMS:  That will be fine.

20          THE COURT:  At this time, I'll have the clerk

21  administer the oath, and you'll be indebted in the penal sum

22  of $500 should you fail to appear.  The clerk will administer

23  the oath.

24          (The oath was administered by the deputy clerk.)

25          THE COURT:  Thank you, ma'am.  You'll be excused at

1    this time.  Any other issues to take up before the jury comes

2    in?

3          MR. BALDANI:  Judge, one thing.  I want to make sure

4    I'm within the Court's rulings on these complaints.  I want to

5    bring up -- there's at least a couple of complaints that were

6    called in after the polling hours were closed, and I

7    understand the rationale for your ruling.  But I want -- I'm

8    going to ask the witness about the fact that some of the

9    complaints were called in after hours, just so that the jury's

10   not left with the belief as to some of them that the clerk

11   would even have ability to take any corrective action while

12   the polls were still open.  So I'm assuming that's proper and

13   okay.  I just wanted to run it past you.

14         THE COURT:  Yes, sir.

15         MR. BALDANI:  Thank you.

16         THE COURT:  Mr. Pinales?

17         MR. PINALES:  Your Honor, over the lunch hour, I've

18   gone through these, and I recall the Court's -- they're not

19   Bates numbered, but it's 11/2, 2006 election, 12:00 noon.

20   There's a comment at the bottom which I would ask for a

21   redaction.  It says "thought I'd make a note of this

22   considering Clay County's history."  That's the caller's

23   thought.

24         THE COURT:  All right.

25         MR. PINALES:  I'm sorry.  That's the person who

6

1    received the call's thoughts at the bottom of the form.

2            THE COURT:  All right.  Is the person making the note

3    identified on the document?

4            MR. PINALES:  Katie.

5            THE COURT:  All right.  I believe that should be

6    redacted.  I agree with you, Mr. Pinales.

7            MR. PINALES:  Thank you, Your Honor.  For purpose of

8    the record, it's 11/2/06, time 12:00 noon p.m.

9            THE COURT:  All right.

10           DEPUTY CLERK:  What was the Bates number?

11           THE COURT:  There's no Bates number.  I don't have

12   copies of this exhibit.  Mr. Smith, this particular exhibit

13   will need to be redacted before the jury can review that

14   exhibit.

15           MR. SMITH:  So I can make sure we're talking about

16   the same one, this is the one that Freddy Thompson called in?

17           MR. PINALES:  Yes.

18           THE COURT:  I don't have the document so if there's

19   something else I'm not aware of, you'll need to tell me what

20   it is, Mr. Smith.  You say Mr. Thompson called this in?

21           MR. SMITH:  Yeah, let me hand up a copy.  This is my

22   copy.  I apologize to the Court for not having supplied these

23   previously.

24           THE COURT:  This note at the bottom reflects the

25   person's opinion or thoughts that's making the notation, as

1    opposed to what the clerk actually said.  So I believe that

2    that part at the bottom should be redacted.  I believe that is

3    the correct page that Mr. Pinales was referring to.

4            MR. PINALES:  We've compared.  It is the same.

5            THE COURT:  All right.

6            MR. SMITH:  We'll take care of that at the next

7    break.

8            THE COURT:  Thank you, Mr. Smith.  Anything else?

9    All right.  Thank you.  You can bring the jury in.

10            (The jury entered the courtroom at 12:56 p.m.)

11            THE COURT:  The record will reflect all members of

12    the jury are present.  Parties and counsel are also present.

13            Bring the witness back in.  Miss Johnson, let me

14    remind you again you're still under oath.

15            Mr. Pinales?

16            MR. PINALES:  Thank you, Your Honor.

17                        CROSS-EXAMINATION

18    BY MR. PINALES:

19    Q.   Good afternoon.

20    A.   Hello.

21    Q.   I'm Marty Pinales, and I represent Cletus Maricle.  I

22    have just a couple questions for you.  On the records that you

23    brought, and I'm going to apologize to you now, I don't have

24    the sticker number, but I'll identify them by year and which

25    election it is.  If you look at the primary 2006, do you see

1    that one?

2    A.   Yes.

3    Q.   And for the purposes of the record, what number is that?

4    A.   PR72.

5    Q.   72, thank you.  Just looking down the list, and if you

6    could follow it with me, starting in Clay County, the total

7    number of absentees cast were 490; is that correct?

8    A.   Are you adding the other, I guess, all the different

9    categories?

10   Q.   That says total.

11   A.   It's 269 for regular, 215 for disabled, and 2 for medical

12   emergency.

13   Q.   I'm looking at page 169, document --

14   A.   I'm sorry.  I thought you were referring to the --

15   Q.   No I'm sorry.  List of Voters Issued Absentee Ballots

16   (33A) Primary 2006.  Do you see that?

17   A.   Yes, that's PR96.

18   Q.   96, thank you.  And looking at that, on the first page,

19   Clay County, about three quarters of the way down, has 490

20   total?

21   A.   Um-hmm.

22   Q.   Is that correct?

23   A.   Yes.

24   Q.   And if you turn on the other page, the next page down,

25   Laurel County, you see that?

1    A.    Um-hmm.

2    Q.    And Laurel County is an adjacent county; is it not?  Is

3    it nearby?

4    A.    Yes.

5    Q.    And it's approximately twice as big?

6    A.    Yes.

7    Q.    And it had 1,349, correct?

8    A.    Yes.

9    Q.    Okay.  Now, if we go through this list in alphabetical

10   order, if you'd follow me, would it be a fair statement that

11   Bath, Bell, Breathitt, Elliott, Fayette, Floyd -- if I'm going

12   too fast, let me know -- Hardin, Henderson, Jackson,

13   Jefferson, Kenton, Laurel, McCracken, Magoffin, Monroe,

14   Pulaski, Russell, and on the final page Wayne all had more

15   absentee total ballots than Clay.  Would that be a fair

16   statement?

17   A.    Total absentee ballots, yes.  Just from glancing at it

18   quickly, as you read off the counties.

19   Q.    And some of these counties are bigger, and some of them

20   are smaller; is that correct?

21   A.    Yes.

22   Q.    And if we just pick up another one, this looks like --

23   and again, I apologize.  I don't have the number.  Primary

24   2004 that goes horizontally.

25   A.    Yes.  It's PR95.

*JOHNSON - Cross (Pinales)*                                                    10

1   Q.   And on PR95, just making sure we have the right one, Clay

2   County had a total of 83 absentee --

3   A.   I'm sorry.  Did you say primary?

4   Q.   Yeah, I'm sorry, 2004 primary election.  Clay County had

5   83?

6   A.   Yes.

7   Q.   And just turning to the next page, Laurel County, that's

8   a county twice as big, had 449, correct?

9   A.   Yes.

10  Q.   And looking at 2003 primary election, and this one we

11  have to add, because you don't have the total on the last

12  column.  But we have a total for Clay County of 45, if my math

13  is correct.

14  A.   Yes.

15  Q.   Okay.  And then if we look at Laurel County, if my math

16  is correct, we have 292.

17  A.   Yes.

18  Q.   And those are 292 of absentees for the same election?

19  A.   Right.  For the -- this was a state constitutional

20  officer election.

21            MR. PINALES:  I have nothing further.  Thank you,

22  Your Honor.

23            THE COURT:  Yes, sir.

24            MR. WESTBERRY:  No questions.

25            THE COURT:  Mr. White?

JOHNSON - Cross (White)                                             11

1          MR. WHITE:  Yes, Your Honor.  Thank you.

2                         CROSS-EXAMINATION

3   BY MR. WHITE:

4   Q.   Good afternoon.

5   A.   Hello.

6   Q.   My name is Scott White, I'm an attorney, and this is my

7   client, Mr. Jones.  I have some follow-up questions, then also

8   want to get into some of my own exhibits.  So let me start

9   with the follow-up.  The first topic I wanted to talk to you

10  about are election officers.  And are they also referred, I

11  think, in the statute as precinct officers?

12  A.   Precinct election officers.

13  Q.   That would be the correct title?

14  A.   Um-hmm.

15  Q.   And there are four of those, correct?  You've got a

16  sheriff, a clerk, and two judges?

17  A.   Right.

18  Q.   And those are selected from a list of names that each

19  political party of that county provides to the County Board of

20  Elections, then they make their selections?

21  A.   Statutorily, yes, the county parties are supposed to be

22  providing lists for people per precinct that the County Board

23  can choose from.  However, in a lot of cases, the county

24  parties either don't submit lists, incomplete lists, et

25  cetera.

JOHNSON - Cross (White)                                          12

1      If they don't have enough people from the list submitted

2   by the parties, assuming they are submitted, the County Board

3   then is responsible for choosing those officers.

4   Q.   Is that -- is one of the reasons for that, based on your

5   experience, is the -- let me just interject real quick.

6   Before you were the -- you became the executive director in

7   200 --

8   A.   4.

9   Q.   4.  Before that, though, you had been employed at the

10  State Board of Elections; is that correct?

11  A.   Yes.

12  Q.   And was your position there as assistant executive

13  director or --

14  A.   Assistant director.  And then for two years, I was a

15  merit employee.

16  Q.   Okay.  During that period of time, up till today, as the

17  executive director, is one of the reasons that the County

18  Board of Elections has some flexibility is that in some

19  counties, it is more -- easier than others to simply find

20  election officers to work?

21  A.   Flexibility in what?

22  Q.   In terms of did you testify that in selecting the

23  precinct election officers, the County Board can go from the

24  list of names by statute given by the political parties.  And

25  then if those lists are incomplete or there aren't enough,

JOHNSON - Cross (White)                                              13

1    then they can come up, there's other ways for them to get

2    precinct election officers to serve on election day?

3    A.   Yes.

4    Q.   Is one of the reasons for that because in some counties,

5    it can be difficult finding election officers?

6    A.   Yes, it is.  It is difficult to find precinct officers.

7    Q.   I wanted to clear one thing up, if I could.  Did you

8    testify on direct that a member of the County Board of

9    Elections is prohibited from also serving as a precinct

10   election officer during the election on election day?

11   A.   Yes, I did say that the County Board has distinct duties

12   in the statute, and they are in session all day from 6:00 a.m.

13   until the votes, you know, the election is counted, votes are

14   totaled.  Yes, that is, that is our opinion that they cannot

15   serve as a precinct officer because the statute requires them

16   to be fulfilling their duties as a County Board of Elections

17   member that day.

18   Q.   So that would -- would it be more accurate to state that

19   that is the opinion of the State Board rather than a

20   statutory -- an affirmative statement in the statute that says

21   if you sit on the County Board of Elections, you then cannot

22   also serve as a precinct election officer?

23   A.   It doesn't specifically state that, but I think it's

24   stated very clearly that they are in session all day as a

25   County Board of Elections member.

*JOHNSON - Cross (White)*                                              14

1    Q.   Would it be fair to say that in discharging your

2    obligations that you're fairly -- that you are intimately

3    familiar with the applicable election laws and statutes to

4    your job?

5    A.   Yes.  Although I'm not an attorney, but yes.

6    Q.   I understand.  But you rely upon the statutes, correct?

7    A.   Yes, we do.

8    Q.   Let me ask you, are you familiar, and I'm happy -- if I

9    could ask -- I'm not going to make this as an exhibit, but it

10   may be something that -- well, let me ask you this.  Are you

11   familiar with KRS 117.035, County Board of Elections

12   Membership, Appointed Members, Meetings, Staff and Counties

13   Containing Cities of First or Second Class?

14   A.   I'm familiar with the statute.

15   Q.   Are you familiar with subpart 3, where it states that a

16   majority of the Board shall constitute a quorum?

17   A.   Yes.

18   Q.   So would it be -- would you agree with me, then, that a

19   County Board of Elections can be in session all day on

20   election day and not have all four members present?

21   A.   Yes.

22   Q.   I wanted to follow up on the voter assistance forms.  You

23   were asked some questions, Mrs. Johnson, about the vote total

24   that -- did you testify on -- sorry about that.  Did you

25   testify on direct that the vote total that was certified by

*JOHNSON - Cross (White)*                                              15

1   the County Board of Elections to the State Board of Elections

2   would be affected if voter assistance forms had been

3   destroyed?

4   A.   I stated that the County Board of Elections post election

5   statistical report that lists each precinct with the number of

6   absentee votes and then the voter assistance numbers, that

7   could be affected by that.  But I did state that the vote

8   totals are never certified to the State Board of Elections by

9   the County Board of Elections.  That is certified to the

10  Secretary of State's office, of which I do not know that form,

11  and we have no involvement with that.

12  Q.   I see.  Also wanted to clarify your testimony.  Did you

13  testify on direct that the County Board of Elections has

14  enforcement or policing authority of the elections going on

15  that day?

16  A.   I stated that the County Board of Elections, under the

17  statute, does oversee the election process that day.  And that

18  is what they do.  I was asked if -- I believe I was asked if

19  that would include policing, and I stated that they have to

20  oversee the elections that day.  In the elections, they are

21  the governing authority that day.

22  Q.   But they don't have any -- they don't have any -- to your

23  knowledge, do they have any investigators on staff?

24  A.   I would have no idea of knowing what a county clerk has

25  or a County Board of Elections has on its staff or not.

JOHNSON - Cross (White)                                          16

1    Q.   Thank you.  I'm going to completely change subject areas

2    on you.  If I could ask the Court security officer, I'm going

3    to hand you --

4           MR. WHITE:  Madam Clerk, can you tell me what number

5    I'm on?  Is it CWJ-5?

6           DEPUTY CLERK:  5.

7    Q.   Mrs. Johnson, I'm going to hand you what I've marked as

8    CWJ-5.  I'll represent to you that's a 32-page exhibit, and

9    I've binder clipped it because there are a couple -- I wanted

10   to get it all in together.  But if you could just take a

11   moment and just thumb through that and tell me if you're

12   generally familiar with these documents.

13   A.   (Reviewing document).  Yes.

14   Q.   Thank you.  Before I ask you specifically about this

15   exhibit, in your position as the executive director of the

16   Kentucky Board of Elections, are you familiar, generally, with

17   the federal statute or federal act, the Help America Vote Act?

18   A.   Yes.

19   Q.   And have you received training in that statute?

20   A.   Yes.

21   Q.   And is it part of your position as the executive director

22   of the Kentucky Board of Elections to administer aspects of

23   that federal statute in Kentucky?

24   A.   Right.  It's part of our job to oversee elections in

25   Kentucky.

*JOHNSON - Cross (White)*                                         17

1    Q.   After the 2002 presidential -- the 2000 presidential

2    election, Congress enacted the Help America Vote Act.  Could

3    you briefly just describe what its purpose was, as you

4    understand it, as an election official in Kentucky?

5    A.   The purpose of the Help America Vote Act of 2002 was to

6    basically clarify some issues or fix some issues that happened

7    across the nation in 2000 and to make specific laws and

8    processes more standardized across the state, like the

9    creation of a statewide voter registration database, which our

10   state has had since 1973.  Other states did not have.  Create

11   provisional ballots, which is something that not all states

12   had, and to do various other items within that statute but to

13   a little bit more standardize election processes.

14   Q.   And as part of the State Board's implementation of the

15   statute, did it also hold trainings for county clerks?

16   A.   Yes.  We did on the specific issues, as it affected the

17   county clerks.

18   Q.   Was part of the matters that HAVA dealt with, would that

19   include the voting machines?

20   A.   The requirement in the Help America Vote Act that did

21   expressly away with the use of punch cards or lever voting

22   equipment, yes.  That was in the statute and, yes, we did meet

23   with the county clerks in those affected counties about that

24   new federal requirement, that they not use those systems.

25   Q.   Can you estimate, to a reasonable degree of certainty,

*JOHNSON - Cross (White)*                                    18

1    the number of counties in Kentucky that needed to get new

2    machines to be in compliance with the federal law?

3    A.   On the lever voting equipment or in general on the other

4    aspects?

5    Q.   I apologize.  The lever voting equipment.

6    A.   I meant to look that up, quite frankly, and I did not.

7    So I believe it's five to seven.

8    Q.   Were there other counties that needed other machines --

9    A.   Yes, all 120 counties, there's a section in Help America

10   Vote Act -- I'm sorry, I call it HAVA, by the acronym.  That

11   required every precinct in the state to have a voting system

12   set up and usable on election days that would allow those

13   people with disabilities, particularly those that are visually

14   impaired, to vote on a voting system, unassisted, on their

15   own, through an audio ballot or one that could have a

16   sip-and-puff mechanism connected to it.

17       So all 120 counties had to buy those voting systems and

18   get those in place by the primary of 2006, and the lever

19   counties had to, along with that, replace their lever voting

20   equipment.

21   Q.   And were there federal funds available to the counties to

22   make the switch?

23   A.   Yes.  The State Board of Elections and the HAVA advisory

24   committee voted to set a certain dollar amount per county

25   based upon the number of precincts in the previous election to

JOHNSON - Cross (White)                                              19

1    give those counties, through a memorandum agreement, which is

2    in this exhibit that you handed me, to purchase that.

3              MR. SMITH:  Your Honor, I'm going to object as to

4    outside the scope and relevance.

5              THE COURT:  It is going a bit broad, counsel.  I did

6    allow you some lead way to go into other matters, but I'm not

7    sure the relevance here, so I'm going to sustain the

8    objection.

9              MR. WHITE:  Very well, Your Honor.  I'll just deal

10   with this later, then.

11             THE COURT:  Again, I don't understand the relevance,

12   so you can raise it later, but I still don't -- I'm not sure I

13   know the relevance.  But I've sustained the objection.  You'll

14   need to move on.

15             MR. WHITE:  Thank you, Your Honor.

16   Q.  Let me ask you this question.  Did Clay County, were they

17   required to move from lever to regular machines?  I mean lever

18   machines to new machines under HAVA?

19   A.  Yes.

20   Q.  And did the State Board -- can a county purchase any

21   machines at once, or can it only purchase machines from an

22   approved list?

23   A.  The County Board can purchase voting equipment from an

24   approved list, and there were four vendors on that approved

25   list.

*JOHNSON - Cross (White)*                                          20

1   Q.   And is that a list approved by the State Board of

2   Elections?

3   A.   Yes.   Pursuant to statute, yes, the State Board provides

4   the list that they can purchase from.

5   Q.   And Mrs. Johnson, on CWJ-5, that collective exhibit, are

6   those the memorandum agreement and the correspondence between

7   your office and the Clay County fiscal court in terms of the

8   purchase of new voting machines for Clay County for the

9   primary, beginning the primary of 2006?

10  A.   This document contains the memorandum agreement, which

11  stipulates the purchase of replacement equipment for the lever

12  and equipment for the accessibility issues and equipment for

13  an optical scan absentee ballot system.

14          MR. WHITE:   Thank you, very much.   Your Honor, those

15  are all the questions I have, thank you.

16          MR. BAYER:   No questions.

17          THE COURT:   Mr. Baldani?

18          MR. WHITE:   Your Honor, I'm sorry.   I forgot.   I

19  would move to introduce Exhibit CWJ-5, please.

20          THE COURT:   Objection?

21          MR. SMITH:   Yes, Your Honor.

22          THE COURT:   As to relevance?

23          MR. SMITH:   And also foundation.   I'm not sure that I

24  heard that foundation elements satisfied either.

25          THE COURT:   I will withhold ruling on this exhibit at

JOHNSON - Cross (Baldani)                                     21

1    this time, until further foundation and establishment of

2    relevancy is made.

3            Now, anyone else?  Mr. Baldani.

4            MR. BALDANI:  Thank you, Your Honor.

5                        CROSS-EXAMINATION

6    BY MR. BALDANI:

7    Q.  Miss Johnson, my name's Russ Baldani.  I'm one of Freddy

8    Thompson's attorneys.  I want to start out by asking you a

9    little bit about the absentee ballot process.  Not so much the

10   statistics that Mr. Pinales asked about, but just the process

11   in general.  And to begin with, how does a person request an

12   absentee ballot?

13   A.  There are two types, mail-in ballot, which is the one by

14   mail, of course, and the in-office voting.  They receive an

15   application from the county clerk and they may call, they may

16   come in, their parents, spouse, child may call on their

17   behalf.

18       The application is sent to the individual.  They fill out

19   the application, return it to the county clerk.  Or if they're

20   voting in the office, they're standing in the office getting

21   the application and filling it out at the time before they

22   vote.

23   Q.  So the county clerk is obligated to give an absentee

24   application or ballot to whoever asks for it, right?

25   A.  Do you mean hand them the application?

1    Q.    Yes.

2    A.    Yes.

3    Q.    And what are the clerk's duties when a person comes in or

4    when a person wants to vote absentee?

5    A.    I'm sorry.  Could you be more specific?

6    Q.    Well, just for example, say a person says, I want to vote

7    absentee because I'm going to be in Florida.  The county clerk

8    is not obligated to do an independent investigation of the

9    legitimacy of that person's excuse?

10   A.    No.  The application contains an affirmation at the

11   bottom stating that what the person is saying is true and

12   accurate, paraphrasing that affirmation, of course.

13   Q.    So the clerk takes that at face value?

14   A.    Yes.

15   Q.    And as far as lists of absentee voters, that's an open

16   public record, isn't it?

17   A.    The SVE-33A, that is where they track the list of who's

18   requested absentee ballots.  Yes, that is a public record.

19   Q.    Anybody can get that?

20   A.    Yes.  Under an open records request, yes.

21   Q.    I want to follow up on something Mr. Smith asked you

22   about, and that's how the State Board selects the Republican

23   and Democrat commission, okay?  I believe you said each party,

24   the Democrat and the Republican, submit a list of five

25   candidates; is that correct?

JOHNSON - Cross (Baldani)                                          23

1    A.   Yes.

2    Q.   To the State Board?

3    A.   Yes.

4    Q.   And is it the general practice that State Board will take

5    the first one off the list?

6    A.   Yes.

7    Q.   Now, I want to ask you about PR84, which is the composite

8    exhibit of election day complaint sheets.

9    A.   Yes.

10   Q.   And unfortunately, I don't think they're numbered.  Is

11   your set numbered?

12   A.   No, they're not numbered.

13   Q.   I've counted 35 pages.  Have you happened to count these,

14   by any chance?

15   A.   No, I have not.

16   Q.   So they're not numbered in any way for you to refer to a

17   specific page, other than perhaps leafing through; is that --

18   A.   Right.

19   Q.   -- the situation we're in?  Let me ask you this.  Would

20   you agree that the first three of those have to do with the

21   '04 election?

22   A.   Yes, the 2004 primary election.

23   Q.   Okay.  And of those three, two of them were actually

24   complaints by Freddy Thompson, clerk, right?

25   A.   Of the 2004 ones?

1    Q.   Yes.  If you look at the first three pages --

2    A.   One says that the caller's name is Freddy Thompson.  And

3    the other says the caller's name is Freddy.

4    Q.   Clay County clerk.  Identified as Clay County clerk?

5    A.   Right.

6    Q.   So two of those first three were actual calls from Freddy

7    Thompson, right?

8    A.   (Nodding affirmatively).

9    Q.   Now, I want to ask you about the '06 primary election day

10   complaint sheets, and I'm afraid I need to ask you how many

11   there are.  So could you --

12   A.   For the primary?

13   Q.   Yes.  Do you know already?

14   A.   I don't.  I can sit here and count them if you'd like.

15   Q.   If you don't mind.  There's not that many, if you could

16   count them, please.

17   A.   Twenty-seven I counted.

18   Q.   Right.  That's what I thought it was.  So you testified

19   on direct that the bulk of the '06 complaints had to do with

20   problems with people pushing the Cast Ballot button; is that

21   true?

22   A.   Right.  It had to do with calls about the voting

23   equipment in the precinct.

24   Q.   About the new voting machine.  And would you agree that

25   in '06, there was other counties using that new electronic

JOHNSON - Cross (Baldani)                                    25

1   machine for the first time, right?

2   A.   Yes.

3   Q.   Would you believe that the number of complaints was

4   probably up statewide because of unfamiliarity with that

5   machine?

6   A.   There are only roughly 20 some odd counties that used

7   this system anyway, and the bulk of those calls, I would say,

8   were from Clay County.

9   Q.   My question is, do you think the complaints were up in

10  other counties as well?

11  A.   They could have been, but the other counties were using

12  the systems that they'd used for years, and they just used

13  these systems for accessible voting.  In Clay County, it was

14  different because they were using only this system, because

15  they did not have the levers so they had -- everybody was

16  using it, versus in other counties, it was just those that

17  were using it for disability reasons.

18  Q.   Okay.  Now, you testified that 27 of these were from the

19  '06 primary election.  You previously testified the bulk had

20  to do with problems with the machine.  I want to ask you if

21  you would count, if you would go through those 27 and tell me

22  if, in fact, 10 of the 27 had to do with the two-step process,

23  people making complaints about, you know, the two-step process

24  or the votes were changed.  See if it's 10 of 27.

25          MR. SMITH:  Just for the record, I'm going to object

JOHNSON - Cross (Baldani)                                    26

1    as to going outside the -- I think we're now going into the

2    specific nature as opposed to the general nature which we've

3    been asked to refer to.  So I'm going to object --

4             THE COURT:  All right.  See if any of the defendants

5    join in your objection.  No?  I'll sustain the objection.

6    It's outside the scope of what we discussed earlier.

7             MR. BALDANI:  Judge, could I respond here or at the

8    Bench?

9             THE COURT:  You'll need to come up to the Bench.

10   Please come up.

11                      (A sidebar conference was held out of the

12                      hearing of the gallery):

13            MR. BALDANI:  Judge, I don't intend to get into the

14   nature of any of the others, but the prosecutor's allowed to

15   elicit that the bulk, and I've counted it.  There's 10 of 27.

16   All I want to establish is, I mean, I don't think, to me, the

17   bulk means most.  And all I want to establish is that of these

18   27, 10 of them deal with this particular issue, and I'm not

19   going to ask the other 17 what they were about, even in a

20   general term.  I just want to establish that.  I mean, I feel

21   like --

22            THE COURT:  I'm telling you if you follow this line

23   of inquiry, I'm going to let Mr. Smith go into the specific

24   nature of the complaints, the specific complaints contained in

25   these documents.  I've already told everybody, if you go into

1    that, you've opened it up.  No one objected.  So Mr. Smith, if

2    you want to go into the specific nature of the complaints, the

3    specific complaints, you can do so because Mr. Baldani has

4    opened the issue.

5           MR. PINALES:  Your Honor, I would object.

6           THE COURT:  Too late.  I gave you a chance to object.

7    You chose not to object.  I asked all the defendants if you

8    wanted to object.  You didn't.  You opened it up.  Mr. Smith

9    can go into it.

10          MR. BALDANI:  I can go into the 17, then?

11          THE COURT:  Yeah, you can.  If you want to violate

12   another ruling that I've made, that's what you're doing,

13   because we had a specific limitation on this issue about going

14   into specific complaints.

15          MR. BALDANI:  Your Honor --

16          THE COURT:  You said you understood it.

17          MR. BALDANI:  Apparently, I didn't, because all I'm

18   trying to establish is that it's not the bulk.  I'm not going

19   into the specifics of the other 17, Judge.  I mean, it seems

20   to me that we're talking about the nature, the general nature

21   of the complaints.  And all I asked was that if -- I mean,

22   I've counted these.  I mean, the numbers are correct.  All

23   I've asked is that, in fact, there's 27 complaints and that

24   the bulk of them aren't to do with that.  I mean, I really

25   don't believe that that was -- it definitely wasn't an

JOHNSON - Cross (Baldani)                                    28

1    intentional --

2          THE COURT:  I think it was, so you've received my

3    ruling.  Mr. Smith, further response?

4          MR. SMITH:  Well, Your Honor, I think what I perceive

5    the questions were eliciting were answers as to describing

6    further the nature of the complaints.  And what that calls for

7    then is for me to redirect into, well, what -- it begs the

8    question about, you know, if we start parcelling these things

9    out into subcategories among subcategories, then I think it's

10   a back and forth which, I think, ultimately does lead us

11   there, whether or not it's in my first or my second round.

12      But I think ultimately, if we go into the specifics of

13   the -- the subcategories within those and having this witness

14   to then further analyze them for the jury, I think that's

15   ultimately where we have to be, and that is -- in fairness to

16   the jury to understand, I guess, if that's what he's wanting

17   to do is have the jury understand the thrust of these

18   complaints, then I think we ought to give them the full thrust

19   of it.

20         THE COURT:  You're going to talk about ten, narrow it

21   down to ten, I'm going to let Mr. Smith talk about the others,

22   specific complaints on the others.

23         MR. BALDANI:  I would like to just say this, Judge.

24   I asked you about questioning about the times, because I was

25   very cognizant of your order.  And, Judge, I really was.  You

1    act like you're skeptical --

2              THE COURT:  I'm very skeptical.  Very skeptical.

3              MR. BALDANI:  I just don't follow how challenging

4    that the bulk has to do with this one issue, I really am at a

5    loss as to how that violated your order, because I'm not

6    getting into even the general nature of the other 17.

7              THE COURT:  Listen, I'm not going to set up here and

8    argue with you on this anymore.

9              MR. BALDANI:  Okay.

10             THE COURT:  Every time I make a ruling in this case,

11   I hear from all the attorneys, and then you want to come back

12   and want to argue with me on another point.  That's what

13   you're doing now.  What I'm telling you is if you get into

14   parsing these complaints, these ten say this, these two say

15   this, you're opening the whole thing up for Mr. Smith to go

16   into.

17             Now, if you want to do that, and the other attorneys

18   are not objecting -- I gave them the chance to object in a

19   timely manner, and they didn't.  You go into those, and then

20   I'm going to let Mr. Smith go into each one if he wants to.

21   Now, do you understand that ruling?

22             MR. BALDANI:  I understand that ruling.

23             THE COURT:  Anyone else want to say anything else

24   about this?  Thank you.

25                  (Sidebar conference concluded.)

JOHNSON - Cross (Baldani)                                    30

1        THE COURT:  Mr. Baldani, please proceed.

2   BY MR. BALDANI:

3   Q.  Miss Johnson, I want to ask you about these forms that

4   you told the jury about.  This is basically a form created by

5   your office to document certain facts about complaints

6   received on election day.  Right?

7   A.  I assume you're referring to the election day complaint

8   sheet?

9   Q.  Yes, yes.

10  A.  I'm sorry.  I'm surrounded by paper.

11  Q.  That's what I'm referring to.  Was that a fair

12  description of what that is?

13  A.  Yes, those are records that we keep on every phone call

14  that we receive.

15  Q.  Okay.  And it documents date, time, person taking the

16  call, county, right?

17  A.  Yes.

18  Q.  And it documents the details of the call and the

19  response, correct?

20  A.  Right.  It's our summary of the details and of the

21  response.

22  Q.  Okay.  Would you agree with me that some of these

23  calls -- strike that.  What time do the polls close?

24  A.  The polls close at 6:00 p.m.  However, if there are

25  people in line to vote, they may vote no matter how long it

1    takes.  So 6:00 p.m., statutory-wise, but it could be as long

2    as 7:30 or longer.

3    Q.   Would you agree that some of these complaints document

4    calls that were received in the evening, after the polls were

5    closed?

6    A.   Yes.

7    Q.   For example, if you go over to the fifth page, a call was

8    6:27 p.m.?

9    A.   Yes.

10   Q.   And the page after that, 8:05 p.m.?

11   A.   I've got them completely out of order with all the

12   counting.

13   Q.   But some of them do document calls after the polling

14   hours were closed?

15   A.   Yes.

16   Q.   And is it fair to believe that if the county clerk -- if

17   the caller -- you took some of the calls, right?

18   A.   Yes.

19   Q.   And other people in your office took others of the calls,

20   right?

21   A.   Yes.

22   Q.   Would it be fair to believe that if the county clerk was

23   called about these problems --

24            MR. SMITH:  Your Honor, I'm going to object.

25            THE COURT:  Sustained.  Fair to believe is

1    speculation.

2    Q.  Would it be typical office policy that if the county

3    clerk was called about a problem, that would be noted down

4    where it says response?

5    A.  It is at times.  Sometimes, as you can matter [sic], with

6    the volume of calls we're getting, we don't always document

7    every single detail of what our follow-up is.

8    Q.  Would you agree that these 35 or so pages, it's only

9    documented the clerk was called three times?

10   A.  Would I believe --

11   Q.  That of these complaints, the only notations that the

12   clerk was called.  So in a vast majority of them, there isn't

13   any notation that the county clerk was called about the

14   problem, right?

15   A.  Right.  I have not sat here and studied every single one,

16   but I do note on several, when I was counting for you, that it

17   does say that.

18   Q.  Well, my question is, on the bulk -- on the bulk of them,

19   it doesn't say anything about the county clerk?

20   A.  It says called the attorney general's office or called

21   the county clerk.

22   Q.  Now, you've had dealings with Freddy Thompson throughout

23   the years in the course of your position, right?

24   A.  Yes.

25   Q.  Have you gotten to know him?

1   A.   He's a county clerk, you know, along with all the other

2   120.

3   Q.   Do you talk with him on a professional basis, I guess,

4   what I'm --

5   A.   Yes.  When we're doing training or when his office calls

6   with questions or, you know, as we do with any other county

7   clerk.

8   Q.   And he has never turned his back when you've talked to

9   him about an issue, has he?

10          MR. SMITH:  Your Honor, I'm going to object.

11          THE COURT:  Sustained.

12   Q.   Miss Johnson, the prosecutor asked you on direct about if

13   a member of the Board of Elections instructed an election

14   officer to destroy voter assistance forms, then the numbers

15   that you would have gotten would be basically fraudulent or

16   corrupt numbers, correct?

17   A.   No.  The question to me was if that had happened, would

18   our numbers be -- would our numbers be affected by that.  And

19   my answer was yes.  On the County Board of Elections

20   post-election statistical report, yes, that if that happened,

21   that would affect the numbers they're reporting.

22   Q.   Okay.

23   A.   That's what I stated.

24   Q.   Of course, you're not here saying that happened?

25   A.   No.

JOHNSON - Cross (Baldani)                                        34

1   Q.   Let me ask you something a little converse to that.  If a

2   precinct officer destroyed election -- I mean voter assistance

3   forms on his own, and only turned in some or none of them to

4   the county clerk, those numbers that you get would still not

5   really reflect what happened, correct?

6   A.   We take the document on face value.  So if it is what

7   they report to us -- obviously, we're in Frankfort.  We're

8   not, you know in that county on election day.  So we have no

9   knowledge of anything like that.

10  Q.   To your knowledge --

11  A.   So we take the numbers on face value.

12  Q.   To your knowledge, is the county clerk usually in the

13  county clerk's office during election day?

14  A.   When we call them, we call the county clerk's office, and

15  we reach them that way.  Do I know where they are every minute

16  of an election day, absolutely not.

17  Q.   So if an election officer threw away voter assistance

18  forms and only turned some or none of them in, it's possible

19  the county clerk could submit --

20       MR. SMITH:  Speculation.

21  Q.   -- to the State Board --

22       THE COURT:  I'll sustain the objection.

23  Q.   Like the State Board, sometimes the county clerk has to

24  take face value what the precinct officers turn in to him?

25       MR. SMITH:  It's outside of her knowledge, Your

*JOHNSON - Redirect (Mr. Smith)*                                      35

1    Honor.  I'll object.

2            THE COURT:  Sustained.  It's also argumentative.

3    I'll sustain the objection.

4            MR. BALDANI:  No other questions, Your Honor.

5            MR. GILBERT:  No questions.

6            THE COURT:  Miss Hughes?

7            MS. HUGHES:  No, sir.

8            THE COURT:  Mr. Simons?

9            MR. SIMONS:  No, thank you.

10           THE COURT:  Any redirect of the witness?

11           MR. SMITH:  Yes, if I could, Your Honor.

12           THE COURT:  Yes, sir.  You may.

13                        REDIRECT EXAMINATION

14   BY MR. SMITH:

15   Q.  Miss Johnson, you were asked about these complaint

16   sheets, and I think it was represented that in the 2004

17   primary -- I want to make sure that you have those, the 2004

18   primary.  It's PR84.  There's about three pages for the

19   beginning of that?

20   A.  Yes.

21   Q.  Do you have those in front of you?

22   A.  Uh-huh.

23   Q.  I was a little bit confused, and I'm not sure if I

24   followed.  Was your testimony that Freddy Thompson, the clerk,

25   called in two of those in the primary 2004?

JOHNSON - Redirect (Mr. Smith)                              36

1   A.   Just going by what the document says, it says that one

2   caller's name was Beverly, one caller's name was Freddy

3   Thompson, Clay clerk is what the sheet says, and the third

4   sheet says Freddy.

5   Q.   Okay.  And the third sheet was for November; is that

6   right?

7   A.   I apologize.  Yes, that was my mistake.  I'm not looking

8   at the date.

9   Q.   So there was only one call from the clerk in May of '04

10  and one call from the clerk in the fall of '04.  Is that

11  accurate?

12  A.   That's correct.

13  Q.   And the nature of those complaints in '04, in a general

14  nature, would be voter eligibility and not to have to do with

15  the machines being used in '06?

16  A.   Correct.

17  Q.   Now, you were also asked about the composition of the

18  County Board of Elections and their duties that they owe the

19  public in administering the laws as regards to elections on

20  election day.  Do you remember those questions?

21  A.   Yes.

22  Q.   And one was, I believe, offered to you about well, they

23  don't have anybody to investigate.  You don't know whether

24  they have anybody to investigate.  Remember that line of

25  questioning?

JOHNSON - Redirect (Mr. Smith)                                    37

1    A.   Yes.

2    Q.   Is it a fact, ma'am, that the statute has within it

3    requirement that one sitting member always be the sheriff?

4    A.   Yes.

5    Q.   And to your knowledge, ma'am, does the sheriff have the

6    ability to enforce the Kentucky revised statutes as it

7    pertains to vote bribery or vote buying?

8    A.   Yes.  He is a law enforcement official charged with all

9    of the statutes implementing all those.

10   Q.   And he would have all resources of the state at his

11   disposal as a sheriff.  He could call upon a lot of resources

12   to investigate, should he choose to?

13   A.   By virtue as sheriff, I would say yes.

14   Q.   And in your opinion, ma'am, did Clay County experience a

15   high volume of absentee voters in the primary of 2002?

16   A.   Yes.

17   Q.   And is that significant for you when you're watching over

18   elections as a member of the State Board of Elections?

19   A.   Right.  And we work in conjunction with the attorney

20   general's office and the U.S. attorney's office.  And yes, we

21   do look at absentee numbers.  Both mail-in numbers and the

22   voting machine numbers in this case were extremely -- we all

23   agree were extremely high.

24   Q.   And why does that play a significance in your analysis as

25   a member of the State Board of Elections?

JOHNSON - Redirect (Mr. Smith)                                    38

1    A.   Those are the early numbers.   Those are coming out --
2    obviously, this is occurring prior to the election day.   And
3    those are the numbers that historically, way before I ever
4    joined the State Board in 1994, those were the mechanism that
5    was put together to look at elections and to find out along
6    with phone calls as to who, what counties may need paying
7    attention to and what don't.
8    Q.   And when you say paying attention to, what do you mean?
9    A.   Working with the AG's office, you know, to alert all of
10   them about these numbers are kind of high.   You may hear
11   something or know something.   If your investigators are out on
12   the road or something, they might want to look into this.
13   Q.   And in the course of questioning, you were also asked
14   about the applications and the list that's made of people who
15   are applying for absentee ballots.   Do you remember those
16   questions?
17   A.   Yes.
18   Q.   And I believe there was a question, I wasn't real sure
19   whether or not those lists are made available to the public,
20   like if you go into the county clerk's office, can you go to a
21   book and open it up and say, oh, here's all the people in Clay
22   County who are gonna apply for an absentee voter ballot?
23   A.   What is available and what I was -- unless I
24   misunderstood the question, what I thought they were asking
25   is, is the list of individuals that have applied, that have

1    sent in applications saying I want an absentee ballot, either

2    mail-in or on the machine, that is a public record.  Some

3    counties keep a list of individuals that call saying I want

4    you to send me an application but maybe haven't filled it out

5    and sent it back in.  Some counties keep those.  And again,

6    that's public record too.

7    Q.  Well, I guess where I'm confused is you made, I believe,

8    as part of your answer that it was subject to an open records

9    request, and --

10   A.  Right.

11   Q.  Is there a difference, is what my question is, between

12   documents that are available for an open records request as

13   opposed to a public record such as a deed or a mortgage?

14   A.  I'm sure there is a difference.  I'm not an attorney so I

15   can't go into that difference.  But yes, it's our policy is if

16   anyone wants to see those records, they have to file an open

17   records request just like anyone does for any type of record.

18   That is our opinion.

19   Q.  And that would require a written application and then a

20   processing and a review and then a response?

21   A.  Yes.  Our belief is open records requests must be in

22   writing.

23   Q.  And how long does it generally take to turn around an

24   open records request, ma'am?

25   A.  The law requires you to respond in some way in three

1    days, whether here's your record, or you may come view it, or

2    here's copies, or I can't get it to you in three days, so come

3    on this day, or it will be available on this day.

4    Q.   If you were disseminating this information without an

5    open records request, that would violate the policy and

6    procedures which you have in place?

7    A.   In our opinion, it would.  But again, the County Board of

8    Elections is -- they're their records.

9              MR. SMITH:  Thank you.

10             THE COURT:  Mr. Pinales?

11             MR. PINALES:  Nothing further, thank you.

12             MR. WESTBERRY:  Nothing.

13             THE COURT:  Mr. White?

14             MR. WHITE:  Yes, Your Honor, just one or two, please.

15                        RECROSS-EXAMINATION

16   BY MR. WHITE:

17   Q.   Miss Johnson, when you were talking about the sheriff

18   having law enforcement, there's the county sheriff who sits on

19   the County Board of Elections, correct?

20   A.   (Nodding affirmatively).

21   Q.   That person is there by statute?  Nobody has to agree

22   that they would come on or anything like that; is that

23   correct?

24   A.   Right.

25   Q.   Then there are the sheriffs that are election precinct

JOHNSON - Recross (Mr. White)                                        41

1    officers that have that title, sheriff.  Correct?

2    A.   Yes.

3    Q.   And when you're talking about law enforcement officials,

4    you're talking about the county sheriff --

5    A.   The county -- elected sheriff of the county.

6    Q.   I just wanted to make sure.

7    A.   Right.  Not the precinct sheriff.

8           MR. WHITE:  Thank you very much.  Thank you, Your

9    Honor.  That's all I have.

10          THE COURT:  Thank you.  Mr. Abell?

11          MR. ABELL:  No questions, Judge.

12          THE COURT:  Mr. Baldani?

13          MR. BALDANI:  I don't have any follow-up.

14          THE COURT:  Anything else?

15          MR. GILBERT:  No, thank you.

16          THE COURT:  Thank you.  Anything else of this

17   witness?

18          MR. SMITH:  No, thank you.

19          THE COURT:  Thank you, ma'am.  You can step down.

20   You can leave those documents there.

21          Thank you.  Mr. Smith, you may call your next

22   witness.

23          MR. SMITH:  Like to call Colleen Haack, H-a-a-c-k.

24           COLLEEN HAACK, GOVERNMENT'S WITNESS, SWORN

25          THE COURT:  You may proceed.

*HAACK - Direct (Mr. Smith)*                                             42

1              MR. SMITH:  Thank you.

2                          DIRECT EXAMINATION

3    BY MR. SMITH:

4    Q.   State your name, please.

5    A.   Colleen Haack.

6    Q.   If you could, ma'am, tell us how you're employed.

7    A.   I'm a director for Election System & Software in Omaha,

8    Nebraska.

9    Q.   What's the name of the company?

10   A.   Election System & Software.

11   Q.   How long have you been so employed?

12   A.   Just a little over five years.

13   Q.   And ma'am, as part of your duties, do also part of your

14   duties include custodian of records, including training

15   records and documents pertaining to training of counties in

16   the use of these machines?

17   A.   That is correct.

18              MR. SMITH:  I'd like to hand to the witness what's

19   marked as Government's Exhibit D1.

20   Q.   Could you identify those, ma'am?

21   A.   These are documents completed in a training session or by

22   the trainer at the completion of a training session.

23   Q.   And what county was trained, according to your documents

24   there?

25   A.   Clay County, Kentucky.

*HAACK - Direct (Mr. Smith)*                                          43

1   Q.   And what time was the training conducted, or what date?

2   A.   Okay.  There were actually two classes.  An ERM class was

3   completed May 4th, 2006 and --

4   Q.   And -- I'm sorry.

5   A.   And an M100 and iVo, the hardware class, April 6, 2006.

6   Q.   And these documents are generated from your company's

7   training on these two dates in Clay County, Kentucky?

8   A.   That is correct.

9   Q.   And you state that these are records kept in the ordinary

10  course of business?

11  A.   They are.

12        MR. SMITH:  I'd move for their introduction at this

13  time.

14        THE COURT:  Any objection to D1?  D1 will be

15  admitted.

16              (Government Exhibit No. D1

17              was admitted into evidence.)

18  Q.   I'd like to direct your attention, ma'am, to --

19        MR. SMITH:  Ask that the Court allow me to publish a

20  document.

21        THE COURT:  Yes, sir.

22  Q.   D1, page 2.  Could you tell us generally, ma'am, what

23  this document we're looking at here as part of this exhibit

24  is, page 2?

25  A.   This document is a training wrap-up report, a report that

1    a trainer completes at the conclusion of a training session.

2    Q.  And is that generally followed in the course of doing

3    business and training in these separate counties?

4    A.  It is.

5    Q.  And this was generated by the training officer after or

6    at the conclusion of the training?

7    A.  Correct.

8    Q.  And who was the training officer that conducted training

9    in Clay County on this date of May the 4th, 2006?

10   A.  Jim Longley.

11   Q.  And if you could, ma'am, read for us the comments that he

12   made about the training session there in Clay County.

13   A.  The whole report?

14   Q.  If you could.

15   A.  "I arrived at Clay County office at 11:45 a.m.  I met

16   with the county clerk and discovered that there were some

17   confusion as to what I was there to train.  Called CAT and

18   confirmed that I was to train ERM.  Discussed further with the

19   county clerk, it was his understanding that I was to be there

20   for two days and training some of the stuff that they'd

21   already been trained on.  We settled on my training ERM per my

22   schedule.

23       "I trained two people on ERM, but during training we

24   discovered some shortcomings in the suitability for their use

25   of ERM.  They are using two iVos at each polling place.  An

*HAACK - Direct (Mr. Smith)*                                    45

1    M100 for central (paper) absentee counting, an iVo for central

2    and early absentee (walk-in) voting and a MicroVote for early

3    voting."

4    Q.   Can I stop you at that point?

5    A.   Um-hmm.

6    Q.   What is that referring to the two iVos?

7    A.   That is a specific type of hardware.  It's a touch

8    screen.

9    Q.   Okay.  And what was being implemented in Clay County for

10   the use in this election cycle of May, 2006, ma'am?

11   A.   The hardware was iVotronics.

12   Q.   Okay.

13   A.   And M100s.  The software was ERM.

14   Q.   When we're seeing ERM, that's the software program?

15   A.   It's a software program to tabulate polling results at

16   the end of election day.

17   Q.   Does that program, ma'am, have a two-step process where a

18   voter, they go in and press the vote button once to vote, and

19   they have to press it again to cast the ballot?

20   A.   The iVotronic does, yes.

21   Q.   If you could continue, please.

22   A.   "They wanted me to show them how to set up a group for

23   the MicroVote, which I explained could not be done.  And then

24   one came up with the idea that a 'null' group could be created

25   so that the results could be input manually.  I explained that

1    while this was not 'proper' usage, they could indeed do that,

2    and then we discussed the benefits, disadvantages, and dangers

3    of doing so."

4    Q.   What is a MicroVote, ma'am?

5    A.   MicroVote is another piece of hardware, but it's not an

6    ES&S piece of hardware.

7    Q.   So was it incompatible to use that with your machine?

8    A.   With the software, correct.

9    Q.   Continue, please.

10   A.   "We also discovered, while discussing the above, that

11   they are not using precincts for absentees or early voting,

12   which seems as though it may complicate reporting through ERM.

13   Although they do have precincts, the absentee ballots (paper)

14   are divided up by districts, and each district may contain up

15   to four precincts.  Similarly, the early voting on the

16   MicroVote is also divided up without regard for districts."

17   Q.   Ma'am, let me ask you to explain this dividing up a

18   county.  Let's assume that it has magisterial districts, such

19   as maybe five within a county, and what was the issue here

20   with the county clerk's office?

21   A.   I believe the concern the trainer had was that election

22   day votes would be brought in to the system in precincts in

23   early voting, and the suggestion that they made of MicroVote

24   was not precinct oriented but divided by districts.

25   Q.   Okay.  So there was an early voting machine set up

1    without regard for the precincts in the county?

2    A.   That's what I would assume.

3    Q.   Continue, please.

4    A.   "I explained that this would complicate any manual

5    updates because they are arranged by precinct and that they

6    might want to port any results from ERM (normally downloaded)

7    to an ASCII file and then concatenate the results in Excel or

8    manually.  They also came up with the idea to create a null

9    precinct to handle early and absentee votes, allowing them to

10   do the manual updates in ERM."

11   Q.   What is a null?

12   A.   What I assume in this that they're labeling it as a zero

13   precinct.  It's null is not a standard ES&S.

14   Q.   So again setting up an early voting machine that doesn't

15   regard the different precincts of the county?

16   A.   The typical precincts used in election day, yes.

17   Q.   As opposed to the election day machine, which would be

18   set up to recognize those precincts?

19   A.   By precinct, yes.

20   Q.   Okay.  If you could continue.

21   A.   "I also pointed out the complications inherent in that

22   plan.  It seems to me that a couple of the computer savvy

23   people like these could find all kinds of 'solutions' to such

24   problems without suggestions from me.

25        "I also checked out the computer that they have for ERM.

*HAACK - Direct (Mr. Smith)*                                           48

None of the ERM or Unity software seems to be installed, nor
are the input devices.  I suggested that they need to call Joe
Bolton or ES&S to get that taken care of.  They say that they
may just not use the ERM for this election, using manual
processes, and learn how to use it better before November.

    "Gladly left there at 5:00 p.m., what a maelstrom.  It
seemed to me that they were going to try things I kept trying
to discourage them no matter what I said so I reluctantly went
along with them."

Q.   Now, how many of these iVotronic machines with the
two-step process are utilized in the state of Kentucky?

A.   I don't know the exact number of machines, but I know we
have equipment in 23 counties in Kentucky.

Q.   And do you offer a variety of machines other than the one
with the two-step process where the voter has to push once to
vote and then again to cast the ballot?

A.   We do.  We offer multiple forms of equipment.

Q.   So you've not, in the 23 other counties that you sell
equipment, you haven't further determined how many of those
use this specific machine with the two-step process?

A.   I don't have the actual facts on that, but I would guess
all of them, because the version is state specific.  So it has
to be certified to be within the state.  So I would assume
each of the counties would have the same equipment if they
were using Ivotronics for the same version.

*HAACK - Cross (Mr. Richardson)*                                          49

1   Q.   In the operation of this machine, ma'am, does it have

2   within it some form of alarm system?

3   A.   It does.  When you're at a step in the process where you

4   need to hit Vote, if you haven't touched the machine, because

5   it is a touch screen machine, either to roll forward or to

6   place a vote, it has what we call a chirping sound when it

7   hasn't been touched over a period of time.

8   Q.   And can the user adjust the time in which that alarm goes

9   off?

10  A.   I believe encoding the election, you can adjust that.

11          MR. SMITH:  Pass the witness.

12          THE COURT:  Thank you.  Mr. Hoskins?

13          MR. HOSKINS:  No questions.

14          MR. WESTBERRY:  No questions.

15          THE COURT:  Mr. White?

16          MR. WHITE:  No questions, Your Honor.

17          MR. ABELL:  None from me, Judge.

18          THE COURT:  All right.

19          MR. RICHARDSON:  Thank you, Judge.

20          THE COURT:  Mr. Richardson.

21                        CROSS-EXAMINATION

22  BY MR. RICHARDSON:

23  Q.   Miss Haack, my name is Tucker Richardson.  I represent

24  Freddy Thompson here today.  You say this training by Jim --

25  A.   Longley.

*HAACK - Cross (Mr. Richardson)*                                           50

1   Q.   -- Longley took place on May 4th, 2006?

2   A.   Correct.

3   Q.   And that was approximately 12 days before the election?

4   A.   I don't, I don't know the actual date, but that would

5   sound right if it was a May primary.

6   Q.   And this is a trainer wrap-up report.  Where is Mr.

7   Longley now?

8   A.   Mr. Longley is no longer employed with Election System &

9   Software.

10  Q.   And when did he leave?

11  A.   2007.

12  Q.   Now, I want you to go to page 6 of the D1 exhibit.  Can

13  you see the numbers?  They're on the bottom right-hand corner.

14  Page 6.

15  A.   I don't see the numbers on this.

16  Q.   I'm sorry.  It's an election systems management course

17  evaluation.

18  A.   Okay.

19  Q.   And there were two employees who were trained by Mr.

20  Longley?

21  A.   Right.  They're a little out of order, but I see a couple

22  of them, yes.

23  Q.   One of them was a lady by the name of Beverly Craft?

24  A.   I see that evaluation.

25  Q.   You said in your direct testimony, you said I explained,

1    but you weren't present there that day?

2    A.  No, I was not.

3    Q.  So you were just saying I explained as in Mr. Longley

4    explained?

5    A.  Yes.  When I read the report, it was his words.

6    Q.  Do you know, basically, the machine, let's just say

7    precinct one.  The machine's set up in precinct one, and it's

8    zeroed out beginning of the day?

9    A.  That's procedure, yes.

10   Q.  And the voter, say, 100 voters come in and vote on that

11   machine.

12   A.  Correct.

13   Q.  And at the end of the day, the machine is cleared out and

14   a tape is given of the number of voters?

15   A.  The term that I would use was the machine, the polls

16   would actually be closed on the machine, and the votes are

17   actually captured on a device called the PEBS1S retained on a

18   flash card within the machine.

19   Q.  And that machine is designed that at the end of the day,

20   the polls are closed and the votes have all been done, all the

21   voters have come through, then a tape is printed out showing

22   the 100 votes, who they voted for and what races?

23   A.  Depending on the iVotronic.  Some iVotronics have a tape

24   produced on the machine or some are taken by the PEB into the

25   ERM software, and the reports are produced out of the ERM

*HAACK - Cross (Mr. Richardson)*                                    52

1    software.

2    Q.   But it's a tape total?

3    A.   I honestly am not sure, on the versions of iVos that

4    Kentucky has, if there is a tape total from the machine.

5    Q.   The important thing, I think you would agree with me, is

6    that the number of voters that vote, cast their votes, and the

7    totals get to the final results.  That's the important thing?

8    A.   There are procedures within counties where -- our machine

9    is not capturing the number of vote -- it is capturing the

10   number of voters, but there's a procedure to tally that back

11   to who steps into the polling place, yes.

12   Q.   But the important thing is to make sure that the voter's

13   vote gets counted for the candidate he wanted to be voting on?

14   A.   That is correct.

15   Q.   And this ERM stands for electronic records management?

16   A.   Electronic results management.  It's a module, yes, of

17   our software.

18   Q.   And do you know that they're using the ERM results

19   manager today?  Do you know if they're using that now?

20   A.   Clay County or other clients?

21   Q.   Clay County.

22   A.   I do not know that.

23   Q.   Do you agree that there's other ways to correctly

24   tabulate the votes without using the ERM system?

25   A.   I do.

*HAACK - Redirect (Mr. Smith)*                                        53

1           MR. RICHARDSON:  Thank you.

2           MR. GILBERT:  No questions, Your Honor.

3           THE COURT:  Anyone else?

4           MS. HUGHES:  No.

5           THE COURT:  Thank you.  Any redirect of the witness?

6           MR. SMITH:  Yes, Your Honor, please the Court.

7                         REDIRECT EXAMINATION

8    BY MR. SMITH:

9    Q.  Miss Haack, you were asked about those who attended

10   training.  There were two trainings, correct?

11   A.  Correct.

12   Q.  And the first training was actually on the operation of

13   the software?

14   A.  That is correct.

15   Q.  And so that's where you would actually receive training

16   on how to operate this particular voting set-up with the

17   software program that's offered with this machine?

18   A.  Correct.  I think I misspoke.  The first training was

19   actually on the hardware in April.  The second was on the

20   software in May.

21   Q.  So to learn the equipment and learn the system and learn

22   how to instruct voters, that would have occurred in the early

23   or the later training?

24   A.  To interact with the voters, that would have been the

25   hardware, and that would have been the April early session.

*HAACK - Redirect (Mr. Smith)*                                    54

1    Q.   Okay.  And could you tell me, from the training

2    documents, if Freddy Thompson certified as being in attendance

3    at that training?

4    A.   Yes.  Freddy Thompson is listed on that training.

5    Q.   And did he also do a course evaluation form for you?

6              MR. SMITH:  Ask to publish.

7    A.   Yes.

8              MR. RICHARDSON:  Your Honor, I'd object.  Outside the

9    scope.

10             THE COURT:  Overruled.

11             MR. SMITH:  Publish that.  Thank you.

12   Q.   Does that appear to be now, on the monitor, Mr. Freddy

13   Thompson's evaluation of the training on the system?

14   A.   Yes.

15   Q.   And it appears that he was very satisfied with the

16   training on how to learn the equipment, learn the system and

17   instruct voters?

18   A.   Yes, he, on the second page, he gives it all 5s, which is

19   the top score.

20             MR. SMITH:  Thank you.

21             THE COURT:  Anything else of the witness?

22             MR. RICHARDSON:  No.

23             THE COURT:  All right.  Thank you, ma'am.  You can

24   leave those documents there.  You may step down, be excused.

25             Thank you.  Mr. Smith?

*BLAIR - Direct (Mr. Smith)*                                        55

1          MR. SMITH:  United States would call Edsel Blair.

2          THE COURT:  Thank you.

3            EDSEL BLAIR, GOVERNMENT'S WITNESS, SWORN

4          THE COURT:  You may proceed.

5          MR. SMITH:  Thank you.

6                      DIRECT EXAMINATION

7    BY MR. SMITH:

8    Q.   State your name, please.

9    A.   Edsel Vincent Blair.

10   Q.   Mr. Blair, how are you employed?

11   A.   I'm a detective through London Police Department,

12   assigned to the task force with the Federal Bureau of

13   Investigation.

14   Q.   And how long have you been a task force officer, sir?

15   A.   Full-time, approximately four years, but I've worked

16   cases with the Bureau for the past 13 years.

17   Q.   In the course of your work as a task force officer, have

18   you worked alongside with Special Agent Timothy Briggs?

19   A.   Yes, I have.

20   Q.   And have you also participated in the investigation that

21   has led to the charges in this case?

22   A.   I have.

23   Q.   And when did you get involved with Special Agent Briggs

24   in assisting in the investigation?

25   A.   The investigation of the voter fraud started

BLAIR - Direct (Mr. Smith)                                    56

1    approximately late '05, '06.

2    Q.  And as part of your interaction in the investigation,

3    sir, did you seek to identify certain records and isolate for

4    purposes of your case incidents that were documented in public

5    records such as in the Clay County circuit clerk's office?

6    A.  Yes, sir, I did.

7    Q.  We have previously introduced some records.  With the

8    Court's permission, I'd like to review some of those with you,

9    Officer Blair.  I would direct your attention, first, to

10   document Exhibit D67.  Just ask you, Agent Blair, did you, in

11   the course of your investigation, learn of an historical

12   relationship between Cletus Maricle and Douglas R. Adams?

13   A.  Yes, sir, we did.

14   Q.  Or Douglas Adams.  Sorry.

15   A.  Yes, sir, we did.

16        MR. SMITH:  Ask that D67 be published for the witness

17   to examine with regard to it.

18        THE COURT:  Yes, sir.

19   Q.  From your examination of the court records, what were you

20   able to find out about that relationship?

21   A.  This is a Clay Circuit Court indictment 89 -CR-047

22   that --

23        MR. WESTBERRY:  Excuse me, Judge.

24        THE COURT:  Yes, sir.

25        MR. WESTBERRY:  Regrettably, I need to ask to

*BLAIR - Direct (Mr. Smith)*                                              57

1    approach for a brief second.

2              THE COURT:  Yes, sir.

3                        (A sidebar conference was held out of the

4                        hearing of the jury):

5              THE COURT:  Yes, sir, Mr. Westberry.

6              MR. WESTBERRY:  Thank you.  Kent Westberry for

7    defendant Douglas Adams.  Before we go much further in direct

8    with this particular witness, I'm reminded of the Court's

9    earlier limine ruling that it is permissible for the

10   government to prove that Mr. Maricle at one time had

11   represented Mr. Adams in a case that, my best recollection, it

12   was ultimately dismissed.

13             I don't know how far the government plans on going

14   with this line of questioning.  My concern is that the

15   admission of a pleading, an entry of appearance, you know,

16   creates the impression that we think that would at least

17   violate the spirit of the Court's earlier limine ruling that

18   the actual -- if I recall correctly, the actual case, they

19   could not get into the substance of the charge.  Excuse me.

20   It's late in the day, and I'm not recalling everything that

21   was said.

22             But I don't think that the government actually needs

23   this pleading, this entry of appearance in evidence in order

24   to establish at least that some representation had been made

25   with Mr. Maricle on behalf of Mr. Adams back in, I believe it

1  was 1989, if my memory serves me correctly.

2         So I don't know how far Mr. Smith is going with this,

3  but I don't think he needs that entry of appearance, this

4  pleading in evidence to establish the point that he's trying

5  to make.  So to that extent, if that's what he's attempting to

6  do, I would object, Judge Reeves.  Thank you.

7         THE COURT:  Mr. Smith?

8         MR. SMITH:  Well, it's already been introduced, to my

9  knowledge, Your Honor, and was not objected to at the time,

10 and I think this witness is going to say that Cletus Maricle

11 represented this man, and that's as far as I intend to go.

12 But I think that this is already introduced into evidence, so

13 it's belated.

14        MR. WESTBERRY:  Forgive me if that's the case.  It

15 must have been introduced very early in the trial.

16        THE COURT:  It was introduced through a witness

17 today.  It's one of the records I recall seeing at the time it

18 was introduced.  It is in evidence, Mr. Smith.  You said that

19 you're just going to establish the relationship that he

20 represented Mr. Adams?

21        MR. SMITH:  Yes, Your Honor.

22        THE COURT:  All right.  I'll overrule the objection

23 but remind Mr. Smith of my pretrial ruling with respect to the

24 substance of the charges that did not result in a conviction.

25        MR. SMITH:  And I have reminded the witness before he

BLAIR - Direct (Mr. Smith)                                    59

1    testified here this afternoon of that so I'm confident he's

2    not going to mention that.

3              THE COURT:  All right.  Thank you.  Mr. Pinales?

4              MR. PINALES:  Your Honor, Martin Pinales on behalf of

5    Mr. Maricle.  Mr. Blair has a very nice, soft voice, but I

6    thought in response to the question -- I was just about to

7    object.  When it was asked what is that, I believe he said

8    this is an indictment.

9              MR. WESTBERRY:  Yes.

10             MR. PINALES:  And it is not an indictment, Your

11   Honor.  It is an entry of appearance, and I was going to

12   object to his response of something that it is not.

13             THE COURT:  All right.  Mr. Smith, I'm going to allow

14   you to lead the witness to identify what the document is and

15   ask him if it's his understanding that Mr. Maricle represented

16   Mr. Adams in a proceeding.

17             MR. SMITH:  Sure.

18             THE COURT:  And then we can move on from there.

19             MR. PINALES:  I'll be careful not to open any doors.

20   Thank you.

21                  (Sidebar conference concluded.)

22             THE COURT:  Thank you.  Mr. Smith, you may proceed.

23   BY MR. SMITH:

24   Q.   Officer Blair, my question was whether or not, in your

25   investigation, you sought to find evidence of an earlier

*BLAIR - Direct (Mr. Smith)*                                            60

1    relationship that existed between Mr. Russell Cletus Maricle

2    and Doug Adams.  My question is, D67 there, is that a record

3    which came to your attention during your investigation, sir?

4    A.  Yes, sir, it did.

5    Q.  And from that document, can you tell me what

6    relationship -- well, let me ask you this.  Was Russell Cletus

7    Maricle at a point in time before he got appointed judge, I

8    believe it's been put in the record around 1990, was he a

9    practicing attorney in Clay County?

10   A.  Yes, sir, he was.

11   Q.  And at the time that he was practicing law and from this

12   document, D67, can you determine from that whether or not he

13   actually was representing Douglas Adams in a matter before the

14   circuit court?

15   A.  He was representing Mr. Adams in this matter.

16   Q.  And from the document, can you testify or identify about

17   what time period he entered his appearance for Mr. Adams as

18   his attorney?

19   A.  This document was filed in the system July 28th, 1989.

20   Q.  And when you say in the system, that would have been

21   filed in the circuit court clerk's office?

22   A.  Circuit clerk's office.

23   Q.  And at that time, it was Larry Joe Roberts?

24   A.  Yes, sir, it was.

25   Q.  Okay.  Now, during your investigation, were you aware of

BLAIR - Direct (Mr. Smith)                                      61

1   statements made by Kenneth Day?

2   A.   Yes, sir, I was.

3   Q.   And did you seek to identify whether there were court

4   records to evidence a civil matter which he said that he

5   represented an estate as a personal representative?

6   A.   Yes, I did.

7   Q.   Okay.  I'd like to direct your attention to D70.

8        MR. SMITH:  With the Court's permission, may we

9   publish that?

10       THE COURT:  It's been admitted.  Yes.

11       MR. SMITH:  Thank you.  D as in Daryl, 70.

12  Q.   Were you able in your investigation, Officer Blair, to

13  verify that, in fact, there was a civil suit filed by Kenneth

14  Day on behalf of the estate of Loretta Day?

15  A.   Yes, there was.

16  Q.   And during the course of your investigation, did you find

17  out whether or not there was actually a jury trial?

18  A.   According to this document, there were a jury trial.

19  Q.   And what date was the jury empanelled to hear that

20  matter?

21  A.   The jury was empanelled on the 20th day of September,

22  1990.

23  Q.   And do you know at that time how long the trial lasted?

24  A.   The trial concluded September 21st, 1990.

25  Q.   So --

*BLAIR - Direct (Mr. Smith)*                                                      62

1    A.   One day.

2    Q.   So it was a one-day trial?

3    A.   Yes.

4    Q.   And in the course of interviewing Kenneth Day, were you

5    made aware that a contact had been made to one of the jurors

6    in the matter?

7    A.   Yes, sir, I was.

8    Q.   And were you, from your interviews with Kenneth Day, were

9    you able to identify who that juror was?

10   A.   We were.

11   Q.   And what was the juror's name?

12   A.   The juror's name was Essie Jackson.

13   Q.   And what number juror does she appear here on the

14   verdict?

15   A.   She is Juror Number 26.

16   Q.   What was the finding of the jury as to liability, as to

17   whose fault it was?

18   A.   According to this document, 100% of the liability was on

19   Gary Runion.

20   Q.   And what did the jury render as a verdict for damages?

21   Direct your attention to page 5, bottom of the page.

22   A.   It's the total sum of $3,510,000.

23   Q.   Would that be 510 dollars or 10 thousand dollars?

24   A.   I'm sorry, $3,000,510.

25   Q.   And Agent Blair, at the time that this verdict came down,

BLAIR - Direct (Mr. Smith)                                    63

1    who was the judge on the civil case?

2    A.   The -- it's a Leonard B. Wilson, special judge.

3    Q.   Do you know when Cletus Maricle got appointed as circuit

4    judge in Clay County?

5    A.   It was 1990.  I'm not sure on the date.

6    Q.   Did you further examine the records to determine -- in

7    your interview with Kenneth Day, did he represent to -- strike

8    that.  In your investigation, did you look to see the

9    relationship Cletus Maricle had with Gary Runion?

10   A.   Gary Runion had also been represented by Russell Cletus

11   Maricle.

12   Q.   Like to direct your attention to D71.  Now, Gary Runion,

13   was he the defendant in the civil matter where this $3 million

14   verdict was rendered against?

15   A.   Yes, he was.

16   Q.   Was he also charged in a criminal case?

17   A.   He was.

18   Q.   And were you able to determine who the attorneys were

19   that were representing him in the criminal case were?

20   A.   Yes, sir.  On the case of Commonwealth of Kentucky versus

21   Gary Runion, he was -- Runion was represented by Cletus

22   Maricle.

23   Q.   Okay.  There's a column there, I believe we're looking at

24   D71, that says trial, and below it says Maricle & Bailey.  Are

25   you familiar with the term or the title Maricle & Bailey?

*BLAIR - Direct (Mr. Smith)*                                      64

1    A.   Correct.  Maricle & Bailey were law partners in a law

2    firm in Clay County.

3    Q.   And again, this was part of the court records that you

4    were able to find in Clay County as to the matter of Gary

5    Runion?

6    A.   Yes, sir, it was.

7    Q.   Now, page 2 of D71, refer you to that.  Can you explain

8    this order certifying the need for a special judge?

9    A.   This --

10   Q.   Who was the judge asking for an appointment of special

11   judge, Officer Blair?  Do you recognize the signature there at

12   the middle of the page?

13   A.   Yes, sir.  That's the signature of Russell Cletus

14   Maricle.

15   Q.   And he's signing that in the capacity of circuit judge?

16   A.   Yes, sir, he is.

17   Q.   And what date did he sign this, certifying that they

18   needed to put a special judge in this murder case against Gary

19   Runion?

20   A.   Looks like December 14, 1990.

21   Q.   I'd like to direct your attention to D77.  Agent Blair,

22   in your investigation, were you aware of a fella by the name

23   of Raleigh Downey making a statement, something to the effect

24   of he was expecting his brother to get let out of jail, John

25   Downey?

*BLAIR - Direct (Mr. Smith)*                                          65

1    A.   Raleigh Downey had made that statement to agents that his

2    brother be let out of jail; and in turn, he would work for the

3    defendants in their election fraud.

4    Q.   Can you determine from examining D77 when John Downey was

5    let out of jail, sir?

6    A.   He was let out of jail October 30th, 2006.

7    Q.   And do you know which judge let him out of jail on that

8    date?  From looking at the records, please.

9    A.   There are two different judges that are signed on

10   documents in this case file.

11   Q.   And who are they?

12   A.   One judge is Russell Cletus Maricle, and the other -- I'm

13   having a hard time reading the signature.  I can't make the

14   signature out.  Another judge.

15   Q.   Okay.  We'll move on.  Thank you.  Direct your attention

16   now to D78.  During your investigation, were you also advised

17   about the release of a prisoner by the name of Bobby Sams?

18   A.   Yes, sir.

19   Q.   And were you able to find the records of the circuit

20   clerk when he was released from custody?

21   A.   We did.

22   Q.   First of all, what were the charges in the circuit court

23   record, D78, that he was facing, sir?

24   A.   The charges that Mr. Sams was facing were receiving

25   stolen property over 300, which is a felony.

*BLAIR - Direct (Mr. Smith)*                                          66

1    Q.   In fact, accused him of possessing aluminum and other

2    valuables over $300?

3    A.   That's correct.

4    Q.   And who was he charged with?  Did he have a co-defendant?

5    A.   He was co-defendant with Wes Caudill.

6    Q.   Okay.  And D78, is that a copy of the records that you

7    found existing in the Clay Circuit clerk's office regarding

8    that matter?

9    A.   Yes, it is.

10   Q.   And from that, sir, can you give us a date in which Bobby

11   Sams was released from custody?

12   A.   He was released from custody on October 20th, 2006.

13   Q.   Do you know when election day was in November, 2006?

14   A.   The -- it was in early November.  He was released

15   before -- or prior to election day.

16   Q.   November 7th, would that be --

17   A.   That's correct.

18   Q.   -- close?  So he was released from custody, and who was

19   the judge that signed his judgment?

20   A.   That would be Russell Cletus Maricle.

21   Q.   And does the court record show who his attorney was that

22   represented him in the matter before Judge R. Cletus Maricle?

23   A.   Mr. Sams was represented by Scott Madden.

24   Q.   And what was the final disposition, sir, of the matter?

25   A.   A plea of guilty was entered to a lesser charge,

*BLAIR - Direct (Mr. Smith)*                                      67

1    receiving stolen property under 300.

2    Q.   Is that a misdemeanor?

3    A.   That is a misdemeanor.

4    Q.   And was he indicted on a misdemeanor or a felony?

5    A.   He was indicted on a felony charge.

6    Q.   And what did the judge sentence him on the misdemeanor?

7    A.   Says that received a maximum term of six months in the

8    Clay County Jail or electronic monitoring was the sentence

9    that he received.

10   Q.   And is there within that record, sir, an actual pleading

11   or filing which says that he was released on that date?

12   A.   Yes.  We have a release form that was.

13        MR. SMITH:  Your Honor, would the Court allow me to

14   publish this from the projector at this time?

15        THE COURT:  Yes, sir.

16   Q.   Do you have that document within Exhibit 78?

17   A.   Yes, sir, I do.

18   Q.   Can you tell us what that document is, sir?

19   A.   This is a release from custody form on the Commonwealth

20   versus Bobby Sams case.  His release date is October 20th,

21   2006.

22   Q.   What conditions was he released on, according to this

23   document, sir?

24   A.   Look like same conditions as before.

25   Q.   Thank you.  Now like to direct your attention to D82.

*BLAIR - Direct (Mr. Smith)*                                        68

1    Did you participate in interviewing Wanda White during the

2    course of the investigation?

3    A.   Yes, sir, I did.

4    Q.   And did she make mention to you at any point in time of a

5    case that was involving her sister, Stephanie Price?

6    A.   She did.

7    Q.   And do you recall what she related happened in Stephanie

8    Price's case, sir?

9    A.   She related to us that a favor had been done to her to

10   have some charges dismissed on her sister, Stephanie Lynn

11   Price.

12   Q.   Do you have in front of you D82, sir?

13   A.   Yes, sir, I do.

14   Q.   Were you able to find within the records of Clay County

15   Circuit Court any documentation that there was, in fact, a

16   case against her sister, Stephanie Lynn Price?

17   A.   Yes, sir, I did.

18   Q.   And what does the matter, as you see it here, what does

19   that describe?  What kind of matter was it?

20   A.   This is a Bench warrant that was on Stephanie Lynn Price.

21   Q.   Do you know what her charges were, sir?

22   A.   Looks like she had some traffic charges and also --

23   Q.   Direct your attention here to the citation.  Does that

24   appear in your documentation, sir?

25   A.   It does.

*BLAIR - Direct (Mr. Smith)*                                                    69

1   Q.   And what were those charges, sir?

2   A.   Operating on suspended OLs, expired registration plates,

3   expired registration received, and also no insurance.

4   Q.   And you had indicated that from your examination of the

5   records that there was a Bench warrant for her?

6   A.   Yes, sir, there were.

7   Q.   And describe for us generally, what is a Bench warrant,

8   sir?

9   A.   Bench warrant is a warrant for a person's arrest by a law

10  enforcement agency.

11  Q.   And how are those generally processed for law enforcement

12  purposes?

13  A.   They are processed through the Court system, which writes

14  the warrant, and then the law enforcement agencies serve the

15  warrant.

16  Q.   It says here to all peace officers in the Commonwealth of

17  Kentucky.  Can the state police arrest you or any other law

18  enforcement agency?

19  A.   Any law enforcement officer in the Commonwealth of

20  Kentucky can make the arrest.

21  Q.   Did you seek to determine from the record whether or not

22  there had been an attempt to dispose of the warrant of arrest

23  on Miss Stephanie Price?

24  A.   Yes, we did.

25  Q.   And what did you find?

BLAIR - Direct (Mr. Smith)                                    70

1   A.   We found that the warrant had been disposed of, that it

2   was recalled without arrest per Russell Cletus Maricle.

3   Q.   Is that documented anywhere in the court record, sir?

4   A.   That is documented on page 2 of the court records at the

5   top.

6   Q.   And what date did Judge Maricle recall this warrant of

7   arrest on Stephanie Price?

8   A.   It was October 11th, 2006, prior to the November 7th

9   election.

10  Q.   Does that appear to you to be unusual, sir, based on your

11  reflection in the record, for a circuit court judge to be

12  withdrawing a warrant of arrest on a district court matter

13  such as a traffic offense?

14        MR. PINALES:  Objection, Your Honor.

15        THE COURT:  Overruled.

16  A.   Yes, this matter was down in district court under Judge

17  Oscar Gayle House.  And yes, that does not occur often at all,

18  a circuit judge intervene in a misdemeanor warrant in district

19  court.

20  Q.   Like to direct your attention now to Exhibit D83.

21        THE COURT:  Mr. Smith, when you get to a good place

22  to stop, we're going to take our afternoon break.

23        MR. SMITH:  Your Honor, I have several other records

24  to review with this witness.  Maybe this is a good point, if

25  the Court's ready.

BLAIR - Direct (Mr. Smith)                                      71

1          THE COURT:  Yes, sir.  Ladies and gentlemen, we will

2    take our afternoon recess at this time until 3:00.  Please

3    keep in mind the admonitions that you've been given

4    previously.  Of course, don't discuss the case among

5    yourselves while we are in recess.  The jury will be excused

6    until 3:00 p.m.

7               (The jury left the courtroom at 2:38 p.m.)

8          THE COURT:  Any matters to take up outside the

9    presence of the jury?  We'll be in recess until 3:00.

10              (Recess from 2:39 p.m. until 2:58 p.m.)

11              (The jury entered the courtroom at 2:58 p.m.)

12         THE COURT:  Thank you.  The record will reflect that

13   all members of the jury are present.  Parties and counsel are

14   also present.  Witness is reminded he's still under oath.

15         Mr. Smith, you may continue.

16   BY MR. SMITH:

17   Q.  Officer Blair, in your investigation, did you inquire of

18   Miss Wanda White about other cases in which she claimed to get

19   favors?

20   A.  Yes, sir, I did.

21   Q.  Do you recall her mentioning the name Sarah Price being a

22   case which --

23   A.  Yes, Sarah Price, who is the mother of Wanda White.

24   Q.  And did you seek to find records of that case involving

25   her mother, Sarah Price?

BLAIR - Direct (Mr. Smith)                                    72

1   A.   I did.  We found a circuit court record of Sarah Price

2   where she was charged with trafficking in a controlled

3   substance first degree, cocaine on June 22nd, 2004.

4   Q.   Is that the date which she was indicted?

5   A.   That was the date in which she was arrested.

6   Q.   And you said that is a felony.  What type felony is

7   trafficking in the first degree of cocaine?

8   A.   That would be a Class C felony.

9   Q.   What range of punishment is a Class C felony, sir?

10  A.   Five, five to ten years.

11  Q.   And you identified that record?

12  A.   Yes, sir, I have.

13  Q.   Is that D83?

14  A.   Yes, sir.

15  Q.   Is this the incident report that was attached as part of

16  the copy of the court record which you found?

17  A.   Yes, sir, it is.

18  Q.   Does that indicate the date of the arrest which it

19  occurred?

20  A.   The violation was on June 22nd, 2004.

21  Q.   Was that in Clay County?

22  A.   That was in Clay County.

23  Q.   Did you seek to find the history of the case as to

24  whether or not there was an attorney representing Miss Sarah

25  Price in the matter?

*BLAIR - Direct (Mr. Smith)*                                           73

1    A.   Yes, sir, we did.   The documentation in the case file is

2    that Miss Sarah Price was represented by Carl Anthony Short.

3    Q.   And in your investigation, sir, were you able to

4    determine whether or not this would have been set for trial at

5    or around the May primary 2006 election?

6    A.   It was.

7    Q.   And if you could give us the dates which you were able to

8    find there and ultimately the disposition of this matter, sir.

9    A.   This particular case has a couple of orders to postpone

10   the trial.   One order was done -- it's an order continuing

11   trial date.   It was entered on March 7th, 2006.   And the order

12   was signed by Russell Cletus Maricle, postponing the trial

13   date.

14   Q.   And did that postpone it till after the election?

15   A.   The trial date was then reset for May 23rd, 2006, which

16   is after the primary election.

17   Q.   Okay.   And like to show you here, was there an actual

18   order which was found within the record disposing of the case?

19   A.   Yes, sir, there were.

20   Q.   And what was the disposition of the case, sir?

21   A.   The order of dismissal and return of property was signed

22   on the 31st day of July, 2006 by Russell Cletus Maricle, and

23   the charges on Miss Sarah Price were ultimately dismissed.

24   Q.   During your investigation, did you also seek to determine

25   if there were other cases in which Cletus Maricle may have

1    presided on as judge which might have involved one of his

2    co-defendants in this case?

3    A.   Yes, sir, there were.

4    Q.   And could you describe for us generally the matter which

5    you found Cletus Maricle to be sitting as a presiding judge

6    over one of his co-defendants in this case?

7    A.   Mr. Cletus Maricle was presiding over a case involving

8    William Stivers, Al Man Stivers.

9    Q.   Like to hand to you now PR81.  Can you identify PR81,

10   sir?

11   A.   Yes, sir, I can.

12   Q.   And what is that?

13   A.   This is a file that was pulled from the circuit clerk's

14   office in Clay County.  This is a William Stivers versus the

15   City of Manchester.  It's an order of dismissal.  It was --

16   Q.   Did you further investigate the matter to see what the

17   controversy was at issue here that was ultimately signed by

18   Judge Cletus Maricle, an order of dismissal?

19   A.   It was on the criminal charges involving William Stivers.

20   Q.   Now, it's styled William Stivers versus City of

21   Manchester, Kentucky.  Are you sure that's a criminal matter,

22   sir?

23   A.   This is a civil action that was in the 41st judicial

24   circuit, Clay Circuit Court.

25   Q.   Do you know what the nature of the controversy was

BLAIR - Direct (Mr. Smith)                                    75

1    between William Stivers and the City of Manchester that

2    brought about this lawsuit?

3    A.    It was a -- it stemmed from criminal charges on Mr.

4    Stivers where he was arrested by Manchester PD for alcohol

5    intoxication, and Mr. Stivers later civilly sued the City of

6    Manchester and its officers.

7    Q.    And were you able to determine who his lawyer was, sir,

8    that represented him in the case against the City of

9    Manchester?

10   A.    His attorney in that case was Yancey White.

11   Q.    And is that the same Yancey White that's been mentioned

12   many times in this case as an unindicted co-conspirator in the

13   election schemes?

14   A.    Yes, sir, it is.

15            MR. SMITH:  Pass the witness.

16            THE COURT:  Thank you.  Mr. Pinales.

17            MR. PINALES:  Thank you, Your Honor.

18               (Mr. Pinales and Mr. Smith conferring.)

19            MR. SMITH:  You need to approach?

20            MR. PINALES:  Yes.  Your Honor, may I?

21            THE COURT:  Yes, sir.

22                   (A sidebar conference was held out of the

23                   hearing of the jury):

24            MR. PINALES:  Your Honor, may it please the Court, we

25   would like to see the entire file that was pulled and in the

1    possession of the government, not just specific documents that

2    were shown to this witness.  I believe Mr. Hoskins went to the

3    circuit court clerk's office and -- there you are.  The entire

4    files are gone.  Not copies left or anything like that.  Is

5    that correct?

6              THE COURT:  Which file are we talking about?

7              MR. PINALES:  The files that were discussed today on

8    each of --

9              (Mr. Pinales and Mr. Hoskins conferring.)

10             MR. PINALES:  The Stephanie Price file specifically,

11   Your Honor.  I would just ask Mr. Smith if he has those

12   complete files.

13             MR. SMITH:  Your Honor, my recollection is back in

14   December, I notified counsel of all parties in the matter that

15   we had some circuit court files that had been given to us

16   pursuant to subpoena, available for inspection and copying.

17   Until this morning, I've not heard from Mr. Maricle's

18   attorneys about setting up a time, and I believe Mr. Hoskins

19   said that later this evening or at a point later, he would be

20   available to look at those.

21             So obviously, copies of these records that have been

22   introduced have been supplied.  The full record as to

23   Stephanie Price, I'm not sure.  I can verify how many of these

24   exist in the box back there, but there is a box that has

25   actual court records in them.  So without me going back and

1    inspecting those, I couldn't really verify to counsel or the

2    Court as to what is in there above and beyond what's been

3    shown to the witnesses and introduced already.

4         MR. HOSKINS:  I went to the Clay County circuit

5    clerk's office and found some of the files I was interested

6    in.  One in particular was this Stephanie Price, and the clerk

7    wasn't able to locate that.  It's my assumption -- they told

8    me that the government, the United States attorney or the FBI,

9    somebody came and got the original files.

10        THE COURT:  Did Mr. Smith make those documents

11   available to you at his office?

12        MR. HOSKINS:  Judge, we did get that letter around

13   the time we got all the Jencks material with hundreds and

14   hundreds --

15        THE COURT:  When was it?

16        MR. HOSKINS:  I'm sure it was in December.

17        THE COURT:  So now the witness has testified, and you

18   now want Mr. Smith to now produce the documents after he's

19   made those available to you for three months, two to three

20   months?  So we'll need to delay the trial while this review

21   takes place.

22        MR. HOSKINS:  I don't believe it would take a long

23   time for us to --

24        THE COURT:  We don't know what's there, do we?

25        MR. HOSKINS:  Pardon?

78

1          THE COURT:  Don't know what's there, do we?

2          MR. HOSKINS:  We know the Stephanie Price file -- I'm

3      confident the Stephanie Price file is there, as well as the

4      entire file of John Downey and -- I said I'm relatively

5      confident that the Stephanie Price file that we were looking

6      for as well as the John Downey file and the Bobby Sams file

7      would be there.

8          THE COURT:  All right.  Mr. Smith, how long will that

9      take you to assemble those records and make those available to

10     counsel?

11         MR. SMITH:  Five or ten minutes, I should be able to

12     locate it.

13         THE COURT:  I'm not going to keep the jury setting

14     here.  If it's going to be significant time to review the

15     materials after they're located, I'm going to go ahead and

16     release the jury for the evening.

17         MR. SMITH:  Can I send someone to give me an

18     estimation of how big this box is?

19         THE COURT:  We'll take a brief recess while you do

20     that.  I want to come back without the jury being present.

21         MR. PINALES:  Thank you, Judge.

22              (Sidebar conference concluded.)

23         THE COURT:  Ladies and gentlemen, we're going to take

24     a brief recess while we locate some records.  I'm not sure if

25     it will be 10 or 15 minutes or exactly how long.  If it's too

1    long, I may call you back in and release you for the evening.

2    If you would stand by, and hopefully we'll be able to call you

3    back here in a little bit.  Please keep in mind the

4    admonitions you've been given previously not to discuss the

5    case among yourselves.  The jury will be excused for

6    approximately 10 to 15 minutes.

7                 (The jury left the courtroom at 3:12 p.m.)

8                 THE COURT:  Mr. Smith, if you would advise me when

9    you locate these materials, and we'll come back in session

10   without the jury being present.

11                MR. SMITH:  Yes, Your Honor.

12                THE COURT:  We'll be in recess.

13                (Recess from 3:13 p.m. until 3:25 p.m.)

14                THE COURT:  Thank you.  The jury's not present at

15   this time.  Where are we on these records?

16                MR. PINALES:  Your Honor, Mr. Smith has shown us I

17   guess a catalog of the items that he had.  They are not the

18   files that we are seeking for the cross-examination.  If and

19   when they are located, we will use it in our case-in-chief and

20   deal with it -- one moment please, Your Honor.

21                THE COURT:  Yes, sir.

22                MR. PINALES:  So, in fact, if we need them, we might

23   have to call this witness as one of ours in our case-in-chief.

24                THE COURT:  All right.  Very well.

25                MR. PINALES:  Or another appropriate witness.

*BLAIR - Cross (Mr. Pinales)*                                    80

1          MR. RICHARDSON:  Your Honor, if I may, before we get

2     down here, on cross-examination, are we limited to the direct

3     examination on this witness also?

4          THE COURT:  Yes, sir.

5          MR. RICHARDSON:  Just wanted to check.

6          MR. PINALES:  And if I may have those, I'll use the

7     Elmo, Your Honor.

8          THE COURT:  You want all the exhibits?

9          MR. PINALES:  Yes, I'll keep them in the same order

10    because that's the order I want to go in.

11         THE COURT:  Deliver those to Mr. Pinales.

12         MR. PINALES:  Thank you.

13         THE COURT:  Anything else before the jury's brought

14    in?  Bring the jury in.

15              (The jury entered the courtroom at 3:27 p.m.)

16         THE COURT:  All members of the jury are present, as

17    are parties and counsel.  Mr. Blair, you're still under oath,

18    of course.

19         Mr. Pinales, you may proceed.

20         MR. PINALES:  Thank you, Your Honor.

21                       CROSS-EXAMINATION

22    BY MR. PINALES:

23    Q.  Good afternoon.

24    A.  Good afternoon.

25    Q.  I have just a few questions to ask you, and I'll try and

*BLAIR - Cross (Mr. Pinales)*                                          81

1   do it in the same order that the questions were asked on

2   direct.

3   A.   Okay.

4   Q.   I believe you said that you've been in this task force

5   for, I believe, four years, you said?

6   A.   Four, five years.

7   Q.   Four, five years.  You started off as a sheriff in Laurel

8   County?

9   A.   I was a -- started off as a part-time deputy sheriff in

10   the late '80s.  Started full-time in January of 1994, worked

11   13 years as chief deputy of Laurel County Sheriff's Department

12   and then went to the London PD, which I'm in my fourth year

13   there.

14   Q.   And so a long time before you became on this -- you

15   started on this task force, you've been in law enforcement?

16   A.   Yes, sir.

17   Q.   Okay.  Now, you've been involved in this case for a

18   number of years?

19   A.   Yes, sir.

20   Q.   Can you see the monitor?

21   A.   Yes, sir.

22   Q.   Thank you.  As soon as it warms up -- there.  You were

23   shown Exhibit D67.  Do you recall that?

24   A.   Yes, sir.

25   Q.   And in that, it's an entry of appearance ; is it not?

*BLAIR - Cross (Mr. Pinales)*                                    82

1   A.   Yes, it is.

2   Q.   And it's an entry of an appearance from an attorney named

3   Cletus Maricle?

4   A.   Yes, sir, it is.

5   Q.   And actually, above Cletus Maricle, R. Cletus Maricle's

6   name, it shows the name of the law firm; does it not?

7   A.   Yes, sir, it does.

8   Q.   And that was Maricle & Bailey?

9   A.   Yes.

10  Q.   And from your investigation in this case, you have

11  learned that Cletus Maricle was a successful attorney in Clay

12  County before he became a judge?

13  A.   I know Cletus Maricle was an attorney before he became a

14  judge.

15  Q.   And that he was in partners with a Ricky Bailey?

16  A.   He was with Mr. Bailey.

17  Q.   Okay.

18  A.   And others.

19  Q.   And in that document that we just had up there, and I'll

20  show it to you again, he actually signed in as the attorney

21  from that firm?

22  A.   According to that document, yes, sir.

23  Q.   Okay.  And from what you know, Mr. Maricle represented a

24  lot of people in Clay County; did he not?

25  A.   He could have.

BLAIR - Cross (Mr. Pinales)                                      83

1    Q.   Okay.  Then I believe you were shown Government

2    Exhibit 70.  Do you see that?

3    A.   Yes, sir, I do.

4    Q.   That was on the Runion case; was it not?

5    A.   It is.

6    Q.   And as a matter of fact, on the Runion case, there were

7    two Runion cases, a civil and a criminal case; is that

8    correct?

9    A.   Yes, there were.

10   Q.   And this happens to be the civil case.  Do you see it up

11   there?

12   A.   I do.

13   Q.   And you were asked in that whether or not Judge Maricle

14   was the Judge, and I believe on direct you said no, Judge

15   Edward -- Judge Leonard B. Wilson was the special judge.

16   A.   I don't recall being asked if Mr. Maricle was the judge.

17   I know I was asked who the judge was on that case, and I

18   stated Leonard B. Wilson.

19   Q.   And Judge Leonard Wilson was a judge who actually handled

20   the Runion civil case; is that correct?

21   A.   That is who has signed this document, yes, sir.

22   Q.   Okay.  And I believe you said that there was a civil and

23   a criminal case?

24   A.   There were.

25   Q.   And on Exhibit Number D71, do you see that in front of

*BLAIR - Cross (Mr. Pinales)*                                          84

1    you?

2    A.   Yes, sir, I do.

3    Q.   That is the criminal case, is it not, on Gary Runion, you

4    see at the top?

5    A.   Yes, sir, I do.

6    Q.   And that is the criminal case associated with the civil

7    case that was shown to you earlier, correct?

8    A.   That is.

9    Q.   And it says the name of the firm representing Mr. Runion,

10   correct?

11   A.   It's got trial, Maricle & Bailey.

12   Q.   And Maricle & Bailey is the firm, correct?

13   A.   That was a firm, I suppose, in Clay County.

14   Q.   And that was the firm that we saw on the original

15   document, Maricle & Bailey.  Remember that?

16   A.   I do.

17   Q.   And do you see anywhere and have you seen anywhere any

18   documents that say that it was Cletus Maricle and not Mr.

19   Ricky Bailey representing Mr. Runion?

20   A.   I was going off the document that Maricle had signed.  I

21   mean, I don't know of any other document where just Maricle or

22   Bailey, for that matter, has signed.

23   Q.   Well, when you say signed, you're talking about this

24   document?

25   A.   No, this is a court calendar document.

*BLAIR - Cross (Mr. Pinales)*                                   85

1   Q.   That's the court document, correct?  And in the criminal

2   case, page 2, this is page 1 of D71, correct?

3   A.   Okay.

4   Q.   And in page 2, Runion's case, Commonwealth versus Gary

5   Runion, do you see that?

6   A.   I do.

7   Q.   And it is saying an order certifying a need for a special

8   judge.  Correct?

9   A.   That's what the document says, yes, sir.

10  Q.   And it's signed by Judge Maricle?

11  A.   It is.

12  Q.   And Judge Maricle is saying, in this document, he's

13  signing an order certifying that there is a need for a special

14  judge; isn't that correct?

15  A.   This was, was after Judge Maricle was appointed circuit

16  judge.

17  Q.   Right.  He was, I believe, appointed judge and then ran

18  for judge.  He was appointed by the governor for a period of

19  time and then immediately had to run in the next election; is

20  that correct?

21  A.   He was appointed in September and, yes, later had to run

22  a race.

23  Q.   And sworn in after the November election, which would

24  have been the first part of the year, correct?

25  A.   In January, yes, sir.

BLAIR - Cross (Mr. Pinales)                                      86

1    Q.   In January.  So while he was an appointed judge, because

2    his office was involved initially, he asked for a special

3    judge so he wouldn't be involved in that; is that correct?

4    Isn't that what this document, page 2 of D71 says?

5    A.   According to records, Mr. Maricle had at one time

6    represented Mr. Runion so of course he couldn't preside over

7    the case.

8    Q.   Exactly.  And what I'm asking you is page 2 of D71, this

9    document that I'm showing you now is an order certifying a

10   need for a special judge.

11   A.   I have acknowledged that, yes, sir.

12   Q.   Okay.  Now, I want to move on to, I believe, the next

13   document that the government asked you about, which was D77,

14   which was Commonwealth versus John Downey.  Do you recall

15   questions --

16   A.   I do.

17   Q.   And that is in document D77.  Can you see that on your

18   monitor?

19   A.   Yes, sir, I do.

20   Q.   Okay.  Mr. Downey appeared in the Clay County Circuit

21   Court.  You agree with that?

22   A.   This is an indictment, yes, sir.  He would have had to

23   have appeared.

24   Q.   And when you were asked questions about who the judge

25   was, you said you see a couple of different signatures.  Do

*BLAIR - Cross (Mr. Pinales)*                                          87

1   you recall that?

2   A.   I do.

3   Q.   And as the result of investigating this case for over

4   four years, you're familiar with Judge Maricle's signature?

5   A.   I am.

6   Q.   And do you see the line here that says judge's signature,

7   printed?

8   A.   Yes, sir, I do.

9   Q.   And do you see a signature that kind of hard to read?

10  A.   That is not Russell Cletus Maricle's signature.

11  Q.   So there was another judge involved in the Downey case,

12  John Downey case, correct?

13  A.   I think that's what I'd testified to earlier.

14  Q.   And it was the other judge that actually let Mr. Downey

15  out of jail; was it not?

16  A.   Information that we had received during the course of our

17  investigation led us to pull this file.  Information that we

18  obtained from sources Kennon and Wanda White and also Mr.

19  Downey, we were told that they went to Mr. Cletus Maricle to

20  have this done.

21  Q.   And as case agent in this case, you've been in this

22  courtroom most of the time.  I believe you were out one day or

23  so.  You've been sitting in this courtroom?

24  A.   Yes, sir, I have.

25  Q.   Were you here when Mr. Downey, John's brother, testified?

*BLAIR - Cross (Mr. Pinales)*                                            88

1    A.   And you would be speaking of Raleigh Downey?

2    Q.   Yes.

3    A.   I was for most of it.

4    Q.   And do you recall him saying that the case came up before

5    Judge Maricle?

6    A.   I don't recall him --

7    Q.   Okay.

8    A.   -- making that statement.

9            MR. PINALES:  May I have the court personnel hand the

10   file to the witness?

11           THE COURT:  Yes, sir.

12           MR. PINALES:  For the purposes of the record, I'm

13   passing back D77 to you.

14   A.   Thank you.

15   Q.   That's the Downey file; is it not?

16   A.   Yes, sir, it is.

17   Q.   And I believe the front of it is the indictment?

18   A.   Yes, sir.

19   Q.   And what's the date of that?

20   A.   Filed it on the 2nd day of May, 2005.

21   Q.   And would you just look through that file and see whether

22   or not there is a judicial order letting Mr. Downey out of

23   jail?  And I submit that the file is stapled together, but

24   it's not in great order so you'll have to look through it.

25   October the 30th, I believe, 2006 is the date of the release.

1   A.   That is correct.  I was looking for the release, order of

2   release from the detention center.  But yes.  There was a --

3   looks like an offer on plea that was entered on October 30th,

4   2006.

5   Q.   And the offer on the plea, just so that we explain it to

6   the jury, an offer on a plea is where the commonwealth

7   attorney, the prosecutor and defense attorney come up with a

8   plea agreement, correct?

9   A.   I think that decision is -- decision is ultimately made

10  by the setting judge, whoever the judge may be.

11  Q.   Well, I understand, but isn't it, from all your years of

12  experience, where the prosecuting attorney and the defense

13  attorney come up with an agreement, and they submit it to the

14  judge for his approval or disapproval?

15  A.   They come up with a range, and then it's submitted to the

16  judge, yes, sir.

17  Q.   And that comes between or is done between the person's

18  attorney and the prosecutor, correct?

19  A.   I'm sure the negotiations may be, but it's ultimately

20  given to the judge.

21  Q.   And the judge has the final say, this is okay, I'll

22  accept it; or this is not okay, I won't accept it, correct?

23  A.   I suppose.

24  Q.   And in this case, it was submitted before the judge with

25  the bad penmanship, which happens to be Thomas Lewis; isn't

*BLAIR - Cross (Mr. Pinales)*                                    90

1    that correct?  Look through the records.  No, you have the

2    records.

3    A.   I'm here.

4    Q.   And who is the judge who agreed?

5    A.   Pardon?

6    Q.   You see the signature of the judge?

7    A.   I do.  I'm here.

8    Q.   And what is that signature?

9    A.   Well, I couldn't read it.  You said it was Thomas Lewis.

10   Q.   Well, let's put it this way.  It's not Cletus Maricle?

11   A.   That's, that's correct.

12   Q.   Okay.  And then ultimately, Mr. Downey was sentenced?

13   A.   Mr. Downey was brought back to court on November 16th,

14   after the election, to be sentenced.

15   Q.   And if you look through the record, he was actually

16   sentenced by the same judge, with the same signature, as

17   appeared who accepted the plea, correct?

18   A.   That's correct.

19   Q.   Now -- I'm sorry.  Go ahead.  Didn't want to interrupt

20   you.

21   A.   Where I had come up with there were two different judges

22   involved, I know Mr. Cletus Maricle had signed some orders,

23   order relative to bond and so on on the case.

24   Q.   And the reality is, unfortunately, they're not in a

25   chronological order.  Mr. John Downey was arrested, correct?

*BLAIR - Cross (Mr. Pinales)*                                         91

1   A.   That's true.

2   Q.   He came into court, correct?

3   A.   Yes, sir.

4   Q.   And a bond was set, correct?

5   A.   I'll try to get this in chronological order, if I may.

6   Okay, when -- yes.  Mr. Downey was arrested.  Yes, Mr. Downey

7   did appear in circuit court for a circuit court indictment.

8   That indictment was handled by R. Cletus Maricle as a judge.

9   Q.   And a bond was set by R. Cletus Maricle?

10  A.   That's correct.

11  Q.   And Mr. Downey went to jail?  He didn't make the bond?

12  A.   That's correct.

13  Q.   And it was Judge Lewis that let him out of jail, not

14  Judge Maricle?

15  A.   I think Judge Lewis is the one who signed the order, yes.

16  Q.   Okay.  Now in Kentucky courts, we have official records

17  in the clerk's office, and that's the records that I believe

18  you identified that you went and looked and picked up from the

19  clerk's office in Clay County, correct?

20  A.   That's correct.

21  Q.   And in addition, there's a court reporter in circuit

22  courts?

23  A.   Yes, sir, there is.

24  Q.   And the court reporter in circuit court, unlike the court

25  reporter that we're all looking at right now, doesn't use a

*BLAIR - Cross (Mr. Pinales)*                                      92

1    stenotype machine.  That court reporter has a series of
2    cameras; isn't that correct?
3    A.   Yes, that is.
4    Q.   And so everything is recorded on a camera that is voice
5    activated, unlike what we're seeing here today, correct?
6    A.   That's correct.
7    Q.   Now, did you go back and, on the Downey case, as an
8    example, did you go back and look at the video to see what
9    judge did what?
10   A.   No, sir, I didn't go back and look at the video.  We went
11   off the court record.
12   Q.   Okay.  And so, clearly, had you looked at the video, you
13   could see who the judge might be, correct?
14   A.   We knew who the judge was.  I just couldn't read the
15   signature.
16   Q.   Okay.  You could put that document down, and I want to
17   turn to -- these are out of order.  Let me get them in the
18   right order.  Pardon me for a second.  The next exhibit would
19   be D78, and that was the -- let me put this in so I don't get
20   them mixed up.
21        I believe D78 was the Bobby Sams case.  Can you see that?
22   A.   Yes, I do.
23   Q.   And that is the Bobby Sams case?
24   A.   Yes, sir.
25   Q.   And that is an indictment in Clay County Circuit Court?

*BLAIR - Cross (Mr. Pinales)*                                        93

1   A.   It is.

2   Q.   And we were talking before about when a plea is entered.

3   Remember, we were talking about on the Downey case?

4   A.   Um-hmm.

5   Q.   And on the Sams case, I believe you testified that there

6   was a plea agreement, correct, and the charges were reduced?

7   A.   I would have to go through the record to identify a plea

8   agreement.

9   Q.   Let me put it back in its envelope so we keep it

10  together.

11         MR. PINALES:  Your Honor, may this be passed to the

12  witness?

13         THE COURT:  Yes, sir.

14         MR. PINALES:  Thank you.  Appreciate it.

15  Q.   And that is, so the record is straight, D78, correct?

16  A.   D78.

17  Q.   And in D78, I believe the first document is an

18  indictment?

19  A.   It is an indictment.

20  Q.   And what is the date of that indictment?

21  A.   This was filed maybe September 1, '05.  It's kind of

22  marked through so --

23  Q.   So in the fall of 2005.  Is that close enough?

24  A.   That's correct.

25  Q.   Okay.  In December of '05, if you look through the

*BLAIR - Cross (Mr. Pinales)*                                    94

1    documents, you'll see that a plea was accepted.

2    A.   What's your question?

3    Q.   I want you to first locate that document, that part of

4    it.

5    A.   On a judgment and sentence on the plea?

6    Q.   Yes.  And what is the date there?

7    A.   Well, the date on the judgment and sentence on plea of

8    guilty is dated November 6, 2006.  Signed by Judge R. Cletus

9    Maricle.

10   Q.   And Mr. Sams was arrested in 2005, sometime in the fall,

11   September, we believe.

12   A.   That's -- he was indicted in September.

13   Q.   And he was arrested?

14   A.   That follows, yes, sir.

15   Q.   And then after the arrest, he was put in jail.  And after

16   he was put in jail, he was let out on house arrest.  If you

17   look through the documents, confirm that, please.

18   A.   I think he was let out on electronic monitoring.

19   Q.   Um-hmm.

20   A.   There's a release from custody here dated October 20th,

21   2006.  Says same bond and conditions as before.

22   Q.   Now, that was the second time.  Would you look at when he

23   was originally arrested on these charges?  You have the

24   indictment in September of 2005.

25   A.   I'm not -- I don't know what date you're looking for.  I

*BLAIR - Cross (Mr. Pinales)*                                    95

1   can't find the order that you're talking about.

2   Q.   Well, isn't it a fact that in October, when he was

3   released again -- let me withdraw that at this point.  He was

4   sentenced to a total of six months, combination of

5   incarceration and house arrest, correct?

6   A.   Well, I think the way I read this, it says six months,

7   Clay County Jail or electronic monitoring.  It don't say and

8   electronic monitoring.

9   Q.   What I'm asking, from reading that, and your years in law

10  enforcement, he got a total sentence of six months, correct?

11  A.   That's what's on this order, yes, sir.

12  Q.   And six months on that order is six months either in jail

13  if he spent time in jail, or under house arrest.  Either one

14  counts, correct?

15  A.   That looks like what was given to him for a felony

16  charge, yes, sir.

17  Q.   Well, it was not a felony charge.  Wasn't that reduced?

18  A.   It started out as a felony charge, receiving stolen

19  property over 300, and was reduced by the judge to a receiving

20  stolen property under 300.

21  Q.   When you say reduced by the judge, we talked before, from

22  your years of experience, isn't it a fact that an agreement is

23  reached between the defense attorney and the prosecuting

24  attorney and presented to a judge to approve or disapprove?

25  Isn't that a fact?

*BLAIR - Cross (Mr. Pinales)*                                              96

1    A.   That's still ultimately the decision of the judge.

2    Q.   That's not my question.  My question is, isn't it a fact

3    that an agreement, a negotiation or whatever you want to call

4    it, is struck between the defense attorney and the prosecuting

5    attorney before it ever gets to the judge?

6    A.   They may negotiate.

7    Q.   And then after they negotiate, the two of them come up

8    with a suggestion, a recommendation to the judge?

9    A.   That's correct.

10   Q.   And it is then that the judge gets involved and says I'll

11   accept this or I won't accept this?

12   A.   Correct.  It's ultimately the decision of the judge.

13   Q.   But initially the decision of the defense attorney and

14   the prosecutor, correct?

15   A.   It's not a decision.  They negotiate.

16   Q.   That's right.  They come up with a decision amongst

17   themselves?

18   A.   Correct.

19   Q.   Okay.  Isn't it a fact that in October, when Bobby "Red"

20   Sams was released, he had already served his combination of

21   six months in jail and on house arrest?

22   A.   Well, I don't think at that time it had been amended down

23   to receiving under when he was in jail originally.

24   Q.   Absolutely.  But he was under house arrest then, wasn't

25   he?

*BLAIR - Cross (Mr. Pinales)*                                        97

1   A.   That's what the order says, yes, sir.

2   Q.   Okay.  Then we went on to Exhibit Number 82.  Do you

3   recall that?

4   A.   Yes, sir, I do.

5   Q.   And that is the Stephanie Price case that you testified

6   just before?

7   A.   Yes, sir, I did.

8   Q.   And that was in a misdemeanor charge; was it not?

9   A.   That was a misdemeanor charge, yes, sir.

10  Q.   Okay.  If you'd put that away so we don't get them

11  confused.

12  A.   I'm trying.

13  Q.   Okay.  They're very hard.  And that case was in the

14  district court, not the circuit court, correct?  Let me go

15  back here.

16  A.   That is in district court, yes, sir.

17  Q.   And district court handles the misdemeanors?

18  A.   They do.

19  Q.   And that is in front of Judge Oscar Gayle House, correct?

20  A.   The front of the page is.  If you could turn the page

21  over one page.  Okay, on the bench warrant, that was recalled

22  per judge Cletus Maricle.

23  Q.   I understand that.  But I'm saying, the case itself was

24  assigned to Oscar Gayle House, correct?

25  A.   That's correct, it was.

*BLAIR - Cross (Mr. Pinales)*                                        98

1    Q.   And actually, the charges were all amended and the case

2    was over for Stephanie Price to be paying a fine; was it not?

3    A.   The warrant was disposed of by -- on request of Judge

4    Cletus Maricle.

5    Q.   That's not my question.

6    A.   I would ask to see the record.

7    Q.   I think that would be easier.

8        MR. PINALES:  Your Honor, may I?  For the record, I'm

9    passing you D82.

10   Q.   Do you have that in front of you now?

11   A.   Yes, sir.

12   Q.   And the case was basically over, was it not, except for

13   the payment of fines?

14   A.   I see where there had been one case or charge disposed

15   of.  Another charge had been amended.  Bottom line is

16   regardless of what, she still had a warrant for her arrest.

17   Q.   I'm going to get to that.

18   A.   Okay.

19   Q.   It was set out, and look through the paperwork, that she

20   had three cases, and it came down that she was paying fines;

21   isn't that correct?  Before Judge Maricle was ever involved,

22   she was paying fines.

23   A.   She had a show cause order, looks like it was deferred

24   for installment payments.

25   Q.   Yes.  And that would be the installment on the fines,

*BLAIR - Cross (Mr. Pinales)*                                          99

1    correct?

2    A.   Well, it shows that she owes $188.

3    Q.   And there was a show cause order, correct?

4    A.   Deferred also.

5    Q.   And then it went and there is a fine docket, is there

6    not, in Clay County and in other counties?

7    A.   There what now?  I'm sorry.

8    Q.   There is a fine docket.  A docket where all the people

9    that owe fines come up at about the same time.  It's called a

10   fine docket.  You're not familiar with that?

11   A.   I'm not a judge or an attorney, so no.

12   Q.   After the Maricle order on page 2, what is the next

13   order?

14   A.   It's on April 16, '08.  Is that the order you're looking

15   for?

16   Q.   The very next order?

17   A.   Show cause deferred, installment payment.

18   Q.   So she was on an installment payment, apparently a show

19   cause was ordered because she wasn't making the payments, and

20   she was placed back on the installment payment, correct,

21   through the sheriff's office?

22   A.   Well, evidently, she was where she either didn't pay or

23   didn't show back to court.

24   Q.   And the end result through the sheriff's office, she went

25   back on the installment plan, correct?

*BLAIR - Cross (Mr. Pinales)*                                    100

1    A.   Well, that's what this order says.

2    Q.   Sure.  You may put those away.  I want to talk to you

3    about Sarah Price.  Do you see D83?

4    A.   Yes, sir, I do.

5    Q.   That's Sarah Price.  Can you see that document now?

6    A.   I can.

7    Q.   Thank you.  And this was the case, you said this was

8    Wanda's mother?

9    A.   That is.

10        MR. PINALES:  I'd like these, if the Court please, to

11   be handed to the witness so he can look through these

12   documents.

13        THE COURT:  Yes, sir.

14   Q.   If you look through that, Sarah Price wasn't the only

15   defendant, was she?  She was charged with her son, Wanda's

16   brother, Stephen?

17   A.   Yes, sir.

18   Q.   And they were charged together.  And ultimately, there is

19   a commonwealth's offer signed by the commonwealth's attorney

20   on the plea; is there not?  Look through the documents.

21   A.   Okay.  What is your question?

22   Q.   My question is, and I don't want to belabor about plea

23   agreements all over again, but isn't it a fact in this case

24   that Stephen Price entered into an agreement to take a plea of

25   guilty for the release of his mother?  Isn't that a fact?  And

*BLAIR - Cross (Mr. Pinales)*                                        101

1    it was recommended by the commonwealth's attorney to the

2    judge?

3    A.    That may have been.   I don't have Stephen's entire case

4    file in front of me.

5    Q.    Well, Stephen, you know, did take a plea.   Is that

6    correct?

7    A.    That's true.

8    Q.    And it was at the suggestion of the commonwealth attorney

9    that the mother, Sarah, was dismissed; isn't that correct?

10   A.    I said I don't have Stephen Price's file in front of me.

11   I don't know what Mr. Price entered.

12   Q.    And plea agreements are agreements that are reached

13   between the commonwealth, the prosecuting attorney and defense

14   attorneys, correct?   And then they're given to the judge?

15   A.    The ultimate decision is made by the judge of the case.

16   Q.    I know that.   My question is -- and if I'm not making

17   myself clear, I really apologize.   The defense attorney makes

18   an agreement with the prosecuting attorney.   They agree

19   amongst themselves on a solution to the case?

20   A.    They negotiate.

21   Q.    They negotiate and come up with a solution?

22   A.    They come up with a possible solution, which then goes to

23   the judge.

24   Q.    And that possible solution is put in writing; is it not?

25   You've been in law enforcement in Laurel County for many, many

*BLAIR - Cross (Mr. Pinales)*                                              102

1    years.  It's put in writing?

2    A.   When it's finally decided, yes, sir.

3    Q.   It's put in writing before it goes to the judge; isn't

4    that correct?

5    A.   Yes.

6    Q.   It's put in writing as an agreement.  Hasn't been decided

7    yet by the judge, but as an agreement between the defense

8    attorney and the prosecuting attorney.  Do we agree on that?

9    A.   That's correct.

10   Q.   It's put in writing, and that paper then goes to the

11   judge.

12   A.   That's correct.

13   Q.   And the judge says yay or nay?

14   A.   He does.

15   Q.   And in this case, Sarah Price's case, it was suggested by

16   the commonwealth attorney, the prosecutor that it be

17   dismissed?

18          MR. SMITH:  Your Honor, I'm going to object.  I think

19   counsel is clearly misstating the evidence here.  I don't see

20   any evidence of that in the record, and the witness can't find

21   it for him, and now he's trying to make him agree with him.

22   It's just not there.  I'll object.

23          THE COURT:  I'll sustain the objection.

24   Q.   The papers in front of you don't reflect the agreement,

25   do they, between Stephen Price, Sarah Price and the

*BLAIR - Cross (Mr. Pinales)*                                        103

1    commonwealth; is that correct?

2    A.   As I stated earlier, I don't have Stephen Price's file in

3    front of me.  I don't know what it says in there.

4    Q.   Did you look at it at any time that you went to the

5    courthouse?

6    A.   I could have.  I don't recall right now if I did or not.

7    Q.   Okay.  Moving on, you can put that away.  Call your

8    attention to PR81.  Do you see that document?

9    A.   I do.

10   Q.   And that is a civil order of dismissal; is it not?

11   A.   That is.

12   Q.   And it's a civil order of dismissal between William

13   Stivers and the City of Manchester; is that correct?

14   A.   Yes, sir, it is.

15   Q.   And this grew out of Mr. Stivers suing the City of

16   Manchester, correct?

17   A.   It did.

18   Q.   And according to the document, which you identified

19   signed by R. Cletus Maricle, the parties -- could you read

20   that?  Is it clear enough on your monitor?

21   A.   It's not very clear.

22   Q.   Let me hand you the original.

23          MR. PINALES:  May I, Your Honor?  It loses some of

24   its definition on the big monitor.

25   Q.   That is the same document we were just talking about

1   that's been handed to you?

2   A.   Yes, it is.

3   Q.   PR81?

4   A.   Yes.

5   Q.   What does the document say?

6   A.   It is a order of dismissal.

7   Q.   And what does it say?

8   A.   Do you want it read?

9   Q.   Yes, please.  It's only two lines, I believe.

10  A.   "The parties by counsel approving this order, having

11  stipulated as to a dismissal of this action as settled with

12  prejudice and having further stipulated to satisfaction of

13  settlement, it is ordered that this action be dismissed as

14  settled with prejudice with each party to pay his or its

15  costs."  Dated September 18th, I believe, 2003.

16  Q.   That is an order which says the parties have come to an

17  agreement, correct?

18  A.   That's what the order says, yes, sir.

19  Q.   And they're asking the judge to go along with what the

20  parties, Mr. Stivers and Cletus -- and the City of Manchester

21  have apparently come to some resolution; isn't that correct?

22  A.   Well, sir, I can't testify to what they're asking the

23  judge.

24  Q.   But the language there, doesn't that indicate that the

25  parties have settled the case and they're asking the judge

*BLAIR - Cross (Mr. Abell)*                                           105

1    to --

2              MR. SMITH:  Your Honor, I'm going to object.

3              THE COURT:  Mr. Pinales, you asked him to read the

4    order, and now you want to interpret it for him.  You're not

5    going to be able to do both.  I'll sustain the objection.

6              MR. PINALES:  Okay.  The order speaks for itself.

7    Pass the witness.  Thank you, Your Honor.

8              THE COURT:  Mr. Westberry, do you have questions for

9    the witness?

10             MR. WESTBERRY:  Yes, thank you, Judge.

11                         CROSS-EXAMINATION

12   BY MR. WESTBERRY:

13   Q.  Good afternoon.

14   A.  Good afternoon.

15   Q.  Mr. Blair, back in 1989, how many lawyers were practicing

16   law in Manchester and Clay County, if you know?

17   A.  I would not have any idea.

18             MR. WESTBERRY:  Thank you.  That's all I have.

19             MR. WHITE:  No questions, Your Honor, thank you.

20             THE COURT:  Mr. Abell?

21                         CROSS-EXAMINATION

22   BY MR. ABELL:

23   Q.  Mr. Blair, I'm Robert Abell, and I represent William

24   Stivers in this case.

25   A.  Yes, sir.

*BLAIR - Cross (Mr. Abell)*                                                      106

1    Q.   As part of your investigation, did you review -- you've

2    talked about a criminal case Mr. Stivers was involved in.  Did

3    you review that file?

4    A.   Yes, sir.

5    Q.   And you're aware and I think testified today that Mr.

6    Stivers was charged with AI, or alcohol intoxication?

7    A.   That's correct.

8    Q.   And is it correct that that charge grew out of an

9    incident at the Clay County circuit clerk's office?

10   A.   Is that where the criminal charge come from?  Is that

11   what you're asking me?

12   Q.   Yes, sir.

13   A.   Yes, sir.

14   Q.   And from your investigation, did you gain the

15   understanding that the charge against Mr. Stivers was done at

16   the direction of Todd Roberts?

17   A.   You know, I would have to see the arrest report, who

18   ultimately arrested Mr. Stivers.  I think there was some

19   direction given to the officers that ultimately ended up

20   taking Mr. Stivers to jail.

21   Q.   Okay.  And the direction given to the officers that took

22   Mr. Stivers to jail was direction given by Mr. Roberts; is

23   that your understanding?

24   A.   That's my understanding.

25   Q.   Okay.  And from your investigation regarding this

*BLAIR - Cross (Mr. Abell)*                                                107

1    criminal case, did you learn that a hearing was held in Clay

2    District Court regarding that charge against Mr. Stivers?

3    A.   Regarding the criminal charges?

4    Q.   Yes, sir.

5    A.   There was a hearing held.  I think Mr. Roberts testified

6    to his arresting Mr. Stivers, and then I think they also had

7    some other officers that testified also.

8    Q.   And the other -- one of the other officers that testified

9    was Jeff Culver?

10   A.   I think Mr. Culver testified, yes, sir.

11   Q.   And Jeff Culver is now the chief of the Manchester Police

12   Department?

13   A.   He is.

14   Q.   And I think that you've worked with him at least some on

15   the investigation that brings us into this courtroom today?

16   At least some, I said.

17   A.   I don't know if you would put that we've worked with him.

18   Mr. -- excuse me.  Mr. Culver has assisted us in possibly

19   locating some people or an address.  But as far as knowledge

20   of investigation, I think --

21   Q.   Fair way to put it, he's worked with you a little bit,

22   but not really that much?

23           MR. SMITH:  Your Honor, I'm going to object to the

24   relevance.

25           THE COURT:  I believe he may have characterized it

*BLAIR - Cross (Mr. Abell)*                                         108

1    himself as to the work that was performed.  I'll sustain.

2    Q.   From your investigation regarding Mr. Stivers's criminal

3    case, did you learn that Officer Culver, at the hearing in

4    Clay District Court, testified --

5            MR. SMITH:  Your Honor, same objection.  Also, it's

6    going to be hearsay for his testimony to be brought up at this

7    point.

8            THE COURT:  Through this witness, it will be.

9    Sustained.

10   Q.   Did you learn that the criminal charge against Mr.

11   Stivers was dismissed in Clay District Court?

12   A.   It was dismissed, yes, sir.

13   Q.   Did you learn the reason why it was dismissed?

14   A.   I'm assuming that, you know.  I don't have the case in

15   front of me.  I can't say to the exact or testify to the exact

16   reason that the case was dismissed.

17   Q.   Do you know if it was dismissed because there was no

18   evidence to support the charge?

19   A.   Well, I think remembering what I've read about the case,

20   there was evidence that the officers put in.  I don't know

21   what -- I don't know what you're asking.

22   Q.   Okay.  You don't know the reason why it was dismissed in

23   Clay District Court?  Is that --

24   A.   I don't have the case in front of me, no.

25   Q.   All right.  Do you know what the type of claim was that

*BLAIR - Cross (Mr. Abell)*                                                      109

1    Mr. Stivers filed in the civil case in Clay Circuit Court that
2    we've talked about?
3    A.   I have looked.   I don't recall right now what his claim
4    was.
5    Q.   Well, you've testified that it related in some way to the
6    criminal case, but it sounds to me like, and tell us if this
7    is fair, you're not sure how.
8    A.   How what?
9    Q.   How the civil case related to the criminal case.
10   A.   I know Mr. Stivers was arrested and then ultimately sued
11   or filed a civil action against the City of Manchester, and I
12   also think, you know, maybe one of its officers.
13   Q.   Do you know whether the civil case in Clay Circuit Court
14   was basically a false arrest claim?
15   A.   That's a possibility what the civil action was.
16   Q.   Okay.   Do you know if it was a false arrest claim
17   asserting, in essence, that he had been falsely arrested for
18   the criminal case that had been in Clay District Court?
19   A.   Are you asking my opinion?
20   Q.   Do you know?   We understand you've done some
21   investigation and testified about this case.   I just want to
22   know if that's your understanding.
23   A.   I guess that's my understanding of what he ultimately
24   filed the civil action against the city.
25   Q.   Do you know who represented the City of Manchester in Mr.

*BLAIR - Cross (Ms. Hughes)*                                          110

1    Stivers' civil case?

2    A.   No, sir, I don't.  I don't have it in front of me.

3    Q.   Do you know how the lawyers for the City of Manchester in

4    Mr. Stivers' civil case were selected?

5    A.   No, sir, I don't.

6            MR. ABELL:  Nothing further, Judge.  Thank you.

7            THE COURT:  Thank you, Mr. Abell.

8            MR. RICHARDSON:  No, Your Honor.

9            MR. GILBERT:  No questions, Your Honor.

10           MS. HUGHES:  I have a question.

11           THE COURT:  Miss Hughes.

12                              CROSS-EXAMINATION

13   BY MS. HUGHES:

14   Q.   Officer Blair, you testified you did some investigation

15   with respect to cases involving Miss Wanda White's family

16   members.  Have you done any investigation of the family

17   members of any of these defendants that may have appeared in

18   front of Judge Maricle?  And specifically, my client's family

19   members.

20   A.   Which, who would you be referring to as a family member?

21   Q.   Have you investigated whether her brother has appeared in

22   front of Judge Maricle?

23   A.   Who -- I don't know who her brother is, ma'am.

24   Q.   So the answer would be no.

25   A.   Well, I don't know what his name is.

*BLAIR - Redirect (Mr. Smith)*                                      111

1              MS. HUGHES:  Thank you.

2              MR. SIMONS:  No questions.

3              THE COURT:  Thank you.  Any redirect of the witness?

4              MR. SMITH:  Yes, Your Honor.

5                          REDIRECT EXAMINATION

6    BY MR. SMITH:

7    Q.  Officer Blair, you were asked about the judge, I believe,

8    that ultimately sat on the jury of Paul Day, Estate of Loretta

9    Day versus Gary Runion.  Do you remember those questions?

10   A.  Yes, sir.

11   Q.  D78.

12   A.  I don't --

13   Q.  Well, I don't think you need to look at it for purposes

14   of clarification here.  You were asked whether or not Cletus

15   Maricle was the judge on that case.  I think you said no.  It

16   was another judge, Leonard Wilson.  Do you recall that?

17   A.  Yes, I do.

18   Q.  Do you recall when Cletus Maricle was appointed as far as

19   a matter of days or weeks or months from this jury verdict, or

20   do you know?

21   A.  It was days.  I think that order was filed on a Friday,

22   and Cletus Maricle was appointed judge on a Monday -- the next

23   following Monday.

24   Q.  Now, you were asked about D77, and that's the case

25   disposing of John Downey's case.  I believe you've described

*BLAIR - Redirect (Mr. Smith)*                                          112

1   that as a Class C felony, five to ten years?

2   A.   Yes, sir.

3   Q.   And I believe that you said in answers to questions on

4   that that that was, in fact, Judge Maricle, at least in part,

5   on the case but not on the whole?

6   A.   That's correct.

7   Q.   In your investigation, you cited the Stephanie Price

8   case, and that's a case in which Judge Maricle wasn't the

9   judge of Stephanie Price's case, correct?

10  A.   That's correct.  Judge Maricle was a circuit court judge,

11  and Oscar Gayle House is down in district court.

12  Q.   And these -- the use of special judges, is that something

13  that happens commonly in circuit court cases?

14  A.   It happens some.

15  Q.   In your opinion, based on your years of experience in

16  Laurel County and Clay County, would you say it's unusual or

17  very unusual for a circuit judge to order a district judge to

18  dispose of a warrant of arrest on a person?

19  A.   From my past experience, I've been in law enforcement for

20  about 21 years, and I have never had a circuit judge intervene

21  on a case that was downstairs in district court.

22  Q.   Now, likewise, John Downey's case got resolved by another

23  judge, ultimately, you've testified, correct?

24  A.   That's correct.

25  Q.   And it was a C felony that was probated for five years,

*BLAIR - Redirect (Mr. Smith)*                                              113

1    according to your testimony.

2    A.   Yes, it was.

3    Q.   You consider that to be usual, unusual, or how would you

4    describe that, based on your years of experience --

5             MR. PINALES:  Objection.

6             THE COURT:  Overruled.

7    A.   That a charge of that magnitude being amended down is

8    very unusual.

9    Q.   In fact, probating a C felony is basically saying that

10   the person doesn't go to jail; is that right?

11   A.   That's correct.

12   Q.   So the law says you're supposed to go to prison for five

13   to ten years, and the judge signs an order saying you get

14   probated and you walk out of the courtroom.

15   A.   That's what happened.

16   Q.   That's what happened to John Downey?

17   A.   Yes, sir, it is.

18   Q.   And these plea agreements that you've been asked about,

19   these are plea agreements that have been prepared by Gary

20   Gregory; is that right?

21   A.   Gary Gregory did prepare the plea agreements.

22   Q.   And Gary Gregory, would you describe him as someone who's

23   been of interest to you in this voter scheme fraud

24   investigation?

25            MR. PINALES:  Objection, Your Honor.

*BLAIR - Redirect (Mr. Smith)*                                          114

1            THE COURT:  Overruled.

2   A.  Gary Gregory's name has come up numerous times in our

3   investigation.

4   Q.  And do you recall Charles "Dobber" Weaver telling you

5   that he was instructed that he was to be put on the slate for

6   these slate of candidates that were going to be beneficiary of

7   these voter fraud?

8   A.  He did, yes, sir.

9   Q.  You were asked about this civil suit with William Stivers

10  suing the City of Manchester.  Do you remember those

11  questions?

12  A.  I do.

13  Q.  Do you know, in your investigation, whether or not

14  there's a close personal relationship that existed back

15  through 2002 between William "Al Man" Stivers and Russell

16  Cletus Maricle?

17  A.  Judge Russell Cletus Maricle and William "Al Man" Stivers

18  are very close friends and associates.

19  Q.  And based on your years of experience in circuit courts,

20  is it common for circuit judges to sit over a disputed matter

21  involving one of their close personal friends?

22            MR. PINALES:  Objection, Your Honor.

23            THE COURT:  Overruled.  You can answer based on your

24  observations.

25  A.  During my observation as a police officer, when that type

*BLAIR - Recross (Mr. Pinales)*                                        115

1    of incident occurs, there would be a special judge that would

2    be put on that case.

3              MR. SMITH:  Thank you.

4              THE COURT:  Mr. Pinales.

5              MR. PINALES:  Just a few, Your Honor.

6                        RECROSS-EXAMINATION

7    BY MR. PINALES:

8    Q.   The John Downey case that was just asked about?

9    A.   Yes, sir.

10   Q.   Do you know all the facts on that case?

11   A.   No, sir, I don't.

12   Q.   Do you know whether or not the prosecutor had any

13   problems of proof on that case?

14   A.   I don't.

15   Q.   So actually, in a Class C felony, a judge has a wide

16   degree of discretion based upon the recommendation of the

17   prosecutor and the defense attorney; does he not?

18   A.   I don't know.  Are we going to the judge's decision now

19   or the --

20   Q.   I don't want to get into that again.  I'm saying in a

21   Class C felony, a judge has a great deal of discretion; does

22   he not?

23   A.   Well, in my opinion, a Class C felony is a Class C

24   felony.  I don't know what his discretion is.

25   Q.   A judge can go to probation?

*BLAIR - Recross (Mr. Pinales)*                                              116

1          MR. SMITH:  Your Honor, I'm going to object.  He's

2    now answered his question.  He does not know what the judge's

3    discretion is.  He's now arguing.

4          MR. PINALES:  I'll move on.

5          THE COURT:  Based upon his knowledge.

6          MR. PINALES:  Thank you.

7    Q.  Class C felony carries a punishment of five to ten years,

8    correct?  We've established that?

9    A.  Yes, sir.

10   Q.  That is the highest that it can go, correct?  The

11   highest?

12   A.  Yes, sir.

13   Q.  But through a series of recommendations or events, it can

14   go lower --

15         MR. SMITH:  Your Honor, same objection.

16   Q.  -- through your experience?

17         THE COURT:  He can answer.

18   A.  Sir, I --

19   Q.  Yes or no, if you know.

20   A.  I don't know their recommendation.

21   Q.  Let me move on.  The prosecutor just at the end asked you

22   a couple questions.  In your experience, is it normal for a

23   judge to sit on a case, sit over a case of disputed matters

24   with somebody that he had a close personal relationship, and

25   you answered no, it isn't usual.  Is that correct?  Do you

*BLAIR - Recross (Mr. Pinales)*                                         117

1    recall that?

2    A.   Could you restate the question, please?

3    Q.   One of the very last questions that the prosecutor asked

4    you just now --

5    A.   Uh-huh.

6    Q.   -- was on the last matter, the Stivers case.

7    A.   Okay.

8    Q.   And he was saying, in your background, in your opinion,

9    is it normal for a judge to sit in a case of disputed matters

10   involving somebody he knows.  Do you recall that question or a

11   question very similar to that?

12   A.   I think the last question that I answered was normally,

13   from my experience, that a judge and a defendant or whatever

14   on a close personal relationship, the case would, you know,

15   possibly be deferred to another judge.

16   Q.   And you used the term in a disputed matter.  Do you

17   recall that in your answer to the question?

18   A.   I used disputed matter?

19   Q.   Yeah.  Do you recall that?

20   A.   I don't recall that.

21   Q.   Well, this case, this Stivers case was not disputed at

22   the time Judge Maricle signed that order, was it?

23              MR. SMITH:  Your Honor, I'm going to object.  I

24   believe that's mischaracterizing a lawsuit.

25              THE COURT:  I'll overrule.  You can ask him the

*BLAIR - Further Direct (Mr. Smith)*                                    118

1    question.  If he understands it, he can answer.

2    Q.   The last exhibit, you may still have it in front of you.

3    81.

4    A.   I do.

5    Q.   The matter was not disputed at that time, was it?  The

6    parties had resolved the matter amongst themselves; isn't that

7    correct?  It's a yes or no, if you can tell.

8    A.   Well, it's from -- I mean, it states what I read as far

9    as what the order says.

10   Q.   And it reads, and it's your understanding that they had

11   resolved the matter.  It was not disputed, was it, at that

12   moment?

13   A.   I mean, I don't see the word resolved on here, no, sir.

14          MR. PINALES:  The document speaks for itself.

15   Nothing further.  Thank you, Judge.

16          THE COURT:  All right.  Thank you.  Anyone else?

17          MR. ABELL:  I'm not going to follow up, Judge.

18          THE COURT:  All right.  Thank you.  Anything else of

19   this witness?

20          MR. SMITH:  Well, I do want to follow up, if the

21   Court would allow, on this issue.

22          THE COURT:  Yes, sir.  Briefly.

23                    FURTHER DIRECT EXAMINATION

24   BY MR. SMITH:

25   Q.   Officer Blair, you were asked about this order here.

*BLAIR - Further Direct (Mr. Smith)*                                    119

1   What was the date of that order?

2   A.   The date on this order was September 18th, 2003.

3   Q.   Based on your review of the record, was it a settled

4   matter on September the 17th, or was it disputed then and not

5   settled until the 18th?

6   A.   I think it was disputed then.

7   Q.   Disputed until it was settled; is that right?

8   A.   That's correct.

9   Q.   And you reviewed all that record.  Did Judge Maricle ever

10  bring to the notice of the parties that he had a conflict of a

11  personal relationship with one of the parties before it was

12  ever settled?

13         MR. PINALES:  Objection, Your Honor.

14  A.   No, sir, he didn't.

15         THE COURT:  Overruled.  What was your answer?

16  A.   No, sir, he didn't.

17  Q.   We didn't hear your answer, I'm sorry.

18  A.   No, sir, he did not bring that to the attention.

19         MR. SMITH:  Thank you.

20         THE COURT:  Anything else?

21         MR. PINALES:  Nothing further.

22         THE COURT:  All right.  Thank you.  Ladies and

23  gentlemen, we're going to take our recess for the evening at

24  this time.  Please keep in mind the admonition that you've

25  been given several times not to discuss the case among

1    yourselves while we are in recess and, of course, when we

2    break for evening, you should not discuss the matter with any

3    friends or family members.

4         You shouldn't do any type of blogging or electronic

5    communication about the case.  You should not read, watch or

6    listen to any accounts of the case if there should be any.

7    Also, don't attempt to perform any type of research or do any

8    investigation on your own.  Don't visit any of the places

9    you've heard about here today or previously in the case.  Of

10   course, don't make up your mind about the matter until it is

11   finally submitted to you.

12        The jury will be excused until 9:00 a.m. tomorrow

13   morning.

14              (The jury left the courtroom at 4:33 p.m.)

15        THE COURT:  Any matters to take up outside the

16   presence of the jury?

17        MR. SMITH:  The United States --

18        THE COURT:  Please be seated.

19        MR. SMITH:  -- will submit the redactions that were

20   requested to be performed on the plea agreements have been

21   done.  If counsel for the defendants would like to inspect

22   that before we turn it into the clerk, I'd be glad to stick

23   around for them to do that.  Otherwise, I will be turning

24   those in today.

25        THE COURT:  There is one other document that was in a

1   group that was admitted today that needed to be redacted, had

2   a reference at the bottom, a handwritten note at the bottom of

3   the page.  It was one of the notes where Mr. Thompson had

4   contacted the -- it was the office in Frankfort, the Board of

5   Elections, and that needed to be redacted.

6            MR. WESTBERRY:  One additional document we agreed

7   upon or approved redaction was one of the OAG forms that

8   referenced years ago "Mr. Adams sticks his nose into people's

9   business and had been convicted of election fraud," something

10   like that.  I asked, and we all agreed that that be redacted.

11            THE COURT:  That is correct, but I can't recall the

12   number of the document.  I think that document had a Bates

13   number on it.

14            MR. WESTBERRY:  Yes.

15            THE COURT:  The one that I just referred to did not.

16            MR. WESTBERRY:  Right.  0785 was that one.

17            THE COURT:  You all can confer among yourselves after

18   we've finished and make sure those redactions have been

19   properly made.  Anything else we can take up?

20            MR. SMITH:  No, Your Honor.

21            THE COURT:  Start again at 9:00 tomorrow morning.

22   Mr. Smith, you anticipate closing tomorrow?

23            MR. SMITH:  I do.  I think that possibly by lunch, if

24   we move as expected.  Obviously, right now, I'm looking at two

25   to three witnesses, so that's maybe a little optimistic, but

122

1    that's what I'm shooting for.

2              THE COURT:  I appreciate that.  The defendants should

3    be prepared to proceed tomorrow, assuming the United States

4    closes as anticipated.

5              MR. HOSKINS:  Yes, Your Honor.

6              THE COURT:  We'll be in recess until 9:00 a.m.

7    tomorrow.

8              (Proceedings adjourned at 4:36 p.m.)

9                           -  -  -

10                   C E R T I F I C A T E

11             I, LISA REED WIESMAN RDR-CRR, certify that the
     foregoing is a correct transcript from the record of
12   proceedings in the above-entitled case.

13

14    \s\ Lisa Reed Wiesman                  March 10, 2010
      LISA REED WIESMAN, RDR-CRR            Date of Certification
15    Official Court Reporter

16

17

18

19

20

21

22

23

24

25

123

1                        INDEX

2

GOVERNMENT'S WITNESS

3

SARAH BALL JOHNSON
4    Cross-examination by Mr. Pinales................. Page  7
     Cross-examination by Mr. White................... Page 11
5    Cross-examination by Mr. Baldani................. Page 21
     Redirect Examination by Mr. Smith............... Page 35
6    Recross-examination by Mr. White................ Page 40

7

     COLLEEN HAACK
8    Direct Examination by Mr. Smith................. Page 42
     Cross-examination by Mr. Richardson............. Page 49
9    Redirect Examination by Mr. Smith............... Page 53

10   EDSEL VINCENT BLAIR
     Direct Examination by Mr. Smith................. Page  55
11   Cross-examination by Mr. Pinales................ Page  80
     Cross-examination by Mr. Westberry............. Page 105
12   Cross-examination by Mr. Abell................. Page 105
     Cross-examination by Ms. Hughes................ Page 110
13   Redirect Examination by Mr. Smith............. Page 111
     Recross-examination by Mr. Pinales............ Page 115
14   Further direct examination by Mr. Smith........ Page 118

15

16   GOVERNMENT EXHIBITS                      ADMITTED

17   Exhibit No. D1, ES&S training documents
     Admitted....................................... Page 43
18

19                        - - -

20

21

22

23

24

25