```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
2                    SOUTHERN DIVISION at LONDON
                               - - -
3

UNITED STATES OF AMERICA,        :  Docket No. CR 09-16-S
4                                :
                  Plaintiff,     :  Frankfort, Kentucky
5                                :  Tuesday, March 9, 2010
      versus                     :  12:55 p.m.
6                                :
RUSSELL CLETUS MARICLE,          :
7  DOUGLAS C. ADAMS              :
   CHARLES WAYNE JONES           :
8  WILLIAM R. STIVERS            :
   FREDDY W. THOMPSON            :      Trial Day 20B
9  WILLIAM B. MORRIS             :
   DEBRA L. MORRIS               :
10 STANLEY BOWLING,              :
                                 :
11                 Defendants.   :

12

13                           - - -
                    TRANSCRIPT OF TRIAL
14                BEFORE DANNY C. REEVES
          UNITED STATES DISTRICT COURT JUDGE and a jury
15                           - - -

16 APPEARANCES:

17 For the United States:      STEPHEN C. SMITH, ESQ.
                               JASON D. PARMAN, ESQ.
18                             Assistant U.S. Attorney
                               601 Meyers Baker Road
19                             Suite 200
                               London, KY 40741
20
   For the Defendant           MARTIN S. PINALES, ESQ.
21 Russell Cletus Maricle:     Strauss & Troy
                               150 E. Fourth Street
22                             Fourth Floor
                               Cincinnati,OH  45202
23
                               DAVID S. HOSKINS, ESQ.
24                             107 E. First Street
                               Corbin, KY  40701
25
```

```
 1      For the Defendant          R. KENT WESTBERRY, ESQ.
        Douglas C. Adams:          KRISTIN N. LOGAN, ESQ.
 2                                 Landrum & Shouse, LLP
                                   220 West Main Street
 3                                 Suite 1900
                                   Louisville, KY 40202
 4

 5
        For the Defendant          T. SCOTT WHITE, ESQ.
 6      Charles Wayne Jones:       Morgan & Pottinger, P.S.C.
                                   133 West Short Street
 7                                 Lexington, KY  40507

 8
        For the Defendant          ROBERT L. ABELL, ESQ.
 9      William R. Stivers:        120 North Upper Street
                                   Lexington, KY  40507
10

11      For the Defendant          RUSSELL JAMES BALDANI, ESQ.
        Freddy W. Thompson:        R. TUCKER RICHARDSON, ESQ.
12                                 Baldani, Rowland & Richardson
                                   300 West Short Street
13                                 Lexington, KY  40507

14
        For the Defendant          JERRY W. GILBERT, ESQ.
15      William B. Morris:         Coy, Gilbert & Gilbert
                                   212 North Second Street
16                                 Richmond, KY 40475

17
        For the Defendant          ELIZABETH SNOW HUGHES, ESQ.
18      Debra L. Morris:           Gess, Mattingly & Atchison, PSC
                                   201 West Short Street
19                                 Lexington, KY 40507

20
        For the Defendant          DANIEL A. SIMONS, ESQ.
21      Stanley Bowling:           Thompson, Simons, Dunlop & Fore
                                   116 West Main Street
22                                 Suite 2A
                                   Richmond, KY 40476
23

24

25
```

3

1    Court Reporter:                LISA REED WIESMAN, RDR-CRR
                                    Official Court Reporter
2                                   35 W. Fifth Street
                                    P.O. Box 1073
3                                   Covington, KY  41012
                                    (859) 291-4410

4

5         Proceedings recorded by mechanical stenography,
     transcript produced with computer.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*SAGRECY – Redirect (Mr. Smith)*                                          4

1              (The jury entered the courtroom at 12:53 p.m.)

2              THE COURT:  Thank you.  All members of the jury are

3       present.  Parties and counsel are also present.  Agent

4       Sagrecy, you're still under oath.

5              Mr. Smith, you may continue.

6              MR. SMITH:  Thank you.

7       BY MR. SMITH:

8       Q.   Agent Sagrecy, I'd like to direct your attention to M7.

9       I believe you received questions regarding the process of B&J

10      Transport [sic] in obtaining contracts.  And you were

11      referenced to, I believe, April the 8th of 1996.  Do you

12      recall that?

13      A.   Yes.

14      Q.   And just for purposes of clarification, these contracts,

15      it's dated April the 8th of 1996, you did not include that as

16      part of your calculation as far as amounts that were proceeds

17      from the unlawful activity; is that correct?

18      A.   No, I did not.

19      Q.   Okay.  But in any event, the city council that approved,

20      it was pointed out that a motion was made, I believe here on

21      the bottom of the page, says motion was made by John Ed

22      Pennington and seconded by Vernon Hacker to approve the bid

23      submitted to B&J Transfer and authorized Mayor White to sign

24      the contract.  You recall being referenced to that part --

25      A.   Yes.

*SAGRECY - Redirect (Mr. Smith)*                                        5

1    Q.   -- of the minutes?

2    A.   Yes.

3    Q.   Let me just ask a couple follow-up questions, if I may.

4    Particularly, Vernon Hacker.  Is he someone that, in your

5    investigation, was a participant in this illegal enterprise

6    that was formed to control Clay County and eventually these

7    contracts?

8    A.   Yes, he was.

9    Q.   And we have also that this meeting was presided over by

10   Mayor White.  Do you know which mayor was presiding over this

11   meeting?

12   A.   Mayor Doug White.

13   Q.   And same question.  In your investigation, did you learn

14   that he was also active and involved in the enterprise which

15   led eventually to the awarding of these contracts?

16   A.   Yes.

17   Q.   We also have -- it says the following other members

18   present, and, of course, you mentioned Vernon Hacker.  What

19   about Ronnie Hacker?  Do you recognize that name as being a

20   member of the enterprise?

21   A.   Yes.

22   Q.   And did he also hold a position of employment with the

23   school board at some time?

24   A.   Yes.

25   Q.   Sherrie House?

*SAGRECY - Redirect (Mr. Smith)*                                                6

1   A.   Yes.  She is the wife of Judge House.

2   Q.   And in your investigation, how did you learn these

3   council members were participating in the ongoing operation of

4   the enterprise?

5   A.   Thousand dollars.  Thousand dollars to get reelected to

6   the council.

7   Q.   And this money that they put together was used for what

8   purpose?

9   A.   To buy votes.

10  Q.   You were also asked to refer to October 16, 2000.  Do you

11  recall those questions?

12  A.   Yes.

13  Q.   And again, this was pointed out to be an extension of the

14  contract of B&J Transfer, and I believe that the minutes say

15  here who made the motion to approve that.  Do you see that

16  there?

17  A.   I think it's on the second page of those minutes.  If

18  not, review that again, please.

19  Q.   Do you recall that motion being made by Vernon Hacker and

20  Ronnie Hacker to approve the extension of the contract with

21  B&J Transfer?

22  A.   Yes.

23  Q.   Is that the same Vernon Hacker and Ronnie Hacker that you

24  referred to in the '96 minutes?

25  A.   Yes.

*SAGRECY - Redirect (Mr. Smith)*                                         7

1    Q.   You were also asked to, I believe, refer to the

2    January 21, 2002 minutes.

3    A.   Yes.

4    Q.   And again, there was a motion made regard to the contract

5    with B&J Transfer?  Do you recall that?

6    A.   Yes.

7    Q.   Again, the members present at this meeting in January,

8    2002 would have included Vernon Hacker and Ronnie Hacker.  Is

9    that the same Vernon and Ronnie Hacker that you've referred

10   to?

11   A.   Yes.

12   Q.   What about Darnell Hipsher.  Was he a member of the

13   enterprise?

14   A.   Yes, he was.

15   Q.   Gary Jackson?

16   A.   Yes.  He's also known as Ouchie.

17   Q.   And again, this was a meeting presided over by Mayor

18   White.  Is that the same mayor that you referred to as Daugh

19   or Doug White?

20   A.   Yes.

21   Q.   You were also asked to refer to September, I believe, 16,

22   2002.

23   A.   Yes.

24   Q.   Is that correct?

25   A.   Yes.

*SAGRECY - Redirect (Mr. Smith)*                                              8

1    Q.   And again, it seems the same issues to come before the

2    council were again regarding the contract of B&J Transfer.

3    I'd like to ask you to read that entry here.

4    A.   "A motion was made by Darnell Hipsher and seconded by

5    Vernon Hacker to give Bart Morris of B&J Transfer an advance

6    of $15,000 to be paid back at the rate of $1,000 per month.

7    Motion carried."

8    Q.   Agent Sagrecy, in the course of your investigation, did

9    you look into the City of Manchester actually making loans to

10   private contractors?

11   A.   This was the only one that I saw.

12   Q.   And what was the nature of the loan that you were able to

13   determine, sir?

14   A.   I believe it was an advance on future services.

15   Q.   Okay.  So they were actually making a payment to the

16   contractor for $15,000 to be paid back.  Was there any

17   interest that the taxpayers were going to earn on their loan

18   of the money to this private contractor?

19   A.   No.  If I can expand on that, the exhibit, M17, I

20   believe, with the payments to B&J, in that exhibit, I show

21   where payments were taken out.  If we could put that up, maybe

22   show at least where it was paid.  Fortunately, that was paid

23   back and there did not appear to be any interest payments.

24   Q.   M17.  Do you have that before you, Agent Sagrecy?

25   A.   I do.  This is M17.  If you'll go to the second page,

1    please.  You can notice, for example, on October 2nd, 2002 the

2    gross amount was $11,628.  There was a $1,000 adjustment, and

3    that adjustment was for the $15,000 advance.  So the actual

4    net pay was $10,628.  And I tried to note all the payments,

5    the loan payments back in the exhibit.

6    Q.  So let's go back to page 1 of M17.  Your calculation of

7    monies received from the City of Manchester during that year

8    would have been $68,724.  Did that include the $15,000 loan?

9    A.  It included the gross amount, because that loan kind of

10   carried over into another year as far as repayment.  The gross

11   amount.  In the previous example, where it was like 11,000

12   some odd dollars, and then there was subtracted a $1,000

13   payment, I used the $11,000 amount in my computation.  So the

14   short answer is yes, I believe it was accounted for in 2002

15   and 2003.

16   Q.  Now, I believe that when questioned about the inception

17   of this, you refer to the contract, I believe, the earlier

18   contract that you referred to was 1996 with B&J Transfer.

19   A.  I recall that, yes.

20   Q.  And there was a proposal that you were referred to, if I

21   recall, where there was a letter proposing that this B&J

22   Transfer be considered by the City as a means to transfer the

23   garbage?

24   A.  Yes.

25   Q.  If I understand the quotation of the figures, it was that

*SAGRECY - Redirect (Mr. Smith)*                                    10

1    $12.50 per yard was available currently for the City of

2    Manchester, and the proposal was to give the City a $12 rate?

3    A.   That's correct.

4    Q.   But I believe that there was also imposed upon this

5    proposal was the expectation that B&J Transport [sic] would

6    get an additional rate of increase each year thereafter.   Do

7    you recall how much money they were going to get for the

8    following year?

9    A.   Dollar twenty-five.

10   Q.   So that would put it up to 13.25, which would put it 75

11   cents over the going rate of 12.50 which the City had at that

12   time?

13   A.   Correct.

14   Q.   And that would occur as quickly as 12 months from the

15   date they signed the contract?

16   A.   Yeah, it was July the following year.

17   Q.   And was there any indication that this was advertised for

18   other private contractors to propose an option to the City at

19   that time?

20   A.   Again, no.

21   Q.   Again, I believe you referenced August 16, 2004.   That

22   is, I believe here, you were referenced to again the B&J

23   contract came up again, and it was made by the motion of

24   Vernon Hacker and seconded by Darnell Hipsher to pay them an

25   increase, I believe you explained.   How did this increase the

1    payments to Darnell -- to B&J Transfer, to your understanding?

2    A.   Excuse me?

3    Q.   It was explained, I believe, in redirect that August 16,

4    2004, while they had a contract in place, that the city

5    council had to approve an increase in the rate to the City of

6    Manchester.  And I believe you were referencing, you were

7    asked to reference this entry in the court -- or the minutes

8    of the meeting, correct?

9    A.   Yes.  And this particular meeting is dealing with the

10   switch from being paid by the yard to being paid by the ton.

11   Q.   And in your investigation, did that result in an

12   increased cost, bottom line figure for the City as opposed to

13   paying for it under the old program of yards?

14   A.   I can't answer that question.

15   Q.   In any event, throughout the totality of the progress of

16   this contract, whether it was bid or not bid, or renewed or

17   extended, it was all being approved by city council that was

18   predominantly occupied by members of the enterprise, based on

19   your investigation?

20   A.   Yes.

21             MR. SMITH:  Thank you.

22             THE COURT:  Mr. Pinales.

23                         RECROSS-EXAMINATION

24   BY MR. PINALES:

25   Q.   Just a couple questions.  In your redirect, you were

1   asked questions about Judge Cletus Maricle running unopposed.

2   Do you recall those questions?

3   A.   Excuse me, unopposed?

4   Q.   Yes.  Do you recall those questions?

5   A.   Yes.

6   Q.   Did you survey how many other circuit judges across the

7   entire commonwealth ran unopposed?

8   A.   No.

9   Q.   And Judge Maricle's district, his circuit included three

10  counties, correct?

11  A.   Correct.

12  Q.   We established that.  And any attorney with seven years'

13  practice, licensed in the commonwealth, in any of those three

14  counties could have run; could they not?

15  A.   I don't know that.

16          MR. PINALES:  Nothing further.

17          THE COURT:  Thank you.  Mr. Westberry.

18          MR. WESTBERRY:  Thank you, Judge.

19                    RECROSS-EXAMINATION

20  BY MR. WESTBERRY:

21  Q.   Afternoon again, Mr. Sagrecy.

22  A.   Good afternoon.

23  Q.   Got a couple questions for you.  I believe you testified

24  in your redirect that but for this scheme, these defendants or

25  these individuals could not have been awarded the salaries in

*SAGRECY - Recross (Mr. Westberry)*                    13

1   the contracts, correct?

2   A.   Yes, that is my opinion.

3   Q.   I believe you also testified, I recall under a question

4   from Mr. Simon [sic], that your full job was to document the

5   money that these individuals received and not whether they did

6   good work, correct?

7   A.   Correct.

8   Q.   Now, you also testified earlier, in response to a

9   question that I asked you, that you did not interview any of

10  the school board members to determine why they initially hired

11  and later extended Mr. Adams as superintendent of the Clay

12  County schools, correct?

13  A.   Correct.

14  Q.   And you understand that it is the school board and the

15  county that is the group, the organization that makes the

16  determination whether to initiate hiring a superintendent and

17  whether or not they want to extend his or her contract,

18  correct?

19  A.   My understanding is that they vote.

20  Q.   Well, sure.

21  A.   I don't know the actual criteria that makes their

22  decision.

23  Q.   Okay.  As part of your investigation, have you learned

24  how many members actually comprise the school board in Clay

25  County?

*SAGRECY - Recross (Mr. Westberry)*                               14

1  A.  I can't recall off the top of my head, no.

2  Q.  As part of your investigation, were you able to determine

3  periodically, some every three or four years, the

4  superintendent such as Mr. Adams comes before the school board

5  for a contract renewal?  Do you know that?

6  A.  I don't know that to be a routine.  I do know in his

7  case, every four years he got a renewal.

8  Q.  Correct.  And do you also recall or acknowledge that in

9  2006, his contract was renewed, if you know?

10 A.  I believe it was.

11 Q.  And as part of your investigation and work that you did

12 in this case, were you made aware that during the course of

13 Doug Adams' employment as superintendent, three out of the

14 five members of the school board either changed or were

15 replaced?

16 A.  I was not made aware of that.

17 Q.  Do you know anything about what state law requires in

18 terms of the qualifications to be a superintendent of schools?

19 A.  No.

20 Q.  You indicated, Mr. Sagrecy, that there was a school board

21 race, I think I've got this right, that you thought that Mr.

22 Adams may have tried to have some influence in.  You recall

23 that line of questioning?  It was on the redirect from Mr.

24 Smith.

25 A.  I believe, yes.

*SAGRECY - Recross (Mr. Gilbert)*                                    15

1    Q.   Can you tell us the specific name of the school board

2    member who was involved, if you know?

3    A.   Again, I can't -- there are so many elections and so many

4    races, and --

5    Q.   Please don't speculate.  I'm asking for --

6    A.   Yeah, I can't.

7    Q.   I know, I know.

8         MR. WESTBERRY:  One minute please, Judge.

9         THE COURT:  Yes, sir.

10   Q.   Do you know the names of any school board members who you

11   could say were pressured into hiring and/or retaining Mr.

12   Adams because of politics?  If you know.

13   A.   No.

14        MR. WESTBERRY:  Thank you, sir.  I pass the witness,

15   Judge.

16        THE COURT:  Thank you.  Mr. White.

17        MR. WHITE:  No questions, Your Honor, thank you.

18        THE COURT:  Mr. Abell, anything else?

19        MR. ABELL:  No recross.

20        MR. RICHARDSON:  No questions.

21        THE COURT:  Mr. Gilbert.

22                     RECROSS-EXAMINATION

23   BY MR. GILBERT:

24   Q.   Mr. Sagrecy, you were asked about, I believe, the 1996

25   contract?

SAGRECY - Recross (Mr. Gilbert)                                    16

1    A.   Yes.

2    Q.   And you indicated, I believe, on a question that at that

3    time the entry of that contract, I believe I wrote it down

4    correctly, you said there was no indication of a bid at that

5    time?  Was that your answer?

6    A.   I don't recall that specific answer.  There's no

7    indication of other bids.

8    Q.   Okay.  That's what I want to clarify.  There is

9    indication in the minutes of advertising for bids and

10   accepting B&J Transfer's bid; is there not?

11   A.   I believe there was a motion to accept the bid, I recall

12   that.  And I do recall -- we can look at it again.

13   Q.   Okay, let's do that.

14   A.   Let's make sure.

15   Q.   March 11, 1996.

16   A.   I don't have that exhibit any longer.

17   Q.   I'm not sure what type of order they're in.

18   A.   March 11, '96?

19   Q.   Yes, sir.  And it indicates that a motion was made by

20   Laura House and seconded by Sherrie House to advertise for

21   bids.

22   A.   That's correct.

23   Q.   Okay.  And the following meeting, on April the 8th, 1996,

24   do you have that?

25   A.   Yes, I have that.

1    Q.   A motion was made by John Ed Pennington and seconded by

2    Vernon Hacker to approve the bid submitted by B&J?

3    A.   Yes, that's correct.

4    Q.   So your testimony is that there's no indication of a

5    competing bid in the record?

6    A.   Correct.

7    Q.   All right.  Not that there wasn't a bidding process or

8    there's no indication of a bidding process?

9    A.   There were no other bids --

10   Q.   Okay.

11   A.   -- besides that one.

12   Q.   All right.  That's fair enough.  If I could have

13   Exhibit M17, please.  Or if Miss Poynter can pull that up,

14   M17.  I believe you were asked a series of questions about an

15   increase in 2004, and your response was that was actually an

16   amendment from yardage to tonnage?

17   A.   I believe that's correct.

18   Q.   Okay.  And if we look at that exhibit there, 2003 would

19   have been the year preceding the amendment from yardage to

20   tonnage?

21   A.   Yes.

22   Q.   And that would be $142,437.43.  Is that correct?

23   A.   Yes.

24   Q.   And the next year, well, it wasn't changed over until

25   August of 2004, was it?

SAGRECY - Recross (Mr. Gilbert)                                    18

1    A.   I believe that to be right.

2    Q.   Okay.  I do too.  So that if we use 2004 as a base year,

3    the following year it went up $4,000.  So that would be an

4    increase; would it not?

5    A.   Yes.

6    Q.   And the next year, it is 148,700 and change?

7    A.   Yes.

8    Q.   And that includes almost $25,000 of PRIDE --

9    A.   That's correct.

10   Q.   -- cleanup?  So that figure would actually be $124,000?

11   A.   It's still garbage removal.

12   Q.   Pardon?

13   A.   It's still garbage removal.

14   Q.   Yes, sir.

15   A.   So it's still 148,760 is what they received.

16   Q.   But the $25,000 of PRIDE money went to a county-wide

17   cleanup.  So it's not the monthly payment that B&J would have

18   received?

19   A.   Right.  It's for the county cleanup.

20   Q.   All right.  So if we back that out, actually, the City

21   saved $9,000 by going from yardage to tonnage in that

22   particular year on the monthly pickups?

23   A.   I can't say they saved money.  It could have been less

24   garbage.

25   Q.   Could have been.  Could have been.  Could have been more

*SAGRECY - Recross (Mr. Simons)*                                    19

1    garbage?  We just don't have those figures.  But in any event,

2    we can agree that the bill was reduced by 9,000 --

3    approximately $9,000?

4    A.   If you take out the PRIDE dollars.

5    Q.   Yes, sir.  All right.  The next year is 2007.  We're

6    still on tonnage, and that would be approximately the same

7    amount as charged in the year before, which I calculate to be

8    around $8,000 less then the prior year with cubic yards.

9    Would you agree with that?

10   A.   And you're saying being the same, less the PRIDE dollars,

11   correct?

12   Q.   Well, there's no PRIDE dollars in 2007.

13   A.   I understand, but you're saying '07 and '06 -- did I

14   misunderstand that they were the same?

15   Q.   Approximately, if you back out the PRIDE.

16   A.   Yes, yes.

17             MR. GILBERT:  Okay.  That's all.

18             THE COURT:  Thank you.  Miss Hughes?

19             MS. HUGHES:  No, sir.

20             THE COURT:  Mr. Simons, anything else?

21             MR. SIMONS:  One or two.

22             THE COURT:  Yes, sir.

23                           RECROSS-EXAMINATION

24   BY MR. SIMONS:

25   Q.   Agent Sagrecy, Mr. Smith asked you on redirect about

*SAGRECY - Recross (Mr. Simons)*                                      20

1   whether you knew about some money under the table being paid

2   by B&B?

3   A.   Yes.

4   Q.   Do you remember that?

5   A.   Yes.

6   Q.   You're familiar with Kennon White, and you know his role

7   in this case; do you not?

8   A.   Yes.

9   Q.   You realize that he pled guilty to extorting money from

10  my client in a series of City contracts?

11  A.   I realize he pled guilty.  I wasn't involved with that

12  investigation.

13  Q.   Okay.  But you understood he pled guilty, he pled guilty

14  to extorting money from my client for giving out City

15  contracts?

16  A.   I actually do not know the exact charge he pleaded to.  I

17  do know he was involved in a kickback scheme.

18  Q.   Did you make any effort to back that money out that

19  Kennon White took from my client from the figures you put up

20  in front of the jury?

21  A.   I do not know which projects that Kennon White took money

22  from.  So no, I did not.

23           MR. SIMONS:  Okay.  That's all.  Thank you.

24           THE COURT:  Anything else of this witness?

25           MR. SMITH:  No, thank you.

*BRIGGS - Direct (Mr. Smith)*                                          21

1          THE COURT:  Thank you.  You may step down.

2          MR. SMITH:  I would ask that this witness be

3    released.

4          THE COURT:  Yes, sir, he may be.

5          Mr. Smith, you may call your next witness.

6          MR. SMITH:  Thank you.  United States would call

7    Special Agent Timothy Briggs.

8          THE COURT:  Thank you.

9          TIMOTHY S. BRIGGS, GOVERNMENT'S WITNESS, SWORN

10         THE COURT:  Thank you.  Mr. Smith, you may proceed.

11         MR. SMITH:  Thank you.

12                         DIRECT EXAMINATION

13   BY MR. SMITH:

14   Q.   State your name, please.

15   A.   Timothy S. Briggs.

16   Q.   And how are you employed?

17   A.   As a special agent with the Federal Bureau of

18   Investigation.

19   Q.   And how long have you been so employed?

20   A.   Approximately -- well, over 13 years now.

21   Q.   And what position do you hold?

22   A.   I'm a special agent investigator.

23   Q.   And where are you assigned?

24   A.   To the London, Kentucky resident agency.

25   Q.   And how long have you been serving the London resident

*BRIGGS - Direct (Mr. Smith)*                                      22

1   agency office?

2   A.   The whole 13 years, I've been in London.

3   Q.   And during the course of your duties there as a special

4   agent with the FBI, what kind of work have you been involved

5   with over the years?

6   A.   I have investigated a variety of criminal violations to

7   include carjackings, kidnappings, bank robberies, drug

8   investigations, civil rights investigations, terrorism cases,

9   child pornography, public corruption, election fraud.  And I'm

10  also a member of the S.W.A.T. team, the special weapons and

11  tactics and also the evidence response team.

12  Q.   And during your tenure as an FBI special agent in

13  Kentucky, have they offered you specialized training and

14  opportunities to specialize in areas involving public

15  corruption and election crimes?

16  A.   Yes, I have attended public corruption and election fraud

17  seminars and actually spoke at election fraud seminars myself.

18  Q.   Does the FBI organize any special task forces in Kentucky

19  to deal with problem election fraud issues?

20  A.   Yes, we do.  We have a public corruption task force which

21  we started in 2005 in the London, Kentucky office.  And also,

22  for a period of time, I was the election crimes coordinator

23  for the state of Kentucky for the FBI.

24  Q.   And generally, what did that involve, sir?

25  A.   It involved dealing with agents throughout the state of

1    Kentucky that had issues that arose with regard to election

2    fraud.  I would help them coordinate the cases and communicate

3    with headquarters and help them, you know, follow up on and

4    pursue those investigations.

5    Q.   As part of your duties with the FBI, have you been

6    involved in other election crime investigations other than the

7    one that's at issue here in this case?

8    A.   Yes.  Several other cases.

9    Q.   And during the time period that you were involved as an

10   investigator with the FBI, have you obtained methods and

11   practices that have been taught to you or learned through

12   experience as to how to approach election fraud type

13   investigations?

14   A.   Yes, that's correct.

15   Q.   Let's talk about this investigation, sir.  If you could,

16   tell the Court and the jury how this investigation began and

17   kind of how it led you into this election crime scheme that

18   has been charged in this case.

19   A.   The election fraud case in this investigation started in

20   2002.  We had a great deal of evidence and information that

21   there was a large amount of voter bribery and voter fraud

22   going on in Clay County.  We opened an investigation into

23   those allegations, and then we later opened a drug

24   investigation in 2005 in Clay County.

25   Q.   Now, in your experience, sir, how is it that drug

*BRIGGS - Direct (Mr. Smith)*                                    24

1    investigations can help you solve election crime?

2    A.   Well, we know that from experience in southeastern

3    Kentucky working election fraud cases that typically drug

4    trafficking, corruption and election fraud go hand in hand.

5    So we focused on a large number of drug -- large scale drug

6    traffickers in 2005, because when we opened the case in 2002,

7    we obtained documents which were helping our investigation,

8    but we had no cooperators to give us information as a witness.

9         So we kicked off a drug investigation on a large scale

10   drug trafficking organization in Clay County, and we arrested

11   probably 65 individuals.  The case encompassed, ended up

12   encompassing ten different states, the United States and

13   Mexico.  And from there, we gained cooperation, and also some

14   of the people that were arrested in that case were Kenny Day,

15   who spoke here, Eugene Lewis, Jennings White, and numerous

16   others.

17        We then spun that case into a public corruption

18   investigation with regard to Manchester and Clay County, ended

19   up arresting in that investigation Daugh White, the former

20   mayor, Kennon White, Darnell Hipsher, Vernon Hacker, Todd

21   Roberts, and a number of others.

22        Then we spun that public corruption investigation into an

23   election fraud investigation.

24   Q.   How important, Agent Briggs, is cooperation from

25   convicted felons in your ability to solve election crimes?

*BRIGGS - Direct (Mr. Smith)*                                           25

1    A.   It's very important, because it's a close-knit type

2    group.  And as in any crime, it's always best to have someone

3    that was involved in the actual crime cooperate with law

4    enforcement and give us insight that maybe our investigation

5    has not revealed to that point and help us further expand the

6    investigation and move up the ladder, so to speak.

7    Q.   How successful were you in 2002 in trying to solve the

8    election crimes that were perceived to be going on in Clay

9    County at that time?

10   A.   We did not have much success initially, because we

11   obtained the records from the clerk's office for 2002

12   election.  We had a great deal of records which had a number

13   of irregularities, but we had no one willing to come forward

14   and cooperate with the government and testify.  So --

15   Q.   What type things did you learn, though?

16   A.   We learned that in 2002, primary election, I believe it

17   was 700 -- I know it was over 700, but I believe the exact

18   number was 716 individuals required voter assistance and

19   filled out a voter assistance form.

20   Q.   Now, would that include absentee voting as well as those

21   who are assisted voters?

22   A.   Yeah, the voter assistance forms across the board.

23   Q.   As you obtained that information, were you able to

24   determine how many people voted absentee in 2002?

25   A.   I don't recall that number off the top of my head, sir.

1    I'm sorry.

2    Q.   The number of 716 were, in your estimation, suspect for

3    what reason?

4    A.   Well, for example, 78 of the individuals that completed

5    voter assistance forms indicated that the reason they needed

6    voter assistance was for blindness, and we did a check and

7    determined that 38 of those individuals actually had valid

8    Kentucky driver's license with no restrictions due to vision.

9        We then invited numerous -- a number of those individuals

10   to come to the FBI office to be interviewed.  They drove

11   themselves to the office, walked in, presented a driver's

12   license, which we verified that way, that they said on the

13   voter assistance forms they needed assistance for blindness

14   when, in fact, they had a Kentucky driver's license and were

15   driving.

16   Q.   We've heard testimony from others in this case that

17   William "Al Man" Stivers was involved as an election officer

18   in that 2002 election.  Did you find any indication in the

19   records that you obtained and reviewed in 2002 of that?

20   A.   Yes, he showed assisting -- it was over 100, and I

21   believe the exact number was 123 voters that he assisted

22   during that election.

23   Q.   What happened to the records that were required -- number

24   one, how did you obtain those records?  What mechanism was

25   used to obtain those records from the county clerk?

*BRIGGS - Direct (Mr. Smith)*                                    27

1    A.   Well, I was not the case agent at the time, but I believe

2    the case agent served a subpoena on the county clerk's office,

3    obtained those records, summarized those records and

4    ultimately returned those records.

5    Q.   And can you explain why those records were returned at

6    that time?

7    A.   Yes, because they'd been, you know, reviewed and

8    summarized by the case agent at the time.

9    Q.   Were you successful in obtaining cooperation in the early

10   2002 investigation?

11   A.   No, we were not.

12   Q.   You indicated that you were successful in your drug

13   investigation in 2005?

14   A.   Correct.

15   Q.   And where was the center of that drug trafficking

16   activity that basically sprang out to all these other parts of

17   the country and even other countries, including Mexico?  Where

18   was this center of activity?

19   A.   Of course, it was in Clay County.  It was outside of

20   Manchester in a small community called Burning Springs, and it

21   was being operated out of KD's Pawn Shop, which is operated by

22   Kenny Day, who testified here earlier in this case.

23   Q.   Now, you indicated that there was others indicted,

24   including Jennings White?

25   A.   Correct, yes, sir.

*BRIGGS - Direct (Mr. Smith)*                                    28

1    Q.   And Eugene Lewis?

2    A.   Yes, sir.

3    Q.   And as those persons were prosecuted, did you seek to

4    interview them and get their cooperation in the drug

5    investigation?

6    A.   Yes, we did.

7    Q.   How was it that you were able to develop leads from those

8    prosecutions into this election scheme?

9    A.   Because those individuals were involved in past elections

10   and election fraud.  So they were debriefed on their knowledge

11   of the -- how the criminal enterprise operated, how they

12   recruited vote haulers, paid voters, how they developed the

13   slate, and just all aspects of the criminal enterprise.

14   Q.   You also indicated that you had success in the public

15   corruption area in Manchester.  Could you explain how you

16   benefitted from cooperation out of the drug case, and how did

17   that help you in your public corruption?

18   A.   Well, of course, when we, you know, arrest an individual

19   on a specific case and they begin to cooperate, our first and

20   biggest priority is to gain information regarding that

21   specific investigation that we have possible potential charges

22   on individuals at that time.

23        Then thereafter, at some point, try to spin that off into

24   other areas such as public corruption and election fraud.  And

25   we were successful in obtaining information from these

*BRIGGS - Direct (Mr. Smith)*                                        29

1    individuals that led to both public corruption and election

2    fraud because they were, they were involved in it.

3    Q.   In your experience as an FBI agent, is it normal to take

4    so many years to get to the bottom of a case such as an

5    election fraud scheme?

6    A.   Yes, it can take a number of years, and this case is

7    going on eight years.  So yeah, they're lengthy

8    investigations.  Anytime you're dealing with public

9    corruption, attempting to gain cooperators and witnesses that

10   are going to be witnesses against people that are high up and

11   powerful in the community, everyone is afraid to testify and

12   cooperate and provide information.  So it's very difficult and

13   it's a lengthy process.

14   Q.   You indicated that one of those that you've prosecuted in

15   the public corruption included mayor Daugh White and his son,

16   Kennon White?

17   A.   Yes, sir, that's correct.

18   Q.   When did you begin using Kennon White as a cooperator?

19   A.   I think it was March of 2007.

20   Q.   And could you explain to the court and the jury how you

21   were able to get his cooperation at that point?

22   A.   Well, he was involved in election fraud and acts of

23   corruption which we confronted him on.  He at that point then

24   agreed to cooperate in the investigation with authorities and

25   the FBI and divulge his knowledge of these criminal acts.

BRIGGS - Direct (Mr. Smith)                                      30

1   Q.   And did he enter a guilty plea and agree to cooperate?

2   A.   He did, yes.

3   Q.   Is that unusual in your training and experience, to have

4   people enter plea agreements and agree to cooperate?

5   A.   No, not at all.  It's more difficult in cases like these

6   for the reasons I've mentioned, but that's very common.  Very

7   common occurrence.

8   Q.   So why, in your experience and training, did you not just

9   write up an interview of Kennon White, indict these people and

10  go forward at that point, sir?

11  A.   Well, putting all your eggs in one basket, so to speak

12  there.  You've got one person or maybe just a handful or a

13  couple people providing information.  The longer you can

14  extend that information and gain more and more and more

15  witnesses, as well as, you know, potentially in this case, as

16  we've done, use audio recording devices to capture, you know,

17  the defendants themselves, the criminal enterprise talking

18  about this past criminal activity on audio tape is very

19  valuable to prosecuting these cases.

20  Q.   How did you get Wanda White's cooperation?

21  A.   Essentially, it was kind of a package deal.  She came

22  along with Mr. Kennon White.  She too, herself, had been

23  involved in election fraud, primarily starting in 2002 when

24  her husband ran for jailer.  She attempted to buy, help him in

25  his conspiracy to buy votes.  And she became a cooperator for

1   us as well.

2   Q.   When she came forward, did you have evidence to hold over

3   her head?

4   A.   Not at that moment in time, we did not.  I think we

5   eventually would have gotten there, of course, but we didn't

6   at that time, no.

7   Q.   How did you proceed with your investigation once you

8   obtained their cooperation, sir?

9   A.   Well, you know, we debriefed them on a number of

10  occasions or interviewed them to provide any and all

11  information they had regarding any kind of illegal acts.  But

12  our primary focus, of course, was election fraud.  We

13  interviewed them on a number of occasions.

14       They had actually retained some records from their

15  election efforts in the past.  They provided those to us.

16  They agreed to begin audio recording some of the defendants in

17  this case, and they continued to make notes throughout the

18  investigation as to things they remembered that they had not

19  initially told us about.

20  Q.   When you made these recordings, what safeguards did you

21  put in place as part of your investigation?

22  A.   I'm not sure I understand the question, sir.

23  Q.   Did you all present -- were you present during the time

24  period, did you actually travel with these witnesses and go on

25  site with these recorders?

*BRIGGS - Direct (Mr. Smith)*                                    32

1    A.   No.  Absolutely not.

2    Q.   Could you explain why you did not do that?

3    A.   Why we did not accompany them to the defendants?

4    Q.   Yes, sir.

5    A.   I mean, obviously, we had been investigating Clay County

6    pretty heavily on a number of fronts; drugs, corruption and

7    election fraud for some time.  A large number of the

8    population knew us, knew what kind of vehicles we drove, what

9    we looked like.  If we went with them, that would have been a

10   huge red flag and we wouldn't have got any conversation.

11        And, you know, they -- during the drug portion of the

12   case, we had a Title III, which is a wire tap, which is where

13   they listen to drug dealers or, in this case, listen to their

14   phone calls.  And when we would come and get off the parkway

15   to come in Manchester, the drug dealer would get a call saying

16   the FBI's in town.  So they were tipping off the individuals

17   involved in criminal activity of our presence in the county.

18   Q.   Now, what year was it that you had the wire tap on the

19   drug organization?

20   A.   That was 2005.

21   Q.   And did you have to prosecute some of those members

22   actually in trial and use those recordings in a public trial

23   setting before you began your 2007 investigation of these

24   corrupt members of this organization?

25   A.   We prosecuted them in a court of law, but none of the

*BRIGGS - Direct (Mr. Smith)*                                        33

1    defendants went to trial on the drug end of it.

2    Q.   What about Jennifer Garrison, did she go to trial?

3    A.   Yes, sir, she did go to trial.

4    Q.   Did you use the evidence from your wire tap in that case?

5    A.   Yes, sir, we did.  Some of it.

6    Q.   Did you also have your agents execute search warrants at

7    or around Halloween of 2006?

8    A.   Yes.  On October 31st, 2006, we executed a search warrant

9    on the City Hall in Manchester, Kentucky, where Daugh White,

10   the mayor, worked, Kennon White, his son worked as city

11   manager and also Wanda White worked there as, I believe, a

12   clerk.  But we executed a search warrant October 31st, 2006 at

13   City Hall in Manchester.

14   Q.   Did Cletus Maricle have relatives working there at the

15   time you executed the warrant?

16   A.   Yes.  His daughter, Linsey Maricle, worked there.  And he

17   had a grandson working there as well, Brandon Mobley.  I'm not

18   sure -- I believe he worked there at that time as well.  I

19   know he worked there in the past.

20   Q.   Did you conduct interviews of people at City Hall at that

21   time?

22   A.   Yes, we did.

23   Q.   Did that include members of Cletus Maricle's family?

24   A.   No, it didn't.

25   Q.   Did you later seek to interview them as part of that

BRIGGS - Direct (Mr. Smith)                                    34

1    investigation?

2    A.   Yes, we did.

3    Q.   And how did you go about doing that, if you know?

4    A.   I went to the police department, and we were doing a

5    number -- we had a number of investigative efforts we were

6    trying to accomplish that day.  Went to the police department

7    and asked where Mr. Maricle lives, so I could get directions

8    to go to his residence to interview his daughter, Linsey

9    Maricle.

10   Q.   And what happened?

11   A.   The officers -- when I traveled through town with the

12   local law enforcement officers, they would always point up the

13   hill towards a large house that overlooked the town and say,

14   well, there's where Cletus Maricle lives and point in the

15   direction of that house.  They told me on that particular day

16   to travel to the end of Circle Drive where it dead ends into

17   Mr. Maricle's driveway.

18        So I traveled to that residence and left a business card

19   in the door.  I think I wrote a notation on the back that I

20   was looking to attempting to interview Linsey Maricle.  Then I

21   left, went back to the police department.  And approximately,

22   I'd say, an hour or so later Mr. Maricle, Mr. Cletus Maricle

23   showed up with his daughter to be interviewed.

24   Q.   And where did you conduct that interview?

25   A.   At the police department, Manchester Police Department.

BRIGGS - Direct (Mr. Smith)                                    35

1    Q.   How did these law enforcement activities in the small

2    town of Manchester calculate into how you approached the use

3    of these cooperators, Kennon White and Wanda White, when it

4    came time to do these recordings?

5    A.   How did it affect the way we handled the recordings?

6    Q.   Yes, sir.

7    A.   Essentially, we would initially prep the tape, meaning

8    we'd put our voices on there, saying this is special agent Tim

9    Briggs and the detective with me, we provided the recorders,

10   sent them on their way to the location.  Again, we didn't try

11   to attempt to surveil them into Clay County or even at the

12   dead-end street where Mr. Maricle lived, for integrity of

13   investigation as well as safety of the sources, so they

14   wouldn't know that we were cooperating or they were

15   cooperating.  They would come back and we would retrieve the

16   audio recording devices at a later time.

17   Q.   During the course of these recordings, we've heard that

18   these witnesses were made aware of certain things they were to

19   inquire about.  Do you recall how those things were generated

20   from the investigation?

21   A.   Yes.  During the time frame in which Miss Wanda White

22   advised Mr. Maricle and others that she was going to the

23   federal grand jury to testify on this election issue, we -- of

24   course, Mr. Maricle showed an interest in getting the

25   information Miss Wanda White had to provide.  But we developed

*BRIGGS - Direct (Mr. Smith)*                                    36

1    a list of questions that she would be asked at federal grand

2    jury to take to the various subjects to discuss that with

3    them.

4    Q.   One point, Agent Briggs, we heard that during one of the

5    recordings that you were having an affair on your spouse.

6    A.   Yes, sir.

7    Q.   Could you explain that?

8    A.   We learned through the cooperators, Kennon and Wanda

9    White, that Mr. Maricle was attempting to find out where

10   myself, Detective Mark Hopkins and Officer Buddy Blair lived

11   and also what kind of vehicles we drove.

12       So my number -- my name had been in the newspaper down

13   there probably 200 times in the recent past, and my name is

14   always on the court affidavits for arrest warrants, search

15   warrants, things of that nature.  So I felt I was the most

16   public of the three.  So to divert him away from my home if,

17   in fact, they tried to find my family, we come up with that

18   ruse.

19   Q.   Do you recall when you made the first recording of Cletus

20   Maricle?

21   A.   It was March 27th, 2007.

22   Q.   And in that first recording, did you give any specific

23   instructions to the witnesses as to what they were to ask

24   about in that first meeting with him, if you recall?

25   A.   No.  Just, you know, the purpose of the recordings was to

BRIGGS - Direct (Mr. Smith)                          37

1    obviously gather communications or talks about the election

2    fraud.  But no specific directions.

3    Q.   In the course of this investigation, did you know at the

4    time that he was a sitting circuit judge?

5    A.   Yes, sir.

6    Q.   Did you know that he had over 30 years' experience as a

7    lawyer and as a judge at that time?

8    A.   I wasn't sure of the years of experience, but I knew he

9    had quite a number of years as an attorney and a judge.

10   Q.   And did you know at the time that they were going to be

11   challenged to get him to talk about criminal acts that had

12   occurred as long as a year or as recently as just one year

13   prior?

14   A.   Yes, I mean, he was, you know, obviously concerned about

15   the fact that the White family was under investigation because

16   we'd searched the City Hall on October 31st of 2006.  His

17   son-in-law, Phillip Mobley, at some point was subpoenaed to

18   the grand jury.  Wanda White was subpoenaed to the grand jury.

19   And there were a number of issues that made him concerned

20   about talking about these, you know, past crimes with Kennon

21   and Wanda.

22   Q.   During the course of your investigation, did you also

23   seek to utilize a federal grand jury to help you in your

24   investigation?

25   A.   Yes, sir, we did.

*BRIGGS - Direct (Mr. Smith)*                                          38

1   Q.   And generally, how was the grand jury going to help you

2   in your investigation?

3   A.    Well, we subpoenaed witnesses, of course, lot of

4   witnesses to the grand jury to discuss their involvement,

5   their role, their knowledge of the election, election process

6   in Clay County and fraud, bribery that they had observed

7   during their, either their voting process or, you know if they

8   hauled voters, if they were a paid voter, that type of thing.

9   Q.   Was the grand jury empanelled on May the 3rd, 2007?

10  A.   Excuse me?

11  Q.   Was the grand jury empanelled on May the 3rd, 2007 to

12  hear evidence in this case?

13  A.   Yes, sir, I believe that's right.

14  Q.   And did you use that as part of your investigative

15  efforts in the recordings in some way?

16  A.   Yes.

17  Q.   And explain to us generally how that was used in your

18  investigation.

19  A.    Well, as I mentioned, a number of witnesses were

20  subpoenaed before the federal grand jury to include Charles

21  Weaver, also known as Dobber, Wanda White, who were two of the

22  election officers that served in 2006, Phillip Mobley and

23  various other individuals, and I think it was quite clear that

24  we were looking into the issues regarding the elections in

25  Clay County.

*BRIGGS - Direct (Mr. Smith)*                                    39

1          MR. SMITH:  I'd like to request D16.

2          THE COURT:  Yes, sir.

3   Q.   Do you recognize that, Agent Briggs?

4   A.   Yes, sir, I do.

5   Q.   And how did you come into -- identify that for us,

6   please.

7   A.   It's a list of names provided to us by Kennon White and

8   Wanda White.

9   Q.   And do you recall when it was that you were provided

10  those list of names?

11  A.   October 20th, 2008.

12  Q.   And what were the circumstances, Agent Briggs, which you

13  obtained that, if you recall?

14  A.   It was provided to us by the sources.

15  Q.   And what information were you able to obtain regard to

16  your investigation as to how this played into the

17  investigation?

18  A.   I believe this is the list that they obtained from Mr.

19  Maricle, who advised that these were potential grand jury

20  witnesses in an ongoing investigation.

21  Q.   Okay.

22          MR. SMITH:  I'd like to publish that at this time,

23  Your Honor.

24          THE COURT:  Yes, sir, you may.

25  Q.   As part of your investigation there in Clay County, do

*BRIGGS - Direct (Mr. Smith)*                                                  40

1    you recognize that any of these individuals were actually

2    grand jury or federal grand jury witnesses?

3    A.   Yes, sir.

4    Q.   If you could just go through the list there and highlight

5    for the court and the jury persons on this list that you

6    recognize as being, in fact, grand jury witnesses in the

7    investigations.

8    A.   Can I do it with my finger?

9    Q.   Just read those off to us.

10   A.   Oh, okay.  Sorry.  Crystal Hibbard was, I believe Amy

11   Abner, Darnell Hipsher, Carmen Lewis, Mansell Baker, Scott

12   Robinson, and there may be others.  A lot of these people we

13   interviewed, some of them were in the grand jury.  I don't

14   want to get confused, but those are the ones I'm pretty sure

15   were subpoenaed to the grand jury.

16   Q.   Do you recognize the name Mike Bishop?

17   A.   Yes, I'm sorry, Mike was subpoenaed as well.

18   Q.   And what about the Raders; David Rader, Gilbert Rader,

19   Randy Rader.  Do you recognize any of those names?

20   A.   Yes, I do.

21   Q.   Are any of those grand jury witnesses at some point

22   during your investigation?

23   A.   I believe they were.

24   Q.   Wes Hacker, do you recognize that name?

25   A.   Yes.

BRIGGS - Direct (Mr. Smith)                                41

1   Q.   Do you recognize that as being a witness in front of the

2   grand jury?

3   A.   Yes.

4   Q.   Agent Briggs, at the time that this was brought to your

5   attention, was it explained to you that Cletus Maricle was

6   actually interested in knowing who was involved in this

7   ongoing investigation?

8   A.   Yes, absolutely.

9   Q.   What other things did Cletus Maricle exhibit to you

10  during the investigation that indicated his interest in your

11  investigation?

12  A.   On March 27th, 2007, the first recording, Kennon White

13  went to him and said he was concerned about Stanley Bowling

14  discussing with the FBI investigators about the kickback

15  scheme.  And Mr. Maricle advised him, don't worry, I'll find

16  out if he's talking to the FBI.

17       And Mr. Bowling was represented by Stephen Charles, a

18  local attorney who is close with Cletus Maricle.  And Stephen

19  Charles also represented Phillip Mobley, Cletus' son-in-law,

20  and he went to the federal grand jury to testify.  And after

21  Wanda testified, she met with Mr. Maricle, and he told her

22  that he was aware that she said too much.  Stephen -- we're

23  assuming Stephen reported back to him that --

24  Q.   Stephen who?

25  A.   Stephen Charles, I'm sorry, said that you talked too much

BRIGGS - Direct (Mr. Smith)                                    42

1    there.  You shouldn't be talking, because they have listening

2    devices in the courthouse and so forth.  So --

3    Q.  At the time that he made that recorded statement to you,

4    had you all made any advancements toward him to try to bring

5    up the federal investigation?

6    A.  No.

7    Q.  During the course of your investigation, was there also a

8    grand jury that met on July the 10th, 2007?

9    A.  Yes.

10   Q.  And during that grand jury session, are you aware that

11   Freddy W. Thompson appeared there to give testimony to the

12   federal grand jury?

13   A.  Yes, he did.

14        MR. SMITH:  Like to hand the witness what's marked

15   Government's Exhibit D84, Your Honor.

16        THE COURT:  Yes, sir.

17   Q.  Do you recognize Government's Exhibit D84?

18   A.  Yes, sir, I do.  It's the July 12, 2007 federal grand

19   jury testimony transcript of Freddy W. Thompson.

20   Q.  And was that sworn testimony that he gave on that

21   occasion?

22   A.  Yes, sir, it was.

23   Q.  And has that been certified by a court reporter to have

24   been transcribed accurately?

25   A.  Yes, sir, it was.  Yes, sir.

*BRIGGS - Direct (Mr. Smith)*                                    43

1          MR. SMITH:  I'd move for the introduction of

2    Government's Exhibit D84, Your Honor.

3          THE COURT:  Any objection?

4          MR. BALDANI:  No objection, Your Honor.

5          THE COURT:  Is it D or P?

6          MR. SMITH:  D as in Daryl.

7          THE COURT:  Exhibit D84 will be admitted.

8               (Government Exhibit No. D84

9               was admitted into evidence.)

10   Q.   Agent Briggs, during the course of that testimony before

11   the federal grand jury, it's been alleged that Freddy Thompson

12   obstructed a federal investigation at that point.  Have you

13   reviewed the transcript for purposes of identifying portions

14   of his testimony which obstructed the federal grand jury

15   investigation?

16   A.   Yes, sir, I have.

17   Q.   I'd like to refer you to page 4, and --

18   A.   Yes, sir.

19   Q.   -- ask if he was specifically asked in the grand jury

20   about returning -- let me ask you this.  Was he required by

21   subpoena to the federal grand jury to produce the records for

22   the 2006 elections?

23   A.   Yes, sir, he was.

24   Q.   And did that include the voter assistance forms?

25   A.   Yes, sir, it did.

*BRIGGS - Direct (Mr. Smith)*                                        44

1    Q.   And on page 4 there, can you read for us the question and

2    answers which ask if those were complete and total records?

3    A.   Yes, sir.  Starting on line 1, are these the complete and

4    total records that you have kept by -- you have kept by

5    Kentucky and federal law?

6         Answer:  "Yes."

7    Q.   Whose answer?

8    A.   Freddy Thompson's answer.

9    Q.   And the next question?

10   A.   Are you required to keep those records for 22 months, I

11   understand?

12        Answer, Freddy Thompson:  22 months.

13        Do you want me to continue?

14   Q.   Did you have an opportunity, Agent Briggs, to -- did the

15   grand jury, after their session that day, did they deliver to

16   you their records for your analysis?

17   A.   Yes, they did.

18   Q.   And did you analyze the voter assistance forms?

19   A.   Yes, we did.

20   Q.   And did you seek to number the ones that were actually

21   signed off as voter assisted by Wanda White and Charles

22   "Dobber" Weaver?

23   A.   Yes, we did.

24   Q.   And do you recall what those numbers showed?

25   A.   I believe Wanda was only appearing on five to eight of

1   them, and I cannot remember about Charles "Dobber" Weaver.

2   Q.  In the course of your investigation, in the recordings,

3   had you already been made aware that these forms had been

4   destroyed by Freddy Thompson and Wayne Jones?

5   A.  Yes, that came up on an audio recording, that Freddy and

6   him, referring to Wayne, had destroyed those records.

7   Q.  And did you seek to have those forms reviewed by Wanda

8   White and Charles "Dobber" Weaver?

9   A.  Yes, we did.

10  Q.  And did they confirm to you that forms they had signed

11  were missing?

12  A.  Yes, they did.

13  Q.  Are you aware of the federal grand jury's questions in

14  this sworn testimony by Freddy Thompson as to whether or not

15  they asked him if there had been problems or complaints during

16  the May, 2006 primary?

17  A.  Yes, I did ask him that.

18  Q.  Direct your attention to page 10, line 5.  I'd ask, if

19  you would, to read that entire page.

20  A.  Page 10, line 5.  Question:  Mr. Thompson, do you have

21  any -- did you have any complaints during the May, '06

22  election?

23      Answer, Freddy Thompson:  Election day or after election

24  or what?

25      Question:  Anytime regarding the process of voting or the

*BRIGGS - Direct (Mr. Smith)*                                     46

1    machine or allegations that poll workers might have been

2    manipulating things.

3        Answer:  Well, I had one guy come in from -- it says

4    Garrett, but it should be Garrard precinct, demanding I shut

5    the precinct, down.  And I tell him I can't shut it down.

6    Then he demands to throw all four election officers out and

7    put four more in, you know.  I said we can't do that.  There's

8    no more -- no more to do it.  That he wants the results

9    throwed out that evening from the Garrard precinct.  He said

10   all of these votes was getting stolen.  That evening, he

11   carried the precinct.

12   Q.  Continue, please.

13   A.  Question:  Who was this?

14       Answer:  Blaine Smith for jailer.

15   Q.  Continue.

16   A.  Question:  Who?  I couldn't understand you.

17       Blaine Smith for jailer.

18       Question:  Thanks.

19   Q.  On to page 11.

20   A.  Line 1, question:  When did you -- when did he bring the

21   complaint to you?

22       Line two, answer from Freddy Thompson:  Right around

23   dinner time election day.  But yet he carried --

24       Question:  Before the results were --

25       Answer:  Yes, yes, really the only complaints that we had

*BRIGGS - Direct (Mr. Smith)*                                              47

1    was losing candidates and their families, really and truly.

2         Question:  You had complaints from losing candidates

3    other than Blaine Smith?

4         Answer:  Just, yeah, just hearsay, you know, people

5    running their, their mouth, yeah.

6         Question:  Any that you can recall?

7         Answer:  Well, Terry Spurlock, he was saying that he was

8    getting cheated, which he runs in every election and he gets

9    worse and worse every time he runs.  Well, I mean, I --

10        Question:  Did they explain to you how they thought they

11   were being cheated at the polls?

12        Answer:  No.  They just said they was getting cheated,

13   you know.  They were getting cheated.  They never said.

14        Question:  They never explained to you how they were

15   getting cheated?

16        No audible response heard.

17        Question:  No?

18        Answer:  No.

19   Q.  Thank you.  During the grand jury investigation on this

20   day, questions posed to Freddy Thompson during his testimony,

21   did they ask him about specifically the voter assistance forms

22   on page 13?  I refer you to line 18 -- or 17, I'm sorry, and

23   following.

24   A.  Yes, page 13, line 17, question:  Now during the course

25   of the election, I assume that there would be voters who will

*BRIGGS - Direct (Mr. Smith)*                                          48

1    come to the polls who will request assistance to vote; is that

2    true?

3         Answer:  Yes.

4         Question:  And by law, you're required to have a form

5    filled out on those individuals?

6         Answer:  Yes.  Should be there, right.  Question --

7    Q.  Should be right there?

8    A.  Yes, sorry.  Should be right there, yes.

9         Question:  And you have produced in these records here

10   and on this -- this is box number 4, this would be the

11   representation of all of the voter assistance forms, correct,

12   that were executed back on May of 2006?

13        Answer:  Well, this is the precinct sheriff's.  They're

14   mixed up.

15        Should I continue?

16   Q.  Read the next question and answer please, yes.

17   A.  Question:  Okay.

18        Answer:  That's the voter assistance forms, yeah.

19        Question:  Are you required as earlier stated by law to

20   keep those, correct, for 22 months?

21        Answer:  Yes, 22 months.

22        Question:  And in course of keeping these records,

23   were -- are these kept, by the way, in your office?

24        Answer:  In the file room.  Excuse me, in the deed room.

25        Question:  In the deed room?

*BRIGGS - Direct (Mr. Smith)*                                          49

1       Answer:  Yeah.

2       Question:  And deed rooms, in most communities, are

3    actually secured, locked spaces.  Is that the same for your

4    place?

5       Answer:  Yes.

6       Question:  And who has access to these records other than

7    yourself in the office?

8       Answer:  Well, just the girls that work there, yeah.

9       Question:  Okay, so you give every person on your staff

10   access to these records?

11      Answer:  Well, I mean, they're not in a file locked up by

12   their self.  They're in the back of the deed room in filing

13   cabinets.

14      Question:  Are those filing cabinets locked?

15      Answer:  No, there's no way to lock them.  No.

16   Q.   Thank you.  Did the grand jury, during the examination,

17   ask specifically about whether or not others may have removed

18   the voter assistance forms?  I direct your attention to

19   page 15, beginning with the question on line 16.

20   A.   Page 15, line 16.  Well, let me ask you this.

21   Are you aware of anybody coming to look at those records that

22   were not present -- not a person in your staff?

23      Answer:  No, nobody's never asked.  No.  We've never seen

24   nobody look at them.

25      Question:  Has anyone asked that you remove those?

*BRIGGS - Direct (Mr. Smith)*                                    50

1    Answer:  No, sir.

2    Question:  These voter assistance forms from your office?

3    Answer:  No.

4    Question:  Have you seen anyone attempt to destroy a

5    voter assistance form?

6    Answer:  No, I have not.

7    Q.   Okay.  Thank you.  During the course of your

8    investigation, did you learn from election officers Wanda

9    White and Charles "Dobber" Weaver that they had actually been

10   given access after hours by Wayne Jones and Freddy Thompson

11   and shown how to steal votes in 2006?

12   A.   Yes.  Our investigation revealed that after the general

13   training session for all election officers, that Charles

14   "Dobber" Weaver and Wanda White were provided, I guess, a

15   tutorial on the machines and how to essentially operate the

16   machines and steal votes.

17   Q.   Direct your attention to page 26, beginning at line 13

18   question.  Was Freddy Thompson specifically asked whether

19   Wayne Jones had access to those machines?

20   A.   I'm sorry, sir, what?

21   Q.   Page 26, beginning on line 13.

22   A.   Yes, sir.  Page 26, question, line 13, question:  Mr.

23   Thompson, I'm going to back up a little bit to follow up on a

24   question I asked you earlier, but I'm going to be more

25   specific this time.  Did Wayne Jones have access to the voting

BRIGGS - Direct (Mr. Smith)                                          51

1    machine demonstrators demos prior to this election?

2        Answer:  No, no.  I had it in my office all day.  He was

3    with me all the time.  I was the only one that took, took it

4    out and demoed at, like, the fire departments and school

5    functions and all.

6    Q.  During your investigation, did you learn that, in fact,

7    there had been multiple complaints about the 2006 election and

8    particularly complaints that voters were being deceived by

9    election officers and walking away from the machine

10   prematurely?

11   A.  Yes.  We don't -- yeah, our investigation revealed that

12   there were over 100 complaints regarding the 2006 election in

13   Clay County.

14   Q.  And did you seek to determine whether those complaints,

15   in part or in whole, were forwarded to the county clerk,

16   Freddy Thompson?

17   A.  I know that some of them were, yes.

18   Q.  And other than Terry Spurlock and Blaine Smith, do you

19   recall in federal grand jury testimony that he gave whether he

20   listed any other complaints other than disgruntled candidates

21   and their families who were upset or making any complaints

22   whatsoever to the county clerk's office?

23   A.  I'm sorry.  What was the question again, sir?

24   Q.  Are you aware, during the testimony of Freddy Thompson,

25   when asked about complaints that were brought to his attention

*BRIGGS - Direct (Mr. Smith)*                                          52

1    in the May, 2006 election, whether he had mentioned any other

2    names other than Blaine Smith and Terry Spurlock?

3    A.   No, sir, he did not.

4    Q.   Did you at some point propose to execute search warrants

5    at various locations in this investigation?

6    A.   Yes.  Yes, we did.

7    Q.   And do you recall when that was?

8    A.   It was March 19, 2009.

9    Q.   And during that -- as part of that investigation, what

10   items were you seeking to find at that point in your

11   investigation, understanding that this was three years past

12   the 2006 election cycle?

13   A.   Well, we were hoping to find evidence of election fraud

14   with regard to, you know, names of lists of voters or vote

15   haulers or vote sellers, amounts of money paid, provided by

16   other candidates.  Just, you know, those types of things which

17   individuals typically involved in election fraud keep from

18   election to election to election, because if I determine a

19   large family or a number of individuals in an apartment

20   complex, per se, for example, that would sell their vote, I

21   want to keep that list for the next election so I know I can

22   approach those people the next time around to buy their votes

23   in the upcoming election.  So --

24   Q.   And did you know through your investigation that members

25   of the enterprise, in fact, had been keeping score, so to

*BRIGGS - Direct (Mr. Smith)*                                        53

1    speak, and keeping those kinds of records?  For instance,

2    Jennings White, were you aware that he'd kept score over the

3    years in your investigation?

4    A.   Yes.  On April 28th, 2009, we executed a search warrant

5    on Mr. Jennings White's residence, and we found records dating

6    back for, I believe, 14 years prior to the year that we'd

7    searched his residence.  So he'd kept records for quite some

8    distance back with regard to election fraud.

9    Q.   How does an FBI agent get authority to search a

10   residence, Agent Briggs?

11   A.   Well, we gather our intelligence and put it in an

12   affidavit and present it to a magistrate judge in the federal

13   court, who then signs that document, allowing us to serve the

14   said premises for evidence of a crime.

15   Q.   And is there a requirement that there be a showing of

16   probable cause to a federal judge before you can do that?

17   A.   Yes, there is.  You have to -- there's a burden of

18   probable cause that we have to meet in order to get the search

19   warrant.

20   Q.   And in this case, who did you present applications to

21   search or what properties, in other words, did you seek to

22   search?

23   A.   The residence of Mr. Cletus Maricle, the residence of Mr.

24   and Miss Morris, and also William Stivers.

25   Q.   Were you able to personally execute those simultaneously

*BRIGGS - Direct (Mr. Smith)*                                        54

1    yourself, or did you have to enlist others to help you in

2    that?

3    A.   No, I did not personally execute those search warrants

4    myself.  We had teams that went to each location and searched

5    those locations.

6    Q.   As the overall case agent, did you have ultimate

7    responsibility for the evidence in that case?

8    A.   Yes, I did.

9    Q.   In each of those locations?

10   A.   Yes, sir, that's correct.

11   Q.   During the execution of the search of the Stivers'

12   residence, did you find documents that were within the scope

13   of your search warrant application?

14   A.   Yes, sir, we did.

15   Q.   And did you seek to take those into the custody of the

16   FBI?

17   A.   Yes, sir, we did.

18           MR. SMITH:  Like to hand to the witness Government's

19   Exhibit D47 --

20           THE COURT:  Yes, sir.

21           MR. SMITH:  -- D51, D53, D54, D55, D56.

22   Q.   I would ask that you look at each of those, Agent Briggs,

23   and identify if you can whether these were items taken from

24   the Stivers residence in a search on March the 19th, 2009.

25   A.   Yes, sir, these are the documents recovered from Mr.

BRIGGS - Direct (Mr. Smith)                                           55

1    Stivers' residence.

2    Q.   And where was his residence at that time, sir?

3    A.   Located at 3257 Highway 149.

4    Q.   And was that a residence which he had maintained for some

5    period of time prior to your executing the warrant?

6    A.   Yes.  He had moved from another location to that

7    location.  I'm not sure exactly when he moved, but he had

8    lived there for some time.

9    Q.   Did that move occur sometime while you were

10   investigating?

11   A.   Yes, it did.

12   Q.   And if you could tell us -- identify for us D47.

13   A.   D47 is an information charging Charles Newton Weaver,

14   also known as Dobber, with election fraud.

15   Q.   Where was this document found, sir?

16   A.   In Mr. Stivers' residence.

17   Q.   And was there a place where he kept his papers?

18   A.   Yes, there was.

19   Q.   And at the time that this was marked as evidence in the

20   case, had Charles Weaver's guilty plea to an information been

21   entered in the federal court system in London, Kentucky?

22   A.   Yes.

23   Q.   Let me ask you this.  What was the date in which this

24   document shows it was filed in federal court?

25   A.   Yes, sir, that's what I was looking at.  Filed March 17,

BRIGGS - Direct (Mr. Smith)                                    56

1   2008.

2            MR. SMITH:  I'd move for introduction of Government's

3   Exhibit D47.

4            THE COURT:  Any objection?  D47 will be admitted.

5                    (Government Exhibit No. D47

6                     was admitted into evidence.)

7            MR. SMITH:  Ask that that be published.

8            THE COURT:  Yes, sir, you may.

9   Q.   Special Agent Briggs, this is D47.  How is it in your

10  training and experience that a document regarding Charles

11  "Dobber" Weaver would be important to someone in the position

12  of William Stivers at that time?

13  A.   Well, if you're involved in criminal activity,

14  particularly when you're involved with criminal activity of

15  other individuals and this individual's a part of this

16  election bribery and fraud scheme, you want to know who is

17  being investigated, who's been charged, who may be

18  cooperating, things of that nature.

19  Q.   And during the recordings that you've been making

20  secretly of William Stivers, had he and others in his

21  associations expressed an interest in possible cooperation of

22  Charles "Dobber" Weaver?

23  A.   I'm sorry, what was the question, sir?

24  Q.   During your recordings that you made secretly of William

25  Stivers and his associates, did he express an interest in

*BRIGGS – Direct (Mr. Smith)*                                                 57

1    knowing whether or not Charles "Dobber" Weaver was cooperating

2    in the federal investigation?

3    A.   Absolutely, he did.  And others.

4    Q.   Like to direct your attention now to D51.

5    A.   Yes, sir.

6    Q.   Can you identify that for the court and the jury, please?

7    A.   Yes.  It's a one-page handwritten list and on the top it

8    says call list, c-l -- c-a-l-l list.  It's got a number of

9    names on it.

10   Q.   And where was this obtained, sir?

11   A.   From Mr. Stivers' residence.

12   Q.   And was that also collected on this date of March

13   the 19th, 2009 by agents at your direction?

14   A.   Yes.

15   Q.   And secured as evidence by the FBI at your direction?

16   A.   Yes, it was.

17            MR. SMITH:  I'd move for its introduction at this

18   time.

19            THE COURT:  Any objection?  Exhibit D51 will be

20   admitted.

21                      (Government Exhibit No. D51

22                       was admitted into evidence.)

23            MR. SMITH:  Ask that it be published.

24            THE COURT:  Yes, sir.

25   Q.   Sir, can you make out the name that's at the top of his

BRIGGS - Direct (Mr. Smith)                                        58

1   list?

2   A.   Clet, C-l-e-t.

3   Q.   And based on your investigation, have you been able to

4   identify the person that is referenced at the top of his let

5   as Clete?

6   A.   Yes, I've heard people refer to Mr. Cletus Maricle as

7   Clete.

8   Q.   Next entry?  Can you recognize the next entry?

9   A.   Looks like hen, h-e-n.

10  Q.   The next entry?

11  A.   Gail.

12  Q.   And have you, in your investigation, learned of any

13  judges by the name of Gayle?

14  A.   Yes, the current Clay County circuit judge, Oscar Gayle

15  House.

16  Q.   Next entry is P-h-i-l-p.  Have you, in your

17  investigation, been able to identify a person with that name?

18  A.   Well, I believe the individual -- I believe it's a

19  spelling for Phillip, and Phillip Mobley is the current

20  property value administrator for Clay County.  He was the

21  son-in-law of Cletus Maricle.

22  Q.   The next entry is F-r-e-d-y.

23  A.   I believe that is referring to the current Clay County

24  clerk, Freddy Thompson.

25  Q.   Further down the list, we have an entry of K -e-n-v-i-n,

BRIGGS - Direct (Mr. Smith)                                    59

1    appears to be Johnson.

2    A.   I believe that's referring to the current Clay County

3    sheriff, Kevin Johnson.

4    Q.   Next entry is S-t-a-l-e-y B-o-l-w-i-n-g.

5    A.   I believe that referring to co-defendant and current Clay

6    County magistrate, Stanley Bowling.

7    Q.   Other names on that list do you recognize, sir?

8    A.   It's Darrell McQueen, who has been involved in elections

9    in the past.  Ray Adams, who ran for magistrate.  Tommy

10   Harmon, who has been a magistrate.

11   Q.   Any others?

12   A.   Kenny Price, current Clay County Jailer.  John Ed

13   Pennington, who is a current -- or has been on the Manchester

14   city council.  I believe the one at the bottom, second from

15   the bottom is supposed to be George Saylor, who has been a

16   city council member.  I believe that's it, sir.

17   Q.   Direct your attention now to D53.

18   A.   Sir, this is an information on D. Kennon White, filed

19   April 27th, 2007.

20   Q.   And where was this document found, sir?

21   A.   This was found in William Stivers' residence.

22   Q.   And was this likewise taken as evidence on March

23   the 19th, 2009, and secured by the FBI?

24   A.   Yes, sir, that's correct.

25           MR. SMITH:  I'd move for the introduction of

*BRIGGS - Direct (Mr. Smith)*                                    60

1   Government's Exhibit D53.

2         THE COURT:  Any objection?  Exhibit D53 will be

3   admitted.

4                    (Government Exhibit No. D53

5                     was admitted into evidence.)

6         MR. SMITH:  Ask that that be published.

7         THE COURT:  Yes, sir.

8   Q.   Do you recognize the subject of this document, sir?

9   A.   Yes.

10  Q.   And who is that?

11  A.   That's Kennon White.  He was a cooperator, one of the

12  main cooperators in this investigation who testified earlier

13  in this trial.

14  Q.   If we could go through the pages, I believe there's

15  numerous pages to this document.  If you could go to the next

16  page, please, does this document appear to be intact,

17  including all relevant pages to this information, Agent

18  Briggs?

19  A.   Yes, it did.

20  Q.   And I believe it covered over seven counts.  I'm sorry.

21  How many counts did it cover?

22  A.   Seven counts.

23  Q.   Did it also follow with a copy of the plea agreement of

24  D. Kennon White?

25  A.   Yes, sir, it does.

BRIGGS - Direct (Mr. Smith)                                    61

1    Q.   At the time of his plea and his charge with this

2    information brought by the United States attorney, was that a

3    sealed matter?

4    A.   Yes, it was.

5    Q.   And during the course of your investigation, did you find

6    evidence that Cletus Maricle and his associates, Charles Wayne

7    Jones, William Stivers and others that you sought to record,

8    were leery of Kennon White?

9    A.   Yes, absolutely.  Absolutely.  They knew his family was

10   under investigation due to the October 31st, 2006 search.  And

11   again, we just finished a large drug trafficking

12   investigation, we're spinning into public corruption, and the

13   general public was well aware of that.

14   Q.   Do you know where within the time frame his father, Daugh

15   White, was charged with racketeering, as well as drug charges

16   against Vernon Hacker and corruption charges against Darnell

17   Hipsher?

18   A.   I don't recall the date, but it was right around this

19   time.

20   Q.   Okay.  Right around this time, being this time that you

21   were making the recordings?  Before the recordings or after

22   the recordings?

23   A.   Before the recordings.

24   Q.   Direct your attention now to D54.

25   A.   Yes, sir.

*BRIGGS - Direct (Mr. Smith)*                                          62

1    Q.   Can you identify D54?

2    A.   Yes.  This is an order from the United States District

3    Court, Eastern District of Kentucky, regarding an arraignment

4    of Charles Newton Weaver, also known as Dobber.

5    Q.   And would that also have been scheduling a date which Mr.

6    Weaver was going to enter his plea of guilty?

7    A.   Yes.

8    Q.   And was this document, could you tell us where you found

9    this document?

10   A.   Mr. Stivers' residence.

11   Q.   Was that likewise placed in FBI custody at that time?

12   A.   Yes.

13          MR. SMITH:  I'd move for the introduction of

14   Government's Exhibit D54.

15          THE COURT:  Any objection?  Exhibit D54 will be

16   admitted.

17                    (Government Exhibit No. D54

18                     was admitted into evidence.)

19          MR. SMITH:  I'd ask that it be published.

20          THE COURT:  Yes, sir, it may be.

21   Q.   What was the date of the filing of this order, if you

22   could tell from the document, sir?

23   A.   March 11, 2008.

24   Q.   Ask that you now be referred to D55.

25   A.   Yes, sir.

BRIGGS - Direct (Mr. Smith)                                    63

1    Q.   Can you identify D55?

2    A.   Yes.  Again, this is from the United States District

3    Court, Eastern District of Kentucky regarding defendant

4    Charles Newton Weaver, also known as Dobber, and it's an order

5    setting conditions of release.

6    Q.   And what was the date of this order?

7    A.   It was filed March 17th, 2008.

8    Q.   And where did you find this document?

9    A.   At Mr. Stivers' residence.

10   Q.   Was it also taken into FBI custody at that time?

11   A.   Yes, sir, it was.

12        MR. SMITH:  I'd move for its introduction, Your

13   Honor.

14        THE COURT:  Any objection?  Exhibit D55 will be

15   admitted.  It may be published as well.

16             (Government Exhibit No. D55

17             was admitted into evidence.)

18   Q.   Agent Briggs, to your knowledge, was the Weaver file a

19   public document at or about the time that this search warrant

20   was executed on March 19, 2009?

21   A.   No, I don't believe it was.

22   Q.   I'd like to direct your attention now to D56.  Can you

23   identify D56?

24   A.   Yes.  This is again from the United States District

25   Court, Eastern District of Kentucky.  It's an indictment

*BRIGGS - Direct (Mr. Smith)*                                    64

1    concerning subject Wayne Reid.

2    Q.   And where did you find that document, sir?

3    A.   At Mr. Stivers' residence.

4    Q.   And did you also take that into FBI custody at that time?

5    A.   Yes, sir, we did.

6         MR. SMITH:  I'd move for its introduction, Your

7    Honor.

8         THE COURT:  Any objection?  Exhibit D56 will be

9    admitted and it may be published as well.

10        MR. SMITH:  Thank you.

11                  (Government Exhibit No. D56

12                   was admitted into evidence.)

13   Q.   Do you recognize the name Wayne Reid, sir?

14   A.   Yes, sir, I do.

15   Q.   And how do you recognize this?

16   A.   He was investigated by the FBI and our task force.  The

17   drug organization I talked about earlier, we took down a

18   number of individuals who were arrested and convicted a number

19   of those individuals in Clay County.  This is a gentleman who

20   was laundering a great deal of their money.  In fact, I

21   believe it was somewhere around $1.5 million Wayne Reid

22   laundered for the drug organization.

23   Q.   And this document here referenced Wayne Reid's

24   indictment?

25   A.   Yes, sir, it does.

*BRIGGS - Direct (Mr. Smith)*                                              65

1    Q.   And was Wayne Reid someone that went to trial?

2    A.   Yes, he did.

3    Q.   And at the time of this discovery of this information,

4    was the case against Wayne Reid ongoing, to your knowledge?

5    A.   At the time of -- I'm sorry, at the time of the

6    indictment of this case?

7    Q.   At the time of the search, when you found this document,

8    which was March the 19th of 2009.

9    A.   Oh, yes, sir.

10   Q.   Was the case ongoing with Wayne Reid, if you know?

11   A.   No, I think he'd been convicted by that point.

12   Q.   And was he a public figure in the community of Clay

13   County as well as some of these others you mentioned?

14   A.   He was not a public official, but he was a Baptist

15   minister.

16   Q.   And has he been sentenced?

17   A.   He has.

18   Q.   And do you know what the sentence was that he received?

19   A.   I believe it was 20 years.

20           THE COURT:   Mr. Smith, we're going to be taking our

21   afternoon break when you get to a good stopping opinion point.

22           MR. SMITH:   I believe I am at this point, Your Honor.

23           THE COURT:   Thank you.  Ladies and gentlemen, we will

24   take a 20-minute recess at this time.  Please keep in mind the

25   admonition that you were given previously not to discuss the

1    case among yourselves while we are in recess.  The jury will

2    be excused for 20 minutes.

3                 (The jury left the courtroom at 2:34 p.m.)

4                 THE COURT:  Any matters to take up outside the

5    presence of the jury?  Mr. Westberry.  Please be seated.

6                 MR. WESTBERRY:  Very briefly, Your Honor.  Thank you.

7    D53 was a plea agreement from Kennon White that had been

8    introduced.  Just a reminder that we had agreed that those

9    portions of the plea agreement that referenced polygraph exams

10   would be redacted.  That has been done.  I believe this

11   exhibit may have even been introduced once already.

12                THE COURT:  Well, I believe it's being introduced now

13   for a totally different reason.  So I know it's duplicative,

14   but it certainly is relevant at this point.

15                MR. WESTBERRY:  I'm not object or raising a concern

16   about the second introduction of the document.  Simply I would

17   ask that portion of the agreement that it talks about

18   polygraphs be redacted for the same reasons that we mentioned

19   in the earlier exhibit.

20                THE COURT:  All right.

21                MR. WESTBERRY:  Thank you.

22                THE COURT:  Mr. Smith, we will redact that portion,

23   but it will be noted on the document that has been redacted

24   during trial at the direction of the Court so there's no

25   misunderstanding that that was redacted by Mr. Stivers or

*BRIGGS - Direct (Mr. Smith)*                                          67

1   someone else prior to today.  And that will be pursuant to my

2   directions on this date.  It will be that same redaction on

3   the polygraph, but it should be pursuant to the Court's

4   directions on this date.

5            MR. SMITH:  Okay.  I will certainly do that.

6            MR. WESTBERRY:  Thank you.

7            THE COURT:  Thank you.  We'll be in recess for 20

8   minutes.

9                 (Recess from 2:36 p.m. until 2:52 p.m.)

10           THE COURT:  Thank you.  I understand that one of the

11  parties has witnesses to recognize?

12           MR. HOSKINS:  Yes, Your Honor.

13           THE COURT:  Mr. Hoskins.

14           MR. HOSKINS:  I have six witnesses here.

15           THE COURT:  Six individuals.  Ladies and gentlemen, I

16  understand that the six of you have been subpoenaed to testify

17  in the trial of this matter on behalf of Defendant Russell

18  Cletus Maricle.  I do not anticipate that you will be -- well,

19  one of you may be called today, actually, but not all six.  So

20  what we'll do is we'll recognize you as being here today

21  pursuant to the subpoena.

22           In just a moment, I'll have the clerk administer an

23  oath that will require you to return as indicated.  You will

24  be indebted in the penal sum of $500 should you fail to appear

25  as directed.  If you would, please, first state your name for

*BRIGGS - Direct (Mr. Smith)*                                          68

1    each of you, if you could.

2              MR. SLYTER:  Steven Slyter.

3              THE COURT:  Spell your last name.

4              MR. SLYTER:  S-l-y-t-e-r.

5              THE COURT:  Yes, sir?

6              MR. NORRIS:  James Norris, N-o-r-r-i-s.

7              THE COURT:  Thank you, Mr. Norris.

8              MS. NICHOLSON:  Ellen Nicholson, N-i-c-h-o-l-s-o-n.

9              THE COURT:  All right.

10             MS. SMITH:  Sandra Smith.

11             THE COURT:  Thank you, Miss Smith.

12             MR. HOUSE:  Louis House, H-o-u-s-e.

13             THE COURT:  Yes, sir.

14             MR. HOPKINS:  Doug Hopkins, H-o-p-k-i-n-s.

15             THE COURT:  Thank you.  Madam Clerk, if you could

16   please administer the oath to these witnesses.

17                  (Oath was administered to all witnesses.)

18             THE COURT:  Mr.  Hoskins, who would your first

19   witness be if we proceed today?

20             MR. HOSKINS:  The first would be Mr. Slyter, and next

21   Mr. Norris.

22             THE COURT:  Mr. Slyter, you would need to remain here

23   until 4:30 this afternoon.  I don't anticipate we'll get to

24   the other witnesses today.  Mr. Hoskins or one of the other

25   attorneys will advise you when you're expected to testify, but

BRIGGS - Direct (Mr. Smith)                                    69

1    I would anticipate tomorrow for a number of these witnesses
2    Mr. Hoskins.  Is that your expectation?
3                 MR. HOSKINS:  Yes, Your Honor.
4                 THE COURT:  All right.  Thank you.
5                 MR. HOSKINS:  Your Honor, we also think that our
6    first witness will move pretty quick so we're really hoping to
7    get Mr. Norris in today too.
8                 THE COURT:  Mr. Norris, if you could remain until
9    4:30 this afternoon.  That may be wishful thinking on my part,
10   but better be safe than sorry.
11                MS. HUGHES:  You aren't going to forget me, are you,
12   Your Honor?
13                THE COURT:  I would not do that.
14                MR. PINALES:  We're trying, Judge.
15                THE COURT:  I reserved 30 minutes just for your
16   opening statement.
17                MS. HUGHES:  Did you hear Mr. Pinales saying he was
18   trying to forget me?
19                THE COURT:  Do we have any issues to take up before
20   we bring the jury in, Mr. Baldani?
21                MR. BALDANI:  I have one thing I want to ask you
22   about.  As you know, the witness has testified about some
23   answers that Mr. Thompson gave the second time he testified at
24   the grand jury, and the whole transcript was admitted.  He
25   had, in fact, testified a time previously and about a lot of

*BRIGGS - Direct (Mr. Smith)*                                          70

1    the same things.

2          I intend to ask Agent Briggs about his previous

3    testimony about the same type issues that Mr. Smith broached

4    and possibly even introduce the first grand jury testimony.

5    So anything that I consider borderline controversial, I try to

6    bring up ahead of time.

7          THE COURT:  Well, I have learned from this case that

8    I need to wait and hear what your questions are before I make

9    any comments about those.  They're not always what I

10   anticipate so we'll just have to wait and see how the

11   questioning goes.

12         MR. BALDANI:  All right.  Just wanted to alert you,

13   Judge.

14         THE COURT:  Yes, sir.  You can bring the jury in.

15             (The jury entered the courtroom at 2:58 p.m.)

16         THE COURT:  The record will reflect that all members

17   of the jury are present.  Parties and counsel are also

18   present.  Special Agent Briggs, of course, you're still under

19   oath.

20         THE WITNESS:  Yes, sir.

21         THE COURT:  Mr. Smith, you may continue.

22   BY MR. SMITH:

23   Q.  Agent Briggs, at the time that you executed the Stivers

24   search, were there other numerous documents that you also

25   collected?

BRIGGS - Direct (Mr. Smith)                                    71

1    A.   Yes, there were.

2              MR. SMITH:  And ask at this time, Your Honor, to hand

3    to the witness Government's Exhibit D59, D60, 61, 62 and 64.

4              THE COURT:  Yes, sir.

5              MR. SMITH:  And 61.

6              THE COURT:  Yes, sir.

7              MR. SMITH:  Your Honor, for the record, because of

8    the object that is D61, we have copied that for full and

9    complete copy.  And it's also marked D61, and we can

10   distinguish that as D61A if the Court would prefer.

11             THE COURT:  Yes, sir.  I suppose the Rolodex would be

12   61, or do you have it marked the other way?

13             MR. SMITH:  I have it marked 61, and I can have the

14   copy 61A, if the Court would allow.

15             THE COURT:  Yes, sir.

16   Q.   Direct your attention to D59.

17   A.   Yes, sir.

18   Q.   Can you identify that, please?

19   A.   Yes.  These documents were recovered from Mr. Cletus

20   Maricle's residence on March 19, 2009.

21   Q.   And was that pursuant to the federal search warrant?

22   A.   Correct, yes, sir.

23   Q.   And did you take that into FBI custody at that time?

24   A.   Yes, sir, we did.

25             MR. SMITH:  I'd move for its introduction, D59.

BRIGGS - Direct (Mr. Smith)                                72

1       THE COURT:  Any objection?  D59 will be admitted.

2                (Government Exhibit No. D59

3                was admitted into evidence.)

4       MR. SMITH:  I'd ask that it be published.

5       THE COURT:  Yes, sir, it may be.

6   Q.   Would you describe this as common household stationery?

7   A.   Yes, sir.

8   Q.   And it says From the Desk of Judy Maricle.  Is she

9   related to Cletus Maricle?

10  A.   Yes, that's his wife.

11  Q.   And from this list, have you been able to analyze the

12  list for relevance to your investigation?

13  A.   Yes, sir, we have.

14  Q.   And in your opinion, sir, how is this relevant to your

15  investigation?

16  A.   Well, it's got a name, it's got the names of a number of

17  individuals involved in this investigation first and foremost,

18  but also too it's broken down by precincts within the

19  Manchester, Clay County -- Clay County community.

20  Q.   Okay.  Let's start out at the top, page 1.  Under the

21  heading of Manchester, what names do you recognize there as

22  significant in the Manchester precinct, sir?

23  A.   Bart Morris, who is a co-defendant.  And then the next

24  name is Betty and then Stanley.

25  Q.   And Stanley has a significance to you in what respect?

BRIGGS - Direct (Mr. Smith)                                    73

1    A.   Because of co-defendant Stanley Bowling.

2    Q.   Okay.  Proceed.

3    A.   Vernon Hacker, Darnell Hipsher, who were both previously

4    convicted during the public corruption portion of this

5    investigation.

6    Q.   And were they also sitting city council members?

7    A.   Also city council members, correct, yes, sir.

8    Q.   And were they also having a vote on contracts such as

9    contracts of B&B Excavating and B&J Transport [sic]?

10   A.   Yes, sir, that's correct.

11   Q.   Or Transfer, if you wish.  You say that they were

12   previously convicted in the earlier investigation?

13   A.   Yes, sir, that's correct.

14   Q.   And did you also learn that they were intimately involved

15   in the racketeering enterprise, unindicted co-conspirators in

16   this case?

17   A.   Yes, they were involved in rounding up paid voters,

18   hauling voters, paying the voters, marking the -- you know, in

19   some cases marking the name off the list so they wouldn't be

20   paid twice, the paid voters.  They also, more so Darnell, but

21   would go to individuals' homes that had received the mail-in

22   absentee ballots and fill those out and return them as if they

23   were returned from the voter.  So they were heavily involved

24   in the election fraud.

25   Q.   And in your investigation, did you find that, in fact,

*BRIGGS - Direct (Mr. Smith)*                                    74

1    they had the most influence in affecting the voter bribery

2    scheme in the Manchester precinct area?

3    A.   Yes.

4    Q.   Let's continue down the list, sir.

5    A.   The next one is Anthony Short, who is a local attorney in

6    Clay County, and he is also -- he also served as a clerk in

7    the 2006 election where Wanda and Charles "Dobber" Weaver were

8    election officers.

9    Q.   Continue, please.

10   A.   Next, James Phillips is the circuit court clerk for Clay

11   County currently.

12   Q.   Do you know who approached Dobber Weaver initially to get

13   him to act as an election officer in the May, 2006 primary?

14   A.   I don't recall that, sir.  I'm sorry.

15   Q.   Go down the list, continue.

16   A.   Doug White, former mayor of Manchester, who was convicted

17   during the public corruption phase of this case.  And then, of

18   course, there's Ouchie Jackson, who was running for city

19   council and distributing money to voters to buy votes.

20   Q.   Likewise, does Doug White and Ouchie Jackson have

21   particular influence in the Manchester precinct, based on your

22   investigation?

23   A.   Yes.

24   Q.   Let's go down to the next category, it looks like it's

25   headed EMAN.  In your opinion, what does that refer to?

*BRIGGS - Direct (Mr. Smith)*                                                75

1    A.   The East Manchester precinct.

2    Q.   Do you recognize names on that list, sir?

3    A.   Yes.  Penny was the second name under East Manchester.  I

4    believe that to be Penny Robertson, who also is a city council

5    person in Manchester, lived in Manchester.

6    Q.   Do you have evidence that she contributed money to the

7    pools that eventually elected these officials?

8    A.   Yes, she would contribute a thousand dollars, as many of

9    the other city council members were to the criminal

10   enterprise, the pay to play.  Pay, we'll get you elected.

11   Q.   Any others?

12   A.   Homer Weaver, and then after that, it's slash Dobber.

13   And, of course, Dobber has testified here before this Court.

14   Q.   Any others?

15   A.   He ran for school board November, 2002 and he also served

16   as an election officer in 2006 in the Manchester precinct.

17   J.E. Hensley, I know him.  He has, according to our

18   investigation, contributed money to political candidates in

19   the past elections.

20   Q.   Money that was contributed for what purpose, based on

21   your investigation?

22   A.   To purchase votes with, to bribe voters.  And I don't

23   recognize off the top of my head the last name there, Jim Bow

24   Little.

25   Q.   The next subheading appears to be G, I'm not sure about

BRIGGS - Direct (Mr. Smith)                                    76

1    the letters of the rest of that.  Can you identify the letters

2    for us from your copy?

3    A.   That's Greenbriar precinct.

4    Q.   Was that also a voting precinct in Clay County?

5    A.   Yes, sir, it is.

6    Q.   Do you recognize any names on that list?

7    A.   Richard Farmer, Charles Stivers.

8    Q.   How do you recognize Charles Stivers?

9    A.   He was involved in election fraud meetings and involved

10   with the criminal enterprise and getting --

11   Q.   He also have a wife named Becky?

12   A.   Yes.

13   Q.   Was he also the brother of William "Al Man" Stivers?

14   A.   Yes.  Brownlow, believe that, I believe stands for

15   Brownlow Arnett.

16   Q.   Did he come up in your investigation?

17   A.   Yes, he did.  And I know who the last two are, but I

18   don't know specifically what, what purpose they are for being

19   on there.

20   Q.   Let's move on to page 2.

21   A.   Yes, sir.

22   Q.   Next subheading there begins with the letter F.  Does

23   your copy help identify this sub-heading?

24   A.   I believe that's Fogertown precinct.

25   Q.   Is that also a precinct in Clay County?

*BRIGGS - Direct (Mr. Smith)*                                    77

1    A.   Yes, it is.

2    Q.   And do you recognize any names on this subheading?

3    A.   Yes, Corky McKeehan has come up as we discussed earlier

4    in the case.   There was evidence that he was running for

5    magistrate, and votes were being purchased for Corky McKeehan.

6    Q.   Do you recall specifically in your investigation who was

7    involved in the voter briberies in the Corky McKeehan case for

8    magistrate?

9    A.   It's Corky McKeehan against Mike Hooker.   I can't recall,

10   but Doug Adams and Cletus Maricle were the election officers

11   in that race, serving the election poll, buying votes for one

12   candidate or the other.

13   Q.   Move on to the next heading.

14   A.   Burning Springs, the second name is -- first name, I

15   believe, is Darrell and Angie.   I believe that's Darrell and

16   Angie McQueen.

17   Q.   How do you recognize them?

18   A.   They've come up in the past in being involved in

19   elections in Clay County, in Burning Springs precinct.

20   Q.   Has he held public office himself?

21   A.   I believe he was magistrate one time.

22   Q.   Burning Springs area?

23   A.   Yes.   Next name is co-defendant Doug Adams, and then

24   Clinton and Joanne Johnson.   Clinton Johnson is a former

25   magistrate in that precinct who was convicted of election

BRIGGS - Direct (Mr. Smith)                                    78

1    fraud.

2    Q.   Was that a part of your investigation?

3    A.   Yes, it was.

4    Q.   And did you say that he was convicted of voter fraud, was

5    that in the London Eastern District of Kentucky federal court?

6    A.   Yes, it was.

7    Q.   And based on your investigation, did he participate in

8    the 2002 voter bribery scheme that's been outlined in this

9    case?

10   A.   Yes.  Yes, he did.

11   Q.   What faction did he support?

12   A.   He, as I recall, he accepted money -- accepted money, I

13   think, from Jennings White and Daugh White, Kennon White, I

14   believe.

15   Q.   For what purpose?

16   A.   To buy votes with.

17   Q.   Did you have information in your investigation that

18   supported that he also helped the other side in the faction,

19   the other faction in that election?

20   A.   Yes.  He basically took money from those individuals and

21   then ended up producing or spending money for them.  They

22   actually went back and demanded the money back.  He wouldn't

23   give them the money back he took money from them but then

24   supported the other side.

25   Q.   And who was the other faction, sir?

*BRIGGS - Direct (Mr. Smith)*                                      79

1    A.   Freddy Thompson.

2    Q.   Any other names you recognize?

3    A.   James Craft.

4    Q.   And what's the significance of that name, sir?

5    A.   He, you know, our investigation revealed that he was

6    involved in election fraud himself.

7    Q.   In what way?

8    A.   He was buying votes.

9    Q.   Where?

10   A.   In Burning Springs.

11   Q.   Is he related to Randy Craft?

12   A.   Father.  His father.

13   Q.   Is he employed by the school board?

14   A.   Yes.

15   Q.   Is he now deceased?

16   A.   He's now deceased.  Yes, sir.

17   Q.   Did you interview him?

18   A.   Yes, I did.

19   Q.   Any other names?

20   A.   Mike Hooker.  It's a name that's come up in our

21   investigation as being involved in election fraud and actually

22   running for office himself.

23   Q.   Is he related to Doug Adams?

24   A.   I believe he is, yes, sir.

25   Q.   Next subheading.

*BRIGGS - Direct (Mr. Smith)*                                    80

1    A.   That's the Sexton's Creek precinct.

2    Q.   Do you recognize any names on that list?

3    A.   Yes.  Bill Dobbs.

4    Q.   And have you learned in your investigation how he was

5    involved in Sexton's Creek area?

6    A.   Yes, he was supporting one of the candidates and

7    assisting in the vote buying process.

8    Q.   Any other names?

9    A.   No, sir.

10   Q.   Let's move on to the next page.

11   A.   This is the Allen precinct.

12   Q.   Do you recognize any names on the Allen precinct

13   subcategory?

14   A.   Yes, Kenny Price, who is the current Clay County Jailer.

15   Q.   Anyone else?

16   A.   Can't make out this next name.  I think it might be Terry

17   Davidson.

18   Q.   I don't want you to speculate, sir.  Do you know the

19   name?

20   A.   No.

21   Q.   Does Terry Davidson have a significance to you, the name

22   Terry Davidson?

23   A.   Yes, Terry Davidson is another magistrate that was

24   convicted in one of my cases in the past.

25   Q.   And did you have information that he was also involved in

*BRIGGS - Direct (Mr. Smith)*                                        81

1   this election bribery scheme?

2   A.   Yes, he was.

3   Q.   Let's move on to the next subcategory.  Can you identify

4   that?

5   A.   Oneida precinct.

6   Q.   Do you recognize any names on that list?

7   A.   John Russell Brown.

8   Q.   What significance does that name have to you?

9   A.   Being involved in election fraud.

10  Q.   In what way did you learn in your investigation he was

11  assisting in the voter fraud?

12  A.   I can't recall off the top of my head what his role was,

13  but I know his name came up as an individual involved in the

14  election voter bribery process.

15  Q.   Any other names?

16  A.   No.  Not on that category.

17  Q.   Next subcategory.

18  A.   Is South Fork precinct.

19  Q.   Do you recognize any names on that list?

20  A.   Yes, Paul Bishop.

21  Q.   What significance does that name have to you, based on

22  your investigation?

23  A.   Paul Bishop was involved in this criminal enterprise with

24  the co-defendants.

25  Q.   In what way?

*BRIGGS - Direct (Mr. Smith)* 82

1   A.   He was purchasing votes.  Well, he had a meeting at his

2   garage, where they pooled their money to -- and selected a

3   slate of candidates and determined how the money would be

4   distributed, utilized to purchase votes.

5   Q.   Was he prosecuted in this investigation?

6   A.   Yes, he was.

7   Q.   And has he entered a guilty plea to racketeering charges?

8   A.   Yes, he has.

9   Q.   Any other names that you recognize?

10  A.   The next --

11  Q.   South Fork?

12  A.   The next two names are Raymond and Jo.

13  Q.   Do you recognize, from your investigation, individuals by

14  the name of Raymond or Jo that are significant?

15  A.   Yes.  Jo Davidson and her husband, Raymond Davidson.

16  Q.   What significance did you find to those names, based on

17  your investigation?

18  A.   Jo Davidson was Cletus's former secretary when he was a

19  judge, and she operated a home incarceration business in Clay

20  County, and I believe she's a distant relative of Mr.

21  Maricle's.

22  Q.   Any other names?

23  A.   No, sir.

24  Q.   Last name there, can you make it out?

25  A.   On South Fork?

BRIGGS - Direct (Mr. Smith)                                     83

1    Q.   Yes, sir.

2    A.   Dick Butler.

3    Q.   Did that name come up to you in your investigation?

4    A.   Yes, it has.

5    Q.   In what way?

6    A.   Can't recall the, exactly how it was involved, sir, how

7    Dick was involved.

8    Q.   Next subcategory.

9    A.   Next subcategory is Harts Branch precinct.

10   Q.   What names are listed on the Maricle list for the Harts

11   Branch?

12   A.   Wayne Jones, who is a co-defendant here, and Stanley

13   Bowling, also a co-defendant.

14   Q.   Do you recognize that other name?

15   A.   First name is Billy, but I can't make out the last name.

16   Q.   Next subcategory.

17   A.   Whites Branch precinct.

18   Q.   Do you recognize any names on that list?

19   A.   Recognize the name George Duff.

20   Q.   What significance, based on your investigation, is the

21   name George Duff?

22   A.   Mr. Duff was allegedly involved in drug trafficking

23   activity in Clay County.

24   Q.   Is he related to Chris Duff?

25   A.   That's his father.

BRIGGS - Direct (Mr. Smith)                                    84

1  Q.   Let's move on to the next page.  Do you recognize that

2  subcategory?

3  A.   I do.  It's Garrard precinct.

4  Q.   Again, can you identify any names there on that

5  subcategory?

6  A.   Peachy Pie Gray.  Of course, that's obviously a nickname.

7  I don't know what his first name is, but he came up in the

8  investigation and, quite frankly, I don't recall his

9  involvement.  And then Stevie Collins.

10  Q.   And what significance do you place upon the name Stevie

11  Collins, based on your investigation?

12  A.   Doug Adams has a son-in-law named Stevie Collins.

13  Q.   First entry on there, do you recognize that entry on the

14  Garrard subcategory?

15  A.   Harmon.

16  Q.   Has the name Harmon come up in your investigation?

17  A.   Yes.  Tommy Harmon, Lester Harmon, the Harmon family.

18  I'm not sure, obviously, specifically who this is referring

19  to.

20  Q.   Next entry.

21  A.   Big Creek precinct.

22  Q.   Do you recognize any names on that list of the Maricles?

23  A.   Roy Morgan, Crawdad.  That's Carl Sizemore's nickname.

24  Q.   What significance does Roy Morgan have, based on your

25  investigation?

BRIGGS - Direct (Mr. Smith)                                    85

1    A.   That's the father of Annette Morgan and the father-in-law

2    of Yancey White, who are both attorneys over there.  And Mr.

3    Morgan had ran for and been elected in the past in Clay

4    County.

5    Q.   Were there reports that he was also present at the

6    meeting at Bishop's where there was money being pooled in

7    2002?

8    A.   Yes, that's correct.

9    Q.   Was he also a candidate for judge executive on the slate

10   that was ultimately decided upon after the meeting?

11   A.   Yes.

12   Q.   Next entry is Flat -- I'm sorry.  Looks like Flat.  Tell

13   me what that is.

14   A.   I believe that's the Flat Creek precinct.

15   Q.   And again, do you recognize any names on the Flat Creek

16   precinct?

17   A.   Yes, Randall Wagers.

18   Q.   What's significant of that name, based on your

19   investigation?

20   A.   He's served as a magistrate in Clay County.  Uncle Bud

21   Smith, his true name is Roger Smith.  He's been involved in

22   election fraud in the past.

23   Q.   Let's move on to the next page.

24   A.   The Bright Shade precinct.

25   Q.   Is that a precinct also in Clay County?

*BRIGGS - Direct (Mr. Smith)*                                    86

1    A.   Yes, it is.

2    Q.   And you recognize any of the names on that list?

3    A.   Yes.  James Woods, who is a school board -- or was a

4    school board employee.  And Woodrow Woods, who was also a

5    school board employee and testified here at this trial.  And

6    Eugene Mills.  Our intelligence in the investigation revealed

7    he was involved in election fraud as well.

8    Q.   Do you recognize that last name?

9    A.   Eugene Mills.

10   Q.   I'm sorry.  There's one that's not highlighted.  Do you

11   recognize that name, sir?

12   A.   Oh, Leman Messer, possibly.

13   Q.   Does the name Leman Messer have any significance to you,

14   based on your investigation, sir?

15   A.   Yes.

16   Q.   In what way?

17   A.   I specifically can't recall that, sir.

18   Q.   Move on to next subcategory.  Can you identify that

19   subcategory?

20   A.   I think it's Goose Rock.

21   Q.   Is that a precinct in Clay County?

22   A.   Yes.

23   Q.   Do you recognize any of the names under that subcategory,

24   Goose Rock, on the Maricle list?

25   A.   Johnny Brumley.

*BRIGGS - Direct (Mr. Smith)*                                          87

1   Q.   And has that name come up in your investigation?

2   A.   Yes.

3   Q.   And what significance do you place on that name?

4   A.   Our investigation revealed that Doug Adams delivered

5   money to Johnny Brumley to buy votes during an election.

6   Q.   Any other names?

7   A.   No, sir, not that I can think of.

8   Q.   Next category.

9   A.   Horse Creek.

10  Q.   Do you recognize any names on that subcategory?

11  A.   Delbert Roberts, Johnny "Poss" Gregory.  Or it says

12  Johnny Poss.

13  Q.   Do you see the first name there, do you recognize that

14  name?

15  A.   Frank Roberts.

16  Q.   Does that name have any significance to you, based on

17  your investigation?

18  A.   Yes.  Again, a lot of these names I recognize as being

19  involved in the election process but cannot recall

20  specifically what, you know, each one of them were involved in

21  or what our investigation revealed.

22  Q.   Let's look at the next subcategory.

23  A.   Portersburg.

24  Q.   Do you recognize any names on that list?

25  A.   I recognize the name Cecil Craft.  I recognize Tony and

*BRIGGS - Direct (Mr. Smith)*                                              88

1    Darrell Bowling.  Sheila -- I recognize all those names, but I

2    cannot specifically recall, you know, what their involvement

3    may have been.  The Garrisons, there is a Garrison family over

4    there that's heavily involved in politics.

5    Q.  Thank you.  Let's move on to D60.

6    A.  I'm sorry.  What was the number, sir?

7    Q.  D as in Darrell, six-zero.  D60.

8    A.  Yes, sir.

9    Q.  Identify that, please, for the Court and the jury.

10   A.  It's four pages of handwriting on legal sized white

11   notebook paper.

12   Q.  And when and where was that located?

13   A.  That was located March 19, 2009 during the search of

14   Cletus Maricle's residence.

15   Q.  Was that secured as evidence by the FBI at that time?

16   A.  Yes, sir, it was.

17          MR. SMITH:  I'd move for its introduction, D60.

18          THE COURT:  Any objection?  Exhibit D60 will be

19   admitted.

20                    (Government Exhibit No. D60

21                     was admitted into evidence.)

22          MR. SMITH:  Ask that it be published.

23          THE COURT:  Yes, sir, it may be.

24   Q.  Could you describe generally what we're looking at here,

25   sir?

*BRIGGS - Direct (Mr. Smith)*                                          89

1    A.   Yes, it's the handwriting on page one from the notebook

2    paper I just mentioned.  Would you like me to read it?

3    Q.   Well, if you could explain generally, sir, how that ties

4    into your election investigation on voter briberies in Clay

5    County.

6    A.   Well, it's talking about --

7             MR. PINALES:  Objection, Your Honor.  Calls for

8    speculation.

9             THE COURT:  You'll need to explain what you

10   understand this to be.  Of course, this is just this witness's

11   understanding of the document.  Objection overruled.

12   A.   It's clearly notes about buying property.

13   Q.   Let's move on to page 2, then.  Based on your

14   investigation, did you know Cletus Maricle expressed an

15   interest in buying up properties?

16   A.   Yes.  And his wife, Judy, is a realtor, and his

17   son-in-law is the property value administrator.

18   Q.   Move on to page 3.  What does that appear to be, Agent

19   Briggs?

20   A.   It says list of contacts.  It mentions a number of names.

21   Q.   Do you recognize any of the names on that list, sir?

22   A.   Yes.  Lonnie Owens.  He's a former Laurel County deputy

23   sheriff.  Brownlow Arnett, who is close to Mr. Maricle.

24   Richie Asher, who is also close to Mr. Maricle.

25   Q.   Let's move on to D61.  Do you have D61 before you now?  I

*BRIGGS - Direct (Mr. Smith)*                                    90

1   believe for the record, we have copies that are D61A.  We have

2   what appears to be a Rolodex marked as D61.

3   A.   Yes, sir.

4   Q.   Can you identify that for the court and the jury, please?

5   A.   Yes, sir.  This is a Rolodex recovered from Mr. Maricle.

6   Mr. Maricle's residence.

7   Q.   And what date was that recovered, sir?

8   A.   March 19, 2009.

9   Q.   And was that taken into FBI custody at that time?

10  A.   Yes, sir, it was.

11       MR. SMITH:  Move for its introduction at this time,

12  D61 and D61A, Your Honor.

13       THE COURT:  Any objection?  D61 and 61A will be

14  admitted.

15                    (Government Exhibit Nos. D61 and D61A

16                    were admitted into evidence.)

17       MR. SMITH:  For purposes of questions, may we publish

18  a copy at this time?

19       THE COURT:  Yes, sir, you may.

20  Q.   We'll look at a couple of these and move on, Mr. Briggs.

21  I'd like you to look at -- the first entry of the Rolodex

22  would be A, normally, is that right?

23  A.   That's right.

24  Q.   The first A listed on the Rolodex?

25  A.   Doug Adams.

*BRIGGS - Direct (Mr. Smith)*                                      91

1    Q.   And the second one?

2    A.   Richie Asher.

3    Q.   And Richie Asher, does he have any significance to you in

4    your investigation?

5    A.   Yes, he worked with Mr. Maricle quite a bit doing odd

6    jobs, lawn, landscaping, acted as a private investigator for

7    him, and he at one point was provided a car to drive by Mr.

8    Maricle.

9    Q.   Like for you to look at the Rolodex, just see if there's

10   a name Wanda or Kennon White.

11   A.   Yes, sir.

12   Q.   Whose names are on that, sir?

13   A.   It says Kennon White's cell, Kennon White's -- it says

14   Kennon cell and a number.  Kennon work and a number.  Home,

15   cell for Wanda, and then there's -- it's list as White, Kennon

16   and below Kennon is listed Wanda, and there's a number written

17   below their names.  It's got the name Kendilynn, Tre' and

18   Tyson on it as at the bottom as well.

19   Q.   Thank you.  Let's move on to D64.

20   A.   Yes, sir.

21   Q.   Do you recognize D64?

22   A.   Yes, it's a small black spiral notebook.

23   Q.   And where was it recovered?

24   A.   At Cletus Maricle's residence.

25   Q.   When was it recovered?

1   A.   March 19, 2009.

2   Q.   Was it taken into FBI custody at that time?

3   A.   Yes, sir, it was.

4             MR. SMITH:  I'd move for its introduction, Your

5   Honor.  D64.

6             THE COURT:  D64 will be admitted.

7                     (Government Exhibit No. D64

8                      was admitted into evidence.)

9             MR. SMITH:  I'd ask to publish a couple pages on

10  this.

11            THE COURT:  Yes, sir, you may.

12  Q.   Agent Briggs, have you examined D64 before testifying

13  here today?

14  A.   Yes, sir, I have.

15  Q.   And did you find items that related to your election

16  voter bribery scheme that is subject of your investigation?

17  A.   Yes, sir.

18  Q.   I'd like to direct your attention, then, moving in to the

19  body of that --

20            MR. SMITH:  I believe it would be, as our copies are

21  labeled, Your Honor, page 3, 4, and following.

22  Q.   -- do you have that before you?

23  A.   Which pages are that, I'm sorry.

24  Q.   The numbers that have an abbreviation on them of APT,

25  along with a name.  Do you see those in the small ledger?

BRIGGS - Direct (Mr. Smith)                                      93

1    A.   I'm trying -- let me locate it.

2    Q.   We're looking at a copy, so I apologize.

3    A.   Sure.  I've got a number of pages like that.  I'm trying

4    to distinguish which ones are on the screen.  I apologize.

5    Q.   Let's talk generally, sir.  How did you find those

6    significant, if at all, to your investigation?

7    A.   Well, these are, according to our investigation, these

8    are individuals that were approached about selling their vote

9    or assisting the election process in some way, shape or form.

10   It's got an apartment number with a name after it.

11   Q.   And as part of the enterprise's efforts to succeed in its

12   effort to bribe voters of their vote with money, were

13   apartments, in your investigation in Manchester, targeted?

14   A.   Yes, they were.

15   Q.   Do you recall the names of some of the apartment

16   complexes that were targeted by the enterprise?

17   A.   I believe the Mountainview Apartment is one, which is a

18   low income housing apartment complex, and also they refer to

19   something called the Highrise, which is where generally the

20   elderly, I believe, live.

21   Q.   Agent Briggs, during the course of your execution of the

22   search warrants, did you all encounter a problem in locating

23   the Maricle residence?

24   A.   Yes, sir, we did.

25   Q.   And if you could explain to the Court and jury what

BRIGGS - Direct (Mr. Smith)                                94

1    problem you had in locating the Maricle residence on the day

2    these search warrants were executed.

3    A.   Well, as I stated earlier, when I would travel through

4    town with the local law enforcement officials, they would

5    point up the hill to the direction of the stucco house, point

6    in the general direction and say that's where Cletus lives,

7    Cletus Maricle.

8         When I went to the police department on that specific day

9    to attempt to locate and interview Linsey Maricle, they gave

10   me directions to go to the end of Circle Drive, and they said

11   that his driveway dead ended into Cletus's -- or the Circle

12   Drive dead ends at his driveway.  I went to that residence,

13   put a business card on the door, and I believe I put a

14   notation on the back I needed to interview Linsey.  A short

15   time later, Mr. Maricle arrived at the police department with

16   Linsey for me to interview her.

17        MR. SMITH:  Like to hand to the witness some

18   photographs, Your Honor.

19        THE COURT:  Yes, sir.

20        MR. SMITH:  I don't have those marked.  I'm going to

21   have to ask the clerk to give me a number.  I apologize.

22   We're a little bit behind on the numbering.  We have two

23   additional photographs here.  They will be P numbers.  I don't

24   recall what last P exhibit number the government introduced,

25   but I would like to have this follow along.

BRIGGS - Direct (Mr. Smith)                               95

1              DEPUTY CLERK:  P33 I think is the next one.

2              THE COURT:  We have P32 so this would be P33 and 34.

3              MR. WESTBERRY:  Have they been produced before?

4              MR. SMITH:  Certainly they have.  They're all part of

5    the search warrant packet.

6              MR. WESTBERRY:  Thank you.

7              MR. SMITH:  I'll hand 33 to the witness now.

8              THE WITNESS:  Thank you.

9              MR. SMITH:  P34, again part of the search warrant

10   packet.

11   Q.   Do you recognize P33, Agent Briggs?

12   A.   Yes, sir, I do.

13   Q.   Identify that, please?

14   A.   That's the residence of Stevie and Danielle Collins I

15   took a photograph of.

16   Q.   Stevie and what was the last name?

17   A.   Danielle Collins, I believe.

18   Q.   Okay.  And were those -- was that, in fact, the residence

19   that you initially identified as the search target for the

20   March 19, 2009 search?

21   A.   Yes, it is.

22   Q.   Did you have a physical description and GPS or other

23   directions for driving for the agents?

24   A.   I had driving directions, the photograph, description of

25   the residence and GPS coordinates and the address.

*BRIGGS - Direct (Mr. Smith)*                                    96

1        MR. SMITH:  Move the introduction of
2   Government's P33.
3        THE COURT:  Any objection?  Exhibit P33 will be
4   admitted.
5                    (Government Exhibit No. P33
6                    was admitted into evidence.)
7        MR. SMITH:  Like to hand the witness now P34.
8        THE COURT:  Yes, sir.
9   Q.  Can you identify P34?
10  A.  Yes, that's Mr. Cletus and Judy Maricle's residence at
11  393 Circle Drive.
12  Q.  And is that, in fact, the residence that you searched and
13  recovered these items that you've previously introduced to the
14  Court and the jury?
15  A.  Yes, sir, it is.
16  Q.  Were there other items that you seized as well that
17  you've not exhibited here for the Court and the jury?
18  A.  Yes, sir, there are.
19  Q.  Did you properly identify those in an inventory to the
20  magistrate judge and give an account for all items that you
21  seized at these locations?
22  A.  Yes, sir, I did.
23        MR. SMITH:  I'd move for introduction of Government's
24  Exhibit P34.
25        THE COURT:  Any objection?  P34 will be admitted.

BRIGGS - Direct (Mr. Smith)                                      97

1                         (Government Exhibit No. P34

2                          was admitted into evidence.)

3    Q.   Did you also prepare search warrant for the Morris

4    residence?

5    A.   Yes, sir, I did.

6              MR. SMITH:  I'd like to hand the witness what's now

7    marked as P35.

8              THE COURT:  Yes, sir.

9    Q.   Which address did you search on March the 19th, 2009,

10   sir?

11   A.   For the Morris residence?

12   Q.   Yes, sir.

13   A.   It was Green Street.  I don't recall the physical address

14   without looking at documentation.

15   Q.   You now have been handed P35?

16   A.   Yes, sir.

17   Q.   Do you recognize P35?

18   A.   Yes, sir.

19   Q.   What is that?

20   A.   That's a photograph of Bart Morris and Debra Morris's

21   residence.

22   Q.   And is that, in fact, a place that you searched on the

23   date of March 19, 2009?

24   A.   Yes, that's correct.

25   Q.   I'd move for its introduction at this time.

*BRIGGS - Direct (Mr. Smith)*                                          98

1          THE COURT:  Any objection?  P35 will be admitted.

2                    (Government Exhibit No. P35

3                    was admitted into evidence.)

4   Q.   What were the results of your search at the Morris

5   residence, sir?

6   A.   There was not much at the residence.  They were in the

7   process of moving to a new residence, and most of their

8   belongings had already been removed from the residence.

9   Q.   Based on your investigation, had you learned that there

10  was actually a use of safe during the time period they were

11  handling large amounts of money?

12  A.   Yes.

13  Q.   Did you find evidence of a safe in that residence?

14  A.   Yes.

15  Q.   Tell us what you found.

16  A.   In the safe were a copy of a letter --

17          MS. HUGHES:  Excuse me.  I'm going to object.  Could

18  we approach the Bench, please?

19          THE COURT:  Yes, you may.

20                    (A sidebar conference was held out of the

21                    hearing of the jury):

22          THE COURT:  I believe one of the documents that was

23  contained in the safe was the subject of a motion in limine.

24  I don't recall the description of the document.

25          MS. HUGHES:  It was a handwritten letter dated back

*BRIGGS - Direct (Mr. Smith)*                                          99

1    in the '80s to the Department of Election Registry, and if

2    you're not trying to do that, could we just remind the

3    witness --

4            MR. SMITH:  It was not responsive to my question,

5    Miss Hughes.  I didn't ask him what was in the safe.

6            MS. HUGHES:  So I'm trying to --

7            THE COURT:  Confirming that the safe was there,

8    right?

9            MS. HUGHES:  Right.  That's why I was waiting, I was

10   hesitating.

11           MR. SMITH:  I'm sorry.

12           MS. HUGHES:  It's not your fault.

13           THE COURT:  You can rephrase the question?

14           MR. SMITH:  Certainly.

15           MS. HUGHES:  Thank you.

16           MR. SMITH:  May I lead?

17           MS. HUGHES:  Yes, if you can avoid that.

18                   (Sidebar conference concluded.)

19           THE COURT:  Thank you.  Mr. Smith, you can repeat

20   your question.

21   Q.  Agent Briggs, during your search of the Green Street

22   residence, did you find a safe?

23   A.  Yes.  What I would like to do is review the evidence

24   recovery log, if I could, because that tells where things were

25   found and what they were found in, so forth and so on.  If I

*BRIGGS - Direct (Mr. Smith)*                                              100

1   could have that opportunity to do that at some point.

2   Q.   Well, I guess my question at this point, Agent Briggs,

3   you've already generally described that there was little

4   evidence found at the Morris residence, because they were

5   moving; is that right?

6   A.   That's correct.

7   Q.   And they moved to Laurel County in a new house?

8   A.   Correct.

9   Q.   And at the time of the Green Street location, did you

10  find the safe in the Morris residence?

11  A.   Yes.

12  Q.   I think that answers my questions.  If you still need to

13  see the inventory, obviously we'll produce that for you?

14  A.   No, that's fine.

15  Q.   We'll move on.  Thank you.  As part of my questions, I

16  believe, for the D60 series of documents?

17          MR. SMITH:  And I believe, Your Honor, for the

18  record, D62 had been identified but not moved to introduce,

19  and I would move to introduce D62.  That's part of the

20  documents retrieved out of the Maricle residence.  If there's

21  an objection, I'll establish a further foundation for that,

22  but I do believe I overlooked that one.

23          THE COURT:  Any objection to D62?  If not, it will be

24  admitted.

25          MR. PINALES:  May I have just a moment, Your Honor?

*BRIGGS - Direct (Mr. Smith)*                                           101

1           THE COURT:  Yes, sir.

2           MR. PINALES:  No objection.  Thank you.

3           THE COURT:  All right.  D62 is admitted.

4                (Government Exhibit No. D62

5                was admitted into evidence.)

6           MR. SMITH:  Thank you.

7    Q.   During your investigation, sir, were you able to

8    determine the relationships of Cletus Maricle and Al Man

9    Stivers, also known as Al Man William Stivers, I believe, as

10   he's listed?

11   A.   Yes, sir.

12   Q.   And what was that relationship?

13   A.   They were close friends and associates.

14   Q.   Charles Wayne Jones, what was the relationship with

15   Cletus Maricle and Charles Wayne Jones?

16   A.   The same relationship, sir.

17   Q.   And relationship of Charles Wayne Jones to Freddy

18   Thompson.

19   A.   Wayne Jones is Freddy Thompson's father-in-law.

20   Q.   Bart Morris, Debbie Morris and Stanley Bowling.

21   A.   Of course, Bart and Debbie are married, and Stanley and

22   Bart and Debbie are close friends.

23   Q.   Doug Adams and Cletus Maricle.

24   A.   They were involved in elections together in the past,

25   sometimes opposing each other, sometimes, more recently,

*BRIGGS - Direct (Mr. Smith)*                                                    102

1   working together for the same goal.

2   Q.   Doug Adams and Freddy Thompson.

3   A.   Doug Adams helped Freddy Thompson a great deal in his

4   election efforts in 2002 to get elected.  He was pushing for

5   him and fighting for him to be elected county clerk.

6   Q.   These individuals within this enterprise that's been --

7   as it's been described also exchange favors for each other?

8   A.   Yes.

9   Q.   And did that include hiring family members?

10  A.   Yes, it did.

11  Q.   And can you give us some examples of those, Agent Briggs?

12  A.   Linsey Maricle worked at the clerk's -- or, I'm sorry,

13  the City Hall.  That's Cletus's daughter.  Cletus's grandson,

14  Brandon Mobley, worked at Manchester City Hall.  Doug Adams,

15  his daughter Melanda worked at the clerk's office.

16  Q.   That's clerk's office under whose -- who was the clerk?

17  A.   Freddy.

18  Q.   Freddy who?

19  A.   Thompson.

20  Q.   Thank you.

21  A.   Wayne Jones' son has or had a job at the state highway

22  department.  Freddy Thompson had a son working at the

23  Manchester 911 city police department.  Chris Duff served as

24  an election officer in the past, who is Bart's stepson and

25  Debbie's son.

*BRIGGS - Direct (Mr. Smith)*                                    103

1   Q.   During the course of your investigation, did you also

2   find that there were favors promised to Wanda White?

3   A.   Yes, there were.

4   Q.   And were those favors used to motivate her to get

5   involved as an election officer in the 2006 election, which

6   ultimately led to voters having their votes stolen?

7   A.   Yes.  That's correct.

8   Q.   And based on your investigation, what favors were

9   promised to Wanda White to get her involved as an election

10  officer in stealing votes in the 2006 elections?

11  A.   Cletus Maricle helped to get her father-in-law, Doug

12  White, reelected as mayor, because Wanda worked there as a

13  clerk at the Manchester City Hall and also her father -- or

14  her husband was the city manager.  They wanted to of course

15  maintain their jobs.  He promised to help in that effort.  He

16  also promised to get Wanda a job with the drug court, and he

17  also promised to help Wanda with her brother, Corky, or Eugene

18  Price, also known as Corky, who was undergoing criminal

19  charges in Cletus's court at that time.

20  Q.   During your investigation, did you find that there were

21  segments of the population in Clay County that were targeted

22  by this enterprise?

23  A.   Yes.  They tried to partner with large drug dealers,

24  because large drug dealers have a lot of disposable income,

25  number one.  Number two, they're not afraid to break the law.

*BRIGGS - Direct (Mr. Smith)*                                      104

1    Number three, they want to get politicians in office so if

2    they get arrested locally, they can get the charges taken care

3    of by the sheriff or the judge.

4        But the people they preyed upon to serve as vote haulers

5    and people to sell the votes were individuals that sometimes

6    were not well educated, they were poorly educated, addicted to

7    drugs, unemployed, looking for a job or they may be under

8    criminal charges in court, in the Clay County court system.

9    Q.   And did the Clay County court system play a part in

10   motivating some of these people under criminal charges to act

11   in criminal ways for the organization, based on your

12   investigation?

13   A.   Yes, absolutely.  Some people were let out of jail to

14   assist in the elections.  Others had charges dismissed, things

15   along those lines.

16   Q.   Cletus Maricle was serving as circuit judge during the

17   time that this alleged enterprise was ongoing, based on your

18   investigation?

19   A.   Yes, he was.

20   Q.   And did you find that he always was the judge, or did he

21   sometimes direct other judges to perform those duties for him?

22          MR. PINALES:  Objection, Your Honor.

23          THE COURT:  Sorry?

24          MR. PINALES:  May I be heard?

25          THE COURT:  Yes, sir, come up.

*BRIGGS - Direct (Mr. Smith)*                                      105

1                    (A sidebar conference was held out of the

2                    hearing of the jury):

3            THE COURT:  Yes, sir.

4            MR. PINALES:  Martin Pinales on behalf of Cletus

5    Maricle.  Your Honor, the question is, was he always the judge

6    or did he direct other judges or something to that effect.

7    That would be a supposition on his part.  If he has evidence

8    of it, let's hear it.  If there's a judge, if there's an

9    incident, fine.

10           THE COURT:  All right.  I'll let you rephrase the

11   question.  I know that there has been that testimony presented

12   during the course of this trial both with respect to Oscar

13   Gayle House as well as Renee Muncy, but you can rephrase the

14   question.  I'll sustain the objection to the form of the

15   question, but you can rephrase it as to information that he

16   obtained during the course of this investigation with respect

17   to specific individuals or other judges.

18           MR. PINALES:  Thank you, Judge.

19           THE COURT:  Thank you.

20                    (Sidebar conference concluded.)

21           THE COURT:  Counsel, before we continue, we're going

22   to take a short bathroom break.  We'll take about a ten-minute

23   recess.  Please keep in mind the admonitions that you've been

24   given.  We'll be in recess for ten minutes.

25                    (The jury left the courtroom at 3:59 p.m.)

*BRIGGS - Direct (Mr. Smith)*                                                    106

1        THE COURT:  Thank you.  Before we take a brief

2   recess, Mr. Hoskins, if you want to release those two

3   witnesses, I don't think we'll get to them today.  Rather than

4   have them stick around, you can let them go.

5        MR. PINALES:  Thank you, Judge.

6        THE COURT:  We'll be in recess for approximately ten

7   minutes.

8              (Recess from 4:00 p.m. until 4:09 p.m.)

9              (The jury entered the courtroom at 4:09 p.m.)

10       THE COURT:  The record will reflect that all members

11   of the jury are present.  Parties and counsel are also

12   present, and Special Agent Briggs, you're still under oath.

13       THE WITNESS:  Yes, sir.

14       THE COURT:  Mr. Smith, you may continue.

15   BY MR. SMITH:

16   Q.   I think before we broke, I was addressing a question

17   regarding the use of judicial office of Cletus Maricle in the

18   investigation.  Could you tell us, Agent Briggs, did you learn

19   during the investigation that there were instances which he

20   used other judges to perform acts of favors for other members?

21   A.   Yes, sir.

22   Q.   And could you describe an example of that, sir?

23   A.   Yes.  On one particular case, I think we discussed

24   yesterday, the case was before Oscar Gayle House, the district

25   judge, who -- he's the current -- he's currently the circuit

*BRIGGS - Direct (Mr. Smith)*                                    107

1    judge, but he was the district judge at the time, which is the

2    lower court.  In the release, it said release per Cletus

3    Maricle.

4    Q.   And whose family member was that that got released from

5    the warrant of arrest?

6    A.   Wanda White.

7    Q.   And how are those two related?

8    A.   I believe it was her mother.

9    Q.   During the course of your investigation, have you --

10   you've earlier mentioned the attempt to locate vehicles or

11   places of residence of some of the agents involved, including

12   yourself.  Were there other acts of Cletus Maricle that you

13   found to be of a similar nature during your investigation?

14   A.   With regard to --

15   Q.   Let me rephrase the question.  As you have described it,

16   there was apprehension in your investigation that Kennon White

17   and Wanda White would be suspect because they had family

18   members under RICO charges, federal government.  You searched

19   the residence or the City Hall in October, 2006.  Were there

20   other acts which you found Cletus Maricle to be highly on

21   guard during your investigation, other than the one that

22   you've previously described for us, which was to locate your

23   residence.

24   A.   Yes, sir.  He at one time told the sources he thought the

25   door stop -- our investigation revealed he thought the door

*BRIGGS - Direct (Mr. Smith)*                                                    108

1    stop in his chambers --

2              MR. PINALES:  Objection, Your Honor.

3              THE COURT:  Overruled.

4    A.   He believed that the door stop in his chambers was

5    actually a bug and requested that they go to meet with him

6    that night at his house, as opposed to talking in his

7    chambers.  He thought there were 40 FBI agents in the

8    Manchester/Clay County area looking at he and other potential

9    subjects.

10        He would, when the Kennon and Wanda would come in, he

11   would pat them down to check for a wire or recording device.

12   Q.   What do you mean by pat them down?

13   A.   He'd give them a hug and try to disguise it the way --

14   you know, disguise it as a friendly hug.

15             MR. PINALES:  Objection, Your Honor.

16             THE COURT:  I'm sorry?

17             MR. PINALES:  Objection, Your Honor.

18             THE COURT:  All right.  It's a summary of what the

19   witnesses have previously testified to, so I'll overrule it.

20   Q.   Would you explain your answer as to what a patdown was --

21   A.   Yeah.

22   Q.   -- during the course of this investigation?

23   A.   It was like a hug, but rubbing your hands up and down the

24   back to check for devices and things of that nature, recording

25   devices and transmitters and so forth.

*BRIGGS - Direct (Mr. Smith)*                                          109

1    Q.   Was that reported to you by Wanda White as well?

2    A.   Yes.

3    Q.   What about the use of telephones or concerns about phones

4    in general?

5    A.   Yes, sir.  Mr. Maricle mentioned on one of the recordings

6    to be careful, not use the phones because that's how they

7    tracked the Bath County folks, which is a -- there was an

8    election fraud case in Bath County, I guess, similar to this

9    case where they utilized, to my knowledge, to be correct, they

10   used the telephones as evidence in the case, where defendants

11   would call each other.

12   Q.   When you say Bath County is the case, are you talking

13   about a federal case?

14   A.   Federal election fraud case.

15   Q.   And was that a federal case which the FBI was involved

16   in?

17   A.   Yes, it was.

18   Q.   Were you personally involved in that case?

19   A.   I was not personally involved in that case.

20   Q.   As you've described it in your investigation, you found

21   that there were factions that formed, including initially in

22   2002, it's been described that Doug Adams and Jennings White

23   were sparring and warring at each other over control of the

24   enterprise.

25        Could you describe for us, did that resolve itself with

*BRIGGS - Direct (Mr. Smith)*                                                    110

1    the members of this organization at some point during your

2    investigation?

3    A.   I mean, yes, in a manner of speaking.  The support was

4    shuffled to Freddy Thompson, who won, and Jennings White fell

5    out of power as county clerk.

6    Q.   You've listed Freddy Thompson as being on the opposite

7    side.  That's because he was running for county clerk?

8    A.   Yes, sir, correct.

9    Q.   In your investigation, who was directing and organizing

10   this opposing faction against Jennings White, his control over

11   the Board of Elections?

12   A.   I'm sorry.  State the question again, sir?

13   Q.   Based on your investigation, who was organizing the

14   effort to take over control of the enterprise referred to as

15   the County Board of Elections?

16   A.   The faction, criminal enterprise, defendants here were

17   trying to seek to get Freddy Thompson elected.  Does that

18   answer your question?

19   Q.   Did Doug Adams lead this effort --

20          MR. WESTBERRY:  Objection.

21   Q.   -- based on your investigation?

22          MR. WESTBERRY:  I think there's a terrible amount of

23   leading.  The agent is literally asking the government what to

24   say.  That's my objection.

25          THE COURT:  I'll sustain the objection to leading.

*BRIGGS - Direct (Mr. Smith)*                                           111

1    You can rephrase the question.

2    Q.   Agent Briggs, based on your investigation, were you able

3    to determine if there were factions developed and how they

4    resolved within this enterprise?

5    A.   Yes, there were factions developed.

6    Q.   Can you explain how they were resolved?

7    A.   How they were resolved?  Doug Adams led the support of

8    Freddy Thompson to get Freddy Thompson elected.  And

9    ultimately, the resolution was Jennings White, Daugh White and

10   Kennon White were also convicted by the federal government,

11   which is the key members of the other faction in previous

12   investigations.

13   Q.   During the time period of Cletus Maricle's rise in the

14   organization, it was referenced earlier in your testimony that

15   in the late '80s, he was, I believe, particularly interested

16   in the elections for himself as it came to pass in September

17   or November of 1990, when he was seeking office for the first

18   time as circuit judge.

19        Did you seek to find evidence in the Board of Elections

20   minute meetings that were covering this time period when

21   Cletus Maricle would have been seeking this office of circuit

22   judge and the actions and activities that were recorded in

23   those minutes for that relevant time period?

24   A.   Yes.  The Clay County Board of Education -- or the Clay

25   County election minute meetings were missing for '89 through

*BRIGGS - Direct (Mr. Smith)*                                           112

1    '92.  They were not provided to the FBI in the course of this

2    investigation.

3    Q.  Did you seek to obtain those by subpoena?

4    A.  Yes, we did.

5    Q.  During the course of your investigation, did you find

6    that the form of incentive used to bribe voters changed at

7    certain times and circumstances?

8    A.  Yes.

9    Q.  In what form did the incentive take at different times

10   based on your investigation to bribe these voters to vote for

11   the slates that were formed by these groups?

12   A.  Well, it could be money, you know, potential job, you

13   know, job offers, help with criminal charges, you know.  Kind

14   of varied depending upon the subject -- or the vote seller and

15   what their needs were at that time.

16   Q.  In your investigation, did you find that paved private

17   driveways was sometimes involved in motivating people to

18   support, again, members of this enterprise?

19   A.  Yes, the pavement of private driveways, providing gravel

20   for driveways, providing drain tiles, things along those lines

21   were given to people to entice them to vote for a specific

22   slate of candidates.

23   Q.  During the course of your investigation, have you always

24   sought to identify how the office of superintendent of schools

25   was utilized, again, to motivate people to operate within the

*BRIGGS - Direct (Mr. Smith)*                                      113

1    direction of this enterprise?

2    A.   Yes.   Superintendent of schools is the largest employer

3    in the county.   It's a small, rural, somewhat economically

4    impoverished area.   Jobs are at a premium, particularly school

5    board jobs, which offer good pay for the area and also

6    benefits that employ anywhere from school bus drivers to

7    janitors to maintenance workers, teachers, administrators,

8    counselors.   So it is -- that power over that largest employer

9    in the county is very helpful in elections.

10   Q.   And in your investigation, did you seek to find out how

11   many people are employed by the school?

12   A.   Yes.   At the time I researched that, I know there were

13   approximately 900 employees in the school board system, which,

14   of course, varies based upon retirements and people quitting,

15   being laid off, and so forth.   But approximately 900.

16   Q.   As part of your investigation, Agent Briggs, were you

17   also able to identify that the method of this enterprise

18   changed in the way it attempted to operate in effectuating the

19   election of a slate of candidates through the years 2002, 2004

20   and 2006?

21   A.   Yes.   They would change up the methodology due to law

22   enforcement scrutiny from the attorney general's office or

23   FBI.   They would use sometimes poker chips to give voters to

24   prove they voted the right way.   Sometimes playing cards with

25   a hole punched in them.   Sometimes small raffle tickets like

*BRIGGS - Direct (Mr. Smith)*                                          114

1    you get at a carnival.  Sometimes a mark would be put on a

2    person's hand.  They might receive an "I Voted" sticker.

3        In some cases, they changed the location where the voters

4    were paid.  They would sometimes focus on absentee voting

5    because on election day, I've got 20 -- if you've got 20

6    precincts in Clay County, you have to control 20 different

7    groups and election officers.  Whereas in absentee voting, you

8    only have a couple of election officers and one location to

9    control with regard to your vote bribery efforts.  It's easier

10   to control that way.

11   Q.  Based on your investigation, did political party

12   affiliation play a significant part in what allegiance these

13   people had to this enterprise?

14   A.  No, none whatsoever.  You have Republicans and Democrats

15   coordinating with each other.  It was just whoever the slate

16   wanted -- or whoever the powers wanted to get elected as

17   candidates is who they -- regardless of which party they were

18   in.

19            MR. SMITH:  Pass the witness.  Thank you.

20            THE COURT:  We're close to the time we usually stop.

21   Would you like to stop at this point before you begin?

22            MR. PINALES:  I didn't realize the time.  Yes, Your

23   Honor.

24            THE COURT:  All right.  We'll end at this point

25   before cross-examination.  Ladies and gentlemen, again, I do

115

1    want to remind you of the admonition that I've given to you

2    several times now, of course.  When we break or for the

3    evening, please don't discuss this case or anything about the

4    case with any friends or family members.

5        Don't read, watch or listen to any accounts of the case

6    if there should be any.  Don't allow anyone to approach you to

7    discuss the case.  Don't attempt to perform any type of

8    research or do any investigation on your own.  Of course,

9    don't visit any of the locations that you've heard about.

10   Finally, don't make up your mind about the case until it is

11   finally submitted to you.

12       We will continue tomorrow at 9:00 a.m.  I do appreciate

13   the jury being here on time.  I know you make a real effort to

14   do that and the Court certainly does appreciate that.  We'll

15   be in recess.  Jury will be in recess until 9:00 a.m.

16                    (The jury left the courtroom at 4:25 p.m.)

17          THE COURT:  Thank you.  Anything to take up outside

18   the presence of the jury?

19          Mr. White.  Please be seated.  Yes, sir?

20          MR. WHITE:  Your Honor, just very briefly.  As I

21   understood one of the Court 's rulings on one of the

22   objections was that Agent Briggs' testimony was being allowed

23   in for summary purposes.

24          THE COURT:  No, I said the question he was asked and

25   his answer was summarizing witnesses prior testimony.

116

1          MR. WHITE:  My apologies, Your Honor.

2          THE COURT:  Anything else?  We'll be in recess until

3    9:00 tomorrow morning.

4               (Proceedings concluded at 4:26 p.m.)

5                         -  -  -

6

7                    C E R T I F I C A T E

8          I, LISA REED WIESMAN RDR-CRR, certify that the
     foregoing is a correct transcript from the record of
9    proceedings in the above-entitled case.

10

11    \s\ Lisa Reed Wiesman              March 11, 2010
     LISA REED WIESMAN, RDR-CRR           Date of Certification
12    Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

117

INDEX

GOVERNMENT'S WITNESS

JEFF SAGRECY
Redirect Examination by Mr. Smith................. Page  4
Recross-examination by Mr. Pinales............... Page 11
Recross-examination by Mr. Westberry............. Page 12
Recross-examination by Mr. Gilbert.............. Page 19
Recross-examination by Mr. Simons............... Page 20

TIMOTHY S. BRIGGS
Direct Examination by Mr. Smith.................. Page 21


GOVERNMENT'S EXHIBITS                         ADMITTED

Exhibit No. D84, Thompson grand jury testimony
Admitted........................................ Page 43

Exhibit No. D47, Information re: Charles Newton Weaver
Admitted........................................ Page 56

Exhibit No. D51, Call List
Admitted........................................ Page 57

Exhibit No. D53, Information re: D. Kennon White
Admitted........................................ Page 60

Exhibit No. D54, Arraignment of Charles Newton Weaver
Admitted........................................ Page 62

Exhibit No. D55, Conditions of Release for
                  Charles Newton Weaver
Admitted........................................ Page 63

Exhibit No. D56, Indictment of Wayne Reid
Admitted........................................ Page 64

Exhibit No. D59, Call List
Admitted........................................ Page 72

Exhibit No. D60, Handwritten notes
Admitted........................................ Page 77

Exhibit No. D61, Rolodex
Admitted........................................ Page 90

GOVERNMENT EXHIBITS (continued)

Exhibit No. D61A, Copies of Rolodex cards
Admitted...................................... Page 90

Exhibit No. D64, black notebook
Admitted...................................... Page 92

Exhibit No. P33, photo
Admitted...................................... Page 96

Exhibit No. P34, photo
Admitted...................................... Page 97

Exhibit No. P35, photo
Admitted...................................... Page 98

Exhibit No. D62, Kentucky Registry of Election Finance
                documents
Admitted...................................... Page 101

- - -