1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF KENTUCKY
 2                    SOUTHERN DIVISION at LONDON
                              - - -
 3
      UNITED STATES OF AMERICA,        :  Docket No. CR 09-16-S
 4                                     :
                       Plaintiff,      :  Frankfort, Kentucky
 5                                     :  Monday, March 15, 2010
          versus                       :  1:15 p.m.
 6                                     :
      RUSSELL CLETUS MARICLE,          :
 7    DOUGLAS C. ADAMS                 :
      CHARLES WAYNE JONES              :
 8    WILLIAM R. STIVERS               :
      FREDDY W. THOMPSON               :       Trial Day 24B
 9    WILLIAM B. MORRIS                :
      DEBRA L. MORRIS                  :
10    STANLEY BOWLING,                 :
                                       :
11                     Defendants.     :
```

```
12


13                            - - -
                        TRANSCRIPT OF TRIAL
14                   BEFORE DANNY C. REEVES
             UNITED STATES DISTRICT COURT JUDGE and a jury
15                            - - -

16    APPEARANCES:

17    For the United States:      STEPHEN C. SMITH, ESQ.
                                  JASON D. PARMAN, ESQ.
18                                Assistant U.S. Attorney
                                  601 Meyers Baker Road
19                                Suite 200
                                  London, KY 40741
20
      For the Defendant           MARTIN S. PINALES, ESQ.
21    Russell Cletus Maricle:     Strauss & Troy
                                  150 E. Fourth Street
22                                Fourth Floor
                                  Cincinnati, OH  45202
23
                                  DAVID S. HOSKINS, ESQ.
24                                107 E. First Street
                                  Corbin, KY  40701
25
```

```
 1    For the Defendant          R. KENT WESTBERRY, ESQ.
      Douglas C. Adams:          KRISTIN N. LOGAN, ESQ.
 2                               Landrum & Shouse, LLP
                                 220 West Main Street
 3                               Suite 1900
                                 Louisville, KY 40202
 4

 5
      For the Defendant          T. SCOTT WHITE, ESQ.
 6    Charles Wayne Jones:       Morgan & Pottinger, P.S.C.
                                 133 West Short Street
 7                               Lexington, KY  40507

 8
      For the Defendant          ROBERT L. ABELL, ESQ.
 9    William R. Stivers:        120 North Upper Street
                                 Lexington, KY  40507
10

11    For the Defendant          RUSSELL JAMES BALDANI, ESQ.
      Freddy W. Thompson:        R. TUCKER RICHARDSON, ESQ.
12                               Baldani, Rowland & Richardson
                                 300 West Short Street
13                               Lexington, KY  40507

14
      For the Defendant          JERRY W. GILBERT, ESQ.
15    William B. Morris:         Coy, Gilbert & Gilbert
                                 212 North Second Street
16                               Richmond, KY 40475

17
      For the Defendant          ELIZABETH SNOW HUGHES, ESQ.
18    Debra L. Morris:           Gess, Mattingly & Atchison, PSC
                                 201 West Short Street
19                               Lexington, KY 40507

20
      For the Defendant          DANIEL A. SIMONS, ESQ.
21    Stanley Bowling:           Thompson, Simons, Dunlop & Fore
                                 116 West Main Street
22                               Suite 2A
                                 Richmond, KY 40476
23

24

25
```

3

1    Court Reporter:              LISA REED WIESMAN, RDR-CRR
                                  Official Court Reporter
2                                 35 W. Fifth Street
                                  P.O. Box 1073
3                                 Covington, KY  41012
                                  (859) 291-4410

4

5        Proceedings recorded by mechanical stenography,
     transcript produced with computer.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*SAMPLES - Direct (Mr. Westberry)*                                    4

 1            (The jury entered the courtroom at 1:20 p.m.)

 2            THE COURT:  Thank you.  The record will reflect that

 3    all members of the jury are present.  Parties and counsel are

 4    also present.  Mr. Westberry, are you ready to call your next

 5    witness?

 6            MR. WESTBERRY:  Yes, Judge Reeves.  Reecia Samples.

 7            THE COURT:  Thank you.

 8            REECIA SAMPLES, DEFENSE WITNESS, SWORN

 9                    DIRECT EXAMINATION

10    BY MR. WESTBERRY:

11    Q.   Good afternoon, Miss Samples.  I'm Kent Westberry.  I'm

12    one of the attorneys for Doug Adams.  Could you tell us your

13    full name, please?

14    A.   Reecia Samples.

15    Q.   And what is your occupation, Miss Samples?

16    A.   I'm the superintendent of Clay County schools.

17    Q.   All right.  How long have you been serving as

18    superintendent of the Clay County schools?

19    A.   Since July of '09.

20    Q.   Where do you reside, ma'am?

21    A.   Manchester, Kentucky.

22    Q.   How long have you lived in Manchester and/or Clay County?

23    A.   All my life.

24    Q.   And I very reluctantly ask you the question, but I've

25    asked everybody else.  Would you tell us how old you are?

*SAMPLES - Direct (Mr. Westberry)*                                          5

1    A.    I'm 53.

2    Q.    Thank you.  We're the same age.  Do you have family?

3    A.    Yes, I do.

4    Q.    Can you just tell us who your family is, ma'am?

5    A.    My husband is Roger Samples.  I have one son, Brandon,

6    and one granddaughter.

7    Q.    What does Roger, your husband, do for a living?

8    A.    He's a former teacher.  He's retired now.

9    Q.    And your son, Brandon, he has one child?

10   A.    Yes, he does.

11   Q.    Does Brandon live in Clay County with his family?

12   A.    Yes, sir, he does.

13   Q.    And how old is the grandchild, please?

14   A.    She's two.

15   Q.    Thank you.  What is your educational background, Miss

16   Samples, if you can tell us, please?

17   A.    I have a Bachelor's from University of Cumberlands, and

18   then I also attended Union, got my Master's there.  Rank 1 at

19   Eastern.

20   Q.    Union is in Barbourville?

21   A.    Yes, Union College in Barbourville.  And got my Master's

22   at Eastern Kentucky University in Richmond and my

23   superintendent certification from the University of

24   Cumberlands in Williamsburg.

25   Q.    How long, Miss Samples, have you been in education?

SAMPLES - Direct (Mr. Westberry)                                      6

1    A.   This is my thirtieth year.

2    Q.   Can you tell us just what you've done in the 30 years

3    that you've worked in education?

4    A.   Um-hmm.  I'm a business teacher.  I taught high school

5    for 15 years.  And then I became the technology coordinator

6    for the district, and after that I was instructional

7    supervisor and then became superintendent last year.

8    Q.   What was that, about nine months ago?

9    A.   Yes.

10   Q.   And what was the immediate position that you held just

11   before you became superintendent of schools?

12   A.   I was supervisor of instruction.  And then immediately

13   before that, I was assistant superintendent briefly.

14   Q.   Do you know Doug Adams?

15   A.   Yes, I do.

16   Q.   How long have you known Doug Adams, approximately?

17   A.   I've worked with Mr. Adams for 20, around 20 years

18   probably.  Close to 20 years.

19   Q.   All right.  Do you recognize him in the courtroom, Miss

20   Samples?

21   A.   Yes, I do.

22   Q.   And could you just identify him, please?

23   A.   In the dark suit with the blue tie.

24   Q.   Thank you.

25            MR. WESTBERRY:  Judge --

SAMPLES - Direct (Mr. Westberry)                                7

1          THE COURT:  The Court will recognize the fact that

2     the witness has identified the defendant, Douglas C. Adams.

3     Q.   You indicated you were the deputy or the assistant

4     superintendent of schools prior to becoming a supervisor of

5     instruction.  Did I hear that correctly?

6     A.   Yes, sir.

7     Q.   And how long did you hold that position?

8     A.   I was supervisor of instruction for about 14 years.

9     Q.   And how long were you deputy superintendent?

10    A.   I became assistant superintendent in --

11    Q.   Assistant.

12    A.   Yes.  In May.

13    Q.   Of which year, ma'am?

14    A.   '09.

15    Q.   Oh, '09, okay.

16    A.   Yes.

17    Q.   In both of those positions, would you have been in a

18    position to report directly to Doug Adams?

19    A.   Yes.

20    Q.   Okay.  Who were the members of the school board, Miss

21    Samples, if you know, when you were hired as superintendent of

22    schools in Clay County?

23    A.   Charles Keith was Chairman of the Board.  Leewood Cornett

24    was vice chair.  Norman Cornett and Geraldine Smith and Kevin

25    Jackson.

*SAMPLES – Direct (Mr. Westberry)*                                    8

1    Q.   Are there currently any vacancies on the school board?

2    A.   Yes.

3    Q.   How many, ma'am?

4    A.   One.

5    Q.   You took over as superintendent of schools when Doug

6    Adams retired; is that correct?

7    A.   That's correct.

8    Q.   Now, do you know what the site-based council is, Miss

9    Samples?

10   A.   Yes, I do.

11   Q.   Can you just tell us what your understanding of that is,

12   please?

13   A.   Each school has a School Based Decision Making Council.

14   SBDM is what we refer to it, and it's made up of two parents

15   with children attending that school, three teachers and the

16   principal.

17   Q.   Are there site-based councils for all the schools in Clay

18   County?

19   A.   Yes.

20   Q.   How many schools are there in Clay County?

21   A.   We have seven elementary schools, a middle school and a

22   high school.

23   Q.   Have the number of schools dropped or decreased over the

24   past several years?

25   A.   Yes.  We have closed two elementary schools due to

SAMPLES - Direct (Mr. Westberry)                                        9

1    declining enrollment.

2    Q.   Okay.  What hiring decisions rest with the site-based

3    council in the schools that you've described to us just a

4    moment ago, ma'am?

5    A.   Well, really, they're responsible for hiring all of the

6    staff at their school.  You know, they hire their teachers and

7    their instructional staff.  They hire the principal at the

8    school.

9    Q.   What hiring decisions rest with the superintendent of

10   schools, as opposed to the site-based councils of the various

11   schools around the county?

12   A.   Well, the principal -- the superintendent usually just

13   hires district or central office people.  Any school level

14   personnel, you know, are -- is hired through the SBDM.

15   Q.   Okay.  From your experience and your personal knowledge,

16   who hires more employees, the site-based council or the office

17   of the superintendent?

18   A.   I didn't understand your question.

19   Q.   I'm sorry.  I made it more complicated than it needed to

20   be.  From your experience, having worked in the school system

21   all the years that you have, currently serving the

22   superintendent of schools, who has more hiring?  In terms of

23   numbers of hires, who hires more, the site-base council or,

24   say, the office of superintendent?

25   A.   The SBDM would have more.

*SAMPLES - Direct (Mr. Westberry)*                                     10

1   Q.   Why would you say that?

2   A.   Well, because most of the personnel, you know, works at

3   the school.  You know, the district level employees, you know,

4   we don't have that many.  You know, they mostly work at the

5   school.  So they're in charge of hiring those people.

6   Q.   Approximately how many employees are there currently in

7   the Clay County school system?

8   A.   We have probably a little over 700.

9   Q.   Okay.  In years previous to this, has the school system

10  employed more people than at present?

11  A.   Possibly.  You know, I don't know the figures for sure.

12  But, you know, I would think since we've closed schools and,

13  you know, with budget restraints and things that we possibly

14  would have had more in the past.

15  Q.   From your personal knowledge, has the school system in

16  Clay County ever employed as many as 900?

17  A.   Not to my knowledge.

18  Q.   Okay.  Are you familiar with a term we call CATS scores?

19  A.   Yes.

20  Q.   Can you just tell us what CATS stand for?

21  A.   It stands for Commonwealth Accountability Testing System.

22  Q.   What kind of testing systems do they measure in schools?

23  A.   It measures all academic areas, reading, math, science,

24  social studies, writing in all grade levels, K through 12.

25  Q.   All right.  I'd like to turn your attention back to about

1   the time Doug Adams first became superintendent of schools in

2   Clay County and ask you, from your personal knowledge, if you

3   know how CATS scores were or how they did at the time that he

4   became superintendent?

5   A.   Well, that was around 2000, somewhere in that

6   neighborhood.  We were at the very bottom of all the school

7   districts across the state.  You know, we were down, our

8   academics index was down, you know, in the 30s.

9   Q.   When you say in the 30s, what significance could I, as a

10  lay person --

11  A.   Well, on a scale of, you know, zero to a hundred.  So,

12  you know, we were, you know, 30%, you know, with our scores.

13  Q.   From your knowledge, the years that you've worked in

14  education in Clay County, had that been a problem in years

15  even before the time when Mr. Adams, Doug Adams became

16  employed as superintendent?

17  A.   Yes.  We probably used a different testing system at that

18  time too.  So -- but yeah, we were pretty much at the bottom.

19  Q.   Was there a time after that, Miss Samples, that these

20  CATS scores, these Commonwealth Accountability Testing Scores

21  began to increase?

22  A.   Yes.  We had worked very hard, because we didn't, you

23  know, we didn't want to be in the bottom.  We didn't want to

24  stay in the bottom.  You know, we wanted our kids to progress.

25  And so we set very high goals.  We were very aggressive in

1    seeking funding for reading programs, you know, whatever we

2    could.  And we began to implement reading, a reading block,

3    and so we saw a lot of increase from that point to 2007.

4    Q.   All right.  Did this occur at a time that Doug Adams

5    served as superintendent of schools in Clay County?

6    A.   Yes, he was.

7    Q.   Were there certain schools within the county school

8    system that stood out in particular for having very high CATS

9    scores?

10   A.   Yes.  We had three elementary schools that were called

11   pacesetter schools, which meant that they scored in the top 5%

12   of all the elementary schools across the state.

13   Q.   Okay.  Do you recall what names of those elementary

14   schools were?

15   A.   I believe it was Big Creek Elementary, Hacker Elementary,

16   and Paces Creek Elementary.

17   Q.   During the period of time that you worked in the school

18   system and in particular when you served as deputy

19   superintendent and supervisor of instruction and reported to

20   Doug Adams, from your personal knowledge, did he ever try to

21   influence you in anything political that you can recall?

22   A.   No, he did not.

23   Q.   And from your personal knowledge, has any information

24   been brought to your attention from any source that he did

25   attempt to influence --

*SAMPLES - Direct (Mr. Westberry)*                                    13

1          MR. SMITH:  Object to the hearsay, Your Honor.

2          THE COURT:  Sustained.

3          MR. WESTBERRY:  Yes, sir.

4     Q.   During the period of time that you worked in the two

5     positions that you just identified, did Doug Adams treat you

6     fairly?

7     A.   Yes, he did.

8     Q.   Was there a period of time within the last, oh, few

9     months, Miss Samples, that you were requested to provide some

10    records to the government with regard to -- some personnel

11    records to the government with regard to an individual named

12    Vernon Hacker?

13    A.   Yes.

14    Q.   Can you tell us what documents you were asked to provide?

15    A.   It was the employment history of Vernon Hacker while he

16    was a bus driver with the Clay County School System.

17    Q.   Okay.  And did you, in fact, provide those documents to

18    the government?

19    A.   Yes, I did.

20    Q.   Did you have an occasion to review those documents at

21    some time either before or after, the employment records of

22    Vernon Hacker before they were provided to the government?

23    A.   Yes, I did.

24    Q.   And was that the personnel file of Mr. Hacker?

25    A.   Yes.

SAMPLES - Direct (Mr. Westberry)                                    14

1    Q.   From the time that he worked in the Clay County School

2    System?

3    A.   Yes.

4    Q.   What position did he hold in the school system, if you

5    can recall?

6    A.   He was a bus driver.

7    Q.   Did you see any indication in your review of those

8    records that he was fired?

9    A.   No, I did not.

10   Q.   What do you recall seeing in those personnel records?

11   A.   I think I reviewed those records with Jeff Sagrecy.   I

12   probably didn't say his name correctly.   I apologize for that.

13   But there was a letter of resignation in there.

14   Q.   Okay.

15   A.   In his file.

16   Q.   Is it -- do bus routes within the school system get

17   changed or rearranged from time to time?

18   A.   Yes, they do.

19   Q.   And can you explain why?

20   A.   Well, we, you know, we closed two schools so of course,

21   you know, those children would be redistricted to other

22   schools and so those bus routes are going to change.   And, you

23   know, as population changes within, you know, the district and

24   those type things, they, you know -- and we're always trying

25   to seek ways to be more efficient, you know, with school and,

SAMPLES - Direct (Mr. Westberry)                                    15

1    you know, to make our routes more efficient.  So yeah, it's a

2    continuous changing.

3    Q.    How are bus drivers paid in Clay County?

4    A.    They're paid hourly.

5    Q.    Okay.  Do the amount of miles that they drive have any --

6    could you explain?

7    A.    The scale is if a driver drives over 100 miles, then the

8    rate is different than a bus driver that would drive less than

9    a hundred miles because they're on the road more.

10   Q.    Do all bus drivers get to drive the same kind of bus?

11   A.    No.

12   Q.    Why is that?

13   A.    Well, just different reasons, you know.  The bus may, you

14   know, break down or something and they're going to get a

15   different one.  Or, you know, if we get new buses in, you

16   know, they may change.  Or, you know, if their route, you

17   know, changes and they may need a 65-passenger bus, you know,

18   as opposed to a 30-passenger bus.  So there's just different

19   factors that would be involved in it.

20         MR. WESTBERRY:  May I have one moment, please, Judge

21   Reeves?

22         THE COURT:  Yes.

23   Q.    Miss Samples?

24   A.    Yes.

25   Q.    Who was the superintendent of schools when you were hired

*SAMPLES - Cross (Mr. Smith)*                                    16

1    as supervisor of instruction?

2    A.   Charles White.

3    Q.   And what year was that again, to the best of your

4    recollection?

5    A.   Should be '95, '96 maybe.

6           MR. WESTBERRY:  Thank you.  Pass the witness.

7           THE COURT:  All right.  Thank you.  Mr. Smith?

8           MR. SMITH:  Yes, Your Honor.

9                        CROSS-EXAMINATION

10   BY MR. SMITH:

11   Q.   Good afternoon.  I'm Stephen Smith, and I represent the

12   United States.  I have a few questions for you, ma'am.  I

13   believe that you gave us the composition of the school board,

14   I believe at the time that you were hired as superintendent of

15   schools?

16   A.   Yes.

17   Q.   And you also hire an attorney to represent the school in

18   legal matters; is that right?

19   A.   Yes.

20   Q.   And who is that, ma'am?

21   A.   Neville Smith.

22   Q.   And how long has Neville Smith been a practicing lawyer

23   there in Clay County, ma'am?

24   A.   I don't know.  Thirty years, maybe longer.  I don't know

25   for sure.

*SAMPLES - Cross (Mr. Smith)*                                        17

1    Q.   Do you know him to be politically active back in the

2    years when they were trying to elect a new circuit judge down

3    there between Oscar Gayle House and Clay M. Bishop?  Did you

4    know that Neville Smith was involved in that election?

5    A.   I do not.

6    Q.   Was he the county school board attorney throughout the

7    term of service of Douglas Adams, ma'am?

8    A.   Yes.

9    Q.   Do you know how long he has been representing the school

10   in legal matters?

11   A.   No.  No, I don't.

12   Q.   As I understand it, before you became superintendent of

13   schools, you served as the assistant superintendent?

14   A.   Yes.

15   Q.   Who served in that position prior to you, ma'am?

16   A.   Woodrow Woods, Jr.

17   Q.   And he resigned some years back; did he not?

18   A.   Yes.

19   Q.   Do you know when he resigned?

20   A.   I can't recall the exact year, no.  It's, you know,

21   three, four maybe.  I don't know.  Time kind of gets away.

22   Q.   How long was that position vacant, ma'am, before you

23   filled it, to your knowledge?

24   A.   Maybe two to three years.  I'm not real sure.

25   Q.   And do you know, ma'am, that Mr. Dick Woods, Woodrow

SAMPLES - Cross (Mr. Smith)                                    18

1    "Dick" Woods, was serving as an election officer in 2002 up in
2    the Bright Shade community?
3    A.   I didn't know that, no.
4    Q.   As I understand your testimony, ma'am, you indicated the
5    site-based council hires teachers, instructors and principals;
6    is that fair?
7    A.   Yes.
8    Q.   Do they operate from a list given by the superintendent?
9    A.   The applications can either come in at the district
10   office, or sometimes applications are sent directly to the
11   principal.
12   Q.   Do you know how the process worked when Mr. Adams was the
13   superintendent of the schools?  Do you know how that
14   relationship worked between the superintendent and the
15   site-based council, personally?
16   A.   No.
17   Q.   Based on your training and experience as superintendent
18   of schools, is it your testimony, ma'am, that the
19   superintendent should not be the person who is exclusively in
20   control of the list of those who the site-based gets to
21   consider?
22   A.   I don't understand your question.
23   Q.   Let me try to restate it.
24   A.   Okay.
25   Q.   Based on your training and experience as the

*SAMPLES - Cross (Mr. Smith)*                                      19

1    superintendent of schools --

2    A.   Um-hmm.

3    Q.   -- if I understood your testimony, the relationship

4    between the superintendent and the site-based council is not

5    one in which it's an exclusive list that only the principal --

6    or only the superintendent is able to give those list of

7    teachers or instructors for the site-based council.  Is that

8    your testimony?

9    A.   Yes.  Sometimes, you know, applicants, new teachers, you

10   know, they may not file their application with the district

11   office.  They may take it directly to the principal.  So, you

12   know, there could be two different lists of applications.

13   Q.   Has that been your experience, ma'am, or is that your

14   training that you're speaking from?

15   A.   That's my experience.

16   Q.   Okay.  But you don't know how it was handled when Mr.

17   Adams was superintendent and how he controlled -- whether he

18   controlled the list going to site based or not?  You don't

19   know?

20   A.   I don't know if it was a shared list or not.  No, I

21   don't.

22   Q.   And you would agree with me, ma'am, that if a

23   superintendent had that kind of control over the list, in

24   fact, while he might not be able to control who got the job,

25   he can sure control who didn't get on the list and who didn't

*SAMPLES - Cross (Mr. Smith)*                                          20

1    get considered for the job.  Would that be fair?

2    A.   Well, yes, that would be possible.  If you had, you know,

3    a number of applicants, you know, you may not to want send 20

4    or 25, you know, out for the same job.  There might be some

5    screening.

6    Q.   So the superintendent would have, you would agree with me

7    under that scenario, some considerable discretion that

8    initially, he would have.  And that is to determine who gets

9    on the list and who doesn't.  Isn't that fair?

10   A.   Yes, but the council can also ask for another list, you

11   know.  They don't have to take the list of the superintendent.

12   They can ask, you know, for additional applicants if they

13   choose to do so.

14   Q.   Now, as I understand it, ma'am, your description of the

15   employment base in Clay County was about 700 or so employees

16   that the school board employs?

17   A.   Yes.

18   Q.   And you would agree with me, ma'am, that it is the

19   largest employer in the county at this time?

20   A.   Yes.

21   Q.   And you've indicated that your scores have gone up in the

22   years in which you spoke, I believe 2000 up to the present

23   date, the scores in your county have gone up?

24   A.   Yes, they have.

25   Q.   And they've gone up across our state in general, wouldn't

1   that be fair?  Since these accountability tests have come in

2   place, schools throughout our regions have had to improve

3   their testing and their scores in order to compete; is that

4   fair?

5   A.   There's, yes, been quite a bit of growth.

6   Q.   And while it might be flattering as a superintendent to

7   take credit for all the hard work of all these teachers out

8   there, you wouldn't state today that you're responsible for

9   the scores solely yourself in Clay County this year, would

10  you, ma'am?

11  A.   No.  We have a lot of hard working teachers out there

12  that do a very good job each and every day.  They work hard.

13  Q.   So while leadership's important, you're not here to say

14  that it's all due to your effort, are you, ma'am?

15  A.   No.

16  Q.   Now, I believe that you testified about the process in

17  which you were subpoenaed.  Were you subpoenaed here today?

18  A.   Yes.

19  Q.   And who subpoenaed you here today?

20  A.   Mr. Westberry.

21  Q.   Okay.  And the subpoena that he was referring to in your

22  testimony earlier was a subpoena that the government had

23  issued producing some records.  Do you recall that?

24  A.   That's correct.

25  Q.   And I believe that early in November, you responded to

*SAMPLES - Cross (Mr. Smith)*                                            22

1    our subpoena initially.  I'm going to hand you now what's

2    marked as Government's Exhibit D66.  Can you identify that,

3    ma'am, for the record?

4    A.   Yes.  This is the complete employment history for Vernon

5    Hacker for the years 2002 -- or for '98, I'm sorry, up through

6    '06-'07 year.

7    Q.   And is that letter signed by you?

8    A.   Yes, it is.

9    Q.   And is that, in fact, a summary of the actual records

10   that you all had produced later to us in total?

11   A.   Yes.

12        MR. SMITH:  I'd move for its introduction at this

13   time.

14        THE COURT:  Any objection?

15        MR. WESTBERRY:  No.

16        THE COURT:  Exhibit D66 will be admitted and may be

17   displayed.

18                  (Government Exhibit No. D66

19                  was admitted into evidence.)

20   Q.   Just hold on one moment, ma'am.  I have some questions

21   about the document, if you could wait.

22   A.   Okay.

23   Q.   Do you see that now, ma'am?  I think you have the hard

24   copy as well as the monitor.  Is the monitor there?

25   A.   Yes, it is.

SAMPLES - Cross (Mr. Smith)                                        23

1    Q.   That left column, school year, would that be identifying

2    the year in which Mr. Hacker was working under the

3    transportation department of the school board?

4    A.   Yes, that would be the school year.

5    Q.   And referring to '97-'98, that would be the school year

6    '97-'98; is that correct?

7    A.   Yes.

8    Q.   And there's apparently a missing record there, '98-'99,

9    according to that entry; is that fair?

10   A.   Yes.

11   Q.   Now, the bus number would be just that, that would be

12   referring to the actual bus that was assigned to Mr. Hacker?

13   A.   That's correct.

14   Q.   And the bus year model would be the year, make, model

15   year of the bus in which he was assigned, would that be fair?

16   A.   That's correct.

17   Q.   And then the school route would be listed there on that

18   final column?

19   A.   Yes.

20   Q.   And it would be fair to say, ma'am, that up until 2002,

21   excluding that first year of '97-'98, he had the same

22   elementary school assigned to him, would be Manchester

23   Elementary?

24   A.   Yes.

25   Q.   And it looks as if, according to your summary, ma'am,

*SAMPLES - Cross (Mr. Smith)*                                          24

1    that he was reassigned a different bus and a different bus

2    route in 2002?

3    A.   Yes.

4    Q.   And his bus went from a 2001 model to a 1997 model; is

5    that fair?

6    A.   Yes.

7    Q.   And he went from the Manchester Elementary route to the

8    Goose Rock Elementary route?

9    A.   Yes.

10   Q.   And these again are summaries of those actual records

11   that we've previously identified as government's exhibits that

12   your office supplied us?

13   A.   Yes.

14   Q.   There's actual records to back up this summary?

15   A.   Yes.

16   Q.   And ma'am, you indicated that you were not aware of

17   activities of Mr. Adams using political pressure on people.

18   Is that your testimony?

19   A.   That's correct.

20   Q.   And did you know that Mr. Adams pressured Vernon Hacker

21   into supporting the political slate of Freddy Thompson in

22   2002?

23   A.   No, I do not know that.

24   Q.   And did you know that in retribution for him not getting

25   on board, that he actually got his bus reassigned and had to

SAMPLES - Cross (Mr. Smith)                                          25

1   take a different route because of the pressure of Mr. Adams?

2   A.   I have no knowledge of that.

3   Q.   Are you aware that Mr. Adams had his brother-in-law,

4   Oscar Hubbard, employed as a transportation director?

5   A.   Yes.

6   Q.   And would it fair to say, Miss Samples, that as

7   superintendent, you rely heavily upon the transportation

8   director in making decisions about who gets jobs within that

9   department?

10  A.   Yes, I do.

11  Q.   And are you aware, Miss Samples, that Oscar Hubbard was a

12  convicted drug dealer, convicted in a drug conspiracy with

13  Kenneth Day?

14  A.   Yes.

15  Q.   Are you also aware that his replacement was Ronnie

16  Hacker?

17  A.   Yes, I believe he was assistant.

18  Q.   And are you aware of him operating within the election of

19  2002 and how he operated?

20  A.   I -- no, I don't know anything about that.

21  Q.   Are you aware of vote buying going on in Clay County,

22  ma'am?

23  A.   I've read quite a bit about it.

24  Q.   You think it should stop?

25           MR. WESTBERRY:   Objection.

*SAMPLES - Redirect (Mr. Westberry)* 26

1          THE COURT:  Sustained.

2   Q.   Other than reading about it, ma'am, have you witnessed --

3   A.   No.

4   Q.   -- acts which you believe were associated with vote

5   buying?

6   A.   No.

7   Q.   Are you aware that Ronnie Hacker is a relative of Doug

8   Adams?

9   A.   No.

10          MR. SMITH:  That's all I have.  Thank you.

11          THE COURT:  See if any of the other parties have any

12   other questions.  Mr. Westberry, you have some follow-up?

13   Yes, sir, you may proceed.

14          MR. WESTBERRY:  May I from here?

15          THE COURT:  Yes, sir.

16                    REDIRECT EXAMINATION

17   BY MR. WESTBERRY:

18   Q.   You were asked about Oscar Hubbard just a moment ago,

19   Miss Samples.  Does he still work for the school system in any

20   capacity?

21   A.   No, he does not.

22   Q.   From your personal experience, did Doug Adams ever lobby

23   you or ask you to reinstate Oscar Hubbard for any kind of job

24   within the school system?

25   A.   No.

SAMPLES - Redirect (Mr. Westberry)                           27

1   Q.   Did anybody ever try to lobby or ask you to reinstate

2   Oscar Hubbard for any kind of job with the school system?

3   A.   No.

4   Q.   You were shown an exhibit just a moment ago of some bus

5   routes of Vernon Hacker.  Do you recall that?  D67, I think,

6   is the exhibit number that I'm referring to.  Some of the bus

7   routes involve buses that were driven in the Manchester

8   Elementary school district; is that correct?

9   A.   Yes.

10  Q.   Those were among the first; is that correct?

11  A.   Well, actually, it started out only at elementary, which

12  is a pretty remote school.

13  Q.   Okay.  How far is Oneida from the City of Manchester?

14  A.   It's probably about 15 mile, 15 to 17 mile.

15  Q.   Is that one of the furthest schools?

16  A.   Yes, it is.

17  Q.   And what year was that, please?

18  A.   That was '97-'98.

19  Q.   Was that at the beginning period of time when Mr. Hacker

20  was employed as a bus driver?

21  A.   Yes.

22  Q.   Now where did it go after that?  Which localities were on

23  his bus route?

24  A.   Well, there was one year we couldn't find the record for.

25  And then '99-2000, then he went to the Manchester area.

*SAMPLES - Redirect (Mr. Westberry)*                                28

1    Q.   And did it change again in 2002?

2    A.   2002, yes, to 2003.

3    Q.   And what did it change to, Miss Samples?

4    A.   It changed to Goose Rock.

5    Q.   Now, where is Goose Rock?

6    A.   Goose Rock's probably maybe five to seven mile from

7    Manchester.

8    Q.   Is that among schools that would be somewhat closer to

9    the City of Manchester?

10   A.   Yes.

11   Q.   Do all bus routes get the same kind of bus?

12   A.   No.

13   Q.   Why is that?

14   A.   Well, there's just, you know, different situations.  For

15   example, the number of passengers, the number of students that

16   may be riding that bus, you know, versus, you know, the types

17   of, you know, I guess the roads, you know, as far as whether

18   they would need, you know, standard versus automatic, that

19   type thing, you know.  There's just different factors, you

20   know.

21   Q.   Is there any difference that you're aware of between the

22   Goose Rock route and that of either Manchester Elementary or

23   even going back to --

24   A.   Are there are any --

25   Q.   With regard to the kind of buses that might be used, if

SAMPLES - Redirect (Mr. Westberry)                                29

1    you know?

2    A.   If it's a narrow road, you know, you would maybe put a

3    smaller bus, you know, on that route, versus, you know, if

4    it's a real curvy road, you know, you may not want to put a

5    long, you know, 65-passenger bus on that just for safety

6    reasons.

7    Q.   What kind of bus out to, say, Goose Rock would you think

8    would be --

9    A.   Well, they would have the same kind of buses as

10   Manchester would have, you know.

11   Q.   All right.  The CATS scores that you were asked about a

12   moment ago, I believe on questioning from Mr. Smith, you told

13   us that it's your recollection that all CATS scores were

14   improving throughout the state during this general period of

15   time?  Is that about right?

16   A.   Yes.

17   Q.   I want to focus on with regard to those elementary school

18   CATS scores that you talked about earlier, the three schools.

19   Did they cover more ground than most, from your personal

20   knowledge?

21   A.   Yes, they made a lot of growth.

22   Q.   They were in the top five percent?

23   A.   Yes, they were.

24           MR. WESTBERRY:  Thank you.  Pass the witness, Judge.

25           THE COURT:  All right.  Let's see if Mr. Smith has

1    redirect and then we'll come back around.  Thank you.  Mr.

2    Smith.

3                        RECROSS-EXAMINATION

4    BY MR. SMITH:

5    Q.  Miss Samples, I have a few more questions for you.  You

6    were asked, I think, to explain some of the differences in

7    these bus routes with Mr. Hacker.  Are you aware of what the

8    '97 bus was that he got assigned to in 2002 after the

9    election?

10   A.  No.

11   Q.  So you're not sure whether the description of the size of

12   the bus actually changed or not, do you?

13   A.  No, I don't.  I don't know that.

14   Q.  As I understand your testimony, ma'am, there was no

15   pressure to, I guess, maintain Oscar Hubbard as the

16   transportation director?

17   A.  No.

18   Q.  Would it be fair to say, ma'am, that a convicted felon

19   couldn't serve in that position, based on policy and the law

20   of the school at this time; would that be fair?

21   A.  Yes.

22   Q.  So there was not a possibility for him to come back and

23   continue to serve after being convicted of these drug crimes?

24   A.  No.

25   Q.  And would it be fair to say that Doug Adams was very,

*SAMPLES - Recross (Mr. Smith)*                                          31

1   very interested in politics in Clay County during the time
2   that you've known him?
3   A.   I didn't have any dealings with him in politics myself,
4   so --
5   Q.   To your knowledge, is he active in political affairs,
6   separate and apart from you?
7   A.   Yes, I think, you know, he has an interest in, you
8   know -- he's a social studies major, so he was interested in
9   that.
10  Q.   And I believe that indication was that Vernon Hacker got
11  assigned this bus to the Oneida Elementary area.  That would
12  not have been during the time that Superintendent Adams was in
13  charge, would it, ma'am?
14  A.   I actually think it may have been.  I think that might
15  have been the time he became superintendent, but I'm not real
16  sure on that.
17  Q.   If we had heard testimony that Charles White was the
18  superintendent at that time period up until '99, would you
19  agree that that is consistent with your knowledge, ma'am?
20  A.   I would --
21  Q.   Do you remember Charles White?
22  A.   Yes, I do.
23  Q.   Do you know when he ended his term as superintendent?
24  A.   I think around that time.  Around, you know, '96, '97.
25  Maybe '98.

*SAMPLES - Cross (Mr. Simons)*                                          32

1   Q.   Let me ask you this, ma'am.  As superintendent, there

2   would be a contract in place before --

3   A.   Yes.

4   Q.   It would show, the contract would show the year in which

5   Mr. Adams began.  If his contract showed as beginning in '99,

6   would you disagree with that date being the hiring date for

7   him?

8   A.   No, I would not disagree with that.

9   Q.   Then if that was the case, '97, '98 would have been

10  assignment to Mr. Hacker under a previous superintendent.

11  Would you agree?

12  A.   Yes.

13          MR. SMITH:  Thank you.

14          THE COURT:  Mr. Simons, you have a couple questions?

15  Mr. Simons is next.  Sorry.

16          MR. WESTBERRY:  Sorry.

17          MR. SIMONS:  My turn?

18          THE COURT:  Yes, sir.

19                          CROSS-EXAMINATION

20  BY MR. SIMONS:

21  Q.   Miss Samples, can you hear me?

22  A.   Yes, I can.

23  Q.   My name is Dan Simons.  I represent Stanley Bowling in

24  this matter.  Do you know Mr. Bowling?

25  A.   I do know Mr. Bowling, yes.

*SAMPLES - Cross (Mr. Simons)*                                              33

1   Q.   You were asked a few moments ago by Mr. Smith about vote

2   buying.  I think you said you'd never seen any evidence of

3   that.  Is that true?

4   A.   That is correct.

5   Q.   Are you a voter?

6   A.   Yes, I am.

7   Q.   Have you voted for many years in all elections?

8   A.   Yes, I have.

9   Q.   What's your precinct?

10  A.   Harts Branch.

11            MR. SIMONS:  Thank you, that's all.

12            THE COURT:  Thank you.  Now Mr. Westberry?

13            MR. WESTBERRY:  Nothing.  Pass the witness.

14            THE COURT:  All right.  Mr. Smith, any questions

15  based on what Mr. Simons has just asked?

16            MR. SMITH:  No, thank you.

17            THE COURT:  Ma'am, you may step down.  You're

18  excused.  Thank you.

19            MR. WHITE:  Your Honor, I was going to ask if I could

20  give this exhibit to the CSO.  It's what I told you I'd give

21  you before lunch and I realize I forgot.

22            THE COURT:  Yes, sir.  Thank you.  Mr. Westberry, you

23  may call your next witness.

24            MR. WESTBERRY:  Call Jim Gravitt.

25            JAMES GRAVITT, DEFENSE WITNESS, SWORN

1                          DIRECT EXAMINATION

2    BY MR. WESTBERRY:

3    Q.   Good afternoon, sir.  My name is Kent Westberry.  I'm one

4    of the attorneys for Doug Adams.  Could you tell us your full

5    name, please?

6    A.   James A. Gravitt.

7    Q.   And where do you reside, Mr. Gravitt?

8    A.   Louisville, Kentucky.

9    Q.   And what is your occupation, Mr. Gravitt?

10   A.   I'm a CPA.

11   Q.   Okay.  How long have you been a CPA?

12   A.   Since 1991.

13   Q.   And what is your educational background, Mr. Gravitt?

14   A.   I have a Bachelor's degree in business administration

15   from the University of Cincinnati and a Master's degree in

16   business administration from the University of Louisville.

17   Q.   And how are you professionally employed, Mr. Gravitt?

18   A.   I'm a managing director with a company called bCatalyst

19   Advisers.  They're a merger and acquisition and financial

20   consulting and capital raising firm in Louisville.

21   Q.   From time to time, as part of what you do for bCatalyst,

22   do you have an opportunity to do financial analysis of various

23   documents?

24   A.   Yeah.  My practice consists of I do some business

25   valuation, I do some investigative accounting, and I do a lot

*GRAVITT - Direct (Mr. Westberry)*                                35

1    of financial analysis in connection with matters such as this.

2    Q.   Are you a member of any professional organizations or

3    associations?

4    A.   Yeah.  Several.

5    Q.   Could you just tell us just a few of what they are?

6    A.   Kentucky Society of CPAs, the American Institute of

7    Certified Public Accountants, the Institute of Business

8    Appraisers, the Association of Certified Fraud Examiners, the

9    Institute of Management Accountants.  That covers most, I

10   would think.

11   Q.   Thank you.  Mr. Gravitt, were you retained by my office

12   on behalf of Doug Adams to undertake or evaluate certain

13   compensation issues involving superintendents of schools in

14   Clay County and other --

15   A.   Yes, I was.

16   Q.   Now, what documents did you review in order to undertake

17   that evaluation?

18   A.   Primarily, superintendent compensation records.  I also

19   looked at some U.S. Census Bureau data on population of

20   counties.

21   Q.   Where were you able to get that kind of information?

22   A.   It's available on the internet.

23   Q.   Mr. Gravitt, have you ever been recognized as an expert

24   witness in the area of financial analysis in court and legal

25   proceedings other than the one that brings us here today?

*GRAVITT - Direct (Mr. Westberry)*                                        36

1    A.   Yes, I have.

2    Q.   Approximately how many times have you been recognized as

3    an expert in the area of financial analysis?

4    A.   Over 50 times since 1993, which was when I first began to

5    testify.

6    Q.   Are there other areas of expertise, Mr. Gravitt, that

7    you've been recognized in courts or legal proceedings other

8    than just financial analysis?

9    A.   Well, business valuation is similar to financial

10   analysis, and I did mention investigative accounting is also

11   related to financial analysis.

12   Q.   How often would you say that you have testified in court

13   proceedings, Mr. Gravitt?

14   A.   As I mentioned, probably over 50 times over the years.

15   Q.   What percentage of your work at bCatalyst involves

16   testifying as an expert witness in court proceedings similar

17   to this, as opposed to the other portion of what you do?

18   A.   Probably about 25% of the time would be working in

19   connection with litigation matters.  I don't always testify in

20   those.  But sometimes, as today, they do result in court

21   testimony.

22   Q.   Have you ever failed to have been recognized by a court

23   in any jurisdiction in this country as an expert in either

24   financial analysis or any other field of expertise?

25   A.   No.

*GRAVITT – Direct (Mr. Westberry)*                                    37

1   Q.   You testified a moment ago as to the records that you

2   looked at as part of your work in determining compensation

3   issues for superintendents of schools.  Can you tell us a

4   little bit more specifically what you were asked to do as part

5   of your retention?

6   A.   Yes.  Just to determine whether or not Mr. Adams'

7   compensation over a period of time was a reasonable amount of

8   compensation in comparison with the compensation of

9   superintendents of Kentucky schools.

10  Q.   And again, what documents did you look at in order to

11  reach any conclusions that you may have as part of that

12  retention?

13  A.   The primary document was obtained from the Kentucky

14  Department of Education.  They report superintendent

15  compensation by school year.  I also supplemented that with

16  looking at some U.S. Census Bureau estimates of the population

17  of Clay County and the surrounding counties.

18          MR. WESTBERRY:  At this time, Judge Reeves, we would

19  offer Mr. Gravitt as an expert witness.

20          THE COURT:  The Court doesn't recognize expert

21  witnesses but will allow you to ask him opinion testimony.

22          MR. WESTBERRY:  Thank you.  That was my question.

23  Q.   I would like to show you, Mr. Gravitt, what we'll refer

24  to as DA Number 1.

25          MR. WESTBERRY:  Judge Reeves, may the courtroom

*GRAVITT - Direct (Mr. Westberry)*                                    38

1   security hand this to --

2           THE COURT:  Yes.

3   Q.  If you could take a look at that document that has been

4   referred to --

5           MR. WESTBERRY:  May I turn the Elmo on while he's

6   looking?

7           THE COURT:  Yes.

8   Q.  Do you recognize DA Number 1, Mr. Gravitt?

9   A.  Yes.

10  Q.  Can you tell us just what that document is, please, sir?

11  A.  Yeah, that's a graphic representation of the results of

12  my analysis in this matter.

13          MR. WESTBERRY:  May I have a little assistance?

14          THE COURT:  Yes, sir.

15          MR. WESTBERRY:  May I have DA Number 1 back?

16  Q.  Mr. Gravitt, you have your own copy of that?

17  A.  Yes, I do.

18  Q.  Mr. Gravitt, looking now at DA Number 1, can you again

19  tell us what this particular chart represents?

20  A.  Yes.  It shows Kentucky superintendent salaries across

21  the years.  There are four bars for each year.  As you begin

22  over at the left-hand side, you can see that the bottom axis

23  is the years, and the axis going up and down is dollars.  So

24  what that shows is four different categories of compensation,

25  year by year.

1        The first bar, the left-most bar that is colored black is

2   the median salary for all districts in Kentucky for the school

3   year 2001-2002, as of September, 2001 was the reporting date.

4   Again, this information was obtained from the Kentucky

5   Department of Education website.  And it shows in that year

6   that the median salary for all districts was about -- looks

7   like close to $85,000.

8        And then the next bar in green is median salary for

9   non-metropolitan areas, so for the rural areas of Kentucky.

10  For that, I excluded the superintendent compensation for

11  Jefferson, Boone, Warren, Fayette, McCracken, Paducah

12  Independent, Kenton and Davis Counties.  And those are where

13  some of the urban areas of some of the larger cities of

14  Kentucky are located.  That's the green bar.

15       The red bar is the average of the surrounding counties,

16  counties surrounding Clay County.  That would be Jackson,

17  Owsley, Perry, Leslie, Bell, Knox and Laurel Counties, the

18  seven counties that surround Clay County.  And the fourth, the

19  blue bar is Clay County salary.

20       As you go across, you can see that in that first year,

21  2001-2002, Clay County superintendent salaries are $80,000,

22  and that represented, just in comparison to the red bar, the

23  average salary for the surrounding counties, about 89% of the

24  salary average of those seven surrounding counties for that

25  year.

GRAVITT - Direct (Mr. Westberry)                    40

1     Then moving across, toward the right, the next year,

2   again, the Clay County salary was about 95% in this case of

3   the average salary of the seven surrounding counties.  And

4   again, less than the salary for all districts and less than

5   the median, which is the middle salary of the non-metropolitan

6   areas superintendent salaries.

7     The next year, similar comparison.  90% of the

8   surrounding seven county areas.  The next year, 2004 through

9   2005, 91%.  The next year, 2005-2006, 92%.  In 2006-2007, the

10  Clay County salary increased to over $100,000, representing

11  103% of the average salary for the sur rounding counties.  The

12  next year, 2007-2008, it was back below the average for

13  surrounding counties at 98% and 99% in 2008-2009.

14     And finally, in 2009-2010 school year, after, as I

15  understand Mr. Adams retired in that year, the figure was 87%

16  of the salary, average salary for the seven counties

17  surrounding Clay County.

18         MR. WESTBERRY:  We would move the introduction of DA

19  Number 1, Your Honor.

20         THE COURT:  Any objection?

21         MR. SMITH:  No objection.

22         THE COURT:  Adams Exhibit Number 1 will be admitted

23  at this time.

24                 (Adams Exhibit No. 1

25                  was admitted into evidence.)

*GRAVITT - Direct (Mr. Westberry)*                                        41

1    Q.   Mr. Gravitt, in '06-'07, there was a -- it appears as

2    though the Clay County superintendent salary did increase in

3    that year.  Is that your understanding?

4    A.   Yes.

5    Q.   Did you look at any other records or do any other

6    analysis that would have given you information as to the bases

7    for that increase?

8    A.   Well, I saw some exhibits prepared by Mr. Sagrecy, the

9    FBI agent, and that number was 130,000 for that year.  I asked

10   Mr. Adams about that.  He indicated that that was --

11          MR. SMITH:  Objection, Your Honor.  I'm going to

12   object to hearsay.

13          THE COURT:  Sustained.

14   Q.   Stay away from what Mr. Adams said.  Talking about in

15   '06-'07, do you know if any period of time in that range, was

16   there a contract renewal for Mr. Adams with the school board?

17   A.   I believe there was sometime in that period, yes.

18   Q.   Do you know if any counties were used as sort of

19   measuring stick or an average for the setting of the

20   superintendent's salary?

21   A.   Yes.  My understanding is that the seven counties

22   surrounding Clay County were used to determine the

23   compensation for Clay County superintendent.

24   Q.   Let me jump ahead to the very last year of Mr. Adams'

25   employ.  Were you made aware that, if you know, was he paid

GRAVITT - Direct (Mr. Westberry)                                    42

1  any amounts of money for any unused sick leave?

2  A.  Yes.

3  Q.  Can you explain in your undertaking what you learned

4  about that?

5  A.  Approximately $30,000 of accumulated sick leave was paid

6  in the 2008-2009 year.  That is not reflected in the amount

7  shown on the chart, however.

8  Q.  Why is it not reflected?

9  A.  Well, I'm not sure.  Apparently, the superintendent

10 salary is just a salary and not the sick leave, as reported by

11 the Kentucky Department of Education.  They do not consider

12 the accumulated sick leave to be in the same category as

13 salary.

14 Q.  And you got this information from the Department of

15 Education website?

16 A.  Yes.

17 Q.  Okay.  I'd like to show you next what I've referred to as

18 DA Number 2.

19       MR. WESTBERRY:  Could I have just one minute, please,

20 Your Honor?

21       THE COURT:  Yes, sir.

22       MR. WESTBERRY:  May I show Mr. Gravitt what I will

23 just for identification purposes refer to as DA Number 2?  Ask

24 if the CSO can hand it.

25       THE COURT:  Yes, sir.

GRAVITT - Direct (Mr. Westberry)                              43

1    Q.   Could you take a look at that, Mr. Gravitt, and see if

2    there is another exhibit that was prepared at your request --

3    at our request by you within the last few days, within the

4    last week perhaps?

5    A.   Yes.  It is this exhibit.

6         MR. WESTBERRY:  May I ask the CSO again, please?  I

7    apologize for running him up and down.

8         THE COURT:  Yes, sir.

9    Q.   Take a look, Mr. Gravitt, at what I will call, for court

10   identification purposes only, the one that has just been

11   handed to you, we'll refer to it as DA Number 3.  Would you

12   recognize that those two have separate numbers on them?

13   A.   Yes.

14   Q.   The one that we've just identified as DA Number 3, do you

15   have a clean copy of that with you, Mr. Gravitt?

16   A.   I don't.  The copy you gave me is the only copy I have.

17   Q.   Okay.  That's fine.

18        MR. WESTBERRY:  Could we retrieve the other two that

19   were marked as DA2 and 3, I believe, and could I hand the

20   witness what we will refer to as DA number 4, Judge Reeves?

21        THE COURT:  Yes, sir.

22   Q.   Take a look, Mr. Gravitt, and is that a document that you

23   recognize?

24   A.   Yes.

25   Q.   Do you have an extra copy of that document up there with

*GRAVITT - Direct (Mr. Westberry)*                                      44

1    you?

2    A.   Yes, I do.

3    Q.   Could you just identify what that document is, please?

4    A.   Yeah.  This is Exhibit 1 to the expert report I prepared

5    last month.

6    Q.   And again, we're going to refer to it, for purposes of

7    court identification, as DA Number 4.  Could you tell us what

8    that exhibit is, please?

9    A.   Yeah, that is a summary, the numbers behind the chart

10   that we were just looking at that's still up on the screen

11   there, showing the numbers year by year for the four

12   categories of compensation that I was talking about just a

13   minute ago.

14            MR. WESTBERRY:  Your Honor, we would move that

15   introduction into evidence as DA Number 4.

16            THE COURT:  Any objection?

17            MR. SMITH:  No.

18            THE COURT:  Adams Exhibit Number 4 will be admitted.

19   If you can take that back to Mr. Westberry, it can be

20   published to the jury.

21                       (Adams Exhibit No. 4

22                        was admitted into evidence.)

23            MR. WESTBERRY:  May I publish, Your Honor?

24            THE COURT:  Yes, sir, you may.

25   Q.   Mr. Gravitt, can you just briefly tell us what the

*GRAVITT - Direct (Mr. Westberry)*                                45

1   numbers on DA Number 4 represent, please?

2   A.   Yes.   Again, we have going across the top the school

3   years as was shown on the chart we were just looking at,

4   beginning 2001-2002 and running through 2009-2010.

5        And then the rows we see are, first of all, the top row

6   is the median salary for all districts.  The second row is the

7   median salary for the non-metropolitan areas.  The third row

8   is the average for those seven surrounding counties.  The

9   fourth row is the Clay County salary for that period of time.

10        Following that, I've calculated the Clay County salary as

11   a percent of each one of those.  So it's difficult to read,

12   but for 2001-2002, the Clay County salary was 91% of the

13   median for all districts, was 92% of the median salary for

14   non-metropolitan areas, was 89% of the average salary for the

15   Jackson, Owsley, Perry, Leslie, Bell, Knox and Laurel

16   Counties.  So that is what is shown for each year as we go

17   across from left to right.

18        I also show in the last column compound annual growth

19   rates.  This means if you would simply see what the percentage

20   increase was on average over that period of time.  And what it

21   shows is from 2001 school year through the 2010 school year,

22   the median for all districts increased at 3.2%.  So a little

23   bit over 3% a year.  And like the same -- just the same, the

24   median salary for the non-metropolitan areas also increased by

25   3% a year.

GRAVITT - Direct (Mr. Westberry)                          46

1   Q.   Go ahead.  How did Clay County measure up?

2   A.   Clay County increased at 2.1% over that period of time,

3   and the salary of the surrounding counties increased at 2.3%.

4   So Clay County was the lowest rated increase over that period

5   of time.

6   Q.   On footnote number 3 at the bottom of DA Number 4, there,

7   I think, are seven counties listed, Jackson, Owsley, Perry,

8   Leslie, Bell, Knox and Laurel.  Do you see those on your copy

9   of that as well?

10  A.   Yes.

11  Q.   Were you able to check for any source information

12  regarding populations in those counties?

13  A.   Yes, I was.

14  Q.   What were you able to find out?

15  A.   Well, Laurel is the most populus county.  I believe Knox

16  is second.  Clay County fits in, if you include Clay County as

17  the eighth county, Clay would be the fifth most populus county

18  during each year that we were looking at here.

19  Q.   Would that roughly be in the middle of those seven or

20  eight counties that we've been talking about?

21  A.   Yes.

22  Q.   And how did the superintendent of schools' salary in Clay

23  County fall?  In what range did it fall when comparing to

24  those seven counties?

25  A.   For all years that I looked at, the Clay County salary

1    was either the fourth, fifth or sixth highest.  So it fell in

2    line pretty well with the population ranking of the counties.

3    Q.   What was the lowest population county that you were able

4    to determine among those seven?

5    A.   I don't have the figure in front, but I think it was

6    about 4,000, four or five thousand.  I think it might have

7    been Owsley County.

8    Q.   Have you been to all these counties before, Mr. Gravitt?

9    A.   I'm not sure all.  I've been to a number of them over the

10   years, yes.

11   Q.   Mr. Gravitt, were you able to form an opinion, just based

12   on these numbers alone, as to the reasonableness or, perhaps,

13   even the lack of reasonableness as to the salary for the

14   superintendent of schools in the time frame that's been

15   referenced in these two exhibits?

16   A.   Yes, I was.

17   Q.   And what is that opinion, Mr. Gravitt?

18   A.   I believe that the salary is reasonable, in comparison to

19   the compensation of other superintendents, based on the

20   information I looked at and the analysis I performed.

21   Q.   Now, have you been, Mr. Gravitt, have you been

22   compensated for your -- for the work that we've asked you to

23   do?

24   A.   Yes.

25   Q.   And could you just tell the jury briefly what -- how

*GRAVITT - Direct (Mr. Westberry)*                                          48

1    you're paid for the work that you do at bCatalyst?

2    A.   I charge by the hour for the work I do.

3    Q.   And what is your hourly rate?

4    A.   $200.

5    Q.   Do you know approximately how much you bill to date?

6    A.   It's been over $6,000, and that does not include today.

7          MR. WESTBERRY:  May I have one minute, please, Your

8    Honor?

9          THE COURT:  Yes, sir.

10         MR. WESTBERRY:  Thank you, Judge.  I pass the

11   witness.

12         THE COURT:  Thank you.  Mr. Smith, before you

13   cross-examine the witness, I'd like to take a recess at this

14   time.  Take a recess until 2:45, ladies and gentlemen.  Please

15   keep in mind the admonition that you've been given previously

16   not to discuss the case among yourselves while we are in

17   recess.  Jury will be excused for 15 minutes.

18               (The jury left the courtroom at 2:29 p.m.)

19         THE COURT:  Thank you.  Mr. White, we can take up

20   your exhibit at sidebar after Mr. Westberry is finished.  We

21   can do it at that time.

22         MR. WHITE:  Startled me a little bit.  Sorry.

23         MR. WESTBERRY:  Can I hand DA4 back to the clerk?

24         THE COURT:  Yes.  We'll be in recess for 15 minutes.

25               (Recess from 2:30 p.m. until 2:46 p.m.)

*GRAVITT - Cross (Mr. Smith)*                                          49

1          (The jury entered the courtroom at 2:46 p.m.)

2          THE COURT:  Thank you.  The record will reflect that

3     all members of the jury are present.  Parties and counsel are

4     also present.

5          Mr. Gravitt, of course, you're still under oath.

6          Mr. Smith, I believe we're up to you to question the

7     witness.

8                            CROSS-EXAMINATION

9     BY MR. SMITH:

10    Q.  Good afternoon.

11    A.  Good afternoon.

12    Q.  I'm Steve Smith.  I represent the United States.  I have

13    a few questions for you.  Sir, as I understand it, you were

14    asked to evaluate salaries on superintendents and I believe

15    give an opinion as to the reasonableness of Mr. Adams' salary;

16    is that fair?

17    A.  Yes.

18    Q.  And you indicated that you had in the past done some

19    investigative accounting, but that was not what you were asked

20    to do, necessarily, in this case?

21    A.  That's correct.

22    Q.  And I assume, sir, isn't it true that as part of your

23    analysis, you weren't asked to look into how Mr. Adams may

24    have gotten his job in the beginning?

25    A.  That's true.

*GRAVITT – Redirect (Mr. Westberry)*                                    50

1    Q.   Nor how he sustained keeping that position in the county

2    as well?

3    A.   That's correct.

4    Q.   And be fair that you've not been asked to determine

5    whether or not his activities, involvement in a racketeer

6    enterprise had anything to do with getting the job or keeping

7    the job.  Is that fair?

8    A.   Yes.

9              MR. SMITH:  Thank you.  That's all I have.

10             THE COURT:  Let me see if any of the other defendants

11   have any questions of the witness.  Mr. Westberry, you have

12   some follow up?

13             MR. WESTBERRY:  One question.

14                        REDIRECT EXAMINATION

15   BY MR. WESTBERRY:

16   Q.   You don't have any knowledge about any of the facts

17   leading up to this particular charge being brought to this

18   court, do you, Mr. Gravitt?

19   A.   No, I do not.

20             MR. WESTBERRY:  Thank you.

21             THE COURT:  Anything else of the witness?

22             MR. SMITH:  No.

23             THE COURT:  All right.  Thank you.  You may step

24   down.  Thank you.  And you're excused at this time.

25             Mr. Westberry?

*ADAMS-HACKER - Direct (Mr. Westberry)*                    51

1        MR. WESTBERRY:  Yes.  Melanda Adams.

2        LAURA MELANDA ADAMS-HACKER, DEFENSE WITNESS, SWORN

3                    DIRECT EXAMINATION

4   BY MR. WESTBERRY:

5   Q.   Good afternoon.

6   A.   Afternoon.

7   Q.   Miss Adams, I'm Kent Westberry.  Of course, I represent

8   Doug Adams, one of the attorneys for Doug Adams.  Could you

9   state your full name, please?

10  A.   Laura Melanda Adams Hacker.

11  Q.   Okay.  How old are you, ma'am?

12  A.   I'm 30.

13  Q.   Okay.  And where do you reside?

14  A.   720 North Highway 11, Manchester, Kentucky.

15  Q.   Okay.  How long have you lived in either Manchester or

16  Clay County?

17  A.   All my life.

18  Q.   All right.  What is your marital status, ma'am?

19  A.   I'm divorced.

20  Q.   Is that why you said Hacker at the tail end?

21  A.   Yes, uh-huh.

22  Q.   Do you have any children?

23  A.   I have one daughter.

24  Q.   One daughter.  How old is your daughter?

25  A.   Two years old.

*ADAMS-HACKER - Direct (Mr. Westberry)* 52

1   Q.   Now, is -- do you know Doug Adams?

2   A.   Yes.

3   Q.   How do you know him?  If he's related to you, just say

4   so.

5   A.   He's my father.

6   Q.   Of course, you see him in the courtroom here today?

7   A.   Yeah.

8   Q.   Who is your mother?

9   A.   Laura Adams.

10  Q.   And your mother and dad are married, correct?

11  A.   Yes, they are.

12  Q.   What is your education, Miss Adams?

13  A.   High school.  High school.

14  Q.   Do any college at all?

15  A.   A little bit.  Not enough to count.

16  Q.   I want to ask you about some personal questions in your

17  background, Miss Adams.  Has there been a time in your life

18  you had a problem with drug addiction?

19  A.   Yes.

20  Q.   You're 30 years old now?

21  A.   Yes.

22  Q.   In terms of your age, can you tell us when that drug

23  addiction began?

24       MR. SMITH:  Your Honor, I'm going to object and ask

25  to approach.

*ADAMS-HACKER - Direct (Mr. Westberry)*                              53

1           THE COURT:  Come on up, please.

2                       (A sidebar conference was held out of the

3                       hearing of the jury):

4           THE COURT:  Mr. Smith.

5           MR. SMITH:  Your Honor, I would state our objection

6    as to relevance as to, again, seems to be a matter that has

7    absolutely no relevance to the issues charged in the

8    indictment.  If there is any relevance, to try to engage this

9    young lady in what everyone knows has been a struggle with

10   drug addiction would do nothing more than, I believe, counter

11   the balance of probativeness and trying to draw on the

12   sympathies and, really, I just, again, I don't see any

13   relevance to it.  But if there is any relevance, I believe

14   that it is --

15          THE COURT:  What is the relevance of any drug

16   addiction that she's had in the past?

17          MR. WESTBERRY:  Thank you, Judge.  Kent Westberry on

18   behalf of Doug Adams.  As we've indicated, Judge Reeves,

19   throughout this trial, Mr. Adams was opposed to Jennings White

20   and drug activity, in particular, in Clay County.  That played

21   a large part of the reason why he took the positions that he

22   did, in particular, in the 2002 election.

23          Miss Adams' drug addiction, which was talked about,

24   of course, with Todd Roberts, if I recall, if not even a few

25   others at the beginning of the trial adds some background,

*ADAMS-HACKER - Direct (Mr. Westberry)*                          54

1    some context to why drugs were of particular concern to Mr.

2    Adams.

3              My line of questioning on this would simply be to ask

4    her to establish the period of time that she had the addiction

5    to drugs.  She would be asked briefly about the rehabilitation

6    centers that she went to.  I would ask her if she's clean now,

7    and I anticipate that she has recovered now, and I think we've

8    heard some testimony about that.

9              I can link -- we would also propose asking her if she

10   purchased drugs from Bobby Joe Curry, which I believe she

11   would testify in the affirmative that she did.

12             THE COURT:  If she did, how is it relevant to the

13   issues in this case?

14             MR. WESTBERRY:  Bobby Joe Curry --

15             THE COURT:  I know who Mr. Curry is, clearly, but I

16   don't know the relevance to the issues in this case.

17             MR. WESTBERRY:  He is linked to Jennings White, as I

18   think has been established.

19             THE COURT:  But we're not trying Jennings White.  I

20   know you've attempted to do that through the course of this

21   case, and I know you've attempted to establish through every

22   witness that your client hates Mr. White.  It's really clear

23   at this point.

24             MR. WESTBERRY:  Yes, sir.

25             THE COURT:  Any more along those lines would be

*ADAMS-HACKER - Direct (Mr. Westberry)*                          55

1    piling on.

2              MR. WESTBERRY:  I understand.

3              THE COURT:  I don't see the relevance of this line of

4    inquiry, number one.  And I do think under 403 that any

5    relevance at all as to her past drug use or drug activity

6    would be more prejudicial than probative and would be designed

7    to engender sympathy, which is not an issue in the case.  So

8    I'll sustain the objection to this line of inquiry.

9              Now, if she has relevant testimony to provide, that's

10   a separate issue.  With respect to her prior drug activity and

11   any connection she has with Bobby Joe Curry, unless it's

12   related to an issue in the case, I don't believe that would be

13   appropriate as well.  I'll sustain the objection to that line

14   of inquiry.

15             MR. WESTBERRY:  I understand the Court's ruling on

16   the Bobby Joe Curry line of questioning.  I wanted to

17   volunteer that at sidebar to the Court.

18             Is there any area of her prior drug addiction, based

19   on the statements I've made to the Court, that the Court would

20   allow me to explore?

21             THE COURT:  I don't see any relevance at this point

22   to the issues in the case.  And I've thought, and I've

23   thought, and I just don't see any relevance to this line of

24   inquiry.  And again, if there is any, it would be so slight,

25   the prejudicial effect would far outweigh the probative value.

*ADAMS-HACKER - Direct (Mr. Westberry)*                          56

1          MR. WESTBERRY:  There is a separate line -- I'll move

2     on, Judge.  With the Court's permission, I'll tell you the

3     remaining line of questioning that I propose to do with

4     Melanda Adams.  She, of course, worked for a period of time in

5     the clerk's office when Mr. Thompson was the clerk.  I'm going

6     to ask her some questions about how she became aware of the

7     job, how she got the job, whether there was any influence that

8     she --

9          THE COURT:  I do think that's relevant to the issue.

10          MR. WESTBERRY:  And let me tell you, to be candid

11     with the Court and Mr. Smith, as to how she first became aware

12     of the job.  She learned about the existence of the job from

13     Mr. Thompson's son, Chad, at the same time they were together

14     in a rehab.

15          THE COURT:  All right.

16          MR. WESTBERRY:  I would submit that portion of it is

17     relevant.

18          THE COURT:  It may be.  But if she utters the magic

19     words rehab, that doesn't mean we then jump back into drug use

20     and drug activity.

21          MR. WESTBERRY:  That's my understanding of the

22     Court's ruling.  I would have to, you know, I would have to

23     establish that she knows a Chad Thompson, probably establish

24     how long she's known him.  I have the impression she's known

25     him pretty much all of her life, as they are approximately the

*ADAMS-HACKER - Direct (Mr. Westberry)*                    57

1    same age or in the same age group.  And ask where was it,

2    Ms. Adams, that you and Chad Thompson talked about this job.

3              THE COURT:  Of course, how she learned about it is

4    one thing.  What he may have said to her, of course, would be

5    hearsay.

6              MR. WESTBERRY:  Exactly.  I had not planned on doing

7    any kind of line of questioning on what Chad Thompson would

8    have said, but that's the context that I was going to offer.

9              THE COURT:  All right.  Anything else?

10             MR. BALDANI:  I do, Judge.  It implicates our client

11   to a certain extent.  I mean, as you know, we haven't made any

12   issue of the fact that Chad had a drug problem, and I hate for

13   it to just to get mentioned.  I mean, if it's -- if the

14   relevance is how she got the job, I would think that Mr.

15   Westberry could lead her a tad, just say did you learn it from

16   Chad, because I hate for it to even get broached with us.

17             THE COURT:  Let me ask this.  If Mr. Westberry

18   doesn't raise the issue of where she obtained this -- where

19   she was located when she obtained the information, Mr. Smith,

20   do you plan to bring it out on cross-examination?  She was in

21   a rehab center with Mr. Thompson's son.

22             MR. SMITH:  I really don't.

23             THE COURT:  All right.  Then Mr. Westberry, if you

24   could limit your questions to avoid that subject, I'll sustain

25   Mr. Baldani's objection to questions about the rehab center.

*ADAMS-HACKER - Direct (Mr. Westberry)*                          58

1    But if you bring it up, of course, then it may make it fair

2    game for Mr. Smith.

3             MR. BALDANI:  I don't intend to bring it up, but I

4    would add along the lines of Mr. Westberry's initial

5    intentions, Your Honor, as you remember, there's been quite a

6    bit made of scratching backs and giving jobs.  And it's my

7    understanding that Freddy gave her a job a couple years, two

8    or three years after '02, and really he was trying to help her

9    get back on her feet because of her drug addiction.

10            So in that sense, I'd intended to ask about some of

11   Melanda's drug problems, because I think that's the reason

12   that Freddy gave her a job and not as a payback for her

13   father's assistance two or three years earlier.  So I don't

14   know if that changes anything that you've ruled as far as the

15   relevance of it or not.  If it doesn't, I just wanted to let

16   the Court know that that was my intention so I would join in

17   Mr. Westberry's, you know, argument that there's some

18   relevance to this.

19            THE COURT:  Well, this witness can't testify to the

20   state of mind of your client as to why he would have hired

21   her.  I don't know how -- how do you plan to get that

22   information from her on examination?

23            MR. BALDANI:  Well, I had anticipated she was going

24   to talk about her drug problem.  I was simply going to ask, is

25   that the -- you know, did Freddy Thompson hiring you have

*ADAMS-HACKER - Direct (Mr. Westberry)*                              59

1    anything to do as far as you're aware of --

2              THE COURT:  And Mr. Smith would object as to her

3    testifying about what someone else knows.  I'd sustain the

4    objection.  So we're back to square one.  I don't think this

5    witness can testify about his motivation for hiring her.  She

6    may be able to testify about timing, but she can't testify

7    about his motivation.

8              So I'll sustain the objection as to discussions about

9    this witness's prior drug activity.  It's not relevant to

10   issues in the case.  We've talked about the narrow scope of

11   the remaining direct examination of the witness.  We'll go

12   from there, okay?

13             MR. HOSKINS:  Your Honor, if I could add one point on

14   behalf of Defendant Maricle, I would submit that because the

15   government has made the case that this group of people was

16   tied in with drug dealers and drug activity, that anything

17   that would indicate that any individual would not have done

18   such a thing would be open.

19             THE COURT:  Any individual would not have done such a

20   thing?

21             MR. HOSKINS:  In other words, I'm saying that Mr.

22   Adams, Mr. Maricle had daughters who had drug problems, which

23   would cause them, if anything, to be distanced from that.

24             THE COURT:  The fact of this witness's prior drug use

25   is not a secret to the jury.  It's already come out.  Facing

*ADAMS-HACKER - Direct (Mr. Westberry)*                    60

1    her on the witness stand and her talking about her prior drug

2    use is a different matter, and that's where the Court has to

3    evaluate the probative effect, whether it is -- there's some

4    probative nature in the questions, and I've determined there's

5    very little at this point in the case.

6          And then the Court has to balance that under 403 with

7    the prejudicial effect of it.  Once I make a determination

8    that this is intended to engender sympathy for the witness or

9    for the defendant in the case, for no other relevant reason,

10   then it's a pretty clear analysis under 403.

11         So I've made my determination that it's not relevant

12   to the -- through this witness, these questions are not

13   relevant.  But if she has a drug problem, it's already in

14   issue in this case.  To further expound on that through this

15   witness would add nothing meaningful at this point.  Mr.

16   Westberry?

17         MR. WESTBERRY:  Just one last point.

18         THE COURT:  Yes, sir.

19         MR. WESTBERRY:  Does it make any difference in the

20   Court's determination that the government, on several

21   occasions today, has interjected Oscar Hubbard's name and his

22   relationship both to Mr. Adams and his prior drug conviction

23   in terms of the Court's determination of relevance?

24         THE COURT:  No.  It's two separate issues.  Two

25   completely separate issues.

*ADAMS-HACKER - Direct (Mr. Westberry)*                              61

1           MR. WESTBERRY:  We're ready to proceed.  Thank you.

2                    (Sidebar conference concluded.)

3           THE COURT:  All right.  Thank you, counsel.  I will

4    sustain the objection to the question.

5    BY MR. WESTBERRY:

6    Q.  Miss Adams, do you have a business of your own that you

7    operate these days?

8    A.  Yes, I do.

9    Q.  Can you tell us just what that business is?

10   A.  It's a little convenient gas station, sell food, gas,

11   cigarettes, stuff like that.

12   Q.  How long have you been operating that convenience store?

13   Rough estimate.

14   A.  Two years.

15   Q.  Is that in Clay County?

16   A.  On the outskirts of it.

17   Q.  Is it in or outside the City of Manchester?

18   A.  Outside the city, I'm sorry.

19   Q.  Before you operated that business, the convenient type

20   store, what did you do for a living?

21   A.  I was a clerk at the county clerk's office.

22   Q.  Okay.  How long did you work there?

23   A.  Three years.

24   Q.  What did you do for the county clerk's office?

25   A.  License, tagged cars, vehicles and done deeds and

ADAMS-HACKER - Direct (Mr. Westberry)                          62

1   mortgages.

2   Q.   Was there anybody that you reported to as a supervisor?

3   A.   Yes.

4   Q.   Who would that have been, please?

5   A.   Freddy Thompson.

6   Q.   Were there any clerks or deputy clerks within the office

7   more senior than you?

8   A.   Yes.

9   Q.   Do you remember some of their names, ma'am?

10  A.   Beverly Gray, Mike Baker, Evelyn Dezarn, Beverly Craft.

11  Q.   Thank you.  What year did you start to work in the

12  clerk's office, to the best of your recollection, Ms. Adams?

13  A.   '05.

14  Q.   Thank you.  Now, how long, again, did you work there,

15  please?

16  A.   For about three years.

17  Q.   Okay.  Ever have any problems while you worked at the

18  clerk's office?

19  A.   No.

20  Q.   Why did you leave the clerk's office employment when you

21  did?

22  A.   I bought the business.

23  Q.   Did you leave on your own?

24  A.   Yes, yes.

25  Q.   No one asked you to leave or anything?

*ADAMS-HACKER - Direct (Mr. Westberry)*                                    63

1    A.   No, uh-uh.

2    Q.   In terms of getting the job as the clerk that you've told

3    us about a little while ago, to your knowledge, did your

4    father help you in any way in getting that job?

5    A.   Not to my knowledge.

6    Q.   Have you received any information that your father helped

7    you at all?

8    A.   No.

9         MR. SMITH:  Objection.  Calls for hearsay, Your

10   Honor.

11        THE COURT:  Sustained.

12   Q.   Have you ever seen your dad wear a Hawaiian shirt?

13   A.   No.  No, I haven't.

14   Q.   You know what we mean by Hawaiian shirt?

15        MR. SMITH:  It's been asked and answered, Your Honor.

16        THE COURT:  Sustained.

17        MR. WESTBERRY:  May I have just one second, please,

18   Judge?

19        THE COURT:  Yes, you may.

20   Q.   The job in the clerk's office, Ms. Adams, that we've

21   talked about just a moment ago, did you seek that job on your

22   own?

23   A.   Yes, I did.

24   Q.   Did you receive --

25   A.   Can I explain how I got that job?

*ADAMS-HACKER - Cross (Mr. Smith)*                                      64

1    Q.   Well, did you receive any encouragement or push from

2    anybody to go apply at the clerk's job?

3    A.   No.

4    Q.   Have you ever appeared in court when Judge Maricle was

5    the presiding judge?

6    A.   No.  Not to my knowledge, no.

7    Q.   Have you been in other courts before?

8    A.   Yes.

9    Q.   Were there judges other than Cletus Maricle?

10   A.   Yes.

11   Q.   Are you sure about that?

12   A.   I'm positive about that.

13            MR. WESTBERRY:  One second, please.  Thank you.  I'll

14   pass the witness at this time.

15            THE COURT:  All right.  Thank you.  Mr. Smith?

16            MR. SMITH:  Thank you.

17                          CROSS-EXAMINATION

18   BY MR. SMITH:

19   Q.   Miss Hacker; is that correct?

20   A.   Yes.

21   Q.   I'm Steve Smith, and I represent the United States.  I

22   have a few questions for you.  You indicated that this job at

23   the clerk's office, you learned about it.  Isn't it true that

24   Freddy Thompson's son told you about that job?  That's how you

25   learned about it?

*ADAMS-HACKER - Cross (Mr. Smith)*                                    65

1   A.   No, Chad never told me about the job.

2   Q.   Okay.  During your testimony, you indicated that you're

3   now a business owner?

4   A.   Yes.

5   Q.   And what's the name of the business, ma'am?

6   A.   It's called Lando's Market.

7   Q.   And when did you take ownership of that, ma'am?

8   A.   January the 31st of '07.  Of '08, I'm sorry.  Of '08.

9   Q.   And was that a going business at the time?

10  A.   Yes.

11  Q.   You said you were a convenience store, gas station kind

12  of store?

13  A.   Um-hmm.

14  Q.   Do y'all have employees?

15  A.   Yes.

16  Q.   How many employees do y'all have?

17  A.   Three.

18  Q.   And is there land that goes with the property?

19  A.   Yes, where the store sits.

20  Q.   And did you obtain the real estate that the business sits

21  on as well?

22  A.   Yes.

23  Q.   And when did you receive your deed to that property,

24  ma'am?

25  A.   A couple -- after we bought the business.  After I bought

*ADAMS-HACKER - Cross (Mr. Smith)*                                66

1    the business.

2    Q.   You think it's after you bought the business or at the

3    same time?

4    A.   I'd say it took a little more time, probably about three

5    or four weeks after.

6    Q.   Okay.  Would that be on record over there in the county

7    clerk's office, to your knowledge, or did you all record your

8    deed?

9    A.   Should be on record.

10   Q.   Did you all go to the bank and borrow money for the

11   business?

12   A.   Yes.

13   Q.   And it showed on record, and you may correct me if I'm

14   wrong, that you paid about $320,000 for that?

15   A.   Yes, sir.

16   Q.   And you went to the bank and borrowed the money?

17   A.   Um-hmm.

18   Q.   And that money was actually loaned to your father, I

19   believe, Doug Adams and his wife Laura Adams?

20   A.   He was the co-signer, yes.

21   Q.   And they got the property from, I guess it would be your

22   brother-in-law, Stevie Collins?

23   A.   Uh-huh.

24   Q.   Is that fair?

25   A.   Yeah, um-hmm.

*ADAMS-HACKER - Cross (Mr. Baldani)*                                    67

1    Q.   Okay.  And I believe the principal amount of the note

2    that was signed is about $325,833.50.

3    A.   Okay.  Yes.

4    Q.   And it's your understanding, ma'am, that you're a title

5    owner to the property as well as your parents?  Is that your

6    understanding?

7    A.   Yeah, I'm an LLC.  So I'm the owner, and I have to have

8    managers so my mom and dad are listed as the managers.

9    Q.   Okay.  So it's in an LLC named Lando's, and that's who

10   you are doing business as?

11   A.   Right.

12           MR. SMITH:  That's all.

13           THE COURT:  Thank you.  Let me go to the other

14   defendants first.  Mr. Hoskins, any questions.

15           MR. HOSKINS:  No questions.

16           THE COURT:  Mr. Baldani, any questions?

17           MR. BALDANI:  I do, Judge.

18           THE COURT:  Yes, sir.

19                          CROSS-EXAMINATION

20   BY MR. BALDANI:

21   Q.   Good afternoon, Miss Adams.  My name is Russ Baldani.

22   I'm one of Freddy's lawyers.

23   A.   Um-hmm.

24   Q.   If I understand your testimony, you began working at the

25   clerk's office over two years after Freddy took that position.

*ADAMS-HACKER - Cross (Mr. Baldani)*                    68

1   Does that sound right?

2   A.   Yeah, probably.

3   Q.   You mentioned the other people that worked there while

4   you worked there, right?

5   A.   Yes, uh-huh.

6   Q.   And they all had seniority on you, I suppose?

7   A.   Yes, quite a bit.

8   Q.   So would you believe that you were the lowest paid

9   employee in the office?

10  A.   Yes.

11  Q.   All right.  And when you worked, did you just do general

12  duties there at the clerk's office?

13  A.   Yeah, yeah, just general duties, working with the public.

14  I would tear up old license plate and tags, and that would be

15  about it.

16  Q.   Did you work at the front desk?

17  A.   Yes.

18  Q.   Were you -- did you work during the absentee voting in

19  November of '06?

20  A.   Yes.

21  Q.   Do you know a person named Marcus McKissic?

22  A.   Yes, I do.

23  Q.   Did you see him come into the county clerk's office in

24  November of '06?

25  A.   Yes, I did.

*ADAMS-HACKER - Redirect (Mr. Westberry)*                           69

1    Q.   You have specific recollection of that?

2    A.   I do.

3    Q.   And did he come in and vote absentee in November of '06?

4    A.   He was in the office, and yes, I think that -- yeah, he

5    voted absentee.

6              MR. BALDANI:  That's all, Your Honor.

7              THE COURT:  All right.  Thank you.  See if anyone

8    else over here has any questions.  Now Mr. Westberry, back to

9    you for redirect.

10                      REDIRECT EXAMINATION

11   BY MR. WESTBERRY:

12   Q.   Mr. Smith asked you about the deed to the property that

13   you borrowed the money on.

14   A.   Um-hmm.

15   Q.   Did you say, are you a co-signer on that loan?

16   A.   No, my parents are the co-signers.

17   Q.   Okay.  And how are you obligated, if at all, Miss Adams,

18   if you know?

19   A.   I'm sorry?

20   Q.   Are you obligated to the bank in any way on the loan to

21   buy the property?

22   A.   I don't understand.

23   Q.   That's all right.  You indicated that your father holds

24   the deed?

25   A.   The deed is in my mother and father's name, yes.

*ADAMS-HACKER - Recross (Mr. Smith)*                                    70

1    Q.   You also indicated that you have something called an LLC

2    for the business?

3    A.   Correct.

4    Q.   Did you say your mother and father are managers of that

5    LLC?

6    A.   Yes.

7    Q.   Are you the one that's runs the business on a day-to-day

8    basis?

9    A.   Yes.

10             MR. WESTBERRY:  One second please, Your Honor.

11             THE COURT:  Yes, sir.

12             MR. WESTBERRY:  Thank you.  Pass the witness.

13             THE COURT:  Thank you.  Mr. Smith, any further

14   questions for the witness?

15             MR. SMITH:  Yes, I do.  Thank you.

16                         RECROSS-EXAMINATION

17   BY MR. SMITH:

18   Q.   Miss Adams -- Miss Hacker, you indicated that this

19   position at the clerk's office that you took, I believe, was

20   '05?  Do you know Robyn Maricle, Cletus Maricle's

21   daughter-in-law?

22   A.   Yeah.

23   Q.   Did you take her position?

24   A.   No.  She quit after I started.

25   Q.   So you both were working there when you started?

*W.H. BISHOP - Direct (Mr. Westberry)*                          71

1    A.   For a little while, yeah.

2    Q.   Okay.  Do you know how long she worked there while you

3    were there?

4    A.   At the most, a month.

5              MR. SMITH:  Okay.  That's all I have.  Thank you.

6              THE COURT:  All right.  Mr. Hoskins, anything?

7    Anyone else?  All right.  Thank you, ma'am.  You may step

8    down.

9              THE WITNESS:  Thank you.

10             THE COURT:  Thank you.  Mr. Westberry, you may call

11   your next witness.

12             MR. WESTBERRY:  Yes, William Hugh Bishop.

13             WILLIAM HUGH BISHOP, DEFENSE WITNESS, SWORN

14                      DIRECT EXAMINATION

15   BY MR. WESTBERRY:

16   Q.   Good afternoon, Mr. Bishop.  I'm Kent Westberry.  I'm one

17   of the attorneys representing Doug Adams.

18   A.   Yes, sir.

19   Q.   Could you tell us your full name, please?

20   A.   William Hugh Bishop.

21   Q.   And Mr. Bishop, where do you reside?

22   A.   Manchester -- well, Burning Springs, Kentucky.

23   Q.   Okay.  How long have you lived in both Burning Springs

24   and/or Clay County?  Rough estimate.

25   A.   All my life with the exception maybe of ten years.

*W.H. BISHOP - Direct (Mr. Westberry)*                                    72

1   Q.   Not to date you, but how old are you, sir?

2   A.   Seventy-two.

3   Q.   The ten years that you indicate that you did not live in

4   either Burning Springs or Clay County, where were you, Mr.

5   Bishop?

6   A.   I was in Frankfort for four years and the military for a

7   year or two and Georgia.  I traveled around with the company

8   that I worked for.

9   Q.   What company did you work for those years?

10  A.   I started out as the Western Adjustment Inspection

11  Company.  I wound up as the General Adjustment Bureau.

12  Q.   What did you do in Frankfort, Mr. Bishop?

13  A.   I was a commissioner in the Department of Insurance.

14  Q.   How many years did you do that job?

15  A.   Four.

16  Q.   What years were those?

17  A.   '68 to '72.

18  Q.   And then you said you were in the service for a little

19  bit?

20  A.   Yeah.

21  Q.   What branch of service were you in, Mr. --

22  A.   I was in reserve officer training.

23  Q.   U.S. Army?

24  A.   Yes, U.S. Army.

25  Q.   Do you have family, Mr. Bishop?

*W.H. BISHOP - Direct (Mr. Westberry)*                                73

1    A.  Yes, sir, I do.

2    Q.  Are you married?

3    A.  Yes, sir, I am.

4    Q.  Can you tell us who your wife is, please?

5    A.  My wife's Wilma Bishop.

6    Q.  And how long have you all been married?

7    A.  Ten years, give or take.

8    Q.  Had you been married previous to that?

9    A.  Yes, I have.

10   Q.  Did your previous wife pass, deceased, or --

11   A.  We were divorced.

12   Q.  Divorced, excuse me.  Do you have children from any of

13   your marriages, Mr. Bishop?

14   A.  I have four children from marriage and one adopted child.

15   Q.  Are they grown?

16   A.  Yes, they are.  Uh-huh.

17   Q.  Any of them have children?  Do you have grandchildren?

18   A.  I've got two grandchildren, yeah.  Actually, I've got

19   three grandchildren.  I'll take that back.  I've got three.

20   Q.  From the time that you came back to Clay County -- let me

21   rephrase the question.  How long have you lived consecutively

22   in Clay County from the ten years that you indicated you were

23   away, rough estimate?

24   A.  Twelve years.

25   Q.  During that period of time, even the period of time that

*W.H. BISHOP - Direct (Mr. Westberry)*                                    74

1    you were away, did you keep in contact with Clay County?

2    A.   Oh, yeah.  Yeah.

3    Q.   You have numerous other relatives, family in Clay County?

4    A.   Yes, sir.

5    Q.   Can you tell us, just give us an example of who some of

6    your living relatives are in Manchester or Clay County?

7    A.   Just lost one yesterday.  She was 102.  But let's see.

8    My immediate relatives that live in Clay County now.  My

9    brother, my niece.

10   Q.   Who is your brother?

11   A.   Clay Massey Bishop, Jr.

12   Q.   Yes, sir.  Your niece?

13   A.   My niece, Amy Robbins, her husband and her family.  And

14   the rest of my aunts and uncles and cousins and things live in

15   Richmond or Lexington.

16   Q.   Were your parents residents of Clay County?

17   A.   Yes, they were.

18   Q.   And who were your mother and father?

19   A.   Clay M. Bishop, Senior and Jessie Marcum Bishop.

20   Q.   Are they deceased?

21   A.   Yes, they are.

22   Q.   What occupation was your father, Mr. Bishop?

23   A.   He was an attorney.

24   Q.   And how long did he practice in Clay County?

25   A.   From 1948 until he passed away.

*W.H. BISHOP - Direct (Mr. Westberry)*                                    75

1    Q.   And how long ago was that that he passed?

2    A.   He was right at 80 years old.  He had been in the

3    courthouse for 50 years.

4    Q.   Thank you.  What occupation have you held in the last

5    several years in Clay County, sir?

6    A.   I work for the Clay County Board of Education.

7    Q.   And what did you do for the Clay County Board of

8    Education?

9    A.   I'm in charge of the substitute teachers for teachers who

10   have to be absent for whatever reason.

11   Q.   Okay.  You indicated you lived in Burning Springs.  Do

12   you currently live in Burning Springs?

13   A.   Yes, I do.

14   Q.   How long have you and your wife lived in Burning Springs?

15   A.   Ten years.

16   Q.   Did you move there when you all got married?

17   A.   I moved there shortly before, then we were married.

18   Q.   Now, did you father ever hold elective office in Clay

19   County?

20   A.   In Clay County, yeah, he was the -- he was the circuit

21   court clerk for 13 years, and he was the county attorney for

22   four years, and he was the circuit judge for 27, 28 years.

23   Q.   Does your brother, Clay Bishop, does he hold any offices

24   in Clay County, Mr. Bishop?

25   A.   Yes, he's the Clay County attorney.

*W.H. BISHOP - Direct (Mr. Westberry)*                          76

1    Q.   Roughly how long has he occupied that position?

2    A.   Twenty-two or twenty-three years, something like that.

3    Q.   Now, Mr. Bishop, what political party do you belong to?

4    A.   I'm a Republican.

5    Q.   Clay County is predominantly Republican?

6    A.   Yes, it is.

7    Q.   Have you ever served on the Board of Election, Mr.

8    Bishop?

9    A.   Yes, I have.

10   Q.   Could you tell us just what the Board of Election is,

11   what it does and how people get selected to serve on that

12   Board, please, sir?

13   A.   As far as I know, the selection is made by the committee,

14   the Democratic committee or the Republican committee.

15   Basically, it's just overseeing the preparation for and the

16   conduct of elections.  Making arrangements for the judge, you

17   know, the election workers and solving any disputes that may

18   come up.

19   Q.   Okay.  How many members make up the Board of Elections?

20   A.   There's four.

21   Q.   And how again are they -- do the Democrats and the

22   Republicans have an equal pick on the Board?

23   A.   Well, there is a Democratic commissioner and a Republican

24   commissioner.  And then the sitting county attorney and the

25   sitting sheriff are also members of the Board.

*W.H. BISHOP - Direct (Mr. Westberry)*                                    77

1    Q.   Okay.  You said county attorney --

2    A.   Not county attorney, I'm sorry.  County court clerk.

3    Q.   Thank you, sir.  Does the county court clerk serve as

4    like a chair of the committee?

5    A.   Yes, sir.

6    Q.   Does that person have an extra vote --

7    A.   Yes, they do.

8    Q.   And how does that work, Mr. Bishop?

9    A.   Well, if you have a split down the middle, two votes one

10   way, two votes the other way, then the clerk can use a third

11   vote or second vote for him to break the tie.

12   Q.   What kind of votes do the Board of Elections typically

13   take or do with each other?

14   A.   Mostly, it would concern election officers or where a

15   precinct's going to be located or the building that it's going

16   to be in, that kind of thing.

17   Q.   Can you tell us, Mr. Bishop, how many elections in years

18   past have you served as a member of the Board of Elections?

19   A.   2002 and 2006, and I serve now.

20   Q.   And are you the Republican --

21   A.   Yes, sir, I am.

22   Q.   Served as the Republican commissioner?

23   A.   That is correct, yes, sir.

24   Q.   Turn your attention, if you can, back to 2002.  And in

25   particular, the May of 2002 primary, Mr. Bishop.  You said --

*W.H. BISHOP - Direct (Mr. Westberry)*                    78

1    were you serving as an election commissioner then?

2    A.   That's correct, yes, sir.

3    Q.   Who were the other commissioners that you served with, if

4    you recall?

5    A.   Jennings White was the county court clerk, and Edd Jordan

6    was the sheriff, and Wayne Jones was the Democratic

7    commissioner.

8    Q.   All right.  Now, did you take your brother's place that

9    year as a commission member on the Board of Elections?

10   A.   Yes, I did.

11   Q.   Why would that be?

12   A.   Because he was a candidate, and I was his alternate.

13   Q.   Is it practice that candidates would not sit on the Board

14   of Elections when they're running for office?

15   A.   That is correct, yes, sir.

16   Q.   And why is that, sir?

17   A.   I think there's a law or a regulation against it.

18   Q.   You mentioned somebody named Edd Jordan just a moment

19   ago.  I think you indicated he was the sheriff?

20   A.   Yes, sir.

21   Q.   Did he have a replacement that year as well?

22   A.   No, sir.

23   Q.   Now, do you have recollection if there was a pretty hot

24   or contested race for county court clerk that year in 2002?

25   A.   Yes, sir.

*W.H. BISHOP - Direct (Mr. Westberry)*                                    79

1    Q.   And who were the two candidates for that race?

2    A.   Jennings White and Freddy Thompson.  Fred Thompson.

3    Q.   Now, have you known Jennings White in years past?

4    A.   All his life.

5    Q.   You indicated that Edd Jordan sat as the sheriff

6    representative on the Board of Elections; is that correct?

7    A.   That's correct, yes, sir.

8    Q.   Okay.  Do you have personal knowledge if Jennings White

9    and Edd Jordan were political allies of one another?

10   A.   Yes, sir.

11   Q.   Okay.  Were they political allies?

12   A.   To my knowledge, they were, yes, sir.

13   Q.   Now, do you know Doug Adams?

14   A.   Yes, sir, I do.

15   Q.   How long have you known Doug Adams, Mr. Bishop?

16   A.   Forty years.

17   Q.   Have you known him in connection with your work at the

18   school system?

19   A.   Yes.

20   Q.   You indicated that you are in charge -- you have been in

21   charge of substitute teaching; is that correct?

22   A.   Right, yes, sir.

23   Q.   Have you had occasion to know Doug Adams outside work at

24   the school system?

25   A.   I knew him outside of work for a lot longer than I have

*W.H. BISHOP - Direct (Mr. Westberry)*                                    80

1    inside work.

2    Q.   Was he a friend of yours?

3    A.   Yes, sir, he was.

4    Q.   Did you all have an occasion to socialize from time to

5    time?

6    A.   Yes, sir, we did.

7    Q.   Can you give us an example of some of the social things

8    that you all would do?

9    A.   We'd go to fish fries, fishing, just deal around on the

10   farm, whatnot.

11   Q.   At any time that you've served on the Board of Elections,

12   Mr. Bishop, from your personal knowledge, has Doug Adams ever

13   tried to influence you in any way in your capacity as a Board

14   of Elections member?

15   A.   No, sir.

16   Q.   At any time that you've served on the Board of Elections,

17   Mr. Bishop, has Doug Adams ever tried to influence you

18   personally in the selection of any of the election officers in

19   any of the precincts in Clay County?

20   A.   No, sir, he has not.

21   Q.   At any time, Mr. Bishop, the times that you've served on

22   that Board of Elections, from your personal knowledge, did

23   Doug Adams ever ask you to use or misuse any of the powers of

24   the Board?

25           MR. SMITH:  Object to hearsay.

*W.H. BISHOP - Direct (Mr. Westberry)*                                        81

1          MR. WESTBERRY:  Personal knowledge.

2          THE COURT:  Sustained as to the question.

3          MR. WESTBERRY:  Pardon.

4    Q.   You have indicated that you've known Doug Adams for, I

5    think you said, about 40 years.  Is that correct, Mr. Bishop?

6    A.   At least, yeah.

7    Q.   And you've lived in Clay County for all of your life with

8    the exception of about ten years; is that right?

9    A.   About ten years, yes, sir.

10   Q.   During the period of time that you've lived in Clay

11   County, have you become aware, Mr. Bishop, as to any

12   reputation for truthfulness and honesty that Doug Adams may

13   have in the Clay County community?

14   A.   Yes, sir.

15   Q.   And can you tell us what his reputation for truthfulness

16   and honesty is?

17   A.   To my knowledge, it's impeccable.

18   Q.   Has Doug Adams -- has anybody on Doug Adams' behalf, from

19   your personal knowledge, ever attempted to influence anything

20   you've done or would do as a member of the Board of Elections?

21   A.   No, sir.

22          MR. WESTBERRY:  May I have one second, please?

23          THE COURT:  Yes, sir.

24          MR. WESTBERRY:  Thank you, Mr. Bishop.  Judge Reeves,

25   we pass the witness.

*W.H. BISHOP - Cross (Mr. Smith)*                                        82

1              THE COURT:  Thank you.  Mr. Smith.

2              MR. SMITH:  Thank you.

3                          CROSS-EXAMINATION

4    BY MR. SMITH:

5    Q.   Good afternoon, Mr. Bishop.  My name's Stephen Smith, and

6    I represent the United States.  I have a few questions for

7    you.

8    A.   All right, sir.

9    Q.   As I understand it, sir, according to your testimony, you

10   are currently employed at the board of -- school board; is

11   that right?

12   A.   That's correct, yes, sir.

13   Q.   And I believe you said that you recalled that you first

14   served on the Board of Elections in 2002.  Is that your

15   testimony?

16   A.   That's correct, yes, sir.

17   Q.   You hadn't served before that?

18   A.   No, sir, I had not.

19   Q.   Your brother, in fact, the county attorney was actually

20   supposed to be serving in that position until he, I believe

21   you said, had an opponent come into the race?

22   A.   Yes.  He was the Republican election commissioner.  And

23   when he ran for office and he had opposition, he couldn't

24   serve as the commissioner so I took his stead, yes, sir.

25   Q.   And he replaced Kenneth Day, I believe, if --

*W.H. BISHOP - Cross (Mr. Smith)*                                      83

1    A.   I believe that's correct, yes, sir.

2    Q.   And he was the Republican election commissioner there for

3    many years prior to your brother?

4    A.   Several years, yes, sir.

5    Q.   I think it goes back to 1988.  Would that be fair?

6    A.   If you say so, yes, sir.

7    Q.   And he served up until about 1996 or '97, when he got

8    arrested down in South Florida with about seven kilos of

9    cocaine and then your brother took over.  Is that a fair

10   statement?

11   A.   When he got arrested in Florida, yes.

12   Q.   Now, you indicated that during that '02 election that you

13   were serving with the other commissioner, Wayne Jones.  Is

14   that your testimony?

15   A.   Yes, sir, that's correct.

16   Q.   That's Mr. Jones seated here in the courtroom, same

17   Jones?  Charles Wayne Jones, is that who you're referring to?

18   A.   That's who I'm referring to, yes, sir.

19   Q.   And so he was the Democrat commissioner, and you were the

20   Republican commissioner?

21   A.   That's correct, yes, sir.

22   Q.   Do you know how many days before the election it was that

23   you got notice that you were going to be serving in that

24   position, sir?

25   A.   I don't remember.

*W.H. BISHOP - Cross (Mr. Smith)*                                    84

1   Q.   Would it be fair to say that it was a short time before

2   the election that you actually knew that you were going to be

3   serving --

4   A.   Yes, it was a short time.

5   Q.   And I believe you said that it was not appropriate for

6   your brother to serve because he had a candidate running

7   against him is how you described it.

8   A.   Well, it's my understanding that there are rules and

9   regulations against the relative of a candidate serving.

10  Q.   Okay.

11  A.   Or a candidate for office serving.

12  Q.   Doesn't affect the ability of a relative?  His brother

13  could serve, but he couldn't serve?  Is that you way you

14  understand it?

15  A.   That's the way I understood it.

16  Q.   All right.  I think we probably -- now, would it be fair

17  to say, sir, that it's also inappropriate for a member of the

18  Board of Elections, such as a commissioner, to also serve as

19  an election officer in an election in Kentucky.  Would that be

20  fair?

21  A.   Yes, sir.

22  Q.   All right.  And are you aware that Charles Wayne Jones at

23  times served down at Harts Branch as an election officer and

24  also served as Democrat commissioner?  Are you aware of that,

25  sir?

*W.H. BISHOP - Cross (Mr. Smith)*                                    85

1    A.   When?

2    Q.   I'm asking are you aware of that?

3    A.   When was it supposed to have happened?

4    Q.   2006, sir.

5    A.   Oh, no, I'm not aware of that.

6    Q.   You were serving in 2006; were you not?

7    A.   Yes, I was.  Yes, sir.

8    Q.   You didn't know that your counterpart, Mr. Jones, was

9    serving as both a board member and an election officer?

10   A.   No, sir, I did not.

11   Q.   Now, you indicated that your position with the school

12   board, I believe, is calling substitute teachers to work in --

13   what's the job title of your job, sir?

14   A.   Just staff.

15   Q.   Staff support, is that what it's called?

16   A.   Yeah, staff support.

17   Q.   And whose position did you take?  Who held that position

18   before you, if you recall?

19   A.   Don't know.  I don't know.

20   Q.   Do you know if that position was in existence before you

21   became the staff support?

22   A.   No, sir, I don't.

23   Q.   Would it be fair to say, sir, that prior to that, you

24   were the bus monitor for the school board?

25   A.   I was bus monitor, yeah.

*W.H. BISHOP - Cross (Mr. Smith)*                                    86

1    Q.   And be fair to say that you served in that position up

2    till about the 2002 mark?  That be fair?

3    A.   Yes, I guess so.

4    Q.   And I believe if the records are read correctly, you got

5    the promotion to staff support in 2002 after the election, is

6    that fair?

7    A.   To my knowledge, it was before.  I got -- it was during

8    that time period, yeah.  I'm not sure about that.

9    Q.   You're not sure.  But you are sure it was 2002 when you

10   got the promotion.  Whether it was just before the election or

11   just after, you got the promotion; is that fair?

12   A.   I had been working in the board for a while before the

13   election, yes.  I don't remember the exact date.

14   Q.   And you were hired by Doug Adams to do that job; isn't

15   that correct?

16   A.   That's correct, yes, sir.

17   Q.   And he's the one actually signed your contract, if I'm

18   reading his signature correctly?

19   A.   I guess so, yes, sir.

20   Q.   Okay.  Now, you said that Mr. Doug Adams, in your

21   opinion, had an impeccable reputation for truthfulness.  Do

22   you recall that?

23   A.   Yes, sir, I do.

24   Q.   Have you heard that Doug Adams was very politically

25   active over there in Clay County?

*W.H. BISHOP - Cross (Mr. Smith)*                                    87

1    A.   Well, yes.

2    Q.   And have you heard how he used members of his staff to

3    make activities as far as election fraud scheme in Clay

4    County?

5           MR. WESTBERRY:  Objection as to form.

6    Q.   Have you heard that?

7           THE COURT:  Overruled.

8    A.   Would you please repeat what you --

9    Q.   Have you heard that he would use employees to do acts for

10   him involving election fraud schemes?

11   A.   No, I haven't.

12   Q.   Have you heard that he had actual school board employees

13   who wanted to run for city council, and he actually would tell

14   them they had to pay a thousand dollars in a fraudulent scheme

15   and bring their money, put it in his desk drawer?  Have you

16   heard that?

17   A.   No, sir.  Well, I've heard it, but it's not true.

18   Q.   Well, let's talk about that.  You've given an opinion

19   here that his reputation's impeccable, yet you're admitting to

20   us here today that you have heard that he was asking people to

21   put a thousand dollars up to run in elections.

22          MR. WESTBERRY:  Objection as to form.  That's not

23   what he said.

24   A.   I don't think that's hardly what I said.

25          THE COURT:  Overruled.

*W.H. BISHOP - Cross (Mr. Smith)*                                        88

1  A.   You asked me if he did that for the -- what was it, the

2  city council race?

3  Q.   I'm asking, have you heard that he actually would make

4  employees pay to play?

5  A.   No.

6  Q.   And put money in his desk drawer in order to participate

7  in fraud schemes?

8  A.   No, I have not.

9  Q.   Okay.  Would you agree with me, sir, that that might

10 affect your opinion here today if you had known some of these

11 things?

12 A.   Possibly, yes, sir.

13         MR. SMITH:  That's all the questions I have.

14         THE COURT:  Let me see if any of the other parties

15 have questions first.  Start with Mr. Hoskins first and work

16 our way around.

17         MR. HOSKINS:  No questions.

18         THE COURT:  Mr. White?

19         MR. WHITE:  Your Honor, I do.  Did you want me to

20 approach real quick?  We had discussed this witness earlier.

21         THE COURT:  Yes, you can come up.

22             (A sidebar conference was held out of the

23             hearing of the jury):

24         MR. WHITE:  Oh, I'm sorry, that was with Katie

25 Gabhart.  Sorry, Your Honor.  I've been trying to juggle

*W.H. BISHOP - Cross (Mr. Smith)*                                         89

1    witnesses all day.

2              THE COURT:  Yes, sir.

3              MR. WHITE:  I didn't want to interrupt you when you

4    turned to Mr. Smith.  This was the witness I said maybe I

5    could go -- since I have him under subpoena as well, there's a

6    couple things I would go outside of the scope.  I wanted to

7    ask him about, in terms of outside the scope, based on his

8    302, it looks like that he did some -- left the county

9    attorney or county clerk's office and, in response to

10   complaints phoned in, went down to a couple of the precincts

11   during the fall '06 election.  Wanted to ask him about that.

12             He also was the election officer during the 2006

13   election cycle, and I wanted to ask him about that.  I can

14   either do it now, or I've got him under subpoena.  I can just

15   bring him back in the morning.

16             THE COURT:  We can go ahead now with those questions.

17   I assume there's no objection to going outside the scope so we

18   don't have to bring him back, Mr. Smith?

19             MR. BALDANI:  I have some questions too.

20             THE COURT:  Mr. Baldani has --

21             MR. BALDANI:  Same type of thing, Judge.  We don't

22   want to have to bring him back up tomorrow to ask the same

23   questions.

24             MR. SMITH:  Same type of thing.  That may mean it's

25   cumulative and not admissible.  I may object, Your Honor.

*W.H. BISHOP - Direct (Mr. White)*                              90

1          MR. BALDANI:  If you remember, I view scope broader

2     than you, Judge.

3          THE COURT:  Yes, you do.  We do agree on that.  All

4     right.  We'll go in the same order.  I think, Mr. Hoskins, you

5     still don't have any questions, do you?

6          MR. WHITE:  I don't have any exhibits with this

7     witness, sir.

8          THE COURT:  I'll advise you have him under subpoena.

9     You can ask your questions at this time.

10          MR. WHITE:  You want to do that before I ask

11     questions?

12          THE COURT:  That will be fine.

13          MR. WHITE:  Thank you, Your Honor.

14               (Sidebar conference concluded.)

15          MR. WHITE:  Your Honor, can I ask from my spot?

16          THE COURT:  Yes, sir, that will be fine.  Mr. White,

17     you have the witness under subpoena as well.  We'll go ahead

18     with your questions as if on direct at this time.

19          MR. WHITE:  Thank you, Your Honor.

20          THE COURT:  Yes, sir.

21                    DIRECT EXAMINATION

22     BY MR. WHITE:

23     Q.   Good morning -- excuse me.  Good afternoon, Mr. Bishop.

24     My name is Scott White.  I'm a lawyer.  I represent Wayne

25     Jones.  Do you recognize Mr. Jones here?

*W.H. BISHOP - Direct (Mr. White)*                                       91

1    A.   Yes, I do.

2    Q.   Great.  I've just got a few questions.  Won't keep you

3    long.  First area I wanted to ask you about, and Mr. Westberry

4    touched on it a bit.  That was the selection of election

5    officers to work in the precincts by the County Board.  In

6    2002 and 2006, the two times that you served on the election

7    board, what was the process?  In other words, how did you get

8    the names to decide who got -- who went to which precincts?

9    A.   The precinct captains of each party would have meetings

10   and elect officers for that year.  And they would make the

11   list up of who they wanted to serve as officers in their

12   precincts.  And then that list was turned over to the Board of

13   Elections, and the choices were made from that list or from

14   those lists.

15   Q.   Let me ask you, in terms of -- just take an example

16   precinct.  Let's just say Harts Branch is a precinct, correct?

17   A.   Say --

18   Q.   Harts Branch.

19   A.   Okay.

20   Q.   The Republicans and the Democrats would each submit four

21   names to work in that particular precinct to the County Board,

22   correct?

23   A.   That's correct.  Yes, sir.

24   Q.   And that is the way it worked that they would then, out

25   of that four, the Board would then appoint a judge from each

*W.H. BISHOP - Direct (Mr. White)*                                      92

1   party, and then each party would get to fill one of the other

2   two spots?

3   A.   In 2002, they used whoever Jennings White wanted.   In

4   2006 and 2004, we took the top two off each list to serve as

5   officers.

6   Q.   Were there times that you would -- that the County Board

7   would select -- elect precinct election officers and for

8   whatever reason they didn't show up did y'all have other ways

9   to get people that could go in and work?

10  A.   We had alternate selections.  We do the same thing with

11  the alternates.   The alternate selections, we would just go

12  down the list till we found somebody that would serve.

13  Q.   Let me ask you now specifically -- since Mr. Westberry

14  covered a lot of the same ground, I'm just going to kind of

15  skip a little bit and try and let you know where I'm at.   I

16  want to ask you now about the absentee voting in the 2006

17  election, okay?

18  A.   Yes.

19  Q.   The absentee voting, as we've heard, occurs prior to

20  election day for some set period of time.  Is that your

21  recollection?

22  A.   Yes, sir, that's correct.

23  Q.   And does that occur at the county clerk's office?

24  A.   Yes, sir, it does.

25  Q.   And I only want to ask you about 2006.

*W.H. BISHOP - Direct (Mr. White)*                                93

1    A.   Okay.

2    Q.   In 2006, were there election officers, if you will,

3    working the absentee voting?

4    A.   Election officers?

5    Q.   Or people from the Board of Elections.

6    A.   Oh, yeah, the Board of Elections were there, yes.

7    Q.   And do you recall who was there in the primary and the

8    general of 2006?

9    A.   Well, not all the time, but I was there a lot and Wayne

10   Jones was there a lot.  Freddy was there continually, since he

11   was the clerk.

12   Q.   If you were not there, was there another Republican that

13   stood in your place while you weren't there?

14   A.   Not really, no.

15   Q.   Do you recall, can you put a percentage in terms of the

16   amount of time that you would have been there during absentee

17   voting period?  If you can, your best estimate.

18   A.   Well, to the best of my memory, maybe a half a day or

19   something like that, every other day.

20   Q.   Time that you were there, were you ever -- did you ever

21   work when Mr. Jones was not there?

22   A.   When he was not there?

23   Q.   When he was not there.

24   A.   Possibly, yes.

25   Q.   Would it be fair to say that most of the time that you

*W.H. BISHOP - Direct (Mr. White)*                                   94

1    were there, Mr. Jones was also there?

2    A.   That is correct, yes, sir.

3    Q.   And do you recall -- were you all standing in close

4    proximity to each other?

5    A.   Sitting next to each other, normally.

6    Q.   And was that inside the clerk's office?

7    A.   That was correct, inside the clerk's office.

8    Q.   And when you were inside the clerk's office, were there

9    times that -- let me ask you this.  Was the absentee ballot or

10   the absentee voting machine, was it located in the clerk's

11   office?

12   A.   Yes, it was.

13            MR. WHITE:  Your Honor, can I use the Elmo, please?

14            THE COURT:  Yes, sir, you may.

15            MR. WHITE:  I would ask the clerk if she could hand

16   me CWJ 4, which was hand drawn sketch I did with Mr. White.

17   I'm just going to show you a very rough sketch.

18   Q.   Can you see that on your screen there, Mr. Bishop?

19   A.   Yes, sir.

20   Q.   Okay.  This here is the -- this is the new county

21   building, okay?

22   A.   Yes.

23   Q.   Are you familiar with that building?

24   A.   Yes.

25   Q.   Did the 2006 absentee voting take place in this building?

*W.H. BISHOP - Direct (Mr. White)*                                    95

1    A.   Yes, it did.

2    Q.   The courthouse entrance was drawn in, and then this area

3    that I'm circling, which on my copy is on the bottom right,

4    was just an overhead diagram of the clerk's office.  Does that

5    generally agree with what you -- what your recollection is?

6    In other words, here's Freddy's office, here's the counter.

7    And if you could just tell me where the voting machine was

8    located?

9           MR. WHITE:  Would it be all right if Mr. Bishop could

10   come down and mark an X on this?

11          THE COURT:  I think he's about to tell us where he

12   remembers.

13   A.   I'm trying to remember where this is, voting machine.

14   You come in here.  Here's the counter.  The voting machine was

15   up on the other side of the counter from what you're showing

16   here.

17   Q.   You mean up here?

18   A.   Yeah, there's a room right here.

19   Q.   And is the room -- does it have a door?

20   A.   Yeah.

21   Q.   Does it have windows?

22   A.   Yes.

23   Q.   Are there curtains in the window or can you see in?

24   A.   There are blinds to the outside windows, but the inside

25   windows are open.

*W.H. BISHOP - Direct (Mr. White)*                                96

1   Q.   Would that be open, then, to the rest of this area here?

2   A.   Yeah, all of the office there can see in there.

3   Q.   And was it right here that you said that the voting

4   machine was that you recall?

5   A.   Yes.

6            MR. WHITE:  Your Honor, if I could just make an "X."

7   A.   Wait a minute, no.  You've got Freddy's office down there

8   on the bottom and the clerk's office.  Okay.  Yeah, it was

9   like up on the other side of the counter in the office.

10  Q.   Right here, where my pen's at now?

11  A.   Right.  And it was in a room by itself.

12  Q.   Okay.  I'm just going to write down PB.  During the time

13  that you've served in the two elections in 2006 as an

14  absentee, in the absentee voting, did you observe Mr. Jones

15  doing anything that you felt was inappropriate?

16  A.   No, sir, I did not.

17  Q.   During the election, on election day, do you have any

18  recollection of being sent out to precincts, any precincts in

19  Clay County to either take a look at or respond to complaints

20  that had been called in?

21  A.   Yes, sir, I do.

22  Q.   And on those times that you -- well, was it more than

23  once?

24  A.   Yes, sir.

25  Q.   And those times that you went, did anyone go with you?

*W.H. BISHOP - Direct (Mr. White)*                                      97

1    A.    Wayne Jones.

2    Q.    And the times that you went out to investigate

3    complaints, can you give us any specific examples that you

4    remember today?

5    A.    We were called to the Manchester precinct first, and some

6    of the candidates were complaining of irregularities at the

7    Manchester precinct.  We went out and observed what was going

8    on, and we suggested to the fella who was running the voting

9    booth and another officer there that they needed to move the

10   voting machine out from behind a corner wall is where it was.

11   And that the other officer needed to get up to the desk where

12   the rest of them were.

13        If you walked into that precinct, it's like the front

14   door of the middle school.  When you walk in, there's just a

15   long hall.  When you get back to the end of that hall, it

16   branches off to the left.  And the voting machine had been

17   placed partially obscured by that wall.  It was all the way

18   down at the end of the walk.

19   Q.    And based on your -- and you all were going out in your

20   capacity as members of the Board of Elections?

21   A.    That's correct.

22   Q.    And was that then -- that problem, did that get taken

23   care of while you were there and then you were able to leave

24   and come back?

25   A.    We had to go back a second time.

*W.H. BISHOP - Direct (Mr. White)*                                     98

1   Q.   Any other precincts you recall going to other than the

2   Manchester and dealing with that?

3   A.   Garrard.

4   Q.   And any others?

5   A.   Not that I can recall, no, sir.

6   Q.   And at both times -- all three times, the two times you

7   went to Manchester and the one time that you went to Garrard,

8   Mr. Jones was with you?

9   A.   Yes, sir.  Mr. Jones drove.

10  Q.   And the times that you were there with Mr. Jones, did you

11  observe him doing anything inappropriate?

12  A.   No, sir, I did not.

13          MR. WHITE:  May I have just a moment, Your Honor?

14          THE COURT:  Yes, sir.

15          MR. WHITE:  Those are all the questions I have, Your

16  Honor.  Thank you.

17          THE COURT:  All right.  Thank you.  Mr. Baldani?

18          MR. ABELL:  Judge --

19          THE COURT:  I'm sorry, Mr. Abell.  I didn't mean to

20  overlook you.

21          MR. ABELL:  Judge, I have a couple questions for Mr.

22  Bishop.  I'll go now if it please the Court.

23          THE COURT:  We'll go in the same order.  I do

24  understand one or more defendants may be questioning as if on

25  direct.  You may proceed at this time.

1                              CROSS-EXAMINATION

2     BY MR. ABELL:

3     Q.   Mr. Bishop, my name's Robert Abell.   I represent William

4     Stivers in this case.   First, with regard to the absentee

5     voting for the primary election in May, 2006, to your

6     knowledge, were you and Mr. Jones the only election officers

7     that worked during that period of absentee voting?

8     A.   I don't understand.

9     Q.   For the absentee voting for the primary election in May,

10    2006, to your knowledge, were you and Mr. Jones the only

11    election officers that worked during that period of absentee

12    voting?

13    A.   No.   That's not correct.

14    Q.   Who else worked?

15    A.   County clerk and sheriff.

16    Q.   The sheriff would be Edd Jordan?

17    A.   2006?

18    Q.   Yes.

19    A.   No, I'm sorry.   It wasn't Edd.   It was his wife.

20    Q.   Now, with regard to absentee voting in the fall of 2006,

21    to your knowledge, were you and Mr. Jones the only election

22    officers that worked during that period of absentee voting?

23    A.   No.   The sheriff's wife was there also.

24              MR. ABELL:   Thank you.

25              THE COURT:   All right.   Thank you.   Mr. Baldani.

*W.H. BISHOP - Direct (Mr. Baldani)*                              100

1              MR. BALDANI:  Thank you, Your Honor.

2                        DIRECT EXAMINATION

3     BY MR. BALDANI:

4     Q.  Good afternoon, Mr. Bishop.  My name is Russ Baldani.

5     I'm one of Freddy Thompson's attorneys.  I'm going to need

6     Exhibit PR16-O.

7          Mr. Bishop, let me ask you in general -- I'll try to keep

8     my voice up.  Election officers are appointed for a whole

9     year, aren't they?

10    A.  Yeah.

11    Q.  In other words, they're not just appointed for the May of

12    a certain year and then somebody new for November of a certain

13    year, right?

14    A.  To my knowledge, it's an election.

15    Q.  And is it hard to get election officers in Clay County?

16    A.  Yes, sir, it is.

17    Q.  Doesn't pay much, does it?

18    A.  I don't know what it pays, but it's not a whole lot.

19    Q.  All right.  Now, I think we've established in '02, you

20    became the Republican commissioner because your brother, Clay

21    Massey, was running for office, right?

22    A.  That's correct, yes, sir.

23    Q.  And, of course in '02, Jennings White was the county

24    clerk?

25    A.  That is correct, yes, sir.

*W.H. BISHOP - Direct (Mr. Baldani)*                                101

1    Q.   Now, I want to go into a little bit more depth or detail

2    about how election officers are selected, okay?  And is it --

3    am I correct that the election -- let me back up.  There's 20

4    precincts in Clay County.  Is that right?

5    A.   Um-hmm.

6    Q.   And each precinct has precinct captains?

7    A.   That's correct.

8    Q.   Correct?

9    A.   That's correct, yeah.

10   Q.   Am I correct that each precinct captain submits a list to

11   the Board of Elections and then the Board of Elections selects

12   the election officers for that precinct?

13   A.   That's correct, yes.

14   Q.   Okay.  So you've been there both under Jennings White's

15   tenure as clerk and under Freddy Thompson's tenure as clerk,

16   right?

17   A.   That's correct, yes, sir.

18   Q.   All right.  I want to talk about Mr. White's tenure

19   first.  When those lists of names were submitted to Jennings

20   White, he would hand pick who he wanted to be election

21   officer, wouldn't he?

22   A.   That's correct, yes, sir.

23   Q.   All right.  And then when Freddy Thompson became clerk,

24   he changed it, or that was changed, wasn't it?

25   A.   That is correct, yes, sir.

*W.H. BISHOP - Direct (Mr. Baldani)*                                102

1   Q.   And just in general, how was that changed?

2   A.   The precinct committees would send in a list of the

3   prospective election officers.

4   Q.   Okay.  So that's the same.  The precinct captains submit

5   the list?

6   A.   Right.  And we would -- we had agreed amongst ourselves

7   that we would take the top two on each list.

8   Q.   Okay.

9   A.   If for some reason or other the top two couldn't serve or

10  wouldn't serve, we would go down the alternates from the top

11  to the bottom till we found somebody that would serve, would

12  do the job.

13  Q.   Would the Board of Elections have regular scheduled

14  meetings?

15  A.   Yes, sir.

16  Q.   And would you all keep minutes of those meetings?

17  A.   Yes, sir.

18  Q.   And the meetings would be semi-formal, people would make

19  motions and they'd be seconded, that kind of thing?

20  A.   That's correct.

21  Q.   I want to show you Government's Exhibit PR16-O.  I

22  believe it would be the first page of this exhibit.  For

23  starters, I want to get it on here straight.  And then I'm

24  going to zoom in, and I'm going to ask you, does that appear

25  to be, three lines down, is that your signature?

*W.H. BISHOP - Direct (Mr. Baldani)*                                103

1    A.   Yeah.

2    Q.   William Hugh Bishop?

3    A.   Yes, sir.

4    Q.   I want you to go to the first paragraph that you can see

5    there and does that say "William Hugh Bishop made a motion to

6    appoint the top two names on each list for appointment of

7    precinct election officers"?

8    A.   Yes.

9    Q.   Okay.  So is that what you were just talking to us about?

10   A.   Yes.

11   Q.   About how that changed under Freddy Thompson?

12   A.   That's correct.

13   Q.   Okay.  And you also made the motion that the top name on

14   each list would be the judge from each party and the second

15   name would be alternated between the parties for the clerk and

16   sheriff.  Is that right?

17   A.   Yes, sir.

18   Q.   Now, it says we take the top two names with the exception

19   of Burning Springs precinct.  Do you see that?

20   A.   Yes, sir.

21   Q.   Do you recall why that was?

22   A.   My recollection is that the two officers that were

23   scheduled to serve did not or would not, could not serve.

24   Q.   Would that be Darrell and Angela McQueen?

25   A.   Yes.

*W.H. BISHOP - Direct (Mr. Baldani)*                                    104

1   Q.   So the only reason that they were the top two, and they,

2   for some reason --

3   A.   Decided they didn't want to serve.

4   Q.   All right.  And you made the motion, right?  I mean,

5   these minutes reflected that it was your motion, correct --

6   A.   Yes.

7   Q.   -- to take the top two names?  What's the general idea

8   behind that motion?  I mean, why would it be that we're just

9   going to take the top two names instead of hand picking?

10  A.   Well, we felt that, all of us felt that the precinct

11  people are the ones that do all the work, and they hold all

12  the meetings, and they elect who they think they want to serve

13  as an election officer and that we should abide by their

14  judgment in it.

15  Q.   Okay.  Now, did this way of doing things, as opposed to

16  the way things were done under Jennings White, did that sort

17  of cut out the county clerk's ability to hand pick election

18  officers?

19       MR. SMITH:  Your Honor, I'm going to object.  That's

20  total speculation on the part of this witness.  I'll object.

21       THE COURT:  I'll sustain.

22  Q.   Did your motion to take the top two have anything to do

23  with the way things had been done in the past?

24       MR. SMITH:  That's been asked and answered.  I'll

25  object.

*W.H. BISHOP - Direct (Mr. Baldani)*                                    105

1        THE COURT:  It's also leading, and you're on direct

2   at this point.

3        MR. BALDANI:  Okay.  No problem, Judge.

4   Q.   Mr. White asked you about getting -- about going to the

5   Manchester precinct, and I wasn't sure what election were you

6   talking about.  Do you recall?

7   A.   2006.

8   Q.   Okay.  May or --

9   A.   Primary election, yeah.

10  Q.   So that would be May?

11  A.   Right.

12  Q.   So you testified that you went out to Manchester twice?

13  A.   Yeah.

14  Q.   Who sent you out there?

15  A.   Freddy Thompson.

16  Q.   To do what?

17  A.   To check on some complaints that had been made about the

18  conduct of the election officers there.

19  Q.   And you mentioned complaints from some candidates, right?

20  A.   Yes.

21  Q.   Is that something that you would see happen often?

22  A.   Yes.

23  Q.   Tell the jury about that.

24  A.   Well, actually, it would be quite normal that you'd have

25  several complaints that somebody wasn't doing right,

1    especially when the fella was making the complaint thought he

2    was losing, but you get two or three of them every time you'd

3    have an election.

4    Q.   So in any event, you went out to Manchester twice because

5    Freddy sent you there?

6    A.   Yes.

7    Q.   And you talked about observing some election officers.

8    Who were the election officers you observed in Manchester?

9    A.   Dobber Weaver and Wanda White.

10   Q.   Okay.  Did you talk to them?

11   A.   Yes, I did.

12   Q.   All right.  What did you say to them?

13   A.   I told them that we had the complaints that they were

14   trying to rig the election and that they were not placed

15   right, and she should get up front to the table where the rest

16   of the officers were, and that they should move the voting

17   machine from out behind the corner out to where people could

18   see what was going on.

19   Q.   So you gave them a warning?

20   A.   That's right.

21   Q.   Mr. White asked you about the absentee process in '06.

22   Do you recall those questions?

23   A.   Yes.

24   Q.   Do you know Marcus McKissic?

25   A.   Yes, I know Marcus McKissic.

*W.H. BISHOP - Direct (Mr. Baldani)*                                     107

1   Q.   Did you see Marcus McKissic during the fall election of

2   '06 at the county clerk's office?

3   A.   Yes, I did.

4   Q.   What was he doing?

5   A.   Just hanging out.

6   Q.   Did you see him vote absentee?

7   A.   No, I did not.

8   Q.   Do you know whether he did or not?

9   A.   I have no knowledge, no, sir.

10  Q.   Mr. Bishop, has the FBI ever interviewed you?

11          MR. SMITH:  Your Honor, I'm going to object.  What's

12  the relevance?

13          THE COURT:  Come on up.

14              (A sidebar conference was held out of the

15              hearing of the jury):

16          THE COURT:  What is the relevance as whether the

17  FBI's interviewed him?

18          MR. BALDANI:  Well, Judge, the government has alleged

19  that the Board of Elections is the RICO enterprise, and

20  there's only four people on the Board of Elections.  And I

21  think the government has made this allegation, and I think

22  since this man is on the Board of Elections for the relevant

23  time period, I think it's very significant that -- it shows

24  the extent of the FBI's investigation in this case.

25          I mean, when we were asking Briggs about did you

*W.H. BISHOP - Direct (Mr. Baldani)*                                    108

1   talk -- did you interview this person, did you interview that

2   person, he made the comment, we've interviewed 250 people.  I

3   can't remember who we've interviewed.  And I think when

4   they've alleged that the Board of Elections is the enterprise,

5   I think it shows a shallow investigation if they --

6              THE COURT:  How is that possibly relevant for you to

7   attack the nature of the FBI's investigation, whether they

8   interviewed a particular person?  I don't see relevancy at

9   all.

10             MR. BALDANI:  Okay.  Well, I mean, I feel like I just

11  explained it the best I can, Judge.

12             THE COURT:  Objection sustained.

13             MR. WHITE:  Your Honor, before we leave, I just want

14  to let you know, I've got three witnesses, that if there's any

15  way I can get them to be recognized at the end of the day -- I

16  thought we would get to me.

17             THE COURT:  I thought we would too.

18             MR. WHITE:  If you don't mind.

19             THE COURT:  I will.  I have a 4:30 hearing on a

20  supervised release violation.  As soon as I excuse the jury,

21  I'll recognize those, and then we'll take our evening break.

22             MR. WHITE:  Thank you, Your Honor.

23             THE COURT:  One more issue?

24             MR. WHITE:  I'm going to let my assistant know to let

25  them know not to go anywhere.

*W.H. BISHOP - Redirect (Mr. Westberry)*                              109

1              (Sidebar conference concluded.)

2              THE COURT:  Thank you, counsel.  I'll sustain the

3    objection to the last question.  You may proceed.

4              MR. BALDANI:  One moment, Your Honor.

5              THE COURT:  Yes, sir.

6    BY MR. BALDANI:

7    Q.   During the time you served on the Board of Elections

8    alongside Freddy Thompson, Mr. Bishop, did you ever see any

9    indication that he was hand picking election officers?

10   A.   No, sir, I didn't.

11             MR. BALDANI:  That's all the questions I have, Your

12   Honor.

13             THE COURT:  Thank you.  Let me continue to go around

14   to my left here.

15             MR. SIMONS:  None.

16             THE COURT:  Mr. Westberry, you have some redirect of

17   the witness?

18             MR. WESTBERRY:  Yes.

19             THE COURT:  You can cover all matters that have just

20   been covered, that's fine, and proceed from there.

21             MR. WESTBERRY:  Thank you.

22                     REDIRECT EXAMINATION

23   BY MR. WESTBERRY:

24   Q.   Mr. Bishop, hello again.  Kent Westberry for Doug Adams.

25   You indicated that you had worked in the central office of the

*W.H. BISHOP - Redirect (Mr. Westberry)*                                110

1    school system; is that correct?

2    A.   Yes.

3    Q.   Of course, that's where the superintendent of schools --

4    A.   Yes, sir.

5    Q.   His or her office is located; is that correct?

6    A.   Yes, sir.

7    Q.   You indicated that you not only got the job involving

8    picking of substitute teachers, but at some period of time you

9    got a promotion, Mr. Bishop, of some kind?

10   A.   Well, the actual turn of events was that I was just doing

11   part-time as a bus monitor.  I had semi-retired on Social

12   Security and whatnot.  And I didn't know what it was at the

13   time, but I had third stage colon cancer, and I couldn't

14   physically do the bus thing anymore.  So they moved me over to

15   the Board where I could sit down and do the job.

16   Q.   Was there any difference in pay of any significance, Mr.

17   Bishop?

18   A.   None at all.

19   Q.   Just stayed the same?

20   A.   The best of my knowledge, it was the same, yeah.

21   Q.   Did you ever feel, Mr. Bishop, that either the job you

22   got involving the buses and the next job that you got for

23   helping to pick substitute teachers, that have anything to do

24   with politics at all, if you know?

25   A.   No, sir.  It was more of sympathy for me, really, because

*W.H. BISHOP - Redirect (Mr. Westberry)* 111

1    I couldn't do the bus monitor anymore.  I couldn't, couldn't

2    move.  And I didn't know what I had, but I knew that I

3    couldn't operate the bus anymore.  And it was like, you know,

4    I'll bring you in and let you sit down here.  There was no

5    change, no promotion.

6    Q.  From your personal knowledge, Mr. Bishop, have you ever

7    seen any indication that Doug Adams was involved in any what's

8    been described as a pay to play kind of scheme?

9    A.  No, sir.

10   Q.  You were asked a question about a fella named Kenneth,

11   Kenny Day a little while ago from Mr. Smith.  Do you remember

12   that question?

13   A.  Kenneth Kinkade?

14   Q.  Excuse me, it's late in the day.  Kenny Day.

15   A.  Oh, Kenny Day, yeah.

16   Q.  And I believe you said that he had been an election

17   officer or he had been on the Board of Elections before you;

18   is that correct?

19   A.  Yes, that's correct.

20   Q.  From your personal knowledge, was Kenny Day a political

21   ally of Jennings White, if you know?

22   A.  Yes, sir, he was.

23         MR. WESTBERRY:  Thank you, sir.  Thank you, Judge.

24         THE COURT:  All right.  Mr. Smith, any additional

25   questions?

*W.H. BISHOP - Recross (Mr. Smith)*                                      112

1           MR. SMITH:  Yes, Your Honor.

2                     RECROSS-EXAMINATION

3    BY MR. SMITH:

4    Q.  Mr. Bishop, you said in your testimony that this was no

5    promotion whatsoever, I believe.

6    A.  To my knowledge, it wasn't, no.

7    Q.  Well, let me ask you this.  Isn't it true that there was

8    a contract on record with the school board as it pertains to

9    both your job as a bus monitor and your job as a staff

10   support?

11   A.  I'm sure there was.

12   Q.  Okay.  Would you agree with me, sir, that if the bus

13   monitor contract that you signed with the school board showed

14   that you were going to be paid $6.16 an hour for four hours a

15   day, and your staff support job showed you were getting $7.68

16   an hour for eight hours a day, that that would be an increase?

17   A.  It's an increase, but it wasn't -- it was because of the

18   pay scale, not because of anything that --

19   Q.  So you don't see that as a promotion at all.  Is that

20   your testimony?

21   A.  I guess you could consider it that, yes, sir.  But the

22   difference in the pay scale was not my doing.  That was set by

23   whoever sets it.

24   Q.  Well, the question is, though, sir -- and I think this is

25   important.  You got a raise, did you not, from six dollars and

*W.H. BISHOP - Recross (Mr. Smith)*                                    113

1    something an hour to seven dollars something an hour?  Isn't

2    that a fact?

3               MR. WHITE:  Objection to the form of the question,

4    Your Honor, as to what --

5               THE COURT:  I'll sustain as to the form of the

6    question, but you can rephrase.

7    Q.   Isn't it a fact, sir, that you got a raise from six

8    dollars -- let me read this, make sure, because I don't want

9    to misquote.  $6.16 an hour to $7.68 an hour.  Isn't that

10   true?

11              MR. WESTBERRY:  Objection.  Asked and answered.

12   A.   I guess so, yes, sir.

13              THE COURT:  Overruled.

14   Q.   And four hours a day, as opposed to eight hours a day.

15   That's not an increase in number of hours?  You agree with

16   me --

17   A.   Sure it's an increase in the number of hours.

18   Q.   But in your opinion, that was not a promotion, just so I

19   understand your testimony?

20   A.   I felt like it was just a lateral deal.  Yes, there was a

21   little more money involved, but that was because the pay rate

22   for staff was basically higher than the pay rate for a bus

23   monitor.

24   Q.   Now, during your term there with the Board of Elections,

25   you've indicated that you were knowledgeable how these

*W.H. BISHOP - Recross (Mr. Smith)*                                    114

1    election officers were being sent in to your board for

2    approval.  You recall that testimony?

3    A.   I'm sorry, sir, could you talk a little louder?

4    Q.   You recall the testimony you gave earlier about the

5    process in which you approved election officers being

6    submitted in the county of Clay County while you were on the

7    Board?  Do you recall giving that testimony about how these

8    were brought to you?

9    A.   Well, it wasn't a question of us approving them.  It was

10   a question of us taking the list that was given to us.  They

11   had already been assigned by the precinct captains and so

12   forth.

13   Q.   So you would disagree with the description given in this

14   case that the Board of Elections approves the election

15   officers to serve in the elections?  Are you disagreeing with

16   that?

17   A.   Am I disagreeing with that?  Well, when we got the list,

18   we would take the top two off each list.  Now, if that's

19   approval, we approved them.

20   Q.   Kentucky revised statute sets out clearly what your role

21   is as the Board of Elections in the county, does it not, sir?

22   A.   It does.

23   Q.   It does say clearly that your job is to approve the

24   election of officers, isn't that true?

25   A.   We approve the lists that's sent to us, yeah.

*W.H. BISHOP - Recross (Mr. Smith)*                                115

1    Q.   And there's ways that's done, and you described that to

2    the jury already; have you not?

3    A.   Yes, sir.

4    Q.   Let me ask you this, sir.  During the time that you

5    worked, you were on the Republican side of the party; is that

6    right?

7    A.   That's correct, yes, sir.

8    Q.   And there was, according to your testimony, absolutely --

9    Jennings White controlled that process completely, you said,

10   before?

11   A.   In 2002?

12   Q.   Yes, sir.  That's your testimony?

13   A.   Yes, sir, he did.

14   Q.   Did he approve the selection of Paul Bishop, one of Doug

15   Adams' best friends, as an election officer for the early

16   voting in 2002, to your knowledge?

17   A.   He must have.

18   Q.   To your knowledge?

19   A.   Not to my knowledge, no.

20   Q.   Did he approve Paul Bishop's son, Mike Bishop, to serve?

21   Is that one he hand picked?  Jennings White, are you saying

22   Jennings White hand picked Paul Bishop, sir?

23   A.   I didn't say he hand picked Paul.  I thought you said

24   Mike.  Mike Bishop.

25   Q.   Did he hand pick Mike Bishop?

*W.H. BISHOP - Recross (Mr. Smith)*                                    116

1    A.   No, he didn't hand pick him.  He just didn't object to

2    him, I guess.

3    Q.   So it wouldn't be completely accurate, sir, to say

4    Jennings White actually hand picked these election officers in

5    2002, would it?  That wouldn't be a fair statement, would it?

6    A.   It would be correct to say that if Jennings White ran

7    into somebody on one of the precincts that was against him, he

8    would take him off.

9    Q.   Well, let's ask you this.  Did he approve Charles Wayne

10   Jones serving as an election officer?

11   A.   Charles Wayne Jones, in 2002, was called as an election

12   commissioner, not an election officer.

13   Q.   What about William Stivers?  Did he approve him serving

14   down there in the early election period in 2002?

15   A.   I don't know whether he did or not, no, sir.

16   Q.   So wouldn't be fair to say, then, in the broad brush that

17   Jennings White hand picked these election officers for 2002,

18   would it, sir?  That wouldn't be a fair, complete statement,

19   would it, sir?

20   A.   It would be a more fair statement if you said he objected

21   and threw off anybody he thought was against him.  Let's put

22   it this way.

23   Q.   Are you telling this court and this jury, if Jennings

24   White had an opportunity, he wouldn't throw William "Al Man"

25   Stivers off the election list in 2002, sir?

*W.H. BISHOP - Recross (Mr. Smith)*                                    117

1    A.   You'd have to ask him that.  I don't know.

2    Q.   You're the one testifying to such a broad statement and

3    I'm challenging it, sir.  I'm asking you, would Jennings White

4    not have taken William "Al Man" Stivers off of that list if he

5    had the power to do so?

6              MR. WHITE:  Objection to the form of the question,

7    argumentative.

8              THE COURT:  Overruled.  You may answer his question.

9    A.   I suppose maybe he would have, yes, sir.

10   Q.   Now, Mr. Bishop, you've also testified about the

11   complaints that you all received down there in the elections.

12   You would agree with me, sir, that there were over a hundred

13   complaints that were received in 2006 by the attorney

14   general's office and the Board of Elections here in the state

15   of Kentucky?

16   A.   I'm sure there were, yeah.

17   Q.   And, in fact, in 2002, Clay County led the entire state

18   of Kentucky in over 120 counties with the number of complaints

19   regarding the process of election down there.  Isn't that a

20   fair statement?

21   A.   I wouldn't doubt that a bit.

22   Q.   And I believe you said that you were paired up with

23   Charles Wayne Jones to go answer some of these complaints in

24   2006.  Do you recall that testimony?

25   A.   I just got done talking about 2002.  Now we're talking

*W.H. BISHOP - Recross (Mr. Smith)*                              118

1    about 2006?

2    Q.   Let me move us forward.  Yes, sir, 2006.

3    A.   Okay.  2006.  Yeah.

4    Q.   Do you recall that testimony?

5    A.   Yeah.

6    Q.   Okay.  And I believe that during that time period, I

7    believe you said that there was complaints about Wanda White

8    and Charles "Dobber" Weaver inappropriately observing voters

9    or manipulating the process in some form down there?

10   A.   That's correct, yes, sir.

11   Q.   And I'm sure that you and Mr. Jones reported that to

12   Freddy Thompson when you got back; did you not?

13   A.   Reported what?

14   Q.   This complaint would have gone through the county clerk?

15   He would have known about Wanda White's wrongdoings down there

16   at the election post; would he not?

17   A.   He was the person that the complaint was made to.

18   Q.   Okay.  So the complaint actually went through him and

19   then was passed on to you; is that right?

20   A.   That's correct, yes, sir.

21   Q.   So it would have been passed through his hands that Wanda

22   White was up to no good down there in that 2006, November

23   election; isn't that true?

24   A.   There was a complaint made to that effect, yes, sir.

25   Q.   And you all were required to go down there and respond to

*W.H. BISHOP - Recross (Mr. Smith)*                                    119

1    that complaint?

2    A.   That's correct.  Yes, sir.

3    Q.   How many times did you go down there on Wanda White and

4    Charles "Dobber" Weaver, sir?

5    A.   Twice.

6    Q.   Twice?

7    A.   Yeah.

8    Q.   And that was in November of 2006?

9    A.   Yeah.

10   Q.   Now, that was a pretty serious complaint, is it not, sir,

11   that you have election officers charged with the duty of

12   policing and protecting the voters' process, isn't it?

13   A.   Yes.

14   Q.   For them to actually be involved in such an egregious

15   act, that's a pretty serious complaint in your role as a Board

16   of Elections member; is it not?

17   A.   That's right.

18   Q.   And you had two complaints, I believe you said, at the

19   Manchester precinct that day?

20   A.   Two that I know of, yes, sir.

21   Q.   There could have been others.  Is that what you're

22   saying?

23   A.   There could have been, but I don't think there were

24   complaints made to the -- there may have been more than one

25   complaint made about that precinct by different people, but we

*W.H. BISHOP - Recross (Mr. Smith)*                                    120

1    went out there twice.

2    Q.   Okay.  Now, in the May 2006, sir, you also got complaints

3    about election officers misadvising voters, telling them to

4    leave before they were finished voting, did you not, sir?

5    A.   Yeah.

6    Q.   And that was also brought through the county clerk's

7    office, Freddy Thompson, was it not, sir?

8    A.   That is correct, yes, sir.

9    Q.   So you didn't act on those complaints until Freddy

10   Thompson had told you about that.  Is that proper?

11   A.   I didn't know about them until Freddy Thompson told me

12   about them.

13   Q.   Now, you indicated that there was at least on one

14   occasion where you and Mr. Charles Wayne Jones responded to a

15   complaint?

16   A.   Yes.

17   Q.   Do you recall whether that was a complaint at the Harts

18   Branch precinct, sir?

19   A.   No, sir.  It was a complaint in Manchester precinct and

20   Garrard precinct.

21   Q.   Were you not told that there was a complaint at the Harts

22   Branch precinct where he was acting as an election officer

23   that day, sir?

24   A.   In 2006?

25   Q.   Yes, sir.

*W.H. BISHOP - Recross (Mr. Smith)*                                   121

1   A.  On election day?

2   Q.  Yes, sir.

3   A.  He was there in the courthouse 95% of that day.  And

4   Harts Branch precinct is not in the courthouse or the

5   administrative office.

6   Q.  So if I understand your testimony, if the records show

7   that he was actually operating a voting booth down at the

8   Harts Branch precinct, that would be incorrect, according to

9   your testimony?

10  A.  I don't know.  I don't know that he was.  I didn't think

11  he was.

12  Q.  Well, if he's 95% of the time at the county clerk's

13  office serving as a board member, 5% of the time wouldn't

14  hardly give you enough time of the day to serve as an election

15  officer, would it, sir?

16  A.  Not much, no.

17  Q.  Do you know a fella by the name of Roger Webb?

18  A.  Roger Webb?

19  Q.  Yes, sir.

20  A.  No, sir, I don't.

21  Q.  Did you not recall him being a candidate for magistrate

22  against Stanley Bowling?

23  A.  Not really, no, sir.

24  Q.  Do you not recall him making a complaint about what he

25  was seeing down there at the Harts Branch precinct, sir?

*W.H. BISHOP - Redirect (Mr. White)*                                      122

1    A.   Not to me, no, sir.

2    Q.   So you didn't investigate that complaint?

3    A.   I wasn't asked to and wasn't aware of it.

4         MR. SMITH:  That's all I have.  Thank you.

5         THE COURT:  Let me see if there's any follow-up

6    questions of the witness.  Mr. White?

7         MR. WHITE:  Just give me a moment, Your Honor.

8         THE COURT:  Yes, sir.

9         MR. WHITE:  Just a couple, Your Honor.

10        THE COURT:  Yes, sir.

11                        REDIRECT EXAMINATION

12   BY MR. WHITE:

13   Q.   Mr. Bishop, I know you come from a long line of lawyers,

14   and I don't know whether to congratulate you or not, but you

15   yourself are not a lawyer; is that correct?

16   A.   That is correct, yes, sir.

17   Q.   As to what an election officer can do or a member of a

18   Board of Elections can do vis a vis also serving as an

19   election officer on election day, would you defer to what the

20   statutes themselves say?

21   A.   I would most definitely defer to the statute.

22   Q.   When you said that Mr. Jones was present in the

23   courthouse on election day 95% of the time, in the general of

24   '06, was that your best estimate?

25        MR. SMITH:  Your Honor, I'm going to object.  He's

*W.H. BISHOP - Redirect (Mr. Baldani)*                                    123

1     mischaracterized his testimony.  I don't believe he gave that

2     answer to the general election.  I believe he gave that to the

3     May election.

4              MR. WHITE:  Then I'll withdraw the question and ask

5     the same question as to the May.  I misheard.

6              THE COURT:  That's fine.  You may rephrase.

7     Q.   Let me reask the question, Mr. Bishop.

8     A.   Sure.

9     Q.   Did you testify on recross-examination to Mr. Smith that

10    you estimated that Mr. Jones was with you in the county

11    clerk's office 95% of the time at the primary election?

12    A.   Yes.

13    Q.   And was that your best estimate, sir?

14    A.   He was there most of the day, yeah.

15             MR. WHITE:  That's all I have, Your Honor.  Thank

16    you.  Thank you, Mr. Bishop.

17             THE COURT:  Thank you.  Mr. Baldani.

18             MR. BALDANI:  Your Honor, I've got a quick one on

19    PR16-O if I can get that again.

20             THE COURT:  Yes, sir.

21                          REDIRECT EXAMINATION

22    BY MR. BALDANI:

23    Q.   First of all, Mr. Bishop, I want to make sure we got it

24    straight, because I don't have it straight in my mind.  The

25    election that you went out to Manchester twice, was that May

1    of '06?

2    A.   It was the general election, yes.

3    Q.   So that's May of '06?

4          MR. SMITH:  General election is November of '06, and

5    I would object to arguing with the witness.

6          THE COURT:  Sustained.

7    Q.   Okay.  So the complaint that Freddy Thompson got, do you

8    know who made it or the particulars of it, or did he just send

9    you out there?

10   A.   Do I know who made it?

11   Q.   Yeah.

12   A.   Who made the complaint?  It was my understanding that the

13   complaint was made by a candidate for mayor.

14         MR. SMITH:  Your Honor, I object.  We had a prior

15   ruling about the substance of the complaints.

16         THE COURT:  All right.  Counsel, y'all need to come

17   up if you're going to ask questions about this.

18                    (A sidebar conference was held out of the

19                    hearing of the jury):

20         THE COURT:  As I understand, Mr. Baldani, you now

21   want to question him about the truthfulness of the complaints

22   that were made to the clerk's office?

23         MR. BALDANI:  No, I'm actually doing the opposite.

24   I'm trying to elicit that he doesn't know what the substance

25   of the complaint was.  So I mean, I'm not trying to get into

*W.H. BISHOP - Redirect (Mr. Baldani)*                          125

1    the substance of the complaint at all.

2          THE COURT:  Well, isn't that what's on 16-O or

3    whatever document you have there --

4          MR. BALDANI:  Well, 16, page 8 just shows that Jones

5    was absent part of the day at the Harts Branch precinct.

6    That's in the election minutes.  But the question I was

7    asking, Judge, I was simply trying to elicit that he didn't

8    know, he wasn't privy to the complaint.  He didn't know what

9    the complaint was.  He was just sent out there.

10         THE COURT:  Okay.

11         MR. BALDANI:  So I don't think that --

12         MR. SMITH:  I must have misunderstood the question.

13   I thought he was going into the substance of the complaint in

14   the question, the way it was asked.

15         THE COURT:  He asked both questions, Mr. Smith.  He

16   asked if he knew the substance of the complaint and who sent

17   him out there.  So it's a compound question.  I'm going to

18   sustain the objection as to the contents.  Obviously, it's not

19   what you're intending anyway.  But if you'll clear up your

20   question, you can ask him about how he responded.

21         Mr. Westberry has a point he wants to make.

22         MR. WESTBERRY:  It is not a point on this, Judge.

23   Scheduling.

24         MR. HOSKINS:  Your Honor, Mr. Maricle asked me if he

25   can be excused from the courtroom.

*W.H. BISHOP - Redirect (Mr. Baldani)*                           126

1              THE COURT:  Yes, he can be excused.

2              MR. WESTBERRY:  Simply a scheduling question, Judge,

3    when you're ready.

4              THE COURT:  All right.  I'm trying to get through Mr.

5    Baldani's objection first.  I think I'm there, but he usually

6    likes to have the last word.  I'll let him do that at this

7    time.

8              MR. WESTBERRY:  You're very gracious, Your Honor.

9              THE COURT:  Yes, sir, I try to be.

10             MR. BALDANI:  Nothing else.

11             MR. WESTBERRY:  Scheduling.  I have another witness

12   before we make our decision to announce whether we close or

13   not.  He's Clay County.  If he comes back tomorrow, it would

14   be the fourth time that he has come back.  I sense that you're

15   not inclined to keep this jury much past 4:30 today.  That's

16   one thing --

17             THE COURT:  Well, two issues.  One, I don't know how

18   much longer he's going to be on redirect/recross.  If it's not

19   going to be much longer, then if your witness is relatively

20   brief --

21             MR. WESTBERRY:  My direct will probably be about the

22   same length all of my direct has been today.

23             THE COURT:  We probably need to bring him back.

24             MR. WESTBERRY:  That was my next question.  Because

25   he comes from the distance that he comes from, could we just,

*W.H. BISHOP - Redirect (Mr. Baldani)*                    127

1    so I don't ask him to get out of bed at 6:00 or 7:00 in the

2    morning and hit the road, could we just start a little bit

3    later to give him a little bit more latitude?

4            THE COURT:  Well, Mr. Baldani, how much more do you

5    have?

6            MR. BALDANI:  I've got two questions, Judge.

7            THE COURT:  Does anyone else have any questions?

8    Anyone?

9            MR. SMITH:  It seems that I would have most likely

10   more questions of this witness.  I mean, if he's going to go

11   down this route, I don't see how I can leave that unaddressed.

12           THE COURT:  We'll start at 10:00 tomorrow.

13           MR. SMITH:  Mr. Westberry, who is the witness we're

14   waiting on?

15           MR. WESTBERRY:  Clay Massey.

16           MR. SMITH:  He's an attorney, isn't he?

17           MR. WESTBERRY:  Yes, and this will be the fourth day

18   out of his private law office.  If he were a government

19   employee, I might say the time is --

20           THE COURT:  We'll start at 10:00 tomorrow.

21           MR. WESTBERRY:  Thank you.

22                 (Sidebar conference concluded.)

23           THE COURT:  Thank you.  Mr. Baldani, you may proceed.

24           MR. BALDANI:  Your Honor, I'd like to put on

25   Exhibit PR16-O.

*W.H. BISHOP - Recross (Mr. Smith)*                              128

1    BY MR. BALDANI:

2    Q.   Mr. Bishop, does this appear to be the Board of Elections

3    minutes for May 16 of '06?

4    A.   Yes.

5    Q.   Okay.  And about three paragraphs down, do you see where

6    it says Wayne Jones was absent during the meeting because he

7    was serving as election officer in the Harts Branch precinct.

8    However, he did attend later when the absentee ballots were

9    being counted?

10   A.   Yes.

11   Q.   Is that what you recall happening?

12   A.   Yes.

13           MR. BALDANI:  That's all, Your Honor.

14           THE COURT:  All right.  Ladies and gentlemen, we're

15   going to stay a little bit longer than we ordinarily would so

16   we can complete the examination of this witness.  I do

17   appreciate you bearing with me on this.

18           Mr. Westberry, you would go next.  Any other

19   questions?

20           MR. WESTBERRY:  No.

21           THE COURT:  Thank you.  Mr. Smith?

22                        RECROSS-EXAMINATION

23   BY MR. SMITH:

24   Q.   Mr. Bishop, just so I understand your testimony now, you

25   earlier did not recall, you said he was 95% of the time at the

*W.H. BISHOP - Recross (Mr. Smith)*                                129

1     county clerk's office serving as a board member?

2     A.   In 2006?

3     Q.   Yes, sir.  And now I think after being shown this

4     document, you've changed your testimony to say you now recall

5     he did serve as a Harts Branch election officer?

6     A.   I don't recall him serving at Harts Branch at all.

7     That's the question you asked me.  I don't recall --

8     Q.   I must have mistaken your answer, I'm sorry.

9     A.   I do not recall him having served as a precinct officer

10    at Harts Branch.  You're talking about election day?

11    Q.   Yes, sir.

12    A.   Okay.  We were there most of the day.  I recall that

13    sometime along in the afternoon, he said he was going over to

14    Harts Branch.  I said why?  And he said, I'm just going over

15    to see what's going on.

16    Q.   So would it be fair to say, sir, that you don't know what

17    he was doing at Harts Branch that day?

18    A.   That's correct.

19              MR. SMITH:  Thank you.

20              THE COURT:  All right.  Let's see if we have any

21    other questions of the witness.

22              MR. WHITE:  Nothing further, Your Honor.

23              THE COURT:  Thank you.  You may step down, and you're

24    excused at this time.  Ladies and gentlemen of the jury, we

25    will take our recess for the evening at this time.  Of course,

1    please keep in mind the admonition that you have been given

2    several times, first not to discuss the case among yourselves,

3    don't discuss the case with any friends or family members or

4    anyone else.  And, of course, don't allow anyone to approach

5    you in an attempt to discuss the case.

6         If that should ever happen, you should report that to

7    the Court promptly.  Don't read, watch or listen to any

8    accounts of the case if there should be any.  Don't attempt to

9    perform any type of research or do any investigation on your

10   own while we are in recess and, of course, don't make up your

11   mind about the case until it is finally submitted to you.

12        We didn't start this morning until 10:00, and we're

13   going to start tomorrow at 10:00 as well.  We do have

14   witnesses who are traveling some distance to be here, so we'll

15   start tomorrow at 10:00.

16        So again, if you get here early, you get the best

17   doughnuts; but otherwise, we'll start at 10:00.  And again, I

18   do appreciate you being here on time, as you're asked to do.

19   You'll be excused until 10:00 a.m. tomorrow.

20                  (The jury left the courtroom at 4:34 p.m.)

21        THE COURT:  We'll check on the schedule briefly

22   before we recess for the evening.  Mr. Westberry, I know you

23   have one other witness.  About how long do you anticipate

24   he'll be?  About 30 minutes or so?

25        MR. WESTBERRY:  About the same length of time as the

131

1    others have.

2           THE COURT:  So sometime before lunch tomorrow we

3    should be completed with your case-in-chief?

4           MR. WESTBERRY:  We will make a decision well before

5    lunch to announce close of our proof.  I have certainly one

6    more witness.

7           THE COURT:  Mr. White, you have your witnesses ready

8    to go?

9           MR. WHITE:  I do.  Miss Sharon went to get my three

10   to be recognized.  I was also going to let you know I do not

11   have Mr. Clay Bishop under subpoena, do not expect to call

12   him.  From my perspective, I won't have much if any.

13          THE COURT:  I appreciate that.  We'll wait just for a

14   moment, then, for your witnesses to appear.

15          MR. ABELL:  Judge, I can tell my witnesses to be here

16   at lunch time, and that would be safe.  Sounds to me like

17   we'll get to them tomorrow afternoon.

18          THE COURT:  That would be a safe course of action.

19   Mr. Abell, if you start tomorrow after lunch, do you

20   anticipate taking most of the evening?

21          MR. ABELL:  A little part of it, but not necessarily

22   most.

23          THE COURT:  That helps for Mr. --

24          MR. RICHARDSON:  We'll have some witnesses here

25   tomorrow.

132

1          THE COURT:  That will be fine.  We'll see if we have

2     any.

3          MR. WESTBERRY:  May I be excused for just a moment?

4          THE COURT:  Yes, sir.  Thank you.  We have some

5     witnesses to recognize.  If you could come up here in front of

6     the clerk, please, and I'll have you identify yourselves.  If

7     you could, please tell the clerk your name.

8          MS. SMITH:  Selena Smith.

9          THE COURT:  Miss Smith.  And sir?

10         MR. OWENS:  Ronnie Owens.

11         THE COURT:  Thank you.  And yes, ma'am.

12         MS. GROSS:  Doris Gross.

13         THE COURT:  Groves?

14         MS. GROSS:  Gross, G-r-o-s-s.

15         THE COURT:  Miss Gross, thank you.  We anticipate you

16    will be called to testify in the trial tomorrow.  We've

17    recessed for the evening.  I do anticipate that you'll be

18    called tomorrow.  So what we want to do is we want to

19    recognize you as being present today, pursuant to the

20    subpoenas that were served on each of you.  What we'll do is

21    we'll let you go for the evening and recognize you to be back

22    tomorrow.

23         Generally, what I do is I'll have the clerk

24    administer an oath to you to appear back tomorrow as

25    indicated.  You'll be indebted in the sum of $500 should you

1    fail to appear.  Of course, if you appear, you would not be

2    obligated in any way for that amount.  That is to assure your

3    appearance.  At this time, I'll ask the clerk to administer

4    the oath to you to reappear tomorrow.

5                        (The oath was administered by the

6                         deputy clerk.)

7              THE COURT:  All right.  We are scheduled to start

8    tomorrow at 10:00.  There is one witness that should testify

9    before each of you would testify, but I can't anticipate at

10   this point how long that would take.  So you should be here

11   ready at 10:00 tomorrow.  Okay?  You all will be excused at

12   this time.  Thank you.

13             Mr. White, you have one more witness to be

14   recognized?

15             MR. WHITE:  No, Your Honor.

16             MR. RICHARDSON:  Shirley Bishop is here.  That's Clay

17   Massey Bishop's wife.  We have her subpoenaed.  I guess since

18   she's here, we'll recognize her.

19             THE COURT:  If you would come up, ma'am.  Ma'am,

20   we're going to go ahead and have you recognized.  I understand

21   that you are under subpoena to testify in the trial of this

22   case.  Could be that you will be testifying as early as

23   tomorrow in the matter.  Of course, the attorneys will advise

24   you as to when they expect you'll be called.  What we'll do at

25   this time is we'll recognize you as being present pursuant to

1    the subpoena that's been served.

2         I'll have the clerk administer an oath to you that

3    would obligate you in the penal sum of $500 should you fail to

4    appear.  Of course, you would not be obligated in that amount

5    if you do appear and testify as expected tomorrow or perhaps

6    on Wednesday in the case.  So at this time, if you could state

7    your full name for the clerk so she can write that down.

8         MS. BISHOP:  Shirley Sue Bishop.

9         THE COURT:  Miss Bishop, we'll have the clerk

10   administer the oath to recognize that you're present.

11              (The oath was administered by the

12              deputy clerk.)

13   THE COURT:  Thank you, ma'am.  Again, you'll be released

14   at this time, and counsel for Mr. Thompson will tell you when

15   he thinks he'll be calling you as a witness in the case.

16   Thank you.

17        Before we recess this matter, let me make sure we

18   don't have any other witnesses that need to be recognized

19   today.  I don't think we do.  We've run out of witnesses for

20   the day.

21        Mr. White, if you could speak with either Mr. Smith

22   or Mr. Parman about the exhibit that we talked about earlier.

23        MR. WHITE:  Yes, sir.

24        THE COURT:  And if there's a problem with foundation

25   as to this document, you can let me know tomorrow morning.

135

1          MR. WHITE:  I will, and I'll get here early if you

2    need to take it up beforehand.  Is that what you'd like to do?

3          THE COURT:  I would.  I'd like to take that up before

4    we get to witnesses in the case.  So five minutes should be

5    sufficient.  If you'd talk to Mr. Smith about that tonight.

6          MR. WHITE:  I can leave a voicemail on the --

7          THE COURT:  I'll be here early.  If you need to take

8    it up, you can let me know tomorrow.  I do have a hearing on a

9    matter that I need to take up here in just a few moments so I

10   will need a little bit of space there, Mr. Hoskins, that

11   initial space.  We'll give you a chance to organize your

12   materials.

13          Again, we start tomorrow at 10:00.  So if you could

14   let me know about 10 minutes till 10:00 about this exhibit,

15   we'll take it up at that time.  Otherwise, this case will be

16   in recess.  Thank you.

17          (Proceedings adjourned at 4:42 p.m.)

18                          - - -

19                  C E R T I F I C A T E

20          I, LISA REED WIESMAN RDR-CRR, certify that the
     foregoing is a correct transcript from the record of
21   proceedings in the above-entitled case.

22

23    \s\ Lisa Reed Wiesman                 March 16, 2010
      LISA REED WIESMAN, RDR-CRR          Date of Certification
24    Official Court Reporter

25

1                                    INDEX

2

3    DEFENSE WITNESSES
     REECIA SAMPLES
     Direct Examination by Mr. Westberry.............. Page  4
4    Cross-examination by Mr. Smith................... Page 16
     Redirect examination by Mr. Westberry........... Page 26
5    Recross-examination by Mr. Smith................. Page 30
     Cross-examination by Mr. Simons................. Page 32
6
     JAMES GRAVITT
7    Direct Examination by Mr. Westberry.............. Page 34
     Cross-examination by Mr. Smith................... Page 49
8    Redirect examination by Mr. Westberry........... Page 50

9    LAURA MELANDA ADAMS-HACKER
     Direct Examination by Mr. Westberry.............. Page 51
10   Cross-examination by Mr. Smith................... Page 64
     Cross-examination by Mr. Baldani................. Page 67
11   Redirect examination by Mr. Westberry........... Page 69
     Recross-examination by Mr. Smith................. Page 70
12
     WILLIAM HUGH BISHOP
13   Direct Examination by Mr. Westberry.............. Page  71
     Cross-examination by Mr. Smith................... Page  81
14   Direct examination by Mr. White................. Page  90
     Cross-examination by Mr. Abell.................. Page  98
15   Direct examination by Mr. Baldani............... Page  99
     Redirect Examination by Mr. Westberry........... Page 109
16   Recross-examination by Mr. Smith................. Page 111
     Redirect examination by Mr. White.............. Page 122
17   Redirect examination by Mr. Baldani............. Page 123
     Recross-examination by Mr. Smith................. Page 128
18
                                - - -
19   GOVERNMENT EXHIBITS                        ADMITTED

20   Exhibit No. D66, Vernon Hacker employment history
     Admitted........................................ Page 22
21
     DEFENSE EXHIBITS
22
     Adams Exhibit No. 1, Superintendent salary bar graph
23   Admitted........................................ Page 40

24   Adams Exhibit No. 4, Back-up data for bar graph
     Admitted........................................ Page 44
25
                                - - -