1

1          UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF KENTUCKY
2            SOUTHERN DIVISION at LONDON
                      - - -
3

UNITED STATES OF AMERICA,        :  Docket No. CR 09-16-S
4                                 :
              Plaintiff,          :  **Frankfort, Kentucky**
5                                 :  Tuesday, March 9, 2010
      versus                      :  12:55 p.m.
6                                 :
RUSSELL CLETUS MARICLE,           :
7   DOUGLAS C. ADAMS              :
    CHARLES WAYNE JONES            :
8   WILLIAM R. STIVERS            :
    FREDDY W. THOMPSON             :      **Trial Day 20B**
9   WILLIAM B. MORRIS            :
    DEBRA L. MORRIS               :   **EXCERPTED TRANSCRIPT**
10  STANLEY BOWLING,              :     **Sagrecy Testimony**
                                  :
11              Defendants.        :

12

13                    - - -
            TRANSCRIPT OF TRIAL
14        BEFORE DANNY C. REEVES
      UNITED STATES DISTRICT COURT JUDGE and a jury
15                    - - -

16   APPEARANCES:

17   For the United States:    STEPHEN C. SMITH, ESQ.
                               JASON D. PARMAN, ESQ.
18                             Assistant U.S. Attorney
                               601 Meyers Baker Road
19                             Suite 200
                               London, KY 40741
20
     For the Defendant         MARTIN S. PINALES, ESQ.
21   Russell Cletus Maricle:   Strauss & Troy
                               150 E. Fourth Street
22                             Fourth Floor
                               Cincinnati,OH  45202
23
                               DAVID S. HOSKINS, ESQ.
24                             107 E. First Street
                               Corbin, KY  40701
25

2

| | | |
|---|---|---|
| 1 | For the Defendant<br>Douglas C. Adams: | R. KENT WESTBERRY, ESQ.<br>KRISTIN N. LOGAN, ESQ.<br>Landrum & Shouse, LLP<br>220 West Main Street<br>Suite 1900<br>Louisville, KY 40202 |
| 6 | For the Defendant<br>Charles Wayne Jones: | T. SCOTT WHITE, ESQ.<br>Morgan & Pottinger, P.S.C.<br>133 West Short Street<br>Lexington, KY  40507 |
| 9 | For the Defendant<br>William R. Stivers: | ROBERT L. ABELL, ESQ.<br>120 North Upper Street<br>Lexington, KY  40507 |
| 11 | For the Defendant<br>Freddy W. Thompson: | RUSSELL JAMES BALDANI, ESQ.<br>R. TUCKER RICHARDSON, ESQ.<br>Baldani, Rowland & Richardson<br>300 West Short Street<br>Lexington, KY  40507 |
| 15 | For the Defendant<br>William B. Morris: | JERRY W. GILBERT, ESQ.<br>Coy, Gilbert & Gilbert<br>212 North Second Street<br>Richmond, KY 40475 |
| 18 | For the Defendant<br>Debra L. Morris: | ELIZABETH SNOW HUGHES, ESQ.<br>Gess, Mattingly & Atchison, PSC<br>201 West Short Street<br>Lexington, KY 40507 |
| 21 | For the Defendant<br>Stanley Bowling: | DANIEL A. SIMONS, ESQ.<br>Thompson, Simons, Dunlop & Fore<br>116 West Main Street<br>Suite 2A<br>Richmond, KY 40476 |

3

```
1     Court Reporter:              LISA REED WIESMAN, RDR-CRR
                                   Official Court Reporter
2                                  35 W. Fifth Street
                                   P.O. Box 1073
3                                  Covington, KY  41012
                                   (859) 291-4410
4

5         Proceedings recorded by mechanical stenography,
      transcript produced with computer.
6
```

 1              (The jury entered the courtroom at 12:53 p.m.)

 2              THE COURT:  Thank you.  All members of the jury are

 3     present.  Parties and counsel are also present.  Agent

 4     Sagrecy, you're still under oath.

 5              Mr. Smith, you may continue.

 6              MR. SMITH:  Thank you.

 7     BY MR. SMITH:

 8     Q.   Agent Sagrecy, I'd like to direct your attention to M7.

 9     I believe you received questions regarding the process of B&J

10     Transport [sic] in obtaining contracts.  And you were

11     referenced to, I believe, April the 8th of 1996.  Do you

12     recall that?

13     A.   Yes.

14     Q.   And just for purposes of clarification, these contracts,

15     it's dated April the 8th of 1996, you did not include that as

16     part of your calculation as far as amounts that were proceeds

17     from the unlawful activity; is that correct?

18     A.   No, I did not.

19     Q.   Okay.  But in any event, the city council that approved,

20     it was pointed out that a motion was made, I believe here on

21     the bottom of the page, says motion was made by John Ed

22     Pennington and seconded by Vernon Hacker to approve the bid

23     submitted to B&J Transfer and authorized Mayor White to sign

24     the contract.  You recall being referenced to that part --

25     A.   Yes.

*SAGRECY - Redirect (Mr. Smith)*                                      5

1    Q.   -- of the minutes?

2    A.   Yes.

3    Q.   Let me just ask a couple follow-up questions, if I may.

4    Particularly, Vernon Hacker.  Is he someone that, in your

5    investigation, was a participant in this illegal enterprise

6    that was formed to control Clay County and eventually these

7    contracts?

8    A.   Yes, he was.

9    Q.   And we have also that this meeting was presided over by

10   Mayor White.  Do you know which mayor was presiding over this

11   meeting?

12   A.   Mayor Doug White.

13   Q.   And same question.  In your investigation, did you learn

14   that he was also active and involved in the enterprise which

15   led eventually to the awarding of these contracts?

16   A.   Yes.

17   Q.   We also have -- it says the following other members

18   present, and, of course, you mentioned Vernon Hacker.  What

19   about Ronnie Hacker?  Do you recognize that name as being a

20   member of the enterprise?

21   A.   Yes.

22   Q.   And did he also hold a position of employment with the

23   school board at some time?

24   A.   Yes.

25   Q.   Sherrie House?

SAGRECY - Redirect (Mr. Smith)                                          6

1    A.   Yes.  She is the wife of Judge House.

2    Q.   And in your investigation, how did you learn these

3    council members were participating in the ongoing operation of

4    the enterprise?

5    A.   Thousand dollars.  Thousand dollars to get reelected to

6    the council.

7    Q.   And this money that they put together was used for what

8    purpose?

9    A.   To buy votes.

10   Q.   You were also asked to refer to October 16, 2000.  Do you

11   recall those questions?

12   A.   Yes.

13   Q.   And again, this was pointed out to be an extension of the

14   contract of B&J Transfer, and I believe that the minutes say

15   here who made the motion to approve that.  Do you see that

16   there?

17   A.   I think it's on the second page of those minutes.  If

18   not, review that again, please.

19   Q.   Do you recall that motion being made by Vernon Hacker and

20   Ronnie Hacker to approve the extension of the contract with

21   B&J Transfer?

22   A.   Yes.

23   Q.   Is that the same Vernon Hacker and Ronnie Hacker that you

24   referred to in the '96 minutes?

25   A.   Yes.

*SAGRECY - Redirect (Mr. Smith)* 7

1   Q.   You were also asked to, I believe, refer to the

2   January 21, 2002 minutes.

3   A.   Yes.

4   Q.   And again, there was a motion made regard to the contract

5   with B&J Transfer?  Do you recall that?

6   A.   Yes.

7   Q.   Again, the members present at this meeting in January,

8   2002 would have included Vernon Hacker and Ronnie Hacker.  Is

9   that the same Vernon and Ronnie Hacker that you've referred

10   to?

11   A.   Yes.

12   Q.   What about Darnell Hipsher.  Was he a member of the

13   enterprise?

14   A.   Yes, he was.

15   Q.   Gary Jackson?

16   A.   Yes.  He's also known as Ouchie.

17   Q.   And again, this was a meeting presided over by Mayor

18   White.  Is that the same mayor that you referred to as Daugh

19   or Doug White?

20   A.   Yes.

21   Q.   You were also asked to refer to September, I believe, 16,

22   2002.

23   A.   Yes.

24   Q.   Is that correct?

25   A.   Yes.

SAGRECY - Redirect (Mr. Smith)                                    8

1    Q.   And again, it seems the same issues to come before the

2    council were again regarding the contract of B&J Transfer.

3    I'd like to ask you to read that entry here.

4    A.   "A motion was made by Darnell Hipsher and seconded by

5    Vernon Hacker to give Bart Morris of B&J Transfer an advance

6    of $15,000 to be paid back at the rate of $1,000 per month.

7    Motion carried."

8    Q.   Agent Sagrecy, in the course of your investigation, did

9    you look into the City of Manchester actually making loans to

10   private contractors?

11   A.   This was the only one that I saw.

12   Q.   And what was the nature of the loan that you were able to

13   determine, sir?

14   A.   I believe it was an advance on future services.

15   Q.   Okay.  So they were actually making a payment to the

16   contractor for $15,000 to be paid back.  Was there any

17   interest that the taxpayers were going to earn on their loan

18   of the money to this private contractor?

19   A.   No.  If I can expand on that, the exhibit, M17, I

20   believe, with the payments to B&J, in that exhibit, I show

21   where payments were taken out.  If we could put that up, maybe

22   show at least where it was paid.  Fortunately, that was paid

23   back and there did not appear to be any interest payments.

24   Q.   M17.  Do you have that before you, Agent Sagrecy?

25   A.   I do.  This is M17.  If you'll go to the second page,

1    please.  You can notice, for example, on October 2nd, 2002 the

2    gross amount was $11,628.  There was a $1,000 adjustment, and

3    that adjustment was for the $15,000 advance.  So the actual

4    net pay was $10,628.  And I tried to note all the payments,

5    the loan payments back in the exhibit.

6    Q.   So let's go back to page 1 of M17.  Your calculation of

7    monies received from the City of Manchester during that year

8    would have been $68,724.  Did that include the $15,000 loan?

9    A.   It included the gross amount, because that loan kind of

10   carried over into another year as far as repayment.  The gross

11   amount.  In the previous example, where it was like 11,000

12   some odd dollars, and then there was subtracted a $1,000

13   payment, I used the $11,000 amount in my computation.  So the

14   short answer is yes, I believe it was accounted for in 2002

15   and 2003.

16   Q.   Now, I believe that when questioned about the inception

17   of this, you refer to the contract, I believe, the earlier

18   contract that you referred to was 1996 with B&J Transfer.

19   A.   I recall that, yes.

20   Q.   And there was a proposal that you were referred to, if I

21   recall, where there was a letter proposing that this B&J

22   Transfer be considered by the City as a means to transfer the

23   garbage?

24   A.   Yes.

25   Q.   If I understand the quotation of the figures, it was that

*SAGRECY - Redirect (Mr. Smith)*                                          10

1    $12.50 per yard was available currently for the City of

2    Manchester, and the proposal was to give the City a $12 rate?

3    A.    That's correct.

4    Q.    But I believe that there was also imposed upon this

5    proposal was the expectation that B&J Transport [sic] would

6    get an additional rate of increase each year thereafter.    Do

7    you recall how much money they were going to get for the

8    following year?

9    A.    Dollar twenty-five.

10   Q.    So that would put it up to 13.25, which would put it 75

11   cents over the going rate of 12.50 which the City had at that

12   time?

13   A.    Correct.

14   Q.    And that would occur as quickly as 12 months from the

15   date they signed the contract?

16   A.    Yeah, it was July the following year.

17   Q.    And was there any indication that this was advertised for

18   other private contractors to propose an option to the City at

19   that time?

20   A.    Again, no.

21   Q.    Again, I believe you referenced August 16, 2004.    That

22   is, I believe here, you were referenced to again the B&J

23   contract came up again, and it was made by the motion of

24   Vernon Hacker and seconded by Darnell Hipsher to pay them an

25   increase, I believe you explained.    How did this increase the

1  payments to Darnell -- to B&J Transfer, to your understanding?

2  A.  Excuse me?

3  Q.  It was explained, I believe, in redirect that August 16,

4  2004, while they had a contract in place, that the city

5  council had to approve an increase in the rate to the City of

6  Manchester.  And I believe you were referencing, you were

7  asked to reference this entry in the court -- or the minutes

8  of the meeting, correct?

9  A.  Yes.  And this particular meeting is dealing with the

10  switch from being paid by the yard to being paid by the ton.

11  Q.  And in your investigation, did that result in an

12  increased cost, bottom line figure for the City as opposed to

13  paying for it under the old program of yards?

14  A.  I can't answer that question.

15  Q.  In any event, throughout the totality of the progress of

16  this contract, whether it was bid or not bid, or renewed or

17  extended, it was all being approved by city council that was

18  predominantly occupied by members of the enterprise, based on

19  your investigation?

20  A.  Yes.

21          MR. SMITH:  Thank you.

22          THE COURT:  Mr. Pinales.

23                          RECROSS-EXAMINATION

24  BY MR. PINALES:

25  Q.  Just a couple questions.  In your redirect, you were

1    asked questions about Judge Cletus Maricle running unopposed.

2    Do you recall those questions?

3    A.   Excuse me, unopposed?

4    Q.   Yes.  Do you recall those questions?

5    A.   Yes.

6    Q.   Did you survey how many other circuit judges across the

7    entire commonwealth ran unopposed?

8    A.   No.

9    Q.   And Judge Maricle's district, his circuit included three

10   counties, correct?

11   A.   Correct.

12   Q.   We established that.  And any attorney with seven years'

13   practice, licensed in the commonwealth, in any of those three

14   counties could have run; could they not?

15   A.   I don't know that.

16          MR. PINALES:  Nothing further.

17          THE COURT:  Thank you.  Mr. Westberry.

18          MR. WESTBERRY:  Thank you, Judge.

19                    RECROSS-EXAMINATION

20   BY MR. WESTBERRY:

21   Q.   Afternoon again, Mr. Sagrecy.

22   A.   Good afternoon.

23   Q.   Got a couple questions for you.  I believe you testified

24   in your redirect that but for this scheme, these defendants or

25   these individuals could not have been awarded the salaries in

1    the contracts, correct?

2    A.   Yes, that is my opinion.

3    Q.   I believe you also testified, I recall under a question

4    from Mr. Simon [sic], that your full job was to document the

5    money that these individuals received and not whether they did

6    good work, correct?

7    A.   Correct.

8    Q.   Now, you also testified earlier, in response to a

9    question that I asked you, that you did not interview any of

10   the school board members to determine why they initially hired

11   and later extended Mr. Adams as superintendent of the Clay

12   County schools, correct?

13   A.   Correct.

14   Q.   And you understand that it is the school board and the

15   county that is the group, the organization that makes the

16   determination whether to initiate hiring a superintendent and

17   whether or not they want to extend his or her contract,

18   correct?

19   A.   My understanding is that they vote.

20   Q.   Well, sure.

21   A.   I don't know the actual criteria that makes their

22   decision.

23   Q.   Okay.  As part of your investigation, have you learned

24   how many members actually comprise the school board in Clay

25   County?

*SAGRECY - Recross (Mr. Westberry)*                                    14

1    A.   I can't recall off the top of my head, no.

2    Q.   As part of your investigation, were you able to determine

3    periodically, some every three or four years, the

4    superintendent such as Mr. Adams comes before the school board

5    for a contract renewal?  Do you know that?

6    A.   I don't know that to be a routine.  I do know in his

7    case, every four years he got a renewal.

8    Q.   Correct.  And do you also recall or acknowledge that in

9    2006, his contract was renewed, if you know?

10   A.   I believe it was.

11   Q.   And as part of your investigation and work that you did

12   in this case, were you made aware that during the course of

13   Doug Adams' employment as superintendent, three out of the

14   five members of the school board either changed or were

15   replaced?

16   A.   I was not made aware of that.

17   Q.   Do you know anything about what state law requires in

18   terms of the qualifications to be a superintendent of schools?

19   A.   No.

20   Q.   You indicated, Mr. Sagrecy, that there was a school board

21   race, I think I've got this right, that you thought that Mr.

22   Adams may have tried to have some influence in.  You recall

23   that line of questioning?  It was on the redirect from Mr.

24   Smith.

25   A.   I believe, yes.

1    Q.   Can you tell us the specific name of the school board

2    member who was involved, if you know?

3    A.   Again, I can't -- there are so many elections and so many

4    races, and --

5    Q.   Please don't speculate.  I'm asking for --

6    A.   Yeah, I can't.

7    Q.   I know, I know.

8            MR. WESTBERRY:  One minute please, Judge.

9            THE COURT:  Yes, sir.

10   Q.   Do you know the names of any school board members who you

11   could say were pressured into hiring and/or retaining Mr.

12   Adams because of politics?  If you know.

13   A.   No.

14           MR. WESTBERRY:  Thank you, sir.  I pass the witness,

15   Judge.

16           THE COURT:  Thank you.  Mr. White.

17           MR. WHITE:  No questions, Your Honor, thank you.

18           THE COURT:  Mr. Abell, anything else?

19           MR. ABELL:  No recross.

20           MR. RICHARDSON:  No questions.

21           THE COURT:  Mr. Gilbert.

22                           RECROSS-EXAMINATION

23   BY MR. GILBERT:

24   Q.   Mr. Sagrecy, you were asked about, I believe, the 1996

25   contract?

SAGRECY - Recross (Mr. Gilbert)                                    16

1    A.   Yes.

2    Q.   And you indicated, I believe, on a question that at that

3    time the entry of that contract, I believe I wrote it down

4    correctly, you said there was no indication of a bid at that

5    time?  Was that your answer?

6    A.   I don't recall that specific answer.  There's no

7    indication of other bids.

8    Q.   Okay.  That's what I want to clarify.  There is

9    indication in the minutes of advertising for bids and

10   accepting B&J Transfer's bid; is there not?

11   A.   I believe there was a motion to accept the bid, I recall

12   that.  And I do recall -- we can look at it again.

13   Q.   Okay, let's do that.

14   A.   Let's make sure.

15   Q.   March 11, 1996.

16   A.   I don't have that exhibit any longer.

17   Q.   I'm not sure what type of order they're in.

18   A.   March 11, '96?

19   Q.   Yes, sir.  And it indicates that a motion was made by

20   Laura House and seconded by Sherrie House to advertise for

21   bids.

22   A.   That's correct.

23   Q.   Okay.  And the following meeting, on April the 8th, 1996,

24   do you have that?

25   A.   Yes, I have that.

1    Q.   A motion was made by John Ed Pennington and seconded by

2    Vernon Hacker to approve the bid submitted by B&J?

3    A.   Yes, that's correct.

4    Q.   So your testimony is that there's no indication of a

5    competing bid in the record?

6    A.   Correct.

7    Q.   All right.  Not that there wasn't a bidding process or

8    there's no indication of a bidding process?

9    A.   There were no other bids --

10   Q.   Okay.

11   A.   -- besides that one.

12   Q.   All right.  That's fair enough.  If I could have

13   Exhibit M17, please.  Or if Miss Poynter can pull that up,

14   M17.  I believe you were asked a series of questions about an

15   increase in 2004, and your response was that was actually an

16   amendment from yardage to tonnage?

17   A.   I believe that's correct.

18   Q.   Okay.  And if we look at that exhibit there, 2003 would

19   have been the year preceding the amendment from yardage to

20   tonnage?

21   A.   Yes.

22   Q.   And that would be $142,437.43.  Is that correct?

23   A.   Yes.

24   Q.   And the next year, well, it wasn't changed over until

25   August of 2004, was it?

1   A.   I believe that to be right.

2   Q.   Okay.  I do too.  So that if we use 2004 as a base year,

3   the following year it went up $4,000.  So that would be an

4   increase; would it not?

5   A.   Yes.

6   Q.   And the next year, it is 148,700 and change?

7   A.   Yes.

8   Q.   And that includes almost $25,000 of PRIDE --

9   A.   That's correct.

10  Q.   -- cleanup?  So that figure would actually be $124,000?

11  A.   It's still garbage removal.

12  Q.   Pardon?

13  A.   It's still garbage removal.

14  Q.   Yes, sir.

15  A.   So it's still 148,760 is what they received.

16  Q.   But the $25,000 of PRIDE money went to a county-wide

17  cleanup.  So it's not the monthly payment that B&J would have

18  received?

19  A.   Right.  It's for the county cleanup.

20  Q.   All right.  So if we back that out, actually, the City

21  saved $9,000 by going from yardage to tonnage in that

22  particular year on the monthly pickups?

23  A.   I can't say they saved money.  It could have been less

24  garbage.

25  Q.   Could have been.  Could have been.  Could have been more

1    garbage?  We just don't have those figures.  But in any event,

2    we can agree that the bill was reduced by 9,000 --

3    approximately $9,000?

4    A.   If you take out the PRIDE dollars.

5    Q.   Yes, sir.  All right.  The next year is 2007.  We're

6    still on tonnage, and that would be approximately the same

7    amount as charged in the year before, which I calculate to be

8    around $8,000 less then the prior year with cubic yards.

9    Would you agree with that?

10   A.   And you're saying being the same, less the PRIDE dollars,

11   correct?

12   Q.   Well, there's no PRIDE dollars in 2007.

13   A.   I understand, but you're saying '07 and '06 -- did I

14   misunderstand that they were the same?

15   Q.   Approximately, if you back out the PRIDE.

16   A.   Yes, yes.

17            MR. GILBERT:  Okay.  That's all.

18            THE COURT:  Thank you.  Miss Hughes?

19            MS. HUGHES:  No, sir.

20            THE COURT:  Mr. Simons, anything else?

21            MR. SIMONS:  One or two.

22            THE COURT:  Yes, sir.

23                          RECROSS-EXAMINATION

24   BY MR. SIMONS:

25   Q.   Agent Sagrecy, Mr. Smith asked you on redirect about

SAGRECY - Recross (Mr. Simons)                                        20

1   whether you knew about some money under the table being paid

2   by B&B?

3   A.   Yes.

4   Q.   Do you remember that?

5   A.   Yes.

6   Q.   You're familiar with Kennon White, and you know his role

7   in this case; do you not?

8   A.   Yes.

9   Q.   You realize that he pled guilty to extorting money from

10  my client in a series of City contracts?

11  A.   I realize he pled guilty.  I wasn't involved with that

12  investigation.

13  Q.   Okay.  But you understood he pled guilty, he pled guilty

14  to extorting money from my client for giving out City

15  contracts?

16  A.   I actually do not know the exact charge he pleaded to.  I

17  do know he was involved in a kickback scheme.

18  Q.   Did you make any effort to back that money out that

19  Kennon White took from my client from the figures you put up

20  in front of the jury?

21  A.   I do not know which projects that Kennon White took money

22  from.  So no, I did not.

23              MR. SIMONS:  Okay.  That's all.  Thank you.

24              THE COURT:  Anything else of this witness?

25              MR. SMITH:  No, thank you.

*SAGRECY – Recross (Mr. Simons)*                                                    21

1          THE COURT:  Thank you.  You may step down.

2          MR. SMITH:  I would ask that this witness be

3     released.

4          THE COURT:  Yes, sir, he may be.

5                              * * *

6                     C E R T I F I C A T E

7          I, LISA REED WIESMAN RDR-CRR, certify that the
      foregoing is a correct excerpted transcript from the record of
8     proceedings in the above-entitled case.

9

10     \s\ Lisa Reed Wiesman                  March 15, 2010
      LISA REED WIESMAN, RDR-CRR            Date of Certification
11    Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25