1

1                      UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF KENTUCKY
2                      SOUTHERN DIVISION at LONDON
                                 - - -
3

UNITED STATES OF AMERICA,        :   Docket No. CR 09-16-S
4                                :
                    Plaintiff,   :   **Frankfort, Kentucky**
5                                :   Tuesday, March 16, 2010
         versus                  :   1:00 p.m.
6                                :
RUSSELL CLETUS MARICLE,          :
7   DOUGLAS C. ADAMS             :        **Trial Day 25B**
    CHARLES WAYNE JONES          :
8   WILLIAM R. STIVERS           :
    FREDDY W. THOMPSON           :     **EXCERPTED TRANSCRIPT**
9   WILLIAM B. MORRIS            :
    DEBRA L. MORRIS              :   **Clay M. Bishop Testimony**
10  STANLEY BOWLING,             :
                                 :
11                  Defendants.  :

12

13                               - - -
                          TRANSCRIPT OF TRIAL
14                     BEFORE DANNY C. REEVES
             UNITED STATES DISTRICT COURT JUDGE and a jury
15                               - - -

16   APPEARANCES:

17   For the United States:       STEPHEN C. SMITH, ESQ.
                                  JASON D. PARMAN, ESQ.
18                                Assistant U.S. Attorney
                                  601 Meyers Baker Road
19                                Suite 200
                                  London, KY 40741
20
     For the Defendant           MARTIN S. PINALES, ESQ.
21   Russell Cletus Maricle:     Strauss & Troy
                                  150 E. Fourth Street
22                                Fourth Floor
                                  Cincinnati, OH  45202
23
                                 DAVID S. HOSKINS, ESQ.
24                                107 E. First Street
                                  Corbin, KY  40701
25

2

```
1      For the Defendant          R. KENT WESTBERRY, ESQ.
       Douglas C. Adams:          KRISTIN N. LOGAN, ESQ.
2                                 Landrum & Shouse, LLP
                                  220 West Main Street
3                                 Suite 1900
                                  Louisville, KY 40202
4

5      For the Defendant          T. SCOTT WHITE, ESQ.
       Charles Wayne Jones:       Morgan & Pottinger, P.S.C.
6                                 133 West Short Street
                                  Lexington, KY  40507
7

8      For the Defendant          ROBERT L. ABELL, ESQ.
       William R. Stivers:        120 North Upper Street
9                                 Lexington, KY  40507

10

11     For the Defendant          RUSSELL JAMES BALDANI, ESQ.
       Freddy W. Thompson:        R. TUCKER RICHARDSON, ESQ.
                                  Baldani, Rowland & Richardson
12                                300 West Short Street
                                  Lexington, KY  40507
13

14     For the Defendant          JERRY W. GILBERT, ESQ.
       William B. Morris:         Coy, Gilbert & Gilbert
15                                212 North Second Street
                                  Richmond, KY 40475
16

17     For the Defendant          ELIZABETH SNOW HUGHES, ESQ.
       Debra L. Morris:           Gess, Mattingly & Atchison, PSC
18                                201 West Short Street
                                  Lexington, KY 40507
19

20     For the Defendant          DANIEL A. SIMONS, ESQ.
       Stanley Bowling:           Thompson, Simons, Dunlop & Fore
21                                116 West Main Street
                                  Suite 2A
22                                Richmond, KY 40476

23

24

25
```

3

Court Reporter:                LISA REED WIESMAN, RDR-CRR
                               Official Court Reporter
                               35 W. Fifth Street
                               P.O. Box 1073
                               Covington, KY  41012
                               (859) 291-4410


     Proceedings recorded by mechanical stenography,
transcript produced with computer.

*C.M. BISHOP - Direct (Mr. Baldani)*                                    4

1                              * * *

2              (The jury entered the courtroom at 1:01 p.m.)

3         THE COURT:  Thank you.  The record will reflect that

4    all members of the jury are present.  Parties and counsel are

5    all present.

6              Witness is reminded that he's still under oath.

7              Mr. Baldani, I think we were still in your, what

8    amounts to your direct examination, since you had this witness

9    under subpoena.

10             MR. BALDANI:  Thank you, Your Honor.

11             THE COURT:  You may proceed.

12                   DIRECT EXAMINATION (continued)

13   BY MR. BALDANI:

14   Q.  Mr. Bishop, when we broke for lunch, I was asking you

15   about Larry Henson.  Do you know Larry Henson?

16   A.  I don't believe I do.

17   Q.  Okay.  But I showed you some minutes from the Board of

18   Elections in '04.  You recall that?

19   A.  Oh, yeah.  I remember looking at it.

20   Q.  Do you recall a motion being made regarding Larry

21   Henson's absence in '04?

22   A.  No, I couldn't.  I can't recall.

23             MR. BALDANI:  Judge, if I could show the witness

24   PR16M, please.

25             THE COURT:  Yes, sir, you may.

*C.M. BISHOP - Direct (Mr. Baldani)*                              5

1    Q.   And Mr. Bishop, I'm going to ask you to read the first

2    three or four paragraphs of this, not out loud, but just to

3    yourself to see, and then I'll ask you if that refreshes your

4    recollection regarding this fella, Larry Henson, I've been

5    asking you about.

6    A.   Okay.

7    Q.   Mr. Bishop, as a member of the Board of Elections, did

8    you ever become familiar with a precinct election officials

9    absence report?  Do you know what that is?

10   A.   Yes, sir.

11   Q.   What is that?

12   A.   Well, if an election officer fails to report for duty

13   that they promise to participate in, then you have to fill out

14   a form.

15   Q.   Okay.  And after reviewing that government exhibit, does

16   that refresh your recollection regarding Mr. Henson in 2004?

17   A.   Yes, it does.

18   Q.   Do you recall a motion being made regarding his absence?

19   A.   Yes.

20   Q.   Or his failure to show up to serve?

21   A.   Yes.

22   Q.   And what was that motion, if you recall now?

23   A.   It was a motion to put his name on the County Board of

24   Elections officials absence report, which is form SB -- SCB54B

25   due to the fact that he didn't show up for duty.

*C.M. BISHOP - Direct (Mr. Baldani)*                                        6

1    Q.   Okay.  Do you recall, I'm not asking you to read from

2    this document.  I'm asking you, do you recall seconding that

3    motion and it being granted?

4    A.   No, but the motion was granted.

5    Q.   During Mr. Smith's cross-examination, he showed you

6    PR42 -- I'm done with that.

7    A.   Oh, okay.

8    Q.   He showed you PR42, which was a photograph of various

9    people in Washington, D.C.  Do you recall that?

10   A.   Yes, sir.

11   Q.   All right.  And you were asked about a whole bunch of

12   different people whose picture -- or who appeared in those

13   pictures, right?

14   A.   Yes, sir.

15   Q.   Do you recall Freddy Thompson being in that picture or

16   any of those pictures?

17   A.   No, sir.

18   Q.   He wasn't at that meeting or on that trip, was he?

19   A.   There was a whole bunch of people, but I don't think he

20   was.  Whoever's in that picture was.  Whoever wasn't, wasn't.

21          MR. BALDANI:  That's all the questions I have, Your

22   Honor.

23          THE COURT:  Thank you.

24          MR. GILBERT:  No questions.

25          MS. HUGHES:  No, sir.

*C.M. BISHOP - Redirect (Mr. Westberry)*                                7

1          MR. SIMONS:  I have none, Your Honor.

2          THE COURT:  We're back to redirect of the witness.

3          MR. WESTBERRY:  Yes.  Thank you.

4                     REDIRECT EXAMINATION

5   BY MR. WESTBERRY:

6   Q.   Good afternoon again, Mr. Bishop.  Kent Westberry for

7   Doug Adams.  I've got some questions that I'd like to ask you

8   that are in response to matters that were raised by Mr. Smith

9   on behalf of the government.  You were asked, Mr. Bishop,

10  about some meetings that you may have attended, or perhaps the

11  better way to describe it is occasions where you may have been

12  present at Paul Bishop's garage or his barn.  Do you recall

13  those lines of questioning?

14  A.   Yes.

15  Q.   And I'm not sure that I heard, but could you tell us

16  again, your best recollection, how many times were you

17  actually at Paul Bishop's garage or his barn or however you

18  want to characterize it?

19  A.   Three times.  I was there initially the first time I ever

20  knew there was such a place, which is just down the hill from

21  his house, which is hidden from the road.  But they had a fish

22  fry, a community fish fry.  And my brother and I were invited,

23  and I remember it was some time ago because he was holding

24  hands with his soon-to-be wife, who he's married to now.  So I

25  remember that.

1    Q.   When you say some time ago, can you ballpark, best you

2    can, how long ago was that fish fry?

3    A.   I can't remember when he got married, but it was prior to

4    2000 -- probably about, let's see.  Hard to figure.  Probably

5    prior to 2000.  May have been somewhere after, shortly after.

6    But it was a while back.

7    Q.   What was the purpose?  Did the fish fry have a stated

8    purpose, or was it just a gathering?

9    A.   Just a gathering, sort of like a potluck fish fry.  Some

10   of the guys were frying fish, and then the ladies brought

11   beans and coleslaw and all the things that went with it.  And

12   we had a big -- everybody ate too much.

13   Q.   Do you have a recollection of politics being discussed at

14   this fish fry, if you recall?

15   A.   No.  No.

16   Q.   And you think this, from the best of your memory, this

17   occurred sometime in 2000, correct?

18   A.   Well, it was a long time ago.  It was a long time ago.

19   That's the first time I'd ever been there.

20   Q.   How many people were there, just again ballpark?

21   A.   Oh, Lord.  There would have been 40 or 50 people or more,

22   maybe.  Some, you know, came through and ate and left, and

23   others sort of hung around.  They had the bluegrass singers

24   there, you know, and they had them again in 2006 or 7.  Can't

25   remember exactly when that was.  But they had them back again,

1    and I know most of -- well, I know all those guys, actually.

2    They pick and sing in the bluegrass band.  Some of them go to

3    church with me.

4    Q.   Right.  Was it a social occasion, Mr. Bishop?

5    A.   Yes, yes, absolutely.  Yeah, just another -- they were --

6    it was a kind of a celebration that Carl Jackson had been

7    elected magistrate, and anytime Clay County people get

8    together, they eat.  That's, you know -- they eat a lot.  So

9    we had a big fish fry and, you know, it was, again, it was a

10   potluck dinner and that was essentially it, you know.

11   Q.   Do you have any recollection if Doug Adams and his wife

12   would have been present at that fish fry, if you know?

13   A.   I don't think they were.  I can't remember Doug being

14   there.  It's possible, because there were a lot of people

15   there, but I don't recall.  I say that because I think if he

16   had been there, I would have talked to him, and I don't

17   remember talking to him on that occasion.

18   Q.   What was the next time that you're at Mr. Bishop's garage

19   or his barn?

20   A.   That would actually fall in between.  That would have

21   been just prior to the May, 2002 election.  I had been

22   approached by several candidates with a list of potential

23   challengers.  And as chairman of the Republican party, it's my

24   duty to appoint or turn in a list of challengers.  And

25   Jennings White had turned in a list of challengers for the

1    Democrat party, even though he was running as a Republican.

2    So that had some of the candidates, of which I was a candidate

3    myself, but it didn't bother me.

4        I have found that challengers are essentially worthless.

5    Q.   What do challengers do again, just real quickly, so we

6    know?

7    A.   They are allowed to be at the polling place, inside the

8    polling place on the day of election.  And if, if they think

9    that somebody is trying to vote in that precinct who doesn't

10   live there, they can challenge that person's credentials,

11   essentially.  And that's about all they have authority to do

12   is say, you know, we don't think you live here.

13   Q.   When you say your experience indicates the concept of

14   challengers are kind of useless, why do you say that?

15   A.   Just I've never seen the purpose in it.  It's just

16   overkill.  These people get -- you know, some of these people

17   running for elections, they don't really have any idea how the

18   process works, quite frankly.  They go around and say, you

19   know, I'm running for magistrate or constable or jailer, would

20   you vote for me.  Of course, everybody says yes, and they

21   believe that everybody's gonna vote for them.  So when they

22   lose, it's like, why, you know, somebody stole this election.

23       That's just the common, common denominator with

24   elections, that everybody thinks that because, you know, that

25   people assure them that they'll vote for them, that that's

1    going to happen.  And doesn't work that way.  I mean, you

2    know, people -- some people will promise you and vote for you,

3    and obviously some don't.

4    Q.   Sure.

5    A.   But challengers are there, and I have appointed them in

6    the past.  Always reluctantly.  I don't find it to be

7    beneficial.  And I was looking for guidance and counsel from

8    Doug as to -- because I didn't -- some of these people get mad

9    when you turn in their names, and I didn't know if some of

10   them -- you know, I didn't want them getting mad at me.  I had

11   some of these other candidates saying please turn in this

12   list.

13        You know, it wasn't that big a deal at all, because it

14   ended up I turned it in a day late.

15   Q.   And what happened when you turned it in a day late?

16   A.   Jennings White said, "I don't have to accept that," and I

17   said, "I didn't say you did."  And he bounced it off my chest,

18   and he said something else about he didn't have to accept

19   that.  And I said, "I'm not here to argue.  I've done my job.

20   Have a nice day."  And I walked away.

21   Q.   That second meeting, Mr. Bishop, at the garage that we've

22   been talking about, who all was present at that garage?

23   A.   Doug Adams and myself.

24   Q.   Anybody else?

25   A.   No.

1    Q.   And who called the meeting again?  I call it a meeting.

2    It's just two people.

3    A.   Yeah, it wasn't much of a meeting.  I asked Doug if he

4    had time, could he stop by and look at this list, see if he

5    had anything, you know.  If he thought these people might get

6    mad at me.  I didn't want to turn it in, but I had to.

7    Actually, it was more of a -- I hadn't seen much of him, and

8    we're friends, and we asked each other how things were going,

9    and it was more of just a chitchat than anything.

10        And we didn't do anything with the list.  We didn't make

11   any changes.  We just looked at them, said whatever,

12   essentially.  And so the next day, I turned it in, and when it

13   was rejected, I, you know, I thought that I had done it

14   correctly.  I called the State Board of Elections and I said,

15   you know, he's refused to accept these list of challengers, so

16   now these other candidates are mad at me, saying that I

17   intentionally delayed turning it in, which was not the case at

18   all.

19        And they said, well, you have to read the calendar in the

20   front of the book.  So that's --

21   Q.   How long did that little gathering or the meeting between

22   you and Mr. Adams, how long did it last that evening?

23   A.   Less than an hour.

24   Q.   Yes.  And it was before the May, '02 primary; is that

25   correct?

*C.M. BISHOP - Redirect (Mr. Westberry)*                    13

1    A.   That's correct.

2    Q.   Was there ever any discussion at that meeting about vote

3    buying?

4    A.   No.

5    Q.   Was there ever any discussion at that meeting about

6    pooling sums of money?

7    A.   No.

8    Q.   Now, I think, Mr. Bishop, you told us a little while ago

9    that was there a third time that you recall that you were at

10   Paul Bishop's garage or barn?

11   A.   That would have been the one that I mentioned a while

12   ago, it was in 2006 or 2007 when Carl Jackson had been elected

13   to replace Terry Davidson's slot.  I think it's District 3 as

14   a magistrate.  And he and Paul Bishop are big buddies.  Of

15   course, Carl's well liked all over the area.  He's a good guy.

16        And it was just another excuse for them to have a fish

17   fry, essentially.

18   Q.   How many people were at that occasion?

19   A.   Well, the barn or garage or whatever you want to call it,

20   it's a big, big place.  Probably about as big as this room.

21   It was full.  I mean, people eating and, of course, the band

22   was playing on top of a flatbed trailer, you know, like you

23   haul tobacco and things on.  The band was up there playing.

24   It's not really a band.  It's just a bunch of guys that get

25   together and play bluegrass, and they're really good.

1    Q.   And when, again, is your best recollection as to when

2    that final time that you were at the Bishop garage or barn

3    occurred?

4    A.   It was 2006 or 2007, and it could have even been 2008.  I

5    just can't remember things like that much.  But the records

6    would show that it was when Carl Jackson was elected to fill

7    the vacancy that had occurred because of Terry Davidson's

8    conviction for whatever he was convicted for.

9    Q.   At that or any of those other instances that you told us

10   about, the other two that you're at the garage, had you ever

11   been there when there was discussion about pooling substantial

12   sums of money for helping somebody's election campaign?

13   A.   No.  No.

14   Q.   Do you recall if Doug Adams or his wife were at that

15   final --

16   A.   I don't believe they were.  No, sir.

17   Q.   If someone had said, Mr. Bishop, that you were present at

18   a meeting at the Bishop garage or barn --

19        MR. SMITH:  Your Honor, I'm going to object.  He's

20   asking him to comment on the evidence in the case.

21        THE COURT:  Sustained.

22   Q.   You were asked some questions, Mr. Bishop, about whether

23   or not there was something improper in you and your office

24   prosecuting either a close friend or the child of a close

25   friend.  Do you recall that line of questioning earlier this

*C.M. BISHOP - Redirect (Mr. Westberry)*                    15

1    morning?

2    A.   Yes, sir.

3    Q.   And again, Mr. Bishop, how long have you been a county

4    attorney?

5    A.   I'm in my 25th year.

6    Q.   Have you been recognized for outstanding service on any

7    occasion?

8    A.   I've been, yes, sir.  I've been named outstanding county

9    attorney for the Commonwealth on two occasions, 1995 and 2006.

10   Five or six.  Can't recall the last one.  But twice, yes, sir.

11   Q.   And what office makes that or gives that recognition out?

12   A.   It's the office of the attorney general and the

13   Prosecutor's Advisory Council.

14   Q.   Is that made up of prosecutors of different political

15   parties?

16   A.   Yes, sir.  The Prosecutor's Advisory Council is made up

17   of the executive director, who is a deputy attorney general

18   for the state of Kentucky.  It's made up of three

19   Commonwealth's attorneys who are appointed by the governor.

20   It's made up of three county attorneys that are appointed by

21   the governor, and it's made up of two citizen at large

22   members, and I have also served on that Prosecutor's Advisory

23   Council under two different governors.  I was named to that

24   board by Brereton Jones and again by Governor Paul Patton.  So

25   I've served on that body as well twice.

1    Q.    And Jones and Patton, are they members of a different

2    political party than the one you're affiliated with?

3    A.    Yes, they are.

4    Q.    Are you aware, Mr. Bishop, of any rule, any law or

5    statute that would prohibit you or your office from

6    prosecuting either someone you know, a friend or perhaps a

7    family member of a friend?

8    A.    No.  If I were prohibited from prosecuting people who are

9    friends to me or I'm friends with their parents or someone in

10   their family, I mean, I would have nothing to do, which would

11   be lovely, but that's not the way it works.  I don't get to

12   pick and choose.  If the evidence is there and they're not kin

13   to me, then I don't -- you know, I don't have any reason to

14   recuse.  And I've never -- if someone has shown a reason, I

15   always say that's fine.  I don't want to have to do another

16   case if I don't, you know, have to.

17        I've never done anything -- and in that hearing, I said

18   if anybody can show me why I need to recuse, I'm outta here.

19   But otherwise, you know, it's -- we were just doing our jobs.

20   And when the evidence is there, I prosecute.  And if it's not

21   there, I have the same responsibility to seek justice.  And if

22   the evidence is not there, I have an obligation to see that

23   that case is not prosecuted.  That's my role, to seek justice.

24   Q.    You were asked questions about whether or not Melanda

25   Adams had come through your court and had been prosecuted by

*C.M. BISHOP - Redirect (Mr. Westberry)*                              17

1    your office; is that correct?

2    A.   That's correct.

3    Q.   Have you prosecuted children of other friends and

4    acquaintances of yours in Clay County over the years?

5    A.   Many.  Yes, unfortunately.

6    Q.   And is that anything out of the ordinary for a community

7    or a county the size of Clay?

8    A.   No, sir.  It happened just last week.

9    Q.   You were asked about an older criminal case from the late

10   1980s involving some criminal prosecution against Doug Adams

11   for something election related.  Do you recall that question?

12   A.   Yes.

13   Q.   Do you recall the questions from the prosecutor, from the

14   government about that older conviction in the late 1980s or,

15   excuse me, the older prosecution in the late 1980s earlier

16   today?

17   A.   Yes, he mentioned something about it, yeah.

18   Q.   Do you know whether or not it ever resulted in a

19   conviction?

20   A.   To my knowledge, they were all indicted, and I don't know

21   what happened from there, because it was from the

22   Commonwealth's attorney's office, not mine.

23   Q.   Do you have any personal knowledge about what led up to

24   that?

25   A.   No, I do not.  The grand jury in Clay County is run

*C.M. BISHOP - Redirect (Mr. Westberry)*                                     18

1    primarily by the Commonwealth's attorney and now exclusively

2    by Commonwealth's attorney.  When I first became county

3    attorney in 1986, the clerk of the court, the court reporter,

4    called me and said the grand jury wants you here now.

5        And I did handle grand jury proceedings when Gillis

6    Colson was the Commonwealth's attorney for a brief, short

7    period of time.  Since then, it's been handled by the

8    Commonwealth's attorney's office, and that's the way it is

9    everywhere, as far as I know.  I don't do the grand jury.

10       So they were -- those indictments came from the Clay

11   County grand jury, and that was from the Commonwealth's

12   attorneys office, not my office.  I don't recall ever having a

13   complaint about an election, election problem.  Those

14   complaints usually go -- because the grand jury has the duty

15   to look over all of the records that are submitted to them,

16   which must be submitted after every single election.  They

17   have to look at all the stuff.  And the grand jury is the one

18   who makes that decision as to whether or not people are

19   indicted or not.

20   Q.  Okay.

21   A.  Not me.

22   Q.  You were shown an exhibit that the government identified

23   as P42.  It was a newspaper article from several years ago

24   there in Manchester, and it had a picture of a lot of people

25   with an elected Congressional official.  Do you remember that

1    being shown to you a little earlier today?

2    A.  Yes, sir, I do.

3    Q.  Do you have P42 --

4         MR. WESTBERRY:  May I ask that the witness be shown

5    P42?

6         THE COURT:  Yes.

7    A.  Yes, sir.

8    Q.  I believe you've said that you have recollection of

9    making that trip to Washington, D.C. area; is that correct?

10   A.  That is correct.  I was there to participate in a

11   domestic violence conference.  I'm almost positive -- could

12   have been child support, but I think it was domestic violence.

13   Q.  From your personal knowledge, what was the purpose,

14   though, of the larger group making that trip to the D.C. area

15   to meet with what appears to be Senator Bunning?

16   A.  Senator Robert Stivers put that together.

17   Q.  And what was the purpose of that meeting?

18   A.  It was to go and -- I don't really know.  It was to go

19   and meet with -- they also met with Senator McConnell later

20   that day.  I did not, because I had to go back to my

21   conference.  But I did introduce all of these folks except one

22   young man.  I didn't know him at the time.  It was Jamey

23   Mills, but, you know, that's the only one I did not know.  And

24   I introduced them all to Senator Bunning.

25        The purpose was to try and tell the delegation in

1   Washington that Clay County was in need of whatever they could

2   do to help us with infrastructure, anything.  Any federal

3   monies that could be of benefit for the county.  That's what I

4   took it to be, because you had the leaders of the community

5   and the elected officials, Chamber of Commerce, that sort of

6   thing.

7       So it was just a community effort to try and explain to

8   the Washington delegation that we needed help.

9   Q.  Looking at that picture, the number of individuals that

10  are contained on P42, are you able to identify some on that

11  picture who were connected at the time to the City of

12  Manchester in Manchester city government?

13  A.  Yes, sir.

14  Q.  Just what's the date on that newspaper article again,

15  please?

16  A.  That is Thursday, February the 5th, 2004.

17  Q.  Okay.  Roughly six years ago, correct?

18  A.  Yes, sir.

19  Q.  Now, can you identify some faces on that photograph of

20  folks that were connected with city government in Manchester

21  at that time?

22  A.  Yes, sir.  Starting from this side over here with Mr.

23  Todd Roberts.

24  Q.  What was he again, please?

25  A.  He was the assistant chief of police of Manchester.

*C.M. BISHOP - Redirect (Mr. Westberry)*                          21

1    Q.   Okay.  Who else, Mr. Bishop?

2    A.   The next one with city government would have been Penny

3    Robinson.  She was an elected city councilwoman.

4    Q.   Okay.

5    A.   And next to her, Ouchie Jackson.  I think his name is

6    Gary.

7    Q.   Yes, sir.  What was he at the time?

8    A.   City councilman.  Sherrie House, city councilwoman.

9    Behind her, I believe, is former mayor Daugh K. White.  And

10   then there's Kennon White, but I'm not sure if he held any

11   position at that time or not.

12   Q.   Had he previously held a position with the City?

13   A.   He did at some point in time.  He was -- I forgot what

14   they call him.  City -- I don't -- he held some position.  But

15   quite frankly, I forget what his title was, if there was a

16   title.  Next to him is the gentleman I didn't know at the time

17   I made the introductions, and I was embarrassed, but I know

18   him now to be then city councilman Jamey Mills.

19   Q.   Okay.

20   A.   He's no longer on the city council.  Well, I don't know

21   if he is or not.  He's running for coroner this time.  So I

22   don't know.

23   Q.   Just kind of move through it.  I'm just trying to get a

24   flavor of all of the city officials that would have been

25   there.  Then I have a question for you.

*C.M. BISHOP - Redirect (Mr. Westberry)* 22

1   A.   Okay.   Then there's over here, just beside Senator

2   Bunning, there's Vernon Hacker, just behind Senator Stivers.

3   Vernon Hacker was a city councilman, I do believe, at that

4   time.   And then Darnell Hipsher was a city councilman.   And

5   that's it for the city, as far as I can tell.

6   Q.   Thank you.

7   A.   Yes, sir.

8   Q.   Do you now know, years later, after, of course, the

9   photograph's been taken, Mr. Bishop, that a number of those

10  city officials that you identified have been convicted in

11  federal court of felony crimes?

12  A.   Yes, sir.

13  Q.   Okay.   Would that involve former assistant police chief

14  Roberts?

15  A.   Yes.   Yes.

16  Q.   Would that involve former Manchester mayor Daugh White?

17  A.   Yes.

18  Q.   Would that involve his son and former city official in

19  some capacity Kennon White?

20  A.   Yeah, I'm not sure of his status, but I think he's pled

21  guilty.  I think.

22  Q.   How about Vernon Hacker?

23  A.   Yes.

24  Q.   How about Darnell Hipsher?

25  A.   Yes.

1    Q.   At the time that you were traveling with the other group

2    to D.C. on that meeting with your senators, did you have

3    personal knowledge yourself that, for example, Kennon White

4    had been involved in a kickback scheme?

5    A.   No, sir.

6    Q.   Did you have personal knowledge yourself that Daugh White

7    had also been involved in a kickback scheme?

8    A.   No, sir.

9    Q.   Would you agree that simply having your picture in a

10   newspaper, a local newspaper article by itself is not --

11        MR. SMITH:   Object.   That's going to be argument,

12   Your Honor.

13        THE COURT:   Sustained.

14   Q.   You do see Senator Bunning in that picture; do you not?

15   A.   Oh, yes, sir.   He and I were the first ones at the

16   meeting.   We visited for about 15, 20 minutes before anybody

17   else showed up.   And he said, are you it?   I said, I hope not.

18   But again, I was there by myself, essentially, until the rest

19   of them showed up.   I was there anyway.

20   Q.   No one's alleged he did anything wrong that you are aware

21   of, correct?

22   A.   Senator Bunning?

23   Q.   Yes, sir.

24   A.   Not that I'm aware of.

25   Q.   You were asked some questions by Mr. Smith on behalf of

*C.M. BISHOP - Redirect (Mr. Westberry)*                              24

1   the government about your brother, William Hugh Smith [sic],

2   and jobs he's held in the school system?

3   A.   William Hugh Bishop, um-hmm.

4   Q.   Excuse me, I'm sorry.  At about the time that you were

5   asked about those jobs, do you have personal recollection if

6   your brother was having health problems at that time?

7   A.   Yes, sir.

8   Q.   Can you tell us what you recall?

9   A.   Yes, sir.  He had a very serious cancer, and he had --

10          MR. SMITH:  Your Honor, I'm going to object to the

11   relevance.

12          THE COURT:  I'll overrule.  You can ask some limited

13   questions on this.

14          MR. WESTBERRY:  Sure.

15   Q.   What is your recollection about his cancer, please?

16   A.   Went to see him in the hospital.  He had a large mass in

17   his intestines.  They were able to remove that --

18          MR. SMITH:  Your Honor, I'm going to object again, as

19   to being --

20          THE COURT:  I will sustain any details as to this.

21          MR. WESTBERRY:  We can move on.

22   Q.   Do you have any personal knowledge if any job or position

23   that your brother, William Hugh, held in the school system was

24   ever obtained on the basis of politics?

25   A.   No.  No, sir.

1    Q.   Do you have any knowledge, and I know you may not, but

2    did any change in job that he may have had within the school

3    system, from your personal knowledge, would it have been in

4    account of any health concerns that he had at the time?

5    A.   Yes.

6    Q.   And why do you say that?  I'm not asking you to get into

7    all the details of his cancer --

8            MR. SMITH:  I'm going to object.  This is outside the

9    witness's knowledge.  It would be hearsay if his brother told

10   him.  It would be hearsay if the school told him.

11           THE COURT:  Sustained.

12           MR. WESTBERRY:  May I have just one second, please?

13           THE COURT:  Yes, sir.

14           MR. WESTBERRY:  Thank you, Mr. Bishop, for your

15   courtesy.  Judge Reeves, we pass the witness.

16           THE COURT:  All right.  Thank you.  See if there's

17   any additional cross-examination.  Mr. Smith?

18           MR. SMITH:  Yes, sir.

19                        RECROSS-EXAMINATION

20   BY MR. SMITH:

21   Q.   Mr. Bishop, I'd like to clear up just a couple things in

22   your testimony, if we could.  You've testified in front of

23   this jury that you were personally aware that Jennings White

24   interjected himself in the selection of election officers.  Is

25   that a fair statement?  You agree with that?

*C.M. BISHOP - Recross (Mr. Smith)*                              26

1    A.   Yes.

2    Q.   Okay.  And you state that based on the fact that you were

3    part of the Board of Elections?  That's how you based your

4    testimony; is that a fact?

5    A.   I saw it.

6    Q.   All right.  And it's your testimony, in front of this

7    Court and this jury, that you were part of the Board of

8    Elections at the time that election officers were selected by

9    Jennings White?  Is that your testimony?

10   A.   Yes, I was.

11   Q.   All right.  Now, Mr. Bishop, you all keep records with

12   your Board meetings; isn't that a fact?

13   A.   The secretary or the deputy clerk does, yes.

14   Q.   By law, it's required; isn't that a fact?

15   A.   Absolutely.

16   Q.   And do you have any reason to believe that this person

17   who would keep the minutes of those meetings would be

18   dishonest or would fail to report accurately what's happened

19   in your meetings?

20   A.   I hope not, but I don't know.

21   Q.   It's never been brought to your attention before, has it?

22   A.   No, sir.

23   Q.   Mr. Bishop, isn't it a fact, sir, that you were not part

24   of the Board of Elections at any time election officers were

25   selected by Jennings White?

1    A.   Well, I -- yeah, I was.

2    Q.   That's your testimony.  Isn't it a fact, sir, that the

3    June 7, 2000 meeting, it reflected that that was the time

4    which you were first appointed as the Republican commissioner.

5    Isn't that true?

6    A.   I'd have to check.  I don't remember.

7         MR. SMITH:  Your Honor, I think in order to proceed

8    with this witness, I'm going to request Exhibits PR16I, PR16J,

9    PR16K, and PR16L.

10        THE COURT:  Yes, sir.

11   Q.   Could you read there on page 2 of PR16I, I believe it

12   says there in the middle of the page, July, no meeting.  New

13   board member.  Do you see that?

14   A.   16J.

15   Q.   Page 2, 16I.

16   A.   16J?

17   Q.   16I.

18   A.   I?

19   Q.   Yes, sir.

20   A.   This is 16I.  That was March, 2000?

21   Q.   May 5th, 2000.

22   A.   Okay.  May the 5th, 2000.  I don't see that one here.

23   Let me find it.

24   Q.   You may have to remove them from the sleeve there.  I'm

25   not sure that you're seeing the whole document.

1   A.   5 May, 2000?

2   Q.   Look at the middle of the page.  July, no meeting.  Do

3   you see that line?  New board member, Clay M. Bishop, filled

4   bond for Republican commissioner August 2nd, 2000.

5   A.   That the May 5?  I'm sorry.

6   Q.   Yes, sir.

7   A.   Okay.

8   Q.   Exact middle of the page.

9   A.   Right in the middle of the page.  July, no meeting.  New

10  board -- yes.  Yes, I see that.

11  Q.   Does that refresh your memory, sir, on when you actually

12  became the new member of the Clay County Board of Elections?

13  A.   I guess it does, yeah.

14  Q.   And would you agree with me, sir, that there was no

15  election in which you were selecting election officers in the

16  fall of 2000?  Would you agree with me with that?

17  A.   I couldn't remember.  Again, that's too far back.  I

18  can't remember stuff like that.

19  Q.   You just don't remember?

20  A.   No, I don't.

21  Q.   Do you remember an election in 2001?  There was no

22  election in 2001, was there, Mr. Bishop?

23  A.   I don't know.  Used to have them every year, and then

24  after 2000, I think it was every two years.  But it used to be

25  an every year thing.

1  Q.  Check PR16J, refresh your memory as to whether or not

2  there were any election officers chosen in 2001.

3  A.  16J would that be dated September, 2001?  September 18?

4  Q.  That would be correct.

5  A.  Okay.  What was your question again?

6  Q.  Isn't it true, Mr. Bishop, there were no election

7  officers selected by your board for 2001?

8  A.  Well, I can't really tell.

9  Q.  Isn't it a fact, sir, that you were not a part of the

10  Board in 2002, because you were a candidate for public office

11  and you had your brother, William Hugh Bishop, serve in your

12  stead?  Isn't that a fact?

13  A.  It was a fact that I did not serve.

14  Q.  So if you're not serving on the Board, then you don't

15  choose election officers; is that fair?

16  A.  For 2000 -- for that time, yes.

17  Q.  2002, you did not participate in the selection of

18  election officers because you were not a part of the Board.

19  Isn't that true?

20       MR. WESTBERRY:  Judge, I would object.  I think the

21  witness -- I sense he's trying to finish an answer, and Mr.

22  Smith --

23       MR. SMITH:  That's fair.  Mr. Bishop, please answer

24  my question, and I'll give you as much time as you need.

25  A.  I did not participate in the selection of election

*C.M. BISHOP - Recross (Mr. Smith)*                          30

1    officers during the election year for 2002 as a member of the

2    Board of Elections.  I was still chairman of the Republican

3    party.  But no, I didn't sit on the Board of Elections once it

4    was told to me that I had to resign or whatever it is that

5    they do.

6    Q.   And yet, your testimony in front of this Court and this

7    jury is that you personally witnessed Jennings White directing

8    and controlling the election officer selection, and that's not

9    true, is it, Mr. Bishop?

10   A.   No, I didn't say for 2002.  I saw him do it at other

11   times.

12   Q.   Well, you just admitted with me that you just got

13   appointed in 2000, sir.  Isn't that a fact?

14   A.   That's what the record shows.

15   Q.   And you're agreeing me that there was not an election

16   that you recall in 2001.  Isn't that a fact, sir?

17   A.   Yes.

18   Q.   And you're a candidate in 2002, and you removed yourself

19   from the Board; isn't that a fact?

20   A.   I think so.

21   Q.   And so now, you want to still remain with your testimony

22   to this Court and this jury that you have observed Jennings

23   White, because you would agree with me, would you not, sir,

24   that Jennings White was defeated as a county clerk in 2002?

25   Isn't that a fact?

1   A.   Yes, sir.

2   Q.   So you explain to this Court and this jury right now, Mr.

3   Bishop, how you could have witnessed this if you were not a

4   member until 2000?  He's defeated in 2002.  Would you explain

5   that, please?

6          MR. WESTBERRY:  Objection, Your Honor.  The tone.

7          THE COURT:  Overruled.

8   A.   There were times when -- the Board of Elections is an

9   open meeting.  There are times when you can observe whatever

10  they do.  And I, if I happened to be there and saw what he did

11  and was complained about what he did by other people, why they

12  were election officers in Whites Branch for all these years

13  and suddenly they're not, and they were blaming me.  I said

14  hey, it wasn't me.

15  Q.   Mr. Bishop, again, isn't it a fact that there are minutes

16  that are prepared for each of these meetings?

17  A.   There's supposed to be.

18  Q.   And if there's persons present, isn't it a fact that it's

19  noted in the record?

20  A.   Supposed to be.

21  Q.   I'd like for you now to look over the record, and you

22  show me where it shows that you were present not as a Board

23  member, but as an observer, where these things that you tell

24  this Court and this jury occurred.

25  A.   Oh, no, it doesn't show who might be present as a

*C.M. BISHOP - Recross (Mr. Smith)*                                     32

1   visitor.

2   Q.  Oh, it doesn't?

3   A.  No.

4   Q.  You're sure about that?

5   A.  Yeah.

6   Q.  I can show you parts there where it says Don Nolan was

7   present and observing.

8           MR. WESTBERRY:  Objection as to form.

9   Q.  Don Nolan is not a member of the Board of Elections.

10          THE COURT:  Sustained.  You can rephrase the

11  question.

12  Q.  Isn't it true, Mr. Bishop, that Don Nolan was not a

13  member of the Board of Elections in 2002?

14  A.  I don't know.  I don't think he was.

15  Q.  You testified already you had personal knowledge of who

16  was a member, and you've listed him as Jennings White as the

17  county clerk, Edd Jordan as the sheriff, you as the

18  Republican, later replaced by your brother before the election

19  and Charles Wayne Jones as the Democrat.

20  A.  Okay.

21  Q.  Would you agree with me, sir, that Don Nolan is not a

22  member of the Board?

23  A.  At that time -- I don't think he ever has been.

24  Q.  And his name's noted in there --

25  A.  Okay.

*C.M. BISHOP - Redirect (Mr. Baldani)*                    33

1    Q.  -- as being present.  You want an opportunity to look for

2    your name in there, sir, being present?

3    A.  No.

4    Q.  Because it's not in there, is it, sir?

5    A.  I don't know.  I might look through it all if you want me

6    to.  I can.

7             MR. SMITH:  That's all the questions I have.

8             THE COURT:  First, let me go with the other

9    defendants.

10            MR. HOSKINS:  No questions.

11            MR. WHITE:  No questions.

12            MR. ABELL:  No questions.

13            MR. BALDANI:  I do, Judge.  I'll ask from here.

14            THE COURT:  Keep your voice up, please.

15            MR. BALDANI:  I will.

16                        REDIRECT EXAMINATION

17   BY MR. BALDANI:

18   Q.  Mr. Bishop, do you have personal knowledge of a lawsuit

19   being filed against Jennings White in '02 regarding his

20   manipulation of election officers?

21   A.  Can't say as I do.

22   Q.  Don't have any recollection of that?

23   A.  No, sir.

24            MR. BALDANI:  That's all, Your Honor.

25            THE COURT:  All right.  Anyone else?  Mr. Westberry

1    just a moment if you need to confer.

2            MR. WESTBERRY:  No, I'm ready to proceed.  Thank you.

3            THE COURT:  Please proceed.

4            MR. WESTBERRY:  Thank you, Judge.  May I from here,

5    Judge Reeves?

6            THE COURT:  You may want to pull the microphone a

7    little closer, make sure everybody can hear.

8                    FURTHER DIRECT EXAMINATION

9    BY MR. WESTBERRY:

10   Q.   Hello again, Mr. Bishop.  Mr. Smith on behalf of the

11   government asked you about some of the minutes from some of

12   the older Board of Elections meetings from years past.  Do you

13   remember that line of questioning just a few moments ago, sir?

14   A.   Yes, sir.

15   Q.   From your experience as having been a past member of the

16   Board, can you say whether or not -- do those minutes always

17   reflect everybody who may have been in attendance at a Board

18   of Elections meeting?

19   A.   I seriously doubt it.

20   Q.   Why do you say that, sir?

21   A.   Well, because people come and go sometimes.  Candidates

22   sometimes come and go.  When there's a tally of the absentee

23   votes, some candidates like to be there to see, or some

24   candidates send somebody to be there to watch us count them.

25   So people come and go, and I don't think that they, you know,

*C.M. BISHOP - Further Direct (Mr. Westberry)*                    35

1    keep them all.  I don't know.  It's not my job to keep them

2    down.  So, you know, I just try to not meddle in other

3    people's affairs any more than I have to.  It's just not my

4    job, and it's -- it's against my religion, quite frankly, to

5    be a busybody.

6    Q.   You were asked questions by Mr. Smith about Jennings

7    White and whether or not he had attempted to manipulate the

8    appointment of election officers in years past.  Do you recall

9    that line of questioning?

10   A.   Yes.

11   Q.   Just to be clear, to the best of your recollection, what

12   time frame were you referring to when you mentioned Jennings

13   White trying to influence the selection of election officers?

14   A.   Must have been in 2000.

15   Q.   Why do you say that, sir?

16   A.   Well, because I remember getting dressed down pretty good

17   by a lady who had served as the judge at Whites Branch

18   precinct for many years.  And she was very upset because she

19   didn't understand why she was not the judge for that period of

20   time.

21        MR. SMITH:  Your Honor, I'm going to object to the

22   hearsay.

23        THE COURT:  Sustained.

24   Q.   You were shown a -- one of the exhibits, I believe it was

25   16I, the May 5, 2000.  It looked to me, I think I understood

*C.M. BISHOP - Further Direct (Mr. Westberry)*                    36

1   it to be some minutes from the Board of Election, and I think

2   it referenced you being a new member of the Board.  Do you

3   recall that one, Mr. Bishop?

4   A.   I think I'm looking at it right now.

5   Q.   My question really is this.  Do you have any personal

6   knowledge whether that referenced a reappointment to the Board

7   of Elections by you?

8   A.   May 5 of 2000?

9   Q.   Yes, sir, May 5 of 2000.  16I.

10        MR. SMITH:  Your Honor, I'm going to object to the

11   leading.

12        THE COURT:  Overruled.

13   Q.   Perhaps the better way to ask the question, from your

14   experience, do people in the past get reappointed to the Board

15   of Elections, if you know?

16   A.   Yes.

17   Q.   Do you have any knowledge if that is what is being

18   referenced there?

19   A.   I think it is.

20   Q.   And why do you say that, sir?

21   A.   Well, that's just, that's the only thing that makes sense

22   to me.  These are not great notes.  But that's the only way

23   that I can make sense of it.

24   Q.   Sure.

25        MR. WESTBERRY:  Please, Your Honor, just one second.

*C.M. BISHOP - Further Direct (Mr. Westberry)*                    37

1   Q.   Mr. Bishop, I believe you indicated earlier today that

2   you know an individual named Kenny Day, correct?

3   A.   Yes, sir, I do.

4   Q.   And do you know that Kenny Day has been convicted for

5   drug activity?

6   A.   Yes.

7   Q.   Do you know, do you recall that Kenny Day was convicted

8   of drug activity back in about --

9        MR. SMITH:  Your Honor, I'm going to object as to the

10  leading.

11       THE COURT:  Yes, sustained.

12  Q.   Do you have any recollection as to when Kenny Day would

13  have first been convicted of drug activity?

14  A.   Sometime in the late -- mid to late '90s.

15  Q.   And had Kenny Day been a member of the Board of Elections

16  at some time?

17  A.   Yes, he had.

18  Q.   Does this refresh your memory now?

19  A.   Yes.

20  Q.   What did you recall, did you take Kenny Day's place as a

21  member of the Board of Elections?

22  A.   As far as I know, I was the first one to fill that seat.

23  As far as I know.  Yes.  Kenny Day was put on the bottom of

24  the list of five by the former chairman of the party that was

25  sent to Frankfort.  I advised him not to do that.  He did it

*C.M. BISHOP - Further Direct (Mr. Westberry)*                    38

1    anyway.  And sure enough, even though he was at the bottom of
2    the list of five, they picked him.
3    Q.   Every time a new election commissioner takes place, from
4    your personal knowledge, is it necessary that a new bond be
5    posted?
6    A.   I think that's required.
7    Q.   And as party chairman, even though you may not at that
8    time have been on the actual Board of Election, as party
9    chairman, would you have been aware of activity on the Board
10   of Elections from time to time?
11   A.   Absolutely.  I was -- yes, absolutely.  I was the
12   chairman, I guess council, you know.  I mean, he -- I was with
13   him whenever he made decisions about things, and he made a bad
14   decision when he did that.
15   Q.   Did what?
16   A.   Put Kenny Day's name on that list.
17           MR. WESTBERRY:  May I have one second, please?
18           THE COURT:  Yes, sir.
19   Q.   One last question.  From your personal knowledge, even if
20   you had previously served as a member of the Board of
21   Elections, if you get reappointed, do you know if it is
22   necessary for a new bond to be posted?
23           MR. SMITH:  Object, Your Honor.  He's asking this
24   witness now to speculate.
25           THE COURT:  Overruled.  He's asking him based on his

1    own personal knowledge.

2    A.   As far as I know, to the best of my knowledge, yes.  It

3    is.

4              THE COURT:  All right.  Thank you.

5              MR. WESTBERRY:  Thank you, Mr. Bishop.  Judge, we

6    pass the witness.

7              THE COURT:  See if there's any further examination of

8    the witness.  Mr. Smith.

9                     FURTHER CROSS-EXAMINATION

10   BY MR. SMITH:

11   Q.   Mr. Bishop, if I understand your testimony now, you're

12   telling this Court and this jury that you were serving prior

13   to 2000 when it says you were the new board member appointed

14   August 2nd, 2000.  Is that your testimony now?

15   A.   No, sir.  I don't know if I was or not.  I can't

16   remember.  Looks as though it was 2000 when I took over, but I

17   really don't remember it.  The records would have to say.

18   Q.   So I'm sorry.  I thought you were agreeing that you took

19   over when Kenny Day was convicted.  Am I mistaken in my

20   recollection of your answer, because I need to get that really

21   firmed up here.

22   A.   You seem to be mistaken by a lot of what I say, but

23   that's all right.

24             MR. SMITH:  I want to ask the judge to strike that

25   from the record, because it's unresponsive, number one, to my

1    question.  And I will make that motion at this time.

2         THE COURT:  I will sustain the motion.  The jury will

3    disregard this witness's last comment as a non-responsive

4    answer.

5    Q.  Now do you want to answer the question?  Do you need me

6    to restate the question, sir?

7    A.  Yeah.

8    Q.  I need it cleared up for the court and the jury whether

9    or not your testimony here today is that you are stating to

10   this Court and this jury today that you were the next

11   Republican -- that you took over at the time Kenny Day was

12   arrested in Florida for his cocaine trafficking charges down

13   there.  Is that your testimony?

14   A.  No, I don't think that's accurate.  Here's how I remember

15   it.  I had, as chairman of the party, I had to write his wife,

16   Sonya, a letter saying that pursuant to the rules of the party

17   and the laws of the state that Kenny could no longer serve as

18   the Republican commissioner on the Board of Elections.

19        She was kind enough to write me a letter back and say

20   thank you.  I hereby, on behalf of my husband, resign, just

21   post as such.  And then whatever the process is that the State

22   Board of Elections makes the County Board of Elections go

23   through, that's what happened.  Whatever that was.  So I can't

24   remember all that stuff.

25        But did I immediately take over upon his conviction?  No.

*C.M. BISHOP - Further Cross (Mr. Smith)*                              41

1   It's not something -- it's not that easy.  You have to -- the

2   list has to be submitted, the State Board of Elections has to

3   approve everything, and they actually appoint from that list

4   that is submitted.

5   Q.   And isn't it a fact, sir, that you were not eventually --

6   you were not put in place until August the 2nd, 2000?  Isn't

7   that a fact?

8   A.   Again, I don't know for sure.  That's what this one thing

9   says that I was sworn in or whatever.  But that could have

10  been because I was -- it was time.  I just can't remember.

11  Q.   Well, if a four-year term would have preceded 2000, that

12  would have put us in '96; isn't that correct?

13  A.   I'm sorry?

14  Q.   If you were there for renewal, that's a four-year term.

15  You would have been renewing from your '96 appointment; isn't

16  that a fact?

17  A.   Well, I don't know, because I don't know if I was

18  appointed in '96.

19  Q.   Isn't it a fact, sir, that if you were on the Board,

20  19H -- I'm sorry, 16H, which is before you, your name would be

21  on there as signing off on these minutes in '99?

22  A.   16H?

23  Q.   PR16H.  Minutes for the 1999 year.

24  A.   I don't have 16H.

25  Q.   Well, I'll read for you the names that are listed on

*C.M. BISHOP - Further Cross (Mr. Smith)*                          42

1   January the 6th of 1999.  Jennings White, Edd Jordan and Billy

2   Jones.  Has no fourth member.  Your name's not on there, would

3   you agree with me?

4   A.   If you say.  I don't have that.

5   Q.   Billy Jones is, in fact, the brother of Charles Wayne

6   Jones, who served before Charles Wayne took over; isn't that a

7   fact?

8           MR. WHITE:  Objection, Your Honor.  Testimony.

9           THE COURT:  Overruled.

10  A.   He's the brother.

11  Q.   Okay.

12  A.   I don't know if he served.  I can't remember.  Seems like

13  I served with Billy, though.  Seems like I did.

14  Q.   Seems like --

15  A.   A long time ago.

16  Q.   Well, sir, do you not have 16H in front of you?

17  A.   No, I sure don't.

18          MR. SMITH:  Let's give the witness 16H.  I'm sorry,

19  Your Honor.

20          THE COURT:  Get the exhibits from the witness and

21  give those to Mr. Smith, let him review those, see if 16H is

22  included.  Kim, do you have 16H?

23          DEPUTY CLERK:  Yes, Your Honor.

24          THE COURT:  16H is here, Mr. Smith.  It's here at the

25  clerk's desk.

1          MR. SMITH:  If I could have that, please.  It may

2     speed it along if I can use the Elmo.

3          THE COURT:  It's been admitted.  You may display it.

4     Q.  All right, Mr. Bishop.  You should have in front of you

5     16H.  Do you see that?

6     A.  Yes, sir.

7     Q.  The top of that reads January 6, 1999.  Do you see your

8     name signing on as a board member in January of 1999, sir?

9     A.  No, sir.

10     Q.  Let's move down to February, 1999.  Do you see your name

11     signed on there as a board member in February, 1999, sir?

12     A.  No, sir.

13     Q.  Move on down to March of 1999.  Do you see your name

14     there in March of 1999, sir?

15     A.  No, sir.

16     Q.  Mr. Bishop, isn't it a fact that you were not appointed

17     to that board until August, 2000, sir?

18     A.  It's very possible.  I simply can't remember.

19     Q.  Your testimony further in front of this jury, I believe,

20     is that it was that August, 2000 meeting now that you recall

21     specifically where Jennings White controlled and dictated who

22     was going to be the election officers ; is that your

23     testimony?

24     A.  No.  That's not what I said.

25     Q.  You didn't testify to that?

*C.M. BISHOP - Further Cross (Mr. Smith)*                    44

1   A.   No, I said that I have been at meetings where Jennings

2   White did what he wanted to do.  And one particular

3   instance -- one particular instance, I remember because

4   there's no way to forget something like that, when a good

5   friend of 30 years calls you and tells you why haven't I been

6   appointed as election officer in my precinct?

7   Q.   And I believe your testimony was that it was in 2000, at

8   the suggestion of counsel for Mr. Adams, it was 2000, you

9   believe that would have had to been the meeting when it

10  happened.  Is that not your testimony?

11          MR. WESTBERRY:  Objection.

12          THE COURT:  I'll overrule.  He can testify as to what

13  his recollection of his testimony was or what it is now.  So

14  he'll be able to answer the question.

15  A.   I can't remember any particular time of any particular

16  meeting when Jennings did what it was that he did.  Those

17  meeting were run haphazardly at best.  Jennings would appear

18  and then escape into his office and come back out.  It was, it

19  was not a Board of Elections meeting, essentially.

20  Q.   Well, I'm trying to understand your testimony, because I

21  think you would agree with me that you did not participate in

22  the selection of the 2002 election officers?

23  A.   I think that's absolutely correct.

24  Q.   And if you agree with me now that the record is right

25  that it was August 2nd, 2000, then the only other meeting that

*C.M. BISHOP - Further Cross (Mr. Smith)*                45

1   would have been held to select election officers would have

2   been the one prior to the May, 2000 election; isn't that a

3   fair statement?

4   A.   The one prior to the May, 2000?

5   Q.   Yeah, because Board of Elections have to select their

6   members by a March date, the year before a primary and general

7   election is held in the state of Kentucky pursuant to the

8   Kentucky revised statute; isn't that a fact?

9   A.   The Board of Elections has to appoint new election

10  officers every single year in March.

11  Q.   And it has to be done in March?

12  A.   Yes.

13  Q.   My question is, Mr. Bishop, selection for the 2000

14  election would have had to have occurred in March; isn't that

15  a fact?

16  A.   Yes.

17  Q.   And in this exhibit that we've directed you before, going

18  to direct your attention to that March meeting, and I've

19  highlighted it, you see chairman Jennings White's absence

20  noted in the record, sir?

21  A.   Yes, sir, I do.

22  Q.   So whether or not you were a member of the Board or an

23  observer of the Board meeting, the fact is the record shows

24  Jennings White wasn't even present when the 2000 election

25  officers were selected; isn't that a fact?

*C.M. BISHOP – Further Direct  (Mr. Westberry)*                    46

1    A.   That's what it shows.

2         MR. SMITH:  Thank you.

3         THE COURT:  All right.  Let me see if there are any

4    questions about this particular issue.  We're going to narrow

5    it down just for this issue.  Mr. Westberry?

6         MR. SMITH:  Sorry, Your Honor.  I'll retrieve these

7    exhibits.

8         THE COURT:  That's fine.

9         MR. WESTBERRY:  One last question.

10                  FURTHER DIRECT EXAMINATION

11   BY MR. WESTBERRY:

12   Q.   Regardless of when you recall you were appointed to the

13   Board of Elections, did you regularly attend those meetings as

14   chair of the party?

15   A.   Yes, I did.  It's my duty to turn in those lists, as I

16   said, that were turned in yesterday by my secretary because I

17   was here.  And yes, I do.  Yeah, I went down there to see, to

18   see if things were going as they were supposed to go for the

19   Republican party, if our people got selected.

20   Q.   Regardless of when this incident with Jennings White

21   occurred, are you clear in your recollection about what you've

22   testified to?

23   A.   Yes.

24        MR. SMITH:  Your Honor, I'm going to object to

25   vouching for his own testimony here today.

47

1          THE COURT:  I'll sustain the objection.  I think

2    we've exhausted this issue.

3          MR. WESTBERRY:  I think we have too.  Thank you,

4    Judge.

5          THE COURT:  All right.

6          MR. WESTBERRY:  Thank you, Mr. Bishop.

7          THE WITNESS:  You're very welcome.

8          THE COURT:  I'm going to excuse the witness at this

9    time, assuming there are no further questions of the witness.

10          MR. SMITH:  That's fine.

11          THE COURT:  Step down.  You're excused.  Before we

12    continue, I want to make sure we have the exhibits up here,

13    all the exhibits that have been admitted at this point.  Mr.

14    Smith, I believe D86 was not admitted as an exhibit; is that

15    correct?

16          MR. SMITH:  Yes, Your Honor, I did not move for its

17    introduction.  If the Court would allow, I can make that a

18    Court exhibit.  It was referenced in our examination.

19          THE COURT:  That will be fine.  It will be the next

20    numbered Court exhibit.  I'm not sure where we are in the

21    Court exhibits, but it would be the next numbered exhibit.

22                     (Court Exhibit No. 7

23                      was admitted into evidence.)

24          THE COURT:  Mr. Westberry, you may call your next

25    witness.

1      MR. WESTBERRY:  May I have a moment?

2      THE COURT:  You may have just a moment, yes, sir.

3      MR. WESTBERRY:  Thank you, Judge Reeves.  May it

4   please the Court, at this juncture of the trial, after

5   considering everything that we have, on behalf of Doug Adams,

6   we are announcing that we are prepared to close.

7                            *  *  *

8                  C E R T I F I C A T E

9      I, LISA REED WIESMAN RDR-CRR, certify that the
    foregoing is a correct excerpted transcript from the record of
10  proceedings in the above-entitled case.

11

12   \s\ Lisa Reed Wiesman                March 17, 2010
    LISA REED WIESMAN, RDR-CRR            Date of Certification
13  Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

49

1                                      INDEX

2       DEFENSE WITNESSES

3       CLAY M. BISHOP, JR.
        Direct Examination by Mr. Baldani................ Page  4
4       Redirect examination by Mr. Westberry........... Page  7
        Recross-examination by Mr. Smith................ Page 25
5       Redirect examination by Mr. Baldani............. Page 33
        Further direct examination by Mr. Westberry..... Page 34
6       Further cross-examination by Mr. Smith.......... Page 39
        Further direct examination by Mr. Westberry..... Page 46

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25