```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF KENTUCKY
 2              SOUTHERN DIVISION AT LONDON

 3  UNITED STATES OF AMERICA    .  Docket No. CR 09-16-S
                                 .
 4       vs.                     .  Frankfort, Kentucky
                                 .  February 17, 2010
 5  RUSSELL CLETUS MARICLE       .  1:03 p.m.
    DOUGLAS C. ADAMS             .
 6  CHARLES WAYNE JONES          .  Trial
    WILLIAM R. STIVERS           .
 7  FREDDY W. THOMPSON           .  VOLUME 8-B
    WILLIAM B. MORRIS            .
 8  DEBRA L. MORRIS              .
    STANLEY BOWLING              .
 9
                     TRANSCRIPT OF TRIAL
10           BEFORE THE HONORABLE DANNY C. REEVES
                UNITED STATES DISTRICT JUDGE
11  APPEARANCES:
    On behalf of the Plaintiff: STEPHEN C. SMITH, ESQ.
12                              JASON D. PARMAN, ESQ.

13  On behalf of the Defendant  DAVID S. HOSKINS, ESQ.
    Russell Cletus Maricle:     MARTIN S. PINALES, ESQ.
14
    On behalf of the Defendant  R. KENT WESTBERRY, ESQ.
15  Douglas C. Adams:           KRISTEN N. LOGAN

16  On behalf of the Defendant  T. SCOTT WHITE, ESQ.
    Charles Wayne Jones:
17
    On behalf of the Defendant  ROBERT L. ABELL, ESQ.
18  William R. Stivers:

19  On behalf of the Defendant  RUSSELL JAMES BALDANI
                                R. TUCKER RICHARDSON III
20
    On behalf of the Defendant  JERRY W. GILBERT, ESQ.
21  William B. Morris:

22  On behalf of the Defendant  ELIZABETH SNOW HUGHES,
    Debra L. Morris:                 ESQ.
23
    On behalf of the Defendant  DANIEL A. SIMONS, ESQ.
24
    Court Reporter:             K. ANN BANTA, RPR, CRR
25
```

```
 1  Appearances of Counsel:

 2  On behalf of the Plaintiff:      STEPHEN C. SMITH, ESQ.
                                     JASON D. PARMAN, ESQ.
 3                                   Assistant U.S. Attorneys
                                     601 Meyers Baker Road
 4                                   Suite 200
                                     London, KY 40741
 5
    On behalf of the Defendant       DAVID S. HOSKINS, ESQ.
 6  Russell Cletus Maricle:          107 East First Street
                                     Corbin, KY 40701
 7
                                     MARTIN S. PINALES, ESQ.
 8                                   150 East Fourth Street
                                     Federal Reserve Building
 9                                   Cincinnati, OH 45202

10  On behalf of the Defendant       R. KENT WESTBERRY, ESQ.
    Douglas C. Adams:                KRISTEN N. LOGAN
11                                   220 West Main Street
                                     Suite 1900
12                                   Louisville, KY 40202

13  On behalf of the Defendant       T. SCOTT WHITE, ESQ.
    Charles Wayne Jones:             133 West Short Street
14                                   Lexington, KY 40507

15  On behalf of the Defendant       ROBERT L. ABELL, ESQ.
    William R. Stivers:              120 North Upper Street
16                                   Lexington, KY 40507

17  On behalf of the Defendant       RUSSELL JAMES BALDANI
    Freddy W. Thompson:              R. TUCKER RICHARDSON
18                                   300 West Short Street
                                     Lexington, KY 40507
19
    On behalf of the defendant       JERRY W. GILBERT, ESQ.
20  William B. Morris:               212 North Second Street
                                     Richmond, KY 40475
21
    On behalf of the Defendant       ELIZABETH SNOW HUGHES
22  Debra L. Morris:                 201 West Short Street
                                     Lexington, KY 40507
23
    On behalf of the Defendant       DANIEL A. SIMONS, ESQ.
24  Stanley Bowling:                 116 West Main Street
                                     Suite 2A
25                                   Richmond, KY 40476
```

1  Appearances (Continued):

2  Court Reporter:                    K. ANN BANTA, RPR, CRR
                                      Official Court Reporter
3                                     United States District
                                          Court
4                                     101 Barr
                                      Lexington, KY 40507
5                                     (502) 545-1090

6  Proceedings recorded by mechanical stenography,
   transcript produced by computer-aided transcription.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          Wednesday afternoon session,

2                          February 17, 2010, 1:03 p.m.

3                              - - -

4          (The following proceedings were had in open

5  court and out of the presence and hearing of the

6  jury.)

7          THE COURT:  Thank you.  The jury is not

8  present at this time.  Parties and counsel are

9  present.

10          I understand someone has an issue,

11  Mr. Westberry?

12          MR. WESTBERRY:  Thank you, Judge, over the

13  lunch break, I have crafted up a proposed admonition

14  or instruction of the jury, and I can read it very

15  slowly.

16          THE COURT:  All right.

17          MR. WESTBERRY:  It's two sentences.

18          THE COURT:  All right.

19          MR. WESTBERRY:  "You have heard testimony

20  given by a witness which includes his interpretation

21  of what other people" -- this is -- I can barely read

22  my own handwriting.

23          The last part of it, "You shall not" -- I

24  will rephrase that again.  I think now I am having

25  help.

1          "You have heard testimony given by a witness

2    which includes his interpretation of what other people

3    meant by what was said -- by what they said.  You

4    shall not consider this interpretation as evidence."

5    Thank you.

6          THE COURT:  All right.  Mr. Smith?

7          MR. SMITH:  Your Honor, I fail to see that

8    that's necessary.

9          I believe that the court's previous

10   instruction is adequate.

11         It covers the concerns that have been raised

12   in this matter.

13         And I would urge the court to remain

14   consistent by using the prior instruction.

15         THE COURT:  All right.  I am going to take

16   this under consideration.

17         If we anticipate this witness testifying for

18   the remainder of the day, I wouldn't expect to give

19   this until after we complete his testimony --

20         MR. WESTBERRY:  Yes.

21         THE COURT:  -- on direct and cross, so I will

22   certainly consider the parties' position on that

23   issue.

24         MR. WESTBERRY:  Yes, sir.

25         THE COURT:  Anything else before the jury

1  comes back in?

2          Bring the jury in, please.

3          (The jury resumed their places in the jury

4  box, and the following proceedings were had in open

5  court.)

6          THE COURT:  Thank you, please be seated.  The

7  record will reflect that all members of the jury are

8  present.

9          Before we took our -- ask Mr. White to come

10 back in.

11         Before we took our lunch break, I think we

12 were having a few audio problems.  Have we been able

13 to correct those?

14         MR. SMITH:  Your Honor, they were resolved

15 before we began, so --

16         THE COURT:  All right.

17         MR. SMITH:  So I am very hopeful that we have

18 those resolved.

19         THE COURT:  We will cross our fingers.

20 Mr. White has returned to the witness stand, and he is

21 reminded that he is still under oath.

22         THE WITNESS:  Thank you, Your Honor.

23         THE COURT:  Mr. Smith, I believe we were on

24 Exhibit A17, and you can continue.

25         MR. SMITH:  Yes, Your Honor.  And for

D. Kennon White - Direct Examination

1  purposes of counsel and for the witness, that's page

2  -- beginning of page 10 where we will resume playing

3  our recording.

4         THE COURT:  Yes, sir.

5                    - - -

6         D. KENNON WHITE, PLAINTIFF'S WITNESS,

7  PREVIOUSLY SWORN

8              DIRECT EXAMINATION (Resumed)

9         (Audio played.)

10 BY MR. SMITH:

11 Q.  Mr. White?

12 A.  Yes.

13 Q.  This conversation we have picked up there on page

14 10.

15     And it appeared that you were reading something

16 to Mr. Maricle.

17     You said, "Well, like no. 8 here.  What is the

18 connection with Cletus Maricle and Wayne Jones?"  What

19 were you representing to him no. 8 to be?

20 A.  That was a list of questions I was directed to

21 talk with him about.

22 Q.  And where did you get direction from?

23 A.  FBI.

24 Q.  Okay.  Further in that conversation, Mr. Maricle

25 asked you, "Did you promise anybody I'd do anything

D. Kennon White – Direct Examination

1  for them?"

2      And you said, "Only one was that Downey boy."

3  Who were you referring to, Mr. White?

4  A.   I was referring to Raleigh Downey.

5  Q.   And had you had a conversation with Mr. Maricle

6  about the Downey boy?

7  A.   Yes, his brother John was in jail at that time.

8  Q.   And could you tell the court and the jury what

9  conversation you had with Mr. Maricle about that

10  Downey boy?

11  A.   Raleigh Downey had offered to help me to haul

12  votes and buy votes with the help of Ouchie Jackson on

13  Whites Branch.

14      And he -- he had -- I talked with -- he was

15  wanting his brother out of jail.

16      His brother was in for a drug charge, and -- and

17  he said if I would help get his brother out of jail,

18  that he had been there for awhile, that he will help

19  me.

20      And I asked Cletus to help me and told him what

21  Raleigh had told me that he would do at the Whites

22  Branch precinct about helping me to buy votes and get

23  them hauled.

24  Q.   When did this happen, Mr. White?

25  A.   That happened sometime before the November

D. Kennon White – Direct Examination

1  election, the general.

2  Q.   And was that 2006 election?

3  A.   That's correct.

4  Q.   You said that when you explained it to

5  Mr. Maricle that he agreed to help.

6       Did he make an agreement with you to help get the

7  Downey boy out?

8  A.   Yes, he said that he would.

9  Q.   And did anybody confirm to you that the Downey

10 boy was released?

11 A.   Yes, I talked with it -- talked about it with Al

12 Man.

13      And Al Man confirmed that he had taken care of it

14 and talked with Cletus and reminded him.

15 Q.   And when did you talk to Al Man?

16 A.   A day or so after I talked with Cletus Maricle.

17 Q.   And exactly what did Mr. Stivers say to you?

18 A.   He said, "He took care of the Downey boy and got

19 him out, so you can tell him it's taken care of."

20          MR. SMITH:   Hand now -- if the court please,

21 I would like to hand the witness Exhibit A18.

22          THE COURT:   Yes, sir.

23          MR. SMITH:   And A18A.

24 BY MR. SMITH:

25 Q.   Mr. White, do you see a disk in front of you

D. Kennon White – Direct Examination

1  marked Government's Exhibit A18?

2  A.   Yes, I do.

3  Q.   And have you reviewed that prior to your

4  testimony today?

5  A.   I sure have.

6  Q.   And could you tell us what that is a recording

7  of?

8  A.   That's a recording of me and Cletus Maricle.

9  Q.   And what date was this recording made?

10 A.   May 16th, 2007.

11 Q.   And you had the opportunity to determine that

12 that is a fair and accurate copy of the conversation

13 that you had with Mr. Maricle on May the 16th, 2007?

14 A.   I have.

15 Q.   And is that a fair and accurate copy?

16 A.   Yes, it is.

17 Q.   You also have A18A in front of you, a transcript?

18 A.   Yes.

19 Q.   Have you been able to compare that transcript

20 with the words spoken on that recording of May the

21 16th, 2007?

22 A.   Several times.

23 Q.   And is that a fair and accurate transcription of

24 the conversation that was spoken on May the 16th, 2007

25 with Cletus Maricle?

D. Kennon White – Direct Examination

1  A.   Yes, it is.

2         MR. SMITH:  I would move at this time for the

3  introduction of Government's Exhibit A18 and A18A,

4  Your Honor.

5         THE COURT:  Any objection other than what's

6  previously stated?  Exhibit A18 and A18A will be

7  admitted.

8         (GOVERNMENT EXHIBIT NO. A18 AND A18A ADMITTED

9  INTO EVIDENCE)

10        MR. SMITH:  I would ask for permission to

11  publish it at this time.

12        THE COURT:  It may be published.

13        (Audio played.)

14  BY MR. SMITH:

15  Q.   Mr. White?

16  A.   Yes.

17  Q.   Is the first portion, Mr. Maricle says, "They

18  have really, to a certain extent, unleashed a reign of

19  terror on this county."

20     To your understanding, who was he referring to as

21  "they"?

22  A.   The FBI.

23  Q.   He then asks you a question, "Did she -- did they

24  give her something in writing?"

25     And you said, "Yeah, Judge Hood was the one that

D. Kennon White – Direct Examination

1 done it."  What were you referring to?

2 A.   I was referring to the immunity.  I was directed

3 to say that.

4 Q.   Had that really happened, Mr. White?

5 A.   No, it hadn't.

6 Q.   But you were told by whom?

7 A.   The FBI.

8         MR. SMITH:  If we could continue, Your Honor.

9         THE COURT:  Yes, sir.

10         MR. SMITH:  Thank you.

11         (Audio played.)

12 BY MR. SMITH:

13 Q.   Mr. White, you said earlier this conversation was

14 recorded on May the 16th?

15 A.   Yes.

16 Q.   And in this conversation with Mr. Maricle, you

17 made this comment, "Somebody needs to let me know

18 something."

19         MR. RICHARDSON:  What page?

20         MR. SMITH:  That's on page 21.

21         MR. RICHARDSON:  Okay.

22         THE WITNESS:  Uh-huh.

23 BY MR. SMITH:

24 Q.   What were you referring to, "Somebody needs to

25 let me know something"?

D. Kennon White - Direct Examination

1  A.   I was referring to someone needs to let me know

2  what I need to -- what Wanda needs to say in front of

3  the -- how to answer those questions when asked in

4  front of the grand jury.

5  Q.   And after the meeting you had with Maricle on the

6  16th, where did you and Wanda go or who did you go

7  meet with after this?

8  A.   With Al Man Stivers.

9  Q.   And why did you and Wanda decide to go to Al Man

10 Stivers?

11 A.   Because when I -- when I was leaving, he told me

12 to see Al Man (indicating).

13 Q.   He did what?

14 A.   He told me to see Al Man (indicating).

15 Q.   And you used a facial expression.

16 A.   Yes, he --

17 Q.   A nonverbal form.

18 A.   Right.

19 Q.   Could you show again for the court and jury what

20 he did?

21 A.   (Witness demonstrating.)

22 Q.   And you understood that to mean Al Man Stivers?

23 A.   Yes.

24 Q.   Page 18, he made the statement you had asked him

25 about -- or you were making a statement about, "Wayne

D. Kennon White - Direct Examination

1 Jones is the man that will do anything."

2      And then the statement was made, "He won't cross

3 me."

4      To your understanding, what was Maricle referring

5 to when he said, "He won't cross me"?

6 A.   That Wayne would not tell anything that he had --

7 that they had did together in the election as far as

8 the election corruption and vote buying or anything --

9           MR. PINALES:  Objection, Your Honor.

10           MR. WHITE:  Objection, Your Honor.

11           THE COURT:  Overruled.

12 BY MR. SMITH:

13 Q.   So when did you and Wanda go to Al Man Stivers?

14 A.   I think it was the next day or within -- it was

15 within a couple of days, around about a couple of

16 days.

17 Q.   And in that conversation, did she do most of the

18 talking with Mr. Stivers?

19 A.   I think she did most of the talking, yes.

20           MR. SMITH:  I would like to hand the witness

21 now, Your Honor, if the court please, Exhibit A20 and

22 A20A.

23           THE COURT:  Yes, sir.

24 BY MR. SMITH:

25 Q.   Mr. White, you should have a disk in front of you

D. Kennon White – Direct Examination

1  listed -- labeled A20.

2  A.    I do.

3  Q.    Have you reviewed that prior to your testimony

4  here today?

5  A.    Yes, I have.

6  Q.    When was that recording made?

7  A.    On May the 22nd, 2007.

8  Q.    And where was it made?

9  A.    At Cletus Maricle's home.

10  Q.    And do you recall who the speakers are in this

11  conversation?

12  A.    There were several of us.  It was myself and

13  Cletus Maricle, Richie Asher, Cletus's daughter,

14  Linsey, Robyn Maricle and his wife, Judy Maricle.

15  Q.    And can you state, Mr. White, if that is a fair

16  and accurate copy recorded on that disk of the

17  conversation in which you participated?

18  A.    It is.

19  Q.    And likewise, Government's Exhibit A20A is a

20  transcript.  Do you have that in front of you?

21  A.    I do.

22  Q.    And have you had a chance to compare that to the

23  recording?

24  A.    Several times.

25  Q.    Is that a fair transcript of the words that were

D. Kennon White – Direct Examination

1 spoken in that conversation?

2 A.   Yes, it's fair and accurate.

3        MR. SMITH:  I would move for the introduction

4 of Government's Exhibit A20 and A20A.

5        THE COURT:  Any objection other than those

6 previously stated?  Exhibits A20 and A20A will be

7 admitted.

8        (GOVERNMENT EXHIBIT NOS. A20 AND A20A

9 ADMITTED INTO EVIDENCE)

10        MR. SMITH:  If Your Honor please, I would ask

11 to publish that now for the jury.

12        THE COURT:  It may be published.

13        (Audio played.)

14        THE COURT:  Mr. Smith --

15        MR. SMITH:  Are you okay with me proceeding,

16 or would you like to take a break?

17        THE COURT:  I would like to take a short

18 break before we proceed to ask any questions about

19 this tape.

20        We will take our afternoon recess at this

21 time.

22        We will take a twenty-minute recess until

23 3:00.

24        Ladies and gentlemen, please keep in mind the

25 admonitions that you have been given.

D. Kennon White – Direct Examination

 1           Don't discuss the case among yourselves while

 2 we are in recess.  The jury is excused.

 3           (Jury excused from the courtroom at this time

 4 for afternoon recess.)

 5           THE COURT:  Thank you.  Please be seated.

 6 Mr. White, you can step down.

 7           THE WITNESS:  Thank you, Your Honor.

 8           THE COURT:  Mr. Westberry, this is the

 9 instruction that I will likely give in the testimony.

10           MR. WESTBERRY:  Yes.

11           THE COURT:  Earlier I had given the general

12 instruction about audio recordings.

13           And it reads, "At the time the audio

14 recordings were made, Kennon White and his wife, Wanda

15 White, were cooperating with the United States.

16           You are instructed that their statements on

17 the audio recordings are admitted to provide context

18 for the defendants' statements.

19           Then you have heard the testimony given by a

20 witness which includes his or her interpretation of

21 what other people meant by what they said.

22           You are reminded that this testimony

23 represents the witness's understanding of what was

24 meant by the statements and was offered to put these

25 statements and the parties' conversations in

D. Kennon White – Direct Examination

1  context."

2          That's the purpose that it was admitted

3  earlier, so that would be the general instruction the

4  court will be giving.

5          I just wanted to alert you where I was

6  heading on that before the -- before the end of the

7  day.

8          MR. WESTBERRY:  Yes, Your Honor.

9          THE COURT:  Anything else that we can take up

10 outside the presence of the jury before we take our

11 recess?  We will be in recess until 3:00.

12          (Afternoon recess taken from 2:42 to

13 3:00 p.m.)

14          (After recess.)

15          (The following proceedings were had in open

16 court and out of the presence and hearing of the

17 jury.)

18          THE COURT:  Thank you.  The record will

19 reflect the jury is not present at this time.  Parties

20 and counsel are present.

21          MS. HUGHES:  It was me.

22          THE COURT:  Miss Hughes.

23          MS. HUGHES:  That's why I am standing.

24          THE COURT:  Yes, ma'am.

25          MS. HUGHES:  I was thinking about the

D. Kennon White - Direct Examination

1 admonition that you read to us --

2         THE COURT:  Yes.

3         MS. HUGHES:  -- before we took the break, and

4 I was wondering if the court would consider adding the

5 word "only."

6         Kennon White's testimony, I want to call it

7 testimony but it's not, his statements on the audio

8 tapes are admitted only to add context because as I

9 understand it, his statements are out-of-court

10 statements and they are in fact hearsay; and they are

11 only admitted to provide context.

12         I just wouldn't want the jury to think that

13 that was an additional reason.

14         So I would just suggest that we add that

15 additional word, if the court would consider that.

16 Thank you.

17         THE COURT:  All right, I will certainly

18 consider that.

19         Of course, in addition to explaining this --

20 the statements that are contained on the audio tape,

21 he's also testified to a number of admissions made by

22 the defendants in the case.

23         So there is a fine line on some of these

24 matters that the court will have to consider, but I

25 will certainly take that into account.

D. Kennon White - Direct Examination

1          Mr. Abell?  You are stretching?

2          MR. ABELL:  I have nothing, Judge, thank you.

3          THE COURT:  All right, anything else before

4   the jury comes back?  Bring the jury in.

5          (The jury resumed their places in the jury

6   box, and the following proceedings were had in open

7   court.)

8          THE COURT:  Thank you, and please be seated.

9   Bring Mr. White in, please.

10          (The witness, Kennon White, was brought back

11   in the courtroom and resumed the witness stand.)

12          THE COURT:  Thank you.  The record will

13   reflect that all members of the jury are present,

14   parties and counsel are all present.

15          Mr. White, you are still under oath.

16          And Mr. Smith, you may continue with your

17   questions.

18   BY MR. SMITH:

19   Q.  Mr. White, we have just completed playing I

20   believe that recording on May the 22nd at the break.

21          And there were a couple of questions I had on

22   that recording.

23          In the beginning of that recording, there was a

24   statement initially saying by Maricle said, "Nobody,

25   let me tell you what Carmen Lewis and her man."  To

D. Kennon White – Direct Examination

1 your understanding, who was he referring to?

2 A.   He was referring to the mayor-elect, Carmen

3 Lewis, and her husband.

4 Q.   And you made the statement, "You don't think

5 Edd's got nothing to do with it, huh?"  Who were you

6 referring to there?

7 A.   I was referring to former sheriff, Edd Jordan.

8 Q.   Mr. Maricle says, "You know what she done to

9 Brandon."

10     To your understanding, who was he referring to

11 when he refers to "Brandon"?

12 A.   Brandon Mobley, his grandson.

13 Q.   Okay, and who was he referring to as "she," what

14 she had done to Brandon?

15 A.   Mayor-elect, Carmen Lewis.

16 Q.   And then he also says, "Carmen and Donna Lea,

17 Donna Lea never got along."

18     To your understanding, who was he referring to as

19 "Donna Lea"?

20 A.   That's his daughter, his stepdaughter.

21 Q.   And to your knowledge, Mr. White, what did Donna

22 Lea have to do with the city government?

23 A.   Nothing to my knowledge.

24 Q.   He further makes a statement, says, "Maybe it's

25 through Lanny and them."

D. Kennon White – Direct Examination

1    To your understanding, who was he referring to

2  "Lanny and them"?

3  A.    He was referring to Lanny Greer and them being

4  the people at the First National Bank.

5  Q.    And what does Lanny Greer have to do with the

6  First National Bank?

7  A.    I don't know his exact title, but I think he owns

8  a part of it, of the National Bank.

9  Q.    He further goes on in that same statement and

10 says, "I mean, you know, they are wanting something

11 out of her, wanting to sell that stuff and that man of

12 hers going around, you know, he was against us."

13    To your understanding, who was he referring to as

14 "that man of hers"?

15 A.    Carmen's husband, Charles Wayne Lewis –– or

16 Charles Ray Lewis, I'm sorry.

17 Q.    Mr. Maricle makes a question, "What has she done

18 to you and us?  Everything she could."

19    To your understanding, who was he referring to

20 again when he says, "She's done to you and us

21 everything she could"?

22 A.    She was referring to –– he was referring to

23 Carmen Webb Lewis.

24 Q.    And he goes on to make a further statement,

25 "Well, she had enough pull on Wednesday before the

D. Kennon White – Direct Examination

1 election to get them over here to City Hall."

2     To your understanding, again, who was he

3 referring to?

4 A.   He was referring to Carmen Webb Lewis, and he was

5 insinuating that she was the reason that City Hall got

6 raided.

7 Q.   And to your understanding, who raided City Hall

8 before the election?

9 A.   The FBI.

10 Q.   Further in the conversation you made the

11 statement, "Well, we got up there and we went over

12 them, you know, Al Man come down there and sit on the

13 steps."  What were you referring to, Mr. White?

14 A.   I was referring to the list of questions that was

15 to be asked of the grand jury.

16 Q.   I am going to ask you when you all discussed

17 those questions, Maricle made a statement, "Did you

18 tell her not to say anything about Wayne?"  To your

19 understanding, who was he referring to?

20 A.   He was referring to Wayne Jones.

21 Q.   Then he makes a question, "What did they ask her

22 about me?"  To your understanding, who was he

23 referring to?

24 A.   He was referring to himself.

25 Q.   And who was asking the questions about him, to

D. Kennon White – Direct Examination

1 your understanding?

2 A.   I guess U.S. attorney.

3 Q.   And, again, he makes a statement, "I think the

4 motivating person behind it all is Carmen."

5     To your understanding, again, who is he referring

6 to?

7 A.   Carmen Lewis.

8 Q.   Then he makes a statement, "Well, I would like to

9 do something about it, but I am not interested in

10 fighting no windmills."

11     To your understanding, who is he referring to

12 there?

13 A.   He is referring to Carmen Lewis, once again.

14 Q.   You then follow with a statement, "I think they

15 would put Harvey in."  What were you referring to,

16 Mr. White?

17 A.   I was referring to if Carmen was ruled that she

18 wasn't eligible to serve as mayor for not living in

19 the city limits, that they would -- the council would

20 put Harvey Hensley in as pro tem mayor because he was

21 pro tem mayor.

22 Q.   Mr. Maricle makes a question, "How do they like

23 her answers that she gave them?"  To your

24 understanding, who was he referring to?

25 A.   He was referring to my wife's answers that she

D. Kennon White – Direct Examination

1  give to the grand jury.

2  Q.   And you further made the statement, "I think they

3  are on Daddy hard enough, and I don't know what he is

4  going to do.  Darnell right there got up at the city

5  council meeting and said he was innocent, he was going

6  to fight this.  He was going to keep serving on the

7  council."  Who were you referring to "Darnell"?

8  A.   Darnell Hipsher, he was a council member that had

9  been charged.

10  Q.   Mr. Maricle makes a statement, "That's the

11  attitude to take."  To your understanding, what was he

12  referring to?

13  A.   He was referring to the attitude that Darnell had

14  to fight whatever the charges was against him.

15        MR. SMITH:  I would like to move now to the

16  next exhibit, Your Honor.

17        Hand the witness Government Exhibit A21 and

18  A21A.  Thank you.

19  BY MR. SMITH:

20  Q.   Mr. White, you now should have in front of you a

21  disk labeled A21.  Do you see that in front of you?

22  A.   Yes, I do.

23  Q.   And if you could tell us, is that a recording

24  that you reviewed prior to testifying here today?

25  A.   Yes, it is.

D. Kennon White – Direct Examination

1  Q.   What date was this recording made?

2  A.   June the 7th, 2007.

3  Q.   And where was this recording made?

4  A.   At a building on Wayne -- beside Wayne Jones's

5  home that's on his property.

6  Q.   On whose property?

7  A.   Wayne Jones's.

8  Q.   And have you had an opportunity prior to

9  testifying to review that recording?

10  A.   Yes, I have.

11  Q.   Is that a fair and accurate copy or depiction of

12  the conversation in which you were a participant?

13  A.   Yes, it is.

14  Q.   Likewise, do you have A21A, a transcript in front

15  of you, correct?

16  A.   That is correct.

17  Q.   Have you had a chance to compare that with the

18  audio recording?

19  A.   I have several times.

20  Q.   Is that a fair and accurate transcription of what

21  was said on that recording?

22  A.   Yes, it is.

23          MR. SMITH:   I would move at this time to

24  introduce Government's Exhibits A21 and A21A, Your

25  Honor.

D. Kennon White - Direct Examination

 1          THE COURT:  Any objection other than

 2 previously stated?  Exhibits A21 and A21A will be

 3 admitted.

 4          (GOVERNMENT EXHIBIT NOS. A21 AND A21A

 5 ADMITTED INTO EVIDENCE)

 6          MR. SMITH:  United States would ask for

 7 permission to publish, Your Honor.

 8          THE COURT:  It may be published.

 9          MR. SMITH:  Thank you.

10          (Audio played.)

11 BY MR. SMITH:

12 Q.  Mr. White, in this conversation you engaged

13 Mr. Jones in, he makes the statement, "2002 is over

14 with."

15      To your understanding, what was he referring to,

16 "2002 is over with"?

17 A.  He was talking about the investigation into

18 election fraud for 2002 and what occurred.

19 Q.  Later in that same conversation on page 8,

20 Mr. Jones says, "It says cast ballot review.  Now,

21 there are some walked off there last year."  To your

22 understanding, what was he referring to?

23 A.  He is referring to the voters that walked away

24 without pushing the vote button on their selection for

25 who they voted for at the polls.

D. Kennon White – Direct Examination

1  Q.   On page 9, Mr. Jones makes the statement to you,

2  "There is a woman that's on the grand jury down there

3  that a person knows she told they actually lied to

4  them twice about the blacktop."

5       To your understanding, who is Mr. Jones referring

6  to?

7  A.   He is referring to when Darnell Hipsher give

8  testimony in front of the grand jury.

9  Q.   Mr. White, did you make any recordings after June

10 the 7th, 2007 pursuant to your cooperation?

11 A.   I don't know for sure.  I think that this is

12 close to the last one.

13 Q.   Okay.

14       MR. SMITH:  Your Honor, I'll pass the

15 witness.

16       THE COURT:  All right, counsel, if you could

17 approach before cross examination, please.

18       (Thereupon, a discussion was had at the bench

19 between the Court and counsel and out of the hearing

20 of the jury.)

21       THE COURT:  I didn't want to take another

22 break.

23       But I did want to confirm that all 3500

24 material has been provided to counsel.

25       MR. SMITH:  As far as I know.  Let me double

D. Kennon White - Direct Examination

 1 check.

 2          I was anticipating that there was a group

 3 that we gathered over the weekend.

 4          I want to make sure there is nothing in there

 5 that is Kennon White specific.

 6          And I don't think there is at all, but let me

 7 double check.

 8          THE COURT:  Why don't we -- we'll take a

 9 break so you don't have to do that in front of the

10 jury.

11          The other question that's still outstanding

12 is the text message issue.  Do you have any additional

13 information on that?

14          MR. SMITH:  As of last Thursday, I was told

15 that they are recoverable, that they are in the

16 process of getting those; and I was told by the FBI

17 that I would have them by Friday.

18          However, a snow storm apparently closed some

19 offices that this involved in Washington, DC, and I

20 have not gotten the text messages yet.

21          THE COURT:  I am not going to release the

22 witness until I have some answer on that -- on that

23 question.

24          We will proceed with cross examination after

25 you confirm that you have given all 3500 material.

D. Kennon White - Direct Examination

1          And if counsel for the defendants need

2   additional time to review any other materials, you

3   will need to let me know before I bring the jury back

4   in; and let me know about how much time that will

5   take.

6          What I am going to do is I am going to excuse

7   the jury for about ten minutes and tell them that it

8   may be a little bit longer before we commence cross

9   examination.  All right?

10         MR. SIMONS:  Your Honor --

11         THE COURT:  Go ahead.

12         MR. PINALES:  Oh, I'm sorry, I was going to

13  say thank you.

14         MR. SIMONS:  Earlier in his testimony I feel

15  like --

16         THE COURT:  This is Mr. Simons, I'm sorry.

17         MR. SIMONS:  -- he looked like he was reading

18  from stuff.  I assume that's the stuff that you have

19  previously introduced that he was reading from?

20         MR. RICHARDSON:  Yeah, the transcripts.

21         MR. SIMONS:  The transcripts?

22         MR. WHITE:  He actually had notes from before

23  we got to the transcripts -- he testified -- I'm

24  sorry, this is Scott White, I represent the defendant

25  Jones -- for about two hours, Your Honor, before the

D. Kennon White – Direct Examination

1 recording started.

2        I know one of them was the exhibit that had

3 that list of precincts, the fire department.

4        I don't know if there is anything beyond

5 that, anything he used to refresh his memory.

6        MR. SMITH:  I would represent to this court

7 it was an exhibit that I gave to him, and I have not

8 given him any extraneous material.

9        THE COURT:  If he's testified from any of his

10 own notes, then of course counsel is entitled to look

11 at that if he's used anything to refresh his memory,

12 give them copies of all his notes.

13        MR. SMITH:  I have not given him extensive --

14        THE COURT:  I understand that, but I'm

15 talking about while he is testifying, if he's used any

16 notes while he was testifying.

17        I'll let you all confirm whether that may be

18 an issue during the break.

19        But we will take a short break, and you can

20 check out additional 3500 material, and you all can

21 let me know if you need more than ten minutes if there

22 is material to be reviewed.  All right, thank you.

23        (End of bench conference.)

24        THE COURT:  Thank you, counsel.

25        Ladies and gentlemen, we are going to take a

D. Kennon White – Direct Examination

1  short break before we continue with further

2  questioning of the witness, hopefully about ten

3  minutes, maybe a little bit longer.

4          But if it is longer, I'll send a message to

5  you as to how long we anticipate being in recess.

6          But please keep in mind the admonitions that

7  you were given previously not to discuss the case

8  while we are in recess.

9          And the jury will be excused for

10 approximately ten minutes.

11         THE MARSHAL:  Please rise for the jury.

12         (Jury excused from the courtroom at this time

13 for recess.)

14         THE COURT:  Thank you.  We will be in recess

15 for approximately ten minutes.

16         (Recess taken from 3:23 p.m. until 3:42 p.m.)

17         (After recess.)

18         (The jury resumed their places in the jury

19 box, and the following proceedings were had in open

20 court.)

21         THE COURT:  All right, thank you.  Counsel,

22 are you ready to proceed?

23         MR. PINALES:  Yes, Your Honor, thank you.

24         THE COURT:  Mr. Pinales, you may examine the

25 witness.

D. Kennon White - Cross Examination

1          MR. PINALES:  Thank you.

2                    - - -

3               CROSS EXAMINATION

4  BY MR. PINALES:

5  Q.   Good afternoon, Mr. White, I am Marty Pinales

6  along with David Hoskins and Candace Crouse.   We

7  represent Cletus Maricle.

8  A.   Uh-huh.

9  Q.   I believe you started testifying last Monday, and

10 then we had a few snow days, and then Thursday and

11 Friday and today we listened to some tapes.  Is that

12 -- do you agree with that?

13 A.   Yes.

14 Q.   And the first tape that we listened to was March

15 the 27th, 2007.  Would you agree with that?  Or

16 thereabouts.

17 A.   Yeah, thereabouts.

18 Q.   Okay, I don't want to pin you down.  Now I am

19 going to get into some background with regarding the

20 tapes.

21      First of all, can you tell me and the jury, what

22 kind of device this was?

23 A.   It was a digital recording.

24 Q.   And a digital recording means that there is no

25 tape, right?  There is -- it is recorded on like a

D. Kennon White - Cross Examination

1 hard drive?

2 A.   Uh-huh.

3 Q.   Is that right?

4 A.   Yes.

5 Q.   Okay.  And can you describe the size of it?

6 A.   It's probably about that long (indicating.)

7 Q.   Well, put your fingers up because the jury -- the

8 record can't decide --

9 A.   It's small (indicating).

10 Q.   Five, six inches?

11 A.   Something around that.

12 Q.   By how high?

13 A.   Probably about like that (indicating).

14 Q.   "Like that" is about an inch, inch and a half?

15 A.   Probably something like that.

16 Q.   And how thick?

17 A.   Okay, now, how long, it's about that long

18 (indicating).

19 Q.   Well, okay, how wide is it?

20 A.   How wide is it?  It's about that wide and that

21 (indicating) --

22 Q.   That's how deep it is, I am talking about if you

23 are looking at it head on, this is the device, okay?

24 A.   Uh-huh.

25 Q.   How long is it?

D. Kennon White - Cross Examination

1  A.   It's about that long (indicating).

2  Q.   And that long is about 5, 6 inches, 5 inches?

3  A.   Probably more about 4 and a half inches.

4  Q.   Four and a half inches.  How tall is it?

5  A.   Probably about -- about that tall (indicating).

6  Q.   About an inch, inch and a half?

7  A.   Something like that.

8  Q.   And how wide is it?

9  A.   Probably about an inch and a half wide or an inch

10 wide.

11 Q.   Okay, and does it have a microphone to it or does

12 it record right there?

13 A.   It records right there.

14 Q.   And where did you put it?

15 A.   I put it in my crotch area.

16 Q.   Okay.  So that you placed this inside your crotch

17 area before you ever got to any of these locations to

18 tape, right?

19 A.   Uh-huh.

20 Q.   And does it have an on/off switch?

21 A.   Yes.

22 Q.   And you turn it on when you are ready to start?

23 A.   When I would leave to go to where I was going, it

24 would be turned on at that time and locked.

25 Q.   And -- okay.  When you would leave to go where

D. Kennon White - Cross Examination

1  you were going, it would be turned on by who?  Or

2  whom?

3  A.   Okay, by -- sometimes by me, sometimes in front

4  of the FBI, sometimes not.

5  Q.   Okay.  Would you meet with the FBI each and every

6  time before you would go do a recording?

7  A.   Not each and every time.

8  Q.   Did you meet with the FBI more often than not

9  when you would do a recording?

10  A.   Yes.

11  Q.   And when you were finished making your recording,

12  did you turn off the machine or did the FBI?

13  A.   There were certain instances that they did, and

14  there were certain instances that I did.

15  Q.   And when you turned it off yourself --

16  A.   Uh-huh.

17  Q.   -- did you advise the FBI that you had just made

18  a recording?

19  A.   Yes.

20  Q.   And did you advise the FBI who you had recorded?

21  A.   Uh-huh.

22  Q.   And did you give them a summary of what was said?

23  A.   Uh-huh.

24  Q.   You told them.

25  A.   Yes.

D. Kennon White - Cross Examination

1  Q.   And when they turned it off, would you meet at a

2  location that was prearranged?

3  A.   Yes.

4  Q.   And they would turn it off, right?

5  A.   Uh-huh.

6  Q.   And did you at that time give them a summary of

7  what was said?

8  A.   Yes.

9  Q.   So each and every time that you did a recording,

10  you summarized what was on the tape for the FBI?

11  A.   Yes.

12  Q.   And did they take notes?

13  A.   Yes.

14  Q.   And when they took notes, was that when you

15  turned in the recorder?

16  A.   Uh-huh.

17        MR. PINALES:  Your Honor, may I approach?

18        THE COURT:  I'm sorry, you need to approach

19  the bench?

20        MR. PINALES:  Yes, please.

21        THE COURT:  You may.

22        (Thereupon, a discussion was had at the bench

23  between the Court and counsel and out of the hearing

24  of the jury.)

25        THE COURT:  Yes, sir, Mr. Pinales.

D. Kennon White - Cross Examination

1            MR. PINALES:  Mr. Pinales on behalf of

2  Mr. Cletus Maricle.

3            The witness has clearly said that he would

4  turn in the tape and either review with them when he

5  turned it in or reviewed them by message somehow that

6  he had.

7            And those times that he was with them in

8  person, he said they were taking notes.

9            I submit, Your Honor, that's a 302, that's a

10 -- a statement that we are entitled to if it in fact

11 exists.

12           THE COURT:  Mr. Smith?

13           MR. SMITH:  Your Honor, we have provided

14 Jencks material to counsel.

15           I think he is taking a great leap here to say

16 that most of the time there were notes taken at these,

17 there are 302s that he now doesn't have.

18           We have reviewed the notes, we have reviewed

19 the 302s.

20           Any information that wasn't in the 302s that

21 was discoverable in the notes, I have asked that they

22 be produced.

23           And I have no reason to believe that full

24 discovery hasn't been complied with at this point.

25           If in his examination he can develop -- I

D. Kennon White - Cross Examination

1  mean, I don't know what the court would ask me to do

2  at this point.

3          All I can tell you is that I have reviewed

4  their files, I have given them copies of the 302s.

5          And that's the best I can do for this process

6  at this point.  I don't know what else I can do.

7          MR. PINALES:  Your Honor, Martin Pinales.

8  The material provided by Mr. Smith in the form of a

9  302 is minimal, at best, and we have a number of tapes

10  that we have heard.

11          I plan on asking how many we haven't heard

12  hourwise, you know, timewise.

13          And he said that each and every time that he

14  was with them, which was more often than not, they

15  were making notes.

16          And we have no notes, we have no 302 on a

17  tape that was turned in of a conversation or a

18  discussion of a tape that was turned in of a

19  conversation.

20          We -- that is not in any of the materials

21  that has been provided.

22          THE COURT:  Well, counsel takes the position

23  that there is information that hasn't been provided.

24          Mr. Smith has represented to the court as an

25  officer that he has reviewed all the files and

D. Kennon White - Cross Examination

1 produced everything that he is aware of in existence.

2         I think he has complied with his obligations

3 at this point.

4         Now, this is a discovery issue.  I think

5 that's as far as we can go with it at a bench

6 conference with the witness on the stand.

7         MR. PINALES:  Yes, Your Honor.

8         THE COURT:  So you can ask him questions

9 about it --

10        MR. PINALES:  Oh, I will.

11        THE COURT:  -- the nature of the recordings

12 and into the nature of notes or whatever.

13        But I think the United States has represented

14 that it's provided everything.

15        I don't have any reason to second guess that

16 that's -- that there is any incorrect statement.  He

17 has been --

18        MR. PINALES:  Just doing my job, Your Honor,

19 best way that I know how.

20        MR. SMITH:  Your Honor, if this would be

21 appropriate, I just -- counsel, I have not objected,

22 but I intend to place an objection.

23        If -- if he wants to get the model and serial

24 number of this recording device and this stuff out on

25 the record, I am going to object to more detail.

D. Kennon White - Cross Examination

1          I mean, he has been asking about where it was

2  put, how big it was, how wide it was, how long it

3  was.

4          And I haven't objected to that, but I just

5  want -- my standard position is always the FBI's

6  equipment is -- I just don't see how that's relevant

7  to further specify what equipment was used.

8          MR. PINALES:  I agree, I am not going to dig

9  into it any further.

10          I just wanted to get a rough idea of the size

11  and where it was placed because it fits in with

12  questions I was planning on asking later.

13          MR. SMITH:  That's fine, Your Honor.

14          MR. PINALES:  Thank you.

15          THE COURT:  Thank you.

16          (End of bench conference.)

17          THE COURT:  Thank you, counsel, you may

18  proceed.

19          MR. PINALES:  Thank you.

20  BY MR. PINALES:

21  Q.  Mr. White, right before we had our side bar, I

22  was asking you questions about when you turned in the

23  recording device.

24          And I believe my questioning was to whether or

25  not when you did, you would tell the agents -- first

D. Kennon White - Cross Examination

1 of all, I'm presuming something.

2     Let me take a step backwards.  Who would you turn

3 it in to?

4 A.   I would turn it in to different agents.

5 Q.   Okay, agents of the Federal Bureau of

6 Investigation?

7 A.   That's correct.

8 Q.   And a variety of FBI agents, could you give us a

9 rough idea how many, just roughly?

10 A.   Three, I think.

11 Q.   Okay, and these three agents of the FBI, when you

12 would turn it in, I believe you said it was in a

13 prearranged location, so you knew where to show up and

14 they knew where to show up, right?

15 A.   Yes.

16 Q.   And when you showed up, you would give them the

17 tape, right?

18 A.   Yes, I would give them the recording.

19 Q.   The digital recording device?

20 A.   Uh-huh.

21 Q.   And when you gave it to them, they would turn it

22 off?

23 A.   Yes, in most cases, that's correct.

24 Q.   In most cases.

25 A.   That's correct.

D. Kennon White - Cross Examination

1  Q.    And you would chat about what had happened?

2  A.    Uh-huh.

3  Q.    This was a recording device that internally

4  recorded the conversation but didn't broadcast it to

5  the FBI agents; isn't that right?

6  A.    Yes, that's correct.

7  Q.    And so by not broadcasting, they had the device

8  and they had you to tell them what was going on,

9  right?

10 A.    They would -- yes, I would tell them what was

11 talked about.

12 Q.    And I am going to come back to that.  Before you

13 did a recording, did you meet, except in that one

14 tape, the second to the last one, where you had a

15 written list of questions --

16 A.    Uh-huh.

17 Q.    -- did you discuss with the agents what you were

18 supposed to talk about?

19 A.    Yes.

20 Q.    So you would meet with them in advance, right?

21 A.    Most of the time.

22 Q.    And they would tell you, "Now, I want you to go

23 see Cletus Maricle"?

24 A.    Uh-huh.

25 Q.    "And I want you to talk to him about X, Y and Z,

D. Kennon White - Cross Examination

1 right?

2 A.   Uh-huh.

3 Q.   And so, I mean, then you would take that device

4 and go recording, right?

5 A.   Uh-huh.

6 Q.   Now I am going to get back to at the end.   When

7 you met with them to turn in the device, did they --

8 you said they took notes?

9 A.   In -- in most cases I could not tell exactly what

10 they were doing.

11       But you know, in some of the cases, I know they

12 took notes.

13 Q.   Okay, I am not asking you whether you read their

14 notes.   Did you see them writing things?

15 A.   Sometimes.

16 Q.   Okay, and when they wrote things, it was based on

17 the conversation that you were telling them, right?

18 A.   I presume.

19          MR. SMITH:   Your Honor, I am going to

20 object.   He is asking again for speculation.

21 BY MR. PINALES:

22 Q.   Did it --

23          THE COURT:   Overrule, I'll let him testify

24 what he discovered.

25 BY MR. PINALES:

D. Kennon White - Cross Examination

1  Q.   Did it appear to you they were taking notes based
2  on the conversation?
3  A.   It appeared that way.
4  Q.   Sure.  You said that you recorded and your wife
5  Wanda recorded?
6  A.   Uh-huh.
7  Q.   Right?
8  A.   Yes.
9  Q.   When you would go, would you have one device or
10 two devices?
11 A.   Sometimes it would be one device, sometimes it
12 was two devices.
13 Q.   And in those occasions when you would have two
14 devices and you were with your wife Wanda, she was
15 wearing one and you were wearing one; would that be a
16 fair statement?
17 A.   Most of the time, that's correct.
18 Q.   And these -- this device or these devices were
19 hidden, right?
20 A.   Yes.
21 Q.   You weren't wearing them on the outside, right?
22 A.   No.
23 Q.   You didn't have a sign saying, "Speak into the
24 microphone," or anything like that, you were making a
25 secret recording, right?

D. Kennon White - Cross Examination

1  A.   That's correct.

2  Q.   And it was a secret recording to the people you

3  were talking to, right?

4  A.   That's right.

5  Q.   And you knew you were being recorded, right?

6  A.   Yes.

7  Q.   And if other people were wearing a device, was it

8  your impression that they knew they were being

9  recorded?

10 A.   Yes.

11       MR. SMITH:  Your Honor, I am going to object,

12 speculation.

13       THE COURT:  Overrule.

14       MR. PINALES:  Thank you.

15 BY MR. PINALES:

16 Q.   But the people you were talking to didn't know

17 they were being recorded, right?

18 A.   No.

19 Q.   No, they didn't know?

20 A.   I don't know for sure.  I don't think they knew.

21 Q.   Okay.  And you were going over the items that you

22 were prompted or told by the FBI to go over?

23 A.   That's right.

24 Q.   How many hours, just you, how many hours would

25 you estimate, best ability, did you record?

D. Kennon White – Cross Examination

1  A.   I don't know the exact amount, but I would say

2  over 50 hours.

3  Q.   Over 50 hours?

4  A.   Probably.

5  Q.   So we just heard the top of an iceberg, top of

6  just a small amount when you testified and we started

7  listening to tapes Thursday, Friday and today, right?

8           MR. SMITH:  Your Honor, again, I am going to

9  object.  Mischaracterization.

10          THE COURT:  It's cross examination.  I'll

11  overrule.

12          MR. PINALES:  Thank you, Your Honor.

13  BY MR. PINALES:

14  Q.   You may answer.

15  A.   Can you repeat the question again?

16  Q.   Let me ask it a little better.  We listened to

17  tapes in this courtroom Thursday and Friday and today;

18  is that a fair statement?

19  A.   Yeah, it's --

20  Q.   And the hours that we heard were not consistent

21  because they were started and stopped and you were

22  asked questions, right?

23  A.   Yeah, they were started and stopped some.

24  Q.   Of the tapes that you made, you have testified

25  approximately came to about 50 hours?

D. Kennon White - Cross Examination

1  A.   Some -- yeah, around that, around about, could

2  have been more.

3  Q.   Could have been more, okay.

4  A.   Yes.

5  Q.   But best guess.

6  A.   Yeah.

7  Q.   So my question was we just heard, the jury and

8  everyone in this courtroom just heard a small amount

9  of the hours that you gave to the FBI, right?

10 A.   You heard -- you heard a certain portion of what

11 was recorded, that's correct.

12 Q.   And you turned over everything to the FBI; is

13 that right?

14 A.   That's right.

15 Q.   And you didn't withhold anything from the FBI,

16 did you?

17 A.   No, I did not.

18 Q.   Every recording that you made, you gave to the

19 FBI?

20 A.   That's right.

21 Q.   You're recording somebody that doesn't know you

22 are recording, and then you have testified to this

23 jury that at the end, Cletus Maricle said

24 (indicating).

25      Did he say that?  Did he mouth to you to go see

D. Kennon White - Cross Examination

1 Al Man?

2 A.   Yes, he did.

3 Q.   Well, he didn't know you were being recorded --

4 or that he was being recorded; is that right?

5 A.   I don't know that he did not know.  He was

6 cautious what it came --

7 Q.   He was cautious --

8 A.   -- when it came to that kind of thing.

9 Q.   Well, he talked for several hours that we heard,

10 and you have maybe another 45 hours, 42 hours that you

11 turned in to the FBI where there were words being

12 spoken, right?

13 A.   I have turned in, yes, but he is cautious when it

14 comes to --

15 Q.   I am not asking you that.  There are words that

16 are audible, and we could all hear them, right?

17 A.   Yes, sir.

18 Q.   So you didn't say, "Speak into that microphone,"

19 and you weren't wearing a sign saying, "I am wired."

20     And you were talking about some -- in a lot of

21 these tapes some very deep subject about his

22 daughter's drug problems, and -- I mean, some really

23 deep down hard-to-talk-about issues.  Would you agree?

24 A.   We --

25 Q.   There were -- I'm sorry, go ahead, finish.

D. Kennon White - Cross Examination

1  A.   Go ahead.

2  Q.   No, I'm sorry, I don't want to cut you off.

3  A.   We talked about some issues, that's correct.

4  Q.   Serious issues?

5  A.   Uh-huh.

6  Q.   And they are in words so we could hear them,

7  right?

8  A.   Well, yeah.

9  Q.   But you are telling this jury that he mouthed to

10  you, "Go see Al Man," without using words?

11  A.   Yes, that's correct.

12  Q.   And you knew you were on a tape, and you wanted

13  to preserve this to turn over to the FBI, right?

14  A.   I knew -- yes.

15  Q.   And you didn't say, "You said I should see Al

16  Man," or anything like that, you didn't do that, did

17  you?

18  A.   No, that would have alerted him for sure that I

19  was wearing a wire or wearing a tape.

20  Q.   Okay.  Going back, but I don't want to start

21  playing tapes today because I don't want to go beyond

22  the 4:30 period.

23       But I do have some questions, and I will come

24  back to the tapes later.

25       I want to talk to you about Clay County, and I

D. Kennon White - Cross Examination

1  want to talk to you about the White family, okay?

2  A.   Okay.

3  Q.   Clay County and the White family go back a long,

4  long way, right?

5  A.   Yeah.

6  Q.   About the 1800s, right?

7  A.   I don't know for sure, but probably.

8  Q.   Long, long time.  And they were powerful, right?

9  A.   It was a political family.

10  Q.   Influential and financially well off; is that a

11  fair statement?

12  A.   Well, the family as a whole, you could look there

13  was certain factions that was and certain factions

14  that wasn't.

15  Q.   Sure.  Your living arrangement was well off,

16  right?

17  A.   Over the last -- for the last so many generations

18  -- yeah, for the last few years, yes.

19  Q.   For many generations, they made their money in

20  salt?

21  A.   I don't think that the money that you are talking

22  about came from salt.

23       I mean, some of the original Whites I think made

24  their money in salt.

25  Q.   And you said they started something called White

D. Kennon White - Cross Examination

1 Chevrolet?

2 A.   Yeah, actually it was started by my grandfather,

3 which was a Langdon, my great-grandfather, which was a

4 Langdon.

5 Q.   And your great-grandfather started this

6 automobile business?

7 A.   That's correct.

8 Q.   Could you share with us about the time period?

9 A.   It was many, many years ago, I would -- I don't

10 know exactly when, but it was before the '50s, I

11 think.

12 Q.   And ultimately your dad and your uncle ran the

13 place?

14 A.   That's right.

15 Q.   And the City of Manchester is the county seat,

16 right?

17 A.   Yes.

18 Q.   And the county seat for the City of Manchester

19 has had a mayor for as long as you can remember?

20 A.   Yes.

21 Q.   Your grandpa, right?

22 A.   Yes.

23 Q.   Your uncle?

24 A.   Uh-huh.

25 Q.   Your dad?

D. Kennon White - Cross Examination

1  A.   Yes.

2  Q.   And probably there was a White in office for at

3  least the past six years?

4  A.   I don't know that.

5  Q.   As long as you could remember?

6  A.   Yes, long time.

7  Q.   You are married?

8  A.   Yes.

9  Q.   Wanda White?

10 A.   That's correct.

11 Q.   Maiden name Price?

12 A.   Yes.

13 Q.   Tell us about the Price family.

14 A.   What would you like to know?

15 Q.   Well, are they a political family like the White

16 family?

17 A.   No, they are not.

18 Q.   And they are not an influential family like the

19 White family?

20 A.   No, they are not.

21 Q.   And they were not a wealthy family like the White

22 family?

23 A.   No, they were not.

24 Q.   And how long have you been married?

25 A.   Around twenty-two years.

D. Kennon White - Cross Examination

1  Q.   You have two children?

2  A.   Yes.

3  Q.   Boy and a girl?

4  A.   Uh-huh.

5  Q.   And Clay County as a whole is a Republican power,

6  is it not?

7  A.   Yes.

8  Q.   You have to -- I'm sorry, you have to audibly

9  answer.

10  A.   Yes.

11  Q.   No nodding.  And in Clay County, the Whites were

12  a powerful Republican family, your lineage?

13  A.   I guess you could say that.  I -- for awhile.

14  Q.   Up until 2002?

15  A.   Yes, probably there, a little bit before that.

16  Q.   Okay.  And what happened in Clay County was the

17  Whites controlled Clay County.  Would you say that's a

18  fair statement?

19  A.   No, I would not say that.

20  Q.   You would not say that's a fair statement?

21  A.   I would not say that's a fair statement.

22  Q.   Well, in 2002, the power and the prestige and the

23  influence, whatever they had ended; is that a fair

24  statement?

25  A.   I wouldn't say it ended, but I would say

D. Kennon White - Cross Examination

1 definitely there was a change in the power structure
2 of Clay County.
3 Q.   And in Clay County at this location, people get
4 their television from cable or satellite for the most
5 part?
6 A.   Yeah.
7 Q.   Not over the area because of the location, right?
8 A.   Yeah, that would be right.
9 Q.   And in about 2002, there was a show that was
10 quite talked about in Clay County on The History
11 Channel, was there not?
12 A.   Yes, there was.
13 Q.   And it was about the White family, was it not?
14 A.   The White family and some other families.
15 Q.   And about the power of the White family and of
16 another family and the struggle that occurred?
17 A.   Yes.
18 Q.   And it was played on The History Channel, but
19 just about everybody in Clay County, because of it
20 being a cable and a satellite area, had The History
21 Channel.  Would you say that's a fair statement?
22 A.   I don't know --
23          MR. SMITH:  Objection, Your Honor,
24 speculation.
25          THE COURT:  Sustained.

D. Kennon White - Cross Examination

1 BY MR. PINALES:

2 Q.   You heard a lot of talk about The History

3 Channel's show, did you not?

4 A.   I heard some talk about it, yes.

5 Q.   A lot of talk, not just some, a lot of talk?

6 A.   For a minimal time, yes, I did, for awhile.

7 Q.   And that minimal time was right before the 2000

8 election?

9 A.   I guess it could have been somewhere around

10 there, yes.

11 Q.   And that History Channel -- you saw it, didn't

12 you?

13 A.   Uh-huh.

14 Q.   And that History Channel show was not very

15 complimentary to the White family, was it?

16 A.   No, it wasn't.

17 Q.   And let's put that aside now.  Kennon White is

18 your uncle?

19 A.   No.

20 Q.   I'm sorry, I'm sorry.  Jennings White, you are

21 Kennon White.

22 A.   Uh-huh.

23 Q.   Jennings White is your uncle?

24 A.   No.

25 Q.   Cousin?

D. Kennon White - Cross Examination

1  A.   Distant cousin.

2  Q.   Distant cousin but a White.

3  A.   Yes, he is a White.

4  Q.   And he ran in 2002?

5  A.   That's correct.

6  Q.   He lost in 2002?

7  A.   Yes, he did.

8  Q.   Your dad was the mayor?

9  A.   Yes.

10  Q.   And in 2002 he ran, right?

11  A.   I don't think he ran in 2002.  He may have ran on

12  a post.

13  Q.   But didn't he lose?

14  A.   Not in 2002.

15  Q.   When did he lose?

16  A.   He lost in 2006.

17  Q.   Okay, and your aunt ran, Barbara Jo?

18  A.   Yes.

19  Q.   And did she win?

20  A.   No.

21  Q.   Any other Whites running and losing in 2002?

22  A.   I don't recall any.

23  Q.   In one of the tapes?

24  A.   Oh, yeah, myself, I ran.

25  Q.   And you ran for sheriff -- or for jailer?

D. Kennon White - Cross Examination

1  A.   Yes.

2  Q.   And you lost in 2002?

3  A.   Yes, I did.

4  Q.   And that's where we got the expression, "White,

5  White, White."   There were three Whites running in

6  2002, right?

7  A.   I think that's correct.

8  Q.   And three Whites lost in 2002?

9  A.   Yeah, that would be true.

10 Q.   After The History Channel played that show.

11 A.   Yeah, I guess it was after The History Channel

12 had played that show.

13 Q.   In addition, there was a lot of other bad press

14 that occurred before that election, was there not?

15 A.   Maybe some.

16 Q.   Yeah.  You had some particularly bad press --

17 A.   Yes.

18 Q.   -- before 2002?

19 A.   Yes, I did.

20 Q.   Share with the jury what bad press that was.

21 A.   I had numerous bad press, I mean, I had had

22 trouble before in London, Kentucky with where I had

23 been arrested there and things like that.

24 Q.   And that became public?

25 A.   Yes.

D. Kennon White - Cross Examination

1  Q.    And that was before the election?

2  A.    Uh-huh.

3  Q.    And Jennings White had some bad press, too,

4  didn't he?

5  A.    I think so, yes.

6  Q.    Well, do you recall that his opponent was saying

7  that he was charged with something?

8          MR. SMITH:  Hearsay, Your Honor.

9          THE WITNESS:  Yes, he was like thirty years

10 earlier had been charged --

11         THE COURT:  Sustain, sustain the objection.

12 BY MR. PINALES:

13 Q.    Don't answer.  But there was some negative press

14 that you recall on your cousin Jennings White?

15 A.    Yeah.

16 Q.    Before the 2000 election?

17 A.    Before the 2000 --

18 Q.    Before the 2002 election, I'm sorry.

19 A.    Yes.

20 Q.    Now, I want to go back to exhibit I believe it is

21 A14.  Do you recall that?  A pink sheet of paper?  I

22 remember the color.

23 A.    Okay, can I see it?

24 Q.    Sure.

25         MR. PINALES:  May the witness please --

D. Kennon White - Cross Examination

 1    THE CLERK:  It's D14.

 2    MR. PINALES:  D14, thank you.

 3  BY MR. PINALES:

 4  Q.  I remembered the color but not the number.  For

 5  purposes of the record, you are looking at an exhibit

 6  that has been admitted marked D14; is that correct?

 7  A.  Uh-huh, yes.

 8  Q.  And it is on a pink sheet of paper?

 9  A.  Yes.

10  Q.  And I believe you identified that earlier?

11  A.  Yeah.

12  Q.  And when you identified it earlier, you said that

13  you made it in approximately 1996?

14  A.  I don't think I said I made it in 1996.

15  Q.  What?

16  A.  I don't think I said I made it --

17  Q.  When did you make it?

18  A.  It was around 2002, I think.

19  Q.  Well, when was the first time your Aunt Barbara

20  Jo ran?

21  A.  She ran, I don't know the exact year.

22  Q.  Approximately.  Before 2002?

23  A.  Yeah, it was -- I don't know, I don't know the

24  exact year.

25  Q.  And you are saying that you did not previously

D. Kennon White - Cross Examination

1 testify that that was when you were helping her in the

2 first time she ran in -- in approximately 1996?

3 A.   No, I don't think that I testified to that.

4 Q.   You don't think you testified to that?

5 A.   Huh-uh.

6 Q.   When was that made?

7 A.   I think that was made around 2002.

8 Q.   And what prompted it to be made?

9 A.   Because I was running for jailer.

10 Q.   I'm sorry.

11        MR. WESTBERRY:  It was 146.

12 BY MR. PINALES:

13 Q.   I will come back to that, I will come back to

14 that.

15     I don't want to waste the jury's time.  You say

16 that you made that list, right?

17 A.   Yes.

18 Q.   You said you made it after talking to several

19 people?

20 A.   Uh-huh.

21 Q.   And I recall you said that you talked to Cletus

22 Maricle?

23 A.   Yes.

24 Q.   You talked to Kenny Day.

25 A.   Yes.

D. Kennon White - Cross Examination

1  Q.   And you talked to Stanley Bowling?

2  A.   Uh-huh.

3  Q.   And you talked to Jennings White?

4  A.   Yes.

5  Q.   Did you talk to anybody else?

6  A.   If -- I don't recollect.  I don't recollect at

7  this time.

8  Q.   And did you make the list after you spoke to all

9  those people from other lists?

10  A.   I made it from what they told me, from what they

11  had told me.

12  Q.   They were not all in the same room at the same

13  time talking to you, were they?

14  A.   Not at the same time.

15  Q.   And so they told you at different times?

16  A.   Yes.

17  Q.   And this list appears -- you might look at it --

18  to be a continuous flow with precinct by precinct by

19  precinct, correct?

20  A.   It may appear that way.

21  Q.   Well, let's look at the top of it.  What does it

22  say, Sexton Creek?

23  A.   Uh-huh.

24  Q.   What is Sexton Creek?

25  A.   It's a precinct.

D. Kennon White - Cross Examination

1  Q.   And below that it says Burning Springs?

2  A.   Uh-huh.

3  Q.   What is that?

4  A.   It's a precinct.

5  Q.   And your writing, Fogger Town.

6  A.   Fogger Town.

7  Q.   Fogger Town, what is that?

8  A.   That's a precinct also.

9  Q.   And Big Creek?

10 A.   It's a precinct.

11 Q.   They are all precincts, aren't they?

12 A.   Yeah, that's right.

13 Q.   So this is a list, precinct by precinct?

14 A.   It's -- yeah, it's a list of people that you see

15 in the precinct that helps with elections when it

16 comes to this kind of stuff.

17 Q.   Precinct by precinct?

18 A.   Yes, it's precinct by precinct.

19 Q.   And you have got some names from one person.

20 A.   Uh-huh.

21 Q.   And some names from another person?

22 A.   That's right.

23 Q.   And you made this list after you talked to each

24 one of those people?

25 A.   Yes, I talked to these people in a short period

D. Kennon White - Cross Examination

1 of time, like probably a day or a day and a half.

2 Q.    There is more than 50 names on this, is there

3 not?

4 A.    Uh-huh, yes.

5 Q.    Well, let's take the first name, let's go up to

6 the top precinct.   Sexton Creek?

7 A.    Uh-huh.

8 Q.    Dallas Robinson?

9 A.    Uh-huh.

10 Q.    Dallas, Jr.?

11 A.    Uh-huh.

12 Q.    And I assume it's Dallas Robinson, Jr.?

13 A.    I think there was actually two of those people,

14 an older man and a junior if I recall correctly.

15 Q.    Well, who told you about that one?

16 A.    I think Kenny Day may have told me about that

17 one, or possibly I may have got information off Sexton

18 Creek.   I got information from Kenny Day and Cletus

19 Maricle.

20 Q.    So you don't know who told you what?

21 A.    I know that Cletus Maricle told me William and

22 Carol, Carolyn Ball.   I know I remember that

23 distinctly.

24 Q.    Well, let -- I'm asking in some type of

25 chronological order, precinct by precinct, Dallas

D. Kennon White - Cross Examination

1 Robinson and Dallas, Jr., the top of the list?

2 A.   Uh-huh.

3 Q.   And you say who told you that?

4 A.   I don't know, I know some of the ones that was

5 told.

6      I think Kenny Day told me about Dallas Robinson,

7 if I am not -- that's what I think.

8      But now if you want me to tell you, I can go down

9 this list and tell you every exact name that every

10 person told me, I can't.

11      I mean, now, if that's where you are going with

12 it, I am going to tell you that I can't do that.

13      But I can tell you that some of the people that

14 give me those names, and I can tell you some of the

15 names of the ones that people give me, but not all of

16 them.

17 Q.   But you made this list at one time.

18 A.   I made that list in a day or two span, yes, in a

19 short period of time.

20 Q.   That's not my question.

21 A.   Okay.

22 Q.   My question is the pink piece of paper in front

23 of you --

24 A.   Uh-huh.

25 Q.   -- you took a pen and you wrote the list.

D. Kennon White - Cross Examination

1  A.   Yes.

2  Q.   Did you write the list at one time or over a

3  period of a couple days?

4  A.   Over a period of a couple days.

5  Q.   And so the list was fluid, it was changing.

6  After you spoke to somebody, you added some names?

7  A.   What I did is -- what I did, I took these lists

8  of precincts, and I took and I spaced them apart to

9  where there was names in there to where I could allow

10  to put several different names.

11      Because I would find names that one person would

12  tell me.

13      And I knew I had to have the room to put more

14  names in one precinct because I wouldn't get all the

15  names from the same person.  So if that's what you are

16  asking --

17  Q.   Okay, is Big Creek a big precinct?

18  A.   Pretty big precinct.

19  Q.   You didn't leave a lot of space there, did you?

20  A.   I did not leave a lot of space there because

21  there wasn't a whole lot of people that I knew over

22  there to talk with.

23  Q.   Well, yeah, but you didn't know who you were

24  going to be talking with until you talked with the

25  four people there, did you?

D. Kennon White - Cross Examination

1  A.   There was another place there that was the same.

2  There were certain precinct areas of the people that

3  the only people I knew in those areas that I was, you

4  know, I knew was those people.

5  Q.   That's not my question.  I am confused.  We have

6  a piece of paper, right?

7  A.   Yes, yes, you do.

8  Q.   And we have precincts written down on the left

9  side.

10  A.   Uh-huh.

11  Q.   And we have names written down on the right

12  side.

13  A.   Yes.

14  Q.   And the precinct then has the names, and there is

15  a space for the names next to the precinct?

16  A.   In some -- in some instances, yes, that's

17  correct.

18  Q.   Well, in every instance, isn't it?  In every

19  instance where we have a precinct.

20  A.   For example, there is three precincts there that

21  there wasn't very many people in those precincts that

22  handled or did what they -- did what they did there.

23      And those names was pretty well known, so some of

24  those precincts had more people than that, you know,

25  that did things.

D. Kennon White - Cross Examination

1 Q.  I am so confused.

2 A.  Well, yeah, you are confusing me.

3 Q.  I don't mean to.  You spoke to four people,

4 right?

5 A.  I spoke to around four people, that's correct.

6 Q.  And in those four people, Cletus Maricle, Kenny

7 Day, in those people, you were curious to find out who

8 could help you in your election, you are saying now?

9 A.  Uh-huh.

10 Q.  2002?

11 A.  Yes.

12 Q.  And you didn't know what they were going to say

13 before they said it, did you?  You didn't know the

14 names before they told you?

15 A.  Not every time.  Sometimes I had a pretty good

16 idea.

17 Q.  And that's why you left some space big and some

18 space small because you knew you were only going to

19 get one name here?

20 A.  Well, I didn't know -- like when it came to Big

21 Creek and it came to Oneida and it came to South Fork,

22 that there was different precincts there, that's

23 correct.

24     There wasn't as many people that you had to talk

25 to or that, you know, I had knowledge to talk to.

D. Kennon White - Cross Examination

1 Q.   But you didn't know if they had knowledge, did

2 you?

3 A.   Well, where are you going with this?

4 Q.   I am just asking -- it seems odd that you are

5 saying that this list was prepared after you spoke to

6 four people --

7 A.   Well, I --

8 Q.   -- not knowing what they were going to say, and

9 it's not four separate lists or it wasn't compiled

10 later from four lists.

11      It just seems rather odd, and I am asking about

12 how it was.

13 A.   That's how it was.

14 Q.   Okay.  One of the last things that you had

15 mentioned was that when the new mayor, Carmen, came

16 in, Carmen Lewis --

17 A.   Uh-huh.

18 Q.   -- she fired Cletus Maricle's grandson?

19 A.   From what he said, yeah.

20 Q.   Well, do you know that?

21 A.   That's what he told me.

22 Q.   And did you know his grandson was a junior in

23 high school?

24 A.   Yes, I knew that he was in high school.

25 Q.   And that he was taking a course for credit where

D. Kennon White - Cross Examination

1  you work out in the field?  Did you know that?

2  A.   He was working under some type of co-op

3  situation, that's correct.

4  Q.   And it was -- it was sponsored by the high

5  school?

6  A.   To my knowledge, yes.

7  Q.  And this was the job that the new mayor fired him

8  from, let him go before the semester was over?

9  A.   I don't know.  I don't know, I mean, after I left

10  there, I wasn't there.  I don't know.

11  Q.   Okay.  But you said that Mr. Maricle, Cletus

12  Maricle was not happy about that.  He was kind of mad

13  about it.

14  A.   Well, you can see in the recording how he felt

15  about it.

16  Q.   Right.

17  A.   He stated it plainly how he felt about it.   He

18  said that he was upset over what he -- or what did to

19  Brandon so --

20  Q.   Brandon being the grandson?

21  A.   Uh-huh, that's correct.

22         MR. PINALES:  Now, I think we have enough

23  time for one more topic, Your Honor.

24         THE COURT:  All right, that's fine.

25  BY MR. PINALES:

D. Kennon White - Cross Examination

1  Q.   You said your wife Wanda was a Price?

2  A.   That's correct.

3  Q.   And we have heard a lot in the tapes, and we have

4  heard a lot of testimony about her brother, Corky.

5  A.   Uh-huh.

6  Q.   Corky is -- was in jail, right?

7  A.   Uh-huh.

8  Q.   And what was he in jail for?  If you know.

9  A.   Which time?  I mean, he had been in jail several

10 times.

11 Q.   I am talking about the time that you are talking

12 about in the tapes.

13 A.   He was in jail for assault.

14 Q.   And that was delivering to a couple of guys a

15 witness or a possible witness?

16 A.   That was part of what the allegations and the

17 charges was, that's correct.

18 Q.   But he was in jail for that?

19 A.   He was in jail for assault, it was the charge and

20 he was in jail for, the crime you are referring to.

21       If you want to go on and say it, I mean, yeah,

22 that's what he was --

23 Q.   And it was a particularly brutal offense, wasn't

24 it?

25            MR. SMITH:  Your Honor, I am going to object

D. Kennon White - Cross Examination

1 as to --

2 BY MR. PINALES:

3 Q.  If you know.

4        MR. SMITH:  -- counsel's characterization of,

5 again, evidence not in the record here.

6        THE COURT:  I'll sustain the objection.  You

7 can rephrase it.

8 BY MR. PINALES:

9 Q.  Let me ask you, what were the facts?  Tell the

10 jury, what were the facts that Corky was in jail for?

11 A.  The facts, now, I don't know what you would say

12 the facts because I don't know, I wasn't there.

13      I know he was charged with an assault concerning

14 a situation that happened in Manchester.

15      You know, with a -- with a -- you know, I mean, I

16 just know he was in there for assault.

17 Q.  And this was your brother-in-law?

18 A.  Yes, it was.

19 Q.  A gentleman very close to Wanda?

20 A.  Yes.

21 Q.  And somebody, as it happened, was a topic of

22 conversation in your household.  Wanda and Corky were

23 very close?

24 A.  Well, yeah, I mean, that's her brother.

25 Q.  Yeah, but they were close as brother and sister.

D. Kennon White - Cross Examination

1  A.   Well, he was -- may not have been as close as

2  brother and sister as what some people are as brothers

3  and sisters.

4      Sometimes you would see him for awhile, sometimes

5  you would not.

6  Q.   At this time they were close?

7  A.   I don't --

8  Q.   And he -- I mean, Manchester and --

9  A.   What are you wanting to ask me?

10 Q.   What I am trying to get to is this isn't a big

11 county, is it?

12 A.   No, it's not.

13 Q.   And everybody knows, or a lot of people know a

14 lot of other people?

15 A.   Yeah.

16 Q.   And it was absolutely no secret that Corky Price

17 was Wanda Price White's brother?

18 A.   That's probably correct.

19 Q.   And would it be your impression that Cletus

20 Maricle knew?

21 A.   Absolutely.

22      MR. SMITH:  Your Honor, I am going to

23 object.

24      Again, calling for speculation as to what his

25 client knew.

D. Kennon White - Cross Examination

1          THE COURT:  All right, I'll overrule.  He is

2  asking what his impression was, and you can ask him

3  how he formed an impression.

4          MR. PINALES:  Do you remember the question?

5          THE WITNESS:  Okay, what was the question?

6          MR. PINALES:  Could I have the question read

7  back?

8          THE COURT:  Yes, you may.

9          (Last question read.)

10          THE WITNESS:  And --

11  BY MR. PINALES:

12  Q.    And let me finish.  Knew that they were brothers

13  and sisters?

14  A.    Yes.

15  Q.    Brother and sister?

16  A.    Yes.

17  Q.    And at the time Cletus Maricle was a judge?

18  A.    That's correct.

19  Q.    Actually he was the judge?

20  A.    That's right.

21  Q.    And he was the judge that sent Corky Price to

22  prison?

23  A.    Yes.

24  Q.    And did you -- do you have any knowledge about

25  whether or not the prosecuting attorney had a

D. Kennon White - Cross Examination

1  recommendation as to what sentence?

2  A.   I don't recall exactly what it was.  It was going

3  to be a lenient sentence, though, for his cooperation.

4  Q.   And I believe when you were -- when you took the

5  witness stand, you were asked questions about your

6  plea agreement.

7      And it was your understanding that only the judge

8  could decide what the sentence would be.

9  A.   That's correct.

10 Q.   And that was exactly the same case with your

11 brother-in-law, Corky Price?

12 A.   I imagine, I don't --

13 Q.   And in reality, isn't it a fact that the then

14 Judge Cletus Maricle gave a sentence much more severe

15 to Corky Price than was recommended by the state's

16 attorney, the prosecutor in that case?

17 A.   He give -- he give the -- I think he went to the

18 top of the guidelines of what they had agreed to.

19 Q.   Okay, and so he gave, as you phrased it, a severe

20 sentence, knowing that that person that he is

21 sentencing was your wife's brother?

22 A.   He told me that it was lucky that he did not get

23 thirty some years.

24      And he ended up with less than five years, and he

25 ended up out of jail in less than probably three

D. Kennon White - Cross Examination

1 years, so --

2 Q.   And when he was sentenced it was over what the

3 prosecutor, state's attorney had recommended.

4     And the family was still trying to get him out

5 earlier, right?

6 A.   Yes, that's --

7 Q.   And that's what we heard about in those tapes?

8 A.   Uh-huh.

9 Q.   And it was a matter that came in discussion often

10 in front of Cletus Maricle, right?

11 A.   It was discussed a few times, that's correct.

12 Q.   And it was discussed while you were secretly

13 wearing a wire?

14 A.   Uh-huh.

15 Q.   Did you ever in any of those tapes, the ones we

16 heard or the ones we didn't hear, ever say to -- to

17 Cletus Maricle, "You promised, you promised you were

18 going to let him out"?

19 A.   In the ones that we have heard --

20 Q.   I am asking in the ones we heard or the ones we

21 didn't.

22 A.   I -- I think that there is a recording that I

23 don't -- I am not sure about that.

24 Q.   And you know, you knew you were wired --

25 A.   Uh-huh.

D. Kennon White - Cross Examination

1 Q.   -- right?  And Wanda knew she was wired, to your

2 knowledge?

3 A.   Uh-huh.

4 Q.   And neither one of you said in anything that we

5 heard, "You know you promised you were going to let

6 him out"?

7        MR. SMITH:  Your Honor, I am going to

8 object.

9        Again, he is mischaracterizing the evidence

10 as though the jury has heard all of the tapes and

11 recordings.

12        MR. PINALES:  I am saying in the ones we've

13 heard.

14        I am going to ask two questions, Your Honor,

15 if I may.

16        THE COURT:  I am going to sustain the

17 objection.  I think it's an improper question.

18        MR. PINALES:  Okay.

19 BY MR. PINALES:

20 Q.   Did Judge Maricle let your brother out?

21 A.   At some point, yes.

22 Q.   Did he let your brother out?

23 A.   Not my brother.

24 Q.   I mean your brother-in-law.  Your brother-in-

25 law.

Colloquy

```
 1      Did he ever grant a motion letting your brother-
 2 in-law out?
 3 A.   I do not know.
 4           MR. PINALES:  Your Honor, I am about to go
 5 into another area.
 6           THE COURT:  All right, we'll stop --
 7           MR. PINALES:  I went three minutes over, I
 8 apologize.
 9           THE COURT:  That's okay, we'll stop for the
10 evening at this time.
11           Ladies and gentlemen, we will resume again
12 tomorrow morning at 9:00.
13           I don't believe we have any bad weather in
14 the forecast.  Let's keep our fingers crossed.
15           As we break for the evening, please keep in
16 mind the admonition that you have been given several
17 times.
18           I do want to remind you while we are in
19 recess, of course you should not talk with anyone
20 about the case.
21           You shouldn't speak with each other, your
22 shouldn't talk with your friends, your family
23 members.
24           I talked to you earlier about not engaging in
25 any type of electronic communications, if you have a
```

Colloquy

1 Blackberry or blogging or doing those kinds of

2 things.

3           So you shouldn't communicate about the case

4 with anyone.

5           And of course you shouldn't allow anyone to

6 approach you and attempt to discuss the case.

7           And if that should ever happen, of course you

8 should bring that to the court's attention promptly.

9           Don't read, watch or listen to any accounts

10 of the case if there should be any.

11           Don't attempt to do any type of research or

12 perform any investigation on your own while we are in

13 recess.

14           And of course, don't make up your mind about

15 the case before it is finally submitted to you.

16           I do hope to see you tomorrow morning at

17 9:00.

18           We will plan to start promptly at that time.

19 The jury will be excused until 9:00 a.m.

20           THE MARSHAL:  Please rise for the jury.

21           (Jury excused from the courtroom at this time

22 for evening recess.)

23           THE COURT:  You may step down, Mr. White.

24           THE WITNESS:  Thank you, Your Honor.

25           THE COURT:  Counsel, any matters to take up

Colloquy

1  outside the presence of the jury?

2          All right.  We will start promptly at

3  9:00 a.m. tomorrow morning.

4          Let me remind counsel, of course, if there

5  are any matters that come up and you need to speak

6  before the jury is placed in the box, advise me by

7  8:30 in the morning.  So we will be in recess until --

8  until 9:00 a.m.

9          (The further trial in this matter was

10  recessed at 4:35 p.m. until the following morning,

11  February 18, 2010 at 9:00 a.m.)

12                              - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

Index – Certificate

                              EXAMINATION INDEX

1

2  Government's Witnesses:

3  D. Kennon White

4  Direct by Mr. Smith . . . . .    7

5  Cross by Mr. Pinales  . . . .   33

6                          – – –

7                            EXHIBIT INDEX

8                                             Marked/Admitted
   Government Exhibits:
9
     A18   Audio                                   11
10
    A18A   Transcript of Audio                     11
11
     A20   Audio                                   16
12
    A20A   Transcript of Audio                     16
13
     A21   Audio                                   27
14
    A21A   Transcript of Audio                     27
15
                           – – –
16
                            CERTIFICATE
17
           I certify that the foregoing is a correct
18
   transcript from the record of proceedings in the
19
   above-entitled matter.
20

21
   s/  K. Ann Banta                  2-23-10
22  K. Ann Banta, RPR, CRR           Date

23

24

25