Wanda White – Direct Examination

1  No?  Court will be in recess for twenty minutes.

2            (Thereupon, a recess was taken from 2:35

3  until 2:55 p.m.)

4            (After recess.)

5            (The jury resumed their places in the jury

6  box, and the following proceedings were had in open

7  court.)

8            THE COURT:  Thank you.  The record will

9  reflect that all members of the jury are present.  All

10 parties and counsel are also present.

11           Miss White has returned to the witness

12 stand.

13           You are still under oath.

14           And Mr. Smith, you may continue with your

15 examination.

16           MR. SMITH:  If the court please, I would like

17 to hand the witness now PR25E.

18           THE COURT:  Yes, sir.

19 BY MR. SMITH:

20 Q.  Miss White, during the fall of 2006 election, do

21 you recall how many voters that you assisted and

22 completed the form as required by law?

23 A.  Twenty plus.

24 Q.  Okay, and during the day, were you also able to

25 observe Mr. Weaver who was operating as a Republican

Wanda White – Direct Examination

1 judge?

2 A.   How many he did?  He --

3 Q.   Were you able to observe him?

4 A.   I observed him, yes.

5 Q.   Okay, did you observe him also executing those

6 forms?

7 A.   I did.

8 Q.   And do you know how many he executed that day?

9 A.   I don't know.

10 Q.   Okay, and I believe you have in front of you now

11 PR25E?

12 A.   Yes.

13 Q.   If you would, just go through those, and if you

14 would isolate those which you find that you are

15 identified on there as the one who is assisting the

16 voter, please.

17     If you find one, if you would just pull it off to

18 the side.

19 A.   Okay.

20 Q.   I am going to ask you the count.

21 A.   Okay.

22 Q.   Would you count those that you identified which

23 are forms that you executed, ma'am?

24 A.   Eight.

25 Q.   Now, you discussed that when you were being

Wanda White – Direct Examination

1 trained by Mr. Stivers, Mr. Jones and others that this

2 was to be avoided and that you were to be -- you would

3 bring attention to yourself if you were to fill out a

4 number of these forms.

5 A.    Yes.

6 Q.    Did they talk about how many would be okay and

7 how many not okay, or did they -- did they ever

8 specify?

9 A.    No more than ten.

10 Q.    Why is it you did not follow their directions in

11 the fall of 2006, ma'am?

12 A.    Well, because Wayne Jones had expressed to me

13 that Freddy had done away with them in May.

14     And again, I really didn't feel like it was a big

15 deal.

16     I knew that it would be taken care of.  He

17 assured me that it would.

18 Q.    Were you concerned that it would draw more

19 attention to you if you were ushering voters in there

20 and assisting them and not filling these out?

21 A.    I did.

22 Q.    Did you have any notice from anyone that the

23 Attorney General's office was in town in November of

24 '06?

25         MR. WHITE:  Objection, leading.  Or

Wanda White – Direct Examination

 1 objection, calls for hearsay, Your Honor.

 2          THE COURT:  Overruled.

 3          If you could, please, if you did learn that

 4 from somebody, identify the source.

 5          THE WITNESS:  Wayne Jones come to the

 6 precinct and told me they were there.

 7 BY MR. SMITH:

 8 Q.   Okay, and was that on election day?

 9 A.   Yes.

10 Q.   And what did you do when Wayne Jones notified you

11 that the Attorney General's office was in town?

12 A.   I backed off.

13 Q.   And do you know about how far into the day on

14 election day that you were that you got --

15 A.   It was mid-morning.

16 Q.   Okay, and when you say you "backed off," what do

17 you mean?

18 A.   I just didn't -- didn't assist them aggressively

19 and --

20 Q.   What about stealing votes?

21 A.   I backed off.

22 Q.   Had you been stealing votes and assisting voters

23 who had been bribed up and to that point in the

24 morning?

25 A.   We had.  We both had.

Wanda White – Direct Examination

1  Q.   And being "we both," being you and who else?

2  A.   Charles Weaver.

3  Q.   And after Mr. Jones came in and told you that the

4  Attorney General's in office -- or Attorney General's

5  office was in town, did you steal any more votes that

6  after -- that -- after that notice?

7  A.   I did, a few more.  But his words to me were,

8  "You need to just calm down, back off.  We have

9  already beat her on the absentees.  He ain't got

10 nothing to worry about."

11 Q.   Okay.  Now, what was the result after the votes

12 were tallied?  Who won the race for mayor?

13 A.   Carmen Webb Lewis.

14 Q.   And then in following up with the results of that

15 election, did you all have any meetings together to

16 discuss the --

17 A.   The outcome?

18 Q.   -- the outcome?

19 A.   We did.

20 Q.   And where did you all meet?

21 A.   Cletus Maricle's home and William Stivers's home

22 and Bart Morris's home.

23 Q.   And in those meetings, what did you all generally

24 discuss?

25 A.   Basically who screwed us, where -- where we were

Wanda White – Direct Examination

1  -- our strategies were down, that type of

2  conversation.

3  Q.   Now, in the City of Manchester, are you aware of

4  Cletus Maricle having relatives that had jobs there?

5  A.   Yes.

6  Q.   And who were they?

7  A.   His daughter, Linsey Maricle, and his grandson,

8  Brandon Mobley.

9      His daughter Linsey's boyfriend also worked

10 there, Randy Owens.

11 Q.   And what happened to those jobs after your

12 father-in-law lost and Carmen Lewis became the mayor?

13 A.   They were terminated.

14 Q.   And what happened to your job and your husband's

15 job?

16 A.   They were terminated.

17 Q.   Now, at some point had you met with the FBI?  Do

18 you recall that?

19 A.   I do.

20 Q.   And at the time that you met with them, were you

21 asked at some point after that meeting to cooperate

22 with them?

23 A.   Yes.

24 Q.   And to your understanding, what were you asked to

25 do as a cooperator for the FBI?

Wanda White – Direct Examination

1  A.   To give full cooperation with ongoing

2  investigation and any that come out of this

3  investigation and give truthful statements and

4  testimony.

5  Q.   And at the time that you went forward to the FBI

6  to offer yourself up to cooperate, were you aware that

7  you were a target yourself?

8  A.   I was not.

9  Q.   Okay, and was any of your family targets in the

10 investigation at that point?

11 A.   My husband was.

12 Q.   Okay.  And were you made any promises by the FBI

13 or by the United States Government?

14 A.   I was told that if I cooperated fully with this

15 investigation and any investigations in the future

16 that would come from this investigation and gave

17 truthful testimony that I would not be charged.

18 Q.   And Miss White, what's your understanding will

19 happen to you here today if you were to testify

20 falsely?

21 A.   That my deal is done away with.

22 Q.   And when you say your "deal is done away with,"

23 what deal is that?

24 A.   That I would not be charged.

25 Q.   And do you know what the law of perjury means?

Wanda White - Direct Examination

1  A.    I do.

2  Q.    If you were to give false statement or testimony

3  here today, do you understand how you could be subject

4  to the law of perjury?

5  A.    Yes.

6  Q.    Now, Miss White, when you got to meet with the

7  FBI, was there some point when they discussed with you

8  the possibility of actually recording conversations

9  with these people that you told us about that you were

10  in this scheme to fix elections through the Board of

11  Elections?

12  A.    Yes, I was asked if I would do so.

13  Q.    And what was your response?

14  A.    My response is, "I don't have a problem with it."

15  Q.    Okay.

16          MR. SMITH:  And I would like to hand the

17  witness now, Your Honor, Government's Exhibit A7 and

18  A7A.

19          THE COURT:  Yes, sir.

20  BY MR. SMITH:

21  Q.    Miss White, you should have a disk in front of

22  you marked Government's Exhibit A7.

23  A.    Yes.

24  Q.    And can you identify that as being a recording

25  which you have previously reviewed prior to your

Wanda White – Direct Examination

1  testimony here today?

2  A.   Yes.

3  Q.   And in that conversation, Miss White, can you

4  tell us, were you a participant in that conversation?

5  A.   I was a participant.

6  Q.   And can you state for us, after having reviewed

7  that, is that a fair and accurate copy of that

8  conversation in which you participated?

9  A.   I believe it to be a fair and accurate

10  conversation.

11  Q.   Likewise, before testifying here today, were you

12  asked to look at a transcript marked A7A that's in

13  front of you?

14  A.   Yes.

15  Q.   And in that, were you also asked to compare that

16  with the recording of the conversation in which you

17  were a participant?

18  A.   Yes.

19  Q.   And can you state to the court if that's a fair

20  and accurate transcription of the conversation in

21  which you were a participant?

22  A.   Yes.

23         MR. SMITH:  I would move for the introduction

24  of Government's Exhibit A7 and A7A, Your Honor.

25         THE COURT:  Any objection other than those

Wanda White – Direct Examination

1  previously stated?  Exhibits A7 and A7A will be

2  admitted.

3          (GOVERNMENT EXHIBIT NOS. A7 AND A7A ADMITTED

4  INTO EVIDENCE)

5  BY MR. SMITH:

6  Q.  Miss White, can you tell us after having taken a

7  look at this, do you recall where it was that this

8  conversation took place and when it took place?

9  A.  Looks to be at the home of William Stivers.

10  Q.  Okay.

11          MR. SMITH:  I would like to publish

12  Government's Exhibit A7A.

13          THE COURT:  Yes, sir, you may.

14  BY MR. SMITH:

15  Q.  What date did this conversation take place on,

16  ma'am?

17  A.  April the 18th, 2007.

18  Q.  Now, we have previously heard testimony and --

19  and some of these recordings that took place at

20  various times.

21      Do you recall that there were earlier recordings

22  that were made prior to this one on April the 18th?

23  A.  Yes.

24  Q.  Okay.

25          (Audio played.)

Wanda White – Direct Examination

1  BY MR. SMITH:

2  Q.  Miss White, in this recording, can you identify

3  who was present in that conversation?

4  A.  Myself, my husband, Kennon, Wayne Jones, William

5  Stivers and Mary Betty Stivers.

6  Q.  And where did this conversation take place?

7  A.  At the home of William Stivers.

8  Q.  And during the course of the investigation, did

9  he move locations at some point?

10 A.  He did.

11 Q.  Do you recall where he was located physically

12 when this recording was made?

13 A.  Charlie Sizemore Road in Greenbriar.

14 Q.  Do you know where he moved from or to?

15 A.  I think it's called Hector.

16 Q.  Okay.  And that occurred during the time that you

17 were cooperating?

18 A.  Yes.

19 Q.  Now, this recording transcript says it begins

20 about 58 minutes and 40 minutes in.

21     Was it common that you had to engage in some

22 early conversation with these individuals?

23 A.  Yes.

24 Q.  And did you all talk about the weather and other

25 things nonrelevant?

Wanda White – Direct Examination

1  A.   Yes.

2           MR. WHITE:  Objection, Your Honor.

3           THE COURT:  Overruled.

4  BY MR. SMITH:

5  Q.   This clip that we have heard of that

6  conversation, it starts out talking about Joe

7  Swafford.  Who is Joe Swafford?

8  A.   He was -- he worked at the Chamber of Commerce.

9  He was the director of the Chamber of Commerce, and he

10 was paid through the city and the county.

11 Q.   Okay, and to your understanding, Mary Betty asked

12 the question, "Did Joe Swafford get fired?"  To your

13 understanding, what was she referring to?

14 A.   I believe at that time he had been indicted in

15 the local court system.

16 Q.   And was that something of a topic of interest

17 between yourself, your husband and the Stiverses?

18 A.   Yes.

19 Q.   And why was there such an interest in knowing

20 about what was going on with this man named Joe

21 Swafford?

22 A.   He knew a lot of information, and they were all

23 inquiring about what he had told or wouldn't tell.

24 Q.   And "knew a lot of information," what are you

25 referring to?

Wanda White – Direct Examination

1  A.   City contracts, county contracts, of that nature.

2  Q.   And who had the most concern that you are aware

3  of about Joe Swafford giving that information up to

4  the authorities?

5            MR. BALDANI:  Objection, Your Honor.

6            THE COURT:  All right, sustain the

7  objection.  You asked who had expressed the most

8  concern.

9            MR. SMITH:  I would restate it, Your Honor.

10           THE COURT:  All right.

11 BY MR. SMITH:

12 Q.   If you could, during your conversations, who

13 expressed the most concern in your presence to the

14 possibility of Joe Swafford cooperating?

15 A.   Wayne Jones and William Stivers.

16 Q.   Further in the conversation, there is mention of

17 individuals, one by the name of Vernon, one by the

18 name of Jennings.  Who is that referring to, to your

19 understanding?

20 A.   Vernon Hacker and Jennings White.

21           MR. WHITE:  Excuse me, Your Honor, if we can

22 get page numbers.

23           THE COURT:  All right.

24           MR. SMITH:  Page 3, Vernon, page 4,

25 Jennings.

Wanda White – Direct Examination

1          MR. WHITE:  Thank you.

2   BY MR. SMITH:

3   Q.   Page 5, it mentions, "About fifteen months."  You

4   say -- your husband asked a question, "How long has

5   Jennings been in there now?"

6          And you make the statement, "About fifteen

7   months."  What were you referring to?

8   A.   They had inquired about how long Jennings White

9   had been incarcerated.

10  Q.   Further in the conversation on page 10, Miss Mary

11  Betty says, "Let me ask you something.  Would they not

12  have -- would the FBI have to give up the

13  ordinances?"  To your understanding, what was she

14  referring to?

15  A.   She was referring to the FBI had come in and

16  seized documents from Manchester City Hall.

17         And it was in question whether Mayor Lewis lived

18  in the city limits at that time.

19  Q.   Now, were you present when the FBI came in and

20  executed a search warrant on City Hall?

21  A.   Yes, I was.

22  Q.   And do you know when that was approximately that

23  they executed the search warrant on City Hall?

24  A.   Weeks -- few weeks before the November election.

25  Q.   What year?

Wanda White – Direct Examination

1  A.  Of '06.

2  Q.  Okay.  Further down on page 10, ma'am, statement

3  is made attributed to Kennon, says, "They ain't been

4  in to get them."  He says, "The last election '04,

5  '06."

6      And then you said, "The only ones they got was

7  the ones signed by Al Man."  Now, what were you

8  referring to, ma'am?

9  A.  Well, if you go back to page 10, Kennon was

10 actually asking that in a question form.  That wasn't

11 a statement.

12     He was asking that in question form to Wayne and

13 William.

14     And on page 11, Stivers's statement, which I

15 could understand, I heard clearly, that it was that

16 they had only got information on the '02 election, and

17 Kennon states, "'04 and '06?"

18     And then he goes, "They didn't."  And then on it

19 says -- Stivers says, "The only ones they got was" --

20 and he -- I heard him say, "'02."

21     And I said, "Yeah, the only ones they got was the

22 ones signed by Al Man," which was the election that he

23 worked in.

24 Q.  Okay, and the only ones signed by Al Man, what

25 were you specifically referring to as election records

98

Wanda White - Direct Examination

1  being signed by Al Man?

2  A.    The voter assistance forms that Jennings had

3  turned over.

4  Q.    And had you had discussions with Al Man and Wayne

5  Jones about the voter assistance forms that Al Man had

6  executed in the '02 election?

7  A.    Yes.

8  Q.    And what had they discussed in the form of a

9  concern to you in that conversation?

10  A.    That Jennings had only turned over the ones that

11  Al Man had signed and not been forthcoming with the

12  ones he signed.

13  Q.    Somebody said, "You signed 500 of them."  To your

14  understanding, what was that referring to?

15  A.    We had heard William Stivers brag about him

16  signing 500 before.

17      So that was basically made as a joke to -- about

18  him.

19  Q.    Page 12, you asked the question, "Why would they

20  call him back though?"

21      And Stivers said, "Verify what Vernon said."

22      Now, what were you asking about there, ma'am, on

23  page 12?

24  A.    If you will let me read through it, please.  I

25  was referring to Jennings.

Wanda White – Direct Examination

1    I was asking a question of why they would call

2  Jennings back again.

3  Q.   Who would call?

4  A.   The FBI.

5  Q.   And to your understanding, what did Stivers need

6  to verify what Vernon said?

7  A.   To -- to verify Jennings's and Vernon's

8  statements to make sure they were consistent.

9  Q.   On page 13, it was talked about, "He ain't got

10  the money to fight it," and, "you might end up with

11  your drawers, but nine times out of ten the right

12  people," and then they make such a big deal about

13  Jennifer Garrison, it was stated.

14    To your understanding, who were they referring to

15  when they referred to Jennifer Garrison?

16  A.   She was a -- an employee at the courthouse, a

17  bonds lady that worked at the courthouse.

18  Q.   Okay.  And to your understanding, what was the

19  relevance of Jennifer Garrison's position in this

20  conversation?

21    To your understanding, what were they referring

22  to about Jennifer Garrison?

23  A.   Well, my interpretation of it was they were

24  saying that Doug should fight it, that Jennifer

25  Garrison fought it and won.

Wanda White – Direct Examination

1  Q.   Doug being whom?

2  A.   Doug being Kennon's father, Doug White.

3  Q.   Okay.

4  A.   And that he had the money to fight it.

5  Q.   Page 16 talks further about "Daddy."  Who were

6  you all referring to or your husband referring to?

7  A.   Doug White, his father.

8  Q.   Okay, and Stivers said, "I would work on that

9  machine."

10      To your understanding, what was he referring to,

11  working on the machine?

12  A.   His ankle, electronic monitoring device.

13  Q.   And had you, in conversation with Mr. Stivers,

14  learned that he had experience with home

15  incarceration?

16  A.   Yes.

17  Q.   And what did he tell you?

18  A.   He told us that he had worked for the home

19  incarceration program.

20  Q.   And in this conversation, what was he suggesting

21  he could do to the machine?

22  A.   That he could disarm it and to where Doug could

23  be free of it.

24  Q.   And on page 18 it was talked about a person name

25  Mike Lane, and there was statements that, "He was a

Wanda White – Direct Examination

1  crook, but Doug ain't no crook."

2      To your understanding, who were they referring to

3  when they say -- Mr. Stivers says, "Doug ain't no

4  crook."

5  A.   Doug White, Kennon's dad.

6          MR. SMITH:  Your Honor, if the court please,

7  I would like to reference the witness now to what's

8  previously been introduced as Government's Exhibit

9  A12.

10          A portion of the clips of that recording were

11  played earlier through a prior witness.

12          THE COURT:  Yes, sir.

13          MR. SMITH:  I would like to refer her now to

14  the remaining page.

15          THE COURT:  The remaining page is page 25 of

16  the transcript; is that correct?

17          MR. SMITH:  That's what I have marked, Your

18  Honor, page 25, yes.

19          THE COURT:  All right, you may proceed.

20          MR. SMITH:  If we could publish that at this

21  point.

22          THE COURT:  Yes, you may, it's already been

23  admitted.

24          MR. SMITH:  Yes, Your Honor, thank you.

25          (Audio played.)

Wanda White – Direct Examination

1 BY MR. SMITH:

2 Q.  Miss White, you should have now in front of you

3 Government's Exhibit A12A.

4      It's previously been identified that you and your

5 husband, pursuant to your cooperation, went on this

6 date of May the 1st, 2007 to make a recording?

7 A.  Yes.

8 Q.  And we have previously heard portions of those

9 clips.

10      Now we are picking up I believe where you get

11 introduced into that conversation.

12      And I think if you could direct your attention to

13 page 25 of A12A.

14 A.  25?

15 Q.  Page 25, ma'am.  Bottom of that page.  There is a

16 statement, it says, "Wanda."  Do you see that at the

17 bottom?

18 A.  Yes.

19 Q.  And you said, "I am filling out the application

20 tomorrow.  Tracy's printing it off on the computer."

21 A.  Yes.

22 Q.  To your understanding, what were you referring

23 to, ma'am?

24 A.  Job opening in Laurel County.

25 Q.  All right.  And who is Tracy?

Wanda White – Direct Examination

1  A.   I think I said Linsey.  I don't know, I don't

2  think there is a Tracy in that.

3  Q.   Okay.

4        MR. SMITH:  If we could proceed, Your Honor.

5        THE COURT:  Yes, sir.

6        MR. SMITH:  Thank you.

7        (Audio played.)

8  BY MR. SMITH:

9  Q.   Miss White, you previously identified an

10  application which you had made in '05 for a job with

11  the drug court?

12  A.   Yes.

13  Q.   Do you recall that?

14  A.   Yes.

15  Q.   And in this conversation in May the 1st, 2007 you

16  are again talking about a job.

17        Are you talking about the same job that you sent

18  in as an application back in '05?

19  A.   I am.  This is the same job that he had promised

20  me, but the opening came up in Laurel County.

21  Q.   All right, and Laurel County, would that have

22  been a place where you were living now at the time

23  that you were making these recordings?

24  A.   Yes.

25  Q.   Okay.

Wanda White – Direct Examination

 1          MR. SMITH:  I would move on to the next clip,

 2 please.

 3          (Audio played.)

 4 BY MR. SMITH:

 5 Q.   Miss White?

 6 A.   Yes.

 7 Q.   You were engaged in conversation with who at this

 8 point in the tape?

 9 A.   Cletus Maricle, my husband Kennon.

10 Q.   And the first question that we heard was, "How

11 long did you stay over there today," asked by

12 Mr. Maricle.

13      To your understanding, what was he asking you

14 about?

15 A.   Yes, he was asking about my meeting with the

16 FBI.

17 Q.   And was that part of your cooperation was to

18 announce to him that you had met with the FBI?

19 A.   Yes.

20 Q.   And you said, "About thirty-five minutes and

21 asked me about 20 questions."  So what were you

22 referring to?

23 A.   The FBI.

24 Q.   Okay.  And one of the first questions that

25 Mr. Maricle asked you is, "They ask you anything about

Wanda White – Direct Examination

1  me?"  To your understanding, what was he asking about?

2  A.   He was asking whether the FBI had inquired about

3  him, asked any questions about him.

4  Q.   Okay, on page 28, shortly thereafter, he says,

5  "Is that all they asked about Phillip?"

6       To your understanding, who was he referring to,

7  "Phillip"?

8  A.   His son-in-law, Phillip Mobley.

9  Q.   Then again on page 30, Mr. Maricle says, "Yeah,

10 only thing they asked about Phillip was whether or not

11 Doug."

12      To your understanding, who was he referring to,

13 again, "Phillip"?

14 A.   Doug Adams.

15 Q.   And who was he -- I'm sorry, who was he referring

16 to as "Phillip"?

17 A.   Phillip Mobley.

18 Q.   Okay, and Phillip Mobley was running for office

19 in that '06 election?

20 A.   Yes.

21 Q.   And what was he seeking as an office?

22 A.   PVA.

23 Q.   And Maricle says, "Jennings and Vernon, well,

24 Jennings wasn't over here last time."  Who is he

25 referring to as Vernon and Jennings?

Wanda White – Direct Examination

1  A.   Jennings White and Vernon Hacker.

2  Q.   And he said, "They wasn't here last time."  What

3  was he referring to?

4  A.   Well, he was referring to Jennings was

5  incarcerated.

6       And he went on to imply that Vernon was shut

7  down, he was under indictment.

8            MR. SMITH:  Let's move on to the next clip,

9  please.

10           (Audio played.)

11 BY MR. SMITH:

12 Q.   Miss White, as you made these recordings, were

13 you advised at points and times about how you were to

14 respond if asked a question?

15 A.   I was.

16 Q.   For instance, Cletus Maricle asks, "Did they ask

17 questions about you?"  And you said no.

18 A.   Yes.

19 Q.   Is that true?

20 A.   Was it true they asked questions about him?  It

21 was true.  What are you asking me?

22 Q.   You told him that they had not been asking

23 questions about him.

24      But in fact they had been asking questions about

25 him.

Wanda White – Direct Examination

1   A.   That's what they told me to tell him.

2   Q.   Okay.  So that wasn't true.

3   A.   No.

4   Q.   And you were asked questions about whether they

5   asked questions about Phillip, and had they asked you

6   questions about Phillip?

7   A.   Yes.

8   Q.   So that wasn't true.

9   A.   No.

10  Q.   And they said, "Did you say anything about Doug

11  Adams?"  And you told them no.  Had you talked to the

12  FBI about Doug Adams?

13  A.   I had.

14  Q.   And that wasn't true.

15  A.   No, but that's what the agents told me to say.

16  Q.   And you were just following their directions?

17  A.   I was.

18  Q.   And at this point, you weren't released or given

19  the opportunity to tell Mr. Maricle that he had been

20  investigated and had been asked about when you had

21  been questioned?

22  A.   No.

23  Q.   Okay.

24        MR. WESTBERRY:  Are you going on with the

25  tape?

Wanda White – Direct Examination

1              Judge Reeves?

2              THE COURT:  Yes, sir.

3              MR. WESTBERRY:  There are some clips

4   regarding identification of Doug in a format that we

5   previously agreed to, a couple in particular.

6              THE COURT:  All right.

7              MR. WESTBERRY:  And I would ask the

8   government to clear up which Doug they are actually

9   referring to, identify those.

10             THE COURT:  All right, do you have the page

11  references?

12             MR. WESTBERRY:  I'm sorry, he never gave the

13  page --

14             THE COURT:  Mr. Smith?

15             MR. SMITH:  I appreciate you bringing that to

16  my attention.  I will be glad to do that at this time.

17             MR. WESTBERRY:  Do you know the ones we are

18  talking about?

19             MR. SMITH:  Yes, sir, I believe we can find

20  those, yes, sir.

21             MR. WESTBERRY:  Thank you very much.  36 and

22  37 I have been told, Your Honor.

23             THE COURT:  All right, thank you.

24  BY MR. SMITH:

25  Q.   Miss -- Miss White?

Wanda White – Direct Examination

1  A.   Yes.

2  Q.   Would you look at page 36 for me, please?  Bottom

3  of that page, Maricle makes a statement, "Something I

4  have consistently said Doug's problem.  I can

5  truthfully say they are going to try him, try him on

6  sex."

7       To your understanding, who was Mr. Maricle

8  referring to when he calls the name Doug in this

9  conversation?

10 A.   He was referring to Kennon's dad, Doug White.

11 Q.   And finally, 37, he says, Maricle again, "If Doug

12 hadn't fooled with women, I don't think he would be

13 where he is."

14 A.   He was referring again to Doug White.

15           MR. WESTBERRY:  Thank you.

16           MR. SMITH:  Your Honor, we are approaching

17 the next exhibit for the court's information.

18           The clips, as they are spaced in this

19 particular audio, is about 32 minutes long.  So --

20           THE COURT:  All right.  We will go ahead and

21 break for the evening at this point, Mr. Smith, rather

22 than stop in the middle of one of those clips.

23           Ladies and gentlemen, before we do break for

24 the evening, I do want to again remind you of the use

25 of transcriptions, and then I'll give you the

Colloquy

1  admonition.

2          Of course, you -- you have heard some tape

3  recordings that have been received into evidence, and

4  you have been shown some written transcripts of the

5  tapes.

6          Please keep in mind that the transcripts are

7  not evidence.

8          They were offered to you as a guide to help

9  you follow what was being said.  The tapes themselves

10 are the evidence.

11         If you notice any difference between what you

12 heard on the tapes and what you read in the

13 transcripts, you must rely upon what you heard and not

14 on what you read.

15         If you could not hear or understand certain

16 parts of the tapes, then you must ignore the

17 transcripts as far as those parts are concerned.

18         Now, with respect to the admonition, it's the

19 same as I have given to you several times now, and you

20 probably know it by heart.

21         The first is, of course, as you leave

22 tonight, you should not have any conversations with

23 anyone about the case.

24         You shouldn't talk with friends or family

25 members about the case.

Colloquy

1          You shouldn't allow anyone to approach you to

2     discuss the case.

3          Please don't read, watch or listen to any

4     accounts of the case if there should be any.

5          Don't attempt to perform any type of

6     investigation or do any type of research.

7          We talked about electronic communications

8     several times.

9          Don't engage in any type of electronic

10    communications, whether it be by Blackberry, on some

11    type of a blog or anything of that nature.  Don't read

12    any newspaper articles.

13         And of course, ladies and gentlemen, don't

14    make up your mind about the case until it is finally

15    submitted to you.

16         Now, before I excuse you for the evening, I

17    do want to remind you of something I told you about a

18    week ago, and that is our schedule.

19         We have missed a couple of days because of

20    bad weather.

21         But as you will recall, I also told you that

22    we had a couple of attorneys that have conflicts this

23    coming Monday.

24         And I have already told them previously that

25    they could attend other court appearances on Monday.

Colloquy

1          So we are not going to have a session on

2   Monday.

3          I know a lot of you have business activities

4   which you need to take care of, and so you will not be

5   here on Monday.

6          We may get some bad weather over the

7   weekend.  We may get some bad weather on Monday.

8          But we will not be in session on Monday in

9   any event, but we will see you back on Tuesday.

10          If we were to have some bad weather, once

11   again, we will follow the same procedure that we

12   followed already to this point.

13          And that is that the clerk will advise you if

14   we -- if we are going to start late, and so you will

15   be advised of that.

16          If -- if there is bad weather, you should be

17   looking for that -- for that telephone call.

18          So with that admonition, the jury will be

19   excused until Tuesday morning at 9:00 unless otherwise

20   notified.  Thank you.

21          THE MARSHAL:  Please rise for the jury.

22          (Jury excused from the courtroom for the

23   evening, and the following proceedings were had out of

24   the presence and hearing of the jury and in open

25   court.)

Colloquy

1              THE COURT:  Thank you, please be seated.

2              Miss White, before I excuse you, I do want to

3    remind you that previously the court invoked the rule

4    on exclusion of witnesses.

5              It's a federal rule, and it essentially

6    provides that one witness is not allowed to discuss

7    with another witness or a potential witness what's

8    been testified to.

9              Now, of course, your husband's previously

10   testified in the case, but you can't talk with him

11   about your testimony or about his testimony.

12             And you also cannot talk about your testimony

13   with any other person that might be a witness in the

14   case, and do you understand that.

15             THE WITNESS:  I do understand that.

16             THE COURT:  All right, you are excused until

17   Tuesday morning at 9:00.

18             THE WITNESS:  Thank you, Your Honor.

19             THE COURT:  Thank you.  Let's see if we have

20   any other matters that need to be taken up.

21             I have just one matter.  Let's see if the

22   attorneys have anything before, Mr. White?

23             MR. WHITE:  Yes, Your Honor.  I would refer

24   the court to -- this is a matter I took up earlier --

25   to Exhibits PR17 and PR25E, I believe.

Colloquy

1          THE COURT:  Yes, sir, I am familiar with
2  those.

3          MR. WHITE:  These were the voter assistance
4  forms that both were identified.

5          But 17 they moved to admit, you withheld the
6  ruling; and they did not move to admit 25E.

7          What my concern is, is that the United States
8  had asked questions about the number of voter
9  assistance forms that Mrs. White had filled out.

10          THE COURT:  Yes, sir.

11          MR. WHITE:  At least on the second batch, the
12  25E, she identified eight forms.

13          And then she testified that she was told to
14  keep it at 10 or below.

15          And the problem that I have got is they had a
16  stack of voter assistance forms up there.

17          And I think the jury could draw what I would
18  say is an improper inference that those were in fact
19  all the voter assistance forms and then draw the
20  inference that some had been destroyed because there
21  were only eight there.

22          And the problem is, is that there was no
23  evidence to suggest that in fact that was all the
24  voter assistance forms from that precinct at that
25  election.

Colloquy

1          And, of course, the only way to do that would
2    be to bring in somebody from the Clay County Clerk's
3    Office to do that.

4          So I would ask the court when we return on
5    Tuesday to give an instruction to the jury to the
6    effect that they cannot draw any inference as to
7    whether or not those were all of the voter assistance
8    forms.

9          THE COURT:  Well, I'm assuming that -- based
10   upon your objection, first of all, I'm assuming a
11   couple of things.

12         First, that the United States obtained these
13   documents from the clerk's office, that they are
14   official records.

15         And based on your objection, because you
16   objected to the foundation, of course, Mr. Smith may
17   need to bring someone else or have an agent testify
18   that these are the records.

19         And, of course, this particular witness has
20   been able to testify based on her knowledge as to some
21   of those records.

22         And once the documents are admitted into
23   evidence, I think it's probably a proper inference
24   then to draw that she testified that there were a
25   number of forms that she filled out, those forms are

Colloquy

1 not missing; therefore, those forms had to be

2 destroyed some way.

3          So it certainly supports the government's

4 version of the case.

5          And likewise, with respect to the last

6 exhibit, which I think was PR25, which she identified

7 eight documents.

8          She identified documents that had her

9 signature on those documents.

10         And of course, those are still part of a

11 group that have not yet been introduced.

12         And I'm assuming the United States will be

13 moving at some point after further foundation has been

14 laid for the admission of those documents.

15         And so to give the jury some other

16 instruction or admonition at this point would be

17 improper, so your request will be denied.

18         MR. WHITE:  Thank you, Your Honor.

19         THE COURT:  All right.

20         MR. PINALES:  If the court please.

21         THE COURT:  Mr. Pinales?

22         MR. PINALES:  Your Honor, pursuant to what we

23 had discussed before, the end of next week I will be

24 out, Miss Crouse will be in.

25         And it's not on a witness that we are doing,

Colloquy

1  I just wanted to advise the court.

2            THE COURT:  All right.

3            MR. PINALES:  And the other thing on I

4  believe it was Exhibit D2, I told Mr. Smith I have

5  absolutely no objection.  The court admitted it.

6            But it had a Social Security number in it,

7  and I don't care even though that it's admitted that

8  it be redacted at this point.  I think that's proper.

9            THE COURT:  All right, I think the policy is

10 that with respect to documents that are filed into the

11 record, if the attorneys are aware of personal

12 identifying information, that that needs to be

13 redacted.

14           MR. PINALES:  I saw it, I am sure it was a

15 mistake, but I brought it to Mr. Smith's attention.

16           Even though it's been admitted, I have no

17 objection that a redaction take place.

18           THE COURT:  All right, well, that -- the

19 court would -- if I become aware that someone's Social

20 Security number is listed in a document, I would

21 require that it be redacted before it can be made a

22 public record.

23           Otherwise, it would be need to be placed

24 under seal if the parties can't agree to that being

25 removed.

Colloquy

1              So that's -- I appreciate you calling that to

2    my attention.

3              But we do need to be vigilant about personal

4    identifying information that's contained in these

5    documents.  I appreciate that.  Thank you.

6              Anyone else have an issue?  Mr. Smith?

7              MR. SMITH:  Your Honor, with the court's

8    permission, I will have that done promptly this

9    afternoon.

10             THE COURT:  All right, I appreciate that.

11   Also, is there any update on the text messaging issue?

12             MR. SMITH:  Well, I have asked and have, at

13   the last break, there was still a pending response

14   from Washington, D.C.

15             THE COURT:  All right.

16             MR. SMITH:  I understand that we have been

17   told, and I have reported to this court that it would

18   have been their expectation that this could have been

19   accomplished by close of business earlier I believe,

20   what, Thursday?  Or Wednesday?

21             THE COURT:  All right.

22             MR. SMITH:  However, when I challenged that

23   through the agent about where it is and what's going

24   on, I was told per the agent that there could have

25   been more material than they initially estimated that

Colloquy

1  had to be captured by this request.

2          It is my expectation that once that's

3  received, that myself and Mr. Parman will review that

4  and determine from our review if there is information

5  that we are obliged to give to the defense as part of

6  our discovery obligations.

7          THE COURT:  All right.

8          MR. SMITH:  I would hope to get that before

9  the close of business today so we can work on it over

10 the break.

11         And with Monday being a freed up day,

12 hopefully that may spur us along to get to that

13 quicker, but that's all I know.

14         THE COURT:  Well, we are going to start on

15 Tuesday at 9:00.

16         I am going to start with the attorneys about

17 five minutes until 9:00 so I can follow up on this

18 before the jury is brought in.

19         But if -- if there are other issues that come

20 up, of course, we will follow the same procedure that

21 you all would -- you will need to let me know -- you

22 being whoever has an issue -- will need to let me know

23 at 8:30.

24         Then we can take up any other issues before

25 the jury is brought in.

Colloquy

 1              I believe this next tape is a bear, about 70

 2  pages or so?

 3              MR. SMITH:  That's correct.

 4              THE COURT:  So I assume that will take up

 5  most of the morning when we start.

 6              MR. SMITH:  Yes, Your Honor.

 7              THE COURT:  Mr. Smith, any other issues that

 8  you have that we need to take up?

 9              MR. SMITH:  No, Your Honor.

10              THE COURT:  All right, thank you.  Counsel,

11  you all have a nice weekend.  We will see you back.

12              I do have a hearing, I will tell you, Monday

13  afternoon here.

14              You are welcome to leave your materials in

15  the courtroom.

16              But I will need -- I have, I believe, a

17  rearraignment at 4:00.

18              So I'll need some space for that, but

19  otherwise if you wanted to leave your materials, leave

20  them on the left side of the courtroom over here.  It

21  shouldn't be a problem.

22              We will be in recess in this matter until

23  Tuesday at 9:00 a.m. -- 8:55.  Thank you.

24                              -  -  -

25

Colloquy

1          (The further trial in this matter was

2    recessed at 4:27 p.m. until Tuesday, February 23, 2010

3    at 8:55 a.m.)

4                          -  -  -

Index – Certificate

1                              – – –

2                         WITNESS INDEX

3  Government's Witness:

4  Wanda White

5  Direct by Mr. Smith . . . . . . . . . . . 7

6                           – – –

7                         EXHIBIT INDEX

8                                              Marked/Admitted
   Government Exhibits:
9
    D2   Employment Application                      44
10
    A7   Audio                                       92
11
   A7A   Transcript of Audio                         92
12
                             – – –
13
                          CERTIFICATE
14
         I certify that the foregoing is a correct
15
   transcript from the record of proceedings in the
16
   above–entitled matter.
17

18
   s/  K. Ann Banta                2–22–10
19 K. Ann Banta, RPR, CRR          Date

20

21

22

23

24

25