```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF KENTUCKY
 2              SOUTHERN DIVISION AT LONDON

 3  UNITED STATES OF AMERICA    .    Docket No. CR 09-16-S
                                .
 4       vs.                    .    Frankfort, Kentucky
                                .    March 12, 2010
 5  RUSSELL CLETUS MARICLE      .    1:00 p.m.
    DOUGLAS C. ADAMS            .
 6  CHARLES WAYNE JONES         .    Trial
    WILLIAM R. STIVERS          .
 7  FREDDY W. THOMPSON          .    VOLUME 23-B
    WILLIAM B. MORRIS           .
 8  DEBRA L. MORRIS             .
    STANLEY BOWLING             .
 9
                     TRANSCRIPT OF TRIAL
10        BEFORE THE HONORABLE DANNY C. REEVES
                UNITED STATES DISTRICT JUDGE
11  APPEARANCES:
    On behalf of the Plaintiff:  STEPHEN C. SMITH, ESQ.
12                               JASON D. PARMAN, ESQ.

13  On behalf of the Defendant   DAVID S. HOSKINS, ESQ.
    Russell Cletus Maricle:      MARTIN S. PINALES, ESQ.
14
    On behalf of the Defendant   R. KENT WESTBERRY, ESQ.
15  Douglas C. Adams:            KRISTEN N. LOGAN, ESQ.

16  On behalf of the Defendant   T. SCOTT WHITE, ESQ.
    Charles Wayne Jones:
17
    On behalf of the Defendant   ROBERT L. ABELL, ESQ.
18  William R. Stivers:

19  On behalf of the Defendant   RUSSELL JAMES BALDANI,
    Freddy W. Thompson:              ESQ.
20
    On behalf of the Defendant   JERRY W. GILBERT, ESQ.
21  William B. Morris:

22  On behalf of the Defendant   ELIZABETH SNOW HUGHES,
    Debra L. Morris:                 ESQ.
23
    On behalf of the Defendant   DANIEL A. SIMONS, ESQ.
24  Stanley Bowling:

25  Court Reporter:              K. ANN BANTA, RPR, CRR
```

```
 1  Appearances of Counsel:

 2  On behalf of the Plaintiff:    STEPHEN C. SMITH, ESQ.
                                   JASON D. PARMAN, ESQ.
 3                                 Assistant U.S. Attorneys
                                   601 Meyers Baker Road
 4                                 Suite 200
                                   London, KY 40741
 5
    On behalf of the Defendant     DAVID S. HOSKINS, ESQ.
 6  Russell Cletus Maricle:        107 East First Street
                                   Corbin, KY 40701
 7
                                   MARTIN S. PINALES, ESQ.
 8                                 150 East Fourth Street
                                   Federal Reserve Building
 9                                 Cincinnati, OH 45202

10  On behalf of the Defendant     R. KENT WESTBERRY, ESQ.
    Douglas C. Adams:              KRISTEN N. LOGAN
11                                 220 West Main Street
                                   Suite 1900
12                                 Louisville, KY 40202

13  On behalf of the Defendant     T. SCOTT WHITE, ESQ.
    Charles Wayne Jones:           133 West Short Street
14                                 Lexington, KY 40507

15  On behalf of the Defendant     ROBERT L. ABELL, ESQ.
    William R. Stivers:            120 North Upper Street
16                                 Lexington, KY 40507

17  On behalf of the Defendant     RUSSELL JAMES BALDANI,
    Freddy W. Thompson:               ESQ.
18                                 300 West Short Street
                                   Lexington, KY 40507
19
    On behalf of the defendant     JERRY W. GILBERT, ESQ.
20  William B. Morris:             212 North Second Street
                                   Richmond, KY 40475
21
    On behalf of the Defendant     ELIZABETH SNOW HUGHES,
22  Debra L. Morris:                  ESQ.
                                   201 West Short Street
23                                 Lexington, KY 40507

24

25
```

```
 1  Appearances of Counsel (Continued):

 2  On behalf of the Defendant      DANIEL A. SIMONS, ESQ.
    Stanley Bowling:                116 West Main Street
 3                                  Suite 2A
                                    Richmond, KY 40476
 4
    Court Reporter:                 K. ANN BANTA, RPR, CRR
 5                                  Official Court Reporter
                                    United States District
 6                                    Court
                                    101 Barr
 7                                  Lexington, KY 40507
                                    (502) 545-1090
 8
    Proceedings recorded by mechanical stenography,
 9  transcript produced by computer-aided transcription.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Russell Cletus Maricle

1                        Friday afternoon session,

2                        March 12, 2010, 1:00 p.m.

3                        - - -

4           (The jury resumed their places in the jury

5  box, and the following proceedings were had in open

6  court.)

7           THE COURT:  Thank you.  The record will

8  reflect that all members of the jury are present.  The

9  parties and counsel are also present.

10           The witness has returned to the witness

11  stand.  Mr. Maricle, you are still under oath.

12           THE WITNESS:  Yes.

13           THE COURT:  Mr. Smith, you may proceed with

14  your questions.

15           MR. SMITH:  Thank you.

16                        - - -

17           RUSSELL CLETUS MARICLE, DEFENDANT'S WITNESS,

18  PREVIOUSLY SWORN

19                    CROSS EXAMINATION

20  BY MR. SMITH:

21  Q.   Mr. Maricle, I am Steve Smith.

22  A.   I know you.

23  Q.   And I represent the United States --

24  A.   Yes, sir.

25  Q.   -- of course.

Russell Cletus Maricle

1  A.   Yes, sir.

2  Q.   I have a few questions.

3  A.   All right.

4  Q.   First of all, Mr. Maricle, I believe that you

5  would agree with me that you also go by the name Clet?

6  A.   That is correct, if you want to call me that,

7  that will be fine.  Most people do.

8  Q.   And that's something that you had answered to in

9  the past; is that correct?

10 A.   For sixty-seven years I guess.

11 Q.   All right.  And I believe that you went into some

12 detail with the jury in your direct examination

13 yesterday, I believe, about your past legal career.

14      I have got a few questions about that, if we

15 could.

16 A.   Yes, sir.

17 Q.   As I understand it, you had, at least while

18 serving as defense attorney and judge, you have also

19 been a prosecutor; is that not right?

20 A.   For probably seventeen or eighteen months, I

21 couldn't afford it any more.

22 Q.   And I believe if my notes are correct that would

23 have been sometime during the time period of the

24 Commonwealth Attorney's Office being operated by

25 Mr. Colson or Hieronymus, which one was it?

Russell Cletus Maricle

1 A.   Mr. Colson was Commonwealth Attorney.

2 Q.   And you were prosecutor under him?

3 A.   Yes, sir.

4 Q.   And about what time period would that have been,

5 sir?

6 A.   '81, '82, I believe.  I think it was '81 and '82,

7 until August of '82, from January '81 until August

8 '82.

9 Q.   And you were his assistant Commonwealth Attorney?

10 A.   That is correct.

11 Q.   And then from there where did you go?

12 A.   Just continued with my private practice.

13 Q.   Okay.  I believe that you indicated that also you

14 were appointed as the circuit judge for the 41st

15 District on September the 24th of 1990; is that true?

16 A.   That is the day I was sworn in.  I am not sure

17 what the date of the order was, but that is the date I

18 was sworn in, yes, that I took office.

19 Q.   And that would also fall on the Monday following

20 the Friday verdict in the Runion case when the jury

21 returned over $3 million verdict in the Clay Circuit

22 Court action that we have heard testimony about; isn't

23 that true?

24 A.   If that was on the Friday before, yes, sir.

25 Q.   It would be September the 21st, I believe.  If my

Russell Cletus Maricle

1 calculations on that historical calendar is correct,

2 that would have been a Friday.

3     And you were appointed circuit judge as sworn in

4 on that Monday the 24th?

5 A.   That is correct.

6 Q.   All right.  I believe that you have indicated

7 that you had lots of friends that you have made over

8 the years.

9     And you have named many of them, I believe, over

10 the course of your testimony, including your former

11 opponent there in the circuit judge's race, Oscar

12 Gayle House.  You consider him to be one of your

13 friends?

14 A.   Sure, he has been a friend of mine from the time

15 we practiced law together, yeah, sure.

16 Q.   And I believe you indicated that your idea about

17 practicing of law had somewhat grown stale and you

18 decided that you were going to become circuit judge,

19 and that appealed to you at the time and that's why

20 you pursued it.

21 A.   I had reached a point in my life that I was

22 needing a change, and that happened to come; and I

23 took advantage of it, yes, sir.

24 Q.   And as you indicated in your testimony that

25 served you well until 2006, I believe it was.

Russell Cletus Maricle

1      Then I think you said you kind of made it known
2 to everybody that was about as far as you were going
3 with your circuit judge, correct?  You were going to
4 retire; is that right?
5 A.  Well, from a financial standpoint I didn't have
6 much choice unless I wanted to continue to lose money.
7 Q.  And you made that decision early on.
8 A.  Pretty much as to a specific date I hadn't made
9 the decision.
10      As to what date it was going to be but I -- you
11 know, it was really going to be before June the 30th
12 of 2007 or January 31st, 2008.
13 Q.  Okay, and as I understand it, you did choose to
14 do that on June 1st, 2007; is that right?
15 A.  Yes, because that was exactly forty years to the
16 date that I started in Manchester.
17 Q.  And I believe you indicated that in the course of
18 your year, that year you were actually a candidate I
19 believe on the ballot of 2006?
20 A.  My name was on the ballot, yes, sir.
21 Q.  Okay, and you put your name on the ballot at that
22 time.
23      And I believe there was no opposition to you in
24 your race; is that right?
25 A.  Other than the first race I ran, I never had

Russell Cletus Maricle

1  opposition, that's correct.

2  Q.    And instead, I believe you said that as you made

3  the conclusion there to your judicial career, I

4  believe you said that Oscar Gayle House succeeded you

5  and got the appointment and also was elected to that

6  position; isn't that true?

7  A.    He was not appointed.  I think that's a mistake,

8  and I have heard that before, so I don't blame you for

9  the mistake.

10      He was not appointed.  He actually was elected in

11  November, and under the senior judge program, I

12  continued to serve in the 41st Circuit until the

13  results were certified in November.  There was a race

14  for that office.

15  Q.    Okay, I see.  I believe that over the course of

16  your testimony, you have indicated that in addition to

17  Oscar Gayle House you had formed some relationships

18  with other people.

19      And it is true and a fact, isn't it, sir, that

20  you had formed relationships early on over in

21  Manchester with Douglas Adams?

22  A.    I had known Doug, my mother taught him in school,

23  I knew who he was.

24      As far as -- I would have to say we were, you

25  know, friends, but I don't know whether you want to

Russell Cletus Maricle

1 say that's an association or not, but yeah, we were

2 friends.

3 Q.   And he had even called on you to represent him in

4 cases that he had; isn't that true?

5 A.   I believe one I represented him in, yes, sir.

6 Q.   And that was while you were a criminal defense

7 lawyer; is that correct?

8 A.   That's correct, yes.

9 Q.   You weren't a judge?

10 A.   No, sir.

11 Q.   You were practicing law?

12 A.   No, sir, I was practicing law then.

13 Q.   And I believe one of the other close associates I

14 think you have identified during your testimony, sir,

15 was William Al Man Stivers?

16 A.   Yes, sir.

17 Q.   And you and Mr. Stivers go back for many years as

18 I understand your testimony.

19 A.   Well, as far as family connection, yes, as far as

20 me and him, probably twenty to thirty years.

21 Q.   Twenty to thirty years.  And you would visit

22 frequently, I assume, from what we have heard in this

23 testimony in this trial, you would agree you were a

24 frequent visitor to his home.

25 A.   Particularly of a morning, if I were on my way to

Russell Cletus Maricle

1  Letcher County or somewhere I might stop by and have a
2  cup of coffee with him because I generally didn't make
3  it to the coffee shops of the morning.
4  Q.   And you likewise identified that Charles, and
5  they call him Wayne, I believe, Jones, the Democrat
6  commissioner over there in Clay County during the
7  subject of this case.  You also considered him a very
8  close friend?
9  A.   Yes, I do.
10 Q.   And I believe that you had a long relationship
11 with him that would go back years and years; isn't
12 that a fact?
13 A.   Well, the relationship would probably go back
14 sometime.
15      As far as being close to him, starting in '96 or
16 '97, we fished at the same place, at the same fish
17 camp at Lake Weiss, Alabama, W-E-I-S-S I think is the
18 way you spell it.
19      I pronounce it Weiss.  Some people pronounce it
20 Weiss, but it's W-E-I-S-S is the pronunciation.
21 Q.   You also had other relationships with him over
22 the years that go back maybe even to the mid-'70s;
23 isn't that a fact?
24 A.   Oh, yes, uh-huh.
25 Q.   And that would include business relationships,

Russell Cletus Maricle

1 wouldn't it, sir?

2 A.   No, I never entered into any business

3 relationships with Mr. Jones.

4 Q.   What about in your position as a lawyer?  Did you

5 have any relationships with him in that capacity?

6 A.   Oh, I did represent him once, I'm sorry, I wasn't

7 thinking in terms of representing him.

8       I was thinking in terms of people being in

9 business together, yes, sir, I did.

10 Q.   And that was back in the mid-'70s?

11 A.   I think it was.

12 Q.   And I believe also you identified the mayor over

13 there, Daugh or Doug White?

14 A.   Yes, sir.

15 Q.   At that point you were close friends over the

16 years?

17 A.   No, I don't really say he is that close.  He is

18 someone I have known and, you know, that's where I

19 bought my cars.

20       If you bought a car in Manchester, you bought it

21 at White Chevrolet Pontiac before they sold to

22 Cornett's.

23       So I wasn't real close to him, but I knew him,

24 and I considered him a friend, yes, sir.

25 Q.   In fact he had -- he had made efforts to employ

Russell Cletus Maricle

1 some members of your family including your daughter

2 and your grandson; isn't that a fact?

3 A.   I don't know whether you would call it made

4 efforts or not.

5      Certainly my grandson was working there as a

6 co-op student.

7      And then my daughter did work there for awhile,

8 yes, sir.

9 Q.   And I believe you said that you described things

10 in Clay County, that's just kind of the way things is,

11 you kind of have got to know people to have a job, at

12 least that's the words you used, you kind of got --

13 that's just kind of the way --

14 A.   I don't --

15 Q.   -- the world works according to Mr. Maricle;

16 isn't that right?

17 A.   I don't limit that to Clay County.  I would

18 extend that to Knox and Laurel, and I would extend it

19 to Cincinnati and Detroit.

20 Q.   Well, I'm sorry, I didn't catch that you had been

21 living in all those places.

22      But if you want to assert that opinion, that's

23 fine.

24 A.   Well, I know a lot of people that went from Clay

25 County that went to those places, and through the

Russell Cletus Maricle

1 unions and friends that had the unions got jobs.  I
2 know a lot of them.
3 Q.  I think we understand your view on things.  Thank
4 you.
5 A.  Yes, sir.
6 Q.  And I believe that you would agree with me, sir,
7 that your grandson Brandon I believe you indicated was
8 really employed both as a co-op student, had received
9 his payment though through the City of Manchester;
10 isn't that true?
11 A.  That's the way the co-op program works.  You are
12 a student getting credit, but the school doesn't put
13 in any of the money.
14     It's whoever the employer is.  Like, I have had
15 them from time to time, and I had to pay for them.
16 Q.  And you never had the impression, if I understand
17 your testimony, that Carmen Webb Lewis had anything to
18 do with firing your grandson.  Is that what your
19 testimony would be?
20 A.  No, I think she did have something to do with it.
21 Q.  Okay, it was your understanding that she did have
22 something to do with it then.  That would be your
23 testimony?
24 A.  Well, when the first person that's laid off is
25 your grandson, and he is a co-op student and they

Russell Cletus Maricle

1  won't let him work for three or four months because of

2  differences they have had with me, I wouldn't -- I

3  didn't care for that, no, sir.

4  Q.   But your testimony is, is that Mayor Lewis had

5  the ability to fire your grandson but Mayor White did

6  not have the ability to hire your grandson; is that

7  your testimony, sir?

8  A.   Oh, I am not saying he didn't have the ability to

9  hire.

10     I don't know whether he delegated that to

11 somebody else or not.

12     But he was hired while Doug White was mayor, I

13 make no issue about that.

14 Q.   All right.  And I believe that you indicated that

15 you were very knowledgeable, I believe, of the White

16 family.

17     You went back to the 1800s, told us some history,

18 if I recall your testimony.

19 A.   I have some knowledge, yes.

20 Q.   And you indicated that Daugh White, in the course

21 of your testimony, I believe, was your choice for the

22 mayor in the 2006; isn't that right?

23 A.   Because of the solid financial condition of the

24 city, that answer is yes.

25 Q.   And you felt like that solid financial condition

Russell Cletus Maricle

1  was legitimate, is that what you are telling this jury?

2  A.   Yes, I think it was.  They had money in the bank

3  and new administration within.

4      They immediately spent a million dollars buying a

5  piece of property that they paid for.  I thought they

6  were pretty solid.

7  Q.   And you didn't have any inside information during

8  your close relationship with Wanda and Kennon that in

9  fact there was kickback schemes going on and all kinds

10 of information relating to the way city business was

11 being handled.

12     And you were saying you were totally blind and

13 oblivious to that?

14 A.   I was blind to that, yes, sir.

15 Q.   You had no idea Kennon White might be in trouble

16 over there for a kickback scheme?

17 A.   That is correct.

18 Q.   You had no information on that?

19 A.   I had no information of that until probably

20 January of 2007.

21 Q.   Okay.  So you did have information about it?

22 A.   In January 2007.

23 Q.   Okay.

24 A.   I had information that he had a problem.

25 Q.   Okay.  Well, I misunderstood then.

Russell Cletus Maricle

1  A.   What is it you misunderstood?  I'll clear it up
2  for you.
3  Q.   I am just trying to understand your
4  relationship --
5  A.   Oh, okay.
6  Q.   -- with Mr. White.
7  A.   Okay.
8  Q.   And it seems that you had been kept in the dark
9  over there in Manchester about a lot of things going
10 on in that small town of about 1,500 people.
11      You just didn't know what was going on, is that
12 what you are telling this jury?
13 A.   I am not going to tell the jury that, but I am
14 also going to say I was gone a good portion of the
15 time and I never did read the local newspaper.
16 Q.   But it seemed, Mr. Maricle, during all those
17 recorded conversations that you had some inside
18 information about his personal life.
19      You seemed to have some information about that,
20 and that would have been something that you gained in
21 your lifetime in your experience down there in
22 Manchester, would it not?
23 A.   In what respect, Mr. Smith?
24 Q.   Well, I believe I recall several times, sir,
25 where you were somewhat musing at the fact that there

Russell Cletus Maricle

1 was sex being brought up in this federal investigation

2 about Mr. Briggs.

3      And I believe you used some terminology about how

4 that had affected Daugh White and his career.

5      And you are telling this jury you didn't know

6 know anything about the sex life of Mayor White when

7 you made that comment?

8 A.   I doubt there was a person in Manchester that

9 didn't know that.

10 Q.   Okay, you knew about his sex life, but you didn't

11 know about the kickback schemes?

12 A.   Well, you are not talking about killing, sex

13 life.  I don't know nothing about his sex life.

14      It was common knowledge Doug had a problem as far

15 as sex and women were concerned.

16 Q.   Common knowledge about his personal matters but

17 not common knowledge about what was going on with the

18 city business?

19 A.   Well --

20 Q.   You just just didn't have any idea about the city

21 business?

22 A.   Well, when you drive up to a housing complex and

23 get out and get a girl and put her in the car with

24 you, I think it's fair to assume that you are not

25 going -- well, that's all I'll say about that.

Russell Cletus Maricle

1 Q.   Well, he is your friend, you can go ahead and

2 tell us about your friend.

3      You have endorsed Daugh White as your candidate

4 of choice, and you turned Miss Lewis away; and he was

5 your choice despite knowing all these dirty facts

6 about his sex life, weren't you?

7      He was still your choice for candidate for mayor;

8 isn't that true, Mr. Maricle?

9 A.   I am not going to go into the sex life of Carmen

10 Lewis either which was pretty well known.

11 Q.   Okay.

12 A.   But that's their life, that's not my life.

13 Q.   But you would agree with me that Daugh White was

14 one of your -- one of your choices for mayor; isn't

15 that true?

16 A.   He is the man I voted for.  I won't make any

17 bones about that.

18 Q.   You are not going to back off on that today, sir,

19 are you?

20 A.   No, I am not going to back off that.

21 Q.   And Jennings White likewise, he was one of your

22 friends, wasn't he?

23 A.   He was a friend of mine but not that close.

24 Q.   Not that close.  You really didn't follow

25 Jennings White very much, over the course of time, and

Russell Cletus Maricle

1  knew what was going on in his life either I assume?
2  A.  No, sir, I didn't, I was shocked, as a lot of
3  people were.
4  Q.  Just somebody you had knew in the past, and you
5  really were just shocked when you heard that he was
6  conspiring with drug dealer Kenny Day down there at
7  the KD's Pawn Shop at Burning Springs?
8  A.  I was shocked.
9  Q.  And I think you used the same words about Kennon
10 White, you were shocked about him as well; is that
11 right?  You had had a long relationship.
12 A.  No, I won't say I would use the word shocked, I
13 was surprised.
14 Q.  Now, Oscar Gayle House again was one of your
15 close associates, and I assume you kept that
16 relationship intact over the years; is that right?
17 Would that be fair?
18 A.  We were friends, but I didn't go to events
19 together.
20     I didn't go to his house for dinner.  He didn't
21 come to my house for dinner.
22     We were friends.  If we met in the courthouse, we
23 would speak and talk, but as far as being really,
24 really close to him, I wasn't; but I still considered
25 him my friend.

Russell Cletus Maricle

1  Q.   And he was your choice, I assume, for Circuit

2  Court judge?

3  A.   No, sir, I had no choice.

4  Q.   You didn't make a --

5  A.   The person that ran against him was also a very

6  fine person.

7  Q.   Who was that, sir?

8  A.   That was Allen Roberts.

9  Q.   Okay, and Allen Roberts is someone that you know

10 as well, I assume?

11 A.   Yes, sir, he is a practicing attorney there.  He

12 is associate pastor at Manchester Baptist Church, and

13 he is the son of Marilyn Roberts who testified here

14 yesterday or day before.

15 Q.   And that's not the same Allen Roberts that J.C.

16 Lawson gave us information about.

17 A.   No, that's not the same person, that's a

18 different person, yes, sir.

19 Q.   Okay.  Now, Gary Gregory is one of your long-time

20 friends I assume then, Mr. Maricle?

21 A.   I don't consider Gary a long-time friend.  We are

22 friendly.

23      I wouldn't consider him a long-time friend, but I

24 would consider him an honorable man.

25 Q.   And in fact I think your daughter and his son

Russell Cletus Maricle

1 have had a relationship for sometime.

2      I believe it's been testified that Jonah was

3 actually there at the time that the search warrant was

4 executed by the FBI at your house.

5 A.   Yes, sir.

6 Q.   So you all also had a family connection?

7 A.   In that sense, yes, sir.

8 Q.   And he has been Commonwealth Attorney there for a

9 number of years; isn't that fair?

10 A.   Let's see, since sometime in the '90s, I consider

11 that they can figure out the date.  But it's sometime

12 in the '90s.

13 Q.   And another one of your friends that I believe

14 you would agree with us is Roy Morgan; isn't that

15 right, Mr. Maricle?

16 A.   Yes.

17 Q.   And Roy Morgan is a businessman, I believe you

18 indicated in your testimony, that's a local fellow

19 there in Clay County?

20 A.   I consider him a personal friend, not necessarily

21 a political friend.

22 Q.   He is a personal friend?

23 A.   Yeah, I do consider him a personal friend, yes, I

24 do.

25 Q.   And he is also somebody that has a daughter there

Russell Cletus Maricle

1  called Annette Morgan White and a son-in-law, Yancey
2  White; isn't that true?
3  A.   Yes, he does.
4  Q.   And you also had a friend that passed away
5  sometime back named Stevie Collins; isn't that true?
6  A.   Passed away, he was a victim of a murder, yes,
7  sir.
8  Q.   And Stevie Collins was someone that you
9  considered a friend; isn't that true?
10 A.   Not particularly, no.
11 Q.   Well, let's say this, how would you describe it
12 then, Mr. Maricle?
13 A.   I probably saw him two or three times a year.  He
14 had a restaurant there.
15      I seldom ate lunch there, maybe once or twice,
16 three times a year, and that was about it.
17 Q.   You know where Lockhard's Creek is down there in
18 Clay County, right?
19 A.   Uh-huh, yes.
20 Q.   There is a lot of Collinses live in that place,
21 don't they?
22 A.   On Lockhard's Creek?  I don't think so.
23 Q.   Well, you know the Collins family is a large
24 family, don't you, sir?
25 A.   They are a large family, but I don't know any of

Russell Cletus Maricle

1  them live on Lockhard's Creek.

2  Q.   Do you know where they live?

3  A.   I think that they live on Hector, which you go

4  through Lockhard's Creek to get there.

5       But Hector actually is on the other side of the

6  hill.

7  Q.   Thank you.

8  A.   I think that's where most of them live.  I don't

9  know any of them live on Lockhard's Creek, Mr. Smith.

10 Q.   How many of the Collinses are related there in

11 that general area, Hector?

12 A.   I have no earthly idea, Mr. Smith.

13 Q.   There is a lot of them?

14 A.   I think there is a fair number, yes, sir.

15 Q.   And Stevie Collins was a well-known businessman

16 there in Clay County; wouldn't that be fair to say?

17 A.   Fairly well-known.

18 Q.   And quite influential in some ways; isn't that

19 fair?

20 A.   Could be.

21 Q.   And this was a person, of course, that was the

22 victim of a murder, very high profile murder in Clay

23 County I believe you said?

24 A.   Yes, he was.

25 Q.   And then I think we have also heard you indicate

Russell Cletus Maricle

1  that you were friends with the jailer there, Charles

2  Marcum.  Isn't that --

3  A.   Now, there are two Charles Marcums, one in McKee

4  that we talked about.  I want to separate this one.

5      We knew each other.  I usually talked to him on

6  Monday to find out what the situation was as far as

7  people in jail were concerned because he always

8  brought the bonds in that had been filled during the

9  weekend because the jail could take bonds.

10     And he would be there about 7:15, 7:30 in the

11 morning.

12     And that's usually the time I would get there

13 even if I were going out of county.

14     So I always talked to him about that, but I did

15 not consider him a very close friend, no.

16 Q.   He was influential in politics in Clay County,

17 wouldn't that be fair for you to say, Mr. Maricle?

18 A.   I would say he is, yes, he's been elected several

19 times.

20     I think he was only beaten once.  So yeah, I

21 would say so.

22 Q.   Has quite a large family there himself that he

23 has the ability there to influence I would assume;

24 isn't that fair?

25 A.   I don't think he's got that large of family.

Russell Cletus Maricle

1 There is several people named Marcum, but I don't

2 think they are all necessarily related.

3 Q.    Then I think you have also identified Joe

4 Davidson I believe as one of your close friends over

5 the years; is that right?

6 A.    Yes, absolutely.

7 Q.    And you would also I think identify Penny

8 Robinson as one of your close friends?

9 A.    No, she is -- she was married to my wife's first

10 cousin.

11 Q.    Okay, so you all were related by marriage?

12 A.    Related by marriage.

13 Q.    And then Scott Madden, of course, I think you

14 indicated was a prior law partner of yours and also

15 one of your friends?

16 A.    Yes.

17 Q.    And Renee Muncie would be the district judge down

18 there as well as while the time you were circuit

19 judge, there would have been two district judges

20 including Oscar Gayle House and Renee Muncie.

21      Those would have been people that you had

22 professional relationships with as well as social;

23 would that be fair?

24 A.    She was district judge, and I was circuit judge.

25 Seldom would we see each other because when I was in

Russell Cletus Maricle

1 Clay County, she was usually somewhere else.

2     And if I was in Letcher County, she was usually

3 somewhere else.

4     In Jackson County we had to share the same

5 courtroom, so we both couldn't there be at the same

6 time.

7 Q.   So my question is, sir, would you agree that she

8 would be someone that you would professionally

9 associate with during the time that you were judge?

10 A.   What do you mean "associated with"?  We were both

11 judges at the same time in the same place.

12     She was district and I was circuit.  I don't

13 necessarily consider that an association.

14 Q.   Were you friends?

15 A.   Friendly, no, I wasn't around her to any extent.

16 We weren't enemies, you know, I don't want to say

17 that.

18     But she was not one of the people you would

19 consider your friend, or that I would.

20     Not that she couldn't be, but I didn't consider

21 her to be my friend.

22 Q.   And I believe that you have indicated in your

23 testimony, Mr. Maricle, that you were very -- very

24 much interested, I believe, in -- in the home

25 incarceration aspect of your court system.

Russell Cletus Maricle

1    I believe we heard quite a bit of testimony from
2 you about that.  Do you recall that testimony?
3 A.   I recall that testimony, yes, sir.
4 Q.   And you have had quite a bit of involvement in a
5 number of oganizations over the years outside of your
6 practice of law and your service as Judge; wouldn't
7 that be fair to say?
8 A.   Such as?
9 Q.   Well, I mean, there has been particular
10 associations that you have formed, nonprofit type
11 corporations over the past; wouldn't that be fair?
12 A.   I don't have any interest in any nonprofit
13 corporations.
14 Q.   All right.  Well, I am not asking you to identify
15 them at the current time.
16    But in, say, 2001 through 2003, you would agree
17 with me, sir, that you were listed as a director of
18 Community Technology Center, Incorporated as a
19 nonprofit; isn't that right?
20 A.   The Community Technology Center was through the
21 Chamber of Commerce.
22    I don't remember, I may well have been.  If it
23 says that, I was.
24    I don't really remember because it never really
25 got started very well, quite frankly.

Russell Cletus Maricle

1  Q.   And in fact you were on there with Daugh White;

2  isn't that true?

3  A.   Whoever is on the list, if you have got the list

4  I'll agree.  If that list says that, that's right.

5  Q.   And Reesie Samples, you were on there with her?

6  A.   If her name's there, yes, sir.  I don't have any

7  independent memory of it.

8       But yes, sir, if her name's there, I won't

9  disagree with you.

10 Q.   Penny Robinson was on there?

11 A.   Well, she is a member of about everything coming

12 and going, so I would guess that her name probably is

13 on there.

14 Q.   And also Doug Adams was on there as well?

15 A.   I don't remember, but if his name is there, yes,

16 because I think we only had a couple meetings; or

17 there was only a couple I went to, and that was it.

18 Q.   And I believe you also indicated that you had

19 something to do with bringing the prison in to Clay

20 County.  Isn't that part of your testimony?

21 A.   Well, I won't say I had something to do with

22 bringing the prison in, but maybe so.

23      They were looking for a place in eastern

24 Kentucky, and Congressman Rogers was a head of one of

25 the committees in Washington.

Russell Cletus Maricle

1      And they were interested, and they looked at a

2 couple sites in Clay County.

3      And they looked at a site that I owned or was

4 part owner in.

5      That's what they eventually purchased.  They

6 actually let their option expire, and I could have

7 gotten out of it.

8      But I let them have it at basically the same

9 money they were supposed to get it at.

10 Q.  So you didn't ask a profit for the money, is that

11 what you are saying, ask a profit for the property?

12 A.  No, I don't want to say that now.

13 Q.  Okay.

14 A.  We agreed on the price.

15 Q.  Okay.

16 A.  And they let -- their option expired, and I could

17 have gone up in price.

18      And they had already made some headway towards

19 getting things going.

20      And I let them have it for the same price plus

21 interest for the time during the option.

22 Q.  That was a great big piece of land, wasn't it,

23 sir?

24 A.  About 180 acres.

25 Q.  And you all incorporated your little company, and

Russell Cletus Maricle

1  it was called Fox Hall Enterprises, Incorporated;

2  isn't that true?

3  A.   Fox Hall Enterprises?  I think not.

4  Q.   Okay.

5  A.   If you have got something to show, I would be

6  happy to look at it and see, but I don't --

7  Q.   Well, the Kentucky Secretary of State lists you

8  along with Scott Madden and Oscar Gayle House and

9  Robert Fintress as directors of this corporation.  You

10 don't recall that, sir?

11 A.   I think they did form a corporation, but we did

12 not put title to the property in the corporate name.

13     We kept it in our individual names.  I don't

14 think it was ever in Fox Hall Enterprises' name.

15 Q.   And that was the group you said you were partners

16 with, Scott Madden and Oscar Gayle House and

17 Mr. Fintress?

18 A.   Those are the four people that originally

19 purchased the property.

20 Q.   Okay, and I believe you also indicated that

21 during the time period again, you also had interest, I

22 believe, in seeing home incarceration succeed in your

23 county; is that fair?

24 A.   I think it was a good program.  I take it

25 statewide.  I still think it's a good program.

Russell Cletus Maricle

1  Q.   But I think your testimony was, sir, that you had

2  absolutely no interest whatsoever.

3  A.   I had no financial interest.

4  Q.   Yourself personally or a person of your family.

5  A.   That is correct.

6  Q.   Because that would not be appropriate for you to

7  have such an interest --

8  A.   It certainly wouldn't.

9  Q.   Are you familiar with what's called the

10 organization 41st Judicial District Community

11 Corrections Corporation?

12 A.   What year was that formed, back about 1990?

13 Q.   1992.

14 A.   I am familiar with that.  That was --

15 Q.   That was a home incarceration program, wasn't it,

16 sir?

17 A.   Never did get really operating very much.  They

18 formed that, what did you say, 1992?

19 Q.   That's what the Secretary of State says.

20 A.   I would go with 1992.  I thought it was a good

21 idea.

22      We got several people together.  We spent

23 extensive money or extensive effort on getting a

24 program written up which was supposed to be given a

25 grant, or at least we were told we were first on the

Russell Cletus Maricle

1 list.

2     But however the program got approved, but it got

3 approved for Oldham County, not Clay County.

4 Q.   You were I believe at that time at 316 Main

5 Street, do you remember that address, Suite 211?

6 A.   That was the address of the building, yes.

7 Q.   Okay.

8 A.   I don't think I was actually there at that time

9 though in 1992 because I became judge in 1990.

10     I sold my interest in that building to Mr. Bailey

11 when I left.

12 Q.   Okay, so if -- if the Secretary of State had your

13 office address as the place where the principal office

14 of this home incarceration business was to be located,

15 that wouldn't be true; is that what you are saying?

16 A.   We would have to see who else's name was on

17 there.

18     That was not my address at the time.  May have

19 been someone else's address, but not mine.

20 Q.   You would agree as sitting circuit judge it would

21 be improper for you to have an interest in that at

22 that time?

23 A.   Absolutely, not only that you couldn't have any

24 family employed by that, yes, sir.

25 Q.   But isn't it a fact, Mr. Maricle, that your wife,

Russell Cletus Maricle

1 Judy Maricle, was listed as the registered agent for

2 that company?

3 A.   Not to my knowledge.

4 Q.   At 316 Main Street, Suite 211 Manchester,

5 Kentucky?

6 A.   Now, you are talking about the 1992 thing, is

7 that what you're talking about?

8 Q.   We are still on the same subject, sir, yes, sir.

9 A.   I just want to know resident agent for what?

10 Q.   The 41st Judicial District Community Corrections

11 Corporation, sir.

12 A.   That was in 1992, and it never did really get --

13 get going.

14    That -- if you will look at Secretary of State's

15 office, I will assure that you shows it's defunct.  Is

16 that not right?

17 Q.   Sir, that's not my question.

18 A.   Okay.

19 Q.   That's not my question.  You have represented to

20 this jury that you are not to have a family member as

21 part of a home incarceration business.

22    And I have evidence from the Secretary of State

23 that your wife's the listed registered agent at a

24 building in which you have acknowledged is part of

25 your address; isn't that true?

Russell Cletus Maricle

1   A.   Is that a profit or nonprofit organization?  It

2   is not a profit organization, that was nonprofit.

3   Q.   So in your mind if your wife's a part of the home

4   incarceration business, it's incorporated as a

5   nonprofit, that makes a difference to you; is that

6   what you are saying?

7   A.   That was never a business, never a business.

8   Q.   So the Secretary of State's office is incorrect;

9   is that what you are saying, sir?

10  A.   The Secretary of State's office shows that as a

11  current corporation?

12  Q.   I didn't say that, sir, I said --

13  A.   I know, that's why I --

14  Q.   I said 1992, sir.  That's the question -- the

15  year --

16  A.   That's --

17  Q.   -- the year you got circuit judge was in 1990,

18  was it not, sir?

19  A.   That's correct.

20  Q.   And in 1992 you would still have been circuit

21  judge, right, sir?

22  A.   Absolutely.

23  Q.   And in 1992 you are saying your wife is not the

24  registered agent of the company registered to do

25  business as home incarceration; is that your

36

Russell Cletus Maricle

1 testimony, sir?

2 A.    If her name is on there as resident agent, she

3 was registered agent, but that was not for any company

4 that was in it for profit, or that company never

5 really did get started.

6 Q.    Does that make a difference, sir, to you that if

7 it's a profit listed company or nonprofit, that makes

8 a difference to you; is that what you are saying?

9 A.    If you will look in the Kentucky Revised Statute

10 under Community Corrections, you will find in it a

11 program that is developed for community corrections,

12 each county can have one.

13      And there are people listed in the Community

14 Corrections that must be members of the -- of a board

15 of directors, you have got to have a probation

16 officer, various things.

17      So there was absolutely nothing wrong with what

18 happened, there, Mr. Smith, I assure you of that.

19 Q.    Well, you would agree with me, sir, that the

20 Secretary of State's office is correct in listing your

21 wife as the registered agent for a company that's

22 listed as I indicated called the 41st Judicial

23 District Community Corrections Corporation?  You would

24 agree with that, sir?

25 A.    If that's what's on there, that's correct.

Russell Cletus Maricle

1 Q.   Okay.

2 A.   I don't disagree with that.  But I also say that

3 there was nothing wrong with that.

4     That never did get going.  It was a nonprofit

5 organization formed under state statute.

6 Q.   Are you familiar with a company called Associated

7 Court Extension Services, sir?

8 A.   Associated Court Extension Services?  Doesn't

9 mean anything to me.

10 Q.   Well, let me read some of the Articles of

11 Incorporation filed with the Secretary of State, sir.

12     It says that, "This Associated Court Extension

13 Services, Incorporated" --

14         MR. HOSKINS:  Your Honor, I am going to

15 object.

16         THE COURT:  I'm sorry, there is an objection.

17         MR. HOSKINS:  May we approach?

18         THE COURT:  Yes, sir, you may.

19         (Thereupon, a discussion was had at the bench

20 between the Court and counsel and out of the hearing

21 of the jury.)

22         THE COURT:  Yes, sir, Mr. Hoskins.

23         MR. HOSKINS:  Thank you, Your Honor.

24 Mr. Maricle was asked if he was familiar with this

25 corporation, whatever it is.

Russell Cletus Maricle

1           And he said that he was not, and then
2    Mr. Smith proceeds to start reading from Articles of
3    Incorporation.
4           If he is attempting to refresh his
5    recollection by referring to that, then that's not the
6    appropriate way to do that.
7           Otherwise, I don't think it's a proper
8    question once the witness has said he doesn't know
9    what it is.
10          THE COURT:  Mr. Smith?
11          MR. SMITH:  It's a prior inconsistent
12   statement, Your Honor.
13          I think I can clearly show this individual is
14   listed as the director over this company.
15          He is trying to deny it, and I am going to
16   impeach him.
17          THE COURT:  All right, objection overruled.
18   You may proceed.
19          (End of bench conference.)
20          THE COURT:  Thank you, the objection will be
21   overruled.  You may proceed.
22   BY MR. SMITH:
23   Q.   Mr. Maricle, the Associated Court Extension
24   Services, Incorporated was listed as Articles of
25   Incorporation that its purpose was to serve the 41st

Russell Cletus Maricle

1  Judicial Circuit Courts to reduce the state prison

2  expenses through alternatives to incarceration.  Isn't

3  that true, sir?

4  A.   I don't remember that.  I would be happy to look

5  at it if you want me to.

6  Q.   And you were also listed, sir, isn't it a fact,

7  by the Secretary of State's office as the lead --

8  first director listed is Cletus Maricle, director.

9  Isn't that true, sir?

10 A.   I have no knowledge of that.  If -- I am not

11 going to deny something if it's there and I can take a

12 look at it and see, but I have no knowledge of that.

13 Q.   Your other directors would be Gary Gregory, sir;

14 isn't that true?

15 A.   Can I see what it is that you are talking about?

16 Q.   Your name is Cletus Maricle; isn't that a fact?

17 A.   Yes, it is.  May I see what you are talking

18 about?

19 Q.   I'll put it on the ELMO if the court would --

20 A.   I would be happy -- love to see it.

21         MR. HOSKINS:  Your Honor, can we see it

22 before it's --

23         THE COURT:  Yes, sir, you may.

24         MR. HOSKINS:  Your Honor, may we approach?

25         THE COURT:  Yes, sir, you may.

Russell Cletus Maricle

 1          (Thereupon, a discussion was had at the bench
 2  between the Court and counsel and out of the hearing
 3  of the jury.)
 4          MR. HOSKINS:  Your Honor, I don't think this
 5  is a proper -- properly to be called a prior
 6  inconsistent statement.
 7          The first couple pages appear to be something
 8  that could be printed off the internet.
 9          There is nowhere on here that Mr. Maricle's
10  signature appears.  It's like one signature on here.
11          THE COURT:  Well, as I understand the
12  question, Mr. Smith is establishing this witness is
13  denying any involvement in this company or entity.
14          He is asking to see it.  He is the one asking
15  to see it.
16          Mr. Smith doesn't have to show it to him.
17  Mr. Smith can establish this through other witnesses.
18          MR. HOSKINS:  He hasn't done that, Judge.
19          THE COURT:  It may be a two-step process.
20  You are wanting it to be a one-step process.
21          And I am saying he doesn't have to do it
22  through a one-step process.
23          Your client is the one that's asking to see
24  it.
25          So if Mr. Smith wants to introduce this and

Russell Cletus Maricle

1 establish that his testimony is inconsistent or

2 incorrect, he can do that through another witness if

3 he continues to deny that he was not involved in this

4 entity or with these individuals that were involved

5 with the entity so -- if he wants to see that

6 document, Mr. Smith is showing it to him.

7          What I am saying is he doesn't have to show

8 him the document.

9          He can establish that he's given an

10 inconsistent statement through another witness if he

11 chooses to do so.

12          MR. HOSKINS:  I understand that, and I would

13 object to this document being shown at this point even

14 though that my client, the witness, has a law degree,

15 he is not acting as an attorney in this case.

16          THE COURT:  All right, if you object to it,

17 I'll sustain the objection.

18          He is asking to see it.  You are objecting to

19 it.

20          I'll sustain the objection.  You can

21 establish the foundation through another witness.

22          But you can still ask him -- you can still

23 ask him if he was involved in this corporation and if

24 these other people were involved in this corporation.

25          He is not immunized from asking those

Russell Cletus Maricle

1  questions because the document's not been shown to

2  him.

3          MR. HOSKINS:  He's already asked that

4  question, and Mr. Maricle said he wasn't familiar with

5  it.

6          THE COURT:  And Mr. Smith is giving him

7  additional information about the corporate or business

8  entity.

9          He can ask the questions about it.  He is the

10 one that wanted to see the document.  You don't want

11 him to see it, I'll sustain the objection.

12         MR. HOSKINS:  I'll withdraw the objection,

13 Judge.

14         THE COURT:  You can't have it both ways.

15         MR. HOSKINS:  I understand, Judge.

16         THE COURT:  Are you objecting or not

17 objecting?

18         MR. HOSKINS:  I'll withdraw the objection.

19         THE COURT:  All right, thank you.

20         (End of bench conference.)

21         THE COURT:  Thank you, counsel, by agreement

22 the document may be displayed on the overhead.

23 BY MR. SMITH:

24 Q.  Mr. Maricle, I would first direct your attention

25 to the Kentucky website there which is

Russell Cletus Maricle

1 Kentucky.govbusinessdocuments/ and there is a long

2 title.  Do you see that down at the bottom?

3      And then just above that it says the directors of

4 this Associated Court Extension Services,

5 Incorporated, and it lists Cletus Maricle.

6      Is that another Cletus Maricle that we have got

7 mistaken here, sir, you are saying that's not you; is

8 that your testimony?

9 A.   I don't know that it would have been one Cletus

10 Maricle.

11      Looks like this was filed May 1st, 1996, so that

12 would be my name.

13      I do not remember what this is.  It's a nonprofit

14 corporation.

15      I assume it has something to do with the -- with

16 the court system.

17      But I don't -- I don't have no independent memory

18 at this time, I'm sorry.

19 Q.   I'll show you, sir, for your information that the

20 purpose of this corporation cited to the Secretary of

21 State's office and also filed in your county clerk's

22 office received I believe in '96 by John Y. Brown,

23 III, it says, "The purpose of this corporation, a

24 nonprofit entity, provides services to the 41st

25 Judicial Circuit Courts and reduce state prison

Russell Cletus Maricle

1 expenses through alternatives to incarceration."

2      Do you see that, sir?  Isn't that what that

3 document reads?

4 A.   That's what it reads, yes, sir.

5 Q.   And the final page of that document, sir, has an

6 attachment, a list, and it has the board of directors

7 listed as follows.

8      If you can read that, sir, I believe it has

9 "Honorable Cletus Maricle, 41st Judicial Circuit

10 Judge, Clay County Courthouse, Manchester, Kentucky."

11 Is that not you, sir?

12 A.   Yes, sir, but I am -- may I say something

13 further?

14      You are not going to let me say who the other

15 board of directors were?

16 Q.   Well, that's not my question.

17 A.   Well, that's me, but I would like to tell who the

18 other directors are and explain what I think it is.

19      If you will notice, my name is first, second is

20 Gary Gregory who was the Commonwealth Attorney.

21      Allen Roberts is listed as the defense attorney,

22 Francis Smith Webb, a crime victim.

23      I don't remember -- I don't remember who Francis

24 Smith Webb was.

25      Mary Gregory was listed as a community leader,

Russell Cletus Maricle

1  Gary Hensley as a social worker, Dennis Rice as chief

2  of police.

3      Margaret Wood was the probation clerk out of the

4  probation office.

5      So this is obviously something to do with the

6  court system that we did back at that time, and it was

7  nonprofit.

8      I don't remember what the purpose of it was, but

9  I don't deny the record.

10      If that's what it is, that's what it is; but

11  there is certainly nothing wrong with that.

12  Q.  So when you testified before this jury that you

13  had nothing to do with the home incarceration business

14  in Clay County, that wasn't accurate, was it, sir?

15  A.  It was accurate.  I had no financial interest.

16  It was very accurate.

17  Q.  Now, during the course of your testimony, sir, I

18  believe you indicated that you found opportunities for

19  certain people to get employment along the way, and

20  that was pretty much par for the course over in Clay

21  County.

22      You didn't find anything wrong with trying to

23  help people get a job.  Do you remember that

24  testimony?

25  A.  If someone was looking for a job and there was

Russell Cletus Maricle

1 one that I knew, I would tell them about it, yes, sir.

2 Q.   And during the course of your position there as

3 circuit judge, you made sure that your family had jobs

4 there in the court system; isn't that true?

5 A.   My family worked in the court system because it

6 was a small area, and I didn't want them working for a

7 bank or a school system or something that would cause

8 a conflict in cases, yes, they did.

9 Q.   In fact, your wife, Judy Maricle, she is listed

10 as one of your employees throughout your service there

11 on and off; isn't that a fact?

12 A.   No, sir, that is not a fact.  The fact is that

13 she went to work in 1991 -- '90 or '91, worked until

14 about '96 or '7.

15     At that time, they issued an opinion which said

16 that judges should not have their wives working for

17 them.

18     I think there were about 23 in the state that did

19 have.

20     I asked for her to resign, and she did resign

21 immediately because of that opinion, and none of the

22 others did.

23     They appealed the decision, and the decision was

24 reversed and said it was permissible for your family

25 to work for you under the court system because of

Russell Cletus Maricle

1 particular problems that could be involved.

2     And after I had her clerk for awhile, then she

3 did come back and work for me.

4     But there was a period of time that she did not

5 work because of the concerns I had as to whether or

6 not it was appropriate, Mr. Smith.

7 Q.   My question is, sir, you did employ your wife to

8 work in your office; isn't that a fact?

9 A.   I have answered that question, I believe.

10 Q.   And I believe you have also employed your

11 daughter?

12 A.   Yes, I did.

13 Q.   And you have also employed Phillip; isn't that a

14 fact?

15 A.   He worked as a temporary employee for a period.

16 Q.   And also Janet?

17 A.   Who?

18 Q.   Janet Mobley?

19 A.   I'm sorry, I never employed Janet Mobley.  I'm

20 sorry, I am going to go back.  I don't think I

21 employed Phillip Mobley.  You are looking at the

22 Family Court.

23 Q.   Okay, so --

24 A.   I was thinking Phillip might have worked for me

25 temporarily, and I went back a way, and he might have;

Russell Cletus Maricle

1 but I don't know that he did.

2     But Phillip and Janet Mobley were full-time

3 employees of the Family Court.

4     Judge Clark, he is the one that hired them.

5 Matter of fact, Miss Mobley was working for him before

6 he became judge.

7 Q.   Well, you wouldn't disagree, sir, that the

8 website from the Supreme Court of Kentucky listed the

9 41st Judicial District at points in time around August

10 27, 2003 did list your daughter Linsey White.  That is

11 your daughter, isn't it?

12 A.   She worked for me awhile, and I had to fire her.

13 Q.   And then Judy Maricle was listed as a legal

14 assistant according to the website?

15 A.   Yes, sir, that's correct.

16 Q.   And also Judge Gene Clark listed your son-in-law,

17 Phillip Mobley, as his court administrator.  That

18 would be a fact, isn't it?

19 A.   That was strictly him.  I had nothing to do with

20 that one way or another.

21 Q.   And Janet Mobley is also related to Phillip,

22 isn't she?

23 A.   That's his mother, and she worked for Judge Clark

24 before he became judge.

25 Q.   And those are all family members that got jobs in

Russell Cletus Maricle

1 the court system while you were there; isn't that a

2 fact?

3 A.   Yes, sir.

4 Q.   Now, I believe that you testified that you had

5 quite a heavy docket over there in Clay County during

6 times that you were judge; isn't that fair?

7 A.   I would estimate that I have handled about 20,000

8 cases while I was judge.

9 Q.   And you have been in front of a lot of juries and

10 seen a lot of jury trials over the course of your

11 career; isn't that a fact?

12 A.   Over the course of my career, I guess a lot.

13 Q.   And you have seen a lot of witnesses testify, I

14 assume, in court.

15 A.   Sure.

16 Q.   And as you have you have had that experience,

17 sir, I assume that when you make statements such as

18 you said earlier in your testimony I believe that your

19 family, Linsey White, your daughter, had encountered

20 problems with the court system herself?

21 A.   Yes, she did.

22 Q.   And I believe you testified that as part of your

23 standard operation with your daughter is that you

24 found it consistent that you were treated no different

25 I believe you said than anybody else?

Russell Cletus Maricle

1  A.   That was my position.

2  Q.   And in fact, your testimony, I believe, was to

3  that effect; wasn't that right?

4  A.   Yes, sir.

5  Q.   Despite that, sir, you have indicated that one of

6  the encounters that Linsey had I believe you indicated

7  was at the Bobby Joe Curry residence.  Do you recall

8  that testimony?

9  A.   That is correct.

10  Q.   Now, Bobby Joe Curry was one of the more

11  notorious drug dealers in your county; isn't that

12  fair?

13  A.   I think that's a fair statement, yes, sir.

14  Q.   And he operated pretty much wide open at large

15  there on Perry Branch for many years selling drugs to

16  many of the young people there in Clay County?

17  A.   Yes, he did.

18  Q.   And he went on for years and years with --

19  basically without repercussion successfully?

20  A.   I would expect that's probably correct, yes, sir.

21  Q.   And this fellow had that reputation, and I

22  believe you said that you actually were the judge who

23  wrote out the warrant for him?

24  A.   I didn't write the warrant.  It was a search

25  warrant.

Russell Cletus Maricle

1    The search warrant was prepared and brought to my
2 house for my signature as officers often did, and I
3 did sign the search warrant.
4 Q.   And a search warrant has to be authorized by a
5 Judge, either a district judge, circuit judge or trial
6 commissioner in the state system; isn't that fair?
7 A.   That's correct, yes, sir.
8 Q.   And nobody can execute a search warrant without a
9 judge approving it; isn't that fair?
10 A.   That's correct, yes.
11 Q.   And you said --
12 A.   Well, now wait a minute, that's not exactly
13 right, but generally speaking that would be -- that
14 would be true.
15    There would be certain searches that you could
16 have that you wouldn't have to have a warrant for it.
17 Q.   We are just talking about search warrants, sir,
18 and --
19 A.   There would be certain --
20 Q.   You would agree with me that with a search
21 warrant a circuit judge would approve the search
22 warrant --
23 A.   A search warrant is --
24       THE COURT REPORTER:  Wait, I -- pardon me, I
25 really need for you to speak one at a time.

Russell Cletus Maricle

1          MR. SMITH:  I apologize.

2          THE COURT REPORTER:  Thank you.

3          THE WITNESS:  All right, you finish, then

4 I'll finish.  Go ahead.

5 BY MR. SMITH:

6 Q.   I am asking you if you would agree with me, sir,

7 that it takes a judge to sign a search warrant?

8 A.   It takes a judge to sign a search warrant, but

9 you don't always have to have a search warrant to

10 search; and you are aware of that, Mr. Smith.

11 Q.   And my -- my question is it takes a judge to sign

12 a search warrant.

13 A.   Sure, yes, I have answered that.

14 Q.   And I believe you said that at the time that your

15 daughter was caught by the police that you got a call,

16 if I understood your testimony.

17 A.   From Mr. Roberts, is that the time you are

18 talking about or the time at Bobby Joe Curry's?

19 Q.   Well, you got a call on both cases, if I

20 understand your testimony?

21 A.   That's correct, yes, sir.

22 Q.   And on each of those occasions the police called

23 you and said, "What should we do with Linsey?"  And I

24 think you told them to take her to jail.

25 A.   The first time I went to check to see whether or

Russell Cletus Maricle

1 not she was under the influence.

2      If she was, I did tell Todd to take her to jail.

3 When she was at Bobby Joe Curry's and they called, I

4 said, "You treat her like you do the rest of them."

5 Q.   And you said that as far as you know, everybody

6 in Clay County got the same treatment as your

7 children?

8 A.   Well, everybody's entitled to the same

9 treatment.

10      Whether or not they did, I don't know; but

11 everybody ought to be treated the same on an

12 individual basis, yes, sir.

13 Q.   And isn't it a fact, sir, despite many of these

14 arrests of your daughter, she was never convicted on

15 any of these drug charges; isn't that a fact?

16 A.   On a drug charge?

17 Q.   Yes, sir.

18 A.   She pled guilty -- it might have been a theft

19 charge that she pled guilty to.

20      I don't know that for sure, but I think it was a

21 theft charge she pled guilty to.

22      She never was convicted on any drug charges.  The

23 grand jury didn't indict her on the one with Bobby Joe

24 Curry's, and the federal government didn't indict

25 her.  Matter of fact, she talked to Mr. Briggs about

Russell Cletus Maricle

1  it.

2  Q.   Sir, my question is again, your daughter was

3  never convicted on any of these drug charges which she

4  was arrested for; isn't that a fact?

5  A.   I have answered that question, as far as I know

6  the answer, yes, sir.

7  Q.   And I believe you would agree with me, sir, that

8  is not the way everybody's children in Clay County is

9  treated, wouldn't you, sir?

10 A.   It depends on the child and what their background

11 is and whether or not they have got serious drug

12 problems, not got serious drug problems.

13      They should be treated alike, but I am not going

14 to say everybody is.

15      But I told them to do mine just like they do

16 everybody else.

17 Q.   Well, I believe your testimony was that your

18 children were treated just like everybody.  Is that

19 not your testimony, sir?

20 A.   They were to be treated like everybody else, that

21 was my direction, yes, sir.

22 Q.   But that wasn't the way it was practiced, was it,

23 sir?

24 A.   No, I won't say that, no, sir.

25 Q.   You won't say that?

Russell Cletus Maricle

1  A.   No, I won't say that.

2  Q.   So everybody in Clay County that's got children

3  that get caught out here on drug arrest, the police

4  are going to call them and ask them what do you want

5  to do with my child, is that the way everybody in Clay

6  County gets treated?  Is that your testimony, sir?

7  A.   There would be a lot of people that they would

8  call, yes, sir.

9       If they had had any trouble with them before,

10 particularly where they might be just an AI which they

11 can get out of by going to jail, they are immediately

12 entitled to get out, they might call them, yes, sir, I

13 am sure --

14 Q.   If they were part of this group over here, they

15 probably would get that.

16      But if they are down there with Mary Gail Roberts

17 and Tonya Davidson --

18            MR. HOSKINS:  Objection.

19 BY MR. SMITH:

20 Q.   -- that wouldn't be the case; isn't that a fact,

21 sir?

22            MR. HOSKINS:  Objection.

23            MR. WESTBERRY:  Objection.

24            THE COURT:  Overrule.  You may answer.

25            THE WITNESS:  Made no difference to me

Russell Cletus Maricle

1 whether they were rich or poor.

2 BY MR. SMITH:

3 Q.   So you are telling this jury that everybody in

4 Clay County whose kid gets stopped with a drug arrest

5 gets called from the police and gets brought down to

6 the scene of the crime and then gets asked the

7 question, "What would you like to happen with your

8 child here tonight?"  Is that your testimony, sir?

9 A.   I am not saying everybody did that, but I would

10 say that if they called, there is not many of them to

11 do what I did and say, "Treat them like the rest of

12 them."

13 Q.   But that isn't the way it was was carried out,

14 was it, sir?

15 A.   Let me say this, you talked to Bobby Joe Curry,

16 my daughter was there; and you didn't indict her.

17 Q.   Sir, that's not my question.

18 A.   Well, yes, that's the answer though.

19 Q.   That's -- the question is, isn't it a fact that

20 not everybody in Clay County gets treated like Cletus

21 Maricle.  Isn't that a fact?

22      Your children got treated differently than the

23 rest of the people in Clay County; isn't that a fact?

24 A.   No, sir.

25 Q.   Can you name an instance where your daughter ever

Russell Cletus Maricle

1  spent more than thirty days in the jail house, sir?

2  A.   No, I don't think she ever spent more than thirty

3  days.

4  Q.   Now, you indicated that you were very interested

5  in seeing the development, I believe, of your town.

6      And I believe you indicated that there had been

7  some progress down there with new courthouses that had

8  been -- since you had been circuit judge, I believe

9  you said there were three different courthouses

10 that --

11 A.   No, there were two new courthouses built.  Clay

12 County was completed, Jackson County was started

13 before I retired.

14     And as you are probably aware, there are probably

15 80 or 90 new courthouses that have been built in

16 Kentucky during the last six, seven, eight years.

17     Been a program that the Supreme Court had and

18 Chief Justice Lambert had.

19     And yes, I did serve on the project development

20 board because I was required by statute to do so.

21 Q.   And you also were the property owner that sold

22 part of that property to the courthouse development;

23 isn't that a fact?

24 A.   I sold the lot that I owned to I believe it's the

25 counties who it goes to.

Russell Cletus Maricle

1    I am not really sure of the name of it, yes, sir,
2 and I sold it to them for exactly the price that it
3 was appraised for by their appraiser.
4 Q.   And you had two properties, I believe, listed on
5 the deed books, isn't that a fact, that you sold to
6 them, two parking lots?
7 A.   No, that's not -- that's not correct.  There were
8 two parking lots.
9    One of them was owned exclusively by Dr. Madden
10 except for the fact that I had a right of first
11 refusal if he ever sold the property.
12    So I had to sign the deed for that lot in order
13 to extinguish that right of first refusal I had
14 because I had sold it to him.
15    That's why my signature's on that deed.  I didn't
16 get any money out of that transaction.
17    I did get money for my part of the other one now,
18 but not on that one, I didn't.
19 Q.   So you didn't donate that property in other
20 words?
21 A.   No, sir, I am -- I am not that rich.
22 Q.   And in the course of your testimony, I believe
23 that you indicated that you -- you identified this Tom
24 Lewis as one of your substitute judges that comes over
25 and covers on some of your cases; is that right?

Russell Cletus Maricle

1  A.   He was assigned by the court to be there, yes,

2  sir.

3  Q.   And I believe your testimony was, is that in fact

4  it was pretty common for him to be there, and you

5  expected him to be there most of the time?

6  A.   He was helping me get rid of the docket, yes,

7  sir, he was there quite a bit.

8  Q.   Is it fair to say, sir, that you served over in

9  Bowling Green on occasion for him as well?

10 A.   No, sir, I never served in Warren County as a

11 circuit judge in my life.

12 Q.   During the course of your testimony you did say

13 that you expected, though, that Tom Lewis would be

14 there because once he got there you just expected that

15 he would return.  That was your testimony, right, sir?

16 A.   If you will note in one of the exhibits that you

17 have, there is a note on October the 1st that Judge

18 Lewis here this month.

19 Q.   And he had -- in that order, you knew that he was

20 going to be there for a period of months based on that

21 subsequent order; isn't that a fact?

22 A.   I think he probably had an order for about every

23 month because like if somebody pled guilty in July and

24 he set their sentencing in August, he would need an

25 order to be the special judge for August because you

Russell Cletus Maricle

1 can't serve unless you have that order.  You have no

2 jurisdiction.

3 Q.   Now, your interest in real property expanded, I

4 believe you said, to include the Yapp property that

5 happened to fall into the hands of some foreclosure

6 process.

7     And I believe your testimony was that you ended

8 up being the owner of that property; isn't that right,

9 sir?

10 A.   The property was foreclosed on.  After it was

11 foreclosed on, we bought the lot and house from the

12 people who foreclosed on it.

13     That was probably four or five years after the

14 Gap trial.

15     If you are trying to imply anything wrong about

16 that, anybody could have bought it.

17 Q.   Whose name did you put it in, sir?

18 A.   It was in Charles Marcum's name, and I have a

19 deed for my half that is not recorded.

20 Q.   And so if I went to the courthouse and looked for

21 who's the record owner, it would say Charles Poodle

22 Marcum.

23 A.   That's correct, yes, sir.

24 Q.   And Charles Poodle Marcum was one of your friends

25 from way back?

Russell Cletus Maricle

1  A.   We have been friends for some years, yes.

2  Q.   Well, you have known Poodle Marcum since back in

3  say the '80s, haven't you?

4  A.   I have known him probably since I got out of law

5  school or a little after I came to Manchester.

6       As far as really, really knowing him, I

7  represented him in his divorce case, whatever year

8  that was.

9       From then on, I have known him fairly well, yes,

10  sir.

11  Q.   What about in his conviction for Hobbs Act

12  extortion in the Federal District Court down there,

13  did you represent him on that in 1980?

14  A.   No, sir, I didn't, I was not close associates

15  with him at that time.

16  Q.   But you are aware he was a convicted felon,

17  aren't you, sir?

18           MR. HOSKINS:  Object, Your Honor.

19           THE WITNESS:  I have -- no problem, I am -- I

20  am aware of that, yes, sir.

21           THE COURT:  Objection overruled.

22           THE WITNESS:  He served his time and got

23  out.

24           I don't know whether he got it pardoned or

25  whether he got his rights restored, one of the two.

Russell Cletus Maricle

1  BY MR. SMITH:

2  Q.   You know it was a Federal Hobbs Act extortion

3  conviction that he had in 1980 in Federal Court, don't

4  you, sir?

5  A.   Yes, sir.

6  Q.   And you chose to partner with him in this real

7  estate venture on the Yapp property and put it in his

8  name and leave it on the record as his property; isn't

9  that a fact?

10 A.   I did, but there was also one piece in Laurel

11 County that was in my name on Recorder Street that he

12 owned half of and they were about of equal value.

13 Q.   And I believe you said that this Yapp case was

14 one in which you felt it was a horrible outcome and

15 that you were very, very dissatisfied with the fact

16 this Steve Yapp had gotten away with murder?

17 A.   Truthfully I actually considered resigning.

18 Q.   And that was one in which you agree with me, sir,

19 you were the judge on that from the beginning to end;

20 isn't that a fact?

21 A.   Oh, I don't think so, yes, sir.

22 Q.   And isn't it a fact despite these egregious and

23 awful acts this man was accused of doing, you let him

24 out of jail, didn't you, sir?

25 A.   He was out on bond.

Russell Cletus Maricle

1  Q.   And it's interesting that you mention that

2  because I actually went back to the court case, and I

3  found the bond.

4      And it says that you approved this bond; isn't

5  that a fact?

6  A.   I would say I did approve the bond, yes, sir.

7  Q.   And it was actually a bond that was put up by Roy

8  Morgan; isn't that a fact?

9  A.   I don't know who signed it at this point in

10 time.   If that's whose signature is there, yes, sir.

11 Q.   And Stevie Collins?

12 A.   I would think those two people would be worth any

13 bond it could -- up to a million dollars or more.

14 Q.   And Roy Morgan and Stevie Collins put up their

15 property to bond this man out for this egregious

16 murder that you just told this jury you were appalled

17 over?

18 A.   Well, I can't help who signs his bond, Mr. Smith,

19 you know that.

20 Q.   Well, you approve that bond, don't you,

21 Mr. Maricle?

22 A.   I set an appointment up --

23 Q.   You approved that bond --

24 A.   No, no.

25 Q.   -- didn't you, Mr. Maricle?

Russell Cletus Maricle

1  A.   No, sir, let me explain.  You set a bond --

2  Q.   Yes or no, you approved the bond; isn't that a

3  fact?

4  A.   Let me say this.  When you set a bond, if you set

5  a $50,000 property bond, then they come in, anybody

6  with $50,000 can fill that bond.

7      Sometimes if there were people that you knew

8  would make sure they were there, I might approve it on

9  an individual basis.

10      I would be happy to look at the bond or any order

11  and see it there if you would want to show it to me.

12  Q.   Government's Exhibit D81?

13  A.   Okay.

14  Q.   I would like to show it to you, sir.

15  A.   Yes, sir.

16          THE COURT:  Show it to counsel, first.

17          MR. SMITH:  May we approach?

18          THE COURT:  Yes, sir, has counsel seen it?

19  If you need to approach, you can come on up.  I just

20  wasn't sure if you had seen it.  Come on up.

21          (Thereupon, a discussion was had at the bench

22  between the Court and counsel and out of the hearing

23  of the jury.)

24          THE COURT:  I think he said no, he didn't

25  sign the bond.  No, he said he didn't sign it.  That's

Russell Cletus Maricle

1  what he said, then he explained, but -- is this it
2  here?  Yes, there is two documents here with it.
3          MR. SMITH:  Ray Morgan and Stevie Collins.
4          THE COURT:  All right.  I want to make it
5  clear these are your highlights on the document.
6          MR. SMITH:  Yes, they are.
7          THE COURT:  All right, show it to him?  Any
8  issues with --
9          MR. HOSKINS:  No.
10          THE COURT:  All right, Mr. Abell?
11          MR. ABELL:  That's collectively D81?
12          MR. SMITH:  Yes, sir.
13          THE COURT:  Has that been introduced
14  previously?
15          THE COURT:  Hang on a second.
16          MR. SMITH:  I don't know, the clerk's copy
17  would have the date on it.
18          I have marked it and given it to counsel
19  because if it's been marked, that means I have
20  discovered it.  It's been introduced.
21          THE COURT:  Let me just ask the clerk if we
22  have D81 that's been introduced yet.
23          I don't know if Mr. Hoskins introduced it
24  through his witness.
25          MR. HOSKINS:  No, in fact I don't think that

Russell Cletus Maricle

1 was -- I don't have any objections to that.

2          THE COURT:  Well, I just want to make sure

3 the record is clear as to whether it has or hasn't

4 been introduced.

5          MR. HOSKINS:  It's not, Judge, that's the

6 court file on that murder case.  It's not been

7 introduced.

8          THE COURT:  Okay, all right.

9          MR. PINALES:  For some reason it wasn't in

10 the box that came from them --

11          THE COURT:  Well, he is going to show the

12 document.

13          MR. PINALES:  Do you have a clean copy of it?

14          MR. SMITH:  That's all I have.

15          THE COURT:  Well, you can show him the

16 document, and we will go from there.

17          If he is able to identify it, you need to

18 make sure that the jury understands that this is not

19 the witness's markings, that it's counsel's markings

20 on it.

21          MR. PINALES:  The highlight, I just want to

22 see the highlight.

23          THE COURT:  It has the names highlighted, I

24 think.

25          Mr. Abell, did you think this had already

Russell Cletus Maricle

1 been introduced?

2          MR. ABELL:  I don't believe it has.

3          MR. PINALES:  This is the signing at the

4 bottom -- not the signing.  Okay.

5          THE COURT:  All right.  Thank you.

6          (End of bench conference.)

7          THE COURT:  All right, thank you, counsel.

8 And Mr. Smith, you may proceed.

9 BY MR. SMITH:

10 Q.   Mr. Maricle, you -- you have indicated in your

11 answer that you had nothing to do with the bond?

12 A.   No, sir, I didn't indicate that, Mr. Smith.

13 Q.   Okay.

14 A.   You are completely wrong, 100 percent wrong.

15 Q.   So you would agree --

16 A.   Being in Circuit Court, I would set what the bond

17 was.

18 Q.   Let me show you the order --

19 A.   I would be happy to see it.

20 Q.   Okay.

21 A.   I signed the order for that bond.  I don't like

22 -- mind for you to exhibit it, if you want to.

23 Q.   Thank you, sir.  And you would agree with me,

24 sir, that the attorneys representing this defendant

25 charged with murder was Yancey White and Annette

Russell Cletus Maricle

1  Morgan; isn't that true?

2  A.   I am not sure both of them were in it.  They

3  probably were.  I am sure it was one or the other of

4  them.

5  Q.   And this would be that order we have referenced

6  as being the order setting the bond posted by Roy

7  Morgan and Stevie Collins for Mr. Yapp; isn't that

8  true?

9       And you have ordered his release according to

10 this order; isn't that a fact?

11 A.   May I read it?

12 Q.   I'm sorry, this is the same one I just brought

13 from you.  I thought you had read it.

14 A.   No, I mean, may I read it out loud?

15          THE COURT:  I don't think that's the

16 question.  The question is whether you signed the

17 order directing his release.

18          THE WITNESS:  This particular order I signed,

19 yes, sir.

20          THE COURT:  All right, thank you.

21 BY MR. SMITH:

22 Q.   And that would be your signature right there;

23 isn't that right, sir?

24 A.   Sir, yes, he set a $50,000 bond cash or 100,000

25 fully secured, I believe it was, and he was required

Russell Cletus Maricle

1  to leave the state and go to Maine and stay in Maine.

2  Q.   And Annette Morgan was listed as well as Yancey

3  White, wouldn't you agree, on -- at least this

4  document listed Annette Morgan?

5  A.   It says Annette Morgan, Morgan and White, one or

6  the other of them represented him.  I guess that's a

7  partnership, both of them did.

8  Q.   So this is the individual that you had indicated

9  in your testimony that you got the property in -- in

10  Manchester from?

11  A.   Several years later -- no, I did not get if from

12  him, Mr. Smith, let's get it right now, you know that

13  and I know that.

14  Q.   Sir --

15  A.   I got the property from the finance company that

16  had bought the property at the courthouse door, yes,

17  sir.

18  Q.   And I want you to agree with me, if you will,

19  sir, that this is the same property that this man

20  owned --

21  A.   Yes, I --

22  Q.   -- and you don't disagree with that; isn't that a

23  fact?

24  A.   No, I am not disagreeing with that at all,

25  Mr. Smith, no, sir.

Russell Cletus Maricle

1  Q.   And you have put this property in the name of
2  Charles Poodle Marcum, a convicted felon, and kept it
3  in his name and kept his back at home, one of those
4  deeds that was not recorded to you; isn't that a fact?
5  A.   There is no -- I do have a deed.  It is not
6  recorded.  There is no requirement that a deed be
7  recorded.
8       Title passes when the deed is signed and
9  delivered, and I think you know that as a lawyer.
10 Q.   Sir, you would agree with me that you did not
11 record your deed; isn't that a fact?
12 A.   Yes, I agree with that.
13 Q.   And so if anyone went down to the courthouse to
14 see who is the record owner of that property, it would
15 appear in the name of Charles Marcum; isn't that a
16 fact?
17 A.   That's correct, yes, sir.
18 Q.   Now, I believe you said that your home
19 incarceration program was quite successful down in
20 Clay County over the period that you were there as
21 judge, is that --
22 A.   It has had periods of success.  It has had
23 periods where it didn't have as many on.  Been in
24 pretty good shape, though, yes, sir.
25 Q.   But it helped along the way if the judge would

Russell Cletus Maricle

1 make a condition of a person's bond if he had to get

2 home incarceration, that would increase the number of

3 persons on home incarceration?

4 A.   Well, certainly it would go up if you did that.

5 Q.   And you did that as a matter of fact; isn't that

6 true?

7 A.   It was not unusual for me to require that people

8 on drug charges particularly to be on electronic

9 monitoring.

10     That's used throughout the state and in Federal

11 Court also, Mr. Smith, as you are aware.

12 Q.   Well, the Federal Court program is quite

13 different, isn't it, in fact, Mr. Maricle?

14 A.   I am not that familiar with it.

15 Q.   You can't really compare that because that's

16 apples and oranges, isn't it true?

17 A.   No, I don't think so.

18 Q.   Well, the federal program is not operated under a

19 private company?

20 A.   I don't know who operates it, but I understand

21 they pay for it.

22 Q.   It's under the authority of the probation office,

23 and it has government oversight and particularly

24 involved in it.  You are not aware of that, are you?

25 A.   I am really not aware of what the federal program

Russell Cletus Maricle

1 is.

2      But there is also as to the state programs, they

3 have to be approved by the Administrative Office of

4 the Court, so they are under their control also.

5 Q.   And I believe you said that during the course of

6 your service there as judge that you had a real

7 disfavor for people who would be involved in fixing

8 juries?

9 A.   Yes, sir, I do.

10 Q.   In fact you took -- I believe you said measures

11 that you took?

12 A.   I certainly did.

13 Q.   And I believe you named some of those measures of

14 how you were going to protect -- protect your

15 courtroom.

16      One of them I believe you said you sequestered

17 jurors and would keep them overnight if it was over a

18 day-long trial.  Do you remember that testimony?

19 A.   In criminal cases, I started doing that, but it

20 didn't work out.

21      Finances weren't that good for the people who

22 paid, and they didn't like that.

23      And besides, you had the people in a captive

24 group, and I explained that when I was talking, yes,

25 sir.

Russell Cletus Maricle

1 Q.  And in fact isn't it true that Roy Morgan was one

2 of those people that you had to watch out for there in

3 your court system with the juries?

4 A.  I had concerns about that.

5 Q.  And Billy Rowland Phillips is another one that

6 you had to have concern about?

7 A.  No, I never did have Bill Rowland in the

8 courthouse much.

9 Q.  You never had any concern for Billy Rowland

10 Phillips?

11 A.  Not that much.  He was around some, but no, I

12 didn't have that much concern for Bill Rowland

13 Phillips.

14 Q.  And during the course of -- I believe you said in

15 your testimony that it was not -- not something that

16 you saw ever occurring in your cases?

17 A.  What do you mean in my cases?

18 Q.  A jury, you weren't part of any jury fixing?

19 A.  No, sir, I certainly was not.

20 Q.  But you would agree with me, sir, that Clay

21 County has developed somewhat of a reputation

22 throughout the --

23        MR. WHITE:  Objection, Your Honor.

24        MR. HOSKINS:  Objection, Your Honor.

25 BY MR. SMITH:

Russell Cletus Maricle

1  Q.  -- State of Kentucky --

2        THE COURT:  I'll sustain the objection.

3  BY MR. SMITH:

4  Q.  Let me ask you this, Mr. Maricle, isn't it a fact

5  that the largest verdict in Kentucky history against

6  Ford Motor Company was rendered in your court; isn't

7  that a fact?

8  A.  Now, you are limiting that to the largest verdict

9  against Ford Motor Company?

10       You are limiting it to Ford Motor Company; is

11 that right?

12       I would not know because I don't know how many

13 verdicts have been against Ford Motor Company in

14 Kentucky, so I wouldn't know whether that's correct or

15 not.

16 Q.  Well, there was a multi-million dollar verdict

17 while you were judge against Ford Motor Company, and

18 that occurred in your county; isn't that a fact?

19 A.  Yes, sir, it went all the way to the Supreme

20 Court --

21 Q.  That was a jury trial?

22 A.  That went all the way to the Supreme Court of the

23 United States.

24 Q.  So it was much, much more significant in quantity

25 and amounts than the Runion case of 3 million; isn't

Russell Cletus Maricle

1  that a fact?  You recall it was over 20 million?

2  A.   Let me explain that.  The answer is yes, but

3  there is an explanation for it.

4      The compensatory damages that were awarded in the

5  case of Ford Motor were less than the compensatory

6  damages awarded in the Runion case.

7      It was the punitive damages that the jury imposed

8  that were extraordinarily high.

9  Q.   So Ford Motor Company didn't have to pay the

10  punitive damages, is that what you are saying?

11  A.   They had to pay some, whatever it wound up, I

12  don't know but it was -- it went to the Supreme

13  Court.

14      And there were several cases involving the same

15  issue as to determination of punitive damage and

16  constitutionality of them.

17      And they reversed a case, I think it was out of

18  Utah that sent a whole bunch of cases back for

19  reconsideration and set out some guidelines on ratios

20  of punitive to compensatory and that sort of thing.

21  That's all I know about that.

22  Q.   And two of your good friends was the plaintiffs'

23  lawyers in that case, I believe Ricky Bailey and Scott

24  Madden; isn't that a fact?

25  A.   They were the plaintiffs' attorneys, yes, sir.

Russell Cletus Maricle

1 Q.   And Ford Motor Company was represented by some

2 lawyers up in Lexington, I believe; isn't that a

3 fact?

4 A.   Yes, sir.

5 Q.   Lionel Halls?

6 A.   I think that's correct, yes, sir.

7 Q.   And you would agree with me, sir -- well, let me

8 just ask you, do you know of a higher verdict that's

9 returned by a jury in your county than this one?

10 A.   Not in my county, but in the state I think there

11 are several.

12 Q.   Okay.  Now, Mr. Maricle, as judge, I am sure you

13 were very sensitive to the requirements under the

14 Kentucky Bar Association enacted and promulgated by

15 the Supreme Court of Kentucky on judges, are you not?

16 A.   I don't know of anything promulgated by the

17 Kentucky Bar Association on judges.

18 Q.   Are you familiar with the Judicial Conduct

19 Commission?

20 A.   I am familiar with the Judicial --

21 Q.   And Supreme Court Rule 4.3?

22 A.   I am familiar with the Judicial Conduct

23 Commission, but I don't think that's by the Kentucky

24 Bar Association.

25 Q.   Well, let's talk about those, sir, and there are

Russell Cletus Maricle

1 canons of ethics for judges that are above and beyond

2 what a practicing lawyer has, you would agree?

3 A.   Yes, yes, there would be restrictions that would

4 be applicable to judges, not lawyers and probably

5 vice-verse, I don't --

6 Q.   And in fact in the preamble the Supreme Court

7 Rule 4.30, it says, and I quote, "Our legal system is

8 based on the principal that an independent, fair and

9 competent judiciary will interpret and apply the laws

10 it governs.

11      The role of the judiciary central to American and

12 Kentucky concepts of justice in the rule of law

13 intrinsic to all sections of this code are the

14 precepts that judges individually and collectively

15 must respect and honor the judicial office as a public

16 trust and strive to enhance and maintain confidence in

17 our legal system.

18      The judge is an arbiter of facts and law for the

19 resolution of disputes and a highly visible symbol of

20 government under the rule of law."

21 A.   Yes, sir.

22 Q.   You have read that, haven't you, Mr. Maricle?

23 A.   I am sure I have.

24 Q.   And you understand that, again, that those canons

25 of ethics are binding on you as a judge; isn't that a

Russell Cletus Maricle

1  fact?

2  A.   To a certain extent, yes, sir.

3  Q.   Well, let me read to you, quote, "The text of the

4  canons and sections is intended to govern the conduct

5  of judges and to be binding upon them."

6  A.   If -- if that is the Kentucky rules, then they

7  would be binding.

8       There are some differences between Kentucky rules

9  and what the ABA has.

10  Q.   Well, I am reading from the Kentucky Rule --

11  A.   All right.

12  Q.   -- Supreme Court 4.300.

13  A.   Yes, sir.  All right, sir.

14  Q.   Do you agree with me so far?

15  A.   Yes, sir.  Yes, sir.

16  Q.   "Canon number one, a judge shall uphold the

17  integrity and independence of the judiciary."  Do you

18  recall that, sir?

19  A.   Yes, sir.

20  Q.   Canon number two, "A judge shall avoid

21  impropriety and the appearance of impropriety in all

22  the judge's activities."

23  A.   I agree with that.

24  Q.   Number three, "A judge shall perform the duties

25  of judicial office impartially and diligently."

Russell Cletus Maricle

1  A.   I agree with that.

2  Q.   Number four, "A judge shall so conduct the

3  judge's extra judicial activities as to minimize the

4  risk of conflict with the judicial obligations."

5  A.   Yes, sir, and I certainly did that.

6  Q.   And number five, "A judge, or candidate for

7  judge, shall refrain from inappropriate political

8  activity."

9  A.   Yes, sir.

10  Q.   So you would agree with me, sir, that those are

11  binding upon judges in Kentucky?

12  A.   Absolutely, absolutely.

13  Q.   And they were binding upon you during the time

14  period that you were judge in Clay County?

15  A.   Absolutely.

16  Q.   I believe you were asked during the course of

17  your testimony to comment upon some of the activities

18  I believe that you had detected over the course of the

19  testimony in which you wanted to correct the record.

20       And I believe one of those things was this

21  situation with the Price family.  Do you remember

22  that, sir?

23  A.   Are you -- what specifically are you talking

24  about?

25  Q.   Well, Wanda White was a Price, and I believe we

Russell Cletus Maricle

1  went through a number of her relative's cases with you

2  when we heard your testimony about those, do you

3  recall that?

4  A.  Yes, uh-huh.

5  Q.  And I believe that you took issue with -- as you

6  described in your testimony, had anything to do with

7  the Corky Price case.  Do you remember that testimony?

8  A.  I did not have anything to do with the Corky

9  Price case.  It was inappropriate whatsoever.

10  Q.  You believed that's --

11  A.  I did what I thought was right, and I still do.

12  Q.  And you would agree with me, sir, that this Corky

13  Price case involved I believe as you described it this

14  young lady Natasha or Tish Saylor --

15  A.  Yes, sir.

16  Q.  -- as the victim?

17  A.  Yes, sir.

18  Q.  And that was the granddaughter of Charles Marcum?

19  A.  Yes, she was.

20  Q.  And that was one of your friends, Charles Marcum;

21  isn't that a fact?

22  A.  I don't think I said that he was that much of a

23  friend.

24      I said I met him on Monday morning at the

25  courthouse.  He was not a close friends.

Russell Cletus Maricle

1  Q.   So you were not in any way indicating that?   Then

2  I misunderstood your testimony.

3  A.   I believe you misunderstood.

4  Q.   You did meet with him weekly I believe you

5  said --

6  A.   On Monday --

7  Q.   -- and you had contact with him on the number of

8  people that he kept in his jail; would that be fair?

9  A.   I would be in contact with him on Monday morning,

10 about every Monday morning to see what his load was,

11 where we stood for that week because we were always

12 overcrowded.

13     And I needed to know that information, and then

14 there would be times that he would contact me relative

15 to somebody who had serious medical problems, were in

16 the hospital because that was a possibility of being a

17 great expense to the county.

18 Q.   You were I believe in this case also aware that

19 Natasha Saylor was the second of the witnesses that

20 had witnessed the murder of Stevie Collins; isn't that

21 a fact?

22 A.   That was my understanding that she was.

23 Q.   And this only other witness was murdered previous

24 to her.

25 A.   That's my understanding, that's right.

Russell Cletus Maricle

1  Q.   And she was left for dead, and her throat was cut
2  I believe you testified?
3  A.   Well, that was what the evidence was at the
4  trial, yes, sir.
5  Q.   And Stevie Collins of course again is someone
6  that is a person who was very prominent in the
7  community, and someone which you have acknowledged
8  that you knew at that time; isn't that a fact?
9  A.   Yes, sir.  Yes, sir.
10  Q.   And in fact he's also got a son, Stevie Collins,
11  Jr. who is married to Doug Adams's daughter that lives
12  across the street from you there in your Circle Drive;
13  isn't that a fact?
14  A.   Yes, they do.
15  Q.   And so in this case, just so I understand the
16  setting then, we have got Corky Price, who is Wanda
17  White's brother, we have got Charles Marcum, whose
18  daughter is the -- granddaughter is the victim.
19      And you have got Stevie Collins whose son is your
20  neighbor who has been murdered.  Is that a fair,
21  accurate description of the setting?
22  A.   I believe that was fair, yes, sir.
23  Q.   And I believe your testimony is, sir, that this
24  had nothing to do with trying to -- again, you never
25  tried in any way to help Corky Price; is that your

Russell Cletus Maricle

1 testimony?

2 A.   I never in any way tried to help Corky Price, no,

3 sir.

4 Q.   Your testimony is that this case just went

5 through the ordinary course of business, and you just

6 handled it like you would any other case; is that your

7 testimony?

8 A.   No, that is not my testimony.

9 Q.   Okay, this case was handled unusual then.

10 Describe what you mean.

11 A.   This -- well, he was not indicted.  There was an

12 information filed pursuant to an agreement between him

13 and the Commonwealth.

14     So he was not indicted.  He filed an information,

15 and he worked a deal with them to testify against

16 others much as these people who have been in here

17 testifying.

18 Q.   So it came about a little bit unusual then, you

19 would agree, in the fact that it was an information.

20 that's not normal, is it, Mr. Maricle?

21 A.   We had a very few of them.  Mr. Gregory doesn't

22 use them that much, that we have very few information.

23 We have one a year, one every two years maybe.

24 Q.   One every year or two?

25 A.   That -- it would certainly be no oftener than

Russell Cletus Maricle

1  that.  I have had very few informations.

2  Q.   So it was unusual for that reason, you would

3  agree?

4  A.   For that reason, yes, sir, it was unusual.

5  Q.   And Corky Price came in and pled guilty to a very

6  significantly lesser crime than any other defendants,

7  you would agree?

8  A.   I would agree, yes, sir.

9  Q.   They were charged with kidnap and assault first

10  and faced up to twenty, thirty years in prison; isn't

11  that a fact?

12  A.   That is correct, sir.

13  Q.   And he came in and got a recommendation from Gary

14  Gregory he would get five years' probation?

15  A.   That's what he got a recommendation of.

16  Q.   And, again, you had that situation came, and you

17  said your testimony was, is that he was kept in jail,

18  if I understand your testimony.

19  A.   From the day he was in my court and he entered a

20  plea of guilty to the information, he was in jail from

21  then until the Department of Corrections let him out.

22  Q.   And during the course of your handling of that

23  case, sir, you learned that your daughter was also

24  listed by one of these defendants as possibly being

25  dropped in to the mix of the Stevie Collins murder;

Russell Cletus Maricle

1 isn't that a fact?

2 A.   No, sir, that is not correct.

3 Q.   Is it not a fact, sir, that you received a letter

4 in your chambers that later got to you which indicated

5 that Linsey was in the car with one of these

6 individuals?

7 A.   On the -- on the murder?  That's absolutely not

8 true.

9 Q.   It was implicated -- implicated, yes, sir, in

10 either the murder or the attempt to cut Tasha Saylor's

11 throat?

12 A.   That is absolutely false, sir.

13 Q.   So your daughter was not mentioned in any letter

14 to you as being present during any of that

15 circumstance; is that your testimony?

16 A.   No, she -- that is absolutely my testimony.

17 Q.   Okay, you never got a letter from Mr. Bubba

18 Collins that made it to your chambers; is that your

19 testimony?

20 A.   Oh, I got a letter from Bubba Collins that made

21 it to my chambers.

22 Q.   Okay.

23 A.   After he was convicted and was facing sentencing

24 begging for mercy.

25 Q.   And he did not mention your daughter?

Russell Cletus Maricle

1  A.   Oh, yes, he mentioned my daughter.  He did not
2  mention her in relation to being in the Stevie Collins
3  murder, no, sir.
4  Q.   Well, he did mention your daughter?
5  A.   He mentioned that he had been friends with my
6  daughter, yes, sir, he did, but that didn't get him
7  anywhere.
8  Q.   And you had -- at this point in time you said
9  this happened after their conviction and trial which
10 was in November I believe you testified?
11 A.   I don't know whether I testified it was in
12 November or not, but I think that to be correct,
13 Mr. Smith.
14 Q.   You would agree with me that the incident I
15 believe you testified to occurred in April of '05?
16 A.   April of '05.
17 Q.   And then the trial of these individuals happened
18 in November of '05?
19 A.   Unless the record shows different, yes, that's
20 correct.
21 Q.   And you would agree with me, sir, that you put
22 off Corky's sentencing until after the election; isn't
23 that a fact?
24 A.   The sentencing was put off until after the trial,
25 and for one reason or another, it was put off.

Russell Cletus Maricle

1       And it was actually the Monday after the day that
2  Wanda Price said she did all these things, yes, sir.
3  Q.   It was put off until after the election, wasn't
4  it, Mr. Maricle?
5  A.   From time to time, yes, sir, he was sentenced --
6  I believe I answered your question, the Monday after
7  -- after the election, I looked that up to see.
8  Q.   The trial being in November, you were continuing
9  and continuing and continuing the sentencing of Corky
10  Price until after the election; isn't that a fact?
11  A.   Well, the fact is that it was continued,
12  Mr. Smith because either he wasn't present there or
13  they weren't prepared.
14       I mean, it was -- I could have sentenced him at
15  any time that he would have been there.
16  Q.   Well, you told this court and this jury that you
17  had him in custody the whole time.
18       So you didn't have him in custody; is that your
19  testimony?
20  A.   He was in custody, Mr. Smith, and you know it,
21  from the day that he was in my court until the day he
22  was turned loose from the Department of Corrections.
23  Q.   Well, your testimony now is that you didn't
24  sentence him because he wasn't there, and I just
25  assumed if he wasn't there, that he would be released

Russell Cletus Maricle

1  since you had him in your custody.  Was he not in your

2  custody?

3  A.   I understand your question.  He was not in

4  custody in Clay County.

5      He was -- for safekeeping, he was in custody

6  somewhere else.

7      And that was the reason we had trouble getting

8  him there.

9      I don't know if it was West Liberty or where, but

10 he was in custody outside of Clay County because of

11 the situation with the jailer and the Collinses and

12 everything.

13     He was there for safekeeping, and that is the

14 reason that he wasn't there those days.  Thank you for

15 bringing that up.

16         MR. SMITH:  I would like to refer to a couple

17 of the transcripts that have already been touched upon

18 by the witness.

19         THE COURT:  All right.  And Mr. Smith, we are

20 probably going to take our evening break here in the

21 next, oh, five minutes or so.

22         Would you like to break first, or do you want

23 to go through these?

24

25