United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09-16-1 |
| vs. | ) |
| | ) Frankfort, Kentucky |
| RUSSELL CLETUS MARICLE | ) March 10, 2011 |
| | ) 9:26 a.m. |

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE DANNY C. REEVES

Appearances of Counsel:

On behalf of the United States:     STEPHEN C. SMITH, ESQ.
                                    JASON D. PARMAN, ESQ.
                                    Assistant U.S. Attorneys
                                    601 Meyers Baker Road
                                    Suite 200
                                    London, Kentucky  40741

On behalf of the Defendant          DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:             107 East First Street
                                    Corbin, Kentucky  40701

                                    MARTIN S. PINALES, ESQ.
                                    150 East Fourth Street
                                    Federal Reserve Building
                                    Cincinnati, Ohio  45202

Court Reporter:                     CYNTHIA A. OAKES, CRR
                                    Official Court Reporter
                                    United States District Court
                                    560 Athens Boonesboro Road
                                    Winchester, Kentucky  40391
                                    (859) 983-4346

Proceedings recorded by mechanical stenography,
transcript produced by computer.

2

THE COURT:  Thank you.  Good morning, everyone.

Madam Clerk, if you could call the matter scheduled for 9:30, please.

THE CLERK:  Yes, Your Honor.  London Criminal Action No. 09-16-1, United States of America v. Russell Cletus Maricle, this matter being called for sentencing, Your Honor.

THE COURT:  Thank you.

If counsel could state their appearances.

Mr. Smith, we'll start with you.

MR. SMITH:  Good morning, Your Honor, Stephen Smith and Jason Parman continuing to represent the United States this morning.

THE COURT:  Thank you.

Mr. Hoskins and Mr. Pinales.

MR. HOSKINS:  Good morning, Your Honor, David Hoskins and Mr. Pinales.

MR. PINALES:  Good morning, Your Honor.

THE COURT:  All right.  Thank you.  Good morning.

This matter is scheduled for sentencing this morning. The Court recognizes the defendant in the courtroom.

Before we proceed with the sentencing hearing, let me first confirm that the defendant has received a copy of his presentence report, that he's had the opportunity to review the report and discuss it with his counsel.

Is that correct?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Thank you.

There are a number of objections that were previously raised that the Court has resolved with prior rulings.  However, I believe there is one objection that remains to be resolved.  Looking at the defendant's objection to the presentence report, I believe it appears at the fourth page of those objections, abuse of a position of trust, two-level increase, which I believe would be applicable to Count 8 — I'm sorry, Count 10, conspiracy to commit voter fraud.

Mr. Hoskins, are you aware of any other objections that need to be resolved that affect the guideline calculations?

MR. HOSKINS:  No, Your Honor.

THE COURT:  All right.  Would you like to be heard on that objection at this time?

MR. HOSKINS:  Your Honor, I don't really have anything to add.  I think it's just a question of what the evidence was in the record.

THE COURT:  All right.  Thank you.

Mr. Smith, do you have any additional information that you would like the Court to consider before the Court makes a ruling as to this issue?

MR. SMITH:  Well, Your Honor, I think that we have also addressed this at a couple of different opportunities with the Court, but I would just restate briefly that obviously the

conspiracy in Count 10, which involved two pivotal players, one which included Wanda White, and in the process of recruiting her, it's our position that he used his office as circuit judge by making certain promises to her relating to a possible job and also favorable treatment for her brother, who was in his court system. So it would be those and other facts that have been laid out in our brief that we would rely upon.

THE COURT: All right. Thank you.

The two-level enhancement for abuse of a position of trust applies — or has been applied by the Probation Office with respect to the one count that we've been referring to. That count is supported by the testimony of — I'm sorry, the enhancement is supported by the testimony of the witnesses in the case, including Ms. White, who Mr. Smith had referred to. The actions that were taken that she testified about were taken by the defendant while he occupied the position of circuit judge and, according to her testimony, he would use his position as circuit judge to obtain better employment for her. And, of course, that also related to the underlying predicate offense for Count 1.

So the Court will overrule the objection to this enhancement. When we go through the Guidelines, Counsel, this count gets included in later and the offense level is lower than Count 1 and Count 2, so it doesn't affect the overall calculation, but it is important for the Court to correctly

5

calculate the Guidelines.  But the objection will be overruled.

Let me take just a moment to review the guideline calculations that relate to Defendant Maricle.  Before I do that, let me remind counsel that if there are any additional factors that you would like to call to my attention that are relevant to sentencing under Title 18, Section 3553, of course, you're certainly welcome to raise those during allocution in the case.  I have reviewed the sentencing memorandum, and it contains a request -- what I consider to be a request for a variance under Title 18, Section 3553(a)(2), and that's supported, in part, by a number of letters that have been attached to the sentencing memorandum, and I have reviewed all of those letters as well.  But there may be some additional information that you would like to call to my attention and you're certainly free to do so.

With respect to the guideline calculations, I call your attention to paragraph 64, which indicates that the 2010 edition of the Guidelines has been used.

The base offense level is a 14.  There's a two-level increase based upon the two predicate offenses that the Court found earlier had been proven, bribery of a public official. The Court also determined previously that the increase that's outlined in paragraph 69 should be reduced from a level 18 down to a level 14, the Court having made a determination that the value of the money that was used to bribe voters that was

reasonably foreseeable to all defendants was in excess of $400,000. There's a four-level increase because the offense involved an elected public official or a public official in a high level decision-making or sensitive position. And there's a four-level increase based upon role in the offense. Although there was an objection to this enhancement earlier, it's been withdrawn. There's also a two-level increase for obstruction of justice, that objection also has been withdrawn. The effect of the reduction in paragraph 69 is that the adjusted offense level for Count 1 becomes 40.

The base offense level for Count Two is determined based upon the base offense level for Count 1 without considering the Chapter 3 enhancements. So the base offense level is 34 as opposed to 38 reflected in the presentence report. There's a two-level increase based upon the conviction under the money laundering statute, Title 18, Section 1956. And there's the two-level increase for obstruction. That has the effect of creating an adjusted offense level of 38. Those two counts are then grouped together and the Court would look to the higher offense level, which would be, for Count 1, a level 40.

For the obstruction of justice count, the offense level that's used in the case -- and I'll call the parties' attention to the commentary in paragraph 82. The number that's used would become a 34 as opposed to a 38. And that has the effect -- when we take this down six levels, that has the effect

7

of creating a base offense level of 28 in the case.  There is
the two-level increase for obstruction and the Court -- although
the objection has been withdrawn, the Court finds that the
defendant's testimony on material issues in which he denied the
testimony of -- or the claims that were made by Wanda White
would constitute obstruction of justice.  Those were material
issues in the case.  But, again, that objection has been
withdrawn.  The adjusted offense level for that count, Count 8,
becomes a level 30.  Again, there's a grouping that takes place,
Count 8 is grouped with 1 and 2 and the -- again, the higher
offense level is the level set forth for Count 1.

    The Court then looks at the second group of offenses,
which begins with Count 10.  There are no modifications to the
presentence report.  The adjusted offense level for that count
is a level 24.

    Likewise, there are no changes to the guideline
calculations for Count 11, and that adjusted offense level is a
level 20.

    When we look at the unit increases, they would not
result in a higher offense level being applied other than the
first count.  But paragraph 102 will be modified to reflect the
offense level of 40 and paragraph 106 would be amended likewise,
as would paragraphs 108 and 110 and 111.

    The defendant doesn't have any criminal history
points.  That would place him in Criminal History Category I for

sentencing purposes.  And based upon my calculations, the guideline range would be amended.  The prior range set forth in the presentence report was a guideline range of life based upon a total offense level 43.  That is now reduced to a level of 292 months to 365 months under the Guidelines.  With an offense level of 40, it would not alter the fine range that's set forth in paragraph 145.

        The Court will adopt the guideline calculations that I have just reviewed.  I'll also adopt the findings that are contained in the presentence report to the extent that they're not contrary to the findings that I have made today and also on Monday of this week when the Court conducted a hearing on joint objections raised by a number of defendants.

        Now, before we move to allocution, are there any additional motions that need to be taken up?  I believe this was a conviction on a superseding indictment, so the Court would, upon motion, dismiss the underlying indictment in the case upon entry of the judgment.

        Mr. Smith?

        MR. SMITH:  Yes, Your Honor, we would make that motion at this time.

        THE COURT:  Of course, that would also be applicable to all defendants that have been sentenced to this point in the case.

        MR. SMITH:  It would, and we would ask that the order

reflect as such.

THE COURT:  All right.  Thank you.

All right.  If there no additional motions that need to be taken up, we will proceed with allocution in the case.

Mr. Hoskins, I'll hear from you or from Mr. Pinales if you would like to address the Court.  Again, the Court considers the motion — or the request that's been made in your sentencing memo as a request for a variance under Title 18, Section 3553. If there are other reasons that you would like for me to consider factors under 3553, of course, I'll certainly hear from you at this time.

MR. HOSKINS:  Your Honor, the only other point I would like to call the Court's attention to is Mrs. Maricle's health is not very good and she's had some serious ailments and problems with her back, and the family situation I think is somewhat reflected in the presentence report.  But I would ask the Court to take that into consideration.

THE COURT:  All right.  Yes, sir.

Mr. Maricle, if you would like to address the Court, of course, you're certainly — you certainly have the opportunity to do so at this time.

THE DEFENDANT:  You gave me that opportunity earlier and I testified and that's my position, I have nothing further to say.  Thank you, Your Honor, for the opportunity, though.

THE COURT:  Yes, sir.

Mr. Smith.

MR. SMITH:  Your Honor, if we look at this particular defendant, as the Court is required to do in each of these sentencings, it's important from the United States' perspective that we articulate a few things, if the Court would allow.

THE COURT:  Yes, sir.

MR. SMITH:  One of the things is, obviously, the Sentencing Guidelines in this case, which are promulgated pursuant to the authority delegated by Congress, sets forth a measure and a way in which the Court can at least establish a starting point which to look at.  And, of course, the 3553 factors are really what controls the Court overall in looking at.  The Sentencing Guidelines is one aspect of that.  And in this case, Your Honor, I believe that we have a number of things that were not taken into consideration by the guideline calculation, and I would like to articulate some of those if the Court would allow —

THE COURT:  Yes, sir.

MR. SMITH:  — under 3553.  And, obviously, when we look at Title 18, Section 1961, the RICO Act that was enacted by Congress, it sets forth in the congressional statement of findings the purpose.  In part, it said that Congress finds that organized crime in the United States is highly sophisticated, diversified, and widespread and drains billions of dollars from American's economy by unlawful conduct.  It goes on to say that

organized crime derives a major portion of its power through
money.  And it also goes on to say that this money and power are
increasingly used to infiltrate and corrupt legitimate
businesses and to subvert and corrupt our Democratic processes.

And I believe in this case, Your Honor, of course,
when we look at the Guidelines, we had to look at what 2C1.1
would allow as far as the measurement of proceeds underlying
bribe activity, but the jury verdict itself set forth that
$3.4 million was obtained by the participation and membership of
this organization, and but for their membership and
participation in this racketeering enterprise, these defendants
would not have obtained that money.  And as we have already
mentioned, $400,000 was put together in bribes, or more, over
the period of 2002 through 2006, and the testimony supported
that they paid about $50 per voter to bribe them for their vote,
which extrapolates out to approximately 8,000 people if we go
with that figure that were bribed in this course of criminal
activity.  A lot of people were affected throughout this
criminal scheme.

In addition, and what I would argue would be more
egregious, was the fact that over 150 of these voters had their
votes stolen.  These were people who had no vested interest in
this, they were not criminal at all, not culpable at all, but
were victims by the scheme of stealing the votes.  And,
obviously, in the 21st Century, we would think that with our

technology that would be unheard of, but in Clay County they found a way to do it.

The result is basically that throughout the course of this scheme, what was affected was the basic right to vote, which we've mentioned before is a right that protects all of our other rights. And essentially what we deduced, the society and culture in Clay County was basically what is our basic right was taken away by the highest bidder. And ultimately public officials in Clay County were controlled by a few; no longer answering to the people, but were controlled by a few of their associates who were willing to be suppliers of the money, they continued to perpetuate this scheme.

Clay County, as a result, became home to some of the largest drug dealers in our state. And this Court has had an opportunity to preside over many of those matters, some which the Court may not have presided over in early 2002, Eastern District of Kentucky saw the indictment and conviction of Bobby Jones and his family living in Manchester. Evidence at those hearings produced and established that Bobby Jones' home was a place where counting the number of vehicles that were there to buy drugs on a daily basis was higher than the local Arby's or McDonald's restaurant. This was the kind of culture that was developed and I would argue was based upon, again, the result of a criminal enterprise that took away the power from the people and allowed just a few to control it by the money.

Bobby Joe Curry, one in which this Court is very familiar, there was evidence in that case of two deaths, one death which he was held responsible for.  But for the drug distribution activity, we had a resulting death at his home.

Of course, we've heard testimony in this case from drug dealers such as J.C. Lawson, a three-time federal convict of drug distribution; Eugene Lewis, again, three times federally convicted drug conviction.  Kenny Day, of course, testified and openly shared how prolific his drug organization was and how that he would take drugs from the southwestern part of the United States and import them into Clay County and distribute them there, to numerous other Clay Countians to further distribute harmful drugs such as methamphetamine, cocaine, and marijuana.  These were the type of people that found themselves comfortable, hosted in this environment, again that I would say was supported by this criminal enterprise.

There were many others, and just to name a few, of course, we've talked about Doug Adams' brother-in-law, Oscar Hubbard, who was a co-conspirator with Kenny Day; Charles Harvey Lewis; Eugene Smith; Roger "Bud" Smith, Donnie Lawson, Jimmy Jones, Jackie Curry, Lorita Smith, the Sizemore brothers, Johnny Sizemore, and then, of course, our own Charles Wayne Jones in this case, just to name a few of the people that we have heard of and throughout the course of these proceedings, Your Honor.

And, again, I would just ask that as we look at the

3553 factors that we look at, not only the impact that this
criminal organization has had upon a community, but also the
display of disrespect at what is an honorable position, circuit
judge.  We have a position which Mr. Maricle occupied and then
shown such disrespect for the law, things such as the use of his
office that we've already talked about as judge to promote this
RICO offense.  Coming before a trial jury and lying to this
trial jury, completely discounting the testimony and the
findings that this jury made completely supported that they did
not believe Mr. Maricle when he totally rejected and denied all
of his criminal activity, admitting only that he was a part of
it in 1988 with Kenny Day.  And, again, to go so far as to be a
part of a scheme, being a sitting circuit judge, and participate
in a scheme to coach a federal grand jury witness to lie before
the federal grand jury.  What disrespect we've seen for the
laws.

        And, of course, as 3553 factors, we're also to look at
deterrence and the necessity to avoid sentence disparity.  Your
Honor has heard many times the government's position, and that
is that this organization, this organization which promoted
these things that I've just outlined was led by Cletus Maricle.
He was one who has been involved in this type of illegal
activity for decades, an activity which has resulted not only in
the abuse of the basic right of vote, but we've seen many
evidences of violence that has occurred throughout 2002 and

2006, people being assaulted, guns being displayed, brandished, people being threatened, jobs being threatened, a complete culture of lawlessness that was established in this environment headed by the circuit judge, one which the people of Clay County looked up to be, again, a man of the law, a man that should be promoting law and justice in their county, and instead he's undermining the very fabric of that community, undermining the Democratic process. And being a part of this, Your Honor, again, I believe, it's important under 3553 that we deter this type of conduct, that this sentence should be the greatest of all of the defendants that the Court has sentenced in this case, not only because of his position but of his role as a leader and organizer of this criminal enterprise.

We would ask the Court to, again, consider the need to avoid sentence disparity. We saw yesterday that Doug Adams, who was a co-leader, but one which we have argued was not the ringleader, he was not the grand puppeteer, he was not the grandmaster of this racketeering enterprise, this organized crime, it was Cletus Maricle. And, therefore, Your Honor, we would ask the Court to consider an upward variance. I know the Guidelines, at this point, sets a range of 292 to 365. We would ask the Court to consider a range more like 380 to 400. Again, sending a sentence of this size and this measure would, I believe, accomplish the objectives of 3553. Thank you.

THE COURT: Thank you, Counsel.

The Guidelines do provide a starting point for the Court, as the attorneys have recognized. The guideline range in this particular case, after we've gone through all of these calculations, is a range of 293 to 365 months. It is close to the ranges of other defendants that have been sentenced to this point.

Mr. Maricle certainly had the right to come into this court and defend himself and testify. The jury didn't believe his testimony, and as a result of that, of course, there are enhancements that are taken into account in the guideline calculations.

The proof at trial did establish to the jury's satisfaction that Mr. Maricle was guilty of a number of offenses, including the RICO offense, which is a very serious offense, conspiracy to violate RICO, as well as money laundering, as well as obstruction of justice, and the other convictions that related to the 2006 election. And there was a substantial amount of testimony that was presented that his involvement in 2006 was driven, in large part, by a desire to have a relative elected to a position within Clay County.

But the testimony also established that Mr. Maricle was active in politics for a number of years prior to the time that he went on the bench in 1990, and there was testimony from Kenny Day that Mr. Maricle was involved in vote-buying activities much earlier than that. Mr. Maricle didn't deny that

when he testified, he admitted that he did engage in vote-buying
activities.

So in terms of his criminal history, while he doesn't
have any criminal history points, there is evidence that he did
commit criminal acts prior to those that are charged here by his
own admission.  The presentence report also indicates that there
is some drug activity, some drug use, marijuana use, but more
than 30 years ago, prior to the time that he was a circuit
judge.

It's not unusual for the Court to see a defendant at
an older age, an age my age or older, that doesn't have any
criminal history but has been involved in criminal history in
the past.  We need only to look at the news to see individuals
that commit very serious offenses that don't have criminal
history.  I would only have to refer the parties to the Madoff
case in New York as an example of that.

But in this particular case, Mr. Maricle did obtain a
very high office in Clay County and the testimony was that he
abused that office, he abused that position, and he used other
individuals to carry out portions of the criminal activity,
people such as Mr. Stivers, who the Court has previously
sentenced.

The testimony and evidence in the case was substantial
with respect to all of the counts of conviction, including the
obstruction of justice count.  Many of the comments that

Mr. Smith has made are certainly supported by the evidence.

With respect to the vote—buying activity, we can generate those numbers of the number of people that sold their votes and their votes were stolen, and Mr. Maricle and other people are, in large part, responsible for that, but a lot of those people need to look — all those people need to look in the mirror tonight when they go home and before they start to comment about how terrible it is that these people are receiving these large sentences for their activities, because they were involved as well. Regardless of their level of poverty, they were involved. Again, not to the same level as these defendants, but they engaged in criminal activity, as did the people that hauled these voters knowing that they were going to sell their votes and then be paid for it afterwards. So there's a lot of folks that should look in the mirror tonight and be ashamed of what they've done. It may be a lot of the people that are in this courtroom today. But there are a lot of folks that need to think about that when they start talking about these high sentences that these defendants are receiving. The defendants are receiving high sentences because they've been convicted of very serious offenses, but they're not the only ones that were committing offenses in Clay County.

Mr. Smith has also talked about drug activity within the county, and it's a shame that this activity exists in a poor county. With low levels of education, high levels of poverty,

we have these drug dealers that move in and act as pirayas, they
take advantage of the population.  And the Court has seen a
number of these people; mentioned Bobby Joe Curry, and I heard
Mr. Lawson testify, but that was not my case, some of the others
were, Mr. Lewis and Mr. Day, and they received very severe
sentences for their drug activities.  I think the United States
Attorney's Office is certainly aware of the sentences that this
Court has handed down for these drug activities, and they've
been very serious, as have been the sentences in this particular
case.

So the Court starts with the Guidelines.  They're high
for a reason.  The Court then looks at some of these other
factors, Title 18, Section 3553, factors.  The nature and the
circumstances of the offense, I've have talked about that,
everyone's heard enough from me about that.

History and characteristics of the defendant.  Much of
what Mr. Smith has said I agree with with respect to this
defendant.  But there are some positive characteristics that he
has.  He's had some hardship in his family, I'm certainly aware
of that, I'm sympathetic of that.  He's raised a number of
family members that perhaps a person of his age shouldn't have
to be raising, but he's stepped up and he's attempted to do
that, he's attempted to assist other people in his family.  And
that's a positive characteristic.  All the other things that we
can say that are negative, that's a positive characteristic.

And it's one that would cause the Court not to sentence above the guideline range, quite frankly.

The Court has reviewed these letters that are submitted, and I will tell you that the starting point in a case such as this, but for what I've reflected as being positive characteristics, would be at the very top of the guideline range. Mr. Smith makes a compelling argument for a sentence above the guideline range, but in this particular case, I believe that the positive characteristics of the defendant would allow the Court not to vary above the guideline range and to sentence within the range itself.

I also have to consider the other factors that are contained in Title 18, Section 3553. Deterrence is a major factor in a case such as this, and individuals that are in a position of authority such as the position that Mr. Maricle was in need to understand that if they engage in this type of activity that they are going to be punished severely for the conduct.

At Mr. Maricle's age — I've joked a little bit about age in this case, but at Maricle's age, I don't believe that it would be necessary to impose a sentence outside the guideline range in order to protect the public from any future crimes that he might commit.

And the Court also looks at the need to avoid unwarranted sentencing disparities among defendants with similar

records who've been found guilty of similar conduct.  To date in
this case the Court has sentenced four of the other defendants
that proceeded to trial, and they've received sentences ranging
from 150 months for Mr. Thompson to 293 months for Mr. Adams.  I
do agree with Mr. Smith that Mr. Maricle is more culpable than
Mr. Adams in the case.  Of course, subsection (6), the one I
just referred to, refers to national sentencing disparities, but
the Sixth Circuit has indicated that that does not prohibit the
Court from considering disparities within a particular case.

          So in this case, considering all the factors that I've
mentioned, including the various letters that are attached to
the sentencing memorandum from individuals in the community, I
do believe that it would be appropriate for the Court to move
down from the top of the range of 365 months down to 320 months.
And when the Court looks at the sentences that have been imposed
with respect to other defendants, I do believe that that is a
fair sentence in terms of any disparities in the case.

          Let me announce the sentence at this time.  And it
will be the sentence of this Court, pursuant to the Sentencing
Reform Act of 1984, as modified by the decisions in *Booker* and
*Fanfan*, and I do think that the following sentence is sufficient
but not greater than necessary to comply with the purposes of
Title 18, Section 3553(a)(2).

          Accordingly, it will be the judgment of this Court
that the defendant, Russell Cletus Maricle, will be committed to

the custody of the Bureau of Prisons for a total term of 320
months, and that term will consist of terms of 240 months on
each of Counts 1 and 2, terms of 120 months on each of Counts 8
and 10, and a term of 60 months on Count 11, with those terms to
be served consecutively to the extent necessary to produce a
total term of 320 months.

Upon release from imprisonment, the defendant shall be
placed on supervised release for a term of two years.  That term
consists of terms of two years on each of Counts 1, 2, 8, 10,
and 11, with those terms to run concurrently.

And within 72 hours of release from the custody of the
Bureau of Prisons, the defendant shall report in person to the
Probation Office in the district in which he is released.

While on supervised release, the defendant shall not
commit another federal, state, or local crime, shall comply with
the standard conditions that have been adopted by this Court, as
well as the following additional conditions:

He shall not possess a firearm, destructive device,
ammunition, or a dangerous weapon.

And although the Court had referred to some earlier
marijuana use, I don't believe that there's any indication that
he's engaged in drug use since that time, which is over 30 years
ago, and so, therefore, the drug testing condition required by
Title 18, Section 3563(a)(5), will be suspended based upon my
determination that Mr. Maricle poses a low risk of any future

substance abuse.

It will further be ordered that he pay to the United
States a special assessment of $500, which will be due
immediately.

However, in light of the forfeiture judgments
previously returned by the jury in this case, I will make a
finding that Mr. Maricle does not have the ability to pay a fine
without imposing an undue hardship on his family and, therefore,
the fine requirement will be waived in the case.  However, the
judgment should reflect the forfeiture judgments that were
previously returned with respect to Counts 12 and 13.

And following this hearing, the defendant will be
remanded to the custody of the United States Marshal pending
designation to a federal facility.

The Court will recommend that he serve his period of
incarceration at the location closest to his home for which he
would qualify, but the Court would also recommend that it not be
at a place where other defendants are incarcerated, other
defendants from this case are incarcerated.

And that will be the judgment of the Court.

In just a moment, I'm going to ask the Clerk to advise
Mr. Maricle of his right of appeal.  Before I do that, let me
ask the attorneys if there is any objection to the sentence
imposed, if there is any objection under *United States v.
Bostic*, which would include other matters that have not been

previously raised in the case, and then, finally, let me ask the
parties if either side would like the Court to make additional
findings to support the sentence that has been imposed.

       Mr. Smith.  I'll start with you.

       MR. SMITH:  No, Your Honor, thank you.

       THE COURT:  Thank you.

       Mr. Pinales?

       MR. PINALES:  Your Honor, no additional objections,
but I believe it's necessary for me to renew, at this point, the
objections we've previously stated.

       THE COURT:  All right.  Those will certainly be noted
for the record.  Of course, without going through all of those,
the Court's ruling would be the same with respect to those
objections.  But for purposes of retaining those for purposes of
appeal, they're certainly noted for the record.

       MR. PINALES:  Thank you, Your Honor.  And I'm not sure
this is the right place or time, but I'll do it at this point
and we can adjust later.  The Court noted in its comments a few
moments ago about the forfeiture.

       THE COURT:  Yes, sir.

       MR. PINALES:  And in addition to that monies from his
wife have been initially frozen.  And so with the finding that
the Court made with regard to his fine, I've asked my client to
fill out a CJA-23 form, which he has in fact done.  It would
show that he has no assets for an appeal.  He will be advised of

his rights in a few moments, and we will advise the Court that
we do wish an appeal, and I would submit this —— I'll take it to
the Clerk's Office, Your Honor, at the appropriate time, but I
would like the Court to recognize that he is, as he stands here
before the Court, unable to retain counsel for an appeal.  And I
have spoken to my client and I have stated, which I state to a
lot of clients, that I would ask the Court for an appointment to
myself unless he would like to have another attorney look at
what I have done, and he has stated that he would like me to
remain on the case with, of course, the Court's permission.

THE COURT:  Well, here's the issue, I think, that we
face, and I'll review the affidavit and consider the motion to
proceed on appeal in forma pauperis.  I'll need to look at the
affidavit, but I'll consider the oral motion.  I'll address that
after I've had a chance to look at it and would likely sustain
it, but the practice that would be followed would be for the
Court of Appeals —— since it would be following the notice of
appeal, for the Court of Appeals to appoint counsel to represent
Mr. Maricle.  So that would be really outside my control in
terms of who would be appointed.

MR. PINALES:  I have talked to the Court of Appeals
and they prefer the District Court to make the appointment if
it's going to be the same counsel.

THE COURT:  All right.  I've never done that before,
but the practice that I would follow would be to direct the

Clerk to appoint the next attorney that would be on the list. It would be from the -- likely from the London panel of CJA attorneys.  So I wouldn't go outside the normal process of having the Clerk designate who the next attorney would be in the case.  So that would be the procedure that would be followed as soon as the -- it's an oral motion to proceed in forma pauperis, but I need to look at the affidavit.

MR. PINALES:  Yes, Your Honor.

THE COURT:  But that's the procedure that we would follow at that point, Mr. Pinales.

MR. PINALES:  Thank you, Your Honor.

THE COURT:  Of course, you can then take the issue up with the Sixth Circuit, but once the notice of appeal is filed, it really is an issue that they would need to address.

MR. PINALES:  It's sort of an in between.

THE COURT:  I understand.  And usually these issues don't come up until the notice of appeal has been filed.  At that point, the person asks to proceed in forma pauperis, the District Court grants the motion.  I've never appointed counsel or designated that retained counsel continue in the case.  It may be something the Sixth Circuit would look favorably to, but, of course, I can't speak for them.

MR. PINALES:  I will check with them, Your Honor. Thank you so much.

THE COURT:  Yes, sir.

Any other issues before I ask the Clerk to advise Mr. Maricle of his rights of appeal?

Madam Clerk.

THE CLERK:  You are notified by this Court that you have a right to appeal your case to the Sixth Circuit Court of Appeals, which on proper appeal will review the case and determine whether there has been an error of law.

If you are unable to pay for the cost of the appeal, you have a right to apply for leave to appeal in forma pauperis, which means you may appeal without paying for it.  If you are without the services of an attorney and desire to appeal, upon request, the Clerk of the Court shall prepare and file forthwith a notice of appeal on your behalf.  This notice of appeal must be filed within 14 calendar days from the date of entry of the written judgment.

If you do not have sufficient funds to employ counsel for appeal proceedings, upon proper application to the United States Court of Appeals for the Sixth Circuit, an attorney will be appointed to prosecute the appeal for you.

THE COURT:  Thank you.

And, Mr. Maricle, were you able to hear and understand those rights as they were read to you?

THE DEFENDANT:  Yes, Your Honor, I was.

THE COURT:  You're being handed what was just read. If you could please take a moment to review that with your

attorneys, make sure that you do understand your rights of
appeal, and after you've done so, if you would sign the original
and there's one copy that you can keep for yourself.

       THE DEFENDANT:  Your Honor, I didn't bring my glasses
with me this morning, but I'm sure that's what I says.

       THE COURT:  You can have Mr. Pinales or Mr. Hoskins
take a moment to go over that and make sure that you do fully
understand those rights.

       THE DEFENDANT:  Yes, that's fine.

       THE COURT:  All right.  Thank you.

       THE DEFENDANT:  May I ask one question?

       THE COURT:  Yes, sir, you may.

       THE DEFENDANT:  As I understand it, in light of the
ruling, I don't have an attorney at this point but I do
understand that the Clerk will file the notice of appeal for me;
is that correct?

       THE COURT:  Your attorneys are still in the case, but
in the event there's not a notice of appeal filed within 14
days, I'll direct the Clerk to file a notice of appeal on your
behalf so that it's preserved.

       THE DEFENDANT:  That's fine.  Thank you, Your Honor.
I did not understand that.  Thank you.

       THE COURT:  It's a 14-day time period, but I'll make
sure that the Clerk will be directed to file that if it's not
filed by your counsel.  They're not relieved in the case at this

point, but once the motion to proceed in forma pauperis has been

filed, I'll sign that, and then we'll have this issue of who

will be drawn to represent you from the CJA panel; okay?

        THE DEFENDANT:  Thank you.

        THE COURT:  All right.

        Thank you.  Counsel, are there any other issues that

need to be taken up?

        Mr. Pinales?

        MR. PINALES:  Yes, Your Honor.  I would ask on behalf

of my client for a bond pending appeal, and if the Court denies

that, to state its reasons.

        THE COURT:  Okay.  Yes, sir, certainly.

        MR. PINALES:  Thank you.

        THE COURT:  Mr. Smith, would you like to respond

briefly?

        MR. PARMAN:  Your Honor, I believe under 3143 the

burden would be on the defendant to show by clear and convincing

evidence that's he's neither a danger or risk of nonappearance.

And given the facts in the case and his role in the offense, I

don't believe that burden can be met at this point.

        THE COURT:  Mr. Pinales?

        MR. PINALES:  I have nothing to add, Your Honor.

        THE COURT:  All right.  The statute does place the

burden upon the defendant following conviction.  The defendant

has not met the burden that would be imposed, which is a higher

burden in this particular case.  So for those reasons, the Court would — again, would agree with Mr. Parman and would deny the request for a bond pending appeal.

MR. PINALES:  Thank you, Your Honor.

THE COURT:  Let's see if the United States has any other issues before we recess.

Mr. Smith, anything else in this case?

MR. SMITH:  No, Your Honor.  We're just — just to follow my procedure, just continue to ask that the judgment reflect the convictions on the forfeiture, which I know — I believe the Court has already mentioned.

THE COURT:  Yes, they will.  They'll also reflect that the United States had requested a variance, the Court denied that, so that's considered an objection to the Court's sentence imposed in the case.

All right.  Thank you.  We'll be in recess until 1:30 this afternoon.

(Proceedings concluded at 10:11 a.m.)

C E R T I F I C A T E

I, Cynthia A. Oakes, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


7/29/2011                          s/CYNTHIA A. OAKES
    DATE                          CYNTHIA A. OAKES, RPR, RMR, CRR